**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF INDIANA**
**INDIANAPOLIS DIVISION**

INSTITUTIONAL SHAREHOLDER
SERVICES INC.,

*Plaintiff*,

v.

Case No. 1:26-cv-717

TODD ROKITA, in his official capacity as the
Indiana Attorney General,

*Defendant*.

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

Plaintiff Institutional Shareholder Services Inc. ("ISS") brings this Complaint for declaratory and injunctive relief against Todd Rokita, in his official capacity as Attorney General of the State of Indiana, to challenge a newly enacted Indiana statute, H.B. 1273, that, if allowed to take effect, will subject ISS to a stunningly broad regime of state-law mandated warnings whenever ISS speaks to *any* of its clients *anywhere* in the world—all for the act of giving advice to those clients that goes against what company managers want their shareholders to do. Because the law takes effect on July 1, 2026—and threatens ISS with ruinous fines—ISS respectfully requests a decision on its forthcoming motion for a preliminary injunction in advance of the law's effective date of July 1, 2026.

**PRELIMINARY STATEMENT**

1. With 40 years of corporate governance expertise, Plaintiff ISS is a leading proxy advisor that provides services to meet market demand from institutional investors for corporate governance and investing solutions. A proxy advisor is an independent third-party service

1

provider that sophisticated institutional investors hire to provide information, advice, and recommendations to help them decide how to vote on board elections, shareholder proposals, and other shareholder votes.

2.     Before proxy advisors like ISS offered their services to institutional investors, those investors often followed the so-called Wall Street Rule ("vote with management or sell") because it was too expensive and time-consuming to inform themselves about thousands of shareholder votes across all the companies in their investment portfolios. That changed after ISS, in the 1980s, became the first proxy advisor. ISS' services allowed institutional investors to "get objective, sophisticated, well-researched opinions about proxy issues," George W. Dent, Jr., *A Defense of Proxy Advisors*, 2014 Mich. St. L. Rev. 1287, 1289 (2014), thus helping institutional investors to make their own informed decisions about how to vote their shares in line with their own investing priorities and proxy voting preferences. For each shareholder vote, ISS analyzes relevant data, reviews voluminous proxy materials, and provides its clients with a report that provides extensive information about the vote at issue and makes recommendations according to criteria that are selected by its investor clients to fit their specific needs and priorities regarding corporate governance matters.

3.     ISS is registered as an investment adviser with the U.S. Securities and Exchange Commission ("SEC") under the Investment Advisers Act of 1940, 15 U.S.C. § 80b-1 *et seq.* ("Advisers Act"). As such, ISS owes its clients fiduciary duties of care and loyalty.

4.     House Bill 1273 ("H.B. 1273") imposes onerous disclosure obligations on proxy advisors, including ISS, when they issue a recommendation to a client that the client not vote in line with the preferred outcome of the company's management. The nature of the proxy advisor's

obligations turns on whether the advisor's recommendation is issued based on an idiosyncratic definition of "written financial analysis" in the Indiana law.

5.      Under H.B. 1273, a recommendation is based on a "written financial analysis" if the proxy advisor has predicted the "short term and long term financial benefits and costs" of proxy proposals and "concluded what vote or course of action is most likely to positively affect interest holder value." The law ignores that many issues that generally come up for a shareholder vote do not lend themselves to financial prediction—like whether to vote for or against reelecting a particular board member who has missed too many meetings in the past, or whether to vote for or against a nonbinding request that a company prepare an additional report analyzing its supply chain vulnerability to climate change. And the law ignores that different clients have differing views about the "best" way to advance shareholder value.

6.      If ISS does not base its recommendation on a "written financial analysis" that falls within the definition in H.B. 1273, the law requires ISS to make specific disclosures: ISS must tell not only its clients receiving the recommendation, but also the public and the company whose shareholder vote is involved in the recommendation, that ISS has not considered "the impact" that ISS' recommendation "would have" on its clients—even though that statement is patently false. If that weren't bad enough, the law would also force ISS to disclose confidential information to the company issuer that is the subject of ISS' advice: ISS must "identif[y]" both the services ISS performed for each client and what ISS recommended.

7.      If ISS *does* attempt to produce this "written financial analysis," H.B. 1273 requires ISS take positions on controversial issues that ISS would not otherwise. The law would, for example, compel ISS to conclude which vote "is most likely to positively affect interest holder value"—something ISS is not in the business of doing. H.B. 1273 would also require ISS to

3

disclose sensitive business information like the "experience and geographic location of the personnel who formed the conclusion." Worse yet, the law obligates ISS to make that "written financial analysis" available upon request.

8. If ISS fails to comply with any of these requirements, H.B. 1273 declares that failure a deceptive trade practice punishable by $5,000 "per violation."

9. H.B. 1273 extends its mandates far beyond the Hoosier State's boundaries. By its plain terms, the law applies to *any* anti-management recommendation that ISS—an out-of-state company—makes to *any* of its clients, about *any* company, *anywhere* on Earth—whether in Indiana, Maine, or Switzerland. H.B. 1273 offers no legal basis for exporting Indiana's policy preferences globally.

10. H.B. 1273's attempt to compel compliance with management violates the U.S. Constitution multiple times over.

11. First, the law violates the First Amendment: The law is state-imposed viewpoint discrimination that burdens anti-management—and *only* anti-management—speech. The law's goal is to force ISS to walk the line that corporate executives want—even if ISS and its clients believe that course of action is wrong for shareholders. It is hard to imagine a more plainly viewpoint-discriminatory law. And if ISS recommends disagreeing with the company management's view, H.B. 1273 forces ISS to recite a series of "warnings" about ISS' services. The First Amendment does not tolerate such state-imposed discrimination on a proxy advisor's private speech.

12. Second, the law is unconstitutionally vague. H.B. 1273 is riddled with vague terms about when, how, and to whom ISS must make the State's series of compelled warnings—a set of

4

labyrinthian requirements that invite arbitrary enforcement by the Attorney General against politically disfavored speakers like ISS, backed by business-crushing fines.

13.     Third, H.B. 1273 violates the Dormant Commerce Clause.  The Constitution forbids states from flexing the kind of extraterritorial reach that H.B. 1273 does, demanding global application on Indiana's policy choices.  "[T]he application of a state statute to commerce that takes place[] wholly outside of the State's borders … exceeds the inherent limits of the enacting State's authority and is invalid."  *Legato Vapors, LLC v. Cook*, 847 F.3d 825, 830 (7th Cir. 2017) (quoting *Healy v. Beer Inst., Inc.*, 491 U.S. 324, 336 (1989)).  The State of Indiana may not dictate how other states and countries regulate business in their own jurisdictions.

14.     The consequences of not enjoining H.B. 1273 as an unconstitutional exercise of state power are severe:  By staining ISS' recommendations with disparaging requirements, H.B. 1273 threatens to distort the free flow of information that sophisticated investors rely on when managing their investment portfolios all over the world.  ISS' sophisticated clients do not need Indiana to protect them from receiving the very services they hired ISS to perform.

15.     For more than three decades, the SEC has recognized that inserting government regulators "into every exchange and conversation among shareholders, their advisors and other parties on matters subject to a vote certainly would raise serious questions under the free speech clause of the First Amendment."  Regulation of Communications Among Shareholders, 57 Fed. Reg. 48,276, 48,279 (Oct. 22, 1992).  H.B. 1273 is just the latest in an unsuccessful and unconstitutional chapter of States attempting to deviate from that basic principle to target proxy advisors for the content of their speech.  Missouri tried it and failed—leaving taxpayers to foot the bill for the plaintiff's legal fees.  *Sec. Indus. & Fin. Mkts. Ass'n v. Ashcroft*, 745 F. Supp. 3d 783, 801 (W.D. Mo. 2024).  Texas tried it, too, and was promptly enjoined before the law took effect.

*See* Text Order, *Institutional Shareholder Servs. Inc. v. Paxton*, No. 1:25-cv-1160 (W.D. Tex. Aug. 29, 2025).  H.B. 1273 is of the same ilk, and this Court should likewise hold it unconstitutional as applied to ISS.

## PARTIES

16.    Plaintiff Institutional Shareholder Services Inc. ("ISS") is a corporation organized in Delaware with its headquarters at 702 King Farm Boulevard, Suite 300, Rockville, MD 20850. ISS supplies proxy voting advice and other forms of investment advice to institutional investors, including to clients in Indiana.

17.     Defendant Todd Rokita is the Indiana Attorney General and is responsible for enforcing H.B. 1273.  *See* H.B. 1273 § 12(b)-(c); Ind. Code § 24-5-0.5 *et seq*.  He is sued in his official capacity.  Defendant Rokita maintains an office at 302 W. Washington Street, 5th Floor, Indianapolis, IN 46204.

## JURISDICTION AND VENUE

18.    This Court has subject-matter jurisdiction over this action under 28 U.S.C. §§ 1331 and 1343(a) because Plaintiff's claims arise under the United States Constitution, as well as the Civil Rights Act, 42 U.S.C. §§ 1983 and 1988.

19.    This Court has authority to grant declaratory and injunctive relief pursuant to 28 U.S.C. §§ 2201-02.

20.    Defendant Attorney General Rokita is not immune under the Eleventh Amendment because this is a pre-enforcement challenge seeking prospective relief for violations of federal law. *See Ex parte Young*, 209 U.S. 123 (1908); *see also 3C, LLC v. Rokita*, No. 1:23-CV-01115, 2024 WL 4348299, at *6 (S.D. Ind. Sept. 29, 2024) ("The *Ex parte Young* doctrine allows a plaintiff to seek a prospective injunction to prevent a state official from enforcing an unconstitutional state

6

law or from engaging in some other unconstitutional action."). H.B. 1273 specifically tasks Defendant Attorney General Rokita with enforcing the law. *See* H.B. 1273 § 12(b)-(c); Ind. Code § 24-5-0.5 *et seq*.

21. There is every reason to believe that Defendant Attorney General Rokita will vigorously enforce H.B. 1273 against ISS. *See Ent. Software Ass'n v. Blagojevich*, 469 F.3d 641, 645 (7th Cir. 2006). H.B. 1273 was specifically designed with ISS in mind.[1] Attorney General Rokita, too, has already taken action against proxy advisors like ISS. In 2023, Attorney General Rokita, along with other Attorneys General, sent a demand letter to ISS and another proxy advisory firm accusing them of violating Indiana's and other States' "prohibitions on unfair or deceptive trade practices," based on the content of proxy advice that those Attorneys General apparently view as "contrary to the financial interests" of shareholders—such as environmental, social, and governance ("ESG") considerations.[2] In 2022, Attorney General Rokita issued an Advisory Opinion declaring that Indiana law prohibits state pension fund managers and their advisors from considering ESG factors when evaluating proxy votes.[3] In 2023, Attorney General Rokita joined a lawsuit challenging a Department of Labor rule endorsing consideration of ESG factors by certain fund managers.[4] And in 2024, Attorney General Rokita, along with other Attorneys General, brought suit against three investment management firms for their ESG practices; Attorney

---

[1] Bill Sponsor Rep. Kyle Pierce explained during an Indiana House floor debate that the bill was designed to apply to "I-S-S, which is kind of close to ISIS." House Floor Action at 1:44:47-1:45:05 (Jan. 20, 2026), https://iga.in.gov/session/2026/video/house (select "Tuesday, Jan. 20" from "House Chamber" drop-down box).

[2] Letter from State Attorneys General to ISS and Glass Lewis (Jan. 17, 2023), https://perma.cc/NNW4-64B4.

[3] Indiana OAG, Press Release, *Attorney General Todd Rokita Moves to Protect Indiana State Employees' Retirement Funds From Being Leveraged For Corporate Woke Causes* (Sep. 1, 2022), https://perma.cc/2WNJ-JFJA; *see also* Indiana Capital Chronicle, *Rokita: No 'Woke' Criteria Allowed in Pension Investments*, The Indiana Lawyer (Sep. 2, 2022), https://www.theindianalawyer.com/articles/rokita-no-woke-criteria-allowed-in-pension-investments.

[4] Compl., *Utah v. Walsh*, No. 2:23-CV-00016, ECF. No. 1 (N.D. Tex. Jan. 26, 2023); *see also* Indiana Office of the Attorney General ("OAG"), Press Release, *Attorney General Todd Rokita Continues Fight Against Woke ESG Agendas—This Time Helping to Lead Multistate Lawsuit* (Jan. 26, 2023), https://perma.cc/QJU6-D59G.

General Rokita touted he was "taking further action to stop woke corporatists and their left-leaning allies in government."[5]  Just last month, Attorney General Rokita announced that one of those firms had entered into a settlement, agreeing, among other things, to restrictions on its proxy voting practices.[6]  H.B. 1273 enables Attorney General Rokita to continue this yearslong campaign:  The law labels the failure to comply with H.B. 1273's requirements "a deceptive act" that "is actionable" by the Indiana Attorney General under Indiana's consumer protection law, and allows the Indiana Attorney General to intervene in suits brought by private parties.  H.B. 1273 § 12(b)-(c); *see* Ind. Code § 24-5-0.5 *et seq.*

22.    As a directly regulated entity, ISS plainly has standing to bring this challenge.  H.B. 1273 inflicts numerous harms on ISS, *see infra* ¶¶ 60-64.  ISS engages in constitutionally protected speech, which H.B. 1273 directly regulates even when that speech occurs wholly outside of Indiana.  Indiana's law and the threat of significant penalties for non-compliance chill ISS' constitutionally protected speech, violate ISS' constitutional due process rights, impermissibly regulate ISS' transactions that occur wholly outside of Indiana's borders, and excessively burden interstate and foreign commerce.

23.    Venue is proper in this District because Defendant resides in this District, 28 U.S.C. § 1391(b)(1), and because substantial events material to Plaintiff's claims occurred in this District, *id.* § 1391(b)(2).

---

[5] Daniel Carson, *Indiana Joins Lawsuit Targeting ESG Practices of Major Investment Firms*, The Indiana Lawyer (Dec. 5, 2024), https://www.theindianalawyer.com/articles/indiana-joins-lawsuit-targeting-esg-practices-of-major-investment-firms.

[6] Indiana OAG, Press Release, *Attorney General Todd Rokita Secures Landmark Settlement With Vanguard to Protect Coal Industry and Investors* (Feb. 26, 2026), https://events.in.gov/event/attorney-general-todd-rokita-secures-landmark-settlement-with-vanguard-to-protect-coal-industry-and-investors.

**BACKGROUND**

### I.    Proxy Advisory Services

24.    Publicly traded companies are required to hold annual and special meetings to conduct business that may require shareholder approval.  At these meetings, shareholders vote on various matters, including board elections, proposals submitted by the board or by shareholders, and any other decisions for which a corporation's charter or bylaws require a shareholder vote.

25.    Matters requiring shareholder votes are compiled into a "proxy statement," which contains information about pending resolutions and other votes for upcoming shareholder meetings and are distributed to shareholders in advance.  At the meetings, shareholders, or more typically their proxies—the specified designees who vote the shares owned by particular stockholders—will vote.

26.    The issues put to a shareholder vote range in complexity, including everything from changing a corporate name or approving an auditor, to electing the board of directors, making key management decisions, or approving proposed mergers and acquisitions.

27.    Proposals put forth by shareholders may cover a range of topics, including issues of corporate governance, executive compensation, disclosure and transparency factors, as well as risks to the company stemming from environmental and social factors.  Shareholder proposals are a component of shareholder democracy, as they allow shareholders to express their views on significant issues facing the companies that the shareholders collectively own.  The results of a vote on a shareholder proposal are typically non-binding, but by submitting proposals and "voting their shares" in corporate elections, shareholders may influence how companies are run.

28.    Institutional investors include pension plans, asset managers, and mutual funds. Because of their vast stock holdings in multiple companies, institutional investors regularly cast

thousands of votes every year on complex questions across these companies. Shareholder meetings of U.S. companies tend to be concentrated during the four-month period from March to June—a time period known as "proxy season." This compressed timeline compounds the challenges associated with voting decisions for institutional investors. To navigate the volume of shareholder votes and complexity of issues, institutional investors often hire independent proxy advisors to provide research and advice on how they should vote on an issue in a shareholder meeting. A proxy advisor aggregates publicly available data, analyzes voluminous proxy materials, offers research and analysis about ballot proposals put forth by companies or shareholders, and provides voting advice in accordance with the investor client's selected criteria and priorities.

## II.    ISS And Proxy Advising

29.    Founded in 1985, ISS is a full-service proxy advisor that helps institutional investors make informed voting decisions, manage the complex process of voting their shares, and report their votes to stakeholders and regulators. ISS fulfills market demand for objective and impartial advice and analysis, and its client base includes many of the world's most sophisticated institutional investors. In 2025 alone, ISS assisted approximately 2,000 clients make and execute informed proxy voting decisions for approximately 52,000 shareholder meetings in approximately 100 developed and emerging markets worldwide. ISS makes voting recommendations for board elections, board/management proposals, and shareholder proposals, only for the companies in which its clients hold shares, and only based on the client's selected voting policy or policies. ISS does not put forth shareholder proposals, nor does ISS assist any clients in formulating shareholder proposals.

30.    ISS has no financial interest in the outcome of a shareholder vote. ISS does not seek to maintain or gain control of a corporation, or to win the passage (or defeat) of a ballot measure. A proxy advisor, "although it holds itself out to attract clients, does not initiate the exchange; it provides advice only in response to the client's request." *ISS v. SEC*, 142 F.4th 757, 767 (D.C. Cir. 2025). ISS offers research and analysis to its clients to help inform their own evaluation of the proposals on which they are entitled to vote.

31.    As a registered investment adviser, ISS is subject to a comprehensive regulatory regime under the Advisers Act. Registered advisers are subject to the Advisers Act's registration, reporting, and conduct requirements. As a registered investment adviser, ISS is subject to the Advisers Act's fiduciary duties of care and loyalty, which follow the contours of ISS' contractual relationship with our clients.

32.    Although ISS is a registered investment adviser, it "does not manage investment accounts."[7] As ISS explains in its public-facing brochure, ISS also does not "make buy, sell or hold investment recommendations to clients, other than indirect purchase or sale recommendations that might be implicit in a proxy voting recommendation, such as a recommendation on a vote on whether or not to approve a proposed merger transaction." *Id.* ISS states in the same brochure that it "does not guarantee that its advice will produce any particular investment return or other results for clients." *Id.*

33.    As part of its core offerings, ISS provides proxy voting recommendations based on its research and corporate governance data. Importantly, it provides these recommendations to each client based on the proxy voting policies selected by its clients. Institutional investors are not monolithic, and so ISS tailors its advice to the directives, priorities, and goals the client selects.

---

[7] ISS, Part 2 Brochures at 11 (updated Mar. 31, 2026), https://perma.cc/MDL6-WDC4.

Recommendations extend to votes on all issues that appear on the ballot for which shareholders are entitled to vote, including core issues of corporate governance, such as board of directors elections, shareholder rights, and executive compensation.

34.    ISS provides its proxy advisory services to its clients in exchange for fees.  ISS' proxy advisory services meet a market need, which is why institutional investors are willing to pay for the services.  ISS does not provide proxy voting advice to any investor who has not specifically engaged ISS for this purpose.

35.    ISS is organized in Delaware and its headquarters is in Maryland.  ISS has no offices or personnel in Indiana.

36.    ISS serves about 2,000 clients around the country and the world.  ISS currently provides proxy advisory services to only six clients in Indiana.

**A.    ISS Offers Three Policy Frameworks:  Custom, Benchmark, and Specialty Policies**

37.    In order to meet the needs of its diverse clientele, ISS offers three different types of voting policies, which are market-specific frameworks that guide ISS' proxy vote recommendations: (1) client-specific Custom Policies; (2) the Benchmark Policy; and (3) various thematic Specialty Policies.

**(1)    Custom Policies**

38.    Custom Policies are designed by ISS' clients or in some cases third parties to address clients' unique needs and preferences.  ISS assists investors in administering custom voting policies that investors develop, in consultation with their governance departments, boards of trustees, and portfolio managers.  A client's Custom Policy reflects the client's own specific approach to proxy voting and/or the mandates they have with the clients for whom they manage assets.

39.     By many measures, Custom Policies are the most significant category of policies at ISS.  In 2025, ISS issued Custom Policy vote recommendations under approximately 450 custom policies, including approximately 250 U.S. Custom Policies.  In 2024, approximately 90% of the shares for which ISS processes voting instructions on behalf of its clients were tied to clients' Custom Policies.

### (2)    Benchmark Policy

40.     The Benchmark Policy is a policy that ISS created and updates each year and to which ISS clients may subscribe.  The Benchmark Policy is based on ISS' four key tenets: accountability, stewardship, independence, and transparency.  The Benchmark Policy is publicly available on ISS' website.[8]  The Benchmark Policy explains in detail ISS' general framework for providing advice on particular issues and the criteria considered in making case-by-case voting decisions.

41.     ISS forms its Benchmark Policy (and its Specialty Policies) from the bottom up, through an annual review and development process that shares many similarities to federal agency notice and comment rulemaking.  ISS starts by collecting feedback from a diverse range of market participants through multiple channels: an annual policy survey of institutional investors and corporate issuers, roundtables with industry groups and investor clients, and ongoing feedback during proxy season.  ISS uses these inputs and ISS' expertise to develop its draft policy updates each year.  ISS then publishes draft updates for an open review and comment period.  Anyone can comment or participate in the survey process—including investors, companies, and the general

---

[8] ISS, U.S. Proxy Voting Guidelines, 2026 Benchmark Policy Recommendations (Dec. 9, 2025) https://www.issgovernance.com/file/policy/latest/americas/US-Voting-Guidelines.pdf ("2026 U.S. Benchmark Policy").

public.  ISS reviews these comments before publishing its final updated policy at the end of each year, to apply to meetings held after February of the following year.

42.    Much of the Benchmark Policy is designed to protect shareholders from what market participants and clients have generally deemed to be bad corporate governance practices. For example, based on market input, ISS generally recommends that shareholders vote against board nominees if the board adopted certain policies called "poison pills"—a defensive tactic to try to defeat takeover bids—without shareholder approval, because poison pills risk entrenching corporate managers unresponsive to shareholders.  *See* 2026 U.S. Benchmark Policy at 14.  ISS also recommends voting against "overboarded directors," meaning directors who sit on too many company boards to give another board sufficient care and attention.  *Id.* at 12.  ISS recommends voting against directors and boards that adopt provisions "materially adverse to shareholder rights," such as "[s]upermajority vote requirements" for amending the company's bylaws or charter, or "classified board structure[s]" that divide a company's board into classes serving different term lengths, making it difficult for a single shareholder or group to gain control of the board in a given year.  *Id.* at 15.  And the Benchmark Policy generally recommends voting against proposals that insulate directors from removal, and for proposals "to restore shareholders' ability to remove directors with or without cause."  *Id.* at 22.

### (3)    Specialty Policies

43.    In addition to the Custom Policies and the Benchmark Policy, ISS also offers seven thematic policy frameworks called Specialty Policies that evaluate governance issues from a variety of specific perspectives: (1) faith-based, (2) board-aligned, (3) labor unions, (4) public funds, (5) sustainability, (6) social responsibility, and (7) climate.  As with the Benchmark Policy,

ISS publishes the Specialty Policies on its website.[9]  The Specialty Policies are intended to address common client preferences when it comes to certain strategic, policy, and social issues.  ISS crafted these policies to meet client demand for coverage tailored to these specific approaches and the factors that the clients demanding these policies view as material.

44.    For example, ISS developed its U.S. Global Board-Aligned Policy in direct response to market demand for voting recommendations that generally defer to board judgment on environmental and social issues.[10]  The Global Board-Aligned Policy thus uses a "presumption on environmental and social topics that the board's recommendations should generally prevail"; the policy generally recommends voting against shareholder proposals that request the company to disclose reports of the company's levels of greenhouse-gas emissions or its reduction targets.  U.S. Global Board-Aligned Policy at 61.

45.    As another example, ISS' U.S. Catholic Faith-Based Policy generally takes as its "frame of reference policies and proposals promulgated by the Catholic Bishops' Pastoral on economics, the Socially Responsible Investment Guidelines adopted by the Bishops, and the policies developed by members of the Interfaith Center on Corporate Responsibility."[11]  U.S. Catholic Faith-Based Policy at 9.  This policy recognizes faith-based investors' "dual objectives: financial and social."  *Id.*  These faith-based investors "invest for economic gain, as do all investors, but they also require that companies in which they invest conduct their business in a socially and environmentally responsible manner."  *Id.*

---

[9] ISS, Voting Policies, 2026, https://www.issgovernance.com/policy-gateway/voting-policies/ (select "Specialty Policies" tab).

[10] ISS, U.S. Global Board-Aligned Proxy Voting Guidelines, 2026 Policy Recommendations (Jan. 16, 2026), https://www.issgovernance.com/file/policy/active/specialty/Global-Board-Aligned-US-Voting-Guidelines.pdf ("U.S. Global Board-Aligned Policy").

[11] ISS, U.S. Catholic Faith-Based Policy Proxy Voting Guidelines, 2026 Policy Recommendations (Dec. 26, 2025), https://www.issgovernance.com/file/policy/active/specialty/Catholic-Faith-Based-US-Voting-Guidelines.pdf ("U.S. Catholic Faith-Based Policy").

**B.    ISS Applies Its Client's Chosen Framework(s) To Provide Advice On Proxy Votes**

46.    Clients' Custom Policies and ISS' Benchmark and Specialty Policies detail frameworks for addressing corporate governance issues. When clients select these policies, they ask ISS to apply the policy they selected to the matters on the ballot at a particular upcoming shareholder meeting. ISS then provides clients with reports summarizing its research and providing voting recommendations based on the particular policy or policies to which each client subscribes.

47.    ISS looks at each proposal on the ballot, pulls relevant publicly available information and data, and then analyzes the proposal and data through the prism of the applicable policy to come up with a voting recommendation. ISS does not determine which issues appear on a proxy ballot or the ballots or agenda items on which it renders advice, nor does ISS engage in solicitation activities in support of (or against) any ballot item.

48.    ISS has no financial interest in the outcome of any shareholder vote, regardless of whether its clients ultimately support a proposal, reject a proposal, or abstain from voting altogether. Indeed, because ISS' clients have a wide variety of different policies and voting criteria, ISS often provides different clients with different recommendations about the same vote, depending on the voting criteria the client selects. For example, ISS may advise clients using its Benchmark Policy to vote for a certain proposal, while advising clients who employ faith-based or sustainability-based voting criteria to vote against that same proposal.

**C.    Additional Services**

49.    ISS also provides other services, which are sometimes performed in connection with an upcoming proxy vote and sometimes not. ISS provides general environmental, social, and governance data and ratings; thought leadership, research, and other market information on

16

corporate governance and voting practices and trends; portfolio screening and other assessment tools and services. ISS also provides services tailored to markets in other countries, including, in particular, Nordic countries and Australia.

### III.    Indiana H.B. 1273

50.    Proxy advisors have come under increasing attack in recent years. As noted above, Attorney General Rokita has played a leading role in this campaign to quell shareholder participation and to stifle speech by proxy advisors that some view as unpopular. The President, for his part, has issued an executive order targeting ISS and one of its competitors for "regularly" advancing so-called ESG "agendas." Exec. Order No. 14,366, *Protecting American Investors From Foreign-Owned and Politically-Motivated Proxy Advisors*, 90 Fed. Reg. 58,503 (Dec. 11, 2025). Last year, Texas enacted a law expressly aimed at stifling ISS' speech when that speech includes recommendations based on considerations Texas did not like. *See* Texas S.B. 2337. The law was preliminarily enjoined before taking effect. *See* Text Order, *Institutional Shareholder Servs. Inc. v. Paxton*, No. 1:25-cv-1160 (W.D. Tex. Aug. 29, 2025). Other states too are enacting laws targeting speech by proxy advisors—apparently inspired by a model law drafted by an advocacy group calling itself "Consumers Defense," a group whose self-proclaimed "mission" is to "protect[] Americans from the scourge of ESG in all its forms, in every state, and in every arena where it infects."[12]

51.    H.B. 1273 is part of this trend. The law, which closely tracks the model law on Consumers Defense's website, imposes onerous disclosure obligations on proxy advisors who recommend voting against a proposal backed by company management. The law authorizes civil

---

[12] Consumers Defense, https://consumersdefense.com/ (last visited Apr. 9, 2026); *Proxy Advisor Transparency Act*, Consumers Defense, https://consumersdefense.com/model-legislation/proxy-advisor-transparency-act/#view-updates (last visited Apr. 9, 2026).

suits against proxy advisors who fail to disclose whether their recommendations are backed by Indiana's bespoke definition of "written financial analysis."

52.    H.B. 1273 is triggered when a proxy advisor like ISS "makes a recommendation against entity management on an entity proposal or proxy proposal, or makes a default recommendation or policy concerning votes against entity management on entity proposals."  H.B. 1273 § 11(a), (b).  An "entity" under H.B. 1273 includes both Indiana companies and companies governed by the laws of other states and countries.  *Id.* § 2(a)(1) (citing Ind. Code § 23-0.5-1.5-3).

53.    The specifics of H.B. 1273's obligations turns on whether the proxy advisor's recommendation to vote against management is "based on a written financial analysis."  *Id.* § 11(a), (b).  The law defines a "written financial analysis" as a "written document" that: "(1) analyzes the expected short term and long term financial benefits and costs" of the proposal, "(2) concludes what vote or course of action is most likely to positively affect interest holder value," and "(3) explains the methods and processes used to prepare the analysis, including the experience and geographic location of the personnel who formed the conclusion."  *Id.* § 10.

54.    If the proxy advisor's recommendation to vote against management is "not … based on a written financial analysis" meeting the above-referenced terms, H.B. 1273 requires the advisor to do three things.  *Id.* § 11(a).

55.    *First*, the proxy advisor must "provide a clear and conspicuous disclosure to each interest holder[13] or any person acting on behalf of an interest holder receiving the proxy advisory services" stating that the proxy advisor "has made the recommendation … without utilizing a written financial analysis regarding the impact that the recommended action would have on entity interest holders" that "(i) analyzes the expected short term and long term financial benefits of

---

[13] H.B. 1273 defines "interest holder" as a "direct holder of" "(1) a share in a business corporation" or "(2) a governance interest or economic interest in any other type of unincorporated entity."  H.B. 1273 §§ 5, 6.

costs" of the proposal, "(ii) concludes what vote or course of action is most likely to positively affect interest holder value," and "(iii) explains the methods and processes used to prepare the analysis, including the experience and geographic location of the personnel who formed the conclusion." *Id.* § 11(a)(1).

56.    *Second*, if the proxy advisor's recommendation is in the context of "an entity proposal or proxy proposal" or related "[p]roxy statement research and analysis," *id.* § 8(1), (2), the advisor must make the same disclosure to the company's management, *id.* § 11(a)(2).

57.    *Third*, the advisor must "prominently display on" its website's "home page" a disclosure that the advisor "has made a recommendation … against entity management on an entity proposal or proxy proposal." *Id.* § 11(a)(3)(A). This disclosure must have the same content as the other disclosures. *Id.* § 11(a)(3)(B). It must remain on the website "[f]or the entire time" the advisor "is providing proxy advisory services." *Id.* § 11(a)(3).

58.    H.B. 1273 also imposes obligations if the proxy advisor's recommendation to vote against management *is* "based on a written financial analysis." *Id.* § 11(b). The advisor must make the same "clear and conspicuous disclosure" discussed above to "each interest holder or any person acting on behalf of an interest holder receiving the proxy advisory services," albeit informing them that the advisor *has* "utilized a written financial analysis." *Id.* § 11(b)(1). The advisor must also make that written financial analysis "available to" this same set of persons "within a reasonable time" of a request. *Id.* § 11(b)(2). And if the advisor's recommendation is in the context of "an entity proposal or proxy proposal" or related "proxy statement research," *id.* § 8(1), (2), the advisor "must provide a copy of the written financial analysis" to the company's management. *Id.* § 11(b)(3).

59.     A proxy advisor that fails to comply with any aspect of H.B. 1273 is deemed to have "commit[ted] a deceptive act which is actionable under" Indiana Code § 24-5-0.5.  H.B. 1273 § 12(b).  The Attorney General may seek injunctive relief, as well as civil penalties of $5,000 per violation.  *See* Ind. Code § 24-5-0.5-4(c), (g).

**IV.     Indiana H.B. 1273 Will Result In Direct, Concrete Harms To Plaintiff ISS**

60.     H.B. 1273 violates ISS' free speech rights under the First Amendment; is unconstitutionally vague under the Due Process Clause of the Fourteenth Amendment; and is impermissibly extraterritorial under the Dormant Commerce Clause, the Fourteenth Amendment, and separation-of-powers principles.

61.     H.B. 1273 will irreparably harm ISS by depriving ISS of its constitutional rights under the First and Fourteenth Amendments.  H.B. 1273 tries to force ISS to agree with company management by burdening ISS' speech that disagrees with company managers.  H.B. 1273 puts ISS in an impossible position where, no matter what ISS chooses, ISS would be forced to make a series of damaging statements that ISS does not believe.  If ISS attempted to perform H.B. 1273's "written financial analysis," ISS would be forced to take public positions on controversial issues, implicitly rank the value of clients' preferences, and provide its speech widely—without compensation—if ISS wishes to speak at all.  If ISS refuses to conduct H.B. 1273's "written financial analysis," the law would force ISS say to its clients, company issuers, and the general public that ISS gave its advice "without utilizing a written financial analysis regarding the impact that the recommended action would have on entity interest holders," including that ISS did not "analyze[] the expected short term and long term financial benefits and costs to the entity of implementing" the proposal; did not "conclude[] what vote or course of action is most likely to

positively affect interest holder value"; and did not "explain[] the methods and processes used to prepare the analysis."  H.B. 1273 § 11(a)(1)(C).

62.    The statute thus forces ISS to make statements that are false and misleading.  ISS *does* consider "the impact that the recommended action would have on entity interest holders" because ISS makes its recommendations based on its clients' chosen criteria.  And ISS' detailed proxy voting reports and public disclosures detail ISS' "methods and processes."  Forcing ISS to say that it did not determine the proposal's "short term and long term financial benefits and costs" is misleading because it suggests that such an analysis is possible and that ISS is withholding it. The proxy research reports and voting recommendations ISS offers its clients often contain dozens of pages of financial information and analysis, including tables and charts reflecting the company's historic financial and operational performance; performance compared to peer companies; valuation and executive compensation; and other financial metrics.  Many issues on proxy ballots, however, do not lend themselves to financial quantification, let alone a prediction about how a vote outcome would affect stock value.

63.    Attempting to comply with H.B. 1273's labyrinthian other requirements also harms ISS.  The statute is riddled with vague terms, making it difficult for ISS to determine what is required.  And if ISS guesses incorrectly, ISS faces the same ruinous fines despite its efforts.

64.    Attempting to comply with H.B. 1273 will also work a severe financial hardship on ISS, even aside from the specter of devastating fines, including to develop systems to supply an enormous volume of information to numerous entities and track information that ISS does not currently collect.  Designing a system with tracking and reporting capabilities—if it is even possible—would be extraordinarily expensive, require tremendous personnel resources, and likely

21

take years to develop.  If ISS does not comply, ISS risks significant penalties of $5,000 per violation.

## COUNT ONE
### (First and Fourteenth Amendments—Freedom of Speech)

65.    ISS incorporates all prior paragraphs of this Complaint.

66.    The First Amendment, which applies to the States through the Fourteenth Amendment, prohibits laws "abridging the freedom of speech."  U.S. Const. amend. I.  H.B. 1273 is unconstitutional as applied to ISS.

67.    ISS engages in speech and expression protected by the First Amendment when it provides independent advice, recommendations, and analysis to its clients.  *Nat'l Inst. of Fam. & Life Advocs. (NIFLA) v. Becerra*, 585 U.S. 755, 767 (2018) ("professional speech" protected by First Amendment).  ISS' speech and expression address matters of critical importance, including topics such as who should govern a company, corporate transactions like mergers and acquisitions, executive compensation, and a company's corporate governance policies—and is thus at the core of the First Amendment's protections.

68.    H.B. 1273 burdens ISS' protected speech and cannot survive any level of scrutiny.

69.    ***Content and viewpoint discrimination***.    H.B. 1273 is a presumptively unconstitutional content- and viewpoint-based regulation of speech.  H.B. 1273 on its face "imposes financial burdens on certain speakers based on the content of their expression"—and because the law also selectively burdens "particular views," the First Amendment violation "is all the more blatant."  *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 828-829 (1995); *see also Chiles v. Salazar*, No. 24-539, slip op. at 8-9 (U.S. Mar. 31, 2026).  H.B. 1273's burdensome requirements are triggered *only* if ISS "makes a recommendation *against* entity management" on how to vote on an entity or shareholder proposal.  H.B. 1273 § 11 (emphasis

added).  Speakers that parrot the views of the company board get a free pass.  But the First Amendment "secures, even and especially, the right to voice dissenting views."  *Chiles*, slip op. at 14.

70.    H.B. 1273 is also impermissibly "aimed at particular speakers" and riddled with other content- and viewpoint-based exceptions.  *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 567 (2011).  H.B. 1273 imposes unique requirements on a specific type of speech (proxy advisory services) and class of speakers (proxy advisors that give advice "for compensation") based on Indiana's desire to elevate the viewpoints of other speakers (company management).  H.B. 1273 does not apply equally to all speakers that also advise institutional investors about how to vote on proxy proposals:  It does not apply to company management, shareholder proponents of proxy proposals, those who solicit proxy votes, other shareholders, certain financial institutions, certain charities, or anyone willing to give their advice away for free.

71.    Content and viewpoint discrimination are also inherent in H.B. 1273's design and purpose:  It was adopted "because of disagreement with the message the speech conveys."  *Reed v. Town of Gilbert*, 576 U.S. 155, 164 (2015) (citation and brackets omitted).  The bill's sponsor compared ISS to a terrorist group.[14]  And the model law on which H.B. 1273 is based is part of a broader mission to cleanse "the scourge of ESG in all its forms, in every state, and in every arena where it infects."[15]  It is clear that Indiana fundamentally disagrees with the advice ISS gives.  But Indiana may not "burden the speech of others in order to tilt public debate in a preferred direction."  *Sorrell*, 564 U.S. at 578-579.

---

[14] House Floor Action at 1:44:47-1:45:05 (Jan. 20, 2026), https://iga.in.gov/session/2026/video/house (select "Tuesday, Jan. 20" from "House Chamber" drop-down box) ("The initials is I-S-S, which is kind of close to ISIS.").

[15] Consumers Defense, https://consumersdefense.com/ (last visited Apr. 9, 2026).

72.     ***Compelled Speech.***   Whenever proxy advisors provide advice "against" company management, H.B. 1273 imposes a state-law mandated series of statements by ISS that burdens ISS' speech, alters ISS' message, and misrepresents ISS' services.  But "[i]n this Nation, no official . . . may command our tongues."  *Chiles*, slip op. at 8.

73.     The exact content of the forced statements depends on whether the advisor made its recommendation "based on a written financial analysis" meeting Indiana's idiosyncratic statutory definition.  *See* H.B. 1273 § 10, 11.  This "analysis" must include "the expected short term and long term financial benefits and costs" to the company of "implementing" the proposal and offer a "conclu[sion]" as to "what vote or course of action is most likely to positively affect interest holder value."  *Id.* § 10.  But, as noted above, many proxy ballot issues do not lend themselves to that kind of financial quantification.  It is unclear how anyone could purport to predictably quantify the "expected short term and long term financial benefits and costs" of a vote for one director on the company board over another, a vote to ratify or reject a particular auditor, or a vote for or against a nonbinding shareholder proposal that the company can ignore even if it passes.  Perhaps that is why no rule requires company issuers, shareholder proponents, or solicitors of proxy votes to quantify the "financial benefits and costs" of proxy voting proposals, even though all those entities would be better situated than ISS to try to do so.

74.     If ISS attempted to produce this "written financial analysis," the law would force ISS to create speech and take positions on controversial issues that ISS would not otherwise.  ISS is not in the business of predicting stock returns; ISS' research reports and voting recommendations are informational and take into account the varied interests of ISS' diverse clientele, meaning that ISS frequently offers different clients different voting recommendations on the same issue based on each client's chosen criteria.  Yet ISS would be forced to "conclude[]"

24

*which* vote "is most likely to positively affect interest holder value"—forcing ISS to undertake a fraught comparative analysis on controversial issues such as disclosures about climate change risk and executive compensation, when many of ISS' clients disagree. Worse still, H.B. 1273 would then force ISS to disseminate this speech not only to its clients, but also to the companies about which ISS provides advice.

75.     If ISS chooses not to engage in this fraught prognosticating, H.B. 1273 forces ISS to make misleading statements that denigrate its services. ISS must tell its clients in "a clear and conspicuous disclosure" that ISS made its recommendation "without utilizing a written financial analysis regarding the impact that the recommended action would have on entity interest holders," including that ISS did not "analyze[] the expected short term and long term financial benefits and costs to the entity of implementing" the proposal; did not "conclude[] what vote or course of action is most likely to positively affect interest holder value"; and did not "explain[] the methods and processes used to prepare the analysis." *Id.* § 11(a)(1). All these statements are misleading.

76.     For starters, ISS *does* consider "the impact that the recommended action would have on entity interest holders" because ISS makes its recommendations based on its clients' chosen criteria. In addition, ISS' detailed proxy advisor reports and analyses thoroughly explain "the methods and processes" ISS used in reaching its conclusions. H.B. 1273 would force ISS to falsely say the opposite. And forcing ISS to say that its advice did not analyze "short term and long term financial benefits" or "conclude[]" which vote "is most likely to positively affect interest holder value" falsely suggests both that such an analysis is possible and that ISS' analyses and advice are not rigorous. These warnings also make no sense: Because many clients subscribe to more than one policy, H.B. 1273 would force ISS to provide warnings to a client if ISS recommends against company management under one of the client's policies, but not if ISS

recommends supporting the company's position under another of the client's policies—even on the same vote. And by exempting pro-management recommendations from any requirement, H.B. 1273 falsely suggests that management's recommendations are always rigorous and backed by extensive modeling when, in ISS' experience, that is not the case.

77.     H.B. 1273 would then force ISS to trumpet those false and misleading statements to the world in perpetuity, requiring ISS to "prominently display" them on "the home page" of ISS' website. *Id.* § 11(a)(3). Capping it all, H.B. 1273 would not only force ISS to deliver these self-denigrating statements directly to the companies that are the subjects of ISS' advice, but would also force ISS to reveal confidential information to these companies: "identif[ying] the services" and "identif[ying] the recommendation or policy" that ISS provided to each of its clients. *Id.* § 11(a)(1), (b)(1).

78.     No matter what ISS does, H.B. 1273 forces ISS "to create speech on weighty issues with which [ISS] disagrees" and then disseminate that speech to an audience ISS has not chosen. *303 Creative LLC v. Elenis*, 600 U.S. 570, 599 (2023). That is textbook compelled speech.

79.     ***Strict scrutiny.***   Whether viewed as content-and-viewpoint discrimination or compelled speech, H.B. 1273 is unconstitutional. Viewpoint discrimination is never constitutionally permissible. *See Iancu v. Brunetti*, 588 U.S. 388, 399 (2019) ("The Court's finding of viewpoint bias end[s] the matter."). And compelled speech is anathema to the First Amendment; courts thus regularly reject compelled-speech laws without considering whether they could survive strict scrutiny. *See, e.g.*, *303 Creative*, 600 U.S. at 603. But strict scrutiny applies at the bare minimum, and H.B. 1273 cannot survive it: H.B. 1273 is not "narrowly tailored to serve compelling state interests." *NIFLA*, 585 U.S. at 766. Indiana does not have even a legitimate interest—let alone a compelling one—in forcing ISS to make misleading statements to its clients

and the public and to share confidential information with companies all over the world.  Nor is H.B. 1273 tailored in any fashion—let alone narrowly—to any possible interest Indiana could drum up in this litigation.

80.    Indiana cannot prove that a commercial-speech exception to strict scrutiny applies. Commercial speech is speech that does "no more than propose a commercial transaction."  *Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc.*, 425 U.S. 748, 762 (1976) (citation omitted).  The speech that H.B. 1273 targets plainly does much more:  H.B. 1273 purports to compel ISS' speech on controversial social and political issues.  ISS' speech is at the very least "inextricably intertwined" with "otherwise fully protected speech," meaning strict scrutiny applies. *Riley v. Nat'l Fed'n of the Blind*, 487 U.S. 781, 796 (1988).  Even under some lesser standard of scrutiny, however, H.B. 1273 could not survive.

81.    Because H.B. 1273's unconstitutional content- and viewpoint-based triggering provisions and compelled speech requirements are integral to the entire law, the entire law must be invalidated and enjoined as to ISS.  Unless invalidated and enjoined as to ISS, H.B. 1273 will deprive ISS of its First Amendment rights and cause it to suffer irreparable injuries.

**COUNT TWO**
**(First and Fourteenth Amendments—Due Process—Void for Vagueness)**

82.    ISS incorporates all prior paragraphs of this Complaint.

83.    Under the Fourteenth Amendment's Due Process Clause, a state law is unconstitutionally vague if it (1) fails to provide those targeted by the statute a reasonable opportunity to know what conduct is prohibited, or (2) is so indefinite that it allows arbitrary and discriminatory enforcement.  *FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 253-254 (2012). "When speech is involved, rigorous adherence to those requirements is necessary to ensure that ambiguity does not chill protected speech."  *Id.*

84.    H.B. 1273 is unconstitutionally vague as applied to ISS.  It is vague in the conditions that trigger H.B. 1273's burdensome disclosure requirements, and once those requirements are triggered, it is vague about what ISS is supposed to do.

85.    H.B. 1273's triggering conditions are not clearly defined.  To take only a few examples, Section 11 is triggered when ISS "makes a recommendation against entity management on an entity proposal or proxy proposal, or makes a default recommendation or policy concerning votes against entity management on entity proposals or proxy proposals."  H.B.  1273 § 11(a), (b).  But the law's definition of "default recommendation or policy" is intractably vague, covering everything from "system[s]" to "guidelines."  *Id.* § 1.  Making matters worse, Section 11 later refers to "proxy advisory services."  *Id.* § 11(a)(1), (b)(1).  The law defines "proxy advisory services" more broadly than just making recommendations or default recommendations or policies, *id.* § 8, rendering it even more unclear when the law's burdens apply.

86.    It is also unclear what a proxy advisor must do if it tries to produce a "written financial analysis" but the issue does not lend itself to the sort of crystal-ball quantification demanded by H.B. 1273's definition of "written financial analysis":  Would the law permit ISS to say that any "short and long term" benefits and costs are unclear, or that ISS cannot "conclude[]" which vote is "most likely to positively affect shareholder value"?  Or must ISS state that it made the recommendation without conducting this so-called "written financial analysis"?[16]

87.    If the required disclosures are triggered, H.B. 1273 leaves substantial uncertainty about how ISS should comply.  For instance, the law does not explain what counts as a "clear and conspicuous disclosure."  *Id.* § 11(a)(1).  The law also does not explain how or how quickly ISS

---

[16] H.B. 1273's references to "the experience and geographic location of the personnel who formed the conclusion," §§ 10, 11, are also vague.  Insofar as the Attorney General would construe this phrase to include information that could be used to identify ISS employees or the particular locations where they work, ISS reserves the right to address constitutional problems that would result from that overbroad interpretation.

must provide the required disclosure to entity management or how "prominent[]" the website disclosure must be.  *Id.* § 11(a)(2), (a)(3).  Nor does the law detail how promptly ISS must respond to a request for a "written financial analysis," nor explain how long this production requirement as to any particular recommendation persists.  *Id.* § 11(b)(1).

88.     This vagueness invites arbitrary enforcement.  For the same reasons the law leaves ISS guessing at how to comply, it fails to "establish minimal guidelines to govern law enforcement," *City of Chicago v. Morales*, 527 U.S. 41, 60 (1999) (citation omitted), thus leaving enforcement up to the Attorney General's "personal predilections," *Kolender v. Lawson*, 461 U.S. 352, 358 (1983) (citation omitted).

89.     H.B. 1273 imposes quasi-criminal penalties on proxy advisors that fail to comply: The Indiana Attorney General can seek civil penalties of up to $5,000 "*per violation*," which could quickly add up to a staggering sum.  Ind. Code § 24-5-0.5-4(g) (emphasis added).  The potential breadth of H.B. 1273 and the consequences for failing to comply with what the Attorney General deems sufficient chills ISS from exercising its First Amendment speech rights.

90.     Because H.B. 1273's unconstitutionally vague provisions are integral to the entire law, H.B. 1273 must be invalidated and enjoined as to ISS.  Unless invalidated and enjoined as to ISS, H.B. 1273 will deprive ISS of its due-process rights and cause it to suffer irreparable injuries.

### COUNT THREE
### (Dormant Commerce Clause)

91.     ISS incorporates all prior paragraphs of this Complaint.

92.     The Commerce Clause gives Congress the power "[t]o regulate Commerce with foreign Nations, and among the several States."  U.S. Const. art. I, § 8, cl. 3.  "Although this language does not expressly limit the states' ability to interfere with interstate commerce," the Supreme Court has long held "that the Clause contains a further negative command, known as the

'dormant Commerce Clause,' which prohibits States from taking certain actions respecting interstate commerce." *Nat'l Solid Wastes Mgmt. Ass'n v. Meyer*, 63 F.3d 652, 656-657 (7th Cir. 1995) (citations and quotation marks omitted); *see also Tenn. Wine & Spirits Retailers Ass'n v. Thomas*, 588 U.S. 504, 514 (2019). The dormant Commerce Clause "reflect[s] the Constitution's special concern both with the maintenance of a national economic union unfettered by state-imposed limitations on interstate commerce and with the autonomy of the individual States within their respective spheres." *Healy*, 491 U.S. at 335-336 (footnotes omitted). This negative aspect of the Commerce Clause extends to state laws implicating foreign commerce as well. *See, e.g.*, *Wardair Canada, Inc. v. Fla. Dep't of Revenue*, 477 U.S. 1, 7-8 (1986); *South-Cent. Timber Dev., Inc. v. Wunnicke*, 467 U.S. 82, 87-88 (1984); *Piazza's Seafood World, LLC v. Odom*, 448 F.3d 744, 749 (5th Cir. 2006).

93.    ***Direct regulation of out-of-state commerce.*** A state law violates the dormant Commerce Clause when it "directly regulates" commerce that "takes place[] wholly outside of the State's borders." *Legato Vapors*, 847 F.3d at 830 (quoting *Healy*, 491 U.S. at 336); *see Edgar v. MITE Corp.*, 457 U.S. 624, 642-643 (1982) (plurality op.); *Nat'l Pork Producers Council v. Ross*, 598 U.S. 356, 376 n.1 (2023) (citing *Edgar* plurality op.); *see also Antilles Cement Corp. v. Acevedo Vila*, 408 F.3d 41, 46 (1st Cir. 2005) ("Although the language of dormant Commerce Clause jurisprudence most often concerns interstate commerce, essentially the same doctrine applies to international commerce.").

94.    H.B. 1273 directly regulates ISS' transactions with its non-Indiana clients. The law imposes onerous burdens on ISS whenever ISS makes a recommendation against "entity management," even if neither the entity nor ISS' client is located in Indiana. *See* H.B. 1273 § 2(a) (defining "entity" to include a "business corporation," "general partnership," "limited liability

partnership," "limited partnership," or "limited liability company" as defined in Indiana Code § 23-0.5-1.5); Ind. Code § 23-0.5-1.5-3 ("'Business corporation' means a domestic business corporation … or a foreign business corporation."); H.B. 1273 § 6 (defining "interest holder" as a "direct holder of an interest in an entity").

95. The application of H.B. 1273 to out-of-state transactions between ISS and ISS' non-Indiana clients violates the dormant Commerce Clause. *See, e.g.*, *Legato Vapors*, 847 F.3d at 830 ("[T]he application of a state statute" to out-of-state commerce "exceeds the inherent limits of the enacting State's authority and is invalid." (quoting *Healy*, 491 U.S. at 336)). Unless invalidated and enjoined as to ISS' out-of-state transactions, H.B. 1273 will cause ISS to suffer irreparable injuries.

96. ***Unduly burdening interstate and foreign commerce***. A state law also violates the dormant Commerce Clause when its burden on interstate or foreign commerce "clearly exceeds [its] local benefits." *Wiesmueller v. Kosobucki*, 571 F.3d 699, 703 (7th Cir. 2009) (citation omitted) (dormant Interstate Commerce Clause); *see Pike v. Bruce Church, Inc.*, 397 U.S. 137 (1970) (same); *Ross*, 598 U.S. at 379 ("[T]his Court has left the courtroom door open to challenges premised on even nondiscriminatory burdens." (citation and quotation marks omitted)); *see also South-Central*, 467 U.S. at 99-101 (considering whether state law excessively burdened foreign commerce); *Piazza's Seafood*, 448 F.3d at 750 ("State regulations violate the dormant Commerce Clause by … unduly burdening foreign or interstate commerce."). "It is a well-accepted rule that state restrictions burdening foreign commerce are subjected to a more rigorous and searching scrutiny." *South-Central*, 467 U.S. at 100.

97. H.B. 1273 imposes multiple substantial burdens on interstate and foreign commerce. The law's global reach is itself a substantial burden: It imposes onerous compliance

31

obligations on every covered proxy advisor whenever it provides any service covered by H.B. 1273 that includes an anti-management recommendation—regardless of where that advisor is providing that service, the location of the client receiving the service, or the company that is the subject of the recommendation.

98.    H.B. 1273's burdens also fall disproportionately on interstate and foreign commerce because proxy advisors are overwhelmingly located outside of Indiana and serve out-of-state clients.  And the law distorts the global market for proxy advisory services, distortions which could cascade through interstate and foreign commerce more generally, considering the broad scope of the services covered by H.B. 1273.  These already-substantial burdens are magnified when considering that other states may—and likely will—"adopt[] similar legislation." *C & A Carbone, Inc. v. Town of Clarkstown*, 511 U.S. 383, 406 (1994) (O'Connor, J., concurring in the judgment) (citation omitted); *see Brown-Forman Distillers Corp. v. New York State Liquor Auth.*, 476 U.S. 573, 583-584 (1986).  On top of that, H.B. 1273 undermines "the special need for federal uniformity" in "foreign intercourse and trade."  *Wardair Canada*, 477 U.S. at 8 (citation omitted).  This "policy of uniformity, embodied in the Commerce Clause, . . . presumptively prevails when the Federal Government has remained silent."  *Id.*  H.B. 1273 also "create[s] a substantial risk of conflicts with foreign governments," *Piazza's Seafood*, 448 F.3d at 750 (citation omitted), with different understandings of what is in shareholder's interests and a proxy advisor's role.

99.    The substantial burdens H.B. 1273 imposes on interstate and foreign commerce outweigh any local interest Indiana may have in regulating how ISS serves its clients.

100.    To the extent Indiana has any local interests, they "could be promoted as well with a lesser impact on interstate activities," *Pike*, 397 U.S. at 142, including, for example, through educational campaigns.

101.    By imposing substantial burdens on interstate commerce that clearly exceed local benefits, H.B. 1273 violates the dormant Commerce Clause.  Unless invalidated and enjoined as to ISS, H.B. 1273 will cause ISS to suffer irreparable injuries.

**COUNT FOUR**
**(Fourteenth Amendment—Due Process—Prohibition on State Laws that Regulate Extraterritorially)**

102.    ISS incorporates all prior paragraphs of this Complaint.

103.    The Due Process Clause of the Fourteenth Amendment provides that no State shall "deprive any person of life, liberty, or property, without due process of law."  U.S. Const. amend. XIV, § 1.  The Supreme Court has long recognized that the Due Process Clause, like the Commerce Clause, prohibits a State from "exercis[ing] 'extra territorial jurisdiction'"—a State may not "regulate and control activities wholly beyond its boundaries."  *Watson v. Emps. Liab. Assurance Corp.*, 348 U.S. 66, 70 (1954); *accord Hartford Accident & Indem. Co. v. Delta & Pine Land Co.*, 292 U.S. 143, 149 (1934).  Due process requires "some minimal contact" between the "regulated *party* and the state," and between the "regulated *subject matter* and the state."  *Gerling Glob. Reinsurance Corp. of Am. v. Gallagher*, 267 F.3d 1228, 1236 (11th Cir. 2001) (citation omitted); *see also, e.g.*, *Adventure Commc'ns, Inc. v. Ky. Registry of Election Fin.*, 191 F.3d 429, 436 (4th Cir. 1999).  "[I]f a State has only an insignificant contact with the part[y] and the occurrence or transaction, application of its law is unconstitutional."  *Allstate Ins. Co. v. Hague*, 449 U.S. 302, 310-311 (1981).

104.    Indiana lacks any significant contacts with ISS when ISS provides services to clients located outside of Indiana.  Such services are transactions that take place entirely outside of Indiana.

105.    Accordingly, the application of H.B. 1273 to ISS and its transactions with its non-Indiana clients violates the Due Process Clause's restriction on extraterritorial state regulation. Unless invalidated and enjoined as to ISS, H.B. 1273 will cause ISS to suffer irreparable injuries.

## COUNT FIVE
### (Horizontal Separation of Powers)

106.    ISS incorporates all prior paragraphs of this Complaint.

107.    In addition to the restraints on extraterritorial legislation imposed by the dormant Commerce Clause and the Due Process Clause, the Constitution more generally bars States from directly regulating conduct that takes place entirely in another State.  This equal-sovereignty principle is embedded in several of the Constitution's structural protections, rooted in the historical tradition, and inherent in the plan of the Convention itself.  *See Ross*, 598 U.S. at 376 n.1; *id.* at 408-410 (Kavanaugh, J., concurring in part and dissenting in part); *Mallory v. Norfolk S. Ry. Co.*, 600 U.S. 122, 154 (2023) (Alito, J., concurring in part and concurring in the judgment) (explaining that this principle is "an 'obviou[s]' and 'necessary result' of our constitutional order," and "is not confined to any one clause or section, but is expressed in the very nature of the federal system that the Constitution created and in numerous provisions that bear on States' interactions with one another" (citation omitted)); *cf. PennEast Pipeline Co. v. New Jersey*, 594 U.S. 482, 501 (2021) ("The plan of the Convention reflects the 'fundamental postulates implicit in the constitutional design." (citation omitted)).

108.    To start, the "territorial limits of state authority," *Ross*, 598 U.S. at 376 n.1, are implicit in the founding premise that "all States enjoy equal sovereignty," *Shelby County v. Holder*,

34

570 U.S. 529, 535 (2013).  The "constitutional equality of the states is essential to the harmonious operation of the scheme upon which the Republic was organized," *Coyle v. Smith*, 221 U.S. 559, 580 (1911), and accordingly, "States are restricted within the orbits of their lawful authority," *N.Y. Life Ins. Co. v. Head*, 234 U.S. 149, 161 (1914).  When a State "directly regulate[s] out-of-state transactions . . . with no connection to the State," *Ross*, 598 U.S. at 376 n.1 (emphases omitted), it invades the sovereignty of its sister States.  The plan of the Convention thus necessarily restricts States from directly regulating conduct that neither occurs in nor is directed within its borders; a Union of equal States could not succeed if each State could regulate conduct within another.

109.    Several provisions of the Constitution, in addition to the Commerce Clause and the Due Process Clause, reflect and implement this equal-sovereignty principle prohibiting one State from directly regulating conduct occurring in another State.  Article I, section 10 strips States of traditional sovereign powers that could be wielded against one another, including the right to "lay any Imposes or Duties on Imports or Exports," and to "lay any Duty of Tonnage, keep Troops, or Ships of War in time of Peace, [or] enter into any Agreement or Compact with other State."  U.S. Const. art. I, § 10, cl. 2-3.  Article IV, in turn, preserves the rights of each State in relation to each, requiring, among other things, that "Full Faith and Credit shall be given in each State to the public Acts, Records, and judicial Proceedings of every other State."  U.S. Const. art. IV, § 1.  And the Tenth Amendment ensures that each State preserves its own "integrity, dignity, and residual sovereignty."  *Bond v. United States*, 564 U.S. 211, 221 (2011); *see* U.S. Const. amend. X.  In short, as the Supreme Court recently recognized, "the territorial limits of state authority under the Constitution's horizontal separation of powers" barring a State from directly regulating transactions occurring outside the State's borders inhere in the "original and historical

understandings of the Constitution's structure and the principles of 'sovereignty and comity' it embraces." *Ross*, 598 U.S. at 376 & n.1 (citation omitted).

110.    When ISS transacts with its non-Indiana clients, it does so wholly outside of Indiana's borders.  H.B. 1273 purports to directly regulate those transactions.

111.    By directly regulating out-of-State transactions, H.B. 1273 violates the Constitution's horizontal separation of powers.  Unless invalidated and enjoined as to ISS, H.B. 1273 will cause ISS to suffer irreparable injuries.

## PRAYER FOR RELIEF

112.    For the foregoing reasons, ISS prays for the following relief:

a.    Declare that H.B. 1273 unconstitutionally infringes ISS' free speech rights under the First and Fourteenth Amendments of the U.S. Constitution;

b.    Declare that H.B. 1273 is void for vagueness under the First Amendment and the Due Process Clause of the Fourteenth Amendment of the U.S. Constitution, as applied to ISS;

c.    Declare that H.B. 1273 violates the Commerce Clause of the U.S. Constitution, the Due Process Clause's prohibition on exterritorial regulation, and/or the horizontal separation of powers protected by the U.S. Constitution, either on its face or as applied to ISS;

d.    Preliminarily and permanently enjoin Defendant and his successors, agents, employees, and all persons acting under his direction or control from taking any action to enforce H.B. 1273 against ISS, including but not limited to intervention in any private right of action, see H.B. 1273 § 12(c);

e.    Enter judgment in favor of ISS;

f.      Award reasonable costs and attorneys' fees incurred in bringing this action,

under 42 U.S.C. § 1988; and

g.      Award ISS all other relief as the Court deems just and proper.


Respectfully submitted,

/s/ *Kandi Kilkelly Hidde*

JESSICA L. ELLSWORTH*
  jessica.ellsworth@hoganlovells.com
DAVID M. FOSTER*
  david.foster@hoganlovells.com
MICHAEL J. WEST*
  michael.west@hoganlovells.com
JAMES YATES*
  james.yates@hoganlovells.com
DANA A. RAPHAEL*
  dana.raphael@hoganlovells.com
AMANDA ALLEN*
  amanda.allen@hoganlovells.com
ASHWIN FUJII*
  ashwin.fujii@hoganlovells.com
HOGAN LOVELLS US LLP
555 Thirteenth Street, N.W.
Washington, D.C. 20004
Tel: (202) 637-5600
Fax: (202) 637-5910

KANDI KILKELLY HIDDE (Ind. Bar No. 18033-49)
  khidde@fbtgibbons.com
DARREN A. CRAIG (Ind. Bar No. 25534-49)
  dcraig@fbtgibbons.com
FBT GIBBONS LLP
111 Monument Circle, Suite 4500
P.O. Box 44961
Indianapolis, IN 46204
Tel: (317) 237-3800
Fax: (317) 237-3900

BRUCE D. OAKLEY*
  bruce.oakley@hoganlovells.com
HOGAN LOVELLS US LLP
609 Main Street, Suite 4200
Houston, TX 77002
Tel: (713) 632-1420
Fax: (713) 632-1401

* application for pro hac vice forthcoming

*Counsel for Plaintiff Institutional Shareholder Services Inc.*

Dated:  April 13, 2026

0164090.0821265   4898-4535-6448v1

37