# Exhibit C

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION**

|  |  |
|---|---|
| INSTITUTIONAL SHAREHOLDER SERVICES INC., <br><br> *Plaintiff,* <br><br> v. <br><br> TODD ROKITA, in his official capacity as the Indiana Attorney General, <br><br> *Defendant.* | Case No. 1:26-cv-00717 |

**DECLARATION OF DAVID M. FOSTER**

1.     My name is David M. Foster.  I am an attorney at Hogan Lovells US LLP and serve as counsel for Plaintiff Institutional Shareholder Services Inc. ("ISS") in the above-captioned case.  I am competent to make this declaration and have personal knowledge that the following facts are true and correct.

2.     This declaration is made in support of ISS' Motion for a Preliminary Injunction.

3.     **Exhibit 1** is a true and correct copy of ISS, U.S. Catholic Faith-Based Specialty Policy Proxy Voting Guidelines, 2026 Policy Recommendations (Dec. 26, 2025), https://perma.cc/684Q-HSEN.

4.     **Exhibit 2** is a true and correct copy of ISS, U.S. Climate Specialty Policy Proxy Voting Guidelines, 2026 Policy Recommendations (Dec. 31, 2025), https://perma.cc/2ERX-3HSU.

1

5.      **Exhibit 3** is a true and correct copy of ISS, U.S. Global Board-Aligned Specialty Policy Proxy Voting Guidelines, 2026 Policy Recommendations (Jan. 16, 2026), https://perma.cc/986V-64CJ.

6.      **Exhibit 4** is a true and correct copy of ISS, U.S. Proxy Voting Guidelines, 2026 Benchmark Policy Recommendations (Dec. 9, 2025), https://perma.cc/2YXG-42C6.

7.      **Exhibit 5** is a true and correct copy of ISS, Part 2 Brochure, filed with the SEC (updated Mar. 31, 2026), https://perma.cc/MDL6-WDC4.

8.      **Exhibit 6** is a true and correct copy of ISS, REDACTED Benchmark Policy proxy analysis and voting recommendations for a shareholder meeting of Tesla, Inc. held on November 6, 2025.  An unredacted copy of Exhibit 6 will be filed separately under seal.

9.      **Exhibit 7** is a true and correct copy of ISS, REDACTED Benchmark Policy proxy analysis and voting recommendations for a shareholder meeting of Exxon Mobil Corp. held on May 31, 2023.  An unredacted copy of Exhibit 7 will be filed separately under seal.

10.      **Exhibit 8** is a true and correct copy of ISS, REDACTED Climate Specialty Policy proxy analysis and voting recommendations for a shareholder meeting of Exxon Mobil Corp. held on May 31, 2023.  An unredacted copy of Exhibit 8 will be filed separately under seal.

11.      **Exhibit 9** is a true and correct copy of ISS, REDACTED Benchmark Policy proxy analysis and voting recommendations for a shareholder meeting of Exxon Mobil Corp. held on May 25, 2022.  An unredacted copy of Exhibit 9 will be filed separately under seal.

12.      **Exhibit 10** is a true and correct copy of ISS, REDACTED Catholic Faith-Based Specialty Policy proxy analysis and voting recommendations for a shareholder meeting of Exxon Mobil Corp. held on May 25, 2022.  An unredacted copy of Exhibit 10 will be filed separately under seal.

13.     **Exhibit 11** is a true and correct copy of ISS Governance Insights, A Look At AI-Related Shareholder Proposals At U.S. Companies, 2022-2025 (Dec. 4, 2025), https://perma.cc/B9GP-TRLR.

14.     **Exhibit 12** is a true and correct copy of ISS, Letter to the U.S. Senate Committee on Banking, Housing and Urban Affairs Committee on Banking, Housing and Urban Affairs (July 6, 2018), https://perma.cc/NXG4-ESR4.

15.     **Exhibit 13** is a true and correct copy of Emmanuel Tamrat, Council of Institutional Investors, Governance Guide: Proxy Voting (July 2024), https://perma.cc/W3QH-SXCT.

16.     **Exhibit 14** is a true and correct copy of Recommendation of the SEC Investor Advisory Committee Relating to SEC Guidance and Rule Proposals on Proxy Advisors and Shareholder Proposals (Jan. 24, 2020), https://perma.cc/HH22-AN8K.

17.     **Exhibit 15** is a true and correct copy of New York State Common Retirement Fund, Comments on Proposed Rule "Amendments to Exemptions from the Proxy Rules for Proxy Voting Advice" (Feb. 3, 2020), https://perma.cc/2EH9-VZP4.

18.     **Exhibit 16** is a true and correct copy of T. Rowe Price, Letter to SEC Re: Proxy Voting Roundtable (Dec. 13, 2018), https://perma.cc/F45A-7EYM.

19.     **Exhibit 17** is a true and correct copy of Elliott Management Corporation, Letter to SEC (Mar. 30, 2020), https://perma.cc/S2T5-KLLU.

20.     **Exhibit 18** is a true and correct copy of Better Markets, Letter to SEC on Amendments to Exemptions From the Proxy Rules for Proxy Voting Advice (Feb. 3, 2020), https://perma.cc/E8SM-SV9N.

21.     **Exhibit 19** is a true and correct copy of Council of Institutional Investors, Letter Re: Proposed Legislation Relating to Proxy Advisory Firms and Institutional Investors (Feb. 27, 2018), https://perma.cc/VL7L-XH2M.

22.     **Exhibit 20** is a screen capture of Ross Kerber, *Proxy Adviser ISS Expands Offerings for 'ESG Skeptic' Clients*, Reuters (Mar. 4, 2024), https://www.reuters.com/sustainability/boards-policy-regulation/proxy-adviser-iss-expands-offerings-esg-skeptic-clients-2024-03-04/ (https://tinyurl.com/38f7z776).

23.     **Exhibit 21** is a screen capture of Bowyer Research, *Summary of Bowyer Research Proxy Voting Guidelines for States*, https://perma.cc/KM5Z-G2ZZ.

24.     **Exhibit 22** is a screen capture of Matt Egan, *Corporate America Loves Deregulation.  Then Why Is It Pushing For These Rules?*, CNN (Mar. 29, 2019), https://www.cnn.com/2019/03/29/investing/regulation-proxy-advisory-reform-sec/index.html (https://tinyurl.com/5f7jpnr6).

25.     **Exhibit 23** is a screen capture of Elizabeth Harris, *Advisory Group Opposes Re-election of Most of Target's Board*, N.Y. Times (May 28, 2014), https://www.nytimes.com/2014/05/29/business/advisory-group-opposes-re-election-of-most-of-targets-board.html (https://tinyurl.com/wp4brkmt).

26.     **Exhibit 24** is a screen capture of *JPMorgan Pushes Back on ISS Recommendations on Severance, Independent Chair*, Reuters (May 14, 2024), https://www.reuters.com/business/finance/jpmorgan-pushes-back-iss-recommendations-severance-independent-chair-2024-05-13/ (https://tinyurl.com/58u7as2j).

27.     **Exhibit 25** is a screen capture of Marco Quiroz-Gutierrez, *With $1 Trillion Pay Package on the Line, Elon Musk Blasts Influential Firms Telling Shareholders to Reject It:*

4

*'Those Guys Are Corporate Terrorists'*, Fortune Mag. (Oct. 23, 2025), https://fortune.com/2025/10/23/elon-musk-tesla-shareholders-ceo-1-trillion-dollar-pay-package-corporate-terrorists-glass-lewis-iss/ (https://tinyurl.com/3kd77puw).

28.     **Exhibit 26** is a true and correct copy of Exxon Mobil Corporation, Letter to the SEC Re: No Action Request (Sept. 15, 2025), https://perma.cc/7JB5-9S4G.

29.     **Exhibit 27** is a screen capture of National Center for Public Policy Research, Press Release, Conservative Group Launches Proxy Navigator Tool to Fight Woke Corporations (Mar. 7, 2024), https://perma.cc/MVB9-DNVV.

30.     **Exhibit 28** is a screen capture of Michael Gennaro, *JPMorgan Chase Says AI Can Replace Proxy Advisers, But Others Have Their Doubts*, Law.com (Jan. 20, 2026), https://www.law.com/corpcounsel/2026/01/20/jpmorgan-chase-says-ai-can-replace-proxy-advisers-but-others-have-their-doubts/ (https://tinyurl.com/bdz9upw8).

31.     **Exhibit 29** is a true and correct copy of Strive, Norfolk Southern Shareholder Letter (May 7, 2024), https://perma.cc/V2HF-YPFA.

32.     **Exhibit 30** is a screen capture of Consumers Defense, *Proxy Advisor Transparency Act*, https://perma.cc/B3P3-FNAF.

33.     **Exhibit 31** is a screen capture of the internet homepage of Consumers Defense, https://perma.cc/U97G-TW9M.

34.     **Exhibit 32** is a true and correct copy of a transcript of excerpts from the Indiana House Financial Institutions Committee hearing on H.B. 1273 held on January 13, 2026.  The transcript was prepared by Veritext Legal Solutions at the request of Hogan Lovells US LLP. The transcript is based on video recordings publicly available on Indiana's official government website.  *See* https://iga.in.gov/session/2026/video/committee_financial_institutions/ (select

"Tuesday, Jan. 13, 10:30am" in the "Meetings" drop-down box; timestamp 1:55:10-2:17:30). The transcriber certified that this transcript "is a true and accurate record of the proceedings to the best of my knowledge, skills, and ability."  Ex. 32 at 24.

35.  **Exhibit 33** is a true and correct copy of a transcript of excerpts from the Indiana House proceedings on H.B. 1273 on January 20, 2026.  The transcript was prepared by Veritext Legal Solutions at the request of Hogan Lovells US LLP.  The transcript is based on a video recording publicly available on Indiana's official government website.  *See* https://iga.in.gov/session/2026/video/house/ (select "Tuesday, Jan. 20" in the "House Chamber" drop-down box; timestamp 1:40:20-1:49:45).  The transcriber certified that this transcript "is a true and accurate record of the proceedings to the best of my knowledge, skills, and ability."  Ex. 33 at 14.

36.  **Exhibit 34** is a true and correct copy of a transcript of excerpts from the Indiana Senate Insurance and Financial Institutions Committee hearing on H.B. 1273 held on February 11, 2026.  The transcript was prepared by Veritext Legal Solutions at the request of Hogan Lovells US LLP.  It is based on a video recording publicly available on Indiana's official government website.  *See* https://iga.in.gov/session/2026/video/committee_insurance_4000/ (select "Wednesday, Feb. 11 - 9:00am" in the "Meetings" drop-down box; timestamps 33:55-1:36:50; 2:03:51-2:04:35).  The transcriber certified that this transcript "is a true and accurate record of the proceedings to the best of my knowledge, skills, and ability."  Ex. 34 at 79.

37.  **Exhibit 35** is a true and correct copy of a transcript of excerpts from the Indiana Senate proceedings on H.B. 1273 on February 17, 2026.  The transcript was prepared by Veritext Legal Solutions at the request of Hogan Lovells US LLP.  It is based on video recordings publicly available on Indiana's official government website.  *See*

https://iga.in.gov/session/2026/video/senate/ (select "Tuesday, Feb. 17" in the "Senate Chamber" drop-down box; timestamp 2:48:30-2:50:10).  The transcriber certified that this transcript "is a true and accurate record of the proceedings to the best of my knowledge, skills, and ability."  Ex. 35 at 5.

38.     **Exhibit 36** is a true and correct copy of a transcript of excerpts from the Indiana House proceedings on H.B. 1273 on February 25, 2026.  The transcript was prepared by Veritext Legal Solutions at the request of Hogan Lovells US LLP.  It is based on an audio recording publicly available on Indiana's official government website.  *See* https://iga.in.gov/session/2026/video/house/ (select "Wednesday, Feb. 25, part 1" in the "House Chamber" drop-down box; timestamp 15:57-17:20).  The transcriber certified that this transcript "is a true and accurate record of the proceedings to the best of my knowledge, skills, and ability."  Ex. 36 at 5.

39.     **Exhibit 37** is a true and correct copy of Letter from State Attorneys General to ISS and Glass Lewis (Jan. 17, 2023), https://perma.cc/NNW4-64B4.

40.     **Exhibit 38** is a true and correct copy of Letter from State Attorneys General to ISS and Glass Lewis (Nov. 29, 2023), https://perma.cc/8UUU-DWWV.

41.     **Exhibit 39** is a true and correct copy of Letter from State Attorneys General to Asset Managers (Aug. 29, 2024), https://perma.cc/H5GD-JD7E.

42.     **Exhibit 40** is a screen capture of Todd Rokita, *'ESG investing' is a Leftist Power Grab by Another Name*, Washington Examiner (July 11, 2022), https://www.washingtonexaminer.com/opinion/380184/esg-investing-is-a-leftist-power-grab-by-another-name/.

43.     **Exhibit 41** is a screen capture of Indiana Office of the Attorney General, Press Release, *Attorney General Todd Rokita Continues Fight Against Woke ESG Agendas—This Time Helping to Lead Multistate Lawsuit* (Jan. 26, 2023), https://perma.cc/QJU6-D59G.

44.     **Exhibit 42** is a screen capture of Indiana Office of the Attorney General, Press Release, *Attorney General Todd Rokita Investigates Six Major Banks Over ESG Investing As Part Of 20-State Coalition* (Oct. 19, 2022), https://perma.cc/8GE7-R5AL.

45.     **Exhibit 43** is a screen capture of Indiana Office of the Attorney General, Press Release, *Attorney General Todd Rokita Fights Biden Effort To Weaponize SEC On Behalf Of Radical Climate Agenda* (Mar. 6, 2024), https://perma.cc/VWA4-JLSC.

46.     **Exhibit 44** is a true and correct copy of Press Release, Indiana State Comptroller, *State Comptroller Nieshalla Votes to Prioritize Fiduciary Duty for Proxy Voting* (May 22, 2025), https://perma.cc/5ZM6-98TT.

47.     **Exhibit 45** is a screen capture of Leslie Bonilla Muñiz, *Indiana Pension System Contracts With Conservative Anti-ESG Firm*, Indiana Cap. Chron. (Mar. 20, 2023), https://indianacapitalchronicle.com/2023/03/20/indiana-pension-system-hires-conservative-anti-esg-presidential-candidate/ (https://tinyurl.com/5n95jkhm).


I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed on April 16, 2026, in Washington, D.C.

*/s/ David M. Foster*
David M. Foster

8

# Foster Declaration Exhibit 1



# UNITED STATES

## CATHOLIC FAITH-BASED PROXY VOTING GUIDELINES

2026 Policy Recommendations

Effective for Meetings on or after February 1, 2026

Published December 26, 2025

*Effective for Shareholder Meeting Reports Published on or after February 25, 2025,
Consideration of Certain Diversity Factors in Making Vote Recommendations Is Suspended
(for more information, see pp. 17-18)*

WWW.ISSGOVERNANCE.COM

Case 1:26-cv-00717-MPB-MKK    Document 26-3    Filed 04/21/26    Page 12 of 1112
PageID #: 178

# TABLE OF CONTENTS

INTRODUCTION .................................................................................................................................9

1.  Board of Directors ................................................................................................. 10

Uncontested Election of Directors..................................................................................................11

Board Accountability ...................................................................................................................11

Problematic Takeover Defenses, Capital Structure, and Governance Structure ...........................11

Problematic Audit-Related Practices ...............................................................................14

Problematic Compensation Practices..............................................................................14

Problematic Pledging of Company Stock..........................................................................15

Material Environmental, Social and Governance (ESG) Risk Oversight Failures ...........................15

Climate Risk Mitigation and Net Zero..............................................................................15

Board Responsiveness .................................................................................................................16

Director Independence .................................................................................................................17

Board Composition ......................................................................................................................17

Board Diversity ...........................................................................................................18

Classification of Directors – U.S. ...................................................................................18

Board-Related Management Proposals............................................................................................21

Classification/Declassification of the Board ...............................................................................21

Majority Vote Threshold for Director Elections...........................................................................21

Cumulative Voting .......................................................................................................................21

Director and Officer Indemnification, Liability Protection, and Exculpation .....................................22

Shareholder Ability to Remove Directors/Fill Vacancies .............................................................22

Board Size ...................................................................................................................................23

Establish/Amend Nominee Qualifications ...................................................................................23

Board Refreshment.......................................................................................................................23

Board-Related Shareholder Proposals/Initiatives ...........................................................................24

Proxy Contests/Proxy Access.....................................................................................................24

Annual Election (Declassification) of the Board ..........................................................................24

Majority Threshold Voting Shareholder Proposals......................................................................24

Majority of Independent Directors...............................................................................................25

Establishment of Independent Committees.................................................................................25

Independent Board Chair ...........................................................................................................25

Establishment of Board Committees ...........................................................................................25

Establish/Amend Nominee Qualifications ...................................................................................26

Board Policy on Shareholder Engagement ..................................................................................26

Proxy Access ...............................................................................................................................26

Board Refreshment.......................................................................................................................27

CEO Succession Planning ...........................................................................................................27

Vote No Campaigns .....................................................................................................................27

2.  Ratification of Auditors................................................................................................. 28

Auditor-Related Shareholder Proposals .........................................................................................28

Ratify Auditors/Ensure Auditor Independence ...........................................................................28

Auditor Rotation .........................................................................................................................28

**3. Takeover Defenses / Shareholder Rights**.................................................................... **30**

Takeover Defenses and Shareholder Rights-Related Management Proposals .......................................30

    Poison Pills (Shareholder Rights Plans)............................................................................................30

    Net Operating Loss (NOL) Poison Pills/Protective Amendments....................................................31

    Ratification Proposals: Management Proposals to Ratify Existing Charter or Bylaw Provisions .......................32

    Supermajority Shareholder Vote Requirements .............................................................................32

    Shareholder Ability to Call a Special Meeting................................................................................32

    Shareholder Ability to Act by Written Consent ..............................................................................33

    Advance Notice Requirements for Shareholder Proposals/Nominations .......................................33

    Fair Price Provisions........................................................................................................................34

    Greenmail .......................................................................................................................................34

    Confidential Voting .........................................................................................................................34

    Control Share Acquisition Provisions..............................................................................................35

    Control Share Cash-Out Provisions.................................................................................................35

    Disgorgement Provisions ................................................................................................................35

    State Takeover Statutes...................................................................................................................35

    Freeze-Out Provisions.....................................................................................................................36

    Reincorporation Proposals .............................................................................................................36

    Amend Bylaws without Shareholder Consent ................................................................................36

    Shareholder Litigation Rights.........................................................................................................36

        Federal Forum Selection Provisions ........................................................................................36

        Exclusive Forum Provisions for State Law Matters..................................................................37

        Fee Shifting ..............................................................................................................................37

Takeover Defenses and Shareholder Rights-Related Shareholder Proposals .......................................37

    Shareholder Proposals to put Pill to a Vote and/or Adopt a Pill Policy .........................................37

    Reduce Supermajority Vote Requirements .....................................................................................38

    Remove Antitakeover Provisions....................................................................................................38

    Reimburse Proxy Solicitation Expenses .........................................................................................38

    Virtual Shareholder Meetings.........................................................................................................39

**4. Miscellaneous Governance Provisions** ........................................................................ **40**

    Bundled Proposals .........................................................................................................................40

    Adjourn Meeting.............................................................................................................................40

    Changing Corporate Name .............................................................................................................40

    Amend Quorum Requirements .......................................................................................................40

    Amend Minor Bylaws.....................................................................................................................41

    Other Business................................................................................................................................41

**5. Capital Structure** ............................................................................................................ **42**

    Common Stock Authorization.........................................................................................................42

        General Authorization Requests...............................................................................................42

        Specific Authorization Requests ..............................................................................................43

    Issue Stock for Use with Rights Plan ..............................................................................................43

    Stock Distributions: Splits and Dividends .......................................................................................43

    Reverse Stock Splits .......................................................................................................................43

    Preferred Stock Authorization ........................................................................................................43

General Authorization Requests ........................................................................................... 44
Specific Authorization Requests ......................................................................................... 45
Blank Check Preferred Stock .................................................................................................. 45
Adjustments to Par Value of Common Stock ......................................................................... 45
Unequal Voting Rights/Dual Class Structure ........................................................................ 45
Preemptive Rights ................................................................................................................. 46
Debt Restructurings .............................................................................................................. 46
Share Repurchase Programs ................................................................................................ 47
Conversion of Securities ....................................................................................................... 47
Recapitalization ..................................................................................................................... 47
Tracking Stock ....................................................................................................................... 47
Share Issuance Mandates at U.S. Domestic Issuers Incorporated Outside the U.S. ........... 48

**6.  Executive and Director Compensation ............................................................... 49**

Criteria for Evaluating Executive Pay .................................................................................... 50
Pay-for-Performance Evaluation .......................................................................................... 50
Pay-for-Performance Elements ......................................................................................... 51
Pay Equity (Quantum) Elements ....................................................................................... 51
Problematic Pay Practices .................................................................................................. 51
Options Backdating ............................................................................................................ 52
Compensation Committee Communications and Responsiveness .................................... 53
Advisory Votes on Executive Compensation- Management Proposals (Management Say-on-Pay) ........... 53
Frequency of Advisory Vote on Executive Compensation – Management Say-on-Pay ........ 54
Advisory Vote on Golden Parachutes in an Acquisition, Merger, Consolidation, or Proposed Sale ......... 54
Equity-Based Incentive Plans ............................................................................................... 55
Shareholder Value Transfer (SVT) ..................................................................................... 56
Repricing Provisions ......................................................................................................... 57
Pay-for-Performance Misalignment – Application to Equity Plans ................................... 57
Three-Year Value Adjusted Burn Rate .............................................................................. 57
Liberal Definition of Change-in-Control ........................................................................... 58
Other Compensation Plans ................................................................................................... 58
Amending Cash and Equity Plans (including Approval for Tax Deductibility (162(m)) ........ 58
Employee Stock Purchase Plans (ESPPs) ............................................................................. 59
Qualified Plans .................................................................................................................. 59
Non-Qualified Plans .......................................................................................................... 59
Employee Stock Ownership Plans (ESOPs) ........................................................................... 60
Option Exchange Programs/Repricing Options .................................................................... 61
Stock Plans in Lieu of Cash ................................................................................................... 61
Transfer Stock Option (TSO) Programs ................................................................................. 61
401(k) Employee Benefit Plans ............................................................................................ 62
Severance Agreements for Executives/Golden Parachutes .................................................. 62
Director Compensation ......................................................................................................... 63
Shareholder Ratification of Director Pay Programs .............................................................. 63
Equity Plans for Non-Employee Directors ............................................................................ 64
Outside Director Stock Awards/Options in Lieu of Cash ...................................................... 64
Non-Employee Director Retirement Plans ............................................................................ 64
Shareholder Proposals on Compensation ............................................................................ 65

Increase Disclosure of Executive Compensation ........................................................65
Limit Executive Compensation ........................................................65
Stock Ownership Requirements ........................................................65
Prohibit/Require Shareholder Approval for Option Repricing ........................................................65
Severance Agreements/Golden Parachutes ........................................................66
Cash Balance Plans ........................................................66
Performance-Based Equity Awards ........................................................67
Pay for Superior Performance ........................................................67
Advisory Vote on Executive Compensation (Say-on-Pay) Shareholder Proposals........................................................68
Termination of Employment Prior to Severance Payment and Eliminating Accelerated Vesting of Unvested Equity........................................................68
Tax Gross-up Proposals........................................................68
Compensation Consultants - Disclosure of Board or Company's Utilization ........................................................68
Golden Coffins/Executive Death Benefits........................................................68
Recoup Bonuses........................................................69
Adopt Anti-Hedging/Pledging/Speculative Investments Policy........................................................69
Bonus Banking ........................................................69
Hold Equity Past Retirement or for a Significant Period of Time........................................................69
Pre-Arranged Trading Plans (10b5-1 Plans) ........................................................70

**7.  Mergers and Corporate Restructurings ........................................................ 71**
Mergers and Acquisitions ........................................................71
Corporate Reorganization/Restructuring Plans (Bankruptcy) ........................................................71
Special Purpose Acquisition Corporations (SPACs)........................................................72
Special Purpose Acquisition Corporations (SPACs) - Proposals for Extensions ........................................................73
Spin-offs........................................................73
Asset Purchases ........................................................73
Asset Sales ........................................................73
Liquidations ........................................................73
Joint Ventures........................................................73
Appraisal Rights ........................................................73
Going Private/Dark Transactions (LBOs and Minority Squeeze-outs) ........................................................74
Private Placements/Warrants/Convertible Debentures........................................................74
Formation of Holding Company........................................................75
Value Maximization Shareholder Proposals ........................................................75

**8.  Social and Environmental Proposals ........................................................ 76**
Global Approach ........................................................76
Diversity and Equality ........................................................77
Add Women and Minorities to the Board ........................................................77
Racial Equity and/or Civil Rights Audits ........................................................77
Report on the Distribution of Stock Options by Gender and Race ........................................................78
Prepare Report/Promote EEOC-Related Activities ........................................................78
Report on Progress Towards Glass Ceiling Commission Recommendations........................................................78
Prohibit Discrimination on the Basis of Sexual Orientation or Gender Identity ........................................................79

Report on/Eliminate Use of Racial Stereotypes in Advertising.................................................................79
Gender, Race, or Ethnicity Pay Gap .........................................................................................................79
Labor and Human Rights ............................................................................................................................79
Codes of Conduct and Vendor Standards................................................................................................80
Adopt/Report on MacBride Principles.....................................................................................................81
Community Impact Assessment/Indigenous Peoples' Rights..................................................................81
Report on Risks of Outsourcing ...............................................................................................................81
Report on the Impact of Health Pandemics on Company Operations .....................................................82
Mandatory Arbitration .............................................................................................................................82
Sexual Harassment ..................................................................................................................................82
Operations in High-Risk Markets .............................................................................................................82
Reports on Operations in Burma/Myanmar ....................................................................................83
Reports on Operations in China........................................................................................................83
Product Sales to Repressive Regimes ..............................................................................................83
Internet Privacy/Censorship and Data Security................................................................................84
Disclosure on Plant Closings ...................................................................................................................85
Climate Change.............................................................................................................................................85
Say on Climate (SoC) Management Proposals.........................................................................................85
Say on Climate (SoC) Shareholder Proposals..........................................................................................85
Climate Change/Greenhouse Gas Emissions...........................................................................................86
Environmental Justice...............................................................................................................................86
Financed Emissions...................................................................................................................................86
Invest in Clean/Renewable Energy ..........................................................................................................87
Just Transition............................................................................................................................................87
Energy Efficiency........................................................................................................................................87
Natural Capital...........................................................................................................................................87
Environment ..................................................................................................................................................88
Environmental/Sustainability Reports.....................................................................................................88
Operations in Environmentally Sensitive Areas.......................................................................................89
Canadian Oil Sands ...........................................................................................................................89
Arctic National Wildlife Refuge.........................................................................................................89
Hydraulic Fracturing .................................................................................................................................90
Phase Out Chlorine-Based Chemicals ......................................................................................................90
Land Procurement and Development ......................................................................................................91
Report on the Sustainability of Concentrated Area Feeding Operations (CAFO) ...................................91
Adopt a Comprehensive Recycling Policy ................................................................................................91
Nuclear Energy..........................................................................................................................................91
Water Use ..................................................................................................................................................91
Compliance to relevant Climate Accords..................................................................................................92
Health and Safety .........................................................................................................................................92
Toxic Materials..........................................................................................................................................92
Product Safety ..........................................................................................................................................92
Workplace/Facility Safety.........................................................................................................................92
Report on Firearm Safety Initiatives........................................................................................................93
Phase-out or Label Products Containing Genetically Engineered Ingredients ........................................93

Tobacco-related Proposals ...................................................................................................93

Adopt Policy/Report on Drug Pricing .................................................................................94

Government and Military .........................................................................................................94

Prepare Report to Renounce Future Landmine Production ...............................................95

Prepare Report on Foreign Military Sales ..........................................................................95

Depleted Uranium/Nuclear Weapons ................................................................................95

Adopt Ethical Criteria for Weapons Contracts ..................................................................95

Animal Welfare ......................................................................................................................96

Animal Rights/Testing ........................................................................................................96

Political and Charitable Giving ...............................................................................................96

Lobbying Efforts .................................................................................................................96

Political Contributions/Non-Partisanship ...........................................................................97

Charitable Contributions ....................................................................................................97

Political Expenditures and Lobbying Congruency ..............................................................97

Disclosure on Prior Government Service ............................................................................98

Consumer Lending and Economic Development......................................................................98

Adopt Policy/Report on Predatory Lending Practices ........................................................98

Disclosure on Credit in Low- and Lower-middle-income Countries (LMIC) or Forgive LMIC Debt .....................98

Community Investing..........................................................................................................99

Miscellaneous ........................................................................................................................99

Adult Entertainment ..........................................................................................................99

Abortion/Right to Life Issues .............................................................................................99

Anti-Social Proposals .........................................................................................................99

Artificial Intelligence (AI) ..................................................................................................100

Tax Transparency..............................................................................................................100

Violence and Adult Themes in Video Games ....................................................................100

Link Compensation to Non-Financial Factors ...................................................................101

**9.   Mutual Fund Proxies ................................................................................................ 102**

Election of Trustees and Directors....................................................................................102

Closed End Funds- Unilateral Opt-In to Control Share Acquisition Statutes .....................102

Investment Advisory Agreement .......................................................................................102

Changing a Fundamental Restriction to a Non-fundamental Restriction...........................102

Change Fundamental Investment Objective to Non-fundamental ....................................102

Distribution Agreements ...................................................................................................103

Approving New Classes or Series of Shares .......................................................................103

Convert Closed-end Fund to Open-end Fund ....................................................................103

Proxy Contests .................................................................................................................103

Preferred Stock Proposals .................................................................................................103

Mergers ...........................................................................................................................104

Business Development Companies – Authorization to Sell Shares of Common Stock at a Price below Net Asset Value ...................................................................................................................104

Change in Fund's Subclassification ...................................................................................104

Changing the Domicile of a Fund .....................................................................................104

Case 1:26-cv-00717-MPB-MKK     Document 26-3     Filed 04/21/26     Page 18 of 1112
PageID #: 184

Disposition of Assets/Termination/Liquidation .................................................................................104

Authorizing the Board to Hire and Terminate Subadvisers Without Shareholder Approval ............................105

Name Change Proposals ...........................................................................................................................105

1940 Act Policies.......................................................................................................................................105


Case 1:26-cv-00717-MPB-MKK    Document 26-3    Filed 04/21/26    Page 19 of 1112
PageID #: 185

# INTRODUCTION

ISS' Catholic Advisory Services division recognizes that faith-based and other socially responsible investors have dual objectives: financial and social. Religious and socially responsible investors invest for economic gain, as do all investors, but they also require that companies in which they invest conduct their business in a socially and environmentally responsible manner.

The dual objectives carry through to proxy voting activity, after the security selection process is completed. In voting their shares, faith-based socially responsible institutional shareholders are concerned not only with sustainable economic returns to shareholders and good corporate governance, but also with the ethical behavior of corporations and the social and environmental impact of their actions.

Catholic Advisory Services has, therefore, developed faith-based proxy voting guidelines for Catholic and other Christian religious institutions that are consistent with the objectives of socially responsible shareholders as well as the teachings of Catholicism and Christianity as a whole. On matters of social and environmental impact, the guidelines seek to reflect a broad consensus of the faith-based socially responsible investing community. Generally, we take as our frame of reference policies and proposals promulgated by the Catholic Bishops' Pastoral on economics, the Socially Responsible Investment Guidelines adopted by the Bishops, and the policies developed by members of the Interfaith Center on Corporate Responsibility (ICCR).

On matters of corporate governance, executive compensation, and corporate structure, these faith-based proxy voting guidelines are based on a commitment to create and preserve economic value and to advance principles of best practice corporate governance and shareholder rights, consistent with responsibilities to society and the environment as a whole.

The guidelines provide an overview of Catholic Advisory Services' faith-based proxy voting policy for Catholic and other Christian denomination institutions. We note there may be cases in which the final vote recommendation varies from the vote guideline due to the fact that we closely examine the merits of each proposal and consider relevant information and company-specific circumstances in arriving at our decisions. These guidelines are revised on an annual basis to take into account emerging issues and trends on environmental, social and corporate governance topics, as well as the evolution of market standards, regulatory changes and client feedback.

Case 1:26-cv-00717-MPB-MKK    Document 26-3    Filed 04/21/26    Page 20 of 1112
PageID #: 186

# 1.  Board of Directors

A corporation's board of directors sits at the apogee of the corporate governance system. Though they normally delegate responsibility for the management of the business to the senior executives they select and oversee, directors bear ultimate responsibility for the conduct of the corporation's business. The role of directors in publicly held corporations has undergone considerable change in recent years. Once derided as rubber stamps for management, directors of public corporations today are expected to serve as effective guardians of shareholders' interests.

Voting on directors and board-related issues is the most important use of the shareholder franchise, not simply a routine proxy item. Although uncontested director elections do not present alternative nominees from whom to choose, a high percentage of opposition votes is an expression of shareholder dissatisfaction and should be sufficient to elicit a meaningful response from management.

The role and responsibilities of directors have increasingly been the subject of much discussion and debate, given the current economic climate and the difficulties many companies now face in their respective markets. Influential organizations, including the American Law Institute, the American Bar Association, the National Association of Corporate Directors, and the Business Roundtable have issued reports and recommendations regarding the duties and accountability of corporate boards. Both mainstream and alternative media outlets have highlighted the numerous gaps within risk oversight of company boards and individual directors, and many institutional investors, in response, have capitalized on their rights as stakeholders to prompt changes. Corporations have taken notice, implementing many of the reforms championed by their shareholders.

Although differences of opinion remain, a fairly strong consensus has emerged on a number of key issues. It is widely agreed that the board's most important responsibility is to ensure that the corporation is managed in the shareholders' best long-term economic interest. This will often require boards to consider the impact of their actions on other constituencies, including employees, customers, local communities, and the environment.

- The board's principal functions are widely agreed to consist of the following:
- To select, evaluate, and if necessary, replace management, including the chief executive officer;
- To review and approve major strategies and financial objectives;
- To advise management on significant issues;
- To assure that effective controls are in place to safeguard corporate assets, manage risk, and comply with the law; and
- To nominate directors and otherwise ensure that the board functions effectively.

Boards are expected to have a majority of directors independent of management. The independent directors are expected to organize much of the board's work, even if the chief executive officer also serves as Chair of the board. Key committees of the board are expected to be entirely independent of management. It is expected that boards will engage in critical self-evaluation of themselves and of individual members. Individual directors, in turn, are expected to devote significant amounts of time to their duties, to limit the number of directorships they accept, and to own a meaningful amount of stock in companies on whose boards they serve. Directors are ultimately responsible to the corporation's shareholders. The most direct expression of this responsibility is the requirement that directors be elected to their positions by the shareholders. Shareholders are also asked to vote on a number of other matters regarding the role, structure, and composition of the board. Catholic Advisory Services classifies directors as either executive, non-independent non-executive, or independent directors.

# Uncontested Election of Directors

Four broad principles apply when determining votes on director nominees:

1. _Board Accountability_: Accountability refers to the promotion of transparency into a company's governance practices and annual board elections and the provision to shareholders the ability to remove problematic directors and to vote on takeover defenses or other charter/bylaw amendments. These practices help reduce the opportunity for management entrenchment.
2. _Board Responsiveness_: Directors should be responsive to shareholders, particularly in regard to shareholder proposals that receive a majority vote or management proposals that receive significant opposition and to tender offers where a majority of shares are tendered. Furthermore, shareholders should expect directors to devote sufficient time and resources to oversight of the company.
3. _Director Independence_: Without independence from management, the board may be unwilling or unable to effectively set company strategy and scrutinize performance or executive compensation.
4. _Director Diversity/Competence_: Companies should seek a diverse board of directors who can add value to the board through their specific skills or expertise and who can devote sufficient time and commitment to serve effectively. Boards should be of a size appropriate to accommodate diversity, expertise, and independence, while ensuring active and collaborative participation by all members. Boards should be sufficiently diverse to ensure consideration of a wide range of perspectives.

**Catholic Advisory Services Recommendation:** Generally vote for director nominees, except under the following circumstances (with new nominees[1] considered on a case-by-case basis):

## Board Accountability

Vote against[2] or withhold from the entire board of directors (except new nominees, who should be considered case-by-case) for the following:

### Problematic Takeover Defenses, Capital Structure, and Governance Structure

**Classified Board Structure:** The board is classified, and a continuing director responsible for a problematic governance issue at the board/committee level that would warrant a withhold/against vote recommendation is not up for election. All appropriate nominees (except new) may be held accountable.

**Removal of Shareholder Discretion on Classified Boards:** The company has opted into, or failed to opt out of, state laws requiring a classified board structure.

**Director Performance Evaluation:** The board lacks mechanisms to promote accountability and oversight, coupled with sustained poor performance relative to peers. Sustained poor performance is measured by one-, three-, and five-year total shareholder returns in the bottom half of a company's four-digit GICS industry group (Russell 3000 companies only). Take into consideration the company's operational metrics and other factors as warranted. Problematic provisions include but are not limited to:

---

[1] A "new nominee" is a director who is being presented for election by shareholders for the first time. Recommendations on new nominees who have served for less than one year are made on a case-by-case basis depending on the timing of their appointment and the problematic governance issue in question.

[2] In general, companies with a plurality vote standard use "Withhold" as the contrary vote option in director elections; companies with a majority vote standard use "Against". However, it will vary by company, and the proxy must be checked to determine the valid contrary vote option for the particular company.

Case 1:26-cv-00717-MPB-MKK     Document 26-3     Filed 04/21/26     Page 22 of 1112
PageID #: 188



- A classified board structure;
- A supermajority vote requirements;
- Either a plurality vote standard in uncontested director elections, or a majority vote standard in contested elections;
- The inability of shareholders to call special meetings;
- The inability of shareholders to act by written consent;
- A multi-class capital structure; and/or
- A non-shareholder approved poison pill.

**Poison Pills:** Generally vote against or withhold from all nominees (except new nominees, who should be considered case-by-case) if:

- The company has a poison pill with a deadhand or slowhand feature[3];
- The board makes a material adverse modification to an existing pill, including, but not limited to, extension, renewal, or lowering the trigger, without shareholder approval; or
- The company has a long-term poison pill (with a term of over one year) that was not approved by the public shareholders[4] feature.

Vote case-by-case on nominees if the board adopts an initial short-term pill (with a term of one year or less) without shareholder approval, taking into consideration:

- The trigger threshold and other terms of the pill;
- The disclosed rationale for the adoption;
- The context in which the pill was adopted, (e.g., factors such as the company's size and stage of development, sudden changes in its market capitalization, and extraordinary industry-wide or macroeconomic events);
- A commitment to put any renewal to a shareholder vote;
- The company's overall track record on corporate governance and responsiveness to shareholders; and
- Other factors as relevant.

**Unilateral Bylaw/Charter Amendments:** Generally vote against or withhold from directors individually, committee members, or the entire board (except new nominees, who should be considered case-by-case) if the board amends the company's bylaws or charter without shareholder approval in a manner that materially diminishes shareholders' rights or that could adversely impact shareholders, considering the following factors:

- The board's rationale for adopting the bylaw/charter amendment without shareholder ratification;
- Disclosure by the company of any significant engagement with shareholders regarding the amendment;
- The level of impairment of shareholders' rights caused by the board's unilateral amendment to the bylaws/charter;
- The board's track record with regard to unilateral board action on bylaw/charter amendments or other entrenchment provisions;
- The company's ownership structure;
- The company's existing governance provisions;
- The timing of the board's amendment to the bylaws/charter in connection with a significant business development; and
- Other factors, as deemed appropriate, that may be relevant to determine the impact of the amendment on shareholders.

---

[3] If a short-term pill with a deadhand or slowhand feature is enacted but expires before the next shareholder vote, Catholic Advisory Services will generally still recommend withhold/against nominees at the next shareholder meeting following its adoption.

[4] Approval prior to, or in connection, with a company's becoming publicly-traded, or in connection with a de-SPAC transaction, is insufficient.

Case 1:26-cv-00717-MPB-MKK    Document 26-3    Filed 04/21/26    Page 23 of 1112    PageID #: 189



Unless the adverse amendment is reversed or submitted to a binding shareholder vote, in subsequent years vote case-by-case on director nominees. Generally vote against directors (except new nominees, who should be considered case-by-case) if the board:

- Classified the board;
- Adopted supermajority vote requirements to amend the bylaws or charter;
- Eliminated shareholders' ability to amend bylaws;
- Adopted a fee-shifting provision; or
- Adopted another provision deemed egregious.

**Problematic Governance Structure:** For companies that hold or held their first annual meeting[5] of public shareholders after Feb. 1, 2015, generally vote against or withhold from directors individually, committee members, or the entire board (except new nominees[1], who should be considered case-by-case) if, prior to or in connection with the company's public offering, the company or its board adopted the following bylaw or charter provisions that are considered to be materially adverse to shareholder rights:

- Supermajority vote requirements to amend the bylaws or charter;
- A classified board structure; or
- Other egregious provisions.

A provision which specifies that the problematic structure(s) will be sunset within seven years of the date of going public will be considered a mitigating factor.

Unless the adverse provision is reversed or removed, vote case-by-case on director nominees in subsequent years.

**Unequal Voting Rights:** Generally vote withhold or against directors individually, committee members, or the entire board (except new nominees[5], who should be considered case-by-case), if the company employs a multi-class capital structure with unequal voting rights[6].

Exceptions to this policy will generally be limited to:

- Newly-public companies[Error! Bookmark not defined.] with a sunset provision of no more than seven years from the date of going public;
- Limited Partnerships and the Operating Partnership (OP) unit structure of REITs;
- Convertible preferred shares that vote on an "as-converted" basis;
- Situations where the enhanced voting rights are limited in duration and applicability, such as where they are intended to overcome low voting turnout and ensure approval of a specific non-controversial agenda item and "mirrored voting" applies;
- Situations where the super-voting shares represent less than 5% of total voting power and therefore considered to be *de minimis*; or
- The company provides sufficient protections for minority shareholders, such as allowing minority shareholders a regular binding vote on whether the capital structure should be maintained.

---

[5] Includes companies that emerge from bankruptcy, SPAC transactions, spin-offs, direct listings, and those who complete a traditional initial public offering.

[6] This generally includes classes of common or preferred stock that have more votes per share than other shares; classes of shares that are not entitled to vote on all the same ballot items or nominees; or stock with time-phased voting rights ("loyalty shares"). Preferred shares that have voting rights only with respect to items that affect the rights of their holders as a class are not generally considered a problematic capital structure.

**Management Proposals to Ratify Existing Charter or Bylaw Provisions:** Vote against/withhold from individual directors, members of the governance committee, or the full board, where boards ask shareholders to ratify existing charter or bylaw provisions considering the following factors:

- The presence of a shareholder proposal addressing the same issue on the same ballot;
- The board's rationale for seeking ratification;
- Disclosure of actions to be taken by the board should the ratification proposal fail;
- Disclosure of shareholder engagement regarding the board's ratification request;
- The level of impairment to shareholders' rights caused by the existing provision;
- The history of management and shareholder proposals on the provision at the company's past meetings;
- Whether the current provision was adopted in response to the shareholder proposal;
- The company's ownership structure; and
- Previous use of ratification proposals to exclude shareholder proposals.

**Restricting Binding Shareholder Proposals:** Generally vote against or withhold support from the members of the governance committee if:

- The company's governing documents impose undue restrictions on shareholders' ability to amend the bylaws. Such restrictions include but are not limited to: outright prohibition on the submission of binding shareholder proposals or share ownership requirements, subject matter restrictions, or time holding requirements in excess of SEC Rule 14a-8. Vote against or withhold on an ongoing basis.

Submission of management proposals to approve or ratify requirements in excess of SEC Rule 14a-8 for the submission of binding bylaw amendments will generally be viewed as an insufficient restoration of shareholders' rights. Generally continue to vote against or withhold on an ongoing basis until shareholders are provided with an unfettered ability to amend the bylaws or a proposal providing for such unfettered right is submitted for shareholder approval.

## Problematic Audit-Related Practices

Vote against/withhold from the members of the audit committee if:

- The non-audit fees paid to the auditor are excessive (see discussion under "Auditor Ratification);
- The company receives an adverse opinion on the company's financial statements from its auditor; or
- There is persuasive evidence that the audit committee entered into an inappropriate indemnification agreement with its auditor that limits the ability of the company, or its shareholders, to pursue legitimate legal recourse against the audit firm.

Vote case-by-case on members of the audit committee and potentially the full board if:

- Poor accounting practices are identified that rise to a level of serious concern, such as: fraud; misapplication of GAAP; and material weaknesses identified in Section 404 disclosures. Examine the severity, breadth, chronological sequence, and duration, as well as the company's efforts at remediation or corrective actions, in determining whether withhold/against votes are warranted.

## Problematic Compensation Practices

In the absence of an Advisory Vote on Executive Compensation (say-on-pay) ballot item, or, in egregious situations, vote against/withhold from members of the compensation committee and potentially the full board if:

- There is an unmitigated misalignment between CEO pay and company performance (pay for performance);
- The company maintains significant problematic pay practices;

- The board exhibits a significant level of <u>poor communication and responsiveness</u> to shareholders;
- The company fails to include a say-on-pay ballot item when required under SEC provisions, or under the company's declared frequency of say-on-pay; or
- The company fails to include a Frequency of say-on-pay ballot item when required under SEC provisions.

**High Non-Employee Director Pay:** Generally vote against members of the board committee responsible for approving/setting non-employee director compensation if there is a pattern (i.e. two or more consecutive or non-consecutive years/across multiple years) of awarding excessive or otherwise problematic[7] non-employee director compensation without disclosing a compelling rationale or other mitigating factors.

Adverse recommendations may be warranted in the first year for director pay issues that are considered egregious.

## Problematic Pledging of Company Stock

Vote against the members of the committee that oversees risks related to pledging, or the full board, where a significant level of pledged company stock by executives or directors raises concerns. The following factors will be considered:

- The presence of an anti-pledging policy, disclosed in the proxy statement, that prohibits future pledging activity;
- The magnitude of aggregate pledged shares in terms of total common shares outstanding, market value, and trading volume;
- Disclosure of progress or lack thereof in reducing the magnitude of aggregate pledged shares over time;
- Disclosure in the proxy statement that shares subject to stock ownership and holding requirements do not include pledged company stock; and
- Any other relevant factors.

## Material Environmental, Social and Governance (ESG) Risk Oversight Failures

Vote against/withhold from directors individually, committee members, or potentially the entire board, due to:

- Material failures of governance, stewardship, risk oversight[8], or fiduciary responsibilities at the company, including failure to adequately guard against or manage ESG risks;
- A lack of sustainability reporting in the company's public documents and/or website in conjunction with a failure to adequately manage or mitigate environmental, social and governance (ESG) risks;
- Failure to replace management as appropriate; or
- Egregious actions related to a director's service on other boards that raise substantial doubt about his or her ability to effectively oversee management and serve the best interests of shareholders at any company.

## Climate Risk Mitigation and Net Zero

For companies that are significant GHG emitters[9], through its operations or value chain, generally vote against or withhold from the incumbent chair of the responsible committee (or other directors on a case-by-case basis) in

---

[7] May include performance awards, retirement benefits, or problematic perquisites.

[8] Examples of failure of risk oversight include, but are not limited to: bribery; large or serial fines or sanctions from regulatory bodies; demonstrably poor risk oversight of environmental and social issues, including climate change; significant environmental incidents including spills and pollution; large scale or repeat workplace fatalities or injuries; significant adverse legal judgments or settlements; or hedging of company stock.

[9] Companies defined as "significant GHG emitters" will be those on the current Climate Action 100+ Focus Group list.



cases where Catholic Advisory Services determines that the company is not taking the minimum steps needed to be aligned with a Net Zero by 2050 trajectory.

Minimum steps needed to be considered to be aligned with a Net Zero by 2050 trajectory are (all minimum criteria will be required to be in alignment with policy):

- The company has detailed disclosure of climate-related risks, such as according to the framework established by the Task Force on Climate-related Financial Disclosures (TCFD), including:
  - Board governance measures;
  - Corporate strategy;
  - Risk management analyses; and
  - Metrics and targets.
- The company has declared a Net Zero target by 2050 or sooner and the target includes scope 1, 2, and relevant scope 3 emissions.
- The company has set a medium-term target for reducing its GHG emissions and the targets include scope 1, 2, and relevant scope 3 emissions.
- The company has a decarbonization strategy in place, with a defined set of quantitative and qualitative actions to reach Net Zero targets.

Expectations about what constitutes "minimum steps needed to be aligned with a Net Zero by 2050 trajectory" will increase over time.

## Board Responsiveness

**Catholic Advisory Services Recommendation:** Vote case-by-case on individual directors, committee members, or the entire board of directors as appropriate if:

- The board failed to act on a shareholder proposal that received the support of a majority of the shares cast in the previous year or failed to act on a management proposal seeking to ratify an existing charter/bylaw provision that received opposition of a majority of the shares cast in the previous year. Factors that will be considered are:
  - Disclosed outreach efforts by the board to shareholders in the wake of the vote;
  - Rationale provided in the proxy statement for the level of implementation;
  - The subject matter of the proposal;
  - The level of support for and opposition to the resolution in past meetings;
  - Actions taken by the board in response to the majority vote and its engagement with shareholders;
  - The continuation of the underlying issue as a voting item on the ballot (as either shareholder or management proposals); and
  - Other factors as appropriate.
- The board failed to act on takeover offers where the majority of shares are tendered;
- At the previous board election, any director received more than 50 percent withhold/against votes of the shares cast and the company has failed to address the issue(s) that caused the high withhold/against vote.

**Catholic Advisory Services Recommendation:** Vote case-by-case on compensation committee members (or, in exceptional cases, the full board) and/or the say-on-pay proposal when the company's previous say-on-pay received support of less than 70 percent of votes cast. Factors that will be considered in assessing board responsiveness include:

- Disclosure of engagement efforts with major institutional investors, including the frequency and timing of engagements and the company participants (including whether independent directors participated);
- Disclosure of the specific concerns voiced by dissenting shareholders that led to the say-on-pay opposition; and



- Disclosure of specific and meaningful actions taken to address shareholders' concerns.

If the company discloses meaningful engagement efforts, but in addition states that it was unable to obtain specific feedback, Catholic Advisory Services will assess company actions taken in response to the say-on-pay vote as well as the company's explanation as to why such actions are beneficial for shareholders.

Addition factors that may be considered include:
- Whether the issues raised are recurring or isolated;
- The company's ownership structure;
- Significant corporate activity, such as a recent merger or proxy contest; and
- Any other compensation action or factor considered relevant to assessing board responsiveness.

If the say-on-pay support level was less than 50 percent of votes case, this would warrant the highest degree of responsiveness, as assessed under the factors noted above.

Vote case-by-case on Compensation Committee members (or, in exceptional cases, the full board) if the board implements an advisory vote on executive compensation on a less frequent basis than the frequency that received the plurality of votes cast.

## Director Independence

Vote against/withhold from the entire board if the full board is less than majority independent.

Vote against/withhold from non-independent directors (Executive Directors and Non-Independent Non-Executive Directors per the Classification of Directors) when:

- The non-independent director serves on the audit, compensation, or nominating committee;
- The company lacks an audit, compensation, or nominating committee so that the full board functions as that committee; or
- The company lacks a formal nominating committee, even if the board attests that the independent directors fulfill the functions of such a committee.

## Board Composition

**Attendance at Board and Committee Meetings:** Generally vote against or withhold from directors (except nominees who served only part of the fiscal year[10]) who attend less than 75 percent of the aggregate of their board and committee meetings for the period for which they served, unless an acceptable reason for absences is disclosed in the proxy or another SEC filing. Acceptable reasons for director absences are generally limited to the following:

- Medical issues/illness;
- Family emergencies; and
- If the director's total service was three meetings or fewer and the director missed only one meeting.

In cases of chronic poor attendance without reasonable justification, in addition to voting against the director(s) with poor attendance, generally vote against or withhold from appropriate members of the nominating/governance committees or the full board.

---

[10] Nominees who served for only part of the fiscal year are generally exempted from the attendance policy.

If the proxy disclosure is unclear and insufficient to determine whether a director attended at least 75 percent of the aggregate of his/her board and committee meetings during his/her period of service, vote against or withhold from the director(s) in question.

**Overboarded Directors:** Vote against or withhold from individual directors who:

- Sit on more than five public company boards; or
- Are CEOs of public companies who sit on the boards of more than two public companies besides their own—withhold only at their outside boards[11].

## Board Diversity

*NOTE: For shareholder meeting reports published on or after February 25th, 2025, Institutional Shareholder Services (ISS) has indefinitely halted the consideration of the gender and racial and/or ethnic diversity of a company's board when making vote recommendations with respect to the election or re-election of directors at U.S. companies covered by these guidelines under its proprietary ISS U.S. Catholic Faith-Based Specialty policy.*

**Catholic Advisory Services Recommendation:** Generally vote against or withhold from incumbent nominees if:

- The board is not comprised of at 40 percent underrepresented gender identities[12]; or
- The board is not comprised of at least 20 percent racially or ethnically diverse directors.

Vote against or withhold from other directors on a case-by-case basis.

## Classification of Directors – U.S.

1. **Executive Director**
   1.1.  Current officer[i] of the company or one of its affiliates[ii].

2. **Non-Independent Non-Executive Director**
   Board Identification
   2.1.  Director identified as not independent by board.
   Controlling/Significant Shareholder
   2.2.  Beneficial owner of more than 50 percent of the company's voting power (this may be aggregated if voting power is distributed among more than one member of a group).
   Current Employment at Company or Related Company
   2.3.  Non-officer employee of the firm (including employee representatives).
   2.4.  Officer[i], former officer, or general or limited partner of a joint venture or partnership with the company.
   Former Employment
   2.5.  Former CEO of the company[iii,iv].
   2.6.  Former non-CEO officer[i] of the company, or an affiliate[ii] within the past five years.
   2.7.  Former officer[i] of an acquired company within the past five years[iv].
   2.8.  Officer[i] of a former parent or predecessor firm at the time the company was sold or split off within the past five years.
   2.9.  Former interim officer if the service was longer than 18 months. If the service was between 12 and 18 months an assessment of the interim officer's employment agreement will be made[v].

---

[11] Although all of a CEO's subsidiary boards will be counted as separate boards, Catholic Advisory Services will not recommend a withhold vote for the CEO of a parent company board or any of the controlled (>50 percent ownership) subsidiaries of that parent, but may do so at subsidiaries that are less than 50 percent controlled and boards outside the parent/subsidiary relationships.

[12] Underrepresented gender identities include directors who identify as women or as non-binary.



Family Members

2.10. Immediate family member*vi* of a current or former officer*i* of the company or its affiliates*ii* within the last five years.

2.11. Immediate family member*vi* of a current employee of company or its affiliates*ii* where additional factors raise concern (which may include, but are not limited to, the following: a director related to numerous employees; the company or its affiliates employ relatives of numerous board members; or a non-Section 16 officer in a key strategic role).

Professional, Transactional, and Charitable Relationships

2.12. Director who (or whose immediate family member*vi*) currently provides professional services*vii* in excess of $10,000 per year to: the company, an affiliate*ii*, or an individual officer of the company or an affiliate; or who is (or whose immediate family member*vi* is) a partner, employee, or controlling shareholder of an organization which provides the services.

2.13. Director who (or whose immediate family member*vi* ) currently has any material transactional relationship*viii* with the company or its affiliates*ii*; or who is (or whose immediate family member*vi* is) a partner in, or a controlling shareholder or an executive officer of, an organization which has the material transactional relationship*viii* (excluding investments in the company through a private placement).

2.14. Director who (or whose immediate family member*vi* is) a trustee, director, or employee of a charitable or non-profit organization that receives material grants or endowments*viii* from the company or its affiliates*ii*.

Other Relationships

2.15. Party to a voting agreement*ix* to vote in line with management on proposals being brought to shareholder vote.

2.16. Has (or an immediate family member*vi* has) an interlocking relationship as defined by the SEC involving members of the board of directors or its compensation committee*x*.

2.17. Founder*xi* of the company but not currently an employee.

2.18. Director with pay comparable to Named Executive Officers.

2.19. Any material*xii* relationship with the company.

3. **Independent Director**

3.1.  No material*xii* connection to the company other than a board seat.

**Footnotes:**

*i* The definition of officer will generally follow that of a "Section 16 officer" (officers subject to Section 16 of the Securities and Exchange Act of 1934) and includes: the chief executive, operating, financial, legal, technology, and accounting officers of a company (including the president, treasurer, secretary, controller, or any vice president in charge of a principal business unit, division, or policy function). Current interim officers are included in this category. For private companies, the equivalent positions are applicable. A non-employee director serving as an officer due to statutory requirements (e.g. corporate secretary) will generally be classified as a Non-Independent Non-Executive Director under "Any material relationship with the company." However, if the company provides explicit disclosure that the director is not receiving additional compensation exceeding $10,000 per year for serving in that capacity, then the director will be classified as an Independent Director.

*ii* "Affiliate" includes a subsidiary, sibling company, or parent company. Catholic Advisory Services uses 50 percent control ownership by the parent company as the standard for applying its affiliate designation. The manager/advisor of an externally managed issuer (EMI) is considered an affiliate.

*iii* Includes any former CEO of the company prior to the company's initial public offering (IPO).

*iv* When there is a former CEO of a special purpose acquisition company (SPAC) serving on the board of an acquired company, Catholic Advisory Services will generally classify such directors as independent unless determined otherwise taking into account the following factors: the applicable listing standards determination of such director's independence; any operating ties to the firm; and the existence of any other conflicting relationships or related party transactions.



*v* Catholic Advisory Services will look at the terms of the interim officer's employment contract to determine if it contains severance pay, long-term health and pension benefits, or other such standard provisions typically contained in contracts of permanent, non-temporary CEOs. Catholic Advisory Services will also consider if a formal search process was under way for a full-time officer at the time.

*vi* "Immediate family member" follows the SEC's definition of such and covers spouses, parents, children, step-parents, step-children, siblings, in-laws, and any person (other than a tenant or employee) sharing the household of any director, nominee for director, executive officer, or significant shareholder of the company.

*vii* Professional services can be characterized as advisory in nature, generally involve access to sensitive company information or to strategic decision-making, and typically have a commission- or fee-based payment structure. Professional services generally include, but are not limited to the following: investment banking/financial advisory services; commercial banking (beyond deposit services); investment services; insurance services; accounting/audit services; consulting services; marketing services; legal services; property management services; realtor services; lobbying services; executive search services; and IT consulting services. The following would generally be considered transactional relationships and not professional services: deposit services; IT tech support services; educational services; and construction services. The case of participation in a banking syndicate by a non-lead bank should be considered a transactional (and hence subject to the associated materiality test) rather than a professional relationship. "Of Counsel" relationships are only considered immaterial if the individual does not receive any form of compensation (in excess of $10,000 per year) from, or is a retired partner of, the firm providing the professional service. The case of a company providing a professional service to one of its directors or to an entity with which one of its directors is affiliated, will be considered a transactional rather than a professional relationship. Insurance services and marketing services are assumed to be professional services unless the company explains why such services are not advisory.

*viii* A material transactional relationship, including grants to non-profit organizations, exists if the company makes annual payments to, or receives annual payments from, another entity exceeding the greater of $200,000 or 5 percent of the recipient's gross revenues, in the case of a company which follows NASDAQ listing standards; or the greater of $1,000,000 or 2 percent of the recipient's gross revenues, in the case of a company which follows NYSE listing standards. In the case of a company which follows neither of the preceding standards, Catholic Advisory Services will apply the NASDAQ-based materiality test. (The recipient is the party receiving the financial proceeds from the transaction).

*ix* Dissident directors who are parties to a voting agreement pursuant to a settlement or similar arrangement may be classified as Independent Directors if an analysis of the following factors indicates that the voting agreement does not compromise their alignment with all shareholders' interests: the terms of the agreement; the duration of the standstill provision in the agreement; the limitations and requirements of actions that are agreed upon; if the dissident director nominee(s) is subject to the standstill; and if there any conflicting relationships or related party transactions.

*x* Interlocks include: executive officers serving as directors on each other's compensation or similar committees (or, in the absence of such a committee, on the board); or executive officers sitting on each other's boards and at least one serves on the other's compensation or similar committees (or, in the absence of such a committee, on the board).

*xi* The operating involvement of the founder with the company will be considered; if the founder was never employed by the company, Catholic Advisory Services may deem him or her an Independent Director.

*xii* For purposes of Catholic Advisory Services' director independence classification, "material" will be defined as a standard of relationship (financial, personal or otherwise) that a reasonable person might conclude could potentially influence one's objectivity in the boardroom in a manner that would have a meaningful impact on an individual's ability to satisfy requisite fiduciary standards on behalf of shareholders.



## Board-Related Management Proposals

### Classification/Declassification of the Board

Under a classified board structure only one class of directors would stand for election each year, and the directors in each class would generally serve three-year terms. Although staggered boards can provide continuity for companies at the board level, there are also a number of downsides to the structure. First, a classified board can also be used to entrench management and effectively preclude most takeover bids or proxy contests. Board classification forces dissidents and would-be acquirers to negotiate with the incumbent board, which has the authority to decide on offers without a shareholder vote. In addition, when a board is classified, it is difficult to remove individual members for either poor attendance or poor performance; shareholders would only have the chance to vote on a given director every third year when he or she comes up for election. The classified board structure can also limit shareholders' ability to withhold votes from inside directors that sit on key board committee, or to withhold votes from an entire board slate to protest the lack of board diversity. According to ISS' 2012 Board Practices study, the number of S&P 500 companies with classified boards has continued to fall. In 2015, only 17 percent of S&P 500 companies maintained staggered boards, compared to 2 percent in 2014, 30 percent in 2013, 41 percent in 2009 and 53 percent in 2005. While we recognize that there are some advantages to classified boards, based on the latest studies on classified boards, the fact that classified boards can make it more difficult for shareholders to remove individual directors, and the fact that classified boards can be used as an antitakeover device, Catholic Advisory Services recommends against the adoption of classified boards.

**Catholic Advisory Services Recommendation:**

- Vote for proposals to repeal classified boards and to elect all directors annually.
- Vote against proposals to classify (stagger) the board of directors.

### Majority Vote Threshold for Director Elections

**Catholic Advisory Services Recommendation:** Generally vote for management proposals to adopt a majority of votes cast standard for directors in uncontested elections.

Vote against if no carve-out for plurality in contested elections is included.

### Cumulative Voting

Most corporations provide that shareholders are entitled to cast one vote for each share owned. Under a cumulative voting scheme, the shareholder is permitted to have one vote per share for each director to be elected. Shareholders are permitted to apportion those votes in any manner they wish among the director candidates. Shareholders have the opportunity to elect a minority representative to a board through cumulative voting, thereby ensuring representation for all sizes of shareholders. For example, if there is a company with a ten-member board and 500 shares outstanding, the total number of votes that may be cast is 5,000. In this case a shareholder with 51 shares (10.2 percent of the outstanding shares) would be guaranteed one board seat because all votes may be cast for one candidate.

**Catholic Advisory Services Recommendation:** Generally vote against management proposals to eliminate cumulative voting, and for shareholder proposals to restore or provide for cumulative voting unless:

- The company has proxy access[13], thereby allowing shareholders to nominate directors to the company's ballot; and
- The company has adopted a majority vote standard, with a carve-out for plurality voting in situations where there are more nominees than seats, and a director resignation policy to address failed elections.

Vote for proposals for cumulative voting at controlled companies (insider voting power > 50%).

## Director and Officer Indemnification, Liability Protection, and Exculpation

**Catholic Advisory Services Recommendation:** Vote case-by-case on proposals on director and officer indemnification, liability protection, and exculpation[14].

Consider the stated rationale for the proposed change. Also consider, among other factors, the extent to which the proposal would:

- Eliminate directors' and officers' liability for monetary damages for violating the duty of care.
- Eliminate directors' and officers' liability for monetary damages for violating the duty of loyalty.
- Expand coverage beyond just legal expenses to liability for acts that are more serious violations of fiduciary obligation than mere carelessness.
- Expand the scope of indemnification to provide for mandatory indemnification of company officials in connection with acts that previously the company was permitted to provide indemnification for, at the discretion of the company's board (*i.e.*, "permissive indemnification"), but that previously the company was not required to indemnify.

Vote for those proposals providing such expanded coverage in cases when a director's or officer's legal defense was unsuccessful if both of the following apply:

- If the individual was found to have acted in good faith and in a manner that the individual reasonably believed was in the best interests of the company; and

If only the individual's legal expenses would be covered.

## Shareholder Ability to Remove Directors/Fill Vacancies

Shareholder ability to remove directors, with or without cause, is either prescribed by a state's business corporation law, an individual company's articles of incorporation, or its bylaws. Many companies have sought shareholder approval for charter or bylaw amendments that would prohibit the removal of directors except for cause, thus ensuring that directors would retain their directorship for their full-term unless found guilty of self-dealing. By requiring cause to be demonstrated through due process, management insulates the directors from removal even if a director has been performing poorly, not attending meetings, or not acting in the best interests of shareholders.

---

[13] A proxy access right that meets the recommended guidelines.

[14] **Indemnification**: the condition of being secured against loss or damage.

**Limited liability**: a person's financial liability is limited to a fixed sum, or personal financial assets are not at risk if the individual loses a lawsuit that results in financial award/damages to the plaintiff.

**Exculpation**: to eliminate or limit the personal liability of a director or officer to the corporation or its shareholders for monetary damages for breach of fiduciary duty as a director or officer.



**Catholic Advisory Services Recommendation:**

- Vote against proposals that provide that directors may be removed only for cause.
- Vote for proposals to restore shareholder ability to remove directors with or without cause.
- Vote against proposals that provide that only continuing directors may elect replacements to fill board vacancies.
- Vote for proposals that permit shareholders to elect directors to fill board vacancies.

## Board Size

Proposals which would allow management to increase or decrease the size of the board at its own discretion are often used by companies as a takeover defense. Catholic Advisory Services supports management proposals to fix the size of the board at a specific number, thus preventing management, when facing a proxy contest, from increasing the board size without shareholder approval. By increasing the size of the board, management can make it more difficult for dissidents to gain control of the board. Fixing the size of the board also prevents a reduction in the size of the board as a strategy to oust independent directors. Fixing board size also prevents management from increasing the number of directors in order to dilute the effects of cumulative voting.

**Catholic Advisory Services Recommendation:**

- Vote for proposals that seek to fix the size of the board.
- Vote case-by-case on proposals that seek to change the size or range of the board.
- Vote against proposals that give management the ability to alter the size of the board outside of a specific range without shareholder approval.

## Establish/Amend Nominee Qualifications

**Catholic Advisory Services Recommendation:** Vote case-by-case on proposals that establish or amend director qualifications. Votes should be based on how reasonable the criteria are and to what degree they may preclude dissident nominees from joining the board.

## Board Refreshment

Board refreshment is best implemented through an ongoing program of individual director evaluations, conducted annually, to ensure the evolving needs of the board are met and to bring in fresh perspectives, skills, and diversity as needed.

**Term/Tenure Limits**

**Catholic Advisory Services Recommendation:** Vote case-by-case on management proposals regarding director term/tenure limits, considering:

- The rationale provided for adoption of the term/tenure limit;
- The robustness of the company's board evaluation process;
- Whether the limit is of sufficient length to allow for a broad range of director tenures;
- Whether the limit would disadvantage independent directors compared to non-independent directors; and
- Whether the board will impose the limit evenly, and not have the ability to waive it in a discriminatory manner.

Case 1:26-cv-00717-MPB-MKK    Document 26-3    Filed 04/21/26    Page 34 of 1112
PageID #: 200

UNITED STATES
2025 CATHOLIC FAITH–BASED PROXY VOTING GUIDELINES

ISS

24 of 106



**Age Limits**

**Catholic Advisory Services Recommendation:** Generally vote against management proposal to limit the tenure of independent directors through mandatory retirement ages. Vote for proposals to remove mandatory age limits.

# Board-Related Shareholder Proposals/Initiatives

## Proxy Contests/Proxy Access

Contested elections of directors frequently occur when a board candidate or slate runs for the purpose of seeking a significant change in corporate policy or control. Competing slates will be evaluated based upon the personal qualifications of the candidates, the economic impact of the policies that they advance, and their expressed and demonstrated commitment to the interests of all shareholders.

**Catholic Advisory Services Recommendation:** Votes in a contested election of directors are evaluated on a case-by-case basis, considering the following factors:

- Long-term financial performance of the target company relative to its industry;
- Management's track record;
- Background to the proxy contest;
- Qualifications of director nominees (both slates);
- Strategic plan of dissident slate and quality of critique against management;
- Likelihood that the proposed goals and objectives can be achieved (both slates);
- Stock ownership positions; and
- Impact on stakeholders, such as job loss, community lending, equal opportunity, impact on environment.

In the case of candidates nominated pursuant to proxy access, vote case-by-case considering any applicable factors listed above or additional factors which may be relevant, including those that are specific to the company, to the nominee(s) and/or to the nature of the election (such as whether or not there are more candidates than board seats).

## Annual Election (Declassification) of the Board

**Catholic Advisory Services Recommendation:** Vote for shareholder proposals to repeal classified (staggered) boards and to elect all directors annually.

Vote against proposals to classify the board.

## Majority Threshold Voting Shareholder Proposals

A majority vote standard requires that for directors to be elected (or re-elected) to serve on the company's board they must receive support from holders of a majority of shares voted. Shareholders have expressed strong support for shareholder proposals on majority threshold voting. Catholic Advisory Services believes shareholders should have a greater voice in the election of directors and believes majority threshold voting represents a viable alternative to the plurality system in the U.S. Companies are strongly encouraged to also adopt a post-election policy (also known as a director resignation policy) that will provide guidelines so that the company will promptly address the situation of a holdover director.

**Catholic Advisory Services Recommendation:** Vote for precatory and binding resolutions requesting that the board change the company's bylaws to stipulate that directors need to be elected with an affirmative majority of

Case 1:26-cv-00717-MPB-MKK    Document 26-3    Filed 04/21/26    Page 35 of 1112
PageID #: 201



votes cast, provided it does not conflict with the state law where the company is incorporated. Binding resolutions need to allow for a carve-out for a plurality vote standard when there are more nominees than board seats.

## Majority of Independent Directors

Catholic Advisory Services believes that a board independent from management is of vital importance to a company and its shareholders. Accordingly, Catholic Advisory Services will cast votes in a manner that shall encourage the independence of boards.

**Catholic Advisory Services Recommendation:**

- Vote for shareholder proposals asking that a majority or more of directors be independent unless the board composition already meets the proposed threshold by Catholic Advisory Services' definition of independence (See Classification of Directors).
- Vote for shareholder proposals to strengthen the definition of independence for board directors.

## Establishment of Independent Committees

Most corporate governance experts agree that the key board committees (audit, compensation, and nominating/corporate governance) of a corporation should include only independent directors. The independence of key committees has been encouraged by regulation. Catholic Advisory Services believes that initiatives to increase the independent representation of these committees or to require that these committees be independent should be supported.

**Catholic Advisory Services Recommendation:** Vote for shareholder proposals asking that board audit, compensation, and/or nominating committees be composed exclusively of independent directors.

## Independent Board Chair

One of the principal functions of the board is to monitor and evaluate the performance of the CEO. The chairperson's duty to oversee management is obviously compromised when he or she is required to monitor himself or herself; or when he or she is a non-independent director. Generally Catholic Advisory Services recommends a vote for shareholder proposals that would require that the position of board chair be held by an individual with no materials ties to the company other than their board seat.

**Catholic Advisory Services Recommendation:** Vote for shareholder proposals that would require the board chair to be independent of management.

## Establishment of Board Committees

**Catholic Advisory Services Recommendation:** Generally vote for shareholder proposals to establish a new board committee to address broad corporate policy topics or to provide a forum for ongoing dialogue on issues such as the environment, human or labor rights, shareholder relations, occupational health and safety etc. when the formation of such committees appears to be a potentially effective method of protecting or enhancing shareholder value. In evaluating such proposals, the following factors will be considered:

- Existing oversight mechanisms (including current committee structure) regarding the issue for which board oversight is sought;
- Level of disclosure regarding the issue for which board oversight is sought;
- Company performance related to the issue for which board oversight is sought;

Case 1:26-cv-00717-MPB-MKK    Document 26-3    Filed 04/21/26    Page 36 of 1112    PageID #: 202



- Board committee structure compared to that of other companies in its industry sector; and
- The scope and structure of the proposal.

## Establish/Amend Nominee Qualifications

**Catholic Advisory Services Recommendation:** Vote case-by-case on proposals that establish or amend director qualifications. Votes should be based on the reasonableness of the criteria and to what degree they may preclude dissident nominees from joining the board.

Vote case-by-case on proposals that establish or amend director qualifications. Votes should be based on the reasonableness of the criteria and to what degree they may preclude dissident nominees from joining the board.

Vote case-by-case on shareholder resolutions seeking a director nominee candidate who possesses a particular subject matter expertise, considering:

- The company's board committee structure, existing subject matter expertise, and board nomination provisions relative to that of its peers;
- The company's existing board and management oversight mechanisms regarding the issue for which board oversight is sought;
- The company's disclosure and performance relating to the issue for which board oversight is sought and any significant related controversies; and
- The scope and structure of the proposal.

## Board Policy on Shareholder Engagement

**Catholic Advisory Services Recommendation:** Vote for shareholders proposals requesting that the board establish an internal mechanism/process, which may include a committee, in order to improve communications between directors and shareholders, unless the company has the following features, as appropriate:

- Established a communication structure that goes beyond the exchange requirements to facilitate the exchange of information between shareholders and members of the board;
- Effectively disclosed information with respect to this structure to its shareholders;
- The company has not ignored majority-supported shareholder proposals or a majority withhold vote on a director nominee; and
- The company has an independent chair or a lead director (according to Catholic Advisory Services' definition). This individual must be made available for periodic consultation and direct communication with major shareholders.

## Proxy Access

**Catholic Advisory Services Recommendation:** Generally vote for management and shareholder proposals for proxy access with the following provisions:

- **Ownership threshold:** maximum requirement not more than three percent (3%) of the voting power;
- **Ownership duration:** maximum requirement not longer than three (3) years of continuous ownership for each member of the nominating group;
- **Aggregation:** minimal or no limits on the number of shareholders permitted to form a nominating group;
- **Cap:** cap on nominees of generally twenty-five percent (25%) of the board.

Review for reasonableness any other restrictions on the right of proxy access.

Case 1:26-cv-00717-MPB-MKK    Document 26-3    Filed 04/21/26    Page 37 of 1112 PageID #: 203



Generally vote against proposals that are more restrictive than these guidelines.

## Board Refreshment

### Term/Tenure Limits

Supporters of term limits argue that this requirement would bring new ideas and approaches to a board. However, we prefer to look at directors and their contributions to the board individually rather than impose a strict rule.

**Catholic Advisory Services Recommendation:** Vote case-by-case on shareholder proposals asking for the company to adopt director term/tenure limits, considering:

- The scope of the shareholder proposal; and
- Evidence of problematic issues at the company combined with, or exacerbated by, a lack of board refreshment.

### Age Limits

**Catholic Advisory Services Recommendation:** Generally vote against shareholder proposals to limit the tenure of independent directors through mandatory retirement ages. Vote for proposals to remove mandatory age limits.

## CEO Succession Planning

**Catholic Advisory Services Recommendation:** Generally vote for proposals seeking disclosure on a CEO succession planning policy, considering at a minimum, the following factors:

- The reasonableness/scope of the request; and
- The company's existing disclosure on its current CEO succession planning process.

## Vote No Campaigns

**Catholic Advisory Services Recommendation:** In cases where companies are targeted in connection with public "vote no" campaigns, evaluate director nominees under the existing governance policies for voting on director nominees in uncontested elections. Take into consideration the arguments submitted by shareholders and other publicly available information.



# 2.  Ratification of Auditors

Annual election of the outside accountants is best practice standard. While it is recognized that the company is in the best position to evaluate the competence of the outside accountants, we believe that outside accountants must ultimately be accountable to shareholders. A Blue Ribbon Commission report concluded that audit committees must improve their current level of oversight of independent accountants. Given the rash of accounting misdeeds that were not detected by audit panels or auditors, shareholder ratification is an essential step in restoring investor confidence. Shareholders should have the right to weigh in on the choice of the audit firm, and all companies should put ratification on the ballot of their annual meeting. Special consideration will be given when non-audit fees exceed audit fees, as high non-audit fees can compromise the independence of the auditor. Catholic Advisory Services will also monitor both auditor tenure and whether auditor ratification has been pulled from the ballot.

**Catholic Advisory Services Recommendation:** Vote for proposals to ratify auditors, unless any of the following apply:

- The non-audit fees paid represent 25 percent or more of the total fees paid to the auditor;
- An auditor has a financial interest in or association with the company, and is therefore not independent;
- There is reason to believe that the independent auditor has rendered an opinion that is neither accurate nor indicative of the company's financial position; or
- Poor accounting practices are identified that rise to a serious level of concern, such as: fraud; misapplication of GAAP; and material weaknesses identified in Section 404 disclosures.

## Auditor-Related Shareholder Proposals

### Ratify Auditors/Ensure Auditor Independence

These shareholder proposals request that the board allow shareholders to ratify the company's auditor at each annual meeting. Annual ratification of the outside accountants is standard practice. While it is recognized that the company is in the best position to evaluate the competence of the outside accountants, we believe that outside accountants must ultimately be accountable to shareholders.

Given the rash of accounting irregularities that were not detected by audit panels or auditors, shareholder ratification is an essential step in restoring investor confidence. Catholic Advisory Services believes that shareholders should have the ability to ratify the auditor on an annual basis.

**Catholic Advisory Services Recommendation:**

- Vote for shareholder proposals to allow shareholders to vote on auditor ratification.
- Vote for proposals that ask a company to adopt a policy on auditor independence.
- Vote for proposals that seek to limit the non-audit services provided by the company's auditor.

### Auditor Rotation

To minimize any conflict of interest that may rise between the company and its auditor, Catholic Advisory Services supports the rotation of auditors. Currently, SEC rules provide that partners should be rotated every five years. However, Catholic Advisory Services also believes that the long tenure of audit firms at U.S. companies can be problematic.



**Catholic Advisory Services Recommendation:** Vote for shareholder proposals to rotate company's auditor every five years or more. Catholic Advisory Services believes that proposing a rotation period less than five years is unreasonably restrictive and may negatively affect audit quality and service while increasing expense.



# 3.  Takeover Defenses / Shareholder Rights

Corporate takeover attempts come in various guises. Usually, a would-be acquirer makes a direct offer to the board of directors of a targeted corporation. The bidder may offer to purchase the company for cash and/or stock. If the board approves the offer, a friendly transaction is completed and presented to shareholders for approval. If, however, the board of directors rejects the bid, the acquirer can make a tender offer for the shares directly to the targeted corporation's shareholders. Such offers are referred to as hostile tender bids.

Not wishing to wait until they are subjects of hostile takeover attempts, many corporations have adopted antitakeover measures designed to deter unfriendly bids or buy time. The most common defenses are the shareholders rights protection plan, also known as the poison pill, and charter amendments that create barriers to acceptance of hostile bids.  In the U.S., poison pills do not require shareholder approval. However, shareholders must approve charter amendments, such as classified boards or supermajority vote requirements. In brief, the very existence of defensive measures can foreclose the possibility of tenders and hence, opportunities to premium prices for shareholders.

Anti-takeover statutes generally increase management's potential for insulating itself and warding off hostile takeovers that may be beneficial to shareholders. While it may be true that some boards use such devices to obtain higher bids and to enhance shareholder value, it is more likely that such provisions are used to entrench management. The majority of historical evidence on individual corporate anti-takeover measures indicates that heavily insulated companies generally realize lower returns than those having managements that are more accountable to shareholders and the market. The evidence also suggests that when states adopt their own anti-takeover devices, or endorse those employed by firms, shareholder returns are harmed. Moreover, the body of evidence appears to indicate that companies in states with the strongest anti-takeover laws experience lower returns than they would absent such statutes.

## Takeover Defenses and Shareholder Rights-Related Management Proposals

### Poison Pills (Shareholder Rights Plans)

Poison pills are corporate-sponsored financial devices that, when triggered by potential acquirers, do one or more of the following: 1) dilute the acquirer's equity holdings in the target company; 2) dilute the acquirer's voting interests in the target company; or 3) dilute the acquirer's equity holdings in the post-merger company. Poison pills generally allow shareholders to purchase shares from, or sell shares back to, the target company (flip-in pill) and/or the potential acquirer (flip-out pill) at a price far out of line with fair market value. Depending on the type of pill, the triggering event can either transfer wealth from the target company or dilute the equity holdings of current shareholders. Poison pills insulate management from the threat of a change in control and provide the target board with veto power over takeover bids. Because poison pills greatly alter the balance of power between shareholders and management, shareholders should be allowed to make their own evaluation of such plans.

**Catholic Advisory Services Recommendation:** Vote case-by-case on management proposals on poison pill ratification, focusing on the features of the shareholder rights plan. Rights plans should contain the following attributes:

- No lower than a 20 percent trigger, flip-in or flip-over provision;
- A term of no more than three years;
- No deadhand, slowhand, no-hand or similar feature that limits the ability of a future board to redeem the pill;



- Shareholder redemption feature (qualifying offer clause); if the board refuses to redeem the pill 90 days after a qualifying offer is announced, 10 percent of the shares may call a special meeting or seek a written consent to vote on rescinding the pill; and
- In addition, the rationale for adopting the pill should be thoroughly explained by the company. In examining the request for the pill, take into consideration the company's existing governance structure, including: board independence, existing takeover defenses, and any problematic governance concerns.

## Net Operating Loss (NOL) Poison Pills/Protective Amendments

The financial crisis has prompted widespread losses in certain industries. This has resulted in previously profitable companies considering the adoption of a poison pill and/or NOL protective amendment to protect their NOL tax assets, which may be lost upon an acquisition of 5 percent of a company's shares.

When evaluating management proposals seeking to adopt NOL pills or protective amendments, the purpose behind the proposal, its terms, and the company's existing governance structure should be taken into account to assess whether the structure actively promotes board entrenchment or adequately protects shareholder rights. While Catholic Advisory Services acknowledges the high estimated tax value of NOLs, which benefit shareholders, the ownership acquisition limitations contained in an NOL pill/protective amendment coupled with a company's problematic governance structure could serve as an antitakeover device.

Given the fact that shareholders will want to ensure that such an amendment does not remain in effect permanently, Catholic Advisory Services will also closely review whether the pill/amendment contains a sunset provision or a commitment to cause the expiration of the NOL pill/protective amendment upon exhaustion or expiration of the NOLs.

**Catholic Advisory Services Recommendation:** Vote against proposals to adopt a poison pill for the stated purpose of protecting a company's net operating losses ("NOLs") if the term of the pill would exceed the shorter of three years and the exhaustion of the NOL.

Vote case-by-case on management proposals for poison pill ratification, considering the following factors, if the term of the pill would be the shorter of three years (or less) and the exhaustion of the NOL:

- The ownership threshold to transfer (NOL pills generally have a trigger slightly below 5%);
- The value of the NOLs;
- Shareholder protection mechanisms (sunset provision, or commitment to cause expiration of the pill upon exhaustion or expiration of NOLs);
- The company's existing governance structure including: board independence, existing takeover defenses, track record of responsiveness to shareholders, and any other problematic governance concerns; and
- Any other factors that may be applicable.

Vote against proposals to adopt a protective amendment for the stated purpose of protecting a company's net operating losses ("NOLs") if the effective term of the protective amendment would exceed the shorter of three years and the exhaustion of the NOL.

Vote case-by-case, considering the following factors, for management proposals to adopt an NOL protective amendment that would remain in effect for the shorter of three years (or less) and the exhaustion of the NOL:

- The ownership threshold (NOL protective amendments generally prohibit stock ownership transfers that would result in a new 5-percent holder or increase the stock ownership percentage of an existing five-percent holder);
- The value of the NOLs;



- Shareholder protection mechanisms (sunset provision or commitment to cause expiration of the protective amendment upon exhaustion or expiration of the NOL);
- The company's existing governance structure including; board independence, existing takeover defenses, track record of responsiveness to shareholders, and any other problematic governance concerns;
- Any other factors that may be applicable.

## Ratification Proposals: Management Proposals to Ratify Existing Charter or Bylaw Provisions

**Catholic Advisory Services Recommendation:** Generally vote against management proposals to ratify provisions of the company's existing charter or bylaws, unless these governance provisions align with best practice.

In addition, voting against/withhold from individual directors, members of the governance committee, or the full board may be warranted, considering:

- The presence of a shareholder proposal addressing the same issue on the same ballot;
- The board's rationale for seeking ratification;
- Disclosure of actions to be taken by the board should the ratification proposal fail;
- Disclosure of shareholder engagement regarding the board's ratification request;
- The level of impairment to shareholders' rights caused by the existing provision;
- The history of management and shareholder proposals on the provision at the company's past meetings;
- Whether the current provision was adopted in response to the shareholder proposal;
- The company's ownership structure; and
- Previous use of ratification proposals to exclude shareholder proposals.

## Supermajority Shareholder Vote Requirements

Supermajority provisions violate the principle that a simple majority of voting shares should be all that is necessary to effect change at a company.

**Catholic Advisory Services Recommendation:**

- Vote for proposals to reduce supermajority shareholder vote requirements for charter amendments, mergers and other significant business combinations. For companies with shareholder(s) who own a significant amount of company stock, vote case-by-case, taking into account: a) ownership structure; b) quorum requirements; and c) supermajority vote requirements.
- Vote against proposals to require a supermajority shareholder vote for charter amendments, mergers and other significant business combinations.

## Shareholder Ability to Call a Special Meeting

Most state corporation statutes allow shareholders to call a special meeting when they want to take action on certain matters that arise between regularly scheduled annual meetings. Sometimes this right applies only if a shareholder or a group of shareholders own a specified percentage of shares, with 10 percent being the most common. Shareholders may lose the ability to remove directors, initiate a shareholder resolution, or respond to a beneficial offer without having to wait for the next scheduled meeting if they are unable to act at a special meeting of their own calling.



**Catholic Advisory Services Recommendation:**

- Vote for proposals that provide shareholders with the ability to call special meetings taking into account: a) shareholders' current right to call special meetings; b) minimum ownership threshold necessary to call special meetings (10% preferred); c) the inclusion of exclusionary or prohibitive language; d) investor ownership structure; and e) shareholder support of and management's response to previous shareholder proposals.
- Vote against proposals to restrict or prohibit shareholders' ability to call special meetings.

## Shareholder Ability to Act by Written Consent

Consent solicitations allow shareholders to vote on and respond to shareholder and management proposals by mail without having to act at a physical meeting. A consent card is sent by mail for shareholder approval and only requires a signature for action. Some corporate bylaws require supermajority votes for consent while at others, standard annual meeting rules apply. Shareholders may lose the ability to remove directors, initiate a shareholder resolution, or respond to a beneficial offer without having to wait for the next scheduled meeting if they are unable to act at a special meeting of their own calling.

**Catholic Advisory Services Recommendation:**

- Generally vote against proposals to restrict or prohibit shareholders' ability to take action by written consent.
- Vote for proposals to allow or facilitate shareholder action by written consent, taking into consideration: a) shareholders' current right to act by written consent; b) consent threshold; c) the inclusion of exclusionary or prohibitive language; d) Investor ownership structure; and e) shareholder support of and management's response to previous shareholder proposals.
- Vote case-by-case on shareholder proposals if, in addition to the considerations above, the company has the following governance and antitakeover provisions; a) an unfettered[15] right for shareholders to call special meetings at a 10 percent threshold; b) a majority vote standard in uncontested director elections; c) no non-shareholder-approved pill, and; d) an annually elected board.

## Advance Notice Requirements for Shareholder Proposals/Nominations

In 2008, the Delaware courts handed down two decisions, which, read together, indicate a judicial move toward a narrower interpretation of companies' advance notice bylaws. These recent court decisions have encouraged companies to take a closer look at their bylaw provisions to ensure that broad language does not provide loopholes for activist investors. Specifically, companies are including language designed to provide more detailed advance notice provisions and to ensure full disclosure of economic and voting interests in a shareholder's notice of proposals, including derivatives and hedged positions.

**Catholic Advisory Services Recommendation:** Vote case-by-case on advance notice proposals, giving support to those proposals which allow shareholders to submit proposals/nominations as close to the meeting date as reasonably possible and within the broadest window possible, recognizing the need to allow sufficient notice for company, regulatory and shareholder review.

To be reasonable, the company's deadline for shareholder notice of a proposal/ nominations must be no earlier than 120 days prior to the anniversary of the previous year's meeting and have a submittal window of no shorter

---

[15] "Unfettered" means no restrictions on agenda items, no restrictions on the number of shareholders who can group together to reach the 10 percent threshold, and only reasonable limits on when a meeting can be called: no greater than 30 days after the last annual meeting and no greater than 90 prior to the next annual meeting.



than 30 days from the beginning of the notice period (also known as a 90-120 day window). The submittal window is the period under which a shareholder must file their proposals/nominations prior to the deadline.

In general, support additional efforts by companies to ensure full disclosure in regard to a proponent's economic and voting position in the company so long as the informational requirements are reasonable and aimed at providing shareholders with the necessary information to review such proposals.

## Fair Price Provisions

Fair price provisions were originally designed to specifically defend against the most coercive of takeover devises, the two-tiered, front-end loaded tender offer. In such a hostile takeover, the bidder offers cash for enough shares to gain control of the target. At the same time the acquirer states that once control has been obtained, the target's remaining shares will be purchased with cash, cash and securities or only securities. Since the payment offered for the remaining stock is, by design, less valuable than the original offer for the controlling shares, shareholders are forced to sell out early to maximize their value. Standard fair price provisions require that, absent board or shareholder approval of the acquisition, the bidder must pay the remaining shareholders the same price for their shares that brought control.

**Catholic Advisory Services Recommendation:**

- Vote case-by-case on proposals to adopt fair price provisions evaluating factors such as the vote required to approve the proposed acquisition, the vote required to repeal the fair price provision, and the mechanism for determining the fair price.
- Generally, vote against fair price provisions with shareholder vote requirements greater than a majority of disinterested shares.

## Greenmail

Greenmail payments are targeted share repurchases by management of company stock from individuals or groups seeking control of the company. Since only the hostile party receives payment, usually at a substantial premium over the market value of shares, the practice discriminates against most shareholders. This transferred cash, absent the greenmail payment, could be put to much better use for reinvestment in the company, payment of dividends, or to fund a public share repurchase program.

**Catholic Advisory Services Recommendation:**

- Vote for proposals to adopt antigreenmail charter or bylaw amendments or otherwise restrict a company's ability to make greenmail payments.
- Review on a case-by-case basis antigreenmail proposals when they are bundled with other charter or bylaw amendments.

## Confidential Voting

Confidential voting, or voting by secret ballot, is one of the key structural issues in the proxy system. It ensures that all votes are based on the merits of proposals and cast in the best interests of fiduciary clients and pension plan beneficiaries. In a confidential voting system, only vote tabulators and inspectors of elections may examine individual proxies and ballots; management and shareholders are given only vote totals. In an open voting system, management can determine who has voted against its nominees or proposals and then re-solicit those votes before the final vote count. As a result, shareholders can be pressured to vote with management at companies with which they maintain, or would like to establish, a business relationship. Confidential voting also protects



employee shareholders from retaliation. Shares held by employee stock ownership plans, for example, are important votes that are typically voted by employees.

**Catholic Advisory Services Recommendation:** Vote for management proposals to adopt confidential voting.

## Control Share Acquisition Provisions

Control share acquisition statutes function by denying shares their voting rights when they contribute to ownership in excess of certain thresholds. Voting rights for those shares exceeding ownership limits may only be restored by approval of either a majority or supermajority of disinterested shares. Thus, control share acquisition statutes effectively require a hostile bidder to put its offer to a shareholder vote or risk voting disenfranchisement if the bidder continues buying up a large block of shares.

**Catholic Advisory Services Recommendation:**

- Vote for proposals to opt out of control share acquisition statutes unless doing so would enable the completion of a takeover that would be detrimental to shareholders.
- Vote against proposals to amend the charter to include control share acquisition provisions.
- Vote for proposals to restore voting rights to the control shares.

## Control Share Cash-Out Provisions

Control share cash-out statutes give dissident shareholders the right to "cash-out" of their position in a company at the expense of the shareholder who has taken a control position. In other words, when an investor crosses a preset threshold level, remaining shareholders are given the right to sell their shares to the acquirer, who must buy them at the highest acquiring price.

**Catholic Advisory Services Recommendation:** Vote for proposals to opt out of control share cash-out statutes.

## Disgorgement Provisions

Disgorgement provisions require an acquirer or potential acquirer of more than a certain percentage of a company's stock to disgorge, or pay back, to the company any profits realized from the sale of that company's stock purchased 24 months before achieving control status. All sales of company stock by the acquirer occurring within a certain period of time (between 18 months and 24 months) prior to the investor's gaining control status are subject to these recapture-of-profits provisions.

**Catholic Advisory Services Recommendation:** Vote for proposals to opt out of state disgorgement provisions.

## State Takeover Statutes

**Catholic Advisory Services Recommendation:** Vote case-by-case on proposals to opt in or out of state takeover statutes (including control share acquisition statutes, control share cash-out statutes, freezeout provisions, fair price provisions, stakeholder laws, poison pill endorsements, severance pay and labor contract provisions, antigreenmail provisions, and disgorgement provisions).

Vote for opting into stakeholder protection statutes if they provide comprehensive protections for employees and community stakeholders. Catholic Advisory Services would be less supportive of takeover statutes that only serve to protect incumbent management from accountability to shareholders and which negatively influence shareholder value.



## Freeze-Out Provisions

Freeze-out provisions force an investor who surpasses a certain ownership threshold in a company to wait a specified period of time before gaining control of the company.

**Catholic Advisory Services Recommendation:** Vote for proposals to opt out of state freeze-out provisions.

## Reincorporation Proposals

**Catholic Advisory Services Recommendation:** Vote case-by-case on proposals to change a company's state of incorporation giving consideration to both financial and corporate governance concerns including the following:

- Reasons for reincorporation;
- Comparison of company's governance practices and provisions prior to and following the reincorporation;
- Comparison of corporation laws of original state and destination state.

Reincorporations into "tax havens" will be given special consideration.

While a firm's country of incorporation will remain the primary basis for evaluating companies, Catholic Advisory Services will generally apply U.S. policies to the extent possible with respect to issuers that file DEF 14As, 10-K annual reports, and 10-Q quarterly reports, and are thus considered domestic issuers by the U.S. Securities and Exchange Commission (SEC). Corporations that have reincorporated outside the U.S. have found themselves subject to a combination of governance regulations and best practice standards that may not be entirely compatible with an evaluation framework based solely on country of incorporation.

## Amend Bylaws without Shareholder Consent

**Catholic Advisory Services Recommendation:** Vote against proposals giving the board exclusive authority to amend the bylaws.

Vote for proposals giving the board the ability to amend the bylaws in addition to shareholders.

## Shareholder Litigation Rights

### Federal Forum Selection Provisions

Federal forum selection provisions require that U.S. federal courts be the sole forum for shareholders to litigate claims arising under federal securities law.

**Catholic Advisory Services Recommendation:** Generally vote for federal forum selection provisions in the charter or bylaws that specify "the district courts of the United States" as the exclusive forum for federal securities law matters, in the absence of serious concerns about corporate governance or board responsiveness to shareholders.

Vote against provisions that restrict the forum to a particular federal district court; unilateral adoption (without a shareholder vote) of such a provision will generally be considered a one-time failure under the Unilateral Bylaw/Charter Amendments policy.

## Exclusive Forum Provisions for State Law Matters

Exclusive forum provisions in the charter or bylaws restrict shareholders' ability to bring derivative lawsuits against the company, for claims arising out of state corporate law, to the courts of a particular state (generally the state of incorporation).

**Catholic Advisory Services Recommendation:** Generally vote for charter or bylaw provisions that specify courts located within the state of Delaware as the exclusive forum for corporate law matters for Delaware corporations, in the absence of serious concerns about corporate governance or board responsiveness to shareholders.

For states other than Delaware, vote case-by-case on exclusive forum provisions, taking into consideration:

- The company's stated rationale for adopting such a provision;
- Disclosure of past harm from duplicative shareholder lawsuits in more than one forum;
- The breadth of application of the charter or bylaw provision, including the types of lawsuits to which it would apply and the definition of key terms; and
- Governance features such as shareholders' ability to repeal the provision at a later date (including the vote standard applied when shareholders attempt to amend the charter or the bylaws) and their ability to hold directors accountable through annual director elections and a majority vote standard in uncontested elections.

Generally vote against provisions that specify a state other than the state of incorporation as the exclusive forum for corporate law matters, or that specify a particular local court within the state; unilateral adoption of such a provision will generally be considered a one-time failure under the Unilateral Bylaw/Charter Amendments policy.

## Fee Shifting

Fee-shifting provisions in the charter or bylaws require that a shareholder who sues a company unsuccessfully pay all litigation expenses of the defendant corporation and its directors and officers.

**Catholic Advisory Services Recommendation:** Generally vote against provisions that mandate fee-shifting whenever plaintiffs are not completely successful on the merits (i.e., including cases where the plaintiffs are partially successful).

Unilateral adoption of a fee-shifting provision will generally be considered an ongoing failure under the Unilateral Bylaw/Charter Amendments policy.

# Takeover Defenses and Shareholder Rights-Related Shareholder Proposals

## Shareholder Proposals to put Pill to a Vote and/or Adopt a Pill Policy

**Catholic Advisory Services Recommendation:** Vote for shareholder proposals requesting that the company submit its poison pill to a shareholder vote or redeem it unless the company has: 1) a shareholder approved poison pill in place; or 2) The company has adopted a policy concerning the adoption of a pill in the future specifying that the board will only adopt a shareholder rights plan if either:

- Shareholders have approved the adoption of the plan; or
- The board, in its exercise of its fiduciary responsibilities, determines that it is in the best interest of shareholders under the circumstances to adopt a pill without the delay in adoption that would result from

Case 1:26-cv-00717-MPB-MKK    Document 26-3    Filed 04/21/26    Page 48 of 1112 PageID #: 214



seeking stockholder approval (i.e., the "fiduciary out" provision). A poison pill adopted under this fiduciary out will be put to a shareholder ratification vote within 12 months of adoption or expire. If the pill is not approved by a majority of the votes cast on this issue, the plan will immediately terminate.

If the shareholder proposal calls for a time period of less than 12 months for shareholder ratification after adoption, vote for the proposal, but add the caveat that a vote within 12 months would be considered sufficient implementation.

## Reduce Supermajority Vote Requirements

Supermajority provisions violate the principle that a simple majority of voting shares should be all that is necessary to effect change regarding a company.

**Catholic Advisory Services Recommendation:**

- Vote for shareholder proposals to lower supermajority shareholder vote requirements for charter and bylaw amendments.
- Vote for shareholder proposals to lower supermajority shareholder vote requirements for mergers and other significant business combinations.

## Remove Antitakeover Provisions

There are numerous antitakeover mechanisms available to corporations that can make takeovers prohibitively expensive for a bidder or at least guarantee that all shareholders are treated equally. The debate over antitakeover devices centers on whether these devices enhance or detract from shareholder value. One theory argues that a company's board, when armed with these takeover protections, may use them as negotiating tools to obtain a higher premium for shareholders. The opposing view maintains that managements afforded such protection are more likely to become entrenched than to actively pursue the best interests of shareholders. Such takeover defenses also serve as obstacles to the normal functioning of the marketplace which, when operating efficiently, should replace incapable and poorly performing managements.

**Catholic Advisory Services Recommendation:** Vote for shareholder proposals that seek to remove antitakeover provisions.

## Reimburse Proxy Solicitation Expenses

**Catholic Advisory Services Recommendation:** Vote case-by-case on proposals to reimburse proxy solicitation expenses. When voting in conjunction with support of a dissident slate, vote for the reimbursement of all appropriate proxy solicitation expenses associated with the election.

Vote for shareholder proposals calling for the reimbursement of reasonable costs incurred in connection with nominating one or more candidates in a contested election where the following apply:

- The election of fewer than 50 percent of the directors to be elected is contested in the election;
- One or more of the dissident's candidates is elected;
- Shareholders are not permitted to cumulate their votes for directors;
- The election occurred, and the expenses were incurred, after the adoption of this bylaw.

Case 1:26-cv-00717-MPB-MKK     Document 26-3     Filed 04/21/26     Page 49 of 1112
PageID #: 215



## Virtual Shareholder Meetings

**Catholic Advisory Services Recommendation:** Generally vote for management proposals allowing for the convening of shareholder meetings by electronic means, so long as they do not preclude in-person meetings. Companies are encouraged to disclose the circumstances under which virtual-only[16] meetings would be held, and to allow for comparable rights and opportunities for shareholders to participate electronically as they would have during an in-person meeting.

Vote case-by-case on shareholder proposals concerning virtual-only meetings, considering:

- Scope and rationale of the proposal; and
- Concerns identified with the company's prior meeting practices.

---

[16] Virtual-only shareholder meeting" refers to a meeting of shareholders that is held exclusively using technology without a corresponding in-person meeting.

ISS▷

# 4. Miscellaneous Governance Provisions

## Bundled Proposals

**Catholic Advisory Services Recommendation:** Review on a case-by-case basis bundled or "conditional" proxy proposals. In the case of items that are conditioned upon each other, examine the benefits and costs of the packaged items. In instances where the joint effect of the conditioned items is not in shareholders' best interests, vote against the proposals. If the combined effect is positive, support such proposals.

## Adjourn Meeting

Companies may ask shareholders to adjourn a meeting in order to solicit more votes. Generally, shareholders already have enough information to make their voting decisions. Once their votes have been cast, there is no justification for spending more money to continue pressing shareholders for more votes.

**Catholic Advisory Services Recommendation:**

- Generally vote against proposals to provide management with the authority to adjourn an annual or special meeting absent compelling reasons to support the proposal.
- Vote for proposals that relate specifically to soliciting votes for a merger or transaction if supporting that merger or transaction. Vote against proposals if the wording is too vague or if the proposal includes "other business."

## Changing Corporate Name

Proposals to change a company's name are generally routine matters. Generally, the name change reflects a change in corporate direction or the result of a merger agreement.

**Catholic Advisory Services Recommendation:** Vote for changing the corporate name unless there is compelling evidence that the change would adversely affect shareholder value.

## Amend Quorum Requirements

**Catholic Advisory Services Recommendation:** Vote against proposals to reduce quorum requirements for shareholder meetings below a majority of the shares outstanding, taking into consideration:

- The new quorum threshold requested;
- The rationale presented for the reduction;
- The market capitalization of the company (size, inclusion in indices);
- The company's ownership structure;
- Previous voter turnout or attempts to achieve quorum;
- Any provisions or commitments to restore quorum to a majority of shares outstanding, should voter turnout improve sufficiently; and
- Other factors as appropriate.

In general, a quorum threshold kept as close to a majority of shares outstanding as is achievable is preferred.

Vote case-by-case on directors who unilaterally lower the quorum requirements below a majority of the shares outstanding, taking into consideration the factors listed above.

## Amend Minor Bylaws

**Catholic Advisory Services Recommendation:** Vote for bylaw or charter changes that are of a housekeeping nature (updates or corrections).

## Other Business

Other business proposals are routine items to allow shareholders to raise other issues and discuss them at the meeting. Only issues that may be legally discussed at meetings may be raised under this authority. However, shareholders cannot know the content of these issues, so they are generally not supported.

**Catholic Advisory Services Recommendation:** Generally vote against other business proposals.

# 5.  Capital Structure

The equity in a corporate enterprise (that is, the residual value of the company's assets after the payment of all debts) belongs to the shareholders. Equity securities may be employed, or manipulated, in a manner that will ultimately enhance or detract from shareholder value. As such, certain actions undertaken by management in relation to a company's capital structure can be of considerable significance to shareholders. Changes in capitalization usually require shareholder approval or ratification.

## Common Stock Authorization

State statutes and stock exchanges require shareholder approval for increases in the number of common shares. Corporations increase their supply of common stock for a variety of ordinary business purposes: raising new capital, funding stock compensation programs, business acquisitions, and implementation of stock splits or payment of stock dividends.

### General Authorization Requests

**Catholic Advisory Services Recommendation:** Vote case-by-case on proposals to increase the number of authorized shares of common stock that are to be used:

- If share usage (outstanding plus reserved) is less than 50% of the current authorized shares, vote for an increase of up to **50**% of current authorized shares.
- If share usage is 50% to 100% of the current authorized, vote for an increase of up to **100**% of current authorized shares.
- If share usage is greater than current authorized shares, vote for an increase of up to the current share usage.
- In the case of a stock split, the allowable increase is calculated (per above) based on the post-split adjusted authorization.

Generally vote against proposed increases, even if within the above ratios, if the proposal or the company's prior or ongoing use of authorized shares is problematic, including, but not limited to:

- The proposal seeks to increase the number of authorized shares of the class of common stock that has superior voting rights to other share classes;
- On the same ballot is a proposal for a reverse split for which support is warranted despite the fact that it would result in an excessive increase in the share authorization;
- The company has a non-shareholder approved poison pill (including an NOL pill); or
- The company has previous sizeable placements (within the past 3 years) of stock with insiders at prices substantially below market value, or with problematic voting rights, without shareholder approval.

However, generally vote for proposed increases beyond the above ratios or problematic situations when there is disclosure of specific and severe risks to shareholders of not approving the request, such as:

- In, or subsequent to, the company's most recent 10-K filing, the company discloses that there is substantial doubt about its ability to continue as a going concern;
- The company states that there is a risk of imminent bankruptcy or imminent liquidation if shareholders do not approve the increase in authorized capital; or
- A government body has in the past year required the company to increase its capital ratios.

For companies incorporated in states that allow increases in authorized capital without shareholder approval, generally vote withhold or against all nominees if a unilateral capital authorization increase does not conform to the above policies.

### Specific Authorization Requests

**Catholic Advisory Services Recommendation:** Generally vote for proposals to increase the number of authorized common shares where the primary purpose of the increase is to issue shares in connection with transaction(s) (such as acquisitions, SPAC transactions, private placements, or similar transactions) on the same ballot, or disclosed in the proxy statement, that warrant support. For such transactions, the allowable increase will be the greater of:

- twice the amount needed to support the transactions on the ballot, and
- the allowable increase as calculated for general issuances above.

## Issue Stock for Use with Rights Plan

**Catholic Advisory Services Recommendation:** Vote against proposals that increase authorized common stock for the explicit purpose of implementing a non-shareholder approved shareholder rights plan (poison pill).

## Stock Distributions: Splits and Dividends

**Catholic Advisory Services Recommendation:** Generally vote for management proposals to increase the common share authorization for stock split or stock dividend, provided that the effective increase in authorized shares is equal to or is less than the allowable increase calculated in accordance with Catholic Advisory Services' Common Stock Authorization policy.

## Reverse Stock Splits

Reverse splits exchange multiple shares for a lesser amount to increase share price. Increasing share price is sometimes necessary to restore a company's share price to a level that will allow it to be traded on the national stock exchanges. In addition, some brokerage houses have a policy of not monitoring or investing in very low priced shares. Reverse stock splits help maintain stock liquidity.

**Catholic Advisory Services Recommendation:** Vote for management proposals to implement a reverse stock split if:

- The number of authorized shares will be proportionately reduced; or
- The effective increase in authorized shares is equal to or less than the allowable increase calculated in accordance with Catholic Advisory Services' Common Stock Authorization policy.

Vote case-by-case on proposals that do not meet either of the above conditions, taking into consideration the following factors:

- Stock exchange notification to the company of a potential delisting;
- Disclosure of substantial doubt about the company's ability to continue as a going concern without additional financing;
- The company's rationale; or
- Other factors as applicable.

## Preferred Stock Authorization

Preferred stock is an equity security which has certain features similar to debt instruments, such as fixed dividend payments, seniority of claims to common stock, and in most cases no voting rights. The terms of blank check

preferred stock give the board of directors the power to issue shares of preferred stock at their discretion—with voting rights, conversion, distribution and other rights to be determined by the board at time of issue. Blank check preferred stock can be used for sound corporate purposes but could be used as a device to thwart hostile takeovers without shareholder approval.

## General Authorization Requests

**Catholic Advisory Services Recommendation:** Vote case-by-case on proposals to increase the number of authorized shares of preferred stock that are used for general corporate services:

- If share usage (outstanding plus reserved) is less than 50% of the current authorized shares, vote for an increase of up to **50**% of current authorized shares.
- If share usage is 50% to 100% of the current authorized, vote for an increase of up to **100**% of current authorized shares.
- If share usage is greater than current authorized shares, vote for an increase of up to the current share usage.
- In the case of a stock split, the allowable increase is calculated (per above) based on the post-split adjusted authorization.
- If no preferred shares are currently issued and outstanding, vote against the request, unless the company discloses a specific use for the shares.

Generally vote against proposed increases, even if within the above ratios, if the proposal or the company's prior or ongoing use of authorized shares is problematic, including, but not limited to:

- If the shares requested are blank check preferred shares that can be used for antitakeover purposes;[17]
- The company seeks to increase a class of non-convertible preferred shares entitled to more than one vote per share on matters that do not solely affect the rights of preferred stockholders "supervoting shares");
- The company seeks to increase a class of convertible preferred shares entitled to a number of votes greater than the number of common shares into which they're convertible ("supervoting shares") on matters that do not solely affect the rights of preferred stockholders;
- The stated intent of the increase in the general authorization is to allow the company to increase an existing designated class of supervoting preferred shares;
- On the same ballot is a proposal for a reverse split for which support is warranted despite the fact that it would result in an excessive increase in the share authorization;
- The company has a non-shareholder approved poison pill (including an NOL pill); or
- The company has previous sizeable placements (within the past 3 years) of stock with insiders at prices substantially below market value, or with problematic voting rights, without shareholder approval.

However, generally vote for proposed increases beyond the above ratios or problematic situations when there is disclosure of specific and severe risks to shareholders of not approving the request, such as:

- In, or subsequent to, the company's most recent 10-K filing, the company discloses that there is substantial doubt about its ability to continue as a going concern;
- The company states that there is a risk of imminent bankruptcy or imminent liquidation if shareholders do not approve the increase in authorized capital; or
- A government body has in the past year required the company to increase its capital ratios.

---

[17] To be acceptable, appropriate disclosure would be needed that the shares are "declawed": i.e., representation by the board that it will not, without prior stockholder approval, issue or use the preferred stock for any defensive or anti-takeover purpose or for the purpose of implementing any stockholder rights plan.



For companies incorporated in states that allow increases in authorized capital without shareholder approval, generally vote withhold or against all nominees if a unilateral capital authorization increase does not conform to the above policies.

## Specific Authorization Requests

**Catholic Advisory Services Recommendation:** Generally vote for proposals to increase the number of authorized preferred shares where the primary purpose of the increase is to issue shares in connection with transaction(s) (such as acquisitions, SPAC transactions, private placements, or similar transactions) on the same ballot, or disclosed in the proxy statement, that warrant support.  For such transactions, the allowable increase will be the greater of:

- twice the amount needed to support the transactions on the ballot, and
- the allowable increase as calculated for general issuances above.

## Blank Check Preferred Stock

**Catholic Advisory Services Recommendation:**

- Vote against proposals that would authorize the creation of new classes of preferred stock with unspecified voting, conversion, dividend distribution, and other rights ("blank check" preferred stock).
- Vote against proposals to increase the number of blank check preferred stock authorized for issuance when no shares have been issued or reserved for a specific purpose.
- Vote for proposals to create "declawed" blank check preferred stock (stock that cannot be used as a takeover defense).
- Vote for requests to require shareholder approval for blank check authorizations.

## Adjustments to Par Value of Common Stock

Stock that has a fixed per share value that is on its certificate is called par value stock. The purpose of par value stock is to establish the maximum responsibility of a stockholder in the event that a corporation becomes insolvent. Proposals to reduce par value come from certain state level requirements for regulated industries such as banks, and other legal requirements relating to the payment of dividends.

**Catholic Advisory Services Recommendation:**

- Vote for management proposals to reduce the par value of common stock unless the action is being taken to facilitate an anti-takeover device or some other negative corporate governance action.
- Vote for management proposals to eliminate par value.

## Unequal Voting Rights/Dual Class Structure

Incumbent managers use unequal voting rights with the voting rights of their common shares superior to other shareholders in order to concentrate their power and insulate themselves from the wishes of the majority of shareholders. Dual class exchange offers involve a transfer of voting rights from one group of shareholders to another group of shareholders typically through the payment of a preferential dividend. A dual class recapitalization also establishes two classes of common stock with unequal voting rights but initially involves an equal distribution of preferential and inferior voting shares to current shareholders.

**Catholic Advisory Services Recommendation:** Generally vote against proposals to create a new class of common stock unless:



- The company discloses a compelling rationale for the dual-class capital structure, including: a) the company's auditor has concluded that there is substantial doubt about the company's ability to continue as a going concern; or b) the new class of shares will be transitory;
- The new class is intended for financing purposes with minimal or no dilution to current shareholders in both the short term and long term; and
- The new class is not designed to preserve or increase the voting power of an insider or significant shareholder.

Generally vote against proposals to create a new class of preferred stock with voting rights superior to the common stock unless:

- The preferred shares are convertible into common shares and vote on an "as converted" basis prior to conversion, or
- The enhanced voting rights of the preferred shares have limited duration and applicability and the shares are voting in a way that mirrors the votes of the common shares (i.e., where such shares are intended to overcome low voting turnout and ensure approval of a specific non-controversial agenda item such as a reverse stock split needed to avoid a delisting).

## Preemptive Rights

Preemptive rights permit shareholders to share proportionately in any new issues of stock of the same class. These rights guarantee existing shareholders the first opportunity to purchase shares of new issues of stock in the same class as their own and in the same proportion. The absence of these rights could cause stockholders' interest in a company to be reduced by the sale of additional shares without their knowledge and at prices unfavorable to them. Preemptive rights, however, can make it difficult for corporations to issue large blocks of stock for general corporate purposes. Both corporations and shareholders benefit when corporations are able to arrange issues without preemptive rights that do not result in a substantial transfer of control.

**Catholic Advisory Services Recommendation:** Review on a case-by-case basis proposals to create or abolish preemptive rights. In evaluating proposals on preemptive rights, we look at the size of a company, the characteristics of its shareholder base and the liquidity of the stock.

## Debt Restructurings

Proposals to increase common and/or preferred shares and to issue shares as part of a debt-restructuring plan will be analyzed considering the following issues:

- _Dilution_: How much will the ownership interest of existing shareholders be reduced, and how extreme will dilution to any future earnings be?
- _Change in Control_: Will the transaction result in a change in control/management at the company? Are board and committee seats guaranteed? Do standstill provisions and voting agreements exist? Is veto power over certain corporate actions in place?
- _Financial Issues_: company's financial situation, degree of need for capital, use of proceeds, and effect of the financing on the company's cost of capital;
- _Terms of the offer_: discount/premium in purchase price to investor including any fairness opinion, termination penalties and exit strategy;
- _Conflict of interest_: arm's length transactions and managerial incentives;
- _Management's efforts to pursue other alternatives_.

**Catholic Advisory Services Recommendation:**

- Review on a case-by-case basis proposals regarding debt restructurings.



- Vote for the debt restructuring if it is expected that the company will file for bankruptcy if the transaction is not approved.

## Share Repurchase Programs

**Catholic Advisory Services Recommendation:** For U.S.-incorporated companies, and foreign-incorporated U.S. Domestic Issuers that are traded solely on U.S. exchanges, vote for management proposals to institute open-market share repurchase plans in which all shareholders may participate on equal terms, or to grant the board authority to conduct open-market repurchases, in the absence of company-specific concerns regarding:

- Greenmail,
- The use of buybacks to inappropriately manipulate incentive compensation metrics,
- Threats to the company's long-term viability, or
- Other company-specific factors as warranted.

Vote case-by-case on proposals to repurchase shares directly from specified shareholders, balancing the stated rationale against the possibility for the repurchase authority to be misused, such as to repurchase shares from insiders at a premium to market price.

## Conversion of Securities

**Catholic Advisory Services Recommendation:** Vote case-by-case on proposals regarding conversion of securities, taking into account the dilution to existing shareholders, the conversion price relative to market value, financial issues, control issues, termination penalties, and conflicts of interest.

Vote for the conversion if it is expected that the company will be subject to onerous penalties or will be forced to file for bankruptcy if the transaction is not approved.

## Recapitalization

**Catholic Advisory Services Recommendation:** Vote case-by-case on recapitalizations (reclassifications of securities), taking into account:

- Whether the capital structure is simplified;
- Liquidity is enhanced;
- Fairness of conversion terms;
- Impact on voting power and dividends;
- Reasons for the reclassification;
- Conflicts of interest;
- Other alternatives considered.

## Tracking Stock

**Catholic Advisory Services Recommendation:** Vote case-by-case on the creation of tracking stock, weighing the strategic value of the transaction against such factors as:

- Adverse governance changes;
- Excessive increases in authorized capital stock;
- Unfair method of distribution;
- Diminution of voting rights;



- Adverse conversion features;
- Negative impact on stock option plans;
- Alternatives such as spin-offs.

## Share Issuance Mandates at U.S. Domestic Issuers Incorporated Outside the U.S.

**Catholic Advisory Services Recommendation:** For U.S. domestic issuers incorporated outside the U.S. and listed <u>solely</u> on a U.S. exchange, generally vote for resolutions to authorize the issuance of common shares up to 20 percent of currently issued common share capital, where not tied to a specific transaction or financing proposal.

For pre-revenue or other early-stage companies that are heavily reliant on periodic equity financing, generally vote for resolutions to authorize the issuance of common shares up to 50 percent of currently issued common share capital. The burden of proof will be on the company to establish that it has a need for the higher limit.

Renewal of such mandates should be sought at each year's annual meeting.

Vote case-by-case on share issuances for a specific transaction or financing proposal.



# 6.  Executive and Director Compensation

The global financial crisis resulted in significant erosion of shareholder value and highlighted the need for greater assurance that executive compensation is principally performance-based, fair, reasonable, and not designed in a manner that would incentivize excessive risk-taking by managements. The financial crisis raised questions about the role of pay incentives in influencing executive behavior and motivating inappropriate or excessive risk-taking that could threaten a corporation's long-term viability. The safety lapses that led to the disastrous explosions at BP's Deepwater Horizon oil rig and Massey Energy's Upper Big Branch mine, and the resulting unprecedented losses in shareholder value; a) underscore the importance of incorporating meaningful economic incentives around social and environmental considerations in compensation program design, and b) exemplify the costly liabilities of failing to do so.

Evolving disclosure requirements have opened a wider window into compensation practices and processes, giving shareholders more opportunity and responsibility to ensure that pay is designed to create and sustain value. Companies in the U.S. are now required to evaluate and discuss potential risks arising from misguided or misaligned compensation programs. The Dodd-Frank Wall Street Reform and Consumer Protection Act requires advisory shareholder votes on executive compensation (management say-on-pay"), an advisory vote on the frequency of say-on-pay, as well as a shareholder advisory vote on golden parachute compensation. The advent of say-on-pay votes for shareholders in the U.S. has provided a new communication mechanism and impetus for constructive engagement between shareholders and managers/directors on pay issues.

The socially responsible investing community contends that corporations should be held accountable for their actions and decisions, including those around executive compensation. Catholic Advisory Services believes that executive pay programs should be fair, competitive, reasonable, and create appropriate incentives, and that pay for performance should be a central tenet in executive compensation philosophy. Most investors expect corporations to adhere to certain best practice pay considerations in designing and administering executive and director compensation programs, including:

- *Appropriate pay-for-performance alignment with emphasis on long-term shareholder value*: executive pay practices must be designed to attract, retain, and appropriately motivate the key employees who drive shareholder value creation over the long term. Evaluating appropriate alignment of pay incentives with shareholder value creation includes taking into consideration, among other factors, the link between pay and performance, the mix between fixed and variable pay, equity-based plan costs, and performance goals - including goals tied to social and environmental considerations.
- *Avoiding arrangements that risk "pay for failure"*: this includes assessing the appropriateness of long or indefinite contracts, excessive severance packages, guaranteed compensation, and practices or policies that fail to adequately mitigate against or address environmental, social and governance failures.
- *Independent and effective compensation committees*: oversight of executive pay programs by directors with appropriate skills, knowledge, experience, and a sound process for compensation decision-making (e.g., including access to independent expertise and advice when needed) should be promoted.
- *Clear and comprehensive compensation disclosures*: shareholders expect companies to provide informative and timely disclosures that enable shareholders to evaluate executive pay practices fully and fairly.
- *Avoiding inappropriate pay to non-executive directors*: compensation to outside directors should not compromise their independence and ability to make appropriate judgments in overseeing managers' pay and performance. At the market level, this may incorporate a variety of generally accepted best practices.

A non-exhaustive list of best pay practices includes:

- *Employment contracts:* Companies should enter into employment contracts under limited circumstances for a short time period (e.g., new executive hires for a three-year contract) for limited executives. The contracts should not have automatic renewal feature and should have a specified termination date.



- *Severance agreements:* Severance provisions should not be so appealing that they become an incentive for the executive to be terminated. Severance provisions should exclude excise tax gross-up. The severance formula should be reasonable and not overly generous to the executive (e.g., severance multiples of 1X, 2X, or 3X and use pro-rated target/average historical bonus and not maximum bonus). Failure to renew employment contract, termination under questionable events, or poor performance should not be considered as appropriate reasons for severance payments.

- *Change-in-control payments:* Change-in-control payments should only be made when there is a significant change in company ownership structure, and when there is a loss of employment or substantial change in job duties associated with the change in company ownership structure ("double-triggered"). Change-in-control provisions should exclude excise tax gross-up and eliminate the acceleration of vesting of equity awards upon a change in control unless provided under a double-trigger scenario. Similarly, change in control provisions in equity plans should be double-triggered. A change in control event should not result in an acceleration of vesting of all unvested stock options or removal of vesting/performance requirements on restricted stock/performance shares, unless there is a loss of employment or substantial change in job duties.

- *Supplemental executive retirement plans (SERPs):* SERPS should not include sweeteners that can increase the SERP value significantly or even exponentially, such as additional years of service credited for pension calculation, inclusion of variable pay (e.g. bonuses and equity awards) into the formula. Pension formula should not include extraordinary annual bonuses paid close to retirement years, and should be based on the average, not the maximum level of compensation earned.

- *Deferred compensation:* Above-market returns or guaranteed minimum returns should not be applied on deferred compensation.

- *Disclosure practices:* The Compensation Discussion & Analysis should be written in plain English, with as little "legalese" as possible and formatted using section headers, bulleted lists, tables, and charts where possible to ease reader comprehension. Ultimately, the document should provide detail and rationale regarding compensation, strategy, pay mix, goals/metrics, challenges, competition and pay for performance linkage, etc. in a narrative fashion.

- *Responsible use of company stock:* Companies should adopt policies that prohibit executives from speculating in company's stock or using company stock in hedging activities, such as "cashless" collars, forward sales, equity swaps or other similar arrangements. Such behavior undermines the ultimate alignment with long-term shareholders' interests. In addition, the policy should prohibit or discourage the use of company stock as collateral for margin loans, to avoid any potential sudden stock sales (required upon margin calls), that could have a negative impact on the company's stock price.

- *Long-term focus:* Executive compensation programs should be designed to support companies' long-term strategic goals. A short-term focus on performance does not necessarily create sustainable shareholder value, since long-term goals may be sacrificed to achieve short-term expectations. Compensation programs embedding a long-term focus with respect to company goals better align with the long-term interests of shareholders. Granting stock options and restricted stock to executives that vest in five years do not necessarily provide a long-term focus, as executives can sell the company shares once they vest. However, requiring senior executives to hold company stock until they retire can encourage a long-term focus on company performance.

## Criteria for Evaluating Executive Pay

### Pay-for-Performance Evaluation

Catholic Advisory Services conducts a five-part pay analysis to evaluate the degree of alignment between the CEO's pay with the company's performance over a sustained period. From a shareholders' perspective, performance is predominantly gauged by the company's stock performance over time. Even when financial, non-financial or operational measures are utilized in incentive awards, the achievement related to these measures should ultimately translate into superior shareholder returns in the long-term. With respect to companies in the S&P1500, Russell 3000 index or Russel 3000E Indices, this analysis considers the following:



### Pay-for-Performance Elements

- The degree of alignment between the company's annualized TSR rank and the CEO's annualized total pay rank within a peer group, each measured over a five-year period,[18] and the rankings of CEO total pay and company financial performance within a peer group, each measured over a five-year period.
- Absolute Alignment: The absolute alignment between the trend in CEO pay and company TSR over the prior five fiscal years – *i.e.*, the difference between the trend in annual pay changes and the trend in annualized TSR during the period.[19]
- Equity Pay Mix: The ratio of the CEO's performance- vs. time-based equity awards.

### Pay Equity (Quantum) Elements

- Multiple of Median: The multiple of the CEO's total pay relative to the peer group median over one- and three-year periods.
- Internal Pay Disparity: The multiple of the CEO's total pay relative to other named executive officers (NEOs) – *i.e.*, an excessive differential between CEO total pay and that of the next highest-paid NEO as well as CEO total pay relative to the average NEO pay.

If the above pay-for-performance analysis demonstrates unsatisfactory long-term pay-for-performance alignment or, in the case of non-Russell 3000 index companies, misaligned pay and performance are otherwise suggested, the following qualitative factors will be evaluated to determine how various pay elements may work to encourage or to undermine long-term value creation and alignment with shareholder interests:

- The ratio of performance-based compensation to overall compensation, including whether any relevant social or environmental factors are a component of performance-contingent pay elements;
- The ratio of performance- to time-based long-term incentive awards;
- The presence of significant environmental, social or governance (ESG) controversies that have the potential to pose material risks to the company and its shareholders;
- Any downward discretion applied to executive compensation on the basis of a failure to achieve performance goals, including ESG performance objectives;
- The completeness of disclosure and rigor of performance goals;
- The company's peer group benchmarking practices;
- Actual results of financial/non-financial and operational metrics, such as growth in revenue, profit, cash flow, workplace safety, environmental performance, etc., both absolute and relative to peers;
- Special circumstances related to, for example, a new CEO in the prior FY or anomalous equity grant practices (e.g., bi-annual awards);
- Realizable and/or realized pay compared to granted pay; and
- Any other factors deemed relevant.

## Problematic Pay Practices

Problematic pay elements are generally evaluated case-by-case considering the context of a company's overall pay program and demonstrated pay-for-performance philosophy. The focus is on executive compensation practices that contravene the global pay principles, including:

---

[18] The Catholic Advisory Services' peer group is generally comprised of 14-24 companies that are selected using factors such as market cap, revenue, assets, GICS industry group, and company's selected peers' GICS industry group. Catholic Advisory Services' peer selection methodology is detailed in the U.S. Peer Group FAQ.

[19] Russell 3000E Index companies (excluding S&P1500 and Russell 3000 companies) are not subject to the Absolute Alignment analysis.

- Problematic practices related to non-performance-based compensation elements;
- Incentives that may motivate excessive risk-taking or present a windfall risk; and
- Pay decisions that circumvent pay-for-performance, such as options backdating or waiving performance requirements.

The list of examples below highlights certain problematic practices that carry significant weight in this overall consideration and may result in adverse vote recommendations:

- Repricing or replacing of underwater stock options/SARs without prior shareholder approval (including cash buyouts and voluntary surrender of underwater options);
- Extraordinary perquisites or tax gross-ups);
- New or materially amended agreements that provide for:

    - Excessive termination or CIC severance payments (generally exceeding 3 times base salary and average/target/most recent bonus);
    - CIC severance payments without involuntary job loss or substantial diminution of duties ("single" or "modified single" triggers) or in connection with a problematic Good Reason definition;
    - CIC excise tax gross-up entitlements (including "modified" gross-ups);
    - Multi-year guaranteed awards that are not at risk due to rigorous performance conditions;

- Liberal CIC definition combined with any single-trigger CIC benefits, including but not limited to a significant lack of disclosure;
- Insufficient executive compensation disclosure by externally-managed issuers (EMIs) such that a reasonable assessment of pay programs and practices applicable to the EMI's executives is not possible;
- Severance payments made when the termination is not clearly disclosed as involuntary (for example, a termination without cause or resignation for good reason);
- E&S Incentives: A lack of any LTI and STI performance metrics, incentives, and/or a lack of disclosure on LTI and STI performance metrics related to E&S criteria;
- Significant disparity in a company's Pay Ratio Disclosure[20]; and
- Any other provision or practice deemed to be egregious and present a significant risk to investors.

The above examples are not an exhaustive list. Please refer to the U.S. Compensation Policies FAQ document for additional detail on specific pay practices that have been identified as problematic and may lead to negative vote recommendations.

## Options Backdating

The following factors should be examined on a case-by-case basis to allow for distinctions to be made between "sloppy" plan administration versus deliberate action or fraud, as well as those instances in which companies that subsequently took corrective action. Cases where companies have committed fraud are considered most egregious.

- Reason and motive for the options backdating issue, such as inadvertent vs. deliberate grant date changes;
- Duration of options backdating;
- Size of restatement due to options backdating;
- Corrective actions taken by the board or compensation committee, such as canceling or re-pricing backdated options, the recouping of option gains on backdated grants;
- Adoption of a grant policy that prohibits backdating, and creates a fixed grant schedule or window period for equity grants in the future.

---

[20] Pay Ratio Disclosure is based on the 2010 Dodd-Frank Act disclosure mandate that has required public companies to disclose the ratio of the compensation of their chief executive officer (CEO) to the median compensation of employees.



## Compensation Committee Communications and Responsiveness

Consider the following factors on a case-by-case basis when evaluating ballot items related to executive pay on the board's responsiveness to investor input and engagement on compensation issues:

- Failure to respond to majority-supported shareholder proposals on executive pay topics; or
- Failure to adequately respond to the company's previous say-on-pay proposal that received- low support, taking into account the factors identified under the Board Responsiveness section in the Board of Directors policy with respect to say-on-pay.

## Advisory Votes on Executive Compensation- Management Proposals (Management Say-on-Pay)

The Dodd-Frank Act mandates advisory votes on executive compensation (say-on-pay) for a proxy or consent or authorization for an annual or other meeting of the shareholders that includes required SEC compensation disclosures. This non-binding shareholder vote on compensation must be included in a proxy or consent or authorization at least once every three years.

In general, the say-on-pay ballot item is the primary focus of voting on executive pay practices – dissatisfaction with compensation practices can be expressed by voting against the say-on-pay proposal rather than voting against or withhold from the compensation committee. However, if there is no say-on-pay on the ballot, then the negative vote will apply to members of the compensation committee. In addition, in egregious cases, or if the board fails to respond to concerns raised by a prior say-on-pay proposal, then Catholic Advisory Services will recommend vote against or withhold votes from compensation committee members (or, if the full board is deemed accountable, all directors). If the negative factors involve equity-based compensation, then a vote against an equity-based plan proposal presented for shareholder approval may be appropriate. In evaluating say-on-pay proposals, Catholic Advisory Services will also assess to what degree social and environmental considerations are incorporated into compensation programs and executive pay decision-making – to the extent that proxy statement Compensation Discussion and Analysis (CD&A) disclosures permit.

**Catholic Advisory Services Recommendation:** Evaluate executive pay and practices, as well as certain aspects of outside director compensation on a case-by-case basis.

- Vote against management say-on-pay ("MSOP") proposals if:
  - There is an unmitigated misalignment between CEO pay and company performance (pay-for-performance);
  - The company maintains problematic pay practices;
  - The board exhibits a significant level of poor communication and responsiveness to shareholders.
- Vote against or withhold from the members of the Compensation Committee and potentially the full board if:
  - There is no SOP on the ballot, and an against vote on an SOP is warranted due to pay-for-performance misalignment, problematic pay practices, or the lack of adequate responsiveness on compensation issues raised previously, or a combination thereof;
  - The board fails to respond adequately to a previous SOP proposal that received less than 70 percent support of votes cast;
  - The company has recently practiced or approved problematic pay practices, such as option repricing or option backdating; or
  - The situation is egregious.
- Vote against an equity plan on the ballot if:
  - A pay for performance misalignment exists, and a significant portion of the CEO's misaligned pay is attributed to non-performance-based equity awards, taking into consideration:
    - Magnitude of pay misalignment;
    - Contribution of non-performance-based equity grants to overall pay; and

Case 1:26-cv-00717-MPB-MKK    Document 26-3    Filed 04/21/26    Page 64 of 1112
PageID #: 230



- The proportion of equity awards granted in the last three fiscal years concentrated at the named executive officer (NEO) level.

## Frequency of Advisory Vote on Executive Compensation – Management Say-on-Pay

The Dodd-Frank Act, in addition to requiring advisory votes on compensation, requires that each proxy for the first annual or other meeting of the shareholders (that includes required SEC compensation disclosures) occurring after Jan. 21, 2011, include an advisory voting item to determine whether, going forward, the "say-on-pay" vote by shareholders to approve compensation should occur every one, two, or three years.

Catholic Advisory Services will recommend a vote for annual advisory votes on compensation. The SOP is at its essence a communication vehicle, and communication is most useful when it is received in a consistent and timely manner. Catholic Advisory Services supports an annual SOP vote for many of the same reasons it supports annual director elections rather than a classified board structure: because this provides the highest level of accountability and direct communication by enabling the SOP vote to correspond to the majority of the information presented in the accompanying proxy statement for the applicable shareholders' meeting. Having SOP votes every two or three years, covering all actions occurring between the votes, would make it difficult to create the meaningful and coherent communication that the votes are intended to provide. Under triennial elections, for example, a company would not know whether the shareholder vote references the compensation year being discussed or a previous year, making it more difficult to understand the implications of the vote.

**Catholic Advisory Services Recommendation:** Vote for annual advisory votes on compensation, which provide the most consistent and clear communication channel for shareholder concerns about companies' executive pay programs.

## Advisory Vote on Golden Parachutes in an Acquisition, Merger, Consolidation, or Proposed Sale

This is a proxy item regarding specific advisory votes on "golden parachute" arrangements for Named Executive Officers (NEOs) that is required under The Dodd-Frank Wall Street Reform and Consumer Protection Act. Catholic Advisory Services places particular focus on severance packages that provide inappropriate windfalls and cover certain tax liabilities of executives.

**Catholic Advisory Services Recommendation:** Vote case-by-case on say on Golden Parachute proposals, including consideration of existing change-in-control arrangements maintained with named executive officers rather than focusing primarily on new or extended arrangements.

Features that may result in an against recommendation include one or more of the following, depending on the number, magnitude, and/or timing of issue(s):

- Single- or modified-single-trigger cash severance;
- Single-trigger acceleration of unvested equity awards;
- Full acceleration of equity awards granted shortly before the change in control;
- Acceleration of performance awards above the target level of performance without compelling rationale;
- Excessive cash severance (>3x base salary and bonus);
- Excise tax gross-ups triggered and payable;
- Excessive golden parachute payments (on an absolute basis or as a percentage of transaction equity value); or
- Recent amendments that incorporate any problematic features (such as those above) or recent actions (such as extraordinary equity grants) that may make packages so attractive as to influence merger agreements that may not be in the best interests of shareholders; or



- The company's assertion that a proposed transaction is conditioned on shareholder approval of the golden parachute advisory vote.

Recent amendment(s) that incorporate problematic features will tend to carry more weight on the overall analysis. However, the presence of multiple legacy problematic features will also be closely scrutinized.

In cases where the golden parachute vote is incorporated into a company's advisory vote on compensation ("management say-on-pay), Catholic Advisory Services will evaluate the say-on-pay proposal in accordance with these guidelines, which may give higher weight to that component of the overall evaluation.

## Equity-Based Incentive Plans

As executive pay levels continue to soar, non-salary compensation remains one of the most sensitive and visible corporate governance issues. The financial crisis raised questions about the role of pay incentives in influencing executive behavior, including their appetite for risk-taking. Although shareholders may have little say about how much the CEO is paid in salary and bonus, they do have a major voice in approving stock incentive plans.

Stock-based plans can transfer significant amounts of wealth from shareholders to executives and directors and are among the most economically significant issues that shareholders are entitled to vote on. Rightly, the cost of these plans must be in line with the anticipated benefits to shareholders. Clearly, reasonable limits must be set on dilution as well as administrative authority. In addition, shareholders must consider the necessity of the various pay programs and examine the appropriateness of award types. Consequently, the pros and cons of these proposals necessitate a case-by-case evaluation.

Factors that increase the cost (or have the potential to increase the cost) of plans to shareholders include: excessive dilution, options awarded at below-market discounts, permissive policies on pyramiding, restricted stock giveaways that reward tenure rather than results, sales of shares on concessionary terms, blank-check authority for administering committees, option repricing or option replacements, accelerated vesting of awards in the event of defined changes in corporate control, stand-alone stock appreciation rights, loans or other forms of assistance, or evidence of improvident award policies.

Positive plan features that can offset costly features include: plans with modest dilution potential (i.e. appreciably below double-digit levels), bars to pyramiding and related safeguards for investor interests. Also favorable are performance programs with a duration of two or more years, bonus schemes that pay off in non-dilutive, fully deductible cash, 401K and other thrift or profit-sharing plans, and tax-favored employee stock purchase plans. In general, we believe that stock plans should afford incentives, not sure-fire, risk-free rewards.

**Catholic Advisory Services Recommendation:** Vote case-by-case on equity plan proposals subject to the Equity Plan Scorecard framework, where positive factors may counterbalance negative factors, under three pillars:

- **Plan Cost:** The total estimated cost of the company's equity plans relative to industry/market cap peers, measured by the company's estimated Shareholder Value Transfer (SVT) in relation to peers and considering both:
  - SVT based on new shares requested plus shares remaining for future grants, plus outstanding unvested/unexercised grants; and
  - SVT based only on new shares requested plus shares remaining for future grants.
- **Plan Features:**
  - Quality of disclosure around vesting upon a change in control (CIC);
  - Discretionary vesting authority;
  - Liberal share recycling on various award types;
  - Lack of minimum vesting period for grants made under the plan;
  - Dividends payable prior to award vesting; and



- ▪ Cash-denominated award limits for non-employee directors.
- ▪ **Grant Practices:**
  - ▪ The company's three year burn rate relative to its industry/market cap peers;
  - ▪ Vesting requirements in CEO's recent equity grants;
  - ▪ The estimated duration of the plan;
  - ▪ The proportion of the CEO's most recent equity grants/awards classified by ISS as performance-based;
  - ▪ Whether the company maintains a sufficient claw-back policy; and
  - ▪ Whether the company maintains sufficient post exercise/vesting share-holding requirements.

Generally vote against the plan proposal if the combination of above factors indicates that the plan is not, overall, in shareholders' interests, or if any of the following ("overriding factors") apply:

- ▪ Awards may vest in connection with a liberal change-of-control definition;
- ▪ The plan would permit repricing or cash buyout of underwater options without shareholder approval (either by expressly permitting it – for NYSE and Nasdaq listed companies -- or by not prohibiting it when the company has a history of repricing – for non-listed companies);
- ▪ The plan is a vehicle for problematic pay practices or a pay-for-performance disconnect; or
- ▪ The plan is excessively dilutive to shareholders' holdings;
- ▪ The plan contains an evergreen feature (automatic share replenishment);
- ▪ The plan lacks sufficient positive features under the Plan Features pillar; or
- ▪ Any other factors that are determined to have a significant negative impact on shareholder interests.

Generally vote against equity plans if the cost is unreasonable. For non-employee director plans, vote for the plan if certain factors are met.

### *FURTHER INFORMATION ON CERTAIN EPSC FACTORS:*

## Shareholder Value Transfer (SVT)

The cost of the equity plans is expressed as Shareholder Value Transfer (SVT), which is measured using a binomial option pricing model that assesses the amount of shareholders' equity flowing out of the company to employees and directors. SVT is expressed as both a dollar amount and as a percentage of market value, and includes the new shares proposed, shares available under existing plans, and shares granted but unexercised (using two measures, in the case of plans subject to the Equity Plan Scorecard evaluation, as noted above). All award types are valued. For omnibus plans, unless limitations are placed on the most expensive types of awards (for example, full value awards), the assumption is made that all awards to be granted will be the most expensive types. See discussion of specific types of awards.

Except for proposals subject to Equity Plan Scorecard evaluation, Shareholder Value Transfer is reasonable if it falls below a company-specific benchmark.   The benchmark is determined as follows: The top quartile performers in each industry group (using the Global Industry Classification Standard: GICS) are identified. Benchmark SVT levels for each industry are established based on these top performers' historic SVT. Regression analyses are run on each industry group to identify the variables most strongly correlated to SVT. The benchmark industry SVT level is then adjusted upwards or downwards for the specific company by plugging the company-specific performance measures, size and cash compensation into the industry cap equations to arrive at the company's benchmark.[21]

---

[21] For plans evaluated under the Equity Plan Scorecard policy, the company's SVT benchmark is considered along with other factors.



## Repricing Provisions

Vote against plans that expressly permit the repricing or exchange of underwater stock options/stock appreciate rights (SARs) without prior shareholder approval. "Repricing" includes the ability to do any of the following:

- Amend the terms of outstanding options or SARs to reduce the exercise price of such outstanding options or SARs;
- Cancel outstanding options or SARs in exchange for options or SARs with an exercise price that is less than the exercise price of the original options or SARs;
- The cancellation of underwater options in exchange for stock awards; or
- Cash buyouts of underwater options.

While the above cover most types of repricing, Catholic Advisory Services may view other provisions as akin to repricing depending on the facts and circumstances.

Also, vote against or withhold from members of the compensation committee who approved repricing (as defined above or otherwise determined by Catholic Advisory Services) without prior shareholder approval, even if such repricings are allowed in their equity plan.

Vote against plans that do not expressly prohibit repricing or cash buyout of underwater options without shareholder approval if the company has a history of repricing/buyouts without shareholder approval, and the applicable listing standards would not preclude them from doing so.

## Pay-for-Performance Misalignment – Application to Equity Plans

If the equity plan on the ballot is a vehicle for problematic pay practices, vote against the plan.

Catholic Advisory Services may recommend a vote against the equity plan if the plan is determined to be a vehicle for pay-for-performance misalignment. Considerations in voting against the equity plan may include, but are not limited to:

- Severity of the pay-for-performance misalignment;
- Whether problematic equity grant practices are driving the misalignment; and/or
- Whether equity plan awards have been heavily concentrated to the CEO and/or the other NEOs.

## Three-Year Value Adjusted Burn Rate

A "Value-Adjusted Burn Rate" is used for stock plan evaluations. Value-Adjusted Burn Rate benchmarks will be calculated as the greater of: (1) an industry-specific threshold based on three-year burn rates within the company's GICS group segmented by S&P 500, Russell 3000 index (less the S&P 500) and non-Russell 3000 index; and (2) a de minimis threshold established separately for each of the S&P 500, the Russell 3000 index less the S&P 500, and the non-Russell 3000 index. Year-over-year burn-rate benchmark changes will be limited to a predetermined range above or below the prior year's burn-rate benchmark.

The Value-Adjusted Burn Rate will be calculated as follows:

Value-Adjusted Burn Rate = ((# of options * option's dollar value using a Black-Scholes model) + (# of full-value awards * stock price)) / (Weighted average common shares * stock price).

### Liberal Definition of Change-in-Control

Generally vote against equity plans if the plan provides for the acceleration of vesting of equity awards even though an actual change in control may not occur. Examples of such a definition could include, but are not limited to, announcement or commencement of a tender offer, provisions for acceleration upon a "potential" takeover, shareholder approval of a merger or other transactions, or similar language.

## Other Compensation Plans

## Amending Cash and Equity Plans (including Approval for Tax Deductibility (162(m))

Cash bonus plans can be an important part of an executive's overall pay package, along with stock-based plans tied to long-term total shareholder returns. Over the long term, stock prices are an excellent indicator of management performance. However, other factors, such as economic conditions and investor reaction to the stock market in general and certain industries in particular, can greatly impact the company's stock price. As a result, a cash bonus plan can effectively reward individual performance and the achievement of business unit objectives that are independent of short-term market share price fluctuations.

**Catholic Advisory Services Recommendation:** Vote case-by-case on amendments to cash and equity incentive plans.

Generally vote for proposals to amend executive cash, stock, or cash and stock incentive plans if the proposal:

▪ Addresses administrative features only; or
▪ Seeks approval for Section 162(m) purposes only, and the plan administering committee consists entirely of independent directors, per Catholic Advisory Services' Classification of Directors. Note that if the company is presenting the plan to shareholders for the first time after the company's initial public offering (IPO), or if the proposal is bundled with other material plan amendments, then the recommendation will be case-by-case (see below).

Vote against proposals to amend executive cash, stock, or cash and stock incentive plans if the proposal:

▪ Seeks approval for Section 162(m) purposes only, and the plan administering committee does not consist entirely of independent directors, per Catholic Advisory Services' Classification of Directors.

Vote case-by-case on all other proposals to amend cash incentive plans. This includes plans presented to shareholders for the first time after the company's IPO and/or proposals that bundle material amendment(s) other than those for Section 162(m) purposes.

Vote case-by-case on all other proposals to amend equity incentive plans, considering the following:

▪ If the proposal requests additional shares and/or the amendments may potentially increase the transfer of shareholder value to employees, the recommendation will be based on the Equity Plan Scorecard evaluation as well as an analysis of the overall impact of the amendments.
▪ If the plan is being presented to shareholders for the first time (including after the company's IPO), whether or not additional shares are being requested, the recommendation will be based on the Equity Plan Scorecard evaluation as well as an analysis of the overall impact of any amendments.
▪ If there is no request for additional shares and the amendments are not deemed to potentially increase the transfer of shareholder value to employees, then the recommendation will be based entirely on an analysis of the overall impact of the amendments, and the EPSC evaluation will be shown for informational purposes.



In the first two case-by-case evaluation scenarios, the EPSC evaluation/score is the more heavily weighted consideration.

## Employee Stock Purchase Plans (ESPPs)

Employee stock purchase plans enable employees to become shareholders, which gives them a stake in the company's growth. However, purchase plans are beneficial only when they are well balanced and in the best interests of all shareholders. From a shareholder's perspective, plans with offering periods of 27 months or less are preferable. Plans with longer offering periods remove too much of the market risk and could give participants excessive discounts on their stock purchases that are not offered to other shareholders.

### Qualified Plans

Qualified employee stock purchase plans qualify for favorable tax treatment under Section 423 of the Internal Revenue Code. Such plans must be broad-based, permitting all full-time employees to participate. Some companies also permit part-time staff to participate. Qualified ESPPs must be expensed under SFAS 123 unless the plan meets the following conditions; a) purchase discount is 5 percent or below; b) all employees can participate in the program; and 3) no look-back feature in the program. Therefore, some companies offer nonqualified ESPPs.

**Catholic Advisory Services Recommendation:** Vote case-by-case on qualified employee stock purchase plans. Vote for employee stock purchase plans where all of the following apply:

- Purchase price is at least 85 percent of fair market value;
- Offering period is 27 months or less; and
- The number of shares allocated to the plan is ten percent or less of the outstanding shares.

Vote against qualified employee stock purchase plans where any of the following apply:

- Purchase price is less than 85 percent of fair market value; or
- Offering period is greater than 27 months; or
- The number of shares allocated to the plan is more than ten percent of the outstanding shares.

### Non-Qualified Plans

For nonqualified ESPPs, companies provide a match to employees' contributions instead of a discount in stock price. Also, limits are placed on employees' contributions. Some companies provide a maximum dollar value for the year, and others specify the limits in terms of a percent of base salary, excluding bonus or commissions. For plans that do not qualify under Section 423 of the Internal Revenue Code, a plan participant will not recognize income by participating in the plan but will recognize ordinary compensation income for federal income tax purposes at the time of the purchase.

**Catholic Advisory Services Recommendation:** Vote case-by-case on nonqualified employee stock purchase plans. Vote for nonqualified employee stock purchase plans with all the following features:

- Broad-based participation (i.e., all employees of the company with the exclusion of individuals with 5 percent or more of beneficial ownership of the company);
- Limits on employee contribution, which may be a fixed dollar amount or expressed as a percent of base salary;
- Company matching contribution up to 25 percent of employee's contribution, which is effectively a discount of 20 percent from market value;
- No discount on the stock price on the date of purchase since there is a company matching contribution.



Vote against nonqualified employee stock purchase plans when any of the plan features do not meet the above criteria. If the matching contribution or effective discount exceeds the above, Catholic Advisory Services may evaluate the SVT cost of the plan as part of the assessment.

## Employee Stock Ownership Plans (ESOPs)

An Employee Stock Ownership Plan (ESOP) is an employee benefit plan that makes the employees of a company also owners of stock in that company. The plans are designed to defer a portion of current employee income for retirement purposes.

The primary difference between ESOPs and other employee benefit plans is that ESOPs invest primarily in the securities of the employee's company. In addition, an ESOP must be created for the benefit of non-management level employees and administered by a trust that cannot discriminate in favor of highly paid personnel.

Academic research of the performance of ESOPs in closely held companies found that ESOPs appear to increase overall sales, employment, and sales per employee over what would have been expected absent an ESOP. Studies have also found that companies with an ESOP are also more likely to still be in business several years later and are more likely to have other retirement oriented benefit plans than comparable non-ESOP companies.

**Catholic Advisory Services Recommendation:** Vote for proposals to implement an ESOP or increase authorized shares for existing ESOPs, unless the number of shares allocated to the ESOP is excessive (more than five percent of outstanding shares).



## Option Exchange Programs/Repricing Options

**Catholic Advisory Services Recommendation:** Vote case-by-case on management proposals seeking approval to exchange/reprice options taking into consideration:

- Historic trading patterns – the stock price should not be so volatile that the options are likely to be back "in-the-money" over the near term;
- Rationale for the re-pricing – was the stock price decline beyond management's control?
- Is this a value-for-value exchange?
- Are surrendered stock options added back to the plan reserve?
- Timing--repricing should occur at least one year out from any precipitous drop in company's stock price;
- Option vesting – does the new option vest immediately or is there a black-out period?
- Term of the option – the term should remain the same as that of the replaced option;
- Exercise price – should be set at fair market or a premium to market;
- Participants – executive officers and directors must be excluded.

If the surrendered options are added back to the equity plans for re-issuance, then also take into consideration the company's total cost of equity plans and its three-year average burn rate.

In addition to the above considerations, evaluate the intent, rationale, and timing of the repricing proposal. The proposal should clearly articulate why the board is choosing to conduct an exchange program at this point in time. Repricing underwater options after a recent precipitous drop in the company's stock price demonstrates poor timing and warrants additional scrutiny. Also, consider the terms of the surrendered options, such as the grant date, exercise price and vesting schedule. Grant dates of surrendered options should be far enough back (two to three years) so as not to suggest that repricings are being done to take advantage of short-term downward price movements. Similarly, the exercise price of surrendered options should be above the 52-week high for the stock price.

Vote for shareholder proposals to put option repricings to a shareholder vote.

## Stock Plans in Lieu of Cash

**Catholic Advisory Services Recommendation:**

- Vote case-by-case on plans that provide participants with the option of taking all or a portion of their cash compensation in the form of stock.
- Vote for non-employee director-only equity plans that provide a dollar-for-dollar cash-for-stock exchange.
- Vote case-by-case on plans which do not provide a dollar-for-dollar cash for stock exchange. In cases where the exchange is not dollar-for-dollar, the request for new or additional shares for such equity program will be considered using the binomial option pricing model. In an effort to capture the total cost of total compensation, Catholic Advisory Services will not make any adjustments to carve out the in-lieu-of cash compensation.

## Transfer Stock Option (TSO) Programs

**Catholic Advisory Services Recommendation:**

**One-time Transfers:** Vote against or withhold from compensation committee members if they fail to submit one-time transfers to shareholders for approval.

Vote case-by-case on one-time transfers. Vote for if:

- Executive officers and non-employee directors are excluded from participating;
- Stock options are purchased by third-party financial institutions at a discount to their fair value using option pricing models such as Black-Scholes or a Binomial Option Valuation or other appropriate financial models;
- There is a two-year minimum holding period for sale proceeds (cash or stock) for all participants.

Additionally, management should provide a clear explanation of why options are being transferred to a third-party institution and whether the events leading up to a decline in stock price were beyond management's control. A review of the company's historic stock price volatility should indicate if the options are likely to be back "in-the-money" over the near term.

**Ongoing TSO program:** Vote against equity plan proposals if the details of ongoing TSO programs are not provided to shareholders. Since TSOs will be one of the award types under a stock plan, the ongoing TSO program, structure and mechanics must be disclosed to shareholders. The specific criteria to be considered in evaluating these proposals include, but not limited, to the following:

- Eligibility;
- Vesting;
- Bid-price;
- Term of options;
- Cost of the program and impact of the TSOs on company's total option expense; and
- Option repricing policy.

Amendments to existing plans that allow for introduction of transferability of stock options should make clear that only options granted post-amendment shall be transferable.

## 401(k) Employee Benefit Plans

The 401(k) plan is one of the most popular employee benefit plans among U.S. companies. A 401(k) plan is any qualified plan under Section 401(k) of the Internal Revenue Code that contains a cash or deferred arrangement. In its simplest form, an employee can elect to have a portion of his salary invested in a 401(k) plan before any income taxes are assessed. The money can only be withdrawn before retirement under penalty. However, because the money contributed to the plan is withdrawn before taxes (reducing the employee's income tax), a properly planned 401(k) plan will enable an employee to make larger contributions to a 401(k) plan than to a savings plan and still take the same amount home.

**Catholic Advisory Services Recommendation:** Vote for proposals to implement a 401(k) savings plan for employees.

## Severance Agreements for Executives/Golden Parachutes

**Catholic Advisory Services Recommendation:** Vote on a case-by-case basis on proposals to ratify or cancel golden parachutes. An acceptable parachute should include, but is not limited to, the following:

- The triggering mechanism should be beyond the control of management;
- The amount should not exceed three times base amount (defined as the average annual taxable W-2 compensation during the five years prior to the year in which the change of control occurs;
- Change-in-control payments should be double-triggered, i.e., (1) after a change in control has taken place, and (2) termination of the executive as a result of the change in control. Change in control is defined as a change in the company ownership structure.

# Director Compensation

The board's legal charge of fulfilling its fiduciary obligations of loyalty and care is put to the ultimate test through the task of the board setting its own compensation. Directors themselves oversee the process for evaluating board performance and establishing pay packages for board members.

Shareholders provide limited oversight of directors by electing individuals who are primarily selected by the board, or a board nominating committee, and by voting on stock-based plans for directors designed by the board compensation committee. Additionally, shareholders may submit and vote on their own resolutions seeking to limit or restructure director pay. While the cost of compensating non-employee directors is small in absolute terms, compared to the cost of compensating executives, it is still a critical aspect of a company's overall corporate governance structure.

Overall, director pay levels are rising in part because of the new forms of pay in use at many companies, as well as because of the increased responsibilities arising from the 2002 Sarbanes-Oxley Act requirements. In addition to an annual retainer fee, many companies also pay fees for attending board and committee meetings, fees for chairing a committee, or a retainer fee for chairing a committee.

Director compensation packages should be designed to provide value to directors for their contribution. Given that many directors are high-level executives whose personal income levels are generally high, cash compensation may hold little appeal. Stock-based incentives on the other hand reinforce the directors' role of protecting and enhancing shareholder value. The stock-based component of director compensation should be large enough to ensure that when faced with a situation in which the interests of shareholders and management differ, the board will have a financial incentive to think as a shareholder. Additionally, many companies have instituted equity ownership programs for directors. Catholic Advisory Services recommends that directors receive stock grants equal to three times of their annual retainer, as it is a reasonable starting point for companies of all sizes and industries. A vesting schedule for director grants helps directors to meet the stock ownership guidelines and maintains their long-term interests in the firm.

Director compensation packages should also be designed to attract and retain competent directors who are willing to risk becoming a defendant in a lawsuit and suffer potentially adverse publicity if the company runs into financial difficulties or is mismanaged.

## Shareholder Ratification of Director Pay Programs

**Catholic Advisory Services Recommendation:** Vote case-by-case on management proposals seeking ratification of non-employee director compensation, based on the following factors:

▪ If the equity plan under which non-employee director grants are made is on the ballot, whether or not it warrants support; and
▪ An assessment of the following qualitative factors:
  ▪ The relative magnitude of director compensation as compared to companies of a similar profile;
  ▪ The presence of problematic pay practices relating to director compensation;
  ▪ Director stock ownership guidelines and holding requirements;
  ▪ Equity award vesting schedules;
  ▪ The mix of cash and equity-based compensation;
  ▪ Meaningful limits on director compensation;
  ▪ The availability of retirement benefits or perquisites; and
  ▪ The quality of disclosure surrounding director compensation.

Case 1:26-cv-00717-MPB-MKK    Document 26-3    Filed 04/21/26    Page 74 of 1112
PageID #: 240
UNITED STATES
2025 CATHOLIC FAITH–BASED PROXY VOTING GUIDELINES

ISS

## Equity Plans for Non-Employee Directors

Stock-based plans may take on a variety of forms including: grants of stock or options, including: discretionary grants, formula based grants, and one-time awards; stock-based awards in lieu of all or some portion of the cash retainer and/or other fees; and deferred stock plans allowing payment of retainer and/or meeting fees to be taken in stock, the payment of which is postponed to some future time, typically retirement or termination of directorship.

**Catholic Advisory Services Recommendation:** Vote case-by-case on compensation plans for non-employee directors, based on:

- The total estimated cost of the company's equity plans relative to industry/market cap peers, measured by the company's estimated Shareholder Value Transfer (SVT) based on new shares requested plus shares remaining for future grants, plus outstanding unvested/unexercised grants;
- The company's three year burn rate relative to its industry/market cap peers; and
- The presence of any egregious plan features (such as an option repricing provision or liberal CIC vesting risk).

On occasion, director stock plans that set aside a relatively small number of shares will exceed the plan cost or burn rate benchmark when combined with employee or executive stock compensation plans. In such cases, vote for the plan if all of the following qualitative factors in the board's compensation are met and disclosed in the proxy statement:

- The relative magnitude of director compensation as compared to companies of a similar profile;
- The presence of problematic pay practices relating to director compensation;
- Director stock ownership guidelines with a minimum of three times the annual cash retainer;
- Equity award vesting schedules;
- The presence of problematic pay practices relating to director compensation;
- The mix of cash and equity-based compensation;
- Meaningful limits on director compensation;
- The availability of retirement benefits or perquisites; and
- The quality of disclosure surrounding director compensation.

## Outside Director Stock Awards/Options in Lieu of Cash

These proposals seek to pay outside directors a portion of their compensation in stock rather than cash. By doing this, a director's interest may be more closely aligned with those of shareholders.

**Catholic Advisory Services Recommendation:** Vote for proposals that seek to pay outside directors a portion of their compensation in stock rather than cash.

## Non-Employee Director Retirement Plans

**Catholic Advisory Services Recommendation:**

- Vote against retirement plans for non-employee directors.
- Vote for shareholder proposals to eliminate retirement plans for non-employee directors.

# Shareholder Proposals on Compensation

## Increase Disclosure of Executive Compensation

The SEC requires that companies disclose, in their proxy statements, the salaries of the top five corporate executives (who make at least $100,000 a year). Companies also disclose their compensation practices and details of their stock-based compensation plans. While this level of disclosure is helpful, it does not always provide a comprehensive picture of the company's compensation practices. For shareholders to make informed decisions on compensation levels, they need to have clear, concise information at their disposal. Increased disclosure will help ensure that management: (1) has legitimate reasons for setting specific pay levels; and (2) is held accountable for its actions.

**Catholic Advisory Services Recommendation:** Vote for shareholder proposals seeking increased disclosure on executive compensation issues including the preparation of a formal report on executive compensation practices and policies.

## Limit Executive Compensation

Proposals that seek to limit executive or director compensation usually focus on the absolute dollar figure of the compensation or focus on the ratio of compensation between the executives and the average worker of a specific company. Proponents argue that the exponential growth of executive salaries is not in the best interests of shareholders, especially when that pay is exorbitant when compared to the compensation of other workers.

**Catholic Advisory Services Recommendation:**

- Vote for proposals to prepare reports seeking to compare the wages of a company's lowest paid worker to the highest paid workers.
- Vote case-by-case on proposals that seek to establish a fixed ratio between the company's lowest paid workers and the highest paid workers.

## Stock Ownership Requirements

Corporate directors should own some amount of stock of the companies on which they serve as board members. Stock ownership is a simple method to align the interests of directors with company shareholders. Nevertheless, many highly qualified individuals such as academics and clergy who can offer valuable perspectives in boardrooms may be unable to purchase individual shares of stock. In such a circumstance, the preferred solution is to look at the board nominees individually and take stock ownership into consideration when voting on the merits of each candidate.

**Catholic Advisory Services Recommendation:** Generally vote against shareholder proposals that mandate a minimum amount of stock that directors must own in order to qualify as a director or to remain on the board.

## Prohibit/Require Shareholder Approval for Option Repricing

Repricing involves the reduction of the original exercise price of a stock option after the fall in share price. Catholic Advisory Services does not support repricing since it undermines the incentive purpose of the plan. The use of options as an incentive means that employees must bear the same risks as shareholders in holding these options. Shareholder resolutions calling on companies to abandon the practice of repricing or to submit repricings to a shareholder vote will be supported.



**Catholic Advisory Services Recommendation:**

- Vote for shareholder proposals seeking to limit repricing.
- Vote for shareholder proposals asking the company to have option repricings submitted for shareholder ratification.

## Severance Agreements/Golden Parachutes

Golden parachutes are designed to protect the employees of a corporation in the event of a change in control. With Golden Parachutes senior level management employees receive a payout during a change in control at usually two to three times base salary.

**Catholic Advisory Services Recommendation:** Vote case-by-case on shareholder proposals requiring that executive severance (including change-in-control related) arrangements or payments be submitted for shareholder ratification.

Factors that will be considered include, but are not limited to:

- The company's severance or change-in-control agreements in place, and the presence of problematic features (such as excessive severance entitlements, single triggers, excise tax gross-ups, etc.);
- Any existing limits on cash severance payouts or policies which require shareholder ratification of severance payments exceeding a certain level;
- Any recent severance-related controversies; and
- Whether the proposal is overly prescriptive, such as requiring shareholder approval of severance that does not exceed market norms.

## Cash Balance Plans

A cash balance plan is a defined benefit plan that treats an earned retirement benefit as if it was a credit from a defined contribution plan, but which provides a stated benefit at the end of its term. Because employer contributions to these plans are credited evenly over the life of a plan and not based on a seniority formula they may reduce payouts to long-term employees who are currently vested in plans.

Cash-balance pension conversions have undergone congressional and federal agency scrutiny following high-profile EEOC complaints on age discrimination and employee anger at companies like IBM. While significant change is unlikely in the short-tm, business interests were concerned enough that the National Association of Manufacturers and other business lobbies formed a Capitol Hill coalition to preserve the essential features of the plans and to overturn a IRS ruling. Driving the push behind conversions from traditional pension plans to cash-balance plans are the substantial savings that companies generate in the process.  Critics point out that these savings are gained at the expense of the most senior employees. Resolutions call on corporate boards to establish a committee of outside directors to prepare a report to shareholders on the potential impact of pension-related proposals now being considered by national policymakers in reaction to the controversy spawned by the plans.

**Catholic Advisory Services Recommendation:**

- Vote for shareholder proposals calling for non-discrimination in retirement benefits.
- Vote for shareholder proposals asking a company to give employees the option of electing to participate in either a cash balance plan or in a defined benefit plan.

## Performance-Based Equity Awards

Catholic Advisory Services supports compensating executives at a reasonable rate and believes that executive compensation should be strongly correlated to performance. Catholic Advisory Services supports equity awards that provide challenging performance objectives and serve to motivate executives to superior performance and as performance-contingent stock options as a significant component of compensation.

**Catholic Advisory Services Recommendation:** Vote case-by-case on shareholder proposal requesting that a significant amount of future long-term incentive compensation awarded to senior executives shall be performance-based and requesting that the board adopt and disclose challenging performance metrics to shareholders, based on the following analytical steps:

- First, vote for shareholder proposals advocating the use of performance-based equity awards, such as performance contingent options or restricted stock, indexed options or premium-priced options, unless the proposal is overly restrictive or if the company has demonstrated that it is using a "substantial" portion of performance-based awards for its top executives.  Standard stock options and performance-accelerated awards do not meet the criteria to be considered as performance-based awards.  Further, premium-priced options should have a meaningful premium to be considered performance-based awards.

- Second, assess the rigor of the company's performance-based equity program.  If the bar set for the performance-based program is too low based on the company's historical or peer group comparison, generally vote for the proposal.  Furthermore, if target performance results in an above target payout, vote for the shareholder proposal due to program's poor design.  If the company does not disclose the performance metric of the performance-based equity program, vote for the shareholder proposal regardless of the outcome of the first step to the test.

In general, vote for the shareholder proposal if the company does not meet both of the above two steps.

## Pay for Superior Performance

**Catholic Advisory Services Recommendation:** Generally vote for shareholder proposals based on a case-by-case analysis that requests the board establish a pay-for-superior performance standard in the company's executive compensation plan for senior executives. The proposal has the following principles:

- Sets compensation targets for the Plan's annual and long-term incentive pay components at or below the peer group median;
- Delivers a majority of the Plan's target long-term compensation through performance-vested, not simply time-vested, equity awards;
- Provides the strategic rationale and relative weightings of the financial and non-financial performance metrics or criteria used in the annual and performance-vested long-term incentive components of the plan;
- Establishes performance targets for each plan financial metric relative to the performance of the company's peer companies;
- Limits payment under the annual and performance-vested long-term incentive components of the plan to when the company's performance on its selected financial performance metrics exceeds peer group median performance.

Consider the following factors in evaluating this proposal:

- What aspects of the company's annual and long-term equity incentive programs are performance driven?
- If the annual and long-term equity incentive programs are performance driven, are the performance criteria and hurdle rates disclosed to shareholders or are they benchmarked against a disclosed peer group?
- Can shareholders assess the correlation between pay and performance based on the current disclosure?



- What type of industry and stage of business cycle does the company belong to?

## Advisory Vote on Executive Compensation (Say-on-Pay) Shareholder Proposals

**Catholic Advisory Services Recommendation:** Generally, vote for shareholder proposals that call for non-binding shareholder ratification of the compensation of the Named Executive Officers and the accompanying narrative disclosure of material factors provided to understand the Summary Compensation Table.

## Termination of Employment Prior to Severance Payment and Eliminating Accelerated Vesting of Unvested Equity

**Catholic Advisory Services Recommendation:** Generally vote for proposals seeking a policy that prohibits acceleration of the vesting of equity awards to senior executives in the event of a change in control (except for pro rata vesting considering the time elapsed and attainment of any related performance goals between the award date and the change in control).

Vote on a case-by-case on shareholder proposals seeking a policy requiring termination of employment prior to severance payment and eliminating accelerated vesting of unvested equity. The following factors will be taken into regarding this policy:

- The company's current treatment of equity in change-of-control situations (i.e. is it double triggered, does it allow for the assumption of equity by acquiring company, the treatment of performance shares;
- Current employment agreements, including potential problematic pay practices such as gross-ups embedded in those agreements.

## Tax Gross-up Proposals

**Catholic Advisory Services Recommendation:** Generally vote for proposals calling for companies to adopt a policy of not providing tax gross-up payments to executives, except in situations where gross-ups are provided pursuant to a plan, policy, or arrangement applicable to management employees of the company, such as a relocation or expatriate tax equalization policy.

## Compensation Consultants - Disclosure of Board or Company's Utilization

**Catholic Advisory Services Recommendation:** Generally vote for shareholder proposals seeking disclosure regarding the company, board, or compensation committee's use of compensation consultants, such as company name, business relationship(s) and fees paid.

## Golden Coffins/Executive Death Benefits

**Catholic Advisory Services Recommendation:** Generally vote for proposals calling companies to adopt a policy of obtaining shareholder approval for any future agreements and corporate policies that could oblige the company to make payments or awards following the death of a senior executive in the form of unearned salary or bonuses, accelerated vesting or the continuation in force of unvested equity grants, perquisites and other payments or awards made in lieu of compensation. This would not apply to any benefit programs or equity plan proposals that the broad-based employee population is eligible.

## Recoup Bonuses

**Catholic Advisory Services Recommendation:** Vote on a case-by-case on proposals to recoup unearned incentive bonuses or other incentive payments made to senior executives if it is later determined that the figures upon which incentive compensation is earned later turn out to have been in error. This is line with the clawback provision in the Troubled Asset Relief Program. Many companies have adopted policies that permit recoupment in cases where fraud, misconduct, or negligence significantly contributed to a restatement of financial results that led to the awarding of unearned incentive compensation. The following will be taken into consideration:

- If the company has adopted a formal recoupment bonus policy;
- If the company has chronic restatement history or material financial problems;
- If the company's policy substantially addresses the concerns raised by the proponent.

## Adopt Anti-Hedging/Pledging/Speculative Investments Policy

**Catholic Advisory Services Recommendation:** Generally vote for proposals seeking a policy that prohibits named executive officers from engaging in derivative or speculative transactions involving company stock, including hedging, holding stock in a margin account, or pledging stock as collateral for a loan. However, the company's existing policies regarding responsible use of company stock will be considered.

## Bonus Banking

**Catholic Advisory Services Recommendation:** Vote case-by-case on proposals seeking deferral of a portion of annual bonus pay, with ultimate payout linked to sustained results for the performance metrics on which the bonus was earned (whether for the named executive officers or a wider group of employees), taking into account the following factors:

- The company's past practices regarding equity and cash compensation;
- Whether the company has a holding period or stock ownership requirements in place, such as a meaningful retention ratio (at least 50 percent for full tenure); and
- Whether the company has a rigorous claw-back policy in place.

## Hold Equity Past Retirement or for a Significant Period of Time

**Catholic Advisory Services Recommendation:** Vote case-by-case on shareholder proposals asking companies to adopt policies requiring senior executive officers to retain a portion of net shares acquired through compensation plans. The following factors will be taken into account:

- The percentage/ratio of net shares required to be retained;
- The time period required to retain the shares;
- Whether the company has equity retention, holding period, and/or stock ownership requirements in place and the robustness of such requirements;
- Whether the company has any other policies aimed at mitigating risk taking by executives;
- Executives' actual stock ownership and the degree to which it meets or exceeds the proponent's suggested holding period/retention ratio or the company's existing requirements; and
- Problematic pay practices, current and past, which may demonstrate a short-term versus long-term focus.

Case 1:26-cv-00717-MPB-MKK    Document 26-3    Filed 04/21/26    Page 80 of 1112
PageID #: 246



## Pre-Arranged Trading Plans (10b5-1 Plans)

**Catholic Advisory Services Recommendation:** Generally vote for shareholder proposals calling for the addition of certain safeguards in prearranged trading plans (10b5-1 plans) for executives. Safeguards may include:

- Adoption, amendment, or termination of a 10b5-1 Plan must be disclosed in a Form 8-K;
- Amendment or early termination of a 10b5-1 Plan allowed only under extraordinary circumstances, as determined by the board;
- Request that a certain number of days that must elapse between adoption or amendment of a 10b5-1 Plan and initial trading under the plan;
- Reports on Form 4 must identify transactions made pursuant to a 10b5-1 Plan;
- An executive may not trade in company stock outside the 10b5-1 Plan;
- Trades under a 10b5-1 Plan must be handled by a broker who does not handle other securities transactions for the executive.



# 7. Mergers and Corporate Restructurings

A merger occurs when one corporation is absorbed into another and ceases to exist. The surviving company gains all the rights, privileges, powers, duties, obligations and liabilities of the merged corporation. The shareholders of the absorbed company receive stock or securities of the surviving company or other consideration as provided by the plan of merger. Mergers, consolidations, share exchanges, and sale of assets are friendly in nature, which is to say that both sides have agreed to the combination or acquisition of assets.

Shareholder approval for an acquiring company is generally not required under state law or stock exchange regulations unless the acquisition is in the form of a stock transaction which would result in the issue of 20 percent or more of the acquirer's outstanding shares or voting power, or unless the two entities involved require that shareholders approve the deal. Under most state laws, however, a target company must submit merger agreements to a shareholder vote.  Shareholder approval is required in the formation of a consolidated corporation.

## Mergers and Acquisitions

M&A analyses are inherently a balance of competing factors. Bright line rules are difficult if not impossible to apply to a world where every deal is different. Ultimately, the question for shareholders (both of the acquirer and the target) is the following: Is the valuation fair? Shareholders of the acquirer may be concerned that the deal values the target too highly. Shareholders of the target may be concerned that the deal undervalues their interests.

Vote recommendation will be based on primarily an analysis of shareholder value, which itself can be affected by ancillary factors such as the negotiation process. The importance of other factors, including corporate governance and social and environmental considerations, however, should not fail to be recognized.

**Catholic Advisory Services Recommendation:** Votes on mergers and acquisitions are considered on a case-by-case basis. A review and evaluation of the merits and drawbacks of the proposed transaction is conducted, balancing various and sometimes countervailing factors including:

- _Valuation_: Is the value to be received by the target shareholders (or paid by the acquirer) reasonable? While the fairness opinion may provide an initial starting point for assessing valuation reasonableness, emphasis is placed on the offer premium, market reaction and strategic rationale;
- _Market reaction_: How has the market responded to the proposed deal? A negative market reaction _should cause closer scrutiny of a deal;_
- _Strategic rationale: Does the deal make sense strategically? From where is the value derived? Cost and_ revenue synergies should not be overly aggressive or optimistic, but reasonably achievable. Management should also have a favorable track record of successful integration of historical acquisitions;
- _Negotiations and process_: Were the terms of the transaction negotiated at arm's-length? Was the process fair and equitable?
- _Conflicts of interest_: Are insiders benefiting from the transaction disproportionately and inappropriately as compared to non-insider shareholders?
- _Governance_: Will the combined company have a better or worse governance profile than the current governance profiles of the respective parties to the transaction?
- _Stakeholder impact_: Impact on community stakeholders and workforce including impact on stakeholders, such as job loss, community lending, equal opportunity, impact on environment etc.

## Corporate Reorganization/Restructuring Plans (Bankruptcy)

The recent financial crisis has placed Chapter 11 bankruptcy reorganizations as a potential alternative for distressed companies. While the number of bankruptcies has risen over the past year as evidenced by many firms,

Case 1:26-cv-00717-MPB-MKK    Document 26-3    Filed 04/21/26    Page 82 of 1112
PageID #: 248



including General Motors and Lehman Brothers, the prevalence of these reorganizations can vary year over year due to, among other things, market conditions and a company's ability to sustain its operations. Additionally, the amount of time that lapses between a particular company's entrance into Chapter 11 and its submission of a plan of reorganization varies significantly depending on the complexity, timing, and jurisdiction of the particular case. These plans are often put to a vote of shareholders (in addition to other interested parties), as required by the Bankruptcy Code.

**Catholic Advisory Services Recommendation:** Vote case-by-case on proposals to common shareholders on bankruptcy plans of reorganization, considering the following factors including, but not limited to:

- Estimated value and financial prospects of the reorganized company;
- Percentage ownership of current shareholders in the reorganized company;
- Whether shareholders are adequately represented in the reorganization process (particularly through the existence of an official equity committee);
- The cause(s) of the bankruptcy filing, and the extent to which the plan of reorganization addresses the cause(s);
- Existence of a superior alternative to the plan of reorganization;
- Governance of the reorganized company.

## Special Purpose Acquisition Corporations (SPACs)

**Catholic Advisory Services Recommendation:** Vote case-by-case on SPAC mergers and acquisitions taking into account the following:

- *Valuation*: Is the value being paid by the SPAC reasonable? SPACs generally lack an independent fairness opinion and the financials on the target may be limited. Compare the conversion price with the intrinsic value of the target company provided in the fairness opinion. Also, evaluate the proportionate value of the combined entity attributable to the SPAC IPO shareholders versus the pre-merger value of SPAC. Additionally, a private company discount may be applied to the target, if it is a private entity.
- *Market reaction*: How has the market responded to the proposed deal? A negative market reaction may be a cause for concern. Market reaction may be addressed by analyzing the one-day impact on the unaffected stock price.
- *Deal timing*: A main driver for most transactions is that the SPAC charter typically requires the deal to be complete within 18 to 24 months, or the SPAC is to be liquidated. Evaluate the valuation, market reaction, and potential conflicts of interest for deals that are announced close to the liquidation date.
- *Negotiations and process*: What was the process undertaken to identify potential target companies within specified industry or location specified in charter? Consider the background of the sponsors.
- *Conflicts of interest*: How are sponsors benefiting from the transaction compared to IPO shareholders? Potential conflicts could arise if a fairness opinion is issued by the insiders to qualify the deal rather than a third party or if management is encouraged to pay a higher price for the target because of an 80 percent rule (the charter requires that the fair market value of the target is at least equal to 80 percent of net assets of the SPAC). Also, there may be sense of urgency by the management team of the SPAC to close the deal since its charter typically requires a transaction to be completed within the 18-24 month timeframe.
- *Voting agreements*: Are the sponsors entering into enter into any voting agreements/tender offers with shareholders who are likely to vote against the proposed merger or exercise conversion rights?
- *Governance*: What is the impact of having the SPAC CEO or founder on key committees following the proposed merger?
- *Stakeholder Impact*: Impact on community stakeholders and workforce including impact on stakeholders, such as job loss, community lending, equal opportunity, impact on environment etc.

## Special Purpose Acquisition Corporations (SPACs) - Proposals for Extensions

**Catholic Advisory Services Recommendation:** Generally support requests to extend the termination date by up to one year from the SPAC's original termination date (inclusive of any built-in extension options, and accounting for prior extension requests).

Other factors that may be considered include: any added incentives, business combination status, other amendment terms, and, if applicable, use of money in the trust fund to pay excise taxes on redeemed shares.

## Spin-offs

**Catholic Advisory Services Recommendation:** Votes on spin-offs should be considered on a case-by-case basis depending on the tax and regulatory advantages, planned use of sale proceeds, valuation of spinoff, fairness opinion, benefits to the parent company, conflicts of interest, managerial incentives, corporate governance changes, changes in the capital structure.

## Asset Purchases

**Catholic Advisory Services Recommendation:** Votes on asset purchase proposals should be made on a case-by-case after considering the purchase price, fairness opinion, financial and strategic benefits, how the deal was negotiated, conflicts of interest, other alternatives for the business, non-completion risk.

## Asset Sales

**Catholic Advisory Services Recommendation:** Votes on asset sales should be made on a case-by-case basis after considering the impact on the balance sheet/working capital, value received for the asset, potential elimination of diseconomies, anticipated financial and operating benefits, anticipated use of funds, fairness opinion, how the deal was negotiated, and conflicts of interest.

## Liquidations

**Catholic Advisory Services Recommendation:** Votes on liquidations should be made on a case-by-case basis after reviewing management's efforts to pursue other alternatives, appraisal value of assets, and the compensation plan for executives managing the liquidation. Vote for the liquidation if the company will file for bankruptcy if the proposal is not approved.

## Joint Ventures

**Catholic Advisory Services Recommendation:** Vote case-by-case on proposals to form joint ventures, taking into account percentage of assets/business contributed, percentage ownership, financial and strategic benefits, governance structure, conflicts of interest, other alternatives and non-completion risk.

## Appraisal Rights

Rights of appraisal provide shareholders who do not approve of the terms of certain corporate transactions the right to demand a judicial review in order to determine the fair value for their shares. The right of appraisal generally applies to mergers, sales of essentially all assets of the corporation, and charter amendments that may have a materially adverse effect on the rights of dissenting shareholders.

Case 1:26-cv-00717-MPB-MKK   Document 26-3   Filed 04/21/26   Page 84 of 1112
PageID #: 250



**Catholic Advisory Services Recommendation:** Vote for proposals to restore, or provide shareholders with, rights of appraisal.

## Going Private/Dark Transactions (LBOs and Minority Squeeze-outs)

**Catholic Advisory Services Recommendation:** Vote case-by-case on going private transactions, taking into account the following: offer price/premium, fairness opinion, how the deal was negotiated, conflicts of interest, other alternatives/offers considered, and non-completion risk.

Vote case-by-case on "going dark" transactions, determining whether the transaction enhances shareholder value by taking into consideration:

- Whether the company has attained benefits from being publicly-traded (examination of trading volume, liquidity, and market research of the stock);
- Balanced interests of continuing vs. cashed-out shareholders, taking into account the following:
    - Are all shareholders able to participate in the transaction?
    - Will there be a liquid market for remaining shareholders following the transaction?
    - Does the company have strong corporate governance?
    - Will insiders reap the gains of control following the proposed transaction?
    - Does the state of incorporation have laws requiring continued reporting that may benefit shareholders?

## Private Placements/Warrants/Convertible Debentures

**Catholic Advisory Services Recommendation:** Vote case-by-case on proposals regarding private placements taking into consideration:

- Dilution to existing shareholders' position.
    - The amount and timing of shareholder ownership dilution should be weighed against the needs and proposed shareholder benefits of the capital infusion.
- Terms of the offer - discount/premium in purchase price to investor, including any fairness opinion; conversion features; termination penalties; exit strategy.
    - The terms of the offer should be weighed against the alternatives of the company and in light of company's financial issues.
    - When evaluating the magnitude of a private placement discount or premium, Catholic Advisory Services will consider whether it is affected by liquidity, due diligence, control and monitoring issues, capital scarcity, information asymmetry and anticipation of future performance.
- Financial issues include but are not limited to examining the following: a) company's financial situation; b) degree of need for capital; c) use of proceeds; d) effect of the financing on the company's cost of capital; e) current and proposed cash burn rate; and f) going concern viability and the state of the capital and credit markets.
- Management's efforts to pursue alternatives and whether the company engaged in a process to evaluate alternatives. A fair, unconstrained process helps to ensure the best price for shareholders. Financing alternatives can include joint ventures, partnership, merger or sale of part or all of the company.
- Control issues including: a) Change in management; b) change in control; c) guaranteed board and committee seats; d) standstill provisions; e) voting agreements; f) veto power over certain corporate actions.
- Minority versus majority ownership and corresponding minority discount or majority control premium
- Conflicts of interest
    - Conflicts of interest should be viewed from the perspective of the company and the investor.
    - Were the terms of the transaction negotiated at arm's-length? Are managerial incentives aligned with shareholder interests?
- Market reaction

Case 1:26-cv-00717-MPB-MKK    Document 26-3    Filed 04/21/26    Page 85 of 1112 PageID #: 251



- The market's response to the proposed deal. A negative market reaction is a cause for concern. Market reaction may be addressed by analyzing the one day impact on the unaffected stock price.

Vote for the private placement if it is expected that the company will file for bankruptcy if the transaction is not approved.

## Formation of Holding Company

**Catholic Advisory Services Recommendation:**

- Vote case-by-case on proposals regarding the formation of a holding company, taking into consideration: a) the reasons for the change; b) any financial or tax benefits; c) regulatory benefits; d) increases in capital structure; and e) changes to the articles of incorporation or bylaws of the company.
- Vote against the formation of a holding company, absent compelling financial reasons to support the transaction, if the transaction would include either: a) increases in common or preferred stock in excess of the allowable maximum; or b) adverse changes in shareholder rights.

## Value Maximization Shareholder Proposals

**Catholic Advisory Services Recommendation:** Vote case-by-case on shareholder proposals seeking to maximize shareholder value by hiring a financial advisor to explore strategic alternatives, selling the company or liquidating the company and distributing the proceeds to shareholders. These proposals should be evaluated based on the following factors:

- Prolonged poor performance with no turnaround in sight;
- Signs of entrenched board and management;
- Strategic plan in place for improving value;
- Likelihood of receiving reasonable value in a sale or dissolution;
- Whether company is actively exploring its strategic options, including retaining a financial advisor.



# 8.  Social and Environmental Proposals

Socially responsible shareholder resolutions are receiving a great deal more attention from institutional shareholders today than they have in the past. In addition to the moral and ethical considerations intrinsic to many of these proposals, there is a growing recognition of their potential impact on the economic performance of the company.  Among the reasons for this change are:

- The number and variety of shareholder resolutions on social and environmental issues has increased;
- Many of the sponsors and supporters of these resolutions are large institutional shareholders with significant holdings, and therefore, greater direct influence on the outcomes;
- The proposals are more sophisticated – better written, more focused, and more sensitive to the feasibility of implementation;
- Investors now understand that a company's response to social and environmental issues can have serious economic consequences for the company and its shareholders.

## Global Approach

**Catholic Advisory Services Recommendation:** Generally vote for social and environmental shareholder proposals that promote good corporate citizens while enhancing long-term shareholder and stakeholder value. Vote for disclosure reports that seek additional information particularly when it appears companies have not adequately addressed shareholders' social, and environmental concerns. In determining vote recommendations on shareholder social, workforce, and environmental proposals, Catholic Advisory Services will analyze the following factors:

- Whether the proposal itself is well framed and reasonable;
- Whether adoption of the proposal would have either a positive or negative impact on the company's short-term or long-term share value;
- Whether the company's analysis and voting recommendation to shareholders is persuasive;
- The degree to which the company's stated position on the issues could affect its reputation or sales, or leave it vulnerable to boycott or selective purchasing;
- Whether the subject of the proposal is best left to the discretion of the board;
- Whether the issues presented in the proposal are best dealt with through legislation, government regulation, or company-specific action;
- The company's approach compared with its peers or any industry standard practices for addressing the issue(s) raised by the proposal;
- Whether the company has already responded in an appropriate or sufficient manner to the issue(s) raised in the proposal;
- Whether there are significant controversies, fines, penalties, or litigation associated with the company's environmental or social practices;
- If the proposal requests increased disclosure or greater transparency, whether sufficient information is publicly available to shareholders and whether it would be unduly burdensome for the company to compile and avail the requested information to shareholders in a more comprehensive or amalgamated fashion;
- Whether implementation of the proposal would achieve the objectives sought in the proposal.

In general, Catholic Advisory Services supports proposals that request the company to furnish information helpful to shareholders in evaluating the company's operations. In order to be able to intelligently monitor their investments, shareholders often need information best provided by the company in which they have invested. Requests to report such information will merit support. Requests to establish special committees of the board to address broad corporate policy and provide forums for ongoing dialogue on issues including, but not limited to shareholder relations, the environment, human rights, occupational health and safety, and executive compensation, will generally be supported, particularly when they appear to offer a potentially effective method for enhancing shareholder value. We will closely evaluate proposals that ask the company to cease certain actions

Case 1:26-cv-00717-MPB-MKK    Document 26-3    Filed 04/21/26    Page 87 of 1112 PageID #: 253



that the proponent believes are harmful to society or some segment of society with special attention to the company's legal and ethical obligations, its ability to remain profitable, and potential negative publicity if the company fails to honor the request. Catholic Advisory Services supports shareholder proposals that improve the company's public image and reduce exposure to liabilities.

## Diversity and Equality

Significant progress has been made in recent years in the advancement of gender and racial diversity in the workplace and the establishment of greater protections against discriminatory practices in the workplace. In the U.S, there are many civil rights laws that are enforced by the Equal Employment Opportunity Commission. The Civil Rights Act of 1964 prohibits discrimination based on race, religion, sex, gender identity, sexual orientation, and nationality. However, discrimination on the basis of federally protected characteristics continues. The SEC's revised disclosure rules now require information on how boards factor diversity into the director nomination process, as well as disclosure on how the board assesses the effectiveness of its diversity policy. Shareholder proposals on diversity may target a company's board nomination procedures or seek greater disclosure on a company's programs and procedures on increasing the diversity of its workforce, and make reference to one or more of the following points:

- Violations of workplace anti-discrimination laws lead to expensive litigation and damaged corporate reputations that are not in the best interests of shareholders;
- Employers already prepare employee diversity reports for the EEOC, so preparing a similar report to shareholders can be done at minimal cost;
- The presence of gender and ethnic diversity in workforce and customer pools gives companies with diversified boards a practical advantage over their competitors as a result of their unique perspectives;
- Efforts to increase diversity on corporate boards can be made at reasonable costs; and
- Reports can be prepared "at reasonable expense" describing efforts to encourage diversified representation on their boards.

### Add Women and Minorities to the Board

Board diversification proposals ask companies to put systems in place to increase the representation of gender, ethnic, and racial diversity as well as union members or other underrepresented minority groups on boards of directors.

**Catholic Advisory Services Recommendation:**

- Vote for shareholder proposals that ask the company to take steps to increase diversity to the board.
- Vote for shareholder proposals asking for reports on board diversity.
- Vote for shareholder proposals asking companies to adopt nomination charters or amend existing charters to include reasonable language addressing diversity.

### Racial Equity and/or Civil Rights Audits

**Catholic Advisory Services Recommendation:** Generally vote for proposals requesting that a company conduct an independent racial equity and/or civil rights audit, considering company disclosures, policies, actions, and engagements.

Case 1:26-cv-00717-MPB-MKK    Document 26-3    Filed 04/21/26    Page 88 of 1112
PageID #: 254



## Report on the Distribution of Stock Options by Gender and Race

Companies have received requests from shareholders to prepare reports documenting the distribution of the stock options and restricted stock awards by race and gender of the recipient. Proponents of these proposals argue that, in the future, there will be a shift toward basing racial and gender discrimination suits on the distribution of corporate wealth through stock options. The appearance of these proposals is also in response to the nationwide wage gap and under representation of minorities and women at the highest levels of compensation.

**Catholic Advisory Services Recommendation:** Vote for shareholder proposals asking companies to report on the distribution of stock options by race and gender of the recipient.

## Prepare Report/Promote EEOC-Related Activities

Filers of proposals on this issue generally ask a company to make available, at reasonable cost and omitting proprietary information, data the company includes in its annual report to the Equal Employment Opportunity Commission (EEOC) outlining the make-up of its workforce by race, gender and position. Shareholders also ask companies to report on any efforts they are making to advance the representation of underrepresented gender, ethnic, and racial identities in their workforce. The costs of violating federal laws that prohibit discrimination by corporations are high and can affect corporate earnings. The Equal Opportunities Employment Commission does not release the companies' filings to the public, unless it is involved in litigation, and this information is difficult to obtain from other sources. Companies need to be sensitive to diverse workforce employment issues as new generations of workers become increasingly diverse. This information can be provided with little cost to the company and does not create an unreasonable burden on management.

**Catholic Advisory Services Recommendation:**

- Vote for shareholder proposals that ask the company to report on its diversity and/or affirmative action programs.
- Vote for shareholder proposals calling for legal and regulatory compliance and public reporting related to non-discrimination, affirmative action, workplace health and safety, and labor policies and practices that effect long-term corporate performance.
- Vote for shareholder proposals requesting nondiscrimination in salary, wages and all benefits.
- Vote for shareholder proposals calling for action on equal employment opportunity and antidiscrimination.

## Report on Progress Towards Glass Ceiling Commission Recommendations

In November 1995, the Glass Ceiling Commission (Commission), a bipartisan panel of leaders from business and government, issued a report describing "an unseen yet unbreachable barrier that keeps women and minorities from rising to the upper rungs of the corporate ladder." The Commission recommended that companies take practical steps to rectify this disparity, such as including diversity goals in business plans, committing to affirmative action for qualified employees and initiating family-friendly labor policies. Shareholders have submitted proposals asking companies to report on progress made toward the Commission's recommendations.

**Catholic Advisory Services Recommendation:**

- Vote for shareholder proposals that ask the company to report on its progress against the Glass Ceiling Commission's recommendations.
- Vote for shareholder proposals seeking to eliminate the "glass ceiling" for women and minority employees.



## Prohibit Discrimination on the Basis of Sexual Orientation or Gender Identity

Federal law bans workplace discrimination against lesbian, gay, bisexual, transgender, and/or queer (LGBTQ) employees, and some states have additionally enacted workplace protections for these employees. Although an increasing number of U.S. companies have explicitly banned discrimination on the basis of sexual orientation or gender identity in their equal employment opportunity (EEO) statements, many still do not. Shareholder proponents and other activist groups concerned with LGBTQ rights, such as the Human Rights Campaign (HRC) and the Pride Foundation, have targeted U.S. companies that do not specifically restrict discrimination on the basis of sexual orientation in their EEO statements. Shareholder proposals on this topic ask companies to change the language of their EEO statements in order to put in place anti-discrimination protection for their LGBTQ employees. In addition, proposals may seek disclosure on a company's general initiatives to create a workplace free of discrimination on the basis of sexual orientation, including reference to such items as support of LGBTQ employee groups, diversity training that addresses sexual orientation, and non-medical benefits to domestic partners of LGBTQ employees.

**Catholic Advisory Services Recommendation:**

- Vote for shareholder proposals to include language in EEO statements specifically barring discrimination on the basis of sexual orientation or gender identity.
- Vote for shareholder proposals seeking reports on a company's initiatives to create a workplace free of discrimination on the basis of sexual orientation or gender identity.
- Vote against shareholder proposals that seek to eliminate protection already afforded to LGBTQ employees.

## Report on/Eliminate Use of Racial Stereotypes in Advertising

Many companies continue to use racial stereotypes or images perceived as racially insensitive in their advertising campaigns. Filers of shareholder proposals on this topic often request companies to give more careful consideration to the symbols and images that are used to promote the company.

**Catholic Advisory Services Recommendation:** Vote for shareholder proposals seeking more careful consideration of using racial stereotypes in advertising campaigns, including preparation of a report on this issue.

## Gender, Race, or Ethnicity Pay Gap

Over the past several years, shareholders have filed resolutions requesting that companies report whether a gender, race, or ethnicity pay gap exists, and if so, what measures are being taken to eliminate the gap.

**Catholic Advisory Services Recommendation:** Vote for requests for reports on a company's pay data by gender, race, or ethnicity, or a report on a company's policies and goals to reduce any gender, race, or ethinicity pay gap.

## Labor and Human Rights

Investors, international human rights groups, and labor advocacy groups have long been making attempts to safeguard worker rights in the international marketplace. In instances where companies themselves operate factories in developing countries for example, these advocates have asked that the companies adopt global corporate standards that guarantee sustainable wages and safe working conditions for their workers abroad. Companies that contract out portions of their manufacturing operations to foreign companies have been asked to ensure that the products they receive from those contractors have not been made using forced labor, child labor, or other forms of modern slavery. These companies are asked to adopt formal vendor standards that, among



other things, include some sort of monitoring mechanism. Globalization, relocation of production overseas, and widespread use of subcontractors and vendors, often make it difficult to obtain a complete picture of a company's labor practices in global markets. Deadly accidents at factories, notably in Bangladesh and Pakistan, have continued to intensify these concerns. Many investors believe that companies would benefit from adopting a human rights policy based on the Universal Declaration of Human Rights and the International Labour Organization's Core Labor Standards. Efforts that seek greater disclosure on a company's global labor practices, including its supply chain, and that seek to establish minimum standards for a company's operations will be supported. In addition, requests for independent monitoring of overseas operations will be supported.

Catholic Advisory Services generally supports proposals that call for the adoption and/or enforcement of principles or codes relating to countries in which there are systematic violations of human rights; such as the use of slave, child, or prison labor; a government that is illegitimate; or there is a call by human rights advocates, pro-democracy organizations, or legitimately-elected representatives for economic sanctions. The use of child labor or forced labor is unethical and can damage corporate reputations. Poor labor practices can lead to litigation against the company, which can be costly and time consuming.

## Codes of Conduct and Vendor Standards

Shareholders have submitted proposals that pertain to the adoption of codes of conduct or provision, greater disclosure on a company's international workplace standards, or that request human rights risk assessment. Companies have been asked to adopt a number of different types of codes, including a workplace code of conduct, standards for international business operations, human rights standards, International Labour Organization (ILO) standards and the SA 8000 principles. The ILO is an independent agency of the United Nations which consists of 187 member nations represented by workers, employers, and governments. The ILO's general mandate is to promote a decent workplace for all individuals. The ILO sets international labor standards in the form of its conventions and then monitors compliance with the standards. The seven conventions of the ILO fall under four broad categories: Right to organize and bargain collectively, Nondiscrimination in employment, Abolition of forced labor, and End of child labor. Each of the 187 member-nations of the ILO is bound to respect and promote these rights to the best of their abilities. SA 8000 is a set of labor standards, based on the principles of the ILO conventions and other human rights conventions, and covers eight workplace conditions, including: child labor, forced labor, health and safety, freedom of association and the right to collective bargaining, discrimination, disciplinary practices, working hours and compensation. Companies have also turned to the United Nations "Guiding Principles on Business and Human Rights," a set of guidelines that create a framework for states to protect human rights, corporations to respect human rights, and rights-holders to access remediation.

**Catholic Advisory Services Recommendation:**

- Vote for shareholder proposals to implement human rights standards and workplace codes of conduct.
- Vote for shareholder proposals calling for the implementation and reporting on ILO codes of conduct, SA 8000 Standards, or human rights due diligence practices.
- Vote for shareholder proposals that call for the adoption of principles or codes of conduct relating to company investments in countries with patterns of human rights abuses.
- Vote for shareholder proposals that call for independent monitoring programs in conjunction with local and respected religious and human rights groups to monitor supplier and licensee compliance with codes.
- Vote for shareholder proposals that seek publication of a "Code of Conduct" by the company's foreign suppliers and licensees, requiring that they satisfy all applicable standards and laws protecting employees' wages, benefits, working conditions, freedom of association, and other rights.
- Vote for proposals requesting that a company conduct an assessment of the human rights risks in its operations or in its supply chain, or report on its human rights risk assessment process.
- Vote for shareholder proposals seeking reports on, or the adoption of, vendor standards including: reporting on incentives to encourage suppliers to raise standards rather than terminate contracts and providing public disclosure of contract supplier reviews on a regular basis.



- Vote for shareholder proposals to adopt labor standards for foreign and domestic suppliers to ensure that the company will not do business with foreign suppliers that manufacture products for sale in the U.S. using forced labor, child labor, or that fail to comply with applicable laws protecting employee's wages and working conditions.

## Adopt/Report on MacBride Principles

These resolutions have called for the adoption of the MacBride Principles for operations located in Northern Ireland. They request companies operating abroad to support the equal employment opportunity policies that apply in facilities they operate domestically. The principles were established to address the sectarian hiring problems between Protestants and Catholics in Northern Ireland. It is well documented that Northern Ireland's Catholic community faced much higher unemployment figures than the Protestant community. In response to this problem, the U.K. government instituted the New Fair Employment Act of 1989 (and subsequent amendments) to address the sectarian hiring problems.

Many companies believe that the Act adequately addresses the problems and that further action, including adoption of the MacBride Principles, only duplicates the efforts already underway. In evaluating a proposal to adopt the MacBride Principles, shareholders must decide whether the principles will cause companies to divest, and therefore worsen the unemployment problem, or whether the principles will promote equal hiring practices. Proponents believe that the Fair Employment Act does not sufficiently address the sectarian hiring problems. They argue that the MacBride Principles serve to stabilize the situation and promote further investment.

**Catholic Advisory Services Recommendation:** Vote for shareholder proposals to report on or implement the MacBride Principles.

## Community Impact Assessment/Indigenous Peoples' Rights

A number of U.S. public companies have found their operations or expansion plans in conflict with local indigenous groups. In order to improve their standing with indigenous groups and decrease any negative publicity companies may face, some concerned shareholders have sought reports requesting that companies review their obligations, actions and presence on these groups. Some companies have made progress in working with indigenous groups. However, shareholders who are concerned with the negative impact that the company's operations may have on the indigenous people's land and community, have sought reports detailing the impact of the company's actions and presence on these groups.

**Catholic Advisory Services Recommendation:** Vote for shareholder proposals asking to prepare reports on a company's environmental and health impact on communities.

## Report on Risks of Outsourcing

Consumer interest in keeping costs low through comparison shopping, coupled with breakthroughs in productivity, have prompted companies to look for methods of increasing profit margins while keeping prices competitive. Through a practice known as off-shoring, the outsourcing or moving of manufacturing and service operations to foreign markets with lower labor costs, companies have found one method where the perceived savings potential is quite substantial. Shareholder opponents of outsourcing argue that there may be long-term consequences to offshore outsourcing that outweigh short-term benefits such as backlash from a public already sensitive to off-shoring, security risks from information technology development overseas, and diminished employee morale. Shareholder proposals addressing outsourcing ask that companies prepare a report to shareholders evaluating the risk to the company's brand name and reputation in the U.S. from outsourcing and off-shoring of manufacturing and service work to other countries.

Case 1:26-cv-00717-MPB-MKK    Document 26-3    Filed 04/21/26    Page 92 of 1112
PageID #: 258



**Catholic Advisory Services Recommendation:** Vote for shareholders proposals asking companies to report on the risks associated with outsourcing or off-shoring.

## Report on the Impact of Health Pandemics on Company Operations

Following the COVID-19 pandemic, among other historic pandemics, the distribution of treatments vastly differed in effectiveness between regions. With limited access to adequate treatments, the increasing death toll is expected to have profound social, political, and economic impact globally, including on the companies or industries with operations in affected areas. In the past, shareholder proposals asked companies to develop policies to provide affordable drugs in historically disadvantaged regions. However, in recent years, shareholders have changed their tactic, asking instead for reports on the impact of these pandemics on company operations, including both pharmaceutical and non-pharmaceutical companies operating in high-risk areas. This change is consistent with the general shift in shareholder proposals towards risk assessment and mitigation.

**Catholic Advisory Services Recommendation:** Vote for shareholder proposals asking for companies to report on the impact of pandemics, such as COVID-19, HIV/AIDS, malaria, and tuberculosis, on their business strategies.

## Mandatory Arbitration

**Catholic Advisory Services Recommendation:** Generally vote for requests for a report on a company's use of mandatory arbitration on employment-related claims.

## Sexual Harassment

**Catholic Advisory Services Recommendation:** Generally vote for requests for a report on company actions taken to strengthen policies and oversight to prevent workplace sexual harassment, or a report on risks posed by a company's failure to prevent workplace sexual harassment.

## Operations in High-Risk Markets

In recent years, shareholder advocates and human rights organizations have highlighted concerns associated with companies operating in regions that are politically unstable, including state sponsors of terror. The U.S. government has active trade sanction regimes in place against specific companies, or persons, including Russia, China, Cuba, Iran, North Korea, Sudan, and Syria, among others. These sanctions are enforced by the Office of Foreign Assets Control, which is part of the U.S. Department of the Treasury, as well as U.S. Customs and Border Patrol for sanctioned goods. However, these countries do not comprise an exhaustive list of countries considered to be high-risk markets.

Shareholder proponents have filed resolutions addressing a variety of concerns around how investments and operations in high-risk regions may support, or be perceived to support, potentially oppressive governments. Proponents contend that operations in these countries may lead to potential reputational, regulatory, and/or supply chain risks as a result of operational disruptions. Concerned shareholders have requested investment withdrawals or cessation of operations in high-risk markets as well as reports on operations in high-risk markets. Such reports may seek additional disclosure from companies on criteria employed for investing in, continuing to operate in, and withdrawing from specific countries.

Depending on the country's human rights record, investors have also asked companies to refrain from commencing new projects in the country of concern until improvements are made. In addition, investors have sought greater disclosure on the nature of a company's involvement in the country and on the impact of their involvement or operations.



**Catholic Advisory Services Recommendation:** Vote for requests for a review of and a report outlining the company's potential financial and reputation risks associated with operations in "high-risk" markets, such as a terrorism-sponsoring state or otherwise, taking into account:

- The nature, purpose, and scope of the operations and business involved that could be affected by social or political disruption;
- Current disclosure of applicable risk assessment(s) and risk management procedures;
- Compliance with U.S. sanctions and laws;
- Consideration of other international policies, standards, and laws;
- Whether the company has been recently involved in significant controversies or violations in "high-risk" markets.

## Reports on Operations in Burma/Myanmar

Since the early 1960s, Burma (also known as Myanmar) has been ruled by a military dictatorship that has been condemned for human rights abuses, including slave labor, torture, rape and murder. Many companies have pulled out of Burma over the past decade given the controversy surrounding involvement in the country. Oil companies continue be the largest investors in Burma and therefore are the usual targets of shareholder proposals on this topic. However, proposals have also been filed at other companies, including financial companies, for their involvement in the country.

**Catholic Advisory Services Recommendation:**

- Vote for shareholder proposals to adopt labor standards in connection with involvement in Burma.
- Vote for shareholder proposals seeking reports on Burmese operations and reports on costs of continued involvement in the country.
- Vote shareholder proposals to pull out of Burma on a case-by-case basis.

## Reports on Operations in China

Documented human rights abuses in China continue to raise concerns among investors, specifically with respect to alleged use of forced and child labor in supply chains across industries such as apparel, solar energy, technology manufacturing, and more. Reports have identified U.S. companies with direct or indirect ties to companies controlled by the Chinese military, the People's Liberation Army (PLA). In addition, a number of Chinese companies have been connected to the use of state-sponsored forced labor of Uyghur and other Muslim minority groups. The Chinese government has explained these forced labor transfer programs as policies to combat terrorism, religious extremism, and poverty in the Xinjiang Uyghur Autonomous Region, China.

**Catholic Advisory Services Recommendation:**

- Vote for shareholder proposals requesting more disclosure on a company's involvement in China
- Vote case-by-case on shareholder proposals that ask a company to terminate a project or investment in China.

## Product Sales to Repressive Regimes

Certain Internet technology companies have been accused of assisting repressive governments in violating human rights through the knowing misuse of their hardware and software. Human rights groups have accused companies such as Yahoo!, Cisco, Google, and Microsoft of allowing the Chinese government to censor and track down dissenting voices on the internet.

**Catholic Advisory Services Recommendation:**

- Vote case-by-case on shareholder proposals requesting that companies cease product sales to repressive regimes that can be used to violate human rights.
- Vote for proposals to report on company efforts to reduce the likelihood of product abuses in this manner.

## Internet Privacy/Censorship and Data Security

Information technology sector companies have been at the center of shareholder advocacy campaigns regarding concerns over Internet service companies and technology providers' alleged cooperation with potentially repressive regimes, notably the Chinese government. Shareholder proposals submitted at various companies advocated for companies to take steps to stop abetting repression and censorship of the Internet and/or review their human rights policies taking this issue into consideration. Resolution sponsors generally argue that the Chinese government is using IT company technologies to track, monitor, identify, and, ultimately, suppress political dissent. In the view of proponents, this process of surveillance and associated suppression violates internationally accepted norms outlined in the U.N. Universal Declaration of Human Rights.

While early shareholder resolutions on Internet issues focused on censorship by repressive regimes and net neutrality, proponents have recently raised concerns regarding privacy and data security in the wake of increased breaches that result in the misuse of personal information. On Oct. 13, 2011, the Securities and Exchange Commission (SEC) issued a guidance document about the disclosure obligations relating to cybersecurity risks and cyber incidents. In the document, the SEC references the negative consequences that are associated with cyber-attacks, such as: remediation costs, including those required to repair relationships with customers and clients; increased cyber-security protection costs; lost revenues from unauthorized use of the information or missed opportunities to attract clients; litigation; and reputational damage. The document says that while the federal securities laws do not explicitly require disclosure of cybersecurity risks and incidents, some disclosure requirements may impose an obligation on the company to disclose such information and provides scenarios where disclosure may be required.  According to the FBI's 2023 Internet Crime Report, potential losses from cybercrimes hit $12.5 billion, up 21% from 2022.[22,23]

**Catholic Advisory Services Recommendation:** Vote for resolutions requesting the disclosure and implementation of Internet privacy and censorship policies and procedures considering:

- The level of disclosure of policies and procedures relating to privacy, freedom of speech, Internet censorship, and government monitoring of the Internet;
- Engagement in dialogue with governments and/or relevant groups with respect to the Internet and the free flow of information;
- The scope of business involvement and of investment in markets that maintain government censorship or monitoring of the Internet;
- The market-specific laws or regulations applicable to Internet censorship or monitoring that may be imposed on the company; and
- The level of controversy or litigation related to the company's international human rights policies and procedures.

---

[22] 2023 report: https://www.aha.org/system/files/media/file/2024/03/fbi-internet-crime-report-2023.pdf
[23] 2022 report: https://www.iafci.org/app_themes/docs/Federal%20Agency/2022_IC3Report.pdf

## Disclosure on Plant Closings

Shareholders have asked that companies contemplating plant closures consider the impact of such closings on employees and the community, especially when such plan closures involve a community's largest employers. Catholic Advisory Services usually recommends voting for greater disclosure of plant closing criteria. In cases where it can be shown that companies have been proactive and responsible in adopting these criteria, Catholic Advisory Services recommends against the proposal.

**Catholic Advisory Services Recommendation:** Vote for shareholder proposals seeking greater disclosure on plant closing criteria if the company has not provided such information.

# Climate Change

## Say on Climate (SoC) Management Proposals

**Catholic Advisory Services Recommendation:** Vote case-by-case on management proposals that request shareholders to approve the company's climate transition action plan[24], taking into account the completeness and rigor of the plan. Information that will be considered where available includes the following:

- The extent to which the company's climate related disclosures are in line with TCFD recommendations and meet other market standards;
- Disclosure of its operational and supply chain GHG emissions (Scopes 1, 2, and 3);
- The completeness, feasibility, and rigor of company's short-, medium-, and long-term targets for reducing operational and supply chain GHG emissions in line with Paris Agreement goals (Scopes 1, 2, and 3 if relevant);
- Whether the company has sought and received third-party approval that its targets are science-based;
- Whether the company has made a commitment to be "net zero" for operational and supply chain emissions (Scopes 1, 2, and 3) by 2050;
- Whether the company discloses a commitment to report on the implementation of its plan in subsequent years;
- Whether the company's climate data has received third-party assurance;
- Disclosure of how the company's lobbying activities and its capital expenditures align with company strategy;
- Whether there are specific industry decarbonization challenges; and
- The company's related commitment, disclosure, and performance compared to its industry peers.

## Say on Climate (SoC) Shareholder Proposals

**Catholic Advisory Services Recommendation:** Generally vote for shareholder proposals that request the company to disclose a report providing its GHG emissions levels and reduction targets and/or its upcoming/approved climate transition action plan and provide shareholders the opportunity to express approval or disapproval of its GHG emissions reduction plan, taking into account information such as the following:

- The completeness, feasibility. and rigor of the company's climate-related disclosure;
- The company's actual GHG emissions performance;
- The company's alignment with relevant internationally recognized frameworks such as the Paris Agreement and IEA's Net Zero Emissions by 2050 Scenario;
- Whether the company has been the subject of recent, significant violations, fines, litigation, or controversy related to its GHG emissions; and

---

[24] Variations of this request also include climate transition related ambitions, or commitment to reporting on the implementation of a climate plan.



- Whether the proposal's request is unduly burdensome (scope or timeframe) or overly prescriptive.

## Climate Change/Greenhouse Gas Emissions

Climate change has emerged as the most significant environmental threat to the planet to date. Scientists generally agree that gases released by chemical reactions including the burning of fossil fuels contribute to a "greenhouse effect" that traps the planet's heat. Environmentalists claim that the Greenhouse Gases (GHG) produced by the industrial age have caused recent weather crises such as heat waves, rainstorms, melting glaciers, rising sea levels and receding coastlines. Climate change skeptics have described the rise and fall of global temperatures as naturally occurring phenomena and depicted human impact on climate change as minimal. Shareholder proposals requesting companies to issue a report to shareholders, "at reasonable cost and omitting proprietary information," on greenhouse gas emissions ask that the report include descriptions of corporate efforts to reduce emissions, companies' financial exposure and potential liability from operations that contribute to global warming, their direct or indirect efforts to promote the view that global warming is not a threat, and their goals in reducing these emissions from their operations. Shareholder proponents argue that there is scientific proof that the burning of fossil fuels causes global warming, that future legislation may make companies financially liable for their contributions to global warming, and that a report on the company's role in global warming can be assembled at reasonable cost.

**Catholic Advisory Services Recommendation:**

- Vote for shareholder proposals seeking information on the financial, physical, or regulatory risks it faces related to climate change- on its operations and investments, or on how the company identifies, measures, and manage such risks.
- Vote for shareholder proposals calling for the reduction of GHG or adoption of GHG goals in products and operations.
- Vote for shareholder proposals seeking reports on responses to regulatory and public pressures surrounding climate change, and for disclosure of research that aided in setting company policies around climate change.
- Vote for shareholder proposals requesting reports on greenhouse gas emissions from companies' operations and/or products.
- Vote for shareholder proposals that request the company to disclose a report on reducing methane emissions and to assess the reliability of the company's methane emission disclosures.

## Environmental Justice

Companies have faced proposals addressing environmental justice concerns, focused on vulnerable stakeholders – particularly communities of color and low-income communities – who are disproportionately impacted by environmental pollution. These heightened risks can be exacerbated by climate change.

**Catholic Advisory Services Recommendation:** Generally vote for shareholder proposals requesting disclosure of an environmental justice report, as well as a third-party environmental justice assessment.

## Financed Emissions

**Catholic Advisory Services Recommendation:** For financial institutions and companies that provide financial services, generally vote for shareholder proposals that request the company to disclose its financed emissions. Financed emissions (scope 3, category 15) are emissions associated with a company's investments, not already covered under scopes 1 and 2 – including but not limited to equity investments, debt investments, and project finance. Information that will be considered where available includes the following:

- The completeness, feasibility, and rigor of the company's financed emissions disclosure;



- Whether the company's targets and climate transition plan are in alignment with the Paris Agreement, the International Energy Agency's (IEA) Net Zero Emissions by 2050 Scenario, and other internationally recognized frameworks;
- Whether the company's methodology is in alignment with the Greenhouse Gas Protocol (GHG Protocol), the Partnership for Carbon Accounting Financials (PCAF), and other generally accepted calculation and reporting methodologies and entities; and
- Whether the proposal's request is unduly burdensome (scope or timeframe) or overly prescriptive.

## Invest in Clean/Renewable Energy

Filers of proposals on renewable energy ask companies to increase their investment in renewable energy sources and to work to develop products that rely more on renewable energy sources. Increased use of renewable energy will reduce the negative environmental impact of energy companies. In addition, as supplies of oil and coal exist in the earth in limited quantities, renewable energy sources represent a competitive – and some would argue essential – long-term business strategy.

**Catholic Advisory Services Recommendation:**

- Vote for shareholder proposals seeking the preparation of a report on a company's activities related to the development of renewable energy sources.
- Vote for shareholder proposals seeking increased investment in renewable energy sources unless the terms of the resolution are overly restrictive.

## Just Transition

Companies have faced proposals requesting disclosure on the "just transition" – addressing stakeholder concerns within a company's value chain with regards to the effects of climate change and the energy transition. Relevant stakeholder groups can include employees, suppliers (and workers in supply chains), communities impacted by operations, and other vulnerable groups potentially affected by a company's climate change strategy. "Just transition" disclosure should adequately assess, consult on, and address impacts on affected stakeholders regarding climate change risks.

**Catholic Advisory Services Recommendation:** Generally vote for shareholder proposals requesting just transition and labor protection disclosure, in alignment with the International Labour Organization, the World Benchmarking Alliance, and other generally accepted guidelines and indicators.

## Energy Efficiency

Reducing the negative impact to the environment can be done through the use of more energy efficient practices and products. Shareholders propose that corporations should have energy efficient manufacturing processes and should market more energy efficient products. This can be done by utilizing renewable energy sources that are cost-competitive and by implementing energy efficient operations.

**Catholic Advisory Services Recommendation:** Vote for shareholder proposals requesting a report on company energy efficiency policies and/or goals.

## Natural Capital

Natural capital disclosure has moved into the mainstream of climate change reporting. The Taskforce on Nature-related Financial Disclosures (TNFD) and the Kunming-Montreal Global Biodiversity Framework have mobilized



widespread recognition of the fact that Paris Agreement-aligned targets can only be achieved by integrating natural capital-related concerns. As such, there has been increased market uptake around natural capital disclosures and commitments, particularly around TNFD-aligned reporting, as well as alignment with other internationally accepted reporting frameworks.

**Catholic Advisory Services Recommendation:** Generally vote for shareholder proposals requesting disclosure of TNFD-aligned reporting, including but not limited to a biodiversity impact and dependency assessment. Information that will be considered where available includes the following:

- The completeness, feasibility, and rigor of the company's natural capital-related disclosure;
- Whether the company's natural capital disclosure adequately incorporate governance, strategy, risk and impact management, and metrics and targets;
- Whether the company's targets and climate transition plan are in alignment with TNFD, the Global Biodiversity Framework, the Paris Agreement, and other internationally recognized frameworks; and
- Whether the proposal's request is unduly burdensome (scope or timeframe) or overly prescriptive.

Natural capital-related shareholder proposals also encompass a broad range of industries. Various market-led initiatives have identified key sectors for investor-issuer engagement, including but not limited to: chemicals, consumer goods, food and agriculture, forestry, mining, oil and gas, packaging, and pharmaceuticals. Some proposals also address indigenous peoples' rights, which is also a key consideration for natural capital frameworks.

**Catholic Advisory Services Recommendation:** Generally vote for shareholder proposals requesting companies to prepare reports or adopt sustainable sourcing policies with regards to natural capital-related risks, dependencies, and impacts.

## Environment

Proposals addressing environmental and energy concerns are plentiful and generally seek greater disclosure on a particular issue or seek to improve a company's environmental practices in order to protect the world's natural resources. In addition, some proponents cite the negative financial implications for companies with poor environmental practices, including liabilities associated with site clean-ups and lawsuits, as well as arguments that energy efficient products and clean environmental practices are sustainable business practices that will contribute to long-term shareholder value. Shareholders proponents point out that the majority of independent atmospheric scientists agree that global warming poses a serious problem to the health and welfare of our planet, citing the findings of the Intergovernmental Panel on Climate Change. Shareholder activists argue that companies can report on their greenhouse gas emissions within a few months at reasonable cost. The general trend indicates a movement towards encouraging companies to have proactive environmental policies, focusing on maximizing the efficient use of non-renewable resources and minimizing threats of harm to human health or the environment.

### Environmental/Sustainability Reports

Shareholders may request general environmental disclosures or reports on a specific location/operation, often requesting that the company detail the environmental risks and potential liabilities of a specific project. Increasingly, companies have begun reporting on environmental and sustainability issues using the Global Reporting Initiative (GRI) standards. The GRI was established in 1997 with the mission of developing globally applicable guidelines for reporting on economic, environmental, and social performance. The GRI was developed by Ceres (formerly known as the Coalition for Environmentally Responsible Economies) in partnership with the United Nations Environment Programme (UNEP).

Ceres was formed in the wake of the March 1989 Exxon Valdez oil spill, when a consortium of investors, environmental groups, and religious organizations drafted what were originally named the Valdez Principles.  Later named the Ceres Principles, and now branded the Ceres Roadmap 2030, corporate signatories of the Ceres



Roadmap 2030 pledge to institute accountability mechanisms that integrate sustainability considerations into core business systems and decision-making on topics such as governance, stakeholder engagement and disclosure. Signatories also pledge to build systems across a corporation's value chain to enable ongoing improvements in three priority environmental and social impact areas (Climate Change, Natural Resources, and Human Rights).

The Equator Principles are the financial industry's benchmark for determining, assessing and managing social and environmental risk in project financing. First launched in June 2003, the Principles were ultimately adopted by over forty financial institutions over a three-year implementation period. Since its adoption, the Principles have undergone a number of revisions, expanding the use of performance standards and signatory banks' banks' commitments to social responsibility, including human rights, climate change, and transparency. The fourth iteration of the Principles was launched in November 2019, incorporating amendments and new commitment to human rights, climate change, Indigenous Peoples and biodiversity related topics. Financial institutions adopt these principles to ensure that the projects they finance are developed in a socially responsible manner and reflect sound environmental management practices. As of 2019, 101 financial institutions have officially adopted the Equator Principles.

**Catholic Advisory Services Recommendation:**

- Vote for shareholder proposals seeking greater disclosure on the company's environmental and social practices, and/or associated risks and liabilities.
- Vote for shareholder proposals asking companies to report in accordance with the Global Reporting Initiative (GRI).
- Vote for shareholder proposals seeking the preparation of sustainability reports.
- Vote for shareholder proposals to study or implement the Ceres Roadmap 2030.
- Vote for shareholder proposals to study or implement the Equator Principles.

## Operations in Environmentally Sensitive Areas

### Canadian Oil Sands

Proposals asking for a report on oil sands operations in the Athabasca region of Alberta, Canada have appeared at a number of oil and gas companies. Alberta's oil sands contain a reserve largely thought to be one of the world's largest potential energy sources. Rising oil sands production in Alberta has been paralleled with concerns from a variety of stakeholders – including environmental groups, local residents, and shareholders – regarding the environmental impacts of the complicated extraction and upgrading processes required to convert oil sands into a synthetic crude oil. The high viscosity of bitumen makes its extraction a challenging and resource-intensive process; the most common extraction technique involves pumping steam into the oil sands to lower the viscosity of bitumen in order to pump it to the surface.

One of the most prominent issues concerning oil sands extraction is the large volume of greenhouse gases (GHG) associated with production. Oil sands extraction is one of the most energy-intensive forms of oil production, releasing three times more GHG emissions from production than conventional oil.

Shareholders have kept up pressure on the issue of potential long-term risks to companies posed by the environmental, social, and economic challenges associated with Canadian oil sands operations. Resolutions on the topic have focused on requesting greater transparency on the ramifications of oil sands development projects.

### Arctic National Wildlife Refuge

The Arctic National Wildlife Refuge (ANWR) is a federally protected wilderness along Alaska's North Slope. In the past, legislation proposed in both the House and Senate that, if passed, would allow a portion of this area to be leased to private companies for development and production of oil, has been witnessed. Oil companies have

Case 1:26-cv-00717-MPB-MKK    Document 26-3    Filed 04/21/26    Page 100 of 1112
PageID #: 266

ISS

expressed an interest in bidding for these leases given the opportunity. In response, shareholder activists have filed resolutions asking these companies to cancel any plans to drill in the ANWR and cease their lobbying efforts to open the area for drilling. Proponents of shareholder proposals on this issue argue that the Coastal Plain section of the ANWR is the most environmentally sensitive area of the refuge, that the majority of Alaska's North Slope that is not federally designated wilderness already provides the oil industry with sufficient resources for oil production, and that advocates of drilling in ANWR overstate the benefit to be derived from opening the wilderness to oil production. Those in favor of opening the area up to drilling note that only a small portion of ANWR would be considered for exploration, and if drilling were to take place, it would be on less than one percent of the entire area, that modern technology reduces the environmental impact of oil drilling on both the land and surrounding wildlife, and that oil production in ANWR would have considerable benefit to company shareholders, Alaskans, and the United States as a whole.

**Catholic Advisory Services Recommendation:**

- Vote for requests for reports on potential environmental damage as a result of company operations in protected regions.
- Vote for shareholder proposals asking companies to prepare reports or adopt policies on operations that include mining, drilling or logging in environmentally sensitive areas.
- Vote for shareholder proposals seeking to curb or reduce the sale of products manufactured from materials extracted from environmentally sensitive areas such as old growth forests.

## Hydraulic Fracturing

Shareholder proponents have elevated concerns on the use of hydraulic fracturing, an increasingly controversial process in which water, sand, and a mix of chemicals are blasted horizontally into tight layers of shale rock to extract natural gas. As this practice has gained more widespread use, environmentalists have raised concerns that the chemicals mixed with sand and water to aid the fracturing process can contaminate ground water supplies. Proponents of resolutions at companies that employ hydraulic fracturing are also concerned that wastewater produced by the process could overload the waste treatment plants to which it is shipped. Shareholders have asked companies that utilize hydraulic fracturing to report on the environmental impact of the practice and to disclose policies aimed at reducing hazards from the process.

**Catholic Advisory Services Recommendation:** Vote for requests seeking greater transparency on the practice of hydraulic fracturing and its associated risks.

## Phase Out Chlorine-Based Chemicals

The Environmental Protection Agency (EPA) identified chlorine bleaching of pulp and paper as a major source of dioxin, a known human carcinogen linked to have negative effects to humans and animals. A number of shareholder proposals have been filed in recent years asking companies to report on the possible phase-out of chlorine bleaching in the production of paper because of the practice's negative environmental impact.

**Catholic Advisory Services Recommendation:**

- Vote for shareholder proposals to prepare a report on the phase-out of chlorine bleaching in paper production.
- Vote on a case-by-case basis on shareholder proposals asking companies to cease or phase-out the use of chlorine bleaching.

## Land Procurement and Development

Certain real estate developers including big-box large retailers have received criticism over their processes for acquiring and developing land. Given a 2005 Supreme Court decision allowing for the usage of eminent domain laws in the U.S. to take land from property-owners for tax generating purposes, as well as certain controversies outside of the U.S. with land procurement, some shareholders would like assurances that companies are acting ethically and with local stakeholders in mind.

**Catholic Advisory Services Recommendation:** Vote for shareholder proposals requesting that companies report on or adopt policies for land procurement and utilize the policies in their decision-making.

## Report on the Sustainability of Concentrated Area Feeding Operations (CAFO)

The potential environmental impact on water, aquatic ecosystems, and local areas from odor and chemical discharges from CAFOs has led to lawsuits and EPA regulations. Certain shareholders have asked companies to provide additional details on their CAFOs in addition to those with which the companies contract to raise their livestock.

**Catholic Advisory Services Recommendation:** Vote for requests that companies report on the sustainability and the environmental impacts of both company-owned and contract livestock operations.

## Adopt a Comprehensive Recycling Policy

A number of companies have received proposals to step-up their recycling efforts, with the goal of reducing the company's negative impact on the environment and reducing costs over the long-term.

**Catholic Advisory Services Recommendation:**

- Vote for shareholder proposals requesting the preparation of a report on the company's recycling efforts.
- Vote for shareholder proposals that ask companies to increase their recycling efforts or to adopt a formal recycling policy.

## Nuclear Energy

Nuclear power continues to be a controversial method of producing electricity. Opponents of nuclear energy are primarily concerned with serious accidents and the related negative human health consequences, and with the difficulties involved in nuclear waste storage.

**Catholic Advisory Services Recommendation:**

- Vote for shareholder proposals seeking the preparation of a report on a company's nuclear energy procedures.
- Vote case-by-case on proposals that ask the company to cease the production of nuclear power.

## Water Use

Shareholders may ask for a company to prepare a report evaluating the business risks linked to water use and impacts on the company's supply chain, including subsidiaries and bottling partners. Such proposals also ask

companies to disclose current policies and procedures for mitigating the impact of operations on local communities in areas of water scarcity.

**Catholic Advisory Services Recommendation:**

- Vote for shareholder proposals seeking the preparation of a report on a company's risks linked to water use.
- Vote for resolutions requesting companies to promote the "human right to water" as articulated by the United Nations.
- Vote for shareholder proposals requesting that companies report on or adopt policies for water use that incorporate social and environmental factors.

## Compliance to relevant Climate Accords

With the Paris Agreement operational as of November 2016, ratifying countries have agreed to reduce their emissions of greenhouse gases and pursue efforts to limit global temperature increases to well below 2°C. The Agreement provides a framework for increasingly ambitious climate action to be carried out by all parties over time.

**Catholic Advisory Services Recommendation:** Vote for shareholder proposals asking companies to review and report on how they will meet GHG reduction targets of the countries in which they operate, or their compliance to relevant science-based climate accords, such as the Paris Agreement.

# Health and Safety

## Toxic Materials

**Catholic Advisory Services Recommendation:**

- Vote for shareholder proposals asking companies to report on policies and activities to ensure product safety.
- Vote for shareholder proposals asking companies to disclose annual expenditures relating to the promotion and/or environmental cleanup of toxins.
- Vote for shareholder proposals asking companies to report on the feasibility of removing, or substituting with safer alternatives, all "harmful" ingredients used in company products.

## Product Safety

**Catholic Advisory Services Recommendation:**

- Generally vote for proposals requesting the company to report on or adopt consumer product safety policies and initiatives.
- Generally vote for proposals requesting the study, adoption and/or implementation of consumer product safety programs in the company's supply chain.

## Workplace/Facility Safety

**Catholic Advisory Services Recommendation:**

- Vote for shareholder proposals requesting workplace safety reports, including reports on accident risk reduction efforts.

- Vote shareholder proposals requesting companies report on or implement procedures associated with their operations and/or facilities on a case-by-case basis.

## Report on Firearm Safety Initiatives

Shareholders may ask for a company to report on policies and procedures that are aimed at curtailing the incidence of gun violence. Such a report may include: implementation of the company's contract instruction to distributors not to sell the company's weapons at gun shows or through pawn shops; recalls or retro-fits of products with safety-related defects causing death or serious injury to consumers, as well as development of systems to identify and remedy these defects; names and descriptions of products that are developed or are being developed for a combination of higher caliber/maximum capacity and greater conceal-ability; and the company's involvement in promotion campaigns that could be construed as aimed at children. The Sandy Hook Principles were established to commemorate the victims of gun violence and to encourage positive corporate behavior in response to the proliferation of gun violence in America.

**Catholic Advisory Services Recommendation:**

- Vote for shareholder proposals requesting the company report on risks associated with firearms, firearm sales, marketing, and societal impacts.
- Vote for shareholder proposals asking the company to report on its efforts to promote firearm safety.
- Vote for shareholder proposals asking the company to stop the sale of firearms and accessories.

## Phase-out or Label Products Containing Genetically Engineered Ingredients

Shareholders have asked companies engaged in the development of genetically modified agricultural products to adopt a policy of not marketing or distributing such products until "long term safety testing" demonstrates that they are not harmful to humans, animals or the environment. Until further long-term testing demonstrates that these products are not harmful, companies in the restaurant and prepared foods industries have been asked to remove genetically altered ingredients from products they manufacture or sell and label such products in the interim. Shareholders have also asked supermarket companies to do the same for their own private label brands.

**Catholic Advisory Services Recommendation:**

- Vote for shareholder proposals to label products that contain genetically engineered products or products from cloned animals.
- Vote for shareholder proposals that ask the company to phase out the use of genetically engineered ingredients in their products.
- Vote for shareholder proposals that ask the company to report on the use of genetically engineered organisms in their products.
- Vote for shareholder proposals asking for reports on the financial, legal, and operational risks posed by the use of genetically engineered organisms.

## Tobacco-related Proposals

Under the pressure of ongoing litigation and negative media attention due to higher youth smoking rates and e-cigarettes, tobacco companies and even non-tobacco companies with ties to the industry have received an assortment of shareholder proposals seeking increased responsibility and social consciousness from tobacco companies and firms affiliated with the tobacco industry.

In June 2009, the Family Smoking Prevention and Tobacco Control Act was signed into law, giving the FDA authority to regulate the tobacco industry for the first time, including the power to block or approve new products

as well as the nicotine and other content in existing tobacco products. This legislation restricts tobacco marketing and sales to youth, requires warning labels, bans cigarettes and e-cigarettes with characterizing flavor, and generally implement standards for tobacco products to protect public health.

**Catholic Advisory Services Recommendation:**

- Vote for shareholder proposals seeking a report on underage tobacco prevention policies and standards.
- Vote for shareholder proposals requesting a report on the public health risk of tobacco sales.
- Vote for shareholder proposals asking producers of tobacco product components (such as filters, adhesives, flavorings, and paper products) to halt sales to tobacco companies or produce a report outlining the risks and potential liabilities of the production of these components.
- Vote for shareholder proposals seeking a report on a tobacco company's advertising approach.
- Vote for shareholder proposals to cease investment in tobacco companies.
- Vote for proposals calling for tobacco companies to cease the production of tobacco products.

## Adopt Policy/Report on Drug Pricing

Pharmaceutical drug pricing, both within the United States and internationally, has raised many questions of the companies that are responsible for creating and marketing these treatments. Shareholder proponents, activists and even some legislators have called upon drug companies to restrain pricing of prescription drugs.

The high cost of prescription drugs is a vital issue for senior citizens across the country. Seniors have the greatest need for prescription drugs, accounting for a significant portion of all prescription drug sales, but they often live on fixed incomes and are underinsured.

Proponents note that efforts to reign-in pharmaceutical costs will not negatively impact research and development (R&D) costs and that retail drug prices are consistently higher in the U.S. than in other industrialized nations. Pharmaceutical companies often respond that adopting a formal drug pricing policy could put the company at a competitive disadvantage.

Against the backdrop of the AIDS crisis in Africa, many shareholders have called on companies to address the issue of affordable drugs for the treatment of AIDS, as well as tuberculosis and malaria throughout low- and middle-income countries (LMIC). When analyzing such resolutions, consideration should be made of the strategic implications of pricing policies in the market.

**Catholic Advisory Services Recommendation:**

- Vote for shareholder proposals to prepare a report on drug pricing.
- Vote for shareholder proposals to adopt a formal policy on drug pricing.
- Vote for shareholder proposals that call on companies to develop a policy to provide affordable HIV, AIDS, tuberculosis, and malaria drugs in low- and middle-income countries (LMIC).
- Vote for proposals asking for reports on the economic effects and legal risks of limiting pharmaceutical products to Canada or certain wholesalers.
- Vote case-by-case proposals requesting that companies adopt policies not to constrain prescription drug re-importation by limiting supplies to foreign markets.

## Government and Military

Weapons-related proposals may target handguns, landmines, defense contracting, or sale of weapons to foreign governments.

## Prepare Report to Renounce Future Landmine Production

Although very few companies currently produce landmines, some companies continue to have links to landmine production or produce components that are used to make landmines. Shareholders have asked companies to renounce the future development of landmines or their components, or to prepare a report on the feasibility of such a renouncement.

**Catholic Advisory Services Recommendation:** Vote for shareholder proposals seeking a report on the renouncement of future landmine production.

## Prepare Report on Foreign Military Sales

Shareholders have filed proxy resolutions asking companies to account for their policies surrounding the sale of military equipment to foreign governments. The proposals can take various forms. One resolution simply calls on companies to report on their foreign military sales, provide information on military product exports, disclose the company's basis for determining whether those sales should be made, and any procedures used to market or negotiate those sales. Another resolution calls for companies to report on "offsets" e.g. guarantee of new jobs in the purchasing country and technology transfers. Offsets involve a commitment by military contractors and the U.S. government to direct benefits back to a foreign government as a condition of a military sale.

**Catholic Advisory Services Recommendation:**

- Vote for shareholder proposals to report on foreign military sales or offset agreements.
- Vote case-by-case on proposals that call for outright restrictions on foreign military sales.

## Depleted Uranium/Nuclear Weapons

Depleted uranium is the less radioactive uranium that is left behind after enriched uranium is produced for nuclear reactor fuel and fissile material for nuclear weapons. The main difference is that depleted uranium contains at least three times less U-235 than natural uranium. However, it is still weakly radioactive. Shareholders want reports on companies' policies, procedures and involvement in the said substance and nuclear weapons.

**Catholic Advisory Services Recommendation:** Vote for shareholder proposals requesting a report on involvement, policies, and procedures related to depleted uranium and nuclear weapons.

## Adopt Ethical Criteria for Weapons Contracts

Shareholders have requested that companies review their code of conduct and statements of ethical criteria for military production-related contract bids, awards, and execution to incorporate environmental factors and sustainability issues related to the contract bidding process. Sustainability is a business model that requires companies to balance the needs and interests of various stakeholders while concurrently sustaining their businesses, communities, and the environment for future generations.

**Catholic Advisory Services Recommendation:** Vote for shareholder proposals asking companies to review and amend, if necessary, the company's code of conduct and statements of ethical criteria for military production-related contract bids, awards and execution.

## Animal Welfare

### Animal Rights/Testing

Shareholders and animal rights groups, including People for the Ethical Treatment of Animals (PETA), may file resolutions calling for the end to painful and unnecessary animal testing on laboratory animals by companies developing products for the cosmetics and medical supply industry. Since advanced testing methods now produce many reliable results without the use of live animals, Catholic Advisory Services generally supports proposals on this issue. In cases where it can be determined that alternative testing methods are unreliable or are required by law, Catholic Advisory Services recommends voting against such proposals. Other resolutions call for the adoption of animal welfare standards that would ensure humane treatment of animals on vendors' farms and slaughter houses. Catholic Advisory Services will generally vote in favor of such resolutions.

**Catholic Advisory Services Recommendation:**

- Vote for shareholder proposals that seek to limit unnecessary animal testing where alternative testing methods are feasible or not barred by law.
- Vote for shareholder proposals that ask companies to adopt or/and report on company animal welfare standards or animal-related risks.
- Vote for shareholder proposals asking companies to report on the operational costs and liabilities associated with selling animals.
- Vote for shareholder proposals to eliminate cruel product testing methods.
- Vote for shareholder proposals that seek to monitor, limit, report, or eliminate the outsourcing of animal testing to overseas laboratories.
- Vote for shareholder proposals to adopt or adhere to a public animal welfare policy at both company and contracted laboratory levels.
- Vote for shareholder proposals to evaluate, adopt, or require suppliers to adopt Controlled Atmosphere Killing (CAK) slaughter methods.

## Political and Charitable Giving

### Lobbying Efforts

Shareholders have asked companies to report on their lobbying efforts on proposed legislation or to refute established scientific research regarding climate change, the health effects of smoking, fuel efficiency standards etc. Proponents have pointed to potential legislation on climate change, the lethargic pace of improvements in fuel efficiency standards in the U.S. automotive industry, and the highly litigious nature surrounding the tobacco industry as rationales for greater transparency on corporate lobbying practices that would shed light on whether companies are acting in the best long-term interests of their shareholders. Proponents of lobbying resolutions typically request enhanced disclosure of lobbying policies and expenditures, including a report on the policies and procedures related to lobbying, amounts used for various types of lobbying, and any membership or payments to a tax-exempt organization that writes and endorses model legislation.

**Catholic Advisory Services Recommendation:**

- Vote for shareholder proposals asking companies to review and report on their lobbying activities, including efforts to challenge scientific research and influence governmental legislation.
- Vote for proposals requesting information on a company's lobbying (including direct, indirect, and grassroots lobbying) activities, policies, or procedures.

## Political Contributions/Non-Partisanship

As evidenced by the U.S. Supreme Court's January 2010 decision in *Citizens United vs. Federal Election Commission* that lifted restrictions on corporate spending in federal elections, changes in legislation that governs corporate political giving have, rather than limiting such contributions, increased the potential for corporate contributions to the political process and the complexity of tracking such contributions.

Proponents of political spending resolutions generally call for enhanced disclosure of political contributions, including a report on the policies and procedures for corporate political campaign contributions and trade association expenditures, the respective amounts of such donations using company funds, or an assessment of the impacts of such contributions on the firm's image, sales and profitability. Shareholder advocates of these proposals are concerned with the lack of transparency on political giving and the increasing involvement and influence of corporations in the political process.

**Catholic Advisory Services Recommendation:**

- Vote for proposals calling for a company to disclose political and trade association contributions, unless the terms of the proposal are unduly restrictive.
- Vote for proposals calling for a company to maintain a policy of political non-partisanship.
- Vote against proposals asking a company to refrain from making any political contributions.

## Charitable Contributions

Shareholder proponents of charitable-contributions related resolutions may seek greater disclosure on a company's charitable donations including dollar amounts, sponsorships, and policies on corporate philanthropy. Catholic Advisory Services is generally supportive of increased transparency around corporate charitable giving. However, some resolutions extend beyond mere disclosure requests and attempt to influence or restrict companies' contributions to specific types of beneficiaries in a manner that furthers particular objectives supported by the proposal sponsors.  Catholic Advisory Services believes that management is better positioned to decide what criteria are appropriate for making corporate charitable contributions. Also, some of the proposals may require companies to poll their shareholders as part of the grant-making process. Since majority of companies generally have thousands of shareholders, contacting, confirming, and processing each individual opinion and/or consent would be a burdensome and expensive exercise.

**Catholic Advisory Services Recommendation:**

- Generally vote for shareholder resolutions seeking enhanced transparency on corporate philanthropy.
- Vote against shareholder proposals imposing charitable giving criteria or requiring shareholder ratification of grants.
- Vote against shareholder proposals requesting that companies prohibit charitable contributions.

## Political Expenditures and Lobbying Congruency

**Catholic Advisory Services Recommendation:** Generally vote for proposals requesting greater disclosure of a company's alignment of political contributions, lobbying, and electioneering spending with a company's publicly stated values and policies, unless the terms of the proposal are unduly restrictive. Additionally, Catholic Advisory Services will consider whether:

- The company's policies, management, board oversight, governance processes, and level of disclosure related to direct political contributions, lobbying activities, and payments to trade associations, political action committees, or other groups that may be used for political purposes;

- The company's disclosure regarding: the reasons for its support of candidates for public offices; the reasons for support of and participation in trade associations or other groups that may make political contributions; and other political activities;
- Any incongruencies identified between a company's direct and indirect political expenditures and its publicly stated values and priorities;
- Recent significant controversies related to the company's direct and indirect lobbying, political contributions, or political activities.

## Disclosure on Prior Government Service

Shareholders have asked companies to disclose the identity of any senior executive and/or other high-level employee, consultant, lobbyist, attorney, or investment banker who has served in government. Although the movement of individuals between government and the private sector may benefit both, the potential also exists for conflicts of interest, especially in industries that have extensive dealings with government agencies.

**Catholic Advisory Services Recommendation:** Vote for shareholder proposals calling for the disclosure of prior government service of the company's key executives.

# Consumer Lending and Economic Development

## Adopt Policy/Report on Predatory Lending Practices

Predatory lending involves charging excessive fees to subprime borrowers without adequate disclosure. More specifically, predatory lending includes misleading subprime borrowers about the terms of a loan, charging excessive fees that are folded into the body of a refinancing loan, including life insurance policies or other unnecessary additions to a mortgage, or lending to homeowners with insufficient income to cover loan payments.

**Catholic Advisory Services Recommendation:** Vote for shareholder proposals seeking the development of a policy or preparation of a report to guard against predatory lending practices.

## Disclosure on Credit in Low- and Lower-middle-income Countries (LMIC) or Forgive LMIC Debt

Shareholders have asked banks and other financial services firms to develop and disclose lending policies for low- and lower-middle-income countries (LMIC). Proponents are concerned that, without such policies, lending to LMIC may contribute to the outflow of capital, the inefficient use of capital, and corruption, all of which increase the risk of loan loss. In the interest of promoting improved LMIC lending practices and responsible loan disclosure, Catholic Advisory Services generally supports voting for such proposals.  In cases where it can be determined that companies have been proactive and responsible in developing such policies, Catholic Advisory Services may recommend a vote against the proposal's adoption. Catholic Advisory Services usually opposes proposals that call for outright loan forgiveness; such action represents an unacceptable loss to lending institutions and their shareholders. Catholic Advisory Services may support such proposals at banks that have failed to make reasonable provisions for non-performing loans as a means to encourage a change in policy.

**Catholic Advisory Services Recommendation:**

- Vote for shareholder proposals asking for disclosure on lending practices in low- and lower-middle-income countries, unless the company has demonstrated a clear proactive record on the issue.
- Vote against shareholder proposals asking banks to forgive loans outright.

- Vote case-by-case on shareholder proposals asking for loan forgiveness at banks that have failed to make reasonable provisions for non-performing loans.
- Vote for proposals to restructure and extend the terms of non-performing loans.

## Community Investing

Shareholders may ask for a company to prepare a report addressing the company's community investing efforts. Such proposals also ask companies to review their policies regarding their investments in different communities.

**Catholic Advisory Services Recommendation:** Vote for proposals that seek a policy review or report addressing the company's community investing efforts.

# Miscellaneous

## Adult Entertainment

Traditionally, there have not been many proposals filed in the area of adult entertainment. However, with the consolidation of the communications industry, a number of large companies have ended up with ownership of cable companies. These cable companies may offer their customers access to pay-per-view programming or channels intended for adult audiences. Proponents of shareholder proposals on this issue ask cable companies and companies with interests in cable companies to assess the costs and benefits of continuing to distribute sexually-explicit content, including the potential negative impact on the company's image.

**Catholic Advisory Services Recommendation:** Vote for shareholder proposals that seek a review of the company's involvement with pornography.

## Abortion/Right to Life Issues

Shareholder proposals pertaining to abortion and right to life issues have appeared more frequently recently, especially in the aftermath of the U.S. Supreme Court decision overturning Roe v. Wade in 2022. However, in the past shareholders have asked companies to stop manufacturing abortifacient drugs; to separate abortifacient drug operations from other operations; or to discontinue acute-care or physician management practices that involve support for abortion services.

**Catholic Advisory Services Recommendation:** Vote on shareholder proposals that address right to life issues in a manner consistent with the teachings of the Catholic Church on abortion and right to life issues.

## Anti-Social Proposals

A number of 'anti-social' shareholder proposals have been filed at companies requesting increased disclosure. While these proposals' requests are very similar to those submitted by shareholder advocates within traditional socially responsible investor circles, the underlying motives for filing the proposals appear to be very different. In addition to charitable contribution proposals, anti-social proposals addressing climate change, sustainability, and conflicts of interest may be seen at shareholder meetings. Despite implicitly different motivations in some of these proposals, the underlying requests for increased disclosure, in some cases, may be worth shareholder support.

**Catholic Advisory Services Recommendation:**

- Vote against shareholder proposals that do not seek to ultimately advance the goals of the social investment community.

- Vote case-by-case on anti-social shareholder proposals seeking a review or report on the company's charitable contributions.

## Artificial Intelligence (AI)

Companies have received shareholder proposals requesting increased disclosure of responsible AI policies, procedures, and practices with respect to board oversight, environmental sustainability, and human rights risk mitigation.

AI and data center issues are wide-ranging. Some areas where companies may face AI-related risks that could materially impact their operations include:

- How high levels of AI-driven energy use may impact GHG emissions targets, climate goals, and climate transition plans;
- How using AI to increase fossil fuel development and production may impact climate targets, and may pose legal and reputational risks;
- Data centers exacerbating water stress, especially in drought-prone areas;
- Child safety;
- End use due diligence (how use of AI for surveillance and censorship, especially in conflict-affected and high-risk areas, may impact legal and reputational risk);
- Data acquisition and usage (privacy, safety, intellectual property);
- Human capital management (bias, discrimination, workplace monitoring, health and safety, automation, and other workforce impacts);
- Just AI transition;
- Misinformation and disinformation;
- Privacy concerns, and potential promotion of hate speech and discrimination, related to targeted advertising; and
- Potential human rights impacts related to weapons development and deployment.

**Catholic Advisory Services Recommendation:** Generally vote for shareholder proposals requesting companies to prepare reports or adopt policies in line with internationally accepted frameworks. The scope of this recommendation takes into consideration the entire AI lifecycle and value chain, from upstream components and data sourcing, to downstream applications, safety and security issues, and other broader societal and environmental impacts.

## Tax Transparency

**Catholic Advisory Services Recommendation:** Generally vote for shareholder proposals that request the company to disclose on tax transparency and country-by-country reporting (CbCR), in alignment with internationally-accepted frameworks, such as the Global Reporting Initiative Tax Standard (GRI 207: Tax 2019) and the Organisation for Economic Co-operation and Development's (OECD) BEPS Action 13 (Base Erosion and Profit Shifting).

## Violence and Adult Themes in Video Games

Perceptions of increased sex and violence in video games have led certain shareholders to question the availability of adult-themed content to children and teens. The Entertainment Software Ratings Board, which provides ratings for video games, has classified approximately 34 percent of the total games it reviews as either Teen, Mature, or Adults Only.

**Catholic Advisory Services Recommendation:** Vote for shareholder proposals asking for reports on company policies related to the sale of mature-rated video games to children and teens.

## Link Compensation to Non-Financial Factors

Proponents of these proposals feel that social and environmental criteria should be factored into the formulas used in determining executive compensation packages. The shareholder sponsors of the resolutions look to companies to review current compensation practices and to include social or environmental performance criteria such as accounting for "poor corporate citizenship" and meeting environmental or workplace safety objectives and metrics when evaluating executive compensation. Some of the non-financial criteria that proponents of these resolutions seek to be incorporated in compensation program design include workplace safety, environmental stewardship, or diversity and customer/employee satisfaction – as part of a written policy used to align compensation with performance on non-financial factors alongside financial criteria.

Proponents believe that factors such as poor environmental performance, workplace lawsuits, etc. could have a significant adverse impact on a company's financial performance if not proactively and adequately addressed, and that these factors *should* be considered along with traditional financial considerations when determining executive pay.  The significant stock price declines and massive losses in shareholder value stemming from the BP Deepwater Horizon oil rig disaster and the tragic explosion at Massey Energy's Upper Big Branch mine that killed 29 employees is a sobering reminder of the need to have the right management incentives in place to ensure that social and environmental risks are actively managed and mitigated against. Given the proliferation of derivative lawsuits targeted at firms such as Halliburton, Transocean and Cameron International that were suppliers to or partners with BP in a capacity that ignored safety considerations or that contributed to the economic and ecological disaster, investors are increasingly mindful of the far-reaching implications that exposure to social or environmental risks could have on shareholder value at portfolio companies.

**Catholic Advisory Services Recommendation:**

- Vote for shareholder proposals calling for linkage of executive pay to non-financial factors including performance against social and environmental goals, customer/employee satisfaction, corporate downsizing, community involvement, human rights, or predatory lending.
- Vote for shareholder proposals seeking reports on linking executive pay to non-financial factors.

# 9. Mutual Fund Proxies

## Election of Trustees and Directors

**Catholic Advisory Services Recommendation:** Vote case-by-case on the election of directors and trustees, following the same guidelines for uncontested directors for public company shareholder meetings. However, mutual fund boards do not usually have compensation committees, so do not withhold for the lack of this committee.

## Closed End Funds- Unilateral Opt-In to Control Share Acquisition Statutes

**Catholic Advisory Services Recommendation:** For closed-end management investment companies (CEFs), vote against or withhold from nominating/governance committee members (or other directors on a case-by-case basis) at CEFs that have not provided a compelling rationale for opting-in to a Control Share Acquisition statute, nor submitted a by-law amendment to a shareholder vote.

## Investment Advisory Agreement

An investment advisory agreement is an agreement between a mutual fund and its financial advisor under which the financial advisor provides investment advice to the fund in return for a fee based on the fund's net asset size.

**Catholic Advisory Services Recommendation:** Votes on investment advisory agreements should be evaluated on a case-by-case basis, considering the following factors:

- Proposed and current fee schedules;
- Fund category/investment objective;
- Performance benchmarks;
- Share price performance as compared with peers;
- Resulting fees relative to peers;
- Assignments (where the advisor undergoes a change of control).

## Changing a Fundamental Restriction to a Non-fundamental Restriction

Fundamental investment restrictions are limitations within a fund's articles of incorporation that limit the investment practices of the particular fund.

**Catholic Advisory Services Recommendation:** Vote case-by-case on proposals to change a fundamental restriction to a non-fundamental restriction, considering the following factors:

- The fund's target investments;
- The reasons given by the fund for the change; and
- The projected impact of the change on the portfolio.

## Change Fundamental Investment Objective to Non-fundamental

**Catholic Advisory Services Recommendation:** Vote against proposals to change a fund's fundamental investment objective to non-fundamental.

## Distribution Agreements

Distribution agreements are agreements between a fund and its distributor which provide that the distributor is paid a fee to promote the sale of the fund's shares.

**Catholic Advisory Services Recommendation:** Vote case-by-case on distribution agreement proposals, considering the following factors:

- Fees charged to comparably sized funds with similar objectives;
- The proposed distributor's reputation and past performance;
- The competitiveness of the fund in the industry; and
- The terms of the agreement.

## Approving New Classes or Series of Shares

**Catholic Advisory Services Recommendation:** Vote for the establishment of new classes or series of shares.

## Convert Closed-end Fund to Open-end Fund

Although approval of these proposals would eliminate the discount at which the fund's shares trade.  The costs associated with converting the fund, in addition to the potential risks to long-term shareholder value, outweigh the potential benefits of the conversion.

**Catholic Advisory Services Recommendation:** Vote case-by-case on conversion proposals, considering the following factors:

- Past performance as a closed-end fund;
- Market in which the fund invests;
- Measures taken by the board to address the discount; and
- Past shareholder activism, board activity, and votes on related proposals.

## Proxy Contests

**Catholic Advisory Services Recommendation:** Vote case-by-case on proxy contests, considering the following factors:

- Past performance relative to its peers;
- Market in which fund invests;
- Measures taken by the board to address the issues;
- Past shareholder activism, board activity, and votes on related proposals;
- Strategy of the incumbents versus the dissidents;
- Independence of directors;
- Experience and skills of director candidates;
- Governance profile of the company;
- Evidence of management entrenchment.

## Preferred Stock Proposals

**Catholic Advisory Services Recommendation:** Vote case-by-case on the authorization for or increase in preferred shares, considering the following factors:

- Stated specific financing purpose;
- Possible dilution for common shares;
- Whether the shares can be used for antitakeover purposes.

## Mergers

**Catholic Advisory Services Recommendation:** Vote case-by-case on merger proposals, considering the following factors:

- Resulting fee structure;
- Performance of both funds;
- Continuity of management personnel; and
- Changes in corporate governance and their impact on shareholder rights.

## Business Development Companies – Authorization to Sell Shares of Common Stock at a Price below Net Asset Value

**Catholic Advisory Services Recommendation:** Vote for proposals authorizing the board to issue shares below Net Asset Value (NAV) if:

- The proposal to allow share issuances below NAV has an expiration date that is less than one year from the date shareholders approve the underlying proposal, as required under the Investment Company Act of 1940;
- A majority of the independent directors who have no financial interest in the sale have made a determination as to whether such sale would be in the best interests of the company and its shareholders prior to selling shares below NAV; and
- The company has demonstrated responsible past use of share issuances by either:
    - Outperforming peers in its 8-digit GICS group as measured by one- and three-year median TSRs; or
    - Providing disclosure that its past share issuances were priced at levels that resulted in only small or moderate discounts to NAV and economic dilution to existing non-participating shareholders.

## Change in Fund's Subclassification

**Catholic Advisory Services Recommendation:** Vote case-by-case on changes in a fund's sub-classification, considering the following factors: a) potential competitiveness; b) current and potential returns; c) risk of concentration; d) consolidation in target industry.

## Changing the Domicile of a Fund

**Catholic Advisory Services Recommendation:** Vote case-by-case on re-incorporations, considering the following factors:  a) regulations of both states; b) required fundamental policies of both states; c) the increased flexibility available.

## Disposition of Assets/Termination/Liquidation

**Catholic Advisory Services Recommendation:** Vote case-by-case on proposals to dispose of assets, to terminate or liquidate, considering the following factors: a) strategies employed to salvage the company; b) the fund's past performance; c) the terms of the liquidation.

## Authorizing the Board to Hire and Terminate Subadvisers Without Shareholder Approval

**Catholic Advisory Services Recommendation:** Vote against proposals authorizing the board to hire or terminate subadvisers without shareholder approval if the investment adviser currently employs only one subadviser.

## Name Change Proposals

**Catholic Advisory Services Recommendation:** Vote case-by-case on name change proposals, considering the following factors: a) political/economic changes in the target market; b) consolidation in the target market; and c) current asset composition.

## 1940 Act Policies

**Catholic Advisory Services Recommendation:**

- Vote case-by-case on policies under the Investment Advisor Act of 1940, considering the following factors: a) potential competitiveness; b) regulatory developments; c) current and potential returns; and d) current and potential risk.
- Generally vote for these amendments as long as the proposed changes do not fundamentally alter the investment focus of the fund and do comply with the current SEC interpretation.

Case 1:26-cv-00717-MPB-MKK    Document 26-3    Filed 04/21/26    Page 116 of 1112
PageID #: 282

We empower investors and companies to build
for long-term and sustainable growth by providing
high-quality data, analytics, and insight.

### GET STARTED WITH ISS SOLUTIONS

Email sales@issgovernance.com or visit www.issgovernance.com for more information.

Founded in 1985, Institutional Shareholder Services group of companies (ISS) empowers investors and companies to build for long-term and sustainable growth by providing high-quality data, analytics and insight. ISS, which is majority owned by Deutsche Bourse Group, along with Genstar Capital and ISS management, is a leading provider of corporate governance and responsible investment solutions, market intelligence, fund services, and events and editorial content for institutional investors and corporations, globally. ISS' 2,600 employees operate worldwide across 29 global locations in 15 countries. Its approximately 3,400 clients include many of the world's leading institutional investors who rely on ISS' objective and impartial offerings, as well as public companies focused on ESG and governance risk mitigation as a shareholder value enhancing measure. Clients rely on ISS' expertise to help them make informed investment decisions. This document and all of the information contained in it, including without limitation all text, data, graphs, and charts (collectively, the "Information") is the property of Institutional Shareholder Services Inc. (ISS), its subsidiaries, or, in some cases third party suppliers.

The Information has not been submitted to, nor received approval from, the United States Securities and Exchange Commission or any other regulatory body. None of the Information constitutes an offer to sell (or a solicitation of an offer to buy), or a promotion or recommendation of, any security, financial product or other investment vehicle or any trading strategy, and ISS does not endorse, approve, or otherwise express any opinion regarding any issuer, securities, financial products or instruments or trading strategies.

The user of the Information assumes the entire risk of any use it may make or permit to be made of the Information.

ISS MAKES NO EXPRESS OR IMPLIED WARRANTIES OR REPRESENTATIONS WITH RESPECT TO THE INFORMATION AND EXPRESSLY DISCLAIMS ALL IMPLIED WARRANTIES (INCLUDING, WITHOUT LIMITATION, ANY IMPLIED WARRANTIES OF ORIGINALITY, ACCURACY, TIMELINESS, NON-INFRINGEMENT, COMPLETENESS, MERCHANTABILITY, AND FITNESS for A PARTICULAR PURPOSE) WITH RESPECT TO ANY OF THE INFORMATION.

Without limiting any of the foregoing and to the maximum extent permitted by law, in no event shall ISS have any liability regarding any of the Information for any direct, indirect, special, punitive, consequential (including lost profits), or any other damages even if notified of the possibility of such damages. The foregoing shall not exclude or limit any liability that may not by applicable law be excluded or limited.

© 2025 | Institutional Shareholder Services and/or its affiliates

# Foster Declaration Exhibit 2



# UNITED STATES

## CLIMATE PROXY VOTING GUIDELINES

### 2026 Policy Recommendations

Effective for Meetings on or after February 1, 2026

Published December 31, 2025

Effective for Shareholder Meeting Reports Published on or after February 25, 2025,
Consideration of Certain Diversity Factors in Making Vote Recommendations Is Suspended
(for more information, see p. 19)

WWW.ISSGOVERNANCE.COM

# TABLE OF CONTENTS

Introduction ........................................................................................................... 8

1.  Routine/Miscellaneous........................................................................................ 9

Adjourn Meeting ......................................................................................................... 9
Amend Quorum Requirements.................................................................................... 9
Amend Minor Bylaws .................................................................................................. 9
Change Company Name............................................................................................... 9
Change Date, Time, or Location of Annual Meeting.................................................... 9
Other Business .......................................................................................................... 10

Audit-Related ............................................................................................................ 10
Auditor Indemnification and Limitation of Liability ................................................. 10
Auditor Ratification ................................................................................................... 10
Shareholder Proposals Limiting Non-Audit Services................................................. 11
Shareholder Proposals on Audit Firm Rotation ........................................................ 11

2.  Board of Directors ............................................................................................ 12

Voting on Director Nominees in Uncontested Elections ........................................... 12
Accountability ........................................................................................................ 12
Problematic Takeover Defenses, Capital Structure, and Governance Structures ........................................... 12
Problematic Audit-Related Practices ................................................................... 15
Problematic Compensation Practices .................................................................. 15
Environmental, Social and Governance (ESG) Failures........................................ 16
Climate Risk Mitigation and Net Zero ................................................................. 17
Responsiveness ...................................................................................................... 17
Composition ........................................................................................................... 18
Gender Diversity .................................................................................................. 19
Racial and/or Ethnic Diversity ............................................................................ 19
Independence ........................................................................................................ 19
Climate Policy Classification of Directors – U.S. ................................................. 20
Other Board-Related Proposals ................................................................................ 22
Board Refreshment.................................................................................................... 22
Board Size................................................................................................................... 23
Classification/Declassification of the Board.............................................................. 23
CEO Succession Planning............................................................................................ 23
Cumulative Voting...................................................................................................... 23
Director and Officer Indemnification, Liability Protection, and Exculpation ............ 24
Establish/Amend Nominee Qualifications ................................................................. 24
Establish Other Board Committee Proposals............................................................. 25
Filling Vacancies/Removal of Directors..................................................................... 25
Independent Board Chair .......................................................................................... 25
Majority of Independent Directors/Establishment of Independent Committees............................................ 25
Majority Vote Standard for the Election of Directors................................................ 26
Proxy Access.............................................................................................................. 26
Require More Nominees than Open Seats ................................................................. 26

Shareholder Engagement Policy (Shareholder Advisory Committee) ................................................. 26

Proxy Contests/Proxy Access – Voting for Director Nominees in Contested Elections...................................... 27

Vote-No Campaigns ........................................................................................................................ 27

**3.  Shareholder Rights & Defenses** ......................................................................... **28**

Advance Notice Requirements for Shareholder Proposals/Nominations .......................................... 28

Amend Bylaws without Shareholder Consent .................................................................................. 28

Control Share Acquisition Provisions ............................................................................................... 28

Control Share Cash-Out Provisions .................................................................................................. 28

Disgorgement Provisions ................................................................................................................. 29

Fair Price Provisions ........................................................................................................................ 29

Freeze-Out Provisions ..................................................................................................................... 29

Greenmail ....................................................................................................................................... 29

Shareholder Litigation Rights .......................................................................................................... 29

    Federal Forum Selection Provisions............................................................................................ 29

    Exclusive Forum Provisions for State Law Matters ...................................................................... 30

    Fee Shifting............................................................................................................................... 30

Net Operating Loss (NOL) Protective Amendments ......................................................................... 30

Poison Pills (Shareholder Rights Plans) ............................................................................................ 31

Shareholder Proposals to Put Pill to a Vote and/or Adopt a Pill Policy ............................................ 31

Management Proposals to Ratify a Poison Pill ................................................................................. 31

Management Proposals to Ratify a Pill to Preserve Net Operating Losses (NOLs) ............................ 32

Proxy Voting Disclosure, Confidentiality, and Tabulation ............................................................... 32

Ratification Proposals: Management Proposals to Ratify Existing Charter or Bylaw Provisions ....................... 32

Reimbursing Proxy Solicitation Expenses ........................................................................................ 33

Reincorporation Proposals............................................................................................................... 33

Shareholder Ability to Act by Written Consent ............................................................................... 33

Shareholder Ability to Call Special Meetings ................................................................................... 34

Stakeholder Provisions .................................................................................................................... 34

State Antitakeover Statutes ............................................................................................................ 34

Supermajority Vote Requirements ................................................................................................... 34

Virtual Shareholder Meetings ......................................................................................................... 35

**4.  Capital/Restructuring** .................................................................................. **36**

Capital............................................................................................................................................. 36

Adjustments to Par Value of Common Stock.................................................................................... 36

Common Stock Authorization .......................................................................................................... 36

    General Authorization Requests................................................................................................. 36

    Specific Authorization Requests ................................................................................................. 37

Unequal Voting Rights/Dual Class Structure.................................................................................... 37

Preemptive Rights ........................................................................................................................... 37

Preferred Stock Authorization ......................................................................................................... 38

    General Authorization Requests................................................................................................. 38

    Specific Authorization Requests ................................................................................................. 39

Recapitalization Plans ..................................................................................................................... 39

Reverse Stock Splits......................................................................................................................... 39

Share Repurchase Programs ............................................................................................................ 39

Stock Distributions: Splits and Dividends ........................................................................................ 40

Tracking Stock ................................................................................................................................ 40

Share Issuance Mandates at U.S. Domestic Issuers Incorporated Outside the U.S. ......................... 40

Restructuring ....................................................................................................................................... 40

Appraisal Rights ............................................................................................................................. 40

Asset Purchases ............................................................................................................................. 41

Asset Sales ..................................................................................................................................... 41

Bundled Proposals ......................................................................................................................... 41

Conversion of Securities ................................................................................................................ 41

Corporate Reorganization/Debt Restructuring/Prepackaged Bankruptcy Plans/Reverse Leveraged
Buyouts/Wrap Plans ...................................................................................................................... 42

Formation of Holding Company ..................................................................................................... 42

Going Private and Going Dark Transactions (LBOs and Minority Squeeze-outs) ............................ 42

Joint Ventures ................................................................................................................................ 43

Liquidations ................................................................................................................................... 43

Mergers and Acquisitions ............................................................................................................... 43

Private Placements/Warrants/Convertible Debentures ................................................................... 44

Reorganization/Restructuring Plan (Bankruptcy) ........................................................................... 45

Special Purpose Acquisition Corporations (SPACs) ......................................................................... 45

Special Purpose Acquisition Corporations (SPACs) – Proposals for Extensions ............................... 46

Spin-offs ........................................................................................................................................ 46

Value Maximization Shareholder Proposals .................................................................................... 46

**5.   Compensation ........................................................................................................... 47**

Executive Pay Evaluation ..................................................................................................................... 47

Advisory Votes on Executive Compensation—Management Proposals (Management Say-on-Pay) ................ 47

Pay-for-Performance Evaluation ............................................................................................... 48
Problematic Pay Practices ......................................................................................................... 48
Compensation Committee Communications and Responsiveness ............................................... 49

Frequency of Advisory Vote on Executive Compensation ("Say When on Pay") ............................... 50

Voting on Golden Parachutes in an Acquisition, Merger, Consolidation, or Proposed Sale .............. 50

Equity-Based and Other Incentive Plans ............................................................................................... 50

Shareholder Value Transfer (SVT) ............................................................................................. 51
Three-Year Value-Adjusted Burn Rate ...................................................................................... 52
Egregious Factors ........................................................................................................................... 52
Liberal Change in Control Definition ......................................................................................... 52
Repricing Provisions ................................................................................................................. 52
Problematic Pay Practices or Significant Pay-for-Performance Disconnect ................................ 53
Specific Treatment of Certain Award Types in Equity Plan Evaluations ........................................... 53
Dividend Equivalent Rights ....................................................................................................... 53
Operating Partnership (OP) Units in Equity Plan Analysis of Real Estate Investment Trusts (REITs) ............. 53
Other Compensation Plans .................................................................................................................. 53

401(k) Employee Benefit Plans ....................................................................................................... 53

Employee Stock Ownership Plans (ESOPs) ...................................................................................... 53

Employee Stock Purchase Plans—Qualified Plans ........................................................................... 54

Employee Stock Purchase Plans—Non-Qualified Plans ................................................................... 54

Amending Cash and Equity Plans (including Approval for Tax Deductibility (162(m)) ...................................... 54

Option Exchange Programs/Repricing Options ................................................................ 55

Stock Plans in Lieu of Cash .................................................................................... 55

Transfer Stock Option (TSO) Programs ...................................................................... 56

Director Compensation ......................................................................................... 56

Shareholder Ratification of Director Pay Programs ......................................................... 56

Equity Plans for Non-Employee Directors .................................................................... 57

Non-Employee Director Retirement Plans .................................................................... 57

Shareholder Proposals on Compensation ...................................................................... 57

Adopt Anti-Hedging/Pledging/Speculative Investments Policy ............................................ 57

Bonus Banking/Bonus Banking "Plus" ........................................................................ 57

Compensation Consultants—Disclosure of Board or Company's Utilization .............................. 58

Disclosure/Setting Levels or Types of Compensation for Executives and Directors ..................... 58

Golden Coffins/Executive Death Benefits ..................................................................... 58

Hold Equity Past Retirement or for a Significant Period of Time ......................................... 58

Pay Disparity ..................................................................................................... 59

Pay for Performance/Performance-Based Awards ........................................................... 59

Pay for Superior Performance .................................................................................. 59

Pre-Arranged Trading Plans (10b5-1 Plans) ................................................................. 60

Prohibit Outside CEOs from Serving on Compensation Committees ..................................... 60

Recoupment of Incentive or Stock Compensation in Specified Circumstances ......................... 60

Severance Agreements for Executives/Golden Parachutes ................................................ 61

Share Buyback Proposals ...................................................................................... 61

Supplemental Executive Retirement Plans (SERPs) ........................................................ 61

Tax Gross-Up Proposals ........................................................................................ 62

Termination of Employment Prior to Severance Payment/Eliminating Accelerated Vesting of Unvested Equity ................................................................................................... 62

**6.  Social and Environmental Issues ........................................................................... 63**

Global Approach ................................................................................................. 63

Animal Welfare .................................................................................................. 63

Animal Welfare Policies ......................................................................................... 63

Animal Testing ................................................................................................... 64

Animal Slaughter ................................................................................................ 64

Consumer Issues ................................................................................................. 64

Genetically Modified Ingredients .............................................................................. 64

Reports on Potentially Controversial Business/Financial Practices ...................................... 65

Consumer Lending ............................................................................................... 65

Pharmaceutical Pricing, Access to Medicines, Product Reimportation and Health Pandemics ......... 65

Health Pandemics ............................................................................................... 66

Product Safety and Toxic/Hazardous Materials .............................................................. 66

Tobacco-Related Proposals ..................................................................................... 66

Climate Change .................................................................................................. 67

Climate Change/Greenhouse Gas (GHG) Emissions ........................................................ 67

Environmental Justice ................................................................................................................. 67

Financed Emissions .................................................................................................................... 67

Just Transition ............................................................................................................................ 68

Natural Capital ........................................................................................................................... 68

Say on Climate (SoC) Management Proposals ........................................................................... 69

Say on Climate (SoC) Shareholder Proposals ........................................................................... 69

Energy Efficiency ........................................................................................................................ 69

Renewable Energy...................................................................................................................... 70

Diversity............................................................................................................................................ 70

Board Diversity ........................................................................................................................... 70

Equality of Opportunity.............................................................................................................. 70

Gender Identity, Sexual Orientation, and Domestic Partner Benefits....................................... 70

Gender or Race/Ethnicity Pay Gap............................................................................................. 70

Racial Equity and/or Civil Rights Audits ..................................................................................... 71

Environment and Sustainability ....................................................................................................... 71

Artificial Intelligence (AI)............................................................................................................ 71

Facility and Workplace Safety .................................................................................................... 71

Hydraulic Fracturing ................................................................................................................... 72

Operations in Protected Areas.................................................................................................... 72

Recycling..................................................................................................................................... 72

Sustainability Reporting ............................................................................................................. 72

Water Issues................................................................................................................................ 73

Equator Principles ...................................................................................................................... 73

General Corporate Issues.................................................................................................................. 74

Charitable Contributions ............................................................................................................ 74

Data Security, Privacy, and Internet Issues................................................................................ 74

Environmental, Social, and Governance (ESG) Compensation-Related Proposals...................... 74

Tax Transparency ....................................................................................................................... 74

Human Rights, Labor Issues, and International Operations .............................................................. 75

Human Rights Proposals ............................................................................................................. 75

Mandatory Arbitration ............................................................................................................... 76

MacBride Principles..................................................................................................................... 76

Community Social and Environmental Impact Assessments ....................................................... 76

Operations in High-Risk Markets ................................................................................................ 76

Outsourcing/Offshoring .............................................................................................................. 77

Sexual Harassment ..................................................................................................................... 77

Weapons and Military Sales........................................................................................................ 77

Political Activities ............................................................................................................................. 78

Lobbying ..................................................................................................................................... 78

Political Contributions................................................................................................................. 78

Political Ties................................................................................................................................. 78

Political Expenditures and Lobbying Congruency ....................................................................... 79

**7. Mutual Fund Proxies ........................................................................................ 80**

Election of Directors.........................................................................................................................80

Closed End Funds - Unilateral Opt-In to Control Share Acquisition Statutes ...................................80

Converting Closed-end Fund to Open-end Fund ..............................................................................80

Proxy Contests................................................................................................................................80

Investment Advisory Agreements....................................................................................................80

Approving New Classes or Series of Shares ....................................................................................81

Preferred Stock Proposals ..............................................................................................................81

1940 Act Policies ...........................................................................................................................81

Changing a Fundamental Restriction to a Nonfundamental Restriction ...........................................81

Change Fundamental Investment Objective to Nonfundamental......................................................81

Name Change Proposals .................................................................................................................81

Change in Fund's Subclassification .................................................................................................82

Business Development Companies - Authorization to Sell Shares of Common Stock at a Price below Net Asset Value...................................................................................................................................................82

Disposition of Assets/Termination/Liquidation ...............................................................................82

Changes to the Charter Document ..................................................................................................82

Changing the Domicile of a Fund ...................................................................................................83

Authorizing the Board to Hire and Terminate Subadvisers Without Shareholder Approval ..............83

Distribution Agreements.................................................................................................................83

Master-Feeder Structure ................................................................................................................83

Mergers .........................................................................................................................................83

Shareholder Proposals for Mutual Funds ........................................................................................84

Establish Director Ownership Requirement .....................................................................................84

Reimburse Shareholder for Expenses Incurred ...............................................................................84

Terminate the Investment Advisor ..................................................................................................84

**8.   Foreign Private Issuers Listed on U.S. Exchanges .................................................... 85**

# Introduction

Many investors, companies, policymakers, and other stakeholders increasingly recognize that the environmental threats of climate change pose significant economic and business risks. Following the 2015 Paris Agreement, most governments are now committed to curb carbon emissions to avoid average global warming of more than 2 degrees Celsius compared to pre-industrial levels. Climate change is today among the top issues for many institutional investors who face the risk of asset loss in a low-carbon future, and who seek to better understand how various potential scenarios could affect short, medium, and long-term business sustainability and investment performance.

**ISS' Climate Proxy Voting Guidelines**

Proxy voting is a key shareholder right and responsibility, and, in the context of climate change, is a tool that investors can use to help actively manage and mitigate exposure to climate-related risks in their portfolio companies. In response to investor demand to be able to address climate change-related concerns through voting, ISS has developed a climate-focused specialty proxy voting policy (Climate Policy).

ISS' extensive and unique climate data and proprietary research along with issue expertise is used to provide a model for assessment of a company's climate-related performance and disclosures that, in turn, is used to inform climate-based proxy voting recommendations for subscribing clients. The model also draws on widely recognized frameworks including the Task Force on Climate-related Financial Disclosures (TCFD) and balances the need for good disclosure on climate-related-risks with a company's performance on key climate-related factors. It includes a view on a company's greenhouse gas (GHG) emissions, its climate strategy, and the impact of its activities on climate, putting these into context within its sector and incident-based climate risk exposure. Factors used to evaluate a company's climate-related performance fall under five primary categories: climate norms violations; disclosure indicators; current performance indicators including greenhouse gas emissions data; future performance indicators drawing from the ISS Carbon Risk Classification (CRR); and Carbon Risk Classification. The factors are used to assess a company's risks associated with the impacts of climate change, along with its preparedness to face and mitigate those risks in an increasingly carbon-restricted economy.  The model's expectations used to assess performance practices are defined by industry groups, based on the specific climate risks identified in industry and multi-stakeholder initiatives and reflected in authoritative standards such as the Global Reporting Initiative, the Sustainability Accounting Standards Board standards, and TCFD recommendations. In cases of assessed underperformance, ISS' Climate Policy will provide relevant information, flags, and voting recommendations. As such, the Climate Policy can be part of a climate-concerned investor's toolbox and can complement shareholder engagement and other initiatives.

On matters of corporate governance, executive compensation, and corporate structure, the Climate Policy approach is based on principles of best practice as typically defined by investors, and a focus on creating and preserving long-term economic value.

ISS will update the Climate Proxy Voting Guidelines on an annual basis to consider emerging trends on climate change and other related environmental, social, and governance issues, and on relevant developments in market standards and regulations as well as investor feedback.

# 1.  Routine/Miscellaneous

### Adjourn Meeting

**Climate Policy Recommendation:** Generally vote against proposals to provide management with the authority to adjourn an annual or special meeting absent compelling reasons to support the proposal.

Vote for proposals that relate specifically to soliciting votes for a merger or transaction if supporting that merger or transaction. Vote against proposals if the wording is too vague or if the proposal includes "other business."

### Amend Quorum Requirements

**Climate Policy Recommendation:** Vote case-by-case on proposals to reduce quorum requirements for shareholder meetings below a majority of the shares outstanding, taking into consideration:

- The new quorum threshold requested;
- The rationale presented for the reduction;
- The market capitalization of the company (size, inclusion in indices);
- The company's ownership structure;
- Previous voter turnout or attempts to achieve quorum;
- Any provisions or commitments to restore quorum to a majority of shares outstanding, should voter turnout improve sufficiently; and
- Other factors as appropriate.

In general, a quorum threshold kept as close to a majority of shares outstanding as is achievable is preferred.

Vote case-by-case on directors who unilaterally lower the quorum requirements below a majority of the shares outstanding, taking into consideration the factors listed above.

### Amend Minor Bylaws

**Climate Policy Recommendation:** Vote for bylaw or charter changes that are of a housekeeping nature (updates or corrections).

### Change Company Name

**Climate Policy Recommendation:** Vote for proposals to change the corporate name unless there is compelling evidence that the change would adversely impact shareholder value.

### Change Date, Time, or Location of Annual Meeting

**Climate Policy Recommendation:** Vote for management proposals to change the date, time, or location of the annual meeting unless the proposed change is unreasonable.

Vote against shareholder proposals to change the date, time, or location of the annual meeting unless the current scheduling or location is unreasonable.

## Other Business

**Climate Policy Recommendation:** Vote against proposals to approve other business when it appears as voting item.

# Audit-Related

## Auditor Indemnification and Limitation of Liability

**Climate Policy Recommendation:** Vote case-by-case on the issue of auditor indemnification and limitation of liability. Factors to be assessed include, but are not limited to:

- The terms of the auditor agreement--the degree to which these agreements impact shareholders' rights;
- The motivation and rationale for establishing the agreements;
- The quality of the company's disclosure; and
- The company's historical practices in the audit area.

Vote against or withhold from members of an audit committee in situations where there is persuasive evidence that the audit committee entered into an inappropriate indemnification agreement with its auditor that limits the ability of the company, or its shareholders, to pursue legitimate legal recourse against the audit firm.

## Auditor Ratification

**Climate Policy Recommendation:** Vote for proposals to ratify auditors unless any of the following apply:

- An auditor has a financial interest in or association with the company, and is therefore not independent;
- There is reason to believe that the independent auditor has rendered an opinion that is neither accurate nor indicative of the company's financial position;
- Poor accounting practices are identified that rise to a serious level of concern, such as: fraud; misapplication of GAAP; and material weaknesses identified in Section 404 disclosures; or
- Fees for non-audit services ("Other" fees) are excessive.

Non-audit fees are excessive if:

- Non-audit ("other") fees > audit fees + audit-related fees + tax compliance/preparation fees

Tax compliance and preparation include the preparation of original and amended tax returns and refund claims, and tax payment planning. All other services in the tax category, such as tax advice, planning, or consulting, should be added to "Other" fees. If the breakout of tax fees cannot be determined, add all tax fees to "Other" fees.

In circumstances where "Other" fees include fees related to significant one-time capital structure events (such as initial public offerings, bankruptcy emergence, and spin-offs) and the company makes public disclosure of the amount and nature of those fees that are an exception to the standard "non-audit fee" category, then such fees may be excluded from the non-audit fees considered in determining the ratio of non-audit to audit/audit-related fees/tax compliance and preparation for purposes of determining whether non-audit fees are excessive.

Case 1:26-cv-00717-MPB-MKK    Document 26-3    Filed 04/21/26    Page 128 of 1112
PageID #: 294

## Shareholder Proposals Limiting Non-Audit Services

**Climate Policy Recommendation:** Vote case-by-case on shareholder proposals asking companies to prohibit or limit their auditors from engaging in non-audit services.

## Shareholder Proposals on Audit Firm Rotation

**Climate Policy Recommendation:** Vote case-by-case on shareholder proposals asking for audit firm rotation, taking into account:

- The tenure of the audit firm;
- The length of rotation specified in the proposal;
- Any significant audit-related issues at the company;
- The number of audit committee meetings held each year;
- The number of financial experts serving on the committee; and
- Whether the company has a periodic renewal process where the auditor is evaluated for both audit quality and competitive price.

# 2. Board of Directors

## Voting on Director Nominees in Uncontested Elections

Four fundamental principles apply when determining votes on director nominees:

- *Accountability:* Boards should be sufficiently accountable to shareholders, including through transparency of the company's governance practices and regular board elections, by the provision of sufficient information for shareholders to be able to assess directors and board composition, and through the ability of shareholders to remove directors.
- *Responsiveness:* Directors should respond to investor input, such as that expressed through significant opposition to management proposals, significant support for shareholder proposals (whether binding or non-binding), and tender offers where a majority of shares are tendered.
- *Composition:* Companies should seek directors who can add value to the board through specific skills or expertise and who can devote sufficient time and commitment to serve effectively. Boards should be of a size appropriate to accommodate diversity, expertise, and independence, while ensuring active and collaborative participation by all members. Boards should be sufficiently diverse to ensure consideration of a wide range of perspectives.
- *Independence:* Boards should be sufficiently independent from management (and significant shareholders) so as to ensure that they are able and motivated to effectively supervise management's performance for the benefit of all shareholders, including in setting and monitoring the execution of corporate strategy, with appropriate use of shareholder capital, and in setting and monitoring executive compensation programs that support that strategy. The chair of the board should ideally be an independent director, and all boards should have an independent leadership position or a similar role in order to help provide appropriate counterbalance to executive management, as well as having sufficiently independent committees that focus on key governance concerns such as audit, compensation, and nomination of directors.

**Climate Policy Recommendation:** Generally vote for director nominees, except under the following circumstances (with new nominees[1] considered on a case-by-case basis):

## Accountability

### Problematic Takeover Defenses, Capital Structure, and Governance Structures

**Classified Board Structure:** The board is classified, and a continuing director responsible for a problematic governance issue at the board/committee level that would warrant a withhold/against vote recommendation is not up for election. All appropriate nominees (except new) may be held accountable.

**Removal of Shareholder Discretion on Classified Boards**: The company has opted into, or failed to opt out of, state laws requiring a classified board structure.

**Director Performance Evaluation:** The board lacks mechanisms to promote accountability and oversight, coupled with sustained poor performance relative to peers. Sustained poor performance is measured by one-, three-, and five-year total shareholder returns in the bottom half of a company's four-digit GICS industry group (Russell 3000

---

[1] A "new nominee" is a director who is being presented for election by shareholders for the first time. Recommendations on new nominees who have served for less than one year are made on a case-by-case basis depending on the timing of their appointment and the problematic governance issue in question.

companies only). Take into consideration the company's operational metrics and other factors as warranted. Problematic provisions include but are not limited to:

- A classified board structure;
- A supermajority vote requirement;
- Either a plurality vote standard in uncontested director elections or a majority vote standard with no plurality carve-out for contested elections;
- The inability of shareholders to call special meetings;
- The inability of shareholders to act by written consent;
- A multi-class capital structure; and/or
- A non–shareholder-approved poison pill.

**Poison Pills:** Generally vote against or withhold from all nominees (except new nominees[1], who should be considered case-by-case) if:

- The company has a poison pill with a deadhand or slowhand feature[2];
- The board makes a material adverse modification to an existing pill, including, but not limited to, extension, renewal, or lowering the trigger, without shareholder approval; or
- The company has a long-term poison pill (with a term of over one year) that was not approved by the public shareholders[3].

Vote case-by-case on nominees if the board adopts an initial short-term pill[3] (with a term of one year or less) without shareholder approval, taking into consideration:

- The trigger threshold and other terms of the pill;
- The disclosed rationale for the adoption;
- The context in which the pill was adopted, (e.g. factors such as the company's size and stage of development, sudden changes in its market capitalization, and extraordinary industry-wide or macroeconomic events);
- A commitment to put any renewal to a shareholder vote;
- The company's overall track record on corporate governance and responsiveness to shareholders; and
- Other factors as relevant.

**Unilateral Bylaw/Charter Amendments:** Generally vote against or withhold from directors individually, committee members, or the entire board (except new nominees[1], who should be considered case-by-case) if the board amends the company's bylaws or charter without shareholder approval in a manner that materially diminishes shareholders' rights or that could adversely impact shareholders, considering the following factors:

- The board's rationale for adopting the bylaw/charter amendment without shareholder ratification;
- Disclosure by the company of any significant engagement with shareholders regarding the amendment;
- The level of impairment of shareholders' rights caused by the board's unilateral amendment to the bylaws/charter;
- The board's track record with regard to unilateral board action on bylaw/charter amendments or other entrenchment provisions;
- The company's ownership structure;
- The company's existing governance provisions;

---

[2] If the short-term pill with a deadhand or slowhand feature is enacted but expires before the next shareholder vote, Climate Advisory Services will generally still recommend withhold/against nominees at the next shareholder meeting following its adoption.

[3] Approval prior to, or in connection, with a company's becoming publicly-traded, or in connection with a de-SPAC transaction, is insufficient.

- The timing of the board's amendment to the bylaws/charter in connection with a significant business development; and,
- Other factors, as deemed appropriate, that may be relevant to determine the impact of the amendment on shareholders.
- Unless the adverse amendment is reversed or submitted to a binding shareholder vote, in subsequent years vote case-by-case on director nominees.

Generally vote against (except new nominees, who should be considered case-by-case) if the directors:

- Classified the board;
- Adopted supermajority vote requirements to amend the bylaws or charter;
- Eliminated shareholders' ability to amend bylaws;
- Adopted a fee-shifting provision; or
- Adopted another provision deemed egregious.

**Problematic Governance Structure:** For companies that hold or held their first annual meeting[8] of public shareholders after Feb. 1, 2015[4], generally vote against or withhold from directors individually, committee members, or the entire board (except new nominees, who should be considered case-by-case) if, prior to or in connection with the company's public offering, the company or its board adopted the following bylaw or charter provisions that are considered to be materially adverse to shareholder rights:

- Supermajority vote requirements to amend the bylaws or charter;
- A classified board structure; or
- Other egregious provisions.

A provision which specifies that the problematic structure(s) will be sunset within seven years of the date of going public will be considered a mitigating factor.

Unless the adverse provision is reversed or removed, vote case-by-case on director nominees in subsequent years.

**Unequal Voting Rights:** Generally vote withhold or against directors individually, committee members, or the entire board (except new nominees[1], who should be considered case-by-case), if the company employs a multi-class capital structure with unequal voting rights[5].

Exceptions to this policy will generally be limited to:

- Newly-public companies[6] with a sunset provision of no more than seven years from the date of going public;
- Limited Partnerships and the Operating Partnership (OP) unit structure of REITs;
- Convertible preferred shares that vote on an "as-converted" basis;
- Situations where the enhanced voting rights are limited in duration and applicability, such as where they are intended to overcome low voting turnout and ensure approval of a specific non-controversial agenda item and "mirrored voting" applies;
- Situations where the unequal voting rights are considered de minimis; or

---

[4] Includes companies that emerge from bankruptcy, SPAC transactions, spin-offs, direct listings, and those who complete a traditional initial public offering.

[5] This generally includes classes of common or preferred stock that have more votes per share than other shares; classes of shares that are not entitled to vote on all the same ballot items or nominees; or stock with time-phased voting rights ("loyalty shares"). Preferred shares that have voting rights only with respect to items that affect the rights of their holders as a class are not generally considered a problematic capital structure.

[6] Newly-public companies generally include companies that emerge from bankruptcy, SPAC transactions, spin-offs, direct listings, and those who complete a traditional initial public offering.

- The company provides sufficient protections for minority shareholders, such as allowing minority shareholders a regular binding vote on whether the capital structure should be maintained.

**Management Proposals to Ratify Existing Charter or Bylaw Provisions:** Vote against/withhold from individual directors, members of the governance committee, or the full board, where boards ask shareholders to ratify existing charter or bylaw provisions considering the following factors:

- The presence of a shareholder proposal addressing the same issue on the same ballot;
- The board's rationale for seeking ratification;
- Disclosure of actions to be taken by the board should the ratification proposal fail;
- Disclosure of shareholder engagement regarding the board's ratification request;
- The level of impairment to shareholders' rights caused by the existing provision;
- The history of management and shareholder proposals on the provision at the company's past meetings;
- Whether the current provision was adopted in response to the shareholder proposal;
- The company's ownership structure; and
- Previous use of ratification proposals to exclude shareholder proposals.

**Restricting Binding Shareholder Proposals:** Generally vote against or withhold from members of the governance committee if:

- The company's governing documents impose undue restrictions on shareholders' ability to amend the bylaws. Such restrictions include, but are not limited to: outright prohibition on the submission of binding shareholder proposals, or share ownership requirements, subject matter restrictions, or time holding requirement in excess of SEC Rule 14a-8. Vote against or withhold on an ongoing basis.
- Submission of management proposals to approve or ratify requirements in excess of SEC Rule 14a-8 for the submission of binding bylaw amendments will generally be viewed as an insufficient restoration of shareholders' rights. Generally continue to vote against or withhold on an ongoing basis until shareholders are provided with an unfettered ability to amend the bylaws or a proposal providing for such unfettered right is submitted for shareholder approval.

## Problematic Audit-Related Practices

Generally vote against or withhold from the members of the audit committee if:

- The non-audit fees paid to the auditor are excessive (see discussion under "Auditor Ratification");
- The company receives an adverse opinion on the company's financial statements from its auditor; or
- There is persuasive evidence that the audit committee entered into an inappropriate indemnification agreement with its auditor that limits the ability of the company, or its shareholders, to pursue legitimate legal recourse against the audit firm.

Vote case-by-case on members of the audit committee and potentially the full board if:

- Poor accounting practices are identified that rise to a level of serious concern, such as: fraud; misapplication of GAAP; and material weaknesses identified in Section 404 disclosures. Examine the severity, breadth, chronological sequence, and duration, as well as the company's efforts at remediation or corrective actions, in determining whether withhold/against votes are warranted.

## Problematic Compensation Practices

In the absence of an Advisory Vote on Executive Compensation (Say on Pay) ballot item or in egregious situations, vote against or withhold from the members of the compensation committee and potentially the full board if:

- There is an unmitigated misalignment between CEO pay and company performance (pay for performance);
- The company maintains significant problematic pay practices;
- The board exhibits a significant level of poor communication and responsiveness to shareholders;
- The company fails to include a Say on Pay ballot item when required under SEC provisions, or under the company's declared frequency of say on pay; or
- The company fails to include a Frequency of Say on Pay ballot item when required under SEC provisions.

**High Non-Employee Director Pay**: Generally vote against members of the board committee responsible for approving/setting non-employee director compensation if there is a pattern (i.e. two or more consecutive or non-consecutive years/across multiple years) of awarding excessive or otherwise problematic[7] non-employee director compensation without disclosing a compelling rationale or other mitigating factors.

Adverse recommendations may be warranted in the first year for director pay issues that are considered egregious.

**Problematic Pledging of Company Stock:** Vote against the members of the committee that oversees risks related to pledging, or the full board, where a significant level of pledged company stock by executives or directors raises concerns. The following factors will be considered:

- The presence of an anti-pledging policy, disclosed in the proxy statement, that prohibits future pledging activity;
- The magnitude of aggregate pledged shares in terms of total common shares outstanding, market value, and trading volume;
- Disclosure of progress or lack thereof in reducing the magnitude of aggregate pledged shares over time;
- Disclosure in the proxy statement that shares subject to stock ownership and holding requirements do not include pledged company stock; and
- Any other relevant factors.

## Environmental, Social and Governance (ESG) Failures

Under extraordinary circumstances, vote against or withhold from directors individually, committee members, or the entire board, due to:

- Material failures of governance, stewardship, risk oversight[8], or fiduciary responsibilities at the company, including failure to adequately guard against or manage ESG risks;
- Failure to adequately guard against or manage climate-related risks;
- A lack of sustainability reporting in the company's public documents and/or website in conjunction with a failure to adequately manage or mitigate ESG risks;
- Failure to replace management as appropriate; or
- Egregious actions related to a director's service on other boards that raise substantial doubt about his or her ability to effectively oversee management and serve the best interests of shareholders at any company.

---

[7] May include performance awards, retirement benefits, or problematic perquisites.

[8] Examples of failure of risk oversight include, but are not limited to: bribery; large or serial fines or sanctions from regulatory bodies; demonstrably poor risk oversight of environmental and social issues, including climate change; significant environmental incidents including spills and pollution; large scale or repeat workplace fatalities or injuries; significant adverse legal judgments or settlements; or hedging of company stock.

## Climate Risk Mitigation and Net Zero

For companies that are significant greenhouse gas (GHG) emitters, through their operations or value chain[9], generally vote against or withhold from the incumbent chair of the responsible committee (or other directors on a case-by-case basis) in cases where Climate Advisory Services determines that the company is not taking the minimum steps needed to be aligned with a Net Zero by 2050 trajectory.

Minimum steps needed to be considered to be aligned with a Net Zero by 2050 trajectory are (all minimum criteria will be required to be in alignment with policy):

- The company has detailed disclosure of climate-related risks, such as according to the framework established by the Task Force on Climate-related Financial Disclosures (TCFD), including:
  - Board governance measures;
  - Corporate strategy;
  - Risk management analyses; and
  - Metrics and targets.
- The company has declared a target of Net Zero by 2050 or sooner and the target includes scope 1, 2, and relevant scope 3 emissions.
- The company has set a medium-term target for reducing its GHG emissions and the targets include scope 1, 2, and relevant scope 3 emissions.
- The company has a decarbonization strategy in place, with a defined set of quantitative and qualitative actions to reach the Net Zero Targets.
- The company's audit report references any assessed material impacts of climate-related matters on the issuer's business or operations.
- The company has provided GHG emissions disclosures identified as material for its sector.
- The company has reported climate change as a business risk in its annual and financial report.
- Expectations about what constitutes "minimum steps needed to be aligned with a Net Zero by 2050 trajectory" will increase over time.

## Responsiveness

Vote case-by-case on individual directors, committee members, or the entire board of directors as appropriate if:

- The board failed to act on a shareholder proposal that received the support of a majority of the shares cast in the previous year or failed to act on a management proposal seeking to ratify an existing charter/bylaw provision that received opposition of a majority of the shares cast in the previous year. Factors that will be considered are:

  - Disclosed outreach efforts by the board to shareholders in the wake of the vote;
  - Rationale provided in the proxy statement for the level of implementation;
  - The subject matter of the proposal;
  - The level of support for and opposition to the resolution in past meetings;
  - Actions taken by the board in response to the majority vote and its engagement with shareholders;
  - The continuation of the underlying issue as a voting item on the ballot (as either shareholder or management proposals); and
  - Other factors as appropriate.

- The board failed to act on takeover offers where the majority of shares are tendered;
- At the previous board election, any director received more than 50 percent withhold/against votes of the shares cast and the company has failed to address the issue(s) that caused the high withhold/against vote.

---

[9] Companies defined as "significant GHG emitters" will be those on the current Climate Action 100+ Focus Group list.

Vote case-by-case on Compensation Committee members (or, in exceptional cases, the full board) and/or the say-on-pay proposal when the company's previous say-on-pay received the support of less than 70 percent of votes cast. Factors that will be considered in assessing board responsiveness include:

- Disclosure of engagement efforts with major institutional investors regarding the issues that contributed to the low level of support (including the timing and frequency of engagements and whether independent directors participated);
- Disclosure of the specific concerns voiced by dissenting shareholders that led to the say-on-pay opposition; and
- Disclosure of specific and meaningful actions taken to address shareholders' concerns.

If the company discloses meaningful engagement efforts, but in addition states that it was unable to obtain specific feedback, Climate Advisory Services will assess company actions taken in response to the say-on-pay vote as well as the company's explanation as to why such actions are beneficial for shareholders.

Additional factors that may be considered include:

- Whether the issues raised are recurring or isolated;
- The company's ownership structure;
- Significant corporate activity, such as a recent merger or proxy contest; and
- Any other compensation action or factor considered relevant to assessing board responsiveness.

If the say-on-pay support level was less than 50 percent of votes cast, this would warrant the highest degree of responsiveness, as assessed under the factors noted above.

Vote case-by-case on Compensation Committee members (or, in exceptional cases, the full board) if the board implements an advisory vote on executive compensation on a less frequent basis than the frequency that received the plurality of votes cast.

## Composition

**Attendance at Board and Committee Meetings:** Generally vote against or withhold from directors (except nominees who served only part of the fiscal year[10]) who attend less than 75 percent of the aggregate of their board and committee meetings for the period for which they served, unless an acceptable reason for absences is disclosed in the proxy or another SEC filing. Acceptable reasons for director absences are generally limited to the following:

- Medical issues/illness;
- Family emergencies; and
- Missing only one meeting (when the total of all meetings is three or fewer).

In cases of chronic poor attendance without reasonable justification, in addition to voting against the director(s) with poor attendance, generally vote against or withhold from appropriate members of the nominating/governance committees or the full board.

If the proxy disclosure is unclear and insufficient to determine whether a director attended at least 75 percent of the aggregate of his/her board and committee meetings during his/her period of service, vote against or withhold from the director(s) in question.

---

[10] Nominees who served for only part of the fiscal year are generally exempted from the attendance policy.

**Overboarded Directors:** Generally, vote against or withhold from individual directors who:

- Sit on more than five public company boards; or
- Are CEOs of public companies who sit on the boards of more than two public companies besides their own—withhold only at their outside boards[11].

## Gender Diversity

*NOTE: For shareholder meeting reports published on or after February 25th, 2025, Institutional Shareholder Services (ISS) has indefinitely halted the consideration of the gender diversity of a company's board when making vote recommendations with respect to the election or re-election of directors at U.S. companies covered by these guidelines under its proprietary ISS U.S. Climate Specialty policy.*

**Climate Policy Recommendation:** Generally vote against or withhold from the chair of the nominating committee, or other nominees on a case-by-case basis, if the board lacks at least one director of an underrepresented gender identity[12].

## Racial and/or Ethnic Diversity

*NOTE: For shareholder meeting reports published on or after February 25th, 2025, Institutional Shareholder Services (ISS) has indefinitely halted the consideration of the racial and/or ethnic diversity of a company's board when making vote recommendations with respect to the election or re-election of directors at U.S. companies covered by these guidelines under its proprietary ISS U.S. Climate Specialty policy.*

**Climate Policy Recommendation:** Generally vote against or withhold from the chair of the nominating committee (or other directors on a case-by-case basis) where the board has no apparent racially or ethnically diverse members[13].

## Independence

Vote against or withhold from non-independent directors (Executive Directors and Non-Independent Non-Executive Directors per Climate Advisory Services' Classification of Directors) when:

- Independent directors comprise 50 percent or less of the board;
- The non-independent director serves on the audit, compensation, or nominating committee;
- The company lacks an audit, compensation, or nominating committee so that the full board functions as that committee; or
- The company lacks a formal nominating committee, even if the board attests that the independent directors fulfill the functions of such a committee.

---

[11] Although all of a CEO's subsidiary boards will be counted as separate boards, Climate Advisory Services will not recommend a withhold vote for the CEO of a parent company board or any of the controlled (>50 percent ownership) subsidiaries of that parent, but may do so at subsidiaries that are less than 50 percent controlled and boards outside the parent/subsidiary relationships.

[12] Underrepresented gender identities include directors as women or as non-binary.

[13] Aggregate diversity statistics provided by the board will only be considered if specific to racial and/or ethnic diversity.

## Climate Policy Classification of Directors – U.S.

1. **Executive Director**
   1.1. Current officer[1] of the company or one of its affiliates[2].
2. **Non-Independent Non-Executive Director**

   Board Identification
   2.1. Director identified as not independent by the board.

   Controlling/Significant Shareholder
   2.2. Beneficial owner of more than 50 percent of the company's voting power (this may be aggregated if voting power is distributed among more than one member of a group).

   Current Employment at Company or Partnership
   2.3. Non-officer employee of the firm (including employee representatives).
   2.4. Officer[1], former officer, or general or limited partner of a joint venture or partnership with the company.

   Former Employment
   2.5. Former CEO of the company.[3],[4]
   2.6. Former non-CEO officer[1] of the company or an affiliate[2] within the past five years.
   2.7. Former officer[1] of an acquired company within the past five years[4].
   2.8. Officer[1] of a former parent or predecessor firm at the time the company was sold or split off within the past five years.
   2.9. Former interim officer if the service was longer than 18 months. If the service was between 12 and 18 months an assessment of the interim officer's employment agreement will be made.[5]

   Family Members
   2.10. Immediate family member[6] of a current or former officer[1] of the company or its affiliates[2] within the last five years.
   2.11. Immediate family member[6] of a current employee of company or its affiliates[2] where additional factors raise concern (which may include, but are not limited to, the following: a director related to numerous employees; the company or its affiliates employ relatives of numerous board members; or a non-Section 16 officer in a key strategic role).

   Professional, Transactional, and Charitable Relationships
   2.12. Director who (or whose immediate family member[6]) currently provides professional services[7] in excess of $10,000 per year to: the company, an affiliate[2], or an individual officer of the company or an affiliate;  either directly or is (or whose family member is) a partner, employee, or controlling shareholder of an organization which provides the services.
   2.13. Director who (or whose immediate family member[6]) currently has any material transactional relationship[8] with the company or its affiliates[2]; or who is (or whose immediately family member[6] is) a partner in, or a controlling shareholder or an executive officer of, an organization which has the material transactional relationship[8] (excluding investments in the company through a private placement).
   2.14. Director who (or whose immediate family member[6]) is a trustee, director, or employee of a charitable or non-profit organization that receives material grants or endowments[8] from the company or its affiliates[2].

   Other Relationships
   2.15. Party to a voting agreement[9] to vote in line with management on proposals being brought to shareholder vote.
   2.16. Has (or an immediate family member[6] has) an interlocking relationship as defined by the SEC involving members of the board of directors or its Compensation Committee[10].
   2.17. Founder[11] of the company but not currently an employee.
   2.18. Director with pay comparable to Named Executive Officers.
   2.19. Any material[12] relationship with the company.

3. **Independent Director**
   3.1. No material[12] connection to the company other than a board seat.

**Footnotes:**

[1]The definition of officer will generally follow that of a "Section 16 officer" (officers subject to Section 16 of the Securities and Exchange Act of 1934) and includes the chief executive, operating, financial, legal, technology, and accounting officers of a company (including the president, treasurer, secretary, controller, or any vice president in charge of a principal business unit, division, or policy function). Current interim officers are included in this category. For private companies, the equivalent positions are applicable. A non-employee director serving as an officer due to statutory requirements (e.g. corporate secretary) will be classified as an Affiliated Outsider under "Any material relationship with the company." However, if the company provides explicit disclosure that the director is not receiving additional compensation in excess of $10,000 per year for serving in that capacity, then the director will be classified as an Independent Outsider.

[2] "Affiliate" includes a subsidiary, sibling company, or parent company. Climate Policy uses 50 percent control ownership by the parent company as the standard for applying its affiliate designation. The manager/advisor of an externally managed issuer (EMI) is considered an affiliate.

[3] Includes any former CEO of the company prior to the company's initial public offering (IPO).

[4] When there is a former CEO of a special purpose acquisition company (SPAC) serving on the board of an acquired company Climate Policy will generally classify such directors as independent unless determined otherwise taking into account the following factors: the applicable listing standards determination of such director's independence; any operating ties to the firm; and the existence of any other conflicting relationships or related party transactions.

[5] The Climate Policy will look at the terms of the interim officer's employment contract to determine if it contains severance pay, long-term health and pension benefits, or other such standard provisions typically contained in contracts of permanent, non-temporary CEOs. The Climate Policy will also consider if a formal search process was under way for a full-time officer at the time.

[6] "Immediate family member" follows the SEC's definition of such and covers spouses, parents, children, step-parents, step-children, siblings, in-laws, and any person (other than a tenant or employee) sharing the household of any director, nominee for director, executive officer, or significant shareholder of the company.

[7] Professional services can be characterized as advisory in nature, generally involve access to sensitive company information or to strategic decision-making, and typically have a commission- or fee-based payment structure. Professional services generally include, but are not limited to the following: investment banking/financial advisory services; commercial banking (beyond deposit services); investment services; insurance services; accounting/audit services; consulting services; marketing services; legal services; property management services; realtor services; lobbying services; executive search services; and IT consulting services. The following would generally be considered transactional relationships and not professional services: deposit services; IT tech support services; educational services; and construction services. The case of participation in a banking syndicate by a non-lead bank should be considered a transactional (and hence subject to the associated materiality test) rather than a professional relationship. "Of Counsel" relationships are only considered immaterial if the individual does not receive any form of compensation (in excess of $10,000 per year) from, or is a retired partner of, the firm providing the professional service. The case of a company providing a professional service to one of its directors or to an entity with which one of its directors is affiliated, will be considered a transactional rather than a professional relationship. Insurance services and marketing services are assumed to be professional services unless the company explains why such services are not advisory.

[8] A material transactional relationship, including grants to non-profit organizations, exists if the company makes annual payments to, or receives annual payments from, another entity exceeding the greater of $200,000 or 5

percent of the recipient's gross revenues, in the case of a company which follows NASDAQ listing standards; or the greater of $1,000,000 or 2 percent of the recipient's gross revenues, in the case of a company which follows NYSE listing standards. In the case of a company which follows neither of the preceding standards, The Climate Policy will apply the NASDAQ-based materiality test. (The recipient is the party receiving the financial proceeds from the transaction).

[9] Dissident directors who are parties to a voting agreement pursuant to a settlement or similar arrangement may be classified as independent outsiders if an analysis of the following factors indicates that the voting agreement does not compromise their alignment with all shareholders' interests: the terms of the agreement; the duration of the standstill provision in the agreement; the limitations and requirements of actions that are agreed upon; if the dissident director nominee(s) is subject to the standstill; and if there any conflicting relationships or related party transactions.

[10] Interlocks include: executive officers serving as directors on each other's compensation or similar committees (or, in the absence of such a committee, on the board); or executive officers sitting on each other's boards and at least one serves on the other's compensation or similar committees (or, in the absence of such a committee, on the board).

[11] The operating involvement of the founder with the company will be considered; if the founder was never employed by the company, Climate Advisory Services may deem him or her an independent outsider.

[12] For purposes of the Climate Policy' director independence classification, "material" will be defined as a standard of relationship (financial, personal or otherwise) that a reasonable person might conclude could potentially influence one's objectivity in the boardroom in a manner that would have a meaningful impact on an individual's ability to satisfy requisite fiduciary standards on behalf of shareholders.

## Other Board-Related Proposals

### Board Refreshment

Board refreshment is best implemented through an ongoing program of individual director evaluations, conducted annually, to ensure the evolving needs of the board are met and to bring in fresh perspectives, skills, and diversity as needed.

**Term/Tenure Limits**

**Climate Policy Recommendation:** Vote case-by-case on management proposals regarding director term/tenure limits, considering:

- The rationale provided for adoption of the term/tenure limit;
- The robustness of the company's board evaluation process;
- Whether the limit is of sufficient length to allow for a broad range of director tenures;
- Whether the limit would disadvantage independent directors compared to non-independent directors; and
- Whether the board will impose the limit evenly and not have the ability to waive it in a discriminatory manner.

Vote case-by-case on shareholder proposals asking for the company to adopt director term/tenure limits, considering:

- The scope of the shareholder proposal; and
- Evidence of problematic issues at the company combined with, or exacerbated by, a lack of board refreshment.

**Age Limits**

**Climate Policy Recommendation:** Generally vote against management and shareholder proposals to limit the tenure of outside directors through mandatory retirement ages. Vote for proposals to remove mandatory age limits.

## Board Size

**Climate Policy Recommendation:** Vote for proposals seeking to fix the board size or designate a range for the board size.

Vote against proposals that give management the ability to alter the size of the board outside of a specified range without shareholder approval.

## Classification/Declassification of the Board

**Climate Policy Recommendation:** Vote against proposals to classify (stagger) the board.

Vote for proposals to repeal classified boards and to elect all directors annually.

## CEO Succession Planning

**Climate Policy Recommendation:** Generally vote for proposals seeking disclosure on a CEO succession planning policy, considering, at a minimum, the following factors:

The reasonableness/scope of the request; and
The company's existing disclosure on its current CEO succession planning process.

## Cumulative Voting

**Climate Policy Recommendation:** Generally vote against management proposals to eliminate cumulate voting, and for shareholder proposals to restore or provide for cumulative voting, unless:

- The company has proxy access, thereby allowing shareholders to nominate directors to the company's ballot; and
- The company has adopted a majority vote standard, with a carve-out for plurality voting in situations where there are more nominees than seats, and a director resignation policy to address failed elections.

Vote for proposals for cumulative voting at controlled companies (insider voting power > 50%).

## Director and Officer Indemnification, Liability Protection, and Exculpation

**Climate Policy Recommendation:** Vote case-by-case on proposals on director and officer indemnification liability protection, and exculpation[14].

Consider the stated rationale for the proposed change. Also consider, among other factors, the extent to which the proposal would:

- Eliminate entirely directors' and officers' liability for monetary damages for violating the duty of care.
- Eliminate directors' and officers' liability for monetary damages for violating the duty of loyalty.
- Expand coverage beyond just legal expenses to liability for acts that are more serious violations of fiduciary obligation than mere carelessness.
- Expand the scope of indemnification to provide for mandatory indemnification of company officials in connection with acts that previously the company was permitted to provide indemnification for, at the discretion of the company's board (*i.e.*, "permissive indemnification"), but that previously the company was not required to indemnify.

Vote for only those proposals providing such expanded coverage in cases when a director's or officer's legal defense was unsuccessful if both of the following apply:

- If the individual was found to have acted in good faith and in a manner that the individual reasonably believed was in the best interests of the company; and
- If only the director's legal expenses would be covered.

## Establish/Amend Nominee Qualifications

**Climate Policy Recommendation:** Vote case-by-case on proposals that establish or amend director qualifications. Votes should be based on the reasonableness of the criteria and the degree to which they may preclude dissident nominees from joining the board.

Vote case-by-case on shareholder resolutions seeking a director nominee who possesses a particular subject matter expertise, considering:

- The company's board committee structure, existing subject matter expertise, and board nomination provisions relative to that of its peers;
- The company's existing board and management oversight mechanisms regarding the issue for which board oversight is sought;
- The company's disclosure and performance relating to the issue for which board oversight is sought and any significant related controversies; and
- The scope and structure of the proposal.

---

[14] **Indemnification**: the condition of being secured against loss or damage.
**Limited liability**: a person's financial liability is limited to a fixed sum, or personal financial assets are not at risk if the individual loses a lawsuit that results in financial award/damages to the plaintiff.
**Exculpation**: to eliminate or limit the personal liability of a director or officer to the corporation or its shareholders for monetary damages for breach of fiduciary duty as a director or officer.

## Establish Other Board Committee Proposals

**Climate Policy Recommendation:** Generally, vote for shareholder proposals to establish a new board committee with oversight responsibilities on climate-related matters, including but not limited to the evaluation the company's strategic vision and responses to climate-related risks.

Vote case-by-case on shareholder proposals to establish a new board committee, considering the following factors:

- Existing oversight mechanisms (including current committee structure) regarding the issue for which board oversight is sought;
- Level of disclosure regarding the issue for which board oversight is sought;
- Company performance related to the issue for which board oversight is sought;
- Board committee structure compared to that of other companies in its industry sector; and
- The scope and structure of the proposal.

## Filling Vacancies/Removal of Directors

**Climate Policy Recommendation:** Vote against proposals that provide that directors may be removed only for cause.

- Vote for proposals to restore shareholders' ability to remove directors with or without cause.
- Vote against proposals that provide that only continuing directors may elect replacements to fill board vacancies.
- Vote for proposals that permit shareholders to elect directors to fill board vacancies.

## Independent Board Chair

One of the principal functions of the board is to monitor and evaluate the performance of the CEO and other executive officers. The board chair's duty to oversee management may be compromised when he/she is connected to or a part of the management team. Generally, The Climate Policy recommends supporting shareholder proposals that would require that the position of board chair be held by an individual with no materials ties to the company other than their board seat.

**Climate Policy Recommendation:** Generally, support shareholder proposals that would require the board chair to be independent of management.

## Majority of Independent Directors/Establishment of Independent Committees

**Climate Policy Recommendation:** Vote for shareholder proposals asking that a majority or more of directors be independent unless the board composition already meets the proposed threshold by the Climate policy's definition of independent outsider. (See Climate Advisory Services' Classification of Directors)

Vote for shareholder proposals asking that board audit, compensation, and/or nominating committees be composed exclusively of independent directors unless they currently meet that standard.

## Majority Vote Standard for the Election of Directors

**Climate Policy Recommendation:** Generally vote for management proposals to adopt a majority of votes cast standard for directors in uncontested elections. Vote against if no carve-out for a plurality vote standard in contested elections is included.

Generally vote for precatory and binding shareholder resolutions requesting that the board change the company's bylaws to stipulate that directors need to be elected with an affirmative majority of votes cast, provided it does not conflict with the state law where the company is incorporated. Binding resolutions need to allow for a carve-out for a plurality vote standard when there are more nominees than board seats.

Companies are strongly encouraged to also adopt a post-election policy (also known as a director resignation policy) that will provide guidelines so that the company will promptly address the situation of a holdover director.

## Proxy Access

**Climate Policy Recommendation:** Generally vote for management and shareholder proposals for proxy access with the following provisions:

- **Ownership threshold:** maximum requirement not more than three percent (3%) of the voting power;
- **Ownership duration:** maximum requirement not longer than three (3) years of continuous ownership for each member of the nominating group;
- **Aggregation:** minimal or no limits on the number of shareholders permitted to form a nominating group;
- **Cap:** cap on nominees of generally twenty-five percent (25%) of the board.

Review for reasonableness any other restrictions on the right of proxy access.
Generally vote against proposals that are more restrictive than these guidelines.

## Require More Nominees than Open Seats

**Climate Policy Recommendation:** Vote against shareholder proposals that would require a company to nominate more candidates than the number of open board seats.

## Shareholder Engagement Policy (Shareholder Advisory Committee)

**Climate Policy Recommendation:** Generally vote for shareholder proposals requesting that the board establish an internal mechanism/process, which may include a committee, in order to improve communications between directors and shareholders, unless the company has the following features, as appropriate:

- Established a communication structure that goes beyond the exchange requirements to facilitate the exchange of information between shareholders and members of the board;
- Effectively disclosed information with respect to this structure to its shareholders;
- Company has not ignored majority-supported shareholder proposals or a majority withhold vote on a director nominee; and
- The company has an independent chairman or a lead director, according to Climate Advisory Services' definition. This individual must be made available for periodic consultation and direct communication with major shareholders.

## Proxy Contests/Proxy Access – Voting for Director Nominees in Contested Elections

**Climate Policy Recommendation:** Vote case-by-case on the election of directors in contested elections, considering the following factors:

- Long-term financial performance of the company relative to its industry;
- Management's track record;
- Background to the contested election;
- Nominee qualifications and any compensatory arrangements;
- Strategic plan of dissident slate and quality of the critique against management;
- Likelihood that the proposed goals and objectives can be achieved (both slates); and
- Stock ownership positions.

In the case of candidates nominated pursuant to proxy access, vote case-by-case considering any applicable factors listed above or additional factors which may be relevant, including those that are specific to the company, to the nominee(s) and/or to the nature of the election (such as whether or not there are more candidates than board seats).

## Vote-No Campaigns

**Climate Policy Recommendation:** In cases where companies are targeted in connection with public "vote-no" campaigns, evaluate director nominees under the existing governance policies for voting on director nominees in uncontested elections. Take into consideration the arguments submitted by shareholders and other publicly available information.

# 3.  Shareholder Rights & Defenses

## Advance Notice Requirements for Shareholder Proposals/Nominations

**Climate Policy Recommendation:** Vote case-by-case on advance notice proposals, giving support to those proposals which allow shareholders to submit proposals/nominations as close to the meeting date as reasonably possible and within the broadest window possible, recognizing the need to allow sufficient notice for company, regulatory, and shareholder review.

To be reasonable, the company's deadline for shareholder notice of a proposal/ nominations must be no earlier than 120 days prior to the anniversary of the previous year's meeting and have a submittal window of no shorter than 30 days from the beginning of the notice period (also known as a 90-120 day window). The submittal window is the period under which a shareholder must file his proposal/nominations prior to the deadline.

In general, support additional efforts by companies to ensure full disclosure in regard to a proponent's economic and voting position in the company so long as the informational requirements are reasonable and aimed at providing shareholders with the necessary information to review such proposals.

## Amend Bylaws without Shareholder Consent

**Climate Policy Recommendation:** Vote against proposals giving the board exclusive authority to amend the bylaws.

Vote for proposals giving the board the ability to amend the bylaws in addition to shareholders.

## Control Share Acquisition Provisions

Control share acquisition statutes function by denying shares their voting rights when they contribute to ownership in excess of certain thresholds. Voting rights for those shares exceeding ownership limits may only be restored by approval of either a majority or supermajority of disinterested shares. Thus, control share acquisition statutes effectively require a hostile bidder to put its offer to a shareholder vote or risk voting disenfranchisement if the bidder continues buying up a large block of shares.

**Climate Policy Recommendation:** Vote for proposals to opt out of control share acquisition statutes unless doing so would enable the completion of a takeover that would be detrimental to shareholders.

Vote against proposals to amend the charter to include control share acquisition provisions.

Vote for proposals to restore voting rights to the control shares.

## Control Share Cash-Out Provisions

Control share cash-out statutes give dissident shareholders the right to "cash-out" of their position in a company at the expense of the shareholder who has taken a control position. In other words, when an investor crosses a preset threshold level, remaining shareholders are given the right to sell their shares to the acquirer, who must buy them at the highest acquiring price.

**Climate Policy Recommendation:** Vote for proposals to opt out of control share cash-out statutes.

## Disgorgement Provisions

Disgorgement provisions require an acquirer or potential acquirer of more than a certain percentage of a company's stock to disgorge, or pay back, to the company any profits realized from the sale of that company's stock purchased 24 months before achieving control status. All sales of company stock by the acquirer occurring within a certain period of time (between 18 months and 24 months) prior to the investor's gaining control status are subject to these recapture-of-profits provisions.

**Climate Policy Recommendation:** Vote for proposals to opt out of state disgorgement provisions.

## Fair Price Provisions

**Climate Policy Recommendation:** Vote case-by-case on proposals to adopt fair price provisions (provisions that stipulate that an acquirer must pay the same price to acquire all shares as it paid to acquire the control shares), evaluating factors such as the vote required to approve the proposed acquisition, the vote required to repeal the fair price provision, and the mechanism for determining the fair price.

Generally vote against fair price provisions with shareholder vote requirements greater than a majority of disinterested shares.

## Freeze-Out Provisions

**Climate Policy Recommendation:** Vote for proposals to opt out of state freeze-out provisions. Freeze-out provisions force an investor who surpasses a certain ownership threshold in a company to wait a specified period of time before gaining control of the company.

## Greenmail

Greenmail payments are targeted share repurchases by management of company stock from individuals or groups seeking control of the company. Since only the hostile party receives payment, usually at a substantial premium over the market value of its shares, the practice discriminates against all other shareholders.

**Climate Policy Recommendation:** Vote for proposals to adopt anti-greenmail charter or bylaw amendments or otherwise restrict a company's ability to make greenmail payments.

Vote case-by-case on anti-greenmail proposals when they are bundled with other charter or bylaw amendments.

## Shareholder Litigation Rights

### Federal Forum Selection Provisions

Federal forum selection provisions require that U.S. federal courts be the sole forum for shareholders to litigate claims arising under federal securities law.

**Climate Policy Recommendation:** Generally vote for federal forum selection provisions in the charter or bylaws that specify "the district courts of the United States" as the exclusive forum for federal securities law matters, in the absence of serious concerns about corporate governance or board responsiveness to shareholders.

Vote against provisions that restrict the forum to a particular federal district court; unilateral adoption (without a shareholder vote) of such a provision will generally be considered a one-time failure under the Unilateral Bylaw/Charter Amendments policy.

### Exclusive Forum Provisions for State Law Matters

Exclusive forum provisions in the charter or bylaws restrict shareholders' ability to bring derivative lawsuits against the company, for claims arising out of state corporate law, to the courts of a particular state (generally the state of incorporation).

**Climate Policy Recommendation:** Generally vote for charter or bylaw provisions that specify courts located within the state of Delaware as the exclusive forum for corporate law matters for Delaware corporations, in the absence of serious concerns about corporate governance or board responsiveness to shareholders.

For states other than Delaware, vote case-by-case on exclusive forum provisions, taking into consideration:

- The company's stated rationale for adopting such a provision;
- Disclosure of past harm from duplicative shareholder lawsuits in more than one forum;
- The breadth of application of the charter or bylaw provision, including the types of lawsuits to which it would apply and the definition of key terms; and
- Governance features such as shareholders' ability to repeal the provision at a later date (including the vote standard applied when shareholders attempt to amend the charter or bylaws) and their ability to hold directors accountable through annual director elections and a majority vote standard in uncontested elections.

Generally vote against provisions that specify a state other than the state of incorporation as the exclusive forum for corporate law matters, or that specify a particular local court within the state; unilateral adoption of such a provision will generally be considered a one-time failure under the Unilateral Bylaw/Charter Amendments policy.

### Fee Shifting

Fee-shifting provisions in the charter or bylaws require that a shareholder who sues a company unsuccessfully pay all litigation expenses of the defendant corporation and its directors and officers.

**Climate Policy Recommendation:** Generally vote against provisions that mandate fee-shifting whenever plaintiffs are not completely successful on the merits (i.e., including cases where the plaintiffs are partially successful).

Unilateral adoption of a fee-shifting provision will generally be considered an ongoing failure under the Unilateral Bylaw/Charter Amendments policy.

## Net Operating Loss (NOL) Protective Amendments

**Climate Policy Recommendation:** Vote against proposals to adopt a protective amendment for the stated purpose of protecting a company's net operating losses (NOL) if the effective term of the protective amendment would exceed the shorter of three years and the exhaustion of the NOL.

Vote case-by-case, considering the following factors, for management proposals to adopt an NOL protective amendment that would remain in effect for the shorter of three years (or less) and the exhaustion of the NOL:

Case 1:26-cv-00717-MPB-MKK    Document 26-3    Filed 04/21/26    Page 148 of 1112
PageID #: 314

- The ownership threshold (NOL protective amendments generally prohibit stock ownership transfers that would result in a new 5-percent holder or increase the stock ownership percentage of an existing 5-percent holder);
- The value of the NOLs;
- Shareholder protection mechanisms (sunset provision or commitment to cause expiration of the protective amendment upon exhaustion or expiration of the NOL);
- The company's existing governance structure including: board independence, existing takeover defenses, track record of responsiveness to shareholders, and any other problematic governance concerns; and
- Any other factors that may be applicable.

## Poison Pills (Shareholder Rights Plans)

### Shareholder Proposals to Put Pill to a Vote and/or Adopt a Pill Policy

**Climate Policy Recommendation:** Vote for shareholder proposals requesting that the company submit its poison pill to a shareholder vote or redeem it unless the company has: (1) A shareholder approved poison pill in place; or (2) The company has adopted a policy concerning the adoption of a pill in the future specifying that the board will only adopt a shareholder rights plan if either:

- Shareholders have approved the adoption of the plan; or
- The board, in its exercise of its fiduciary responsibilities, determines that it is in the best interest of shareholders under the circumstances to adopt a pill without the delay in adoption that would result from seeking stockholder approval (*i.e.*, the "fiduciary out" provision). A poison pill adopted under this fiduciary out will be put to a shareholder ratification vote within 12 months of adoption or expire. If the pill is not approved by a majority of the votes cast on this issue, the plan will immediately terminate.

If the shareholder proposal calls for a time period of less than 12 months for shareholder ratification after adoption, vote for the proposal, but add the caveat that a vote within 12 months would be considered sufficient implementation.

### Management Proposals to Ratify a Poison Pill

**Climate Policy Recommendation:** Vote case-by-case on management proposals on poison pill ratification, focusing on the features of the shareholder rights plan. Rights plans should contain the following attributes:

- No lower than a 20% trigger, flip-in or flip-over;
- A term of no more than three years;
- No dead-hand, slow-hand, no-hand or similar feature that limits the ability of a future board to redeem the pill;
- Shareholder redemption feature (qualifying offer clause); if the board refuses to redeem the pill 90 days after a qualifying offer is announced, 10 percent of the shares may call a special meeting or seek a written consent to vote on rescinding the pill.

In addition, the rationale for adopting the pill should be thoroughly explained by the company. In examining the request for the pill, take into consideration the company's existing governance structure, including: board independence, existing takeover defenses, and any problematic governance concerns.

## Management Proposals to Ratify a Pill to Preserve Net Operating Losses (NOLs)

**Climate Policy Recommendation:** Vote against proposals to adopt a poison pill for the stated purpose of protecting a company's net operating losses (NOL) if the term of the pill would exceed the shorter of three years and the exhaustion of the NOL.

Vote case-by-case on management proposals for poison pill ratification, considering the following factors, if the term of the pill would be the shorter of three years (or less) and the exhaustion of the NOL:

- The ownership threshold to transfer (NOL pills generally have a trigger slightly below 5 percent);
- The value of the NOLs;
- Shareholder protection mechanisms (sunset provision, or commitment to cause expiration of the pill upon exhaustion or expiration of NOLs);
- The company's existing governance structure including: board independence, existing takeover defenses, track record of responsiveness to shareholders, and any other problematic governance concerns; and
- Any other factors that may be applicable.

## Proxy Voting Disclosure, Confidentiality, and Tabulation

**Climate Policy Recommendation:** Vote case-by-case on proposals regarding proxy voting mechanics, taking into consideration whether implementation of the proposal is likely to enhance or protect shareholder rights. Specific issues covered under the policy include, but are not limited to, confidential voting of individual proxies and ballots, confidentiality of running vote tallies, and the treatment of abstentions and/or broker non-votes in the company's vote-counting methodology.

While a variety of factors may be considered in each analysis, the guiding principles are: transparency, consistency, and fairness in the proxy voting process. The factors considered, as applicable to the proposal, may include:

- The scope and structure of the proposal;
- The company's stated confidential voting policy (or other relevant policies) and whether it ensures a "level playing field" by providing shareholder proponents with equal access to vote information prior to the annual meeting;
- The company's vote standard for management and shareholder proposals and whether it ensures consistency and fairness in the proxy voting process and maintains the integrity of vote results;
- Whether the company's disclosure regarding its vote counting method and other relevant voting policies with respect to management and shareholder proposals are consistent and clear;
- Any recent controversies or concerns related to the company's proxy voting mechanics;
- Any unintended consequences resulting from implementation of the proposal; and
- Any other factors that may be relevant.

## Ratification Proposals: Management Proposals to Ratify Existing Charter or Bylaw Provisions

**Climate Policy Recommendation:** Generally vote against management proposals to ratify provisions of the company's existing charter or bylaws, unless these governance provisions align with best practice.

In addition, voting against/withhold from individual directors, members of the governance committee, or the full board may be warranted, considering:

- The presence of a shareholder proposal addressing the same issue on the same ballot;
- The board's rationale for seeking ratification;
- Disclosure of actions to be taken by the board should the ratification proposal fail;
- Disclosure of shareholder engagement regarding the board's ratification request;
- The level of impairment to shareholders' rights caused by the existing provision;
- The history of management and shareholder proposals on the provision at the company's past meetings;
- Whether the current provision was adopted in response to the shareholder proposal;
- The company's ownership structure; and
- Previous use of ratification proposals to exclude shareholder proposals.

## Reimbursing Proxy Solicitation Expenses

**Climate Policy Recommendation:** Vote case-by-case on proposals to reimburse proxy solicitation expenses.

When voting in conjunction with support of a dissident slate, vote for the reimbursement of all appropriate proxy solicitation expenses associated with the election.

Generally vote for shareholder proposals calling for the reimbursement of reasonable costs incurred in connection with nominating one or more candidates in a contested election where the following apply:

- The election of fewer than 50% of the directors to be elected is contested in the election;
- One or more of the dissident's candidates is elected;
- Shareholders are not permitted to cumulate their votes for directors; and
- The election occurred, and the expenses were incurred, after the adoption of this bylaw.

## Reincorporation Proposals

**Climate Policy Recommendation:** Management or shareholder proposals to change a company's state of incorporation should be evaluated case-by-case, giving consideration to both financial and corporate governance concerns including the following:

- Reasons for reincorporation;
- Comparison of company's governance practices and provisions prior to and following the reincorporation; and
- Comparison of corporation laws of original state and destination state.

Vote for reincorporation when the economic factors outweigh any neutral or negative governance changes.

## Shareholder Ability to Act by Written Consent

**Climate Policy Recommendation:** Generally vote against management and shareholder proposals to restrict or prohibit shareholders' ability to act by written consent.

Generally vote for management and shareholder proposals that provide shareholders with the ability to act by written consent, taking into account the following factors:

- Shareholders' current right to act by written consent;
- The consent threshold;
- The inclusion of exclusionary or prohibitive language;
- Investor ownership structure; and
- Shareholder support of, and management's response to, previous shareholder proposals.

Vote case-by-case on shareholder proposals if, in addition to the considerations above, the company has the following governance and antitakeover provisions:

- An unfettered[15] right for shareholders to call special meetings at a 10 percent threshold;
- A majority vote standard in uncontested director elections;
- No non-shareholder-approved pill; and
- An annually elected board.

## Shareholder Ability to Call Special Meetings

**Climate Policy Recommendation:** Vote against management or shareholder proposals to restrict or prohibit shareholders' ability to call special meetings.

Generally vote for management or shareholder proposals that provide shareholders with the ability to call special meetings taking into account the following factors:

- Shareholders' current right to call special meetings;
- Minimum ownership threshold necessary to call special meetings (10% preferred);
- The inclusion of exclusionary or prohibitive language;
- Investor ownership structure; and
- Shareholder support of, and management's response to, previous shareholder proposals.

## Stakeholder Provisions

**Climate Policy Recommendation:** Vote against proposals that ask the board to consider non-shareholder constituencies or other non-financial effects when evaluating a merger or business combination.

## State Antitakeover Statutes

**Climate Policy Recommendation:** Vote case-by-case on proposals to opt in or out of state takeover statutes (including fair price provisions, stakeholder laws, poison pill endorsements, severance pay and labor contract provisions, and anti-greenmail provisions).

## Supermajority Vote Requirements

**Climate Policy Recommendation:** Vote against proposals to require a supermajority shareholder vote.

Vote for management or shareholder proposals to reduce supermajority vote requirements. However, for companies with shareholder(s) who have significant ownership levels, vote case-by-case, taking into account:

- Ownership structure;
- Quorum requirements; and
- Vote requirements.

---

[15] "Unfettered" means no restrictions on agenda items, no restrictions on the number of shareholders who can group together to reach the 10 percent threshold, and only reasonable limits on when a meeting can be called: no greater than 30 days after the last annual meeting and no greater than 90 prior to the next annual meeting.

## Virtual Shareholder Meetings

**Climate Policy Recommendation:** Generally vote for management proposals allowing for the convening of shareholder meetings by electronic means, so long as they do not preclude in-person meetings. Companies are encouraged to disclose the circumstances under which virtual-only[16] meetings would be held, and to allow for comparable rights and opportunities for shareholders to participate electronically as they would have during an in-person meeting.

Vote case-by-case on shareholder proposals concerning virtual-only meetings, considering:

- Scope and rationale of the proposal; and
- Concerns identified with the company's prior meeting practices.

---

[16] Virtual-only shareholder meeting" refers to a meeting of shareholders that is held exclusively using technology without a corresponding in-person meeting.

# 4. Capital/Restructuring

## Capital

### Adjustments to Par Value of Common Stock

**Climate Policy Recommendation:** Vote for management proposals to reduce the par value of common stock unless the action is being taken to facilitate an anti-takeover device or some other negative corporate governance action.

Vote for management proposals to eliminate par value.

### Common Stock Authorization

#### General Authorization Requests

**Climate Policy Recommendation:** Vote case-by-case on proposals to increase the number of authorized shares of preferred stock that are to be used for general corporate purpose.

- If share usage (outstanding plus reserved) is less than 50% of the current authorized shares, vote for an increase of up to **50**% of current authorized shares.
- If share usage is 50% to 100% of the current authorized, vote for an increase of up to **100**% of current authorized shares.
- If share usage is greater than current authorized shares, vote for an increase of up to the current share usage.
- In the case of a stock split, the allowable increase is calculated (per above) based on the post-split adjusted authorization.

Generally vote against proposed increases, even if within the above ratios, if the proposal or the company's prior or ongoing use of authorized shares is problematic, including, but not limited to:

- The proposal seeks to increase the number of authorized shares of the class of common stock that has superior voting rights to other share classes;
- On the same ballot is a proposal for a reverse split for which support is warranted despite the fact that it would result in an excessive increase in the share authorization;
- The company has a non-shareholder approved poison pill (including an NOL pill); or
- The company has previous sizeable placements (within the past 3 years) of stock with insiders at prices substantially below market value, or with problematic voting rights, without shareholder approval.

However, generally vote for proposed increases beyond the above ratios or problematic situations when there is disclosure of specific and severe risks to shareholders of not approving the request, such as:

- In, or subsequent to, the company's most recent 10-K filing, the company discloses that there is substantial doubt about its ability to continue as a going concern;
- The company states that there is a risk of imminent bankruptcy or imminent liquidation if shareholders do not approve the increase in authorized capital; or
- A government body has in the past year required the company to increase its capital ratios.

For companies incorporated in states that allow increases in authorized capital without shareholder approval, generally vote withhold or against all nominees if a unilateral capital authorization increase does not conform to the above policies.

## Specific Authorization Requests

**Climate Policy Recommendation:** Generally vote for proposals to increase the number of authorized common shares where the primary purpose of the increase is to issue shares in connection with transaction(s) (such as acquisitions, SPAC transitions, private placement, or similar transactions) on the same ballot, or disclosed in the proxy statement, that warrant support. For such transitions, the allowable increase will be the greater of:

- twice the amount needed to support the transactions on the ballot, and
- the allowable increase as calculated for general issuances above.

## Unequal Voting Rights/Dual Class Structure

**Climate Policy Recommendation:** Generally vote against proposals to create a new class of common stock unless:

- The company discloses a compelling rationale for the dual-class capital structure, such as:
    - The company's auditor has concluded that there is substantial doubt about the company's ability to continue as a going concern; or
    - The new class of shares will be transitory;
- The new class is intended for financing purposes with minimal or no dilution to current shareholders in both the short term and long term; and
- The new class is not designed to preserve or increase the voting power of an insider or significant shareholder.

Generally vote against proposals to create a new class of preferred stock with voting rights superior to the common stock unless:

- The preferred shares are convertible into common shares and vote on an "as converted" basis prior to conversion, or
- The enhanced voting rights of the preferred shares have limited duration and applicability and the shares are voted in a way that mirrors the votes of the common shares (i.e., where such shares are intended to overcome low voting turnout and ensure approval of a specific non-controversial agenda item such as a reverse stock split needed to avoid a delisting).

## Issue Stock for Use with Rights Plan

**Climate Policy Recommendation:** Vote against proposals that increase authorized common stock for the explicit purpose of implementing a non-shareholder- approved shareholder rights plan (poison pill).

## Preemptive Rights

**Climate Policy Recommendation:** Vote case-by-case on shareholder proposals that seek preemptive rights, taking into consideration:

- The size of the company;
- The shareholder base; and
- The liquidity of the stock.

# Preferred Stock Authorization

## General Authorization Requests

**Climate Policy Recommendation:** Vote case-by-case on proposals to increase the number of authorized shares of preferred stock that are to be used for general corporate purposes:

- If share usage (outstanding plus reserved) is less than 50% of the current authorized shares, vote for an increase of up to **50**% of current authorized shares.
- If share usage is 50% to 100% of the current authorized, vote for an increase of up to **100**% of current authorized shares.
- If share usage is greater than current authorized shares, vote for an increase of up to the current share usage.
- In the case of a stock split, the allowable increase is calculated (per above) based on the post-split adjusted authorization.
- If no preferred shares are currently issued and outstanding, vote against the request, unless the company discloses a specific use for the shares.

Generally vote against proposed increases, even if within the above ratios, if the proposal or the company's prior or ongoing use of authorized shares is problematic, including, but not limited to:

- If the shares requested are blank check preferred shares that can be used for antitakeover purposes;[17]
- The company seeks to increase a class of non-convertible preferred shares entitled to more than one vote per share on matters that do not solely affect the rights of preferred stockholders "supervoting shares");
- The company seeks to increase a class of convertible preferred shares entitled to a number of votes greater than the number of common shares into which they're convertible ("supervoting shares") on matters that do not solely affect the rights of preferred stockholders;
- The stated intent of the increase in the general authorization is to allow the company to increase an existing designated class of supervoting preferred shares;
- On the same ballot is a proposal for a reverse split for which support is warranted despite the fact that it would result in an excessive increase in the share authorization;
- The company has a non-shareholder approved poison pill (including an NOL pill); or
- The company has previous sizeable placements (within the past 3 years) of stock with insiders at prices substantially below market value, or with problematic voting rights, without shareholder approval.

However, generally vote for proposed increases beyond the above ratios or problematic situations when there is disclosure of specific and severe risks to shareholders of not approving the request, such as:

- In, or subsequent to, the company's most recent 10-K filing, the company discloses that there is substantial doubt about its ability to continue as a going concern;
- The company states that there is a risk of imminent bankruptcy or imminent liquidation if shareholders do not approve the increase in authorized capital; or
- A government body has in the past year required the company to increase its capital ratios.

For companies incorporated in states that allow increases in authorized capital without shareholder approval, generally vote withhold or against all nominees if a unilateral capital authorization increase does not conform to the above policies.

---

[17] To be acceptable, appropriate disclosure would be needed that the shares are "declawed": i.e., representation by the board that it will not, without prior stockholder approval, issue or use the preferred stock for any defensive or anti-takeover purpose or for the purpose of implementing any stockholder rights plan.

## Specific Authorization Requests

**Climate Policy Recommendation:** Generally vote for proposals to increase the number of authorized preferred shares where the primary purpose of the increase is to issue shares in connection with transaction(s) (such as acquisitions, SPAC transactions, private placements, or similar transactions) on the same ballot, or disclosed in the proxy statement, that warrant support.  For such transactions, the allowable increase will be the greater of:

- twice the amount needed to support the transactions on the ballot, and
- the allowable increase as calculated for general issuances above.

## Recapitalization Plans

**Climate Policy Recommendation:** Vote case-by-case on recapitalizations (reclassifications of securities), taking into account the following:

- More simplified capital structure;
- Enhanced liquidity;
- Fairness of conversion terms;
- Impact on voting power and dividends;
- Reasons for the reclassification;
- Conflicts of interest; and
- Other alternatives considered.

## Reverse Stock Splits

**Climate Policy Recommendation:** Vote for management proposals to implement a reverse stock split if:

- The number of authorized shares will be proportionately reduced; or
- The effective increase in authorized shares is equal to or less than the allowable increase calculated in accordance with Climate Advisory Services' Common Stock Authorization policy.

Vote case-by-case on proposals that do not meet either of the above conditions, taking into consideration the following factors:

- Stock exchange notification to the company of a potential delisting;
- Disclosure of substantial doubt about the company's ability to continue as a going concern without additional financing;
- The company's rationale; or
- Other factors as applicable.

## Share Repurchase Programs

**Climate Policy Recommendation:** For U.S.-incorporated companies, and foreign-incorporated U.S. Domestic Issuers that are traded solely on U.S. exchanges, vote for management proposals to institute open-market share repurchase plans in which all shareholders may participate on equal terms, or to grant the board authority to conduct open-market repurchases, in the absence of company-specific concerns regarding:

- Greenmail;
- The use of buybacks to inappropriately manipulate incentive compensation metrics;
- Threats to the company's long-term viability; or
- Other company-specific factors as warranted.

Vote case-by-case on proposals to repurchase shares directly from specified shareholders, balancing the stated rationale against the possibility for the repurchase authority to be misused, such as to repurchase shares from insiders at a premium to market price.

## Stock Distributions: Splits and Dividends

**Climate Policy Recommendation:** Generally vote for management proposals to increase the common share authorization for stock split or stock dividend, provided that the effective increase in authorized shares is equal to or is less than the allowable increase calculated in accordance with Climate Advisory Services' Common Stock Authorization policy.

## Tracking Stock

**Climate Policy Recommendation:** Vote case-by-case on the creation of tracking stock, weighing the strategic value of the transaction against such factors as:

- Adverse governance changes;
- Excessive increases in authorized capital stock;
- Unfair method of distribution;
- Diminution of voting rights;
- Adverse conversion features;
- Negative impact on stock option plans; and
- Alternatives such as spin-off.

## Share Issuance Mandates at U.S. Domestic Issuers Incorporated Outside the U.S.

**Climate Policy Recommendation:** For U.S. domestic issuers incorporated outside the U.S. and listed solely on a U.S. exchange, generally vote for resolutions to authorize the issuance of common shares up to 20 percent of currently issued common share capital, where not tied to a specific transaction or financing proposal.

For pre-revenue or other early-stage companies that are heavily reliant on periodic equity financing, generally vote for resolutions to authorize the issuance of common shares up to 50 percent of currently issued common share capital. The burden of proof will be on the company to establish that it has a need for the higher limit.

Renewal of such mandates should be sought at each year's annual meeting.

Vote case-by-case on share issuances for a specific transaction or financing proposal.

## Restructuring

## Appraisal Rights

**Climate Policy Recommendation:** Vote for proposals to restore or provide shareholders with rights of appraisal.

## Asset Purchases

**Climate Policy Recommendation:** Vote case-by-case on asset purchase proposals, considering the following factors:

- Purchase price;
- Fairness opinion;
- Financial and strategic benefits;
- How the deal was negotiated;
- Conflicts of interest;
- Other alternatives for the business; and
- Non-completion risk.

## Asset Sales

**Climate Policy Recommendation:** Vote case-by-case on asset sales, considering the following factors:

- Impact on the balance sheet/working capital;
- Potential elimination of diseconomies;
- Anticipated financial and operating benefits;
- Anticipated use of funds;
- Value received for the asset;
- Fairness opinion;
- How the deal was negotiated; and
- Conflicts of interest.

## Bundled Proposals

**Climate Policy Recommendation:** Vote case-by-case on bundled or "conditional" proxy proposals. In the case of items that are conditioned upon each other, examine the benefits and costs of the packaged items. In instances when the joint effect of the conditioned items is not in shareholders' best interests, vote against the proposals. If the combined effect is positive, support such proposals.

## Conversion of Securities

**Climate Policy Recommendation:** Vote case-by-case on proposals regarding conversion of securities. When evaluating these proposals, the investor should review the dilution to existing shareholders, the conversion price relative to market value, financial issues, control issues, termination penalties, and conflicts of interest.

Vote for the conversion if it is expected that the company will be subject to onerous penalties or will be forced to file for bankruptcy if the transaction is not approved.

## Corporate Reorganization/Debt Restructuring/Prepackaged Bankruptcy Plans/Reverse Leveraged Buyouts/Wrap Plans

**Climate Policy Recommendation:** Vote case-by-case on proposals to increase common and/or preferred shares and to issue shares as part of a debt restructuring plan, after evaluating:

- Dilution to existing shareholders' positions;
- Terms of the offer - discount/premium in purchase price to investor, including any fairness opinion; termination penalties; exit strategy;
- Financial issues - company's financial situation; degree of need for capital; use of proceeds; effect of the financing on the company's cost of capital;
- Management's efforts to pursue other alternatives;
- Control issues - change in management; change in control, guaranteed board and committee seats; standstill provisions; voting agreements; veto power over certain corporate actions; and
- Conflict of interest - arm's length transaction, managerial incentives.

Vote for the debt restructuring if it is expected that the company will file for bankruptcy if the transaction is not approved.

## Formation of Holding Company

**Climate Policy Recommendation:** Vote case-by-case on proposals regarding the formation of a holding company, taking into consideration the following:

- The reasons for the change;
- Any financial or tax benefits;
- Regulatory benefits;
- Increases in capital structure; and
- Changes to the articles of incorporation or bylaws of the company.

Absent compelling financial reasons to recommend for the transaction, vote against the formation of a holding company if the transaction would include either of the following:

- Increases in common or preferred stock in excess of the allowable maximum (see discussion under "Capital"); or
- Adverse changes in shareholder rights.

## Going Private and Going Dark Transactions (LBOs and Minority Squeeze-outs)

**Climate Policy Recommendation:** Vote case-by-case on going private transactions, taking into account the following:

- Offer price/premium;
- Fairness opinion;
- How the deal was negotiated;
- Conflicts of interest;
- Other alternatives/offers considered; and
- Non-completion risk.

Vote case-by-case on going dark transactions, determining whether the transaction enhances shareholder value by taking into consideration:

- Whether the company has attained benefits from being publicly-traded (examination of trading volume, liquidity, and market research of the stock);
- Balanced interests of continuing vs. cashed-out shareholders, taking into account the following:
- Are all shareholders able to participate in the transaction?
- Will there be a liquid market for remaining shareholders following the transaction?
- Does the company have strong corporate governance?
- Will insiders reap the gains of control following the proposed transaction?
- Does the state of incorporation have laws requiring continued reporting that may benefit shareholders?

## Joint Ventures

**Climate Policy Recommendation:** Vote case-by-case on proposals to form joint ventures, taking into account the following:

- Percentage of assets/business contributed;
- Percentage ownership;
- Financial and strategic benefits;
- Governance structure;
- Conflicts of interest;
- Other alternatives; and
- Non-completion risk.

## Liquidations

**Climate Policy Recommendation:** Vote case-by-case on liquidations, taking into account the following:

- Management's efforts to pursue other alternatives;
- Appraisal value of assets; and
- The compensation plan for executives managing the liquidation.

Vote for the liquidation if the company will file for bankruptcy if the proposal is not approved.

## Mergers and Acquisitions

**Climate Policy Recommendation:** Vote case-by-case on mergers and acquisitions. Review and evaluate the merits and drawbacks of the proposed transaction, balancing various and sometimes countervailing factors including:

- *Valuation* - Is the value to be received by the target shareholders (or paid by the acquirer) reasonable? While the fairness opinion may provide an initial starting point for assessing valuation reasonableness, emphasis is placed on the offer premium, market reaction and strategic rationale.
- *Market reaction* - How has the market responded to the proposed deal? A negative market reaction should cause closer scrutiny of a deal.
- *Strategic rationale* - Does the deal make sense strategically? From where is the value derived? Cost and revenue synergies should not be overly aggressive or optimistic, but reasonably achievable. Management should also have a favorable track record of successful integration of historical acquisitions.
- *Negotiations and process* - Were the terms of the transaction negotiated at arm's-length? Was the process fair and equitable? A fair process helps to ensure the best price for shareholders. Significant negotiation "wins"

can also signify the deal makers' competency. The comprehensiveness of the sales process (*e.g.*, full auction, partial auction, no auction) can also affect shareholder value.

- *Conflicts of interest* - Are insiders benefiting from the transaction disproportionately and inappropriately as compared to non-insider shareholders? As the result of potential conflicts, the directors and officers of the company may be more likely to vote to approve a merger than if they did not hold these interests. Consider whether these interests may have influenced these directors and officers to support or recommend the merger.
- *Governance* - Will the combined company have a better or worse governance profile than the current governance profiles of the respective parties to the transaction? If the governance profile is to change for the worse, the burden is on the company to prove that other issues (such as valuation) outweigh any deterioration in governance.

## Private Placements/Warrants/Convertible Debentures

**Climate Policy Recommendation:** Vote case-by-case on proposals regarding private placements, warrants, and convertible debentures taking into consideration:

- Dilution to existing shareholders' position: The amount and timing of shareholder ownership dilution should be weighed against the needs and proposed shareholder benefits of the capital infusion. Although newly issued common stock, absent preemptive rights, is typically dilutive to existing shareholders, share price appreciation is often the necessary event to trigger the exercise of "out of the money" warrants and convertible debt. In these instances from a value standpoint, the negative impact of dilution is mitigated by the increase in the company's stock price that must occur to trigger the dilutive event.

- Terms of the offer (discount/premium in purchase price to investor, including any fairness opinion, conversion features, termination penalties, exit strategy):

  - The terms of the offer should be weighed against the alternatives of the company and in light of company's financial condition. Ideally, the conversion price for convertible debt and the exercise price for warrants should be at a premium to the then prevailing stock price at the time of private placement.
  - When evaluating the magnitude of a private placement discount or premium, consider factors that influence the discount or premium, such as, liquidity, due diligence costs, control and monitoring costs, capital scarcity, information asymmetry and anticipation of future performance.

- Financial issues:

  - The company's financial condition;
  - Degree of need for capital;
  - Use of proceeds;
  - Effect of the financing on the company's cost of capital;
  - Current and proposed cash burn rate;
  - Going concern viability and the state of the capital and credit markets.

- Management's efforts to pursue alternatives and whether the company engaged in a process to evaluate alternatives: A fair, unconstrained process helps to ensure the best price for shareholders. Financing alternatives can include joint ventures, partnership, merger or sale of part or all of the company.

- Control issues:

  - Change in management;
  - Change in control;
  - Guaranteed board and committee seats;
  - Standstill provisions;
  - Voting agreements;
  - Veto power over certain corporate actions; and
  - Minority versus majority ownership and corresponding minority discount or majority control premium

- Conflicts of interest:

  - Conflicts of interest should be viewed from the perspective of the company and the investor.
  - Were the terms of the transaction negotiated at arm's length? Are managerial incentives aligned with shareholder interests?

- Market reaction:

  - The market's response to the proposed deal. A negative market reaction is a cause for concern. Market reaction may be addressed by analyzing the one-day impact on the unaffected stock price.

Vote for the private placement, or for the issuance of warrants and/or convertible debentures in a private placement, if it is expected that the company will file for bankruptcy if the transaction is not approved.

## Reorganization/Restructuring Plan (Bankruptcy)

**Climate Policy Recommendation:** Vote case-by-case on proposals to common shareholders on bankruptcy plans of reorganization, considering the following factors including, but not limited to:

- Estimated value and financial prospects of the reorganized company;
- Percentage ownership of current shareholders in the reorganized company;
- Whether shareholders are adequately represented in the reorganization process (particularly through the existence of an official equity committee);
- The cause(s) of the bankruptcy filing, and the extent to which the plan of reorganization addresses the cause(s);
- Existence of a superior alternative to the plan of reorganization; and
- Governance of the reorganized company.

## Special Purpose Acquisition Corporations (SPACs)

**Climate Policy Recommendation:** Vote case-by-case on SPAC mergers and acquisitions taking into account the following:

- *Valuation*—Is the value being paid by the SPAC reasonable? SPACs generally lack an independent fairness opinion and the financials on the target may be limited. Compare the conversion price with the intrinsic value of the target company provided in the fairness opinion. Also, evaluate the proportionate value of the combined entity attributable to the SPAC IPO shareholders versus the pre-merger value of SPAC. Additionally, a private company discount may be applied to the target, if it is a private entity.
- *Market reaction*—How has the market responded to the proposed deal? A negative market reaction may be a cause for concern. Market reaction may be addressed by analyzing the one-day impact on the unaffected stock price.
- *Deal timing*—A main driver for most transactions is that the SPAC charter typically requires the deal to be complete within 18 to 24 months, or the SPAC is to be liquidated. Evaluate the valuation, market reaction, and potential conflicts of interest for deals that are announced close to the liquidation date.
- *Negotiations and process*—What was the process undertaken to identify potential target companies within specified industry or location specified in charter? Consider the background of the sponsors.
- *Conflicts of interest*—How are sponsors benefiting from the transaction compared to IPO shareholders? Potential conflicts could arise if a fairness opinion is issued by the insiders to qualify the deal rather than a third party or if management is encouraged to pay a higher price for the target because of an 80% rule (the charter requires that the fair market value of the target is at least equal to 80% of net assets of the SPAC). Also, there may be sense of urgency by the management team of the SPAC to close the deal since its charter typically requires a transaction to be completed within the 18-24 month timeframe.

- *Voting agreements*—Are the sponsors entering into enter into any voting agreements/ tender offers with shareholders who are likely to vote against the proposed merger or exercise conversion rights?
- *Governance*—What is the impact of having the SPAC CEO or founder on key committees following the proposed merger?

## Special Purpose Acquisition Corporations (SPACs) – Proposals for Extensions

**Climate Policy Recommendation:** Generally support requests to extend the termination date by up to one year from the SPAC's original termination date (inclusive of any built-in extension options, and accounting for prior extension requests).

Other factors that may be considered include: any added incentives, business combination status, other amendment terms, and, if applicable, use of money in the trust fund to pay excise taxes on redeemed shares.

## Spin-offs

**Climate Policy Recommendation:** Vote case-by-case on spin-offs, considering:

- Tax and regulatory advantages;
- Planned use of the sale proceeds;
- Valuation of spinoff;
- Fairness opinion;
- Benefits to the parent company;
- Conflicts of interest;
- Managerial incentives;
- Corporate governance changes;
- Changes in the capital structure.

## Value Maximization Shareholder Proposals

**Climate Policy Recommendation:** Vote case-by-case on shareholder proposals seeking to maximize shareholder value by:

- Hiring a financial advisor to explore strategic alternatives;
- Selling the company; or
- Liquidating the company and distributing the proceeds to shareholders.

These proposals should be evaluated based on the following factors:

- Prolonged poor performance with no turnaround in sight;
- Signs of entrenched board and management (such as the adoption of takeover defenses);
- Strategic plan in place for improving value;
- Likelihood of receiving reasonable value in a sale or dissolution; and
- The company actively exploring its strategic options, including retaining a financial advisor.

# 5. Compensation

## Executive Pay Evaluation

Underlying all evaluations are five global principles that most investors expect corporations to adhere to in designing and administering executive and director compensation programs:

1.  Maintain appropriate pay-for-performance alignment, with emphasis on long-term shareholder value: This principle encompasses overall executive pay practices, which must be designed to attract, retain, and appropriately motivate the key employees who drive shareholder value creation over the long term. It will take into consideration, among other factors, the link between pay and performance; the mix between fixed and variable pay; performance goals; and equity-based plan costs;
2.  Avoid arrangements that risk "pay for failure": This principle addresses the appropriateness of long or indefinite contracts, excessive severance packages, and guaranteed compensation;
3.  Maintain an independent and effective compensation committee: This principle promotes oversight of executive pay programs by directors with appropriate skills, knowledge, experience, and a sound process for compensation decision-making (*e.g.*, including access to independent expertise and advice when needed);
4.  Provide shareholders with clear, comprehensive compensation disclosures: This principle underscores the importance of informative and timely disclosures that enable shareholders to evaluate executive pay practices fully and fairly;
5.  Avoid inappropriate pay to non-executive directors: This principle recognizes the interests of shareholders in ensuring that compensation to outside directors does not compromise their independence and ability to make appropriate judgments in overseeing managers' pay and performance. At the market level, it may incorporate a variety of generally accepted best practices.

## Advisory Votes on Executive Compensation—Management Proposals (Management Say-on-Pay)

**Climate Policy Recommendation:** Vote case-by-case on ballot items related to executive pay and practices, as well as certain aspects of outside director compensation.

Vote against Advisory Votes on Executive Compensation (Say-on-Pay or "SOP") if:

- There is an unmitigated misalignment between CEO pay and company performance (pay for performance);
- The company maintains significant problematic pay practices;
- The board exhibits a significant level of poor communication and responsiveness to shareholders.

Vote against or withhold from the members of the compensation committee and potentially the full board if:

- There is no SOP on the ballot, and an against vote on an SOP is warranted due to pay for performance misalignment, problematic pay practices, or the lack of adequate responsiveness on compensation issues raised previously, or a combination thereof;
- The board fails to respond adequately to a previous SOP proposal that received less than 70 percent support of votes cast;
- The company has recently practiced or approved problematic pay practices, such as option repricing or option backdating; or
- The situation is egregious.

*PRIMARY EVALUATION FACTORS FOR EXECUTIVE PAY*

## Pay-for-Performance Evaluation

Climate Advisory Services annually conducts a pay-for-performance analysis to identify strong or satisfactory alignment between pay and performance over a sustained period. With respect to companies in the Russell 3000 or Russell 3000E Indices, this analysis considers the following:

1.  Peer Group[18] Alignment:

- The degree of alignment between the company's annualized TSR rank and the CEO's annualized total pay rank within a peer group, each measured over a five-year period.
- The rankings of CEO total pay and company financial performance within a peer group, each measured over a five-year period.
- The multiple of the CEO's total pay relative to the peer group median over one- and three-year periods.

2.  Absolute Alignment[19] – the absolute alignment between the trend in CEO pay and company TSR over the prior five fiscal years – i.e., the difference between the trend in annual pay changes and the trend in annualized TSR during the period.

If the above analysis demonstrates significant unsatisfactory long-term pay-for-performance alignment or, in the case of companies outside the Russell indices, misaligned pay and performance are otherwise suggested, our analysis may include any of the following qualitative factors, as relevant to evaluating how various pay elements may work to encourage or to undermine long-term value creation and alignment with shareholder interests:

- The overall ratio of performance-based compensation to fixed or discretionary pay;
- The ratio of performance- to time-based long-term incentive awards;
- Vesting and/or retention requirements for equity awards that demonstrate a long-term focus;
- The rigor of performance goals;
- The complexity and risks around pay program design;
- The transparency and clarity of disclosure;
- The company's peer group benchmarking practices;
- Financial/operational results, both absolute and relative to peers;
- Special circumstances related to, for example, a new CEO in the prior FY or anomalous equity grant practices (e.g., bi-annual awards);
- Realizable and/or realized pay compared to granted pay; and
- Any other factors deemed relevant.

## Problematic Pay Practices

Problematic pay elements are generally evaluated case-by-case considering the context of a company's overall pay program and demonstrated pay-for-performance philosophy. The focus in on executive compensation practices that contravene the global pay principles, including:

- Problematic practices related to non-performance-based compensation elements;

---

[18] The ISS peer group is generally comprised of 14-24 companies that are selected using factors such as market cap, revenue, assets, GICS industry group, and the company selected peers' GICS industry group. ISS' peer selection methodology is detailed in the U.S. Peer Group FAQ.

[19] Russell 3000E Index companies (excluding S&P1500 and Russell 3000 companies) are not subject to the Absolute Alignment analysis.

- Incentives that may motivate excessive risk-taking or present a windfall risk; and
- Pay decisions that circumvent pay-for-performance, such as options backdating or waiving performance requirements.

The list of examples below highlights certain problematic practices that carry significant weight in this overall consideration and may result in adverse vote recommendations:

- Repricing or replacing of underwater stock options/SARs without prior shareholder approval (including cash buyouts and voluntary surrender of underwater options);
- Extraordinary perquisites or tax gross-ups;
- New or materially amended agreements that provide for:
    - Excessive termination or CIC severance payments (generally exceeding 3 times base salary and average/target/most recent bonus);
    - CIC severance payments without involuntary job loss or substantial diminution of duties ("single" or "modified single" triggers) or in connection with a problematic Good Reason definition;
    - CIC excise tax gross-up entitlements (including "modified" gross-ups);
    - Multi-year guaranteed awards that are not at risk due to rigorous performance conditions;
- Liberal CIC definition combined with any single-trigger CIC benefits;
- Severance payments made when the termination is not clearly disclosed as involuntary (for example, a termination without cause or resignation for good reason);
- Insufficient executive compensation disclosure by externally-managed issuers (EMIs) such that a reasonable assessment of pay programs and practices applicable to the EMI's executives is not possible;
- Any other provision or practice deemed to be egregious and present a significant risk to investors.

The above examples are not an exhaustive list. Please refer to ISS' U.S. Compensation Policies FAQ document for additional detail on specific pay practices that have been identified as problematic and may lead to negative vote recommendations.

**Options Backdating**

The following factors should be examined case-by-case to allow for distinctions to be made between "sloppy" plan administration versus deliberate action or fraud:

- Reason and motive for the options backdating issue, such as inadvertent vs. deliberate grant date changes;
- Duration of options backdating;
- Size of restatement due to options backdating;
- Corrective actions taken by the board or compensation committee, such as canceling or re-pricing backdated options, the recouping of option gains on backdated grants; and
- Adoption of a grant policy that prohibits backdating, and creates a fixed grant schedule or window period for equity grants in the future.

## Compensation Committee Communications and Responsiveness

Consider the following factors case-by-case when evaluating ballot items related to executive pay on the board's responsiveness to investor input and engagement on compensation issues:

- Failure to respond to majority-supported shareholder proposals on executive pay topics; or
- Failure to adequately respond to the company's previous say-on-pay proposal that received low support, taking into account the factors identified under the Responsiveness section in the Board of Directors policy with respect to say-on-pay.

## Frequency of Advisory Vote on Executive Compensation ("Say When on Pay")

**Climate Policy Recommendation:** Vote for annual advisory votes on compensation, which provide the most consistent and clear communication channel for shareholder concerns about companies' executive pay programs.

## Voting on Golden Parachutes in an Acquisition, Merger, Consolidation, or Proposed Sale

**Climate Policy Recommendation:** Vote case-by-case on say on Golden Parachute proposals, including consideration of existing change-in-control arrangements maintained with named executive officers rather than focusing primarily on new or extended arrangements.

Features that may result in an "against" recommendation include one or more of the following, depending on the number, magnitude, and/or timing of issue(s):

- Single- or modified-single-trigger cash severance;
- Single-trigger acceleration of unvested equity awards;
- Full acceleration of equity awards granted shortly before the change in control;
- Acceleration of performance awards above the target level of performance without compelling rationale;
- Excessive cash severance (>3x base salary and bonus);
- Excise tax gross-ups triggered and payable;
- Excessive golden parachute payments (on an absolute basis or as a percentage of transaction equity value); or
- Recent amendments that incorporate any problematic features (such as those above) or recent actions (such as extraordinary equity grants) that may make packages so attractive as to influence merger agreements that may not be in the best interests of shareholders; or
- The company's assertion that a proposed transaction is conditioned on shareholder approval of the golden parachute advisory vote.

Recent amendment(s) that incorporate problematic features will tend to carry more weight on the overall analysis. However, the presence of multiple legacy problematic features will also be closely scrutinized.

In cases where the golden parachute vote is incorporated into a company's advisory vote on compensation (management say-on-pay), the say-on-pay proposal will be evaluated in accordance with these guidelines, which may give higher weight to that component of the overall evaluation.

## Equity-Based and Other Incentive Plans

Please refer to ISS' U.S. Equity Compensation Plans FAQ document for additional details on the Equity Plan Scorecard policy.

**Climate Policy Recommendation:** Vote case-by-case on equity plan proposals subject to the Equity Plan Scorecard framework, where positive factors may counterbalance negative factors under three pillars:

- **Plan Cost:** The total estimated cost of the company's equity plans relative to industry/market cap peers, measured by the company's estimated Shareholder Value Transfer (SVT) in relation to peers and considering both:
  - SVT based on new shares requested plus shares remaining for future grants, plus outstanding unvested/unexercised grants; and
  - SVT based only on new shares requested plus shares remaining for future grants.

- **Plan Features:**

  - Quality of disclosure around vesting upon a change in control (CIC);
  - Discretionary vesting authority;
  - Liberal share recycling on various award types;
  - Lack of minimum vesting period for grants made under the plan;
  - Dividends payable prior to award vesting; and
  - Cash-denominated award limits for non-employee directors.

- **Grant Practices:**

  - The company's three year burn rate relative to its industry/market cap peers;
  - Vesting requirements in CEO'S recent equity grants;
  - The estimated duration of the plan;
  - The proportion of the CEO's most recent equity grants/awards classified by ISS as performance-based;
  - Whether the company maintains a sufficient claw-back policy;
  - Whether the company maintains sufficient post exercise/vesting share-holding requirements.

Generally vote against the plan proposal if the combination of above factors indicates that the plan is not, overall, in shareholders' interests, or if any of the following egregious factors ("overriding factors") apply:

- Awards may vest in connection with a liberal change-of-control definition;
- The plan would permit repricing or cash buyout of underwater options without shareholder approval (either by expressly permitting it – for NYSE and Nasdaq listed companies -- or by not prohibiting it when the company has a history of repricing – for non-listed companies);
- The plan is a vehicle for problematic pay practices or a significant pay-for-performance disconnect under certain circumstances;
- The plan is excessively dilutive to shareholders' holdings;
- The plan contains an evergreen (automatic share replenishment) feature;
- The plan lacks sufficient positive features under the Plan Features pillar; or
- Any other factors that are determined to have a significant negative impact on shareholder interests.

### FURTHER INFORMATION ON CERTAIN EPSC FACTORS

### Shareholder Value Transfer (SVT)

The cost of the equity plans is expressed as Shareholder Value Transfer (SVT), which is measured using a binomial option pricing model that assesses the amount of shareholders' equity flowing out of the company to employees and directors. SVT is expressed as both a dollar amount and as a percentage of market value, and includes the new shares proposed, shares available under existing plans, and shares granted but unexercised (using two measures, in the case of plans subject to the Equity Plan Scorecard evaluation, as noted above). All award types are valued. For omnibus plans, unless limitations are placed on the most expensive types of awards (for example, full value awards), the assumption is made that all awards to be granted will be the most expensive types.

Except for proposals subject to Equity Plan Scorecard evaluation, Shareholder Value Transfer is reasonable if it falls below a company-specific benchmark. The benchmark is determined as follows: The top quartile performers in each industry group (using the Global Industry Classification Standard: GICS) are identified. Benchmark SVT levels for each industry are established based on these top performers' historic SVT. Regression analyses are run on each industry group to identify the variables most strongly correlated to SVT. The benchmark industry SVT level is then

adjusted upwards or downwards for the specific company by plugging the company-specific performance measures, size and cash compensation into the industry cap equations to arrive at the company's benchmark.[20]

### Three-Year Value-Adjusted Burn Rate

A "Value-Adjusted Burn Rate" is used for stock plan evaluations. Value-Adjusted Burn Rate benchmarks are calculated as the greater of: (1) an industry-specific threshold based on three-year burn rates within the company's GICS group segmented by S&P 500, Russell 3000 index (less the S&P 500) and non-Russell 3000 index; and (2) a *de minimis* threshold established separately for each of the S&P 500, the Russell 3000 index less the S&P 500, and the non-Russell 3000 index. Year-over-year burn-rate benchmark changes will be limited to a predetermined range above or below the prior year's burn-rate benchmark.

The Value-Adjusted Burn Rate will be calculated as follows:

Value-Adjusted Burn Rate = ((# of options * option's dollar value using a Black-Scholes model) + (# of full-value awards * stock price)) / (Weighted average common shares * stock price).

## Egregious Factors

### Liberal Change in Control Definition

Generally vote against equity plans if the plan has a liberal definition of change in control and the equity awards could vest upon such liberal definition of change-in-control, even though an actual change in control may not occur. Examples of such a definition include, but are not limited to, announcement or commencement of a tender offer, provisions for acceleration upon a "potential" takeover, shareholder approval of a merger or other transactions, or similar language.

### Repricing Provisions

Vote against plans that expressly permit the repricing or exchange of underwater stock options/stock appreciate rights (SARs) without prior shareholder approval. "Repricing" includes the ability to do any of the following:

- Amend the terms of outstanding options or SARs to reduce the exercise price of such outstanding options or SARs;
- Cancel outstanding options or SARs in exchange for options or SARs with an exercise price that is less than the exercise price of the original options or SARs.
- Cancel underwater options in exchange for stock awards; or
- Provide cash buyouts of underwater options.

While the above cover most types of repricing, Climate Advisory Services may view other provisions as akin to repricing depending on the facts and circumstances,

Also, vote against or withhold from members of the Compensation Committee who approved repricing (as defined above or otherwise determined by Climate Advisory Services) without prior shareholder approval, even if such repricings are allowed in their equity plan.

---

[20] For plans evaluated under the Equity Plan Scorecard policy, the company's SVT benchmark is considered along with other factors.

Vote against plans that do not expressly prohibit repricing or cash buyout of underwater options without shareholder approval if the company has a history of repricing/buyouts without shareholder approval, and the applicable listing standards would not preclude them from doing so.

### Problematic Pay Practices or Significant Pay-for-Performance Disconnect

If the equity plan on the ballot is a vehicle for problematic pay practices, vote against the plan.

If a significant portion of the CEO's misaligned pay is attributed to non-performance-based equity awards, and there is an equity plan on the ballot with the CEO as one of the participants, Climate Advisory Services may recommend a vote against the equity plan. Considerations in voting against the equity plan may include, but are not limited to:

- Magnitude of pay misalignment;
- Contribution of non–performance-based equity grants to overall pay; and
- The proportion of equity awards granted in the last three fiscal years concentrated at the named executive officer level.

## Specific Treatment of Certain Award Types in Equity Plan Evaluations

### Dividend Equivalent Rights

Options that have Dividend Equivalent Rights (DERs) associated with them will have a higher calculated award value than those without DERs under the binomial model, based on the value of these dividend streams. The higher value will be applied to new shares, shares available under existing plans, and shares awarded but not exercised per the plan specifications. DERS transfer more shareholder equity to employees and non-employee directors and this cost should be captured.

### Operating Partnership (OP) Units in Equity Plan Analysis of Real Estate Investment Trusts (REITs)

For Real Estate Investment Trusts (REITS), include the common shares issuable upon conversion of outstanding Operating Partnership (OP) units in the share count for the purposes of determining: (1) market capitalization in the Shareholder Value Transfer (SVT) analysis and (2) shares outstanding in the burn rate analysis.

## Other Compensation Plans

## 401(k) Employee Benefit Plans

**Climate Policy Recommendation:** Vote for proposals to implement a 401(k) savings plan for employees.

## Employee Stock Ownership Plans (ESOPs)

**Climate Policy Recommendation:** Vote for proposals to implement an ESOP or increase authorized shares for existing ESOPs, unless the number of shares allocated to the ESOP is excessive (more than five percent of outstanding shares).

## Employee Stock Purchase Plans—Qualified Plans

**Climate Policy Recommendation:** Vote case-by-case on qualified employee stock purchase plans. Vote for employee stock purchase plans where all of the following apply:

- Purchase price is at least 85 percent of fair market value;
- Offering period is 27 months or less; and
- The number of shares allocated to the plan is 10 percent or less of the outstanding shares.

Vote against qualified employee stock purchase plans where any of the following apply:

- Purchase price is less than 85 percent of fair market value; or
- Offering period is greater than 27 months; or
- The number of shares allocated to the plan is more than ten percent of the outstanding shares.

## Employee Stock Purchase Plans—Non-Qualified Plans

**Climate Policy Recommendation:** Vote case-by-case on nonqualified employee stock purchase plans. Vote for nonqualified employee stock purchase plans with all the following features:

- Broad-based participation (*i.e.*, all employees of the company with the exclusion of individuals with 5 percent or more of beneficial ownership of the company);
- Limits on employee contribution, which may be a fixed dollar amount or expressed as a percent of base salary;
- Company matching contribution up to 25 percent of employee's contribution, which is effectively a discount of 20 percent from market value;
- No discount on the stock price on the date of purchase when there is a company matching contribution.

Vote against nonqualified employee stock purchase plans when any of the plan features do not meet the above criteria. If the company matching contribution or effective discount exceeds the above, Climate Advisory Services may evaluate the SVT cost as part of the assessment.

## Amending Cash and Equity Plans (including Approval for Tax Deductibility (162(m))

**Climate Policy Recommendation:** Vote case-by-case on amendments to cash and equity incentive plans.

Generally vote for proposals to amend executive cash, stock, or cash and stock incentive plans if the proposal:

- Addresses administrative features only; or
- Seeks approval for Section 162(m) purposes only, and the plan administering committee consists entirely of independent outsiders, per Climate Advisory Services' Classification of Directors. Note that if the company is presenting the plan to shareholders for the first time after the company's initial public offering (IPO), or if the proposal is bundled with other material plan amendments, then the recommendation will be case-by-case (see below).

Vote against such proposals to amend executive cash, stock, or cash and stock incentive plans if the proposal:

- Seeks approval for Section 162(m) purposes only, and the plan administering committee does not consist entirely of independent outsiders, per Climate Advisory Services' Classification of Directors.

Vote case-by-case on all other proposals to amend <u>cash</u> incentive plans. This includes plans presented to shareholders for the first time after the company's IPO and/or proposals that bundle material amendment(s) other than those for Section 162(m) purposes

Vote case-by-case on all other proposals to amend <u>equity</u> incentive plans, considering the following:

- If the proposal requests additional shares and/or the amendments may potentially increase the transfer of shareholder value to employees, the recommendation will be based on the Equity Plan Scorecard evaluation as well as an analysis of the overall impact of the amendments.
- If the plan is being presented to shareholders for the first time after the company's IPO, whether or not additional shares are being requested, the recommendation will be based on the Equity Plan Scorecard evaluation as well as an analysis of the overall impact of any amendments.
- If there is no request for additional shares and the amendments are not deemed to potentially increase the transfer of shareholder value to employees, then the recommendation will be based entirely on an analysis of the overall impact of the amendments, and the EPSC evaluation will be shown for informational purposes.

## Option Exchange Programs/Repricing Options

**Climate Policy Recommendation:** Vote case-by-case on management proposals seeking approval to exchange/reprice options taking into consideration:

- Historic trading patterns--the stock price should not be so volatile that the options are likely to be back "in-the-money" over the near term;
- Rationale for the re-pricing--was the stock price decline beyond management's control?
- Is this a value-for-value exchange?
- Are surrendered stock options added back to the plan reserve?
- Timing--repricing should occur at least one year out from any precipitous drop in company's stock price;
- Option vesting--does the new option vest immediately or is there a black-out period?
- Term of the option--the term should remain the same as that of the replaced option;
- Exercise price--should be set at fair market or a premium to market;
- Participants--executive officers and directors must be excluded.

If the surrendered options are added back to the equity plans for re-issuance, then also take into consideration the company's total cost of equity plans and its three-year average burn rate.

In addition to the above considerations, evaluate the intent, rationale, and timing of the repricing proposal. The proposal should clearly articulate why the board is choosing to conduct an exchange program at this point in time. Repricing underwater options after a recent precipitous drop in the company's stock price demonstrates poor timing. and warrants additional scrutiny. Also, consider the terms of the surrendered options, such as the grant date, exercise price and vesting schedule. Grant dates of surrendered options should be far enough back (two to three years) so as not to suggest that repricings are being done to take advantage of short-term downward price movements. Similarly, the exercise price of surrendered options should be above the 52-week high for the stock price.

Vote for shareholder proposals to put option repricings to a shareholder vote.

## Stock Plans in Lieu of Cash

**Climate Policy Recommendation:** Vote case-by-case on plans that provide participants with the option of taking all or a portion of their cash compensation in the form of stock.

Vote for non-employee director-only equity plans that provide a dollar-for-dollar cash-for-stock exchange.

Vote case-by-case on plans which do not provide a dollar-for-dollar cash for stock exchange. In cases where the exchange is not dollar-for-dollar, the request for new or additional shares for such equity program will be considered using the binomial option pricing model. In an effort to capture the total cost of total compensation, no adjustments will be made to carve out the in-lieu-of cash compensation.

## Transfer Stock Option (TSO) Programs

**Climate Policy Recommendation:** One-time Transfers: Vote against or withhold from compensation committee members if they fail to submit one-time transfers to shareholders for approval.

Vote case-by-case on one-time transfers. Vote for if:

- Executive officers and non-employee directors are excluded from participating;
- Stock options are purchased by third-party financial institutions at a discount to their fair value using option pricing models such as Black-Scholes or a Binomial Option Valuation or other appropriate financial models;
- There is a two-year minimum holding period for sale proceeds (cash or stock) for all participants.

Additionally, management should provide a clear explanation of why options are being transferred to a third-party institution and whether the events leading up to a decline in stock price were beyond management's control. A review of the company's historic stock price volatility should indicate if the options are likely to be back "in-the-money" over the near term.

Ongoing TSO program: Vote against equity plan proposals if the details of ongoing TSO programs are not provided to shareholders. Since TSOs will be one of the award types under a stock plan, the ongoing TSO program, structure and mechanics must be disclosed to shareholders. The specific criteria to be considered in evaluating these proposals include, but not limited, to the following:

- Eligibility;
- Vesting;
- Bid-price;
- Term of options;
- Cost of the program and impact of the TSOs on company's total option expense; and
- Option repricing policy.

Amendments to existing plans that allow for introduction of transferability of stock options should make clear that only options granted post-amendment shall be transferable.

## Director Compensation

## Shareholder Ratification of Director Pay Programs

**Climate Policy Recommendation:** Vote case-by-case on management proposals seeking ratification of non-employee director compensation, based on the following factors:

- If the equity plan under which non-employee director grants are made is on the ballot, whether or not it warrants support; and
- An assessment of the following qualitative factors:
  - The relative magnitude of director compensation as compared to companies of a similar profile;

- The presence of problematic pay practices relating to director compensation;
- Director stock ownership guidelines and holding requirements;
- Equity award vesting schedules;
- The mix of cash and equity-based compensation;
- Meaningful limits on director compensation;
- The availability of retirement benefits or perquisites; and
- The quality of disclosure surrounding director compensation.

## Equity Plans for Non-Employee Directors

**Climate Policy Recommendation:** Vote case-by-case on compensation plans for non-employee directors, based on:

- The total estimated cost of the company's equity plans relative to industry/market cap peers, measured by the company's estimated Shareholder Value Transfer (SVT) based on new shares requested plus shares remaining for future grants, plus outstanding unvested/unexercised grants;
- The company's three-year burn rate relative to its industry/market cap peers; and
- The presence of any egregious plan features (such as an option repricing provision or liberal CIC vesting risk).

On occasion, director stock plans will exceed the plan cost or burn rate benchmarks when combined with employee or executive stock plans. In such cases, vote case-by-case on the plan taking into consideration the following qualitative factors:

- The relative magnitude of director compensation as compared to companies of a similar profile;
- The presence of problematic pay practices relating to director compensation;
- Director stock ownership guidelines and holding requirements;
- Equity award vesting schedules;
- The mix of cash and equity-based compensation;
- Meaningful limits on director compensation;
- The availability of retirement benefits or perquisites; and
- The quality of disclosure surrounding director compensation.

## Non-Employee Director Retirement Plans

**Climate Policy Recommendation:** Vote against retirement plans for non-employee directors.

Vote for shareholder proposals to eliminate retirement plans for non-employee directors.

# Shareholder Proposals on Compensation

## Adopt Anti-Hedging/Pledging/Speculative Investments Policy

**Climate Policy Recommendation:** Generally vote for proposals seeking a policy that prohibits named executive officers from engaging in derivative or speculative transactions involving company stock, including hedging, holding stock in a margin account, or pledging stock as collateral for a loan. However, the company's existing policies regarding responsible use of company stock will be considered.

## Bonus Banking/Bonus Banking "Plus"

**Climate Policy Recommendation:** Vote case-by-case on proposals seeking deferral of a portion of annual bonus pay, with ultimate payout linked to sustained results for the performance metrics on which the bonus was earned

(whether for the named executive officers or a wider group of employees), taking into account the following factors:

- The company's past practices regarding equity and cash compensation;
- Whether the company has a holding period or stock ownership requirements in place, such as a meaningful retention ratio (at least 50 percent for full tenure); and
- Whether the company has a rigorous claw-back policy in place.

## Compensation Consultants—Disclosure of Board or Company's Utilization

**Climate Policy Recommendation:** Generally vote for shareholder proposals seeking disclosure regarding the company, board, or compensation committee's use of compensation consultants, such as company name, business relationship(s), and fees paid.

## Disclosure/Setting Levels or Types of Compensation for Executives and Directors

**Climate Policy Recommendation:** Generally vote for shareholder proposals seeking additional disclosure of executive and director pay information, provided the information requested is relevant to shareholders' needs, would not put the company at a competitive disadvantage relative to its industry, and is not unduly burdensome to the company.

Vote against shareholder proposals seeking to set absolute levels on compensation or otherwise dictate the amount or form of compensation.

Vote against shareholder proposals seeking to eliminate stock options or any other equity grants to employees or directors.

Vote against shareholder proposals requiring director fees be paid in stock only.

Generally vote against shareholder proposals that mandate a minimum amount of stock that directors must own in order to qualify as a director or to remain on the board.

Vote case-by-case on all other shareholder proposals regarding executive and director pay, taking into account company performance, pay level versus peers, pay level versus industry, and long-term corporate outlook.

## Golden Coffins/Executive Death Benefits

**Climate Policy Recommendation:** Generally vote for proposals calling companies to adopt a policy of obtaining shareholder approval for any future agreements and corporate policies that could oblige the company to make payments or awards following the death of a senior executive in the form of unearned salary or bonuses, accelerated vesting or the continuation in force of unvested equity grants, perquisites and other payments or awards made in lieu of compensation. This would not apply to any benefit programs or equity plan proposals that the broad-based employee population is eligible.

## Hold Equity Past Retirement or for a Significant Period of Time

**Climate Policy Recommendation:** Vote case-by-case on shareholder proposals asking companies to adopt policies requiring senior executive officers to retain a portion of net shares acquired through compensation plans. The following factors will be taken into account:

- The percentage/ratio of net shares required to be retained;
- The time period required to retain the shares;
- Whether the company has equity retention, holding period, and/or stock ownership requirements in place and the robustness of such requirements;
- Whether the company has any other policies aimed at mitigating risk taking by executives;
- Executives' actual stock ownership and the degree to which it meets or exceeds the proponent's suggested holding period/retention ratio or the company's existing requirements; and
- Problematic pay practices, current and past, which may demonstrate a short-term versus long-term focus.

## Pay Disparity

**Climate Policy Recommendation:** Generally vote case-by-case on proposals calling for an analysis of the pay disparity between corporate executives and other non-executive employees.

## Pay for Performance/Performance-Based Awards

**Climate Policy Recommendation:** Vote case-by-case on shareholder proposals requesting that a significant amount of future long-term incentive compensation awarded to senior executives shall be performance-based and requesting that the board adopt and disclose challenging performance metrics to shareholders, based on the following analytical steps:

- First, vote for shareholder proposals advocating the use of performance-based equity awards, such as performance contingent options or restricted stock, indexed options or premium-priced options, unless the proposal is overly restrictive or if the company has demonstrated that it is using a "substantial" portion of performance-based awards for its top executives. Standard stock options and performance-accelerated awards do not meet the criteria to be considered as performance-based awards. Further, premium-priced options should have a meaningful premium to be considered performance-based awards.
- Second, assess the rigor of the company's performance-based equity program. If the bar set for the performance-based program is too low based on the company's historical or peer group comparison, generally vote for the proposal. Furthermore, if target performance results in an above target payout, vote for the shareholder proposal due to program's poor design. If the company does not disclose the performance metric of the performance-based equity program, vote for the shareholder proposal regardless of the outcome of the first step to the test.

In general, vote for the shareholder proposal if the company does not meet both of the above two steps.

## Pay for Superior Performance

**Climate Policy Recommendation:** Vote case-by-case on shareholder proposals that request the board establish a pay-for-superior performance standard in the company's executive compensation plan for senior executives. These proposals generally include the following principles:

- Set compensation targets for the plan's annual and long-term incentive pay components at or below the peer group median;
- Deliver a majority of the plan's target long-term compensation through performance-vested, not simply time-vested, equity awards;
- Provide the strategic rationale and relative weightings of the financial and non-financial performance metrics or criteria used in the annual and performance-vested long-term incentive components of the plan;
- Establish performance targets for each plan financial metric relative to the performance of the company's peer companies;

- Limit payment under the annual and performance-vested long-term incentive components of the plan to when the company's performance on its selected financial performance metrics exceeds peer group median performance.

Consider the following factors in evaluating this proposal:

- What aspects of the company's annual and long-term equity incentive programs are performance driven?
- If the annual and long-term equity incentive programs are performance driven, are the performance criteria and hurdle rates disclosed to shareholders or are they benchmarked against a disclosed peer group?
- Can shareholders assess the correlation between pay and performance based on the current disclosure?
- What type of industry and stage of business cycle does the company belong to?

## Pre-Arranged Trading Plans (10b5-1 Plans)

**Climate Policy Recommendation:** Generally vote for shareholder proposals calling for the addition of certain safeguards in prearranged trading plans (10b5-1 plans) for executives. Safeguards may include:

- Adoption, amendment, or termination of a 10b5-1 Plan must be disclosed in a Form 8-K;
- Amendment or early termination of a 10b5-1 Plan allowed only under extraordinary circumstances, as determined by the board;
- Request that a certain number of days that must elapse between adoption or amendment of a 10b5-1 Plan and initial trading under the plan;
- Reports on Form 4 must identify transactions made pursuant to a 10b5-1 Plan;
- An executive may not trade in company stock outside the 10b5-1 Plan;
- Trades under a 10b5-1 Plan must be handled by a broker who does not handle other securities transactions for the executive.

## Prohibit Outside CEOs from Serving on Compensation Committees

**Climate Policy Recommendation:** Generally vote against proposals seeking a policy to prohibit any outside CEO from serving on a company's compensation committee, unless the company has demonstrated problematic pay practices that raise concerns about the performance and composition of the committee.

## Recoupment of Incentive or Stock Compensation in Specified Circumstances

**Climate Policy Recommendation:** Vote case-by-case on proposals to recoup incentive cash or stock compensation made to senior executives if it is later determined that the figures upon which incentive compensation is earned turn out to have been in error, or if the senior executive has breached company policy or has engaged in misconduct that may be significantly detrimental to the company's financial position or reputation, or if the senior executive failed to manage or monitor risks that subsequently led to significant financial or reputational harm to the company. Many companies have adopted policies that permit recoupment in cases where an executive's fraud, misconduct, or negligence significantly contributed to a restatement of financial results that led to the awarding of unearned incentive compensation. However, such policies may be narrow given that not all misconduct or negligence may result in significant financial restatements. Misconduct, negligence or lack of sufficient oversight by senior executives may lead to significant financial loss or reputational damage that may have long-lasting impact.

In considering whether to support such shareholder proposals, the following factors will be taken into consideration:

- If the company has adopted a formal recoupment policy;

- The rigor of the recoupment policy focusing on how and under what circumstances the company may recoup incentive or stock compensation;
- Whether the company has chronic restatement history or material financial problems;
- Whether the company's policy substantially addresses the concerns raised by the proponent;
- Disclosure of recoupment of incentive or stock compensation from senior executives or lack thereof; or
- Any other relevant factors.

## Severance Agreements for Executives/Golden Parachutes

**Climate Policy Recommendation:** Vote case-by-case on shareholder proposals requiring that executive severance (including change-in-control related) arrangements or payments be submitted for shareholder ratification.

Factors that will be considered include, but are not limited to:

- The company's severance or change-in-control agreements in place, and the presence of problematic features (such as excessive severance entitlements, single triggers, excise tax gross-ups, etc.);
- Any existing limits on cash severance payouts or policies which require shareholder ratification of severance payments exceeding a certain level;
- Any recent severance-related controversies; and
- Whether the proposal is overly prescriptive, such as requiring shareholder approval of severance that does not exceed market norms.

## Share Buyback Proposals

**Climate Policy Recommendation:** Generally vote against shareholder proposals prohibiting executives from selling shares of company stock during periods in which the company has announced that it may or will be repurchasing shares of its stock. Vote for the proposal when there is a pattern of abuse by executives exercising options or selling shares during periods of share buybacks.

Vote case-by-case on proposals requesting the company exclude the impact of share buybacks from the calculation of incentive program metrics, considering the following factors:

- The frequency and timing of the company's share buybacks;
- The use of per-share metrics in incentive plans;
- The effect of recent buybacks on incentive metric results and payouts; and
- Whether there is any indication of metric result manipulation.

## Supplemental Executive Retirement Plans (SERPs)

**Climate Policy Recommendation:** Generally vote for shareholder proposals requesting to put extraordinary benefits contained in SERP agreements to a shareholder vote unless the company's executive pension plans do not contain excessive benefits beyond what is offered under employee-wide plans.

Generally vote for shareholder proposals requesting to limit the executive benefits provided under the company's supplemental executive retirement plan (SERP) by limiting covered compensation to a senior executive's annual salary or those pay elements covered for the general employee population.

## Tax Gross-Up Proposals

**Climate Policy Recommendation:** Generally vote for proposals calling for companies to adopt a policy of not providing tax gross-up payments to executives, except in situations where gross-ups are provided pursuant to a plan, policy, or arrangement applicable to management employees of the company, such as a relocation or expatriate tax equalization policy.

## Termination of Employment Prior to Severance Payment/Eliminating Accelerated Vesting of Unvested Equity

**Climate Policy Recommendation:** Vote case-by-case on shareholder proposals seeking a policy requiring termination of employment prior to severance payment and/or eliminating accelerated vesting of unvested equity.

The following factors will be considered:

- The company's current treatment of equity in change-of-control situations (i.e. is it double triggered, does it allow for the assumption of equity by acquiring company, the treatment of performance shares, etc.);
- Current employment agreements, including potential poor pay practices such as gross-ups embedded in those agreements.

Generally vote for proposals seeking a policy that prohibits acceleration of the vesting of equity awards to senior executives in the event of a change in control (except for pro rata vesting considering the time elapsed and attainment of any related performance goals between the award date and the change in control).

# 6. Social and Environmental Issues

## Global Approach

Socially responsible shareholder resolutions receive a great deal more attention from institutional shareholders today than in the past. While focusing on value enhancement through risk mitigation and exposure to new sustainability-related opportunities, these resolutions also seek standardized reporting on ESG issues, request information regarding an issuer's adoption of, or adherence to, relevant norms, standards, codes of conduct or universally recognized international initiatives to promote disclosure and transparency. ISS' Climate Policy generally supports standards-based ESG shareholder proposals that enhance long-term shareholder and stakeholder value while aligning the interests of the company with those of society at large. In particular, the policy will focus on resolutions seeking greater transparency and/or adherence to internationally recognized standards and principles.

**Climate Policy Recommendation:** In determining our vote recommendation on standardized ESG reporting shareholder proposals, we also analyze the following factors:

- Whether the proposal itself is well framed and reasonable;
- Whether adoption of the proposal would have either a positive or negative impact on the company's short-term or long-term share value;
- The percentage of sales, assets and earnings affected;
- Whether the company has already responded in some appropriate manner to the request embodied in a proposal;
- Whether the company's analysis and voting recommendation to shareholders is persuasive;
- Whether there are significant controversies, fines, penalties, or litigation associated with the company's environmental or social practices;
- What other companies have done in response to the issue addressed in the proposal;
- Whether implementation of the proposal would achieve the objectives sought in the proposal; and
- The degree to which the company's stated position on the issues raised in the proposal could affect its reputation or sales, or leave it vulnerable to a boycott or selective purchasing.

## Animal Welfare

### Animal Welfare Policies

**Climate Policy Recommendation:** Generally vote for proposals seeking a report on a company's animal welfare standards, or animal welfare-related risks, unless:

- The company has already published a set of animal welfare standards and monitors compliance;
- The company's standards are comparable to industry peers; and
- There are no recent significant fines, litigation, or controversies related to the company's and/or its suppliers' treatment of animals.

## Animal Testing

**Climate Policy Recommendation:** Generally vote against proposals to phase out the use of animals in product testing, unless:

- The company is conducting animal testing programs that are unnecessary or not required by regulation;
- The company is conducting animal testing when suitable alternatives are commonly accepted and used by industry peers; or
- There are recent, significant fines or litigation related to the company's treatment of animals.

## Animal Slaughter

**Climate Policy Recommendation:** Generally vote against proposals requesting the implementation of Controlled Atmosphere Killing (CAK) methods at company and/or supplier operations unless such methods are required by legislation or generally accepted as the industry standard.

Vote case-by-case on proposals requesting a report on the feasibility of implementing CAK methods at company and/or supplier operations considering the availability of existing research conducted by the company or industry groups on this topic and any fines or litigation related to current animal processing procedures at the company.

# Consumer Issues

## Genetically Modified Ingredients

**Climate Policy Recommendation:** Generally vote against proposals requesting that a company voluntarily label genetically engineered (GE) ingredients in its products. The labeling of products with GE ingredients is best left to the appropriate regulatory authorities.

Vote case-by-case on proposals asking for a report on the feasibility of labeling products containing GE ingredients, taking into account:

- The potential impact of such labeling on the company's business;
- The quality of the company's disclosure on GE product labeling, related voluntary initiatives, and how this disclosure compares with industry peer disclosure; and
- Company's current disclosure on the feasibility of GE product labeling.

Generally vote for proposals seeking a report on the social, health, and environmental effects of genetically modified organism (GMOs).

Generally vote against proposals to eliminate GE ingredients from the company's products, or proposals asking for reports outlining the steps necessary to eliminate GE ingredients from the company's products. Such decisions are more appropriately made by management with consideration of current regulations.

## Reports on Potentially Controversial Business/Financial Practices

**Climate Policy Recommendation:** Vote case-by-case on requests for reports on a company's potentially controversial business or financial practices or products, taking into account:

- Whether the company has adequately disclosed mechanisms in place to prevent abuses;
- Whether the company has adequately disclosed the financial risks of the products/practices in question;
- Whether the company has been subject to violations of related laws or serious controversies; and
- Peer companies' policies/practices in this area.

## Consumer Lending

**Climate Policy Recommendation:** Vote case-by-case on requests for reports on the company's lending guidelines and procedures taking into account:

- Whether the company has adequately disclosed mechanisms in place to prevent abusive lending practices;
- Whether the company has adequately disclosed the financial risks of the lending products in question;
- Whether the company has been subject to violations of lending laws or serious lending controversies; and
- Peer companies' policies to prevent abusive lending practices.

## Pharmaceutical Pricing, Access to Medicines, Product Reimportation and Health Pandemics

**Climate Policy Recommendation:** Generally vote against proposals requesting that companies implement specific price restraints on pharmaceutical products unless the company fails to adhere to legislative guidelines or industry norms in its product pricing practices.

Vote case-by-case on proposals requesting that a company report on its product pricing or access to medicine policies, considering:

- The potential for reputational, market, and regulatory risk exposure;
- Existing disclosure of relevant policies;
- Deviation from established industry norms;
- Relevant company initiatives to provide research and/or products to disadvantaged consumers;
- Whether the proposal focuses on specific products or geographic regions;
- The potential burden and scope of the requested report; and
- Recent significant controversies, litigation, or fines at the company.

Generally vote for proposals requesting that a company report on the financial and legal impact of its prescription drug reimportation policies unless such information is already publicly disclosed.

Generally vote against proposals requesting that companies adopt specific policies to encourage or constrain prescription drug reimportation. Such matters are more appropriately the province of legislative activity and may place the company at a competitive disadvantage relative to its peers.

## Health Pandemics

**Climate Policy Recommendation:** Vote case-by-case on requests for reports outlining the impact of health pandemics (such as COVID-19, HIV/AIDS, malaria, tuberculosis, and avian flu) on the company's operations and how the company is responding to the situation, taking into account:

- The scope of the company's operations in the affected/relevant area(s);
- The company's existing healthcare policies, including benefits and healthcare access; and
- Company donations to relevant healthcare providers.

Vote against proposals asking companies to establish, implement, and report on a standard of response to health pandemics (such as COVID-19, HIV/AIDS, malaria, tuberculosis, and avian flu), unless the company has significant operations in the affected markets and has failed to adopt policies and/or procedures to address these issues comparable to those of industry peers.

## Product Safety and Toxic/Hazardous Materials

**Climate Policy Recommendation:** Generally vote for proposals requesting that a company report on its policies, initiatives/procedures, and oversight mechanisms related to toxic/hazardous materials or product safety in its supply chain.

Generally vote for resolutions requesting that companies develop a feasibility assessment to phase-out of certain toxic/hazardous materials, or evaluate and disclose the potential financial and legal risks associated with utilizing certain materials.

Generally vote against resolutions requiring that a company reformulate its products.

## Tobacco-Related Proposals

**Climate Policy Recommendation:** Vote case-by-case on resolutions regarding the advertisement of tobacco products, considering:

- Recent related fines, controversies, or significant litigation;
- Whether the company complies with relevant laws and regulations on the marketing of tobacco;
- Whether the company's advertising restrictions deviate from those of industry peers;
- Whether the company entered into the Master Settlement Agreement, which restricts marketing of tobacco to youth; and
- Whether restrictions on marketing to youth extend to foreign countries.

Vote case-by-case on proposals regarding second-hand smoke, considering;

- Whether the company complies with all laws and regulations;
- The degree that voluntary restrictions beyond those mandated by law might hurt the company's competitiveness; and
- The risk of any health-related liabilities.

Generally vote against resolutions to cease production of tobacco-related products, to avoid selling products to tobacco companies, to spin-off tobacco-related businesses, or prohibit investment in tobacco equities. Such business decisions are better left to company management or portfolio managers.

Generally vote against proposals regarding tobacco product warnings. Such decisions are better left to public health authorities.

# Climate Change

## Climate Change/Greenhouse Gas (GHG) Emissions

Climate change has emerged as the most significant environmental threat to the planet to date. Scientists agree that gases released by chemical reactions including the burning of fossil fuels contribute to a "greenhouse effect" that traps the planet's heat. Environmentalists claim that the greenhouse gases produced by the industrial age have caused recent weather crises such as heat waves, rainstorms, melting glaciers, rising sea levels and receding coastlines. With notable exceptions, business leaders have described the rise and fall of global temperatures as naturally occurring phenomena and depicted corporate impact on climate change as minimal. Shareholder proposals asking a company to issue a report to shareholders, "at reasonable cost and omitting proprietary information," on greenhouse gas emissions ask that the report include descriptions of efforts within companies to reduce emissions, their financial exposure and potential liability from operations that contribute to global warming, their direct or indirect efforts to promote the view that global warming is not a threat and their goals in reducing these emissions from their operations. Proponents argue that there is scientific proof that the burning of fossil fuels causes global warming, that future legislation may make companies financially liable for their contributions to global warming, and that a report on the company's role in global warming can be assembled at reasonable cost.

**Climate Policy Recommendation:**

- Vote for shareholder proposals seeking information on the financial, physical, or regulatory risks it faces related to climate change- on its operations and investments, or on how the company identifies, measures, and manage such risks.
- Vote for shareholder proposals calling for the reduction of GHG emissions.
- Vote for shareholder proposals seeking reports on responses to regulatory and public pressures surrounding climate change, and for disclosure of research that aided in setting company policies around climate change.
- Vote for shareholder proposals requesting a report/disclosure of goals on GHG emissions from company operations and/or products.
- Vote for shareholder proposals that request the company to disclose a report on reducing methane emissions and to assess the reliability of the company's methane emission disclosures.

## Environmental Justice

Companies have faced proposals addressing environmental justice concerns, focused on vulnerable stakeholders – particularly communities of color and low-income communities – who are disproportionately impacted by environmental pollution. These heightened risks can be exacerbated by climate change.

**Climate Policy Recommendation:** Generally vote for shareholder proposals requesting disclosure of an environmental justice report, as well as a third-party environmental justice assessment.

## Financed Emissions

For financial institutions and companies that provide financial services, generally vote for shareholder proposals that request the company to increase disclosure of its financed emissions. Generally vote case-by-case on shareholder proposals that request a company to adopt a policy to reduce its financed emissions. Financed emissions (scope 3, category 15) are emissions associated with a company's investments, not already covered

under scopes 1 and 2 – including but not limited to equity investments, debt investments, and project finance. Information that will be considered where available includes the following:

- The completeness, feasibility, and rigor of the company's financed emissions disclosure;
- Whether the company's decarbonization targets and climate transition plan are in alignment with the Paris Agreement, the International Energy Agency's (IEA) Net Zero Emissions by 2050 Scenario, and other internationally recognized frameworks;
- Whether the company's methodology is in alignment with the Greenhouse Gas Protocol (GHG Protocol), the Partnership for Carbon Accounting Financials (PCAF), and other generally accepted calculation and reporting methodologies; and
- Whether the proposal's request is unduly burdensome (scope or timeframe) or overly prescriptive.

## Just Transition

Companies have faced proposals requesting disclosure on the just transition – addressing stakeholder concerns within a company's value chain with regards to the effects of climate change and the energy transition. Relevant stakeholder groups can include employees, suppliers (and workers in supply chains), communities impacted by operations, and other vulnerable groups potentially affected by a company's climate change strategy. Just transition disclosure should adequately assess, consult on, and address impacts on affected stakeholders regarding climate change risks.

**Climate Policy Recommendation:** Generally vote for shareholder proposals requesting just transition and labor protection disclosure, in alignment with the International Labour Organization, the World Benchmarking Alliance, and other generally accepted guidelines and indicators.

## Natural Capital

Natural capital disclosure has moved into the mainstream of climate change reporting. The Taskforce on Nature-related Financial Disclosures (TNFD) and the Kunming-Montreal Global Biodiversity Framework have mobilized widespread recognition of the fact that Paris Agreement-aligned targets can only be achieved by integrating natural capital-related concerns. As such, there has been increased market uptake around natural capital disclosures and commitments, particularly around TNFD-aligned reporting, as well as alignment with other internationally accepted reporting frameworks.

**Climate Policy Recommendation:** Generally vote for shareholder proposals requesting disclosure of TNFD-aligned reporting, including but not limited to a biodiversity impact and dependency assessment. Information that will be considered where available includes the following:

- The completeness, feasibility, and rigor of the company's natural capital-related disclosure;
- Whether the company's natural capital disclosure adequately incorporate governance, strategy, risk and impact management, and metrics and targets;
- Whether the company's targets and climate transition plan are in alignment with TNFD, the Global Biodiversity Framework, the Paris Agreement, and other internationally recognized frameworks; and
- Whether the proposal's request is unduly burdensome (scope or timeframe) or overly prescriptive.

Natural capital-related shareholder proposals also encompass a broad range of industries. Various market-led initiatives have identified key sectors for investor-issuer engagement, including but not limited to: chemicals, consumer goods, food and agriculture, forestry, mining, oil and gas, packaging, and pharmaceuticals. Some proposals also address indigenous peoples' rights, which is also a key consideration for natural capital frameworks.

**Climate Policy Recommendation:** Generally vote for shareholder proposals requesting companies to increase disclosure and/or to adopt sustainable sourcing policies with regards to natural capital-related risks, dependencies, and impacts.

## Say on Climate (SoC) Management Proposals

**Climate Policy Recommendation:** Vote case-by-case on management proposals that request shareholders to approve the company's climate transition action plan[21], taking into account the completeness and rigor of the plan. Information that will be considered where available includes the following:

- The extent to which the company's climate related disclosures are in line with TCFD recommendations and meet other market standards;
- Disclosure of its operational and supply chain GHG emissions (Scopes 1, 2, and 3);
- The completeness, feasibility and rigor of company's short-, medium-, and long-term targets for reducing operational and supply chain GHG emissions in line with Paris Agreement goals (Scopes 1, 2, and 3 if relevant);
- Whether the company has sought and received third-party approval that its targets are science-based;
- Whether the company has made a commitment to be "net zero" for operational and supply chain emissions (Scopes 1, 2, and 3) by 2050;
- Whether the company discloses a commitment to report on the implementation of its plan in subsequent years;
- Whether the company's climate data has received third-party assurance;
- Disclosure of how the company's lobbying activities and its capital expenditures align with company strategy;
- Whether there are specific industry decarbonization challenges; and
- The company's related commitment, disclosure, and performance compared to its industry peers.

## Say on Climate (SoC) Shareholder Proposals

**Climate Policy Recommendation:** Vote case-by-case on shareholder proposals that request the company to disclose a report providing its GHG emissions levels and reduction targets and/or its upcoming/approved climate transition action plan and provide shareholders the opportunity to express approval or disapproval of its GHG emissions reduction plan, taking into account information such as the following:

- The completeness, feasibility and rigor of the company's climate-related disclosure;
- The company's actual GHG emissions performance;
- The company's alignment with relevant internationally recognized frameworks such as the Paris Agreement and IEA's Net Zero Emissions by 2050 Scenario;
- Whether the company has been the subject of recent, significant violations, fines, litigation, or controversy related to its GHG emissions; and
- Whether the proposal's request is unduly burdensome (scope or timeframe) or overly prescriptive.

## Energy Efficiency

**Climate Policy Recommendation:** Generally vote for proposals requesting that a company report on its energy efficiency policies.

---

[21] Variations of this request also include climate transition related ambitions, or commitment to reporting on the implementation of a climate plan.

## Renewable Energy

**Climate Policy Recommendation:** Generally vote for requests for reports on the feasibility of developing renewable energy resources.

Generally vote for proposals requesting that the company invest in renewable energy resources.

# Diversity

## Board Diversity

**Climate Policy Recommendation:** Generally vote for requests for reports on a company's efforts to diversify the board, unless:

- The gender and racial minority representation of the company's board is reasonably inclusive in relation to companies of similar size and business; and
- The board already reports on its nominating procedures and gender and racial minority initiatives on the board and within the company.

Generally vote for shareholder proposals that ask the company to take reasonable steps to increase the levels of underrepresented gender identities and racial minorities on the board.

## Equality of Opportunity

**Climate Policy Recommendation:** Generally vote for proposals requesting a company disclose its diversity policies or initiatives, or proposals requesting disclosure of a company's comprehensive workforce diversity data, including requests for EEO-1 data.

Generally vote for proposals seeking information on the diversity efforts of suppliers and service providers.

## Gender Identity, Sexual Orientation, and Domestic Partner Benefits

**Climate Policy Recommendation:** Generally vote for proposals seeking to amend a company's EEO statement or diversity policies to prohibit discrimination based on sexual orientation and/or gender identity, unless the change would be unduly burdensome.

Generally vote for proposals to extend company benefits to domestic partners.

## Gender or Race/Ethnicity Pay Gap

**Climate Policy Recommendation:** Vote case-by-case on requests for reports on a company's pay data by gender or race/ethnicity or a report on a company's policies and goals to reduce any gender or race/ethnicity pay gap, taking into account:

- The company's current policies and disclosure related to both its diversity and inclusion policies and practices and its compensation philosophy and fair and equitable compensation practices;
- Whether the company has been the subject of recent controversy, litigation, or regulatory actions related to gender, race, or ethnicity pay gap issues;

- The company's disclosure regarding gender, race, or ethnicity pay gap policies or initiatives compared to its industry peers; and
- Local laws regarding categorization of race and/or ethnicity and definitions of ethnic and/or racial minorities.

## Racial Equity and/or Civil Rights Audits

**Climate Policy Recommendation:** Generally vote for proposals requesting that a company conduct an independent racial equity and/or civil rights audit, considering a company disclosures, policies, actions, and engagements.

# Environment and Sustainability

## Artificial Intelligence (AI)

Companies have received shareholder proposals requesting increased disclosure of responsible AI policies, procedures, and practices with respect to board oversight, environmental sustainability, and human rights risk mitigation.

AI and data center issues are wide-ranging. Some areas where companies may face AI-related risks that could materially impact their operations include:

- How high levels of AI-driven energy use may impact GHG emissions targets, climate goals, and climate transition plans;
- How using AI to increase fossil fuel development and production may impact climate targets, and may pose legal and reputational risks;
- Data centers exacerbating water stress, especially in drought-prone areas;
- Child safety;
- End use due diligence (how use of AI for surveillance and censorship, especially in conflict-affected and high-risk areas, may impact legal and reputational risk);
- Data acquisition and usage (privacy, safety, intellectual property);
- Human capital management (bias, discrimination, workplace monitoring, health and safety, automation, and other workforce impacts);
- Just AI transition;
- Misinformation and disinformation;
- Privacy concerns, and potential promotion of hate speech and discrimination, related to targeted advertising; and
- Potential human rights impacts related to weapons development and deployment.

**Climate Policy Recommendation:** Generally vote for shareholder proposals requesting companies to prepare reports or adopt policies in line with internationally accepted frameworks. The scope of this recommendation takes into consideration the entire AI lifecycle and value chain, from upstream components and data sourcing, to downstream applications, safety and security issues, and other broader societal and environmental impacts.

## Facility and Workplace Safety

**Climate Policy Recommendation:** Vote case-by-case on resolutions requesting that a company report on safety and/or security risks associated with its operations and/or facilities, considering:

- The company's compliance with applicable regulations and guidelines;

- The company's current level of disclosure regarding its security and safety policies, procedures, and compliance monitoring; and
- The existence of recent, significant violations, fines, or controversy regarding the safety and security of the company's operations and/or facilities.

## Hydraulic Fracturing

**Climate Policy Recommendation:** Generally vote for proposals requesting greater disclosure of a company's (natural gas) hydraulic fracturing operations, including measures the company has taken to manage and mitigate the potential community and environmental impacts of those operations.

## Operations in Protected Areas

**Climate Policy Recommendation:** Generally vote for requests for reports on potential environmental damage as a result of company operations in protected regions, unless:

- Operations in the specified regions are not permitted by current laws or regulations;
- The company does not currently have operations or plans to develop operations in these protected regions; or
- The company's disclosure of its operations and environmental policies in these regions is comparable to industry peers.

## Recycling

**Climate Policy Recommendation:** Vote FOR proposals to adopt a comprehensive recycling strategy, taking into account:

- The nature of the company's business;
- The current level of disclosure of the company's existing related programs;
- The timetable and methods of program implementation prescribed by the proposal;
- The company's ability to address the issues raised in the proposal; and
- How the company's recycling programs compare to similar programs of its industry peers.

## Sustainability Reporting

Shareholders may request general environmental disclosures or reports on a specific location/operation, often requesting that the company detail the environmental risks and potential liabilities of a specific project. Increasingly, companies have begun reporting on environmental and sustainability issues using the Global Reporting Initiative (GRI) standards. The GRI was established in 1997 with the mission of developing globally applicable guidelines for reporting on economic, environmental, and social performance. The GRI was developed by Ceres (formerly known as the Coalition for Environmentally Responsible Economies, CERES) in partnership with the United Nations Environment Programme (UNEP).

Ceres was formed in the wake of the March 1989 Exxon Valdez oil spill, when a consortium of investors, environmental groups, and religious organizations drafted what were originally named the Valdez Principles. Later to be renamed the CERES Principles, and now branded as the Ceres Roadmap 2030, corporate signatories to the Ceres Roadmap 2030 pledge to publicly report on environmental issues, including protection of the biosphere, sustainable use of natural resources, reduction and disposal of wastes, energy conservation, and employee and community risk reduction in a standardized form.

The Equator Principles are the financial industry's benchmark for determining, assessing and managing social and environmental risk in project financing. The Principles were first launched in June 2003 and were ultimately

adopted by over forty financial institutions during a three year implementation period. The principles were subsequently revised in July 2006 to take into account the new performance standards approved by the World Bank Group's International Finance Corporation (IFC). The third iteration of the Principles was launched in June 2013 and it amplified the banks' commitments to social responsibility, including human rights, climate change, and transparency. Financial institutions adopt these principles to ensure that the projects they venture in are developed in a socially responsible manner and reflect sound environmental management practices.

**Climate Policy Recommendation:**

▪ Vote for shareholder proposals seeking greater disclosure on the company's environmental and social practices, and/or associated risks and liabilities.
▪ Vote for shareholder proposals asking companies to report in accordance with the Global Reporting Initiative (GRI).
▪ Vote for shareholder proposals seeking the preparation of sustainability reports.
▪ Vote for shareholder proposals to study or implement the CERES Roadmap 2030.
▪ Vote for shareholder proposals to study or implement the Equator Principles.

## Water Issues

**Climate Policy Recommendation:** Generally vote for proposals requesting a company to report on, or to adopt a new policy on, water-related risks and concerns, taking into account:

▪ The company's current disclosure of relevant policies, initiatives, oversight mechanisms, and water usage metrics;
▪ Whether or not the company's existing water-related policies and practices are consistent with relevant internationally recognized standards and national/local regulations;
▪ The potential financial impact or risk to the company associated with water-related concerns or issues; and
▪ Recent, significant company controversies, fines, or litigation regarding water use by the company and its suppliers.

## Equator Principles

The Equator Principles are the financial industry's benchmark for determining, assessing and managing social and environmental risk in project financing. First launched in June 2003, the Principles were ultimately adopted by over forty financial institutions over a three-year implementation period. Since its adoption, the Principles have undergone a number of revisions, expanding the use of performance standards and signatory banks' banks' commitments to social responsibility, including human rights, climate change, and transparency. The fourth iteration of the Principles was launched in November 2019, incorporating amendments and new commitment to human rights, climate change, Indigenous Peoples and biodiversity related topics. Financial institutions adopt these principles to ensure that the projects they finance are developed in a socially responsible manner and reflect sound environmental management practices. As of 2024, 131 financial institutions globally are Signatories to the Equator Principles.[22]

**Climate Policy Recommendation:** Vote for shareholder proposals to study or implement the Equator Principles.

---

[22] https://equator-principles.com/signatories-epfis-reporting/

# General Corporate Issues

## Charitable Contributions

**Climate Policy Recommendation:** Vote against proposals restricting a company from making charitable contributions. Charitable contributions are generally useful for assisting worthwhile causes and for creating goodwill in the community. In the absence of bad faith, self-dealing, or gross negligence, management should determine which, and if, contributions are in the best interests of the company.

## Data Security, Privacy, and Internet Issues

**Climate Policy Recommendation:** Vote case-by-case on proposals requesting the disclosure or implementation of data security, privacy, or information access and management policies and procedures, considering:

- The level of disclosure of company policies and procedures relating to data security, privacy, freedom of speech, information access and management, and Internet censorship;
- Engagement in dialogue with governments or relevant groups with respect to data security, privacy, or the free flow of information on the Internet;
- The scope of business involvement and of investment in countries whose governments censor or monitor the Internet and other telecommunications;
- Applicable market-specific laws or regulations that may be imposed on the company; and
- Controversies, fines, or litigation related to data security, privacy, freedom of speech, or Internet censorship.

## Environmental, Social, and Governance (ESG) Compensation-Related Proposals

**Climate Policy Recommendation:** Generally vote for proposals to link, or report on linking, executive compensation to environmental and social criteria (such as corporate downsizings, customer or employee satisfaction, community involvement, human rights, environmental performance, or predatory lending).

## Tax Transparency

**Climate Policy Recommendation:** Generally vote for shareholder proposals that request the company to disclose on tax transparency and country-by-country reporting (CbCR), in alignment with internationally-accepted frameworks, such as the Global Reporting Initiative Tax Standard (GRI 207: Tax 2019) and the Organisation for Economic Co-operation and Development's (OECD) BEPS Action 13 (Base Erosion and Profit Shifting).

# Human Rights, Labor Issues, and International Operations

Investors, international human rights groups, and labor advocacy groups have long been making attempts to safeguard domestic and international workers' rights. In instances where companies operate in low- and middle-income countries (LMIC), for example, these advocates have asked that the companies adopt global corporate human rights standards that guarantee sustainable wages and safe working conditions for workers in their supply chains. Companies that contract out portions of their manufacturing operations to their suppliers have been asked to ensure that the products they receive from those suppliers have not been made using forced labor, child labor, or other forms of modern slavery. These companies are asked to adopt formal vendor standards that, among other things, include monitoring or auditing mechanism. Globalization, relocation of production overseas, and widespread use of subcontractors and vendors, often make it difficult to obtain a complete picture of a company's labor practices in global markets. Many Investors believe that companies would benefit from adopting a human rights policy based on the Universal Declaration of Human Rights and the International Labor Organization's Core Labor Standards. Efforts that seek greater disclosure on a company's labor practices and that seek to establish minimum standards for a company's operations will be supported. In addition, requests for independent monitoring of domestic and international operations will be supported.

The Climate Policy generally supports proposals that call for the adoption and/or enforcement of principles or codes relating to countries in which there are systematic violations of human rights; such as the use of slave, child, or prison labor; a government that is illegitimate; or there is a call by human rights advocates, pro-democracy organizations, or legitimately-elected representatives for economic sanctions. The use of child labor or forced labor is unethical and can damage corporate reputations. Poor labor practices can lead to litigation against the company, which can be costly and time consuming.

## Human Rights Proposals

**Climate Policy Recommendation:**

- Generally vote for proposals requesting a report on company or company supplier labor and/or human rights standards and policies.
- Vote for shareholder proposals to implement human rights standards and workplace codes of conduct.
- Vote for shareholder proposals calling for the implementation and reporting on ILO codes of conduct, SA 8000 Standards, or human rights due diligence standards.
- Vote for shareholder proposals that call for the adoption and/or enforcement of principles or codes relating to countries in which there are systematic violations of human rights.
- Vote for shareholder proposals that call for independent monitoring programs in conjunction with local and respected religious and human rights groups to monitor supplier and licensee compliance with codes.
- Vote for shareholder proposals that seek publication of a "Code of Conduct" to the company's domestic and international suppliers and licensees, requiring they satisfy all applicable standards and laws protecting employees' wages, benefits, working conditions, freedom of association, and other rights.
- Vote for shareholder proposals seeking reports on, or the adoption of, vendor standards including: reporting on incentives to encourage suppliers to raise standards rather than terminate contracts and providing public disclosure of contract supplier reviews on a regular basis.
- Vote for shareholder proposals to adopt labor standards for foreign and domestic suppliers to ensure that the company will not do business with any suppliers that manufacture products for sale using forced labor, child labor, or that fail to comply with applicable laws protecting employee's wages and working conditions.
- Vote for proposals requesting that a company conduct an assessment of the human rights risks in its operations or in its supply chain, or report on its human rights risk assessment process.

## Mandatory Arbitration

**Climate Policy Recommendation:** Vote case-by-case on requests for a report on a company's use of mandatory arbitration on employment-related claims, taking into account**:**

- The company's current policies and practices related to the use of mandatory arbitration agreements on workplace claims;
- Whether the company has been the subject of recent controversy, litigation, or regulatory actions related to the use of mandatory arbitration agreements on workplace claims; and
- The company's disclosure of its policies and practices related to the use of mandatory arbitration agreements compared to its peers.

## MacBride Principles

These resolutions have called for the adoption of the MacBride Principles for operations located in Northern Ireland. They request companies operating abroad to support the equal employment opportunity policies that apply in facilities they operate domestically. The principles were established to address the sectarian hiring problems between Protestants and Catholics in Northern Ireland. It is well documented that Northern Ireland's Catholic community faced much higher unemployment figures than the Protestant community. In response to this problem, the UK government instituted the New Fair Employment Act of 1989 (and subsequent amendments) to address the sectarian hiring problems.

Many companies believe that the Act adequately addresses the problems and that further action, including adoption of the MacBride Principles, only duplicates the efforts already underway. In evaluating a proposal to adopt the MacBride Principles, shareholders must decide whether the principles will cause companies to divest, and therefore worsen the unemployment problem, or whether the principles will promote equal hiring practices. Proponents believe that the Fair Employment Act does not sufficiently address the sectarian hiring problems. They argue that the MacBride Principles serve to stabilize the situation and promote further investment.

**Climate Policy Recommendation:** Support the MacBride Principles for operations in Northern Ireland that request companies to abide by equal employment opportunity policies.

## Community Social and Environmental Impact Assessments

**Climate Policy Recommendation:** Generally vote for requests for reports outlining policies and/or the potential (community) social and/or environmental impact of company operations considering:

- Alignment of current disclosure of applicable company policies, metrics, risk assessment report(s) and risk management procedures with any relevant, broadly accepted reporting frameworks;
- The impact of regulatory non-compliance, litigation, remediation, or reputational loss that may be associated with failure to manage the company's operations in question, including the management of relevant community and stakeholder relations;
- The nature, purpose, and scope of the company's operations in the specific region(s);
- The degree to which company policies and procedures are consistent with industry norms; and
- The scope of the resolution.

## Operations in High-Risk Markets

**Climate Policy Recommendation:** Vote case-by-case on requests for a report on a company's potential financial and reputational risks associated with operations in "high-risk" markets, such as a terrorism-sponsoring state or politically/socially unstable region, taking into account:

- The nature, purpose, and scope of the operations and business involved that could be affected by social or political disruption;
- Current disclosure of applicable risk assessment(s) and risk management procedures;
- Compliance with U.S. sanctions and laws;
- Consideration of other international policies, standards, and laws; and
- Whether the company has been recently involved in recent, significant controversies, fines or litigation related to its operations in "high-risk" markets.

## Outsourcing/Offshoring

**Climate Policy Recommendation:** Vote case-by-case on proposals calling for companies to report on the risks associated with outsourcing/plant closures, considering:

- Controversies surrounding operations in the relevant market(s);
- The value of the requested report to shareholders;
- The company's current level of disclosure of relevant information on outsourcing and plant closure procedures; and
- The company's existing human rights standards relative to industry peers.

## Sexual Harassment

**Climate Policy Recommendation:** Vote case-by-case on requests for a report on company actions taken to strengthen policies and oversight to prevent workplace sexual harassment, or a report on risks posed by a company's failure to prevent workplace sexual harassment, taking into account:

- The company's current policies, practices, oversight mechanisms related to preventing workplace sexual harassment;
- Whether the company has been the subject of recent controversy, litigation, or regulatory actions related to workplace sexual harassment issues; and
- The company's disclosure regarding workplace sexual harassment policies or initiatives compared to its industry peers.

## Weapons and Military Sales

**Climate Policy Recommendation:** Vote against reports on foreign military sales or offsets. Such disclosures may involve sensitive and confidential information. Moreover, companies must comply with government controls and reporting on foreign military sales.

Generally vote against proposals asking a company to cease production or report on the risks associated with the use of depleted uranium munitions or nuclear weapons components and delivery systems, including disengaging from current and proposed contracts. Such contracts are monitored by government agencies, serve multiple military and non-military uses, and withdrawal from these contracts could have a negative impact on the company's business.

## Political Activities

### Lobbying

**Climate Policy Recommendation:** Vote case-by-case on proposals requesting information on a company's lobbying (including direct, indirect, and grassroots lobbying) activities, policies, or procedures, considering:

- The company's current disclosure of relevant lobbying policies, and management and board oversight;
- The company's disclosure regarding trade associations or other groups that it supports, or is a member of, that engage in lobbying activities; and
- Recent significant controversies, fines, or litigation regarding the company's lobbying-related activities.

### Political Contributions

**Climate Policy Recommendation:** Generally vote for proposals requesting greater disclosure of a company's political contributions and trade association spending policies and activities, considering:

- The company's policies, and management and board oversight related to its direct political contributions and payments to trade associations or other groups that may be used for political purposes;
- The company's disclosure regarding its support of, and participation in, trade associations or other groups that may make political contributions; and
- Recent significant controversies, fines, or litigation related to the company's political contributions or political activities.

Vote against proposals barring a company from making political contributions. Businesses are affected by legislation at the federal, state, and local level; barring political contributions can put the company at a competitive disadvantage.

Vote against proposals to publish in newspapers and other media a company's political contributions. Such publications could present significant cost to the company without providing commensurate value to shareholders.

### Political Ties

**Climate Policy Recommendation:** Generally vote against proposals asking a company to affirm political nonpartisanship in the workplace, so long as:

- There are no recent, significant controversies, fines, or litigation regarding the company's political contributions or trade association spending; and
- The company has procedures in place to ensure that employee contributions to company-sponsored political action committees (PACs) are strictly voluntary and prohibit coercion.

Vote against proposals asking for a list of company executives, directors, consultants, legal counsels, lobbyists, or investment bankers that have prior government service and whether such service had a bearing on the business of the company. Such a list would be burdensome to prepare without providing any meaningful information to shareholders.

**ISS** ▷

## Political Expenditures and Lobbying Congruency

**Climate Policy Recommendation:** Generally vote for proposals requesting greater disclosure of a company's alignment of political contributions, lobbying, and electioneering spending with a company's publicly stated values and policies, unless the terms of the proposal are unduly restrictive. Additionally, Climate Advisory Services will consider whether:

- The company's policies, management, board oversight, governance processes, and level of disclosure related to direct political contributions, lobbying activities, and payments to trade associations, political action committees, or other groups that may be used for political purposes;
- The company's disclosure regarding: the reasons for its support of candidates for public offices; the reasons for support of and participation in trade associations or other groups that may make political contributions; and other political activities;
- Any incongruencies identified between a company's direct and indirect political expenditures and its publicly stated values and priorities;
- Recent significant controversies related to the company's direct and indirect lobbying, political contributions, or political activities.

# 7.  Mutual Fund Proxies

## Election of Directors

**Climate Policy Recommendation:** Vote case-by-case on the election of directors and trustees, following the same guidelines for uncontested directors for public company shareholder meetings. However, mutual fund boards do not usually have compensation committees, so do not withhold for the lack of this committee.

## Closed End Funds - Unilateral Opt-In to Control Share Acquisition Statutes

**Climate Policy Recommendation:** For closed-end management investment companies (CEFs), vote against or withhold from nominating/governance committee members (or other directors on a case-by-case basis) at CEFs that have not provided a compelling rationale for opting-in to a Control Share Acquisition statute, nor submitted a by-law amendment to a shareholder vote.

## Converting Closed-end Fund to Open-end Fund

**Climate Policy Recommendation:** Vote case-by-case on conversion proposals, considering the following factors:

- Past performance as a closed-end fund;
- Market in which the fund invests;
- Measures taken by the board to address the discount; and
- Past shareholder activism, board activity, and votes on related proposals.

## Proxy Contests

**Climate Policy Recommendation:** Vote case-by-case on proxy contests, considering the following factors:

- Past performance relative to its peers;
- Market in which fund invests;
- Measures taken by the board to address the issues;
- Past shareholder activism, board activity, and votes on related proposals;
- Strategy of the incumbents versus the dissidents;
- Independence of directors;
- Experience and skills of director candidates;
- Governance profile of the company;
- Evidence of management entrenchment.

## Investment Advisory Agreements

**Climate Policy Recommendation:** Vote case-by-case on investment advisory agreements, considering the following factors:

- Proposed and current fee schedules;
- Fund category/investment objective;
- Performance benchmarks;
- Share price performance as compared with peers;
- Resulting fees relative to peers;
- Assignments (where the advisor undergoes a change of control).

## Approving New Classes or Series of Shares

**Climate Policy Recommendation:** Vote for the establishment of new classes or series of shares.

## Preferred Stock Proposals

**Climate Policy Recommendation:** Vote case-by-case on the authorization for or increase in preferred shares, considering the following factors:

- Stated specific financing purpose;
- Possible dilution for common shares;
- Whether the shares can be used for antitakeover purposes.

## 1940 Act Policies

**Climate Policy Recommendation:** Vote case-by-case on policies under the Investment Advisor Act of 1940, considering the following factors:

- Potential competitiveness;
- Regulatory developments;
- Current and potential returns; and
- Current and potential risk.

Generally vote for these amendments as long as the proposed changes do not fundamentally alter the investment focus of the fund and do comply with the current SEC interpretation.

## Changing a Fundamental Restriction to a Nonfundamental Restriction

**Climate Policy Recommendation:** Vote case-by-case on proposals to change a fundamental restriction to a non-fundamental restriction, considering the following factors:

- The fund's target investments;
- The reasons given by the fund for the change; and
- The projected impact of the change on the portfolio.

## Change Fundamental Investment Objective to Nonfundamental

**Climate Policy Recommendation:** Vote against proposals to change a fund's fundamental investment objective to non-fundamental.

## Name Change Proposals

**Climate Policy Recommendation:** Vote case-by-case on name change proposals, considering the following factors:

- Political/economic changes in the target market;
- Consolidation in the target market; and
- Current asset composition.

## Change in Fund's Subclassification

**Climate Policy Recommendation:** Vote case-by-case on changes in a fund's sub-classification, considering the following factors:

- Potential competitiveness;
- Current and potential returns;
- Risk of concentration;
- Consolidation in target industry.

## Business Development Companies - Authorization to Sell Shares of Common Stock at a Price below Net Asset Value

**Climate Policy Recommendation:** Vote for proposals authorizing the board to issue shares below Net Asset Value (NAV) if:

- The proposal to allow share issuances below NAV has an expiration date no more than one year from the date shareholders approve the underlying proposal, as required under the Investment Company Act of 1940;
- The sale is deemed to be in the best interests of shareholders by (1) a majority of the company's independent directors and (2) a majority of the company's directors who have no financial interest in the issuance; and
- The company has demonstrated responsible past use of share issuances by either:

  - Outperforming peers in its 8-digit GICS group as measured by one- and three-year median TSRs; or
  - Providing disclosure that its past share issuances were priced at levels that resulted in only small or moderate discounts to NAV and economic dilution to existing non-participating shareholders.

## Disposition of Assets/Termination/Liquidation

**Climate Policy Recommendation:** Vote case-by-case on proposals to dispose of assets, to terminate or liquidate, considering the following factors:

- Strategies employed to salvage the company;
- The fund's past performance;
- The terms of the liquidation.

## Changes to the Charter Document

**Climate Policy Recommendation:** Vote case-by-case on changes to the charter document, considering the following factors:

- The degree of change implied by the proposal;
- The efficiencies that could result;
- The state of incorporation;
- Regulatory standards and implications.

Vote against any of the following changes:

- Removal of shareholder approval requirement to reorganize or terminate the trust or any of its series;
- Removal of shareholder approval requirement for amendments to the new declaration of trust;

- Removal of shareholder approval requirement to amend the fund's management contract, allowing the contract to be modified by the investment manager and the trust management, as permitted by the 1940 Act;
- Allow the trustees to impose other fees in addition to sales charges on investment in a fund, such as deferred sales charges and redemption fees that may be imposed upon redemption of a fund's shares;
- Removal of shareholder approval requirement to engage in and terminate subadvisory arrangements;
- Removal of shareholder approval requirement to change the domicile of the fund.

## Changing the Domicile of a Fund

**Climate Policy Recommendation:** Vote case-by-case on re-incorporations, considering the following factors:

- Regulations of both states;
- Required fundamental policies of both states;
- The increased flexibility available.

## Authorizing the Board to Hire and Terminate Subadvisers Without Shareholder Approval

**Climate Policy Recommendation:** Vote against proposals authorizing the board to hire or terminate subadvisers without shareholder approval if the investment adviser currently employs only one subadviser.

## Distribution Agreements

**Climate Policy Recommendation:** Vote case-by-case on distribution agreement proposals, considering the following factors:

- Fees charged to comparably sized funds with similar objectives;
- The proposed distributor's reputation and past performance;
- The competitiveness of the fund in the industry;
- The terms of the agreement.

## Master-Feeder Structure

**Climate Policy Recommendation:** Vote for the establishment of a master-feeder structure.

## Mergers

**Climate Policy Recommendation:** Vote case-by-case on merger proposals, considering the following factors:

- Resulting fee structure;
- Performance of both funds;
- Continuity of management personnel;
- Changes in corporate governance and their impact on shareholder rights.

## Shareholder Proposals for Mutual Funds

### Establish Director Ownership Requirement

**Climate Policy Recommendation:** Generally vote against shareholder proposals that mandate a specific minimum amount of stock that directors must own in order to qualify as a director or to remain on the board.

### Reimburse Shareholder for Expenses Incurred

**Climate Policy Recommendation:** Vote case-by-case on shareholder proposals to reimburse proxy solicitation expenses. When supporting the dissidents, vote for the reimbursement of the proxy solicitation expenses.

### Terminate the Investment Advisor

**Climate Policy Recommendation:** Vote case-by-case on proposals to terminate the investment advisor, considering the following factors:

- Performance of the fund's Net Asset Value (NAV);
- The fund's history of shareholder relations; and
- The performance of other funds under the advisor's management.

Case 1:26-cv-00717-MPB-MKK    Document 26-3    Filed 04/21/26    Page 202 of 1112
PageID #: 368

ISS

# 8. Foreign Private Issuers Listed on U.S. Exchanges

**Climate Policy Recommendation:** Vote against (or withhold from) non-independent director nominees at companies which fail to meet the following criteria: a majority-independent board, and the presence of an audit, a compensation, and a nomination committee, each of which is entirely composed of independent directors.

Where the design and disclosure levels of equity compensation plans are comparable to those seen at U.S. companies, U.S. compensation policy will be used to evaluate the compensation plan proposals. Otherwise, they, and all other voting items, will be evaluated using the relevant Climate Advisory Services' regional or market proxy voting guidelines.

# We empower investors and companies to build for long-term and sustainable growth by providing high-quality data, analytics, and insight.

## GET STARTED WITH ISS SOLUTIONS

Email sales@issgovernance.com or visit www.issgovernance.com for more information.

Founded in 1985, Institutional Shareholder Services group of companies (ISS) empowers investors and companies to build for long-term and sustainable growth by providing high-quality data, analytics and insight. ISS, which is majority owned by Deutsche Bourse Group, along with Genstar Capital and ISS management, is a leading provider of corporate governance and responsible investment solutions, market intelligence, fund services, and events and editorial content for institutional investors and corporations, globally. ISS' 2,600 employees operate worldwide across 29 global locations in 15 countries. Its approximately 3,400 clients include many of the world's leading institutional investors who rely on ISS' objective and impartial offerings, as well as public companies focused on ESG and governance risk mitigation as a shareholder value enhancing measure. Clients rely on ISS' expertise to help them make informed investment decisions. This document and all of the information contained in it, including without limitation all text, data, graphs, and charts (collectively, the "Information") is the property of Institutional Shareholder Services Inc. (ISS), its subsidiaries, or, in some cases third party suppliers.

The Information has not been submitted to, nor received approval from, the United States Securities and Exchange Commission or any other regulatory body. None of the Information constitutes an offer to sell (or a solicitation of an offer to buy), or a promotion or recommendation of, any security, financial product or other investment vehicle or any trading strategy, and ISS does not endorse, approve, or otherwise express any opinion regarding any issuer, securities, financial products or instruments or trading strategies.

The user of the Information assumes the entire risk of any use it may make or permit to be made of the Information.

ISS MAKES NO EXPRESS OR IMPLIED WARRANTIES OR REPRESENTATIONS WITH RESPECT TO THE INFORMATION AND EXPRESSLY DISCLAIMS ALL IMPLIED WARRANTIES (INCLUDING, WITHOUT LIMITATION, ANY IMPLIED WARRANTIES OF ORIGINALITY, ACCURACY, TIMELINESS, NON-INFRINGEMENT, COMPLETENESS, MERCHANTABILITY, AND FITNESS for A PARTICULAR PURPOSE) WITH RESPECT TO ANY OF THE INFORMATION.

Without limiting any of the foregoing and to the maximum extent permitted by law, in no event shall ISS have any liability regarding any of the Information for any direct, indirect, special, punitive, consequential (including lost profits), or any other damages even if notified of the possibility of such damages. The foregoing shall not exclude or limit any liability that may not by applicable law be excluded or limited.

© 2026 | Institutional Shareholder Services and/or its affiliates

# Foster Declaration Exhibit 3



# UNITED STATES

## GLOBAL BOARD-ALIGNED PROXY VOTING GUIDELINES

2026 Policy Recommendations

Effective for Meetings on or after February 1, 2026

Published January 16, 2026

WWW.ISSGOVERNANCE.COM

# TABLE OF CONTENTS

Introduction..................................................................................................................................7

1. **Board of Directors** .................................................................................................................8

    Voting on Director Nominees in Uncontested Elections .............................................................8

    Independence...........................................................................................................................8

    ISS Classification of Directors – U.S. .......................................................................................9

    Composition............................................................................................................................11

    Attendance ........................................................................................................................11

    Overboarded Directors .......................................................................................................11

    Responsiveness......................................................................................................................11

    Accountability .......................................................................................................................12

    Poison Pills.........................................................................................................................12

    Unequal Voting Rights .......................................................................................................13

    Classified Board Structure ..................................................................................................13

    Removal of Shareholder Discretion on Classified Boards....................................................13

    Problematic Governance Structure .....................................................................................13

    Unilateral Bylaw/Charter Amendments ..............................................................................14

    Restricting Binding Shareholder Proposals..........................................................................14

    Director Performance Evaluation ........................................................................................14

    Management Proposals to Ratify Existing Charter or Bylaw Provisions...............................15

    Problematic Audit-Related Practices ...................................................................................15

    Problematic Compensation Practices...................................................................................15

    High Non-Employee Director Pay: ......................................................................................16

    Problematic Pledging of Company Stock.............................................................................16

    Governance Failures ...........................................................................................................16

    Voting on Director Nominees in Contested Elections ...............................................................16

    Vote-No Campaigns ...............................................................................................................16

    Proxy Contests/Proxy Access .................................................................................................17

    Other Board-Related Proposals .................................................................................................17

    Adopt Anti-Hedging/Pledging/Speculative Investments Policy................................................17

    Board Refreshment.................................................................................................................17

    Term/Tenure Limits ...........................................................................................................17

    Age Limits ..........................................................................................................................18

    Board Size ..............................................................................................................................18

    Classification/Declassification of the Board ...........................................................................18

    CEO Succession Planning .......................................................................................................18

    Cumulative Voting .................................................................................................................18

    Director and Officer Indemnification, Liability Protection, and Exculpation ...........................19

    Establish/Amend Nominee Qualifications...............................................................................19

    Establish Other Board Committee Proposals ..........................................................................20

    Filling Vacancies/Removal of Directors ..................................................................................20

    Independent Board Chair .......................................................................................................20

    Majority of Independent Directors/Establishment of Independent Committees ......................21

    Majority Vote Standard for the Election of Directors..............................................................21

    Proxy Access ..........................................................................................................................21

Require More Nominees than Open Seats ........................................................................................21

Shareholder Engagement Policy (Shareholder Advisory Committee) .............................................21

2. **Audit-Related** ........................................................................................................ **23**

Auditor Indemnification and Limitation of Liability.........................................................................23

Auditor Ratification..........................................................................................................................23

Shareholder Proposals Limiting Non-Audit Services .......................................................................23

Shareholder Proposals on Audit Firm Rotation ..............................................................................24

3. **Shareholder Rights & Defenses** ............................................................................ **25**

Advance Notice Requirements for Shareholder Proposals/Nominations ........................................25

Amend Bylaws without Shareholder Consent .................................................................................25

Control Share Acquisition Provisions...............................................................................................25

Control Share Cash-Out Provisions .................................................................................................25

Disgorgement Provisions .................................................................................................................26

Fair Price Provisions.........................................................................................................................26

Freeze-Out Provisions......................................................................................................................26

Greenmail .........................................................................................................................................26

Shareholder Litigation Rights...........................................................................................................26

Federal Forum Selection Provisions ............................................................................................26

Exclusive Forum Provisions for State Law Matters......................................................................27

Fee shifting ..................................................................................................................................27

Net Operating Loss (NOL) Protective Amendments ........................................................................28

Poison Pills (Shareholder Rights Plans)................................................................................................28

Shareholder Proposals to Put Pill to a Vote and/or Adopt a Pill Policy ..........................................28

Management Proposals to Ratify a Poison Pill .................................................................................28

Management Proposals to Ratify a Pill to Preserve Net Operating Losses (NOLs)..........................29

Proxy Voting Disclosure, Confidentiality, and Tabulation ..............................................................29

Ratification Proposals: Management Proposals to Ratify Existing Charter or Bylaw Provisions........................29

Reimbursing Proxy Solicitation Expenses .......................................................................................30

Reincorporation Proposals ..............................................................................................................30

Shareholder Ability to Act by Written Consent ...............................................................................30

Shareholder Ability to Call Special Meetings ..................................................................................31

Stakeholder Provisions ....................................................................................................................31

State Antitakeover Statutes.............................................................................................................31

Supermajority Vote Requirements ..................................................................................................31

Virtual Shareholder Meetings..........................................................................................................32

4. **Capital/Restructuring** .......................................................................................... **33**

Capital .................................................................................................................................................33

Adjustments to Par Value of Common Stock...................................................................................33

Common Stock Authorization..........................................................................................................33

General Authorization Requests..................................................................................................33

Specific Authorization Requests .................................................................................................34

Dual Class Structure.........................................................................................................................34

Issue Stock for Use with Rights Plan ...............................................................................................34

Preemptive Rights............................................................................................................................34

Preferred Stock Authorization ....................................................................................................34

    General Authorization Requests...........................................................................................34

Recapitalization Plans ..............................................................................................................36

Reverse Stock Splits .................................................................................................................36

Share Issuance Mandates at U.S. Domestic Issuers Incorporated Outside the U.S. ...........................36

Share Repurchase Programs ......................................................................................................37

Share Repurchase Programs Shareholder Proposals......................................................................37

Stock Distributions: Splits and Dividends ...................................................................................37

Tracking Stock .........................................................................................................................37

Restructuring .................................................................................................................................37

Appraisal Rights .....................................................................................................................37

Asset Purchases ......................................................................................................................38

Asset Sales .............................................................................................................................38

Bundled Proposals ...................................................................................................................38

Conversion of Securities ...........................................................................................................38

Corporate Reorganization/Debt Restructuring/Prepackaged Bankruptcy Plans/Reverse Leveraged
Buyouts/Wrap Plans .................................................................................................................38

Formation of Holding Company...................................................................................................39

Going Private and Going Dark Transactions (LBOs and Minority Squeeze-outs)..................................39

Joint Ventures.........................................................................................................................40

Liquidations ...........................................................................................................................40

Mergers and Acquisitions .........................................................................................................40

Private Placements/Warrants/Convertible Debentures....................................................................41

Reorganization/Restructuring Plan (Bankruptcy) ..........................................................................42

Special Purpose Acquisition Corporations (SPACs)........................................................................42

Special Purpose Acquisition Corporations (SPACs) - Proposals for Extensions ...................................43

Spin-offs................................................................................................................................43

Value Maximization Shareholder Proposals .................................................................................43

5.   Compensation ........................................................................................................... 44

Executive Pay Evaluation ...............................................................................................................44

Advisory Votes on Executive Compensation—Management Proposals (Say-on-Pay) .......................44

    Pay-for-Performance Evaluation .......................................................................................45

    Problematic Pay Practices ................................................................................................45

    Compensation Committee Communications and Responsiveness .............................................46

Frequency of Advisory Vote on Executive Compensation ("Say When on Pay").................................47

Voting on Golden Parachutes in an Acquisition, Merger, Consolidation, or Proposed Sale ...............47

Equity-Based and Other Incentive Plans.........................................................................................47

    Shareholder Value Transfer (SVT).....................................................................................48

    Three-Year Value-Adjusted Burn Rate ...............................................................................49

Egregious Factors ........................................................................................................................49

    Liberal Change in Control Definition...................................................................................49

    Repricing Provisions........................................................................................................49

    Problematic Pay Practices or Significant Pay-for-Performance Disconnect .................................50

Amending Cash and Equity Plans (including Approval for Tax Deductibility (162(m)) .......................50

    Specific Treatment of Certain Award Types in Equity Plan Evaluations ........................................51

Dividend Equivalent Rights ........................................................................................51

Operating Partnership (OP) Units in Equity Plan Analysis of Real Estate Investment Trusts (REITs) .............51

Other Compensation Plans ............................................................................................51

401(k) Employee Benefit Plans .....................................................................................51

Employee Stock Ownership Plans (ESOPs) ....................................................................51

Employee Stock Purchase Plans—Qualified Plans.........................................................51

Employee Stock Purchase Plans—Non-Qualified Plans .................................................52

Option Exchange Programs/Repricing Options ..............................................................52

Stock Plans in Lieu of Cash...........................................................................................52

Transfer Stock Option (TSO) Programs .........................................................................53

Director Compensation..................................................................................................53

Shareholder Ratification of Director Pay Programs........................................................53

Equity Plans for Non-Employee Directors .....................................................................54

Non-Employee Director Retirement Plans .....................................................................54

Shareholder Proposals on Compensation .......................................................................54

Bonus Banking/Bonus Banking "Plus" ..........................................................................54

Compensation Consultants—Disclosure of Board or Company's Utilization ...................55

Disclosure/Setting Levels or Types of Compensation for Executives and Directors...........55

Golden Coffins/Executive Death Benefits......................................................................55

Hold Equity Past Retirement or for a Significant Period of Time....................................55

Pay Disparity ................................................................................................................56

Pay for Performance/Performance-Based Awards...........................................................56

Pay for Superior Performance .......................................................................................56

Pre-Arranged Trading Plans (10b5-1 Plans) ..................................................................57

Prohibit Outside CEOs from Serving on Compensation Committees ...............................57

Recoupment of Incentive or Stock Compensation in Specified Circumstances .................57

Severance Agreements for Executives/Golden Parachutes ..............................................58

Share Buyback Impact on Incentive Program Metrics.....................................................58

Supplemental Executive Retirement Plans (SERPs) ......................................................58

Tax Gross-Up Proposals ...............................................................................................58

Termination of Employment Prior to Severance Payment/Eliminating Accelerated Vesting of Unvested Equity ....................................................................................................................59

**6.   Routine/Miscellaneous** ............................................................................ **60**

Adjourn Meeting...........................................................................................................60

Amend Quorum Requirements ......................................................................................60

Amend Minor Bylaws....................................................................................................60

Change Company Name ................................................................................................60

Change Date, Time, or Location of Annual Meeting.......................................................60

Other Business ..............................................................................................................61

**7.   Environmental and Social Issues** .......................................................... **61**

Global Approach – E&S-related Proposals......................................................................61

Say on Climate (SoC) Management Proposals.................................................................61

Say on Climate (SoC) Shareholder Proposals.................................................................61

**8.   Mutual Fund Proxies**................................................................................ **62**

Case 1:26-cv-00717-MPB-MKK Document 26-3 Filed 04/21/26 Page 210 of 1112 PageID #: 376

Election of Directors ...................................................................................................................62

Closed End Funds- Unilateral Opt-In to Control Share Acquisition Statutes ......................................62

Converting Closed-end Fund to Open-end Fund ................................................................................62

Proxy Contests ...............................................................................................................................62

Investment Advisory Agreements ...................................................................................................62

Approving New Classes or Series of Shares .....................................................................................63

Preferred Stock Proposals ..............................................................................................................63

1940 Act Policies ...........................................................................................................................63

Changing a Fundamental Restriction to a Nonfundamental Restriction ............................................63

Change Fundamental Investment Objective to Nonfundamental .......................................................63

Name Change Proposals .................................................................................................................63

Change in Fund's Subclassification ................................................................................................64

Business Development Companies—Authorization to Sell Shares of Common Stock at a Price below Net Asset Value .........................................................................................................................................64

Disposition of Assets/Termination/Liquidation ...............................................................................64

Changes to the Charter Document ..................................................................................................64

Changing the Domicile of a Fund ...................................................................................................65

Authorizing the Board to Hire and Terminate Subadvisers Without Shareholder Approval ...............65

Distribution Agreements ................................................................................................................65

Master-Feeder Structure ................................................................................................................65

Mergers .........................................................................................................................................65

Shareholder Proposals for Mutual Funds .........................................................................................65

Establish Director Ownership Requirement .....................................................................................65

Reimburse Shareholder for Expenses Incurred ................................................................................66

Terminate the Investment Advisor ..................................................................................................66

Case 1:26-cv-00717-MPB-MKK     Document 26-3     Filed 04/21/26     Page 211 of 1112
PageID #: 377

# Introduction

ISS' Global Board-Aligned Policy is designed to enable subscribing investors to vote in a manner that upholds many foundational corporate governance principles as a means of protecting and maximizing their investments, whilst generally aligning with issuers' board recommendations for voting on environmental and social matters.

On matters of corporate governance, executive compensation, and corporate structure, the Global Board-Aligned Policy guidelines are focused on a range of widely accepted good standards of corporate governance and shareholder rights protection, and on the creation and preservation of economic value. On environmental or social matters, the Global Board-Aligned Policy will generally be in line with the board's recommendations, with support limited to circumstances where it is considered that greater disclosure will directly enhance or protect shareholder value and is reflective of a clearly established reporting standard in the market. Although board diversity is a widely accepted factor in assessing board composition and good standards of corporate governance in many markets globally and for many investors, the Global Board-Aligned Policy excludes consideration of board diversity, or any lack thereof, in determining vote recommendations under the policy, taking the approach that the consideration of such matters is the responsibility of the board.

Details of the full policy are as further described in these guidelines.

# 1. Board of Directors

## Voting on Director Nominees in Uncontested Elections

Four fundamental principles apply when determining votes on director nominees:

**Independence**: Boards should be sufficiently independent from management (and significant shareholders) to ensure that they are able and motivated to effectively supervise management's performance for the benefit of all shareholders, including in setting and monitoring the execution of corporate strategy, with appropriate use of shareholder capital, and in setting and monitoring executive compensation programs that support that strategy. The chair of the board should ideally be an independent director, and all boards should have an independent leadership position or a similar role in order to help provide appropriate counterbalance to executive management, as well as having sufficiently independent committees that focus on key governance concerns such as audit, compensation, and nomination of directors.

**Composition**: Companies should ensure that directors add value to the board through their specific skills and expertise and by having sufficient time and commitment to serve effectively. Boards should be of a size appropriate to accommodate sufficient expertise, perspectives and independence, while ensuring active and collaborative participation by all members.

**Responsiveness**: Directors should respond to investor input, such as that expressed through significant opposition to management proposals, significant support for shareholder proposals (whether binding or non-binding), and tender offers where a majority of shares are tendered.

**Accountability**: Boards should be sufficiently accountable to shareholders, including through transparency of the company's governance practices and regular board elections, by the provision of sufficient information for shareholders to be able to assess directors and board composition, and through the ability of shareholders to remove directors.

**General Recommendation:** Generally vote for director nominees, except under the following circumstances (with new nominees[1] considered on case-by-case basis):

## Independence

Vote against[2] or withhold from non-independent directors (Executive Directors and Non-Independent Non-Executive Directors per ISS' Classification of Directors) when:

- Independent directors comprise 50 percent or less of the board;
- The non-independent director serves on the audit, compensation, or nominating committee;
- The company lacks an audit, compensation, or nominating committee so that the full board functions as that committee; or
- The company lacks a formal nominating committee, even if the board attests that the independent directors fulfill the functions of such a committee.

---

[1] A "new nominee" is a director who is being presented for election by shareholders for the first time. Recommendations on new nominees who have served for less than one year are made on a case-by-case basis depending on the timing of their appointment and the problematic governance issue in question.

[2] In general, companies with a plurality vote standard use "Withhold" as the contrary vote option in director elections; companies with a majority vote standard use "Against". However, it will vary by company and the proxy must be checked to determine the valid contrary vote option for the particular company.

## ISS Classification of Directors – U.S.

1. **Executive Director**
   1.1. Current officer[1] of the company or one of its affiliates[2].

2. **Non-Independent Non-Executive Director**
   Board Identification
   2.1. Director identified as not independent by the board.
   Controlling/Significant Shareholder
   2.2. Beneficial owner of more than 50 percent of the company's voting power (this may be aggregated if voting power is distributed among more than one member of a group).
   Current Employment at Company or Related Company
   2.3. Non-officer employee of the firm (including employee representatives).
   2.4. Officer[1], former officer, or general or limited partner of a joint venture or partnership with the company.
   Former Employment
   2.5. Former CEO of the company. [3, 4]
   2.6. Former non-CEO officer[1] of the company or an affiliate[2] within the past five years.
   2.7. Former officer[1] of an acquired company within the past five years.[4]
   2.8. Officer[1] of a former parent or predecessor firm at the time the company was sold or split off within the past five years.
   2.9. Former interim officer if the service was longer than 18 months. If the service was between 12 and 18 months an assessment of the interim officer's employment agreement will be made.[5]
   Family Members
   2.10. Immediate family member[6] of a current or former officer[1] of the company or its affiliates[2] within the last five years.
   2.11. Immediate family member[6] of a current employee of company or its affiliates[2] where additional factors raise concern (which may include, but are not limited to, the following: a director related to numerous employees; the company or its affiliates employ relatives of numerous board members; or a non-Section 16 officer in a key strategic role).
   Professional, Transactional, and Charitable Relationships
   2.12. Director who (or whose immediate family member[6]) currently provides professional services[7] in excess of $10,000 per year to: the company, an affiliate[2], or an individual officer of the company or an affiliate; or who is (or whose immediate family member[6] is) a partner, employee, or controlling shareholder of an organization which provides the services.
   2.13. Director who (or whose immediate family member[6]) currently has any material transactional relationship[8] with the company or its affiliates[2]; or who is (or whose immediate family member[6] is) a partner in, or a controlling shareholder or an executive officer of, an organization which has the material transactional relationship[8] (excluding investments in the company through a private placement).
   2.14. Director who (or whose immediate family member[6]) is a trustee, director, or employee of a charitable or non-profit organization that receives material grants or endowments[8] from the company or its affiliates[2].
   Other Relationships
   2.15. Party to a voting agreement[9] to vote in line with management on proposals being brought to shareholder vote.
   2.16. Has (or an immediate family member[6] has) an interlocking relationship as defined by the SEC involving members of the board of directors or its Compensation Committee.[10]
   2.17. Founder[11] of the company but not currently an employee.
   2.18. Director with pay comparable to Named Executive Officers.
   2.19. Any material[12] relationship with the company.

3. **Independent Director**
   3.1. No material[12] connection to the company other than a board seat.

**Footnotes:**

*1.* The definition of officer will generally follow that of a "Section 16 officer" (officers subject to Section 16 of the Securities and Exchange Act of 1934) and includes the chief executive, operating, financial, legal, technology, and accounting officers of a company (including the president, treasurer, secretary, controller, or any vice president in charge of a principal business unit, division, or policy function). Current interim officers are included in this category. For private companies, the equivalent positions are applicable. A non-employee director serving as an officer due to statutory requirements (e.g. corporate secretary) will generally be classified as a Non-Independent Non-Executive Director under "Any material relationship with the company." However, if the company provides explicit disclosure that the director is not receiving additional compensation exceeding $10,000 per year for serving in that capacity, then the director will be classified as an Independent Director.

*2.* "Affiliate" includes a subsidiary, sibling company, or parent company. ISS uses 50 percent control ownership by the parent company as the standard for applying its affiliate designation. The manager/advisor of an externally managed issuer (EMI) is considered an affiliate.

*3.* Includes any former CEO of the company prior to the company's initial public offering (IPO).

*4.* When there is a former CEO of a special purpose acquisition company (SPAC) serving on the board of an acquired company, ISS will generally classify such directors as independent unless determined otherwise taking into account the following factors: the applicable listing standards determination of such director's independence; any operating ties to the firm; and the existence of any other conflicting relationships or related party transactions.

*5.* ISS will look at the terms of the interim officer's employment contract to determine if it contains severance pay, long-term health and pension benefits, or other such standard provisions typically contained in contracts of permanent, non-temporary CEOs. ISS will also consider if a formal search process was under way for a full-time officer at the time.

*6.* "Immediate family member" follows the SEC's definition of such and covers spouses, parents, children, step-parents, step-children, siblings, in-laws, and any person (other than a tenant or employee) sharing the household of any director, nominee for director, executive officer, or significant shareholder of the company.

*7.* Professional services can be characterized as advisory in nature, generally involve access to sensitive company information or to strategic decision-making, and typically have a commission- or fee-based payment structure. Professional services generally include but are not limited to the following: investment banking/financial advisory services, commercial banking (beyond deposit services), investment services, insurance services, accounting/audit services, consulting services, marketing services, legal services, property management services, realtor services, lobbying services, executive search services, and IT consulting services. The following would generally be considered transactional relationships and not professional services: deposit services, IT tech support services, educational services, and construction services. The case of participation in a banking syndicate by a non-lead bank should be considered a transactional (and hence subject to the associated materiality test) rather than a professional relationship. "Of Counsel" relationships are only considered immaterial if the individual does not receive any form of compensation (in excess of $10,000 per year) from, or is a retired partner of, the firm providing the professional service. The case of a company providing a professional service to one of its directors or to an entity with which one of its directors is affiliated, will be considered a transactional rather than a professional relationship. Insurance services and marketing services are assumed to be professional services unless the company explains why such services are not advisory.

*8.* A material transactional relationship, including grants to non-profit organizations, exists if the company makes annual payments to, or receives annual payments from, another entity, exceeding the greater of: $200,000 or 5 percent of the recipient's gross revenues, for a company that follows NASDAQ listing standards; or the greater of $1,000,000 or 2 percent of the recipient's gross revenues, for a company that follows NYSE listing standards. For a company that follows neither of the preceding standards, ISS will apply the NASDAQ-based materiality test. (The recipient is the party receiving the financial proceeds from the transaction).

*9.* Dissident directors who are parties to a voting agreement pursuant to a settlement or similar arrangement may be classified as Independent Directors if an analysis of the following factors indicates that the voting agreement does not compromise their alignment with all shareholders' interests: the terms of the agreement; the duration of the standstill provision in the agreement; the limitations and requirements of actions that are agreed upon; if the dissident director nominee(s) is subject to the standstill; and if there any conflicting relationships or related party transactions.

*10.* Interlocks include: executive officers serving as directors on each other's compensation or similar committees (or, in the absence of such a committee, on the board); or executive officers sitting on each other's boards and at least one serves on the other's compensation or similar committees (or, in the absence of such a committee, on the board).

*11*. The operating involvement of the founder with the company will be considered; if the founder was never employed by the company, ISS may deem him or her an Independent Director.

> *12.* For purposes of ISS's director independence classification, "material" will be defined as a standard of relationship (financial, personal, or otherwise) that a reasonable person might conclude could potentially influence one's objectivity in the boardroom in a manner that would have a meaningful impact on an individual's ability to satisfy requisite fiduciary standards on behalf of shareholders.

## Composition

**Attendance at Board and Committee Meetings:** Generally vote against or withhold from directors (except nominees who served only part of the fiscal year[3]) who attend less than 75 percent of the aggregate of their board and committee meetings for the period for which they served, unless an acceptable reason for absences is disclosed in the proxy or another SEC filing. Acceptable reasons for director absences are generally limited to the following:

- Medical issues/illness;
- Family emergencies; and
- Missing only one meeting (when the total of all meetings is three or fewer).

In cases of chronic poor attendance without reasonable justification, in addition to voting against the director(s) with poor attendance, generally vote against or withhold from appropriate members of the nominating/governance committees or the full board.

If the proxy disclosure is unclear and insufficient to determine whether a director attended at least 75 percent of the aggregate of his/her board and committee meetings during his/her period of service, vote against or withhold from the director(s) in question.

**Overboarded Directors:** Generally vote against or withhold from individual directors who:

- Sit on more than five public company boards; or
- Are CEOs of public companies who sit on the boards of more than two public companies besides their own— withhold only at their outside boards[4].

## Responsiveness

Vote case-by-case on individual directors, committee members, or the entire board of directors as appropriate if:

- The board failed to act on a shareholder proposal that received the support of a majority of the shares cast in the previous year or failed to act on a management proposal seeking to ratify an existing charter/bylaw provision that received opposition of a majority of the shares cast in the previous year. Factors that will be considered are:
    - Disclosed outreach efforts by the board to shareholders in the wake of the vote;
    - Rationale provided in the proxy statement for the level of implementation;
    - The subject matter of the proposal;
    - The level of support for and opposition to the resolution in past meetings;
    - Actions taken by the board in response to the majority vote and its engagement with shareholders;

---

[3] Nominees who served for only part of the fiscal year are generally exempted from the attendance policy.

[4] Although all of a CEO's subsidiary boards with publicly-traded common stock will be counted as separate boards, ISS will not recommend a withhold vote for the CEO of a parent company board or any of the controlled (>50 percent ownership) subsidiaries of that parent but may do so at subsidiaries that are less than 50 percent controlled and boards outside the parent/subsidiary relationships.

- The continuation of the underlying issue as a voting item on the ballot (as either shareholder or management proposals); and
- Other factors as appropriate.
- The board failed to act on takeover offers where the majority of shares are tendered;
- At the previous board election, any director received more than 50 percent withhold/against votes of the shares cast and the company has failed to address the issue(s) that caused the high withhold/against vote.

Vote case-by-case on Compensation Committee members (or, in exceptional cases, the full board) and/or the say on pay proposal when the company's previous say-on-pay received support of less than 70 percent of votes cast. Factors that will be considered in assessing board responsiveness include:

- Disclosure of engagement efforts with major institutional investors regarding the issues that contributed to the low level of support (including the timing and frequency of engagements and whether independent directors participated);
- Disclosure of the specific concerns voiced by dissenting shareholders that led to the say-on-pay opposition; and
- Disclosure of specific and meaningful actions taken to address shareholders' concerns.

If the company discloses meaningful engagement efforts, but in addition states that it was unable to obtain specific feedback, ISS will assess company actions taken in response to the say-on-pay vote as well as the company's explanation as to why such actions are beneficial for shareholders.

Additional factors that may be considered include:

- Whether the issues raised are recurring or isolated;
- The company's ownership structure;
- Significant corporate activity, such as a recent merger or proxy contest; and
- Any other compensation action or factor considered relevant to assessing board responsiveness.

If the say-on-pay support level was less than 50 percent of votes cast, this would warrant the highest degree of responsiveness, as assessed under the factors noted above.

Vote case-by-case on Compensation Committee members (or, in exceptional cases, the full board) if the board implements an advisory vote on executive compensation on a less frequent basis than the frequency that received the plurality of votes cast.

## Accountability

### PROBLEMATIC TAKEOVER DEFENSES, CAPITAL STRUCTURE, AND GOVERNANCE STRUCTURE

**Poison Pills:** Generally vote against or withhold from all nominees (except new nominees[1], who should be considered case-by-case) if:

- The company has a poison pill with a deadhand or slowhand feature[5];
- The board makes a material adverse modification to an existing pill, including, but not limited to, extension, renewal, or lowering the trigger, without shareholder approval; or
- The company has a long-term poison pill (with a term of over one year) that was not approved by the public shareholders[6].

[5] If a short-term pill with a deadhand or slowhand feature is enacted but expires before the next shareholder vote, ISS will generally still recommend withhold/against nominees at the next shareholder meeting following its adoption.

[6] Approval prior to, or in connection, with a company's becoming publicly-traded, or in connection with a de-SPAC transaction, is insufficient.

Vote case-by-case on nominees if the board adopts an initial short-term pill[5] (with a term of one year or less) without shareholder approval, taking into consideration:

- The trigger threshold and other terms of the pill;
- The disclosed rationale for the adoption;
- The context in which the pill was adopted, (e.g., factors such as the company's size and stage of development, sudden changes in its market capitalization, and extraordinary industry-wide or macroeconomic events);
- A commitment to put any renewal to a shareholder vote;
- The company's overall track record on corporate governance and responsiveness to shareholders; and
- Other factors as relevant.

**Unequal Voting Rights**: Generally vote withhold or against directors individually, committee members, or the entire board (except new nominees[1], who should be considered case-by-case), if the company employs a multi-class capital structure with unequal voting rights[7].

Exceptions to this policy will generally be limited to:

- Newly-public companies[8] with a sunset provision of no more than seven years from the date of going public;
- Limited Partnerships and the Operating Partnership (OP) unit structure of REITs;
- Convertible preferred shares that vote on an "as-converted" basis;
- Situations where the enhanced voting rights are limited in duration and applicability, such as where they are intended to overcome low voting turnout and ensure approval of a specific non-controversial agenda item and "mirrored voting" applies;
- Situations where the super-voting shares represent less than 5% of total voting power and therefore considered to be *de minimis*; or
- The company provides sufficient protections for minority shareholders, such as allowing minority shareholders a regular binding vote on whether the capital structure should be maintained.

**Classified Board Structure:** The board is classified, and a continuing director responsible for a problematic governance issue at the board/committee level that would warrant a withhold/against vote recommendation is not up for election. All appropriate nominees (except new) may be held accountable.

**Removal of Shareholder Discretion on Classified Boards**: The company has opted into, or failed to opt out of, state laws requiring a classified board structure.

**Problematic Governance Structure**: For companies that hold or held their first annual meeting[8] of public shareholders after Feb. 1, 2015, generally vote against or withhold from directors individually, committee members, or the entire board (except new nominees[1], who should be considered case-by-case) if, prior to or in connection with the company's public offering, the company or its board adopted the following bylaw or charter provisions that are considered to be materially adverse to shareholder rights:

- Supermajority vote requirements to amend the bylaws or charter;
- A classified board structure; or
- Other egregious provisions.

---

[7] This generally includes classes of common or preferred stock that have more votes per share than other shares; classes of shares that are not entitled to vote on all the same ballot items or nominees; or stock with time-phased voting rights ("loyalty shares").

Preferred shares that have voting rights only with respect to items that affect the rights of their holders as a class are not generally considered a problematic capital structure.

[8] Includes companies that emerge from bankruptcy, SPAC transactions, spin-offs, direct listings, and those who complete a traditional initial public offering.

A provision which specifies that the problematic structure(s) will be sunset within seven years of the date of going public will be considered a mitigating factor.

Unless the adverse provision is reversed or removed, vote case-by-case on director nominees in subsequent years.

**Unilateral Bylaw/Charter Amendments:** Generally vote against or withhold from directors individually, committee members, or the entire board (except new nominees[1], who should be considered case-by-case) if the board amends the company's bylaws or charter without shareholder approval in a manner that materially diminishes shareholders' rights or that could adversely impact shareholders, considering the following factors:

- The board's rationale for adopting the bylaw/charter amendment without shareholder ratification;
- Disclosure by the company of any significant engagement with shareholders regarding the amendment;
- The level of impairment of shareholders' rights caused by the board's unilateral amendment to the bylaws/charter;
- The board's track record with regard to unilateral board action on bylaw/charter amendments or other entrenchment provisions;
- The company's ownership structure;
- The company's existing governance provisions;
- The timing of the board's amendment to the bylaws/charter in connection with a significant business development; and
- Other factors, as deemed appropriate, that may be relevant to determine the impact of the amendment on shareholders.

Unless the adverse amendment is reversed or submitted to a binding shareholder vote, in subsequent years vote case-by-case on director nominees. Generally vote against (except new nominees[1], who should be considered case-by-case) if the directors:

- Classified the board;
- Adopted supermajority vote requirements to amend the bylaws or charter;
- Eliminated shareholders' ability to amend bylaws;
- Adopted a fee-shifting provision; or
- Adopted another provision deemed egregious.

**Restricting Binding Shareholder Proposals:** Generally vote against or withhold from the members of the governance committee if:

- The company's governing documents impose undue restrictions on shareholders' ability to amend the bylaws. Such restrictions include but are not limited to: outright prohibition on the submission of binding shareholder proposals or share ownership requirements, subject matter restrictions, or time holding requirements in excess of SEC Rule 14a-8. Vote against or withhold on an ongoing basis.

Submission of management proposals to approve or ratify requirements in excess of SEC Rule 14a-8 for the submission of binding bylaw amendments will generally be viewed as an insufficient restoration of shareholders' rights. Generally continue to vote against or withhold on an ongoing basis until shareholders are provided with an unfettered ability to amend the bylaws or a proposal providing for such unfettered right is submitted for shareholder approval.

**Director Performance Evaluation:** The board lacks mechanisms to promote accountability and oversight, coupled with sustained poor performance relative to peers. Sustained poor performance is measured by one-, three-, and five-year total shareholder returns in the bottom half of a company's four-digit GICS industry group (Russell 3000 companies only). Take into consideration the company's operational metrics and other factors as warranted. Problematic provisions include but are not limited to:

- A classified board structure;

- A supermajority vote requirement;
- Either a plurality vote standard in uncontested director elections, or a majority vote standard in contested elections;
- The inability of shareholders to call special meetings;
- The inability of shareholders to act by written consent;
- A multi-class capital structure; and/or
- A non-shareholder-approved poison pill.

**Management Proposals to Ratify Existing Charter or Bylaw Provisions:** Vote against/withhold from individual directors, members of the governance committee, or the full board, where boards ask shareholders to ratify existing charter or bylaw provisions considering the following factors:

- The presence of a shareholder proposal addressing the same issue on the same ballot;
- The board's rationale for seeking ratification;
- Disclosure of actions to be taken by the board should the ratification proposal fail;
- Disclosure of shareholder engagement regarding the board's ratification request;
- The level of impairment to shareholders' rights caused by the existing provision;
- The history of management and shareholder proposals on the provision at the company's past meetings;
- Whether the current provision was adopted in response to the shareholder proposal;
- The company's ownership structure; and
- Previous use of ratification proposals to exclude shareholder proposals.

### Problematic Audit-Related Practices

Generally vote against or withhold from the members of the Audit Committee if:

- The non-audit fees paid to the auditor are excessive;
- The company receives an adverse opinion on the company's financial statements from its auditor; or
- There is persuasive evidence that the Audit Committee entered into an inappropriate indemnification agreement with its auditor that limits the ability of the company, or its shareholders, to pursue legitimate legal recourse against the audit firm.

Vote case-by-case on members of the Audit Committee and potentially the full board if:

- Poor accounting practices are identified that rise to a level of serious concern, such as: fraud; misapplication of GAAP; and material weaknesses identified in Section 404 disclosures. Examine the severity, breadth, chronological sequence, and duration, as well as the company's efforts at remediation or corrective actions, in determining whether withhold/against votes are warranted.

### Problematic Compensation Practices

In the absence of an Advisory Vote on Executive Compensation (Say on Pay) ballot item or in egregious situations, vote against or withhold from the members of the Compensation Committee and potentially the full board if:

- There is an unmitigated misalignment between CEO pay and company performance (pay for performance);
- The company maintains significant problematic pay practices; or
- The board exhibits a significant level of poor communication and responsiveness to shareholders.

Generally vote against or withhold from the Compensation Committee chair, other committee members, or potentially the full board if:

- The company fails to include a Say on Pay ballot item when required under SEC provisions, or under the company's declared frequency of say on pay; or
- The company fails to include a Frequency of Say on Pay ballot item when required under SEC provisions.

**High Non-Employee Director Pay:** Generally vote against members of the board committee responsible for approving/setting non-employee director compensation if there is a pattern (i.e. two or more consecutive or non-consecutive years/across multiple years) of awarding excessive or otherwise problematic[9] non-employee director compensation without disclosing a compelling rationale or other mitigating factors.

Adverse recommendations may be warranted in the first year for director pay issues that are considered egregious.

**Problematic Pledging of Company Stock**: Vote against the members of the committee that oversees risks related to pledging, or the full board, where a significant level of pledged company stock by executives or directors raises concerns. The following factors will be considered:

- The presence of an anti-pledging policy, disclosed in the proxy statement, that prohibits future pledging activity;
- The magnitude of aggregate pledged shares in terms of total common shares outstanding, market value, and trading volume;
- Disclosure of progress or lack thereof in reducing the magnitude of aggregate pledged shares over time;
- Disclosure in the proxy statement that shares subject to stock ownership and holding requirements do not include pledged company stock; and
- Any other relevant factors.

**Governance Failures**

Under extraordinary circumstances, vote against or withhold from directors individually, committee members, or the entire board, due to:

- Material failures of governance, stewardship, risk oversight[10], or fiduciary responsibilities at the company;
- Failure to replace management as appropriate; or
- Egregious actions related to a director's service on other boards that raise substantial doubt about his or her ability to effectively oversee management and serve the best interests of shareholders at any company.

## Voting on Director Nominees in Contested Elections

### Vote-No Campaigns

**General Recommendation:** In cases where companies are targeted in connection with public "vote-no" campaigns, evaluate director nominees under the existing governance policies for voting on director nominees in uncontested elections. Take into consideration the arguments submitted by shareholders and other publicly available information.

---

[9] May include performance awards, retirement benefits, or problematic perquisites.

[10] Examples of failure of risk oversight include but are not limited to: bribery; large or serial fines or sanctions from regulatory bodies; significant adverse legal judgments or settlement; or hedging of company stock.

## Proxy Contests/Proxy Access

**General Recommendation:** Vote case-by-case on the election of directors in contested elections, considering the following factors:

- Long-term financial performance of the company relative to its industry;
- Management's track record;
- Background to the contested election;
- Nominee qualifications and any compensatory arrangements;
- Strategic plan of dissident slate and quality of the critique against management;
- Likelihood that the proposed goals and objectives can be achieved (both slates); and
- Stock ownership positions.

In the case of candidates nominated pursuant to proxy access, vote case-by-case considering any applicable factors listed above or additional factors which may be relevant, including those that are specific to the company, to the nominee(s) and/or to the nature of the election (such as whether there are more candidates than board seats).

# Other Board-Related Proposals

## Adopt Anti-Hedging/Pledging/Speculative Investments Policy

**General Recommendation:** Generally vote for proposals seeking a policy that prohibits named executive officers from engaging in derivative or speculative transactions involving company stock, including hedging, holding stock in a margin account, or pledging stock as collateral for a loan. However, the company's existing policies regarding responsible use of company stock will be considered.

## Board Refreshment

Board refreshment is best implemented through an ongoing program of individual director evaluations, conducted annually, to ensure the evolving needs of the board are met and to bring in fresh perspectives, skills, and experience as needed.

### Term/Tenure Limits

**General Recommendation:** Vote case-by-case on management proposals regarding director term/tenure limits, considering:

- The rationale provided for adoption of the term/tenure limit;
- The robustness of the company's board evaluation process;
- Whether the limit is of sufficient length to allow for a broad range of director tenures;
- Whether the limit would disadvantage independent directors compared to non-independent directors; and
- Whether the board will impose the limit evenly, and not have the ability to waive it in a discriminatory manner.

Vote case-by-case on shareholder proposals asking for the company to adopt director term/tenure limits, considering:

- The scope of the shareholder proposal; and
- Evidence of problematic issues at the company combined with, or exacerbated by, a lack of board refreshment.

### Age Limits

**General Recommendation:** Generally vote against management and shareholder proposals to limit the tenure of independent directors through mandatory retirement ages. Vote for proposals to remove mandatory age limits.

## Board Size

**General Recommendation:** Vote for proposals seeking to fix the board size or designate a range for the board size.

Vote against proposals that give management the ability to alter the size of the board outside of a specified range without shareholder approval.

## Classification/Declassification of the Board

**General Recommendation:** Vote against proposals to classify (stagger) the board.

Vote for proposals to repeal classified boards and to elect all directors annually.

## CEO Succession Planning

**General Recommendation:** Generally vote for proposals seeking disclosure on a CEO succession planning policy, considering, at a minimum, the following factors:

- The reasonableness/scope of the request; and
- The company's existing disclosure on its current CEO succession planning process.

## Cumulative Voting

**General Recommendation:** Generally vote against management proposals to eliminate cumulate voting, and for shareholder proposals to restore or provide for cumulative voting, unless:

- The company has proxy access[11], thereby allowing shareholders to nominate directors to the company's ballot; and
- The company has adopted a majority vote standard, with a carve-out for plurality voting in situations where there are more nominees than seats, and a director resignation policy to address failed elections.

Vote for proposals for cumulative voting at controlled companies (insider voting power > 50%).

---

[11] A proxy access right that meets the recommended guidelines.

## Director and Officer Indemnification, Liability Protection, and Exculpation

**General Recommendation:** Vote case-by-case on proposals on director and officer indemnification, liability protection, and exculpation[12].

Consider the stated rationale for the proposed change. Also consider, among other factors, the extent to which the proposal would:

- Eliminate directors' and officers' liability for monetary damages for violating the duty of care.
- Eliminate directors' and officers' liability for monetary damages for violating the duty of loyalty.
- Expand coverage beyond just legal expenses to liability for acts that are more serious violations of fiduciary obligation than mere carelessness.
- Expand the scope of indemnification to provide for mandatory indemnification of company officials in connection with acts that previously the company was permitted to provide indemnification for, at the discretion of the company's board (*i.e.*, "permissive indemnification"), but that previously the company was not required to indemnify.

Vote for those proposals providing such expanded coverage in cases when a director's or officer's legal defense was unsuccessful if both of the following apply:

- If the individual was found to have acted in good faith and in a manner that the individual reasonably believed was in the best interests of the company; and

If only the individual's legal expenses would be covered.

## Establish/Amend Nominee Qualifications

**General Recommendation:** Vote case-by-case on proposals that establish or amend director qualifications. Votes should be based on the reasonableness of the criteria and the degree to which they may preclude dissident nominees from joining the board.

Vote case-by-case on shareholder resolutions seeking a director nominee who possesses a particular subject matter expertise, considering:

- The company's board committee structure, existing subject matter expertise, and board nomination provisions relative to that of its peers;
- The company's existing board and management oversight mechanisms regarding the issue for which board oversight is sought;
- The company's disclosure and performance relating to the issue for which board oversight is sought and any significant related controversies; and
- The scope and structure of the proposal.

---

[12] **Indemnification**: the condition of being secured against loss or damage.
**Limited liability**: a person's financial liability is limited to a fixed sum, or personal financial assets are not at risk if the individual loses a lawsuit that results in financial award/damages to the plaintiff.
**Exculpation**: to eliminate or limit the personal liability of a director or officer to the corporation or its shareholders for monetary damages for breach of fiduciary duty as a director or officer.

## Establish Other Board Committee Proposals

**General Recommendation:** Generally vote against shareholder proposals to establish a new board committee, as such proposals seek a specific oversight mechanism/structure that potentially limits a company's flexibility to determine an appropriate oversight mechanism for itself. However, the following factors will be considered:

- Existing oversight mechanisms (including current committee structure) regarding the issue for which board oversight is sought;
- Level of disclosure regarding the issue for which board oversight is sought;
- Company performance related to the issue for which board oversight is sought;
- Board committee structure compared to that of other companies in its industry sector; and
- The scope and structure of the proposal.

## Filling Vacancies/Removal of Directors

**General Recommendation:** Vote against proposals that provide that directors may be removed only for cause. Vote for proposals to restore shareholders' ability to remove directors with or without cause.

Vote against proposals that provide that only continuing directors may elect replacements to fill board vacancies.

Vote for proposals that permit shareholders to elect directors to fill board vacancies.

## Independent Board Chair

**General Recommendation:** Generally vote for shareholder proposals requiring that the board chair position be filled by an independent director, taking into consideration the following:

- The scope and rationale of the proposal;
- The company's current board leadership structure;
- The company's governance structure and practices;
- Company performance; and
- Any other relevant factors that may be applicable.

The following factors will increase the likelihood of a "for" recommendation:

- A majority non-independent board and/or the presence of non-independent directors on key board committees;
- A weak or poorly-defined lead independent director role that fails to serve as an appropriate counterbalance to a combined CEO/chair role;
- The presence of an executive or non-independent chair in addition to the CEO, a recent recombination of the role of CEO and chair, and/or departure from a structure with an independent chair;
- Evidence that the board has failed to oversee and address material risks facing the company;
- A material governance failure, particularly if the board has failed to adequately respond to shareholder concerns or if the board has materially diminished shareholder rights; or
- Evidence that the board has failed to intervene when management's interests are contrary to shareholders' interests.

## Majority of Independent Directors/Establishment of Independent Committees

**General Recommendation:** Vote for shareholder proposals asking that a majority or more of directors be independent unless the board composition already meets the proposed threshold by ISS' definition of Independent Director (See ISS' Classification of Directors.)

Vote for shareholder proposals asking that board audit, compensation, and/or nominating committees be composed exclusively of independent directors unless they currently meet that standard.

## Majority Vote Standard for the Election of Directors

**General Recommendation:** Generally vote for management proposals to adopt a majority of votes cast standard for directors in uncontested elections. Vote against if no carve-out for a plurality vote standard in contested elections is included.

Generally vote for precatory and binding shareholder resolutions requesting that the board change the company's bylaws to stipulate that directors need to be elected with an affirmative majority of votes cast, provided it does not conflict with the state law where the company is incorporated. Binding resolutions need to allow for a carve-out for a plurality vote standard when there are more nominees than board seats.

Companies are strongly encouraged to also adopt a post-election policy (also known as a director resignation policy) that will provide guidelines so that the company will promptly address the situation of a holdover director.

## Proxy Access

**General Recommendation:** Generally vote for management and shareholder proposals for proxy access with the following provisions:

- **Ownership threshold:** maximum requirement not more than three percent (3%) of the voting power;
- **Ownership duration:** maximum requirement not longer than three (3) years of continuous ownership for each member of the nominating group;
- **Aggregation:** minimal or no limits on the number of shareholders permitted to form a nominating group;
- **Cap:** cap on nominees of generally twenty-five percent (25%) of the board.

Review for reasonableness any other restrictions on the right of proxy access. Generally vote against proposals that are more restrictive than these guidelines.

## Require More Nominees than Open Seats

**General Recommendation:** Vote against shareholder proposals that would require a company to nominate more candidates than the number of open board seats.

## Shareholder Engagement Policy (Shareholder Advisory Committee)

**General Recommendation:** Generally vote for shareholder proposals requesting that the board establish an internal mechanism/process, which may include a committee, in order to improve communications between directors and shareholders, unless the company has the following features, as appropriate:

- Established a communication structure that goes beyond the exchange requirements to facilitate the exchange of information between shareholders and members of the board;
- Effectively disclosed information with respect to this structure to its shareholders;
- Company has not ignored majority-supported shareholder proposals, or a majority withhold vote on a director nominee; and
- The company has an independent chair or a lead director, according to ISS' definition. This individual must be made available for periodic consultation and direct communication with major shareholders.

# 2. Audit-Related

## Auditor Indemnification and Limitation of Liability

**General Recommendation:** Vote case-by-case on the issue of auditor indemnification and limitation of liability. Factors to be assessed include, but are not limited to:

- The terms of the auditor agreement—the degree to which these agreements impact shareholders' rights;
- The motivation and rationale for establishing the agreements;
- The quality of the company's disclosure; and
- The company's historical practices in the audit area.

Vote against or withhold from members of an audit committee in situations where there is persuasive evidence that the audit committee entered into an inappropriate indemnification agreement with its auditor that limits the ability of the company, or its shareholders, to pursue legitimate legal recourse against the audit firm.

## Auditor Ratification

**General Recommendation:** Vote for proposals to ratify auditors unless any of the following apply:

- An auditor has a financial interest in or association with the company, and is therefore not independent;
- There is reason to believe that the independent auditor has rendered an opinion that is neither accurate nor indicative of the company's financial position;
- Poor accounting practices are identified that rise to a serious level of concern, such as fraud or misapplication of GAAP; or
- Fees for non-audit services ("Other" fees) are excessive.

Non-audit fees are excessive if:

- Non-audit ("other") fees > audit fees + audit-related fees + tax compliance/preparation fees

Tax compliance and preparation include the preparation of original and amended tax returns and refund claims, and tax payment planning. All other services in the tax category, such as tax advice, planning, or consulting, should be added to "Other" fees. If the breakout of tax fees cannot be determined, add all tax fees to "Other" fees.

In circumstances where "Other" fees include fees related to significant one-time capital structure events (such as initial public offerings, bankruptcy emergence, and spin-offs) and the company makes public disclosure of the amount and nature of those fees that are an exception to the standard "non-audit fee" category, then such fees may be excluded from the non-audit fees considered in determining the ratio of non-audit to audit/audit-related fees/tax compliance and preparation for purposes of determining whether non-audit fees are excessive.

## Shareholder Proposals Limiting Non-Audit Services

**General Recommendation:** Vote case-by-case on shareholder proposals asking companies to prohibit or limit their auditors from engaging in non-audit services.

## Shareholder Proposals on Audit Firm Rotation

**General Recommendation:** Vote case-by-case on shareholder proposals asking for audit firm rotation, taking into account:

- The tenure of the audit firm;
- The length of rotation specified in the proposal;
- Any significant audit-related issues at the company;
- The number of Audit Committee meetings held each year;
- The number of financial experts serving on the committee; and
- Whether the company has a periodic renewal process where the auditor is evaluated for both audit quality and competitive price.

# 3. Shareholder Rights & Defenses

## Advance Notice Requirements for Shareholder Proposals/Nominations

**General Recommendation:** Vote case-by-case on advance notice proposals, giving support to those proposals which allow shareholders to submit proposals/nominations as close to the meeting date as reasonably possible and within the broadest window possible, recognizing the need to allow sufficient notice for company, regulatory, and shareholder review.

To be reasonable, the company's deadline for shareholder notice of a proposal/nominations must be no earlier than 120 days prior to the anniversary of the previous year's meeting and have a submittal window of no shorter than 30 days from the beginning of the notice period (also known as a 90-120-day window). The submittal window is the period under which shareholders must file their proposals/nominations prior to the deadline.

In general, support additional efforts by companies to ensure full disclosure in regard to a proponent's economic and voting position in the company so long as the informational requirements are reasonable and aimed at providing shareholders with the necessary information to review such proposals.

## Amend Bylaws without Shareholder Consent

**General Recommendation:** Vote against proposals giving the board exclusive authority to amend the bylaws.

Vote case-by-case on proposals giving the board the ability to amend the bylaws in addition to shareholders, taking into account the following:

- Any impediments to shareholders' ability to amend the bylaws (i.e. supermajority voting requirements);
- The company's ownership structure and historical voting turnout;
- Whether the board could amend bylaws adopted by shareholders; and
- Whether shareholders would retain the ability to ratify any board-initiated amendments.

## Control Share Acquisition Provisions

**General Recommendation:** Vote for proposals to opt out of control share acquisition statutes unless doing so would enable the completion of a takeover that would be detrimental to shareholders.

Vote against proposals to amend the charter to include control share acquisition provisions.

Vote for proposals to restore voting rights to the control shares.

Control share acquisition statutes function by denying shares their voting rights when they contribute to ownership in excess of certain thresholds. Voting rights for those shares exceeding ownership limits may only be restored by approval of either a majority or supermajority of disinterested shares. Thus, control share acquisition statutes effectively require a hostile bidder to put its offer to a shareholder vote or risk voting disenfranchisement if the bidder continues buying up a large block of shares.

## Control Share Cash-Out Provisions

**General Recommendation:** Vote for proposals to opt out of control share cash-out statutes.

Control share cash-out statutes give dissident shareholders the right to "cash-out" of their position in a company at the expense of the shareholder who has taken a control position. In other words, when an investor crosses a preset threshold level, remaining shareholders are given the right to sell their shares to the acquirer, who must buy them at the highest acquiring price.

## Disgorgement Provisions

**General Recommendation:** Vote for proposals to opt out of state disgorgement provisions.

Disgorgement provisions require an acquirer or potential acquirer of more than a certain percentage of a company's stock to disgorge, or pay back, to the company any profits realized from the sale of that company's stock purchased 24 months before achieving control status. All sales of company stock by the acquirer occurring within a certain period of time (between 18 months and 24 months) prior to the investor's gaining control status are subject to these recapture-of-profits provisions.

## Fair Price Provisions

**General Recommendation:** Vote case-by-case on proposals to adopt fair price provisions (provisions that stipulate that an acquirer must pay the same price to acquire all shares as it paid to acquire the control shares), evaluating factors such as the vote required to approve the proposed acquisition, the vote required to repeal the fair price provision, and the mechanism for determining the fair price.

Generally vote against fair price provisions with shareholder vote requirements greater than a majority of disinterested shares.

## Freeze-Out Provisions

**General Recommendation:** Vote for proposals to opt out of state freeze-out provisions. Freeze-out provisions force an investor who surpasses a certain ownership threshold in a company to wait a specified period of time before gaining control of the company.

## Greenmail

**General Recommendation:** Vote for proposals to adopt anti-greenmail charter or bylaw amendments or otherwise restrict a company's ability to make greenmail payments.

Vote case-by-case on anti-greenmail proposals when they are bundled with other charter or bylaw amendments.

Greenmail payments are targeted share repurchases by management of company stock from individuals or groups seeking control of the company. Since only the hostile party receives payment, usually at a substantial premium over the market value of its shares, the practice discriminates against all other shareholders.

## Shareholder Litigation Rights

### Federal Forum Selection Provisions

Federal forum selection provisions require that U.S. federal courts be the sole forum for shareholders to litigate claims arising under federal securities law.

**General Recommendation:** Generally vote for federal forum selection provisions in the charter or bylaws that specify "the district courts of the United States" as the exclusive forum for federal securities law matters, in the absence of serious concerns about corporate governance or board responsiveness to shareholders.

Vote against provisions that restrict the forum to a particular federal district court; unilateral adoption (without a shareholder vote) of such a provision will generally be considered a one-time failure under the Unilateral Bylaw/Charter Amendments policy.

## Exclusive Forum Provisions for State Law Matters

Exclusive forum provisions in the charter or bylaws restrict shareholders' ability to bring derivative lawsuits against the company, for claims arising out of state corporate law, to the courts of a particular state (generally the state of incorporation).

**General Recommendation:** Generally vote for charter or bylaw provisions that specify courts located within the state of Delaware as the exclusive forum for corporate law matters for Delaware corporations, in the absence of serious concerns about corporate governance or board responsiveness to shareholders.

For states other than Delaware, vote case-by-case on exclusive forum provisions, taking into consideration:

- The company's stated rationale for adopting such a provision;
- Disclosure of past harm from duplicative shareholder lawsuits in more than one forum;
- The breadth of application of the charter or bylaw provision, including the types of lawsuits to which it would apply and the definition of key terms; and
- Governance features such as shareholders' ability to repeal the provision at a later date (including the vote standard applied when shareholders attempt to amend the charter or bylaws) and their ability to hold directors accountable through annual director elections and a majority vote standard in uncontested elections.

Generally vote against provisions that specify a state other than the state of incorporation as the exclusive forum for corporate law matters, or that specify a particular local court within the state; unilateral adoption of such a provision will generally be considered a one-time failure under the Unilateral Bylaw/Charter Amendments policy.

## Fee shifting

Fee-shifting provisions in the charter or bylaws require that a shareholder who sues a company unsuccessfully pay all litigation expenses of the defendant corporation and its directors and officers.

**General Recommendation:** Generally vote against provisions that mandate fee-shifting whenever plaintiffs are not completely successful on the merits (i.e., including cases where the plaintiffs are partially successful).

Unilateral adoption of a fee-shifting provision will generally be considered an ongoing failure under the Unilateral Bylaw/Charter Amendments policy.

## Net Operating Loss (NOL) Protective Amendments

**General Recommendation:** Vote against proposals to adopt a protective amendment for the stated purpose of protecting a company's net operating losses (NOL) if the effective term of the protective amendment would exceed the shorter of three years and the exhaustion of the NOL.

Vote case-by-case, considering the following factors, for management proposals to adopt an NOL protective amendment that would remain in effect for the shorter of three years (or less) and the exhaustion of the NOL:

- The ownership threshold (NOL protective amendments generally prohibit stock ownership transfers that would result in a new 5-percent holder or increase the stock ownership percentage of an existing 5-percent holder);
- The value of the NOLs;
- Shareholder protection mechanisms (sunset provision or commitment to cause expiration of the protective amendment upon exhaustion or expiration of the NOL);
- The company's existing governance structure including: board independence, existing takeover defenses, track record of responsiveness to shareholders, and any other problematic governance concerns; and
- Any other factors that may be applicable.

## Poison Pills (Shareholder Rights Plans)

### Shareholder Proposals to Put Pill to a Vote and/or Adopt a Pill Policy

**General Recommendation:** Vote for shareholder proposals requesting that the company submit its poison pill to a shareholder vote or redeem it unless the company has: (1) A shareholder-approved poison pill in place; or (2) The company has adopted a policy concerning the adoption of a pill in the future specifying that the board will only adopt a shareholder rights plan if either:

- Shareholders have approved the adoption of the plan; or
- The board, in its exercise of its fiduciary responsibilities, determines that it is in the best interest of shareholders under the circumstances to adopt a pill without the delay in adoption that would result from seeking stockholder approval (i.e., the "fiduciary out" provision). A poison pill adopted under this fiduciary out will be put to a shareholder ratification vote within 12 months of adoption or expire. If the pill is not approved by a majority of the votes cast on this issue, the plan will immediately terminate.

If the shareholder proposal calls for a time period of less than 12 months for shareholder ratification after adoption, vote for the proposal, but add the caveat that a vote within 12 months would be considered sufficient implementation.

### Management Proposals to Ratify a Poison Pill

**General Recommendation:** Vote case-by-case on management proposals on poison pill ratification, focusing on the features of the shareholder rights plan. Rights plans should contain the following attributes:

- No lower than a 20 percent trigger, flip-in or flip-over;
- A term of no more than three years;
- No deadhand, slowhand, no-hand, or similar feature that limits the ability of a future board to redeem the pill;
- Shareholder redemption feature (qualifying offer clause); if the board refuses to redeem the pill 90 days after a qualifying offer is announced, 10 percent of the shares may call a special meeting or seek a written consent to vote on rescinding the pill.

In addition, the rationale for adopting the pill should be thoroughly explained by the company. In examining the request for the pill, take into consideration the company's existing governance structure, including: board independence, existing takeover defenses, and any problematic governance concerns.

## Management Proposals to Ratify a Pill to Preserve Net Operating Losses (NOLs)

**General Recommendation:** Vote against proposals to adopt a poison pill for the stated purpose of protecting a company's net operating losses (NOL) if the term of the pill would exceed the shorter of three years and the exhaustion of the NOL.

Vote case-by-case on management proposals for poison pill ratification, considering the following factors, if the term of the pill would be the shorter of three years (or less) and the exhaustion of the NOL:

- The ownership threshold to transfer (NOL pills generally have a trigger slightly below 5 percent);
- The value of the NOLs;
- Shareholder protection mechanisms (sunset provision, or commitment to cause expiration of the pill upon exhaustion or expiration of NOLs);
- The company's existing governance structure, including: board independence, existing takeover defenses, track record of responsiveness to shareholders, and any other problematic governance concerns; and
- Any other factors that may be applicable.

## Proxy Voting Disclosure, Confidentiality, and Tabulation

**General Recommendation:** Vote case-by-case on proposals regarding proxy voting mechanics, taking into consideration whether implementation of the proposal is likely to enhance or protect shareholder rights. Specific issues covered under the policy include, but are not limited to, confidential voting of individual proxies and ballots, confidentiality of running vote tallies, and the treatment of abstentions and/or broker non-votes in the company's vote-counting methodology.

While a variety of factors may be considered in each analysis, the guiding principles are: transparency, consistency, and fairness in the proxy voting process. The factors considered, as applicable to the proposal, may include:

- The scope and structure of the proposal;
- The company's stated confidential voting policy (or other relevant policies) and whether it ensures a "level playing field" by providing shareholder proponents with equal access to vote information prior to the annual meeting;
- The company's vote standard for management and shareholder proposals and whether it ensures consistency and fairness in the proxy voting process and maintains the integrity of vote results;
- Whether the company's disclosure regarding its vote counting method and other relevant voting policies with respect to management and shareholder proposals are consistent and clear;
- Any recent controversies or concerns related to the company's proxy voting mechanics;
- Any unintended consequences resulting from implementation of the proposal; and
- Any other factors that may be relevant.

## Ratification Proposals: Management Proposals to Ratify Existing Charter or Bylaw Provisions

**General Recommendation:** Generally vote against management proposals to ratify provisions of the company's existing charter or bylaws, unless these governance provisions align with best practice.

In addition, voting against/withhold from individual directors, members of the governance committee, or the full board may be warranted, considering:

- The presence of a shareholder proposal addressing the same issue on the same ballot;
- The board's rationale for seeking ratification;
- Disclosure of actions to be taken by the board should the ratification proposal fail;
- Disclosure of shareholder engagement regarding the board's ratification request;
- The level of impairment to shareholders' rights caused by the existing provision;
- The history of management and shareholder proposals on the provision at the company's past meetings;
- Whether the current provision was adopted in response to the shareholder proposal;
- The company's ownership structure; and
- Previous use of ratification proposals to exclude shareholder proposals.

## Reimbursing Proxy Solicitation Expenses

**General Recommendation:** Vote case-by-case on proposals to reimburse proxy solicitation expenses.

When voting in conjunction with support of a dissident slate, vote for the reimbursement of all appropriate proxy solicitation expenses associated with the election.

Generally vote for shareholder proposals calling for the reimbursement of reasonable costs incurred in connection with nominating one or more candidates in a contested election where the following apply:

- The election of fewer than 50 percent of the directors to be elected is contested in the election;
- One or more of the dissident's candidates is elected;
- Shareholders are not permitted to cumulate their votes for directors; and
- The election occurred, and the expenses were incurred, after the adoption of this bylaw.

## Reincorporation Proposals

**General Recommendation:** Management or shareholder proposals to change a company's state of incorporation should be evaluated case-by-case, giving consideration to both financial and corporate governance concerns including the following:

- Reasons for reincorporation;
- Comparison of company's governance practices and provisions prior to and following the reincorporation; and
- Comparison of corporation laws of original state and destination state.

Vote for reincorporation when the economic factors outweigh any neutral or negative governance changes.

## Shareholder Ability to Act by Written Consent

**General Recommendation:** Generally vote against management and shareholder proposals to restrict or prohibit shareholders' ability to act by written consent.

Generally vote for management and shareholder proposals that provide shareholders with the ability to act by written consent, taking into account the following factors:

- Shareholders' current right to act by written consent;
- The consent threshold;
- The inclusion of exclusionary or prohibitive language;

- Investor ownership structure; and
- Shareholder support of, and management's response to, previous shareholder proposals.

Vote case-by-case on shareholder proposals if, in addition to the considerations above, the company has the following governance and antitakeover provisions:

- An unfettered[13] right for shareholders to call special meetings at a 10 percent threshold;
- A majority vote standard in uncontested director elections;
- No non-shareholder-approved pill; and
- An annually elected board.

## Shareholder Ability to Call Special Meetings

**General Recommendation:** Vote against management or shareholder proposals to restrict or prohibit shareholders' ability to call special meetings.

Generally vote for management or shareholder proposals that provide shareholders with the ability to call special meetings taking into account the following factors:

- Shareholders' current right to call special meetings;
- Minimum ownership threshold necessary to call special meetings (10 percent preferred);
- The inclusion of exclusionary or prohibitive language;
- Investor ownership structure; and
- Shareholder support of, and management's response to, previous shareholder proposals.

## Stakeholder Provisions

**General Recommendation:** Vote against proposals that ask the board to consider non-shareholder constituencies or other non-financial effects when evaluating a merger or business combination.

## State Antitakeover Statutes

**General Recommendation:** Vote case-by-case on proposals to opt in or out of state takeover statutes (including fair price provisions, stakeholder laws, poison pill endorsements, severance pay and labor contract provisions, and anti-greenmail provisions).

## Supermajority Vote Requirements

**General Recommendation:** Vote against proposals to require a supermajority shareholder vote.

Vote for management or shareholder proposals to reduce supermajority vote requirements. However, for companies with shareholder(s) who have significant ownership levels, vote case-by-case, taking into account:

- Ownership structure;
- Quorum requirements; and
- Vote requirements.

---

[13] "Unfettered" means no restrictions on agenda items, no restrictions on the number of shareholders who can group together to reach the 10 percent threshold, and only reasonable limits on when a meeting can be called: no greater than 30 days after the last annual meeting and no greater than 90 prior to the next annual meeting.

## Virtual Shareholder Meetings

**General Recommendation:** Generally vote for management proposals allowing for the convening of shareholder meetings by electronic means, so long as they do not preclude in-person meetings. Companies are encouraged to disclose the circumstances under which virtual-only[14] meetings would be held, and to allow for comparable rights and opportunities for shareholders to participate electronically as they would have during an in-person meeting.

Vote case-by-case on shareholder proposals concerning virtual-only meetings, considering:

- Scope and rationale of the proposal; and
- Concerns identified with the company's prior meeting practices.

---

[14] Virtual-only shareholder meeting" refers to a meeting of shareholders that is held exclusively using technology without a corresponding in-person meeting.

# 4. Capital/Restructuring

## Capital

### Adjustments to Par Value of Common Stock

**General Recommendation:** Vote for management proposals to reduce the par value of common stock unless the action is being taken to facilitate an anti-takeover device or some other negative corporate governance action.

Vote for management proposals to eliminate par value.

### Common Stock Authorization

#### General Authorization Requests

**General Recommendation:** Vote case-by-case on proposals to increase the number of authorized shares of common stock that are to be used for general corporate purposes:

- If share usage (outstanding plus reserved) is less than 50% of the current authorized shares, vote for an increase of up to **50**% of current authorized shares.
- If share usage is 50% to 100% of the current authorized, vote for an increase of up to **100**% of current authorized shares.
- If share usage is greater than current authorized shares, vote for an increase of up to the current share usage.
- In the case of a stock split, the allowable increase is calculated (per above) based on the post-split adjusted authorization.

Generally vote against proposed increases, even if within the above ratios, if the proposal or the company's prior or ongoing use of authorized shares is problematic, including, but not limited to:

- The proposal seeks to increase the number of authorized shares of the class of common stock that has superior voting rights to other share classes;
- On the same ballot is a proposal for a reverse split for which support is warranted despite the fact that it would result in an excessive increase in the share authorization;
- The company has a non-shareholder approved poison pill (including an NOL pill); or
- The company has previous sizeable placements (within the past 3 years) of stock with insiders at prices substantially below market value, or with problematic voting rights, without shareholder approval.

However, generally vote for proposed increases beyond the above ratios or problematic situations when there is disclosure of specific and severe risks to shareholders of not approving the request, such as:

- In, or subsequent to, the company's most recent 10-K filing, the company discloses that there is substantial doubt about its ability to continue as a going concern;
- The company states that there is a risk of imminent bankruptcy or imminent liquidation if shareholders do not approve the increase in authorized capital; or
- A government body has in the past year required the company to increase its capital ratios.

For companies incorporated in states that allow increases in authorized capital without shareholder approval, generally vote withhold or against all nominees if a unilateral capital authorization increase does not conform to the above policies.

## Specific Authorization Requests

**General Recommendation:** Generally vote for proposals to increase the number of authorized common shares where the primary purpose of the increase is to issue shares in connection with transaction(s) (such as acquisitions, SPAC transactions, private placements, or similar transactions) on the same ballot, or disclosed in the proxy statement, that warrant support. For such transactions, the allowable increase will be the greater of:

- twice the amount needed to support the transactions on the ballot, and
- the allowable increase as calculated for general issuances above.

## Dual Class Structure

**General Recommendation:** Generally vote against proposals to create a new class of common stock unless:

- The company discloses a compelling rationale for the dual-class capital structure, such as:
- The company's auditor has concluded that there is substantial doubt about the company's ability to continue as a going concern; or
- The new class of shares will be transitory;
- The new class is intended for financing purposes with minimal or no dilution to current shareholders in both the short term and long term; and
- The new class is not designed to preserve or increase the voting power of an insider or significant shareholder.

## Issue Stock for Use with Rights Plan

**General Recommendation:** Vote against proposals that increase authorized common stock for the explicit purpose of implementing a non-shareholder-approved shareholder rights plan (poison pill).

## Preemptive Rights

**General Recommendation:** Vote case-by-case on shareholder proposals that seek preemptive rights, taking into consideration:

- The size of the company;
- The shareholder base; and
- The liquidity of the stock.

## Preferred Stock Authorization

### General Authorization Requests

**General Recommendation:** Vote case-by-case on proposals to increase the number of authorized shares of preferred stock that are to be used for general corporate purposes:

- If share usage (outstanding plus reserved) is less than 50% of the current authorized shares, vote for an increase of up to **50**% of current authorized shares.
- If share usage is 50% to 100% of the current authorized, vote for an increase of up to **100**% of current authorized shares.
- If share usage is greater than current authorized shares, vote for an increase of up to the current share usage.

- In the case of a stock split, the allowable increase is calculated (per above) based on the post-split adjusted authorization.
- If no preferred shares are currently issued and outstanding, vote against the request, unless the company discloses a specific use for the shares.

Generally vote against proposed increases, even if within the above ratios, if the proposal or the company's prior or ongoing use of authorized shares is problematic, including, but not limited to:

- If the shares requested are blank check preferred shares that can be used for antitakeover purposes;[15]
- The company seeks to increase a class of non-convertible preferred shares entitled to more than one vote per share on matters that do not solely affect the rights of preferred stockholders "supervoting shares");
- The company seeks to increase a class of convertible preferred shares entitled to a number of votes greater than the number of common shares into which they are convertible ("supervoting shares") on matters that do not solely affect the rights of preferred stockholders;
- The stated intent of the increase in the general authorization is to allow the company to increase an existing designated class of supervoting preferred shares;
- On the same ballot is a proposal for a reverse split for which support is warranted despite the fact that it would result in an excessive increase in the share authorization;
- The company has a non-shareholder approved poison pill (including an NOL pill); or
- The company has previous sizeable placements (within the past 3 years) of stock with insiders at prices substantially below market value, or with problematic voting rights, without shareholder approval.

However, generally vote for proposed increases beyond the above ratios or problematic situations when there is disclosure of specific and severe risks to shareholders of not approving the request, such as:

- In, or subsequent to, the company's most recent 10-K filing, the company discloses that there is substantial doubt about its ability to continue as a going concern;
- The company states that there is a risk of imminent bankruptcy or imminent liquidation if shareholders do not approve the increase in authorized capital; or
- A government body has in the past year required the company to increase its capital ratios.

For companies incorporated in states that allow increases in authorized capital without shareholder approval, generally vote withhold or against all nominees if a unilateral capital authorization increase does not conform to the above policies.

**Specific Authorization Requests**

**General Recommendation:** Generally vote for proposals to increase the number of authorized preferred shares where the primary purpose of the increase is to issue shares in connection with transaction(s) (such as acquisitions, SPAC transactions, private placements, or similar transactions) on the same ballot, or disclosed in the proxy statement, that warrant support. For such transactions, the allowable increase will be the greater of:

- twice the amount needed to support the transactions on the ballot, and
- the allowable increase as calculated for general issuances above.

---

[15] To be acceptable, appropriate disclosure would be needed that the shares are "declawed": i.e., representation by the board that it will not, without prior stockholder approval, issue or use the preferred stock for any defensive or anti-takeover purpose or for the purpose of implementing any stockholder rights plan.

## Recapitalization Plans

**General Recommendation:** Vote case-by-case on recapitalizations (reclassifications of securities), taking into account the following:

- More simplified capital structure;
- Enhanced liquidity;
- Fairness of conversion terms;
- Impact on voting power and dividends;
- Reasons for the reclassification;
- Conflicts of interest; and
- Other alternatives considered.

## Reverse Stock Splits

**General Recommendation:** Vote for management proposals to implement a reverse stock split if:

- The number of authorized shares will be proportionately reduced; or
- The effective increase in authorized shares is equal to or less than the allowable increase calculated in accordance with ISS' Common Stock Authorization policy.

Vote case-by-case on proposals that do not meet either of the above conditions, taking into consideration the following factors:

- Stock exchange notification to the company of a potential delisting;
- Disclosure of substantial doubt about the company's ability to continue as a going concern without additional financing;
- The company's rationale; or
- Other factors as applicable.

## Share Issuance Mandates at U.S. Domestic Issuers Incorporated Outside the U.S.

**General Recommendation:** For U.S. domestic issuers incorporated outside the U.S. and listed solely on a U.S. exchange, generally vote for resolutions to authorize the issuance of common shares up to 20 percent of currently issued common share capital, where not tied to a specific transaction or financing proposal.

For pre-revenue or other early-stage companies that are heavily reliant on periodic equity financing, generally vote for resolutions to authorize the issuance of common shares up to 50 percent of currently issued common share capital. The burden of proof will be on the company to establish that it has a need for the higher limit.

Renewal of such mandates should be sought at each year's annual meeting.

Vote case-by-case on share issuances for a specific transaction or financing proposal.

## Share Repurchase Programs

**General Recommendation:** For U.S.-incorporated companies, and foreign-incorporated U.S. Domestic Issuers that are traded solely on U.S. exchanges, vote for management proposals to institute open-market share repurchase plans in which all shareholders may participate on equal terms, or to grant the board authority to conduct open-market repurchases, in the absence of company-specific concerns regarding:

- Greenmail;
- The use of buybacks to inappropriately manipulate incentive compensation metrics;
- Threats to the company's long-term viability; or
- Other company-specific factors as warranted.

Vote case-by-case on proposals to repurchase shares directly from specified shareholders, balancing the stated rationale against the possibility for the repurchase authority to be misused, such as to repurchase shares from insiders at a premium to market price.

## Share Repurchase Programs Shareholder Proposals

**General Recommendation:** Generally vote against shareholder proposals prohibiting executives from selling shares of company stock during periods in which the company has announced that it may or will be repurchasing shares of its stock. Vote for the proposal when there is a pattern of abuse by executives exercising options or selling shares during periods of share buybacks.

## Stock Distributions: Splits and Dividends

**General Recommendation:** Generally vote for management proposals to increase the common share authorization for stock split or stock dividend, provided that the effective increase in authorized shares is equal to or is less than the allowable increase calculated in accordance with ISS' Common Stock Authorization policy.

## Tracking Stock

**General Recommendation:** Vote case-by-case on the creation of tracking stock, weighing the strategic value of the transaction against such factors as:

- Adverse governance changes;
- Excessive increases in authorized capital stock;
- Unfair method of distribution;
- Diminution of voting rights;
- Adverse conversion features;
- Negative impact on stock option plans; and
- Alternatives such as spin-off.

# Restructuring

## Appraisal Rights

**General Recommendation:** Vote for proposals to restore or provide shareholders with rights of appraisal.

## Asset Purchases

**General Recommendation:** Vote case-by-case on asset purchase proposals, considering the following factors:

- Purchase price;
- Fairness opinion;
- Financial and strategic benefits;
- How the deal was negotiated;
- Conflicts of interest;
- Other alternatives for the business;
- Non-completion risk.

## Asset Sales

**General Recommendation:** Vote case-by-case on asset sales, considering the following factors:

- Impact on the balance sheet/working capital;
- Potential elimination of diseconomies;
- Anticipated financial and operating benefits;
- Anticipated use of funds;
- Value received for the asset;
- Fairness opinion;
- How the deal was negotiated;
- Conflicts of interest.

## Bundled Proposals

**General Recommendation:** Vote case-by-case on bundled or "conditional" proxy proposals. In the case of items that are conditioned upon each other, examine the benefits and costs of the packaged items. In instances when the joint effect of the conditioned items is not in shareholders' best interests, vote against the proposals. If the combined effect is positive, support such proposals.

## Conversion of Securities

**General Recommendation:** Vote case-by-case on proposals regarding conversion of securities. When evaluating these proposals, the investor should review the dilution to existing shareholders, the conversion price relative to market value, financial issues, control issues, termination penalties, and conflicts of interest.

Vote for the conversion if it is expected that the company will be subject to onerous penalties or will be forced to file for bankruptcy if the transaction is not approved.

## Corporate Reorganization/Debt Restructuring/Prepackaged Bankruptcy Plans/Reverse Leveraged Buyouts/Wrap Plans

**General Recommendation:** Vote case-by-case on proposals to increase common and/or preferred shares and to issue shares as part of a debt restructuring plan, after evaluating:

- Dilution to existing shareholders' positions;
- Terms of the offer - discount/premium in purchase price to investor, including any fairness opinion; termination penalties; exit strategy;

- Financial issues - company's financial situation; degree of need for capital; use of proceeds; effect of the financing on the company's cost of capital;
- Management's efforts to pursue other alternatives;
- Control issues - change in management; change in control, guaranteed board and committee seats; standstill provisions; voting agreements; veto power over certain corporate actions; and
- Conflict of interest - arm's length transaction, managerial incentives.

Vote for the debt restructuring if it is expected that the company will file for bankruptcy if the transaction is not approved.

## Formation of Holding Company

**General Recommendation:** Vote case-by-case on proposals regarding the formation of a holding company, taking into consideration the following:

- The reasons for the change;
- Any financial or tax benefits;
- Regulatory benefits;
- Increases in capital structure; and
- Changes to the articles of incorporation or bylaws of the company.

Absent compelling financial reasons to recommend for the transaction, vote against the formation of a holding company if the transaction would include either of the following:

- Increases in common or preferred stock in excess of the allowable maximum (see discussion under "Capital"); or
- Adverse changes in shareholder rights.

## Going Private and Going Dark Transactions (LBOs and Minority Squeeze-outs)

**General Recommendation:** Vote case-by-case on going private transactions, taking into account the following:

- Offer price/premium;
- Fairness opinion;
- How the deal was negotiated;
- Conflicts of interest;
- Other alternatives/offers considered; and
- Non-completion risk.

Vote case-by-case on going dark transactions, determining whether the transaction enhances shareholder value by taking into consideration:

- Whether the company has attained benefits from being publicly-traded (examination of trading volume, liquidity, and market research of the stock);
- Balanced interests of continuing vs. cashed-out shareholders, taking into account the following:
- Are all shareholders able to participate in the transaction?
- Will there be a liquid market for remaining shareholders following the transaction?
- Does the company have strong corporate governance?
- Will insiders reap the gains of control following the proposed transaction?
- Does the state of incorporation have laws requiring continued reporting that may benefit shareholders?

## Joint Ventures

**General Recommendation:** Vote case-by-case on proposals to form joint ventures, taking into account the following:

- Percentage of assets/business contributed;
- Percentage ownership;
- Financial and strategic benefits;
- Governance structure;
- Conflicts of interest;
- Other alternatives; and
- Non-completion risk.

## Liquidations

**General Recommendation:** Vote case-by-case on liquidations, taking into account the following:

- Management's efforts to pursue other alternatives;
- Appraisal value of assets; and
- The compensation plan for executives managing the liquidation.

Vote for the liquidation if the company will file for bankruptcy if the proposal is not approved.

## Mergers and Acquisitions

**General Recommendation:** Vote case-by-case on mergers and acquisitions. Review and evaluate the merits and drawbacks of the proposed transaction, balancing various and sometimes countervailing factors including:

- *Valuation* - Is the value to be received by the target shareholders (or paid by the acquirer) reasonable? While the fairness opinion may provide an initial starting point for assessing valuation reasonableness, emphasis is placed on the offer premium, market reaction, and strategic rationale.
- *Market reaction* - How has the market responded to the proposed deal? A negative market reaction should cause closer scrutiny of a deal.
- *Strategic rationale* - Does the deal make sense strategically? From where is the value derived? Cost and revenue synergies should not be overly aggressive or optimistic, but reasonably achievable. Management should also have a favorable track record of successful integration of historical acquisitions.
- *Negotiations and process* - Were the terms of the transaction negotiated at arm's-length? Was the process fair and equitable? A fair process helps to ensure the best price for shareholders. Significant negotiation "wins" can also signify the deal makers' competency. The comprehensiveness of the sales process (e.g., full auction, partial auction, no auction) can also affect shareholder value.
- *Conflicts of interest* - Are insiders benefiting from the transaction disproportionately and inappropriately as compared to non-insider shareholders? As the result of potential conflicts, the directors and officers of the company may be more likely to vote to approve a merger than if they did not hold these interests. Consider whether these interests may have influenced these directors and officers to support or recommend the merger. The CIC figure presented in the "ISS Transaction Summary" section of this report is an aggregate figure that can in certain cases be a misleading indicator of the true value transfer from shareholders to insiders. Where such figure appears to be excessive, analyze the underlying assumptions to determine whether a potential conflict exists.
- *Governance* - Will the combined company have a better or worse governance profile than the current governance profiles of the respective parties to the transaction? If the governance profile is to change for the

worse, the burden is on the company to prove that other issues (such as valuation) outweigh any deterioration in governance.

## Private Placements/Warrants/Convertible Debentures

**General Recommendation:** Vote case-by-case on proposals regarding private placements, warrants, and convertible debentures taking into consideration:

- Dilution to existing shareholders' position: The amount and timing of shareholder ownership dilution should be weighed against the needs and proposed shareholder benefits of the capital infusion. Although newly issued common stock, absent preemptive rights, is typically dilutive to existing shareholders, share price appreciation is often the necessary event to trigger the exercise of "out of the money" warrants and convertible debt. In these instances from a value standpoint, the negative impact of dilution is mitigated by the increase in the company's stock price that must occur to trigger the dilutive event.

- Terms of the offer (discount/premium in purchase price to investor, including any fairness opinion, conversion features, termination penalties, exit strategy):

  - The terms of the offer should be weighed against the alternatives of the company and in light of company's financial condition. Ideally, the conversion price for convertible debt and the exercise price for warrants should be at a premium to the then prevailing stock price at the time of private placement.

  - When evaluating the magnitude of a private placement discount or premium, consider factors that influence the discount or premium, such as, liquidity, due diligence costs, control and monitoring costs, capital scarcity, information asymmetry, and anticipation of future performance.

- Financial issues:
  - The company's financial condition;
  - Degree of need for capital;
  - Use of proceeds;
  - Effect of the financing on the company's cost of capital;
  - Current and proposed cash burn rate;
  - Going concern viability and the state of the capital and credit markets.

- Management's efforts to pursue alternatives and whether the company engaged in a process to evaluate alternatives: A fair, unconstrained process helps to ensure the best price for shareholders. Financing alternatives can include joint ventures, partnership, merger, or sale of part or all of the company.

- Control issues:
  - Change in management;
  - Change in control;
  - Guaranteed board and committee seats;
  - Standstill provisions;
  - Voting agreements;
  - Veto power over certain corporate actions; and
  - Minority versus majority ownership and corresponding minority discount or majority control premium.

- Conflicts of interest:
  - Conflicts of interest should be viewed from the perspective of the company and the investor.
  - Were the terms of the transaction negotiated at arm's length? Are managerial incentives aligned with shareholder interests?

- Market reaction:

- The market's response to the proposed deal. A negative market reaction is a cause for concern. Market reaction may be addressed by analyzing the one-day impact on the unaffected stock price.

Vote for the private placement, or for the issuance of warrants and/or convertible debentures in a private placement, if it is expected that the company will file for bankruptcy if the transaction is not approved.

## Reorganization/Restructuring Plan (Bankruptcy)

**General Recommendation:** Vote case-by-case on proposals to common shareholders on bankruptcy plans of reorganization, considering the following factors including, but not limited to:

- Estimated value and financial prospects of the reorganized company;
- Percentage ownership of current shareholders in the reorganized company;
- Whether shareholders are adequately represented in the reorganization process (particularly through the existence of an Official Equity Committee);
- The cause(s) of the bankruptcy filing, and the extent to which the plan of reorganization addresses the cause(s);
- Existence of a superior alternative to the plan of reorganization; and
- Governance of the reorganized company.

## Special Purpose Acquisition Corporations (SPACs)

**General Recommendation:** Vote case-by-case on SPAC mergers and acquisitions taking into account the following:

- *Valuation* - Is the value being paid by the SPAC reasonable? SPACs generally lack an independent fairness opinion and the financials on the target may be limited. Compare the conversion price with the intrinsic value of the target company provided in the fairness opinion. Also, evaluate the proportionate value of the combined entity attributable to the SPAC IPO shareholders versus the pre-merger value of SPAC. Additionally, a private company discount may be applied to the target if it is a private entity.
- *Market reaction* - How has the market responded to the proposed deal? A negative market reaction may be a cause for concern. Market reaction may be addressed by analyzing the one-day impact on the unaffected stock price.
- *Deal timing* - A main driver for most transactions is that the SPAC charter typically requires the deal to be complete within 18 to 24 months, or the SPAC is to be liquidated. Evaluate the valuation, market reaction, and potential conflicts of interest for deals that are announced close to the liquidation date.
- *Negotiations and process* - What was the process undertaken to identify potential target companies within specified industry or location specified in charter? Consider the background of the sponsors.
- *Conflicts of interest* - How are sponsors benefiting from the transaction compared to IPO shareholders? Potential conflicts could arise if a fairness opinion is issued by the insiders to qualify the deal rather than a third party or if management is encouraged to pay a higher price for the target because of an 80 percent rule (the charter requires that the fair market value of the target is at least equal to 80 percent of net assets of the SPAC). Also, there may be sense of urgency by the management team of the SPAC to close the deal since its charter typically requires a transaction to be completed within the 18-24-month timeframe.
- *Voting agreements* - Are the sponsors entering into enter into any voting agreements/tender offers with shareholders who are likely to vote against the proposed merger or exercise conversion rights?
- *Governance* - What is the impact of having the SPAC CEO or founder on key committees following the proposed merger?

## Special Purpose Acquisition Corporations (SPACs) - Proposals for Extensions

**General Recommendation:** Generally support requests to extend the termination date by up to one year from the SPAC's original termination date (inclusive of any built-in extension options, and accounting for prior extension requests).

Other factors that may be considered include: any added incentives, business combination status, other amendment terms, and, if applicable, use of money in the trust fund to pay excise taxes on redeemed shares.

## Spin-offs

**General Recommendation:** Vote case-by-case on spin-offs, considering:

- Tax and regulatory advantages;
- Planned use of the sale proceeds;
- Valuation of spinoff;
- Fairness opinion;
- Benefits to the parent company;
- Conflicts of interest;
- Managerial incentives;
- Corporate governance changes;
- Changes in the capital structure.

## Value Maximization Shareholder Proposals

**General Recommendation:** Vote case-by-case on shareholder proposals seeking to maximize shareholder value by:

- Hiring a financial advisor to explore strategic alternatives;
- Selling the company; or
- Liquidating the company and distributing the proceeds to shareholders.

These proposals should be evaluated based on the following factors:

- Prolonged poor performance with no turnaround in sight;
- Signs of entrenched board and management (such as the adoption of takeover defenses);
- Strategic plan in place for improving value;
- Likelihood of receiving reasonable value in a sale or dissolution; and
- The company actively exploring its strategic options, including retaining a financial advisor.

Case 1:26-cv-00717-MPB-MKK    Document 26-3    Filed 04/21/26    Page 248 of 1112
PageID #: 414

# 5. Compensation

## Executive Pay Evaluation

Underlying all evaluations are five global principles that most investors expect corporations to adhere to in designing and administering executive and director compensation programs:

1. Maintain appropriate pay-for-performance alignment, with emphasis on long-term shareholder value: This principle encompasses overall executive pay practices, which must be designed to attract, retain, and appropriately motivate the key employees who drive shareholder value creation over the long term. It will take into consideration, among other factors, the link between pay and performance; the mix between fixed and variable pay; performance goals; and equity-based plan costs;
2. Avoid arrangements that risk "pay for failure": This principle addresses the appropriateness of long or indefinite contracts, excessive severance packages, and guaranteed compensation;
3. Maintain an independent and effective compensation committee: This principle promotes oversight of executive pay programs by directors with appropriate skills, knowledge, experience, and a sound process for compensation decision-making (*e.g.*, including access to independent expertise and advice when needed);
4. Provide shareholders with clear, comprehensive compensation disclosures: This principle underscores the importance of informative and timely disclosures that enable shareholders to evaluate executive pay practices fully and fairly;
5. Avoid inappropriate pay to non-executive directors: This principle recognizes the interests of shareholders in ensuring that compensation to outside directors is reasonable and does not compromise their independence and ability to make appropriate judgments in overseeing managers' pay and performance. At the market level, it may incorporate a variety of generally accepted best practices.

## Advisory Votes on Executive Compensation—Management Proposals (Say-on-Pay)

**General Recommendation:** Vote case-by-case on ballot items related to executive pay and practices, as well as certain aspects of outside director compensation.

Vote against Advisory Votes on Executive Compensation (Say-on-Pay or "SOP") if:

- There is an unmitigated misalignment between CEO pay and company performance (pay for performance);
- The company maintains significant problematic pay practices;
- The board exhibits a significant level of poor communication and responsiveness to shareholders.

Vote against or withhold from the members of the Compensation Committee and potentially the full board if:

- There is no SOP on the ballot, and an against vote on an SOP would otherwise be warranted due to pay-for-performance misalignment, problematic pay practices, or the lack of adequate responsiveness on compensation issues raised previously, or a combination thereof;
- The board fails to respond adequately to a previous SOP proposal that received less than 70 percent support of votes cast;
- The company has recently practiced or approved problematic pay practices, such as option repricing or option backdating; or
- The situation is egregious.

## Primary Evaluation Factors for Executive Pay

### Pay-for-Performance Evaluation

ISS annually conducts a pay-for-performance analysis to identify strong or satisfactory alignment between pay and performance over a sustained period. With respect to companies in the S&P1500, Russell 3000, or Russell 3000E Indices, this analysis considers the following:

1. Peer Group[16] Alignment:

- The degree of alignment between the company's annualized TSR rank and the CEO's annualized total pay rank within a peer group, each measured over a five-year period.
- The rankings of CEO total pay and company financial performance within a peer group, each measured over a five-year period.
- The multiple of the CEO's total pay relative to the peer group median over one-and three-year periods.

2. Absolute Alignment[17] – the absolute alignment between the trend in CEO pay and company TSR over the prior five fiscal years – i.e., the difference between the trend in annual pay changes and the trend in annualized TSR during the period.

If the above analysis demonstrates significant unsatisfactory long-term pay-for-performance alignment or, in the case of companies outside the Russell indices, a misalignment between pay and performance is otherwise suggested, our analysis may include any of the following qualitative factors, as relevant to an evaluation of how various pay elements may work to encourage or to undermine long-term value creation and alignment with shareholder interests:

- The overall ratio of performance-based compensation to fixed or discretionary pay;
- The ratio of performance- to time-based long-term incentive awards;
- The rigor of performance goals;
- The complexity and risks around pay program design;
- The transparency and clarity of disclosure;
- The company's peer group benchmarking practices;
- Financial/operational results, both absolute and relative to peers;
- Special circumstances related to, for example, a new CEO in the prior FY or anomalous equity grant practices (e.g., bi-annual awards);
- Realizable and/or realized pay compared to granted pay; and
- Any other factors deemed relevant.

### Problematic Pay Practices

Problematic pay elements are generally evaluated case-by-case considering the context of a company's overall pay program and demonstrated pay-for-performance philosophy. The focus is on executive compensation practices that contravene the global pay principles, including:

---

[16] The ISS peer group is generally comprised of 14-24 companies that are selected using factors such as market cap, revenue, assets, GICS industry group, and the company-selected peers' GICS industry group, ISS' peer selection methodology is detailed in the U.S. Peer Group FAQ.

[17] Russell 3000E Index companies (excluding S&P1500 and Russell 3000 companies) are not subject to the Absolute Alignment analysis.

- Problematic practices related to non-performance-based compensation elements;
- Incentives that may motivate excessive risk-taking or present a windfall risk; and
- Pay decisions that circumvent pay-for-performance, such as options backdating or waiving performance requirements.

The list of examples below highlights certain problematic practices that carry significant weight in this overall consideration and may result in adverse vote recommendations:

- Repricing or replacing of underwater stock options/SARs without prior shareholder approval (including cash buyouts and voluntary surrender of underwater options);
- Extraordinary perquisites or tax gross-ups;
- New or materially amended agreements that provide for:
  - Excessive termination or CIC severance payments (generally exceeding 3 times base salary and average/target/most recent bonus);
  - CIC severance payments without involuntary job loss or substantial diminution of duties ("single" or "modified single" triggers) or in connection with a problematic Good Reason definition;
  - CIC excise tax gross-up entitlements (including "modified" gross-ups);
  - Multi-year guaranteed awards that are not at risk due to rigorous performance conditions;
- Liberal CIC definition combined with any single-trigger CIC benefits;
- Insufficient executive compensation disclosure by externally-managed issuers (EMIs) such that a reasonable assessment of pay programs and practices applicable to the EMI's executives is not possible;
- Severance payments made when the termination is not clearly disclosed as involuntary (for example, a termination without cause or resignation for good reason);
- Any other provision or practice deemed to be egregious and present a significant risk to investors.

The above examples are not an exhaustive list. Please refer to ISS' U.S. Compensation Policies FAQ document for additional detail on specific pay practices that have been identified as problematic and may lead to negative vote recommendations.

**Options Backdating**

The following factors should be examined case-by-case to allow for distinctions to be made between "sloppy" plan administration versus deliberate action or fraud:

- Reason and motive for the options backdating issue, such as inadvertent vs. deliberate grant date changes;
- Duration of options backdating;
- Size of restatement due to options backdating;
- Corrective actions taken by the board or compensation committee, such as canceling or re-pricing backdated options, the recouping of option gains on backdated grants; and
- Adoption of a grant policy that prohibits backdating and creates a fixed grant schedule or window period for equity grants in the future.

## Compensation Committee Communications and Responsiveness

Consider the following factors case-by-case when evaluating ballot items related to executive pay on the board's responsiveness to investor input and engagement on compensation issues:

- Failure to respond to majority-supported shareholder proposals on executive pay topics; or
- Failure to adequately respond to the company's previous say-on-pay proposal that received low support, taking into account the factors identified under the Responsiveness section in the Board of Directors policy with respect to say-on-pay.

## Frequency of Advisory Vote on Executive Compensation ("Say When on Pay")

**General Recommendation:** Vote for annual advisory votes on compensation, which provide the most consistent and clear communication channel for shareholder concerns about companies' executive pay programs.

## Voting on Golden Parachutes in an Acquisition, Merger, Consolidation, or Proposed Sale

**General Recommendation:** Vote case-by-case on say on Golden Parachute proposals, including consideration of existing change-in-control arrangements maintained with named executive officers but also considering new or extended arrangements.

Features that may result in an "against" recommendation include one or more of the following, depending on the number, magnitude, and/or timing of issue(s):

- Single- or modified-single-trigger cash severance;
- Single-trigger acceleration of unvested equity awards;
- Full acceleration of equity awards granted shortly before the change in control;
- Acceleration of performance awards above the target level of performance without compelling rationale;
- Excessive cash severance (generally >3x base salary and bonus);
- Excise tax gross-ups triggered and payable;
- Excessive golden parachute payments (on an absolute basis or as a percentage of transaction equity value); or
- Recent amendments that incorporate any problematic features (such as those above) or recent actions (such as extraordinary equity grants) that may make packages so attractive as to influence merger agreements that may not be in the best interests of shareholders; or
- The company's assertion that a proposed transaction is conditioned on shareholder approval of the golden parachute advisory vote.

Recent amendment(s) that incorporate problematic features will tend to carry more weight on the overall analysis. However, the presence of multiple legacy problematic features will also be closely scrutinized.

In cases where the golden parachute vote is incorporated into a company's advisory vote on compensation (management say-on-pay), ISS will evaluate the say-on-pay proposal in accordance with these guidelines, which may give higher weight to that component of the overall evaluation.

## Equity-Based and Other Incentive Plans

Please refer to ISS' U.S. Equity Compensation Plans FAQ document for additional details on the Equity Plan Scorecard policy.

**General Recommendation:** Vote case-by-case on equity plan proposals subject to the Equity Plan Scorecard framework, where positive factors may counterbalance negative factors under three pillars:

- **Plan Cost:** The total estimated cost of the company's equity plans relative to industry/market cap peers, measured by the company's estimated Shareholder Value Transfer (SVT) in relation to peers and considering both:
    - SVT based on new shares requested plus shares remaining for future grants, plus outstanding unvested/unexercised grants; and
    - SVT based only on new shares requested plus shares remaining for future grants.

- **Plan Features:**
    - Quality of disclosure around vesting upon a change in control (CIC);
    - Discretionary vesting authority;
    - Liberal share recycling on various award types;
    - Lack of minimum vesting period for grants made under the plan;
    - Dividends payable prior to award vesting; and
    - Cash-denominated award limits for non-employee directors.

- **Grant Practices:**
    - The company's three-year burn rate relative to its industry/market cap peers;
    - Vesting requirements in CEO's recent equity grants;
    - The estimated duration of the plan;
    - The proportion of the CEO's most recent equity grants/awards classified by ISS as performance-based;
    - Whether the company maintains a sufficient claw-back policy;
    - Whether the company maintains sufficient post-exercise/vesting share-holding requirements.

Generally vote against the plan proposal if the combination of above factors indicates that the plan is not, overall, in shareholders' interests, or if any of the following egregious factors ("overriding factors") apply:

- Awards may vest in connection with a liberal change-of-control definition;
- The plan would permit repricing or cash buyout of underwater options without shareholder approval (either by expressly permitting it – for NYSE and Nasdaq listed companies – or by not prohibiting it when the company has a history of repricing – for non-listed companies);
- The plan is a vehicle for problematic pay practices or a significant pay-for-performance disconnect under certain circumstances;
- The plan is excessively dilutive to shareholders' holdings;
- The plan contains an evergreen (automatic share replenishment) feature;
- The plan lacks sufficient positive features under the Plan Features pillar; or
- Any other plan features are determined to have a significant negative impact on shareholder interests.

**Further Information on certain EPSC Factors:**

## Shareholder Value Transfer (SVT)

The cost of the equity plans is expressed as Shareholder Value Transfer (SVT), which is measured using a binomial option pricing model that assesses the amount of shareholders' equity flowing out of the company to employees and directors. SVT is expressed as both a dollar amount and as a percentage of market value, and includes the new shares proposed, shares available under existing plans, and shares granted but unexercised (using two measures, in the case of plans subject to the Equity Plan Scorecard evaluation, as noted above). All award types are valued. For omnibus plans, unless limitations are placed on the most expensive types of awards (for example, full-value awards), the assumption is made that all awards to be granted will be the most expensive types.

For proposals that are not subject to the Equity Plan Scorecard evaluation, Shareholder Value Transfer is reasonable if it falls below a company-specific benchmark. The benchmark is determined as follows: The top quartile performers in each industry group (using the Global Industry Classification Standard: GICS) are identified. Benchmark SVT levels for each industry are established based on these top performers' historic SVT. Regression analyses are run on each industry group to identify the variables most strongly correlated to SVT. The benchmark industry SVT level is then adjusted upwards or downwards for the specific company by plugging the company-

specific performance measures, size, and cash compensation into the industry cap equations to arrive at the company's benchmark.[18]

### Three-Year Value-Adjusted Burn Rate

A "Value-Adjusted Burn Rate" is used for stock plan evaluations. Value-Adjusted Burn Rate benchmarks are calculated as the greater of: (1) an industry-specific threshold based on three-year burn rates within the company's GICS group segmented by S&P 500, Russell 3000 index (less the S&P 500) and non-Russell 3000 index; and (2) a *de minimis* threshold established separately for each of the S&P 500, the Russell 3000 index less the S&P 500, and the non-Russell 3000 index. Year-over-year burn-rate benchmark changes will be limited to a predetermined range above or below the prior year's burn-rate benchmark.

The Value-Adjusted Burn Rate is calculated as follows:

Value-Adjusted Burn Rate = ((# of options * option's dollar value using a Black-Scholes model) + (# of full-value awards * stock price)) / (Weighted average common shares * stock price).

## Egregious Factors

### Liberal Change in Control Definition

Generally vote against equity plans if the plan has a liberal definition of change in control and the equity awards could vest upon such liberal definition of change in control, even though an actual change in control may not occur. Examples of such a definition include, but are not limited to, announcement or commencement of a tender offer, provisions for acceleration upon a "potential" takeover, shareholder approval of a merger or other transactions, or similar language.

### Repricing Provisions

Vote against plans that expressly permit the repricing or exchange of underwater stock options/stock appreciate rights (SARs) without prior shareholder approval. "Repricing" typically includes the ability to do any of the following:

- Amend the terms of outstanding options or SARs to reduce the exercise price of such outstanding options or SARs;
- Cancel outstanding options or SARs in exchange for options or SARs with an exercise price that is less than the exercise price of the original options or SARs;
- Cancel underwater options in exchange for stock awards; or
- Provide cash buyouts of underwater options.

While the above cover most types of repricing, ISS may view other provisions as akin to repricing depending on the facts and circumstances.

---

[18] For plans evaluated under the Equity Plan Scorecard policy, the company's SVT benchmark is considered along with other factors.

Also, vote against or withhold from members of the Compensation Committee who approved repricing (as defined above or otherwise determined by ISS), without prior shareholder approval, even if such repricings are allowed in their equity plan.

Vote against plans that do not expressly prohibit repricing or cash buyout of underwater options without shareholder approval if the company has a history of repricing/buyouts without shareholder approval, and the applicable listing standards would not preclude them from doing so.

## Problematic Pay Practices or Significant Pay-for-Performance Disconnect

If the equity plan on the ballot is a vehicle for problematic pay practices, vote against the plan.

ISS may recommend a vote against the equity plan if the plan is determined to be a vehicle for pay-for-performance misalignment. Considerations in voting against the equity plan may include, but are not limited to:

- Severity of the pay-for-performance misalignment;
- Whether problematic equity grant practices are driving the misalignment; and/or
- Whether equity plan awards have been heavily concentrated to the CEO and/or the other NEOs.

## Amending Cash and Equity Plans (including Approval for Tax Deductibility (162(m))

**General Recommendation:** Vote case-by-case on amendments to cash and equity incentive plans.

Generally vote for proposals to amend executive cash, stock, or cash and stock incentive plans if the proposal:

- Addresses administrative features only; or
- Seeks approval for Section 162(m) purposes only, and the plan administering committee consists entirely of independent directors, per ISS' Classification of Directors. Note that if the company is presenting the plan to shareholders for the first time for any reason (including after the company's initial public offering), or if the proposal is bundled with other material plan amendments, then the recommendation will be case-by-case (see below).

Vote against proposals to amend executive cash, stock, or cash and stock incentive plans if the proposal:

- Seeks approval for Section 162(m) purposes only, and the plan administering committee does not consist entirely of independent directors, per ISS' Classification of Directors.

Vote case-by-case on all other proposals to amend cash incentive plans. This includes plans presented to shareholders for the first time after the company's IPO and/or proposals that bundle material amendment(s) other than those for Section 162(m) purposes.

Vote case-by-case on all other proposals to amend equity incentive plans, considering the following:

- If the proposal requests additional shares and/or the amendments include a term extension or addition of full value awards as an award type, the recommendation will be based on the Equity Plan Scorecard evaluation as well as an analysis of the overall impact of the amendments.
- If the plan is being presented to shareholders for the first time (including after the company's IPO), whether or not additional shares are being requested, the recommendation will be based on the Equity Plan Scorecard evaluation as well as an analysis of the overall impact of any amendments.

▪ If there is no request for additional shares and the amendments do not include a term extension or addition of full value awards as an award type, then the recommendation will be based entirely on an analysis of the overall impact of the amendments, and the EPSC evaluation will be shown only for informational purposes.

In the first two case-by-case evaluation scenarios, the EPSC evaluation/score is the more heavily weighted consideration.

## Specific Treatment of Certain Award Types in Equity Plan Evaluations

### Dividend Equivalent Rights

Options that have Dividend Equivalent Rights (DERs) associated with them will have a higher calculated award value than those without DERs under the binomial model, based on the value of these dividend streams. The higher value will be applied to new shares, shares available under existing plans, and shares awarded but not exercised per the plan specifications. DERS transfer more shareholder equity to employees and non-employee directors and this cost should be captured.

### Operating Partnership (OP) Units in Equity Plan Analysis of Real Estate Investment Trusts (REITs)

For Real Estate Investment Trusts (REITS), include the common shares issuable upon conversion of outstanding Operating Partnership (OP) units in the share count for the purposes of determining: (1) market capitalization in the Shareholder Value Transfer (SVT) analysis and (2) shares outstanding in the burn rate analysis.

## Other Compensation Plans

### 401(k) Employee Benefit Plans

**General Recommendation:** Vote for proposals to implement a 401(k) savings plan for employees.

### Employee Stock Ownership Plans (ESOPs)

**General Recommendation:** Vote for proposals to implement an ESOP or increase authorized shares for existing ESOPs, unless the number of shares allocated to the ESOP is excessive (more than five percent of outstanding shares).

### Employee Stock Purchase Plans—Qualified Plans

**General Recommendation:** Vote case-by-case on qualified employee stock purchase plans. Vote for employee stock purchase plans where all of the following apply:

▪ Purchase price is at least 85 percent of fair market value;
▪ Offering period is 27 months or less; and
▪ The number of shares allocated to the plan is 10 percent or less of the outstanding shares.

Vote against qualified employee stock purchase plans where when the plan features do not meet all of the above criteria.

## Employee Stock Purchase Plans—Non-Qualified Plans

**General Recommendation:** Vote case-by-case on nonqualified employee stock purchase plans. Vote for nonqualified employee stock purchase plans with all the following features:

- Broad-based participation;
- Limits on employee contribution, which may be a fixed dollar amount or expressed as a percent of base salary;
- Company matching contribution up to 25 percent of employee's contribution, which is effectively a discount of 20 percent from market value; and
- No discount on the stock price on the date of purchase when there is a company matching contribution.

Vote against nonqualified employee stock purchase plans when the plan features do not meet all of the above criteria. If the matching contribution or effective discount exceeds the above, ISS may evaluate the SVT cost of the plan as part of the assessment.

## Option Exchange Programs/Repricing Options

**General Recommendation:** Vote case-by-case on management proposals seeking approval to exchange/reprice options taking into consideration:

- Historic trading patterns--the stock price should not be so volatile that the options are likely to be back "in-the-money" over the near term;
- Rationale for the re-pricing--was the stock price decline beyond management's control?;
- Is this a value-for-value exchange?;
- Are surrendered stock options added back to the plan reserve?;
- Timing--repricing should occur at least one year out from any precipitous drop in company's stock price;
- Option vesting--does the new option vest immediately or is there a black-out period?;
- Term of the option--the term should remain the same as that of the replaced option;
- Exercise price--should be set at fair market or a premium to market;
- Participants--executive officers and directors must be excluded.

If the surrendered options are added back to the equity plans for re-issuance, then also take into consideration the company's total cost of equity plans and its three-year average burn rate.

In addition to the above considerations, evaluate the intent, rationale, and timing of the repricing proposal. The proposal should clearly articulate why the board is choosing to conduct an exchange program at this point in time. Repricing underwater options after a recent precipitous drop in the company's stock price demonstrates poor timing and warrants additional scrutiny. Also, consider the terms of the surrendered options, such as the grant date, exercise price and vesting schedule. Grant dates of surrendered options should be far enough back (two to three years) so as not to suggest that repricings are being done to take advantage of short-term downward price movements. Similarly, the exercise price of surrendered options should be above the 52-week high for the stock price.

Vote for shareholder proposals to put option repricings to a shareholder vote.

## Stock Plans in Lieu of Cash

**General Recommendation:** Vote case-by-case on plans that provide participants with the option of taking all or a portion of their cash compensation in the form of stock.

Vote for non-employee director-only equity plans that provide a dollar-for-dollar cash-for-stock exchange.

Vote case-by-case on plans which do not provide a dollar-for-dollar cash for stock exchange. In cases where the exchange is not dollar-for-dollar, the request for new or additional shares for such equity program will be considered using the binomial option pricing model. In an effort to capture the total cost of total compensation, ISS will not make any adjustments to carve out the in-lieu-of cash compensation.

## Transfer Stock Option (TSO) Programs

**General Recommendation:** One-time Transfers: Vote against or withhold from compensation committee members if they fail to submit one-time transfers to shareholders for approval.

Vote case-by-case on one-time transfers. Vote for if:

- Executive officers and non-employee directors are excluded from participating;
- Stock options are purchased by third-party financial institutions at a discount to their fair value using option pricing models such as Black-Scholes or a Binomial Option Valuation or other appropriate financial models; and
- There is a two-year minimum holding period for sale proceeds (cash or stock) for all participants.

Additionally, management should provide a clear explanation of why options are being transferred to a third-party institution and whether the events leading up to a decline in stock price were beyond management's control. A review of the company's historic stock price volatility should indicate if the options are likely to be back "in-the-money" over the near term.

Ongoing TSO program: Vote against equity plan proposals if the details of ongoing TSO programs are not provided to shareholders. Since TSOs will be one of the award types under a stock plan, the ongoing TSO program, structure, and mechanics must be disclosed to shareholders. The specific criteria to be considered in evaluating these proposals include, but not limited, to the following:

- Eligibility;
- Vesting;
- Bid-price;
- Term of options;
- Cost of the program and impact of the TSOs on company's total option expense; and
- Option repricing policy.

Amendments to existing plans that allow for introduction of transferability of stock options should make clear that only options granted post-amendment shall be transferable.

## Director Compensation

### Shareholder Ratification of Director Pay Programs

**General Recommendation:** Vote case-by-case on management proposals seeking ratification of non-employee director compensation, based on the following factors:

- If the equity plan under which non-employee director grants are made is on the ballot, whether or not it warrants support; and
- An assessment of the following qualitative factors:
  - The relative magnitude of director compensation as compared to companies of a similar profile;
  - The presence of problematic pay practices relating to director compensation;
  - Director stock ownership guidelines and holding requirements;

- Equity award vesting schedules;
- The mix of cash and equity-based compensation;
- Meaningful limits on director compensation;
- The availability of retirement benefits or perquisites; and
- The quality of disclosure surrounding director compensation.

## Equity Plans for Non-Employee Directors

**General Recommendation:** Vote case-by-case on compensation plans for non-employee directors, based on:

- The total estimated cost of the company's equity plans relative to industry/market cap peers, measured by the company's estimated Shareholder Value Transfer (SVT) based on new shares requested plus shares remaining for future grants, plus outstanding unvested/unexercised grants;
- The company's three-year burn rate relative to its industry/market cap peers (in certain circumstances); and
- The presence of any egregious plan features (such as an option repricing provision or liberal CIC vesting risk).

On occasion, non-employee director stock plans will exceed the plan cost or burn-rate benchmarks when combined with employee or executive stock plans. In such cases, vote case-by-case on the plan taking into consideration the following qualitative factors:

- The relative magnitude of director compensation as compared to companies of a similar profile;
- The presence of problematic pay practices relating to director compensation;
- Director stock ownership guidelines and holding requirements;
- Equity award vesting schedules;
- The mix of cash and equity-based compensation;
- Meaningful limits on director compensation;
- The availability of retirement benefits or perquisites; and
- The quality of disclosure surrounding director compensation.

## Non-Employee Director Retirement Plans

**General Recommendation:** Vote against retirement plans for non-employee directors. Vote for shareholder proposals to eliminate retirement plans for non-employee directors.

## Shareholder Proposals on Compensation

## Bonus Banking/Bonus Banking "Plus"

**General Recommendation:** Vote case-by-case on proposals seeking deferral of a portion of annual bonus pay, with ultimate payout linked to sustained results for the performance metrics on which the bonus was earned (whether for the named executive officers or a wider group of employees), taking into account the following factors:

- The company's past practices regarding equity and cash compensation;
- Whether the company has a holding period or stock ownership requirements in place, such as a meaningful retention ratio (at least 50 percent for full tenure); and
- Whether the company has a rigorous claw-back policy in place.

## Compensation Consultants—Disclosure of Board or Company's Utilization

**General Recommendation:** Generally vote for shareholder proposals seeking disclosure regarding the company, board, or compensation committee's use of compensation consultants, such as company name, business relationship(s), and fees paid.

## Disclosure/Setting Levels or Types of Compensation for Executives and Directors

**General Recommendation:** Generally vote for shareholder proposals seeking additional disclosure of executive and director pay information, provided the information requested is relevant to shareholders' needs, would not put the company at a competitive disadvantage relative to its industry, and is not unduly burdensome to the company.

Generally vote against shareholder proposals seeking to set absolute levels on compensation or otherwise dictate the amount or form of compensation (such as types of compensation elements or specific metrics) to be used for executive or directors.

Generally vote against shareholder proposals that mandate a minimum amount of stock that directors must own in order to qualify as a director or to remain on the board.

Vote case-by-case on all other shareholder proposals regarding executive and director pay, taking into account relevant factors, including but not limited to: company performance, pay level and design versus peers, history of compensation concerns or pay-for-performance disconnect, and/or the scope and prescriptive nature of the proposal.

## Golden Coffins/Executive Death Benefits

**General Recommendation:** Generally vote for proposals calling for companies to adopt a policy of obtaining shareholder approval for any future agreements and corporate policies that could oblige the company to make payments or awards following the death of a senior executive in the form of unearned salary or bonuses, accelerated vesting or the continuation in force of unvested equity grants, perquisites and other payments or awards made in lieu of compensation. This would not apply to any benefit programs or equity plan proposals for which the broad-based employee population is eligible.

## Hold Equity Past Retirement or for a Significant Period of Time

**General Recommendation:** Vote case-by-case on shareholder proposals asking companies to adopt policies requiring senior executive officers to retain a portion of net shares acquired through compensation plans. The following factors will be taken into account:

- The percentage/ratio of net shares required to be retained;
- The time period required to retain the shares;
- Whether the company has equity retention, holding period, and/or stock ownership requirements in place and the robustness of such requirements;
- Whether the company has any other policies aimed at mitigating risk taking by executives;
- Executives' actual stock ownership and the degree to which it meets or exceeds the proponent's suggested holding period/retention ratio or the company's existing requirements; and
- Problematic pay practices, current and past, which may demonstrate a short-term versus long-term focus.

## Pay Disparity

**General Recommendation:** Vote case-by-case on proposals calling for an analysis of the pay disparity between corporate executives and other non-executive employees. The following factors will be considered:

- The company's current level of disclosure of its executive compensation setting process, including how the company considers pay disparity;
- If any problematic pay practices or pay-for-performance concerns have been identified at the company; and
- The level of shareholder support for the company's pay programs.

Generally vote against proposals calling for the company to use the pay disparity analysis or pay ratio in a specific way to set or limit executive pay.

## Pay for Performance/Performance-Based Awards

**General Recommendation:** Vote case-by-case on shareholder proposals requesting that a significant amount of future long-term incentive compensation awarded to senior executives shall be performance-based and requesting that the board adopt and disclose challenging performance metrics to shareholders, based on the following analytical steps:

- First, vote for shareholder proposals advocating the use of performance-based equity awards, such as performance contingent options or restricted stock, indexed options, or premium-priced options, unless the proposal is overly restrictive or if the company has demonstrated that it is using a "substantial" portion of performance-based awards for its top executives. Standard stock options and performance-accelerated awards do not meet the criteria to be considered as performance-based awards. Further, premium-priced options should have a meaningful premium to be considered performance-based awards.

- Second, assess the rigor of the company's performance-based equity program. If the bar set for the performance-based program is too low based on the company's historical or peer group comparison, generally vote for the proposal. Furthermore, if target performance results in an above target payout, vote for the shareholder proposal due to program's poor design. If the company does not disclose the performance metric of the performance-based equity program, vote for the shareholder proposal regardless of the outcome of the first step to the test.

In general, vote for the shareholder proposal if the company does not meet both of the above two steps.

## Pay for Superior Performance

**General Recommendation:** Vote case-by-case on shareholder proposals that request the board establish a pay-for-superior performance standard in the company's executive compensation plan for senior executives. These proposals generally include the following principles:

- Set compensation targets for the plan's annual and long-term incentive pay components at or below the peer group median;
- Deliver a majority of the plan's target long-term compensation through performance-vested, not simply time-vested, equity awards;
- Provide the strategic rationale and relative weightings of the financial and non-financial performance metrics or criteria used in the annual and performance-vested long-term incentive components of the plan;
- Establish performance targets for each plan financial metric relative to the performance of the company's peer companies;

- Limit payment under the annual and performance-vested long-term incentive components of the plan to when the company's performance on its selected financial performance metrics exceeds peer group median performance.

Consider the following factors in evaluating this proposal:

- What aspects of the company's annual and long-term equity incentive programs are performance driven?
- If the annual and long-term equity incentive programs are performance driven, are the performance criteria and hurdle rates disclosed to shareholders or are they benchmarked against a disclosed peer group?
- Can shareholders assess the correlation between pay and performance based on the current disclosure?
- What type of industry and stage of business cycle does the company belong to?

## Pre-Arranged Trading Plans (10b5-1 Plans)

**General Recommendation:** Generally vote for shareholder proposals calling for the addition of certain safeguards in prearranged trading plans (10b5-1 plans) for executives. Safeguards may include:

- Adoption, amendment, or termination of a 10b5-1 Plan must be disclosed in a Form 8-K;
- Amendment or early termination of a 10b5-1 Plan allowed only under extraordinary circumstances, as determined by the board;
- Request that a certain number of days that must elapse between adoption or amendment of a 10b5-1 Plan and initial trading under the plan;
- Reports on Form 4 must identify transactions made pursuant to a 10b5-1 Plan;
- An executive may not trade in company stock outside the 10b5-1 Plan;
- Trades under a 10b5-1 Plan must be handled by a broker who does not handle other securities transactions for the executive.

## Prohibit Outside CEOs from Serving on Compensation Committees

**General Recommendation:** Generally vote against proposals seeking a policy to prohibit any outside CEO from serving on a company's compensation committee, unless the company has demonstrated problematic pay practices that raise concerns about the performance and composition of the committee.

## Recoupment of Incentive or Stock Compensation in Specified Circumstances

**General Recommendation:** Vote case-by-case on proposals to recoup incentive cash or stock compensation made to senior executives if it is later determined that the figures upon which incentive compensation is earned turn out to have been in error, or if the senior executive has breached company policy or has engaged in misconduct that may be significantly detrimental to the company's financial position or reputation, or if the senior executive failed to manage or monitor risks that subsequently led to significant financial or reputational harm to the company. Many companies have adopted policies that permit recoupment in cases where an executive's fraud, misconduct, or negligence significantly contributed to a restatement of financial results that led to the awarding of unearned incentive compensation. However, such policies may be narrow given that not all misconduct or negligence may result in significant financial restatements. Misconduct, negligence, or lack of sufficient oversight by senior executives may lead to significant financial loss or reputational damage that may have long-lasting impact.

In considering whether to support such shareholder proposals, ISS will take into consideration the following factors:

- If the company has adopted a formal recoupment policy;

- The rigor of the recoupment policy focusing on how and under what circumstances the company may recoup incentive or stock compensation;
- Whether the company has chronic restatement history or material financial problems;
- Whether the company's policy substantially addresses the concerns raised by the proponent;
- Disclosure of recoupment of incentive or stock compensation from senior executives or lack thereof; or
- Any other relevant factors.

## Severance Agreements for Executives/Golden Parachutes

**General Recommendation:** Vote case-by-case on shareholder proposals requiring that executive severance (including change-in-control related) arrangements or payments be submitted for shareholder ratification.

Factors that will be considered include, but are not limited to:

- The company's severance or change-in-control agreements in place, and the presence of problematic features (such as excessive severance entitlements, single triggers, excise tax gross-ups, etc.);
- Any existing limits on cash severance payouts or policies which require shareholder ratification of severance payments exceeding a certain level;
- Any recent severance-related controversies; and
- Whether the proposal is overly prescriptive, such as requiring shareholder approval of severance that does not exceed market norms.

## Share Buyback Impact on Incentive Program Metrics

**General Recommendation:** Vote case-by-case on proposals requesting the company exclude the impact of share buybacks from the calculation of incentive program metrics, considering the following factors:

- The frequency and timing of the company's share buybacks;
- The use of per-share metrics in incentive plans;
- The effect of recent buybacks on incentive metric results and payouts; and
- Whether there is any indication of metric result manipulation.

## Supplemental Executive Retirement Plans (SERPs)

**General Recommendation:** Generally vote for shareholder proposals requesting to put extraordinary benefits contained in SERP agreements to a shareholder vote unless the company's executive pension plans do not contain excessive benefits beyond what is offered under employee-wide plans.

Generally vote for shareholder proposals requesting to limit the executive benefits provided under the company's supplemental executive retirement plan (SERP) by limiting covered compensation to a senior executive's annual salary or those pay elements covered for the general employee population.

## Tax Gross-Up Proposals

**General Recommendation:** Generally vote for proposals calling for companies to adopt a policy of not providing tax gross-up payments to executives, except in situations where gross-ups are provided pursuant to a plan, policy, or arrangement applicable to management employees of the company, such as a relocation or expatriate tax equalization policy.

Case 1:26-cv-00717-MPB-MKK    Document 26-3    Filed 04/21/26    Page 263 of 1112
PageID #: 429

## Termination of Employment Prior to Severance Payment/Eliminating Accelerated Vesting of Unvested Equity

**General Recommendation:** Vote case-by-case on shareholder proposals seeking a policy requiring termination of employment prior to severance payment and/or eliminating accelerated vesting of unvested equity.

The following factors will be considered:

- The company's current treatment of equity upon employment termination and/or in change-in-control situations (i.e., vesting is double triggered and/or pro rata, does it allow for the assumption of equity by acquiring company, the treatment of performance shares, etc.);
- Current employment agreements, including potential poor pay practices such as gross-ups embedded in those agreements.

Generally vote for proposals seeking a policy that prohibits automatic acceleration of the vesting of equity awards to senior executives upon a voluntary termination of employment or in the event of a change in control (except for pro rata vesting considering the time elapsed and attainment of any related performance goals between the award date and the change in control).

# 6. Routine/Miscellaneous

## Adjourn Meeting

**General Recommendation:** Generally vote against proposals to provide management with the authority to adjourn an annual or special meeting absent compelling reasons to support the proposal.

Vote for proposals that relate specifically to soliciting votes for a merger or transaction if supporting that merger or transaction. Vote against proposals if the wording is too vague or if the proposal includes "other business."

## Amend Quorum Requirements

**General Recommendation:** Vote case-by-case on proposals to reduce quorum requirements for shareholder meetings below a majority of the shares outstanding, taking into consideration:

- The new quorum threshold requested;
- The rationale presented for the reduction;
- The market capitalization of the company (size, inclusion in indices);
- The company's ownership structure;
- Previous voter turnout or attempts to achieve quorum;
- Any provisions or commitments to restore quorum to a majority of shares outstanding, should voter turnout improve sufficiently; and
- Other factors as appropriate.

In general, a quorum threshold kept as close to a majority of shares outstanding as is achievable is preferred.

Vote case-by-case on directors who unilaterally lower the quorum requirements below a majority of the shares outstanding, taking into consideration the factors listed above.

## Amend Minor Bylaws

**General Recommendation:** Vote for bylaw or charter changes that are of a housekeeping nature (updates or corrections).

## Change Company Name

**General Recommendation:** Vote for proposals to change the corporate name unless there is compelling evidence that the change would adversely impact shareholder value.

## Change Date, Time, or Location of Annual Meeting

**General Recommendation:** Vote for management proposals to change the date, time, or location of the annual meeting unless the proposed change is unreasonable.

Vote against shareholder proposals to change the date, time, or location of the annual meeting unless the current scheduling or location is unreasonable.

## Other Business

**General Recommendation:** Vote against proposals to approve other business when it appears as a voting item.

# 7.  Environmental and Social Issues

## Global Approach – E&S-related Proposals

Environmental and social proposals will be reviewed with a focus on how, and to what extent, the issues dealt with in such proposals will directly affect shareholder value, and with a presumption on environmental and social topics that the board's recommendations should generally prevail. In those circumstances where it is widely considered that greater disclosure will directly enhance or protect shareholder value and is reflective of a clearly established reporting standard in the market, the Global Board-Aligned Policy will generally recommend in support of such proposals (*e.g.* proposals requesting greater disclosure of a company's political contributions and/or trade association spending policies and activities). In the absence of a clear determination that environmental and social proposals will have a positive effect on shareholder value or there are proposals that seek information that exceeds a widely endorsed standard in the market or place any burden upon the company beyond a reasonable and clearly established reporting standard in the market, the Global Board-Aligned policy will generally recommend voting against such proposals, or in line with the board's recommendations if different.

## Say on Climate (SoC) Management Proposals

**General Recommendation:** Generally vote with the board's recommendation on management proposals that request shareholders to approve the company's climate transition action plan.[19]

## Say on Climate (SoC) Shareholder Proposals

**General Recommendation:** Generally vote against shareholder proposals that request the company to disclose a report providing its GHG emissions levels and reduction targets and/or its upcoming/approved climate transition action plan and provide shareholders the opportunity to express approval or disapproval of its GHG emissions reduction plan.

---

[19] Variations of this request also include climate transition related ambitions, or commitment to reporting on the implementation of a climate plan.

# 8. Mutual Fund Proxies

## Election of Directors

**General Recommendation:** Vote case-by-case on the election of directors and trustees, following the same guidelines for uncontested directors for public company shareholder meetings. However, mutual fund boards do not usually have compensation committees, so do not withhold for the lack of this committee.

## Closed End Funds- Unilateral Opt-In to Control Share Acquisition Statutes

**General Recommendation:** For closed-end management investment companies (CEFs), vote against or withhold from nominating/governance committee members (or other directors on a case-by-case basis) at CEFs that have not provided a compelling rationale for opting-in to a Control Share Acquisition statute, nor submitted a by-law amendment to a shareholder vote.

## Converting Closed-end Fund to Open-end Fund

**General Recommendation:** Vote case-by-case on conversion proposals, considering the following factors:

- Past performance as a closed-end fund;
- Market in which the fund invests;
- Measures taken by the board to address the discount; and
- Past shareholder activism, board activity, and votes on related proposals.

## Proxy Contests

**General Recommendation:** Vote case-by-case on proxy contests, considering the following factors:

- Past performance relative to its peers;
- Market in which the fund invests;
- Measures taken by the board to address the issues;
- Past shareholder activism, board activity, and votes on related proposals;
- Strategy of the incumbents versus the dissidents;
- Independence of directors;
- Experience and skills of director candidates;
- Governance profile of the company;
- Evidence of management entrenchment.

## Investment Advisory Agreements

**General Recommendation:** Vote case-by-case on investment advisory agreements, considering the following factors:

- Proposed and current fee schedules;
- Fund category/investment objective;
- Performance benchmarks;
- Share price performance as compared with peers;
- Resulting fees relative to peers;
- Assignments (where the advisor undergoes a change of control).

## Approving New Classes or Series of Shares

**General Recommendation:** Vote for the establishment of new classes or series of shares.

## Preferred Stock Proposals

**General Recommendation:** Vote case-by-case on the authorization for or increase in preferred shares, considering the following factors:

- Stated specific financing purpose;
- Possible dilution for common shares;
- Whether the shares can be used for antitakeover purposes.

## 1940 Act Policies

**General Recommendation:** Vote case-by-case on policies under the Investment Advisor Act of 1940, considering the following factors:

- Potential competitiveness;
- Regulatory developments;
- Current and potential returns; and
- Current and potential risk.

Generally vote for these amendments as long as the proposed changes do not fundamentally alter the investment focus of the fund and do comply with the current SEC interpretation.

## Changing a Fundamental Restriction to a Nonfundamental Restriction

**General Recommendation:** Vote case-by-case on proposals to change a fundamental restriction to a non-fundamental restriction, considering the following factors:

- The fund's target investments;
- The reasons given by the fund for the change; and
- The projected impact of the change on the portfolio.

## Change Fundamental Investment Objective to Nonfundamental

**General Recommendation:** Vote against proposals to change a fund's fundamental investment objective to non-fundamental.

## Name Change Proposals

**General Recommendation:** Vote case-by-case on name change proposals, considering the following factors:

- Political/economic changes in the target market;
- Consolidation in the target market; and
- Current asset composition.

## Change in Fund's Subclassification

**General Recommendation:** Vote case-by-case on changes in a fund's sub-classification, considering the following factors:

- Potential competitiveness;
- Current and potential returns;
- Risk of concentration;
- Consolidation in target industry.

## Business Development Companies—Authorization to Sell Shares of Common Stock at a Price below Net Asset Value

**General Recommendation:** Vote for proposals authorizing the board to issue shares below Net Asset Value (NAV) if:

- The proposal to allow share issuances below NAV has an expiration date no more than one year from the date shareholders approve the underlying proposal, as required under the Investment Company Act of 1940;
- The sale is deemed to be in the best interests of shareholders by (1) a majority of the company's independent directors and (2) a majority of the company's directors who have no financial interest in the issuance; and
- The company has demonstrated responsible past use of share issuances by either:
- Outperforming peers in its 8-digit GICS group as measured by one- and three-year median TSRs; or
- Providing disclosure that its past share issuances were priced at levels that resulted in only small or moderate discounts to NAV and economic dilution to existing non-participating shareholders.

## Disposition of Assets/Termination/Liquidation

**General Recommendation:** Vote case-by-case on proposals to dispose of assets, to terminate or liquidate, considering the following factors:

- Strategies employed to salvage the company;
- The fund's past performance;
- The terms of the liquidation.

## Changes to the Charter Document

**General Recommendation:** Vote case-by-case on changes to the charter document, considering the following factors:

- The degree of change implied by the proposal;
- The efficiencies that could result;
- The state of incorporation;
- Regulatory standards and implications.

Vote against any of the following changes:

- Removal of shareholder approval requirement to reorganize or terminate the trust or any of its series;
- Removal of shareholder approval requirement for amendments to the new declaration of trust;
- Removal of shareholder approval requirement to amend the fund's management contract, allowing the contract to be modified by the investment manager and the trust management, as permitted by the 1940 Act;

- Allow the trustees to impose other fees in addition to sales charges on investment in a fund, such as deferred sales charges and redemption fees that may be imposed upon redemption of a fund's shares;
- Removal of shareholder approval requirement to engage in and terminate subadvisory arrangements;
- Removal of shareholder approval requirement to change the domicile of the fund.

## Changing the Domicile of a Fund

**General Recommendation:** Vote case-by-case on re-incorporations, considering the following factors:

- Regulations of both states;
- Required fundamental policies of both states;
- The increased flexibility available.

## Authorizing the Board to Hire and Terminate Subadvisers Without Shareholder Approval

**General Recommendation:** Vote against proposals authorizing the board to hire or terminate subadvisers without shareholder approval if the investment adviser currently employs only one subadviser.

## Distribution Agreements

**General Recommendation:** Vote case-by-case on distribution agreement proposals, considering the following factors:

- Fees charged to comparably sized funds with similar objectives;
- The proposed distributor's reputation and past performance;
- The competitiveness of the fund in the industry;
- The terms of the agreement.

## Master-Feeder Structure

**General Recommendation:** Vote for the establishment of a master-feeder structure.

## Mergers

**General Recommendation:** Vote case-by-case on merger proposals, considering the following factors:

- Resulting fee structure;
- Performance of both funds;
- Continuity of management personnel;
- Changes in corporate governance and their impact on shareholder rights.

## Shareholder Proposals for Mutual Funds

## Establish Director Ownership Requirement

**General Recommendation:** Generally vote against shareholder proposals that mandate a specific minimum amount of stock that directors must own in order to qualify as a director or to remain on the board.

Case 1:26-cv-00717-MPB-MKK    Document 26-3    Filed 04/21/26    Page 270 of 1112
PageID #: 436

## Reimburse Shareholder for Expenses Incurred

**General Recommendation:** Vote case-by-case on shareholder proposals to reimburse proxy solicitation expenses. When supporting the dissidents, vote for the reimbursement of the proxy solicitation expenses.

## Terminate the Investment Advisor

**General Recommendation:** Vote case-by-case on proposals to terminate the investment advisor, considering the following factors:

- Performance of the fund's Net Asset Value (NAV);
- The fund's history of shareholder relations;
- The performance of other funds under the advisor's management.

# We empower investors and companies to build for long-term and sustainable growth by providing high-quality data, analytics, and insight.

**GET STARTED WITH ISS SOLUTIONS**

Email sales@issgovernance.com or visit www.issgovernance.com for more information.

---

Founded in 1985, Institutional Shareholder Services group of companies (ISS) empowers investors and companies to build for long-term and sustainable growth by providing high-quality data, analytics and insight. ISS, which is majority owned by Deutsche Bourse Group, along with Genstar Capital and ISS management, is a leading provider of corporate governance and responsible investment solutions, market intelligence, fund services, and events and editorial content for institutional investors and corporations, globally. ISS' 2,600 employees operate worldwide across 29 global locations in 15 countries. Its approximately 3,400 clients include many of the world's leading institutional investors who rely on ISS' objective and impartial offerings, as well as public companies focused on ESG and governance risk mitigation as a shareholder value enhancing measure. Clients rely on ISS' expertise to help them make informed investment decisions. This document and all of the information contained in it, including without limitation all text, data, graphs, and charts (collectively, the "Information") is the property of Institutional Shareholder Services Inc. (ISS), its subsidiaries, or, in some cases third party suppliers.

The Information has not been submitted to, nor received approval from, the United States Securities and Exchange Commission or any other regulatory body. None of the Information constitutes an offer to sell (or a solicitation of an offer to buy), or a promotion or recommendation of, any security, financial product or other investment vehicle or any trading strategy, and ISS does not endorse, approve, or otherwise express any opinion regarding any issuer, securities, financial products or instruments or trading strategies.

The user of the Information assumes the entire risk of any use it may make or permit to be made of the Information.

ISS MAKES NO EXPRESS OR IMPLIED WARRANTIES OR REPRESENTATIONS WITH RESPECT TO THE INFORMATION AND EXPRESSLY DISCLAIMS ALL IMPLIED WARRANTIES (INCLUDING, WITHOUT LIMITATION, ANY IMPLIED WARRANTIES OF ORIGINALITY, ACCURACY, TIMELINESS, NON-INFRINGEMENT, COMPLETENESS, MERCHANTABILITY, AND FITNESS for A PARTICULAR PURPOSE) WITH RESPECT TO ANY OF THE INFORMATION.

Without limiting any of the foregoing and to the maximum extent permitted by law, in no event shall ISS have any liability regarding any of the Information for any direct, indirect, special, punitive, consequential (including lost profits), or any other damages even if notified of the possibility of such damages. The foregoing shall not exclude or limit any liability that may not by applicable law be excluded or limited.

© 2026 | Institutional Shareholder Services and/or its affiliates

# Foster Declaration Exhibit 4



# UNITED STATES

## Proxy Voting Guidelines
## Benchmark Policy Recommendations

Effective for Meetings on or after February 1, 2026
Published December 9, 2025

Effective for Meetings Published on or after February 25, 2025, Consideration of Certain Diversity Factors in Making Vote Recommendations Is Suspended (see pp. 12-13 for more information).

WWW.ISSGOVERNANCE.COM

# TABLE OF CONTENTS

Coverage ...........................................................................................................................8

1. Board of Directors .....................................................................................................9

Voting on Director Nominees in Uncontested Elections ...........................................................9

Independence ........................................................................................................................9

ISS Classification of Directors – U.S. ...................................................................................10

Composition...........................................................................................................................12

Attendance .........................................................................................................................12

Overboarded Directors .......................................................................................................12

Gender Diversity .................................................................................................................12

Racial and/or Ethnic Diversity...........................................................................................13

Responsiveness.....................................................................................................................13

Accountability .......................................................................................................................14

Poison Pills..........................................................................................................................14

Unequal Voting Rights ........................................................................................................14

Classified Board Structure ..................................................................................................15

Removal of Shareholder Discretion on Classified Boards..................................................15

Problematic Governance Structure ....................................................................................15

Unilateral Bylaw/Charter Amendments .............................................................................15

Restricting Binding Shareholder Proposals.........................................................................16

Director Performance Evaluation .......................................................................................16

Management Proposals to Ratify Existing Charter or Bylaw Provisions.............................16

Problematic Audit-Related Practices ..................................................................................17

Problematic Compensation Practices .................................................................................17

Problematic Pledging of Company Stock ............................................................................17

Climate Accountability........................................................................................................18

Governance Failures ...........................................................................................................18

Voting on Director Nominees in Contested Elections ............................................................18

Vote-No Campaigns ..............................................................................................................18

Proxy Contests/Proxy Access...............................................................................................19

Other Board-Related Proposals ...............................................................................................19

Adopt Anti-Hedging/Pledging/Speculative Investments Policy............................................19

Board Refreshment................................................................................................................19

Term/Tenure Limits ............................................................................................................19

Age Limits ...........................................................................................................................20

Board Size .............................................................................................................................20

Classification/Declassification of the Board .........................................................................20

CEO Succession Planning ......................................................................................................20

Cumulative Voting ................................................................................................................20

Director and Officer Indemnification, Liability Protection, and Exculpation .......................21

Establish/Amend Nominee Qualifications ............................................................................21

Establish Other Board Committee Proposals ........................................................................22

Filling Vacancies/Removal of Directors ................................................................................22

Independent Board Chair ......................................................................................................22

Majority of Independent Directors/Establishment of Independent Committees .................23

Majority Vote Standard for the Election of Directors...........................................................23

Proxy Access .................................................................................................................................23

Require More Nominees than Open Seats ...................................................................................24

Shareholder Engagement Policy (Shareholder Advisory Committee) .........................................24

### 2. Audit-Related.................................................................................................. 25

Auditor Indemnification and Limitation of Liability ...................................................................25

Auditor Ratification.....................................................................................................................25

Shareholder Proposals Limiting Non-Audit Services ..................................................................25

Shareholder Proposals on Audit Firm Rotation ..........................................................................26

### 3. Shareholder Rights & Defenses ..................................................................... 27

Advance Notice Requirements for Shareholder Proposals/Nominations ...................................27

Amend Bylaws without Shareholder Consent .............................................................................27

Control Share Acquisition Provisions..........................................................................................27

Control Share Cash-Out Provisions .............................................................................................28

Disgorgement Provisions ............................................................................................................28

Fair Price Provisions....................................................................................................................28

Freeze-Out Provisions.................................................................................................................28

Greenmail ...................................................................................................................................28

Shareholder Litigation Rights......................................................................................................29

    Federal Forum Selection Provisions .....................................................................................29
    Exclusive Forum Provisions for State Law Matters...............................................................29
    Fee shifting ............................................................................................................................29

Net Operating Loss (NOL) Protective Amendments ...................................................................30

Poison Pills (Shareholder Rights Plans)........................................................................................30

Shareholder Proposals to Put Pill to a Vote and/or Adopt a Pill Policy ......................................30

Management Proposals to Ratify a Poison Pill ...........................................................................31

Management Proposals to Ratify a Pill to Preserve Net Operating Losses (NOLs).......................31

Proxy Voting Disclosure, Confidentiality, and Tabulation .........................................................31

Ratification Proposals: Management Proposals to Ratify Existing Charter or Bylaw Provisions .......................32

Reimbursing Proxy Solicitation Expenses ..................................................................................32

Reincorporation Proposals .........................................................................................................33

Shareholder Ability to Act by Written Consent ..........................................................................33

Shareholder Ability to Call Special Meetings .............................................................................33

Stakeholder Provisions ...............................................................................................................34

State Antitakeover Statutes.........................................................................................................34

Supermajority Vote Requirements .............................................................................................34

Virtual Shareholder Meetings.....................................................................................................34

### 4. Capital/Restructuring ..................................................................................... 35

Capital..........................................................................................................................................35

Adjustments to Par Value of Common Stock..............................................................................35

Common Stock Authorization.....................................................................................................35

    General Authorization Requests...........................................................................................35
    Specific Authorization Requests ...........................................................................................36

Dual Class Structure....................................................................................................................36

Issue Stock for Use with Rights Plan ..........................................................................................36

Preemptive Rights ........................................................................................................................ 36

Preferred Stock Authorization ..................................................................................................... 37

   General Authorization Requests .............................................................................................. 37

Recapitalization Plans .................................................................................................................. 38

Reverse Stock Splits ..................................................................................................................... 38

Share Issuance Mandates at U.S. Domestic Issuers Incorporated Outside the U.S. ................... 38

Share Repurchase Programs ........................................................................................................ 39

Share Repurchase Programs Shareholder Proposals ................................................................... 39

Stock Distributions: Splits and Dividends .................................................................................... 39

Tracking Stock ............................................................................................................................. 40

Restructuring .................................................................................................................................. 40

Appraisal Rights .......................................................................................................................... 40

Asset Purchases .......................................................................................................................... 40

Asset Sales .................................................................................................................................. 40

Bundled Proposals ...................................................................................................................... 41

Conversion of Securities ............................................................................................................. 41

Corporate Reorganization/Debt Restructuring/Prepackaged Bankruptcy Plans/Reverse Leveraged Buyouts/Wrap Plans .................................................................................................. 41

Formation of Holding Company ................................................................................................... 41

Going Private and Going Dark Transactions (LBOs and Minority Squeeze-outs) ........................ 42

Joint Ventures ............................................................................................................................. 42

Liquidations ................................................................................................................................ 43

Mergers and Acquisitions ........................................................................................................... 43

Private Placements/Warrants/Convertible Debentures .............................................................. 43

Reorganization/Restructuring Plan (Bankruptcy) ....................................................................... 45

Special Purpose Acquisition Corporations (SPACs) ..................................................................... 45

Special Purpose Acquisition Corporations (SPACs) - Proposals for Extensions ........................... 45

Spin-offs ..................................................................................................................................... 46

Value Maximization Shareholder Proposals ................................................................................ 46

**5.   Compensation .......................................................................................................... 47**

Executive Pay Evaluation ................................................................................................................ 47

Advisory Votes on Executive Compensation—Management Proposals (Say-on-Pay) .................. 47

   Pay-for-Performance Evaluation ............................................................................................ 48

   Problematic Pay Practices ...................................................................................................... 48

   Compensation Committee Communications and Responsiveness ........................................... 49

Frequency of Advisory Vote on Executive Compensation ("Say When on Pay") .......................... 50

Voting on Golden Parachutes in an Acquisition, Merger, Consolidation, or Proposed Sale ......... 50

Equity-Based and Other Incentive Plans ...................................................................................... 50

   Shareholder Value Transfer (SVT) .......................................................................................... 51

   Three-Year Value-Adjusted Burn Rate .................................................................................... 52

Egregious Factors ........................................................................................................................ 52

   Liberal Change in Control Definition ....................................................................................... 52

   Repricing Provisions ............................................................................................................... 52

   Problematic Pay Practices or Significant Pay-for-Performance Disconnect .............................. 53

Amending Cash and Equity Plans (including Approval for Tax Deductibility (162(m)) ................. 53

Specific Treatment of Certain Award Types in Equity Plan Evaluations ............................................................ 54
    Dividend Equivalent Rights ..................................................................................... 54
    Operating Partnership (OP) Units in Equity Plan Analysis of Real Estate Investment Trusts (REITs) ............ 54
Other Compensation Plans ................................................................................................. 54
    401(k) Employee Benefit Plans ............................................................................... 54
    Employee Stock Ownership Plans (ESOPs) ............................................................. 54
    Employee Stock Purchase Plans—Qualified Plans ................................................. 55
    Employee Stock Purchase Plans—Non-Qualified Plans ......................................... 55
    Option Exchange Programs/Repricing Options ..................................................... 55
    Stock Plans in Lieu of Cash ..................................................................................... 56
    Transfer Stock Option (TSO) Programs .................................................................. 56

Director Compensation ...................................................................................................... 57
    Shareholder Ratification of Director Pay Programs ............................................... 57
    Equity Plans for Non-Employee Directors ............................................................. 57
    Non-Employee Director Retirement Plans ............................................................. 58

Shareholder Proposals on Compensation ........................................................................... 58
    Bonus Banking/Bonus Banking "Plus" .................................................................. 58
    Compensation Consultants—Disclosure of Board or Company's Utilization ......... 58
    Disclosure/Setting Levels or Types of Compensation for Executives and Directors ......................................... 58
    Golden Coffins/Executive Death Benefits .............................................................. 59
    Hold Equity Past Retirement or for a Significant Period of Time ........................... 59
    Pay Disparity ......................................................................................................... 59
    Pay for Performance/Performance-Based Awards ................................................ 60
    Pay for Superior Performance ............................................................................... 60
    Pre-Arranged Trading Plans (10b5-1 Plans) .......................................................... 61
    Prohibit Outside CEOs from Serving on Compensation Committees ...................... 61
    Recoupment of Incentive or Stock Compensation in Specified Circumstances ...... 61
    Severance and Golden Parachute Agreements ...................................................... 61
    Share Buyback Impact on Incentive Program Metrics ........................................... 62
    Supplemental Executive Retirement Plans (SERPs) ............................................... 62
    Tax Gross-Up Proposals ........................................................................................ 62
    Termination of Employment Prior to Severance Payment/Eliminating Accelerated Vesting of Unvested Equity
    ................................................................................................................................ 62

6. **Routine/Miscellaneous** .................................................................................. 64
    Adjourn Meeting .................................................................................................... 64
    Amend Quorum Requirements .............................................................................. 64
    Amend Minor Bylaws ............................................................................................ 64
    Change Company Name ......................................................................................... 64
    Change Date, Time, or Location of Annual Meeting ............................................... 65
    Other Business ...................................................................................................... 65

7. **Social and Environmental Issues** ..................................................................... 66
Global Approach – E&S Shareholder Proposals ................................................................... 66
Endorsement of Principles .................................................................................................. 66
Animal Welfare ................................................................................................................... 67

Animal Welfare Policies ........................................................................................................................67

Animal Testing ....................................................................................................................................67

Animal Slaughter ................................................................................................................................67

Consumer Issues ....................................................................................................................................67

Genetically Modified Ingredients .......................................................................................................67

Reports on Potentially Controversial Business/Financial Practices .....................................................68

Pharmaceutical Pricing, Access to Medicines, and Prescription Drug Reimportation.........................68

Product Safety and Toxic/Hazardous Materials ..................................................................................69

Tobacco-Related Proposals .................................................................................................................69

Climate Change .......................................................................................................................................70

Say on Climate (SoC) Management Proposals .....................................................................................70

Say on Climate (SoC) Shareholder Proposals ......................................................................................70

Climate Change/Greenhouse Gas (GHG) Emissions ............................................................................70

Energy Efficiency.................................................................................................................................71

Renewable Energy ..............................................................................................................................71

Diversity .................................................................................................................................................72

Board Diversity ...................................................................................................................................72

Equality of Opportunity ......................................................................................................................72

Gender Identity, Sexual Orientation, and Domestic Partner Benefits.................................................73

Gender, Race/Ethnicity Pay Gap ........................................................................................................73

Racial Equity and/or Civil Rights Audit Guidelines..............................................................................73

Environment and Sustainability..............................................................................................................73

Facility and Workplace Safety.............................................................................................................73

Natural Capital- Related and/or Community Impact Assessment Proposals ........................................74

Hydraulic Fracturing ...........................................................................................................................74

Operations in Protected Areas ...........................................................................................................74

Recycling ............................................................................................................................................75

Sustainability Reporting......................................................................................................................75

Water Issues .......................................................................................................................................75

General Corporate Issues ........................................................................................................................75

Charitable Contributions ....................................................................................................................75

Data Security, Privacy, and Internet Issues ........................................................................................76

ESG Compensation-Related Proposals ................................................................................................76

Human Rights, Human Capital Management, and International Operations............................................76

Human Rights Proposals .....................................................................................................................76

Mandatory Arbitration .......................................................................................................................77

Operations in High-Risk Markets ........................................................................................................77

Outsourcing/Offshoring......................................................................................................................78

Sexual Harassment .............................................................................................................................78

Weapons and Military Sales ...............................................................................................................78

Political Activities...................................................................................................................................78

Lobbying ............................................................................................................................................78

Political Contributions ........................................................................................................................79

Political Expenditures and Lobbying Congruency ..........................................................................................79

Political Ties ...................................................................................................................................................80

**8.  Mutual Fund Proxies ...................................................................................... 81**

Election of Directors .....................................................................................................................................81

Closed End Funds- Unilateral Opt-In to Control Share Acquisition Statutes ................................................81

Converting Closed-end Fund to Open-end Fund ...........................................................................................81

Proxy Contests ..............................................................................................................................................81

Investment Advisory Agreements ................................................................................................................82

Approving New Classes or Series of Shares ..................................................................................................82

Preferred Stock Proposals ............................................................................................................................82

1940 Act Policies............................................................................................................................................82

Changing a Fundamental Restriction to a Nonfundamental Restriction .......................................................82

Change Fundamental Investment Objective to Nonfundamental..................................................................83

Name Change Proposals ................................................................................................................................83

Change in Fund's Subclassification ...............................................................................................................83

Business Development Companies—Authorization to Sell Shares of Common Stock at a Price below Net Asset
Value ..............................................................................................................................................................83

Disposition of Assets/Termination/Liquidation ...........................................................................................84

Changes to the Charter Document ................................................................................................................84

Changing the Domicile of a Fund ..................................................................................................................84

Authorizing the Board to Hire and Terminate Subadvisers Without Shareholder Approval ..........................84

Distribution Agreements ...............................................................................................................................85

Master-Feeder Structure ..............................................................................................................................85

Mergers .........................................................................................................................................................85

Shareholder Proposals for Mutual Funds ..........................................................................................................85

Establish Director Ownership Requirement ..................................................................................................85

Reimburse Shareholder for Expenses Incurred ............................................................................................85

Terminate the Investment Advisor ...............................................................................................................86

# Coverage

The U.S. research team provides proxy analyses and voting recommendations for the common shareholder meetings of U.S. - incorporated companies that are publicly-traded on U.S. exchanges, as well as certain OTC companies, if they are held in our institutional investor clients' portfolios. Coverage generally includes corporate actions for common equity holders, such as written consents and bankruptcies. ISS' U.S. coverage includes investment companies (including open-end funds, closed-end funds, exchange-traded funds, and unit investment trusts), limited partnerships ("LPs"), master limited partnerships ("MLPs"), limited liability companies ("LLCs"), and business development companies. ISS reviews its universe of coverage on an annual basis, and the coverage is subject to change based on client need and industry trends.

**Foreign-incorporated companies**

In addition to U.S.- incorporated, U.S.- listed companies, ISS' U.S. policies are applied to certain foreign-incorporated company analyses. Like the SEC, ISS distinguishes two types of companies that list but are not incorporated in the U.S.:

- U.S. Domestic Issuers – which have a majority of outstanding shares held in the U.S. and meet other criteria, as determined by the SEC, and are subject to the same disclosure and listing standards as U.S. incorporated companies (e.g. they are required to file DEF14A proxy statements) – are generally covered under standard U.S. policy guidelines.
- Foreign Private Issuers (FPIs) – which are allowed to take exemptions from most disclosure requirements (e.g., they are allowed to file 6-K for their proxy materials) and U.S. listing standards – are generally covered under a combination of policy guidelines:
  - FPI Guidelines (see the Americas Regional Proxy Voting Guidelines), may apply to companies incorporated in governance havens, and apply certain minimum independence and disclosure standards in the evaluation of key proxy ballot items, such as the election of directors; and/or
  - Guidelines for the market that is responsible for, or most relevant to, the item on the ballot.

U.S. incorporated companies listed only on non-U.S. exchanges are generally covered under the ISS guidelines for the market on which they are traded.

An FPI is generally covered under ISS' approach to FPIs outlined above, even if such FPI voluntarily files a proxy statement and/or other filing normally required of a U.S. Domestic Issuer, so long as the company retains its FPI status.

In all cases – including with respect to other companies with cross-market features that may lead to ballot items related to multiple markets – items that are on the ballot solely due to the requirements of another market (listing, incorporation, or national code) may be evaluated under the policy of the relevant market, regardless of the "assigned" primary market coverage.

# 1. Board of Directors

## Voting on Director Nominees in Uncontested Elections

Four fundamental principles apply when determining votes on director nominees:

**Independence**: Boards should be sufficiently independent from management (and significant shareholders) to ensure that they are able and motivated to effectively supervise management's performance for the benefit of all shareholders, including in setting and monitoring the execution of corporate strategy, with appropriate use of shareholder capital, and in setting and monitoring executive compensation programs that support that strategy. The chair of the board should ideally be an independent director, and all boards should have an independent leadership position or a similar role in order to help provide appropriate counterbalance to executive management, as well as having sufficiently independent committees that focus on key governance concerns such as audit, compensation, and nomination of directors.

**Composition**: Companies should ensure that directors add value to the board through their specific skills and expertise and by having sufficient time and commitment to serve effectively. Boards should be of a size appropriate to accommodate diversity, expertise, and independence, while ensuring active and collaborative participation by all members. Boards should be sufficiently diverse to ensure consideration of a wide range of perspectives.

**Responsiveness**: Directors should respond to investor input, such as that expressed through significant opposition to management proposals, significant support for shareholder proposals (whether binding or non-binding), and tender offers where a majority of shares are tendered.

**Accountability**: Boards should be sufficiently accountable to shareholders, including through transparency of the company's governance practices and regular board elections, by the provision of sufficient information for shareholders to be able to assess directors and board composition, and through the ability of shareholders to remove directors.

**General Recommendation:** Generally vote for director nominees, except under the following circumstances (with new nominees[1] considered on case-by-case basis):

## Independence

Vote against[2] or withhold from non-independent directors (Executive Directors and Non-Independent Non-Executive Directors per ISS' Classification of Directors) when:

- Independent directors comprise 50 percent or less of the board;
- The non-independent director serves on the audit, compensation, or nominating committee;
- The company lacks an audit, compensation, or nominating committee so that the full board functions as that committee; or
- The company lacks a formal nominating committee, even if the board attests that the independent directors fulfill the functions of such a committee.

---

[1] A "new nominee" is a director who is being presented for election by shareholders for the first time. Recommendations on new nominees who have served for less than one year are made on a case-by-case basis depending on the timing of their appointment and the problematic governance issue in question.

[2] In general, companies with a plurality vote standard use "Withhold" as the contrary vote option in director elections; companies with a majority vote standard use "Against". However, it will vary by company and the proxy must be checked to determine the valid contrary vote option for the particular company.

## ISS Classification of Directors – U.S.

1. **Executive Director**
   1.1. Current officer[1] of the company or one of its affiliates[2].

2. **Non-Independent Non-Executive Director**
   Board Identification
   2.1. Director identified as not independent by the board.
   Controlling/Significant Shareholder
   2.2. Beneficial owner of more than 50 percent of the company's voting power (this may be aggregated if voting power is distributed among more than one member of a group).
   Current Employment at Company or Related Company
   2.3. Non-officer employee of the firm (including employee representatives).
   2.4. Officer[1], former officer, or general or limited partner of a joint venture or partnership with the company.
   Former Employment
   2.5. Former CEO of the company. [3, 4]
   2.6. Former non-CEO officer[1] of the company or an affiliate[2] within the past five years.
   2.7. Former officer[1] of an acquired company within the past five years.[4]
   2.8. Officer[1] of a former parent or predecessor firm at the time the company was sold or split off within the past five years.
   2.9. Former interim officer if the service was longer than 18 months. If the service was between 12 and 18 months an assessment of the interim officer's employment agreement will be made.[5]
   Family Members
   2.10. Immediate family member[6] of a current or former officer[1] of the company or its affiliates[2] within the last five years.
   2.11. Immediate family member[6] of a current employee of company or its affiliates[2] where additional factors raise concern (which may include, but are not limited to, the following: a director related to numerous employees; the company or its affiliates employ relatives of numerous board members; or a non-Section 16 officer in a key strategic role).
   Professional, Transactional, and Charitable Relationships
   2.12. Director who (or whose immediate family member[6]) currently provides professional services[7] in excess of $10,000 per year to: the company, an affiliate[2], or an individual officer of the company or an affiliate; or who is (or whose immediate family member[6] is) a partner, employee, or controlling shareholder of an organization which provides the services.
   2.13. Director who (or whose immediate family member[6]) currently has any material transactional relationship[8] with the company or its affiliates[2]; or who is (or whose immediate family member[6] is) a partner in, or a controlling shareholder or an executive officer of, an organization which has the material transactional relationship[8] (excluding investments in the company through a private placement).
   2.14. Director who (or whose immediate family member[6]) is a trustee, director, or employee of a charitable or non-profit organization that receives material grants or endowments[8] from the company or its affiliates[2].
   Other Relationships
   2.15. Party to a voting agreement[9] to vote in line with management on proposals being brought to shareholder vote.
   2.16. Has (or an immediate family member[6] has) an interlocking relationship as defined by the SEC involving members of the board of directors or its Compensation Committee.[10]
   2.17. Founder[11] of the company but not currently an employee.
   2.18. Director with pay comparable to Named Executive Officers.
   2.19. Any material[12] relationship with the company.

3. **Independent Director**
   3.1. No material[12] connection to the company other than a board seat.

**Footnotes:**

*1.* The definition of officer will generally follow that of a "Section 16 officer" (officers subject to Section 16 of the Securities and Exchange Act of 1934) and includes the chief executive, operating, financial, legal, technology, and accounting officers of a company (including the president, treasurer, secretary, controller, or any vice president in charge of a principal business unit, division, or policy function). Current interim officers are included in this category. For private companies, the equivalent positions are applicable. A non-employee director serving as an officer due to statutory requirements (e.g. corporate secretary) will generally be classified as a Non-Independent Non-Executive Director under "Any material relationship with the company." However, if the company provides explicit disclosure that the director is not receiving additional compensation exceeding $10,000 per year for serving in that capacity, then the director will be classified as an Independent Director.

*2.* "Affiliate" includes a subsidiary, sibling company, or parent company. ISS uses 50 percent control ownership by the parent company as the standard for applying its affiliate designation. The manager/advisor of an externally managed issuer (EMI) is considered an affiliate.

*3.* Includes any former CEO of the company prior to the company's initial public offering (IPO).

*4.* When there is a former CEO of a special purpose acquisition company (SPAC) serving on the board of an acquired company, ISS will generally classify such directors as independent unless determined otherwise taking into account the following factors: the applicable listing standards determination of such director's independence; any operating ties to the firm; and the existence of any other conflicting relationships or related party transactions.

*5.* ISS will look at the terms of the interim officer's employment contract to determine if it contains severance pay, long-term health and pension benefits, or other such standard provisions typically contained in contracts of permanent, non-temporary CEOs. ISS will also consider if a formal search process was under way for a full-time officer at the time.

*6.* "Immediate family member" follows the SEC's definition of such and covers spouses, parents, children, step-parents, step-children, siblings, in-laws, and any person (other than a tenant or employee) sharing the household of any director, nominee for director, executive officer, or significant shareholder of the company.

*7.* Professional services can be characterized as advisory in nature, generally involve access to sensitive company information or to strategic decision-making, and typically have a commission- or fee-based payment structure. Professional services generally include but are not limited to the following: investment banking/financial advisory services, commercial banking (beyond deposit services), investment services, insurance services, accounting/audit services, consulting services, marketing services, legal services, property management services, realtor services, lobbying services, executive search services, and IT consulting services. The following would generally be considered transactional relationships and not professional services: deposit services, IT tech support services, educational services, and construction services. The case of participation in a banking syndicate by a non-lead bank should be considered a transactional (and hence subject to the associated materiality test) rather than a professional relationship. "Of Counsel" relationships are only considered immaterial if the individual does not receive any form of compensation (in excess of $10,000 per year) from, or is a retired partner of, the firm providing the professional service. The case of a company providing a professional service to one of its directors or to an entity with which one of its directors is affiliated, will be considered a transactional rather than a professional relationship. Insurance services and marketing services are assumed to be professional services unless the company explains why such services are not advisory.

*8.* A material transactional relationship, including grants to non-profit organizations, exists if the company makes annual payments to, or receives annual payments from, another entity, exceeding the greater of: $200,000 or 5 percent of the recipient's gross revenues, for a company that follows NASDAQ listing standards; or the greater of $1,000,000 or 2 percent of the recipient's gross revenues, for a company that follows NYSE listing standards. For a company that follows neither of the preceding standards, ISS will apply the NASDAQ-based materiality test. (The recipient is the party receiving the financial proceeds from the transaction).

*9.* Dissident directors who are parties to a voting agreement pursuant to a settlement or similar arrangement may be classified as Independent Directors if an analysis of the following factors indicates that the voting agreement does not compromise their alignment with all shareholders' interests: the terms of the agreement; the duration of the standstill provision in the agreement; the limitations and requirements of actions that are agreed upon; if the dissident director nominee(s) is subject to the standstill; and if there any conflicting relationships or related party transactions.

*10.* Interlocks include: executive officers serving as directors on each other's compensation or similar committees (or, in the absence of such a committee, on the board); or executive officers sitting on each other's boards and at least one serves on the other's compensation or similar committees (or, in the absence of such a committee, on the board).

*11.* The operating involvement of the founder with the company will be considered; if the founder was never employed by the company, ISS may deem him or her an Independent Director.

> 12. For purposes of ISS's director independence classification, "material" will be defined as a standard of relationship (financial, personal, or otherwise) that a reasonable person might conclude could potentially influence one's objectivity in the boardroom in a manner that would have a meaningful impact on an individual's ability to satisfy requisite fiduciary standards on behalf of shareholders.

## Composition

**Attendance at Board and Committee Meetings:** Generally vote against or withhold from directors (except nominees who served only part of the fiscal year[3]) who attend less than 75 percent of the aggregate of their board and committee meetings for the period for which they served, unless an acceptable reason for absences is disclosed in the proxy or another SEC filing. Acceptable reasons for director absences are generally limited to the following:

- Medical issues/illness;
- Family emergencies; and
- Missing only one meeting (when the total of all meetings is three or fewer).

In cases of chronic poor attendance without reasonable justification, in addition to voting against the director(s) with poor attendance, generally vote against or withhold from appropriate members of the nominating/governance committees or the full board.

If the proxy disclosure is unclear and insufficient to determine whether a director attended at least 75 percent of the aggregate of his/her board and committee meetings during his/her period of service, vote against or withhold from the director(s) in question.

**Overboarded Directors:** Generally vote against or withhold from individual directors who:

- Sit on more than five public company boards; or
- Are CEOs of public companies who sit on the boards of more than two public companies besides their own—withhold only at their outside boards[4].

*NOTE: For shareholder meeting reports published on or after February 25th, 2025, Institutional Shareholder Services (ISS) has indefinitely halted the consideration of the gender diversity of a company's board when making vote recommendations with respect to the election or re-election of directors at U.S. companies covered by these guidelines under its proprietary ISS U.S. Benchmark policy.*

**Gender Diversity:** Generally vote against or withhold from the chair of the nominating committee (or other directors on a case-by-case basis) at companies where there are no women on the company's board. An exception will be made if there was at least one woman on the board at the preceding annual meeting and the board makes a firm commitment to return to a gender-diverse status within a year.

*NOTE: For shareholder meeting reports published on or after February 25th, 2025, Institutional Shareholder Services (ISS) has indefinitely halted the consideration of the racial and/or ethnic diversity of a company's board*

---

[3] Nominees who served for only part of the fiscal year are generally exempted from the attendance policy.

[4] Although all of a CEO's subsidiary boards with publicly-traded common stock will be counted as separate boards, ISS will not recommend a withhold vote for the CEO of a parent company board or any of the controlled (>50 percent ownership) subsidiaries of that parent but may do so at subsidiaries that are less than 50 percent controlled and boards outside the parent/subsidiary relationships.

*when making vote recommendations with respect to the election or re-election of directors at U.S. companies covered under these guidelines under its proprietary ISS U.S. Benchmark policy.*

**Racial and/or Ethnic Diversity:** For companies in the Russell 3000 or S&P 1500 indices, generally vote against or withhold from the chair of the nominating committee (or other directors on a case-by-case basis) where the board has no apparent racially or ethnically diverse members[5]. An exception will be made if there was racial and/or ethnic diversity on the board at the preceding annual meeting and the board makes a firm commitment to appoint at least one racial and/or ethnic diverse member within a year.

## Responsiveness

Vote case-by-case on individual directors, committee members, or the entire board of directors as appropriate if:

- The board failed to act on a shareholder proposal that received the support of a majority of the shares cast in the previous year or failed to act on a management proposal seeking to ratify an existing charter/bylaw provision that received opposition of a majority of the shares cast in the previous year. Factors that will be considered are:
  - Disclosed outreach efforts by the board to shareholders in the wake of the vote;
  - Rationale provided in the proxy statement for the level of implementation;
  - The subject matter of the proposal;
  - The level of support for and opposition to the resolution in past meetings;
  - Actions taken by the board in response to the majority vote and its engagement with shareholders;
  - The continuation of the underlying issue as a voting item on the ballot (as either shareholder or management proposals); and
  - Other factors as appropriate.
- The board failed to act on takeover offers where the majority of shares are tendered; or
- At the previous board election, any director received more than 50 percent withhold/against votes of the shares cast and the company has failed to address the issue(s) that caused the high withhold/against vote.

Vote case-by-case on Compensation Committee members (or, in exceptional cases, the full board) and/or the say-on-pay proposal when the company's previous say-on-pay received support of less than 70 percent of votes cast.

Factors that will be considered in assessing board responsiveness include:

- Disclosure of engagement efforts with major institutional investors, including the frequency and timing of engagements and the company participants (including whether independent directors participated);
- Disclosure of the specific concerns voiced by dissenting shareholders that led to the say-on-pay opposition; and
- Disclosure of specific and meaningful actions taken to address shareholders' concerns.

If the company discloses meaningful engagement efforts, but in addition states that it was unable to obtain specific feedback, ISS will assess company actions taken in response to the say-on-pay vote as well as the company's explanation as to why such actions are beneficial for shareholders.

Additional factors that may be considered include:

- Whether the issues raised are recurring or isolated;
- The company's ownership structure;

---

[5] Aggregate diversity statistics provided by the board will only be considered if specific to racial and/or ethnic diversity.

- Significant corporate activity, such as a recent merger or proxy contest; and
- Any other compensation action or factor considered relevant to assessing board responsiveness.

If the say-on-pay support level was less than 50 percent of votes cast, this would warrant the highest degree of responsiveness, as assessed under the factors noted above.

Vote case-by-case on Compensation Committee members (or, in exceptional cases, the full board) if the board implements an advisory vote on executive compensation on a less frequent basis than the frequency that received the plurality of votes cast.


## Accountability

### PROBLEMATIC TAKEOVER DEFENSES, CAPITAL STRUCTURE, AND GOVERNANCE STRUCTURE

**Poison Pills:** Generally vote against or withhold from all nominees (except new nominees[1], who should be considered case-by-case) if:

- The company has a poison pill with a deadhand or slowhand feature[6];
- The board makes a material adverse modification to an existing pill, including, but not limited to, extension, renewal, or lowering the trigger, without shareholder approval; or
- The company has a long-term poison pill (with a term of over one year) that was not approved by the public shareholders[7].

Vote case-by-case on nominees if the board adopts an initial short-term pill[6] (with a term of one year or less) without shareholder approval, taking into consideration:

- The trigger threshold and other terms of the pill;
- The disclosed rationale for the adoption;
- The context in which the pill was adopted, (e.g., factors such as the company's size and stage of development, sudden changes in its market capitalization, and extraordinary industry-wide or macroeconomic events);
- A commitment to put any renewal to a shareholder vote;
- The company's overall track record on corporate governance and responsiveness to shareholders; and
- Other factors as relevant.


**Unequal Voting Rights**: Generally vote withhold or against directors individually, committee members, or the entire board (except new nominees[1], who should be considered case-by-case), if the company employs a multi-class capital stock structure with unequal voting rights[8].

Exceptions to this policy will generally be limited to:

---

[6] If a short-term pill with a deadhand or slowhand feature is enacted but expires before the next shareholder vote, ISS will generally still recommend withhold/against nominees at the next shareholder meeting following its adoption.

[7] Approval prior to, or in connection, with a company's becoming publicly-traded, or in connection with a de-SPAC transaction, is insufficient.

[8] This generally includes classes of common stock that have additional votes per share than other shares; classes of shares that are not entitled to vote on all the same ballot items or nominees; or stock with time-phased voting rights ("loyalty shares").

- Newly-public companies[9] with a sunset provision of no more than seven years from the date of going public;
- Limited Partnerships and the Operating Partnership (OP) unit structure of REITs;
- Convertible preferred shares that vote on an "as-converted" basis;
- Situations where the enhanced voting rights are limited in duration and applicability, such as where they are intended to overcome low voting turnout and ensure approval of a specific non-controversial agenda item and "mirrored voting" applies;
- Situations where the super-voting shares represent less than 5% of total voting power and therefore considered to be *de minimis*; or
- The company provides sufficient protections for minority shareholders, such as allowing minority shareholders a regular binding vote on whether the capital structure should be maintained.

**Classified Board Structure:** The board is classified, and a continuing director responsible for a problematic governance issue at the board/committee level that would warrant a withhold/against vote recommendation is not up for election. All appropriate nominees (except new) may be held accountable.

**Removal of Shareholder Discretion on Classified Boards**: The company has opted into, or failed to opt out of, state laws requiring a classified board structure.

**Problematic Governance Structure**: For companies that hold or held their first annual meeting[9] of public shareholders after Feb. 1, 2015, generally vote against or withhold from directors individually, committee members, or the entire board (except new nominees[1], who should be considered case-by-case) if, prior to or in connection with the company's public offering, the company or its board adopted the following bylaw or charter provisions that are considered to be materially adverse to shareholder rights:

- Supermajority vote requirements to amend the bylaws or charter;
- A classified board structure; or
- Other egregious provisions.

A provision which specifies that the problematic structure(s) will be sunset within seven years of the date of going public will be considered a mitigating factor.

Unless the adverse provision is reversed or removed, vote case-by-case on director nominees in subsequent years.

**Unilateral Bylaw/Charter Amendments:** Generally vote against or withhold from directors individually, committee members, or the entire board (except new nominees[1], who should be considered case-by-case) if the board amends the company's bylaws or charter without shareholder approval in a manner that materially diminishes shareholders' rights or that could adversely impact shareholders, considering the following factors:

- The board's rationale for adopting the bylaw/charter amendment without shareholder ratification;
- Disclosure by the company of any significant engagement with shareholders regarding the amendment;
- The level of impairment of shareholders' rights caused by the board's unilateral amendment to the bylaws/charter;
- The board's track record with regard to unilateral board action on bylaw/charter amendments or other entrenchment provisions;
- The company's ownership structure;
- The company's existing governance provisions;
- The timing of the board's amendment to the bylaws/charter in connection with a significant business development; and

---

[9] Includes companies that emerge from bankruptcy, SPAC transactions, spin-offs, direct listings, and those who complete a traditional initial public offering.

- Other factors, as deemed appropriate, that may be relevant to determine the impact of the amendment on shareholders.

Unless the adverse amendment is reversed or submitted to a binding shareholder vote, in subsequent years vote case-by-case on director nominees. Generally vote against (except new nominees[1], who should be considered case-by-case) if the directors:

- Classified the board;
- Adopted supermajority vote requirements to amend the bylaws or charter;
- Eliminated shareholders' ability to amend bylaws;
- Adopted a fee-shifting provision; or
- Adopted another provision deemed egregious.

**Restricting Binding Shareholder Proposals**: Generally vote against or withhold from the members of the governance committee if:

- The company's governing documents impose undue restrictions on shareholders' ability to amend the bylaws. Such restrictions include but are not limited to: outright prohibition on the submission of binding shareholder proposals or share ownership requirements, subject matter restrictions, or time holding requirements in excess of SEC Rule 14a-8. Vote against or withhold on an ongoing basis.

Submission of management proposals to approve or ratify requirements in excess of SEC Rule 14a-8 for the submission of binding bylaw amendments will generally be viewed as an insufficient restoration of shareholders' rights. Generally continue to vote against or withhold on an ongoing basis until shareholders are provided with an unfettered ability to amend the bylaws or a proposal providing for such unfettered right is submitted for shareholder approval.

**Director Performance Evaluation**: The board lacks mechanisms to promote accountability and oversight, coupled with sustained poor performance relative to peers. Sustained poor performance is measured by one-, three-, and five-year total shareholder returns in the bottom half of a company's four-digit GICS industry group (Russell 3000 companies only). Take into consideration the company's operational metrics and other factors as warranted. Problematic provisions include but are not limited to:

- A classified board structure;
- A supermajority vote requirement;
- Either a plurality vote standard in uncontested director elections, or a majority vote standard in contested elections;
- The inability of shareholders to call special meetings;
- The inability of shareholders to act by written consent;
- A multi-class capital structure; and/or
- A non-shareholder-approved poison pill.

**Management Proposals to Ratify Existing Charter or Bylaw Provisions**: Vote against/withhold from individual directors, members of the governance committee, or the full board, where boards ask shareholders to ratify existing charter or bylaw provisions considering the following factors:

- The presence of a shareholder proposal addressing the same issue on the same ballot;
- The board's rationale for seeking ratification;
- Disclosure of actions to be taken by the board should the ratification proposal fail;
- Disclosure of shareholder engagement regarding the board's ratification request;
- The level of impairment to shareholders' rights caused by the existing provision;
- The history of management and shareholder proposals on the provision at the company's past meetings;
- Whether the current provision was adopted in response to the shareholder proposal;
- The company's ownership structure; and

▪ Previous use of ratification proposals to exclude shareholder proposals.

## Problematic Audit-Related Practices

Generally vote against or withhold from the members of the Audit Committee if:

▪ The non-audit fees paid to the auditor are excessive;
▪ The company receives an adverse opinion on the company's financial statements from its auditor; or
▪ There is persuasive evidence that the Audit Committee entered into an inappropriate indemnification agreement with its auditor that limits the ability of the company, or its shareholders, to pursue legitimate legal recourse against the audit firm.

Vote case-by-case on members of the Audit Committee and potentially the full board if:

▪ Poor accounting practices are identified that rise to a level of serious concern, such as: fraud; misapplication of GAAP; and material weaknesses identified in Section 404 disclosures. Examine the severity, breadth, chronological sequence, and duration, as well as the company's efforts at remediation or corrective actions, in determining whether withhold/against votes are warranted.

## Problematic Compensation Practices

In the absence of an Advisory Vote on Executive Compensation (Say on Pay) ballot item or in egregious situations, vote against or withhold from the members of the Compensation Committee and potentially the full board if:

▪ There is an unmitigated misalignment between CEO pay and company performance (pay for performance);
▪ The company maintains significant problematic pay practices; or
▪ The board exhibits a significant level of poor communication and responsiveness to shareholders.

Generally vote against or withhold from the Compensation Committee chair, other committee members, or potentially the full board if:

▪ The company fails to include a Say on Pay ballot item when required under SEC provisions, or under the company's declared frequency of say on pay; or
▪ The company fails to include a Frequency of Say on Pay ballot item when required under SEC provisions.

Generally vote against members of the board committee responsible for approving/setting non-employee director compensation if there is a pattern (i.e. two or more consecutive or non-consecutive years/across multiple years) of awarding excessive or otherwise problematic[10] non-employee director compensation without disclosing a compelling rationale or other mitigating factors.

Adverse recommendations may be warranted in the first year for particularly egregious director compensation issues/instances/cases[10].

**Problematic Pledging of Company Stock**: Vote against the members of the committee that oversees risks related to pledging, or the full board, where a significant level of pledged company stock by executives or directors raises concerns. The following factors will be considered:

▪ The presence of an anti-pledging policy, disclosed in the proxy statement, that prohibits future pledging activity;
▪ The magnitude of aggregate pledged shares in terms of total common shares outstanding, market value, and trading volume;
▪ Disclosure of progress or lack thereof in reducing the magnitude of aggregate pledged shares over time;

---

[10] May include excessive magnitude, problematic perquisites, performance awards, stock options, or retirement benefits.

- Disclosure in the proxy statement that shares subject to stock ownership and holding requirements do not include pledged company stock; and
- Any other relevant factors.

### Climate Accountability

For companies that are significant greenhouse gas (GHG) emitters, through their operations or value chain[11], generally vote against or withhold from the incumbent chair of the responsible committee (or other directors on a case-by-case basis) in cases where ISS determines that the company is not taking the minimum steps needed to understand, assess, and mitigate risks related to climate change to the company and the larger economy.

Minimum steps to understand and mitigate those risks are considered to be the following. Both minimum criteria will be required to be in alignment with the policy :

- Detailed disclosure of climate-related risks, such as according to the framework established by the Task Force on Climate-related Financial Disclosures (TCFD), including:
    - Board governance measures;
    - Corporate strategy;
    - Risk management analyses; and
    - Metrics and targets.
- Appropriate GHG emissions reduction targets.

At this time, "appropriate GHG emissions reductions targets" will be medium-term GHG reduction targets or Net Zero-by-2050 GHG reduction targets for a company's operations (Scope 1) and electricity use (Scope 2). Targets should cover the vast majority of the company's direct emissions.

### Governance Failures

Under extraordinary circumstances, vote against or withhold from directors individually, committee members, or the entire board, due to:

- Material failures of governance, stewardship, risk oversight[12], or fiduciary responsibilities at the company;
- Failure to replace management as appropriate; or
- Egregious actions related to a director's service on other boards that raise substantial doubt about his or her ability to effectively oversee management and serve the best interests of shareholders at any company.

## Voting on Director Nominees in Contested Elections

## Vote-No Campaigns

**General Recommendation:** In cases where companies are targeted in connection with public "vote-no" campaigns, evaluate director nominees under the existing governance policies for voting on director nominees in uncontested

---

[11] Companies defined as "significant GHG emitters" will be those on the current Climate Action 100+ Focus Group list.

[12] Examples of failure of risk oversight include but are not limited to: bribery; large or serial fines or sanctions from regulatory bodies; demonstrably poor risk oversight of environmental and social issues, including climate change; significant adverse legal judgments or settlement; or hedging of company stock.

elections. Take into consideration the arguments submitted by shareholders and other publicly available information.

## Proxy Contests/Proxy Access

**General Recommendation:** Vote case-by-case on the election of directors in contested elections, considering the following factors:

- Long-term financial performance of the company relative to its industry;
- Management's track record;
- Background to the contested election;
- Nominee qualifications and any compensatory arrangements;
- Strategic plan of dissident slate and quality of the critique against management;
- Likelihood that the proposed goals and objectives can be achieved (both slates); and
- Stock ownership positions.

In the case of candidates nominated pursuant to proxy access, vote case-by-case considering any applicable factors listed above or additional factors which may be relevant, including those that are specific to the company, to the nominee(s) and/or to the nature of the election (such as whether there are more candidates than board seats).

## Other Board-Related Proposals

### Adopt Anti-Hedging/Pledging/Speculative Investments Policy

**General Recommendation:** Generally vote for proposals seeking a policy that prohibits named executive officers from engaging in derivative or speculative transactions involving company stock, including hedging, holding stock in a margin account, or pledging stock as collateral for a loan. However, the company's existing policies regarding responsible use of company stock will be considered.

### Board Refreshment

Board refreshment is best implemented through an ongoing program of individual director evaluations, conducted annually, to ensure the evolving needs of the board are met and to bring in fresh perspectives, skills, and diversity as needed.

#### Term/Tenure Limits

**General Recommendation:** Vote case-by-case on management proposals regarding director term/tenure limits, considering:

- The rationale provided for adoption of the term/tenure limit;
- The robustness of the company's board evaluation process;
- Whether the limit is of sufficient length to allow for a broad range of director tenures;
- Whether the limit would disadvantage independent directors compared to non-independent directors; and

- Whether the board will impose the limit evenly, and not have the ability to waive it in a discriminatory manner.

Vote case-by-case on shareholder proposals asking for the company to adopt director term/tenure limits, considering:

- The scope of the shareholder proposal; and
- Evidence of problematic issues at the company combined with, or exacerbated by, a lack of board refreshment.

### Age Limits

**General Recommendation:** Generally vote against management and shareholder proposals to limit the tenure of independent directors through mandatory retirement ages. Vote for proposals to remove mandatory age limits.

## Board Size

**General Recommendation:** Vote for proposals seeking to fix the board size or designate a range for the board size.

Vote against proposals that give management the ability to alter the size of the board outside of a specified range without shareholder approval.

## Classification/Declassification of the Board

**General Recommendation:** Vote against proposals to classify (stagger) the board.

Vote for proposals to repeal classified boards and to elect all directors annually.

## CEO Succession Planning

**General Recommendation:** Generally vote for proposals seeking disclosure on a CEO succession planning policy, considering, at a minimum, the following factors:

- The reasonableness/scope of the request; and
- The company's existing disclosure on its current CEO succession planning process.

## Cumulative Voting

**General Recommendation:** Generally vote against management proposals to eliminate cumulate voting, and for shareholder proposals to restore or provide for cumulative voting, unless:

- The company has proxy access[13], thereby allowing shareholders to nominate directors to the company's ballot; and
- The company has adopted a majority vote standard, with a carve-out for plurality voting in situations where there are more nominees than seats, and a director resignation policy to address failed elections.

Vote for proposals for cumulative voting at controlled companies (insider voting power > 50%).

## Director and Officer Indemnification, Liability Protection, and Exculpation

**General Recommendation:** Vote case-by-case on proposals on director and officer indemnification, liability protection, and exculpation[14].

Consider the stated rationale for the proposed change. Also consider, among other factors, the extent to which the proposal would:

- Eliminate directors' and officers' liability for monetary damages for violating the duty of care;
- Eliminate directors' and officers' liability for monetary damages for violating the duty of loyalt;
- Expand coverage beyond just legal expenses to liability for acts that are more serious violations of fiduciary obligation than mere carelessness; and
- Expand the scope of indemnification to provide for mandatory indemnification of company officials in connection with acts that previously the company was permitted to provide indemnification for, at the discretion of the company's board (*i.e.*, "permissive indemnification"), but that previously the company was not required to indemnify.

Vote for those proposals providing such expanded coverage in cases when a director's or officer's legal defense was unsuccessful if both of the following apply:

- If the individual was found to have acted in good faith and in a manner that the individual reasonably believed was in the best interests of the company; and
- If only the individual's legal expenses would be covered.

## Establish/Amend Nominee Qualifications

**General Recommendation:** Vote case-by-case on proposals that establish or amend director qualifications. Votes should be based on the reasonableness of the criteria and the degree to which they may preclude dissident nominees from joining the board.

Vote case-by-case on shareholder resolutions seeking a director nominee who possesses a particular subject matter expertise, considering:

---

[13] A proxy access right that meets the recommended guidelines.

[14] **Indemnification**: the condition of being secured against loss or damage.
**Limited liability**: a person's financial liability is limited to a fixed sum, or personal financial assets are not at risk if the individual loses a lawsuit that results in financial award/damages to the plaintiff.
**Exculpation**: to eliminate or limit the personal liability of a director or officer to the corporation or its shareholders for monetary damages for breach of fiduciary duty as a director or officer.

- The company's board committee structure, existing subject matter expertise, and board nomination provisions relative to that of its peers;
- The company's existing board and management oversight mechanisms regarding the issue for which board oversight is sought;
- The company's disclosure and performance relating to the issue for which board oversight is sought and any significant related controversies; and
- The scope and structure of the proposal.

## Establish Other Board Committee Proposals

**General Recommendation:** Generally vote against shareholder proposals to establish a new board committee, as such proposals seek a specific oversight mechanism/structure that potentially limits a company's flexibility to determine an appropriate oversight mechanism for itself. However, the following factors will be considered:

- Existing oversight mechanisms (including current committee structure) regarding the issue for which board oversight is sought;
- Level of disclosure regarding the issue for which board oversight is sought;
- Company performance related to the issue for which board oversight is sought;
- Board committee structure compared to that of other companies in its industry sector; and
- The scope and structure of the proposal.

## Filling Vacancies/Removal of Directors

**General Recommendation:** Vote against proposals that provide that directors may be removed only for cause. Vote for proposals to restore shareholders' ability to remove directors with or without cause.

Vote against proposals that provide that only continuing directors may elect replacements to fill board vacancies.

Vote for proposals that permit shareholders to elect directors to fill board vacancies.

## Independent Board Chair

**General Recommendation:** Generally vote for shareholder proposals requiring that the board chair position be filled by an independent director, taking into consideration the following:

- The scope and rationale of the proposal;
- The company's current board leadership structure;
- The company's governance structure and practices;
- Company performance; and
- Any other relevant factors that may be applicable.

The following factors will increase the likelihood of a "for" recommendation:

- A majority non-independent board and/or the presence of non-independent directors on key board committees;
- A weak or poorly-defined lead independent director role that fails to serve as an appropriate counterbalance to a combined CEO/chair role;
- The presence of an executive or non-independent chair in addition to the CEO, a recent recombination of the role of CEO and chair, and/or departure from a structure with an independent chair;

- Evidence that the board has failed to oversee and address material risks facing the company;
- A material governance failure, particularly if the board has failed to adequately respond to shareholder concerns or if the board has materially diminished shareholder rights; or
- Evidence that the board has failed to intervene when management's interests are contrary to shareholders' interests.

## Majority of Independent Directors/Establishment of Independent Committees

**General Recommendation:** Vote for shareholder proposals asking that a majority or more of directors be independent unless the board composition already meets the proposed threshold by ISS' definition of Independent Director (See ISS' Classification of Directors.)

Vote for shareholder proposals asking that board audit, compensation, and/or nominating committees be composed exclusively of independent directors unless they currently meet that standard.

## Majority Vote Standard for the Election of Directors

**General Recommendation:** Generally vote for management proposals to adopt a majority of votes cast standard for directors in uncontested elections. Vote against if no carve-out for a plurality vote standard in contested elections is included.

Generally vote for precatory and binding shareholder resolutions requesting that the board change the company's bylaws to stipulate that directors need to be elected with an affirmative majority of votes cast, provided it does not conflict with the state law where the company is incorporated. Binding resolutions need to allow for a carve-out for a plurality vote standard when there are more nominees than board seats.

Companies are strongly encouraged to also adopt a post-election policy (also known as a director resignation policy) that will provide guidelines so that the company will promptly address the situation of a holdover director.

## Proxy Access

**General Recommendation:** Generally vote for management and shareholder proposals for proxy access with the following provisions:

- **Ownership threshold:** maximum requirement not more than three percent (3%) of the voting power;
- **Ownership duration:** maximum requirement not longer than three (3) years of continuous ownership for each member of the nominating group;
- **Aggregation:** minimal or no limits on the number of shareholders permitted to form a nominating group; and
- **Cap:** cap on nominees of generally twenty-five percent (25%) of the board.

Review for reasonableness any other restrictions on the right of proxy access. Generally vote against proposals that are more restrictive than these guidelines.

## Require More Nominees than Open Seats

**General Recommendation:** Vote against shareholder proposals that would require a company to nominate more candidates than the number of open board seats.

## Shareholder Engagement Policy (Shareholder Advisory Committee)

**General Recommendation:** Generally vote for shareholder proposals requesting that the board establish an internal mechanism/process, which may include a committee, in order to improve communications between directors and shareholders, unless the company has the following features, as appropriate:

- Established a communication structure that goes beyond the exchange requirements to facilitate the exchange of information between shareholders and members of the board;
- Effectively disclosed information with respect to this structure to its shareholders;
- Company has not ignored majority-supported shareholder proposals, or a majority withhold vote on a director nominee; and
- The company has an independent chair or a lead director, according to ISS' definition. This individual must be made available for periodic consultation and direct communication with major shareholders.

# 2. Audit-Related

## Auditor Indemnification and Limitation of Liability

**General Recommendation:** Vote case-by-case on the issue of auditor indemnification and limitation of liability. Factors to be assessed include, but are not limited to:

- The terms of the auditor agreement—the degree to which these agreements impact shareholders' rights;
- The motivation and rationale for establishing the agreements;
- The quality of the company's disclosure; and
- The company's historical practices in the audit area.

Vote against or withhold from members of an audit committee in situations where there is persuasive evidence that the audit committee entered into an inappropriate indemnification agreement with its auditor that limits the ability of the company, or its shareholders, to pursue legitimate legal recourse against the audit firm.

## Auditor Ratification

**General Recommendation:** Vote for proposals to ratify auditors unless any of the following apply:

- An auditor has a financial interest in or association with the company, and is therefore not independent;
- There is reason to believe that the independent auditor has rendered an opinion that is neither accurate nor indicative of the company's financial position;
- Poor accounting practices are identified that rise to a serious level of concern, such as fraud or misapplication of GAAP; or
- Fees for non-audit services ("Other" fees) are excessive.

Non-audit fees are excessive if:

- Non-audit ("other") fees > audit fees + audit-related fees + tax compliance/preparation fees

Tax compliance and preparation include the preparation of original and amended tax returns and refund claims, and tax payment planning. All other services in the tax category, such as tax advice, planning, or consulting, should be added to "Other" fees. If the breakout of tax fees cannot be determined, add all tax fees to "Other" fees.

In circumstances where "Other" fees include fees related to significant one-time capital structure events (such as initial public offerings, bankruptcy emergence, and spin-offs) and the company makes public disclosure of the amount and nature of those fees that are an exception to the standard "non-audit fee" category, then such fees may be excluded from the non-audit fees considered in determining the ratio of non-audit to audit/audit-related fees/tax compliance and preparation for purposes of determining whether non-audit fees are excessive.

## Shareholder Proposals Limiting Non-Audit Services

**General Recommendation:** Vote case-by-case on shareholder proposals asking companies to prohibit or limit their auditors from engaging in non-audit services.

## Shareholder Proposals on Audit Firm Rotation

**General Recommendation:** Vote case-by-case on shareholder proposals asking for audit firm rotation, taking into account:

- The tenure of the audit firm;
- The length of rotation specified in the proposal;
- Any significant audit-related issues at the company;
- The number of Audit Committee meetings held each year;
- The number of financial experts serving on the committee; and
- Whether the company has a periodic renewal process where the auditor is evaluated for both audit quality and competitive price.

# 3.  Shareholder Rights & Defenses

## Advance Notice Requirements for Shareholder Proposals/Nominations

**General Recommendation:** Vote case-by-case on advance notice proposals, giving support to those proposals which allow shareholders to submit proposals/nominations as close to the meeting date as reasonably possible and within the broadest window possible, recognizing the need to allow sufficient notice for company, regulatory, and shareholder review.

To be reasonable, the company's deadline for shareholder notice of a proposal/nominations must be no earlier than 120 days prior to the anniversary of the previous year's meeting and have a submittal window of no shorter than 30 days from the beginning of the notice period (also known as a 90-120-day window). The submittal window is the period under which shareholders must file their proposals/nominations prior to the deadline.

In general, support additional efforts by companies to ensure full disclosure in regard to a proponent's economic and voting position in the company so long as the informational requirements are reasonable and aimed at providing shareholders with the necessary information to review such proposals.

## Amend Bylaws without Shareholder Consent

**General Recommendation:** Vote against proposals giving the board exclusive authority to amend the bylaws.

Vote case-by-case on proposals giving the board the ability to amend the bylaws in addition to shareholders, taking into account the following:

- Any impediments to shareholders' ability to amend the bylaws (i.e. supermajority voting requirements);
- The company's ownership structure and historical voting turnout;
- Whether the board could amend bylaws adopted by shareholders; and
- Whether shareholders would retain the ability to ratify any board-initiated amendments.

## Control Share Acquisition Provisions

**General Recommendation:** Vote for proposals to opt out of control share acquisition statutes unless doing so would enable the completion of a takeover that would be detrimental to shareholders.

Vote against proposals to amend the charter to include control share acquisition provisions.

Vote for proposals to restore voting rights to the control shares.

Control share acquisition statutes function by denying shares their voting rights when they contribute to ownership in excess of certain thresholds. Voting rights for those shares exceeding ownership limits may only be restored by approval of either a majority or supermajority of disinterested shares. Thus, control share acquisition statutes effectively require a hostile bidder to put its offer to a shareholder vote or risk voting disenfranchisement if the bidder continues buying up a large block of shares.

## Control Share Cash-Out Provisions

**General Recommendation:** Vote for proposals to opt out of control share cash-out statutes.

Control share cash-out statutes give dissident shareholders the right to "cash-out" of their position in a company at the expense of the shareholder who has taken a control position. In other words, when an investor crosses a preset threshold level, remaining shareholders are given the right to sell their shares to the acquirer, who must buy them at the highest acquiring price.

## Disgorgement Provisions

**General Recommendation:** Vote for proposals to opt out of state disgorgement provisions.

Disgorgement provisions require an acquirer or potential acquirer of more than a certain percentage of a company's stock to disgorge, or pay back, to the company any profits realized from the sale of that company's stock purchased 24 months before achieving control status. All sales of company stock by the acquirer occurring within a certain period of time (between 18 months and 24 months) prior to the investor's gaining control status are subject to these recapture-of-profits provisions.

## Fair Price Provisions

**General Recommendation:** Vote case-by-case on proposals to adopt fair price provisions (provisions that stipulate that an acquirer must pay the same price to acquire all shares as it paid to acquire the control shares), evaluating factors such as the vote required to approve the proposed acquisition, the vote required to repeal the fair price provision, and the mechanism for determining the fair price.

Generally vote against fair price provisions with shareholder vote requirements greater than a majority of disinterested shares.

## Freeze-Out Provisions

**General Recommendation:** Vote for proposals to opt out of state freeze-out provisions. Freeze-out provisions force an investor who surpasses a certain ownership threshold in a company to wait a specified period of time before gaining control of the company.

## Greenmail

**General Recommendation:** Vote for proposals to adopt anti-greenmail charter or bylaw amendments or otherwise restrict a company's ability to make greenmail payments.

Vote case-by-case on anti-greenmail proposals when they are bundled with other charter or bylaw amendments.

Greenmail payments are targeted share repurchases by management of company stock from individuals or groups seeking control of the company. Since only the hostile party receives payment, usually at a substantial premium over the market value of its shares, the practice discriminates against all other shareholders.

## Shareholder Litigation Rights

### Federal Forum Selection Provisions

Federal forum selection provisions require that U.S. federal courts be the sole forum for shareholders to litigate claims arising under federal securities law.

**General Recommendation:** Generally vote for federal forum selection provisions in the charter or bylaws that specify "the district courts of the United States" as the exclusive forum for federal securities law matters, in the absence of serious concerns about corporate governance or board responsiveness to shareholders.

Vote against provisions that restrict the forum to a particular federal district court; unilateral adoption (without a shareholder vote) of such a provision will generally be considered a one-time failure under the Unilateral Bylaw/Charter Amendments policy.

### Exclusive Forum Provisions for State Law Matters

Exclusive forum provisions in the charter or bylaws restrict shareholders' ability to bring derivative lawsuits against the company, for claims arising out of state corporate law, to the courts of a particular state (generally the state of incorporation).

**General Recommendation:** Generally vote for charter or bylaw provisions that specify courts located within the state of Delaware as the exclusive forum for corporate law matters for Delaware corporations, in the absence of serious concerns about corporate governance or board responsiveness to shareholders.

For states other than Delaware, vote case-by-case on exclusive forum provisions, taking into consideration:

- The company's stated rationale for adopting such a provision;
- Disclosure of past harm from duplicative shareholder lawsuits in more than one forum;
- The breadth of application of the charter or bylaw provision, including the types of lawsuits to which it would apply and the definition of key terms; and
- Governance features such as shareholders' ability to repeal the provision at a later date (including the vote standard applied when shareholders attempt to amend the charter or bylaws) and their ability to hold directors accountable through annual director elections and a majority vote standard in uncontested elections.

Generally vote against provisions that specify a state other than the state of incorporation as the exclusive forum for corporate law matters, or that specify a particular local court within the state; unilateral adoption of such a provision will generally be considered a one-time failure under the Unilateral Bylaw/Charter Amendments policy.

### Fee shifting

Fee-shifting provisions in the charter or bylaws require that a shareholder who sues a company unsuccessfully pay all litigation expenses of the defendant corporation and its directors and officers.

**General Recommendation:** Generally vote against provisions that mandate fee-shifting whenever plaintiffs are not completely successful on the merits (i.e., including cases where the plaintiffs are partially successful).

Unilateral adoption of a fee-shifting provision will generally be considered an ongoing failure under the Unilateral Bylaw/Charter Amendments policy.

## Net Operating Loss (NOL) Protective Amendments

**General Recommendation:** Vote against proposals to adopt a protective amendment for the stated purpose of protecting a company's net operating losses (NOL) if the effective term of the protective amendment would exceed the shorter of three years and the exhaustion of the NOL.

Vote case-by-case, considering the following factors, for management proposals to adopt an NOL protective amendment that would remain in effect for the shorter of three years (or less) and the exhaustion of the NOL:

- The ownership threshold (NOL protective amendments generally prohibit stock ownership transfers that would result in a new 5-percent holder or increase the stock ownership percentage of an existing 5-percent holder);
- The value of the NOLs;
- Shareholder protection mechanisms (sunset provision or commitment to cause expiration of the protective amendment upon exhaustion or expiration of the NOL);
- The company's existing governance structure including: board independence, existing takeover defenses, track record of responsiveness to shareholders, and any other problematic governance concerns; and
- Any other factors that may be applicable.

## Poison Pills (Shareholder Rights Plans)

### Shareholder Proposals to Put Pill to a Vote and/or Adopt a Pill Policy

**General Recommendation:** Vote for shareholder proposals requesting that the company submit its poison pill to a shareholder vote or redeem it unless the company has: (1) A shareholder-approved poison pill in place; or (2) The company has adopted a policy concerning the adoption of a pill in the future specifying that the board will only adopt a shareholder rights plan if either:

- Shareholders have approved the adoption of the plan; or
- The board, in its exercise of its fiduciary responsibilities, determines that it is in the best interest of shareholders under the circumstances to adopt a pill without the delay in adoption that would result from seeking stockholder approval (i.e., the "fiduciary out" provision). A poison pill adopted under this fiduciary out will be put to a shareholder ratification vote within 12 months of adoption or expire. If the pill is not approved by a majority of the votes cast on this issue, the plan will immediately terminate.

If the shareholder proposal calls for a time period of less than 12 months for shareholder ratification after adoption, vote for the proposal, but add the caveat that a vote within 12 months would be considered sufficient implementation.

## Management Proposals to Ratify a Poison Pill

**General Recommendation:** Vote case-by-case on management proposals on poison pill ratification, focusing on the features of the shareholder rights plan. Rights plans should contain the following attributes:

- No lower than a 20 percent trigger, flip-in or flip-over;
- A term of no more than three years;
- No deadhand, slowhand, no-hand, or similar feature that limits the ability of a future board to redeem the pill; and
- Shareholder redemption feature (qualifying offer clause); if the board refuses to redeem the pill 90 days after a qualifying offer is announced, 10 percent of the shares may call a special meeting or seek a written consent to vote on rescinding the pill.

In addition, the rationale for adopting the pill should be thoroughly explained by the company. In examining the request for the pill, take into consideration the company's existing governance structure, including: board independence, existing takeover defenses, and any problematic governance concerns.

## Management Proposals to Ratify a Pill to Preserve Net Operating Losses (NOLs)

**General Recommendation:** Vote against proposals to adopt a poison pill for the stated purpose of protecting a company's net operating losses (NOL) if the term of the pill would exceed the shorter of three years and the exhaustion of the NOL.

Vote case-by-case on management proposals for poison pill ratification, considering the following factors, if the term of the pill would be the shorter of three years (or less) and the exhaustion of the NOL:

- The ownership threshold to transfer (NOL pills generally have a trigger slightly below 5 percent);
- The value of the NOLs;
- Shareholder protection mechanisms (sunset provision, or commitment to cause expiration of the pill upon exhaustion or expiration of NOLs);
- The company's existing governance structure, including: board independence, existing takeover defenses, track record of responsiveness to shareholders, and any other problematic governance concerns; and
- Any other factors that may be applicable.

## Proxy Voting Disclosure, Confidentiality, and Tabulation

**General Recommendation:** Vote case-by-case on proposals regarding proxy voting mechanics, taking into consideration whether implementation of the proposal is likely to enhance or protect shareholder rights. Specific issues covered under the policy include, but are not limited to, confidential voting of individual proxies and ballots, confidentiality of running vote tallies, and the treatment of abstentions and/or broker non-votes in the company's vote-counting methodology.

While a variety of factors may be considered in each analysis, the guiding principles are: transparency, consistency, and fairness in the proxy voting process. The factors considered, as applicable to the proposal, may include:

- The scope and structure of the proposal;

- The company's stated confidential voting policy (or other relevant policies) and whether it ensures a "level playing field" by providing shareholder proponents with equal access to vote information prior to the annual meeting;
- The company's vote standard for management and shareholder proposals and whether it ensures consistency and fairness in the proxy voting process and maintains the integrity of vote results;
- Whether the company's disclosure regarding its vote counting method and other relevant voting policies with respect to management and shareholder proposals are consistent and clear;
- Any recent controversies or concerns related to the company's proxy voting mechanics;
- Any unintended consequences resulting from implementation of the proposal; and
- Any other factors that may be relevant.

## Ratification Proposals: Management Proposals to Ratify Existing Charter or Bylaw Provisions

**General Recommendation:** Generally vote against management proposals to ratify provisions of the company's existing charter or bylaws, unless these governance provisions align with best practice.

In addition, voting against/withhold from individual directors, members of the governance committee, or the full board may be warranted, considering:

- The presence of a shareholder proposal addressing the same issue on the same ballot;
- The board's rationale for seeking ratification;
- Disclosure of actions to be taken by the board should the ratification proposal fail;
- Disclosure of shareholder engagement regarding the board's ratification request;
- The level of impairment to shareholders' rights caused by the existing provision;
- The history of management and shareholder proposals on the provision at the company's past meetings;
- Whether the current provision was adopted in response to the shareholder proposal;
- The company's ownership structure; and
- Previous use of ratification proposals to exclude shareholder proposals.

## Reimbursing Proxy Solicitation Expenses

**General Recommendation:** Vote case-by-case on proposals to reimburse proxy solicitation expenses.

When voting in conjunction with support of a dissident slate, vote for the reimbursement of all appropriate proxy solicitation expenses associated with the election.

Generally vote for shareholder proposals calling for the reimbursement of reasonable costs incurred in connection with nominating one or more candidates in a contested election where the following apply:

- The election of fewer than 50 percent of the directors to be elected is contested in the election;
- One or more of the dissident's candidates is elected;
- Shareholders are not permitted to cumulate their votes for directors; and
- The election occurred, and the expenses were incurred, after the adoption of this bylaw.

## Reincorporation Proposals

**General Recommendation:** Management or shareholder proposals to change a company's state of incorporation should be evaluated case-by-case, giving consideration to both financial and corporate governance concerns including the following:

- Reasons for reincorporation;
- Comparison of company's governance practices and provisions prior to and following the reincorporation; and
- Comparison of corporation laws of original state and destination state.

Vote for reincorporation when the economic factors outweigh any neutral or negative governance changes.

## Shareholder Ability to Act by Written Consent

**General Recommendation:** Generally vote against management and shareholder proposals to restrict or prohibit shareholders' ability to act by written consent.

Generally vote for management and shareholder proposals that provide shareholders with the ability to act by written consent, taking into account the following factors:

- Shareholders' current right to act by written consent;
- The consent threshold;
- The inclusion of exclusionary or prohibitive language;
- Investor ownership structure; and
- Shareholder support of, and management's response to, previous shareholder proposals.

Vote case-by-case on shareholder proposals if, in addition to the considerations above, the company has the following governance and antitakeover provisions:

- An unfettered[15] right for shareholders to call special meetings at a 10 percent threshold;
- A majority vote standard in uncontested director elections;
- No non-shareholder-approved pill; and
- An annually elected board.

## Shareholder Ability to Call Special Meetings

**General Recommendation:** Vote against management or shareholder proposals to restrict or prohibit shareholders' ability to call special meetings.

Generally vote for management or shareholder proposals that provide shareholders with the ability to call special meetings taking into account the following factors:

- Shareholders' current right to call special meetings;

---

[15] "Unfettered" means no restrictions on agenda items, no restrictions on the number of shareholders who can group together to reach the 10 percent threshold, and only reasonable limits on when a meeting can be called: no greater than 30 days after the last annual meeting and no greater than 90 prior to the next annual meeting.

- Minimum ownership threshold necessary to call special meetings (10 percent preferred);
- The inclusion of exclusionary or prohibitive language;
- Investor ownership structure; and
- Shareholder support of, and management's response to, previous shareholder proposals.

## Stakeholder Provisions

**General Recommendation:** Vote against proposals that ask the board to consider non-shareholder constituencies or other non-financial effects when evaluating a merger or business combination.

## State Antitakeover Statutes

**General Recommendation:** Vote case-by-case on proposals to opt in or out of state takeover statutes (including fair price provisions, stakeholder laws, poison pill endorsements, severance pay and labor contract provisions, and anti-greenmail provisions).

## Supermajority Vote Requirements

**General Recommendation:** Vote against proposals to require a supermajority shareholder vote.

Vote for management or shareholder proposals to reduce supermajority vote requirements. However, for companies with shareholder(s) who have significant ownership levels, vote case-by-case, taking into account:

- Ownership structure;
- Quorum requirements; and
- Vote requirements.

## Virtual Shareholder Meetings

**General Recommendation:** Generally vote for management proposals allowing for the convening of shareholder meetings by electronic means, so long as they do not preclude in-person meetings. Companies are encouraged to disclose the circumstances under which virtual-only[16] meetings would be held, and to allow for comparable rights and opportunities for shareholders to participate electronically as they would have during an in-person meeting.

Vote case-by-case on shareholder proposals concerning virtual-only meetings, considering:

- Scope and rationale of the proposal; and
- Concerns identified with the company's prior meeting practices.

---

[16] Virtual-only shareholder meeting" refers to a meeting of shareholders that is held exclusively using technology without a corresponding in-person meeting.

# 4. Capital/Restructuring

## Capital

### Adjustments to Par Value of Common Stock

**General Recommendation:** Vote for management proposals to reduce the par value of common stock unless the action is being taken to facilitate an anti-takeover device or some other negative corporate governance action.

Vote for management proposals to eliminate par value.

### Common Stock Authorization

#### General Authorization Requests

**General Recommendation:** Vote case-by-case on proposals to increase the number of authorized shares of common stock that are to be used for general corporate purposes:

- If share usage (outstanding plus reserved) is less than 50% of the current authorized shares, vote for an increase of up to **50**% of current authorized share;
- If share usage is 50% to 100% of the current authorized, vote for an increase of up to **100**% of current authorized shares;
- If share usage is greater than current authorized shares, vote for an increase of up to the current share usage; or
- In the case of a stock split, the allowable increase is calculated (per above) based on the post-split adjusted authorization.

Generally vote against proposed increases, even if within the above ratios, if the proposal or the company's prior or ongoing use of authorized shares is problematic, including, but not limited to:

- The proposal seeks to increase the number of authorized shares of the class of common stock that has superior voting rights to other share classes;
- On the same ballot is a proposal for a reverse split for which support is warranted despite the fact that it would result in an excessive increase in the share authorization;
- The company has a non-shareholder approved poison pill (including an NOL pill); or
- The company has previous sizeable placements (within the past 3 years) of stock with insiders at prices substantially below market value, or with problematic voting rights, without shareholder approval.

However, generally vote for proposed increases beyond the above ratios or problematic situations when there is disclosure of specific and severe risks to shareholders of not approving the request, such as:

- In, or subsequent to, the company's most recent 10-K filing, the company discloses that there is substantial doubt about its ability to continue as a going concern;
- The company states that there is a risk of imminent bankruptcy or imminent liquidation if shareholders do not approve the increase in authorized capital; or
- A government body has in the past year required the company to increase its capital ratios.

For companies incorporated in states that allow increases in authorized capital without shareholder approval, generally vote withhold or against all nominees if a unilateral capital authorization increase does not conform to the above policies.

### Specific Authorization Requests

**General Recommendation:** Generally vote for proposals to increase the number of authorized common shares where the primary purpose of the increase is to issue shares in connection with transaction(s) (such as acquisitions, SPAC transactions, private placements, or similar transactions) on the same ballot, or disclosed in the proxy statement, that warrant support. For such transactions, the allowable increase will be the greater of:

- twice the amount needed to support the transactions on the ballot, and
- the allowable increase as calculated for general issuances above.

## Dual Class Structure

**General Recommendation:** Generally vote against proposals to create a new class of common stock unless:

- The company discloses a compelling rationale for the dual-class capital structure, such as:
- The company's auditor has concluded that there is substantial doubt about the company's ability to continue as a going concern; or
- The new class of shares will be transitory;
- The new class is intended for financing purposes with minimal or no dilution to current shareholders in both the short term and long term; and
- The new class is not designed to preserve or increase the voting power of an insider or significant shareholder.

## Issue Stock for Use with Rights Plan

**General Recommendation:** Vote against proposals that increase authorized common stock for the explicit purpose of implementing a non-shareholder-approved shareholder rights plan (poison pill).

## Preemptive Rights

**General Recommendation:** Vote case-by-case on shareholder proposals that seek preemptive rights, taking into consideration:

- The size of the company;
- The shareholder base; and
- The liquidity of the stock.

## Preferred Stock Authorization

### General Authorization Requests

**General Recommendation:** Vote case-by-case on proposals to increase the number of authorized shares of preferred stock that are to be used for general corporate purposes:

- If share usage (outstanding plus reserved) is less than 50% of the current authorized shares, vote for an increase of up to **50**% of current authorized shares;
- If share usage is 50% to 100% of the current authorized, vote for an increase of up to **100**% of current authorized shares;
- If share usage is greater than current authorized shares, vote for an increase of up to the current share usage.
- In the case of a stock split, the allowable increase is calculated (per above) based on the post-split adjusted authorization; or
- If no preferred shares are currently issued and outstanding, vote against the request, unless the company discloses a specific use for the shares.

Generally vote against proposed increases, even if within the above ratios, if the proposal or the company's prior or ongoing use of authorized shares is problematic, including, but not limited to:

- If the shares requested are blank check preferred shares that can be used for antitakeover purposes;[17]
- The company seeks to increase a class of non-convertible preferred shares entitled to more than one vote per share on matters that do not solely affect the rights of preferred stockholders "supervoting shares");
- The company seeks to increase a class of convertible preferred shares entitled to a number of votes greater than the number of common shares into which they are convertible ("supervoting shares") on matters that do not solely affect the rights of preferred stockholders;
- The stated intent of the increase in the general authorization is to allow the company to increase an existing designated class of supervoting preferred shares;
- On the same ballot is a proposal for a reverse split for which support is warranted despite the fact that it would result in an excessive increase in the share authorization;
- The company has a non-shareholder approved poison pill (including an NOL pill); and
- The company has previous sizeable placements (within the past 3 years) of stock with insiders at prices substantially below market value, or with problematic voting rights, without shareholder approval.

However, generally vote for proposed increases beyond the above ratios or problematic situations when there is disclosure of specific and severe risks to shareholders of not approving the request, such as:

- In, or subsequent to, the company's most recent 10-K filing, the company discloses that there is substantial doubt about its ability to continue as a going concern;
- The company states that there is a risk of imminent bankruptcy or imminent liquidation if shareholders do not approve the increase in authorized capital; or
- A government body has in the past year required the company to increase its capital ratios.

For companies incorporated in states that allow increases in authorized capital without shareholder approval, generally vote withhold or against all nominees if a unilateral capital authorization increase does not conform to the above policies.

---

[17] To be acceptable, appropriate disclosure would be needed that the shares are "declawed": i.e., representation by the board that it will not, without prior stockholder approval, issue or use the preferred stock for any defensive or anti-takeover purpose or for the purpose of implementing any stockholder rights plan.

**Specific Authorization Requests**

**General Recommendation:** Generally vote for proposals to increase the number of authorized preferred shares where the primary purpose of the increase is to issue shares in connection with transaction(s) (such as acquisitions, SPAC transactions, private placements, or similar transactions) on the same ballot, or disclosed in the proxy statement, that warrant support. For such transactions, the allowable increase will be the greater of:

- twice the amount needed to support the transactions on the ballot, and
- the allowable increase as calculated for general issuances above.

## Recapitalization Plans

**General Recommendation:** Vote case-by-case on recapitalizations (reclassifications of securities), taking into account the following:

- More simplified capital structure;
- Enhanced liquidity;
- Fairness of conversion terms;
- Impact on voting power and dividends;
- Reasons for the reclassification;
- Conflicts of interest; and
- Other alternatives considered.

## Reverse Stock Splits

**General Recommendation:** Vote for management proposals to implement a reverse stock split if:

- The number of authorized shares will be proportionately reduced; or
- The effective increase in authorized shares is equal to or less than the allowable increase calculated in accordance with ISS' Common Stock Authorization policy.

Vote case-by-case on proposals that do not meet either of the above conditions, taking into consideration the following factors:

- Stock exchange notification to the company of a potential delisting;
- Disclosure of substantial doubt about the company's ability to continue as a going concern without additional financing;
- The company's rationale; or
- Other factors as applicable.

## Share Issuance Mandates at U.S. Domestic Issuers Incorporated Outside the U.S.

**General Recommendation:** For U.S. domestic issuers incorporated outside the U.S. and listed <u>solely</u> on a U.S. exchange, generally vote for resolutions to authorize the issuance of common shares up to 20 percent of currently issued common share capital, where not tied to a specific transaction or financing proposal.

For pre-revenue or other early-stage companies that are heavily reliant on periodic equity financing, generally vote for resolutions to authorize the issuance of common shares up to 50 percent of currently issued common share capital. The burden of proof will be on the company to establish that it has a need for the higher limit.

Renewal of such mandates should be sought at each year's annual meeting.

Vote case-by-case on share issuances for a specific transaction or financing proposal.

## Share Repurchase Programs

**General Recommendation:** For U.S.-incorporated companies, and foreign-incorporated U.S. Domestic Issuers that are traded solely on U.S. exchanges, vote for management proposals to institute open-market share repurchase plans in which all shareholders may participate on equal terms, or to grant the board authority to conduct open-market repurchases, in the absence of company-specific concerns regarding:

- Greenmail;
- The use of buybacks to inappropriately manipulate incentive compensation metrics;
- Threats to the company's long-term viability; or
- Other company-specific factors as warranted.

Vote case-by-case on proposals to repurchase shares directly from specified shareholders, balancing the stated rationale against the possibility for the repurchase authority to be misused, such as to repurchase shares from insiders at a premium to market price.

## Share Repurchase Programs Shareholder Proposals

**General Recommendation:** Generally vote against shareholder proposals prohibiting executives from selling shares of company stock during periods in which the company has announced that it may or will be repurchasing shares of its stock. Vote for the proposal when there is a pattern of abuse by executives exercising options or selling shares during periods of share buybacks.

## Stock Distributions: Splits and Dividends

**General Recommendation:** Generally vote for management proposals to increase the common share authorization for stock split or stock dividend, provided that the effective increase in authorized shares is equal to or is less than the allowable increase calculated in accordance with ISS' Common Stock Authorization policy.

## Tracking Stock

**General Recommendation:** Vote case-by-case on the creation of tracking stock, weighing the strategic value of the transaction against such factors as:

- Adverse governance changes;
- Excessive increases in authorized capital stock;
- Unfair method of distribution;
- Diminution of voting rights;
- Adverse conversion features;
- Negative impact on stock option plans; and
- Alternatives such as spin-off.

# Restructuring

## Appraisal Rights

**General Recommendation:** Vote for proposals to restore or provide shareholders with rights of appraisal.

## Asset Purchases

**General Recommendation:** Vote case-by-case on asset purchase proposals, considering the following factors:

- Purchase price;
- Fairness opinion;
- Financial and strategic benefits;
- How the deal was negotiated;
- Conflicts of interest;
- Other alternatives for the business; and
- Non-completion risk.

## Asset Sales

**General Recommendation:** Vote case-by-case on asset sales, considering the following factors:

- Impact on the balance sheet/working capital;
- Potential elimination of diseconomies;
- Anticipated financial and operating benefits;
- Anticipated use of funds;
- Value received for the asset;
- Fairness opinion;
- How the deal was negotiated; and
- Conflicts of interest.

## Bundled Proposals

**General Recommendation:** Vote case-by-case on bundled or "conditional" proxy proposals. In the case of items that are conditioned upon each other, examine the benefits and costs of the packaged items. In instances when the joint effect of the conditioned items is not in shareholders' best interests, vote against the proposals. If the combined effect is positive, support such proposals.

## Conversion of Securities

**General Recommendation:** Vote case-by-case on proposals regarding conversion of securities. When evaluating these proposals, the investor should review the dilution to existing shareholders, the conversion price relative to market value, financial issues, control issues, termination penalties, and conflicts of interest.

Vote for the conversion if it is expected that the company will be subject to onerous penalties or will be forced to file for bankruptcy if the transaction is not approved.

## Corporate Reorganization/Debt Restructuring/Prepackaged Bankruptcy Plans/Reverse Leveraged Buyouts/Wrap Plans

**General Recommendation:** Vote case-by-case on proposals to increase common and/or preferred shares and to issue shares as part of a debt restructuring plan, after evaluating:

- Dilution to existing shareholders' positions;
- Terms of the offer - discount/premium in purchase price to investor, including any fairness opinion; termination penalties; exit strategy;
- Financial issues - company's financial situation; degree of need for capital; use of proceeds; effect of the financing on the company's cost of capital;
- Management's efforts to pursue other alternatives;
- Control issues - change in management; change in control, guaranteed board and committee seats; standstill provisions; voting agreements; veto power over certain corporate actions; and
- Conflict of interest - arm's length transaction, managerial incentives.

Vote for the debt restructuring if it is expected that the company will file for bankruptcy if the transaction is not approved.

## Formation of Holding Company

**General Recommendation:** Vote case-by-case on proposals regarding the formation of a holding company, taking into consideration the following:

- The reasons for the change;
- Any financial or tax benefits;
- Regulatory benefits;
- Increases in capital structure; and

Case 1:26-cv-00717-MPB-MKK     Document 26-3     Filed 04/21/26     Page 314 of 1112
PageID #: 480

UNITED STATES
Proxy Voting Guidelines

ISS ◢

42 of 87

▪ Changes to the articles of incorporation or bylaws of the company.

Absent compelling financial reasons to recommend for the transaction, vote against the formation of a holding company if the transaction would include either of the following:

▪ Increases in common or preferred stock in excess of the allowable maximum (see discussion under "Capital"); or
▪ Adverse changes in shareholder rights.

## Going Private and Going Dark Transactions (LBOs and Minority Squeeze-outs)

**General Recommendation:** Vote case-by-case on going private transactions, taking into account the following:

▪ Offer price/premium;
▪ Fairness opinion;
▪ How the deal was negotiated;
▪ Conflicts of interest;
▪ Other alternatives/offers considered; and
▪ Non-completion risk.

Vote case-by-case on going dark transactions, determining whether the transaction enhances shareholder value by taking into consideration:

▪ Whether the company has attained benefits from being publicly-traded (examination of trading volume, liquidity, and market research of the stock); and
▪ Balanced interests of continuing vs. cashed-out shareholders, taking into account the following:
  ▪ Are all shareholders able to participate in the transaction?
  ▪ Will there be a liquid market for remaining shareholders following the transaction?
  ▪ Does the company have strong corporate governance?
  ▪ Will insiders reap the gains of control following the proposed transaction? and
  ▪ Does the state of incorporation have laws requiring continued reporting that may benefit shareholders?

## Joint Ventures

**General Recommendation:** Vote case-by-case on proposals to form joint ventures, taking into account the following:

▪ Percentage of assets/business contributed;
▪ Percentage ownership;
▪ Financial and strategic benefits;
▪ Governance structure;
▪ Conflicts of interest;
▪ Other alternatives; and
▪ Non-completion risk.

## Liquidations

**General Recommendation:** Vote case-by-case on liquidations, taking into account the following:

- Management's efforts to pursue other alternatives;
- Appraisal value of assets; and
- The compensation plan for executives managing the liquidation.

Vote for the liquidation if the company will file for bankruptcy if the proposal is not approved.

## Mergers and Acquisitions

**General Recommendation:** Vote case-by-case on mergers and acquisitions. Review and evaluate the merits and drawbacks of the proposed transaction, balancing various and sometimes countervailing factors including:

- *Valuation* - Is the value to be received by the target shareholders (or paid by the acquirer) reasonable? While the fairness opinion may provide an initial starting point for assessing valuation reasonableness, emphasis is placed on the offer premium, market reaction, and strategic rationale.
- *Market reaction* - How has the market responded to the proposed deal? A negative market reaction should cause closer scrutiny of a deal.
- *Strategic rationale* - Does the deal make sense strategically? From where is the value derived? Cost and revenue synergies should not be overly aggressive or optimistic, but reasonably achievable. Management should also have a favorable track record of successful integration of historical acquisitions.
- *Negotiations and process* - Were the terms of the transaction negotiated at arm's-length? Was the process fair and equitable? A fair process helps to ensure the best price for shareholders. Significant negotiation "wins" can also signify the deal makers' competency. The comprehensiveness of the sales process (e.g., full auction, partial auction, no auction) can also affect shareholder value.
- *Conflicts of interest* - Are insiders benefiting from the transaction disproportionately and inappropriately as compared to non-insider shareholders? As the result of potential conflicts, the directors and officers of the company may be more likely to vote to approve a merger than if they did not hold these interests. Consider whether these interests may have influenced these directors and officers to support or recommend the merger. The CIC figure presented in the "ISS Transaction Summary" section of this report is an aggregate figure that can in certain cases be a misleading indicator of the true value transfer from shareholders to insiders. Where such figure appears to be excessive, analyze the underlying assumptions to determine whether a potential conflict exists.
- *Governance* - Will the combined company have a better or worse governance profile than the current governance profiles of the respective parties to the transaction? If the governance profile is to change for the worse, the burden is on the company to prove that other issues (such as valuation) outweigh any deterioration in governance.

## Private Placements/Warrants/Convertible Debentures

**General Recommendation:** Vote case-by-case on proposals regarding private placements, warrants, and convertible debentures taking into consideration:

- Dilution to existing shareholders' position: The amount and timing of shareholder ownership dilution should be weighed against the needs and proposed shareholder benefits of the capital infusion. Although newly issued common stock, absent preemptive rights, is typically dilutive to existing shareholders, share price

appreciation is often the necessary event to trigger the exercise of "out of the money" warrants and convertible debt. In these instances from a value standpoint, the negative impact of dilution is mitigated by the increase in the company's stock price that must occur to trigger the dilutive event.

- Terms of the offer (discount/premium in purchase price to investor, including any fairness opinion, conversion features, termination penalties, exit strategy):

  - The terms of the offer should be weighed against the alternatives of the company and in light of company's financial condition. Ideally, the conversion price for convertible debt and the exercise price for warrants should be at a premium to the then prevailing stock price at the time of private placement.

  - When evaluating the magnitude of a private placement discount or premium, consider factors that influence the discount or premium, such as, liquidity, due diligence costs, control and monitoring costs, capital scarcity, information asymmetry, and anticipation of future performance.

- Financial issues:
  - The company's financial condition;
  - Degree of need for capital;
  - Use of proceeds;
  - Effect of the financing on the company's cost of capital;
  - Current and proposed cash burn rate; and
  - Going concern viability and the state of the capital and credit markets.

- Management's efforts to pursue alternatives and whether the company engaged in a process to evaluate alternatives: A fair, unconstrained process helps to ensure the best price for shareholders. Financing alternatives can include joint ventures, partnership, merger, or sale of part or all of the company.

- Control issues:
  - Change in management;
  - Change in control;
  - Guaranteed board and committee seats;
  - Standstill provisions;
  - Voting agreements;
  - Veto power over certain corporate actions; and
  - Minority versus majority ownership and corresponding minority discount or majority control premium.

- Conflicts of interest:
  - Conflicts of interest should be viewed from the perspective of the company and the investor; and
  - Were the terms of the transaction negotiated at arm's length? Are managerial incentives aligned with shareholder interests?

- Market reaction:
  - The market's response to the proposed deal. A negative market reaction is a cause for concern. Market reaction may be addressed by analyzing the one-day impact on the unaffected stock price.

Vote for the private placement, or for the issuance of warrants and/or convertible debentures in a private placement, if it is expected that the company will file for bankruptcy if the transaction is not approved.

## Reorganization/Restructuring Plan (Bankruptcy)

**General Recommendation:** Vote case-by-case on proposals to common shareholders on bankruptcy plans of reorganization, considering the following factors including, but not limited to:

- Estimated value and financial prospects of the reorganized company;
- Percentage ownership of current shareholders in the reorganized company;
- Whether shareholders are adequately represented in the reorganization process (particularly through the existence of an Official Equity Committee);
- The cause(s) of the bankruptcy filing, and the extent to which the plan of reorganization addresses the cause(s);
- Existence of a superior alternative to the plan of reorganization; and
- Governance of the reorganized company.

## Special Purpose Acquisition Corporations (SPACs)

**General Recommendation:** Vote case-by-case on SPAC mergers and acquisitions taking into account the following:

- *Valuation* - Is the value being paid by the SPAC reasonable? SPACs generally lack an independent fairness opinion and the financials on the target may be limited. Compare the conversion price with the intrinsic value of the target company provided in the fairness opinion. Also, evaluate the proportionate value of the combined entity attributable to the SPAC IPO shareholders versus the pre-merger value of SPAC. Additionally, a private company discount may be applied to the target if it is a private entity.
- *Market reaction* - How has the market responded to the proposed deal? A negative market reaction may be a cause for concern. Market reaction may be addressed by analyzing the one-day impact on the unaffected stock price.
- *Deal timing* - A main driver for most transactions is that the SPAC charter typically requires the deal to be complete within 18 to 24 months, or the SPAC is to be liquidated. Evaluate the valuation, market reaction, and potential conflicts of interest for deals that are announced close to the liquidation date.
- *Negotiations and process* - What was the process undertaken to identify potential target companies within specified industry or location specified in charter? Consider the background of the sponsors.
- *Conflicts of interest* - How are sponsors benefiting from the transaction compared to IPO shareholders? Potential conflicts could arise if a fairness opinion is issued by the insiders to qualify the deal rather than a third party or if management is encouraged to pay a higher price for the target because of an 80 percent rule (the charter requires that the fair market value of the target is at least equal to 80 percent of net assets of the SPAC). Also, there may be sense of urgency by the management team of the SPAC to close the deal since its charter typically requires a transaction to be completed within the 18-24-month timeframe.
- *Voting agreements* - Are the sponsors entering into enter into any voting agreements/tender offers with shareholders who are likely to vote against the proposed merger or exercise conversion rights?
- *Governance* - What is the impact of having the SPAC CEO or founder on key committees following the proposed merger?

## Special Purpose Acquisition Corporations (SPACs) - Proposals for Extensions

The main purpose of SPACs is to identify and acquire a viable target within a specified timeframe, and failure to achieve this objective within the allotted time calls into question management's ability to execute its primary objective. The end of that timeframe is generally referred to as the termination date.

**General Recommendation:** Generally support requests to extend the termination date by up to one year from the SPAC's original termination date (inclusive of any built-in extension options, and accounting for prior extension requests).

Other factors that may be considered include: any added incentives, business combination status, other amendment terms, and, if applicable, use of money in the trust fund to pay excise taxes on redeemed shares.

## Spin-offs

**General Recommendation:** Vote case-by-case on spin-offs, considering:

- Tax and regulatory advantages;
- Planned use of the sale proceeds;
- Valuation of spinoff;
- Fairness opinion;
- Benefits to the parent company;
- Conflicts of interest;
- Managerial incentives;
- Corporate governance changes; and
- Changes in the capital structure.

## Value Maximization Shareholder Proposals

**General Recommendation:** Vote case-by-case on shareholder proposals seeking to maximize shareholder value by:

- Hiring a financial advisor to explore strategic alternatives;
- Selling the company; or
- Liquidating the company and distributing the proceeds to shareholders.

These proposals should be evaluated based on the following factors:

- Prolonged poor performance with no turnaround in sight;
- Signs of entrenched board and management (such as the adoption of takeover defenses);
- Strategic plan in place for improving value;
- Likelihood of receiving reasonable value in a sale or dissolution; and
- The company actively exploring its strategic options, including retaining a financial advisor.

# 5. Compensation

## Executive Pay Evaluation

Underlying all evaluations are five global principles that most investors expect corporations to adhere to in designing and administering executive and director compensation programs:

1. Maintain appropriate pay-for-performance alignment, with emphasis on long-term shareholder value: This principle encompasses overall executive pay practices, which must be designed to attract, retain, and appropriately motivate the key employees who drive shareholder value creation over the long term. It will take into consideration, among other factors, the link between pay and performance; the mix between fixed and variable pay; performance goals; and equity-based plan costs;
2. Avoid arrangements that risk "pay for failure": This principle addresses the appropriateness of long or indefinite contracts, excessive severance packages, and guaranteed compensation;
3. Maintain an independent and effective compensation committee: This principle promotes oversight of executive pay programs by directors with appropriate skills, knowledge, experience, and a sound process for compensation decision-making (*e.g.*, including access to independent expertise and advice when needed);
4. Provide shareholders with clear, comprehensive compensation disclosures: This principle underscores the importance of informative and timely disclosures that enable shareholders to evaluate executive pay practices fully and fairly; and
5. Avoid inappropriate pay to non-executive directors: This principle recognizes the interests of shareholders in ensuring that compensation to outside directors is reasonable and does not compromise their independence and ability to make appropriate judgments in overseeing managers' pay and performance. At the market level, it may incorporate a variety of generally accepted best practices.

### Advisory Votes on Executive Compensation—Management Proposals (Say-on-Pay)

**General Recommendation:** Vote case-by-case on ballot items related to executive pay and practices, as well as certain aspects of outside director compensation.

Vote against Advisory Votes on Executive Compensation (Say-on-Pay or "SOP") if:

- There is an unmitigated misalignment between CEO pay and company performance (pay for performance);
- The company maintains significant problematic pay practices; or
- The board exhibits a significant level of poor communication and responsiveness to shareholders.

Vote against or withhold from the members of the Compensation Committee and potentially the full board if:

- There is no SOP on the ballot, and an against vote on an SOP would otherwise be warranted due to pay-for-performance misalignment, problematic pay practices, or the lack of adequate responsiveness on compensation issues raised previously, or a combination thereof;
- The board fails to respond adequately to a previous SOP proposal that received less than 70 percent support of votes cast;
- The company has recently practiced or approved problematic pay practices, such as option repricing or option backdating; or
- The situation is egregious.

Primary Evaluation Factors for Executive Pay

## Pay-for-Performance Evaluation

ISS annually conducts a pay-for-performance analysis to identify strong or satisfactory alignment between pay and performance over a sustained period. With respect to companies in the S&P1500, Russell 3000, or Russell 3000E Indices, this analysis considers the following:

1. Peer Group[18] Alignment:

- The degree of alignment between the company's annualized TSR rank and the CEO's annualized total pay rank within a peer group, each measured over a five-year period.
- The rankings of CEO total pay and company financial performance within a peer group, each measured over a five-year period.
- The multiple of the CEO's total pay relative to the peer group median over one- and three-year periods.

2. Absolute Alignment[19] – the absolute alignment between the trend in CEO pay and company TSR over the prior five fiscal years – i.e., the difference between the trend in annual pay changes and the trend in annualized TSR during the period.

If the above analysis demonstrates significant unsatisfactory long-term pay-for-performance alignment or, in the case of companies outside the Russell indices, a misalignment between pay and performance is otherwise suggested, our analysis may include any of the following qualitative factors, as relevant to an evaluation of how various pay elements may work to encourage or to undermine long-term value creation and alignment with shareholder interests:

- The overall ratio of performance-based compensation to fixed or discretionary pay;
- The ratio of performance- to time-based long-term incentive awards;
- Vesting and/or retention requirements for equity awards that demonstrate a long-term focus;
- The rigor of performance goals;
- The complexity and risks around pay program design;
- The transparency and clarity of disclosure;
- The company's peer group benchmarking practices;
- Financial/operational results, both absolute and relative to peers;
- Special circumstances related to, for example, a new CEO in the prior FY or anomalous equity grant practices (e.g., bi-annual awards);
- Realizable and/or realized pay compared to granted pay; and
- Any other factors deemed relevant.

## Problematic Pay Practices

Problematic pay elements are generally evaluated case-by-case considering the context of a company's overall pay program and demonstrated pay-for-performance philosophy. The focus is on executive compensation practices that contravene the global pay principles, including:

- Problematic practices related to non-performance-based compensation elements;
- Incentives that may motivate excessive risk-taking or present a windfall risk; and

---

[18] The ISS peer group is generally comprised of 14-24 companies that are selected using factors such as market cap, revenue, assets, GICS industry group, and the company selected peers' GICS industry group. ISS' peer selection methodology is detailed in the U.S. Peer Group FAQ.

[19] Russell 3000E Index companies (excluding S&P1500 and Russell 3000 companies) are not subject to the Absolute Alignment analysis.

- Pay decisions that circumvent pay-for-performance, such as options backdating or waiving performance requirements.

The list of examples below highlights certain problematic practices that carry significant weight in this overall consideration and may result in adverse vote recommendations:

- Repricing or replacing of underwater stock options/SARs without prior shareholder approval (including cash buyouts and voluntary surrender of underwater options);
- Extraordinary perquisites or tax gross-ups;
- New or materially amended agreements that provide for:
  - Excessive termination or CIC severance payments (generally exceeding 3 times base salary and average/target/most recent bonus);
  - CIC severance payments without involuntary job loss or substantial diminution of duties ("single" or "modified single" triggers) or in connection with a problematic Good Reason definition;
  - CIC excise tax gross-up entitlements (including "modified" gross-ups); and/or
  - Multi-year guaranteed awards that are not at risk due to rigorous performance conditions;
- Liberal CIC definition combined with any single-trigger CIC benefits;
- Insufficient executive compensation disclosure by externally-managed issuers (EMIs) such that a reasonable assessment of pay programs and practices applicable to the EMI's executives is not possible;
- Severance payments made when the termination is not clearly disclosed as involuntary (for example, a termination without cause or resignation for good reason); and/or
- Any other provision or practice deemed to be egregious and present a significant risk to investors.

The above examples are not an exhaustive list. Please refer to ISS' U.S. Compensation Policies FAQ document for additional detail on specific pay practices that have been identified as problematic and may lead to negative vote recommendations.

**Options Backdating**

The following factors should be examined case-by-case to allow for distinctions to be made between "sloppy" plan administration versus deliberate action or fraud:

- Reason and motive for the options backdating issue, such as inadvertent vs. deliberate grant date changes;
- Duration of options backdating;
- Size of restatement due to options backdating;
- Corrective actions taken by the board or compensation committee, such as canceling or re-pricing backdated options, the recouping of option gains on backdated grants; and
- Adoption of a grant policy that prohibits backdating and creates a fixed grant schedule or window period for equity grants in the future.

## Compensation Committee Communications and Responsiveness

Consider the following factors case-by-case when evaluating ballot items related to executive pay on the board's responsiveness to investor input and engagement on compensation issues:

- Failure to respond to majority-supported shareholder proposals on executive pay topics; or
- Failure to adequately respond to the company's previous say-on-pay proposal that received low support taking into account the factors identified under the Responsiveness section in the Board of Directors policy with respect to say-on-pay.

Case 1:26-cv-00717-MPB-MKK    Document 26-3    Filed 04/21/26    Page 322 of 1112
PageID #: 488

## Frequency of Advisory Vote on Executive Compensation ("Say When on Pay")

**General Recommendation:** Vote for annual advisory votes on compensation, which provide the most consistent and clear communication channel for shareholder concerns about companies' executive pay programs.

## Voting on Golden Parachutes in an Acquisition, Merger, Consolidation, or Proposed Sale

**General Recommendation:** Vote case-by-case on say on Golden Parachute proposals, including consideration of existing change-in-control arrangements maintained with named executive officers but also considering new or extended arrangements.

Features that may result in an "against" recommendation include one or more of the following, depending on the number, magnitude, and/or timing of issue(s):

- Single- or modified-single-trigger cash severance;
- Single-trigger acceleration of unvested equity awards;
- Full acceleration of equity awards granted shortly before the change in control;
- Acceleration of performance awards above the target level of performance without compelling rationale;
- Excessive cash severance (generally >3x base salary and bonus);
- Excise tax gross-ups triggered and payable;
- Excessive golden parachute payments (on an absolute basis or as a percentage of transaction equity value); or
- Recent amendments that incorporate any problematic features (such as those above) or recent actions (such as extraordinary equity grants) that may make packages so attractive as to influence merger agreements that may not be in the best interests of shareholders; or
- The company's assertion that a proposed transaction is conditioned on shareholder approval of the golden parachute advisory vote.

Recent amendment(s) that incorporate problematic features will tend to carry more weight on the overall analysis. However, the presence of multiple legacy problematic features will also be closely scrutinized.

In cases where the golden parachute vote is incorporated into a company's advisory vote on compensation (management say-on-pay), ISS will evaluate the say-on-pay proposal in accordance with these guidelines, which may give higher weight to that component of the overall evaluation.

## Equity-Based and Other Incentive Plans

Please refer to ISS' U.S. Equity Compensation Plans FAQ document for additional details on the Equity Plan Scorecard policy.

**General Recommendation:** Vote case-by-case on equity plan proposals subject to the Equity Plan Scorecard framework, where positive factors may counterbalance negative factors under three pillars:

**I. Plan Cost:** The total estimated cost of the company's equity plans relative to industry/market cap peers, measured by the company's estimated Shareholder Value Transfer (SVT) in relation to peers and considering both:

- SVT based on new shares requested plus shares remaining for future grants, plus outstanding unvested/unexercised grants; and
- SVT based only on new shares requested plus shares remaining for future grants.

**II. Plan Features:**

- Quality of disclosure around vesting upon a change in control (CIC);
- Discretionary vesting authority;
- Liberal share recycling on various award types;
- Lack of minimum vesting period for grants made under the plan;
- Dividends payable prior to award vesting; and
- Cash-denominated award limits for non-employee directors.

**III. Grant Practices:**

- The company's three-year burn rate relative to its industry/market cap peers;
- Vesting requirements in CEO's recent equity grants;
- The estimated duration of the plan;
- The proportion of the CEO's most recent equity grants/awards classified by ISS as performance-based;
- Whether the company maintains a sufficient claw-back policy; and
- Whether the company maintains sufficient post-exercise/vesting share-holding requirements.

Generally vote against the plan proposal if the combination of above factors indicates that the plan is not, overall, in shareholders' interests, or if any of the following egregious factors ("overriding factors") apply:

- Awards may vest in connection with a liberal change-of-control definition;
- The plan would permit repricing or cash buyout of underwater options without shareholder approval (either by expressly permitting it – for NYSE and Nasdaq listed companies – or by not prohibiting it when the company has a history of repricing – for non-listed companies);
- The plan is a vehicle for problematic pay practices or a significant pay-for-performance disconnect under certain circumstances;
- The plan is excessively dilutive to shareholders' holdings;
- The plan contains an evergreen (automatic share replenishment) feature;
- The plan lacks sufficient positive features under the Plan Features pillar; or
- Any other factors that are determined to have a significant negative impact on shareholder interests.

**Further Information on certain EPSC Factors:**

## Shareholder Value Transfer (SVT)

The cost of the equity plans is expressed as Shareholder Value Transfer (SVT), which is measured using a binomial option pricing model that assesses the amount of shareholders' equity flowing out of the company to employees and directors. SVT is expressed as both a dollar amount and as a percentage of market value, and includes the new shares proposed, shares available under existing plans, and shares granted but unexercised (using two measures, in the case of plans subject to the Equity Plan Scorecard evaluation, as noted above). All award types are valued. For omnibus plans, unless limitations are placed on the most expensive types of awards (for example, full-value awards), the assumption is made that all awards to be granted will be the most expensive types.

For proposals that are not subject to the Equity Plan Scorecard evaluation, Shareholder Value Transfer is reasonable if it falls below a company-specific benchmark. The benchmark is determined as follows: The top quartile performers in each industry group (using the Global Industry Classification Standard: GICS) are identified. Benchmark SVT levels for each industry are established based on these top performers' historic SVT. Regression analyses are run on each industry group to identify the variables most strongly correlated to SVT. The benchmark industry SVT level is then adjusted upwards or downwards for the specific company by plugging the company-specific performance measures, size, and cash compensation into the industry cap equations to arrive at the company's benchmark.[20]

### Three-Year Value-Adjusted Burn Rate

A "Value-Adjusted Burn Rate" is used for stock plan evaluations. Value-Adjusted Burn Rate benchmarks are calculated as the greater of: (1) an industry-specific threshold based on three-year burn rates within the company's GICS group segmented by S&P 500, Russell 3000 index (less the S&P 500) and non-Russell 3000 index; and (2) a *de minimis* threshold established separately for each of the S&P 500, the Russell 3000 index less the S&P 500, and the non-Russell 3000 index. Year-over-year burn-rate benchmark changes will be limited to a predetermined range above or below the prior year's burn-rate benchmark.

The Value-Adjusted Burn Rate is calculated as follows:

Value-Adjusted Burn Rate = ((# of options * option's dollar value using a Black-Scholes model) + (# of full-value awards * stock price)) / (Weighted average common shares * stock price).

## Egregious Factors

### Liberal Change in Control Definition

Generally vote against equity plans if the plan has a liberal definition of change in control and the equity awards could vest upon such liberal definition of change in control, even though an actual change in control may not occur. Examples of such a definition include, but are not limited to, announcement or commencement of a tender offer, provisions for acceleration upon a "potential" takeover, shareholder approval of a merger or other transactions, or similar language.

### Repricing Provisions

Vote against plans that expressly permit the repricing or exchange of underwater stock options/stock appreciate rights (SARs) without prior shareholder approval. "Repricing" typically includes the ability to do any of the following:

- Amend the terms of outstanding options or SARs to reduce the exercise price of such outstanding options or SARs;
- Cancel outstanding options or SARs in exchange for options or SARs with an exercise price that is less than the exercise price of the original options or SARs;
- Cancel underwater options in exchange for stock awards; or
- Provide cash buyouts of underwater options.

---

[20] For plans evaluated under the Equity Plan Scorecard policy, the company's SVT benchmark is considered along with other factors.

While the above cover most types of repricing, ISS may view other provisions as akin to repricing depending on the facts and circumstances.

Also, vote against or withhold from members of the Compensation Committee who approved repricing (as defined above or otherwise determined by ISS), without prior shareholder approval, even if such repricings are allowed in their equity plan.

Vote against plans that do not expressly prohibit repricing or cash buyout of underwater options without shareholder approval if the company has a history of repricing/buyouts without shareholder approval, and the applicable listing standards would not preclude them from doing so.

## Problematic Pay Practices or Significant Pay-for-Performance Disconnect

If the equity plan on the ballot is a vehicle for problematic pay practices, vote against the plan.

ISS may recommend a vote against the equity plan if the plan is determined to be a vehicle for pay-for-performance misalignment. Considerations in voting against the equity plan may include, but are not limited to:

- Severity of the pay-for-performance misalignment;
- Whether problematic equity grant practices are driving the misalignment; and/or
- Whether equity plan awards have been heavily concentrated to the CEO and/or the other NEOs.

## Amending Cash and Equity Plans (including Approval for Tax Deductibility (162(m))

**General Recommendation:** Vote case-by-case on amendments to cash and equity incentive plans.

Generally vote for proposals to amend executive cash, stock, or cash and stock incentive plans if the proposal:
- Addresses administrative features only; or
- Seeks approval for Section 162(m) purposes only, and the plan administering committee consists entirely of independent directors, per ISS' Classification of Directors. Note that if the company is presenting the plan to shareholders for the first time for any reason (including after the company's initial public offering), or if the proposal is bundled with other material plan amendments, then the recommendation will be case-by-case (see below).

Vote against proposals to amend executive cash, stock, or cash and stock incentive plans if the proposal:
- Seeks approval for Section 162(m) purposes only, and the plan administering committee does not consist entirely of independent directors, per ISS' Classification of Directors.

Vote case-by-case on all other proposals to amend cash incentive plans. This includes plans presented to shareholders for the first time after the company's IPO and/or proposals that bundle material amendment(s) other than those for Section 162(m) purposes.

Vote case-by-case on all other proposals to amend equity incentive plans, considering the following:

- If the proposal requests additional shares and/or the amendments include a term extension or addition of full value awards as an award type, the recommendation will be based on the Equity Plan Scorecard evaluation as well as an analysis of the overall impact of the amendments;

- If the plan is being presented to shareholders for the first time (including after the company's IPO), whether or not additional shares are being requested, the recommendation will be based on the Equity Plan Scorecard evaluation as well as an analysis of the overall impact of any amendments; and
- If there is no request for additional shares and the amendments do not include a term extension or addition of full value awards as an award type, then the recommendation will be based entirely on an analysis of the overall impact of the amendments, and the EPSC evaluation will be shown only for informational purposes.

In the first two case-by-case evaluation scenarios, the EPSC evaluation/score is the more heavily weighted consideration.

## Specific Treatment of Certain Award Types in Equity Plan Evaluations

### Dividend Equivalent Rights

Options that have Dividend Equivalent Rights (DERs) associated with them will have a higher calculated award value than those without DERs under the binomial model, based on the value of these dividend streams. The higher value will be applied to new shares, shares available under existing plans, and shares awarded but not exercised per the plan specifications. DERS transfer more shareholder equity to employees and non-employee directors and this cost should be captured.

### Operating Partnership (OP) Units in Equity Plan Analysis of Real Estate Investment Trusts (REITs)

For Real Estate Investment Trusts (REITS), include the common shares issuable upon conversion of outstanding Operating Partnership (OP) units in the share count for the purposes of determining: (1) market capitalization in the Shareholder Value Transfer (SVT) analysis and (2) shares outstanding in the burn rate analysis.

## Other Compensation Plans

### 401(k) Employee Benefit Plans

**General Recommendation:** Vote for proposals to implement a 401(k) savings plan for employees.

### Employee Stock Ownership Plans (ESOPs)

**General Recommendation:** Vote for proposals to implement an ESOP or increase authorized shares for existing ESOPs, unless the number of shares allocated to the ESOP is excessive (more than five percent of outstanding shares).

## Employee Stock Purchase Plans—Qualified Plans

**General Recommendation:** Vote case-by-case on qualified employee stock purchase plans. Vote for employee stock purchase plans where all of the following apply:

- Purchase price is at least 85 percent of fair market value;
- Offering period is 27 months or less; and
- The number of shares allocated to the plan is 10 percent or less of the outstanding shares.

Vote against qualified employee stock purchase plans where when the plan features do not meet all of the above criteria.

## Employee Stock Purchase Plans—Non-Qualified Plans

**General Recommendation:** Vote case-by-case on nonqualified employee stock purchase plans. Vote for nonqualified employee stock purchase plans with all the following features:

- Broad-based participation;
- Limits on employee contribution, which may be a fixed dollar amount or expressed as a percent of base salary;
- Company matching contribution up to 25 percent of employee's contribution, which is effectively a discount of 20 percent from market value; and
- No discount on the stock price on the date of purchase when there is a company matching contribution.

Vote against nonqualified employee stock purchase plans when the plan features do not meet all of the above criteria. If the matching contribution or effective discount exceeds the above, ISS may evaluate the SVT cost of the plan as part of the assessment.

## Option Exchange Programs/Repricing Options

**General Recommendation:** Vote case-by-case on management proposals seeking approval to exchange/reprice options taking into consideration:

- Historic trading patterns--the stock price should not be so volatile that the options are likely to be back "in-the-money" over the near term;
- Rationale for the re-pricing--was the stock price decline beyond management's control?;
- Is this a value-for-value exchange?;
- Are surrendered stock options added back to the plan reserve?;
- Timing--repricing should occur at least one year out from any precipitous drop in company's stock price;
- Option vesting--does the new option vest immediately or is there a black-out period?;
- Term of the option--the term should remain the same as that of the replaced option;
- Exercise price--should be set at fair market or a premium to market; and
- Participants--executive officers and directors must be excluded.

If the surrendered options are added back to the equity plans for re-issuance, then also take into consideration the company's total cost of equity plans and its three-year average burn rate.

In addition to the above considerations, evaluate the intent, rationale, and timing of the repricing proposal. The proposal should clearly articulate why the board is choosing to conduct an exchange program at this point in time. Repricing underwater options after a recent precipitous drop in the company's stock price demonstrates poor timing and warrants additional scrutiny. Also, consider the terms of the surrendered options, such as the grant date, exercise price and vesting schedule. Grant dates of surrendered options should be far enough back (two to three years) so as not to suggest that repricings are being done to take advantage of short-term downward price movements. Similarly, the exercise price of surrendered options should be above the 52-week high for the stock price.

Vote for shareholder proposals to put option repricings to a shareholder vote.

## Stock Plans in Lieu of Cash

**General Recommendation:** Vote case-by-case on plans that provide participants with the option of taking all or a portion of their cash compensation in the form of stock.

Vote for non-employee director-only equity plans that provide a dollar-for-dollar cash-for-stock exchange.

Vote case-by-case on plans which do not provide a dollar-for-dollar cash for stock exchange. In cases where the exchange is not dollar-for-dollar, the request for new or additional shares for such equity program will be considered using the binomial option pricing model. In an effort to capture the total cost of total compensation, ISS will not make any adjustments to carve out the in-lieu-of cash compensation.

## Transfer Stock Option (TSO) Programs

**General Recommendation:** One-time Transfers: Vote against or withhold from compensation committee members if they fail to submit one-time transfers to shareholders for approval.

Vote case-by-case on one-time transfers. Vote for if:

- Executive officers and non-employee directors are excluded from participating;
- Stock options are purchased by third-party financial institutions at a discount to their fair value using option pricing models such as Black-Scholes or a Binomial Option Valuation or other appropriate financial models; and
- There is a two-year minimum holding period for sale proceeds (cash or stock) for all participants.

Additionally, management should provide a clear explanation of why options are being transferred to a third-party institution and whether the events leading up to a decline in stock price were beyond management's control. A review of the company's historic stock price volatility should indicate if the options are likely to be back "in-the-money" over the near term.

Ongoing TSO program: Vote against equity plan proposals if the details of ongoing TSO programs are not provided to shareholders. Since TSOs will be one of the award types under a stock plan, the ongoing TSO program, structure, and mechanics must be disclosed to shareholders. The specific criteria to be considered in evaluating these proposals include, but not limited, to the following:

- Eligibility;
- Vesting;
- Bid-price;

- Term of options;
- Cost of the program and impact of the TSOs on company's total option expense; and
- Option repricing policy.

Amendments to existing plans that allow for introduction of transferability of stock options should make clear that only options granted post-amendment shall be transferable.

# Director Compensation

## Shareholder Ratification of Director Pay Programs

**General Recommendation:** Vote case-by-case on management proposals seeking ratification of non-employee director compensation, based on the following factors:

- If the equity plan under which non-employee director grants are made is on the ballot, whether or not it warrants support; and
- An assessment of the following qualitative factors:
  - The relative magnitude of director compensation as compared to companies of a similar profile;
  - The presence of problematic pay practices relating to director compensation;
  - Director stock ownership guidelines and holding requirements;
  - Equity award vesting schedules;
  - The mix of cash and equity-based compensation;
  - Meaningful limits on director compensation;
  - The availability of retirement benefits or perquisites; and
  - The quality of disclosure surrounding director compensation.

## Equity Plans for Non-Employee Directors

**General Recommendation:** Vote case-by-case on compensation plans for non-employee directors, based on:

- The total estimated cost of the company's equity plans relative to industry/market cap peers, measured by the company's estimated Shareholder Value Transfer (SVT) based on new shares requested plus shares remaining for future grants, plus outstanding unvested/unexercised grants;
- The company's three-year burn rate relative to its industry/market cap peers (in certain circumstances); and
- The presence of any egregious plan features (such as an option repricing provision or liberal CIC vesting risk).

On occasion, non-employee director stock plans will exceed the plan cost or burn-rate benchmarks when combined with employee or executive stock plans. In such cases, vote case-by-case on the plan taking into consideration the following qualitative factors:

- The relative magnitude of director compensation as compared to companies of a similar profile;
- The presence of problematic pay practices relating to director compensation;
- Director stock ownership guidelines and holding requirements;
- Equity award vesting schedules;
- The mix of cash and equity-based compensation;
- Meaningful limits on director compensation;
- The availability of retirement benefits or perquisites; and

▪ The quality of disclosure surrounding director compensation.

## Non-Employee Director Retirement Plans

**General Recommendation:** Vote against retirement plans for non-employee directors. Vote for shareholder proposals to eliminate retirement plans for non-employee directors.

# Shareholder Proposals on Compensation

## Bonus Banking/Bonus Banking "Plus"

**General Recommendation:** Vote case-by-case on proposals seeking deferral of a portion of annual bonus pay, with ultimate payout linked to sustained results for the performance metrics on which the bonus was earned (whether for the named executive officers or a wider group of employees), taking into account the following factors:

▪ The company's past practices regarding equity and cash compensation;
▪ Whether the company has a holding period or stock ownership requirements in place, such as a meaningful retention ratio (at least 50 percent for full tenure); and
▪ Whether the company has a rigorous claw-back policy in place.

## Compensation Consultants—Disclosure of Board or Company's Utilization

**General Recommendation:** Generally vote for shareholder proposals seeking disclosure regarding the company, board, or compensation committee's use of compensation consultants, such as company name, business relationship(s), and fees paid.

## Disclosure/Setting Levels or Types of Compensation for Executives and Directors

**General Recommendation:** Generally vote for shareholder proposals seeking additional disclosure of executive and director pay information, provided the information requested is relevant to shareholders' needs, would not put the company at a competitive disadvantage relative to its industry, and is not unduly burdensome to the company.

Generally vote against shareholder proposals seeking to set absolute levels on compensation or otherwise dictate the amount or form of compensation (such as types of compensation elements or specific metrics) to be used for executive or directors.

Generally vote against shareholder proposals that mandate a minimum amount of stock that directors must own in order to qualify as a director or to remain on the board.

Vote case-by-case on all other shareholder proposals regarding executive and director pay, taking into account relevant factors, including but not limited to: company performance, pay level and design versus peers, history of

compensation concerns or pay-for-performance disconnect, and/or the scope and prescriptive nature of the proposal.

## Golden Coffins/Executive Death Benefits

**General Recommendation:** Generally vote for proposals calling for companies to adopt a policy of obtaining shareholder approval for any future agreements and corporate policies that could oblige the company to make payments or awards following the death of a senior executive in the form of unearned salary or bonuses, accelerated vesting or the continuation in force of unvested equity grants, perquisites and other payments or awards made in lieu of compensation. This would not apply to any benefit programs or equity plan proposals for which the broad-based employee population is eligible.

## Hold Equity Past Retirement or for a Significant Period of Time

**General Recommendation:** Vote case-by-case on shareholder proposals asking companies to adopt policies requiring senior executive officers to retain a portion of net shares acquired through compensation plans. The following factors will be taken into account:

- The percentage/ratio of net shares required to be retained;
- The time period required to retain the shares;
- Whether the company has equity retention, holding period, and/or stock ownership requirements in place and the robustness of such requirements;
- Whether the company has any other policies aimed at mitigating risk taking by executives;
- Executives' actual stock ownership and the degree to which it meets or exceeds the proponent's suggested holding period/retention ratio or the company's existing requirements; and
- Problematic pay practices, current and past, which may demonstrate a short-term versus long-term focus.

## Pay Disparity

**General Recommendation:** Vote case-by-case on proposals calling for an analysis of the pay disparity between corporate executives and other non-executive employees. The following factors will be considered:

- The company's current level of disclosure of its executive compensation setting process, including how the company considers pay disparity;
- If any problematic pay practices or pay-for-performance concerns have been identified at the company; and
- The level of shareholder support for the company's pay programs.

Generally vote against proposals calling for the company to use the pay disparity analysis or pay ratio in a specific way to set or limit executive pay.

## Pay for Performance/Performance-Based Awards

**General Recommendation:** Vote case-by-case on shareholder proposals requesting that a significant amount of future long-term incentive compensation awarded to senior executives shall be performance-based and requesting that the board adopt and disclose challenging performance metrics to shareholders, based on the following analytical steps:

- First, vote for shareholder proposals advocating the use of performance-based equity awards, such as performance contingent options or restricted stock, indexed options, or premium-priced options, unless the proposal is overly restrictive or if the company has demonstrated that it is using a "substantial" portion of performance-based awards for its top executives. Standard stock options and performance-accelerated awards do not meet the criteria to be considered as performance-based awards. Further, premium-priced options should have a meaningful premium to be considered performance-based awards; and

- Second, assess the rigor of the company's performance-based equity program. If the bar set for the performance-based program is too low based on the company's historical or peer group comparison, generally vote for the proposal. Furthermore, if target performance results in an above target payout, vote for the shareholder proposal due to program's poor design. If the company does not disclose the performance metric of the performance-based equity program, vote for the shareholder proposal regardless of the outcome of the first step to the test.

In general, vote for the shareholder proposal if the company does not meet both of the above two steps.

## Pay for Superior Performance

**General Recommendation:** Vote case-by-case on shareholder proposals that request the board establish a pay-for-superior performance standard in the company's executive compensation plan for senior executives. These proposals generally include the following principles:

- Set compensation targets for the plan's annual and long-term incentive pay components at or below the peer group median;
- Deliver a majority of the plan's target long-term compensation through performance-vested, not simply time-vested, equity awards;
- Provide the strategic rationale and relative weightings of the financial and non-financial performance metrics or criteria used in the annual and performance-vested long-term incentive components of the plan;
- Establish performance targets for each plan financial metric relative to the performance of the company's peer companies; and
- Limit payment under the annual and performance-vested long-term incentive components of the plan to when the company's performance on its selected financial performance metrics exceeds peer group median performance.

Consider the following factors in evaluating this proposal:

- What aspects of the company's annual and long-term equity incentive programs are performance driven?
- If the annual and long-term equity incentive programs are performance driven, are the performance criteria and hurdle rates disclosed to shareholders or are they benchmarked against a disclosed peer group?
- Can shareholders assess the correlation between pay and performance based on the current disclosure? and
- What type of industry and stage of business cycle does the company belong to?

## Pre-Arranged Trading Plans (10b5-1 Plans)

**General Recommendation:** Generally vote for shareholder proposals calling for the addition of certain safeguards in prearranged trading plans (10b5-1 plans) for executives. Safeguards may include:

- Adoption, amendment, or termination of a 10b5-1 Plan must be disclosed in a Form 8-K;
- Amendment or early termination of a 10b5-1 Plan allowed only under extraordinary circumstances, as determined by the board;
- Request that a certain number of days that must elapse between adoption or amendment of a 10b5-1 Plan and initial trading under the plan;
- Reports on Form 4 must identify transactions made pursuant to a 10b5-1 Plan;
- An executive may not trade in company stock outside the 10b5-1 Plan; and
- Trades under a 10b5-1 Plan must be handled by a broker who does not handle other securities transactions for the executive.

## Prohibit Outside CEOs from Serving on Compensation Committees

**General Recommendation:** Generally vote against proposals seeking a policy to prohibit any outside CEO from serving on a company's compensation committee, unless the company has demonstrated problematic pay practices that raise concerns about the performance and composition of the committee.

## Recoupment of Incentive or Stock Compensation in Specified Circumstances

**General Recommendation:** Vote case-by-case on proposals to recoup incentive cash or stock compensation made to senior executives if it is later determined that the figures upon which incentive compensation is earned turn out to have been in error, or if the senior executive has breached company policy or has engaged in misconduct that may be significantly detrimental to the company's financial position or reputation, or if the senior executive failed to manage or monitor risks that subsequently led to significant financial or reputational harm to the company. Many companies have adopted policies that permit recoupment in cases where an executive's fraud, misconduct, or negligence significantly contributed to a restatement of financial results that led to the awarding of unearned incentive compensation. However, such policies may be narrow given that not all misconduct or negligence may result in significant financial restatements. Misconduct, negligence, or lack of sufficient oversight by senior executives may lead to significant financial loss or reputational damage that may have long-lasting impact.

In considering whether to support such shareholder proposals, ISS will take into consideration the following factors:

- If the company has adopted a formal recoupment policy;
- The rigor of the recoupment policy focusing on how and under what circumstances the company may recoup incentive or stock compensation;
- Whether the company has chronic restatement history or material financial problems;
- Whether the company's policy substantially addresses the concerns raised by the proponent;
- Disclosure of recoupment of incentive or stock compensation from senior executives or lack thereof; and
- Any other relevant factors.

## Severance and Golden Parachute Agreements

**General Recommendation:** Vote case-by-case on shareholder proposals requiring that executive severance (including change-in-control related) arrangements or payments be submitted for shareholder ratification.

Factors that will be considered include, but are not limited to:

- The company's severance or change-in-control agreements in place, and the presence of problematic features (such as excessive severance entitlements, single triggers, excise tax gross-ups, etc.);
- Any existing limits on cash severance payouts or policies which require shareholder ratification of severance payments exceeding a certain level;
- Any recent severance-related controversies; and
- Whether the proposal is overly prescriptive, such as requiring shareholder approval of severance that does not exceed market norms.

## Share Buyback Impact on Incentive Program Metrics

**General Recommendation:** Vote case-by-case on proposals requesting the company exclude the impact of share buybacks from the calculation of incentive program metrics, considering the following factors:

- The frequency and timing of the company's share buybacks;
- The use of per-share metrics in incentive plans;
- The effect of recent buybacks on incentive metric results and payouts; and
- Whether there is any indication of metric result manipulation.

## Supplemental Executive Retirement Plans (SERPs)

**General Recommendation:** Generally vote for shareholder proposals requesting to put extraordinary benefits contained in SERP agreements to a shareholder vote unless the company's executive pension plans do not contain excessive benefits beyond what is offered under employee-wide plans.

Generally vote for shareholder proposals requesting to limit the executive benefits provided under the company's supplemental executive retirement plan (SERP) by limiting covered compensation to a senior executive's annual salary or those pay elements covered for the general employee population.

## Tax Gross-Up Proposals

**General Recommendation:** Generally vote for proposals calling for companies to adopt a policy of not providing tax gross-up payments to executives, except in situations where gross-ups are provided pursuant to a plan, policy, or arrangement applicable to management employees of the company, such as a relocation or expatriate tax equalization policy.

## Termination of Employment Prior to Severance Payment/Eliminating Accelerated Vesting of Unvested Equity

**General Recommendation:** Vote case-by-case on shareholder proposals seeking a policy requiring termination of employment prior to severance payment and/or eliminating accelerated vesting of unvested equity.

The following factors will be considered:

UNITED STATES
Proxy Voting Guidelines

Case 1:26-cv-00717-MPB-MKK    Document 26-3    Filed 04/21/26    Page 335 of 1112
PageID #: 501

ISS

63 of 87

- The company's current treatment of equity upon employment termination and/or in change-in-control situations (i.e., vesting is double triggered and/or pro rata, does it allow for the assumption of equity by acquiring company, the treatment of performance shares, etc.); and
- Current employment agreements, including potential poor pay practices such as gross-ups embedded in those agreements.

Generally vote for proposals seeking a policy that prohibits automatic acceleration of the vesting of equity awards to senior executives upon a voluntary termination of employment or in the event of a change in control (except for pro rata vesting considering the time elapsed and attainment of any related performance goals between the award date and the change in control).

# 6.  Routine/Miscellaneous

## Adjourn Meeting

**General Recommendation:** Generally vote against proposals to provide management with the authority to adjourn an annual or special meeting absent compelling reasons to support the proposal.

Vote for proposals that relate specifically to soliciting votes for a merger or transaction if supporting that merger or transaction. Vote against proposals if the wording is too vague or if the proposal includes "other business."

## Amend Quorum Requirements

**General Recommendation:** Vote case-by-case on proposals to reduce quorum requirements for shareholder meetings below a majority of the shares outstanding, taking into consideration:

- The new quorum threshold requested;
- The rationale presented for the reduction;
- The market capitalization of the company (size, inclusion in indices);
- The company's ownership structure;
- Previous voter turnout or attempts to achieve quorum;
- Any provisions or commitments to restore quorum to a majority of shares outstanding, should voter turnout improve sufficiently; and
- Other factors as appropriate.

In general, a quorum threshold kept as close to a majority of shares outstanding as is achievable is preferred.

Vote case-by-case on directors who unilaterally lower the quorum requirements below a majority of the shares outstanding, taking into consideration the factors listed above.

## Amend Minor Bylaws

**General Recommendation:** Vote for bylaw or charter changes that are of a housekeeping nature (updates or corrections).

## Change Company Name

**General Recommendation:** Vote for proposals to change the corporate name unless there is compelling evidence that the change would adversely impact shareholder value.

Case 1:26-cv-00717-MPB-MKK    Document 26-3    Filed 04/21/26    Page 337 of 1112
PageID #: 503

## Change Date, Time, or Location of Annual Meeting

**General Recommendation:** Vote for management proposals to change the date, time, or location of the annual meeting unless the proposed change is unreasonable.

Vote against shareholder proposals to change the date, time, or location of the annual meeting unless the current scheduling or location is unreasonable.

## Other Business

**General Recommendation:** Vote against proposals to approve other business when it appears as a voting item.

Case 1:26-cv-00717-MPB-MKK     Document 26-3     Filed 04/21/26     Page 338 of 1112
PageID #: 504

# 7. Social and Environmental Issues

## Global Approach – E&S Shareholder Proposals

ISS applies a common approach globally to evaluating social and environmental shareholder proposals. which cover a wide range of topics, including consumer and product safety, environment and energy, labor standards and human rights, workplace and board diversity, and corporate political issues. While a variety of factors goes into each analysis, the overall principle guiding all vote recommendations focuses on how the proposal may enhance or protect shareholder value in either the short or long term.

General Recommendation: Generally vote case-by-case, examining primarily whether implementation of the proposal is likely to enhance or protect shareholder value. The following factors will be considered:

- If the issues presented in the proposal are being appropriately or effectively dealt with through legislation or regulation;
- If the company has already responded in an appropriate and sufficient manner to the issue(s) raised in the proposal;
- Whether the proposal's request is unduly burdensome (scope or timeframe) or overly prescriptive;
- The company's relevant practices compared with any industry standard practices for addressing the issue(s) raised by the proposal;
- Whether there are significant controversies, fines, penalties, or litigation associated with the company's practices related to the issue(s) raised in the proposal;
- If the proposal requests increased disclosure or greater transparency, whether reasonable and sufficient information is currently available to shareholders from the company or from other publicly available sources;
- If the proposal requests increased disclosure or greater transparency, whether implementation would reveal proprietary or confidential information that could place the company at a competitive disadvantage; and
- Whether the proposal addresses substantive matters that may impact shareholders' interests, including how the proposal may impact shareholders' rights.

## Endorsement of Principles

**General Recommendation:** Generally vote against proposals seeking a company's endorsement of principles that support a particular public policy position. Endorsing a set of principles may require a company to take a stand on an issue that is beyond its own control and may limit its flexibility with respect to future developments. Management and the board should be afforded the flexibility to make decisions on specific public policy positions based on their own assessment of the most beneficial strategies for the company.

# Animal Welfare

## Animal Welfare Policies

**General Recommendation:** Generally vote for proposals seeking a report on a company's animal welfare standards, or animal welfare-related risks, unless:

- The company has already published a set of animal welfare standards and monitors compliance;
- The company's standards are comparable to industry peers; and
- There are no recent significant fines, litigation, or controversies related to the company's and/or its suppliers' treatment of animals.

## Animal Testing

**General Recommendation:** Generally vote against proposals to phase out the use of animals in product testing, unless:

- The company is conducting animal testing programs that are unnecessary or not required by regulation;
- The company is conducting animal testing when suitable alternatives are commonly accepted and used by industry peers; or
- There are recent, significant fines or litigation related to the company's treatment of animals.

## Animal Slaughter

**General Recommendation:** Generally vote against proposals requesting the implementation of Controlled Atmosphere Killing (CAK) methods at company and/or supplier operations unless such methods are required by legislation or generally accepted as the industry standard.

Vote case-by-case on proposals requesting a report on the feasibility of implementing CAK methods at company and/or supplier operations considering the availability of existing research conducted by the company or industry groups on this topic and any fines or litigation related to current animal processing procedures at the company.

# Consumer Issues

## Genetically Modified Ingredients

**General Recommendation:** Generally vote against proposals requesting that a company voluntarily label genetically engineered (GE) ingredients in its products. The labeling of products with GE ingredients is best left to the appropriate regulatory authorities.

Vote case-by-case on proposals asking for a report on the feasibility of labeling products containing GE ingredients, taking into account:

- The potential impact of such labeling on the company's business;

- The quality of the company's disclosure on GE product labeling, related voluntary initiatives, and how this disclosure compares with industry peer disclosure; and
- Company's current disclosure on the feasibility of GE product labeling.

Generally vote against proposals seeking a report on the social, health, and environmental effects of genetically modified organisms (GMOs). Studies of this sort are better undertaken by regulators and the scientific community.

Generally vote against proposals to eliminate GE ingredients from the company's products, or proposals asking for reports outlining the steps necessary to eliminate GE ingredients from the company's products. Such decisions are more appropriately made by management with consideration of current regulations.

## Reports on Potentially Controversial Business/Financial Practices

**General Recommendation:** Vote case-by-case on requests for reports on a company's potentially controversial business or financial practices or products, taking into account:

- Whether the company has adequately disclosed mechanisms in place to prevent abuses;
- Whether the company has adequately disclosed the financial risks of the products/practices in question;
- Whether the company has been subject to violations of related laws or serious controversies; and
- Peer companies' policies/practices in this area.

## Pharmaceutical Pricing, Access to Medicines, and Prescription Drug Reimportation

**General Recommendation:** Generally vote against proposals requesting that companies implement specific price restraints on pharmaceutical products unless the company fails to adhere to legislative guidelines or industry norms in its product pricing practices.

Vote case-by-case on proposals requesting that a company report on its product pricing or access to medicine policies, considering:

- The potential for reputational, market, and regulatory risk exposure;
- Existing disclosure of relevant policies;
- Deviation from established industry norms;
- Relevant company initiatives to provide research and/or products to disadvantaged consumers;
- Whether the proposal focuses on specific products or geographic regions;
- The potential burden and scope of the requested report; and
- Recent significant controversies, litigation, or fines at the company.

Generally vote for proposals requesting that a company report on the financial and legal impact of its prescription drug reimportation policies unless such information is already publicly disclosed.

Generally vote against proposals requesting that companies adopt specific policies to encourage or constrain prescription drug reimportation. Such matters are more appropriately the province of legislative activity and may place the company at a competitive disadvantage relative to its peers.

## Product Safety and Toxic/Hazardous Materials

**General Recommendation:** Generally vote for proposals requesting that a company report on its policies, initiatives/procedures, and oversight mechanisms related to toxic/hazardous materials or product safety in its supply chain, unless:

- The company already discloses similar information through existing reports such as a supplier code of conduct and/or a sustainability report;
- The company has formally committed to the implementation of a toxic/hazardous materials and/or product safety and supply chain reporting and monitoring program based on industry norms or similar standards within a specified time frame; or
- The company has not been recently involved in relevant significant controversies, fines, or litigation.

Vote case-by-case on resolutions requesting that companies develop a feasibility assessment to phase-out of certain toxic/hazardous materials, or evaluate and disclose the potential financial and legal risks associated with utilizing certain materials, considering:

- The company's current level of disclosure regarding its product safety policies, initiatives, and oversight mechanisms;
- Current regulations in the markets in which the company operates; and
- Recent significant controversies, litigation, or fines stemming from toxic/hazardous materials at the company.

Generally vote against resolutions requiring that a company reformulate its products.

## Tobacco-Related Proposals

**General Recommendation:** Vote case-by-case on resolutions regarding the advertisement of tobacco products, considering:

- Recent related fines, controversies, or significant litigation;
- Whether the company complies with relevant laws and regulations on the marketing of tobacco;
- Whether the company's advertising restrictions deviate from those of industry peers;
- Whether the company entered into the Master Settlement Agreement, which restricts marketing of tobacco to youth; and
- Whether restrictions on marketing to youth extend to foreign countries.

Vote case-by-case on proposals regarding second-hand smoke, considering;

- Whether the company complies with all laws and regulations;
- The degree that voluntary restrictions beyond those mandated by law might hurt the company's competitiveness; and
- The risk of any health-related liabilities.

Generally vote against resolutions to cease production of tobacco-related products, to avoid selling products to tobacco companies, to spin-off tobacco-related businesses, or prohibit investment in tobacco equities. Such business decisions are better left to company management or portfolio managers.

Generally vote against proposals regarding tobacco product warnings. Such decisions are better left to public health authorities.

# Climate Change

## Say on Climate (SoC) Management Proposals

**General Recommendation:** Vote case-by-case on management proposals that request shareholders to approve the company's climate transition action plan[21], taking into account the completeness and rigor of the plan. Information that will be considered where available includes the following:

- The extent to which the company's climate related disclosures are in line with TCFD recommendations and meet other market standards;
- Disclosure of its operational and supply chain GHG emissions (Scopes 1, 2, and 3);
- The completeness and rigor of company's short-, medium-, and long-term targets for reducing operational and supply chain GHG emissions (Scopes 1, 2, and 3 if relevant);
- Whether the company has sought and received third-party approval that its targets are science-based;
- Whether the company has made a commitment to be "net zero" for operational and supply chain emissions (Scopes 1, 2, and 3) by 2050;
- Whether the company discloses a commitment to report on the implementation of its plan in subsequent years;
- Whether the company's climate data has received third-party assurance;
- Disclosure of how the company's lobbying activities and its capital expenditures align with company strategy;
- Whether there are specific industry decarbonization challenges; and
- The company's related commitment, disclosure, and performance compared to its industry peers.

## Say on Climate (SoC) Shareholder Proposals

**General Recommendation:** Vote case-by-case on shareholder proposals that request the company to disclose a report providing its GHG emissions levels and reduction targets and/or its upcoming/approved climate transition action plan and provide shareholders the opportunity to express approval or disapproval of its GHG emissions reduction plan, taking into account information such as the following:

- The completeness and rigor of the company's climate-related disclosure;
- The company's actual GHG emissions performance;
- Whether the company has been the subject of recent, significant violations, fines, litigation, or controversy related to its GHG emissions; and
- Whether the proposal's request is unduly burdensome (scope or timeframe) or overly prescriptive.

## Climate Change/Greenhouse Gas (GHG) Emissions

**General Recommendation:** Vote case-by-case on resolutions requesting that a company disclose information on the climate change related financial, physical, or regulatory risks it faces to its operations and investments or on how the company identifies, measures, and manages such risks, considering:

---

[21] Variations of this request also include climate transition related ambitions, or commitment to reporting on the implementation of a climate plan.

Case 1:26-cv-00717-MPB-MKK    Document 26-3    Filed 04/21/26    Page 343 of 1112
PageID #: 509

UNITED STATES
Proxy Voting Guidelines

ISS

71 of 87

- Whether the company provides current, publicly-available information on the climate change-related financial, physical, or regulatory risks it faces to its operations and investments or on the impact that climate change may have on the company;
- Associated company policies and practices addressing climate change related risks and/or opportunities;
- The company's level of disclosure compared to industry peers; and
- Whether there are significant controversies, fines, penalties, or litigation associated with the company's climate change-related performance.

Vote case-by-case on proposals requesting that a company report on its greenhouse gas (GHG) emissions from company operations and/or products and operations, considering:

- Whether the company discloses current, publicly-available information on the impacts that GHG emissions may have on the company as well as associated company policies and procedures to address related risks and/or opportunities;
- Whether the company's level of disclosure is comparable to that of industry peers; or
- Whether there are significant, controversies, fines, penalties, or litigation associated with the company's GHG emissions.

Vote case-by-case on proposals that call for the adoption of GHG reduction goals from products and operations, considering: :

- The company's actual GHG emissions performance;
- The company's current GHG emission policies, oversight mechanisms, and related initiatives;
- Whether the company provides disclosure of year-over-year GHG emissions performance data;
- Whether company disclosure lags behind industry peers; and
- Whether the company has been the subject of recent, significant violations, fines, litigation, or controversy related to GHG emissions.

## Energy Efficiency

**General Recommendation:** Generally vote for proposals requesting that a company report on its energy efficiency policies, unless:

- The company complies with applicable energy efficiency regulations and laws, and discloses its participation in energy efficiency policies and programs, including disclosure of benchmark data, targets, and performance measures; or
- The proponent requests adoption of specific energy efficiency goals within specific timelines.

## Renewable Energy

**General Recommendation:** Generally vote for requests for reports on the feasibility of developing renewable energy resources unless the report would be duplicative of existing disclosure or irrelevant to the company's line of business.

Generally vote against proposals requesting that the company invest in renewable energy resources. Such decisions are best left to management's evaluation of the feasibility and financial impact that such programs may have on the company.

Generally vote against proposals that call for the adoption of renewable energy goals, taking into account:

- The scope and structure of the proposal;
- The company's current level of disclosure on renewable energy use and GHG emissions; and
- The company's disclosure of policies, practices, and oversight implemented to manage GHG emissions and mitigate climate change risks.

# Diversity

## Board Diversity

**General Recommendation:** Generally vote for requests for reports on a company's efforts to diversify the board, unless:

- The gender and racial minority representation of the company's board is reasonably inclusive in relation to companies of similar size and business; or
- The board already reports on its nominating procedures and gender and racial minority initiatives on the board and within the company.

Vote case-by-case on proposals asking a company to increase the gender and racial minority representation on its board, taking into account:

- The degree of existing gender and racial minority diversity on the company's board and among its executive officers;
- The level of gender and racial minority representation that exists at the company's industry peers;
- The company's established process for addressing gender and racial minority board representation;
- Whether the proposal includes an overly prescriptive request to amend nominating committee charter language;
- The independence of the company's nominating committee;
- Whether the company uses an outside search firm to identify potential director nominees; and
- Whether the company has had recent controversies, fines, or litigation regarding equal employment practices.

## Equality of Opportunity

**General Recommendation:** Generally vote case-by-case on proposals requesting a company disclose its diversity policies or initiatives, or proposals requesting disclosure of a company's comprehensive workforce diversity data, including requests for EEO-1 data. Factors that will be considered are:

- Whether the company publicly discloses equal employment opportunity policies and initiatives;
- Whether the company publicly discloses comprehensive workforce diversity data/EEO-1 report; or
- Whether the company has recent significant workplace discrimination/fair employment violations or litigation.

Generally vote against proposals seeking information on the diversity efforts of suppliers and service providers. Such requests may pose a significant burden on the company.

## Gender Identity, Sexual Orientation, and Domestic Partner Benefits

**General Recommendation:** Generally vote for proposals seeking to amend a company's EEO statement or diversity policies to prohibit discrimination based on sexual orientation and/or gender identity, unless the change would be unduly burdensome.

Generally vote against proposals to extend company benefits to, or eliminate benefits from, domestic partners. Decisions regarding benefits should be left to the discretion of the company.

## Gender, Race/Ethnicity Pay Gap

**General Recommendation:** Vote case-by-case on requests for reports on a company's pay data by gender or race/ethnicity, or a report on a company's policies and goals to reduce any gender or race/ethnicity pay gaps, taking into account:

- The company's current policies and disclosure related to both its diversity and inclusion policies and practices and its compensation philosophy on fair and equitable compensation practices;
- Whether the company has been the subject of recent controversy, litigation, or regulatory actions related to gender, race, or ethnicity pay gap issues;
- The company's disclosure regarding gender, race, or ethnicity pay gap policies or initiatives compared to its industry peers; and
- Local laws regarding categorization of race and/or ethnicity and definitions of ethnic and/or racial minorities.

## Racial Equity and/or Civil Rights Audit Guidelines

**General Recommendation:** Vote case-by-case on proposals asking a company to conduct an independent racial equity and/or civil rights audit, taking into account:

- The company's established process or framework for addressing racial inequity and discrimination internally;
- Whether the company adequately discloses workforce diversity and inclusion metrics and goals;
- Whether the company has issued a public statement related to its racial justice efforts in recent years, or has committed to internal policy review;
- Whether the company has engaged with impacted communities, stakeholders, and civil rights experts;
- The company's track record in recent years of racial justice measures and outreach externally; and
- Whether the company has been the subject of recent controversy, litigation, or regulatory actions related to racial inequity or discrimination.

## Environment and Sustainability

## Facility and Workplace Safety

**General Recommendation:** Vote case-by-case on requests for workplace safety reports, including reports on accident risk reduction efforts, taking into account:

- The company's current level of disclosure of its workplace health and safety performance data, health and safety management policies, initiatives, and oversight mechanisms;
- The nature of the company's business, specifically regarding company and employee exposure to health and safety risks;
- Recent significant controversies, fines, or violations related to workplace health and safety; and
- The company's workplace health and safety performance relative to industry peers.

Vote case-by-case on resolutions requesting that a company report on safety and/or security risks associated with its operations and/or facilities, considering:

- The company's compliance with applicable regulations and guidelines;
- The company's current level of disclosure regarding its security and safety policies, procedures, and compliance monitoring; and
- The existence of recent, significant violations, fines, or controversy regarding the safety and security of the company's operations and/or facilities.

## Natural Capital- Related and/or Community Impact Assessment Proposals

**General Recommendation:** Vote case-by-case on requests for reports on policies and/or the potential (community) social and/or environmental impact of company operations, considering:

- Alignment of current disclosure of applicable company policies, metrics, risk assessment report(s) and risk management procedures with any relevant, broadly accepted reporting frameworks;
- The impact of regulatory non-compliance, litigation, remediation, or reputational loss that may be associated with failure to manage the company's operations in question, including the management of relevant community and stakeholder relations;
- The nature, purpose, and scope of the company's operations in the specific region(s);
- The degree to which company policies and procedures are consistent with industry norms; and
- The scope of the resolution.

## Hydraulic Fracturing

**General Recommendation:** Generally vote for proposals requesting greater disclosure of a company's (natural gas) hydraulic fracturing operations, including measures the company has taken to manage and mitigate the potential community and environmental impacts of those operations, considering:

- The company's current level of disclosure of relevant policies and oversight mechanisms;
- The company's current level of such disclosure relative to its industry peers;
- Potential relevant local, state, or national regulatory developments; and
- Controversies, fines, or litigation related to the company's hydraulic fracturing operations.

## Operations in Protected Areas

**General Recommendation:** Generally vote for requests for reports on potential environmental damage as a result of company operations in protected regions, unless:

- Operations in the specified regions are not permitted by current laws or regulations;
- The company does not currently have operations or plans to develop operations in these protected regions; or

- The company's disclosure of its operations and environmental policies in these regions is comparable to industry peers.

## Recycling

**General Recommendation:** Vote case-by-case on proposals to report on an existing recycling program, or adopt a new recycling program, taking into account:

- The nature of the company's business;
- The current level of disclosure of the company's existing related programs;
- The timetable and methods of program implementation prescribed by the proposal;
- The company's ability to address the issues raised in the proposal; and
- How the company's recycling programs compare to similar programs of its industry peers.

## Sustainability Reporting

**General Recommendation:** Generally vote for proposals requesting that a company report on its policies, initiatives, and oversight mechanisms related to social, economic, and environmental sustainability, unless:

- The company already discloses similar information through existing reports or policies such as an environment, health, and safety (EHS) report; a comprehensive code of corporate conduct; and/or a diversity report; or
- The company has formally committed to the implementation of a reporting program based on Global Reporting Initiative (GRI) guidelines or a similar standard within a specified time frame.

## Water Issues

**General Recommendation:** Vote case-by-case on proposals requesting a company report on, or adopt a new policy on, water-related risks and concerns, taking into account:

- The company's current disclosure of relevant policies, initiatives, oversight mechanisms, and water usage metrics;
- Whether or not the company's existing water-related policies and practices are consistent with relevant internationally recognized standards and national/local regulations;
- The potential financial impact or risk to the company associated with water-related concerns or issues; and
- Recent, significant company controversies, fines, or litigation regarding water use by the company and its suppliers.

# General Corporate Issues

## Charitable Contributions

**General Recommendation:** Vote against proposals restricting a company from making charitable contributions. Charitable contributions are generally useful for assisting worthwhile causes and for creating goodwill in the

community. In the absence of bad faith, self-dealing, or gross negligence, management should determine which, and if, contributions are in the best interests of the company.

## Data Security, Privacy, and Internet Issues

**General Recommendation:** Vote case-by-case on proposals requesting the disclosure or implementation of data security, privacy, or information access and management policies and procedures, considering:

- The level of disclosure of company policies and procedures relating to data security, privacy, freedom of speech, information access and management, and Internet censorship;
- Engagement in dialogue with governments or relevant groups with respect to data security, privacy, or the free flow of information on the Internet;
- The scope of business involvement and of investment in countries whose governments censor or monitor the Internet and other telecommunications;
- Applicable market-specific laws or regulations that may be imposed on the company; and
- Controversies, fines, or litigation related to data security, privacy, freedom of speech, or Internet censorship.

## ESG Compensation-Related Proposals

**General Recommendation:** Vote case-by-case on proposals seeking a report or additional disclosure on the company's approach, policies, and practices on incorporating environmental and social criteria into its executive compensation strategy, considering:

- The scope and prescriptive nature of the proposal;
- The company's current level of disclosure regarding its environmental and social performance and governance;
- The degree to which the board or compensation committee already discloses information on whether it has considered related E&S criteria; and
- Whether the company has significant controversies or regulatory violations regarding social or environmental issues.

# Human Rights, Human Capital Management, and International Operations

## Human Rights Proposals

**General Recommendation:** Vote case-by-case on proposals requesting a report on company or company supplier labor and/or human rights standards and policies, taking into consideration:

- Whether such information is publicly disclosed;
- Whether the company is lagging industry peers; and
-  Whether there are recent, significant company controversies, fines, or litigation regarding human rights at the company or its suppliers.

Vote case-by-case on proposals to implement company or company supplier labor and/or human rights standards and policies, considering:

- The scope of the request;
- The degree to which existing relevant policies and practices are disclosed;
- Whether or not existing relevant policies are consistent with internationally recognized standards;
- Deviation from industry sector peer company standards and practices;
- Whether company facilities and those of its suppliers are monitored and how;
- Company participation in fair labor organizations or other internationally recognized human rights initiatives;
- Scope and nature of business conducted in markets known to have higher risk of workplace labor/human rights abuse; and
- Recent, significant company controversies, fines, or litigation regarding human rights at the company or its suppliers.

Vote case-by-case on proposals requesting that a company conduct an assessment of the human rights risks in its operations or in its supply chain, or report on its human rights risk assessment process, considering:

- The degree to which existing relevant policies and practices are disclosed, including information on the implementation of these policies and any related oversight mechanisms;
- The company's industry and whether the company or its suppliers operate in countries or areas where there is a history of human rights concerns;
- Recent significant controversies, fines, or litigation regarding human rights involving the company or its suppliers, and whether the company has taken remedial steps; and
- Whether the proposal is unduly burdensome or overly prescriptive.

## Mandatory Arbitration

**General Recommendation:** Vote case-by-case on requests for a report on a company's use of mandatory arbitration on employment-related claims, taking into account:

- The company's current policies and practices related to the use of mandatory arbitration agreements on workplace claims;
- Whether the company has been the subject of recent controversy, litigation, or regulatory actions related to the use of mandatory arbitration agreements on workplace claims; and
- The company's disclosure of its policies and practices related to the use of mandatory arbitration agreements compared to its peers.

## Operations in High-Risk Markets

**General Recommendation:** Vote case-by-case on requests for a report on a company's potential financial and reputational risks associated with operations in "high-risk" markets, such as a terrorism-sponsoring state or politically/socially unstable region, taking into account:

- The nature, purpose, and scope of the operations and business involved that could be affected by social or political disruption;
- Current disclosure of applicable risk assessment(s) and risk management procedures;
- Compliance with U.S. sanctions and laws;
- Consideration of other international policies, standards, and laws; and
- Whether the company has been recently involved in recent, significant controversies, fines, or litigation related to its operations in "high-risk" markets.

## Outsourcing/Offshoring

**General Recommendation:** Vote case-by-case on proposals calling for companies to report on the risks associated with outsourcing/plant closures, considering:

- Controversies surrounding operations in the relevant market(s);
- The value of the requested report to shareholders;
- The company's current level of disclosure of relevant information on outsourcing and plant closure procedures; and
- The company's existing human rights standards relative to industry peers.

## Sexual Harassment

**General Recommendation:** Vote case-by-case on requests for a report on company actions taken to strengthen policies and oversight to prevent workplace sexual harassment, or a report on risks posed by a company's failure to prevent workplace sexual harassment, taking into account:

- The company's current policies, practices, oversight mechanisms related to preventing workplace sexual harassment;
- Whether the company has been the subject of recent controversy, litigation, or regulatory actions related to workplace sexual harassment issues; and
- The company's disclosure regarding workplace sexual harassment policies or initiatives compared to its industry peers.

## Weapons and Military Sales

**General Recommendation:** Vote against reports on foreign military sales or offsets. Such disclosures may involve sensitive and confidential information. Moreover, companies must comply with government controls and reporting on foreign military sales.

Generally vote against proposals asking a company to cease production or report on the risks associated with the use of depleted uranium munitions or nuclear weapons components and delivery systems, including disengaging from current and proposed contracts. Such contracts are monitored by government agencies, serve multiple military and non-military uses, and withdrawal from these contracts could have a negative impact on the company's business.

# Political Activities

## Lobbying

**General Recommendation:** Vote case-by-case on proposals requesting information on a company's lobbying (including direct, indirect, and grassroots lobbying) activities, policies, or procedures, considering:

- The company's current disclosure of relevant lobbying policies, and management and board oversight;

- The company's disclosure regarding trade associations or other groups that it supports, or is a member of, that engage in lobbying activities; and
- Recent significant controversies, fines, or litigation regarding the company's lobbying-related activities.


## Political Contributions

**General Recommendation:** Vote case-by-case on proposals requesting greater disclosure of a company's political contributions and trade association spending policies and activities, considering:

- The company's policies, and management and board oversight related to its direct political contributions and payments to trade associations or other groups that may be used for political purposes;
- The company's disclosure regarding its support of, and participation in, trade associations or other groups that may make political contributions;
- The company's disclosure of its direct corporate political contributions; and
- Recent significant controversies, fines, or litigation related to the company's political contributions or political activities.

Vote against proposals barring a company from making political contributions. Businesses are affected by legislation at the federal, state, and local level; barring political contributions can put the company at a competitive disadvantage.

Vote against proposals to publish in newspapers and other media a company's political contributions. Such publications could present significant cost to the company without providing commensurate value to shareholders.


## Political Expenditures and Lobbying Congruency

**General Recommendation:** Generally vote case-by-case on proposals requesting greater disclosure of a company's alignment of political contributions, lobbying, and electioneering spending with a company's publicly stated values and policies, considering:

- The company's policies, management, board oversight, governance processes, and level of disclosure related to direct political contributions, lobbying activities, and payments to trade associations, political action committees, or other groups that may be used for political purposes;
- The company's disclosure regarding: the reasons for its support of candidates for public offices; the reasons for support of and participation in trade associations or other groups that may make political contributions; and other political activities;
- Any incongruencies identified between a company's direct and indirect political expenditures and its publicly stated values and priorities; and
- Recent significant controversies related to the company's direct and indirect lobbying, political contributions, or political activities.

Generally vote case-by-case on proposals requesting comparison of a company's political spending to objectives that can mitigate material risks for the company, such as limiting global warming.

## Political Ties

**General Recommendation:** Generally vote against proposals asking a company to affirm political nonpartisanship in the workplace, so long as:

- There are no recent, significant controversies, fines, or litigation regarding the company's political contributions or trade association spending; and
- The company has procedures in place to ensure that employee contributions to company-sponsored political action committees (PACs) are strictly voluntary and prohibit coercion.

Vote against proposals asking for a list of company executives, directors, consultants, legal counsels, lobbyists, or investment bankers that have prior government service and whether such service had a bearing on the business of the company. Such a list would be burdensome to prepare without providing any meaningful information to shareholders.

# 8. Mutual Fund Proxies

## Election of Directors

**General Recommendation:** Vote case-by-case on the election of directors and trustees, following the same guidelines for uncontested directors for public company shareholder meetings. However, mutual fund boards do not usually have compensation committees, so do not withhold for the lack of this committee.

## Closed End Funds- Unilateral Opt-In to Control Share Acquisition Statutes

**General Recommendation:** For closed-end management investment companies (CEFs), vote against or withhold from nominating/governance committee members (or other directors on a case-by-case basis) at CEFs that have not provided a compelling rationale for opting-in to a Control Share Acquisition statute, nor submitted a by-law amendment to a shareholder vote.

## Converting Closed-end Fund to Open-end Fund

**General Recommendation:** Vote case-by-case on conversion proposals, considering the following factors:

- Past performance as a closed-end fund;
- Market in which the fund invests;
- Measures taken by the board to address the discount; and
- Past shareholder activism, board activity, and votes on related proposals.

## Proxy Contests

**General Recommendation:** Vote case-by-case on proxy contests, considering the following factors:

- Past performance relative to its peers;
- Market in which the fund invests;
- Measures taken by the board to address the issues;
- Past shareholder activism, board activity, and votes on related proposals;
- Strategy of the incumbents versus the dissidents;
- Independence of directors;
- Experience and skills of director candidates;
- Governance profile of the company; and
- Evidence of management entrenchment.

## Investment Advisory Agreements

**General Recommendation:** Vote case-by-case on investment advisory agreements, considering the following factors:

- Proposed and current fee schedules;
- Fund category/investment objective;
- Performance benchmarks;
- Share price performance as compared with peers;
- Resulting fees relative to peers; and
- Assignments (where the advisor undergoes a change of control).

## Approving New Classes or Series of Shares

**General Recommendation:** Vote for the establishment of new classes or series of shares.

## Preferred Stock Proposals

**General Recommendation:** Vote case-by-case on the authorization for or increase in preferred shares, considering the following factors:

- Stated specific financing purpose;
- Possible dilution for common shares; and
- Whether the shares can be used for antitakeover purposes.

## 1940 Act Policies

**General Recommendation:** Vote case-by-case on policies under the Investment Advisor Act of 1940, considering the following factors:

- Potential competitiveness;
- Regulatory developments;
- Current and potential returns; and
- Current and potential risk.

Generally vote for these amendments as long as the proposed changes do not fundamentally alter the investment focus of the fund and do comply with the current SEC interpretation.

## Changing a Fundamental Restriction to a Nonfundamental Restriction

**General Recommendation:** Vote case-by-case on proposals to change a fundamental restriction to a non-fundamental restriction, considering the following factors:

- The fund's target investments;

- The reasons given by the fund for the change; and
- The projected impact of the change on the portfolio.

## Change Fundamental Investment Objective to Nonfundamental

**General Recommendation:** Vote against proposals to change a fund's fundamental investment objective to non-fundamental.

## Name Change Proposals

**General Recommendation:** Vote case-by-case on name change proposals, considering the following factors:

- Political/economic changes in the target market;
- Consolidation in the target market; and
- Current asset composition.

## Change in Fund's Subclassification

**General Recommendation:** Vote case-by-case on changes in a fund's sub-classification, considering the following factors:

- Potential competitiveness;
- Current and potential returns;
- Risk of concentration; and
- Consolidation in target industry.

## Business Development Companies—Authorization to Sell Shares of Common Stock at a Price below Net Asset Value

**General Recommendation:** Vote for proposals authorizing the board to issue shares below Net Asset Value (NAV) if:

- The proposal to allow share issuances below NAV has an expiration date no more than one year from the date shareholders approve the underlying proposal, as required under the Investment Company Act of 1940;
- The sale is deemed to be in the best interests of shareholders by (1) a majority of the company's independent directors and (2) a majority of the company's directors who have no financial interest in the issuance; and
- The company has demonstrated responsible past use of share issuances by either:
- Outperforming peers in its 8-digit GICS group as measured by one- and three-year median TSRs; or
- Providing disclosure that its past share issuances were priced at levels that resulted in only small or moderate discounts to NAV and economic dilution to existing non-participating shareholders.

## Disposition of Assets/Termination/Liquidation

**General Recommendation:** Vote case-by-case on proposals to dispose of assets, to terminate or liquidate, considering the following factors:

- Strategies employed to salvage the company;
- The fund's past performance; and
- The terms of the liquidation.

## Changes to the Charter Document

**General Recommendation:** Vote case-by-case on changes to the charter document, considering the following factors:

- The degree of change implied by the proposal;
- The efficiencies that could result;
- The state of incorporation; and
- Regulatory standards and implications.

Vote against any of the following changes:

- Removal of shareholder approval requirement to reorganize or terminate the trust or any of its series;
- Removal of shareholder approval requirement for amendments to the new declaration of trust;
- Removal of shareholder approval requirement to amend the fund's management contract, allowing the contract to be modified by the investment manager and the trust management, as permitted by the 1940 Act;
- Allow the trustees to impose other fees in addition to sales charges on investment in a fund, such as deferred sales charges and redemption fees that may be imposed upon redemption of a fund's shares;
- Removal of shareholder approval requirement to engage in and terminate subadvisory arrangements; or
- Removal of shareholder approval requirement to change the domicile of the fund.

## Changing the Domicile of a Fund

**General Recommendation:** Vote case-by-case on re-incorporations, considering the following factors:

- Regulations of both states;
- Required fundamental policies of both states; and
- The increased flexibility available.

## Authorizing the Board to Hire and Terminate Subadvisers Without Shareholder Approval

**General Recommendation:** Vote against proposals authorizing the board to hire or terminate subadvisers without shareholder approval if the investment adviser currently employs only one subadviser.

**UNITED STATES**
Proxy Voting Guidelines

Case 1:26-cv-00717-MPB-MKK     Document 26-3     Filed 04/21/26     Page 357 of 1112
PageID #: 523

**ISS** ▷

85 of 87

## Distribution Agreements

**General Recommendation:** Vote case-by-case on distribution agreement proposals, considering the following factors:

- Fees charged to comparably sized funds with similar objectives;
- The proposed distributor's reputation and past performance;
- The competitiveness of the fund in the industry; and
- The terms of the agreement.

## Master-Feeder Structure

**General Recommendation:** Vote for the establishment of a master-feeder structure.

## Mergers

**General Recommendation:** Vote case-by-case on merger proposals, considering the following factors:

- Resulting fee structure;
- Performance of both funds;
- Continuity of management personnel; and
- Changes in corporate governance and their impact on shareholder rights.

# Shareholder Proposals for Mutual Funds

## Establish Director Ownership Requirement

**General Recommendation:** Generally vote against shareholder proposals that mandate a specific minimum amount of stock that directors must own in order to qualify as a director or to remain on the board.

## Reimburse Shareholder for Expenses Incurred

**General Recommendation:** Vote case-by-case on shareholder proposals to reimburse proxy solicitation expenses. When supporting the dissidents, vote for the reimbursement of the proxy solicitation expenses.

Case 1:26-cv-00717-MPB-MKK    Document 26-3    Filed 04/21/26    Page 358 of 1112
PageID #: 524

## Terminate the Investment Advisor

**General Recommendation:** Vote case-by-case on proposals to terminate the investment advisor, considering the following factors:

- Performance of the fund's Net Asset Value (NAV);
- The fund's history of shareholder relations; and
- The performance of other funds under the advisor's management.

# We empower investors and companies to build for long-term and sustainable growth by providing high-quality data, analytics, and insight.

**GET STARTED WITH ISS SOLUTIONS**

Email sales@issgovernance.com or visit www.issgovernance.com for more information.

Founded in 1985, Institutional Shareholder Services group of companies (ISS) empowers investors and companies to build for long-term and sustainable growth by providing high-quality data, analytics and insight. ISS, which is majority owned by Deutsche Bourse Group, along with Genstar Capital and ISS management, is a leading provider of corporate governance and responsible investment solutions, market intelligence, fund services, and events and editorial content for institutional investors and corporations, globally. ISS' 2,600 employees operate worldwide across 29 global locations in 15 countries. Its approximately 3,400 clients include many of the world's leading institutional investors who rely on ISS' objective and impartial offerings, as well as public companies focused on ESG and governance risk mitigation as a shareholder value enhancing measure. Clients rely on ISS' expertise to help them make informed investment decisions. This document and all of the information contained in it, including without limitation all text, data, graphs, and charts (collectively, the "Information") is the property of Institutional Shareholder Services Inc. (ISS), its subsidiaries, or, in some cases third party suppliers.

The Information has not been submitted to, nor received approval from, the United States Securities and Exchange Commission or any other regulatory body. None of the Information constitutes an offer to sell (or a solicitation of an offer to buy), or a promotion or recommendation of, any security, financial product or other investment vehicle or any trading strategy, and ISS does not endorse, approve, or otherwise express any opinion regarding any issuer, securities, financial products or instruments or trading strategies.

The user of the Information assumes the entire risk of any use it may make or permit to be made of the Information.

ISS MAKES NO EXPRESS OR IMPLIED WARRANTIES OR REPRESENTATIONS WITH RESPECT TO THE INFORMATION AND EXPRESSLY DISCLAIMS ALL IMPLIED WARRANTIES (INCLUDING, WITHOUT LIMITATION, ANY IMPLIED WARRANTIES OF ORIGINALITY, ACCURACY, TIMELINESS, NON-INFRINGEMENT, COMPLETENESS, MERCHANTABILITY, AND FITNESS for A PARTICULAR PURPOSE) WITH RESPECT TO ANY OF THE INFORMATION.

Without limiting any of the foregoing and to the maximum extent permitted by law, in no event shall ISS have any liability regarding any of the Information for any direct, indirect, special, punitive, consequential (including lost profits), or any other damages even if notified of the possibility of such damages. The foregoing shall not exclude or limit any liability that may not by applicable law be excluded or limited.

© 2025 | Institutional Shareholder Services and/or its affiliates

# Foster Declaration Exhibit 5



# INSTITUTIONAL SHAREHOLDER SERVICES

This brochure was updated on March 31, 2026

This brochure provides information about the qualifications and business practices of Institutional Shareholder Services Inc. ("ISS" or the "Company").  If you have any questions about the contents of this brochure, please contact ISS' Chief Compliance Officer, Rhea Jones.  She can be reached at (301) 556-0488 or at mailto: rhea.jones@iss-stoxx.com.  The information in this brochure has not been approved or verified by the United States Securities and Exchange Commission ("SEC") or by any state securities authority.  ISS is registered with the SEC as an investment adviser; however, please note that such registration does not imply a certain level of skill or training.

Additional information about ISS is available on the SEC's website at www.adviserinfo.sec.gov.

© 2026 | Institutional Shareholder Services and/or its affiliates

**INSTITUTIONAL SHAREHOLDER SERVICES INC.**

702 King Farm Boulevard, Suite 300
Rockville, MD 20850
T: 301.556.0500 F: 301.556.0491

ISSGOVERNANCE.COM

**STATEMENT OF MATERIAL CHANGES**

Since ISS' last annual update of this Brochure on March 27, 2026, there has been the following material change to our business:

On March 31, 2026 Deutsche Börse AG ("DB") completed a transaction pursuant to which it acquired all the outstanding equity interests held by private equity firm General Atlantic.  DB is now the sole ultimate owner of ISS.

**TABLE OF CONTENTS**<sup>*</sup>

ADVISORY BUSINESS..................................................................................................................................5

   Background...........................................................................................................................................5

   Services Provided ...............................................................................................................................5

      Services Produced by ISS ..............................................................................................................5

      Services Produced by Third Parties ..............................................................................................8

FEES AND COMPENSATION ......................................................................................................................9

PERFORMANCE-BASED FEES AND SIDE-BY-SIDE MANAGEMENT ...........................................................9

TYPES OF CLIENTS....................................................................................................................................9

METHODS OF ANALYSIS, INVESTMENT STRATEGIES AND RISK OF LOSS ................................................9

DISCIPLINARY INFORMATION.................................................................................................................11

OTHER FINANCIAL INDUSTRY ACTIVITIES AND AFFILIATIONS...............................................................11

   Foreign Advisory Affiliates............................................................................................................. 11

   Securities Class Action Services...................................................................................................... 12

   Services for Issuers ........................................................................................................................ 12

   Market Intelligence Services for Asset Managers ......................................................................... 12

   Index Services ................................................................................................................................ 12

   Ownership Structure ..................................................................................................................... 13

CODE OF ETHICS, PARTICIPATION OR INTEREST IN CLIENT TRANSACTIONS AND PERSONAL TRADING .................13

   Code of Ethics ............................................................................................................................... 13

   Standards of Conduct .................................................................................................................... 13

   Potential Conflicts of Interest........................................................................................................ 13

      Issuers that are clients of ISS-Corporate ...................................................................................... 14

      Issuers that are clients of ISS........................................................................................................ 15

---

<sup>*</sup> A NOTE ABOUT THE FORMAT OF THIS BROCHURE:  The SEC requires all investment advisers to organize their disclosure documents according to specific categories, some of which may not pertain to a particular adviser's business.  Where a required category is not relevant to its business, ISS will list the category and state that it does not apply.

Ownership Structure ............................................................................................................... 15

Conflicts Generally.................................................................................................................................16

    Participation or Interest in Client Transactions.................................................................... 16

    Personal Trading.................................................................................................................... 16

BROKERAGE PRACTICES.........................................................................................................................17

REVIEW OF ACCOUNTS...........................................................................................................................17

CLIENT REFERRALS AND OTHER COMPENSATION...................................................................................17

CUSTODY ...............................................................................................................................................17

INVESTMENT DISCRETION .....................................................................................................................17

VOTING CLIENT SECURITIES....................................................................................................................18

FINANCIAL INFORMATION......................................................................................................................18

# ADVISORY BUSINESS

## Background

Founded in 1985 as a proxy advisory firm, ISS today offers a suite of corporate governance and responsible investment solutions, fund services, data and analytics for institutional investors worldwide. ISS' services, and those of its non-investment advisory affiliates, are designed to help investors and companies achieve long-term and sustainable growth.

ISS is part of the ISS STOXX group of companies[1], whose ultimate owner is Deutsche Börse AG ("DB").

## Services Provided

### Services Produced by ISS

ISS seeks to help institutional investors understand corporate governance practices and make informed proxy voting decisions that suit their particular investment needs in many different markets across the globe. ISS also provides environmental, social and governance ("ESG") data and ratings, thought leadership, research and other market information on corporate governance and voting practices and trends, portfolio screening and other assessment tools and services, all of which are available to assist investors in their wider ownership activities and responsibilities. As with any analytical investment tool, clients must determine whether and how to incorporate research or ratings into their investment decision-making process.

ISS' investment advisory services are primarily produced by two ISS business lines: ISS Governance Solutions and ISS Sustainability Solutions.

#### ISS Governance Solutions

**Governance Research and Voting Services:** These services include research, voting recommendations and voting-related services to help institutional investors establish corporate governance policies and practices and take these into account in their proxy voting and engagement activities.

In 2025, ISS Governance Solutions assisted approximately 1,400 clients to make and execute informed proxy voting decisions for approximately 52,000 shareholder meetings in approximately 100 developed and emerging markets worldwide. As indicated below, ISS Governance Solutions' clients are substantially all institutional investors, including investment managers, private-sector and public employee benefit plans, and mutual funds. Some of these clients pursue aggressive, short-term investment strategies, while others are risk-averse buy-and-hold investors. Some are focused solely on maximizing profit, while others seek to achieve reasonable financial returns in a way that aligns with their religious or philosophical beliefs. Some ISS Governance Solutions clients themselves pursue divergent investment and proxy voting strategies, depending on the needs of their own clientele.

---

[1] The ISS STOXX group of companies consists of the companies which are wholly-owned, directly or indirectly, by ISS Stoxx GmbH, a holding company that owns ISS and is ultimately owned by DB. Today, the ISS STOXX group of companies consists of the following businesses: ISS Governance Solutions, ISS Sustainability Solutions, ISS SCAS, STOXX | DAX, ISS-Corporate, and ISS MI, each of which is described below.

In order to meet the needs of this diverse clientele, ISS Governance Solutions offers a Benchmark Voting Policy based on market input and a range of Thematic Voting Policies that reflect clients' varied investment strategies and goals. ISS also assists investors in implementing custom voting policies that investors develop in-house, in consultation with their governance departments, boards of trustees, and portfolio managers, and sometimes, in consultation with ISS.

The ISS Benchmark Voting Policy serves as a tool to assist institutional investors in promoting long-term shareholder value, good governance, and risk mitigation.  As described more fully in the Methods of Analysis, Investment Strategies and Risk of Loss Section below, this Policy—which differs market to market—is developed through a robust, inclusive, and transparent process, which is open to investors, companies, and the general public.

In addition, ISS Governance Solutions currently offers Thematic Voting Policies that evaluate voting matters from the following different perspectives:

- Catholic Faith Based Policy voting guidelines, designed to provide analyses and recommendations that are broadly consistent with the objectives of socially responsible shareholders as well as the teachings of Catholicism and Christianity as a whole.

- Climate Policy voting guidelines, designed to provide analyses and recommendations based on a model for assessment of a company's climate-related performance and disclosures. The model draws on widely recognized frameworks, including the Task Force on Climate-related Financial Disclosures (TCFD), and balances the need for good disclosure on climate-related-risks with a company's performance on key climate-related factors.

- Global Board-Aligned Policy voting guidelines, designed to enable investors to vote in a manner that upholds many foundational corporate governance principles as a means of protecting and maximizing their investments, while generally aligning with issuers' board recommendations for voting on environmental and social matters.

- Public Fund Policy voting guidelines, designed to provide analyses and recommendations to assist public funds, with the intent of maximizing the long-term economic benefits of beneficiaries. The guidelines are generally designed to help public funds vote their proxies in a manner consistent with widely accepted corporate governance and corporate responsibility practices that lead to increased long-term shareholder value.

- Socially Responsible Investor (SRI) Policy voting guidelines, designed to provide analyses and recommendations that are consistent with the financial and social objectives of socially responsible shareholders.

- Sustainability Policy voting guidelines, designed to provide analyses and recommendations that promote support for recognized global governing bodies that promote sustainable business practices, stewardship of the environment, fair labor practices, nondiscrimination, and the protection of human rights.

- Taft-Hartley Policy voting guidelines, designed to provide analyses and recommendations that are based upon the AFL-CIO Proxy Voting Guidelines and with a focus on a worker-owner view of long-term shareholder value.

As an alternative to its proprietary policies, ISS Governance Solutions often prepares research and voting recommendations based on a client's own custom voting policies which reflect their specific approaches to proxy voting and/or the mandates they have with the clients for whom they manage assets. In 2025, ISS Governance Solutions implemented approximately 480 customized voting policies and issued custom policy vote recommendations for a broad range of clients. These customized voting policies reflect clients' particular corporate governance and voting philosophies. Accordingly, the vote recommendations issued under these policies may – and often do – differ from those issued under the ISS Benchmark Voting Policy and Thematic Voting Policies.

ISS' ProxyExchange ("PX") application provides clients with end-to-end management of their proxy voting process.  ISS clients control their voting policy(ies) and final proxy voting decisions while leveraging ISS Governance Solutions in the processing and data management elements of the proxy voting process.  To this end, ISS Governance Solutions receives proxy ballots on behalf of many clients, works with custodian banks, assists clients in executing their proxy votes, maintains vote records, and provides comprehensive reporting.

**Special Situations Research:** This service provides in-depth analyses regarding high-profile mergers and acquisitions, proxy contests and other strategic corporate transactions that are put to a shareholder vote. Through this service, ISS helps clients better understand the strategic rationale for each covered transaction, and its impact on valuation, corporate governance and shareholder rights.  Special Situations Research clients typically receive analyses throughout the full lifecycle of the events covered, from deal announcement through the shareholder meeting.

**Vote Disclosure Service:** ISS Governance Solutions offers its Vote Disclosure Service to help investment companies and 13(f) filers comply with their respective regulatory disclosure obligations.  ISS Governance Solutions collects vote history reports and prepares the extensive information the SEC requires investment companies to file on Form N-PX, as well as the say-on-pay vote information 13(f) filers are required to report. ISS also offers a comprehensive reporting service that includes daily updates of funds, meetings, and agenda information.  The Vote Disclosure Service can also be used by institutional investor clients, whether investment companies or not, to fulfill voluntary or mandatory vote disclosure obligations.

**Add-On Workflow Solutions:** ISS Governance Solutions offers several solutions to help investors increase efficiency in the proxy voting process. For example, ISS Communicator helps investors disseminate information on proxy meetings to internal stakeholders and assists in internal collaboration by the client on its vote decisions.  ISS Governance Solutions also offers tools to assist investors in their engagement process, such as databasing engagement notes or preparing engagement materials.

### ISS Sustainability Solutions

The following offerings of ISS Sustainability Solutions are designed to provide clients choice by addressing a wide variety of questions in support of investors' diverse investment strategies.

**Screening & Controversies:** This service identifies corporate involvement in a range of controversial products, business practices and high-risk sectors, allowing clients to screen, monitor and analyze responsible investment performance. ISS Sustainability Solutions' analysts provide on-going monitoring and research on company practices, assessing information gathered from numerous sources complemented by analysis, research, and engagement.  Analysts gather information through publicly

available sources, conduct interviews with stakeholders, and collect information on the policies and practices of covered companies.

**Ratings & Rankings:** Through its Ratings & Rankings solutions, ISS Sustainability Solutions provides comparable analyses on companies, countries and bonds, providing investors with the ability to incorporate sustainability into their investment processes, including on a customizable basis. ISS Sustainability Solutions' ratings aim to assist investors to minimize ESG risks, comply with evolving regulatory and stakeholder requirements and capitalize on potential opportunities. ISS Sustainability Solutions' proprietary rating concept places a sector-specific focus on the materiality of non-financial information.

**Climate Solutions:** ISS Sustainability Solutions provides a suite of climate solutions designed to provide investors with a better understanding of their exposure to climate-related risks in their portfolios. Through its dedicated team, ISS Sustainability Solutions offers a range of data and intelligence on climate change performance and risk and its impact on investments. In addition to carbon footprint data, ISS Sustainability Solutions assesses potential avoided emissions, transitional and physical risk, and future carbon performance - based on nearly 100 sector-specific indicators.

**Indices:** ISS Sustainability Solutions data is also used in the construction of thematic indices in various ways.  ISS Sustainability Solutions and its affiliated benchmark administrator (STOXX Ltd.) work with asset managers, asset owners, investment funds and other clients to create thematic and customized indices incorporating ISS Sustainability Solutions data.  In addition, ISS Sustainability Solutions supplies its data to third parties who create their own indices or investment products. Finally, ISS Sustainability Solutions licenses certain proprietary indices for the creation of passive financial investment products or for benchmarking. These indices are administered by an unaffiliated authorized benchmark administrator under the European Union Benchmark Regulation.

## Services Produced by Third Parties

### Access to Other Third-Party Research

In addition to providing access to its own Governance Research and Voting services through the PX platform, ISS also provides access through the platform to independent third-party proxy research material to some clients that subscribe directly to such third-party research and pay the third-party directly for that research.  ISS does not have a role in producing such research and is not affiliated with the research providers.  Additionally, some of ISS' proprietary work products can contain certain summary data supplied by independent providers.

### Securities Class Action Services

ISS also distributes the services of Securities Class Action Services, LLC ("ISS SCAS").  This company, which is not a registered investment adviser, offers a fully outsourced securities class action claims filing service which involves monitoring securities class and group action litigation and settlements on behalf of mutual fund, investment manager, pension fund and other clients. This service provides global coverage. ISS SCAS is available in three levels of service, designed to meet a variety of professional needs. This includes claims filing, portfolio monitoring, and research.

**A COMPLETE LIST OF ISS' PRODUCT OFFERINGS CAN BE FOUND ON ISS' WEBSITE AT:  www.issgovernance.com.**

## FEES AND COMPENSATION

ISS clients may purchase different elements of the ISS Governance Solutions and ISS Sustainability Solutions products and services described above. Fees charged for products and services generally range from $5,000 to above $1m depending on several factors including the types of products purchased, the volume of products consumed, coverage universes, delivery mechanisms, and individual client use cases which will determine the final price for each client. Please note that these fees are sometimes negotiable.  Most services are offered on an annual subscription basis and are generally paid for in advance.  In view of the nature of ISS' services, refunds generally are not available in the event of early termination of a subscription. Fees for ISS Sustainability Solutions' offerings are sometimes based, in part, on assets invested in products utilizing ISS Sustainability Solutions data.

## PERFORMANCE-BASED FEES AND SIDE-BY-SIDE MANAGEMENT

This item does not apply to ISS' business.

## TYPES OF CLIENTS

ISS' clients generally include other investment advisers, including investment advisers to investment companies, pension and profit-sharing plans, broker-dealers, asset owners, asset managers, banks or thrift institutions, hedge funds, charitable organizations and other institutional investors, as well as law firms, and universities. ISS also provides data to third parties for use in thematic based indices. ISS does not directly serve a retail clientele.

## METHODS OF ANALYSIS, INVESTMENT STRATEGIES AND RISK OF LOSS

In rendering proxy voting recommendations, ISS Governance Solutions uses publicly available information to analyze the terms of proposals presented to shareholders for a vote. ISS applies automation and artificial intelligence to support data collection and analytical processes using defined data sources, with all governance research and conclusions subject to qualitative assessment and judgment by ISS analysts.

While analysts consider company- and market-specific factors in generating voting recommendations, all proxy analyses are undertaken in accordance with a published analytical framework comprising voting policy guidelines chosen by clients.  In some cases, these are guidelines that ISS Governance Solutions develops and maintains, and clients have elected to adopt; in other cases, they are the clients' own guidelines (prepared with or without ISS Governance Solutions' assistance).  Each proxy research report under ISS Governance Solutions Benchmark and Thematic Voting Policies includes a URL for a direct hyperlink to ISS Governance Solutions' summary voting guidelines for easy access by users.

ISS Governance Solutions has an annual policy review process for its ISS Governance Solutions Benchmark and Thematic Voting Policies, to help ensure that the voting policy guidelines are updated to reflect investor and market

views, accepted good governance practices, the inclusion of relevant regulatory changes and practical implementation matters. All of ISS Governance Solutions' Benchmark and Thematic Voting Policies are reviewed annually, taking into account evolving perspectives, best practices, and related legal and market-specific developments. The annual review and development process starts in the summer each year and generally ends in November when policy updates for the following year are released publicly, with transparency to clients, to companies and to the market generally.

This inclusive approach to policy formulation and development is designed to ensure that ISS Governance Solutions policies reflect a market consensus and are informed by a broad set of relevant inputs and expertise, combining ISS Governance Solutions' expertise with views and feedback from a diverse range of market participants through multiple channels, including:

› Ongoing dialogue with and feedback from investor clients, and other participants in the capital markets, including companies, regulatory agencies, and the academic community.
› Periodic policy roundtables and other similar sessions with clients and relevant industry groups.
› An annual policy survey open to all interested parties and designed to obtain a variety of input from institutional investors, companies, and from other stakeholder groups to test policy development ideas and elicit feedback.

The ISS Governance Solutions Global Policy Board uses this input to consider draft policy updates on key emerging governance issues each year. Before finalizing material policy changes, ISS also publishes draft updates for an open review and comment period. Comments received during the open comment period are considered and are also posted to ISS' Policy Gateway at www.issgovernance.com/policy, in order to provide transparency into the feedback received.

In addition to this process, ISS Governance Solutions has established a Feedback Review Board, an ISS Governance Solutions body comprising members of senior management that considers comments from stakeholders regarding the general fairness of ISS Governance Solutions policies and methodologies as well those related to how we operate as a provider of research, voting recommendations, corporate ratings, and other solutions and services to financial market participants.

ISS Sustainability Solutions also provides issue screens, assessments, and ratings based on ESG criteria, sometimes defined by the client and sometimes by other generally accepted (inter)national norms, normative frameworks, and recognized ESG standards.

ISS Sustainability Solutions operates in a sustainable investment landscape is highly dynamic and as such, believes that investors require flexible and forward-looking solutions to meet ever-evolving global market demands. ISS Sustainability Solutions' approach to global ESG methodology governance consists of a cross-functional team of methodology experts and an internal independent oversight body comprising research leaders, product managers, and compliance officers:

› Global Sustainability Methodology Team – responsible for monitoring trends, developments and existing and emerging client and prospect needs, while leading ISS Sustainability Solutions' research quality program. More information on ISS Sustainability Solutions' approach to methodology, quality, and research processes can be found here.

› Methodology Review Board – internal body designed to independently steer and vet the methodology development strategy and process, setting and agreeing upon overall objectives and strategic targets, clarifying, reviewing and reassessing priorities as well as reviewing and approving material methodology developments.

ISS Sustainability Solutions' research is principally based on company-provided public disclosures, such as quarterly and annual reports, SEC filings and proxy statements, as well as sustainability and impact reports. Corporate reporting alone, however, often does not fully satisfy clients' informational requests. To supplement such information gaps, ISS Sustainability Solutions also incorporates into its corporate ratings public information derived from governmental and international institutions, recognized international or local non-governmental organizations (NGOs), reputable media sources, and subscription databases such as the Carbon Disclosure Project (CDP) and S&P Capital IQ.

ISS Sustainability Solutions may engage entities being rated during the research phase to confirm that the information obtained from public sources is complete, accurate, and up to date, or provide companies with draft reports of its ISS Sustainability Solutions corporate rating strictly for factual accuracy review. Finally, ISS Sustainability Solutions makes certain research reports available to the covered issuer free of charge.

* * * * *

ISS does not manage investment accounts or make buy, sell or hold investment recommendations to clients, other than indirect purchase or sale recommendations that might be implicit in a proxy voting recommendation, such as a recommendation on a vote on whether or not to approve a proposed merger transaction. Nevertheless, clients should be advised that investing in securities involves risk of loss that clients should be prepared to bear. ISS does not guarantee that its advice will produce any particular investment return or other results for clients.

## DISCIPLINARY INFORMATION

There is nothing to report for this item.

## OTHER FINANCIAL INDUSTRY ACTIVITIES AND AFFILIATIONS

### Foreign Advisory Affiliates

ISS has entered into arrangements with the following foreign affiliates: Institutional Shareholder Services Canada Inc., Institutional Shareholder Services Europe S.A. (Belgium), Institutional Shareholder Services France S.A.R.L., Institutional Shareholder Services K.K. (Japan), Institutional Shareholder Services (Australia) Pty. Ltd., Institutional Shareholder Services India Private Limited, Institutional Shareholder Services (Singapore) Private Limited, Institutional Shareholder Services (Hong Kong) Ltd, Institutional Shareholder Services Philippines Inc., Institutional Shareholder Services UK Limited, ISS-Ethix AB (Sweden), Institutional Shareholder Services Switzerland AG, and Institutional Shareholder Services Germany AG, whereby designated employees of the foreign affiliates render investment advice to ISS' clients, solely under ISS' auspices. The foreign affiliates, which share personnel with ISS under such arrangements, are not registered as investment advisers in the United States and may render advice to their own clients regarding the same securities about which advice is rendered to ISS' clients. Each individual

foreign employee who renders investment advice to ISS' clients is subject to the same Code of Ethics which governs the activities of ISS' own employees.

Each of ISS' foreign affiliates whose employees render investment advice to ISS' clients has agreed to maintain certain books and records in accordance with the Investment Advisers Act of 1940 and to submit to the jurisdiction of the U.S. regulatory authorities and courts with regard to the investment advice rendered to U.S. clients by its employees.

## Securities Class Action Services

As explained above, ISS distributes the services of its wholly owned subsidiary, ISS SCAS.  We note that this is not an investment advisory service and ISS SCAS is not registered as an investment adviser.

## Services for Issuers

ISS' wholly owned subsidiary, ISS Corporate Solutions, Inc. ("ISS-Corporate"), helps companies design and manage their corporate governance, executive compensation, sustainability, and financial programs to align with company goals, reduce risk, and manage the needs of a diverse shareholder base by delivering data, tools, and advisory services. Products and services include web-based tools, advisory services and publications that assist issuers with executive and director compensation modeling, capital structure planning and ESG issues.  These are not investment advisory products and services, and ISS-Corporate is not registered as an investment adviser.

ISS is aware that the existence of the relationship between ISS-Corporate and its corporate issuer clients presents a potential conflict of interest for ISS.  ISS has taken a number of steps, which are discussed below, designed to ensure that its clients' interests are protected at all times.

## Market Intelligence Services for Asset Managers

ISS' wholly owned subsidiary, Asset International, Inc. and its subsidiaries, serve the global investment management community by providing products and services related to data, market intelligence, and research. These are not investment advisory products and services and neither Asset International, Inc. nor any of its subsidiaries are registered as an investment adviser. Asset International's products and services (branded as "ISS MI") include data and market intelligence, such as investment flow data, investment product characteristics, adviser and fund analysis, ratings, events, and editorial content for investment managers, asset owners and custodians.

## Index Services

STOXX Ltd., a sister company of ISS, is a globally integrated index provider, covering markets across asset classes, and is a recognized benchmark administrator under the European Union Benchmark Regulation.  STOXX develops, maintains and distributes a comprehensive family of strictly rules-based and transparent indices and acts as the administrator for the DAX indices.  STOXX licenses its indices to financial institutions and other users in connection with mutual funds, exchange-traded funds, options, futures, structured products and other matters.  As noted above, STOXX utilizes also ISS Sustainability Solutions data in the creation of thematic and customized indices.

## Ownership Structure

As noted above, ISS is ultimately owned by DB.

ISS operates independently in the application of its research, recommendations, ratings and other analytical offerings (collectively referred to hereafter as "Research Offerings"). Procedures for maintaining this independence are described in the Code of Ethics, Participation or Interest in Client Transactions and Personal Trading section below.

# CODE OF ETHICS, PARTICIPATION OR INTEREST IN CLIENT TRANSACTIONS AND PERSONAL TRADING

## Code of Ethics

In accordance with SEC Rule 204A-1, ISS has adopted a Code of Ethics that describes certain standards of conduct that the Company's employees must follow.

A copy of the Code of Ethics is available on ISS' website here. A paper copy will be supplied upon written request directed to ISS' Chief Compliance Officer. Contact information can be found on the cover of this brochure.

## Standards of Conduct

The Code of Ethics affirms ISS' fiduciary relationship with its clients and obligates the Company to carry out its duties solely in the best interests of clients and free from all compromising influences and loyalties. With this goal in mind, the Code of Ethics devotes special attention to conflicts of interest, including potential conflicts between ISS' teams and the work of ISS-Corporate with corporate issuers, conflicts within the institutional advisory business, conflicts relating to ISS' ownership structure, and other conflicts generally. In each case, the goal of the Code of Ethics is to eliminate conflicts wherever possible, and to manage and disclose those conflicts that cannot be eliminated. In order to ensure compliance with the Code of Ethics, ISS conducts periodic training sessions for employees and requires employees to affirm their commitment to adhere to the Code of Ethics upon hire and on an annual basis. Furthermore, ISS regularly monitors the sufficiency of the Code of Ethics and the effectiveness of its implementation.

## Potential Conflicts of Interest

ISS has identified three primary potential conflicts of interest. These are:

- › a client relationship between a corporate issuer and ISS-Corporate;
- › a client relationship between ISS and a client that is (or is affiliated with) a corporate issuer or acts as the primary shareholder proponent seeking to have a specific proposal acted on by shareholders; and
- › the relationship between ISS and its ultimately owner, DB, a public company whose shares are traded on the Frankfurt Stock Exchange.

## Issuers that are clients of ISS-Corporate

ISS-Corporate provides corporate issuers with analytical tools, data, and advisory services to enable them, in part, to improve shareholder value and reduce risk through the adoption of improved corporate governance and ESG practices. Some of the products and services offered by ISS-Corporate are closely related to some of the matters which will ultimately be analyzed by the ISS Governance Solutions and ISS Sustainability Solutions business units. For example, subscribers to certain ExecComp services offered by ISS-Corporate receive web-based tools and, in some cases, advisory services that rely upon the analytical framework developed by ISS Governance Solutions to assess and make vote recommendations with respect to equity compensation plans that are put to a shareholder vote.

A critical component of ISS' approach to managing this potential conflict of interest is the firewall it maintains between its business for institutional investors and the services offered by ISS-Corporate to corporations.  A key goal of the firewall is to keep the teams preparing Research Offerings from learning the identity of ISS-Corporate's clients, thereby helping to ensure the objectivity and independence of ISS' investment advice.

The firewall mitigates potential conflicts via several layers of separation:

› ISS-Corporate is a separate legal entity from ISS.
› ISS-Corporate is physically separated from ISS and its day-to-day operations are separately managed.
› ISS' Research teams responsible for its Research Offerings work independently from ISS-Corporate.
› ISS-Corporate and ISS staff members are prohibited from discussing a range of matters, including the identity of ISS-Corporate clients.
› ISS employees' salaries, bonuses and other forms of compensation are not linked to any specific ISS-Corporate activity or sale.

ISS-Corporate explicitly informs its corporate clients that ISS will not give preferential treatment and is under no obligation to (i) support any proxy proposal of a corporate issuer or (ii) provide a favorable rating, assessment and/or any other favorable result to a corporate issuer, whether or not that corporate issuer has purchased products or services from ISS-Corporate.

As outlined in the ISS Policy Regarding Disclosure of Significant Relationships, ISS takes the view that in light of the products and services provided by ISS-Corporate, any paying-client relationship between ISS-Corporate and a corporate issuer, where ISS provides Research Offerings regarding that issuer, is significant.

PX provides proactive visibility regarding the disclosure of applicable clients of ISS-Corporate and ISS described in this Policy in a manner that can be seamlessly integrated within a client's workflow.

Within both the "Meetings" and "Research Materials" views in PX, there is a column indicating in Yes/No fashion whether there is a significant relationship associated with that meeting/research report. If there is, the user will be able to click a link to get more information about that relationship. In addition, users of PX's onscreen and/or email alerts for notification of the publication of new benchmark or custom research have a column on those notifications indicating whether there is a significant relationship associated with the report. PX also provides users with a tab labeled "Disclosure of Significant ISS

Relationships" within which a user can use a look-up box to search for entities with which ISS has a significant relationship.

ISS also maintains a long-standing process for providing its clients with disclosure regarding its significant relationships through its Compliance department via the disclosure@issgovernance.com email address. That disclosure mechanism remains in place for all institutional clients subscribing to ISS' Research Offerings.

## Issuers that are clients of ISS

Within ISS' broad institutional client base, there is a subset of clients who are themselves corporate issuers (or who have a parent or affiliated company that is a corporate issuer) or who may act as the primary shareholder proponent seeking to have a specific proposal acted on by shareholders. These clients, in their capacity as institutional investors, could have an interest in the analyses, recommendations, ratings and other conclusions reached in ISS' Research Offerings. The products and services offered to these clients are the same as the products and services available to all of ISS' clients.

ISS views the potential significance of its relationships with these types of clients as a function of the dollar value of the client relationship and the potential that a client might use its client relationship with ISS as a lever to exert influence on ISS' Research Offerings (whether in their capacity as a corporate issuer, shareholder proponent or otherwise). After considering ISS' business operations and benchmarks for significance/materiality, including measures used in different contexts under SEC laws and rules, ISS has determined it appropriate to adopt a 5% threshold, so that ISS will view a relationship with an institutional client as significant if the annual revenues received from that client across all of the businesses within the ISS STOXX group of companies are in excess of five percent of the total, consolidated revenues for the ISS STOXX group of companies for the most recently completed fiscal year. Any client relationship in excess of this threshold will be disclosed via the mechanism described directly above. In addition to robust disclosure, ISS' faithful adherence to the policy-based methods of analysis discussed above mitigates the effects of conflicts that may arise from any significant client relationships.

## Ownership Structure

ISS operates on an arm's length basis from DB and has adopted policies designed to protect the independence and integrity of ISS' Research Offerings. Among other things, these policies are intended to establish appropriate standards and procedures to protect the integrity and independence of the Research Offerings produced by ISS Governance Solutions and to safeguard the reputations of ISS and its owners. The policies also identify situations that exist or give rise to actual or potential conflicts of interest, or to the appearance of conflicts of interest, in connection with the Research Offerings of ISS relating to certain publicly-traded companies with which its owners might have a connection and the steps taken to mitigate any actual or potential conflicts.

ISS maintains a number of different mechanisms (in addition to this Form ADV) alerting clients to the relationship ISS maintains with DB. This includes, for example, disclosures within ISS' website and within its Research Offerings related to DB.

## Conflicts Generally

In addition to the organizational conflicts of interest explained above, ISS maintains policies and procedures within its Code of Ethics related to potential conflicts of interest at the employee level (e.g. limitations on personal securities trading, outside business activities, and the giving and receipt of gifts and entertainment).

ISS provides its clients with an extensive array of information designed to ensure that they are fully informed of potential conflicts of interest and the steps ISS has taken to address them.  Among other things, ISS supplies a comprehensive due diligence compliance package on its website[2] to assist clients and prospective clients in fulfilling their own obligations regarding the use of independent, third-party proxy advisory firms and Sustainability Solutions service providers.  This package includes an overview of the ISS organization, information related to ISS Governance Solutions, as well as information related to ISS Sustainability Solutions. A copy of ISS' Code of Ethics is also available on the website.

Moreover, Research Offerings contain a legend indicating that the subject of the analysis or report may be a client of or affiliated with a client of ISS or ISS-Corporate.  Proxy research reports also note that one or more proponents of a shareholder proposal may be a client of ISS or ISS-Corporate or may be affiliated with such a party.  Clients who wish to learn more about the relationship, if any, between ISS-Corporate and the subject of an analysis or report have the ability to review such relationships as described above.  Institutional clients can also obtain lists of all ISS-Corporate clients. These processes allow ISS' clients to receive the information they need without revealing the identity of ISS-Corporate clients to those ISS employees preparing Research Offerings.

ISS believes that these extensive measures provide clients with a high degree of assurance that ISS has substantially eliminated or is effectively managing the potential conflicts of interest its business entails.  ISS welcomes questions from its clients and prospective clients on these matters and encourages clients and prospective clients to incorporate a review of our conflict management procedures and practices in their own due diligence endeavors.

In addition, all relevant ISS employees are required to perform their duties in accordance with the standards set forth in the Code of Ethics.

## Participation or Interest in Client Transactions

This item does not pertain to ISS' business.

## Personal Trading

ISS, from time to time, renders advice to clients that could lead clients to buy or sell securities in which employees of ISS or of its affiliated companies have a financial interest.  Or, ISS' employees or those of its affiliated companies could buy for their own accounts securities that are the subject of advice rendered to clients.  As described below,

---

[2] http://www.issgovernance.com/compliance/due-diligence-materials/


ISS has adopted internal procedures which it believes will protect its clients' interests. At all times, advice to clients will be rendered independently of the securities holdings of ISS' employees.

With regard to personal trading, the Code of Ethics obligates Access Persons to formally report their trading activity to the company's Compliance department on a quarterly basis. They also must receive the Compliance department's permission before investing in initial public offerings, private placements or other limited offerings. ISS has also adopted restrictions on personal trading designed to prevent employees from improperly trading on, or benefiting from, material, non-public information. In this last regard, ISS maintains a restricted list of issuers whose proxies are currently being analyzed or acted upon by ISS and prohibits Access Persons from buying or selling the securities of any issuer on that list. ISS may also impose restrictions on personal trading in issuers who are the subject of Special Situations Research Notes.

## BROKERAGE PRACTICES

This item does not apply to ISS' business.

## REVIEW OF ACCOUNTS

Please refer to the Voting Client Securities section below for information about reports regarding the proxy votes ISS Governance Solutions casts on behalf of clients. Otherwise, this item does not apply to ISS' business.

## CLIENT REFERRALS AND OTHER COMPENSATION

At a client's election, ISS could receive cash payments from one or more broker-dealers in consideration for providing services to the client. In such a situation, ISS acts as a third-party research vendor to the client's soft-dollar arrangement with its broker-dealer. ISS does not believe such situations involve any conflicts between ISS' interests and those of ISS' clients who choose to pay by this method.

From time to time, ISS pays a cash fee to parties who refer advisory clients. Such solicitation fees are typically a portion of the fees ISS receives from the referred clients. Any such payments will be made in accordance with Rule 206(4)-1 under the Investment Advisers Act of 1940.

## CUSTODY

This item does not apply to ISS' business.

## INVESTMENT DISCRETION

This item does not apply to ISS' business.



# VOTING CLIENT SECURITIES

As noted in the Advisory Business section, ISS' Governance Research and Voting services involve analyzing shareholder proposals and providing voting recommendations to clients in accordance with a Benchmark, Thematic or custom proxy voting policy(ies) chosen by the client. Clients retain the right to override ISS' recommendations and direct their voting as they determine. The many steps ISS takes to address potential conflicts of interest that could arise in connection with its Governance Research and Voting services are described in the Code of Ethics, Participation or Interest in Client Transactions and Personal Trading section above.

All subscribers to ISS' Governance Research and Voting services have access to the proxy voting policies and procedures applicable to their accounts, as well as information about how ISS assisted clients in executing proxy votes on their behalf.

# FINANCIAL INFORMATION

There is no financial condition that is reasonably likely to impair ISS' ability to meet its contractual commitments to clients.

# Foster Declaration Exhibit 6

ISS▷

ISS Proxy Analysis & Benchmark Policy Voting Recommendations

# Tesla, Inc.

## Key Takeaways



QualityScore

**Meeting Type:** Annual
**Meeting Date:** 6 November 2025
**Record Date:** 15 September 2025
**Meeting ID:** 1994609

**NASDAQ**: TSLA
**Index:** S&P 500
**Sector:** Automobile Manufacturers
**GICS:** 25102010

**Primary Contact**
U.S. Research
U.S. Research Help Center

---

## Agenda & Recommendations

**Policy: United States**
**Incorporated:** Texas, USA

| Item | Code | Proposal | Board Rec. | ISS Rec. |
|---|---|---|---|---|
| **MANAGEMENT PROPOSALS** | | | | |
| 1a | M0201 | Elect Director Ira Ehrenpreis | FOR | AGAINST |
| 1b | M0201 | Elect Director Joe Gebbia | FOR | FOR |
| 1c | M0201 | Elect Director Kathleen Wilson-Thompson | FOR | FOR |
| 2 | M0550 | Advisory Vote to Ratify Named Executive Officers' Compensation | FOR | AGAINST |
| 3 | M0524 | Amend Omnibus Stock Plan | FOR | AGAINST |
| 4 | M0593 | Approve Issuance of Common Stock to Elon Musk Pursuant to CEO Performance Award | FOR | AGAINST |
| 5 | M0101 | Ratify PricewaterhouseCoopers LLP as Auditors | FOR | FOR |
| 6 | M0608 | Eliminate Supermajority Vote Requirement | NONE | FOR |

---

## Report Contents

| | | | |
|---|---|---|---|
| Financial Highlights | 4 | QualityScore | 11 |
| Ownership and Control Overview | 5 | Vote Results | 13 |
| Corporate Governance Profile | 5 | Meeting Agenda and Proposals | 14 |
| Board Profile | 7 | Additional Information | 58 |
| Compensation Profile | 9 | | |

© 2025 Institutional Shareholder Services Inc.  All Rights Reserved. This proxy analysis and the information herein may not be reproduced or disseminated in whole or in part. For information on the policies applied in this research report, please see our Policy Gateway.

**Tesla, Inc. (TSLA)**
POLICY: United States

**Meeting Date: 6 November 2025**
Meeting ID: 1994609

## SHAREHOLDER PROPOSALS

| | | | | |
|---|---|---|---|---|
| 7 | S0810 | Authorize Board to Invest Company Funds in xAI | NONE | AGAINST |
| 8 | S0510 | Assess Feasibility of Including Sustainability as a Performance Measure for Senior Executive Compensation | AGAINST | AGAINST |
| 9 | S0412 | Report on the Use of Child Labor in Connection with Electric Vehicles | AGAINST | AGAINST |
| 10 | S0126 | Amend the Bylaws To Repeal 3% Derivative Suit Ownership Threshold | AGAINST | AGAINST |
| 11 | S0232 | Amend Bylaws | AGAINST | AGAINST |
| 12 | S0201 | Declassify the Board of Directors | AGAINST | FOR |
| 13 | S0311 | Reduce Supermajority Vote Requirement | AGAINST | FOR |
| 14 | S0232 | Require Shareholder Approval of Bylaw Amendments Adopted by the Board of Directors | AGAINST | FOR |

Shading indicates that ISS recommendation differs from Board recommendation
▶ Items deserving attention due to contentious issues or controversy

## ISS-Company Dialogue

| Date | Initiated By | Notes |
|---|---|---|
| Oct. 6, 2025 | Issuer | Discussed the 2025 CEO Performance Award and other ballot items. |

**Note:** ISS engages in ongoing dialogue with issuers in order to ask for additional information or clarification, but not to engage on behalf of its clients. Any draft review which may occur as part of this process is done for purposes of data verification only. All ISS recommendations are based solely upon publicly disclosed information.

Copyright © 2025 Institutional Shareholder Services Inc.  All Rights Reserved.  This proxy analysis and the information herein may not be reproduced or disseminated in whole or in part. For information on the policies applied in this research report, please see our Policy Gateway.

**Tesla, Inc. (TSLA)**                                                    **Meeting Date: 6 November 2025**
POLICY: United States                                                         Meeting ID: 1994609

## Material Company Updates

| Item | Summary |
| --- | --- |
| **Board Update** | On June 1, 2025, John R. (Jack) Hartung was appointed to the board. |
| **Bylaw Changes** | On May 15, 2025, following changes to Texas corporate laws, the board amended the bylaws to:<br><br>• provide for a jury trial waiver for "internal entity claims" as defined in the Texas Business Organizations Code; and<br>• add a 3 percent of shares outstanding ownership threshold requirement for any shareholder, or group, to institute or maintain a shareholder derivative lawsuit.<br><br>See Item 1, elect directors, for further commentary on the derivative suit bylaw. |
| **Tornetta Decision Appeal** | The Delaware Supreme Court held oral arguments on Oct. 15, 2025 on the company's appeal of the *Tornetta v. Musk* case, which relates to whether Musk can exercise his 2018 CEO Performance Award. |
| **Notable Vote Results** | At the last annual meeting, the following shareholder proposals received the support of a majority of votes cast: Adopt Simple Majority Vote and Declassify the Board of Directors. See *Board Responsiveness* section of **Elect Directors** below. |

Copyright © 2025 Institutional Shareholder Services Inc.  All Rights Reserved.  This proxy analysis and the information herein may not be reproduced or disseminated in whole or in part. For information on the policies applied in this research report, please see our Policy Gateway.

**Tesla, Inc. (TSLA)**
POLICY: United States

**Meeting Date: 6 November 2025**
Meeting ID: 1994609

## Financial Highlights

**Company Description:** Tesla, Inc. designs, develops, manufactures, leases, and sells electric vehicles, and energy generation and storage systems in the United States, China, and internationally. The company operates in two segments, Automotive; and Energy Generation and Storage.

### STOCK PRICE PERFORMANCE



Tesla, Inc. — MSCI ACWI: Automobiles (251020) — S&P500

### TOTAL SHAREHOLDER RETURNS (ANNUALIZED)

|  | 1 Yr | 3 Yr | 5 Yr |
|---|---|---|---|
| Company TSR (%) | 62.52 | 4.66 | 70.67 |
| GICS 2510 TSR (%) | -27.05 | -16.42 | -0.66 |
| S&P500 TSR (%) | 25.02 | 8.94 | 14.53 |

Source: Compustat. As of last day of company FY end month: 12/31/2024

### COMPANY SNAPSHOT (AS OF RECORD DATE)

| | |
|---|---|
| Market Cap (M) | 1,322,563.1 |
| Closing Price | 410.04 |
| Dividends Paid (LTM) | 0.00 |
| 52-Week High | 488.54 |
| 52-Week Low | 212.11 |
| Shares Outstanding (M)[1] | 3,325.15 |
| Average daily trading volume (prior mo)[2] | 84,154.71 |

Source: Compustat. As of September 15, 2025 (All currency in USD)
(1) DEF14A As of September 15, 2025
(2) Trading Volume in thousands of shares

### FINANCIAL & OPERATIONAL PERFORMANCE

| All currency in USD | Historical Performance (FY ending) | | | | | Compared to Peers (Compustat FY*) – 2024 |
|---|---|---|---|---|---|---|
| | 12/2020 | 12/2021 | 12/2022 | 12/2023 | 12/2024 | |
| **Earnings** | | | | | | |
| Revenue (M) | 31,536 | 53,823 | 81,462 | 96,773 | 97,690 | |
| Net Income (M) | 721 | 5,519 | 12,556 | 14,997 | 7,091 | |
| EBITDA (M) | 4,506 | 9,407 | 17,579 | 13,558 | 13,128 | |
| EPS (USD) | 0.25 | 1.87 | 4.02 | 4.73 | 2.23 | |
| EPS Y/Y Growth (%) | 176 | 648 | 115 | 18 | -53 | |
| **Profitability** | | | | | | |
| Pretax Net Margin (%) | 4 | 12 | 17 | 10 | 9 | |
| EBITDA Margin (%) | 14 | 17 | 22 | 14 | 13 | |
| Return on Equity (%) | 3 | 18 | 28 | 24 | 10 | |
| Return on Assets (%) | 1 | 9 | 15 | 14 | 6 | |
| ROIC (%) | 2 | 14 | 25 | 21 | 8 | |
| **Leverage** | | | | | | |
| Debt/Assets | 26 | 14 | 7 | 9 | 11 | |
| Debt/Equity | 60 | 29 | 13 | 15 | 19 | |
| **Cash Flows** | | | | | | |
| Operating (M) | 5,943 | 11,497 | 14,724 | 13,256 | 14,923 | |
| Investing (M) | -3,132 | -7,868 | -11,973 | -15,584 | -18,787 | |
| Financing (M) | 9,973 | -5,203 | -3,527 | 2,589 | 3,853 | |
| Net Change (M) | 13,118 | -1,757 | -1,220 | 265 | -152 | |
| **Valuation & Performance** | | | | | | |
| Price/Earnings | 940.89 | 188.37 | 30.64 | 52.53 | 181.09 | |
| Annual TSR (%) | 743.44 | 49.76 | -65.03 | 101.72 | 62.52 | |

Source: Compustat. *Note: Compustat standardizes financial data and fiscal year designations to allow for meaningful comparison across companies. Compustat data may differ from companies' disclosed financials and does not incorporate non-trading equity units. Peers shown here represent closest industry peers drawn from those peers used in ISS' pay-for-performance analysis. See www.issgovernance.com/policy-gateway/company-financials-faq/ for more information.

Copyright © 2025 Institutional Shareholder Services Inc. All Rights Reserved. This proxy analysis and the information herein may not be reproduced or disseminated in whole or in part. For information on the policies applied in this research report, please see our Policy Gateway.

**Tesla, Inc. (TSLA)**
POLICY: United States

**Meeting Date: 6 November 2025**
Meeting ID: 1994609

## Ownership & Control Overview

| Stock Type | Votes per Share | Outstanding | |
|---|---|---|---|
| Common Stock | 1 | 3,325,150,886 | |
| **Top Holders - Ownership & Control** | | **% of Stock** | **% of Votes** |
| ▶MUSK ELON REEVE | | 12.4 | 12.4 |
| The Vanguard Group | | 6.9 | 6.9 |
| Blackrock, Inc. | | 5.6 | 5.6 |

Proxy Statement, © 2025 Factset Research Systems, Inc. All Rights Reserved. As of: 15 Sep 2025



Percentages rounded down to 1 decimal. "▶" identifies shareholders considered strategic under ISS' definition.

to Detailed Ownership Profile

ISS' definition of strategic shareholders may include, but is not limited to, shareholders with board representation, State-controlled entities, insiders/executives, and employee funds.

## Corporate Governance Profile

### BOARD SUMMARY

| | |
|---|---|
| Chair classification | Independent |
| Separate chair/CEO | Yes |
| Independent lead director | N/A |
| Voting standard | Majority |
| Plurality carveout for contested elections | Yes |
| Resignation policy | No |
| Total director ownership (000 shares) | 416,570 |
| Total director ownership (%) | 12.5 |
| Percentage of directors owning stock | 77.8% |
| Number of directors attending < 75% of meetings | 0 |
| Average director age | 56 years |
| Average director tenure | 10 years |
| Percentage of women on board | 22% |

### SHAREHOLDER RIGHTS SUMMARY

| | |
|---|---|
| Controlled company | No |
| Classified board | Yes |
| Multi-class common stock w/ unequal voting rights | No |
| Vote standard for mergers/acquisitions | 66.67% |
| Vote standard for charter amendment | 66.67% |
| Vote standard for bylaw amendment | 66.67% |
| Shareholder right to call special meetings | Yes, 50% |
| Material restrictions on right to call special meetings | No |
| Shareholder right to act by written consent | Unanimous |
| Cumulative voting | No |
| Board authorized to issue blank-check preferred stock | Yes |
| Poison pill | No |
| Proxy Access | Yes |
| -     Ownership requirement (%) | 3 |
| -     Time requirement (years) | 3 |
| -     Nomination limit (% of seats) | 20 |
| -     Nomination limit (# of nominees) | 2 |
| -     Aggregation cap (# of nominators) | 20 |

Copyright © 2025 Institutional Shareholder Services Inc.  All Rights Reserved.  This proxy analysis and the information herein may not be reproduced or disseminated in whole or in part. For information on the policies applied in this research report, please see our Policy Gateway.

**Tesla, Inc. (TSLA)**
POLICY: United States

**Meeting Date: 6 November 2025**
Meeting ID: 1994609

## Board & Committee Composition

The information provided in the charts and tables below is based on ISS data records, which rely on disclosures in proxy materials and other public sources available as of the date set forth below (for the general meeting under review) and, with respect to information from prior years, information that was available ahead of each year's annual general meeting at the time of ISS' report for that meeting. As such, these charts and tables might not reflect changes to the board composition and/or other covered elements subsequently disclosed by the issuer after ISS' publications or between general meetings.

Independence values refer to ISS Independence classifications ("Exec": Executive Director; "N-Ind.": Non-Independent Director; "Ind.": Independent Director).

### Board

N-Ind.: 22%, 2
Ind.: 67%, 6
Exec.: 11%, 1

Meetings last FY:29

as of November 6, 2025

### Audit
Ind.: 100%, 4
Meetings last FY:9

### Comp
Ind.: 100%, 3
Meetings last FY:9

### Nom
Ind.: 100%, 4
Meetings last FY:7

■ **Exec**   ■ **N-Ind.**   ■ **Ind.**

### Independence History

| | 2021 | 2022 | 2023 | 2024 | After Meeting |
|---|---|---|---|---|---|
| Board | 75% | 71% | 63% | 63% | 67% |
| Audit Com | 100% | 100% | 100% | 100% | 100% |
| Comp Com | 100% | 100% | 100% | 100% | 100% |
| Nom Com | 100% | 100% | 100% | 100% | 100% |

### Gender Diversity Trend

| | 2021 | 2022 | 2023 | 2024 | After Meeting |
|---|---|---|---|---|---|
| male | 75% | 71% | 75% | 75% | 78% |
| female | 25% | 29% | 25% | 25% | 22% |

### Director Tenure



Copyright © 2025 Institutional Shareholder Services Inc. All Rights Reserved. This proxy analysis and the information herein may not be reproduced or disseminated in whole or in part. For information on the policies applied in this research report, please see our Policy Gateway.

**Tesla, Inc. (TSLA)**  
POLICY: United States

**Meeting Date: 6 November 2025**  
Meeting ID: 1994609

## Board Profile (after upcoming meeting)

| Item # | Executive Directors | Affiliation | Independence | | Leadership | Gender | Age | Tenure | Term Ends | Committee | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | Co. | ISS | | | | | | Audit | Comp | Nom[1] | Gov[1] |
| | Elon Musk | Founder | Exec | Exec | CEO | M | 54 | 21 | 2026 | | | | |
| | **Non-Executive Directors** | | | | | | | | | | | | |
| | Robyn Denholm | | Ind. | Ind. | Chair | F | 62 | 11 | 2026 | C F | M | M | M |
| 1a | Ira Ehrenpreis | | Ind. | Ind. | | M | 56 | 18 | 2028 | | C | C | C |
| 1b | Joseph (Joe) Gebbia | | Ind. | Ind. | | M | 44 | 3* | 2028 | M | | | |
| | John (Jack) Hartung | | Ind. | Ind. | | M | 68 | 0 | 2027 | F | | | |
| | James Murdoch | | Ind. | Ind. | | M | 52 | 8 | 2027 | M | | M | M |
| | Kimbal Musk | Familial Relationship | Non-Ind. | Non-Ind. | | M | 52 | 21 | 2027 | | | | |
| | Jeffrey (JB) Straubel | Founder | Ind. | Non-Ind. | | M | 49 | 2 | 2026 | | | | |
| 1c | Kathleen Wilson-Thompson | | Ind. | Ind. | | F | 68 | 6 | 2028 | | M | M | M |
| | | | 78% Ind. | 67% Ind. | | 22% F | Ave: 56 | Ave: 10 | Ave: 2 | 100% Ind. | 100% Ind. | 100% Ind. | 100% Ind. |

Shaded cells in blue indicate that company and ISS independence classifications differ.  
*Indicates director not previously submitted to shareholders for election.  
Committee Membership: M = Member | C = Chair | **F = Member and Financial Expert**  
1. The company has a combined Nominating and Governance committee.

### DIRECTOR NOTES

| | | |
|---|---|---|
| Elon Musk | FOUNDER | Elon Musk is a founder of the company. (Source(s): DEF14A, 9/17/25, p. 10.) |

Elon Musk — OTHER INFORMATION 1) Elon Musk is the brother of Kimbal Musk, a non-employee director of the company. (Source(s): DEF14A, 9/17/25, pp. 8, 36, 119, 129.) 2) The Boring Company (TBC) is a party to commercial agreements with the company. Under these agreements, the company incurred expenses of approximately $0.8 million through February 2025. Elon Musk is the founder of TBC. Space Exploration Technologies Corporation (SpaceX) is a party to certain commercial, licensing, and support agreements with the company. Under these agreements, SpaceX incurred expenses of approximately $0.1 million through February 2025. Elon Musk serves as CEO, chief technology officer, and chairman of SpaceX. x.AI Corp is a party to certain commercial, consulting, and support agreements with the company. Under these agreements, xAI incurred expenses of approximately $36.9 million through February 2025. Approximately $36.8 million through February 2025 was incurred by xAI for its purchase of the company's Megapack products. Elon Musk served as the CEO and treasurer of x.AI Corp. Following the March 2025 merger of X and x.AI Corp, he now serves as the CEO of X.AI Holdings Corp. As part of a multi-platform advertising campaign, the company directly or indirectly purchased advertising on X, which totaled approximately $0.01 million through February 2025. Elon Musk served as chief technology officer of X. Following the March 2025 merger of X and x.AI Corp, he now serves as the CEO of X.AI Holdings Corp. The company is a party to a service agreement with a security company, owned by Elon Musk and organized to provide security services concerning him, including in connection with his duties to, and work for, the company. The company incurred expenses of approximately $0.5 million through February 2025, representing a portion of the total cost of security services concerning Elon Musk. Since April 2016, SpaceX has invoiced the company for their use of an aircraft owned and operated by SpaceX at rates determined by the company and SpaceX, subject to rules of the Federal Aviation Administration governing such arrangements. The company incurred expenses of approximately $0.04 million through February 2025. (Source(s): DEF14A, 9/17/25, pp. 10, 158.; DEF14A, 9/17/25, p. 157.; DEF14A, 9/17/25, pp. 10, 157.) 3) Elon Musk and/or investment funds managed by, or otherwise affiliated with, him have made minority investments in certain companies or investment funds, (i) of which the company's other directors are founders, significant shareholders, directors, officers, managers, or affiliates and/or (ii) with which the company has had certain relationships. (Source: DEF14A, 9/17/25, p. 119)

1a Ira Ehrenpreis — OTHER INFORMATION Ira Ehrenpreis and/or investment funds managed by, or otherwise affiliated with, him have made minority investments in certain companies or investment funds, (i) of which the company's other directors are founders, significant shareholders, directors, officers, managers, or affiliates and/or (ii) with which the company has had certain relationships. (Source: DEF14A, 9/17/25, p. 119)

1b Joseph (Joe) Gebbia — OTHER INFORMATION Joseph Gebbia and/or investment funds managed by, or otherwise affiliated with, him have made minority investments in certain companies or investment funds, (i) of which the company's other directors are founders, significant shareholders, directors, officers, managers, or affiliates and/or (ii) with which the company has had certain relationships. (Source: DEF14A, 9/17/25, p. 119)

John (Jack) Hartung — OTHER INFORMATION 1) John R. Hartung is the father-in-law of a senior program manager at the company. (Source(s): DEF14A, 9/17/25, p. 158.) 2) John Hartung and/or investment funds managed by, or otherwise affiliated with, him have made minority investments in certain companies or investment funds, (i) of which the company's other directors are founders, significant shareholders, directors, officers, managers, or affiliates and/or (ii) with which the company has had certain relationships. (Source: DEF14A, 9/17/25, p. 119)

James Murdoch — OTHER INFORMATION James Murdoch and/or investment funds managed by, or otherwise affiliated with, him have made minority investments in certain companies or investment funds, (i) of which the company's other directors are founders, significant shareholders, directors, officers, managers, or affiliates and/or (ii) with which the company has had certain relationships. (Source: DEF14A, 9/17/25, p. 119)

Copyright © 2025 Institutional Shareholder Services Inc.  All Rights Reserved.  This proxy analysis and the information herein may not be reproduced or disseminated in whole or in part. For information on the policies applied in this research report, please see our Policy Gateway.

**Tesla, Inc. (TSLA)**

POLICY: United States

**Meeting Date: 6 November 2025**

Meeting ID: 1994609

| | | |
|---|---|---|
| Kimbal Musk | **FAMILIAL RELATIONSHIP** | Kimbal Musk is the brother of Elon Musk, CEO of the company. (Source(s): DEF14A, 9/17/25, pp. 8, 36, 119, 129.) |
| | **OTHER INFORMATION** | 1) For information about related-party transactions with companies affiliated with Elon Musk, see director note above. 2) Kimbal Musk and/or investment funds managed by, or otherwise affiliated with, him have made minority investments in certain companies or investment funds, (i) of which the company's other directors are founders, significant shareholders, directors, officers, managers, or affiliates and/or (ii) with which the company has had certain relationships. (Source: DEF14A, 9/17/25, p. 119) |
| Jeffrey (JB) Straubel | **FOUNDER** | Jeffrey Straubel is a co-founder of the company. (Source(s): DEF14A, 9/17/25, p. 17.) |
| | **OTHER INFORMATION** | 1) Jeffrey Straubel served as chief technology officer of the company until July 2019. (Source(s): DEF14A, 9/17/25, p. 17.) 2) The company is party to an agreement with Redwood Materials Inc. to supply certain scrap materials. Under this agreement, Redwood incurred expenses of approximately $0.6 million through February 2025. Jeffrey Straubel is the founder and CEO of Redwood. (Source(s): DEF14A, 9/17/25, p. 157.) 3) Jeffrey Straubel and/or investment funds managed by, or otherwise affiliated with, him have made minority investments in certain companies or investment funds, (i) of which the company's other directors are founders, significant shareholders, directors, officers, managers, or affiliates and/or (ii) with which the company has had certain relationships. (Source: DEF14A, 9/17/25, p. 119) |

## COMMITMENTS AT PUBLIC COMPANIES

| Item # | Director Name | # of boards* | Company Name | Mandate Type | CEO | Board Chair | Audit | Comp | Nom |
|---|---|---|---|---|---|---|---|---|---|
| | Elon Musk | 1 | *Tesla, Inc.* | Executive Director | ✓ | | | | |
| | Robyn Denholm | 1 | *Tesla, Inc.* | Non-Executive Director | | ✓ | C F | M | M |
| 1a | Ira Ehrenpreis | 1 | *Tesla, Inc.* | Non-Executive Director | | | | C | C |
| 1b | Joseph (Joe) Gebbia | 2 | *Tesla, Inc.* | Non-Executive Director | | | M | | |
| | | | Airbnb, Inc. | Non-Executive Director | | | | | |
| | John (Jack) Hartung | 3 | *Tesla, Inc.* | Non-Executive Director | | | F | | |
| | | | The Honest Company, Inc. | Non-Executive Director | | | F | C | |
| | | | Portillo's, Inc. | Non-Executive Director | | | F | | |
| | | | Chipotle Mexican Grill, Inc. | Executive/Employee (non-director) | | | | | |
| | James Murdoch | 2 | *Tesla, Inc.* | Non-Executive Director | | | M | | M |
| | | | MCH Group AG | Non-Executive Director | | | | | |
| | Kimbal Musk | 1 | *Tesla, Inc.* | Non-Executive Director | | | | | |
| | Jeffrey (JB) Straubel | 2 | *Tesla, Inc.* | Non-Executive Director | | | | | |
| | | | QuantumScape Corporation | Non-Executive Director | | | | | |
| 1c | Kathleen Wilson-Thompson | 3 | *Tesla, Inc.* | Non-Executive Director | | | | M | M |
| | | | Wolverine World Wide, Inc. | Non-Executive Director | | | | C | M |
| | | | McKesson Corporation | Non-Executive Director | | | | M | M |

The information provided is based on ISS data records, which rely on disclosures in proxy materials and other public sources available as of the date set forth below (for the general meeting under review) and, with respect to information from prior years, information that was available ahead of each year's annual general meeting at the time of ISS' report for that meeting.

*The number of boards for each director is the total of executive director and/or non-executive director mandates.

## DIRECTOR PAY, ATTENDANCE AND EQUITY OWNERSHIP OVERVIEW MOST RECENT FY

| Item # | Director Name | Board Position | Attendance (in %) | Total Compensation | Ownership # | % stock | % votes |
|---|---|---|---|---|---|---|---|
| | **Elon Musk** | ED, CEO | ≥75% | ** | 413,362,808 | 12.4 | 12.4 |
| | **Robyn Denholm** | NED, Chair, Audit (C), Comp (M), Nom (M) | ≥75% | USD 0 | 85,000 | <0.1 | <0.1 |
| 1a | Ira Ehrenpreis | NED, Comp (C), Nom (C) | ≥75% | USD 0 | 855,394 | <0.1 | <0.1 |
| 1b | **Joseph (Joe) Gebbia** | NED, Audit (M) | ≥75% | USD 0 | 4,111 | <0.1 | <0.1 |
| | John (Jack) Hartung | NED, Audit (M) | N/A | N/A | 0 | 0 | 0 |
| | **James Murdoch** | NED, Audit (M), Nom (M) | ≥75% | USD 0 | 794,306 | <0.1 | <0.1 |
| | **Kimbal Musk** | NED | ≥75% | USD 0 | 1,463,220 | <0.1 | <0.1 |
| | **Jeffrey (JB) Straubel** | NED | ≥75% | USD 0 | 0 | 0 | 0 |
| 1c | Kathleen Wilson-Thompson | NED, Comp (M), Nom (M) | ≥75% | USD 0 | 5,400 | <0.1 | <0.1 |
| **Total** | | | | USD 0 | | | |

ED for Executive Directors, NED for Non-Executive Directors

Attendance rates take into account board and committee meetings.

Copyright © 2025 Institutional Shareholder Services Inc. All Rights Reserved. This proxy analysis and the information herein may not be reproduced or disseminated in whole or in part. For information on the policies applied in this research report, please see our Policy Gateway.

\*\*For executive director data, please refer to Executive Pay Overview.
Ownership values include shares held, stock awards that vest within 60 days of the disclosure date, and deferred stock units (DSUs). Stock options are excluded.

## Compensation Profile

### EXECUTIVE PAY OVERVIEW

| Executive | Title | Base Salary | Change in Pension, Deferred Comp, All Other Comp | Bonus & Non-equity Incentives | Restricted Stock | Option Grant | Total |
|---|---|---|---|---|---|---|---|
| **E. Musk** | Technoking of Tesla and Chief Executive Officer | 0 | 0 | 0 | 0 | 0 | 0 |
| **V. Taneja** | Chief Financial Officer | 304 | 3 | 0 | 26,137 | 171,897 | 198,340 |
| **X. Zhu** | SVP, APAC and Global Vehicle Manufacturing | 350 | 168 | 0 | 0 | 0 | 518 |
| **Median CEO Pay** | ISS Selected Peer Group | 1,312 | 555 | 2,215 | 11,061 | 0 | **16,537** |
| | Company Defined Peers | N/A | N/A | N/A | N/A | N/A | **N/A** |

Source: ISS. Pay in $thousands. Total pay is sum of all reported pay elements, using ISS' Black-Scholes estimate for option grant-date values. Median total pay will not equal sum of pay elements medians. Company Defined Peers are as disclosed. More information on ISS' peer group methodology is available at www.issgovernance.com/policy-gateway/us-compensation-policy-guidance/.

Copyright © 2025 Institutional Shareholder Services Inc.  All Rights Reserved.  This proxy analysis and the information herein may not be reproduced or disseminated in whole or in part. For information on the policies applied in this research report, please see our Policy Gateway.

**Tesla, Inc. (TSLA)**
POLICY: United States

**Meeting Date: 6 November 2025**
Meeting ID: 1994609

## OPTION VALUATION ASSUMPTIONS

| For CEO's last FY Grant | Company | ISS |
|---|---|---|
| Volatility (%) | N/A | N/A |
| Dividend Yield (%) | N/A | N/A |
| Term (yrs) | N/A | N/A |
| Risk-free Rate (%) | N/A | N/A |
| Grant date fair value per option | N/A | N/A |
| Grant Date Fair Value ($ in 000) | N/A | N/A |

The CEO did not receive stock options in the most recent fiscal year.

## CEO PAY MULTIPLES

| Compared to | Multiple |
|---|---|
| 2nd highest active executive | 0.00 |
| Average active NEO | 0.00 |
| ISS peer median | 0.00 |
| Company peer median | N/A |
| Median employee/CEO Pay Ratio* (FY24, FY23) | 0.00, 0 |

*As disclosed by the company. The company disclosed the median compensation of all employees to be $57,243.

## CEO TALLY SHEET

| CEO | E. Musk |
|---|---|
| CEO tenure at FYE: | 16.2 years |
| Present value of all accumulated pension: | N/A |
| Value of CEO stock owned (excluding options): | $169,495,289,324 |
| **Potential Termination Payments** | |
| Involuntary termination without cause: | N/A |
| Termination after a change in control: | N/A |

Source: DEF14A

### 3-YEAR GRANTED VS. REALIZABLE CEO PAY

This chart is not displayed because the company discloses no granted pay to the CEO in the prior three fiscal years.

## CEO PAY VERSUS PERFORMANCE

| Year | SCT Total | Compensation Actually Paid | Value of $100 Investment (TSR) | | Revenue* |
|---|---|---|---|---|---|
| | | | Company | Peers | |
| 1 | $0 | $0 | $1,448 | $285 | $97,690,000,000 |
| 2 | $0 | $1,403,000 | $891 | $209 | $96,773,000,000 |
| 3 | $0 | ($9,703,000) | $442 | $151 | $81,462,000,000 |

**Important Metrics*:** Revenue, Adjusted EBITDA, Market Capitalization

Source: DEF14A. CEO Pay in $thousands. Year 1 = most recent fiscal year. SCT = Summary Compensation Table. TSR peers are as disclosed and may differ from pay peers. *The company disclosed these metrics as the most important for determining CEO pay.

Copyright © 2025 Institutional Shareholder Services Inc. All Rights Reserved. This proxy analysis and the information herein may not be reproduced or disseminated in whole or in part. For information on the policies applied in this research report, please see our Policy Gateway.

**Tesla, Inc. (TSLA)**
POLICY: United States

# Quality Score

The ISS Cyber Risk Score is a concise, empirical, and proactive metric that seeks to convey how well a company manages and maintains its network security. It is a quantitative and data-driven rating that provides visibility into the level of cyber readiness and resilience an organization has implemented based on its ongoing actions to identify, manage, and mitigate cyber risk across its external technology networks, powered by a machine learning model trained to identify the potential for a breach event over the next 12 months. The Firmographic Max presented below the ISS Cyber Risk Score reflects the organization's maximum achievable Cyber Risk Score for their organization, considering inherent industry and organizational factors including sector classification and employee count. The ISS Cyber Risk Score is presented in this report for information only, and is not a factor in ISS's analysis or vote recommendations.

For more information on ISS Cyber Risk Score, visit http://www.issgovernance.com/esg/cyber-risk/. For questions, visit ISS Help Center.

Copyright © 2025 Institutional Shareholder Services Inc.  All Rights Reserved.  This proxy analysis and the information herein may not be reproduced or disseminated in whole or in part. For information on the policies applied in this research report, please see our Policy Gateway.

**Tesla, Inc. (TSLA)**
POLICY: United States

**Meeting Date: 6 November 2025**
Meeting ID: 1994609

## Climate Awareness Scorecard

The ISS Climate Awareness Scorecard reflects publicly disclosed data and reporting on the company's climate change-related disclosures and performance. The Scorecard uses a range of climate-related factors to indicate a company's disclosure practices and performance record including its carbon risk classification. Companies are evaluated on overall disclosure (Governance, Strategy, Risk Management, Metrics & Targets) and performance factors (Norms Violations, GHG Emissions, Performance Ratings). For more information or questions regarding ISS Climate Awareness Scorecard, please contact: ISS Help Center.
*Reported **Estimated

Copyright © 2025 Institutional Shareholder Services Inc.  All Rights Reserved.  This proxy analysis and the information herein may not be reproduced or disseminated in whole or in part. For information on the policies applied in this research report, please see our Policy Gateway.

**Tesla, Inc. (TSLA)**
POLICY: United States

Meeting Date: **6 November 2025**
Meeting ID: 1994609

## Vote Results

### ANNUAL MEETING 13 JUNE 2024

| Proposal | Board Rec | ISS Rec | Disclosed Result | Support Including Abstains (%)[1] | Support Excluding Abstains (%)[2] |
|---|---|---|---|---|---|
| 1a Elect Director James Murdoch | For | Against | Pass | 67.9 | 68.8 |
| 1b Elect Director Kimbal Musk | For | For | Pass | 78.5 | 79.5 |
| 2 Advisory Vote to Ratify Named Executive Officers' Compensation | For | Against | Pass | 79.4 | 80.3 |
| 3 Change State of Incorporation from Delaware to Texas | For | For | Pass | 62.7* | 62.7* |
| 4 Ratify Performance Based Stock Options to Elon Musk | For | Against | Pass | 76.2 | 76.9 |
| 5 Ratify PricewaterhouseCoopers LLP as Auditors | For | For | Pass | 96.2 | 97.5 |
| 6 Declassify the Board of Directors | Against | For | Pass | 53.3 | 54.1 |
| 7 Adopt Simple Majority Vote | Against | For | Pass | 53.1 | 53.9 |
| 8 Report on Harassment and Discrimination Prevention Efforts | Against | For | Fail | 30.9 | 31.5 |
| 9 Adopt a Non-Interference Policy Respecting Freedom of Association | Against | For | Fail | 20.0 | 20.6 |
| 10 Report on Effects and Risks Associated with Electromagnetic Radiation and Wireless Technologies | Against | Against | Fail | 3.6 | 3.8 |
| 11 Assess Feasibility of Including Sustainability as a Performance Measure for Senior Executive Compensation | Against | Against | Fail | 9.9 | 10.2 |
| 12 Commit to a Moratorium on Sourcing Minerals from Deep Sea Mining | Against | Against | Fail | 7.5 | 7.7 |

Shaded results reflect a majority of votes cast FOR shareholder proposal or AGAINST management proposal or director election

[1]Support Including Abstains is defined as %FOR/(For + Against + Abstain), as expressed as a percentage.

[2]Support Excluding Abstains is defined as %FOR/(For + Against), as expressed as a percentage, provided if different from For + Against + Abstain.

*Support as a percentage of outstanding shares.

Publication Date: 17 October 2025

Copyright © 2025 Institutional Shareholder Services Inc. All Rights Reserved. This proxy analysis and the information herein may not be reproduced or disseminated in whole or in part. For information on the policies applied in this research report, please see our Policy Gateway.

**Tesla, Inc. (TSLA)**
POLICY: United States

**Meeting Date: 6 November 2025**
Meeting ID: 1994609

## Meeting Agenda & Proposals

| Items 1a-1c. Elect Directors | SPLIT |
|---|---|

**VOTE RECOMMENDATION**

A vote AGAINST Nominating and Corporate Governance Committee Chair Ira Ehrenpreis is ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

A vote FOR the other director nominees, Kathleen Wilson-Thompson and Joseph (Joe) Gebbia, is warranted.

**BACKGROUND INFORMATION**

Policies: Board Accountability | Board Responsiveness | Director Competence | Director Independence | Election of Directors | ISS Categorization of Directors | Vote No campaigns

**Vote Requirement:** The company has adopted a majority vote standard (of shares cast) for the election of directors with a plurality carve-out for contested elections.

## Discussion

Please see the Board Profile section above for more information on director nominees.

**ELECTION SUMMARY**

The company proposes the following (re)elections:

| Type of election | Nominees |
|---|---|
| Incumbent board members to be reelected | Ira Ehrenpreis and Kathleen Wilson-Thompson |
| Nominee to be elected by shareholders for the first time | Joseph (Joe) Gebbia |

| Terms of candidates | Nominees |
|---|---|
| Three-year term | All nominees |

**INFORMATION ON NEW NOMINEES**

| | Joseph (Joe) Gebbia |
|---|---|
| # Shares held | 4,111 |
| Voting power | Less than 1% |
| CEO or Chair positions | N/A |

**ISS POLICY COMPLIANCE TABLE**

| | Company-level | Nominee impact |
|---|---|---|
| **Disclosure** | | |
| Names of new nominee(s) | Disclosed | |

Copyright © 2025 Institutional Shareholder Services Inc. All Rights Reserved. This proxy analysis and the information herein may not be reproduced or disseminated in whole or in part. For information on the policies applied in this research report, please see our Policy Gateway.

| Biographies of new nominee(s) | Disclosed | |
|---|---|---|
| **Independence** | | |
| Board | 67% | |
| Audit committee | 100% | |
| Compensation committee | 100% | |
| Nominating committee | 100% | |
| **Composition** | | |
| Poor attendance | No concerns | |
| Overboarding | No concerns | |
| Executive on a key committee | No concerns | |
| Combined Chair/CEO | N/A | |
| Length of term | N/A | |

| | N/A in this market | | No concerns | | No impacted nominees | | Impacted nominees are on ballot |
|---|---|---|---|---|---|---|---|

Copyright © 2025 Institutional Shareholder Services Inc.  All Rights Reserved.  This proxy analysis and the information herein may not be reproduced or disseminated in whole or in part. For information on the policies applied in this research report, please see our Policy Gateway.

## PLEDGING OF SHARES

| | |
|---|---|
| Anti-pledging policy | Company permits |
| Anti-hedging policy | Company has robust policy |
| Pledging of at least 1,000 shares of company stock by NEOs or directors? | Yes |
| Aggregate shares pledged/value* | 237,461,941 shares valued at $95,896,630,253 |
| % of common shares outstanding or market value** | 7.38% |
| # of days to unwind pledged shares based on average daily trading volume*** | 2.82 days |
| Name and position | Elon Musk, CEO and director – 235,998,721 shares pledged<br><br>Kimbal Musk, director – 1,463,220 shares pledged |
| Pledged shares as % of total stock ownership**** | Elon Musk – 57.09%<br>Kimbal Musk – 100.00% |

*Based on fiscal year end stock price of $403.84*
*\*\*Based on common shares outstanding as of fiscal year end*
*\*\*\*Based on average daily trading volume over the past 30 days at 84,154,707 shares.*
*\*\*\*\*Based on ownership as captured in the Director Pay and Ownership table in the Board Profile above.*

Copyright © 2025 Institutional Shareholder Services Inc.  All Rights Reserved.  This proxy analysis and the information herein may not be reproduced or disseminated in whole or in part. For information on the policies applied in this research report, please see our Policy Gateway.

**Tesla, Inc. (TSLA)**                                                                    **Meeting Date: 6 November 2025**
POLICY: United States                                                                    Meeting ID: 1994609

Copyright © 2025 Institutional Shareholder Services Inc.  All Rights Reserved.  This proxy analysis and the information herein may not be reproduced or disseminated in whole or in part. For information on the policies applied in this research report, please see our Policy Gateway.

**Tesla, Inc. (TSLA)**
POLICY: United States

**Meeting Date: 6 November 2025**
Meeting ID: 1994609



## Item 2. Advisory Vote to Ratify Named Executive Officers' Compensation

### AGAINST

**VOTE RECOMMENDATION**

A vote AGAINST this proposal is warranted

**BACKGROUND INFORMATION**

Policies: Advisory Votes on Executive Compensation

**Vote Requirement:** Majority of votes cast (abstentions count against; broker non-votes have no effect)

## Executive Compensation Analysis

**COMPONENTS OF PAY**

| ($ in thousands) | CEO | | | | | CEO Peer Median | Other NEOs |
|---|---|---|---|---|---|---|---|
| | E. Musk | | E. Musk | | E. Musk | | |
| | 2024 | Change | 2023 | | 2022 | 2024 | 2024 |
| Base salary | 0 | | 0 | | 0 | 1,312 | 654 |
| Deferred comp & pension | 0 | | 0 | | 0 | 0 | 0 |
| All other comp | 0 | | 0 | | 0 | 517 | 171 |
| Bonus | 0 | | 0 | | 0 | 0 | 0 |
| Non-equity incentives | 0 | | 0 | | 0 | 2,109 | 0 |
| Restricted stock | 0 | | 0 | | 0 | 11,061 | 26,137 |
| Option grant | 0 | | 0 | | 0 | 0 | 171,897 |
| **Total** | **0** | | **0** | | **0** | **16,537** | **198,859** |
| % of Net Income | N/A | | | | | | 2.8% |
| % of Revenue | N/A | | | | | | 0.2% |

Copyright © 2025 Institutional Shareholder Services Inc.  All Rights Reserved.  This proxy analysis and the information herein may not be reproduced or disseminated in whole or in part. For information on the policies applied in this research report, please see our Policy Gateway.

## Non-Performance-Based Pay Elements (CEO)

| | |
|---|---|
| *Key perquisites ($)* | N/A |
| *Tax gross-ups on key perks ($)* | None |
| *Value of accumulated NQDC* ($)* | N/A |
| *Present value of all pensions ($)* | N/A |
| *Years of actual plan service* | N/A |
| *Additional years credited service* | N/A |

*Non-qualified Deferred Compensation

## Disclosed Benchmarking Targets

| | |
|---|---|
| *Base salary* | None Disclosed |
| *Target short-term incentive* | None Disclosed |
| *Target long-term incentive (equity)* | None Disclosed |
| *Target total compensation* | None Disclosed |

## Severance/Change-in-Control Arrangements (CEO unless noted)

| | |
|---|---|
| *Contractual severance arrangement* | None |
| *Non-CIC estimated severance ($)* | N/A |

### Change-in-Control Severance Arrangement

| | |
|---|---|
| *Cash severance trigger** | No Agreement |
| *Cash severance multiple* | N/A |
| *Cash severance basis* | N/A |
| *Treatment of equity* | The company has not entered into any agreements with NEOs that provide for certain treatment of normal equity grants in the event of severance or a change in control. However, the vesting of CEO Musk's 2025 CEO Interim Award will accelerate in the in the event of a change in control or death if he is still in eligible service at the time of either event. Additionally, CEO Musk's 2025 CEO Performance Award has certain severance and change in control provisions – see the discussion under Item 4. |
| *Excise tax gross-up** | No |
| *Estimated CIC severance ($)* | Not disclosed |

*All NEOs considered

## Compensation Committee Communication & Responsiveness

### Disclosure of Metrics/Goals

| | |
|---|---|
| *Annual incentives* | N/A – no annual incentive program |
| *Long-term incentives* | N/A – FY24 equity award made to one NEO is entirely time-based |

### Pay Riskiness Discussion

| | |
|---|---|
| *Process discussed?* | Yes |
| *Material risks found?* | No |

### Risk Mitigators

| | |
|---|---|
| *Robust equity clawback policy** | Not considered robust |
| *CEO stock ownership guideline* | 6X |
| *Stock holding period requirements* | Stock options: 6 months<br>Restricted stock: 6 months |

Copyright © 2025 Institutional Shareholder Services Inc.  All Rights Reserved.  This proxy analysis and the information herein may not be reproduced or disseminated in whole or in part. For information on the policies applied in this research report, please see our Policy Gateway.

*Must cover all NEOs and apply to performance- *and* time-based equity incentives.

### Pledging/Hedging of Shares

| | |
|---|---|
| *Anti-hedging policy* | Company has a robust policy |
| *Anti-pledging policy* | The proxy statement does not disclose a robust policy |

### Compensation Committee Responsiveness

| | |
|---|---|
| *MSOP vote results (F/F+A)* | 2024: 80.3%; 2023: 90.9%; 2022: N/A |
| *Frequency approved by shareholders* | Annual with 56.6% support (most recent frequency vote: 2023) |
| *Frequency adopted by company* | Annual |

### Repricing History

| | |
|---|---|
| *Repriced/exchanged underwater options last FY?* | No |

## Pay for Performance Evaluation

Copyright © 2025 Institutional Shareholder Services Inc.  All Rights Reserved.  This proxy analysis and the information herein may not be reproduced or disseminated in whole or in part. For information on the policies applied in this research report, please see our Policy Gateway.

**Tesla, Inc. (TSLA)**
POLICY: United States

**Meeting Date: 6 November 2025**
Meeting ID: 1994609

Copyright © 2025 Institutional Shareholder Services Inc.  All Rights Reserved.  This proxy analysis and the information herein may not be reproduced or disseminated in whole or in part. For information on the policies applied in this research report, please see our Policy Gateway.



Data for ISS' pay-for-performance tests are sourced from proxy disclosures for pay and from Compustat for TSR and financial performance. For more information on ISS' quantitative pay-for-performance evaluation, visit https://www.issgovernance.com/policy-gateway/voting-policies/.

## Short-Term Cash Incentives

| CEO STI Opportunities | FY 2024 (E. Musk) | | FY 2023 (E. Musk) | |
|---|---|---|---|---|
| | **Target** | **Maximum** | **Target** | **Maximum** |
| *STI targets ($)* | N/A | N/A | N/A | N/A |
| *STI targets (calculated)* | N/A | N/A | N/A | N/A |
| *STI targets (as disclosed)* | ND | | | |
| *ISS peer median* | 153% of base salary | | | |
| *Company peer median* | N/A | | | |

| Actual Payouts ($) | FY 2024 (E. Musk) | | FY 2023 (E. Musk) | |
|---|---|---|---|---|
| | **Amount** | **% of base salary** | **Amount** | **% of base salary** |
| *Bonus* | 0 | N/A | 0 | N/A |
| *Non-equity incentive* | 0 | N/A | 0 | N/A |
| *Total Bonus + Non-equity* | 0 | N/A | 0 | N/A |

| | |
|---|---|
| *STI performance metrics/goals* | N/A: no annual incentive program in FY24 |

*Other Short-Term Incentive Factors*

| | |
|---|---|
| *Performance results adjusted?* | N/A |
| *Discretionary component?* | N/A |
| *Discretionary bonus paid?\** | No |
| *Future performance metrics* | Not disclosed |

*Based on the Bonus column in the SCT; per SEC rules, amounts disclosed in this column were not based on pre-set goals.

## Long-Term Incentives

| | |
|---|---|
| *CEO's last FY LTI target* | None disclosed |
| *NEOs' last FY award type(s)* | Time-based options, Time-based stock |

Copyright © 2025 Institutional Shareholder Services Inc.  All Rights Reserved.  This proxy analysis and the information herein may not be reproduced or disseminated in whole or in part. For information on the policies applied in this research report, please see our Policy Gateway.

| | |
|---|---|
| *Last FY performance metrics/goals* | N/A (CEO received no equity awards in FY24; other NEO's equity award was entirely time-based) |

### Long-Term Equity Grants

| CEO Equity Awards | FY 2024 | | | | FY 2023 | | | |
|---|---|---|---|---|---|---|---|---|
| | Shares (#) | % shares* | Value ($)* | % value | Shares (#) | % shares* | Value ($)* | % value |
| *Time-based shares* | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| *Time-based options* | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| *Performance shares* | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| *Performance options* | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| *Total equity* | 0 | | 0 | | 0 | | 0 | |
| *Time-based equity vesting* | Taneja RSUs: Vest 1/16th every three months, beginning Dec. 5, 2024 Taneja Options: Vest 1/48th every month, beginning Dec. 5, 2024 | | | | | | | |
| *Perf. measurement period* | N/A | | | | | | | |
| *CEO one-time equity awards* | N/A | | | | | | | |
| *CEO equity pay mix (by value)** | N/A – CEO received no equity awards in FY24 | | | | | | | |

*Performance shares, if any, are counted and valued at target.

### Other Long-Term Incentive Factors

| | |
|---|---|
| *Performance results adjusted?* | N/A |
| *Discretionary component?* | No |

## Executive Summary

## Analysis

### OVERVIEW

Copyright © 2025 Institutional Shareholder Services Inc.  All Rights Reserved.  This proxy analysis and the information herein may not be reproduced or disseminated in whole or in part. For information on the policies applied in this research report, please see our Policy Gateway.

**Tesla, Inc. (TSLA)**
POLICY: United States

**Meeting Date: 6 November 2025**
Meeting ID: 1994609

Copyright © 2025 Institutional Shareholder Services Inc.  All Rights Reserved.  This proxy analysis and the information herein may not be reproduced or disseminated in whole or in part. For information on the policies applied in this research report, please see our Policy Gateway.



Copyright © 2025 Institutional Shareholder Services Inc.  All Rights Reserved.  This proxy analysis and the information herein may not be reproduced or disseminated in whole or in part. For information on the policies applied in this research report, please see our Policy Gateway.

## Item 3. Amend Omnibus Stock Plan | AGAINST

### VOTE RECOMMENDATION

███████████████████████████████████████████████████

███, a vote AGAINST this proposal is warranted due to the following key factor(s):

- ███████████████████████████████████████
- █████████████████████████████████████████████
- ████████████████████████████

### BACKGROUND INFORMATION

Policies: [Amending Equity Plans](#)

**Vote Requirement:** Majority of votes cast (abstentions count against; broker non-votes not counted)

## Proposal

| Plan Name | 2019 Equity Incentive Plan |
|---|---|
| Year of last share request | 2019 |
| New share request | 60,000,000 shares under General Share Reserve<br>207,960,630 shares under Special Share Reserve (ISS' cost analysis excludes these shares – see the [Proposal & Assumptions](#) section below) |
| Shares rolled over from prior plan(s) | None |
| Shares remaining under existing plan(s) | 47,444,367 shares |
| Evergreen provision | No |
| Shares outstanding* | 3,229,150,886 shares |
| Market value* | $989,702,455,050 |
| Material amendments | In addition to requests related to increasing share reserves, the plan is amended to authorize the board (i) to grant Musk awards from the Special Share Reserve with terms that may vary from the terms of the 2019 Plan (other than the share reserve and share recycling provisions), and (ii) to grant non-qualified stock options with an exercise price below fair market value on the date of grant. |

*As of Record Date using 200-day average closing price as of June 1, 2025; excludes 96 million shares underlying the 2025 CEO Interim Award (see section immediately below).

### VOTE NO CAMPAIGNS

The following shareholders have launched "Vote No" campaigns urging shareholders to oppose this proposal:

(i)    The Comptroller of the City of New York
(ii)    SOC Investment Group

The [filing](#) from the Comptroller of the City of New York and the [filing](#) from the SOC Investment Group both cite the same factors for opposing this proposal. The shareholders assert that the need for a pool of shares for employees "was only necessitated by the Interim Award, which delivered to Mr. Musk the vast majority of remaining authorized shares, leaving the Company without the ability to use equity to attract, incentivize, and retain other employees." The shareholders also object to the amendment provision that allows for the issuance of in-the-money options, and they further argue that CEO Musk should buy more shares on the open market, rather than by equity award, if he wants to increase his voting power.

Copyright © 2025 Institutional Shareholder Services Inc.  All Rights Reserved.  This proxy analysis and the information herein may not be reproduced or disseminated in whole or in part. For information on the policies applied in this research report, please see our [Policy Gateway](#).

PROPOSAL & ASSUMPTIONS

This proposal seeks shareholder approval of the Amended and Restated 2019 Equity Incentive Plan (the "2019 Plan") to (i) provide for a new 208 million share pool (the "Special Share Reserve") from which the board can grant future equity awards only to CEO Musk, and (ii) provide for a separate 60 million share pool increase (the "General Share Reserve") for awards to plan participants other than CEO Musk. The board states that this proposal will "help ensure that Tesla can honor its bargain with Mr. Musk under the 2018 CEO Award by providing increased flexibility through the authorization of shares for making future awards to Mr. Musk…." The board has committed that the CEO Interim Award already issued from the General Share Reserve as well as any CEO award to be made from the Special Share Reserve can provide the CEO "no material additional benefit" beyond the 2018 CEO Award that is the subject of ongoing litigation; in other words, any such award would be intended to make whole CEO Musk to the event that his 2018 CEO Award is reduced or forfeited as a result of the ongoing litigation. The proxy states that "in any case, the number of shares awarded to Musk through any combination of the 2018 CEO Performance Award, 2025 CEO Interim Award, and any Musk Award [from the Special Share Reserve] should not exceed 303,960,630 shares of common stock, which is the total amount of shares promised under the 2018 CEO Performance Award."



Analysis

Copyright © 2025 Institutional Shareholder Services Inc.  All Rights Reserved.  This proxy analysis and the information herein may not be reproduced or disseminated in whole or in part. For information on the policies applied in this research report, please see our Policy Gateway.

**Tesla, Inc. (TSLA)**

POLICY: United States

**Meeting Date: 6 November 2025**

Meeting ID: 1994609

SUMMARY EVALUATION

**EPSC Model: S&P500**



*ISS Recommendation:* **AGAINST**

For the following analysis, ✓ has a positive impact, ✗ has a negative impact, and ↔ is neutral.

Copyright © 2025 Institutional Shareholder Services Inc.  All Rights Reserved.  This proxy analysis and the information herein may not be reproduced or disseminated in whole or in part. For information on the policies applied in this research report, please see our Policy Gateway.



DISCUSSION

There are no overriding factors that have an impact on this proposal.

SUPPLEMENTAL INFORMATION

**Shareholder Value Transfer (SVT)**

| | |
|---|---|
| *Evergreen funding:* | No |
| *Fungible share counting (FV multiplier):* | None |
| *200-day average closing price as of June 1, 2025* | $306.49 |
| *4-digit GICS* | 2510 (Automobiles & Components) |

| SVT Calculation (2019 Equity Incentive Plan) | Company | ISS Valuation | SVT |
|---|---|---|---|
| *New shares requested (A)* | 60,000,000 | | |
| *Available shares remaining (B)* | 47,444,367 | | |
| *Unvested/Unexercised granted shares (C)* | 359,752,000 | | |
| *New + Available (A+B)* | 107,444,367 | | |
| *New + Available + Outstanding (A+B+C)* | 467,196,367 | | |

Source: A shares* - (DEF 14A filed 9/17/2025, p. 37); B shares* - (as of 8/19/2025; DEF 14A filed 9/17/2025, pp. 39-40, DEF 14A filed 9/17/2025, p. 37, B-5); C shares* consist of 342,300,000 stock options and 17,452,000 full-value awards (as of 8/19/2025; DEF 14A filed 9/17/2025, pp. 39-40).

*A shares exclude the shares reserved under the Special Share Reserve. B shares include the maximum possible 36 million recycled shares upon the assumed forfeiture of the 2025 CEO Interim Award. C shares capture the full CEO 2018 performance option award, and correspondingly exclude that the CEO Interim Award. Please see the Proposal & Assumptions section above.

**Company Burn Rate (Historical Grants)**

Copyright © 2025 Institutional Shareholder Services Inc.  All Rights Reserved.  This proxy analysis and the information herein may not be reproduced or disseminated in whole or in part. For information on the policies applied in this research report, please see our Policy Gateway.

**Tesla, Inc. (TSLA)**                    **Meeting Date: 6 November 2025**
POLICY: United States                     Meeting ID: 1994609

| Index/GICS industry group: | S&P500/2510 (Automobiles & Components) | | |
| --- | --- | --- | --- |
| ISS benchmark: | ███ | | |

| Fiscal Year | 2024 | 2023 | 2022* |
| --- | --- | --- | --- |
| Options/SARs (O): | 14,979,000 | 9,521,000 | 105,440,210 |
| Full value awards (FV): | 12,045,000 | 11,743,000 | 8,714,000 |
| O + FV: | 27,024,000 | 21,264,000 | 114,154,210 |
| Wtd. common shares outstanding: | 3,197,000,000 | 3,174,000,000 | 3,130,000,000 |
| Unadjusted burn rate: | 0.85% | 0.67% | 3.65% |
| | *3-year average unadjusted burn rate:  1.72%* | | |
| Value-adjusted burn rate: | 0.70% | 0.60% | 2.80% |
| | *3-year average ISS value-adjusted burn rate:  1.36%* | | |

For more information on the Value-Adjusted Burn Rate methodology, please visit https://www.issgovernance.com/policy-gateway/voting-policies/. *Note: figures are adjusted to reflect a three-for-one stock split in 2022. The FY22 option figure includes 101.3 million shares earned by CEO Musk in that year pertaining to the 2018 CEO Performance Award.

## Share Dilution

| Shares outstanding (1): 3,229,150,886 | Warrants & convertibles (2): 0 |
| --- | --- |
| Shares reserved under plans (3): 467,196,367 | Fully diluted shares (1+2+3): 3,696,347,253 |

| | Shares | Dilution (Basic)* | Dilution (Full)* |
| --- | --- | --- | --- |
| New shares requested: | 60,000,000 | 1.86% | 1.62% |
| Existing shares available for grant: | 47,444,367 | 1.47% | 1.28% |
| Granted unexercised/Unvested shares: | 359,752,000 | 11.14% | 9.73% |
| Total share allocation: | 467,196,367 | 14.47% | 12.64% |

*Assuming maximum dilution

## Additional Plan Features

| Award types authorized (minimum option exercise price): | ISOs (100%), NSOs (0%), SARs, restricted stock units, restricted stock, performance units, performance shares, unrestricted stock/common shares, and other stock awards |
| --- | --- |
| Award-type limits: | None |
| Eligible participants: | All employees, officers, non-employee directors, and consultants |
| Plan administrator: | Compensation Committee |
| Plan expiration date: | June 11, 2029 |
| Individual award limits: | None |
| Terms/vesting provisions: | Stock options have a maximum 10-year term. |
| Minimum vesting requirements: | Appreciation and full-value awards: None or not all award types |
| Loans to participants: | The plan does not allow the company to extend loans to participants. |
| Performance criteria disclosed: | No |
| Treatment in a CIC: | Unvested time-based equity awards would accelerate if not assumed; performance awards would be settled at target. |

Copyright © 2025 Institutional Shareholder Services Inc.  All Rights Reserved.  This proxy analysis and the information herein may not be reproduced or disseminated in whole or in part. For information on the policies applied in this research report, please see our Policy Gateway.

| **Item 4. Approve Issuance of Common Stock to Elon Musk Pursuant to CEO Performance Award** | **AGAINST** |
|---|---|

VOTE RECOMMENDATION

A vote AGAINST this proposal is warranted.

**Vote Requirement:** Majority of votes cast (abstentions count against; broker non-votes have no effect)

## Discussion

### PROPOSAL

The board is seeking shareholder approval of the 2025 CEO Performance Award (the "2025 CEO Award") granted to CEO Elon Musk. The award, preliminarily valued by the company at $87.8 billion, is comprised of performance-based restricted stock which may vest in 12 tranches upon the achievement of 12 operational and 12 market capitalization ("market cap") goals over a 10-year period, and is also conditioned upon his continued service as CEO.

While the award has been approved by the board, CEO Musk will not receive the shares underlying the award until the later of either the "termination or expiration (and any extension thereof) under the HSR Act" or the approval of the award by shareholders. The company notes that shareholder approval is not necessary under Texas law, but it is required for equity compensation plans under Nasdaq rules.

Under Texas law, both Elon Musk and his brother Kimbal Musk are allowed to vote their shares owned, directly or indirectly, on this proposal as well as the A&R 2019 Equity Incentive Plan proposal further discussed under Item 3. While the proxy states that both recused themselves when "considering these matters as directors of Tesla," they are entitled to vote their shares owned on both proposals at the 2025 annual meeting. Combined, they have a beneficial ownership equating to 21.6 percent of common stock outstanding as of Sept. 15, 2025, according to the Ownership of Securities table in the proxy.

### VOTE NO CAMPAIGNS

This proposal is also the subject of two "Vote No" campaigns. One notice of exempt solicitation filed by The Comptroller of the City of New York, on behalf of the New York City Employees', Teachers', and Board of Education's retirement systems. One of the proponent's main concerns surrounds the goal rigor of the award, stating the performance targets are "in many cases vague, undemanding, and subject to significant discretion by what [they] believe is a non-independent board." They also cite the potential for significant dilution to shareholders caused by the award as well as the lack of "concrete commitments" from CEO Musk to keep his

Copyright © 2025 Institutional Shareholder Services Inc.  All Rights Reserved.  This proxy analysis and the information herein may not be reproduced or disseminated in whole or in part. For information on the policies applied in this research report, please see our Policy Gateway.

attention on Tesla as concerns. The other notice of exempt solicitation was filed by SOC Investment Group and cites the same three main concerns regarding goal rigor, dilution, and Musk's commitment to Tesla.

BACKGROUND

Tesla was founded in 2003 as an independent auto-maker specializing in electric cars and completed its IPO in 2010. Since that time, the company has seen extraordinary growth under CEO Musk's leadership, growing to a market cap of $1.32 trillion (and even larger at $1.43 trillion as of Oct. 16, 2025) with global revenues of $97.7 billion. Tesla has since completed multiple acquisitions and expanded its business model to cover electric vehicles, lithium-ion battery energy storage, solar panels, artificial intelligence ("AI") technologies, and more.

Unlike most public company CEOs, Musk is the CEO of multiple other companies such as Space Exploration Technologies Corp., a privately owned space technology and transportation company, and X.AI Holdings Corp., a privately owned AI, social media, and technology company. Musk was also a founder of The Boring Company and Neuralink Corp. In fact, because he holds multiple leadership positions, the Special Committee Report recognizes that "Musk has more attractive options today than ever before, which may afford him greater influence over the fruits of his labor" and the "opportunity cost" for him to continue to devote time and focus to Tesla as part of the committee's rationale for granting him this award.

In 2018, the board proposed a separate large performance stock options grant (the "2018 CEO Award"), with an initial company valuation of $2.6 billion. The 2018 CEO Award was approved by shareholders at the company's March 2018 special meeting with 80.4 percent of votes cast in support of the proposal. Since that time, the performance requirements for all 12 tranches of the award were met, but Musk has not been permitted to exercise these options. After the 2018 special meeting, Richard Tornetta, a Tesla shareholder, filed a shareholder derivative complaint with the Delaware Chancery Court alleging that CEO Musk controlled the board and influenced the process, which resulted in an unfair award. The Delaware Chancery Court published its original opinion (the "First Tornetta Opinion") in January of 2024, which supported these claims and found that the award was not "entirely fair" to the company's shareholders and ordered the award be rescinded. Since the original opinion was published, the Delaware legislature has approved changes to the statutory framework regarding controlling stockholders that differs with much of the court's reasoning for its original ruling.

Following this decision by the Delaware court, the board held several meetings to address potential reincorporation outside of Delaware. These meetings led to the creation of a special committee (the "2024 committee"). The 2024 committee ultimately recommended the company reincorporate to Texas and ratify the 2018 Award by shareholder vote. These issues were both brought to and approved by shareholders as two separate proposals at the 2024 annual meeting with the reincorporation proposal receiving 86.6 percent support and the ratification proposal receiving 76.2 percent support.

Following shareholder re-ratification of the 2018 CEO Award at the 2024 annual meeting, the company as well as directors involved in the *Tornetta* lawsuit filed motions requesting that the Delaware Chancery Court revise the First Tornetta Opinion. In December of 2024, the Delaware court issued another opinion (the "Second Tornetta Opinion"), which, in conjunction with the First Tornetta Opinion, ruled that the ratification of the 2018 Award by the company's shareholders at the 2024 annual meeting does not reinstate the award. The Delaware court's opinion held that the "procedural safeguards that [the company] had implemented around the ratification were insufficient" to solve the issues within the initial approval process of the 2018 Award. The Second Tornetta Opinion also rejected the company's attempt to eliminate the need for rescinding the 2018 Award. The company has an appeal pending before the Delaware Supreme Court following the Second Tornetta Opinion, seeking reinstatement of the 2018 CEO Award. CEO Musk has been unable to exercise options from the 2018 CEO Award as a result of the ongoing litigation.

These opinions published by the Delaware court led the company to form a special committee of the board tasked with evaluating and determining whether it was in the best interests of the company to retain and incentivize CEO Musk as well as any new compensation that would potentially be awarded to him. The special committee

Copyright © 2025 Institutional Shareholder Services Inc.  All Rights Reserved.  This proxy analysis and the information herein may not be reproduced or disseminated in whole or in part. For information on the policies applied in this research report, please see our Policy Gateway.

ultimately recommended that CEO Musk be awarded the CEO Interim Award, discussed under Item 2 above, prior to the 2025 CEO Award.

### BOARD RATIONALE

**The board believes that the award is necessary to retain and incentivize CEO Musk.** The committee outlined three main reasons why shareholders should approve the 2025 performance award to Musk. While Musk currently owns 19.8 percent of Tesla's outstanding shares, the committee asserts that the pay-for-performance nature of the award design further aligns CEO Musk with shareholders as he will only earn compensation if the challenging milestones are met and will not receive any other pay outside of this award other than potentially the 2025 Interim CEO Award (only to the extent the 2018 CEO Award is reduced or forfeited). Secondly, the proxy disclosed that Musk has raised "the possibility of prioritizing other ventures if alignment could not be reached on a path forward with [the company]." The special committee determined that it was important to retain CEO Musk and "believes that Mr. Musk singularly possesses the leadership characteristics necessary to transform [the company] and realize its long-term mission at an unparalleled level." The committee also outlined that his continued service is essential for the company's successful transition from the EV and renewable energy industries to becoming a leading company in AI and robotics. Thirdly, the committee highlights the pay-for-performance nature of the award, which is intended to spur the achievement of strategic and financial goals under Tesla's updated strategic plans. The proxy indicates that if all market cap milestones are met, Tesla's market cap will be $8.5 trillion, which is "approximately equal to the combined market capitalizations of each of Meta, Microsoft, and Alphabet as of the date of this proxy statement." If none of the goals are met, then CEO Musk would not receive any shares.

**The board believes that conventional pay would not incentivize Musk.** The board states that Musk is "motivated by more than just conventional forms of compensation" and that traditional forms of compensation would be insufficient to incentivize him. Instead, they outlined how Musk is "driven by bold, high-stakes challenges that allow him to fundamentally reshape industries and society, while maximizing long-term shareholder value," which is why they designed this award to provide him with the opportunity to earn the astronomical grant value, but only if he achieves these far-reaching performance goals. The committee also "expressly declined" to use traditional benchmarking when determining the value and design of this award. The committee's reasoning behind this is that "no company in the world has similar goals to what is expected under the pay-for-performance structure of the 2025 CEO Performance Award" and that other companies also do not utilize compensation plans where pay for their CEO is based entirely on achievement of "such daunting and challenging goals." These differences all contribute to the company's opposition to implementing a more traditional CEO pay structure.

**The award is also intended to provide CEO Musk with greater voting power.** As disclosed in the Special Committee Report, the committee stated that "the 2025 CEO Performance Award was structured with the primary objective of delivering approximately 12 [percent] of additional voting power to Musk in exchange for Musk driving long-term stratospheric company stock price growth by meeting financial and product goals subject to an extended vesting period." Based on advice from external firms, the board determined that performance-conditioned restricted stock would be the best vehicle to accomplish both goals. This goal is also reflected by the voting agreement and extended vesting periods attached to each tranche, which are further discussed under the Award Terms section below.

### PRIOR AWARDS

**The 2012 award design has influenced the design of subsequent CEO awards.** In 2012, the board granted Musk a $78 million performance stock option award tied to market cap expansion targets and operational milestones. The 2012 award could be earned in 10 tranches over a 10-year term and the market cap goals required expansions in successive increments of $4 billion. The operational milestones consisted of delivering production versions of vehicles, meeting vehicle delivery targets, and achieving a gross margin greater than 30 percent for four consecutive quarters. To earn the full award (which ISS valued at more than $111 million), Tesla's market cap would have needed to grow from $3.2 billion to $43.2 billion. By 2017, this market cap expansion target was met, and all but one of the operational milestones had been achieved (the exception being the gross margin goal). Achievement of nearly all of the goals for this prior award influenced the design of awards to follow.

Copyright © 2025 Institutional Shareholder Services Inc.  All Rights Reserved.  This proxy analysis and the information herein may not be reproduced or disseminated in whole or in part. For information on the policies applied in this research report, please see our Policy Gateway.

**The 2025 CEO Performance Award shares design elements with the 2018 Award.** In 2018, the board granted Musk a performance stock option award tied to market capitalization growth targets and operational milestones, originally valued by the company at $2.6 billion. The 2018 Award could be earned in 12 tranches over a 10-year term. The market cap goals required an initial milestone of $100 billion and then successive increases in increments of $50 billion. The operational milestones consisted of total revenue increases of $15-25 billion and adjusted EBITDA increases of $1.5-2 billion between tranche goals. In order to earn the full award (which ISS initially valued at $3.7 billion), the company's market cap would have needed to grow to $650 billion. By the 2021 annual meeting, the market cap growth goals had all been achieved and all of the operational milestones were later achieved by the 2023 annual meeting. Due to the success the company saw from the design of the 2018 and 2012 awards, the committee modeled the 2025 Award similarly, while also noting certain design changes that are intended to (i) achieve the goal of increasing the CEO's voting power and (ii) responding to shareholder input. For instance, the equity vehicle for this award will be restricted stock with an extended vesting period to retain Musk "in exchange for allowing him to exercise voting rights upon earning shares under a tranche without the burden of needing to create the liquidity in Tesla's stock." Additionally, the number of operational milestones was reduced, which was "responsive to input received from shareholders that there were too many opportunities for Musk to earn the entire 2018 CEO Performance Award." The company will utilize an "offset amount," which is further discussed below, to further drive stock appreciation growth and included CEO succession framework goals for the final two tranches to address shareholder feedback, as well.

**The CEO Interim Award may potentially be forfeited.** The CEO Interim Award was granted in August 2025 prior to the 2025 CEO Award and was valued by the company at $26.1 billion, compared to an ISS valuation of $27.3 billion. The award consists entirely of time-based restricted stock to immediately provide the voting influence that Musk desired. This equity vehicle was also intended to ensure retaining Musk through the two-year cliff vesting period. The award is also subject to a five-year holding period from the date of grant (Aug. 3, 2025). The company does not disclose that Musk may vote these shares prior to vesting as they do with the 2025 CEO Award further discussed below. The CEO Interim Award also requires Musk to pay a purchase price of $23.34 per share, equivalent to the exercise price of the 2018 Award options. The shares underlying the 2025 CEO Award equate to about one-third of the shares he is entitled to under the 2018 Award. The CEO Interim Award may potentially be forfeited in the future, however, dependent upon the outcome of the ongoing litigation of his 2018 CEO Award. If the Delaware courts ultimately allow Musk to exercise his 2018 options, he must forfeit the CEO Interim Award and cannot "double dip" in the value of both. Further information surrounding this award can be found under Item 2. While

### AWARD TERMS

**Multi-billion dollar award value requires the achievement of far-reaching market cap and operational milestones.** The size of this award is again unprecedented following the 2018 CEO Award, which was valued at $2.6 billion upon grant. The company estimates the grant value of this new award at $87.8 billion (ISS' valuation is $104.4 billion). The 2025 CEO Award consists of performance-conditioned restricted stock that can be earned in 12 tranches, with the value of each tranche representing approximately one percent of Tesla's outstanding shares. Each tranche is tied to the achievement of successive market cap growth targets as well as operational milestones comprised of product, adjusted EBITDA, and CEO succession framework goals (see below) that must be achieved within the 10-year performance period. The 2025 Award has a five-year post-exercise holding requirement. The award was also designed with an "offset amount" per share of $334.09, which was the stock price on the date of grant in order to encourage stock appreciation growth.

**The 2025 Award also provides for a voting agreement with Musk.** Once the market cap and operational milestones for a tranche have been achieved, those associated shares will become "earned shares" and Musk will have the right to determine the vote of the shares in that given tranche. Prior to shares becoming earned shares, Musk will provide the Corporate Secretary of Tesla an irrevocable proxy allowing the unearned shares to vote proportionately to the shareholder votes cast for or against and provide written consents proportionately to shareholder consents for or not provided, as applicable, at any annual or special meeting of shareholders.

Copyright © 2025 Institutional Shareholder Services Inc.  All Rights Reserved.  This proxy analysis and the information herein may not be reproduced or disseminated in whole or in part. For information on the policies applied in this research report, please see our Policy Gateway.

| | |
|---|---|
| *Grant Value* | Number of shares: 423,743,904 restricted shares (12% of the Company's outstanding shares as of Aug. 29, 2025)<br><br>Tesla valuation: $87.8 billion<br><br>ISS valuation ▮▮▮▮▮▮▮<br><br>Offset amount per share: $334.09 (fair market value on grant date Sept. 3, 2025)<br><br>Each of the 12 tranches represents 1% of the total adjusted outstanding shares |

| 2025 CEO Performance Award | Company | ISS |
|---|---|---|
| Volatility (%) | 57.3% | █ |
| Dividend Yield (%) | 0.00% | █ |
| Vesting period/term (yrs) | 10 years | █ |
| Risk-free Rate (%) | 4.18% | █ |
| Grant Date Price per Share | $334.09 | █ |
| *Offset Amount per Share* | $334.09 | █ |
| Grant Date Fair Value ($ in billions) | $87.8 | █ |

*Valuation Assumptions*

The company used a Monte Carlo simulation model on the date of grant to determine the valuation of the 2025 Award (see footnote (5) on page 86 of the 2025 proxy statement).

███████████████████████████████████████████

| | |
|---|---|
| *Offset Amount* | As the committee did not want this award to provide larger compensation than the case would be with a net-settled stock option exercise, an "offset amount" was implemented as part of the award. This offset amount will reduce the number of earned shares that can become vested shares by the value of those shares on the grant date ($334.09 per share). As a result, the share price on the vesting date must exceed that of the grant date share price for Musk to see any economic value. The use of an offset amount is intended to reinforce the requirement of unprecedented growth in price appreciation for Musk. |
| *Award Milestones* | <u>Market Capitalization Milestones</u><br><br>• The award vests based on 12 market capitalization milestones:<br>    o First tranche milestone is $2 trillion<br>    o Each of the next nine tranches thereafter requires an additional $500 billion in market capitalization to vest, up to $6.5 trillion<br>    o The final two tranches each require an additional $1 trillion in market capitalization to vest, up to $8.5 trillion for the last tranche |

Copyright © 2025 Institutional Shareholder Services Inc.  All Rights Reserved.  This proxy analysis and the information herein may not be reproduced or disseminated in whole or in part. For information on the policies applied in this research report, please see our Policy Gateway.

- o Sustained trailing average market cap for each tranche is required over (i) a 6-calendar-month period and (ii) a 30-calendar-day period in order to be considered earned

Operational Milestones

- 12 operational milestones, comprised of four product goals and eight adjusted EBITDA milestones, of which one must be paired with each of the market capitalization milestones for all tranches to vest.

| Product Goals | Adjusted EBITDA (in billions) |
|---|---|
| 20 million Tesla vehicles delivered | $50 |
| 10 million active FSD subscriptions | $80 |
| 1 million Bots delivered | $130 |
| 1 million Robotaxis in commercial operation | $210 |
| | $300 |
| | $400* |
| | $400* |
| | $400* |

*Adjusted EBITDA milestones six through eight will require adjusted EBITDA to be $400 billion over three non-overlapping periods, each made up of four consecutive quarters.

CEO Succession Framework:

- The final two tranches (11 and 12) are also subject to CEO Musk developing a CEO succession framework, which will be approved by the administrator in good faith.

| | |
|---|---|
| *Vesting and Performance Period* | Each of the 12 tranches becomes "earned shares" when both a market capitalization milestone and an operational milestone are met during the 10-year performance period. Generally, any tranches that become earned shares prior to the 5th anniversary of the grant date will vest on the 7.5th anniversary. Generally, any tranches that become earned shares following the 5th anniversary of the grant date will vest on the 10th anniversary. |
| *Holding Period* | Five years after shares become earned shares |
| *Employment Requirement for Continued Vesting* | Vesting eligibility is contingent upon Musk (i) remaining as CEO, or (ii) serving as an executive officer responsible for Tesla's product development or operations that have been approved by disinterested members of the board. |
| *Employment Termination* | Acceleration of vesting of earned shares upon termination of employment without cause, death, or disability. |
| *Change in Control* | Any earned shares will vest upon a change in control. The administrator will assess whether shares have become earned shares solely based on the market capitalization milestones. |

Copyright © 2025 Institutional Shareholder Services Inc.  All Rights Reserved.  This proxy analysis and the information herein may not be reproduced or disseminated in whole or in part. For information on the policies applied in this research report, please see our Policy Gateway.

**Tesla, Inc. (TSLA)**
POLICY: United States

**Meeting Date: 6 November 2025**
Meeting ID: 1994609

Analysis



Copyright © 2025 Institutional Shareholder Services Inc.  All Rights Reserved.  This proxy analysis and the information herein may not be reproduced or disseminated in whole or in part. For information on the policies applied in this research report, please see our Policy Gateway.

**Tesla, Inc. (TSLA)**                                            **Meeting Date: 6 November 2025**
POLICY: United States                                              Meeting ID: 1994609

Copyright © 2025 Institutional Shareholder Services Inc.  All Rights Reserved.  This proxy analysis and the information herein may not be reproduced or disseminated in whole or in part. For information on the policies applied in this research report, please see our Policy Gateway.



Copyright © 2025 Institutional Shareholder Services Inc.  All Rights Reserved.  This proxy analysis and the information herein may not be reproduced or disseminated in whole or in part. For information on the policies applied in this research report, please see our Policy Gateway.

| Item 5. Ratify PricewaterhouseCoopers LLP as Auditors | FOR |
|---|---|

### VOTE RECOMMENDATION

A vote FOR this proposal to ratify the auditor is warranted.

### BACKGROUND INFORMATION

Policies: Auditor Ratification

**Vote Requirement:** Majority of votes cast (abstentions count against)

## Discussion

### AUDIT FIRM INFORMATION

The board recommends that PricewaterhouseCoopers LLP be reappointed as the company's independent audit firm.

| Audit firm name | PricewaterhouseCoopers LLP |
|---|---|
| Audit firm since (as disclosed) | 2005 |
| Audit opinion for the last fiscal year | Unqualified |
| Term to serve if reappointed | 1 year |

### FEES PAID DURING THE LAST FISCAL YEAR

| Audit firm name | PricewaterhouseCoopers LLP |
|---|---|
| Fees currency | USD |
| **Total fees paid to the audit firm** | **17,923,000** |
| Audit fees | 15,634,000 |
| Audit-related fees | 54,000 |
| Tax fees | 2,154,000 |
| Other fees | 81,000 |
| **Total non-audit fees*** | **2,235,000** |
| **Total non-audit fees as a percentage of total fees** | **12.5%** |

*Total non-audit fees include other fees, tax advice fees, and certain transaction-related fees. Non-audit fees will also include any tax-related fees not identified as tax compliance or tax preparation.

The auditor's report contained in the annual report is unqualified, meaning that in the opinion of the auditor, the company's financial statements are fairly presented in accordance with generally accepted accounting principles.

## Analysis

Copyright © 2025 Institutional Shareholder Services Inc.  All Rights Reserved.  This proxy analysis and the information herein may not be reproduced or disseminated in whole or in part. For information on the policies applied in this research report, please see our Policy Gateway.

## Item 6. Eliminate Supermajority Vote Requirement — FOR

**VOTE RECOMMENDATION**

A vote FOR this proposal is warranted, ██████████████████████████████████
████████████

**BACKGROUND INFORMATION**

Policies: Supermajority Vote Requirements

**Vote Requirement:** Two-thirds of outstanding shares (abstentions count against; broker non-votes have no effect)

## Discussion

### PROPOSAL

The board seeks shareholder approval to amend the company's certificate of formation and bylaws to eliminate various supermajority voting requirements and replace them with majority requirements.

Currently, approval from two-thirds of the outstanding voting power is required to amend various provisions of the certificate of formation (including those related to board classification) and the bylaws. If approved, amendments to these governing documents would require approval from a majority of shares outstanding.

The board is not providing shareholders with a recommendation of how to vote on this proposal; the board recommendation is "NONE". At the 2022 annual meeting, when a similar binding proposal was last on ballot, the board recommended that shareholders vote "FOR" that proposal.

### BACKGROUND AND RATIONALE

Previous binding proposals to remove supermajority requirements have been on ballots at each of the 2019, 2021, and 2022 annual meetings, though none were approved by the requisite supermajority of shareholders. The board indicated in the proxies for the 2023 and 2024 annual meetings that "once we have achieved a total shareholder participation rate of at least 65% at a shareholder meeting, the Board will again propose amendments to Tesla's governing documents to eliminate supermajority voting requirements." Because this participation rate was met at the 2024 meeting, the board is again submitting this proposal topic to a binding shareholder vote.

### EXEMPT SOLICITATIONS

On Sept. 9, 2025, John Chevedden filed an exempt solicitation in which he urges shareholders to vote in favor of this proposal along with the non-binding proposal in Item 13, and to vote against director Ira Ehrenpreis in Item 1a as chair of the governance committee. The filer contends that the two-thirds vote required to approve this proposal is a substantial hurdle to meet and that the proposal in Item 13 only requires a majority of votes cast to be approved, indicating that it is important for at least one of them to be approved. In recommending against the governance committee chair, the filer highlights concerns over the lack of a binding vote on board declassification at this meeting (see Item 1 for further discussion).

## Analysis

Copyright © 2025 Institutional Shareholder Services Inc. All Rights Reserved. This proxy analysis and the information herein may not be reproduced or disseminated in whole or in part. For information on the policies applied in this research report, please see our Policy Gateway.



## Item 7. Authorize Board to Invest Company Funds in xAI                    AGAINST

**VOTE RECOMMENDATION**

A vote AGAINST this proposal is warranted.

**Vote Requirement:** Majority of votes cast (abstentions count against; broker non-votes have no effect)

## Discussion

Tesla's CEO, Elon Musk, also serves as the CEO of X.AI Holdings Corp., which is the owner of X, the social media platform, and x.AI, an artificial intelligence company.

PROPOSAL

Stephen Hawk intends to present the following proposal for consideration:

> WHEREAS, Tesla, Inc. is transforming into a leading artificial intelligence (AI), robotics, and energy company, with its mission to advance technology for human benefit and advance sustainable energy;

> WHEREAS, xAI, a company focused on building AI to accelerate human scientific discovery, has developed Grok, an AI assistant already integrated into Tesla vehicles to enhance user experience, vehicle functionality, and autonomous driving capabilities;

> WHEREAS, the synergies between Tesla and xAI are evident, as both companies share a commitment to advancing technology for human benefit, with xAI's AI expertise complementing Tesla's advancements in autonomous driving, robotics (e.g., Tesla Bot), and energy optimization;

Copyright © 2025 Institutional Shareholder Services Inc.  All Rights Reserved.  This proxy analysis and the information herein may not be reproduced or disseminated in whole or in part. For information on the policies applied in this research report, please see our Policy Gateway.

**Tesla, Inc. (TSLA)**                                                                                                                     **Meeting Date: 6 November 2025**
POLICY: United States                                                                                                          Meeting ID: 1994609

WHEREAS, Tesla's strategic investments in AI are critical to maintaining its competitive edge in the rapidly evolving AI and robotics industries, and a direct investment in xAI would strengthen Tesla's access to cutting-edge AI technologies, talent, and intellectual property;

WHEREAS, xAI's mission aligns with Tesla's, creating opportunities for collaborative innovation in areas such as vehicle AI, energy grid optimization, and humanoid robotics, which could enhance Tesla's product offerings and market leadership;

WHEREAS, an investment in xAI would provide Tesla with a stake in a major AI player, potentially yielding significant financial returns while fostering technological advancements that benefit Tesla's customers and shareholders;

WHEREAS, the Board of Directors has a fiduciary duty to evaluate strategic investments that align with Tesla's long-term growth and innovation goals;

NOW, THEREFORE, BE IT RESOLVED, that the shareholders of Tesla, Inc. request that the Board of Directors authorize an investment in xAI, in an amount and form deemed appropriate by the Board, to capitalize on the synergies between the two companies and strengthen Tesla's position as a leader in AI, robotics, and energy.

### PROPONENT STATEMENT

The proponent contends that there are evident synergies between Tesla and xAI. Tesla is transforming into a leading artificial intelligence (AI) company, and xAI is focused on building AI and its AI assistant is already integrated into Tesla vehicles. The proponent believes that a direct investment from Tesla into xAI would "strengthen Tesla's access to cutting-edge AI technologies, talent, and intellectual property." This proposal does not specify a size or structure of any investment in xAI, providing the board with flexibility.

### BOARD COMMENTARY

The board is not making any recommendation on this proposal, and it will take into consideration the results. The board highlights that this is an advisory proposal that is not binding on the company or the board. Since an investment in xAI would likely be considered a related party transaction, the board will "ultimately determine and implement financial strategies related to artificial intelligence (including any potential investment in xAI) in a manner that is consistent with its fiduciary duties".

## Analysis



Copyright © 2025 Institutional Shareholder Services Inc.  All Rights Reserved.  This proxy analysis and the information herein may not be reproduced or disseminated in whole or in part. For information on the policies applied in this research report, please see our Policy Gateway.

| Item 8. Assess Feasibility of Including Sustainability as a Performance Measure for Senior Executive Compensation | AGAINST |
| --- | --- |

**VOTE RECOMMENDATION**

A vote AGAINST this proposal is warranted, ████████████████████████████
████████████████████████████████████████

**BACKGROUND INFORMATION**

Policies: Environmental, Social, and Governance (ESG) Compensation-Related Proposals

**Vote Requirement:** Majority of votes cast (abstentions count against; broker non-votes have no effect)

## Discussion

### PROPOSAL

Tulipshare Capital LLC has submitted a precatory proposal requesting that Tesla adopt targets and report on the quantitative metrics for assessing the feasibility of integrating sustainability metrics in the company's compensation plan for senior executives.

The resolved clause of the resolution specifically requests:

> **Resolved:** Shareholders request that, within one year, the Board Compensation Committee adopt targets and publicly report quantitative data appropriate to assessing the feasibility of integrating sustainability metrics, including those regarding diversity and independence among senior executives, into performance measures or vesting conditions that may apply to senior executives under compensation plans or arrangements.

### PROPONENT'S STATEMENT

In its supporting statement, the proponent argues that the integration of sustainability metrics into executive compensation can enhance transparency, promote corporate citizenship, and avoid legal and reputational harm. The filer notes that, increasingly, shareholders have rejected generous executive pay packages and that companies are embracing different ways to integrate ESG factors into executive pay programs. It adds that a majority of the largest companies in Europe and North America consider ESG performance in at least one incentive program. The proponent asserts that "Tesla does not integrate environmental or human capital management-related metrics in executive pay, despite 53.6% and 90.4% of S&P 500 companies doing so, respectively." It goes on to note that as a result of a lawsuit filed at the company, Tesla's directors were asked to return $735 million to the company to settle claims that they overpaid themselves. Additionally, the proponent points out that Elon Musk's pay package has raised the ceiling of CEO pay and led to "widening the gap between workers' and executives' pay packages." The proponent recommends that the report requested in the proposal include:

- "A robust, comprehensive human rights due diligence process with specific performance metrics aligned with UN Guiding Principles on Business and Human Rights assessing Tesla's success in preventing and mitigating human rights risks across its value chain.
- A performance-based component in the executive compensation structure directly tied to achieving established human rights and sustainability performance metrics, thus incentivizing the Board to embed such considerations into Tesla's core operations."

### BOARD'S STATEMENT

In its opposition statement, the board states that the prescriptive request of the proposal is unnecessary given the company's existing disclosures and commitment to sustainability. It asserts that the company's mission is to accelerate the world's transition to sustainable energy and that ethical treatment of all people and respect for human rights are core to its mission. It states that the company's Global Human Rights Policy discloses "[its]

Copyright © 2025 Institutional Shareholder Services Inc. All Rights Reserved. This proxy analysis and the information herein may not be reproduced or disseminated in whole or in part. For information on the policies applied in this research report, please see our Policy Gateway.

commitment to uphold, respect and embed human rights and the values they represent throughout [its] business." It says the policy also states that Tesla is committed to implementing the United Nations Guiding Principles on Business and Human Rights and that it "conduct[s] human rights due diligence to identify risks and work[s] to mitigate them." The board states that the company sources responsibly according to the Organization for Economic Cooperation and Development (OECD) Due Diligence Guidance for Responsible Mineral Supply Chains and Responsible Business Conduct and the United Nations Guiding Principles on Business and Human Rights. It asserts that Tesla sets forth clear expectations for its suppliers, including through its Responsible Sourcing Policy and Supplier Code of Conduct. The board argues that the prescriptive actions requested by the proposal would "unduly constrain" Tesla's board and management's ability to determine an appropriately tailored approach to its sustainability efforts. It notes that Tesla's annual Impact Report provides additional information on how human rights values are respected in its operations. Lastly, the board notes that it is cognizant of the scrutiny surrounding its compensation practices but adds that shareholders continue to support them as designed.

### BACKGROUND AND RECENT SHAREHOLDER ACTIVISM

For more information on linking compensation and sustainability, see ISS' Environmental and Social Background Report.  For an update on the most recent shareholder activism around environmental and social issues, see ISS' Top Governance and Stewardship Trends for 2025.

This is the second consecutive year that Tesla has received this proposal. Last year the proposal received 10.2 percent shareholder support (calculated as votes FOR as a percentage of votes cast FOR or AGAINST).

## Analysis



Copyright © 2025 Institutional Shareholder Services Inc.  All Rights Reserved.  This proxy analysis and the information herein may not be reproduced or disseminated in whole or in part. For information on the policies applied in this research report, please see our Policy Gateway.

**Tesla, Inc. (TSLA)**
POLICY: United States

**Meeting Date: 6 November 2025**
Meeting ID: 1994609



Copyright © 2025 Institutional Shareholder Services Inc.  All Rights Reserved.  This proxy analysis and the information herein may not be reproduced or disseminated in whole or in part. For information on the policies applied in this research report, please see our Policy Gateway.

**Tesla, Inc. (TSLA)**
POLICY: United States

**Meeting Date: 6 November 2025**
Meeting ID: 1994609

| Item 9. Report on the Use of Child Labor in Connection with Electric Vehicles | AGAINST |
|---|---|

**VOTE RECOMMENDATION**

A vote AGAINST this proposal is warranted, ████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████

**Vote Requirement:** Majority of votes cast (abstentions count against; broker non-votes have no effect)

## Discussion

### PROPOSAL

The National Center for Public Policy Research (the "NCPPR") has submitted a proposal requesting that the company publish a report that discloses the extent to which its electric vehicle supply chain may involve child labor.

The resolution specifically requests:

> **RESOLVED:** Shareholders request that, beginning in 2026, Tesla report to shareholders (at reasonable cost and omitting proprietary information) on the extent to which its business plans with respect to electric vehicles and their charging stations involve, rely on, or depend on child labor outside the United States. The report would optimally be fully transparent with regard to sources relied on and their credibility and expressly identifies any instances in which Tesla has failed to determine whether child labor is implicated and the causes of those failures.

### PROPONENT'S STATEMENT

In its supporting statement, the proponent voices its concerns regarding the potential and actual use of child labor in Tesla's supply chain, particularly in cobalt mining, a component for electric vehicle batteries. The proponent says that most of the global cobalt supply originates from the Democratic Republic of the Congo (DRC) and alleges that children often work in hazardous conditions in these mines. It asserts that Tesla is aware that child labor may be present in its supply lines, highlighting that the company noted in 2022 the potential dangers involved in sourcing cobalt from the DRC. The proponent says that while Tesla stated in its 2024 Impact Report that the company invested more human and legal resources than ever before to address forced and child labor, it has not disclosed specific metrics on these efforts. It notes that although a lawsuit against Tesla and other companies by former child miners was dismissed on procedural grounds, questions remain about Tesla's potential involvement in international child labor. The proponent asserts that shareholders are entitled to understand the extent of any direct or indirect reliance on child labor outside the United States.

### BOARD'S STATEMENT

In its opposing statement, the board says the proposal is unnecessary, as the company already has robust policies and processes to prevent child labor. It notes that the prohibition of child labor is reinforced across Tesla's Code of Business Ethics, Supplier Code of Conduct, and Global Human Rights Policy. Tesla reports that it engages regularly with external groups for feedback on its human rights approach and requires all suppliers to follow its Supplier Code of Conduct, prohibiting child labor in all stages of manufacturing. It adds that multiple risk assessment and mitigation measures are in place to minimize child labor risks across the supply chain.

The company also highlights its sourcing strategy. In 2024, all direct cobalt suppliers underwent an audit, with ten assessed against a Tesla-preferred international standard covering environmental and social risks. It states this audit was in addition to a series of audits and assessments over the past three years, including a human rights assessment. Tesla notes that it also conducts its own audits of mine sites and refiners and reviews third-party audit results, such as those from the Responsible Minerals Initiative. For materials not directly sourced, it says it applies

Copyright © 2025 Institutional Shareholder Services Inc. All Rights Reserved. This proxy analysis and the information herein may not be reproduced or disseminated in whole or in part. For information on the policies applied in this research report, please see our Policy Gateway.

the same mapping and due diligence requirements. The board concludes the proposal is unnecessary because Tesla already has strong human rights policies and regularly reports on efforts to prevent and address child labor.

BACKGROUND AND RECENT SHAREHOLDER ACTIVISM

For background information on business and human rights see ISS' Environmental and Social Background Report. For an update on the most recent shareholder activism around environmental and social issues, see ISS' Top Governance and Stewardship Trends for 2025.

This is the second time the company has received a proposal on this topic. In 2022, it received a proposal asking it to issue a report on the use of child labor in connection with its battery supply chain, which garnered 10.5 percent shareholder support.

## Analysis



Copyright © 2025 Institutional Shareholder Services Inc. All Rights Reserved. This proxy analysis and the information herein may not be reproduced or disseminated in whole or in part. For information on the policies applied in this research report, please see our Policy Gateway.

**Tesla, Inc. (TSLA)**                                                                              **Meeting Date: 6 November 2025**
POLICY: United States                                                                              Meeting ID: 1994609



Copyright © 2025 Institutional Shareholder Services Inc.  All Rights Reserved.  This proxy analysis and the information herein may not be reproduced or disseminated in whole or in part. For information on the policies applied in this research report, please see our Policy Gateway.

| Item 10. Amend the Bylaws To Repeal 3% Derivative Suit Ownership Threshold | AGAINST |
|---|---|

VOTE RECOMMENDATION

A vote AGAINST this proposal is warranted. ████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████

**Vote Requirement:** Two-thirds of outstanding shares (abstentions count against; broker non-votes have no effect)

## Discussion

### PROPOSAL

The Comptroller of the State of New York, as lead filer, intends to present the following binding bylaw proposal for consideration:

> **Resolved:** Tesla's bylaws are hereby amended as follows:
>
> (1)  The title of Article XI is amended as follows: the phrase "OWNERSHIP THRESHOLD FOR DERIVATIVE PROCEEDINGS" is deleted;
>
> (2)  "Section 11.3 — OWNERSHIP THRESHOLD FOR DERIVATIVE PROCEEDINGS" is repealed and deleted in its entirety; and
>
> (3)  ARTICLE X — AMENDMENTS is amended to add the following language to the end of the last sentence: "; and *provided further*, that the board of directors shall not have the power to adopt or amend the bylaws to provide for an ownership threshold for shareholders to institute derivative proceedings."

### PROPONENT STATEMENT

The proponent reminds shareholders that when the company proposed to reincorporate from Delaware to Texas, the board stated that shareholder rights under Delaware and Texas law were substantially equivalent, and that there was no reason to believe that Texas law would lessen shareholders' litigation rights relative to Delaware.

On May 14, 2025, Texas amended its corporate laws to permit Texas corporations to set up to a 3 percent ownership threshold before a shareholder can enforce their rights in a derivative suit. The proponent believes that derivative suits are a last resort for shareholders to enforce their rights, where shareholders can sue directors and officers who have violated their fiduciary duties on behalf of the company. For Tesla, a 3 percent holding would amount to tens of billions of dollars, which is something that few shareholders could satisfy on their own, Elon Musk excluded.

The proponent highlights that the Tesla board amended the bylaws the next day to implement the 3 percent threshold, which it contends insulates directors/officers from accountability to shareholders, and characterizes it as a "bait-and-switch" given the board's past statements at the time of the reincorporation.

The proponent believes that amending the Tesla bylaws to remove this provision will "restore both faith in the Board's accountability and shareholders' ability to raise legitimate legal concerns about corporate governance" and that Tesla's adoption of it in the first place is egregious.

### BOARD STATEMENT

In recommending that shareholders vote against this proposal, the board dedicates considerable real estate to correct what it characterizes as the proponent's misleading and incorrect statements (see page 102 of the proxy for full accounting). The board highlights that the Texas law at issue was not introduced until 10 months after the 2024 proxy was filed and that when Tesla moved to Texas, the Texas legislature was not even in session. Further,

Copyright © 2025 Institutional Shareholder Services Inc.  All Rights Reserved.  This proxy analysis and the information herein may not be reproduced or disseminated in whole or in part. For information on the policies applied in this research report, please see our Policy Gateway.

the board states that any shareholder can initiate a derivative claim if it gathers support from 3 percent of the shareholder base, and that this bylaw allows the company to remain accountable to shareholders while focusing corporate resources on claims that matter to a meaningful portion of the shareholder base. The board also takes issue with the last part of the proponent's request, which would preclude the board from adopting any sort of ownership requirement for derivative proceedings, limiting future flexibility.

The board further highlights the considerable expense the company has incurred related to derivative suits brought by shareholders. Specifically, in 2018, a holder of just nine Tesla shares brought a derivative suit challenging Musk's compensation, which has for over seven years resulted in expense and diversion of resources. Last year, shareholders voted again on that compensation package in question and the holders of 72 percent of disinterested shares supported the ratification of the package, demonstrating "our shareholder base's overwhelming rejection of the litigation challenging our CEO's compensation."

In addition, the board highlights various ways in which it believes it has been responsive and accountable to shareholders, and that shareholders have a variety of means with which to hold the board accountable.

Further, in the Q&A portion of the proxy, the company adds that if Item 6 is adopted, the management proposal to remove various supermajority requirements, then Article X of the bylaws would be deleted in its entirety. As this proposal relates to amending Article X of the bylaws, it would also be impossible for the company to implement both Item 6 and this Item 10 (i.e. deleting and then amending Article X). As such, the board "will need to consider how to take appropriate actions to reflect any conflicting bylaws amendments to the extent adopted by our shareholders."

## Analysis



Copyright © 2025 Institutional Shareholder Services Inc.  All Rights Reserved.  This proxy analysis and the information herein may not be reproduced or disseminated in whole or in part. For information on the policies applied in this research report, please see our Policy Gateway.

**Tesla, Inc. (TSLA)**
POLICY: United States

**Meeting Date: 6 November 2025**
Meeting ID: 1994609

| Item 11. Amend Bylaws | AGAINST |
|---|---|

**VOTE RECOMMENDATION**

A vote AGAINST this proposal is warranted. ████████████████
█████████████████████████████████████████████████████████

**Vote Requirement:** Two-thirds of outstanding shares (abstentions count against; broker non-votes have no effect)

## Discussion

### PROPOSAL

The Treasurer for the State of Illinois and Trustee of the Bright Directions College Savings Trust, as lead filer, intends to present the following binding proposal for consideration:

> RESOLVED, pursuant to Article X of the Amended and Restated Bylaws of Tesla, Inc., shareholders of Tesla, Inc. ("Tesla") hereby amend the Bylaws to add the following to the end of Article X:

> "; *and provided further, however,* that any amendment of these bylaws by the board of directors to make the "affirmative election" referenced in section 21.373(b) of the TBOC to be governed by section 21.373 of the TBOC shall be invalid if it is not ratified within one year of such amendment by the affirmative vote of the holders of at least 66 2/3% of the total voting power of outstanding voting securities, voting together as a single class."

### PROPONENT STATEMENT

The proponent highlights that Section 21.373 of the Texas Business Organizations Code permits corporations whose principal office is in Texas to amend their governing documents to elect to be governed by the section, which imposes more stringent requirements for submitting shareholder proposals relative to the default rules under SEC Rule 14a-8. Whereas Rule 14a-8 requires ownership of between $2,000 and $25,000 of stock, Section 21.373 requires $1,000,000 of stock or 3 percent of voting shares. In addition, Section 21.373 requires that any shareholder proponent solicit the holders of at least 67 percent of shares entitled to vote.

The proponent believes that shareholder proposals are a crucial mechanism for providing feedback, and curtailing this ability, if adopted, would not serve the company's or shareholders' financial interests. The proponent also cites some of Tesla's recent financial and governance challenges, and concerns over Elon Musk's outside commitments and the board's oversight.

Therefore, the proponent believes that shareholders should have the opportunity to ratify any bylaw amendment that would limit their rights.

### BOARD STATEMENT

The board asserts that the proponent has not cited any actions taken by it to curtail shareholder proposals or limit shareholder communication, stating that it has not adopted the bylaw in question permitted by Section 21.373, making this proposal premature. Further, the board highlights Tesla's commitment to shareholder engagement and that it remains responsive on issues that matter to a meaningful portion of the shareholder base.

Moreover, if Item 6 is adopted, the management proposal to remove various supermajority requirements, then Article X of the bylaws would be deleted in its entirety. As this proposal relates to amending Article X of the bylaws, it would not only be unnecessary, but it would also be impossible for the company to implement both Item 6 and this Item 11 (i.e. deleting and then amending Article X).

Copyright © 2025 Institutional Shareholder Services Inc. All Rights Reserved. This proxy analysis and the information herein may not be reproduced or disseminated in whole or in part. For information on the policies applied in this research report, please see our Policy Gateway.

Finally, the board highlights that there are multiple proposals related to Section 21.373 on this ballot, Item 11 and 14, each of which recommend a different approach. The board believes it should have discretion and flexibility in taking action on such a novel and evolving issue.

### EXEMPT SOLICITATION

On Oct. 16, 2025, the Illinois State Treasurer's Office filed an exempt solicitation in which it urges shareholders to vote in favor of this proposal. The filing includes responses to some of the points made by the board in its opposition statement.

## Analysis



| Item 12. Declassify the Board of Directors | FOR |
|---|---|

### VOTE RECOMMENDATION

A vote FOR this proposal is warranted ███████████████████████████████████████
███████████

### BACKGROUND INFORMATION

Policies: Classification/Declassification of the Board

**Vote Requirement:** Majority of votes cast (abstentions count against; broker non-votes have no effect)

## Discussion

### PROPOSAL

James McRitchie intends to present the following proposal for consideration:

> RESOLVED: Tesla Inc. ("Company" or "Tesla") shareholders, including James McRitchie of CorpGov.net, ask that our Company take all steps necessary to reorganize the Board of Directors into one class with each director subject to election each year for a one-year term so that all directors are elected annually. The proposal can be implemented in one-year, a best practice, or can be phased in.

### PROPONENT STATEMENT

The proponent highlights that 90 percent of S&P 500 boards are declassified, that annual director elections are widely viewed as best practice, and annual elections make directors more accountable. The proponent also indicates that this proposal topic has historically received majority support at other companies, and that a similar proposal last year at Tesla also received majority support. Moreover, the proponent highlights some of the company's governance deficiencies, including certain supermajority voting requirements.

Copyright © 2025 Institutional Shareholder Services Inc.  All Rights Reserved.  This proxy analysis and the information herein may not be reproduced or disseminated in whole or in part. For information on the policies applied in this research report, please see our Policy Gateway.

**Tesla, Inc. (TSLA)**                                                                                    **Meeting Date: 6 November 2025**
POLICY: United States                                                                                   Meeting ID: 1994609

## BOARD STATEMENT

As discussed elsewhere, because the "shareholder participation rate" was over 65 percent at the last annual meeting, the board has submitted a proposal for shareholder consideration to remove various supermajority requirements (Item 6). If that proposal is approved, it would "unlock a gateway for our Board and shareholders to adopt further shareholder-driven governance actions, including, without limitation, the declassification of the Board, as may be appropriate in accordance with law."

In addition, the board does not believe this is the right time to move toward a declassification, believing it is more appropriate to first enable shareholders to vote on a removal of supermajority requirements, and " whether the gateway for adopting further shareholder-driven governance actions (such as Board declassification, as may be appropriate in accordance with law) should be unlocked." However, the board also highlights the risks to stability and Tesla's long-term strategy that a declassification could cause.

## Analysis



Copyright © 2025 Institutional Shareholder Services Inc.  All Rights Reserved.  This proxy analysis and the information herein may not be reproduced or disseminated in whole or in part. For information on the policies applied in this research report, please see our Policy Gateway.

**Tesla, Inc. (TSLA)**
POLICY: United States

Meeting Date: **6 November 2025**
Meeting ID: 1994609

| Item 13. Reduce Supermajority Vote Requirement | FOR |
|---|---|

**VOTE RECOMMENDATION**

A vote FOR this proposal is warranted ████████████████████████████
████████████████

**Vote Requirement:** Majority of votes cast (abstentions count against; broker non-votes have no effect)

## Discussion

### PROPOSAL

John Chevedden intends to present the following proposal for consideration:

> Shareholders request that our board take each step necessary so that each voting requirement in our charter and bylaws (that is explicit or implicit due to default to state law) that calls for a greater than simple majority vote be replaced by a requirement for a majority of the votes cast for and against applicable proposals, or a simple majority in compliance with applicable laws. If necessary this means the closest standard to a majority of the votes cast for and against such proposals consistent with applicable laws. This includes making the necessary changes in plain English.

### PROPONENT STATEMENT

The proponent states that supermajority requirements have been found to be an entrenching mechanism and can be used to block proposals that can improve shareholder rights. The proponent highlights that this proposal topic won majority support at the 2024 and 2020 annual meetings. Further, the proponent contends that it would be useful for the board to "prepare a detailed report, omitting proprietary data, on the Board of Directors' expenses to proxy solicitors and other vendors to obtain the challenging supermajority approval requirement from all shares outstanding on this proposal topic when less such *[sic]* supermajority of Tesla shares typically cast ballots."

### BOARD STATEMENT

In recommending that shareholders vote against this proposal, the board highlights that Tesla is already asking shareholders to vote on amendments to remove supermajority requirements under Item 6, making this shareholder proposal unnecessary if it is approved. The board believes that the requested report is also unnecessary when considering that Tesla achieved a total shareholder participation rate of 72 percent at the 2024 annual meeting. Further, the board highlights that it has repeatedly sought to remove supermajority requirements at each of the 2019, 2021, and 2022 annual meetings, though they did not receive the requisite two-thirds vote required for approval. Finally, the board states that at this meeting it is delivering on its prior commitment to propose a binding vote to remove the supermajority requirements because the shareholder participation rate was in excess of 65 percent at the 2024 meeting.

### EXEMPT SOLICITATION

On Sept. 24, 2025, John Chevedden, the proponent, filed an exempt solicitation in which he urges shareholders to vote in favor of this proposal along with the binding proposal in Item 6, and to vote against director Ira Ehrenpreis in Item 1a as chair of the governance committee. The filer contends that the two-thirds vote required to approve Item 6, the binding proposal, is a substantial hurdle to meet and that this shareholder proposal only requires a majority of votes cast to be approved, indicating that it is important for at least one of them to be approved. In recommending against the governance committee chair, the filer highlights concerns over the lack of a binding vote on a board declassification at this meeting (see Item 1 for further discussion).

Copyright © 2025 Institutional Shareholder Services Inc.  All Rights Reserved.  This proxy analysis and the information herein may not be reproduced or disseminated in whole or in part. For information on the policies applied in this research report, please see our Policy Gateway.

Analysis



Copyright © 2025 Institutional Shareholder Services Inc.  All Rights Reserved.  This proxy analysis and the information herein may not be reproduced or disseminated in whole or in part. For information on the policies applied in this research report, please see our Policy Gateway.

| Item 14. Require Shareholder Approval of Bylaw Amendments Adopted by the Board of Directors | FOR |
|---|---|

**VOTE RECOMMENDATION**

A vote FOR this proposal is warranted ████████████████████████████
████████████████████████████████████████████████████████████████

**Vote Requirement:** Majority of votes cast (abstentions count against; broker non-votes have no effect)

## Discussion

### PROPOSAL

Newground Social Investment, on behalf of certain co-filers, intends to present the following proposal for consideration:

> **RESOLVED:**   Shareholders request that the Board seek shareholder approval before adopting any bylaw amendment that sets ownership thresholds or solicitation requirements for shareholder proposals above those specified in Rule 14a 8 of the Securities Exchange Act of 1934.

### PROPONENT STATEMENT

In 2025, Texas enacted SB 1057, which allows Texas-registered corporations, or those listed on the Texas stock exchange, to impose significantly higher thresholds to file a shareholder proposal than those set by the SEC under Rule 14a-8. As permitted by the new law, as a pre-condition, Tesla could require a shareholder, or a group, to hold at least 3 percent of shares outstanding or at least $1 million in voting shares, and require them to solicit support from 67 percent of shareholders if they were to try to submit a shareholder proposal. (Note that SB 1057 provides for Section 21.373, which is the topic of Item 11 at this meeting)

The proponent is concerned that Tesla could impose these restrictions without a shareholder vote (bylaw amendments do not necessarily require shareholder approval), allowing management to override SEC rules and long-established shareholder rights without consent. The proponent asserts that the $1 million ownership threshold is unreasonable in light of most shareholders' modest holdings, and that shareholder proposals have proven to be a low-cost, high-value tool for companies to better understand and manage material risks.

### BOARD STATEMENT

In recommending that shareholders vote against this proposal, the board highlights much of the same arguments that are stated in Item 11, including:

- that limiting the board's ability to respond to novel and evolving issues would not be in the best interests of shareholders;
- the presence of multiple shareholder proposals on this topic, which outline different approaches, further highlights the importance of board flexibility; and
- that the board has consistently demonstrated its commitment to shareholders' ability to communicate with Tesla or with each other.

## Analysis

████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████

Copyright © 2025 Institutional Shareholder Services Inc.  All Rights Reserved.  This proxy analysis and the information herein may not be reproduced or disseminated in whole or in part. For information on the policies applied in this research report, please see our Policy Gateway.

**Tesla, Inc. (TSLA)**
POLICY: United States

**Meeting Date: 6 November 2025**
Meeting ID: 1994609

## Detailed Ownership Profile

<span style="background-color:#1b5e9e;color:white">back to Ownership and Control Overview</span>

Percentages rounded down to 1 decimal. "▶" identifies shareholders considered strategic under ISS' definition.

| Type | Votes per Share | Outstanding |
|---|---|---|
| Common Stock | 1 | 3,325,150,886 |

| Ownership - Common Stock | Number of Shares | % of Class |
|---|---|---|
| ▶MUSK ELON REEVE | 413,362,808 | 12.4 |
| The Vanguard Group | 229,805,491 | 6.9 |
| Blackrock, Inc. | 188,797,465 | 5.6 |
| SSgA Funds Management, Inc. | 113,418,687 | 3.4 |
| Geode Capital Management LLC | 64,767,993 | 1.9 |
| Capital Research & Management Co. (World Investors) | 41,632,930 | 1.2 |
| Norges Bank Investment Management | 37,272,002 | 1.1 |
| JPMorgan Investment Management, Inc. | 32,123,572 | 0.9 |
| Northern Trust Investments, Inc.(Investment Management) | 23,084,319 | 0.6 |
| Fidelity Management & Research Co. LLC | 22,043,484 | 0.6 |
| T. Rowe Price Associates, Inc. (IM) | 20,228,729 | 0.6 |
| Amundi Asset Management US, Inc. | 19,558,787 | 0.5 |
| Charles Schwab Investment Management, Inc. | 18,576,698 | 0.5 |
| Goldman Sachs & Co. LLC (Private Banking) | 17,819,904 | 0.5 |
| Morgan Stanley & Co. LLC | 13,634,156 | 0.4 |
| Barclays Bank Plc (Private Banking) | 13,230,784 | 0.4 |
| BAMCO, Inc. | 13,018,798 | 0.3 |
| Loomis, Sayles & Co. LP | 12,914,797 | 0.3 |
| ▶Vaibhav Taneja | 120,856 | <0.1 |
| ▶Tom Zhu | 47,600 | <0.1 |

Source(s): Proxy Statement, © 2025 Factset Research Systems, Inc. All Rights Reserved. As of: 15 Sep 2025

## Additional Information

| | |
|---|---|
| Meeting Location | Tesla's Gigafactory Texas, 1 Tesla Road, Austin, Texas 78725 |
| | Virtual Meeting: http://www.virtualshareholdermeeting.com/TSLA2025 |
| Meeting Time | 15:00 |
| Shareholder Proposal Deadline | May 20, 2026 |
| Solicitor | INNISFREE M&A Incorporated |
| Security IDs | 88160R101(CUSIP) |

Copyright © 2025 Institutional Shareholder Services Inc. All Rights Reserved. This proxy analysis and the information herein may not be reproduced or disseminated in whole or in part. For information on the policies applied in this research report, please see our Policy Gateway.

**Tesla, Inc. (TSLA)**                                    **Meeting Date: 6 November 2025**
POLICY: United States                                    Meeting ID: 1994609

ISS' experienced research team provides comprehensive proxy analysis and complete vote recommendations for over 50,000 meetings annually in over 100 markets worldwide. With over 300 research professionals, ISS aims to cover every holding within a client's portfolio in both developed and emerging markets.

Our research analysts are located in offices worldwide, offering local insight and global breadth. Research office locations include Berlin, Brussels, London, Manila, Mumbai, Norman, Paris, Rockville, Stockholm, Sydney, Tokyo, Toronto, and Washington, D.C.

ISS has long been committed to engagement and transparency. For information on the policies applied in this research report, please see our Policy Gateway. Please use the ISS Help Center for questions on research reports, policy, and for requests for engagements.



Copyright © 2025 Institutional Shareholder Services Inc. and/or its subsidiaries ("ISS STOXX"). All rights reserved.

This report and all of the information contained in it, including without limitation all text, data, graphs and charts, is the property of ISS STOXX and/or its licensors and is provided for informational purposes only. The information may not be modified, reverse-engineered, reproduced or disseminated, in whole or in part, without prior written permission from ISS STOXX.

This report and the recommendations, ratings and/or other analytical content in the report has not been submitted to, nor received approval from, the United States Securities and Exchange Commission or any other regulatory body.

The user of this report assumes all risks of any use that it may make or permit to be made of the information. While ISS STOXX exercised due care in compiling this report, ISS STOXX makes no express or implied warranties or representations with respect to the information in, or any results to be obtained by the use of, the report. In particular, the recommendations, ratings and/or other analytical content in the report are not intended to constitute an offer, solicitation or advice to buy or sell securities nor are they intended to solicit votes or proxies. ISS STOXX shall not be liable for any losses or damages arising from or in connection with the information contained herein or the use of, reliance on, or inability to use any such information.

Please note the issuer(s) mentioned within this report and/or material may have a commercial relationship with ISS Corporate Solutions, Inc. ("ISS-Corporate"), a wholly owned subsidiary of Institutional Shareholder Services Inc., or ISS-Corporate may have provided advisory or analytical services to the issuer(s) in connection with the information described in this report. No employee of ISS-Corporate played a role in the preparation of this report. If you are an institutional client of ISS STOXX, you may inquire about any issuer's use of products and services from ISS-Corporate via ProxyExchange or by emailing disclosure@issgovernance.com.

Additionally, the issuer(s) mentioned within this report and/or material may be a client of ISS STOXX, or the parent of, or affiliated with, a client of ISS STOXX. One or more of the proponents of a shareholder proposal at an upcoming meeting may be a client of ISS STOXX, or the parent of, or affiliated with, a client of ISS STOXX. None of the sponsors of any shareholder proposal(s) played a role in preparing this report.

ISS STOXX is majority owned by Deutsche Börse AG ("DB"), an international exchange organization. Both ISS STOXX and DB have established standards and procedures to protect the integrity and independence of the research, recommendations, ratings and other analytical offerings ("Research Offerings") produced by ISS STOXX.

Further information about conflict mitigation can be found here.

Copyright © 2025 Institutional Shareholder Services Inc.  All Rights Reserved.  This proxy analysis and the information herein may not be reproduced or disseminated in whole or in part. For information on the policies applied in this research report, please see our Policy Gateway.

# Foster Declaration Exhibit 7



ISS Proxy Analysis & Benchmark Policy Voting Recommendations

# Exxon Mobil Corporation

## Key Takeaways



**QualityScore**

**Meeting Type:** Annual (Virtual)
**Meeting Date:** 31 May 2023
**Record Date:** 5 April 2023
**Meeting ID:** 1743652

**New York Stock Exchange**: XOM
**Index:** S&P 500
**Sector:** Integrated Oil & Gas
**GICS:** 10102010

**Primary Contacts**
Marc Goldstein, JD
Rachel Hedrick – Items 3 & 6
U.S. Research Help Center

---

## Agenda & Recommendations

**Policy: United States**
**Incorporated:** New Jersey, USA

| Item | Code | Proposal | Board Rec. | ISS Rec. |
|---|---|---|---|---|
| **MANAGEMENT PROPOSALS** | | | | |
| 1.1 | M0201 | Elect Director Michael J. Angelakis | FOR | FOR |
| 1.2 | M0201 | Elect Director Susan K. Avery | FOR | FOR |
| 1.3 | M0201 | Elect Director Angela F. Braly | FOR | FOR |
| 1.4 | M0201 | Elect Director Gregory J. Goff | FOR | FOR |
| 1.5 | M0201 | Elect Director John D. Harris, II | FOR | FOR |
| 1.6 | M0201 | Elect Director Kaisa H. Hietala | FOR | FOR |
| 1.7 | M0201 | Elect Director Joseph L. Hooley | FOR | FOR |
| 1.8 | M0201 | Elect Director Steven A. Kandarian | FOR | FOR |
| 1.9 | M0201 | Elect Director Alexander A. Karsner | FOR | FOR |
| 1.10 | M0201 | Elect Director Lawrence W. Kellner | FOR | FOR |
| 1.11 | M0201 | Elect Director Jeffrey W. Ubben | FOR | FOR |
| 1.12 | M0201 | Elect Director Darren W. Woods | FOR | FOR |
| 2 | M0101 | Ratify PricewaterhouseCoopers LLP as Auditors | FOR | FOR |

## Report Contents

| | | | |
|---|---|---|---|
| ISS-Company Dialogue | 3 | Compensation Profile | 9 |
| Financial Highlights | 5 | QualityScore | 11 |
| Ownership and Control Overview | 6 | Vote Results | 15 |
| Corporate Governance Profile | 6 | Meeting Agenda and Proposals | 16 |
| Board Profile | 8 | Additional Information | 65 |

© 2023 Institutional Shareholder Services Inc.  All Rights Reserved. This proxy analysis and the information herein may not be reproduced or disseminated in whole or in part. For information on the policies applied in this research report, please see our  Policy Gateway.

**Exxon Mobil Corporation (XOM)**     **Meeting Date: 31 May 2023**
POLICY: United States     Meeting ID: 1743652

| | | | | |
|---|---|---|---|---|
| ▶3 | M0550 | Advisory Vote to Ratify Named Executive Officers' Compensation | FOR | FOR |
| 4 | M0552 | Advisory Vote on Say on Pay Frequency | ONE YEAR | ONE YEAR |
| **SHAREHOLDER PROPOSALS** | | | | |
| 5 | S0746 | Establish Board Committee on Decarbonization Risk | AGAINST | AGAINST |
| 6 | S0500 | Reduce Executive Stock Holding Period | AGAINST | AGAINST |
| 7 | S0742 | Report on Carbon Capture and Storage | AGAINST | AGAINST |
| 8 | S0743 | Report on Methane Emission Disclosure Reliability | AGAINST | FOR |
| 9 | S0743 | Adopt Medium-Term Scope 3 GHG Reduction Target | AGAINST | AGAINST |
| 10 | S0731 | Issue a Report on Worst-Case Impacts of Oil Spills from Operations Offshore of Guyana | AGAINST | AGAINST |
| 11 | S0730 | Recalculate GHG Emissions Baseline to Exclude Emissions from Material Divestitures | AGAINST | AGAINST |
| 12 | S0730 | Report on Asset Retirement Obligations Under IEA NZE Scenario | AGAINST | AGAINST |
| 13 | S0781 | Commission Audited Report on Reduced Plastics Demand | AGAINST | FOR |
| 14 | S0742 | Report on Potential Costs of Environmental Litigation | AGAINST | AGAINST |
| 15 | S0429 | Publish a Tax Transparency Report | AGAINST | AGAINST |
| 16 | S0742 | Report on Social Impact From Plant Closure or Energy Transition | AGAINST | AGAINST |
| 17 | S0741 | Report on Benefits and Risks of Commitment to Not Develop Projects in the Arctic *Withdrawn Resolution* | NONE | NONE |

Shading indicates that ISS recommendation differs from Board recommendation
▶ Items deserving attention due to contentious issues or controversy

Copyright © 2023 Institutional Shareholder Services Inc. All Rights Reserved. This proxy analysis and the information herein may not be reproduced or disseminated in whole or in part. For information on the policies applied in this research report, please see our Policy Gateway.

**Exxon Mobil Corporation (XOM)**
POLICY: United States

Meeting Date: **31 May 2023**
Meeting ID: 1743652

## ISS-Company Dialogue

| Dates | Topic(s) | Initiated By | Notes |
|---|---|---|---|
| Jan 10 & March 21, 2023 | ESG | Issuer | The company discussed its views of certain shareholder proposals and its plans to expand disclosure regarding shareholder engagement and various climate-related matters. Company also discussed new board and executive appointments. |

**Note:** ISS engages in ongoing dialogue with issuers in order to ask for additional information or clarifica tion, but not to engage on behalf of its clients. Any draft review which may occur as part of this process is done for purposes of data verification only. All ISS rec ommendations are based solely upon publicly disclosed information.

## Material Company Updates

| Item | Summary |
|---|---|
| **Board Updates** | John D. Harris II and Lawrence W. Kellner were appointed to the board effective Jan. 1, 2023. |
| | Ursula M. Burns will not stand for re-election to the board at the 2023 annual meeting. |
| **Notable Vote Result** | At the last annual meeting, the following shareholder proposal received the support of a majority of votes cast (excluding abstentions): Report on Scenario Analysis Consistent with International Energy Agency's Net Zero by 2050. See *Board Responsiveness* section of ***Elect Directors*** below. |
| **Climate and Environmental Legal Proceedings** | In April 2021, authorities in Anne Arundel County, Maryland filed suit in local circuit court against a number of fossil fuel companies, including Exxon Mobil, accusing the defendants of acting to mislead the public about the contributions of their products to climate change, and seeking to recover costs incurred by the county to "survive the consequences of climate change." The case was subsequently removed to the U.S. District Court for the District of Maryland; however, the federal court issued an order remanding the case to state court. That order has been temporarily stayed due to the Supreme Court's consideration of a similar case brought by local governments in Colorado. |
| | On Aug. 4, 2022, Exxon Mobil subsidiary XTO Energy, Inc. received a letter from the U.S. Department of Justice notifying XTO of the U.S. Environmental Protection Agency's request to initiate a potential civil action against XTO regarding the Schnegg well in Powhatan Point, Ohio. The letter did not quantify an associated civil penalty potentially sought by the DOJ. The EPA alleges XTO breached its duty under the General Duty Clause of the Clean Air Act for the Schnegg well, and such breaches resulted in a 2018 well blowout. Neither a civil action has been filed nor a draft consent decree has been provided by the DOJ. XTO is assessing the factual basis of the allegation and any associated penalties. In discussions in January 2023, the DOJ indicated it may seek a potential penalty substantially in excess of $1 million. XTO strongly disagrees with DOJ's initial position. |
| | On Jan. 3, 2022, the State of Texas, on behalf of the Texas Commission on Environmental Quality, filed a lawsuit against Exxon Mobil in Travis County District Court for alleged violations of the Texas Clean Air Act, ExxonMobil's permits and promulgated regulations. The original complaint alleged that from Dec. 21-23, 2021, a pipeline containing vaporized naphtha at the Baytown Refinery leaked, and that a spark in the course of repairs caused an explosion. In August 2022, the State amended its petition to seek additional penalties for additional alleged permit and regulatory violations in connection with unrelated subsequent emission events at the refinery, for an aggregate amount in excess of $1 million. On Nov. 21, 2022, the State of Texas filed a complaint against Exxon Mobil in Travis County District Court for alleged violations of the Texas Clean Air Act at the Baytown Olefins Plant located in Baytown, Texas. The complaint seeks civil penalties for alleged unauthorized air pollution, |

Copyright © 2023 Institutional Shareholder Services Inc. All Rights Reserved. This proxy analysis and the information herein may not be reproduced or disseminated in whole or in part. For information on the policies applied in this research report, please see our Policy Gateway.

| | |
|---|---|
| | unauthorized outdoor burning, nuisance, and unauthorized visible emissions associated with multiple alleged air emissions events between 2018 and 2022 in an amount in excess of $1 million and injunctive relief against the company to enjoin a violation or threatened violation of any Texas Commission on Environmental Quality statute. The State also seeks to recover its fees and costs of litigation. |
| **Amendment to Bylaws** | On Oct. 25, 2022, the company amended its bylaws to update certain aspects of the advance notice provisions following the promulgation of new SEC rules on universal proxy cards, as well as to remove a requirement that the board elect a general tax counsel as an officer of the company. |

Copyright © 2023 Institutional Shareholder Services Inc.  All Rights Reserved.  This proxy analysis and the information herein may not be reproduced or disseminated in whole or in part. For information on the policies applied in this research report,  please see our Policy Gateway.

**Exxon Mobil Corporation (XOM)**
POLICY: United States

**Meeting Date: 31 May 2023**
Meeting ID: 1743652

## Financial Highlights

**Company Description:** Exxon Mobil Corporation engages in the exploration and production of crude oil and natural gas in the United States and internationally. It operates through Upstream, Energy Products, Chemical Products, and Specialty Products segments.

STOCK PRICE PERFORMANCE



TOTAL SHAREHOLDER RETURNS (ANNUALIZED)

|  | 1 Yr | 3 Yr | 5 Yr |
|---|---|---|---|
| Company TSR (%) | 87.16 | 23.63 | 11.49 |
| GICS 1010 TSR (%) | 52.29 | 17.12 | 3.82 |
| S&P500 TSR (%) | -18.11 | 7.66 | 9.42 |

Source: Compustat. As of last day of company FY end month: 12/31/2022

COMPANY SNAPSHOT (AS OF RECORD DATE)

| Market Cap (M) | 476,264.5 |
|---|---|
| Closing Price | 116.99 |
| Dividends Paid (LTM) | 3.58 |
| 52-Week High | 119.63 |
| 52-Week Low | 79.29 |
| Shares Outstanding (M) | 4070.99 |
| Average daily trading volume (prior mo)* | 18,958.53 |

Source: Compustat. As of April 5, 2023 (All currency in USD)
* Trading Volume in thousands of shares

FINANCIAL & OPERATIONAL PERFORMANCE

| All currency in USD | Historical Performance (FY ending) | | | | | Compared to Peers (Compustat FY*) – 2022 |
|---|---|---|---|---|---|---|
|  | 12/2018 | 12/2019 | 12/2020 | 12/2021 | 12/2022 | |
| **Earnings** | | | | | | |
| Revenue (M) | 279,332 | 255,583 | 178,574 | 276,692 | 398,675 | |
| Net Income (M) | 20,840 | 14,340 | -22,440 | 23,040 | 55,740 | |
| EBITDA (M) | 40,869 | 31,764 | -8,889 | 43,484 | 86,168 | |
| EPS (USD) | 4.88 | 3.36 | -5.25 | 5.39 | 13.26 | |
| EPS Y/Y Growth (%) | 5 | -31 | N/A | N/A | 146 | |
| **Profitability** | | | | | | |
| Pretax Net Margin (%) | 11 | 8 | -16 | 11 | 20 | |
| EBITDA Margin (%) | 15 | 12 | -5 | 16 | 22 | |
| Return on Equity (%) | 11 | 7 | -14 | 14 | 29 | |
| Return on Assets (%) | 6 | 4 | -7 | 7 | 15 | |
| ROIC (%) | 10 | 6 | -10 | 10 | 23 | |
| **Leverage** | | | | | | |
| Debt/Assets | 11 | 15 | 22 | 16 | 13 | |
| Debt/Equity | 20 | 28 | 46 | 31 | 24 | |
| **Cash Flows** | | | | | | |
| Operating (M) | 36,014 | 29,716 | 14,668 | 48,129 | 76,797 | |
| Investing (M) | -16,446 | -23,084 | -18,459 | -10,235 | -14,742 | |
| Financing (M) | -19,446 | -6,618 | 5,285 | -35,423 | -39,114 | |
| Net Change (M) | -135 | 47 | 1,275 | 2,438 | 22,863 | |
| **Valuation & Performance** | | | | | | |
| Price/Earnings | 13.97 | 20.77 | N/A | 11.35 | 8.32 | |
| Annual TSR (%) | -15.09 | 7.35 | -36.02 | 57.80 | 87.16 | |

Source: Compustat. *Note: Compustat standardizes financial data and fiscal year designations to allow for meaningful comparis on across companies. Compustat data may differ from companies' disclosed financials and does not incorporate non-trading equity units. Peers shown here represent closest industry peers drawn from those peers used in ISS' pay-for-performance analysis. See www.issgovernance.com/policy-gateway/company-financials-faq/ for more information.

Copyright © 2023 Institutional Shareholder Services Inc. All Rights Reserved. This proxy analysis and the information herein may not be reproduced or disseminated in whole or in part. For information on the policies applied in this research report, please see our Policy Gateway.

**Exxon Mobil Corporation (XOM)**
POLICY: United States

Meeting Date: **31 May 2023**
Meeting ID: 1743652

## Ownership & Control Overview

| Stock Type | Votes per Share | Outstanding | |
|---|---|---|---|
| Common Stock | 1 | 4,059,294,340 | |
| **Top Holders - Ownership & Control** | | **% of Stock** | **% of Votes** |
| The Vanguard Group | | 9.0 | 9.0 |
| BlackRock, Inc. | | 7.2 | 7.2 |
| State Street Corporation | | 5.5 | 5.5 |
| ▶D.W. Woods | | <0.1 | <0.1 |

Proxy Statement, © 2023 Factset Research Systems, Inc. All Rights Reserved. As of: 28 Feb 2023



Percentages rounded down to 1 decimal. "▶" identifies shareholders considered strategic under ISS' definition.

to Detailed Ownership Profile

ISS' definition of strategic shareholders may include, but is not limited to, shareholders with board representation, State-controlled entities, insiders/executives, and employee funds.

## Corporate Governance Profile

### BOARD SUMMARY

| | |
|---|---|
| Chairman classification | Executive Director |
| Separate chair/CEO | No |
| Independent lead director | Yes |
| Voting standard | Majority |
| Plurality carveout for contested elections | Yes |
| Resignation policy | Yes |
| Total director ownership (000 shares) | 1,623 |
| Total director ownership (%) | < 1 |
| Percentage of directors owning stock | 100% |
| Number of directors attending < 75% of meetings | 0 |
| Average director age | 62 years |
| Average director tenure | 3 years |
| Percentage of women on board | 25% |

### SHAREHOLDER RIGHTS SUMMARY

| | |
|---|---|
| Controlled company | No |
| Classified board | No |
| Multi-class common stock w/ unequal voting rights | No |
| Vote standard for mergers/acquisitions | Majority |
| Vote standard for charter amendment | Majority |
| Vote standard for bylaw amendment | Majority |
| Shareholder right to call special meetings | Yes, 15% |
| Material restrictions on right to call special meetings | Yes |
| Shareholder right to act by written consent | Yes |
| Cumulative voting | No |
| Board authorized to issue blank-check preferred stock | Yes |
| Poison pill | No |
| Proxy Access | Yes |
| -    Ownership requirement (%) | 3 |
| -    Time requirement (years) | 3 |
| -    Nomination limit (% of seats) | 20 |
| -    Nomination limit (# of nominees) | 2 |
| -    Aggregation cap (# of nominators) | 20 |

Copyright © 2023 Institutional Shareholder Services Inc. All Rights Reserved. This proxy analysis and the information herein may not be reproduced or disseminated in whole or in part. For information on the policies applied in this research report, please see our Policy Gateway.

**Exxon Mobil Corporation (XOM)**                                    Meeting Date: **31 May 2023**
POLICY: United States                                                Meeting ID: 1743652

## Board & Committee Composition

The information provided in the charts and tables below is based on ISS data records, which rely on disclosures in proxy materials and other public sources available as of the date set forth below (for the general meeting under review) and, with respect to information from prior years, information that was available ahead of each year's annual general meeting at the time of ISS' report for that meeting. As such, these charts and tables might not reflect changes to the board composition and/or other covered elements subsequently disclosed by the issuer after ISS' publications or between general meetings.

Independence values refer to ISS Independence classifications ( "Exec": Executive Director; "N-Ind.": Non-Independent Director; "Ind.": Independent Director).

### Board

as of May 31, 2023

Ind.: 92%, 11
Exec.: 8%, 1

Meetings last FY:9

### Audit

Ind.: 100%, 4

Meetings last FY:10

### Comp

Ind.: 100%, 4

Meetings last FY:6

### Nom

Ind.: 100%, 5

Meetings last FY:8

■ **Exec**    ■ **N-Ind.**    ■ **Ind.**

### Independence History

| | 2019 | 2020 | 2021 | 2022 | After Meeting |
|---|---|---|---|---|---|
| Board | 90% | 90% | 92% | 91% | 92% |
| Audit Com | 100% | 100% | 100% | 100% | 100% |
| Comp Com | 100% | 100% | 100% | 100% | 100% |
| Nom Com | 100% | 100% | 100% | 100% | 100% |

### Gender Diversity Trend

| | 2019 | 2020 | 2021 | 2022 | After Meeting |
|---|---|---|---|---|---|
| male | 70% | 70% | 75% | 64% | 75% |
| female | 30% | 30% | 25% | 36% | 25% |

### Director Tenure



0    1    2    3    4    5    6    7    8    9

Publication Date: 18 May 2023

Copyright © 2023 Institutional Shareholder Services Inc.  All Rights Reserved.  This proxy analysis and the information herein may not be reproduced or disseminated in whole or in part. For information on the policies applied in this research report,  please see our Policy Gateway.

**Exxon Mobil Corporation (XOM)**
POLICY: United States

<div align="right">

**Meeting Date: 31 May 2023**
Meeting ID: 1743652

</div>

## Board Profile (after upcoming meeting)

| Item # | Executive Directors | Affiliation | Independence | | Leadership | Gender | Age | Tenure | Term Ends | Committee | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | Co. | ISS | | | | | | Audit | Comp | Nom | Gov |
| 1.12 | Darren Woods | | Exec | Exec | CEO, Chair | M | 58 | 7 | 2024 | | | | |
| | **Non-Executive Directors** | | | | | | | | | | | | |
| 1.7 | Joseph (Jay) Hooley | | Ind. | Ind. | Lead Dir | M | 66 | 3 | 2024 | | M | C | C |
| 1.1 | Michael (Mike) Angelakis | | Ind. | Ind. | | M | 59 | 2 | 2024 | F | | | |
| 1.2 | Susan Avery | | Ind. | Ind. | | F | 73 | 6 | 2024 | | | M | M |
| 1.3 | Angela Braly | | Ind. | Ind. | | F | 61 | 7 | 2024 | | C | | |
| 1.4 | Gregory (Greg) Goff | | Ind. | Ind. | | M | 66 | 1 | 2024 | F | | | |
| 1.5 | John Harris II | | Ind. | Ind. | | M | 62 | 0* | 2024 | F | M | | |
| 1.6 | Kaisa Hietala | | Ind. | Ind. | | F | 52 | 1 | 2024 | F | | | |
| 1.8 | Steven Kandarian | | Ind. | Ind. | | M | 71 | 5 | 2024 | | M | M | M |
| 1.9 | Alexander Karsner | | Ind. | Ind. | | M | 56 | 1 | 2024 | | | M | M |
| 1.10 | Lawrence (Larry) Kellner | | Ind. | Ind. | | M | 64 | 0* | 2024 | | | M | M |
| 1.11 | Jeffrey (Jeff) Ubben | | Ind. | Ind. | | M | 61 | 2 | 2024 | | | | |
| | | | 92% Ind. | 92% Ind. | | 25% F | Ave: 62 | Ave: 3 | Ave: 1 | 100% Ind. | 100% Ind. | 100% Ind. | 100% Ind. |

Committee Membership: M = Member | C = Chair | **F = Member and Financial Expert**

*Indicates director not previously submitted to shareholders for election.

## COMMITMENTS AT PUBLIC COMPANIES

| Item # | Director Name | # of boards* | Company Name | Mandate Type | CEO | Board Chair | Committee | | |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | Audit | Comp | Nom |
| 1.12 | Darren Woods | 1 | *Exxon Mobil Corporation* | Executive Director | ⬚ | ⬚ | | | |
| 1.7 | Joseph (Jay) Hooley | 2 | *Exxon Mobil Corporation* | Non-Executive Director | | | | M | C |
| | | | Aptiv Plc | Non-Executive Director | | | F | C | |
| 1.1 | Michael (Mike) Angelakis | 4 | *Exxon Mobil Corporation* | Non-Executive Director | | | F | | |
| | | | Bowlero Corp. | Non-Executive Director | | | | | C |
| | | | TriNet Group, Inc. | Non-Executive Director | | | | M | M |
| | | | Clarivate Plc | Non-Executive Director | | | | | M |
| 1.2 | Susan Avery | 1 | *Exxon Mobil Corporation* | Non-Executive Director | | | | | M |
| 1.3 | Angela Braly | 3 | *Exxon Mobil Corporation* | Non-Executive Director | | | | C | |
| | | | The Procter & Gamble Company | Non-Executive Director | | | M | | C |
| | | | Brookfield Corporation | Non-Executive Director | | | M | | |
| 1.4 | Gregory (Greg) Goff | 2 | *Exxon Mobil Corporation* | Non-Executive Director | | | F | | |
| | | | Avient Corporation | Non-Executive Director | | | | | M |
| 1.5 | John Harris II | 4 | *Exxon Mobil Corporation* | Non-Executive Director | | | F | M | |
| | | | Flex Ltd. | Non-Executive Director | | | | M | |
| | | | Kyndryl Holdings, Inc. | Non-Executive Director | | | | | M |
| | | | Cisco Systems, Inc. | Non-Executive Director | | | | | |
| 1.6 | Kaisa Hietala | 3 | *Exxon Mobil Corporation* | Non-Executive Director | | | F | | |
| | | | Smurfit Kappa Group Plc | Non-Executive Director | | | M | | M |
| | | | Rio Tinto Limited | Non-Executive Director | | | | | |
| | | | Rio Tinto Plc | Non-Executive Director | | | | | |
| 1.8 | Steven Kandarian | 2 | *Exxon Mobil Corporation* | Non-Executive Director | | | | M | M |
| | | | Jackson Financial Inc. | Non-Executive Director | | ⬚ | | M | C |
| 1.9 | Alexander Karsner | 2 | *Exxon Mobil Corporation* | Non-Executive Director | | | | | M |
| | | | Applied Materials, Inc. | Non-Executive Director | | | | M | M |
| | | | Alphabet Inc. | Executive Officer (non-director) | | | | | |

Publication Date: 18 May 2023

<div align="right">Page 8</div>

Copyright © 2023 Institutional Shareholder Services Inc. All Rights Reserved. This proxy analysis and the information herein may not be reproduced or disseminated in whole or in part. For information on the policies applied in this research report, please see our Policy Gateway.

**Exxon Mobil Corporation (XOM)**
POLICY: United States

**Meeting Date: 31 May 2023**
Meeting ID: 1743652

| Item # | Director Name | # of boards* | Company Name | Mandate Type | CEO | Board Chair | Audit | Comp | Nom |
|---|---|---|---|---|---|---|---|---|---|
| 1.10 | Lawrence (Larry) Kellner | 2 | *Exxon Mobil Corporation* | Non-Executive Director | | | | | M |
| | | | The Boeing Company | Non-Executive Director | | ☐ | | | M |
| 1.11 | Jeffrey (Jeff) Ubben | 3 | *Exxon Mobil Corporation* | Non-Executive Director | | | | | |
| | | | Enviva, Inc. | Non-Executive Director | | | | M | |
| | | | Vistry Group Plc | Non-Executive Director | | | | | |

*The number of boards for each director is the total of executive director and/ or non-executive director mandates. Companies highlighted in blue are considered belonging to the same group and count as 1 for ISS board count calculations.

## DIRECTOR PAY, ATTENDANCE AND EQUITY OWNERSHIP OVERVIEW MOST RECENT FY

| Item # | Director Name | Board Position | Attendance (in %) | Total Compensation | # | % stock | % votes |
|---|---|---|---|---|---|---|---|
| 1.12 | **Darren Woods** | ED, CEO, Chair | ≥75% | ** | 210,173 | <0.1 | <0.1 |
| 1.7 | **Joseph (Jay) Hooley** | NED, Comp (M), Nom (C) | ≥75% | USD 296,205 | 15,500 | <0.1 | <0.1 |
| 1.1 | **Michael (Mike) Angelakis** | NED, Audit (M) | ≥75% | USD 266,260 | 53,792 | <0.1 | <0.1 |
| 1.2 | **Susan Avery** | NED, Nom (M) | ≥75% | USD 266,260 | 23,000 | <0.1 | <0.1 |
| 1.3 | **Angela Braly** | NED, Comp (C) | ≥75% | USD 276,260 | 27,575 | <0.1 | <0.1 |
| 1.4 | **Gregory (Greg) Goff** | NED, Audit (M) | ≥75% | USD 266,260 | 23,462 | <0.1 | <0.1 |
| 1.5 | **John Harris II** | NED, Audit (M), Comp (M) | N/A | N/A | 8,250 | <0.1 | <0.1 |
| 1.6 | **Kaisa Hietala** | NED, Audit (M) | ≥75% | USD 266,260 | 13,000 | <0.1 | <0.1 |
| 1.8 | **Steven Kandarian** | NED, Comp (M), Nom (M) | ≥75% | USD 266,260 | 20,500 | <0.1 | <0.1 |
| 1.9 | **Alexander Karsner** | NED, Nom (M) | ≥75% | USD 266,260 | 30,000 | <0.1 | <0.1 |
| 1.10 | **Lawrence (Larry) Kellner** | NED, Nom (M) | N/A | N/A | 8,000 | <0.1 | <0.1 |
| 1.11 | **Jeffrey (Jeff) Ubben** | NED | ≥75% | USD 266,260 | 1,190,000 | <0.1 | <0.1 |
| **Total** | | | | USD 2,436,285 | | | |

Attendance rates take into account board and committee meetings.
ED for Executive Directors, NED for Non-Executive Directors
**For executive director data, please refer to Executive Pay Overview.
Ownership values include shares held, stock awards that vest within 60 days of the disclosure date, and deferred stock units (DSUs). Stock options are excluded.

## Compensation Profile

### EXECUTIVE PAY OVERVIEW

| Executive | Title | Base Salary | Change in Pension, Deferred Comp, All Other Comp | Bonus & Non-equity Incentives | Restricted Stock | Option Grant | Total |
|---|---|---|---|---|---|---|---|
| **D. Woods** | Chairman and CEO | 1,703 | 2,885 | 6,382 | 25,052 | 0 | 36,022 |
| **J. Williams Jr.** | Senior Vice President | 1,100 | 3,859 | 4,206 | 13,116 | 0 | 22,281 |
| **N. Chapman** | Senior Vice President | 1,100 | 3,680 | 4,035 | 12,426 | 0 | 21,240 |
| **K. Mikells** | Senior Vice President; CFO | 1,100 | 794 | 4,376 | 13,806 | 0 | 20,076 |
| **K. McKee** | President, ExxonMobil Product Solutions | 909 | 4,224 | 3,617 | 11,256 | 0 | 20,006 |
| **Median CEO Pay** | ISS Selected Peer Group | 1,690 | 662 | 3,900 | 10,274 | 3,122 | **23,397** |
| | Company Defined Peers | 1,673 | 650 | 3,690 | 9,785 | 3,520 | **22,424** |

Source: ISS. Pay in $thousands. Total pay is sum of all reported pay elements, using ISS' Black-Scholes estimate for option grant-date values. Median total pay will not equal sum of pay elements medians. Company Defined Peers are as disclosed. More information on ISS' peer group methodology is available at www.issgovernance.com/policy-gateway/us-compensation-policy-guidance/.

Copyright © 2023 Institutional Shareholder Services Inc. All Rights Reserved. This proxy analysis and the information herein may not be reproduced or disseminated in whole or in part. For information on the policies applied in this research report, please see our Policy Gateway.

## OPTION VALUATION ASSUMPTIONS

| For CEO's last FY Grant | Company | ISS |
|---|---|---|
| Volatility (%)* | N/A | N/A |
| Dividend Yield (%)* | N/A | N/A |
| Term (yrs)* | N/A | N/A |
| Risk-free Rate (%)* | N/A | N/A |
| Grant date fair value per option* | N/A | N/A |
| Grant Date Fair Value ($ in 000)** | N/A | N/A |

The CEO did not receive stock options in the most recent fiscal year.

## CEO PAY MULTIPLES

| Compared to | Multiple |
|---|---|
| 2nd highest active executive | 1.62 |
| Average active NEO | 1.72 |
| ISS peer median | 1.54 |
| Company peer median | 1.61 |
| Median employee/CEO Pay Ratio* (FY22, FY21) | 210, 125 |

*As disclosed by the company. The company disclosed the median compensation of all employees to be $171,582.

## CEO TALLY SHEET

| CEO | D. Woods |
|---|---|
| CEO tenure at FYE: | 6 years |
| Present value of all accumulated pension: | $35,015,801 |
| Value of CEO stock owned (excluding options): | $24,588,139 |
| **Potential Termination Payments** | |
| Involuntary termination without cause: | N/A |
| Termination after a change in control: | $0 |

Source: DEF14A

### 3-YEAR GRANTED VS. REALIZABLE CEO PAY

### 3-year TSR: 23.63%



Source: DEF14A and ISS ($ in thousands)

Granted pay equals the sum of all CEO pay, as disclosed in the proxy statement for the applicable fiscal years, except that equity grant values may be based on ISS' valuation. Realizable pay equals the sum of all cash paid (as disclosed) during the same period, plus the value of all equity grants at the end of the period (based on earned value, if applicable, or re-calculated FV of target level equity awards not yet earned/vested). For periods that include multiple CEOs, values include pay to all CEOs during the period. For additional information, please visit www.issgovernance.com/policy-gateway/us-compensation-policy-guidance/.

## CEO PAY VERSUS PERFORMANCE

| Year | SCT Total | Compensation Actually Paid | Value of $100 Investment (TSR) | | CFOAS* |
|---|---|---|---|---|---|
| | | | Company | Peers | |
| 1 | $35,909 | $89,748 | $188 | $136 | $82,044,000,000 |
| 2 | $23,572 | $40,080 | $101 | $94 | $51,305,000,000 |
| 3 | $15,639 | ($7,692) | $64 | $69 | $15,667,000,000 |

**Important Metrics*:** TSR, Earnings, Cash Flow From Operations And Asset Sales, Return On Capital Employed, Safety Performance, Environmental Performance, Corporate-wide Operated Asset GHG Emissions Intensity

Source: DEF14A. CEO Pay in $thousands. Year 1 = most recent fiscal year. SCT = Summary Compensation Table. TSR peers are as disclosed and may differ from pay peers. *The company disclosed these metrics as the most important for determining CEO pay.

Copyright © 2023 Institutional Shareholder Services Inc. All Rights Reserved. This proxy analysis and the information herein may not be reproduced or disseminated in whole or in part. For information on the policies applied in this research report, please see our Policy Gateway.

**Exxon Mobil Corporation (XOM)**                    **Meeting Date: 31 May 2023**
POLICY: United States                                Meeting ID: 1743652

## Dilution & Burn Rate

### DILUTION

|  | Dilution (%) |
|---|---|
| Exxon Mobil Corporation | 2.53 |
| 4-digit GICS median | 6.04 |
| 4-digit GICS weighted average | 6.01 |
| 4-digit GICS 75th percentile | 10.34 |

Dilution is the sum of the total amount of shares available for grant and outstanding under options and other equity awards (vested and unvested) expressed as a percentage of total basic common shares outstanding as of the record date. The dilution figure typically excludes employee stock purchase plans and 401(k) shares. The underlying information is based on the company's equity compensation table in the most recent proxy statement or 10-K.

### BURN RATE

|  | Unadjusted (%) | Value-Adjusted (%) |
|---|---|---|
| 1-year | 0.20 | 0.20 |
| 3-year average | 0.20 | 0.20 |

Burn rate equals the number of shares granted in each fiscal year, including stock options, restricted stock (units), actual performance shares delivered under the long-term incentive plan or earned deferred shares, to employees and directors divided by weighted average common shares outstanding.

The value-adjusted burn rate uses stock price to value full-value awards and Black Scholes to value stock options. For more information on these burn rate methodologies, please visit www.issgovernance.com/policy-gateway/voting-policies/.

Copyright © 2023 Institutional Shareholder Services Inc. All Rights Reserved. This proxy analysis and the information herein may not be reproduced or disseminated in whole or in part. For information on the policies applied in this research report, please see our Policy Gateway.

**Exxon Mobil Corporation (XOM)**
POLICY: United States

**Meeting Date: 31 May 2023**
Meeting ID: 1743652

**Quality**Score

Copyright © 2023 Institutional Shareholder Services Inc.  All Rights Reserved.  This proxy analysis and the information herein may not be reproduced or disseminated in whole or in part. For information on the policies applied in this research report,  please see our Policy Gateway.

## Climate Awareness Scorecard

Copyright © 2023 Institutional Shareholder Services Inc.  All Rights Reserved.  This proxy analysis and the information herein may not be reproduced or disseminated in whole or in part. For information on the policies applied in this research report,  please see our Policy Gateway.

Copyright © 2023 Institutional Shareholder Services Inc.  All Rights Reserved.  This proxy analysis and the information herein may not be reproduced or disseminated in whole or in part. For information on the policies applied in this research report,  please see our Policy Gateway.

**Exxon Mobil Corporation (XOM)**
POLICY: United States

**Meeting Date: 31 May 2023**
Meeting ID: 1743652

## Vote Results

### ANNUAL MEETING 25 MAY 2022

| Proposal | Board Rec | ISS Rec | Disclosed Result | Support Including Abstains (%)[1] | Support Excluding Abstains (%)[2] |
|---|---|---|---|---|---|
| 1.1 Elect Director Michael J. Angelakis | For | For | Pass | 97.2 | 97.9 |
| 1.2 Elect Director Susan K. Avery | For | For | Pass | 94.5 | 95.4 |
| 1.3 Elect Director Angela F. Braly | For | For | Pass | 95.9 | 96.6 |
| 1.4 Elect Director Ursula M. Burns | For | For | Pass | 88.8 | 89.1 |
| 1.5 Elect Director Gregory J. Goff | For | For | Pass | 97.7 | 98.1 |
| 1.6 Elect Director Kaisa H. Hietala | For | For | Pass | 97.9 | 98.3 |
| 1.7 Elect Director Joseph L. Hooley | For | For | Pass | 94.5 | 94.9 |
| 1.8 Elect Director Steven A. Kandarian | For | For | Pass | 98.1 | 98.5 |
| 1.9 Elect Director Alexander A. Karsner | For | For | Pass | 96.6 | 97.0 |
| 1.10 Elect Director Jeffrey W. Ubben | For | For | Pass | 97.6 | 98.4 |
| 1.11 Elect Director Darren W. Woods | For | For | Pass | 91.3 | 91.6 |
| 2 Ratify PricewaterhouseCoopers LLP as Auditors | For | For | Pass | 96.5 | 96.8 |
| 3 Advisory Vote to Ratify Named Executive Officers' Compensation | For | For | Pass | 90.0 | 91.0 |
| 4 Remove Executive Perquisites | Against | For | Fail | 21.2 | 21.8 |
| 5 Amend Bylaws to Limit Shareholder Rights for Proposal Submission | Against | Against | Fail | 1.4 | 1.5 |
| 6 Set GHG Emissions Reduction targets Consistent With Paris Agreement Goal | Against | For | Fail | 24.2 | 27.1 |
| 7 Report on Low Carbon Business Planning | Against | Against | Fail | 10.3 | 10.5 |
| 8 Report on Scenario Analysis Consistent with International Energy Agency's Net Zero by 2050 | Against | For | Pass | 46.3 | 51.0 |
| 9 Report on Reducing Plastic Pollution | Against | For | Fail | 35.9 | 36.5 |
| 10 Report on Political Contributions and Expenditures | Against | For | Fail | 26.5 | 26.7 |

Shaded results reflect a majority of votes cast FOR shareholder proposal or AGAINST management proposal or director election

[1]Support Including Abstains is defined as %FOR/(For + Against + Abstain), as expressed as a percentage.

[2]Support Excluding Abstains is defined as %FOR/(For + Against), as expressed as a percentage, provided if different from For + Against + Abstain.

Copyright © 2023 Institutional Shareholder Services Inc. All Rights Reserved. This proxy analysis and the information herein may not be reproduced or disseminated in whole or in part. For information on the policies applied in this research report, please see our Policy Gateway.

**Exxon Mobil Corporation (XOM)**                                                                    **Meeting Date: 31 May 2023**
POLICY: United States                                                                                            Meeting ID: 1743652

## Meeting Agenda & Proposals

| Items 1.1-1.12. Elect Directors | FOR |
|---|---|

### VOTE RECOMMENDATION

A vote FOR, with caution, is recommended for Susan Avery, Chair of the Environment, Safety and Public Policy Committee ███████████████████████████████

Votes FOR the other director nominees are warranted.

### BACKGROUND INFORMATION

Policies: Board Accountability | Board Responsiveness | Director Competence | Director Independence | Election of Directors | ISS Categorization of Directors | Vote No campaigns

**Vote Requirement:** The company has adopted a majority vote standard (of shares cast) for the election of directors with a plurality carve-out for contested elections, and has a director resignation policy in its governance guidelines.

## Discussion

Please see the Board Profile section above for more information on director nominees.

### ELECTION SUMMARY

The company proposes the following (re)elections:

| Type of election | Nominees |
|---|---|
| Incumbent board members to be reelected | Darren Woods, Joseph (Jay) Hooley, Michael (Mike) Angelakis, Susan Avery, Angela Braly, Gregory (Greg) Goff, Kaisa Hietala, Steven Kandarian, Alexander Karsner, and Jeffrey (Jeff) Ubben |
| New board nominees to be elected by shareholders | John Harris II and Lawrence (Larry) Kellner |
| **Terms of candidates** | **Nominees** |
| One-year term | All nominees |

### INFORMATION ON NEW NOMINEES

| | John Harris II | Lawrence (Larry) Kellner |
|---|---|---|
| # Shares held | 8,250 | 8,000 |
| Voting power | Less than 1% | Less than 1% |
| CEO or Chair positions | N/A | Chair of The Boeing Company |

### ISS POLICY COMPLIANCE TABLE

| | Company-level | Nominee impact |
|---|---|---|
| **Disclosure** | | |
| Names of new nominee(s) | Disclosed | |

Copyright © 2023 Institutional Shareholder Services Inc.  All Rights Reserved.  This proxy analysis and the information herein may not be reproduced or disseminated in whole or in part. For information on the policies applied in this research report, please see our Policy Gateway.

**Exxon Mobil Corporation (XOM)**
POLICY: United States

| Biographies of new nominee(s) | Disclosed | |
|---|---|---|
| **Independence** | | |
| Board | 92% | |
| Audit committee | 100% | |
| Compensation committee | 100% | |
| Nominating committee | 100% | |
| **Composition** | | |
| Poor attendance | No concerns | |
| Overboarding | No concerns | |
| Executive on a key committee | No concerns | |
| Combined Chair/CEO | N/A | |
| Length of term | N/A | |

| N/A in this market | | No concerns | | No impacted nominees | | Impacted nominees are on ballot |
|---|---|---|---|---|---|---|



Copyright © 2023 Institutional Shareholder Services Inc.  All Rights Reserved.  This proxy analysis and the information herein may not be reproduced or disseminated in whole or in part. For information on the policies applied in this research report, please see our Policy Gateway.



| Item 2. Ratify PricewaterhouseCoopers LLP as Auditors | FOR |
|---|---|

**VOTE RECOMMENDATION**

A vote FOR this proposal to ratify the auditor is warranted.

**BACKGROUND INFORMATION**

Policies: Auditor Ratification

**Vote Requirement:** Majority of votes cast (abstentions not counted)

## Discussion

### AUDIT FIRM INFORMATION

The board recommends that PricewaterhouseCoopers LLP be reappointed as the company's independent audit firm.

| Audit firm name | PricewaterhouseCoopers LLP |
|---|---|
| Audit firm since (as disclosed) | 1934 |
| Audit opinion for the last fiscal year | Unqualified |

Copyright © 2023 Institutional Shareholder Services Inc.  All Rights Reserved.  This proxy analysis and the information herein may not be reproduced or disseminated in whole or in part. For information on the policies applied in this research report, please see our Policy Gateway.

| Term to serve if reappointed | 1 year |
|---|---|

### FEES PAID DURING THE LAST FISCAL YEAR

| Audit firm name | PricewaterhouseCoopers LLP |
|---|---|
| Fees currency | USD |
| Total fees paid to the audit firm | 41,900,000 |
| **Audit fees** | **35,400,000** |
| **Audit-related fees** | **5,800,000** |
| Total transaction-related fees | 0 |
| Total tax fees | 700,000 |
| Other fees | 0 |
| **Total non-audit fees*** | **700,000** |
| Total non-audit fees as a percentage of total fees | 1.67% |

*Total non-audit fees include other fees, tax advice fees, and certain transaction-related fees. Non-audit fees will also include any tax-related fees not identified as tax compliance or tax preparation.

The auditor's report contained in the annual report is unqualified, meaning that in the opinion of the auditor, the company's financial statements are fairly presented in accordance with generally accepted accounting principles.

### Analysis

| Item 3. Advisory Vote to Ratify Named Executive Officers' Compensation | FOR |
|---|---|

**VOTE RECOMMENDATION**

A vote FOR this proposal is warranted, with caution.

**BACKGROUND INFORMATION**

Policies: Advisory Votes on Executive Compensation

**Vote Requirement:** Majority of votes cast (abstentions and broker non-votes not counted)

### Executive Compensation Analysis

Copyright © 2023 Institutional Shareholder Services Inc. All Rights Reserved. This proxy analysis and the information herein may not be reproduced or disseminated in whole or in part. For information on the policies applied in this research report, please see our Policy Gateway.

**Exxon Mobil Corporation (XOM)**
POLICY: United States

Meeting Date: **31 May 2023**
Meeting ID: 1743652

**COMPONENTS OF PAY**

| ($ in thousands) | CEO | | | | | CEO Peer Median | Other NEOs |
|---|---|---|---|---|---|---|---|
| | D. Woods | | D. Woods | D. Woods | | | |
| | **2022** | Change | **2021** | **2020** | | **2022** | **2022** |
| Base salary | 1,703 | 5.4% | 1,615 | 1,615 | | 1,690 | 4,208 |
| Deferred comp & pension | 2,506 | | 5,137 | 5,349 | | 0 | 12,177 |
| All other comp | 379 | 118.9% | 173 | 241 | | 639 | 380 |
| Bonus | 6,382 | 103.1% | 3,142 | 0 | | 0 | 16,234 |
| Non-equity incentives | 0 | | 0 | 0 | | 3,419 | 0 |
| Restricted stock | 25,052 | 84.6% | 13,573 | 8,606 | | 10,274 | 50,604 |
| Option grant | 0 | | 0 | 0 | | 3,122 | 0 |
| **Total** | **36,022** | **52.4%** | **23,640** | **15,810** | | **23,397** | **83,603** |
| % of Net Income | 0.1% | | | | | | 0.1% |
| % of Revenue | N/A | | | | | | - |

## Non-Performance-Based Pay Elements (CEO)

| | |
|---|---|
| *Key perquisites ($)* | Personal aircraft use: 158,286; Personal/home security: 58,167; Auto: 30,804; Financial Planning: 12,401 |
| *Tax gross-ups on key perks ($)* | None |
| *Value of accumulated NQDC* ($)* | 772,678 |
| *Present value of all pensions ($)* | 35,015,801 |
| *Years of actual plan service* | 30.3 |
| *Additional years credited service* | None |

*Non-qualified Deferred Compensation

## Disclosed Benchmarking Targets

| | |
|---|---|
| *Base salary* | None Disclosed |
| *Target short-term incentive* | None Disclosed |
| *Target long-term incentive (equity)* | None Disclosed |
| *Target total compensation* | 50th Percentile |

## Severance/Change-in-Control Arrangements (CEO unless noted)

| | |
|---|---|
| *Contractual severance arrangement* | None |
| *Non-CIC estimated severance ($)* | N/A |

*Change-in-Control Severance Arrangement*

| | |
|---|---|
| *Cash severance trigger** | No Agreement |
| *Cash severance multiple* | N/A |
| *Cash severance basis* | N/A |
| *Treatment of equity* | Not disclosed |
| *Excise tax gross-up** | No |

Copyright © 2023 Institutional Shareholder Services Inc. All Rights Reserved. This proxy analysis and the information herein may not be reproduced or disseminated in whole or in part. For information on the policies applied in this research report, please see our Policy Gateway.

**Exxon Mobil Corporation (XOM)**                                    **Meeting Date: 31 May 2023**
POLICY: United States                                                   Meeting ID: 1743652

| | |
|---|---|
| *Estimated CIC severance ($)* | Not disclosed |

*All NEOs considered

## Compensation Committee Communication & Responsiveness

### Disclosure of Metrics/Goals

| | |
|---|---|
| *Annual incentives* | Partial |
| *Long-term incentives* | N/A |

### Pay Riskiness Discussion

| | |
|---|---|
| *Process discussed?* | Yes |
| *Material risks found?* | No |

### Risk Mitigators

| | |
|---|---|
| *Clawback policy** | Yes |
| *CEO stock ownership guideline* | No stock ownership guidelines or guidelines include unvested or unearned awards |
| *Stock holding period requirements* | Stock options: No disclosure / Restricted Stock: Holding period until end of employment |

*Must apply to cash as well as equity incentives and at least all NEOs.

### Pledging/Hedging of Shares

| | |
|---|---|
| *Anti-hedging policy* | Company has a robust policy |
| *Anti-pledging policy* | The proxy statement does not disclose a robust policy |

### Compensation Committee Responsiveness

| | |
|---|---|
| *MSOP vote results (F/F+A)* | 2022: 91.0%; 2021: 88.6%; 2020: 91.5% |
| *Frequency approved by shareholders* | Annual with 88.2% support |
| *Frequency adopted by company* | Annual (most recent frequency vote: 2017) |

### Repricing History

| | |
|---|---|
| *Repriced/exchanged underwater options last FY?* | No |

## Pay for Performance Evaluation

Copyright © 2023 Institutional Shareholder Services Inc. All Rights Reserved. This proxy analysis and the information herein may not be reproduced or disseminated in whole or in part. For information on the policies applied in this research report, please see our Policy Gateway.

Copyright © 2023 Institutional Shareholder Services Inc.  All Rights Reserved.  This proxy analysis and the information herein may not be reproduced or disseminated in whole or in part. For information on the policies applied in this research report, please see our Policy Gateway.

## Short-Term Cash Incentives

| CEO STI Opportunities | FY 2022 (D. Woods) | | FY 2021 (D. Woods) | |
|---|---|---|---|---|
| | **Target** | **Maximum** | **Target** | **Maximum** |
| *STI targets ($)* | N/A | N/A | N/A | N/A |
| *STI targets (calculated)* | N/A | N/A | N/A | N/A |
| *STI targets (as disclosed)* | ND | | | |
| *ISS peer median* | 200% of base salary | | | |
| *Company peer median* | 200% of base salary | | | |

Copyright © 2023 Institutional Shareholder Services Inc.  All Rights Reserved.  This proxy analysis and the information herein may not be reproduced or disseminated in whole or in part. For information on the policies applied in this research report, please see our Policy Gateway.

**Exxon Mobil Corporation (XOM)**
POLICY: United States

<div align="right">

**Meeting Date: 31 May 2023**
Meeting ID: 1743652
</div>

| Actual Payouts ($) | FY 2022 (D. Woods) | | FY 2021 (D. Woods) | |
|---|---|---|---|---|
| | Amount | % of base salary | Amount | % of base salary |
| *Bonus* | 6,382,000 | 375 | 3,142,000 | 195 |
| *Non-equity incentive* | 0 | 0 | 0 | 0 |
| *Total Bonus + Non-equity* | 6,382,000 | 375 | 3,142,000 | 195 |

| *STI performance metrics/goals* | Metric | Form | Weight | Threshold | Target | Maximum | Actual |
|---|---|---|---|---|---|---|---|
| | Year-over-year change in earnings | Absolute | 100% | ND | ND | ND | ND |

### Other Short-Term Incentive Factors

| | |
|---|---|
| *Performance results adjusted?* | N/A |
| *Discretionary component?* | Yes, award sizes are determined using committee discretion, though guided by an assessment of performance. |
| *Discretionary bonus?** | Yes |
| *Future performance metrics* | Not disclosed |

*Based on the Bonus column in the SCT; per SEC rules, amounts disclosed in this column were not based on pre-set goals.

## Long-Term Incentives

| | |
|---|---|
| *CEO's last FY LTI target (%)* | None disclosed |
| *NEOs' last FY award type(s)* | Time-based stock |
| *Last FY performance metrics/goals* | N/A (awards do not maintain performance vesting criteria); however, the committee does consider the metrics below in determining award size: |

| | Threshold | Target | Maximum |
|---|---|---|---|
| Personnel Safety | ND | ND | ND |
| Environmental | ND | ND | ND |
| GHG Emissions | ND | ND | ND |
| ROCE | ND | ND | ND |
| Cash Flow from Operations and Asset Sales | ND | ND | ND |
| TSR | ND | ND | ND |
| Strategic Objectives | ND | ND | ND |

*Performance charts are provided for each metric (either compared to peers or based on Exxon's absolute performance) on page 57 of the proxy.

### Long-Term Equity Grants

| CEO Equity Awards | FY 2022 | | | | FY 2021 | | | |
|---|---|---|---|---|---|---|---|---|
| | Shares (#) | % shares* | Value ($)* | % value | Shares (#) | % shares* | Value ($)* | % value |
| *Time-based shares* | 225,000 | 100 | 25,051,500 | 100 | 215,000 | 100 | 13,572,950 | 100 |
| *Time-based options* | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |

Publication Date: 18 May 2023

Copyright © 2023 Institutional Shareholder Services Inc.  All Rights Reserved.  This proxy analysis and the information herein may not be reproduced or disseminated in whole or in part. For information on the policies applied in this research report, please see our Policy Gateway.

**Exxon Mobil Corporation (XOM)**                                    **Meeting Date: 31 May 2023**
POLICY: United States                                                Meeting ID: 1743652

| Performance shares | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
|---|---|---|---|---|---|---|---|---|
| Performance options | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Total equity | 225,000 | | 25,051,500 | | 215,000 | | 13,572,950 | |

| | |
|---|---|
| Time-based equity vesting | RSUs: Vest 50 percent after five years and 50 percent ten years after grant |
| Perf. measurement period | N/A, awards do not have forward-looking performance vesting criteria |
| CEO one-time equity award | N/A |
| CEO equity pay mix (by value)* | Performance-conditioned: 0%; Time-based: 100% |

*Performance shares, if any, are counted and valued at target.

*Other Long-Term Incentive Factors*

| | |
|---|---|
| Performance results adjusted? | Not disclosed |
| Discretionary component? | Yes, while the size of the award is determined using compensation committee discretion, award determinations are informed by prior 10-year performance, progress against strategic objectives, and compensation benchmarking. |

Executive Summary



Analysis

Copyright © 2023 Institutional Shareholder Services Inc. All Rights Reserved. This proxy analysis and the information herein may not be reproduced or disseminated in whole or in part. For information on the policies applied in this research report, please see our Policy Gateway.



Copyright © 2023 Institutional Shareholder Services Inc.  All Rights Reserved.  This proxy analysis and the information herein may not be reproduced or disseminated in whole or in part. For information on the policies applied in this research report, please see our Policy Gateway.



| Item 4. Advisory Vote on Say on Pay Frequency | ONE YEAR |
|---|---|

**VOTE RECOMMENDATION**

A vote for the adoption of an ANNUAL say-on-pay frequency is warranted. ▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

**BACKGROUND INFORMATION**

Policies: Frequency of Advisory Vote on Executive Compensation

**Vote Requirement:** Majority of votes cast (abstentions and broker non-votes not counted)

## Discussion

SEC rules implementing the Dodd-Frank Wall Street Reform & Consumer Protection Act require U.S. issuers to provide shareholders with an advisory vote on the preferred frequency of say-on-pay. The frequency choices are every year, every two years, or every three years. Each covered issuer was required to offer a say-on-pay

Copyright © 2023 Institutional Shareholder Services Inc.  All Rights Reserved.  This proxy analysis and the information herein may not be reproduced or disseminated in whole or in part. For information on the policies applied in this research report, please see our Policy Gateway.

frequency vote at their first annual meeting after January 2011. After this initial vote, another say-on-pay frequency vote must be offered at least once every six years.



In this case, management recommends a say-on-pay frequency of every one year.

## Analysis



---

### Item 5. Establish Board Committee on Decarbonization Risk          AGAINST

**VOTE RECOMMENDATION**

A vote AGAINST this resolution is warranted,

**Vote Requirement:** Majority of votes cast (abstentions and broker non-votes not counted)

## Discussion

### PROPOSAL

The Bahnsen Family Trust has submitted a precatory proposal requesting that ExxonMobil (Exxon) create a committee to evaluate the risks of decarbonization.

The "resolved clause" of the proposal specifically reads:

"**Be It Resolved**: Shareholders request the Board of Directors charter a new Board Committee on Decarbonization Risk to evaluate ExxonMobil's strategic vision and responses to calls for ExxonMobil decarbonization on activist-established timelines. The charter should require the committee to engage in formal review and oversight of corporate strategy, above and beyond matters of legal compliance, to assess the company's responses to demands for such decarbonization schedules, including the potential impacts on the Company from flaws in activists' climate models, the possibility that the U.S. will not force decarbonization according to such schedules, thus obviating 'stranded asset' calculations, the possibility that other countries will not adopt similar targets, thus making

Copyright © 2023 Institutional Shareholder Services Inc.  All Rights Reserved.  This proxy analysis and the information herein may not be reproduced or disseminated in whole or in part. For information on the policies applied in this research report, please see our Policy Gateway.

Company efforts meaningless, concerns about technological or economic infeasibility, and other relevant considerations."

## PROPONENT'S STATEMENT

In its supporting statement (p. 78), the proponent writes that Exxon has committed to reaching net zero carbon emissions by 2050 without fully considering the risks. Specifically, the proponent contends that claims about the necessity of decarbonization are based on faulty assumptions, and decarbonization will be meaningless if other countries do not follow the same schedule, and evidence suggests they will not. It argues that the lack of a federal net zero statute "contravenes the assumptions of 'stranded asset' analysis." It claims that if decarbonization is neither required nor technologically feasible, then Exxon will lose market share and revenues to less-clean competitors, thus harming shareholders and the environment.

## BOARD'S STATEMENT

In its opposing statement (p. 79), the board asserts that the full board and several of its committees actively oversee the development of the Company's strategy, including all matters related to [its] decarbonization efforts." It argues that creating a new committee for this specific purpose when the board and several committees already spend time overseeing related risk, would be "unnecessary and redundant." The board says it understands that the proponent's primary concern is disclosure of risks it may face if it over-invests in the energy transition. The board says there are risks in pursuing and foregoing investments. It says decarbonization risk is incorporated into its rigorous oversight framework and process which are overseen by the board and its relevant committees.

For more information on climate change, see ISS' Environmental and Social Background Report. For an update on the most recent shareholder activism on environmental and social issues, refer to ISS' 2022 US Environmental & Social Issue Proxy Voting Review (requires login to ISS Link).

This is the first year that Exxon has received this proposal.

## Analysis



Copyright © 2023 Institutional Shareholder Services Inc. All Rights Reserved. This proxy analysis and the information herein may not be reproduced or disseminated in whole or in part. For information on the policies applied in this research report, please see our Policy Gateway.



## Item 6. Reduce Executive Stock Holding Period                          AGAINST

### VOTE RECOMMENDATION

A vote AGAINST this proposal is warranted ████████████████████████████████
████████████████████████████████████████████████████████████████████████

### BACKGROUND INFORMATION

Policies: Hold Equity Past Retirement or for a Significant Period of Time

**Vote Requirement:** Majority of votes cast (abstentions and broker non-votes not counted)

### PROPOSAL

Kenneth Steiner, beneficial owner of at least 500 shares of Exxon Mobil's common stock has proposed the adoption of the following resolution:

Copyright © 2023 Institutional Shareholder Services Inc.  All Rights Reserved.  This proxy analysis and the information herein may not be reproduced or disseminated in whole or in part. For information on the policies applied in this research report, please see our Policy Gateway.

"Shareholders urge that our executive pay committee adopt a policy requiring senior executives to retain 50% of stock acquired through equity pay programs until reaching normal retirement age and to report to shareholders regarding the policy in our Company's next annual meeting proxy. For the purpose of this policy, normal retirement age would be an age of at least 60 and be determined by our executive pay committee."

### SHAREHOLDER'S SUPPORTING STATEMENT

The proponent recommends that the company adopt a policy that requires executives to retain at least 50 percent of shares acquired through the long-term incentive program though retirement age, which should be set at 60 years of age or older. The proponent believes that requiring executives to hold a significant portion of stock will focus them on the company's long-term success. The proponent's supporting statements propose that the policy will supplement other share ownership requirements, should be implemented without violating the company's other policies and contracts, and should prohibit hedging transactions.

### BOARD'S STATEMENT

The board recognizes the important of tying executive compensation to the long-term success of the company, which is why the executive compensation program is designed with longer-than-typical vesting periods. Exxon's long-term incentive program requires that half of the shares granted vest five years after the grant date, with the remainder vesting ten years after grant. Vesting is not accelerated at retirement. The proxy notes that most equity remains unvested at retirement, based on the company's average CEO retirement age. The board states that they attempted to engage with the proponent but that the proponent declined to engage. However, the board is concerned that the proposal would reduce the company's current holding periods and result in accelerated vesting, as compared to the current practice. The board notes that the company's policies already prohibit hedging awards granted under long-term incentive programs.

## Analysis



Copyright © 2023 Institutional Shareholder Services Inc.  All Rights Reserved.  This proxy analysis and the information herein may not be reproduced or disseminated in whole or in part. For information on the policies applied in this research report, please see our Policy Gateway.

**Exxon Mobil Corporation (XOM)**  
POLICY: United States

**Meeting Date: 31 May 2023**  
Meeting ID: 1743652

<div style="background:black"> </div>

| Item 7. Report on Carbon Capture and Storage | AGAINST |
|---|---|

**VOTE RECOMMENDATION**

A vote AGAINST this proposal is warranted ████████████████████████
████████████████████████████████████████████████████████████████

**BACKGROUND INFORMATION**

Policies: Climate Change/Greenhouse Gas (GHG) Emissions

**Vote Requirement:** Majority of votes cast (abstentions and broker non-votes not counted

## Discussion

### PROPOSAL

Steve Milloy has filed a precatory proposal requesting that ExxonMobil (Exxon) report the net amount of carbon dioxide stored underground as a result of its enhanced oil recovery activities.

The "resolved clause" of the resolution specifically reads:

**"Resolved**:

Shareholders request that, beginning in 2023, ExxonMobil report annually to shareholders, omitting any confidential business information, the net amount of carbon dioxide (CO2) stored underground as a result of the company's enhanced oil recovery (EOR) activities, including:

1. The total amount (in tons) of captured CO2 stored underground during EOR for the year;
2. The total amount of oil (in barrels) produced through CO2-based EOR for the year; and
3. The difference (in tons) between the CO2 stored underground during EOR and the expected CO2 emissions produced by the burning of the oil produced by EOR, as calculated using EPA greenhouse gas equivalencies (i.e., 0.43 tons of CO2 per barrel of oil, https://www.epa.gov/energy/greenhouse-gases-equivalencies-calculator-calculations-and-references) or other reasonable means."

### PROPONENT'S STATEMENT

In his supporting statement, the proponent argues that it is not clear Exxon's carbon dioxide ($CO_2$) capture as a result of its enhanced oil recovery (EOR) activities results in net $CO_2$ storage. He says, "After all, the produced oil will be burned by consumers and the amount of $CO_2$ emitted thereby may in fact be greater than the amount of $CO_2$ stored." He argues that if more $CO_2$ is emitted as a result of EOR than stored, it would be "false and misleading" to imply EOR reduces $CO_2$ in the atmosphere. He says such a statement could lead to government enforcement actions, lawsuits, and reputational harm. He asserts that shareholders have a right to know if the company is making claims that are not supported by facts.

### BOARD'S STATEMENT

In its opposition statement, the board asserts that the proposal is based on "an incomplete understanding of our widespread and well-funded efforts to advance carbon capture and storage technology, and the effectiveness of these initiatives." It argues that the proposal does not recognize that the company already provides carbon capture and storage (CCS) metrics in Exxon's Advancing Climate Solutions Progress Report and other

Publication Date: 18 May 2023

Page 32

Copyright © 2023 Institutional Shareholder Services Inc. All Rights Reserved. This proxy analysis and the information herein may not be reproduced or disseminated in whole or in part. For information on the policies applied in this research report, please see our Policy Gateway.

communications. The board discusses several of the company's CCS related initiatives and metrics. The board states that carbon dioxide capture from its enhanced oil recovery activities "is broadly recognized for its economic and GHG benefits through the use of a closed loop CO2 injection system." It argues that the proponent's assertion that there is no emissions benefit associated with $CO_2$ injection for enhanced oil recovery is based on a 2016 article that does not take into account a full lifecycle analysis. Citing a Clean Air Task Force factsheet it argues, "On a life cycle basis, which includes global oil market impacts, 63 percent of all $CO_2$ stored through EOR is a net reduction in $CO_2$ emissions. Compared to conventional oil, every barrel of $CO_2$-EOR oil emits 37 percent less $CO_2$." The board states that Exxon plans to invest "approximately $17 billion from 2022 through 2027 on initiatives to lower GHG emissions," which includes "advancing commercialization of emission-reduction and emission-storage technologies." The board argues that the requested disclosures by the proposal are unwarranted, would provide no meaningful insight into the company's efforts to reduce its emissions intensity, and that shareholders already have access to extensive reporting related to its decarbonization efforts.

### BACKGROUND AND RECENT SHAREHOLDER ACTIVISM

For more information on climate change related issues, see ISS' Environmental and Social Background Report. For an update on the most recent shareholder activism around this issue, view ISS 2022 US Environmental & Social Issues Proxy Voting Review (requires login to ISS Link).

This is the first year that ExxonMobil has received this proposal.

## Analysis



Copyright © 2023 Institutional Shareholder Services Inc.  All Rights Reserved.  This proxy analysis and the information herein may not be reproduced or disseminated in whole or in part. For information on the policies applied in this research report, please see our Policy Gateway.

**Exxon Mobil Corporation (XOM)**
POLICY: United States

Copyright © 2023 Institutional Shareholder Services Inc.  All Rights Reserved.  This proxy analysis and the information herein may not be reproduced or disseminated in whole or in part. For information on the policies applied in this research report, please see our Policy Gateway.

**Exxon Mobil Corporation (XOM)**                                    **Meeting Date: 31 May 2023**
POLICY: United States                                                    Meeting ID: 1743652

| Item 8. Report on Methane Emission Disclosure Reliability | FOR |
|---|---|

**VOTE RECOMMENDATION**

A vote FOR this proposal is warranted ███████████████████████████
████████████████████████████████████████████████████████████████

**Vote Requirement:** Majority of votes cast (abstentions and broker non-votes not counted)

## Discussion

### PROPOSAL

The Sisters of St. Francis Charitable Trust has submitted a precatory proposal asking Exxon Mobil Corporation (Exxon) to issue a report that assesses the reliability of its methane emission disclosure.

Specifically, the "resolved clause" of the resolution states:

"**Resolved,** shareholders request that ExxonMobil issue a report analyzing the reliability of its methane emission disclosures. The report should:

- Be made public, omit proprietary information, and be prepared expeditiously at reasonable cost; and

- Summarize the outcome of efforts to directly measure methane emissions, using recognized frameworks such as OGMP; and whether those outcomes suggest a need to alter the Company's actions to achieve its climate targets."

### PROPONENT'S STATEMENT

In its statement supporting the proposal, the proponent states that methane is a greenhouse gas that is 80 percent more potent than carbon dioxide over a 20-year period, and it cites a news article published by the Harvard University School of Engineering and Applied Sciences which states that the EPA underestimates methane emissions from oil and gas production. Furthermore, methane emissions may be 50 to 100 percent higher than they are currently reported to be. The filer argues that companies that do not adequately manage their methane emissions face reputational risk.

At management's discretion, the proponent recommends that the board 1) describe the types of source- and site-level measurements it uses, 2) describe any material difference between its own or third-party direct measurement results and the company's methane emissions, 3) explain its plans to validate its emissions estimates and disclose them through a third-party audit or evaluation; and 4) describe its plans to improve emission estimates over time, consistent with frameworks such as the Oil and Gas Methane Partnership 2.0 (OGMP).

### BOARD'S STATEMENT

In its opposing statement, the board asserts that the requested initiatives are duplicative to what the company is already doing to reduce methane emissions and disclose its progress. The board states that it has reported its methane emissions annually since 2014, and that it uses internationally recognized methodologies to report its data. Additionally, the board states that its emissions are measured at each asset the company operates. Furthermore, the board argues that its efforts to improve the reliability of its methane emissions reporting have been disclosed in its Advancing Climate Solutions 2023 Progress Report.

### BACKGROUND AND RECENT SHAREHOLDER ACTIVISM

For more information on methane emissions, see ISS' Environmental and Social Background Report. For an update on the most recent shareholder activism around this issue, view ISS' 2022 US Environmental & Social Issues Proxy Voting Review (requires login to ISS Link).

Publication Date: 18 May 2023                                                    Page 35

Copyright © 2023 Institutional Shareholder Services Inc. All Rights Reserved. This proxy analysis and the information herein may not be reproduced or disseminated in whole or in part. For information on the policies applied in this research report, please see our Policy Gateway.

This is the first time Exxon has received a proposal requesting that the company assess the reliability of its methane emissions reporting. In 2017, the company received a proposal asking it to report on its methane emissions management. That proposal received 38.7 percent shareholder support.

The Environmental Defense Fund and other scientists have conducted a series of studies showing that the EPA's methodology for calculating methane emissions does not match direct measurements of emissions. The International Energy Agency (IEA) reports that global methane emissions from the energy sector are 70 percent higher than the amount reported by national governments.

The EPA is aiming to aggressively cut U.S. methane emissions through a new rule proposed in November 2021 and a fee on methane that was included in the Inflation Reduction Act. In a Supplemental Proposal to the proposed rule that was published in 2022, the EPA laid out stronger requirements around monitoring and mitigating methane emissions, such as requiring monitoring at sites based on the equipment at the site rather than the estimated emissions and strengthening the rules for emissions from unplugged wells.

The Oil and Gas Methane Partnership 2.0 is a partnership of the UN Environment Programme, European Commission, Environmental Defense Fund, Climate and Clean Air Coalition, and Clean Air Task Force, along with 100 oil and gas companies. The partnership aims to improve the accuracy and transparency of methane emissions reporting.

OGMP  lays out five levels of reporting, with level 1 being the lowest and 5 the highest. Companies that join the initiative commit to reaching the 'gold standard' within three years of joining for their operated ventures and five years for non-operated ventures. The gold standard is achieved when all assets with material emissions where there are no restrictions on reporting report at level 4 and demonstrate efforts to move to level 5. Level 4 requires companies to report on emissions by detailed source type and using specific emission factors (EF) and activity factors (AFs). To establish these factors, source-level measurement and sampling, along with simulation tools and detailed engineering calculations may be used. Level 5 requires site-level measurements. Companies report to the partnership and much of the data is aggregated. OGMP has published guidance for member companies, including on implementing level 4 and 5 methods and reconciling uncertainty in methane emissions estimates.

The UNEP publishes a report that details where member companies are as part of this commitment. According to the 2022 report, most reported emissions are not yet at level 5, but companies are making progress toward moving to levels 3 and 4.

## Analysis



Copyright © 2023 Institutional Shareholder Services Inc.  All Rights Reserved.  This proxy analysis and the information herein may not be reproduced or disseminated in whole or in part. For information on the policies applied in this research report, please see our Policy Gateway.

Copyright © 2023 Institutional Shareholder Services Inc.  All Rights Reserved.  This proxy analysis and the information herein may not be reproduced or disseminated in whole or in part. For information on the policies applied in this research report, please see our Policy Gateway.

Copyright © 2023 Institutional Shareholder Services Inc.  All Rights Reserved.  This proxy analysis and the information herein may not be reproduced or disseminated in whole or in part. For information on the policies applied in this research report, please see our Policy Gateway.

**Exxon Mobil Corporation (XOM)**                                        **Meeting Date: 31 May 2023**
POLICY: United States                                                    Meeting ID: 1743652

| Item 9. Adopt Medium-Term Scope 3 GHG Reduction Target | AGAINST |
|---|---|

**VOTE RECOMMENDATION**

A vote AGAINST this proposal is warranted, ███████████████████████
███████████████

**Vote Requirement:** Majority of votes cast (abstentions and broker non-votes not counted)

Discussion

**PROPOSAL**

Follow This has submitted a precatory proposal asking the company to adopt a medium-term Scope 3 greenhouse gas emissions target aligned with the goals of the Paris Agreement.

The resolution specifically reads:

"RESOLVED: Shareholders request the Company to set a medium-term reduction target covering the greenhouse gas (GHG) emissions of the use of its energy products (Scope 3) consistent with the goal of the Paris Climate Agreement: to limit global warming to well below 2°C above pre-industrial levels and to pursue efforts to limit the temperature increase to 1.5°C.

The strategy for how to achieve this target is entirely up to the board.

You have our support."

**PROPONENT'S STATEMENT**

In its supporting statement, the proponent states that Exxon is one of the few oil majors that has not set a Scope 3 target. Additionally, it states that this proposal will support the long-term interest of the company because it will protect its assets from the effects of climate change. Additionally, the proponent states that limiting global warming is essential for risk management and responsible stewardship of the economy.

**BOARD'S STATEMENT**

In its opposing statement, the board states it is working toward becoming a leader in the energy transition. It states that from 2022 to 2027, it will invest approximately $17 billion in initiatives to reduce GHG emissions within its operations and to help other companies reduce theirs. The board states that in making its recommendation, it notes that the proposal does not acknowledge the company's work and commitment to reducing emissions. Additionally, it argues that existing frameworks for establishing Scope 3 emissions targets are flawed, and that adopting a Scope 3 target would have unintended consequences for society. Furthermore, the board argues that the proponent is an anti-oil and gas activist group that is using ESG to diminish the important role the company plays in the energy industry.

**BACKGROUND AND RECENT SHAREHOLDER ACTIVISM**

For more information on climate change, see ISS' Environmental and Social Background Report. For an update on the most recent shareholder activism around this issue, view ISS' 2022 U.S. Environmental & Social Issues Proxy Season Review (requires login to ISS Link).

This is the first year ExxonMobil Corporation has received a proposal asking it to establish a medium-term Scope 3 emissions target. Last year the company received a proposal asking it to adopt medium and long-term GHG emissions targets that received 27.1 percent shareholder support. In 2021, a proposal asking for greater disclosure around its climate lobbying received 63.8 percent and a proposal asking for the company to issue an audited report on the financial impacts of IEA's Net Zero 2050 scenario received 48.9 percent support. In 2017, a proposal

Copyright © 2023 Institutional Shareholder Services Inc.  All Rights Reserved.  This proxy analysis and the information herein may not be reproduced or disseminated in whole or in part. For information on the policies applied in this research report, please see our Policy Gateway.

asking for the company to assess the portfolio impacts of policies to meet a scenario to limit warming to under 2 degrees received majority support, with 62.1 percent of shareholders voting for it. In 2021, three board members backed by an activist group won seats on the board, at least in part on the strength of an argument that the company's strategy to mitigate climate change was inadequate.

While there is no universal definition of the timeline for a medium-term target, Climate Action 100+ currently defines a medium-term target as between 2026-2035.

*Regulations*

California's Advanced Clean Cars II rule requires zero-emissions to represent 35 percent of new cars and light trucks sold by 2026, 68 percent by 2030, and 100 percent by 2035. Six states have announced plans to follow California's rule and a total of 17 states will need to decide whether they intend to follow the rule. In April 2023, the EPA proposed rules that could mean up to 67 percent of new vehicles sold in 2032 may need to be electric. The EU member states gave final approval for a rule to require all new cars sold to be zero-emission vehicles starting in 2035.

In May, the EPA proposed new regulations on emissions from fossil fuel power plants. Starting in 2030, the rule would set out various requirements for fossil fuel power plants to control carbon emissions.

## Analysis



Copyright © 2023 Institutional Shareholder Services Inc.  All Rights Reserved.  This proxy analysis and the information herein may not be reproduced or disseminated in whole or in part. For information on the policies applied in this research report, please see our Policy Gateway.



Copyright © 2023 Institutional Shareholder Services Inc.  All Rights Reserved.  This proxy analysis and the information herein may not be reproduced or disseminated in whole or in part. For information on the policies applied in this research report, please see our Policy Gateway.

**Exxon Mobil Corporation (XOM)**                                    **Meeting Date: 31 May 2023**
POLICY: United States                                                 Meeting ID: 1743652

| Item 10. Issue a Report on Worst-Case Impacts of Oil Spills from Operations Offshore of Guyana | AGAINST |
| --- | --- |

**VOTE RECOMMENDATION**

A vote AGAINST this proposal is warranted ███████████████████████████
███████████████████████████████████████████████████████████████████

**BACKGROUND INFORMATION**

Policies: General Environmental and Community Impact Proposals | Water Issues

**Vote Requirement:** Majority of votes cast (abstentions and broker non-votes not counted)

## Discussion

### PROPOSAL

Mercy Investment Services has submitted a precatory proposal requesting that the company produce a report evaluating the impacts of a significant oil spill in its operations off the shore of Guyana.

Specifically, the "resolved clause" states:

"RESOLVED: Shareholders request that the Company issue a report evaluating the economic, human, and environmental impacts of a worst-case oil spill from its operations offshore of Guyana. The report should be prepared at reasonable expense, omit proprietary or privileged information, and clarify the extent of the Company's cleanup response commitments given the potential for severe impact on Caribbean economies."

### PROPONENTS' STATEMENT

In its statement supporting the proposal, the proponent states that it is concerned that the company is not fully accounting for its potential liability if a large accident were to occur. The filer states that the company is operating above its listed peak production safety threshold in its projects off the shore of Guyana, which is being criticized by a local expert. It states that the most severe spill scenario in ExxonMobil's Environmental Impact Assessment accounts for a 30-day spill, but a peer company operating a deep-water drilling project in the Gulf of Mexico had a spill that lasted 87 days. The proponent would like to see the company use for its most severe spill scenario an extended duration of an uncontrolled release similar to the 87-day spill, severe weather conditions, risks from operating beyond the production thresholds in the EIA, and potential harm to marine ecosystems and public health.

### BOARD'S STATEMENT

In its opposing statement, the board argues that the information requested by the proposal is already publicly available in published reports prepared by the company and credible third-party experts. The company has prepared multiple Environmental Impact Assessments (EIAs), the Oil Spill Response Plan for Guyana Operations (OSRP), and other publications and filings that are available on its website and the website of the Guyana Environmental Protection Agency (EPA) as part of the legally required permitting process. The company states that capping technology has improved since 2010, when the large spill referenced in the supporting statement took place. It also states that "above design capacity" means "that the volume is above the investment basis, meaning its performance is exceeding expectations. The actual volume that is safe to produce is well above the design capacity. It in no way indicates that the asset is producing at an unsafe level."

Copyright © 2023 Institutional Shareholder Services Inc.  All Rights Reserved.  This proxy analysis and the information herein may not be reproduced or disseminated in whole or in part. For information on the policies applied in this research report, please see our Policy Gateway.

BACKGROUND AND RECENT SHAREHOLDER ACTIVISM

For an update on the most recent shareholder activism around environmental and social issues, view ISS'2022 US Environmental & Social Issues Proxy Season Review (requires login to ISS Link).

Analysis



Copyright © 2023 Institutional Shareholder Services Inc.  All Rights Reserved.  This proxy analysis and the information herein may not be reproduced or disseminated in whole or in part. For information on the policies applied in this research report, please see our Policy Gateway.



## Item 11. Recalculate GHG Emissions Baseline to Exclude Emissions from Material Divestitures

**AGAINST**

### VOTE RECOMMENDATION

A vote AGAINST this proposal is warranted ███████████████████████████
████████████████████████████████████████████████████████████████

**Vote Requirement:** Majority of votes cast (abstentions and broker non-votes not counted)

## Discussion

### PROPOSAL

Andy Behar has submitted a precatory proposal requesting that the company recalculate its emissions baseline to not include asset divestitures.

Specifically, the "resolved clause" states:

"RESOLVED: Shareholders request that ExxonMobil, at reasonable cost and omitting proprietary information, disclose a recalculated emissions baseline that excludes the aggregated GHG emissions from material asset divestitures occurring since 2016, the year ExxonMobil uses to baseline its emissions."

### PROPONENTS' STATEMENT

In its statement supporting the proposal, the proponent asserts that the Glasgow Financial Alliance for Net Zero contends that divestments of carbon-intensive assets should not be counted as emissions reductions because a divestment is probably not leading to a decrease in emissions. The Greenhouse Gas Protocol and the International

Copyright © 2023 Institutional Shareholder Services Inc.  All Rights Reserved.  This proxy analysis and the information herein may not be reproduced or disseminated in whole or in part. For information on the policies applied in this research report, please see our Policy Gateway.

Petroleum Industry Environmental Conservation Association (IPIECA) state that companies should recalculate base year emissions when they sell emissions generating assets. The proponent highlights that ExxonMobil reports Scope 1 and 2 emissions reductions of roughly 10 percent since 2016 and has sold more assets than most American oil and gas companies, so shareholders cannot determine whether emissions reductions are the result of operational improvements or "transferring assets off its books." The proponent suggests that the report include the emissions associated with ExxonMobil's material asset divestments since 2016; what portion, if any, of ExxonMobil's current emissions reduction targets relies on accounting for asset transfers as emissions reductions; and a base year emissions recalculation policy establishing a threshold for future recalculations related to divestitures.

### BOARD'S STATEMENT

In its opposing statement, the board states that it agrees with the proponent that GHG accounting methods should not incentivize divesting to manipulate company-specific absolute emissions. That is why, according to the statement, the company advocates for the use of an economy-wide emissions accounting method that uses a life-cycle approach and counts intensity of emissions instead of absolute emissions. The board notes that the accounting method that the company uses, which is consistent with the U.S. Environmental Protection Agency Greenhouse Gas Reporting Program regulations, does not adjust the emissions baseline for divestments or for acquisitions or added capacity. The board also says that the proponent of this proposal and the proponent of another proposal are directly affiliated with As You Sow, violating the intent of the SEC's limit of one proposal each year from one organization.

### BACKGROUND AND RECENT SHAREHOLDER ACTIVISM

For more information on climate change, see ISS' Climate Change Issue Background Report. For an update on the most recent shareholder activism around this issue, view ISS' 2022 US Environmental & Social Issues Proxy Season Review (requires login to ISS Link).

This is the first year that Exxon has received a proposal requesting it to recalculate its GHG emissions baseline to not include reductions from asset divestitures.

The EPA's Greenhouse Gas Reporting Program (GHGRP) requires the reporting of GHG emissions data from large emissions sources, fuel and industrial gas suppliers, and $CO_2$ injection sites in the U.S. Facilities are generally required to submit an annual report if their GHG emissions from covered sources exceed 25,000 metric tons of $CO_2e$ emissions per year, of if the supply of certain products would result in over 25,000 metric tons of $CO_2e$ GHG emissions if they were released, combusted, or oxidized. It does not appear that the EPA suggests that companies adjust their emissions baseline for divestments.

## Analysis



Copyright © 2023 Institutional Shareholder Services Inc.  All Rights Reserved.  This proxy analysis and the information herein may not be reproduced or disseminated in whole or in part. For information on the policies applied in this research report, please see our Policy Gateway.



| Item 12. Report on Asset Retirement Obligations Under IEA NZE Scenario | AGAINST |
|---|---|

**VOTE RECOMMENDATION**

A vote AGAINST this proposal is warranted ███████████████████████████████
████████████████████████████████████████████████████████████

**Vote Requirement:** Majority of votes cast (abstentions and broker non-votes not counted)

Discussion

PROPOSAL

Legal & General Investment Management America, Inc., as the lead proponent for a filing group, has submitted a proposal asking Exxon to issue an audited report estimating the quantitative impacts of the IEA NZE scenario on asset retirement obligations.

Specifically, the resolution requests:

"**Resolved:** Shareholders request that the Board provide an audited report estimating the quantitative impacts of the IEA NZE scenario on all asset retirement obligations. The report should disclose, as the Board deems appropriate, the estimated undiscounted costs to settle, in aggregate, related upstream and downstream AROs, and separately, identify both recognized and unrecognized amounts, as applicable. The Board should publish the

Copyright © 2023 Institutional Shareholder Services Inc.  All Rights Reserved.  This proxy analysis and the information herein may not be reproduced or disseminated in whole or in part. For information on the policies applied in this research report, please see our Policy Gateway.

report by February 2024 at reasonable cost and omitting proprietary information. Alternately this information could be disclosed in the 2023 consolidated financial statements."

## PROPONENT'S STATEMENT

In its supporting statement, the proponent says that in 2022, 51 percent of the company's shareholders supported a proposal asking for an audited report on how the International Energy Agency Net Zero by 2050 pathway (IEA NZE) would affect the assumptions underlying its financial statements, including Asset Retirement Obligations (AROs). It argues that investors continue to lack the requested transparency. The proponent writes, despite a legal obligation to decommission long-lived tangible assets at the end of their useful lives, oil and gas companies have mostly only recognized upstream AROs due to the uncertainty around the lives of midstream and downstream segments. It contends that investors have limited insight into the estimates of reported AROs. It claims that peers have provided more disclosure, stating that BP has disclosed the estimated undiscounted ARO amounts and estimated timing, and Shell has recognized previously unrecognized AROs. In creating the report, the proponent recommends that it disclose quantitative key assumptions used to estimate the AROs and whether it is reasonably possible that the assumptions will change in the near term.

## BOARD'S STATEMENT

In its opposing statement, the board references its Advancing Climate Solutions 2023 Progress Report which reportedly includes an account of its most recent resiliency modeling, making this proposal unnecessary. It argues that the proposal's request is unreasonable given that the IEA acknowledges that society is not on an IEA NZE pathway. In the company's most recent resiliency modeling, which was subject to a quality-assurance audit by an independent third-party, oil and natural gas remain an important part of the supply mix at least through 2050. It says that market conditions described in IEA NZE do not necessarily make an individual asset obsolete, and the future value and flexibility of these assets vary based on a variety of factors. The board writes that select assets can be repurposed, and the company is investing in technology to change its product mix as the market changes.

## BACKGROUND AND RECENT SHAREHOLDER ACTIVISM

For more information on Climate Change/GHG Emissions see ISS' Environmental and Social Background Report. For an update on the most recent shareholder activism related to environmental and social issues, see ISS' Review 2022 U.S. - Environmental and Social Issues in Proxy Voting (requires login to ISS Link).

In 2022, Exxon received a related proposal asking the company to report on the potential financial impacts to the company of the IEA Net Zero (NZE) 2050 scenario which garnered 51 percent of shareholder support. However, this is the first year that companies have specifically been asked to issue an audited report with expected costs to settle asset retirement obligations. For an assessment of the company's responsiveness on last year's majority-supported proposal, see the Elect Directors Item.

The SEC has allowed Phillips 66 and Valero to omit similar proposals filed this year on the grounds that the proposals micromanaged the companies.

The International Accounting Standards Board (IASB), which governs international accounting standards, has been developing guidelines for how to prepare financial reports using assumptions consistent with the Paris Agreement. A paper entitled "Effects of climate-related matters on financial statements" was published in November 2020. Key areas for consideration in that guidance document included presentation of financial statements; inventories; property, plant, and equipment; impairment of assets; provisions, contingent liabilities and contingent assets; fair value measurement; and insurance contracts. In an article in Forbes, Robert Eccles quotes David Pitt-Watson on the importance of accounting standards:

> The reason companies invest in climate-destroying assets is because they look profitable. The rules by which that profitability is calculated are determined by the accounting standards bodies. Those bodies are now clear that climate must be taken into account, and assumptions shown. Then investors are demanding that those assumptions should be sustainable ones. If that is done, it puts an end to investment in stranded assets those which are valued in a way which is incompatible with climate

Copyright © 2023 Institutional Shareholder Services Inc.  All Rights Reserved.  This proxy analysis and the information herein may not be reproduced or disseminated in whole or in part. For information on the policies applied in this research report, please see our Policy Gateway.

sustainability. It also makes sure that our financial system is not fooled into believing companies are solvent and profitable when they are not.

The Financial Accounting Standards Board, which controls U.S. GAAP standards, issued an Invitation to Comment in June 2021 on a number of topics including standard setting on climate-related issues. In its February 2022 summary of those comments, the organization stated, "we believe there may be opportunities for the FASB to take thoughtful action on targeted areas of accounting, disclosure, and financial reporting that are consistent with the objective of general purpose financial statements, in response to the evolving business environment, transactions, and investor needs regarding climate-related issues."

The U.S. Securities and Exchange Commission announced in March 2022 a proposed rule on climate-related disclosures that would standardize disclosure on many climate-related financial assumptions. The final rule is expected to be published this year but is not yet out at this time. The proposal includes new requirements that would require companies to disclose the impact of climate change in financial statement metrics.

Flying Blind: The glaring absence of climate risk in financial reporting is a report by Carbon Tracker coordinated with the Climate Accounting Project (CAP) and the PRI. For the report, the authors reviewed the 2020 financial reports of 107 companies deemed crucial to the energy transition and assessed whether the companies appeared to have considered climate in the audited financial statements and whether the auditors appeared to assess risks related to climate change when auditing those companies. One of the metrics examined was whether climate was mentioned in the auditor's Critical Audit Matter or Key Audit Matter section.

## Analysis



Copyright © 2023 Institutional Shareholder Services Inc.  All Rights Reserved.  This proxy analysis and the information herein may not be reproduced or disseminated in whole or in part. For information on the policies applied in this research report, please see our Policy Gateway.

Copyright © 2023 Institutional Shareholder Services Inc.  All Rights Reserved.  This proxy analysis and the information herein may not be reproduced or disseminated in whole or in part. For information on the policies applied in this research report, please see our Policy Gateway.



| Item 13. Commission Audited Report on Reduced Plastics Demand | FOR |
|---|---|

**VOTE RECOMMENDATION**

A vote FOR this proposal is warranted █████████████████████████
███████████████████████████████████████████████████

**BACKGROUND INFORMATION**

Policies: Recycling

**Vote Requirement:** Majority of votes cast (abstentions and broker non-votes not counted)

## Discussion

### PROPOSAL

Meyer Memorial Trust has submitted a precatory proposal requesting that the company produce an audited report analyzing potential future reduction of demand for virgin plastics and the resulting financial repercussions.

Specifically, the "resolved clause" states:

"RESOLVED: Shareholders request the Board issue an audited report addressing, at reasonable cost and omitting proprietary information, whether and how a significant reduction in virgin plastic demand, as set forth in Breaking the Plastic Wave's System Change Scenario for reducing ocean plastic pollution, would affect the Company's financial position and assumptions underlying its financial statements."

Copyright © 2023 Institutional Shareholder Services Inc. All Rights Reserved. This proxy analysis and the information herein may not be reproduced or disseminated in whole or in part. For information on the policies applied in this research report, please see our Policy Gateway.

## PROPONENTS' STATEMENT

In its statement supporting the proposal, the proponent explains the problems caused to the environment by plastic waste, with particular concern for single-use plastics (SUPs). It states that countries and major packaging brands are beginning to drive reductions in virgin plastic use. The filer cites a reduction pathway, called the System Change Scenario (SCS), presented in the *Breaking the Plastic Wave* report, which explores ways to reduce ocean plastic infiltration by 80 percent. The proponent contends that the implications of the SCS are at odds with the company's planned investments. The proponent asserts that the company is the largest global producer of polymers used for single-use plastics. It argues that ExxonMobil faces risks from its investment in virgin plastic production infrastructure. The proponent suggests that the report include a quantification of the company's polymer production for SUP markets, a summary of the company's investments that could be materialy impacted by the SCS, and plans or goals to shift its business model to recycled plastics such as through recycling technologies.

## BOARD'S STATEMENT

In its opposing statement, the board argues that "The proponent has wrongly concluded that developing solutions to the plastic waste challenge requires the elimination or reduced use of plastics, thereby using a flawed scenario to support a flawed conclusion." The board states that it agrees with the report that waste collection infrastructure should be developed and that plastic waste recycling rates should be increased. However, it does not agree with the report's assertions that paper-based or compostable materials can be substituted for plastics without consequences and that advanced recycling does not have great potential to alleviate pollution. The company discloses its efforts to address the problem of plastic waste in the environment in its Sustainability Report, its Advancing Climate Solutions Progress Report, and other communications. The company's efforts include manufacturing without plastic pellet loss, "advanced recycling solutions," and collaborations to increase plastic recycling.

## BACKGROUND AND RECENT SHAREHOLDER ACTIVISM

For more information on extended producer responsibility, see ISS' Environmental and Social Background Report. For an update on the most recent shareholder activism around this issue, view ISS' 2022 US Environmental & Social Issues Proxy Season Review (requires login to ISS Link).

*Regulatory Developments*

At a United Nations Environment Assembly in February of 2022, 175 nations agreed to develop an international, legally binding instrument on plastic pollution by 2024 due to the increased severity of plastic pollution and its associated effects worldwide. According to the UN, if business as normal were to continue, the amount of plastic waste entering aquatic ecosystems could nearly triple from some 9-14 million tonnes per year in 2016 to a projected 23-37 million tons per year by 2040. The Intergovernmental negotiating committee set forth by the UN stated that a proper resolution would focus on the lifecycle of plastic, looking to address the concern from all angles.

In January 2018, the European Commission released a plastics strategy as part of its action plan for a circular economy, and in 2019 it followed up with a report on the implementation of the Circular Economy Action Plan. The strategy's main objective is to have all plastic packaging in the EU market be reusable or recyclable and to have more than half of the plastic waste generated in Europe recycled by 2030. The 2019 report shows how this can be accomplished across entire value chains. EU regulators proposed additional rules to further reduce plastic pollution in November 2022. The UK has outlined a plastic waste plan focused on improving plastic's recyclability and decreasing the amount of plastic in circulation. The UK has also instituted a tax on plastic packaging manufactured or imported into the UK that does not contain at least 30 percent recycled materials.

In July 2022, California passed new legislation to require a 25 percent reduction of plastics in single-use products by 2032, 40 percent of plastic to be recycled by 2028 and 65 percent by 2032, and the shifting of costs of recycling

Copyright © 2023 Institutional Shareholder Services Inc.  All Rights Reserved.  This proxy analysis and the information herein may not be reproduced or disseminated in whole or in part. For information on the policies applied in this research report, please see our Policy Gateway.

from consumers to producers. In British Columbia, the EPR's Blue Box program will start collecting "packaging-like" and "single-use" products in 2023.

*Breaking the Plastic Wave*

The Breaking the Plastic Wave report that the proponent references is a model of the global plastics system. The report finds that if current government commitments are met, along with new industry regulation, the world would only see a 7 percent reduction in annual rates of plastic pollution. To more comprehensively solve the plastics pollution problem, the report finds, the world would need an overhaul of legislation, regulation, and business and consumer practices. Under the SCS Scenario, there could be a 55 percent decline in virgin plastic demand by 2040.

ExxonMobil received a similar proposal last year. In 2022, the company received a proposal asking it to produce a report on how it would shift its plastic resin business model from virgin to recycled polymer production. The proposal received 36.5 shareholder support.

## Analysis



Copyright © 2023 Institutional Shareholder Services Inc.  All Rights Reserved.  This proxy analysis and the information herein may not be reproduced or disseminated in whole or in part. For information on the policies applied in this research report, please see our Policy Gateway.

Copyright © 2023 Institutional Shareholder Services Inc.  All Rights Reserved.  This proxy analysis and the information herein may not be reproduced or disseminated in whole or in part. For information on the policies applied in this research report, please see our Policy Gateway.

Copyright © 2023 Institutional Shareholder Services Inc.  All Rights Reserved.  This proxy analysis and the information herein may not be reproduced or disseminated in whole or in part. For information on the policies applied in this research report, please see our Policy Gateway.

██████████████████████████████████████████

| Item 14. Report on Potential Costs of Environmental Litigation | AGAINST |
| --- | --- |

VOTE RECOMMENDATION

A vote AGAINST this proposal is warranted ████████████████████
████████████████

BACKGROUND INFORMATION

Policies: Climate Change/Greenhouse Gas (GHG) Emissions

**Vote Requirement:** Majority of votes cast (abstentions and broker non-votes not counted)

## Discussion

### PROPOSAL

Anna Marie Lyles has filed a precatory proposal requesting that ExxonMobil present an assessment of the potential cumulative risk from environment-related litigation.

The "resolved clause" of the resolution specifically reads:

"PROPOSAL

RESOLVED: Shareholders request an actuarial assessment, omitting confidential information and prepared at a reasonable cost, of the potential cumulative risk to Exxon Mobil Corporation ('ExxonMobil' or the 'Company') from current environment-related litigation against the Company and its affiliates."

### PROPONENT'S STATEMENT

In its supporting statement, the proponent argues that ExxonMobil is insufficiently disclosing its risks related to environmental legislation. The filer points to several trends that it believes are increasing the risk to the company: courts have ruled against other oil and gas development companies on climate-related grounds; ExxonMobil faces several environment-related lawsuits, and courts may use as a point of reference the fact that the International Energy Agency has stated that no new oil, gas, or thermal coal plants are needed to meet Paris Agreement goals.

### BOARD'S STATEMENT

In its opposition statement, the board states that the company already discloses material litigation risks and, where appropriate, financial contingencies related to such litigation. The board states that reporting information beyond what is required by legal and accounting disclosure rules unnecessarily risks public disclosure of information that could jeopardize operations or limit the company's ability to effectively defend itself in current and future litigation. The board states that it believes that the proceedings referred to by the proponent "do not meet the materiality standard for disclosure under applicable accounting rules and regulations." The board also says that the proponent of this proposal and the proponent of another proposal are directly affiliated with As You Sow, and so violated the intent of the SEC's limit of one proposal each year from one organization.

### BACKGROUND AND RECENT SHAREHOLDER ACTIVISM

Copyright © 2023 Institutional Shareholder Services Inc.  All Rights Reserved.  This proxy analysis and the information herein may not be reproduced or disseminated in whole or in part. For information on the policies applied in this research report, please see our Policy Gateway.

**Exxon Mobil Corporation (XOM)**                    **Meeting Date: 31 May 2023**
POLICY: United States                                Meeting ID: 1743652

For an update on the most recent shareholder activism around this environmental and social issues, view ISS 2022 US Environmental & Social Issues Proxy Voting Review (requires login to ISS Link).

This is the first year that ExxonMobil has received this proposal.

## Analysis



Copyright © 2023 Institutional Shareholder Services Inc.  All Rights Reserved.  This proxy analysis and the information herein may not be reproduced or disseminated in whole or in part. For information on the policies applied in this research report, please see our Policy Gateway.

Copyright © 2023 Institutional Shareholder Services Inc.  All Rights Reserved.  This proxy analysis and the information herein may not be reproduced or disseminated in whole or in part. For information on the policies applied in this research report, please see our Policy Gateway.



| Item 15. Publish a Tax Transparency Report | AGAINST |
| --- | --- |

**VOTE RECOMMENDATION**

A vote AGAINST this proposal is warranted ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮

**Vote Requirement:** Majority of votes cast (abstentions and broker non-votes not counted)

## Discussion

### PROPOSAL

Oxfam has filed a precatory proposal requesting that ExxonMobil report its tax payments in accordance with the GRI Tax Standard.

The "resolved clause" of the resolution specifically reads:

"RESOLVED: Shareholders request that the Board of Directors issue a tax transparency report to shareholders, at reasonable expense and excluding confidential information, prepared in consideration of the indicators and guidelines set forth in the Global Reporting Initiative's (GRI) Tax Standard.

### PROPONENT'S STATEMENT

Copyright © 2023 Institutional Shareholder Services Inc.  All Rights Reserved.  This proxy analysis and the information herein may not be reproduced or disseminated in whole or in part. For information on the policies applied in this research report, please see our Policy Gateway.

In its supporting statement, the proponent argues that investors are increasingly interested in tax transparency aligned with the GRI Tax Standard. The GRI Tax Standard is the first comprehensive, global standard for public tax disclosure and requires public reporting of a company's business activities, including governance, control, risk management, and country-by-country reporting of revenues, profits and losses, and tax payments. The proponent asserts that ExxonMobil does not disclose revenues, profits or tax payments in non-U.S. markets, challenging investors' ability to evaluate the risks to the company of taxation reforms, or assess whether ExxonMobil is engaged in responsible tax practices that ensure long term value creation for the company and the communities in which it operates. The proponent argues that this proposal would bring ExxonMobil's disclosures in line with leading companies that already report using the standard.

## BOARD'S STATEMENT

In its opposition statement, the board states that it would be risky to report financial information that is not required by regulation because it would be unevenly applied and may require the disclosure of competitively sensitive information. That said, the company will be complying for the 2023 financial year with the newly implemented rules for reporting of payments to governments, including taxes, for extractive activities on a country or project basis, as applicable, under Section 1504 of the Dodd-Frank Wall Street Reform and Consumer Protection Act. Section 1504 of Dodd-Frank is only applicable to public companies in the extractive sectors, and will provide shareholders, policymakers, civil society, and the public country-by-country tax payment information. Additionally, beginning no later than for the 2025 financial year, ExxonMobil will be disclosing country-by-country data in the European Union as applicable under rules to be adopted by each jurisdiction. In general, the board states that it cannot jurisdiction shop because energy demand and the location of natural resources dictate where it does business. It states that ExxonMobil's worldwide effective income tax rate, including equity companies, was 31 percent for 2021, and increased to 33 percent for 2022.

## BACKGROUND AND RECENT SHAREHOLDER ACTIVISM

For an update on the most recent shareholder activism around this issue, view ISS 2022 US Environmental & Social Issues Proxy Voting Review (requires login to ISS Link).

This is the first year that ExxonMobil has received this proposal.

### *Windfall Tax in Europe*

ExxonMobil's subsidiaries in Germany and the Netherlands have sued the European Commission contesting the use of the EU Treaty's Article 122 to levy a temporary minimum 33 percent tax on profits for fossil fuel and refinery companies that exceed a four-year historical average by 20 percent, known as the windfall tax.

## Analysis



Copyright © 2023 Institutional Shareholder Services Inc. All Rights Reserved. This proxy analysis and the information herein may not be reproduced or disseminated in whole or in part. For information on the policies applied in this research report, please see our Policy Gateway.



Copyright © 2023 Institutional Shareholder Services Inc.  All Rights Reserved.  This proxy analysis and the information herein may not be reproduced or disseminated in whole or in part. For information on the policies applied in this research report, please see our Policy Gateway.

**Exxon Mobil Corporation (XOM)**                                       **Meeting Date: 31 May 2023**
POLICY: United States                                                    Meeting ID: 1743652

| **Item 16. Report on Social Impact From Plant Closure or Energy Transition** | **AGAINST** |
|---|---|

VOTE RECOMMENDATION

A vote AGAINST this proposal is warranted ███████████████████████████████
████████████████████████████████████████████████████████████████████████

BACKGROUND INFORMATION

Policies: Climate Change/Greenhouse Gas (GHG) Emissions

**Vote Requirement:** Majority of votes cast (abstentions and broker non-votes not counted)

## Discussion

### PROPOSAL

United Steelworkers has submitted a precatory proposal requesting that the company report on the social impact of the energy transition of the company's facilities on workers and communities.

The "resolved clause" of the resolution specifically states:

> **"RESOLVED:** The shareholders of Exxon Mobil Corporation (the 'Company'), hereby request that the Board of Directors create a report regarding the social impact on workers and communities from closure or energy transition of the Company's facilities, and alternatives that can be developed to help mitigate the social impact of such closures or energy transitions. The report should be prepared at reasonable cost, omitting proprietary information, and be available on the Company's website by the 2024 Annual Meeting of Shareholders."

### PROPONENT'S STATEMENT

In its statement supporting the proposal, the proponent writes that the company should play a role in helping provide security for impacted workers and communities as it prepares for and participates in a transitioning energy economy. Additionally, the filer states that the company did not address the impact on workers and communities when a refining, petrochemical, or production facility is transitioned or closed down in its Advancing Climate Solutions 2022 Progress Report. However, the report did discuss the company's investments over the next few years to reduce its GHG emissions. The filer states that the proposed report will improve understanding of the impact future plant closings will have on workers and communities.

### BOARD'S STATEMENT

In its statement opposing the proposal, the board asserts that the requested report is not necessary due to the company's existing disclosure within its publications, including its sustainability report. The board elaborates by stating that its Advancing Climate Solutions Progress Report and its Sustainability Report lay out how the company addresses the issues the proponent is raising. These documents outline the company's environmental and socioeconomic management approach, which serves as a framework for managing the impacts to local communities. Furthermore, the company asserts that its people are its greatest competitive advantage, and that it invests in and supports employees in developing long-term careers.

### BACKGROUND AND RECENT SHAREHOLDER ACTIVISM

For more information on Climate Change/GHG Emissions, see ISS' Environmental and Social Background Report. For an update on the most recent shareholder activism around this issue, view ISS 2022 US Environmental & Social Issues Proxy Voting Review (requires login to ISS Link).

---

Publication Date: 18 May 2023                                            Page 61

Copyright © 2023 Institutional Shareholder Services Inc. All Rights Reserved. This proxy analysis and the information herein may not be reproduced or disseminated in whole or in part. For information on the policies applied in this research report, please see our Policy Gateway.

This is the first year that Exxon has received a proposal asking it to report on the social impact of plant closures or energy transitions.

*Just Transition Disclosure Industry Guidance*

The International Labour Organization (ILO)'s Guidelines document lays out seven principles to guide the transition toward environmentally sustainable economies and societies.

The World Benchmarking Alliance (WBA) released a 2021 Just Transition Benchmark Assessment, comparing 180 oil and gas companies, electric utility companies, and automotive manufacturers on their just and equitable low-carbon transition. The Benchmark found that only 23 percent of the companies that were assessed had commitments in place to upskill or reskill their workers who will be displaced by the low-carbon transition. Out of 16 possible points in the assessment, Exxon scored 2.

## Analysis



Copyright © 2023 Institutional Shareholder Services Inc.  All Rights Reserved.  This proxy analysis and the information herein may not be reproduced or disseminated in whole or in part. For information on the policies applied in this research report, please see our Policy Gateway.



Copyright © 2023 Institutional Shareholder Services Inc.  All Rights Reserved.  This proxy analysis and the information herein may not be reproduced or disseminated in whole or in part. For information on the policies applied in this research report, please see our Policy Gateway.

**Exxon Mobil Corporation (XOM)**

POLICY: United States

**Meeting Date: 31 May 2023**

Meeting ID: 1743652

## Item 17. Report on Benefits and Risks of Commitment to Not Develop Projects in the Arctic *Withdrawn Resolution*

**NONE**

### VOTE RECOMMENDATION

The proponent has withdrawn this proposal. Therefore, it will not be presented or voted upon at the meeting, nor will any votes cast on this item be tabulated or reported. Accordingly, no votes are called for, and the recommendation is "NONE".

### BACKGROUND INFORMATION

Policies: Operations in Protected Areas

**Vote Requirement:** N/A

Copyright © 2023 Institutional Shareholder Services Inc.  All Rights Reserved.  This proxy analysis and the information herein may not be reproduced or disseminated in whole or in part. For information on the policies applied in this research report, please see our Policy Gateway.

**Exxon Mobil Corporation (XOM)**
POLICY: United States

<div align="right">

**Meeting Date: 31 May 2023**
Meeting ID: 1743652

</div>

## Detailed Ownership Profile

<div align="right">back to Ownership and Control Overview</div>

Percentages rounded down to 1 decimal. "▶" identifies shareholders considered strategic under ISS' definition.

| Type | Votes per Share | Outstanding |
|---|---|---|
| Common Stock | 1 | 4,059,294,340 |
| **Ownership - Common Stock** | **Number of Shares** | **% of Class** |
| The Vanguard Group | 368,671,214 | 9.0 |
| BlackRock, Inc. | 292,132,859 | 7.2 |
| State Street Corporation | 223,630,483 | 5.5 |
| Fidelity Management & Research Co. LLC | 104,171,896 | 2.5 |
| Geode Capital Management LLC | 73,350,328 | 1.8 |
| Norges Bank Investment Management | 47,383,406 | 1.1 |
| Northern Trust Investments, Inc.(Investment Management) | 42,200,431 | 1.0 |
| T. Rowe Price Associates, Inc. (Investment Management) | 41,011,875 | 1.0 |
| JPMorgan Investment Management, Inc. | 36,693,792 | 0.9 |
| GQG Partners LLC | 32,917,561 | 0.8 |
| State Farm Investment Management Corp. | 30,520,300 | 0.7 |
| Dimensional Fund Advisors LP | 29,023,605 | 0.7 |
| Charles Schwab Investment Management, Inc. | 28,976,733 | 0.7 |
| Morgan Stanley Smith Barney LLC (Investment Management) | 26,551,841 | 0.6 |
| Mellon Investments Corp. | 23,020,788 | 0.5 |
| Strategic Advisers LLC | 22,758,039 | 0.5 |
| The Bank of New York Mellon Corp. (Investment Management) | 22,461,277 | 0.5 |
| Columbia Management Investment Advisers LLC | 20,159,476 | 0.5 |
| ▶D.W. Woods | 210,173 | <0.1 |
| ▶N.A. Chapman | 151,536 | <0.1 |
| ▶J.P. Williams, Jr. | 151,384 | <0.1 |
| ▶K.T. McKee | 79,447 | <0.1 |
| ▶K.A. Mikells | 10,050 | <0.1 |

Source(s): Proxy Statement, © 2023 Factset Research Systems, Inc. All Rights Reserved. As of: 28 Feb 2023

## Additional Information

| | |
|---|---|
| Meeting Location | Virtual Meeting Only: www.virtualshareholdermeeting.com/XOM2023 |
| Meeting Time | 09:30 Central Time |
| Shareholder Proposal Deadline | December 15, 2023 |
| Security IDs | 30231G102(CUSIP), U30266107(CINS) |

Copyright © 2023 Institutional Shareholder Services Inc. All Rights Reserved. This proxy analysis and the information herein may not be reproduced or disseminated in whole or in part. For information on the policies applied in this research report, please see our Policy Gateway.

ISS' experienced research team provides comprehensive proxy analysis and complete vote recommendations for over 48,000 meetings annually and around 115 markets worldwide. With over 300 research professionals, ISS aims to cover every holding within a client's portfolio in both developed and emerging markets.

Our Research Analysts are located in offices worldwide, offering local insight and global breadth. Research office locations include Berlin, Brussels, London, Manila, Mumbai, Norman, Paris, Rockville, Singapore, Stockholm, Sydney, Tokyo, and Toronto.

ISS has long been committed to engagement and transparency. For information on the policies applied in this research report, please see our Policy Gateway. Please use the ISS Help Center for questions on research reports, policy, and for requests for engagements.



*The issuer that is the subject of this analysis may have purchased self-assessment tools and publications from ISS Corporate Solutions, Inc. (formerly known as ISS Corporate Services, Inc. and referred to as "ICS"), a wholly-owned subsidiary of ISS, or ICS may have provided advisory or analytical services to the issuer in connection with the proxies described in this report. These tools and services may have utilized preliminary peer groups generated by ISS' institutional research group. No employee of ICS played a role in the preparation of this report. If you are an ISS institutional client, you may inquire about any issuer's use of products and services from ICS by emailing disclosure@issgovernance.com.*

This proxy analysis and vote recommendation has not been submitted to, nor received approval from, the United States Securities and Exchange Commission or any other regulatory body. While ISS exercised due care in compiling this analysis, it makes no warranty, express or implied, regarding the accuracy, completeness or usefulness of this information and assumes no liability with respect to the consequences of relying on this information for investment or other purposes. In particular, the research and voting recommendations provided are not intended to constitute an offer, solicitation or advice to buy or sell securities nor are they intended to solicit votes or proxies.

In February 2021, Deutsche Börse AG ("DB") completed a transaction pursuant to which it acquired an approximate 80% stake in ISS HoldCo Inc., the holding company which owns ISS. The remainder of ISS HoldCo Inc. is held by a combination of Genstar Capital ("Genstar") and ISS management. Policies on non-interference and potential conflicts of interest related to DB and Genstar are available at https://www.issgovernance.com/compliance/due-diligence-materials.

The issuer that is the subject of this proxy analysis may be a client of ISS or ICS, or the parent of, or affiliated with, a client of ISS or ICS.

One or more of the proponents of a shareholder proposal at an upcoming meeting may be a client of ISS or ICS, or the parent of, or affiliated with, a client of ISS or ICS. None of the sponsors of any shareholder proposal(s) played a role in preparing this report.

ISS may in some circumstances afford issuers, whether or not they are clients of ICS, the right to review draft research analyses so that factual inaccuracies may be corrected before the report and recommendations are finalized. Control of research analyses and voting recommendations remains, at all times, with ISS.

ISS makes its proxy voting policy formation process and summary proxy voting policies readily available to issuers, investors and others on its public website: http://www.issgovernance.com/policy.

Copyright © 2023 Institutional Shareholder Services Inc. All Rights Reserved. This proxy analysis and the information herein may not be reproduced or disseminated in whole or in part.

Copyright © 2023 Institutional Shareholder Services Inc. All Rights Reserved. This proxy analysis and the information herein may not be reproduced or disseminated in whole or in part. For information on the policies applied in this research report, please see our Policy Gateway.

# Foster Declaration Exhibit 8



Climate Advisory Services' Policy Voting Recommendations

# Exxon Mobil Corporation

## Key Takeaways

QualityScore

**Meeting Type:** Annual (Virtual)
**Meeting Date:** 31 May 2023
**Record Date:** 5 April 2023
**Meeting ID:** 1743652

**New York Stock Exchange**: XOM
**Index:** S&P 500
**Sector:** Integrated Oil & Gas
**GICS:** 10102010

**Primary Contacts**
Steven Cenname
Alissa Coliano
Climate Advisory Services Help Center

---

## Report Contents

| | | | |
|---|---|---|---|
| ISS-Company Dialogue | 4 | Compensation Profile | 10 |
| Financial Highlights | 5 | QualityScore | 12 |
| Ownership and Control Overview | 6 | Vote Results | 17 |
| Corporate Governance Profile | 7 | Meeting Agenda and Proposals | 18 |
| Board Profile | 9 | Additional Information | 72 |

© 2023 Institutional Shareholder Services Inc.  All Rights Reserved. This proxy analysis and the information herein may not be reproduced or disseminated in whole or in part. For information on the policies applied in this research report, please see our  Policy Gateway.



## Agenda & Recommendations

**Policy: Climate**

**Incorporated:** New Jersey, USA

| Item | Code | Proposal | Board Rec. | Clim. Rec. |
|---|---|---|---|---|
| **MANAGEMENT PROPOSALS** | | | | |
| 1.1 | M0201 | Elect Director Michael J. Angelakis | FOR | FOR |
| 1.2 | M0201 | Elect Director Susan K. Avery | FOR | AGAINST |
| 1.3 | M0201 | Elect Director Angela F. Braly | FOR | FOR |
| 1.4 | M0201 | Elect Director Gregory J. Goff | FOR | FOR |
| 1.5 | M0201 | Elect Director John D. Harris, II | FOR | FOR |
| 1.6 | M0201 | Elect Director Kaisa H. Hietala | FOR | FOR |
| 1.7 | M0201 | Elect Director Joseph L. Hooley | FOR | AGAINST |
| 1.8 | M0201 | Elect Director Steven A. Kandarian | FOR | FOR |
| 1.9 | M0201 | Elect Director Alexander A. Karsner | FOR | FOR |
| 1.10 | M0201 | Elect Director Lawrence W. Kellner | FOR | FOR |
| 1.11 | M0201 | Elect Director Jeffrey W. Ubben | FOR | FOR |
| 1.12 | M0201 | Elect Director Darren W. Woods | FOR | AGAINST |
| 2 | M0101 | Ratify PricewaterhouseCoopers LLP as Auditors | FOR | FOR |
| ▶3 | M0550 | Advisory Vote to Ratify Named Executive Officers' Compensation | FOR | FOR |
| 4 | M0552 | Advisory Vote on Say on Pay Frequency | ONE YEAR | ONE YEAR |

Copyright © 2023 Institutional Shareholder Services Inc.  All Rights Reserved.  This proxy analysis and the information herein may not be reproduced or disseminated in whole or in part. For information on the policies applied in this research report, please see our Policy Gateway.

**Exxon Mobil Corporation (XOM)**                                                                    Meeting Date: **31 May 2023**
POLICY: Climate                                                                                        Meeting ID: 1743652

## SHAREHOLDER PROPOSALS

| | | | | |
|---|---|---|---|---|
| 5 | S0746 | Establish Board Committee on Decarbonization Risk | AGAINST | AGAINST |
| 6 | S0500 | Reduce Executive Stock Holding Period | AGAINST | AGAINST |
| 7 | S0742 | Report on Carbon Capture and Storage | AGAINST | AGAINST |
| 8 | S0743 | Report on Methane Emission Disclosure Reliability | AGAINST | FOR |
| 9 | S0743 | Adopt Medium-Term Scope 3 GHG Reduction Target | AGAINST | FOR |
| 10 | S0731 | Issue a Report on Worst-Case Impacts of Oil Spills from Operations Offshore of Guyana | AGAINST | FOR |
| 11 | S0730 | Recalculate GHG Emissions Baseline to Exclude Emissions from Material Divestitures | AGAINST | FOR |
| 12 | S0730 | Report on Asset Retirement Obligations Under IEA NZE Scenario | AGAINST | FOR |
| 13 | S0781 | Commission Audited Report on Reduced Plastics Demand | AGAINST | FOR |
| 14 | S0742 | Report on Potential Costs of Environmental Litigation | AGAINST | FOR |
| 15 | S0429 | Publish a Tax Transparency Report | AGAINST | FOR |
| 16 | S0742 | Report on Social Impact From Plant Closure or Energy Transition | AGAINST | FOR |
| 17 | S0741 | Report on Benefits and Risks of Commitment to Not Develop Projects in the Arctic *Withdrawn Resolution* | NONE | NONE |

Shading indicates that Climate Advisory Services recommendation differs from Board recommendation

▶ Items deserving attention due to contentious issues or controversy

Copyright © 2023 Institutional Shareholder Services Inc. All Rights Reserved. This proxy analysis and the information herein may not be reproduced or disseminated in whole or in part. For information on the policies applied in this research report, please see our Policy Gateway.

**Exxon Mobil Corporation (XOM)**
POLICY: Climate

## Material Company Updates

| Item | Summary |
|------|---------|
| **Board Updates** | John D. Harris II and Lawrence W. Kellner were appointed to the board effective Jan. 1, 2023. |
| | Ursula M. Burns will not stand for re-election to the board at the 2023 annual meeting. |
| **Notable Vote Result** | At the last annual meeting, the following shareholder proposal received the support of a majority of votes cast (excluding abstentions): Report on Scenario Analysis Consistent with International Energy Agency's Net Zero by 2050. See *Board Responsiveness* section of ***Elect Directors*** below. |
| **Climate and Environmental Legal Proceedings** | In April 2021, authorities in Anne Arundel County, Maryland filed suit in local circuit court against a number of fossil fuel companies, including Exxon Mobil, accusing the defendants of acting to mislead the public about the contributions of their products to climate change, and seeking to recover costs incurred by the county to "survive the consequences of climate change." The case was subsequently removed to the U.S. District Court for the District of Maryland; however, the federal court issued an order remanding the case to state court. That order has been temporarily stayed due to the Supreme Court's consideration of a similar case brought by local governments in Colorado. |
| | On Aug. 4, 2022, Exxon Mobil subsidiary XTO Energy, Inc. received a letter from the U.S. Department of Justice notifying XTO of the U.S. Environmental Protection Agency's request to initiate a potential civil action against XTO regarding the Schnegg well in Powhatan Point, Ohio. The letter did not quantify an associated civil penalty potentially sought by the DOJ. The EPA alleges XTO breached its duty under the General Duty Clause of the Clean Air Act for the Schnegg well, and such breaches resulted in a 2018 well blowout. Neither a civil action has been filed nor a draft consent decree has been provided by the DOJ. XTO is assessing the factual basis of the allegation and any associated penalties. In discussions in January 2023, the DOJ indicated it may seek a potential penalty substantially in excess of $1 million. XTO strongly disagrees with DOJ's initial position. |
| | On Jan. 3, 2022, the State of Texas, on behalf of the Texas Commission on Environmental Quality, filed a lawsuit against Exxon Mobil in Travis County District Court for alleged violations of the Texas Clean Air Act, ExxonMobil's permits and promulgated regulations. The original complaint alleged that from Dec. 21-23, 2021, a pipeline containing vaporized naphtha at the Baytown Refinery leaked, and that a spark in the course of repairs caused an explosion. In August 2022, the State amended its petition to seek additional penalties for additional alleged permit and regulatory violations in connection with unrelated subsequent emission events at the refinery, for an aggregate amount in excess of $1 million. On Nov. 21, 2022, the State of Texas filed a complaint against Exxon Mobil in Travis County District Court for alleged violations of the Texas Clean Air Act at the Baytown Olefins Plant located in Baytown, Texas. The complaint seeks civil penalties for alleged unauthorized air pollution, unauthorized outdoor burning, nuisance, and unauthorized visible emissions associated with multiple alleged air emissions events between 2018 and 2022 in an amount in excess of $1 million and injunctive relief against the company to enjoin a violation or threatened violation of any Texas Commission on Environmental Quality statute. The State also seeks to recover its fees and costs of litigation. |
| **Amendment to Bylaws** | On Oct. 25, 2022, the company amended its bylaws to update certain aspects of the advance notice provisions following the promulgation of new SEC rules on universal proxy cards, as well as to remove a requirement that the board elect a general tax counsel as an officer of the company. |

Copyright © 2023 Institutional Shareholder Services Inc. All Rights Reserved. This proxy analysis and the information herein may not be reproduced or disseminated in whole or in part. For information on the policies applied in this research report, please see our Policy Gateway.

**Exxon Mobil Corporation (XOM)**
POLICY: Climate

**Meeting Date: 31 May 2023**
Meeting ID: 1743652

## Financial Highlights

**Company Description:** Exxon Mobil Corporation engages in the exploration and production of crude oil and natural gas in the United States and internationally. It operates through Upstream, Energy Products, Chemical Products, and Specialty Products segments

STOCK PRICE PERFORMANCE



Exxon Mobil Corporation
MSCI ACWI: Oil, Gas & Consumable Fuels (GICS: 101020)
S&P 500

TOTAL SHAREHOLDER RETURNS (ANNUALIZED)

|  | 1 Yr | 3 Yr | 5 Yr |
|---|---|---|---|
| Company TSR (%) | 87.16 | 23.63 | 11.49 |
| GICS 1010 TSR (%) | 52.29 | 17.12 | 3.82 |
| S&P500 TSR (%) | -18.11 | 7.66 | 9.42 |

Source: Compustat. As of last day of company FY end month: 12/31/2022

COMPANY SNAPSHOT (AS OF RECORD DATE)

| Market Cap (M) | 476,264.5 |
|---|---|
| Closing Price | 116.99 |
| Dividends Paid (LTM) | 3.58 |
| 52-Week High | 119.63 |
| 52-Week Low | 79.29 |
| Shares Outstanding (M) | 4070.99 |
| Average daily trading volume (prior mo)* | 18,958.53 |

Source: Compustat. As of April 5, 2023 (All currency in USD)
* Trading Volume in thousands of shares

FINANCIAL & OPERATIONAL PERFORMANCE

| | Historical Performance (FY ending) | | | | | Compared to Peers (Compustat FY*) − 2022 |
|---|---|---|---|---|---|---|
| **All currency in USD** | 12/2018 | 12/2019 | 12/2020 | 12/2021 | 12/2022 | |
| **Earnings** | | | | | | |
| Revenue (M) | 279,332 | 255,583 | 178,574 | 276,692 | 398,675 | |
| Net Income (M) | 20,840 | 14,340 | -22,440 | 23,040 | 55,740 | |
| EBITDA (M) | 40,869 | 31,764 | -8,889 | 43,484 | 86,168 | |
| EPS (USD) | 4.88 | 3.36 | -5.25 | 5.39 | 13.26 | |
| EPS Y/Y Growth (%) | 5 | -31 | N/A | N/A | 146 | |
| **Profitability** | | | | | | |
| Pretax Net Margin (%) | 11 | 8 | -16 | 11 | 20 | |
| EBITDA Margin (%) | 15 | 12 | -5 | 16 | 22 | |
| Return on Equity (%) | 11 | 7 | -14 | 14 | 29 | |
| Return on Assets (%) | 6 | 4 | -7 | 7 | 15 | |
| ROIC (%) | 10 | 6 | -10 | 10 | 23 | |
| **Leverage** | | | | | | |
| Debt/Assets | 11 | 15 | 22 | 16 | 13 | |
| Debt/Equity | 20 | 28 | 46 | 31 | 24 | |
| **Cash Flows** | | | | | | |
| Operating (M) | 36,014 | 29,716 | 14,668 | 48,129 | 76,797 | |
| Investing (M) | -16,446 | -23,084 | -18,459 | -10,235 | -14,742 | |
| Financing (M) | -19,446 | -6,618 | 5,285 | -35,423 | -39,114 | |
| Net Change (M) | -135 | 47 | 1,275 | 2,438 | 22,863 | |
| **Valuation & Performance** | | | | | | |
| Price/Earnings | 13.97 | 20.77 | N/A | 11.35 | 8.32 | |
| Annual TSR (%) | -15.09 | 7.35 | -36.02 | 57.80 | 87.16 | |

Source: Compustat. *Note: Compustat standardizes financial data and fiscal year designations to allow for meaningful comparis on across companies. Compustat data may differ from companies' disclosed financials and does not incorporate non-trading equity units. Peers shown here represent closest industry peers drawn from those peers used in ISS' pay-for-performance analysis. See www.issgovernance.com/policy-gateway/company-financials-faq/ for more information.

Copyright © 2023 Institutional Shareholder Services Inc. All Rights Reserved. This proxy analysis and the information herein may not be reproduced or disseminated in whole or in part. For information on the policies applied in this research report, please see our Policy Gateway.

**Exxon Mobil Corporation (XOM)**    **Meeting Date: 31 May 2023**
POLICY: Climate    Meeting ID: 1743652

## Ownership & Control Overview

| Stock Type | Votes per Share | Outstanding |
|---|---|---|
| Common Stock | 1 | 4,059,294,340 |

| Top Holders - Ownership & Control | % of Stock | % of Votes |
|---|---|---|
| The Vanguard Group | 9.0 | 9.0 |
| BlackRock, Inc. | 7.2 | 7.2 |
| State Street Corporation | 5.5 | 5.5 |
| ▶D.W. Woods | <0.1 | <0.1 |

Proxy Statement, © 2023 Factset Research Systems, Inc. All Rights Reserved. As of: 28 Feb 2023



Percentages rounded down to 1 decimal. "▶" identifies shareholders considered strategic under ISS' definition.

to Detailed Ownership Profile

ISS' definition of strategic shareholders may include, but is not limited to, shareholders with board representation, State-controlled entities, insiders/executives, and employee funds.

Copyright © 2023 Institutional Shareholder Services Inc. All Rights Reserved. This proxy analysis and the information herein may not be reproduced or disseminated in whole or in part. For information on the policies applied in this research report, please see our Policy Gateway.

**Exxon Mobil Corporation (XOM)**
POLICY: Climate

**Meeting Date: 31 May 2023**
Meeting ID: 1743652

## Corporate Governance Profile

### BOARD SUMMARY

| | |
|---|---|
| Chairman classification | Executive Director |
| Separate chair/CEO | No |
| Independent lead director | Yes |
| Voting standard | Majority |
| Plurality carveout for contested elections | Yes |
| Resignation policy | Yes |
| Total director ownership (000 shares) | 1,623 |
| Total director ownership (%) | < 1 |
| Percentage of directors owning stock | 100% |
| Number of directors attending < 75% of meetings | 0 |
| Average director age | 62 years |
| Average director tenure | 3 years |
| Percentage of women on board | 25% |

### SHAREHOLDER RIGHTS SUMMARY

| | |
|---|---|
| Controlled company | No |
| Classified board | No |
| Multi-class common stock w/ unequal voting rights | No |
| Vote standard for mergers/acquisitions | Majority |
| Vote standard for charter amendment | Majority |
| Vote standard for bylaw amendment | Majority |
| Shareholder right to call special meetings | Yes, 15% |
| Material restrictions on right to call special meetings | Yes |
| Shareholder right to act by written consent | Yes |
| Cumulative voting | No |
| Board authorized to issue blank-check preferred stock | Yes |
| Poison pill | No |
| Proxy Access | Yes |
| -       Ownership requirement (%) | 3 |
| -       Time requirement (years) | 3 |
| -       Nomination limit (% of seats) | 20 |
| -       Nomination limit (# of nominees) | 2 |
| -       Aggregation cap (# of nominators) | 20 |

Copyright © 2023 Institutional Shareholder Services Inc.  All Rights Reserved.  This proxy analysis and the information herein may not be reproduced or disseminated in whole or in part. For information on the policies applied in this research report, please see our Policy Gateway.

## Board & Committee Composition

The information provided in the charts and tables below is based on Climate Advisory Services data records, which rely on disclosures in proxy materials and other public sources available as of the date set forth below (for the general meeting under review) and, with respect to information from prior years, information that was available ahead of each year's annual general meeting at the time of Climate Advisory Services' report for that meeting. As such, these charts and tables might not reflect changes to the board composition and/or other covered elements subsequently disclosed by the issuer after Climate Advisory Services' publications or between general meetings.

Independence values refer to Climate Advisory Services Independence classifications ("Exec": Executive Director; "N-Ind.": Non-Independent Director; "Ind.": Independent Director).



Meetings last FY:9

as of May 31, 2023



Meetings last FY:10          Meetings last FY:6          Meetings last FY:8

■ **Exec**          ■ **N-Ind.**          ■ **Ind.**

### Independence History



| | 2019 | 2020 | 2021 | 2022 | After Meeting |
|---|---|---|---|---|---|
| Board | 90% | 90% | 92% | 91% | 92% |
| Audit Com | 100% | 100% | 100% | 100% | 100% |
| Comp Com | 100% | 100% | 100% | 100% | 100% |
| Nom Com | 100% | 100% | 100% | 100% | 100% |

### Gender Diversity Trend



| | 2019 | 2020 | 2021 | 2022 | After Meeting |
|---|---|---|---|---|---|
| male | 70% | 70% | 75% | 64% | 75% |
| female | 30% | 30% | 25% | 36% | 25% |

### Director Tenure



Copyright © 2023 Institutional Shareholder Services Inc. All Rights Reserved. This proxy analysis and the information herein may not be reproduced or disseminated in whole or in part. For information on the policies applied in this research report, please see our Policy Gateway.

**Exxon Mobil Corporation (XOM)**                                                                       **Meeting Date: 31 May 2023**
POLICY: Climate                                                                                          Meeting ID: 1743652

## Board Profile (after upcoming meeting)

| Item # | Executive Directors | Affiliation | Independence | | Leadership | Gender | Age | Tenure | Term Ends | Committee | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | Co. | Climate Advisory Services | | | | | | Audit | Comp | Nom | Gov |
| 1.12 | Darren Woods | | Exec | Exec | CEO, Chair | M | 58 | 7 | 2024 | | | | |
| | **Non-Executive Directors** | | | | | | | | | | | | |
| 1.7 | Joseph (Jay) Hooley | | Ind. | Ind. | Lead Dir | M | 66 | 3 | 2024 | | M | C | C |
| 1.1 | Michael (Mike) Angelakis | | Ind. | Ind. | | M | 59 | 2 | 2024 | F | | | |
| 1.2 | Susan Avery | | Ind. | Ind. | | F | 73 | 6 | 2024 | | | M | M |
| 1.3 | Angela Braly | | Ind. | Ind. | | F | 61 | 7 | 2024 | | C | | |
| 1.4 | Gregory (Greg) Goff | | Ind. | Ind. | | M | 66 | 1 | 2024 | F | | | |
| 1.5 | John Harris II | | Ind. | Ind. | | M | 62 | 0* | 2024 | F | M | | |
| 1.6 | Kaisa Hietala | | Ind. | Ind. | | F | 52 | 1 | 2024 | F | | | |
| 1.8 | Steven Kandarian | | Ind. | Ind. | | M | 71 | 5 | 2024 | | M | M | M |
| 1.9 | Alexander Karsner | | Ind. | Ind. | | M | 56 | 1 | 2024 | | | M | M |
| 1.10 | Lawrence (Larry) Kellner | | Ind. | Ind. | | M | 64 | 0* | 2024 | | | M | M |
| 1.11 | Jeffrey (Jeff) Ubben | | Ind. | Ind. | | M | 61 | 2 | 2024 | | | | |
| | | | 92% Ind. | 92% Ind. | | 25% F | Ave: 62 | Ave: 3 | Ave: 1 | 100% Ind. | 100% Ind. | 100% Ind. | 100% Ind. |

Committee Membership: M = Member | C = Chair | **F = Member and Financial Expert**
*Indicates director not previously submitted to shareholders for election.

## COMMITMENTS AT PUBLIC COMPANIES

| Item # | Director Name | # of boards* | Company Name | Mandate Type | CEO | Board Chair | Committee | | |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | Audit | Comp | Nom |
| 1.12 | Darren Woods | 1 | *Exxon Mobil Corporation* | Executive Director | ☐ | ☐ | | | |
| 1.7 | Joseph (Jay) Hooley | 2 | *Exxon Mobil Corporation* | Non-Executive Director | | | | M | C |
| | | | Aptiv Plc | Non-Executive Director | | | F | C | |
| 1.1 | Michael (Mike) Angelakis | 4 | *Exxon Mobil Corporation* | Non-Executive Director | | | F | | |
| | | | Bowlero Corp. | Non-Executive Director | | | | | C |
| | | | TriNet Group, Inc. | Non-Executive Director | | | | M | M |
| | | | Clarivate Plc | Non-Executive Director | | | | | M |
| 1.2 | Susan Avery | 1 | *Exxon Mobil Corporation* | Non-Executive Director | | | | | M |
| 1.3 | Angela Braly | 3 | *Exxon Mobil Corporation* | Non-Executive Director | | | | C | |
| | | | The Procter & Gamble Company | Non-Executive Director | | | M | | C |
| | | | Brookfield Corporation | Non-Executive Director | | | M | | |
| 1.4 | Gregory (Greg) Goff | 2 | *Exxon Mobil Corporation* | Non-Executive Director | | | F | | |
| | | | Avient Corporation | Non-Executive Director | | | | | M |
| 1.5 | John Harris II | 4 | *Exxon Mobil Corporation* | Non-Executive Director | | | F | M | |
| | | | Flex Ltd. | Non-Executive Director | | | | M | |
| | | | Kyndryl Holdings, Inc. | Non-Executive Director | | | | | M |
| | | | Cisco Systems, Inc. | Non-Executive Director | | | | | |
| 1.6 | Kaisa Hietala | 3 | *Exxon Mobil Corporation* | Non-Executive Director | | | F | | |
| | | | Smurfit Kappa Group Plc | Non-Executive Director | | | M | | M |
| | | | Rio Tinto Limited | Non-Executive Director | | | | | |
| | | | Rio Tinto Plc | Non-Executive Director | | | | | |
| 1.8 | Steven Kandarian | 2 | *Exxon Mobil Corporation* | Non-Executive Director | | | | M | M |
| | | | Jackson Financial Inc. | Non-Executive Director | | ☐ | | M | C |
| 1.9 | Alexander Karsner | 2 | *Exxon Mobil Corporation* | Non-Executive Director | | | | | M |
| | | | Applied Materials, Inc. | Non-Executive Director | | | | M | M |
| | | | Alphabet Inc. | Executive Officer (non-director) | | | | | |

Publication Date: 23 May 2023                                                                            Page 9

Copyright © 2023 Institutional Shareholder Services Inc.  All Rights Reserved.  This proxy analysis and the information herein may not be reproduced or disseminated in whole or in part. For information on the policies applied in this research report, please see our Policy Gateway.

**Exxon Mobil Corporation (XOM)**                                    Meeting Date: **31 May 2023**
POLICY: Climate                                                      Meeting ID: 1743652

| Item # | Director Name | # of boards* | Company Name | Mandate Type | CEO | Board Chair | Audit | Comp | Nom |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | **Committee** | | |
| 1.10 | Lawrence (Larry) Kellner | 2 | *Exxon Mobil Corporation* | Non-Executive Director | | | | | M |
| | | | The Boeing Company | Non-Executive Director | | ☐ | | | M |
| 1.11 | Jeffrey (Jeff) Ubben | 3 | *Exxon Mobil Corporation* | Non-Executive Director | | | | | |
| | | | Enviva, Inc. | Non-Executive Director | | | | M | |
| | | | Vistry Group Plc | Non-Executive Director | | | | | |

*The number of boards for each director is the total of executive director and/ or non-executive director mandates. Companies highlighted in blue are considered belonging to the same group and count as 1 for Climate Advisory Services board count calculations.

### DIRECTOR PAY, ATTENDANCE AND EQUITY OWNERSHIP OVERVIEW MOST RECENT FY

| Item # | Director Name | Board Position | Attendance (in %) | Total Compensation | # | % stock | % votes |
|---|---|---|---|---|---|---|---|
| | | | | | **Ownership** | | |
| **1.12** | **Darren Woods** | ED, CEO, Chair | ≥75% | ** | 210,173 | <0.1 | <0.1 |
| **1.7** | **Joseph (Jay) Hooley** | NED, Comp (M), Nom (C) | ≥75% | USD 296,205 | 15,500 | <0.1 | <0.1 |
| **1.1** | **Michael (Mike) Angelakis** | NED, Audit (M) | ≥75% | USD 266,260 | 53,792 | <0.1 | <0.1 |
| **1.2** | **Susan Avery** | NED, Nom (M) | ≥75% | USD 266,260 | 23,000 | <0.1 | <0.1 |
| **1.3** | **Angela Braly** | NED, Comp (C) | ≥75% | USD 276,260 | 27,575 | <0.1 | <0.1 |
| **1.4** | **Gregory (Greg) Goff** | NED, Audit (M) | ≥75% | USD 266,260 | 23,462 | <0.1 | <0.1 |
| **1.5** | **John Harris II** | NED, Audit (M), Comp (M) | N/A | N/A | 8,250 | <0.1 | <0.1 |
| **1.6** | **Kaisa Hietala** | NED, Audit (M) | ≥75% | USD 266,260 | 13,000 | <0.1 | <0.1 |
| **1.8** | **Steven Kandarian** | NED, Comp (M), Nom (M) | ≥75% | USD 266,260 | 20,500 | <0.1 | <0.1 |
| **1.9** | **Alexander Karsner** | NED, Nom (M) | ≥75% | USD 266,260 | 30,000 | <0.1 | <0.1 |
| **1.10** | **Lawrence (Larry) Kellner** | NED, Nom (M) | N/A | N/A | 8,000 | <0.1 | <0.1 |
| **1.11** | **Jeffrey (Jeff) Ubben** | NED | ≥75% | USD 266,260 | 1,190,000 | <0.1 | <0.1 |
| **Total** | | | | USD 2,436,285 | | | |

Attendance rates take into account board and committee meetings.
ED for Executive Directors, NED for Non-Executive Directors
**For executive director data, please refer to Executive Pay Overview.
Ownership values include shares held, stock awards that vest within 60 days of the disclosure date, and deferred stock units (DSUs). Stock options are excluded.

## Compensation Profile

### EXECUTIVE PAY OVERVIEW

| Executive | Title | Base Salary | Change in Pension, Deferred Comp, All Other Comp | Bonus & Non-equity Incentives | Restricted Stock | Option Grant | Total |
|---|---|---|---|---|---|---|---|
| **D. Woods** | Chairman and CEO | 1,703 | 2,885 | 6,382 | 25,052 | 0 | 36,022 |
| **J. Williams Jr.** | Senior Vice President | 1,100 | 3,859 | 4,206 | 13,116 | 0 | 22,281 |
| **N. Chapman** | Senior Vice President | 1,100 | 3,680 | 4,035 | 12,426 | 0 | 21,240 |
| **K. Mikells** | Senior Vice President; CFO | 1,100 | 794 | 4,376 | 13,806 | 0 | 20,076 |
| **K. McKee** | President, ExxonMobil Product Solutions | 909 | 4,224 | 3,617 | 11,256 | 0 | 20,006 |
| **Median CEO Pay** | ISS Selected Peer Group | 1,690 | 662 | 3,900 | 10,274 | 3,122 | **23,397** |
| | Company Defined Peers | 1,673 | 650 | 3,690 | 9,785 | 3,520 | **22,424** |

Source: ISS. Pay in $thousands. Total pay is sum of all reported pay elements, using ISS' Black-Scholes estimate for option grant-date values. Median total pay will not equal sum of pay elements medians. Company Defined Peers are as disclosed. More information on ISS' peer group methodology is available at www.issgovernance.com/policy-gateway/us-compensation-policy-guidance/.

Copyright © 2023 Institutional Shareholder Services Inc. All Rights Reserved. This proxy analysis and the information herein may not be reproduced or disseminated in whole or in part. For information on the policies applied in this research report, please see our Policy Gateway.

**Exxon Mobil Corporation (XOM)**                                     Meeting Date: **31 May 2023**
POLICY: Climate                                                       Meeting ID: 1743652

## OPTION VALUATION ASSUMPTIONS

| For CEO's last FY Grant | Company | ISS |
|---|---|---|
| Volatility (%)* | N/A | N/A |
| Dividend Yield (%)* | N/A | N/A |
| Term (yrs)* | N/A | N/A |
| Risk-free Rate (%)* | N/A | N/A |
| Grant date fair value per option* | N/A | N/A |
| Grant Date Fair Value ($ in 000)** | N/A | N/A |

The CEO did not receive stock options in the most recent fiscal year.

## CEO PAY MULTIPLES

| Compared to | Multiple |
|---|---|
| 2nd highest active executive | 1.62 |
| Average active NEO | 1.72 |
| ISS peer median | 1.54 |
| Company peer median | 1.61 |
| Median employee/CEO Pay Ratio* (FY22, FY21) | 210, 125 |

*As disclosed by the company. The company disclosed the median compensation of all employees to be $171,582.

## CEO TALLY SHEET

| CEO | D. Woods |
|---|---|
| CEO tenure at FYE: | 6 years |
| Present value of all accumulated pension: | $35,015,801 |
| Value of CEO stock owned (excluding options): | $24,588,139 |
| **Potential Termination Payments** | |
| Involuntary termination without cause: | N/A |
| Termination after a change in control: | $0 |

Source: DEF14A

## 3-YEAR GRANTED VS. REALIZABLE CEO PAY

### 3-year TSR: 23.63%



Source: DEF14A and ISS ($ in thousands)

Granted pay equals the sum of all CEO pay, as disclosed in the proxy statement for the applicable fiscal years, except that equity grant values may be based on ISS' valuation. Realizable pay equals the sum of all cash paid (as disclosed) during the same period, plus the value of all equity grants at the end of the period (based on earned value, if applicable, or re-calculated FV of target level equity awards not yet earned/vested). For periods that include multiple CEOs, values include pay to all CEOs during the period. For additional information, please visit www.issgovernance.com/policy-gateway/us-compensation-policy-guidance/.

## CEO PAY VERSUS PERFORMANCE

| Year | SCT Total | Compensation Actually Paid | Value of $100 Investment (TSR) | | CFOAS* |
|---|---|---|---|---|---|
| | | | Company | Peers | |
| 1 | $35,909 | $89,748 | $188 | $136 | $82,044,000,000 |
| 2 | $23,572 | $40,080 | $101 | $94 | $51,305,000,000 |
| 3 | $15,639 | ($7,692) | $64 | $69 | $15,667,000,000 |

**Important Metrics*:** TSR, Earnings, Cash Flow From Operations And Asset Sales, Return On Capital Employed, Safety Performance, Environmental Performance, Corporate-wide Operated Asset GHG Emissions Intensity

Source: DEF14A. CEO Pay in $thousands. Year 1 = most recent fiscal year. SCT = Summary Compensation Table. TSR peers are as disclosed and may differ from pay peers. *The company disclosed these metrics as the most important for determining CEO pay.

Copyright © 2023 Institutional Shareholder Services Inc.  All Rights Reserved.  This proxy analysis and the information herein may not be reproduced or disseminated in whole or in part. For information on the policies applied in this research report, please see our Policy Gateway.

**Exxon Mobil Corporation (XOM)**    **Meeting Date: 31 May 2023**
POLICY: Climate    Meeting ID: 1743652

## Dilution & Burn Rate

### DILUTION

| | Dilution (%) |
|---|---|
| Exxon Mobil Corporation | 2.53 |
| 4-digit GICS median | 6.04 |
| 4-digit GICS weighted average | 6.00 |
| 4-digit GICS 75th percentile | 10.34 |

Dilution is the sum of the total amount of shares available for grant and outstanding under options and other equity awards (vested and unvested) expressed as a percentage of total basic common shares outstanding as of the record date. The dilution figure typically excludes employee stock purchase plans and 401(k) shares. The underlying information is based on the company's equity compensation table in the most recent proxy statement or 10-K.

### BURN RATE

| | Unadjusted (%) | Value-Adjusted (%) |
|---|---|---|
| 1-year | 0.20 | 0.20 |
| 3-year average | 0.20 | 0.20 |

Burn rate equals the number of shares granted in each fiscal year, including stock options, restricted stock (units), actual performance shares delivered under the long-term incentive plan or earned deferred shares, to employees and directors divided by weighted average common shares outstanding.

The value-adjusted burn rate uses stock price to value full-value awards and Black Scholes to value stock options. For more information on these burn rate methodologies, please visit www.issgovernance.com/policy-gateway/voting-policies/.

Copyright © 2023 Institutional Shareholder Services Inc. All Rights Reserved. This proxy analysis and the information herein may not be reproduced or disseminated in whole or in part. For information on the policies applied in this research report, please see our Policy Gateway.

**Quality**Score

Copyright © 2023 Institutional Shareholder Services Inc.  All Rights Reserved.  This proxy analysis and the information herein may not be reproduced or disseminated in whole or in part. For information on the policies applied in this research report, please see our Policy Gateway.

**Quality**Score

## Climate Awareness Scorecard

Copyright © 2023 Institutional Shareholder Services Inc.  All Rights Reserved.  This proxy analysis and the information herein may not be reproduced or disseminated in whole or in part. For information on the policies applied in this research report, please see our Policy Gateway.

Copyright © 2023 Institutional Shareholder Services Inc.  All Rights Reserved.  This proxy analysis and the information herein may not be reproduced or disseminated in whole or in part. For information on the policies applied in this research report, please see our Policy Gateway.

## SDG Impact Rating

Copyright © 2023 Institutional Shareholder Services Inc.  All Rights Reserved.  This proxy analysis and the information herein may not be reproduced or disseminated in whole or in part. For information on the policies applied in this research report, please see our Policy Gateway.

**Exxon Mobil Corporation (XOM)**                                                      **Meeting Date: 31 May 2023**
POLICY: Climate                                                                         Meeting ID: 1743652

## Vote Results

### ANNUAL MEETING 25 MAY 2022

| Proposal | Board Rec | Clim. Rec | Disclosed Result | Support Including Abstains (%)[1] | Support Excluding Abstains (%)[2] |
|---|---|---|---|---|---|
| 1.1 Elect Director Michael J. Angelakis | For | For | Pass | 97.2 | 97.9 |
| 1.2 Elect Director Susan K. Avery | For | Against | Pass | 94.5 | 95.4 |
| 1.3 Elect Director Angela F. Braly | For | For | Pass | 95.9 | 96.6 |
| 1.4 Elect Director Ursula M. Burns | For | For | Pass | 88.8 | 89.1 |
| 1.5 Elect Director Gregory J. Goff | For | For | Pass | 97.7 | 98.1 |
| 1.6 Elect Director Kaisa H. Hietala | For | For | Pass | 97.9 | 98.3 |
| 1.7 Elect Director Joseph L. Hooley | For | Against | Pass | 94.5 | 94.9 |
| 1.8 Elect Director Steven A. Kandarian | For | For | Pass | 98.1 | 98.5 |
| 1.9 Elect Director Alexander A. Karsner | For | For | Pass | 96.6 | 97.0 |
| 1.10 Elect Director Jeffrey W. Ubben | For | For | Pass | 97.6 | 98.4 |
| 1.11 Elect Director Darren W. Woods | For | Against | Pass | 91.3 | 91.6 |
| 2 Ratify PricewaterhouseCoopers LLP as Auditors | For | For | Pass | 96.5 | 96.8 |
| 3 Advisory Vote to Ratify Named Executive Officers' Compensation | For | For | Pass | 90.0 | 91.0 |
| 4 Remove Executive Perquisites | Against | For | Fail | 21.2 | 21.8 |
| 5 Amend Bylaws to Limit Shareholder Rights for Proposal Submission | Against | Against | Fail | 1.4 | 1.5 |
| 6 Set GHG Emissions Reduction targets Consistent With Paris Agreement Goal | Against | For | Fail | 24.2 | 27.1 |
| 7 Report on Low Carbon Business Planning | Against | For | Fail | 10.3 | 10.5 |
| 8 Report on Scenario Analysis Consistent with International Energy Agency's Net Zero by 2050 | Against | For | Pass | 46.3 | 51.0 |
| 9 Report on Reducing Plastic Pollution | Against | For | Fail | 35.9 | 36.5 |
| 10 Report on Political Contributions and Expenditures | Against | For | Fail | 26.5 | 26.7 |

Shaded results reflect a majority of votes cast FOR shareholder proposal or AGAINST management proposal or director election
[1]Support Including Abstains is defined as %FOR/(For + Against + Abstain), as expressed as a percentage.
[2]Support Excluding Abstains is defined as %FOR/(For + Against), as expressed as a percentage, provided if different from For + Against + Abstain.

Copyright © 2023 Institutional Shareholder Services Inc. All Rights Reserved. This proxy analysis and the information herein may not be reproduced or disseminated in whole or in part. For information on the policies applied in this research report, please see our Policy Gateway.

**Exxon Mobil Corporation (XOM)**                                    **Meeting Date: 31 May 2023**
POLICY: Climate                                                      Meeting ID: 1743652

## Meeting Agenda & Proposals

| **Items 1.1-1.12. Elect Directors** | **SPLIT** |
|---|---|



VOTE RECOMMENDATION

A vote AGAINST CEO and Chair Darren Woods, Lead Director Joseph Hooley, and Public Issues and Contributions Committee Chair Susan Avery ████████████████████████████████████

████████████████████████████████████████████████████████████████████████████

████████████████████

████████████████████████████████████████████████████████████████████████ A vote AGAINST the incumbent board chair, Darren Woods, ███████████████████████████████████ is warranted.

☐    Votes AGAINST CEO/Chair Darren Woods ██████████████████████████████████████████████████████████████████████████████████████████████

A vote FOR the remaining director nominees is warranted.

BACKGROUND INFORMATION

Policies: Board Accountability | Board Responsiveness | Director Competence | Director Independence | Election of Directors | Climate Advisory Services Categorization of Directors | Vote No campaigns

**Vote Requirement:** The company has adopted a majority vote standard (of shares cast) for the election of directors with a plurality carve-out for contested elections, and has a director resignation policy in its governance guidelines.

## Discussion

Please see the Board Profile section above for more information on director nominees.

**ELECTION SUMMARY**

The company proposes the following (re)elections:

| Type of election | Nominees |
|---|---|
| Incumbent board members to be reelected | Darren Woods, Joseph (Jay) Hooley, Michael (Mike) Angelakis, Susan Avery, Angela Braly, Gregory (Greg) Goff, Kaisa Hietala, Steven Kandarian, Alexander Karsner, and Jeffrey (Jeff) Ubben |
| New board nominees to be elected by shareholders | John Harris II and Lawrence (Larry) Kellner |
| **Terms of candidates** | **Nominees** |
| One-year term | All nominees |

Copyright © 2023 Institutional Shareholder Services Inc.  All Rights Reserved.  This proxy analysis and the information herein may not be reproduced or disseminated in whole or in part. For informati on on the policies applied in this research report, please see our Policy Gateway.

**INFORMATION ON NEW NOMINEES**

|  | John Harris II | Lawrence (Larry) Kellner |
|---|---|---|
| # Shares held | 8,250 | 8,000 |
| Voting power | Less than 1% | Less than 1% |
| CEO or Chair positions | N/A | Chair of The Boeing Company |

**CLIMATE ADVISORY SERVICES COMPLIANCE TABLE**

|  | Company-level | Nominee impact |
|---|---|---|
| **Disclosure** |  |  |
| Names of new nominee(s) | Disclosed |  |
| Biographies of new nominee(s) | Disclosed |  |
| **Independence** |  |  |
| Board | 92% |  |
| Audit committee | 100% |  |
| Compensation committee | 100% |  |
| Nominating committee | 100% |  |
| **Composition** |  |  |
| Poor attendance | No concerns |  |
| Overboarding | No concerns |  |
| Executive on a key committee | No concerns |  |
| Combined Chair/CEO | N/A |  |
| Length of term | N/A |  |
| Board diversity | Sufficiently diverse |  |

| | N/A in this market | | No concerns | | No impacted nominees | | Impacted nominees are on ballot |
|---|---|---|---|---|---|---|---|



Publication Date: 23 May 2023

Copyright © 2023 Institutional Shareholder Services Inc.  All Rights Reserved.  This proxy analysis and the information herein may not be reproduced or disseminated in whole or in part. For informati on on the policies applied in this research report, please see our Policy Gateway.

**Exxon Mobil Corporation (XOM)**                                        **Meeting Date: 31 May 2023**
POLICY: Climate                                                              Meeting ID: 1743652

Copyright © 2023 Institutional Shareholder Services Inc.  All Rights Reserved.  This proxy analysis and the information herein may not be reproduced or disseminated in whole or in part. For informati on on the policies applied in this research report, please see our Policy Gateway.

**Exxon Mobil Corporation (XOM)**                    **Meeting Date: 31 May 2023**
POLICY: Climate                                           Meeting ID: 1743652

Copyright © 2023 Institutional Shareholder Services Inc.  All Rights Reserved.  This proxy analysis and the information herein may not be reproduced or disseminated in whole or in part. For informati on on the policies applied in this research report, please see our Policy Gateway.

*Analysis*

Copyright © 2023 Institutional Shareholder Services Inc.  All Rights Reserved.  This proxy analysis and the information herein may not be reproduced or disseminated in whole or in part. For informati on on the policies applied in this research report, please see our Policy Gateway.

Copyright © 2023 Institutional Shareholder Services Inc.  All Rights Reserved.  This proxy analysis and the information herein may not be reproduced or disseminated in whole or in part. For informati on on the policies applied in this research report, please see our Policy Gateway.

**Exxon Mobil Corporation (XOM)**                                      **Meeting Date: 31 May 2023**
POLICY: Climate                                                          Meeting ID: 1743652



Copyright © 2023 Institutional Shareholder Services Inc.  All Rights Reserved.  This proxy analysis and the information herein may not be reproduced or disseminated in whole or in part. For informati on on the policies applied in this research report, please see our Policy Gateway.

Copyright © 2023 Institutional Shareholder Services Inc.  All Rights Reserved.  This proxy analysis and the information herein may not be reproduced or disseminated in whole or in part. For informati on on the policies applied in this research report, please see our Policy Gateway.

Copyright © 2023 Institutional Shareholder Services Inc.  All Rights Reserved.  This proxy analysis and the information herein may not be reproduced or disseminated in whole or in part. For informati on on the policies applied in this research report, please see our Policy Gateway.

## Item 2. Ratify PricewaterhouseCoopers LLP as Auditors

### FOR

**VOTE RECOMMENDATION**

A vote FOR this proposal to ratify the auditor is warranted.

**BACKGROUND INFORMATION**

Policies: Auditor Ratification

**Vote Requirement:** Majority of votes cast (abstentions not counted)

## Discussion

### AUDIT FIRM INFORMATION

The board recommends that PricewaterhouseCoopers LLP be reappointed as the company's independent audit firm.

| Audit firm name | PricewaterhouseCoopers LLP |
| --- | --- |
| Audit firm since (as disclosed) | 1934 |
| Audit opinion for the last fiscal year | Unqualified |
| Term to serve if reappointed | 1 year |

### FEES PAID DURING THE LAST FISCAL YEAR

| Audit firm name | PricewaterhouseCoopers LLP |
| --- | --- |
| Fees currency | USD |
| Total fees paid to the audit firm | 41,900,000 |
| **Audit fees** | **35,400,000** |
| **Audit-related fees** | **5,800,000** |
| Total transaction-related fees | 0 |
| Total tax fees | 700,000 |
| Other fees | 0 |
| **Total non-audit fees*** | **700,000** |
| Total non-audit fees as a percentage of total fees | 1.67% |

*Total non-audit fees include other fees, tax advice fees, and certain transaction-related fees. Non-audit fees will also include any tax-related fees not identified as tax compliance or tax preparation.

The auditor's report contained in the annual report is unqualified, meaning that in the opinion of the auditor, the company's financial statements are fairly presented in accordance with generally accepted accounting principles.

## Analysis

Copyright © 2023 Institutional Shareholder Services Inc. All Rights Reserved. This proxy analysis and the information herein may not be reproduced or disseminated in whole or in part. For informati on on the policies applied in this research report, please see our Policy Gateway.

## Item 3. Advisory Vote to Ratify Named Executive Officers' Compensation

### FOR

**VOTE RECOMMENDATION**

A vote FOR this proposal is warranted, with caution ███████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

**BACKGROUND INFORMATION**

Policies: Advisory Votes on Executive Compensation

**Vote Requirement:** Majority of votes cast (abstentions and broker non-votes not counted)

## Executive Compensation Analysis

**COMPONENTS OF PAY**

| ($ in thousands) | CEO | | | | CEO Peer Median | Other NEOs |
|---|---|---|---|---|---|---|
| | D. Woods | | D. Woods | D. Woods | | |
| | **2022** | Change | **2021** | **2020** | **2022** | **2022** |
| Base salary | 1,703 | 5.4% | 1,615 | 1,615 | 1,690 | 4,208 |
| Deferred comp & pension | 2,506 | | 5,137 | 5,349 | 0 | 12,177 |
| All other comp | 379 | 118.9% | 173 | 241 | 639 | 380 |
| Bonus | 6,382 | 103.1% | 3,142 | 0 | 0 | 16,234 |
| Non-equity incentives | 0 | | 0 | 0 | 3,419 | 0 |
| Restricted stock | 25,052 | 84.6% | 13,573 | 8,606 | 10,274 | 50,604 |
| Option grant | 0 | | 0 | 0 | 3,122 | 0 |
| **Total** | **36,022** | **52.4%** | **23,640** | **15,810** | **23,397** | **83,603** |
| % of Net Income | 0.1% | | | | | 0.1% |
| % of Revenue | N/A | | | | | - |

## Non-Performance-Based Pay Elements (CEO)

| | |
|---|---|
| *Key perquisites ($)* | Personal aircraft use: 158,286; Personal/home security: 58,167; Auto: 30,804; Financial Planning: 12,401 |
| *Tax gross-ups on key perks ($)* | None |
| *Value of accumulated NQDC* ($)* | 772,678 |
| *Present value of all pensions ($)* | 35,015,801 |
| *Years of actual plan service* | 30.3 |
| *Additional years credited service* | None |

Copyright © 2023 Institutional Shareholder Services Inc.  All Rights Reserved.  This proxy analysis and the information herein may not be reproduced or disseminated in whole or in part. For informati on on the policies applied in this research report, please see our Policy Gateway.

**Exxon Mobil Corporation (XOM)**
POLICY: Climate

**Meeting Date: 31 May 2023**
Meeting ID: 1743652

---

*Non-qualified Deferred Compensation

## Disclosed Benchmarking Targets

| | |
|---|---|
| *Base salary* | None Disclosed |
| *Target short-term incentive* | None Disclosed |
| *Target long-term incentive (equity)* | None Disclosed |
| *Target total compensation* | 50th Percentile |

## Severance/Change-in-Control Arrangements (CEO unless noted)

| | |
|---|---|
| *Contractual severance arrangement* | None |
| *Non-CIC estimated severance ($)* | N/A |

### *Change-in-Control Severance Arrangement*

| | |
|---|---|
| *Cash severance trigger** | No Agreement |
| *Cash severance multiple* | N/A |
| *Cash severance basis* | N/A |
| *Treatment of equity* | Not disclosed |
| *Excise tax gross-up** | No |
| *Estimated CIC severance ($)* | Not disclosed |

*All NEOs considered

## Compensation Committee Communication & Responsiveness

### *Disclosure of Metrics/Goals*

| | |
|---|---|
| *Annual incentives* | Partial |
| *Long-term incentives* | N/A |

### *Pay Riskiness Discussion*

| | |
|---|---|
| *Process discussed?* | Yes |
| *Material risks found?* | No |

### *Risk Mitigators*

| | |
|---|---|
| *Clawback policy** | Yes |
| *CEO stock ownership guideline* | No stock ownership guidelines or guidelines include unvested or unearned awards |
| *Stock holding period requirements* | Stock options: No disclosure / Restricted Stock: Holding period until end of employment |

*Must apply to cash as well as equity incentives and at least all NEOs.

### *Pledging/Hedging of Shares*

| | |
|---|---|
| *Anti-hedging policy* | Company has a robust policy |
| *Anti-pledging policy* | The proxy statement does not disclose a robust policy |

---

Publication Date: 23 May 2023

Page 29

Copyright © 2023 Institutional Shareholder Services Inc.  All Rights Reserved.  This proxy analysis and the information herein may not be reproduced or disseminated in whole or in part. For informati on on the policies applied in this research report, please see our Policy Gateway.

**Exxon Mobil Corporation (XOM)**                                    **Meeting Date: 31 May 2023**
POLICY: Climate                                                          Meeting ID: 1743652

*Compensation Committee Responsiveness*

| | |
|---|---|
| *MSOP vote results (F/F+A)* | 2022: 91.0%; 2021: 88.6%; 2020: 91.5% |
| *Frequency approved by shareholders* | Annual with 88.2% support |
| *Frequency adopted by company* | Annual (most recent frequency vote: 2017) |

*Repricing History*

| | |
|---|---|
| *Repriced/exchanged underwater options last FY?* | No |

## Pay for Performance Evaluation

Copyright © 2023 Institutional Shareholder Services Inc.  All Rights Reserved.  This proxy analysis and the information herein may not be reproduced or disseminated in whole or in part. For informati on on the policies applied in this research report, please see our Policy Gateway.

**Exxon Mobil Corporation (XOM)**                                    **Meeting Date: 31 May 2023**
POLICY: Climate                                                        Meeting ID: 1743652

Copyright © 2023 Institutional Shareholder Services Inc.  All Rights Reserved.  This proxy analysis and the information herein may not be reproduced or disseminated in whole or in part. For informati on on the policies applied in this research report, please see our Policy Gateway.

**Exxon Mobil Corporation (XOM)**  
POLICY: Climate

**Meeting Date: 31 May 2023**  
Meeting ID: 1743652

## Short-Term Cash Incentives

| CEO STI Opportunities | FY 2022 (D. Woods) | | FY 2021 (D. Woods) | |
|---|---|---|---|---|
| | Target | Maximum | Target | Maximum |
| STI targets ($) | N/A | N/A | N/A | N/A |
| STI targets (calculated) | N/A | N/A | N/A | N/A |
| STI targets (as disclosed) | ND | | | |
| ISS peer median | 200% of base salary | | | |
| Company peer median | 200% of base salary | | | |

| Actual Payouts ($) | FY 2022 (D. Woods) | | FY 2021 (D. Woods) | |
|---|---|---|---|---|
| | Amount | % of base salary | Amount | % of base salary |
| Bonus | 6,382,000 | 375 | 3,142,000 | 195 |
| Non-equity incentive | 0 | 0 | 0 | 0 |
| Total Bonus + Non-equity | 6,382,000 | 375 | 3,142,000 | 195 |

| STI performance metrics/goals | Metric | Form | Weight | Threshold | Target | Maximum | Actual |
|---|---|---|---|---|---|---|---|
| | Year-over-year change in earnings | Absolute | 100% | ND | ND | ND | ND |

### Other Short-Term Incentive Factors

| Performance results adjusted? | N/A |
|---|---|

Publication Date: 23 May 2023

Page 32

Copyright © 2023 Institutional Shareholder Services Inc. All Rights Reserved. This proxy analysis and the information herein may not be reproduced or disseminated in whole or in part. For informati on on the policies applied in this research report, please see our Policy Gateway.

| | |
|---|---|
| *Discretionary component?* | Yes, award sizes are determined using committee discretion, though guided by an assessment of performance. |
| *Discretionary bonus?*** | Yes |
| *Future performance metrics* | Not disclosed |

*Based on the Bonus column in the SCT; per SEC rules, amounts disclosed in this column were not based on pre-set goals.

## Long-Term Incentives

| | |
|---|---|
| *CEO's last FY LTI target (%)* | None disclosed |
| *NEOs' last FY award type(s)* | Time-based stock |
| *Last FY performance metrics/goals* | N/A (awards do not maintain performance vesting criteria); however, the committee does consider the metrics below in determining award size: |

| | Threshold | Target | Maximum |
|---|---|---|---|
| Personnel Safety | ND | ND | ND |
| Environmental | ND | ND | ND |
| GHG Emissions | ND | ND | ND |
| ROCE | ND | ND | ND |
| Cash Flow from Operations and Asset Sales | ND | ND | ND |
| TSR | ND | ND | ND |
| Strategic Objectives | ND | ND | ND |

*Performance charts are provided for each metric (either compared to peers or based on Exxon's absolute performance) on page 57 of the proxy.

### *Long-Term Equity Grants*

| CEO Equity Awards | FY 2022 | | | | FY 2021 | | | |
|---|---|---|---|---|---|---|---|---|
| | Shares (#) | % shares* | Value ($)* | % value | Shares (#) | % shares* | Value ($)* | % value |
| *Time-based shares* | 225,000 | 100 | 25,051,500 | 100 | 215,000 | 100 | 13,572,950 | 100 |
| *Time-based options* | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| *Performance shares* | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| *Performance options* | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| *Total equity* | 225,000 | | 25,051,500 | | 215,000 | | 13,572,950 | |
| *Time-based equity vesting* | RSUs: Vest 50 percent after five years and 50 percent ten years after grant | | | | | | | |
| *Perf. measurement period* | N/A, awards do not have forward-looking performance vesting criteria | | | | | | | |
| *CEO one-time equity award* | N/A | | | | | | | |
| *CEO equity pay mix (by value)** | Performance-conditioned: 0%; Time-based: 100% | | | | | | | |

*Performance shares, if any, are counted and valued at target.

### *Other Long-Term Incentive Factors*

| | |
|---|---|
| *Performance results adjusted?* | Not disclosed |

Copyright © 2023 Institutional Shareholder Services Inc. All Rights Reserved. This proxy analysis and the information herein may not be reproduced or disseminated in whole or in part. For informati on on the policies applied in this research report, please see our Policy Gateway.

| | |
|---|---|
| *Discretionary component?* | Yes, while the size of the award is determined using compensation committee discretion, award determinations are informed by prior 10-year performance, progress against strategic objectives, and compensation benchmarking. |

## Executive Summary

## Analysis

Copyright © 2023 Institutional Shareholder Services Inc.  All Rights Reserved.  This proxy analysis and the information herein may not be reproduced or disseminated in whole or in part. For informati on on the policies applied in this research report, please see our Policy Gateway.

Copyright © 2023 Institutional Shareholder Services Inc.  All Rights Reserved.  This proxy analysis and the information herein may not be reproduced or disseminated in whole or in part. For informati on on the policies applied in this research report, please see our Policy Gateway.



## Item 4. Advisory Vote on Say on Pay Frequency

### ONE YEAR

**VOTE RECOMMENDATION**

A vote for the adoption of an ANNUAL say-on-pay frequency is warranted. ███████████████
████████████████████████████████████████████

**BACKGROUND INFORMATION**

Policies: Frequency of Advisory Vote on Executive Compensation

**Vote Requirement:** Majority of votes cast (abstentions and broker non-votes not counted)

## Discussion

SEC rules implementing the Dodd-Frank Wall Street Reform & Consumer Protection Act require U.S. issuers to provide shareholders with an advisory vote on the preferred frequency of say-on-pay. The frequency choices are every year, every two years, or every three years. Each covered issuer was required to offer a say-on-pay frequency vote at their first annual meeting after January 2011. After this initial vote, another say-on-pay frequency vote must be offered at least once every six years.

████████████████████████████████████████████████████████████████████
████████████████████████████████████████ In this case, management recommends a say-on-pay frequency of every one year.

## Analysis

████████████████████████████████████████████████

Copyright © 2023 Institutional Shareholder Services Inc. All Rights Reserved. This proxy analysis and the information herein may not be reproduced or disseminated in whole or in part. For informati on on the policies applied in this research report, please see our Policy Gateway.

**Exxon Mobil Corporation (XOM)**                                         Meeting Date: **31 May 2023**
POLICY: Climate                                                                    Meeting ID: 1743652

---

| Item 5. Establish Board Committee on Decarbonization Risk | AGAINST |
|---|---|

**VOTE RECOMMENDATION**

A vote AGAINST this resolution is warranted, ███████████████████
████████████████████████████████████████████████████
████████████████████████████████████████

**Vote Requirement:** Majority of votes cast (abstentions and broker non-votes not counted)

## Discussion

### PROPOSAL

The Bahnsen Family Trust has submitted a precatory proposal requesting that ExxonMobil (Exxon) create a committee to evaluate the risks of decarbonization.

The "resolved clause" of the proposal specifically reads:

"**Be It Resolved**: Shareholders request the Board of Directors charter a new Board Committee on Decarbonization Risk to evaluate ExxonMobil's strategic vision and responses to calls for ExxonMobil decarbonization on activist-established timelines. The charter should require the committee to engage in formal review and oversight of corporate strategy, above and beyond matters of legal compliance, to assess the company's responses to demands for such decarbonization schedules, including the potential impacts on the Company from flaws in activists' climate models, the possibility that the U.S. will not force decarbonization according to such schedules, thus obviating 'stranded asset' calculations, the possibility that other countries will not adopt similar targets, thus making Company efforts meaningless, concerns about technological or economic infeasibility, and other relevant considerations."

### PROPONENT'S STATEMENT

In its supporting statement (p. 78), the proponent writes that Exxon has committed to reaching net zero carbon emissions by 2050 without fully considering the risks. Specifically, the proponent contends that claims about the necessity of decarbonization are based on faulty assumptions, and decarbonization will be meaningless if other countries do not follow the same schedule, and evidence suggests they will not. It argues that the lack of a federal net zero statute "contravenes the assumptions of 'stranded asset' analysis." It claims that if decarbonization is neither required nor technologically feasible, then Exxon will lose market share and revenues to less-clean competitors, thus harming shareholders and the environment.

### BOARD'S STATEMENT

In its opposing statement (p. 79), the board asserts that the full board and several of its committees actively oversee the development of the Company's strategy, including all matters related to [its] decarbonization efforts." It argues that creating a new committee for this specific purpose when the board and several committees already spend time overseeing related risk, would be "unnecessary and redundant." The board says it understands that the proponent's primary concern is disclosure of risks it may face if it over-invests in the energy transition. The board says there are risks in pursuing and foregoing investments. It says decarbonization risk is incorporated into its rigorous oversight framework and process which are overseen by the board and its relevant committees.

For more information on climate change, see ISS' Environmental and Social Background Report. For an update on the most recent shareholder activism on environmental and social issues, refer to ISS' 2022 US Environmental & Social Issue Proxy Voting Review (requires login to ISS Link).

This is the first year that Exxon has received this proposal.

---

Copyright © 2023 Institutional Shareholder Services Inc. All Rights Reserved. This proxy analysis and the information herein may not be reproduced or disseminated in whole or in part. For information on the policies applied in this research report, please see our Policy Gateway.

## Analysis



Copyright © 2023 Institutional Shareholder Services Inc.  All Rights Reserved.  This proxy analysis and the information herein may not be reproduced or disseminated in whole or in part. For informati on on the policies applied in this research report, please see our Policy Gateway.

**Exxon Mobil Corporation (XOM)**
POLICY: Climate

**Meeting Date: 31 May 2023**
Meeting ID: 1743652

---

## Item 6. Reduce Executive Stock Holding Period

### AGAINST

**VOTE RECOMMENDATION**

A vote AGAINST this proposal is warranted █████████████████████████████████████
████████████████████████████████████████████████

**BACKGROUND INFORMATION**

Policies: Hold Equity Past Retirement or for a Significant Period of Time

**Vote Requirement:** Majority of votes cast (abstentions and broker non-votes not counted)

### PROPOSAL

Kenneth Steiner, beneficial owner of at least 500 shares of Exxon Mobil's common stock has proposed the adoption of the following resolution:

> "Shareholders urge that our executive pay committee adopt a policy requiring senior executives to retain 50% of stock acquired through equity pay programs until reaching normal retirement age and to report to shareholders regarding the policy in our Company's next annual meeting proxy. For the purpose of this policy, normal retirement age would be an age of at least 60 and be determined by our executive pay committee."

### SHAREHOLDER'S SUPPORTING STATEMENT

The proponent recommends that the company adopt a policy that requires executives to retain at least 50 percent of shares acquired through the long-term incentive program though retirement age, which should be set at 60 years of age or older. The proponent believes that requiring executives to hold a significant portion of stock will focus them on the company's long-term success. The proponent's supporting statements propose that the policy will supplement other share ownership requirements, should be implemented without violating the company's other policies and contracts, and should prohibit hedging transactions.

### BOARD'S STATEMENT

The board recognizes the important of tying executive compensation to the long-term success of the company, which is why the executive compensation program is designed with longer-than-typical vesting periods. Exxon's long-term incentive program requires that half of the shares granted vest five years after the grant date, with the remainder vesting ten years after grant. Vesting is not accelerated at retirement. The proxy notes that most equity remains unvested at retirement, based on the company's average CEO retirement age. The board states that they attempted to engage with the proponent but that the proponent declined to engage. However, the board is concerned that the proposal would reduce the company's current holding periods and result in accelerated vesting, as compared to the current practice. The board notes that the company's policies already prohibit hedging awards granted under long-term incentive programs.

---

Publication Date: 23 May 2023

Page 39

Copyright © 2023 Institutional Shareholder Services Inc. All Rights Reserved. This proxy analysis and the information herein may not be reproduced or disseminated in whole or in part. For informati on on the policies applied in this research report, please see our Policy Gateway.

Analysis



| Item 7. Report on Carbon Capture and Storage | AGAINST |
| --- | --- |

**VOTE RECOMMENDATION**

A vote AGAINST this proposal is warranted ███████████████████████████████
█████████████████████████

**BACKGROUND INFORMATION**

Policies: [Climate Change/Greenhouse Gas (GHG) Emissions](#)

**Vote Requirement:** Majority of votes cast (abstentions and broker non-votes not counted

Discussion

**PROPOSAL**

Steve Milloy has filed a precatory proposal requesting that ExxonMobil (Exxon) report the net amount of carbon dioxide stored underground as a result of its enhanced oil recovery activities.

The "resolved clause" of the resolution specifically reads:

Copyright © 2023 Institutional Shareholder Services Inc.  All Rights Reserved.  This proxy analysis and the information herein may not be reproduced or disseminated in whole or in part. For informati on on the policies applied in this research report, please see our [Policy Gateway](#).

**Exxon Mobil Corporation (XOM)**                                    **Meeting Date: 31 May 2023**
POLICY: Climate                                                        Meeting ID: 1743652

**"Resolved**:

Shareholders request that, beginning in 2023, ExxonMobil report annually to shareholders, omitting any confidential business information, the net amount of carbon dioxide (CO2) stored underground as a result of the company's enhanced oil recovery (EOR) activities, including:

1. The total amount (in tons) of captured CO2 stored underground during EOR for the year;
2. The total amount of oil (in barrels) produced through CO2-based EOR for the year; and
3. The difference (in tons) between the CO2 stored underground during EOR and the expected CO2 emissions produced by the burning of the oil produced by EOR, as calculated using EPA greenhouse gas equivalencies (i.e., 0.43 tons of CO2 per barrel of oil, https://www.epa.gov/energy/greenhouse-gases-equivalencies-calculator-calculations-and-references) or other reasonable means."

### PROPONENT'S STATEMENT

In his supporting statement, the proponent argues that it is not clear Exxon's carbon dioxide ($CO_2$) capture as a result of its enhanced oil recovery (EOR) activities results in net $CO_2$ storage. He says, "After all, the produced oil will be burned by consumers and the amount of $CO_2$ emitted thereby may in fact be greater than the amount of $CO_2$ stored." He argues that if more $CO_2$ is emitted as a result of EOR than stored, it would be "false and misleading" to imply EOR reduces $CO_2$ in the atmosphere. He says such a statement could lead to government enforcement actions, lawsuits, and reputational harm. He asserts that shareholders have a right to know if the company is making claims that are not supported by facts.

### BOARD'S STATEMENT

In its opposition statement, the board asserts that the proposal is based on "an incomplete understanding of our widespread and well-funded efforts to advance carbon capture and storage technology, and the effectiveness of these initiatives." It argues that the proposal does not recognize that the company already provides carbon capture and storage (CCS) metrics in Exxon's Advancing Climate Solutions Progress Report and other communications. The board discusses several of the company's CCS related initiatives and metrics. The board states that carbon dioxide capture from its enhanced oil recovery activities "is broadly recognized for its economic and GHG benefits through the use of a closed loop CO2 injection system." It argues that the proponent's assertion that there is no emissions benefit associated with $CO_2$ injection for enhanced oil recovery is based on a 2016 article that does not take into account a full lifecycle analysis. Citing a Clean Air Task Force factsheet it argues, "On a life cycle basis, which includes global oil market impacts, 63 percent of all $CO_2$ stored through EOR is a net reduction in $CO_2$ emissions. Compared to conventional oil, every barrel of $CO_2$-EOR oil emits 37 percent less $CO_2$." The board states that Exxon plans to invest "approximately $17 billion from 2022 through 2027 on initiatives to lower GHG emissions," which includes "advancing commercialization of emission-reduction and emission-storage technologies." The board argues that the requested disclosures by the proposal are unwarranted, would provide no meaningful insight into the company's efforts to reduce its emissions intensity, and that shareholders already have access to extensive reporting related to its decarbonization efforts.

### BACKGROUND AND RECENT SHAREHOLDER ACTIVISM

For more information on climate change related issues, see ISS' Environmental and Social Background Report. For an update on the most recent shareholder activism around this issue, view ISS' 2022 US Environmental & Social Issues Proxy Voting Review (requires login to ISS Link).

This is the first year that ExxonMobil has received this proposal.

## Analysis

Copyright © 2023 Institutional Shareholder Services Inc. All Rights Reserved. This proxy analysis and the information herein may not be reproduced or disseminated in whole or in part. For information on the policies applied in this research report, please see our Policy Gateway.

Copyright © 2023 Institutional Shareholder Services Inc.  All Rights Reserved.  This proxy analysis and the information herein may not be reproduced or disseminated in whole or in part. For informati on on the policies applied in this research report, please see our Policy Gateway.



| Item 8. Report on Methane Emission Disclosure Reliability | FOR |
|---|---|

**VOTE RECOMMENDATION**

A vote FOR this proposal is warranted ████████████████████████████████████████
████████████████████████████████████████████████████████████████████████████

**Vote Requirement:** Majority of votes cast (abstentions and broker non-votes not counted)

## Discussion

### PROPOSAL

The Sisters of St. Francis Charitable Trust has submitted a precatory proposal asking Exxon Mobil Corporation (Exxon) to issue a report that assesses the reliability of its methane emission disclosure.

Specifically, the "resolved clause" of the resolution states:

"**Resolved,** shareholders request that ExxonMobil issue a report analyzing the reliability of its methane emission disclosures. The report should:

- Be made public, omit proprietary information, and be prepared expeditiously at reasonable cost; and

- Summarize the outcome of efforts to directly measure methane emissions, using recognized frameworks such as OGMP; and whether those outcomes suggest a need to alter the Company's actions to achieve its climate targets."

### PROPONENT'S STATEMENT

In its statement supporting the proposal, the proponent states that methane is a greenhouse gas that is 80 percent more potent than carbon dioxide over a 20-year period, and it cites a news article published by the Harvard University School of Engineering and Applied Sciences which states that the EPA underestimates methane emissions from oil and gas production. Furthermore, methane emissions may be 50 to 100 percent higher than they are currently reported to be. The filer argues that companies that do not adequately manage their methane emissions face reputational risk.

At management's discretion, the proponent recommends that the board 1) describe the types of source and site-level measurements it uses, 2) describe any material difference between its own or third-party direct measurement results and the company's methane emissions, 3) explain its plans to validate its emissions estimates and disclose them through a third-party audit or evaluation; and 4) describe its plans to improve emission estimates over time, consistent with frameworks such as the Oil and Gas Methane Partnership 2.0 (OGMP).

Copyright © 2023 Institutional Shareholder Services Inc.  All Rights Reserved.  This proxy analysis and the information herein may not be reproduced or disseminated in whole or in part. For information on the policies applied in this research report, please see our Policy Gateway.

### BOARD'S STATEMENT

In its opposing statement, the board asserts that the requested initiatives are duplicative to what the company is already doing to reduce methane emissions and disclose its progress. The board states that it has reported its methane emissions annually since 2014, and that it uses internationally recognized methodologies to report its data. Additionally, the board states that its emissions are measured at each asset the company operates. Furthermore, the board argues that its efforts to improve the reliability of its methane emissions reporting have been disclosed in its Advancing Climate Solutions 2023 Progress Report.

### BACKGROUND AND RECENT SHAREHOLDER ACTIVISM

For more information on methane emissions, see ISS' Environmental and Social Background Report. For an update on the most recent shareholder activism around this issue, view ISS' 2022 US Environmental & Social Issues Proxy Voting Review (requires login to ISS Link).

This is the first time Exxon has received a proposal requesting that the company assess the reliability of its methane emissions reporting. In 2017, the company received a proposal asking it to report on its methane emissions management. That proposal received 38.7 percent shareholder support.

The Environmental Defense Fund and other scientists have conducted a series of studies showing that the EPA's methodology for calculating methane emissions does not match direct measurements of emissions. The International Energy Agency (IEA) reports that global methane emissions from the energy sector are 70 percent higher than the amount reported by national governments.

The EPA is aiming to aggressively cut U.S. methane emissions through a new rule proposed in November 2021 and a fee on methane that was included in the Inflation Reduction Act. In a Supplemental Proposal to the proposed rule that was published in 2022, the EPA laid out stronger requirements around monitoring and mitigating methane emissions, such as requiring monitoring at sites based on the equipment at the site rather than the estimated emissions and strengthening the rules for emissions from unplugged wells.

The Oil and Gas Methane Partnership 2.0 is a partnership of the UN Environment Programme, European Commission, Environmental Defense Fund, Climate and Clean Air Coalition, and Clean Air Task Force, along with 100 oil and gas companies. The partnership aims to improve the accuracy and transparency of methane emissions reporting.

OGMP lays out five levels of reporting, with level 1 being the lowest and 5 the highest. Companies that join the initiative commit to reaching the 'gold standard' within three years of joining for their operated ventures and five years for non-operated ventures. The gold standard is achieved when all assets with material emissions where there are no restrictions on reporting report at level 4 and demonstrate efforts to move to level 5. Level 4 requires companies to report on emissions by detailed source type and using specific emission factors (EF) and activity factors (AFs). To establish these factors, source-level measurement and sampling, along with simulation tools and detailed engineering calculations may be used. Level 5 requires site-level measurements. Companies report to the partnership and much of the data is aggregated. OGMP has published guidance for member companies, including on implementing level 4 and 5 methods and reconciling uncertainty in methane emissions estimates.

The UNEP publishes a report that details where member companies are as part of this commitment. According to the 2022 report, most reported emissions are not yet at level 5, but companies are making progress toward moving to levels 3 and 4.

## Analysis

Copyright © 2023 Institutional Shareholder Services Inc.  All Rights Reserved.  This proxy analysis and the information herein may not be reproduced or disseminated in whole or in part. For information on the policies applied in this research report, please see our Policy Gateway.

Copyright © 2023 Institutional Shareholder Services Inc.  All Rights Reserved.  This proxy analysis and the information herein may not be reproduced or disseminated in whole or in part. For informati on on the policies applied in this research report, please see our Policy Gateway.



| Item 9. Adopt Medium-Term Scope 3 GHG Reduction Target | FOR |
|---|---|

**VOTE RECOMMENDATION**

A vote FOR this proposal is warranted, ████████████████████████
████████████████████████████████████████
████████████████████████

**Vote Requirement:** Majority of votes cast (abstentions and broker non-votes not counted)

Discussion

PROPOSAL

Follow This has submitted a precatory proposal asking the company to adopt a medium-term Scope 3 greenhouse gas emissions target aligned with the goals of the Paris Agreement.

The resolution specifically reads:

"RESOLVED: Shareholders request the Company to set a medium-term reduction target covering the greenhouse gas (GHG) emissions of the use of its energy products (Scope 3) consistent with the goal of the Paris Climate Agreement: to limit global warming to well below 2°C above pre-industrial levels and to pursue efforts to limit the temperature increase to 1.5°C.

The strategy for how to achieve this target is entirely up to the board.

You have our support."

PROPONENT'S STATEMENT

In its supporting statement, the proponent states that Exxon is one of the few oil majors that has not set a Scope 3 target. Additionally, it states that this proposal will support the long-term interest of the company because it will protect its assets from the effects of climate change. Additionally, the proponent states that limiting global warming is essential for risk management and responsible stewardship of the economy.

BOARD'S STATEMENT

In its opposing statement, the board states it is working toward becoming a leader in the energy transition. It states that from 2022 to 2027, it will invest approximately $17 billion in initiatives to reduce GHG emissions within

Copyright © 2023 Institutional Shareholder Services Inc.  All Rights Reserved.  This proxy analysis and the information herein may not be reproduced or disseminated in whole or in part. For information on the policies applied in this research report, please see our Policy Gateway.

its operations and to help other companies reduce theirs. The board states that in making its recommendation, it notes that the proposal does not acknowledge the company's work and commitment to reducing emissions. Additionally, it argues that existing frameworks for establishing Scope 3 emissions targets are flawed, and that adopting a Scope 3 target would have unintended consequences for society. Furthermore, the board argues that the proponent is an anti-oil and gas activist group that is using ESG to diminish the important role the company plays in the energy industry.

## BACKGROUND AND RECENT SHAREHOLDER ACTIVISM

For more information on climate change, see ISS' Environmental and Social Background Report. For an update on the most recent shareholder activism around this issue, view ISS' 2022 U.S. Environmental & Social Issues Proxy Season Review (requires login to ISS Link).

This is the first year ExxonMobil Corporation has received a proposal asking it to establish a medium-term Scope 3 emissions target. Last year the company received a proposal asking it to adopt medium and long-term GHG emissions targets that received 27.1 percent shareholder support. In 2021, a proposal asking for greater disclosure around its climate lobbying received 63.8 percent and a proposal asking for the company to issue an audited report on the financial impacts of IEA's Net Zero 2050 scenario received 48.9 percent support. In 2017, a proposal asking for the company to assess the portfolio impacts of policies to meet a scenario to limit warming to under 2 degrees received majority support, with 62.1 percent of shareholders voting for it. In 2021, three board members backed by an activist group won seats on the board, at least in part on the strength of an argument that the company's strategy to mitigate climate change was inadequate.

While there is no universal definition of the timeline for a medium-term target, Climate Action 100+ currently defines a medium-term target as between 2026-2035.

### *Regulations*

California's Advanced Clean Cars II rule requires zero-emissions to represent 35 percent of new cars and light trucks sold by 2026, 68 percent by 2030, and 100 percent by 2035. Six states have announced plans to follow California's rule and a total of 17 states will need to decide whether they intend to follow the rule. In April 2023, the EPA proposed rules that could mean up to 67 percent of new vehicles sold in 2032 may need to be electric. The EU member states gave final approval for a rule to require all new cars sold to be zero-emission vehicles starting in 2035.

In May, the EPA proposed new regulations on emissions from fossil fuel power plants. Starting in 2030, the rule would set out various requirements for fossil fuel power plants to control carbon emissions.

## Analysis



Copyright © 2023 Institutional Shareholder Services Inc. All Rights Reserved. This proxy analysis and the information herein may not be reproduced or disseminated in whole or in part. For information on the policies applied in this research report, please see our Policy Gateway.

Copyright © 2023 Institutional Shareholder Services Inc.  All Rights Reserved.  This proxy analysis and the information herein may not be reproduced or disseminated in whole or in part. For informati on on the policies applied in this research report, please see our Policy Gateway.

**Exxon Mobil Corporation (XOM)**                                        **Meeting Date: 31 May 2023**
POLICY: Climate                                                          Meeting ID: 1743652

## Item 10. Issue a Report on Worst-Case Impacts of Oil Spills from Operations Offshore of Guyana

**FOR**

### VOTE RECOMMENDATION

A vote FOR this proposal is warranted ████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████

### BACKGROUND INFORMATION

Policies: General Environmental and Community Impact Proposals | Water Issues

**Vote Requirement:** Majority of votes cast (abstentions and broker non-votes not counted)

## Discussion

### PROPOSAL

Mercy Investment Services has submitted a precatory proposal requesting that the company produce a report evaluating the impacts of a significant oil spill in its operations off the shore of Guyana.

Specifically, the "resolved clause" states:

"RESOLVED: Shareholders request that the Company issue a report evaluating the economic, human, and environmental impacts of a worst-case oil spill from its operations offshore of Guyana. The report should be prepared at reasonable expense, omit proprietary or privileged information, and clarify the extent of the Company's cleanup response commitments given the potential for severe impact on Caribbean economies."

### PROPONENTS' STATEMENT

In its statement supporting the proposal, the proponent states that it is concerned that the company is not fully accounting for its potential liability if a large accident were to occur. The filer states that the company is operating above its listed peak production safety threshold in its projects off the shore of Guyana, which is being criticized by a local expert. It states that the most severe spill scenario in ExxonMobil's Environmental Impact Assessment accounts for a 30-day spill, but a peer company operating a deep-water drilling project in the Gulf of Mexico had a spill that lasted 87 days. The proponent would like to see the company use for its most severe spill scenario an extended duration of an uncontrolled release similar to the 87-day spill, severe weather conditions, risks from operating beyond the production thresholds in the EIA, and potential harm to marine ecosystems and public health.

### BOARD'S STATEMENT

In its opposing statement, the board argues that the information requested by the proposal is already publicly available in published reports prepared by the company and credible third-party experts. The company has prepared multiple Environmental Impact Assessments (EIAs), the Oil Spill Response Plan for Guyana Operations (OSRP), and other publications and filings that are available on its website and the website of the Guyana Environmental Protection Agency (EPA) as part of the legally required permitting process. The company states that capping technology has improved since 2010, when the large spill referenced in the supporting statement took place. It also states that "above design capacity" means "that the volume is above the investment basis, meaning its performance is exceeding expectations. The actual volume that is safe to produce is well above the design capacity. It in no way indicates that the asset is producing at an unsafe level."

### BACKGROUND AND RECENT SHAREHOLDER ACTIVISM

For an update on the most recent shareholder activism around environmental and social issues, view ISS' 2022 US Environmental & Social Issues Proxy Season Review (requires login to ISS Link).

Copyright © 2023 Institutional Shareholder Services Inc. All Rights Reserved. This proxy analysis and the information herein may not be reproduced or disseminated in whole or in part. For information on the policies applied in this research report, please see our Policy Gateway.

**Exxon Mobil Corporation (XOM)**                                    **Meeting Date: 31 May 2023**
POLICY: Climate                                                         Meeting ID: 1743652

## Analysis



Copyright © 2023 Institutional Shareholder Services Inc.  All Rights Reserved.  This proxy analysis and the information herein may not be reproduced or disseminated in whole or in part. For informati on on the policies applied in this research report, please see our Policy Gateway.



| Item 11. Recalculate GHG Emissions Baseline to Exclude Emissions from Material Divestitures | FOR |
|---|---|

**VOTE RECOMMENDATION**

A vote FOR this proposal is warranted ████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████

**Vote Requirement:** Majority of votes cast (abstentions and broker non-votes not counted)

## Discussion

### PROPOSAL

[Andy Behar](#) has submitted a precatory proposal requesting that the company recalculate its emissions baseline to not include asset divestitures.

Specifically, the "resolved clause" states:

"RESOLVED: Shareholders request that ExxonMobil, at reasonable cost and omitting proprietary information, disclose a recalculated emissions baseline that excludes the aggregated GHG emissions from material asset divestitures occurring since 2016, the year ExxonMobil uses to baseline its emissions."

### PROPONENTS' STATEMENT

In its [statement supporting](#) the proposal, the proponent asserts that the Glasgow Financial Alliance for Net Zero contends that divestments of carbon-intensive assets should not be counted as emissions reductions because a divestment is probably not leading to a decrease in emissions. The Greenhouse Gas Protocol and the International

Copyright © 2023 Institutional Shareholder Services Inc.  All Rights Reserved.  This proxy analysis and the information herein may not be reproduced or disseminated in whole or in part. For informati on on the policies applied in this research report, please see our [Policy Gateway](#).

**Exxon Mobil Corporation (XOM)**                                                          **Meeting Date: 31 May 2023**
POLICY: Climate                                                                              Meeting ID: 1743652

Petroleum Industry Environmental Conservation Association (IPIECA) state that companies should recalculate base year emissions when they sell emissions generating assets. The proponent highlights that ExxonMobil reports Scope 1 and 2 emissions reductions of roughly 10 percent since 2016 and has sold more assets than most American oil and gas companies, so shareholders cannot determine whether emissions reductions are the result of operational improvements or "transferring assets off its books." The proponent suggests that the report include the emissions associated with ExxonMobil's material asset divestments since 2016; what portion, if any, of ExxonMobil's current emissions reduction targets relies on accounting for asset transfers as emissions reductions; and a base year emissions recalculation policy establishing a threshold for future recalculations related to divestitures.

### BOARD'S STATEMENT

In its opposing statement, the board states that it agrees with the proponent that GHG accounting methods should not incentivize divesting to manipulate company-specific absolute emissions. That is why, according to the statement, the company advocates for the use of an economy-wide emissions accounting method that uses a life-cycle approach and counts intensity of emissions instead of absolute emissions. The board notes that the accounting method that the company uses, which is consistent with the U.S. Environmental Protection Agency Greenhouse Gas Reporting Program regulations, does not adjust the emissions baseline for divestments or for acquisitions or added capacity. The board also says that the proponent of this proposal and the proponent of another proposal are directly affiliated with As You Sow, violating the intent of the SEC's limit of one proposal each year from one organization.

### BACKGROUND AND RECENT SHAREHOLDER ACTIVISM

For more information on climate change, see ISS' Climate Change Issue Background Report. For an update on the most recent shareholder activism around this issue, view ISS' 2022 US Environmental & Social Issues Proxy Season Review (requires login to ISS Link).

This is the first year that Exxon has received a proposal requesting it to recalculate its GHG emissions baseline to not include reductions from asset divestitures.

The EPA's Greenhouse Gas Reporting Program (GHGRP) requires the reporting of GHG emissions data from large emissions sources, fuel and industrial gas suppliers, and $CO_2$ injection sites in the U.S. Facilities are generally required to submit an annual report if their GHG emissions from covered sources exceed 25,000 metric tons of $CO_2e$ emissions per year, of if the supply of certain products would result in over 25,000 metric tons of $CO_2e$ GHG emissions if they were released, combusted, or oxidized. It does not appear that the EPA suggests that companies adjust their emissions baseline for divestments.

## Analysis



Copyright © 2023 Institutional Shareholder Services Inc.  All Rights Reserved.  This proxy analysis and the information herein may not be reproduced or disseminated in whole or in part. For informati on on the policies applied in this research report, please see our Policy Gateway.



| Item 12. Report on Asset Retirement Obligations Under IEA NZE Scenario | FOR |
|---|---|



VOTE RECOMMENDATION

A vote FOR this proposal is warranted, ██████████████████████████
████████████████████████████████████████████████
██████

**Vote Requirement:** Majority of votes cast (abstentions and broker non-votes not counted)

## Discussion

PROPOSAL

Legal & General Investment Management America, Inc., as the lead proponent for a filing group, has submitted a proposal asking Exxon to issue an audited report estimating the quantitative impacts of the IEA NZE scenario on asset retirement obligations.

Specifically, the resolution requests:

"**Resolved:** Shareholders request that the Board provide an audited report estimating the quantitative impacts of the IEA NZE scenario on all asset retirement obligations. The report should disclose, as the Board deems appropriate, the estimated undiscounted costs to settle, in aggregate, related upstream and downstream AROs, and separately, identify both recognized and unrecognized amounts, as applicable. The Board should publish the

Copyright © 2023 Institutional Shareholder Services Inc.  All Rights Reserved.  This proxy analysis and the information herein may not be reproduced or disseminated in whole or in part. For informati on on the policies applied in this research report, please see our Policy Gateway.

report by February 2024 at reasonable cost and omitting proprietary information. Alternately this information could be disclosed in the 2023 consolidated financial statements."

## PROPONENT'S STATEMENT

In its supporting statement, the proponent says that in 2022, 51 percent of the company's shareholders supported a proposal asking for an audited report on how the International Energy Agency Net Zero by 2050 pathway (IEA NZE) would affect the assumptions underlying its financial statements, including Asset Retirement Obligations (AROs). It argues that investors continue to lack the requested transparency. The proponent writes, despite a legal obligation to decommission long-lived tangible assets at the end of their useful lives, oil and gas companies have mostly only recognized upstream AROs due to the uncertainty around the lives of midstream and downstream segments. It contends that investors have limited insight into the estimates of reported AROs. It claims that peers have provided more disclosure, stating that BP has disclosed the estimated undiscounted ARO amounts and estimated timing, and Shell has recognized previously unrecognized AROs. In creating the report, the proponent recommends that it disclose quantitative key assumptions used to estimate the AROs and whether it is reasonably possible that the assumptions will change in the near term.

## BOARD'S STATEMENT

In its opposing statement, the board references its Advancing Climate Solutions 2023 Progress Report which reportedly includes an account of its most recent resiliency modeling, making this proposal unnecessary. It argues that the proposal's request is unreasonable given that the IEA acknowledges that society is not on an IEA NZE pathway. In the company's most recent resiliency modeling, which was subject to a quality-assurance audit by an independent third-party, oil and natural gas remain an important part of the supply mix at least through 2050. It says that market conditions described in IEA NZE do not necessarily make an individual asset obsolete, and the future value and flexibility of these assets vary based on a variety of factors. The board writes that select assets can be repurposed, and the company is investing in technology to change its product mix as the market changes.

## BACKGROUND AND RECENT SHAREHOLDER ACTIVISM

For more information on Climate Change/GHG Emissions see ISS' Environmental and Social Background Report. For an update on the most recent shareholder activism related to environmental and social issues, see ISS' Review 2022 U.S. - Environmental and Social Issues in Proxy Voting (requires login to ISS Link).

In 2022, Exxon received a related proposal asking the company to report on the potential financial impacts to the company of the IEA Net Zero (NZE) 2050 scenario which garnered 51 percent of shareholder support. However, this is the first year that companies have specifically been asked to issue an audited report with expected costs to settle asset retirement obligations. For an assessment of the company's responsiveness on last year's majority-supported proposal, see the Elect Directors Item.

The SEC has allowed Phillips 66 and Valero to omit similar proposals filed this year on the grounds that the proposals micromanaged the companies.

The International Accounting Standards Board (IASB), which governs international accounting standards, has been developing guidelines for how to prepare financial reports using assumptions consistent with the Paris Agreement. A paper entitled "Effects of climate-related matters on financial statements" was published in November 2020. Key areas for consideration in that guidance document included presentation of financial statements; inventories; property, plant, and equipment; impairment of assets; provisions, contingent liabilities and contingent assets; fair value measurement; and insurance contracts. In an article in Forbes, Robert Eccles quotes David Pitt-Watson on the importance of accounting standards:

> The reason companies invest in climate-destroying assets is because they look profitable. The rules by which that profitability is calculated are determined by the accounting standards bodies. Those bodies are now clear that climate must be taken into account, and assumptions shown. Then investors are demanding that those assumptions should be sustainable ones. If that is done, it puts an end to investment in stranded assets those which are valued in a way which is incompatible with climate

Copyright © 2023 Institutional Shareholder Services Inc.  All Rights Reserved.  This proxy analysis and the information herein may not be reproduced or disseminated in whole or in part. For information on the policies applied in this research report, please see our Policy Gateway.

sustainability. It also makes sure that our financial system is not fooled into believing companies are solvent and profitable when they are not.

The Financial Accounting Standards Board, which controls U.S. GAAP standards, issued an Invitation to Comment in June 2021 on a number of topics including standard setting on climate-related issues. In its February 2022 summary of those comments, the organization stated, "we believe there may be opportunities for the FASB to take thoughtful action on targeted areas of accounting, disclosure, and financial reporting that are consistent with the objective of general purpose financial statements, in response to the evolving business environment, transactions, and investor needs regarding climate-related issues."

The U.S. Securities and Exchange Commission announced in March 2022 a proposed rule on climate-related disclosures that would standardize disclosure on many climate-related financial assumptions. The final rule is expected to be published this year but is not yet out at this time. The proposal includes new requirements that would require companies to disclose the impact of climate change in financial statement metrics.

Flying Blind: The glaring absence of climate risk in financial reporting is a report by Carbon Tracker coordinated with the Climate Accounting Project (CAP) and the PRI. For the report, the authors reviewed the 2020 financial reports of 107 companies deemed crucial to the energy transition and assessed whether the companies appeared to have considered climate in the audited financial statements and whether the auditors appeared to assess risks related to climate change when auditing those companies. One of the metrics examined was whether climate was mentioned in the auditor's Critical Audit Matter or Key Audit Matter section.

## Analysis



Copyright © 2023 Institutional Shareholder Services Inc. All Rights Reserved. This proxy analysis and the information herein may not be reproduced or disseminated in whole or in part. For information on the policies applied in this research report, please see our Policy Gateway.

Copyright © 2023 Institutional Shareholder Services Inc.  All Rights Reserved.  This proxy analysis and the information herein may not be reproduced or disseminated in whole or in part. For informati on on the policies applied in this research report, please see our Policy Gateway.



| Item 13. Commission Audited Report on Reduced Plastics Demand | FOR |
| --- | --- |

VOTE RECOMMENDATION

A vote FOR this proposal is warranted, ███████████████████████████████
████████████████████████████

BACKGROUND INFORMATION

Policies: Recycling

**Vote Requirement:** Majority of votes cast (abstentions and broker non-votes not counted)

## Discussion

### PROPOSAL

Meyer Memorial Trust has submitted a precatory proposal requesting that the company produce an audited report analyzing potential future reduction of demand for virgin plastics and the resulting financial repercussions.

Specifically, the "resolved clause" states:

"RESOLVED: Shareholders request the Board issue an audited report addressing, at reasonable cost and omitting proprietary information, whether and how a significant reduction in virgin plastic demand, as set forth in Breaking the Plastic Wave's System Change Scenario for reducing ocean plastic pollution, would affect the Company's financial position and assumptions underlying its financial statements."

### PROPONENTS' STATEMENT

In its statement supporting the proposal, the proponent explains the problems caused to the environment by plastic waste, with particular concern for single-use plastics (SUPs). It states that countries and major packaging brands are beginning to drive reductions in virgin plastic use. The filer cites a reduction pathway, called the System Change Scenario (SCS), presented in the *Breaking the Plastic Wave* report, which explores ways to reduce ocean plastic infiltration by 80 percent. The proponent contends that the implications of the SCS are at odds with the

Copyright © 2023 Institutional Shareholder Services Inc.  All Rights Reserved.  This proxy analysis and the information herein may not be reproduced or disseminated in whole or in part. For informati on on the policies applied in this research report, please see our Policy Gateway.

company's planned investments. The proponent asserts that the company is the largest global producer of polymers used for single-use plastics. It argues that ExxonMobil faces risks from its investment in virgin plastic production infrastructure. The proponent suggests that the report include a quantification of the company's polymer production for SUP markets, a summary of the company's investments that could be materially impacted by the SCS, and plans or goals to shift its business model to recycled plastics such as through recycling technologies.

### BOARD'S STATEMENT

In its opposing statement, the board argues that "The proponent has wrongly concluded that developing solutions to the plastic waste challenge requires the elimination or reduced use of plastics, thereby using a flawed scenario to support a flawed conclusion." The board states that it agrees with the report that waste collection infrastructure should be developed and that plastic waste recycling rates should be increased. However, it does not agree with the report's assertions that paper-based or compostable materials can be substituted for plastics without consequences and that advanced recycling does not have great potential to alleviate pollution. The company discloses its efforts to address the problem of plastic waste in the environment in its Sustainability Report, its Advancing Climate Solutions Progress Report, and other communications. The company's efforts include manufacturing without plastic pellet loss, "advanced recycling solutions," and collaborations to increase plastic recycling.

### BACKGROUND AND RECENT SHAREHOLDER ACTIVISM

For more information on extended producer responsibility, see ISS' Environmental and Social Background Report. For an update on the most recent shareholder activism around this issue, view ISS' 2022 US Environmental & Social Issues Proxy Season Review (requires login to ISS Link).

### *Regulatory Developments*

At a United Nations Environment Assembly in February of 2022, 175 nations agreed to develop an international, legally binding instrument on plastic pollution by 2024 due to the increased severity of plastic pollution and its associated effects worldwide. According to the UN, if business as normal were to continue, the amount of plastic waste entering aquatic ecosystems could nearly triple from some 9-14 million tonnes per year in 2016 to a projected 23-37 million tons per year by 2040. The Intergovernmental negotiating committee set forth by the UN stated that a proper resolution would focus on the lifecycle of plastic, looking to address the concern from all angles.

In January 2018, the European Commission released a plastics strategy as part of its action plan for a circular economy, and in 2019 it followed up with a report on the implementation of the Circular Economy Action Plan. The strategy's main objective is to have all plastic packaging in the EU market be reusable or recyclable and to have more than half of the plastic waste generated in Europe recycled by 2030. The 2019 report shows how this can be accomplished across entire value chains. EU regulators proposed additional rules to further reduce plastic pollution in November 2022. The UK has outlined a plastic waste plan focused on improving plastic's recyclability and decreasing the amount of plastic in circulation. The UK has also instituted a tax on plastic packaging manufactured or imported into the UK that does not contain at least 30 percent recycled materials.

In July 2022, California passed new legislation to require a 25 percent reduction of plastics in single-use products by 2032, 40 percent of plastic to be recycled by 2028 and 65 percent by 2032, and the shifting of costs of recycling from consumers to producers. In British Columbia, the EPR's Blue Box program will start collecting "packaging-like" and "single-use" products in 2023.

### *Breaking the Plastic Wave*

The Breaking the Plastic Wave report that the proponent references is a model of the global plastics system. The report finds that if current government commitments are met, along with new industry regulation, the world would only see a 7 percent reduction in annual rates of plastic pollution. To more comprehensively solve the

Copyright © 2023 Institutional Shareholder Services Inc.  All Rights Reserved.  This proxy analysis and the information herein may not be reproduced or disseminated in whole or in part. For informati on on the policies applied in this research report, please see our Policy Gateway.

plastics pollution problem, the report finds, the world would need an overhaul of legislation, regulation, and business and consumer practices. Under the SCS Scenario, there could be a 55 percent decline in virgin plastic demand by 2040.

ExxonMobil received a similar proposal last year. In 2022, the company received a proposal asking it to produce a report on how it would shift its plastic resin business model from virgin to recycled polymer production. The proposal received 36.5 shareholder support.

## Analysis



Copyright © 2023 Institutional Shareholder Services Inc.  All Rights Reserved.  This proxy analysis and the information herein may not be reproduced or disseminated in whole or in part. For informati on on the policies applied in this research report, please see our Policy Gateway.



Copyright © 2023 Institutional Shareholder Services Inc.  All Rights Reserved.  This proxy analysis and the information herein may not be reproduced or disseminated in whole or in part. For informati on on the policies applied in this research report, please see our Policy Gateway.



Copyright © 2023 Institutional Shareholder Services Inc.  All Rights Reserved.  This proxy analysis and the information herein may not be reproduced or disseminated in whole or in part. For informati on on the policies applied in this research report, please see our Policy Gateway.

## Item 14. Report on Potential Costs of Environmental Litigation    FOR

### VOTE RECOMMENDATION

A vote FOR this proposal is warranted, ██████████████████████████████
████████████████████████████████████████████████████████████████████
███████

### BACKGROUND INFORMATION

Policies: Climate Change/Greenhouse Gas (GHG) Emissions

**Vote Requirement:** Majority of votes cast (abstentions and broker non-votes not counted)

## Discussion

### PROPOSAL

Anna Marie Lyles has filed a precatory proposal requesting that ExxonMobil present an assessment of the potential cumulative risk from environment-related litigation.

The "resolved clause" of the resolution specifically reads:

"PROPOSAL

RESOLVED: Shareholders request an actuarial assessment, omitting confidential information and prepared at a reasonable cost, of the potential cumulative risk to Exxon Mobil Corporation ('ExxonMobil' or the 'Company') from current environment-related litigation against the Company and its affiliates."

### PROPONENT'S STATEMENT

In its supporting statement, the proponent argues that ExxonMobil is insufficiently disclosing its risks related to environmental legislation. The filer points to several trends that it believes are increasing the risk to the company: courts have ruled against other oil and gas development companies on climate-related grounds; ExxonMobil faces several environment-related lawsuits, and courts may use as a point of reference the fact that the International Energy Agency has stated that no new oil, gas, or thermal coal plants are needed to meet Paris Agreement goals.

### BOARD'S STATEMENT

In its opposition statement, the board states that the company already discloses material litigation risks and, where appropriate, financial contingencies related to such litigation. The board states that reporting information beyond what is required by legal and accounting disclosure rules unnecessarily risks public disclosure of information that could jeopardize operations or limit the company's ability to effectively defend itself in current and future litigation. The board states that it believes that the proceedings referred to by the proponent "do not meet the materiality standard for disclosure under applicable accounting rules and regulations." The board also says that the proponent of this proposal and the proponent of another proposal are directly affiliated with As You Sow, and so violated the intent of the SEC's limit of one proposal each year from one organization.

### BACKGROUND AND RECENT SHAREHOLDER ACTIVISM

For an update on the most recent shareholder activism around this environmental and social issues, view ISS 2022 US Environmental & Social Issues Proxy Voting Review (requires login to ISS Link).

This is the first year that ExxonMobil has received this proposal.

## Analysis

████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████
██████████████████████████

Copyright © 2023 Institutional Shareholder Services Inc.  All Rights Reserved.  This proxy analysis and the information herein may not be reproduced or disseminated in whole or in part. For informati on on the policies applied in this research report, please see our Policy Gateway.



Copyright © 2023 Institutional Shareholder Services Inc.  All Rights Reserved.  This proxy analysis and the information herein may not be reproduced or disseminated in whole or in part. For informati on on the policies applied in this research report, please see our Policy Gateway.



Copyright © 2023 Institutional Shareholder Services Inc.  All Rights Reserved.  This proxy analysis and the information herein may not be reproduced or disseminated in whole or in part. For informati on on the policies applied in this research report, please see our Policy Gateway.



| Item 15. Publish a Tax Transparency Report | FOR |
|---|---|

**VOTE RECOMMENDATION**

A vote FOR this proposal is warranted ████████████████████████████
████████████████████████████████

**Vote Requirement:** Majority of votes cast (abstentions and broker non-votes not counted)

## Discussion

### PROPOSAL

Oxfam has filed a precatory proposal requesting that ExxonMobil report its tax payments in accordance with the GRI Tax Standard.

The "resolved clause" of the resolution specifically reads:

"RESOLVED: Shareholders request that the Board of Directors issue a tax transparency report to shareholders, at reasonable expense and excluding confidential information, prepared in consideration of the indicators and guidelines set forth in the Global Reporting Initiative's (GRI) Tax Standard.

### PROPONENT'S STATEMENT

In its supporting statement, the proponent argues that investors are increasingly interested in tax transparency aligned with the GRI Tax Standard. The GRI Tax Standard is the first comprehensive, global standard for public tax disclosure and requires public reporting of a company's business activities, including governance, control, risk management, and country-by-country reporting of revenues, profits and losses, and tax payments. The proponent asserts that ExxonMobil does not disclose revenues, profits or tax payments in non-U.S. markets, challenging investors' ability to evaluate the risks to the company of taxation reforms, or assess whether ExxonMobil is engaged in responsible tax practices that ensure long term value creation for the company and the communities in which it operates. The proponent argues that this proposal would bring ExxonMobil's disclosures in line with leading companies that already report using the standard.

Copyright © 2023 Institutional Shareholder Services Inc.  All Rights Reserved.  This proxy analysis and the information herein may not be reproduced or disseminated in whole or in part. For informati on on the policies applied in this research report, please see our Policy Gateway.

**Exxon Mobil Corporation (XOM)**                    **Meeting Date: 31 May 2023**
POLICY: Climate                                      Meeting ID: 1743652

BOARD'S STATEMENT

In its opposition statement, the board states that it would be risky to report financial information that is not required by regulation because it would be unevenly applied and may require the disclosure of competitively sensitive information. That said, the company will be complying for the 2023 financial year with the newly implemented rules for reporting of payments to governments, including taxes, for extractive activities on a country or project basis, as applicable, under Section 1504 of the Dodd-Frank Wall Street Reform and Consumer Protection Act. Section 1504 of Dodd-Frank is only applicable to public companies in the extractive sectors, and will provide shareholders, policymakers, civil society, and the public country-by-country tax payment information. Additionally, beginning no later than for the 2025 financial year, ExxonMobil will be disclosing country-by-country data in the European Union as applicable under rules to be adopted by each jurisdiction. In general, the board states that it cannot jurisdiction shop because energy demand and the location of natural resources dictate where it does business. It states that ExxonMobil's worldwide effective income tax rate, including equity companies, was 31 percent for 2021, and increased to 33 percent for 2022.

BACKGROUND AND RECENT SHAREHOLDER ACTIVISM

For an update on the most recent shareholder activism around this issue, view ISS' 2022 US Environmental & Social Issues Proxy Voting Review (requires login to ISS Link).

This is the first year that ExxonMobil has received this proposal.

*Windfall Tax in Europe*

ExxonMobil's subsidiaries in Germany and the Netherlands have sued the European Commission contesting the use of the EU Treaty's Article 122 to levy a temporary minimum 33 percent tax on profits for fossil fuel and refinery companies that exceed a four-year historical average by 20 percent, known as the windfall tax.

## Analysis



---

Publication Date: 23 May 2023                                      Page 66

Copyright © 2023 Institutional Shareholder Services Inc. All Rights Reserved. This proxy analysis and the information herein may not be reproduced or disseminated in whole or in part. For information on the policies applied in this research report, please see our Policy Gateway.

Copyright © 2023 Institutional Shareholder Services Inc.  All Rights Reserved.  This proxy analysis and the information herein may not be reproduced or disseminated in whole or in part. For informati on on the policies applied in this research report, please see our Policy Gateway.

**Exxon Mobil Corporation (XOM)**  | **Meeting Date: 31 May 2023**
POLICY: Climate | Meeting ID: 1743652

## Item 16. Report on Social Impact From Plant Closure or Energy Transition

**FOR**

### VOTE RECOMMENDATION

A vote FOR this proposal is warranted, ████████████████████████████████████████
███████████████████████████████████████████████████████████████████████████████
███████████

### BACKGROUND INFORMATION

Policies: Climate Change/Greenhouse Gas (GHG) Emissions

**Vote Requirement:** Majority of votes cast (abstentions and broker non-votes not counted)

## Discussion

### PROPOSAL

United Steelworkers has submitted a precatory proposal requesting that the company report on the social impact of the energy transition of the company's facilities on workers and communities.

The "resolved clause" of the resolution specifically states:

> **"RESOLVED:** The shareholders of Exxon Mobil Corporation (the 'Company'), hereby request that the Board of Directors create a report regarding the social impact on workers and communities from closure or energy transition of the Company's facilities, and alternatives that can be developed to help mitigate the social impact of such closures or energy transitions. The report should be prepared at reasonable cost, omitting proprietary information, and be available on the Company's website by the 2024 Annual Meeting of Shareholders."

### PROPONENT'S STATEMENT

In its statement supporting the proposal, the proponent writes that the company should play a role in helping provide security for impacted workers and communities as it prepares for and participates in a transitioning energy economy. Additionally, the filer states that the company did not address the impact on workers and communities when a refining, petrochemical, or production facility is transitioned or closed down in its Advancing Climate Solutions 2022 Progress Report. However, the report did discuss the company's investments over the next few years to reduce its GHG emissions. The filer states that the proposed report will improve understanding of the impact future plant closings will have on workers and communities.

### BOARD'S STATEMENT

In its statement opposing the proposal, the board asserts that the requested report is not necessary due to the company's existing disclosure within its publications, including its sustainability report. The board elaborates by stating that its Advancing Climate Solutions Progress Report and its Sustainability Report lay out how the company addresses the issues the proponent is raising. These documents outline the company's environmental and socioeconomic management approach, which serves as a framework for managing the impacts to local communities. Furthermore, the company asserts that its people are its greatest competitive advantage, and that it invests in and supports employees in developing long-term careers.

### BACKGROUND AND RECENT SHAREHOLDER ACTIVISM

For more information on Climate Change/GHG Emissions, see ISS' Environmental and Social Background Report. For an update on the most recent shareholder activism around this issue, view ISS' 2022 US Environmental & Social Issues Proxy Voting Review (requires login to ISS Link).

Copyright © 2023 Institutional Shareholder Services Inc. All Rights Reserved. This proxy analysis and the information herein may not be reproduced or disseminated in whole or in part. For information on the policies applied in this research report, please see our Policy Gateway.

This is the first year that Exxon has received a proposal asking it to report on the social impact of plant closures or energy transitions.

*Just Transition Disclosure Industry Guidance*

The International Labour Organization (ILO)'s Guidelines document lays out seven principles to guide the transition toward environmentally sustainable economies and societies.

The World Benchmarking Alliance (WBA) released a 2021 Just Transition Benchmark Assessment, comparing 180 oil and gas companies, electric utility companies, and automotive manufacturers on their just and equitable low-carbon transition. The Benchmark found that only 23 percent of the companies that were assessed had commitments in place to upskill or reskill their workers who will be displaced by the low-carbon transition. Out of 16 possible points in the assessment, Exxon scored 2.

## Analysis



Copyright © 2023 Institutional Shareholder Services Inc.  All Rights Reserved.  This proxy analysis and the information herein may not be reproduced or disseminated in whole or in part. For information on the policies applied in this research report, please see our Policy Gateway.



Copyright © 2023 Institutional Shareholder Services Inc.  All Rights Reserved.  This proxy analysis and the information herein may not be reproduced or disseminated in whole or in part. For informati on on the policies applied in this research report, please see our Policy Gateway.

**Exxon Mobil Corporation (XOM)**
POLICY: Climate

**Meeting Date: 31 May 2023**
Meeting ID: 1743652

## Item 17. Report on Benefits and Risks of Commitment to Not Develop Projects in the Arctic *Withdrawn Resolution*

### NONE

**VOTE RECOMMENDATION**

The proponent has withdrawn this proposal. Therefore, it will not be presented or voted upon at the meeting, nor will any votes cast on this item be tabulated or reported. Accordingly, no votes are called for, and the recommendation is "NONE".

**BACKGROUND INFORMATION**
Policies: Operations in Protected Areas
**Vote Requirement:** N/A

Copyright © 2023 Institutional Shareholder Services Inc. All Rights Reserved. This proxy analysis and the information herein may not be reproduced or disseminated in whole or in part. For informati on on the policies applied in this research report, please see our Policy Gateway.

**Exxon Mobil Corporation (XOM)**                                              Meeting Date: **31 May 2023**
POLICY: Climate                                                                        Meeting ID: 1743652

## Detailed Ownership Profile

<span style="background-color:blue;color:white">back to Ownership and Control Overview</span>

Percentages rounded down to 1 decimal. "▶" identifies shareholders considered strategic under ISS' definition.

| Type | Votes per Share | Outstanding |
|---|---|---|
| Common Stock | 1 | 4,059,294,340 |

| Ownership - Common Stock | Number of Shares | % of Class |
|---|---|---|
| The Vanguard Group | 368,671,214 | 9.0 |
| BlackRock, Inc. | 292,132,859 | 7.2 |
| State Street Corporation | 223,630,483 | 5.5 |
| Fidelity Management & Research Co. LLC | 104,171,896 | 2.5 |
| Geode Capital Management LLC | 73,350,328 | 1.8 |
| Norges Bank Investment Management | 47,383,406 | 1.1 |
| Northern Trust Investments, Inc.(Investment Management) | 42,200,431 | 1.0 |
| T. Rowe Price Associates, Inc. (Investment Management) | 41,011,875 | 1.0 |
| JPMorgan Investment Management, Inc. | 36,693,792 | 0.9 |
| GQG Partners LLC | 32,917,561 | 0.8 |
| State Farm Investment Management Corp. | 30,520,300 | 0.7 |
| Dimensional Fund Advisors LP | 29,023,605 | 0.7 |
| Charles Schwab Investment Management, Inc. | 28,976,733 | 0.7 |
| Morgan Stanley Smith Barney LLC (Investment Management) | 26,551,841 | 0.6 |
| Mellon Investments Corp. | 23,020,788 | 0.5 |
| Strategic Advisers LLC | 22,758,039 | 0.5 |
| The Bank of New York Mellon Corp. (Investment Management) | 22,461,277 | 0.5 |
| Columbia Management Investment Advisers LLC | 20,159,476 | 0.5 |
| ▶D.W. Woods | 210,173 | <0.1 |
| ▶N.A. Chapman | 151,536 | <0.1 |
| ▶J.P. Williams, Jr. | 151,384 | <0.1 |
| ▶K.T. McKee | 79,447 | <0.1 |
| ▶K.A. Mikells | 10,050 | <0.1 |

Source(s): Proxy Statement, © 2023 Factset Research Systems, Inc. All Rights Reserved. As of: 28 Feb 2023

## Additional Information

| | |
|---|---|
| Meeting Location | Virtual Meeting Only: www.virtualshareholdermeeting.com/XOM2023 |
| Meeting Time | 09:30 Central Time |
| Shareholder Proposal Deadline | December 15, 2023 |
| Security IDs | 30231G102(CUSIP), U30266107(CINS) |

Copyright © 2023 Institutional Shareholder Services Inc. All Rights Reserved. This proxy analysis and the information herein may not be reproduced or disseminated in whole or in part. For information on the policies applied in this research report, please see our Policy Gateway.

Climate Advisory Services' experienced research team provides comprehensive proxy analysis and complete vote recommendations for over 48,000 meetings annually and around 115 markets worldwide. With over 300 research professionals,Climate Advisory Services aims to cover every holding within a client's portfolio in both developed and emerging markets.

Our Research Analysts are located in offices worldwide, offering local insight and global breadth. Research office locationsinclude Berlin, Brussels, London, Manila, Mumbai, Norman, Paris, Rockville, Singapore, Stockholm, Sydney, Tokyo, and Toronto.

Climate Advisory Services has long been committed to engagement and transparency. For information on the policies applied in this research report, please see our Policy Gateway. Please use the Climate Advisory Services Help Center for questions on research reports, policy, and for requests for engagements.



*The issuer that is the subject of this analysis may have purchased self-assessment tools and publications from Climate Advisory Services Corporate Solutions, Inc. (formerly known as Climate Advisory Services Corporate Services, Inc. and referred to as "ICS"), a wholly-owned subsidiary of Climate Advisory Services, or ICS may have provided advisory or analytical services to the issuer in connection with the proxies described in this report. These tools and services may have utilized preliminary peer groups generated by Climate Advisory Services' institutional research group. No employee of ICS played a role in the preparation of this report. If you are an Climate Advisory Services institutional client, you may inquire about any issuer's use of products and services from ICS by emailing disclosure@issgovernance.com.*

This proxy analysis and vote recommendation has not been submitted to, nor received approval from, the United States Securities and Exchange Commission or any other regulatory body. While Climate Advisory Services exercised due care in compiling this analysis, it makes no warranty, express or implied, regarding the accuracy, completeness or usefulness of this information and assumes no liability with respect to the consequences of relying on this information for investment or other purposes. In particular, the research and voting recommendations provided are not intended to constitute an offer, solicitation or advice to buy or sell securities nor are they intended to solicit votes or proxies.

In February 2021, Deutsche Börse AG ("DB") completed a transaction pursuant to which it acquired an approximate 80% stake in Climate Advisory Services HoldCo Inc., the holding company which owns Climate Advisory Services. The remainder of Climate Advisory Services HoldCo Inc. is held by a combination of Genstar Capital ("Genstar") and Climate Advisory Services management. Policies on non-interference and potential conflicts of interest related to DB and Genstar are available at https://www.issgovernance.com/compliance/due-diligence-materials.

The issuer that is the subject of this proxy analysis may be a client of Climate Advisory Services or ICS, or the parent of, or affiliated with, a client of Climate Advisory Services or ICS.

One or more of the proponents of a shareholder proposal at an upcoming meeting may be a client of Climate Advisory Services or ICS, or the parent of, or affiliated with, a client of Climate Advisory Services or ICS. None of the sponsors of any shareholder proposal(s) played a role in preparing this report.

Climate Advisory Services may in some circumstances afford issuers, whether or not they are clients of ICS, the right to review draft research analyses so that factual inaccuracies may be corrected before the report and recommendations are finalized. Control of research analyses and voting recommendations remains, at all times, with Climate Advisory Services.

Climate Advisory Services makes its proxy voting policy formation process and summary proxy voting policies readily available to issuers, investors and others on its public website: http://www.issgovernance.com/policy.

Copyright © 2023 Climate Advisory Services Inc. All Rights Reserved. This proxy analysis and the information herein may not be reproduced or disseminated in whole or in part.

Copyright © 2023 Institutional Shareholder Services Inc. All Rights Reserved. This proxy analysis and the information herein may not be reproduced or disseminated in whole or in part. For information on the policies applied in this research report, please see our Policy Gateway.

# Foster Declaration Exhibit 9



ISS Proxy Analysis & Benchmark Policy Voting Recommendations

# Exxon Mobil Corporation

## Key Takeaways

QualityScore

**Meeting Type:** Annual (Virtual)
**Meeting Date:** 25 May 2022
**Record Date:** 1 April 2022
**Meeting ID:** 1632904

**New York Stock Exchange**: XOM
**Index:** S&P 500
**Sector:** Integrated Oil & Gas
**GICS:** 10102010

**Primary Contacts**
Marc Goldstein, JD
Rachel Hedrick – Items 3 and 4
Kathy Belyeu – E&S
U.S. Research Help Center

## Agenda & Recommendations

**Policy: United States**
**Incorporated:** New Jersey, USA

| Item | Code | Proposal | Board Rec. | ISS Rec. |
|------|------|----------|------------|----------|
| MANAGEMENT PROPOSALS | | | | |
| 1.1 | M0201 | Elect Director Michael J. Angelakis | FOR | FOR |
| 1.2 | M0201 | Elect Director Susan K. Avery | FOR | FOR |
| 1.3 | M0201 | Elect Director Angela F. Braly | FOR | FOR |
| 1.4 | M0201 | Elect Director Ursula M. Burns | FOR | FOR |
| 1.5 | M0201 | Elect Director Gregory J. Goff | FOR | FOR |
| 1.6 | M0201 | Elect Director Kaisa H. Hietala | FOR | FOR |
| ▶1.7 | M0201 | Elect Director Joseph L. Hooley | FOR | FOR |
| 1.8 | M0201 | Elect Director Steven A. Kandarian | FOR | FOR |
| 1.9 | M0201 | Elect Director Alexander A. Karsner | FOR | FOR |
| 1.10 | M0201 | Elect Director Jeffrey W. Ubben | FOR | FOR |

## Report Contents

| | | | |
|---|---|---|---|
| Financial Highlights | 4 | QualityScore | 10 |
| Ownership and Control Overview | 5 | Vote Results | 13 |
| Corporate Governance Profile | 5 | Meeting Agenda and Proposals | 15 |
| Board Profile | 7 | Additional Information | 47 |
| Compensation Profile | 8 | | |

© 2022 Institutional Shareholder Services Inc.  All Rights Reserved. This proxy analysis and the information herein may not b e reproduced or disseminated in whole or in part. For information on the policies applied in this research report, please see our  Policy Gateway.

**Exxon Mobil Corporation (XOM)**
POLICY: United States

**Meeting Date: 25 May 2022**
Meeting ID: 1632904

| | | | | |
|---|---|---|---|---|
| ▶1.11 | M0201 | Elect Director Darren W. Woods | FOR | FOR |
| 2 | M0101 | Ratify PricewaterhouseCoopers LLP as Auditors | FOR | FOR |
| ▶3 | M0550 | Advisory Vote to Ratify Named Executive Officers' Compensation | FOR | FOR |

### SHAREHOLDER PROPOSALS

| | | | | |
|---|---|---|---|---|
| 4 | S0511 | Remove Executive Perquisites | AGAINST | FOR |
| 5 | S0126 | Amend Bylaws to Limit Shareholder Rights for Proposal Submission | AGAINST | AGAINST |
| 6 | S0743 | Set GHG Emissions Reduction targets Consistent With Paris Agreement Goal | AGAINST | FOR |
| 7 | S0742 | Report on Low Carbon Business Planning | AGAINST | AGAINST |
| 8 | S0742 | Report on Scenario Analysis Consistent with International Energy Agency's Net Zero by 2050 | AGAINST | FOR |
| 9 | S0781 | Report on Reducing Plastic Pollution | AGAINST | FOR |
| 10 | S0807 | Report on Political Contributions and Expenditures | AGAINST | FOR |

Shading indicates that ISS recommendation differs from Board recommendation
▶ Items deserving attention due to contentious issues or controversy

Copyright © 2022 Institutional Shareholder Services Inc.  All Rights Reserved.  This proxy analysis and the information herein may not be reproduced or disseminated in whole or in part. For information on the policies applied in this research report, please see o ur Policy Gateway.

**Exxon Mobil Corporation (XOM)**
POLICY: United States

**Meeting Date: 25 May 2022**
Meeting ID: 1632904

## Material Company Updates

| Item | Summary |
|---|---|
| **Board and Executive Updates** | Lead independent director Kenneth C. Frazier will not stand for re-election at this year's annual meeting. The independent directors have selected Joseph L. Hooley to serve as lead director following the annual meeting. |
| | SVP and principal financial officer Andrew Swiger retired from the company effective Sept. 1, 2021. Kathryn Mikells was appointed as SVP and Chief Financial Officer effective Aug. 9, 2021. |
| **Notable Vote Results** | At the last annual meeting, shareholder proposals seeking a Report on Corporate Climate Lobbying Aligned with Paris Agreement and a Report on Lobbying Payments and Policy received the support of a majority of votes cast. See *Board Responsiveness* section of **Elect Directors** below. |
| **Climate Litigation** | In April 2021, authorities in Anne Arundel County, Maryland filed suit in local circuit court against a number of fossil fuel companies, including Exxon Mobil, accusing the defendants of acting to mislead the public about the contributions of their products to climate change, and seeking to recover costs incurred by the county to "survive the consequences of climate change." The case was subsequently removed to the U.S. District Court for the District of Maryland where it remains pending. |

Copyright © 2022 Institutional Shareholder Services Inc. All Rights Reserved. This proxy analysis and the information herein may not be reproduced or disseminated in whole or in part. For information on the policies applied in this research report, please see o ur Policy Gateway.

**Exxon Mobil Corporation (XOM)**
POLICY: United States

Meeting Date: **25 May 2022**
Meeting ID: 1632904

## Financial Highlights

**Company Description:** Exxon Mobil Corporation explores for and produces crude oil and natural gas in the United States and internationally. It operates through Upstream, Downstream, and Chemical segments.

### STOCK PRICE PERFORMANCE



- Exxon Mobil Corporation
- MSCI ACWI: Oil, Gas & Consumable Fuels (GICS: 101020)
- S&P 500

### TOTAL SHAREHOLDER RETURNS (ANNUALIZED)

|  | 1 Yr | 3 Yr | 5 Yr |
|---|---|---|---|
| Company TSR (%) | 57.80 | 2.72 | -2.40 |
| GICS 1010 TSR (%) | 46.05 | 2.95 | -3.50 |
| S&P500 TSR (%) | 28.71 | 26.07 | 18.47 |

Source: Compustat. As of last day of company FY end month: 12/31/2021

### COMPANY SNAPSHOT (AS OF RECORD DATE)

| | |
|---|---|
| Market Cap (M) | 351,896.2 |
| Closing Price | 83.12 |
| Dividends Paid (LTM) | 3.50 |
| 52-Week High | 91.51 |
| 52-Week Low | 52.10 |
| Shares Outstanding (M) | 4233.59 |
| Average daily trading volume (prior mo)* | 36,148.29 |

Source: Compustat. As of April 1, 2022 (All currency in USD)
* Trading Volume in thousands of shares

### FINANCIAL & OPERATIONAL PERFORMANCE

| All currency in USD | Historical Performance (FY ending) | | | | | Compared to Peers (Compustat FY*) − 2021 |
|---|---|---|---|---|---|---|
| | 12/2017 | 12/2018 | 12/2019 | 12/2020 | 12/2021 | |
| **Earnings** | | | | | | |
| Revenue (M) | 237,162 | 279,332 | 255,583 | 178,574 | 276,692 | |
| Net Income (M) | 19,710 | 20,840 | 14,340 | -22,440 | 23,040 | |
| EBITDA (M) | 31,967 | 40,869 | 31,764 | -8,889 | 43,484 | |
| EPS (USD) | 4.63 | 4.88 | 3.36 | -5.25 | 5.39 | |
| EPS Y/Y Growth (%) | 146 | 5 | -31 | N/A | N/A | |
| **Profitability** | | | | | | |
| Pretax Net Margin (%) | 8 | 11 | 8 | -16 | 11 | |
| EBITDA Margin (%) | 13 | 15 | 12 | -5 | 16 | |
| Return on Equity (%) | 11 | 11 | 7 | -14 | 14 | |
| Return on Assets (%) | 6 | 6 | 4 | -7 | 7 | |
| ROIC (%) | 9 | 10 | 6 | -10 | 10 | |
| **Leverage** | | | | | | |
| Debt/Assets | 12 | 11 | 15 | 22 | 16 | |
| Debt/Equity | 23 | 20 | 28 | 46 | 31 | |
| **Cash Flows** | | | | | | |
| Operating (M) | 30,066 | 36,014 | 29,716 | 14,668 | 48,129 | |
| Investing (M) | -15,730 | -16,446 | -23,084 | -18,459 | -10,235 | |
| Financing (M) | -15,130 | -19,446 | -6,618 | 5,285 | -35,423 | |
| Net Change (M) | -480 | -135 | 47 | 1,275 | 2,438 | |
| **Valuation & Performance** | | | | | | |
| Price/Earnings | 18.06 | 13.97 | 20.77 | N/A | 11.35 | |
| Annual TSR (%) | -3.75 | -15.09 | 7.35 | -36.02 | 57.80 | |

Source: Compustat. *Note: Compustat standardizes financial data and fiscal year designations to allow for meaningful comparis on across companies. Compustat data may differ from companies' disclosed financials and does not incorporate non -trading equity units. Peers shown here represent closest industry peers drawn from those peers used in ISS' pay-for-performance analysis. See www.issgovernance.com/policy-gateway/company-financials-faq/ for more information.

Copyright © 2022 Institutional Shareholder Services Inc. All Rights Reserved. This proxy analysis and the information herein may not be reproduced or disseminated in whole or in part. For information on the policies applied in this research report, please see o ur Policy Gateway.

**Exxon Mobil Corporation (XOM)**

POLICY: United States

**Meeting Date: 25 May 2022**

Meeting ID: 1632904

## Ownership & Control Overview

| Stock Type | Votes per Share | Outstanding |
|---|---|---|
| Common Stock | 1 | 4,225,673,726 |

| Top Holders - Ownership & Control | % of Stock | % of Votes |
|---|---|---|
| The Vanguard Group | 8.4 | 8.4 |
| BlackRock, Inc. | 6.2 | 6.2 |
| State Street Corporation | 5.9 | 5.9 |

Proxy Statement, © 2022 Factset Research Systems, Inc. All Rights Reserved. As of: 28 Feb 2022



Percentages rounded down to 1 decimal. "▶" identifies shareholders considered strategic under ISS' definition.

ISS' definition of strategic shareholders may include, but is not limited to, shareholders with board representation, State-controlled entities, insiders/executives, and employee funds.

to Detailed Ownership Profile

## Corporate Governance Profile

### BOARD SUMMARY

| | |
|---|---|
| Chairman classification | Executive Director |
| Separate chair/CEO | No |
| Independent lead director | Yes |
| Voting standard | Majority |
| Plurality carveout for contested elections | Yes |
| Resignation policy | Yes |
| Total director ownership (000 shares) | 577 |
| Total director ownership (%) | < 1 |
| Percentage of directors owning stock | 100% |
| Number of directors attending < 75% of meetings | 0 |
| Average director age | 61 years |
| Average director tenure | 3 years |
| Percentage of women on board | 36% |

### SHAREHOLDER RIGHTS SUMMARY

| | |
|---|---|
| Controlled company | No |
| Classified board | No |
| Multi-class common stock w/ unequal voting rights | No |
| Vote standard for mergers/acquisitions | Majority |
| Vote standard for charter amendment | Majority |
| Vote standard for bylaw amendment | Majority |
| Shareholder right to call special meetings | Yes, 15% |
| Material restrictions on right to call special meetings | Yes |
| Shareholder right to act by written consent | Yes |
| Cumulative voting | No |
| Board authorized to issue blank-check preferred stock | Yes |
| Poison pill | No |
| Proxy Access | Yes |
| -     Ownership requirement (%) | 3 |
| -     Time requirement (years) | 3 |
| -     Nomination limit (% of seats) | 20 |
| -     Nomination limit (# of nominees) | 2 |
| -     Aggregation cap (# of nominators) | 20 |

Copyright © 2022 Institutional Shareholder Services Inc. All Rights Reserved. This proxy analysis and the information herein may not be reproduced or disseminated in whole or in part. For information on the policies applied in this research report, please see o ur Policy Gateway.

## Board & Committee Composition

The information provided in the charts and tables below is based on ISS data records, which rely on disclosures in proxy materials and other public sources available as of the date set forth below (for the general meeting under review) and, with respect to information from prior years, information that was available ahead of each year's annual general meeting at the time of ISS' report for that meeting.   As such, these charts and tables might not reflect changes to the board composition and/or other covered elements subsequently disclosed by the issuer after ISS' publications or between general meetings.

Independence values refer to ISS Independence classifications ("Exec": Executive Director; "N-Ind.": Non-Independent Director; "Ind.": Independent Director).

### Board

Ind.: 91%, 10
Exec.: 9%, 1

Meetings last FY:13

### as of May 25, 2022

**Audit** — Ind.: 100%, 4 — Meetings last FY:10

**Comp** — Ind.: 100%, 3 — Meetings last FY:5

**Nom** — Ind.: 100%, 3 — Meetings last FY:8

■ **Exec**    ■ **N-Ind.**    ■ **Ind.**

### Independence History

|              | 2018 | 2019 | 2020 | 2021 | After AGM |
|--------------|------|------|------|------|-----------|
| Board        | 90%  | 90%  | 90%  | 94%  | 91%       |
| Audit Com    | 100% | 100% | 100% | 100% | 100%      |
| Comp Com     | 100% | 100% | 100% | 100% | 100%      |
| Nom Com      | 100% | 100% | 100% | 100% | 100%      |

### Gender Diversity Trend

|        | 2018 | 2019 | 2020 | 2021 | After AGM |
|--------|------|------|------|------|-----------|
| male   | 70%  | 70%  | 70%  | 75%  | 64%       |
| female | 30%  | 30%  | 30%  | 25%  | 36%       |

### Director tenure



Copyright © 2022 Institutional Shareholder Services Inc.  All Rights Reserved.  This proxy analysis and the information herein may not be reproduced or disseminated in whole or in part. For information on the policies applied in this research report, please see our Policy Gateway.

**Exxon Mobil Corporation (XOM)**
POLICY: United States

**Meeting Date: 25 May 2022**
Meeting ID: 1632904

## Board Profile (after upcoming meeting)

| Item # | Executive Directors | Affiliation | Independence | | Leadership | Gender | Age | Tenure | Term Ends | Committee | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | Co. | ISS | | | | | | Audit | Comp | Nom | Gov |
| **1.11** | **Darren Woods** | | Exec | Exec | CEO, Chair | M | 57 | 6 | 2023 | | | | |
| | Non-Executive Directors | | | | | | | | | | | | |
| **1.7** | **Joseph (Jay) Hooley** | | Ind. | Ind. | Lead Dir | M | 65 | 2 | 2023 | F | | | |
| **1.1** | **Michael (Mike) Angelakis** | | Ind. | Ind. | | M | 57 | 1 | 2023 | F | | | |
| **1.2** | **Susan Avery** | | Ind. | Ind. | | F | 72 | 5 | 2023 | | | M | M |
| **1.3** | **Angela Braly** | | Ind. | Ind. | | F | 60 | 6 | 2023 | | C | | |
| **1.4** | **Ursula Burns** | | Ind. | Ind. | | F | 63 | 9 | 2023 | C F | | | |
| **1.5** | **Gregory (Greg) Goff** | | Ind. | Ind. | | M | 65 | 1 | 2023 | | M | M | M |
| **1.6** | **Kaisa Hietala** | | Ind. | Ind. | | F | 51 | 1 | 2023 | F | | | |
| **1.8** | **Steven Kandarian** | | Ind. | Ind. | | M | 70 | 4 | 2023 | | M | | |
| **1.9** | **Alexander Karsner** | | Ind. | Ind. | | M | 55 | 1 | 2023 | | | M | M |
| **1.10** | **Jeffrey Ubben** | | Ind. | Ind. | | M | 60 | 1 | 2023 | | | | |
| | | | 91% Ind. | 91% Ind. | | 36% F | Ave: 61 | Ave: 3 | Ave: 1 | 100% Ind. | 100% Ind. | 100% Ind. | 100% Ind. |

Committee Membership: M = Member | C = Chair | **F = Financial Expert**

### COMMITMENTS AT PUBLIC COMPANIES

| Item # | Director Name | # of boards* | Company Name | Mandate Type | CEO | Board Chair | Committee | | | Ownership | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | Audit | Comp | Nom | # | % stock | % votes |
| 1.11 | Darren Woods | 1 | *Exxon Mobil Corporation* | Executive Director | ☐ | ☐ | | | | 169,496 | <0.1 | <0.1 |
| 1.7 | Joseph (Jay) Hooley | 2 | *Exxon Mobil Corporation* | Non-Executive Director | | | F | | | 13,000 | <0.1 | <0.1 |
| | | | Aptiv Plc | Non-Executive Director | | | F | C | | | | |
| 1.1 | Michael (Mike) Angelakis | 4 | *Exxon Mobil Corporation* | Non-Executive Director | | | F | | | 51,292 | <0.1 | <0.1 |
| | | | Bowlero Corp. | Non-Executive Director | | | | | C | | | |
| | | | TriNet Group, Inc. | Non-Executive Director | | | | M | M | | | |
| | | | Clarivate Plc | Non-Executive Director | | | | | | | | |
| 1.2 | Susan Avery | 1 | *Exxon Mobil Corporation* | Non-Executive Director | | | | | M | 20,500 | <0.1 | <0.1 |
| 1.3 | Angela Braly | 3 | *Exxon Mobil Corporation* | Non-Executive Director | | | | C | | 25,075 | <0.1 | <0.1 |
| | | | The Procter & Gamble Company | Non-Executive Director | | | M | C | | | | |
| | | | Brookfield Asset Management Inc. | Non-Executive Director | | | M | | | | | |
| 1.4 | Ursula Burns | 5 | *Exxon Mobil Corporation* | Non-Executive Director | | | C F | | | 33,206 | <0.1 | <0.1 |
| | | | Plum Acquisition Corp. I | Executive Director | ☐ | | | | | | | |
| | | | Uber Technologies, Inc. | Non-Executive Director | | | F | M | | | | |
| | | | Endeavor Group Holdings, Inc. | Non-Executive Director | | | | | | | | |
| | | | IHS Holding Ltd. | Non-Executive Director | | | | | | | | |
| 1.5 | Gregory (Greg) Goff | 2 | *Exxon Mobil Corporation* | Non-Executive Director | | | | M | M | 20,962 | <0.1 | <0.1 |
| | | | Avient Corporation | Non-Executive Director | | | | | M | | | |
| 1.6 | Kaisa Hietala | 2 | *Exxon Mobil Corporation* | Non-Executive Director | | | F | | | 10,500 | <0.1 | <0.1 |
| | | | Smurfit Kappa Group Plc | Non-Executive Director | | | M | | | | | |
| 1.8 | Steven Kandarian | 2 | *Exxon Mobil Corporation* | Non-Executive Director | | | | M | | 18,000 | <0.1 | <0.1 |
| | | | Jackson Financial, Inc. (Michigan) | Non-Executive Director | | ☐ | | | | | | |
| 1.9 | Alexander Karsner | 3 | *Exxon Mobil Corporation* | Non-Executive Director | | | | | M | 27,500 | <0.1 | <0.1 |
| | | | Applied Materials, Inc. | Non-Executive Director | | | | M | M | | | |
| | | | Alphabet Inc. | Executive Officer (non-director) | | | | | | | | |
| | | | Broadscale Acquisition Corp. | Non-Executive Director | | | | | | | | |
| 1.10 | Jeffrey Ubben | 3 | *Exxon Mobil Corporation* | Non-Executive Director | | | | | | 187,500 | <0.1 | <0.1 |
| | | | Enviva, Inc. | Non-Executive Director | | | | | | | | |
| | | | Fertiglobe Plc | Non-Executive Director | | | | | | | | |

*The number of boards for each director is the total of executive director and/ or non-executive director mandates.

Publication Date: 9 May 2022

Copyright © 2022 Institutional Shareholder Services Inc. All Rights Reserved. This proxy analysis and the information herein may not be reproduced or disseminated in whole or in part. For information on the policies applied in this research report, please see o ur Policy Gateway.

**Exxon Mobil Corporation (XOM)**    **Meeting Date: 25 May 2022**
POLICY: United States    Meeting ID: 1632904

Ownership values include shares held, stock awards that vest within 60 days of the disclosure date, and deferred stock units (DSUs). Stock options are excluded.

## DIRECTOR PAY AND ATTENDANCE OVERVIEW MOST RECENT FY

| Item # | Director Name | Board Position | Attendance (in %) | Total Compensation |
|---|---|---|---|---|
| **1.11** | **Darren Woods** | ED, CEO, Chair | ≥75% | ** |
| 1.7 | Joseph (Jay) Hooley | NED, Audit (M) | ≥75% | USD 214,295 |
| 1.1 | Michael (Mike) Angelakis | NED, Audit (M) | ≥75% | USD 547,185 |
| 1.2 | Susan Avery | NED, Nom (M) | ≥75% | USD 214,295 |
| 1.3 | Angela Braly | NED, Comp (C) | ≥75% | USD 219,020 |
| 1.4 | Ursula Burns | NED, Audit (C) | ≥75% | USD 224,295 |
| 1.5 | Gregory (Greg) Goff | NED, Comp (M), Nom (M) | ≥75% | USD 552,538 |
| 1.6 | Kaisa Hietala | NED, Audit (M) | ≥75% | USD 552,538 |
| 1.8 | Steven Kandarian | NED, Comp (M) | ≥75% | USD 214,295 |
| 1.9 | Alexander Karsner | NED, Nom (M) | ≥75% | USD 552,538 |
| 1.10 | Jeffrey Ubben | NED | ≥75% | USD 547,185 |
| **Total** | | | | USD 3,838,184 |

Attendance rates take into account board and committee meetings.
ED for Executive Directors, NED for Non-Executive Directors
**For executive director data, please refer to Executive Pay Overview.

## Compensation Profile

### EXECUTIVE PAY OVERVIEW

| Executive | Title | Base Salary | Change in Pension, Deferred Comp, All Other Comp | Bonus & Non-equity Incentives | Restricted Stock | Option Grant | Total |
|---|---|---|---|---|---|---|---|
| **D. Woods** | Chairman and CEO | 1,615 | 5,310 | 3,142 | 13,573 | 0 | 23,640 |
| **N. Chapman** | Senior Vice President | 955 | 5,558 | 1,932 | 6,717 | 0 | 15,162 |
| **K. Mikells** | Senior Vice President; CFO | 1,100 | 260 | 1,932 | 11,293 | 0 | 14,585 |
| **J. Williams Jr.** | Senior Vice President | 1,068 | 4,632 | 1,932 | 6,717 | 0 | 14,349 |
| **L. Mallon** | President, ExxonMobil Upstream Company | 849 | 3,280 | 1,429 | 4,861 | 0 | 10,419 |
| **Median CEO Pay** | ISS Selected Peer Group | 1,688 | 980 | 4,200 | 11,625 | 4,040 | **23,313** |
| | Company Defined Peers | 1,669 | 972 | 4,226 | 12,523 | 4,144 | **23,654** |

Source: ISS. Pay in $thousands. Total pay is sum of all reported pay elements, using ISS' Black-Scholes estimate for option grant-date values. Median total pay will not equal sum of pay elements medians. Company Defined Peers are as disclosed. More information on ISS' peer group methodology is available at www.issgovernance.com/policy-gateway/us-compensation-policy-guidance/.

Copyright © 2022 Institutional Shareholder Services Inc. All Rights Reserved. This proxy analysis and the information herein may not be reproduced or disseminated in whole or in part. For information on the policies applied in this research report, please see our Policy Gateway.

**Exxon Mobil Corporation (XOM)**
POLICY: United States

**Meeting Date: 25 May 2022**
Meeting ID: 1632904

## OPTION VALUATION ASSUMPTIONS

| For CEO's last FY Grant | Company | ISS |
|---|---|---|
| Volatility (%) | N/A | N/A |
| Dividend Yield (%) | N/A | N/A |
| Term (yrs) | N/A | N/A |
| Risk-free Rate (%) | N/A | N/A |
| Grant date fair value per option | N/A | N/A |
| Grant Date Fair Value ($ in 000) | N/A | N/A |

The CEO did not receive stock options in the most recent fiscal year.

## CEO PAY MULTIPLES

| Compared to | Multiple |
|---|---|
| 2nd highest active executive | 1.56 |
| Average active NEO | 1.73 |
| ISS peer median | 1.01 |
| Company peer median | 1.00 |
| Median employee/CEO Pay Ratio* (FY21, FY20) | 125, 86 |

*As disclosed by the company. The company disclosed the median compensation of all employees to be $189,082.

## CEO TALLY SHEET

| CEO | D. Woods |
|---|---|
| CEO tenure at FYE: | 5 years |
| Present value of all accumulated pension: | $32,509,438 |
| Value of CEO stock owned (excluding options): | $14,088,508 |
| **Potential Termination Payments** | |
| Involuntary termination without cause: | N/A |
| Termination after a change in control: | N/A |

Source: DEF14A

## 3-YEAR GRANTED VS. REALIZABLE CEO PAY

3-year TSR: 2.72%



Source: DEF14A and ISS ($ in thousands)

Granted pay equals the sum of all CEO pay, as disclosed in the proxy statement for the applicable fiscal years, except that equity grant values may be based on ISS' valuation. Realizable pay equals the sum of all cash paid (as disclosed) during the same period, plus the value of all equity grants at the end of the period (based on earned value, if applicable, or re-calculated FV of target level equity awards not yet earned/vested). For periods that include multiple CEOs, values include pay to all CEOs during the period. For additional information, please visit www.issgovernance.com/policy-gateway/us-compensation-policy-guidance/.

Copyright © 2022 Institutional Shareholder Services Inc. All Rights Reserved. This proxy analysis and the information herein may not be reproduced or disseminated in whole or in part. For information on the policies applied in this research report, please see o ur Policy Gateway.

**Exxon Mobil Corporation (XOM)**　　　　　　　　　　　　　　　　　　　　　　　　**Meeting Date: 25 May 2022**
POLICY: United States　　　　　　　　　　　　　　　　　　　　　　　　　　　　Meeting ID: 1632904

## Dilution & Burn Rate

### DILUTION

|  | Dilution (%) |
|---|---|
| Exxon Mobil Corporation | 2.56 |
| Peer group median | 6.03 |
| Peer group weighted average | 5.94 |
| Peer group 75th percentile | 9.41 |

Dilution is the sum of the total amount of shares available for grant and outstanding under options and other equity awards (vested and unvested) expressed as a percentage of total basic common shares outstanding as of the record date. The dilution figure typically excludes employee stock purchase plans and 401(k) shares. The underlying information is based on the company's equity compensation table in the most recent proxy statement or 10-K.

### BURN RATE

|  | Unadjusted (%) | Adjusted (%) | Value-Adjusted (%) |
|---|---|---|---|
| 1-year | 0.20 | 0.41 | 0.20 |
| 3-year average | 0.21 | 0.41 | 0.21 |

Burn rate equals the number of shares granted in each fiscal year, including stock options, restricted stock (units), actual performance shares delivered under the long-term incentive plan or earned deferred shares, to employees and directors divided by weighted average common shares outstanding. The adjusted burn rate places a premium on grants of full-value awards using a multiplier based on the company's annual volatility.
The value-adjusted burn rate uses stock price to value full-value awards and Black Scholes to value stock options. For more information on these burn rate methodologies, please visit www.issgovernance.com/policy-gateway/voting-policies/.

Copyright © 2022 Institutional Shareholder Services Inc.  All Rights Reserved.  This proxy analysis and the information herein may not be reproduced or disseminated in whole or in part. For information on the policies applied in this research report, please see o ur Policy Gateway.

**Quality**Score

Copyright © 2022 Institutional Shareholder Services Inc.  All Rights Reserved.  This proxy analysis and the information herein may not be reproduced or disseminated in whole or in part. For information on the policies applied in this research report, please see o ur Policy Gateway.

## Climate Awareness Scorecard

The ISS Climate Awareness Scorecard reflects publicly disclosed data and reporting on the company's climate change -related disclosures and performance. The Scorecard uses a range of climate-related factors to indicate a company's disclosure practices and performance record including its carbon risk classification. Companies are evaluated on overall disclosure (Governance, Strategy, Risk Management, Metrics & Targets) and performance fact ors (Norms Violations, GHG Emissions, Performance Ratings). For more information or questions regarding ISS Climate Awareness Scorecard, please contact: ISS Help Center.

*Reported **Estimated

Copyright © 2022 Institutional Shareholder Services Inc.  All Rights Reserved.  This proxy analysis and the information herein may not be reproduced or disseminated in whole or in part. For information on the policies applied in this research report, please see o ur Policy Gateway.



## Vote Results

### ANNUAL MEETING 26 MAY 2021

| Proposal | Board Rec | ISS Rec | Disclosed Result | Support Including Abstains (%)[1] | Support Excluding Abstains (%)[2] |
|---|---|---|---|---|---|
| **MANAGEMENT PROXY (BLUE PROXY CARD)** | | | | | |
| 1.1 Elect Director Michael J. Angelakis | For | Do Not Vote | Pass | 98.4 | 98.4 |
| 1.2 Elect Director Susan K. Avery | For | Do Not Vote | Pass | 96.7 | 96.7 |
| 1.3 Elect Director Angela F. Braly | For | Do Not Vote | Pass | 95.3 | 95.3 |
| 1.4 Elect Director Ursula M. Burns | For | Do Not Vote | Pass | 97.8 | 97.8 |
| 1.5 Elect Director Kenneth C. Frazier | For | Do Not Vote | Pass | 94.5 | 94.5 |
| 1.6 Elect Director Joseph L. Hooley | For | Do Not Vote | Pass | 96.6 | 96.6 |
| 1.7 Elect Director Steven A. Kandarian | For | Do Not Vote | Pass | 97.2 | 97.2 |
| 1.8 Elect Director Douglas R. Oberhelman | For | Do Not Vote | Fail | 97.2 | 97.2 |
| 1.9 Elect Director Samuel J. Palmisano | For | Do Not Vote | Fail | 93.2 | 93.2 |
| 1.10 Elect Director Jeffrey W. Ubben | For | Do Not Vote | Pass | 98.1 | 98.1 |
| 1.11 Elect Director Darren W. Woods | For | Do Not Vote | Pass | 94.5 | 94.5 |
| 1.12 Elect Director Wan Zulkiflee | For | Do Not Vote | Fail | 93.4 | 93.4 |
| 2 Ratify PricewaterhouseCoopers LLP as Auditors | For | Do Not Vote | Pass | 96.2 | 96.7 |

Publication Date: 9 May 2022

Copyright © 2022 Institutional Shareholder Services Inc.  All Rights Reserved.  This proxy analysis and the information herein may not be reproduced or disseminated in whole or in part. For information on the policies applied in this research report, please see o ur Policy Gateway.

**Exxon Mobil Corporation (XOM)**  Meeting Date: **25 May 2022**
POLICY: United States  Meeting ID: 1632904

| Proposal | | | | | |
|---|---|---|---|---|---|
| 3 Advisory Vote to Ratify Named Executive Officers' Compensation | For | Do Not Vote | Pass | 87.1 | 88.6 |
| 4 Require Independent Board Chair | Against | Do Not Vote | Fail | 22.5 | 23.0 |
| 5 Reduce Ownership Threshold for Shareholders to Call Special Meeting | Against | Do Not Vote | Fail | 20.2 | 20.7 |
| 6 Issue Audited Report on Financial Impacts of IEA's Net Zero 2050 Scenario | Against | Do Not Vote | Fail | 48.2 | 49.4 |
| 7 Report on Costs and Benefits of Environmental-Related Expenditures | Against | Do Not Vote | Fail | 5.2 | 5.3 |
| 8 Report on Political Contributions | Against | Do Not Vote | Fail | 29.7 | 30.3 |
| 9 Report on Lobbying Payments and Policy | Against | Do Not Vote | Pass | 55.0 | 56.1 |
| 10 Report on Corporate Climate Lobbying Aligned with Paris Agreement | Against | Do Not Vote | Pass | 62.9 | 64.2 |

### DISSIDENT PROXY (WHITE PROXY CARD)

| Proposal | Dissident Rec | ISS Rec | Disclosed Result | Support Including Abstains (%)[1] | Support Excluding Abstains (%)[2] |
|---|---|---|---|---|---|
| 1.1 Elect Director Gregory J. Goff | For | For | Pass | 85.6 | 85.6 |
| 1.2 Elect Director Kaisa Hietala | For | For | Pass | 90.7 | 90.7 |
| 1.3 Elect Director Alexander A. Karsner | For | For | Pass | 73.1 | 73.1 |
| 1.4 Elect Director Anders Runevad | For | Withhold | Fail | 17.7 | 17.7 |
| 1.5 Management Nominee Michael J. Angelakis | For | For | Pass | 98.4 | 98.4 |
| 1.6 Management Nominee Susan K. Avery | For | For | Pass | 96.7 | 96.7 |
| 1.7 Management Nominee Angela F. Braly | For | For | Pass | 95.3 | 95.3 |
| 1.8 Management Nominee Ursula M. Burns | For | For | Pass | 97.8 | 97.8 |
| 1.9 Management Nominee Kenneth C. Frazier | For | For | Pass | 94.5 | 94.5 |
| 1.10 Management Nominee Joseph L. Hooley | For | For | Pass | 96.6 | 96.6 |
| 1.11 Management Nominee Jeffrey W. Ubben | For | For | Pass | 98.1 | 98.1 |
| 1.12 Management Nominee Darren W. Woods | For | For | Pass | 94.5 | 94.5 |
| 2 Ratify PricewaterhouseCoopers LLP as Auditors | For | For | Pass | 96.2 | 96.7 |
| 3 Advisory Vote to Ratify Named Executive Officers' Compensation | Against | For | Pass | 87.1 | 88.6 |
| 4 Require Independent Board Chair | None | Against | Fail | 22.5 | 23.0 |
| 5 Reduce Ownership Threshold for Shareholders to Call Special Meeting | None | For | Fail | 20.2 | 20.7 |
| 6 Issue Audited Report on Financial Impacts of IEA's Net Zero 2050 Scenario | None | For | Fail | 48.2 | 49.4 |
| 7 Report on Costs and Benefits of Environmental-Related Expenditures | None | Against | Fail | 5.2 | 5.3 |
| 8 Report on Political Contributions | None | For | Fail | 29.7 | 30.3 |
| 9 Report on Lobbying Payments and Policy | None | For | Pass | 55.0 | 56.1 |
| 10 Report on Corporate Climate Lobbying Aligned with Paris Agreement | None | For | Pass | 62.9 | 64.2 |

Shaded results reflect a majority of votes cast FOR shareholder proposal or AGAINST management proposal or director election

[1]Support Including Abstains is defined as %FOR/(For + Against + Abstain), as expressed as a perc entage.

[2]Support Excluding Abstains is defined as %FOR/(For + Against), as expressed as a percentage, provided if different from For + Against + Abstain.

Copyright © 2022 Institutional Shareholder Services Inc. All Rights Reserved. This proxy analysis and the information herein may not be reproduced or disseminated in whole or in part. For information on the policies applied in this research report, please see o ur Policy Gateway.

**Exxon Mobil Corporation (XOM)**
POLICY: United States

**Meeting Date: 25 May 2022**
Meeting ID: 1632904

## Meeting Agenda & Proposals

| Items 1.1-1.11. Elect Directors | FOR |
| --- | --- |

### VOTE RECOMMENDATION

Votes FOR Darren Woods and Joseph Hooley are warranted, ██████████████████████
████████████████████████████████████

A vote FOR the other director nominees is warranted.

### BACKGROUND INFORMATION

Policies: Board Accountability | Board Responsiveness | Director Competence | Director Independence | Election of Directors | ISS Categorization of Directors | Vote No campaigns

**Vote Requirement:** The company has adopted a majority vote standard (of shares cast) for the election of directors with a plurality carve-out for contested elections, and has a director resignation policy in its governance guidelines.

## Discussion

Please see the Board Profile section above for more information on director nominees.

### ELECTION SUMMARY

The company proposes the following (re)elections:

| Type of election | Nominees |
| --- | --- |
| Incumbent board members to be reelected | Darren Woods, Joseph (Jay) Hooley, Michael (Mike) Angelakis, Susan Avery, Angela Braly, Ursula Burns, Gregory (Greg) Goff, Kaisa Hietala, Steven Kandarian, Alexander Karsner, and Jeffrey Ubben |
| New board nominees to be elected by shareholders | No new board nominees on ballot |
| Terms of candidates | Nominees |
| One-year term | All nominees |

### ISS POLICY COMPLIANCE TABLE

| | Company-level | Nominee impact |
| --- | --- | --- |
| **Disclosure** | | |
| Names of new nominee(s) | No new nominees | |
| Biographies of new nominee(s) | No new nominees | |
| **Independence** | | |
| Board | 91% | |
| Audit committee | 100% | |
| Compensation committee | 100% | |

Copyright © 2022 Institutional Shareholder Services Inc.  All Rights Reserved.  This proxy analysis and the information herein may not be reproduced or disseminated in whole or in part. For information on the policies applied in this research report, please see our Policy Gateway.

**Exxon Mobil Corporation (XOM)**
POLICY: United States

| Nominating committee | 100% | |
| **Composition** | | |
| Poor attendance | No concerns | |
| Overboarding | No concerns | |
| Executive on a key committee | No concerns | |
| Combined Chair/CEO | N/A | |
| Length of term | N/A | |

| | N/A in this market | | No concerns | | No impacted nominees | | Impacted nominees are on ballot |



Copyright © 2022 Institutional Shareholder Services Inc.  All Rights Reserved.  This proxy analysis and the information herein may not be reproduced or disseminated in whole or in part. For information on the policies applied in this research report, please see our Policy Gateway.

**Exxon Mobil Corporation (XOM)**
POLICY: United States

**Meeting Date: 25 May 2022**
Meeting ID: 1632904

Copyright © 2022 Institutional Shareholder Services Inc.  All Rights Reserved.  This proxy analysis and the information herein may not be reproduced or disseminated in whole or in part. For information on the policies applied in this research report, please see our Policy Gateway.

Copyright © 2022 Institutional Shareholder Services Inc.  All Rights Reserved.  This proxy analysis and the information herein may not be reproduced or disseminated in whole or in part. For information on the policies applied in this research report, please see our Policy Gateway.

## Item 2. Ratify PricewaterhouseCoopers LLP as Auditors — FOR

VOTE RECOMMENDATION

A vote FOR this proposal to ratify the auditor is warranted.

BACKGROUND INFORMATION

Policies: Auditor Ratification

**Vote Requirement:** Majority of votes cast (abstentions not counted)

## Discussion

AUDIT FIRM INFORMATION

The board recommends that PricewaterhouseCoopers LLP be reappointed as the company's independent audit firm.

| Audit firm name | PricewaterhouseCoopers LLP |
|---|---|
| Audit firm since (as disclosed) | 1934 |
| Audit opinion for the last fiscal year | Unqualified |
| Term to serve if reappointed | 1 year |

FEES PAID DURING THE LAST FISCAL YEAR

| Audit firm name | PricewaterhouseCoopers LLP |
|---|---|
| Fees currency | USD |
| Total fees paid to the audit firm | 40,900,000 |
| **Audit fees** | **34,100,000** |
| **Audit-related fees** | **5,800,000** |
| Total transaction-related fees | 0 |
| Total tax fees | 1,000,000 |
| Other fees | 0 |
| **Total non-audit fees*** | **1,000,000** |
| Total non-audit fees as a percentage of total fees | 2.44% |

*Total non-audit fees include other fees, tax advice fees, and certain transaction-related fees. Non-audit fees will also include any tax-related fees not identified as tax compliance or tax preparation.

The auditor's report contained in the annual report is unqualified, meaning that in the opinion of the auditor, the company's financial statements are fairly presented in accordance with generally accepted accounting principles.

## Analysis

Copyright © 2022 Institutional Shareholder Services Inc. All Rights Reserved. This proxy analysis and the information herein may not be reproduced or disseminated in whole or in part. For information on the policies applied in this research report, please see our Policy Gateway.

**Exxon Mobil Corporation (XOM)**
POLICY: United States

**Meeting Date: 25 May 2022**
Meeting ID: 1632904

| Item 3. Advisory Vote to Ratify Named Executive Officers' Compensation | FOR |
|---|---|

**VOTE RECOMMENDATION**

A vote FOR this proposal is warranted, with caution. ██████████████████████████████
████████████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████████████

**BACKGROUND INFORMATION**

Policies: Advisory Votes on Executive Compensation

**Vote Requirement:** Majority of votes cast (abstentions and broker non-votes not counted)

## Executive Compensation Analysis

**COMPONENTS OF PAY**

| ($ in thousands) | CEO | | | | CEO Peer Median | Other NEOs |
|---|---|---|---|---|---|---|
| | D. Woods | | D. Woods | D. Woods | | |
| | 2021 | Change | 2020 | 2019 | 2021 | 2021 |
| Base salary | 1,615 | 0.0% | 1,615 | 1,500 | 1,688 | 3,972 |
| Deferred comp & pension | 5,137 | | 5,349 | 7,071 | 0 | 13,551 |
| All other comp | 173 | -28.1% | 241 | 336 | 518 | 179 |
| Bonus | 3,142 | | 0 | 2,216 | 0 | 7,225 |
| Non-equity incentives | 0 | | 0 | 0 | 3,780 | 0 |
| Restricted stock | 13,573 | 57.7% | 8,606 | 12,373 | 11,625 | 29,588 |
| Option grant | 0 | | 0 | 0 | 4,040 | 0 |
| **Total** | **23,640** | **49.5%** | **15,810** | **23,496** | **23,313** | **54,515** |
| % of Net Income | 0.1% | | | | | 0.2% |
| % of Revenue | N/A | | | | | - |

## Non-Performance-Based Pay Elements (CEO)

| | |
|---|---|
| *Key perquisites ($)* | Personal aircraft use: 57,768; Personal/home security: 43,241; Auto: 31,492; Financial Planning: 12,347 |
| *Key tax gross-ups on perks ($)* | None |
| *Value of accumulated NQDC* ($)* | 648,533 |
| *Present value of all pensions ($)* | 32,509,438 |
| *Years of actual plan service* | 29.3 |

Publication Date: 9 May 2022

Page 20

Copyright © 2022 Institutional Shareholder Services Inc. All Rights Reserved. This proxy analysis and the information herein may not be reproduced or disseminated in whole or in part. For information on the policies applied in this research report, please see our Policy Gateway.

| | |
|---|---|
| *Additional years credited service* | None |

*Non-qualified Deferred Compensation

## Disclosed Benchmarking Targets

| | |
|---|---|
| *Base salary* | None Disclosed |
| *Target short-term incentive* | None Disclosed |
| *Target long-term incentive (equity)* | None Disclosed |
| *Target total compensation* | 50th Percentile |

## Severance/Change-in-Control Arrangements (CEO unless noted)

| | |
|---|---|
| *Contractual severance arrangement* | None |
| *Non-CIC estimated severance ($)* | N/A |

### *Change-in-Control Severance Arrangement*

| | |
|---|---|
| *Cash severance trigger** | No Agreement |
| *Cash severance multiple* | N/A |
| *Cash severance basis* | N/A |
| *Treatment of equity* | Not disclosed |
| *Excise tax gross-up** | No |
| *Estimated CIC severance ($)* | Not disclosed |

*All NEOs considered

## Compensation Committee Communication & Responsiveness

### *Disclosure of Metrics/Goals*

| | |
|---|---|
| *Annual incentives* | Partial (bonuses are determined based on change in earnings but there are no quantified performance targets) |
| *Long-term incentives* | Partial (metrics are disclosed but there are no quantified performance targets) |

### *Pay Riskiness Discussion*

| | |
|---|---|
| *Process discussed?* | Yes |
| *Material risks found?* | No |

### *Risk Mitigators*

| | |
|---|---|
| *Clawback policy** | Yes |
| *CEO stock ownership guideline* | Stock ownership guidelines include unvested awards |
| *Stock holding period requirements* | Stock options: No disclosure / Restricted Stock: Holding period until end of employment |

*Must apply to cash as well as equity incentives and at least all NEOs.

### *Pledging/Hedging of Shares*

| | |
|---|---|
| *Anti-hedging policy* | Company has a robust policy |

---

Copyright © 2022 Institutional Shareholder Services Inc.  All Rights Reserved.  This proxy analysis and the information herein may not be reproduced or disseminated in whole or in part. For information on the policies applied in this research report, please see our Policy Gateway.

| | |
|---|---|
| *Anti-pledging policy* | The proxy statement does not disclose a robust policy |

### Compensation Committee Responsiveness

| | |
|---|---|
| *MSOP vote results (F/F+A)* | 2021: 88.6%; 2020: 91.5%; 2019: 91.6% |
| *Frequency approved by shareholders* | Annual with 88.2% support |
| *Frequency adopted by company* | Annual (most recent frequency vote: 2017) |

### Repricing History

| | |
|---|---|
| *Repriced/exchanged underwater options last FY?* | No |

## Pay for Performance Evaluation

Copyright © 2022 Institutional Shareholder Services Inc.  All Rights Reserved.  This proxy analysis and the information herein may not be reproduced or disseminated in whole or in part. For information on the policies applied in this research report, please see our Policy Gateway.

Copyright © 2022 Institutional Shareholder Services Inc.  All Rights Reserved.  This proxy analysis and the information herein may not be reproduced or disseminated in whole or in part. For information on the policies applied in this research report, please see our Policy Gateway.

Data for ISS' pay-for-performance tests are sourced from proxy disclosures for pay and from Compustat for TSR and financial performance. For more information on ISS' quantitative pay-for-performance evaluation, visit https://www.issgovernance.com/policy-gateway/voting-policies/.

## Short-Term Cash Incentives

| CEO STI Opportunities | FY 2021 (D. Woods) | | FY 2020 (D. Woods) | |
|---|---|---|---|---|
| | Target | Maximum | Target | Maximum |
| STI targets ($) | ND | ND | ND | ND |
| STI targets (calculated) | ND | ND | ND | ND |
| STI targets (as disclosed) | ND | | | |
| ISS peer median | 196% of base salary | | | |
| Company peer median | 198% of base salary | | | |

| Actual Payouts ($) | FY 2021 (D. Woods) | | FY 2020 (D. Woods) | |
|---|---|---|---|---|
| | Amount | % of base salary | Amount | % of base salary |
| Bonus | 3,142,000 | 195 | 0 | 0 |
| Non-equity incentive | 0 | 0 | 0 | 0 |
| Total Bonus + Non-equity | 3,142,000 | 195 | 0 | 0 |

| STI performance metrics/goals | Metric | Form | Weight | Threshold | Target | Maximum | Actual |
|---|---|---|---|---|---|---|---|
| | Year-over-year change in earnings | Absolute | 100% | ND | ND | ND | ND |

### Other Short-Term Incentive Factors

| Performance results adjusted? | N/A |
|---|---|

Copyright © 2022 Institutional Shareholder Services Inc.  All Rights Reserved.  This proxy analysis and the information herein may not be reproduced or disseminated in whole or in part. For information on the policies applied in this research report, please see our Policy Gateway.

**Exxon Mobil Corporation (XOM)**
POLICY: United States

**Meeting Date: 25 May 2022**
Meeting ID: 1632904

| | |
|---|---|
| *Discretionary component?* | Yes, award sizes are determined using committee discretion, though guided by an assessment of performance. |
| *Discretionary bonus?** | Yes |
| *Future performance metrics* | Not disclosed |

*Based on the Bonus column in the SCT; per SEC rules, amounts disclosed in this column were not based on pre-set goals.

## Long-Term Incentives

| | |
|---|---|
| *CEO's last FY LTI target (%)* | None disclosed |
| *NEOs' last FY award type(s)* | Time-based stock |
| *Last FY performance metrics/goals* | N/A (awards do not maintain performance vesting criteria); however, the committee does consider the metrics below in determining award size: |

| Metric | Threshold | Target | Maximum |
|---|---|---|---|
| Personnel Safety | ND | ND | ND |
| Environmental | ND | ND | ND |
| GHG Emissions | ND | ND | ND |
| ROCE | ND | ND | ND |
| Cash Flow from Operations and Asset Sales | ND | ND | ND |
| TSR | ND | ND | ND |
| Strategic Objectives | ND | ND | ND |

*Performance charts are provided for each metric (either compared to peers or based on Exxon's absolute performance) on page 49 of the proxy.

### Long-Term Equity Grants

| CEO Equity Awards | FY 2021 | | | | FY 2020 | | | |
|---|---|---|---|---|---|---|---|---|
| | Shares (#) | % shares* | Value ($)* | % value | Shares (#) | % shares* | Value ($)* | % value |
| *Time-based shares* | 215,000 | 100 | 13,572,950 | 100 | 205,000 | 100 | 8,605,900 | 100 |
| *Time-based options* | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| *Performance shares* | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| *Performance options* | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| *Total equity* | 215,000 | | 13,572,950 | | 205,000 | | 8,605,900 | |

| | |
|---|---|
| *Time-based equity vesting* | RSUs: Vest 50 percent after five years and 50 percent upon the later of 10 years from grant and retirement from the company |
| *Perf. measurement period* | N/A, awards do not have forward-looking performance vesting criteria |
| *CEO one-time equity award* | N/A |
| *CEO equity pay mix (by value)** | Performance-conditioned: 0%; Time-based: 100% |

*Performance shares, if any, are counted and valued at target.

### Other Long-Term Incentive Factors

| | |
|---|---|
| *Performance results adjusted?* | Not disclosed |
| *Discretionary component?* | Yes, while the size of the award is determined using compensation committee |

Publication Date: 9 May 2022

Page 25

Copyright © 2022 Institutional Shareholder Services Inc.  All Rights Reserved.  This proxy analysis and the information herein may not be reproduced or disseminated in whole or in part. For information on the policies applied in this research report, please see our Policy Gateway.

discretion, award determinations are informed by prior 10-year performance, progress against strategic objectives, and compensation benchmarking.

## Executive Summary

*ISS Recommendation:* **FOR**

## Analysis

Copyright © 2022 Institutional Shareholder Services Inc.  All Rights Reserved.  This proxy analysis and the information herein may not be reproduced or disseminated in whole or in part. For information on the policies applied in this research report, please see our Policy Gateway.



Copyright © 2022 Institutional Shareholder Services Inc.  All Rights Reserved.  This proxy analysis and the information herein may not be reproduced or disseminated in whole or in part. For information on the policies applied in this research report, please see our Policy Gateway.

Copyright © 2022 Institutional Shareholder Services Inc.  All Rights Reserved.  This proxy analysis and the information herein may not be reproduced or disseminated in whole or in part. For information on the policies applied in this research report, please see our Policy Gateway.

| Item 4. Remove Executive Perquisites | FOR |
|---|---|

**VOTE RECOMMENDATION**

A vote FOR this proposal is warranted. ██████████████████████████
████████████████████████████████████████████████████████████████
██████████

**BACKGROUND INFORMATION**

Policies: Disclosure/Setting Levels or Types of Compensation for Executives and Directors | Supplemental Executive Retirement Plans (SERPs) | Golden Coffins/Executive Death Benefits

**Vote Requirement:** Majority of votes cast (abstentions and broker non-votes not counted)

PROPOSAL

Bernie J. Pafford has submitted a proposal requesting the board discontinue payments or reimbursements of perquisites provided for executives that are not provided to the general employee population. The proposal reads in the proxy statement exactly as follows:

"Resolved – Shareholders request that payments and/or reimbursements to current and former Named Executive Officers (NEOs) for personal expenses which are not allowed to US dollar paid salaried employees under the Company's policies and procedures be discontinued."

PROPONENT'S SUPPORTING STATEMENT

While acknowledging that the total dollar value of executive perquisites is relatively small, the proponent believes that Exxon's executive perquisites are provided as an exception to company policy and that giving these benefits to NEOs sends the wrong message to other employees. The proponent notes that NEOs receive, among other things, tax preparation assistance, financial planning services, residential security systems, and certain personal travel costs. The proponent believes that NEOs are compensated well enough to pay their expenses and points out that other employees who charge personal expenses to the company must reimburse the company or be subject to disciplinary action. The proponent notes that in 2020 the compensation committee discontinued certain tax and financial planning perquisites for future NEOs but did not eliminate the benefit for current NEOs. The proponent also states that there is a current third-party service that provides financial advice to regular employees and asks that NEOs use that service instead. Lastly, the proponent states that NEOs may use Exxon headquarters office space with administrative support after retirement, even for activities that are not necessarily related to their prior employment, which is not provided to other retirees.

BOARD'S STATEMENT

The board believes that the company's compensation and benefits programs are designed to support the core principles and business strategies and are market competitive for all employees. The board notes that executive and other employees participate in the same broad-based programs and in cases where programs differ, it is generally due to legacy participation in previously provided and/or terminated programs or based on "position-specific requirements." The board uses the financial planning program as an example because all employees can access a broad-based financial planning program, but the executive program was closed to new participants in January of 2021. The board also states that Exxon provides security for employees based on a risk assessment that includes the employee's role and work location. The company does not consider security costs to be personal benefits because they believe these costs are necessary due to the employee's role within the company. The board also points out that the company requires the CEO to use the company aircraft for all travel for security reasons.

Copyright © 2022 Institutional Shareholder Services Inc. All Rights Reserved. This proxy analysis and the information herein may not be reproduced or disseminated in whole or in part. For information on the policies applied in this research report, please see our Policy Gateway.

Analysis



CONCLUSION



## Item 5. Amend Bylaws to Limit Shareholder Rights for Proposal Submission — AGAINST

**VOTE RECOMMENDATION**

A vote AGAINST this proposal is warranted, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

**Vote Requirement:** Majority of votes cast (abstentions and broker non-votes not counted)

## Discussion

### PROPOSAL

Stephen Milloy has submitted a proposal seeking to limit the rights of what he terms "nuisance shareholders" to submit proposals at annual meetings. The proposal reads as follows:

"Resolved: That the Company amend its bylaws to no longer permit shareholders to submit precatory (non-binding or advisory) proposals for consideration at annual shareholder meetings, unless the board of directors takes specific action to approve submission of such proposals."

### PROPONENT'S SUPPORTING STATEMENT

The proponent asserts that "many shareholders own stock in publicly-owned corporations for the sole purpose of advancing the shareholders' own social or political agendas, while simultaneously assailing the corporations' legitimate business operations." The proponent states that "climate activists are nuisance shareholders who have leveraged proposals over the years to the point where they now have a significant presence on the ExxonMobil

Copyright © 2022 Institutional Shareholder Services Inc. All Rights Reserved. This proxy analysis and the information herein may not be reproduced or disseminated in whole or in part. For information on the policies applied in this research report, please see our Policy Gateway.

board of directors," and goes on to suggest that such activists "may soon control the ExxonMobil board." He argues further that the submission of precatory shareholder proposals is a "primary tool of nuisance shareholders" which "can coerce management into making decisions not in the best interests of ExxonMobil and its bona fide shareholders," and that the "overarching purpose of these proposals is to harass, intimidate and otherwise force ExxonMobil management into actions that it would not normally undertake and that, in fact, may be harmful to the company and its bona fide shareholders." The proponent believes that this will inevitably reduce the company's profits and thereby prevent it from achieving its "actual social responsibility" of generating wealth.

### BOARD RESPONSE

The board states that it values input from shareholders and respects their right to have their perspectives heard through written and electronic communications with the board, and through shareholder proposals, which it recognizes "can be a constructive element of corporate governance." The board believes this proposal is unnecessary.

## Analysis



| Item 6. Set GHG Emissions Reduction targets Consistent With Paris Agreement Goal | FOR |
| --- | --- |

### VOTE RECOMMENDATION

A vote FOR this proposal is warranted

**Vote Requirement:** Majority of votes cast (abstentions and broker non-votes not counted)

## Discussion

### PROPOSAL

Follow This has submitted a precatory proposal asking that the company report on its plans to reduce its total contribution to climate change and align its operations with the Paris Agreement's goals.

The resolution specifically reads:

**"Resolved:** Shareholders request the Company to set and publish medium- and long-term targets to reduce the greenhouse gas (GHG) of the Company's operations and energy products (Scope 1, 2, and 3) consistent with the

Copyright © 2022 Institutional Shareholder Services Inc. All Rights Reserved. This proxy analysis and the information herein may not be reproduced or disseminated in whole or in part. For information on the policies applied in this research report, please see our Policy Gateway.

**Exxon Mobil Corporation (XOM)**
POLICY: United States

**Meeting Date: 25 May 2022**
Meeting ID: 1632904

goal of the Paris Climate Agreement: to limit global warming to well below 2°C above pre-industrial levels and to pursue efforts to limit the temperature increase to 1.5°C."

## PROPONENT'S STATEMENT

In its supporting statement, the proponent states that there is scientific consensus that global warming emissions need to be deeply cut in order to limit warming to safe levels, that investors are increasingly insisting on targets to cut emissions, and that companies in the energy sector are likely to face increasing legal risk related to climate change. The proponent cites as an example of potential legal risk the 2021 by a Dutch court for Shell to "severely reduce [its] worldwide emissions (Scope 1, 2, and 3) by 2030." The proponent believes the company "could lead and thrive in the energy transition" and encourages shareholder support for the proposal.

## BOARD'S STATEMENT

In its opposing statement, the board states that it agrees with the proponent that the company could be a leader in the energy transition. The company recently published its Advancing Climate Solutions report that discusses initiatives the company is taking to reduce GHG emissions. The company has set a target to achieve net-zero operational (Scope 1 & 2) emissions by 2050. To support that ambition, the company has set medium-term targets to reduce Scope 1 & 2 emissions that will result in a GHG emissions intensity reduction of 20-30 percent and an absolute reduction of 20 percent by 2030 (compared to 2016 levels). The board states that the company plans to spend more than $15 billion by 2027 on low-carbon technologies such as carbon capture and storage, hydrogen, and biofuels. The board also highlights some of the problems that it finds in Scope 3 accounting: that there are some activities that may lower global emissions but would raise one company's Scope 3 emissions, that Scope 3 emissions may be counted by more than one company, and that one company lowering its Scope 3 emissions doesn't necessarily mean that global emissions will go down.

## BACKGROUND AND RECENT SHAREHOLDER ACTIVISM

For more information on climate change, see ISS' Environmental and Social Background Report. For an update on the most recent shareholder activism around this issue, view ISS' 2022 U.S. Environmental & Social Issues Proxy Season Preview (requires login to ISS Link).

ExxonMobil has not received a proposal asking for it to set GHG emissions reductions targets in recent years.

## Analysis



Copyright © 2022 Institutional Shareholder Services Inc.  All Rights Reserved.  This proxy analysis and the information herein may not be reproduced or disseminated in whole or in part. For information on the policies applied in this research report, please see our Policy Gateway.

**Exxon Mobil Corporation (XOM)**                                    **Meeting Date: 25 May 2022**
POLICY: United States                                                    Meeting ID: 1632904



Copyright © 2022 Institutional Shareholder Services Inc.  All Rights Reserved.  This proxy analysis and the information herein may not be reproduced or disseminated in whole or in part. For information on the policies applied in this research report, please see our Policy Gateway.

**Exxon Mobil Corporation (XOM)**
POLICY: United States

**Meeting Date: 25 May 2022**
Meeting ID: 1632904

Copyright © 2022 Institutional Shareholder Services Inc.  All Rights Reserved.  This proxy analysis and the information herein may not be reproduced or disseminated in whole or in part. For information on the policies applied in this research report, please see our Policy Gateway.

| Item 7. Report on Low Carbon Business Planning | AGAINST |
|---|---|

**VOTE RECOMMENDATION**

A vote AGAINST this proposal is warranted. ███████████████████
████████████████████████████████████████████████████
██████████████████████████████████

**BACKGROUND INFORMATION**

Policies: Climate Change/Greenhouse Gas (GHG) Emissions

**Vote Requirement:** Majority of votes cast (abstentions and broker non-votes not counted)

Discussion

PROPOSAL

Individual shareholders who are clients of Arjuna Capital have submitted a precatory proposal asking the company to report on how the company could change its business model to make money within the limits required by keeping global warming to more than 1.5 degrees C of global warming.

The resolution specifically reads:

"Resolved: With board oversight, shareholders request ExxonMobil issue a report (at reasonable cost, omitting proprietary information) describing how the company could alter its business model to yield profits within the limits of a 1.5 degree Celsius global temperature rise by substantially reducing its dependence on fossil fuels."

PROPONENT'S STATEMENT

In its supporting statement, the proponents assert that "a global transition towards a low carbon economy places unprecedented risk on oil companies and the economy," yet the company has no business strategy consistent with limiting global temperature rise to 1.5 degrees C. The statement cites an IPCC assessment that oil industry emissions need to drop by 50 to 90 percent by 2050 to avoid "catastrophic consequences," that the U.S. Commodity Futures Trading Commissions asserts that climate change "poses a major risk to the stability of the U.S. financial system," and the United Nations Environment Programme Finance Initiative finds that half of companies' earnings are at risk from climate costs. The non-profit Carbon Tracker estimates that 80 of ExxonMobil's investments could be stranded if the world takes adequate action to limit temperature rise to "safe" levels. The proponents highlight that peer companies are investing more in clean energy, including wind, solar, and renewables storage. The World Benchmarking Alliance has reportedly estimated that companies need to dedicate over three-fourths of capital expenditure toward low-carbon projects, yet ExxonMobil has only committed to invest 3.3 percent through 2025. The proponents assert that the company is not pursuing a longterm competitive strategy. They suggest a report from the company could include a roadmap to change its energy mix, including buying renewable energy assets, internally expanding its renewable energy portfolio, and/or focusing capital expenditures on low-carbon capital projects.

BOARD'S STATEMENT

In its opposing statement, the board states that the company already produces the information requested in its Advancing Climate Solutions report, it Energy Outlook, its Sustainability Report, and other publications and filings. The company states that it plans to spend $15 billion through 2027 to lower emissions in the company's operations and to grow lower-emissions opportunities in carbon capture and storage, hydrogen, and biofuels. The Advancing Climate Solutions report shows the company's analysis of its business and investment portfolio under the International Energy Agency's (IEA's) Net Zero Emissions by 2050 (NZE) scenario. The company's assessment—

Copyright © 2022 Institutional Shareholder Services Inc. All Rights Reserved. This proxy analysis and the information herein may not be reproduced or disseminated in whole or in part. For information on the policies applied in this research report, please see our Policy Gateway.

which assumes a higher price on carbon emissions as the IEA NZE scenario does—showed "significant growth potential exists in chemicals, lower-emission fuels, carbon capture and storage, and hydrogen."

BACKGROUND AND RECENT SHAREHOLDER ACTIVISM

For more information on climate change, see ISS' Environmental and Social Background Report. For an update on the most recent shareholder activism around this issue, view ISS' 2022 U.S. Environmental & Social Issues Proxy Season Preview (requires login to ISS Link).

This is the first time ExxonMobil has received a request to change its business model to yield profits within the limits of a 1.5 degree Celsius global temperature rise by substantially reducing its dependence on fossil fuels.

Analysis



Copyright © 2022 Institutional Shareholder Services Inc.  All Rights Reserved.  This proxy analysis and the information herein may not be reproduced or disseminated in whole or in part. For information on the policies applied in this research report, please see our Policy Gateway.

## Item 8. Report on Scenario Analysis Consistent with International Energy Agency's Net Zero by 2050

### FOR

### VOTE RECOMMENDATION

A vote FOR this proposal is warranted ██████████████████████████████████
████████████████████████████████████

### BACKGROUND INFORMATION

Policies: Climate Change/Greenhouse Gas (GHG) Emissions

**Vote Requirement:** Majority of votes cast (abstentions and broker non-votes not counted)

Discussion

### PROPOSAL

Christian Brothers Investment Services has submitted a proposal asking the company to report on the potential financial impacts to the company of the IEA Net Zero (NZE) 2050 scenario.

Specifically, the resolution requests:

"RESOLVED: Shareholders request that ExxonMobil's Board of Directors seek an audited report assessing how applying the assumptions of the International Energy Agency's Net Zero by 2050 pathway would affect the assumptions, costs, estimates, and valuations underlying its financial statements, including those related to long-term commodity and carbon prices, remaining asset lives, future asset retirement obligations, capital expenditures and impairments. The Board should obtain and ensure publication of the report by February 2023, at reasonable cost and omitting proprietary information."

### PROPONENT'S STATEMENT

In its supporting statement, the proponent states that investors are increasingly concerned that the company's investment strategy will lead to stranded assets (impairments). For that reason, the proponent is asking the company to provide an assessment, assured by an independent auditor, that compares showing how applying the assumptions of the IEA NZE scenario would impact the company's financial statements. For example, the scenario assumes that no new fossil fuel development is needed and projects an oil price as low as $35/barrel in 2030 and $24/barrel in 2050. The proponent argues that Exxon lags many of its peers who have released more transparent climate disclosures in their audited financial statements.

### BOARD'S STATEMENT

In its opposing statement, the board states that the company recently produced in its Advancing Climate Solutions report an audited analysis comparing its business strategy to the IEA NZE scenario. The company states the company's assessment showed the company "could continue to grow cash flows over time through reduced investments in oil and natural gas and increased investments in accretive projects in chemicals, carbon capture and storage, lower-emissions fuels, hydrogen, and carbon capture and storage." The company goes on to say that the IEA NZE scenario assumes that 24 million barrels of oil and 169 billion cubic feet of natural gas will still be needed to meet demand in 2050. It states that its analysis includes an analysis of the company's spending plan and a modeling of potential future cash flow and that it shows the resiliency of its business strategy.

### BACKGROUND AND RECENT SHAREHOLDER ACTIVISM

For more information on climate change, see ISS' Environmental and Social Background Report. For an update on the most recent shareholder activism around this issue, view ISS' 2022 U.S. Environmental & Social Issues Proxy Season Preview (requires login to ISS Link).

Copyright © 2022 Institutional Shareholder Services Inc.  All Rights Reserved.  This proxy analysis and the information herein may not be reproduced or disseminated in whole or in part. For information on the policies applied in this research report, please see our Policy Gateway.

**Exxon Mobil Corporation (XOM)**
POLICY: United States

**Meeting Date: 25 May 2022**
Meeting ID: 1632904



Copyright © 2022 Institutional Shareholder Services Inc.  All Rights Reserved.  This proxy analysis and the information herein may not be reproduced or disseminated in whole or in part. For information on the policies applied in this research report, please see our Policy Gateway.

Analysis

Copyright © 2022 Institutional Shareholder Services Inc.  All Rights Reserved.  This proxy analysis and the information herein may not be reproduced or disseminated in whole or in part. For information on the policies applied in this research report, please see our Policy Gateway.



Copyright © 2022 Institutional Shareholder Services Inc.  All Rights Reserved.  This proxy analysis and the information herein may not be reproduced or disseminated in whole or in part. For information on the policies applied in this research report, please see our Policy Gateway.

Copyright © 2022 Institutional Shareholder Services Inc.  All Rights Reserved.  This proxy analysis and the information herein may not be reproduced or disseminated in whole or in part. For information on the policies applied in this research report, please see our Policy Gateway.

## Item 9. Report on Reducing Plastic Pollution

### FOR

### VOTE RECOMMENDATION

A vote FOR this proposal is warranted ███████████████████████████████
████████████████████████████████████████████████████████████████████
████████████████████████████████████████

### BACKGROUND INFORMATION

Policies: Recycling

**Vote Requirement:** Majority of votes cast (abstentions and broker non-votes not counted)

Discussion

### PROPOSAL

Andrew Behar has submitted a precatory proposal requesting that the company produce a report on shifting to recycled polymer for single use plastics.

Specifically, the "resolved clause" states:

"Resolved: Shareholders request that Exxon's Board issue an audited report addressing whether and how a significant reduction in virgin plastic demand, as set forth in *Breaking the Plastic Wave's* System Change Scenario to reduce ocean plastic pollution, would affect the Company's financial position and assumptions underlying its financial statements. The report should be at reasonable cost and omit proprietary information."

### PROPONENTS' STATEMENT

In its statement supporting the proposal, the proponents explain the problems caused to the environment by virgin plastic use and the need to shift the current "linear take-make-waste production model" of single-use plastic (SUP). The proponent highlights the fact that the company was recently identified as the largest global producer of SUP-bound polymers (5.9 million metric tons in 2019, an estimated 50 percent of its total polymer production). The proponent cites a BP Energy Outlook report that found that a global SUP plastic ban by 2040 would reduce oil demand growth by 60 percent. This demand destruction for virgin plastics has the potential to result in stranded assets, according to the statement. The proponent suggests that the report asked for include quantification of the company's polymer production for SUP markets; a summary or list of the company's existing and planned investment that may be materially impacted by a scenario similar to the System Change Scenario, and any future plans or goals to shift away from virgin plastics.

### BOARD'S STATEMENT

In its opposing statement, the board states that the report asked for by the proposal is unnecessary due to the company's work on plastic recycling goals and its established risk management processes. The board said the company is working with several partners to reduce plastic waste. It is a founding member of the Alliance to End Plastic Waste. It reportedly has plans to build recycling capacity capable of processing approximately 500,000 metric tons of plastics waste per year. The company works to eliminate plastic pellet pollution from its manufacturing facilities. It also formed a joint venture with Agilyx Corp. called Cyclyx International that is focused on aggregating and pre-processing large volumes of plastic waste. The statement also highlights the benefits of lightweight plastics and their important role in lower-emission technologies.

### BACKGROUND AND RECENT SHAREHOLDER ACTIVISM

For more information on extended producer responsibility and post-consumer packaging waste, see ISS' Environmental and Social Background Report. For an update on the most recent shareholder activism on

Copyright © 2022 Institutional Shareholder Services Inc.  All Rights Reserved.  This proxy analysis and the information herein may not be reproduced or disseminated in whole or in part. For information on the policies applied in this research report, please see our Policy Gateway.

environmental and social issues, refer to ISS 2022 U.S. Environmental and Social Shareholder Proxy Season Preview (requires login to ISS Link).

This is the first year that Exxon Mobil has received a resolution asking for a report on shifting the company's business model away from single use plastics.

Analysis

EXXONMOBIL'S RELATED DISCLOSURES



Copyright © 2022 Institutional Shareholder Services Inc.  All Rights Reserved.  This proxy analysis and the information herein may not be reproduced or disseminated in whole or in part. For information on the policies applied in this research report, please see our Policy Gateway.



| Item 10. Report on Political Contributions and Expenditures | FOR |
|---|---|

**VOTE RECOMMENDATION**

A vote FOR this resolution is warranted ████████████████████████
████████████████████████████████████████████████████████████

**BACKGROUND INFORMATION**

Policies: Political Spending & Lobbying Activities

**Vote Requirement:** Majority of votes cast (abstentions and broker non-votes not counted)

Discussion

PROPOSAL

The Unitarian Universalist Association and co-filers have filed a precatory proposal requesting that the company report on its political contributions.

Specifically, the resolution states:

**"Resolved,** that the shareholders of Exxon Mobil Corp. ('Exxon' or 'Company') hereby request the Company to prepare and semiannually update a report, which shall be presented to the pertinent board of directors committee and posted on the Company's website, disclosing the Company's:

(a) Policies and procedures for making electoral contributions and expenditures (direct and indirect) with corporate funds, including the board's role (if any) in that process; and

(b) Monetary and non-monetary contributions or expenditures that could not be deducted as an ordinary and necessary business expense under section 162(e)(1)(B) of the Internal Revenue Code, including (but not limited to) contributions or expenditures on behalf of candidates, parties, and committees and entities organized and operating under section 501(c)(4) of the Internal Revenue Code, as well as the portion of any dues or payments made to any tax-exempt organization (such as a trade association) used for an expenditure or contribution that, if made directly by the Company, would not be deductible under section 162(e)(1)(B) of the Internal Revenue Code.

The report shall be made available within 12 months of the annual meeting and identify all recipients and the amount paid to each recipient from Company funds. This proposal does not encompass lobbying spending."

SHAREHOLDERS SUPPORTING STATEMENT

In their supporting statement, the proponents say that they support transparency and accountability in corporate spending. The filers state that the company discloses some election related spending, but it does not disclose

Copyright © 2022 Institutional Shareholder Services Inc.  All Rights Reserved.  This proxy analysis and the information herein may not be reproduced or disseminated in whole or in part. For information on the policies applied in this research report, please see our Policy Gateway.

direct independent expenditures; payments to influence the outcome of ballot measures; or payments to trade associations or 501(c)(4)s that could be used for election-related purposes. Public records show that ExxonMobil has contributed nearly $20 million in corporate funds since the 2010 election cycle, but information on electoral spending through trade associations and 501(c)(4) groups are not publicly available unless the company discloses it. The filers say that this proposal asks that Exxon disclose all of its electoral spending, direct and indirect. They say that would bring the company in line with peers AT&T, Phillips 66, and ConocoPhillips, which present this information on their websites.

## BOARD'S STATEMENT

In its opposing statement, the board states that Exxon is in full compliance with all applicable regulations, and that it publicly shares its corporate political spending policy and its direct contributions to candidates, parties, and committees. It states that the company is of the belief that the disclosure rules outlined by federal and state laws are adequate and equitable. Further, the board states that, pursuant to its Political Activities Guidelines, its corporate political contributions are subject to a strict internal review process that requires approval by the board's chairman. Both political contributions and contributions of its Political Action Committees (PACs) are reviewed annually with the Public Issues and Contributions Committee and the board and these procedures are verified through internal audits. Regarding contributions to third-party organizations, the board says that on its website, ExxonMobil publishes a list of all U.S. trade associations in which it or its affiliates are members and reports using a portion of the company's payments for lobbying. The board believes that, for these reasons, the company's current federal and state oversight and reporting are sufficiently transparent, and requests for further disclosure would be more appropriately addressed to Congress, the Executive Branch, and/or relevant state and local governments.

## BACKGROUND AND RECENT SHAREHOLDER ACTIVISM

For more information on political contributions, see ISS' Environmental and Social Background Report. For an update on the most recent shareholder activism on environmental and social issues, refer to ISS 2022 U.S. Environmental and Social Shareholder Proxy Season Preview (requires login to ISS Link).

According to the 2021 CPA-Zicklin Index of Corporate Political Disclosure and Accountability, which gauges a company's transparency around political spending, ExxonMobil received a score of 60 out of 100, placing it in the 2nd tier (out of five tiers).

Exxon has received this proposal for the past three years. In 2021, it received 30.5 percent shareholder support. In 2020 and 2019. It received 31 percent and 26.1 percent shareholder support, respectively.

## Analysis



Copyright © 2022 Institutional Shareholder Services Inc.  All Rights Reserved.  This proxy analysis and the information herein may not be reproduced or disseminated in whole or in part. For information on the policies applied in this research report, please see our Policy Gateway.

Copyright © 2022 Institutional Shareholder Services Inc.  All Rights Reserved.  This proxy analysis and the information herein
may not be reproduced or disseminated in whole or in part. For information on the policies applied in this research report,
please see our Policy Gateway.

**Exxon Mobil Corporation (XOM)**
POLICY: United States

**Meeting Date: 25 May 2022**
Meeting ID: 1632904

## Detailed Ownership Profile

back to Ownership and Control Overview

Percentages rounded down to 1 decimal. "▶" identifies shareholders considered strategic under ISS' definition.

| Type | Votes per Share | Outstanding |
|---|---|---|
| Common Stock | 1 | 4,225,673,726 |

| Ownership - Common Stock | Number of Shares | % of Class |
|---|---|---|
| The Vanguard Group | 355,607,673 | 8.4 |
| BlackRock, Inc. | 262,837,867 | 6.2 |
| State Street Corporation | 253,266,613 | 5.9 |
| Fidelity Management & Research Co. LLC | 71,245,644 | 1.6 |
| Geode Capital Management LLC | 70,815,006 | 1.6 |
| Norges Bank Investment Management | 52,041,575 | 1.2 |
| Northern Trust Investments, Inc.(Investment Management) | 48,860,767 | 1.1 |
| GQG Partners LLC | 32,397,153 | 0.7 |
| Charles Schwab Investment Management, Inc. | 30,619,880 | 0.7 |
| State Farm Investment Management Corp. | 30,520,300 | 0.7 |
| Capital Research & Management Co. (World Investors) | 30,240,300 | 0.7 |
| First Eagle Investment Management LLC | 23,812,283 | 0.5 |
| The Bank of New York Mellon Corp. (Investment Management) | 22,130,858 | 0.5 |
| Mellon Investments Corp. | 21,932,098 | 0.5 |
| Morgan Stanley Smith Barney LLC (Investment Management) | 21,553,176 | 0.5 |
| Franklin Advisers, Inc. | 21,520,125 | 0.5 |
| T. Rowe Price Associates, Inc. (Investment Management) | 18,747,010 | 0.4 |
| Dimensional Fund Advisors LP | 18,696,371 | 0.4 |
| ▶D.W. Woods | 169,496 | <0.1 |
| ▶J.P. Williams, Jr. | 137,241 | <0.1 |
| ▶N.A. Chapman | 136,842 | <0.1 |
| ▶K.A. Mikells | 10,050 | <0.1 |

Source(s): Proxy Statement,  © 2022 Factset Research Systems, Inc. All Rights Reserved. As of: 28 Feb 2022

## Additional Information

| | |
|---|---|
| Meeting Location | Virtual Meeting Only: www.virtualshareholdermeeting.com/XOM2022 |
| Meeting Time | 09:30 Central Time |
| Shareholder Proposal Deadline | December 8, 2022 |
| Solicitor | D.F. King & Co. |
| Security IDs | 30231G102(CUSIP) |

Copyright © 2022 Institutional Shareholder Services Inc.  All Rights Reserved.  This proxy analysis and the information herein may not be reproduced or disseminated in whole or in part. For information on the policies applied in this research report, please see o ur Policy Gateway.

ISS' experienced research team provides comprehensive proxy analyses and complete vote recommendations for approximately 44,000 meetings annually in around 115 markets worldwide. With a team of approximately 300 research professionals, ISS aims to cover every holding within a client's portfolio in both developed and emerging markets.

Our Research Analysts are located in offices worldwide, offering local insight and global breadth. Research office locations include Berlin, Brussels, London, Manila, Mumbai, Norman, Paris, San Francisco, Singapore, Sydney, Tokyo, Toronto, and Rockville, Maryland.

ISS has long been committed to engagement and transparency. For information on the policies applied in this research report, please see our Policy Gateway. Please use the ISS Help Center for questions on research reports, policy, and for requests for engagements.



*The issuer that is the subject of this analysis may have purchased self-assessment tools and publications from ISS Corporate Solutions, Inc. (formerly known as ISS Corporate Services, Inc. and referred to as "ICS"), a wholly-owned subsidiary of ISS, or ICS may have provided advisory or analytical services to the issuer in connection with the proxies described in this report. These tools and services may have utilized preliminary peer groups generated by ISS' institutional research group. No employee of ICS played a role in the preparation of this report. If you are an ISS institutional client, you may inquire about any issuer's use of products and services from ICS by emailing disclosure@issgovernance.com.*

This proxy analysis and vote recommendation has not been submitted to, nor received approval from, the United States Securities and Exchange Commission or any other regulatory body. While ISS exercised due care in compiling this analysis, it makes no warranty, express or implied, regarding the accuracy, completeness or usefulness of this information and assumes no liability with respect to the consequences of relying on this information for investment or other purposes. In particular, the research and voting recommendations provided are not intended to constitute an offer, solicitation or advice to buy or sell securities nor are they intended to solicit votes or proxies.

In February 2021, Deutsche Börse AG ("DB") completed a transaction pursuant to which it acquired an approximate 80% stake in ISS HoldCo Inc., the holding company which owns ISS. The remainder of ISS HoldCo Inc. is held by a combination of Genstar Capital ("Genstar") and ISS management. Policies on non-interference and potential conflicts of interest related to DB and Genstar are available at https://www.issgovernance.com/compliance/due-diligence-materials.

The issuer that is the subject of this proxy analysis may be a client of ISS or ICS, or the parent of, or affiliated with, a client of ISS or ICS.

One or more of the proponents of a shareholder proposal at an upcoming meeting may be a client of ISS or ICS, or the parent of, or affiliated with, a client of ISS or ICS. None of the sponsors of any shareholder proposal(s) played a role in preparing this report.

ISS may in some circumstances afford issuers, whether or not they are clients of ICS, the right to review draft research analyses so that factual inaccuracies may be corrected before the report and recommendations are finalized. Control of research analyses and voting recommendations remains, at all times, with ISS.

ISS makes its proxy voting policy formation process and summary proxy voting policies readily available to issuers, investors and others on its public website: http://www.issgovernance.com/policy.

Copyright © 2022 Institutional Shareholder Services Inc. All Rights Reserved. This proxy analysis and the information herein may not be reproduced or disseminated in whole or in part.

Copyright © 2022 Institutional Shareholder Services Inc. All Rights Reserved. This proxy analysis and the information herein may not be reproduced or disseminated in whole or in part. For information on the policies applied in this research report, please see our Policy Gateway.

# Foster Declaration Exhibit 10

ISS▷

Catholic Advisory Services' Policy Voting Recommendations

# Exxon Mobil Corporation

## Key Takeaways



QualityScore

**Meeting Type:** Annual (Virtual)
**Meeting Date:** 25 May 2022
**Record Date:** 1 April 2022
**Meeting ID:** 1632904

**New York Stock Exchange**: XOM
**Index:** S&P 500
**Sector:** Integrated Oil & Gas
**GICS:** 10102010

**Primary Contacts**
Brenna Fitzpatrick
Catholic Advisory Services Help Center

## Report Contents

| | | | |
|---|---|---|---|
| Financial Highlights | 4 | QualityScore | 11 |
| Ownership and Control Overview | 5 | Vote Results | 16 |
| Corporate Governance Profile | 6 | Meeting Agenda and Proposals | 18 |
| Board Profile | 8 | Additional Information | 56 |
| Compensation Profile | 9 | | |

© 2022 Institutional Shareholder Services Inc.  All Rights Reserved. This proxy analysis and the information herein may not b e reproduced or disseminated in whole or in part. For information on the policies applied in this research report, please see our Policy Gateway.

**Exxon Mobil Corporation (XOM)**
POLICY: Catholic

**Meeting Date: 25 May 2022**
Meeting ID: 1632904

## Agenda & Recommendations

**Policy: Catholic**
**Incorporated:** New Jersey, USA

| Item | Code | Proposal | Board Rec. | Catholic Rec. |
|---|---|---|---|---|
| **MANAGEMENT PROPOSALS** | | | | |
| 1.1 | M0201 | Elect Director Michael J. Angelakis | FOR | AGAINST |
| 1.2 | M0201 | Elect Director Susan K. Avery | FOR | AGAINST |
| 1.3 | M0201 | Elect Director Angela F. Braly | FOR | AGAINST |
| 1.4 | M0201 | Elect Director Ursula M. Burns | FOR | AGAINST |
| 1.5 | M0201 | Elect Director Gregory J. Goff | FOR | AGAINST |
| 1.6 | M0201 | Elect Director Kaisa H. Hietala | FOR | AGAINST |
| 1.7 | M0201 | Elect Director Joseph L. Hooley | FOR | AGAINST |
| 1.8 | M0201 | Elect Director Steven A. Kandarian | FOR | AGAINST |
| 1.9 | M0201 | Elect Director Alexander A. Karsner | FOR | AGAINST |
| 1.10 | M0201 | Elect Director Jeffrey W. Ubben | FOR | AGAINST |
| 1.11 | M0201 | Elect Director Darren W. Woods | FOR | AGAINST |
| 2 | M0101 | Ratify PricewaterhouseCoopers LLP as Auditors | FOR | FOR |
| ▶3 | M0550 | Advisory Vote to Ratify Named Executive Officers' Compensation | FOR | FOR |
| **SHAREHOLDER PROPOSALS** | | | | |
| 4 | S0511 | Remove Executive Perquisites | AGAINST | FOR |
| 5 | S0126 | Amend Bylaws to Limit Shareholder Rights for Proposal Submission | AGAINST | AGAINST |
| 6 | S0743 | Set GHG Emissions Reduction targets Consistent With Paris Agreement Goal | AGAINST | FOR |
| 7 | S0742 | Report on Low Carbon Business Planning | AGAINST | FOR |
| 8 | S0742 | Report on Scenario Analysis Consistent with International Energy Agency's Net Zero by 2050 | AGAINST | FOR |
| 9 | S0781 | Report on Reducing Plastic Pollution | AGAINST | FOR |
| 10 | S0807 | Report on Political Contributions and Expenditures | AGAINST | FOR |

Shading indicates that Catholic Advisory Services recommendation differs from Board recommendation
▶ Items deserving attention due to contentious issues or controversy

Publication Date: 12 May 2022

Page 2

Copyright © 2022 Institutional Shareholder Services Inc. All Rights Reserved. This proxy analysis and the information herein may not be reproduced or disseminated in whole or in part. For information on the policies applied in this research report, please see our Policy Gateway.

**Exxon Mobil Corporation (XOM)**

POLICY: Catholic

**Meeting Date: 25 May 2022**

Meeting ID: 1632904

## Material Company Updates

| Item | Summary |
|------|---------|
| **Board and Executive Updates** | Lead independent director Kenneth C. Frazier will not stand for re-election at this year's annual meeting. The independent directors have selected Joseph L. Hooley to serve as lead director following the annual meeting. |
| | SVP and principal financial officer Andrew Swiger retired from the company effective Sept. 1, 2021. Kathryn Mikells was appointed as SVP and Chief Financial Officer effective Aug. 9, 2021. |
| **Notable Vote Results** | At the last annual meeting, shareholder proposals seeking a Report on Corporate Climate Lobbying Aligned with Paris Agreement and a Report on Lobbying Payments and Policy received the support of a majority of votes cast. See *Board Responsiveness* section of **Elect Directors** below. |
| **Climate Litigation** | In April 2021, authorities in Anne Arundel County, Maryland filed suit in local circuit court against a number of fossil fuel companies, including ExxonMobil, accusing the defendants of acting to mislead the public about the contributions of their products to climate change, and seeking to recover costs incurred by the county to "survive the consequences of climate change." The case was subsequently removed to the U.S. District Court for the District of Maryland where it remains pending. |

Copyright © 2022 Institutional Shareholder Services Inc. All Rights Reserved. This proxy analysis and the information herein may not be reproduced or disseminated in whole or in part. For information on the policies applied in this research report, please see our Policy Gateway.

**Exxon Mobil Corporation (XOM)**
POLICY: Catholic

**Meeting Date: 25 May 2022**
Meeting ID: 1632904

## Financial Highlights

**Company Description:** Exxon Mobil Corporation explores for and produces crude oil and natural gas in the United States and internationally. It operates through Upstream, Downstream, and Chemical segments.

STOCK PRICE PERFORMANCE



— Exxon Mobil Corporation
— MSCI ACWI: Oil, Gas & Consumable Fuels (GICS: 101020)
— S&P 500

TOTAL SHAREHOLDER RETURNS (ANNUALIZED)

| | 1 Yr | 3 Yr | 5 Yr |
|---|---|---|---|
| Company TSR (%) | 57.80 | 2.72 | -2.40 |
| GICS 1010 TSR (%) | 46.05 | 2.95 | -3.50 |
| S&P500 TSR (%) | 28.71 | 26.07 | 18.47 |

Source: Compustat. As of last day of company FY end month: 12/31/2021

COMPANY SNAPSHOT (AS OF RECORD DATE)

| | |
|---|---|
| Market Cap (M) | 351,896.2 |
| Closing Price | 83.12 |
| Dividends Paid (LTM) | 3.50 |
| 52-Week High | 91.51 |
| 52-Week Low | 52.10 |
| Shares Outstanding (M) | 4233.59 |
| Average daily trading volume (prior mo)* | 36,148.29 |

Source: Compustat. As of April 1, 2022 (All currency in USD)
* Trading Volume in thousands of shares

### FINANCIAL & OPERATIONAL PERFORMANCE

| All currency in USD | Historical Performance (FY ending) | | | | | Compared to Peers (Compustat FY*) – 2021 |
|---|---|---|---|---|---|---|
| | 12/2017 | 12/2018 | 12/2019 | 12/2020 | 12/2021 | |
| **Earnings** | | | | | | |
| Revenue (M) | 237,162 | 279,332 | 255,583 | 178,574 | 276,692 | |
| Net Income (M) | 19,710 | 20,840 | 14,340 | -22,440 | 23,040 | |
| EBITDA (M) | 31,967 | 40,869 | 31,764 | -8,889 | 43,484 | |
| EPS (USD) | 4.63 | 4.88 | 3.36 | -5.25 | 5.39 | |
| EPS Y/Y Growth (%) | 146 | 5 | -31 | N/A | N/A | |
| **Profitability** | | | | | | |
| Pretax Net Margin (%) | 8 | 11 | 8 | -16 | 11 | |
| EBITDA Margin (%) | 13 | 15 | 12 | -5 | 16 | |
| Return on Equity (%) | 11 | 11 | 7 | -14 | 14 | |
| Return on Assets (%) | 6 | 6 | 4 | -7 | 7 | |
| ROIC (%) | 9 | 10 | 6 | -10 | 10 | |
| **Leverage** | | | | | | |
| Debt/Assets | 12 | 11 | 15 | 22 | 16 | |
| Debt/Equity | 23 | 20 | 28 | 46 | 31 | |
| **Cash Flows** | | | | | | |
| Operating (M) | 30,066 | 36,014 | 29,716 | 14,668 | 48,129 | |
| Investing (M) | -15,730 | -16,446 | -23,084 | -18,459 | -10,235 | |
| Financing (M) | -15,130 | -19,446 | -6,618 | 5,285 | -35,423 | |
| Net Change (M) | -480 | -135 | 47 | 1,275 | 2,438 | |
| **Valuation & Performance** | | | | | | |
| Price/Earnings | 18.06 | 13.97 | 20.77 | N/A | 11.35 | |
| Annual TSR (%) | -3.75 | -15.09 | 7.35 | -36.02 | 57.80 | |

Source: Compustat. *Note: Compustat standardizes financial data and fiscal year designations to allow for meaningful comparison across companies. Compustat data may differ from companies' disclosed financials and does not incorporate non-trading equity units. Peers shown here represent closest industry peers drawn from those peers used in ISS' pay-for-performance analysis. See www.issgovernance.com/policy-gateway/company-financials-faq/ for more information.

Publication Date: 12 May 2022

Copyright © 2022 Institutional Shareholder Services Inc. All Rights Reserved. This proxy analysis and the information herein may not be reproduced or disseminated in whole or in part. For information on the policies applied in this research report, please see our Policy Gateway.

**Exxon Mobil Corporation (XOM)**
POLICY: Catholic

## Ownership & Control Overview

| Stock Type | Votes per Share | Outstanding | |
|---|---|---|---|
| Common Stock | 1 | 4,225,673,726 | |
| **Top Holders - Ownership & Control** | | **% of Stock** | **% of Votes** |
| The Vanguard Group | | 8.4 | 8.4 |
| BlackRock, Inc. | | 6.2 | 6.2 |
| State Street Corporation | | 5.9 | 5.9 |

Proxy Statement, © 2022 Factset Research Systems, Inc. All Rights Reserved. As of: 28 Feb 2022



Percentages rounded down to 1 decimal. "▶" identifies shareholders considered strategic under ISS' definition.

to Detailed Ownership Profile

ISS' definition of strategic shareholders may include, but is not limited to, shareholders with board representation, State-controlled entities, insiders/executives, and employee funds.

Copyright © 2022 Institutional Shareholder Services Inc. All Rights Reserved. This proxy analysis and the information herein may not be reproduced or disseminated in whole or in part. For information on the policies applied in this research report, please see our Policy Gateway.

**Exxon Mobil Corporation (XOM)**
POLICY: Catholic

**Meeting Date: 25 May 2022**
Meeting ID: 1632904

# Corporate Governance Profile

## BOARD SUMMARY

| | |
|---|---|
| Chairman classification | Executive Director |
| Separate chair/CEO | No |
| Independent lead director | Yes |
| Voting standard | Majority |
| Plurality carveout for contested elections | Yes |
| Resignation policy | Yes |
| Total director ownership (000 shares) | 577 |
| Total director ownership (%) | < 1 |
| Percentage of directors owning stock | 100% |
| Number of directors attending < 75% of meetings | 0 |
| Average director age | 61 years |
| Average director tenure | 3 years |
| Percentage of women on board | 36% |

## SHAREHOLDER RIGHTS SUMMARY

| | |
|---|---|
| Controlled company | No |
| Classified board | No |
| Multi-class common stock w/ unequal voting rights | No |
| Vote standard for mergers/acquisitions | Majority |
| Vote standard for charter amendment | Majority |
| Vote standard for bylaw amendment | Majority |
| Shareholder right to call special meetings | Yes, 15% |
| Material restrictions on right to call special meetings | Yes |
| Shareholder right to act by written consent | Yes |
| Cumulative voting | No |
| Board authorized to issue blank-check preferred stock | Yes |
| Poison pill | No |
| Proxy Access | Yes |
| -    Ownership requirement (%) | 3 |
| -    Time requirement (years) | 3 |
| -    Nomination limit (% of seats) | 20 |
| -    Nomination limit (# of nominees) | 2 |
| -    Aggregation cap (# of nominators) | 20 |

Copyright © 2022 Institutional Shareholder Services Inc.  All Rights Reserved. This proxy analysis and the information herein may not be reproduced or disseminated in whole or in part. For information on the policies applied in this research report,  please see our Policy Gateway.

**Exxon Mobil Corporation (XOM)**
POLICY: Catholic

**Meeting Date: 25 May 2022**
Meeting ID: 1632904

## Board & Committee Composition

The information provided in the charts and tables below is based on Catholic Advisory Services data records, which rely on disclosures in proxy materials and other public sources available as of the date set forth below (for the general meeting under review) and, with respect to information from prior years, information that was available ahead of each year's annual general meeting at the time of Catholic Advisory Services' report for that meeting. As such, these charts and tables might not reflect changes to the board composition and/or other covered elements subsequently disclosed by the issuer after Catholic Advisory Services' publications or between general meetings.

Independence values refer to Catholic Advisory Services Independence classifications ( "Exec": Executive Director; "N-Ind.": Non-Independent Director; "Ind.": Independent Director).

### Board

Ind.: 91%, 10
Exec.: 9%, 1

Meetings last FY:13

as of May 25, 2022

### Audit

Ind.: 100%, 4

Meetings last FY:10

### Comp

Ind.: 100%, 3

Meetings last FY:5

### Nom

Ind.: 100%, 3

Meetings last FY:8

■ **Exec**    ■ **N-Ind.**    ■ **Ind.**

### Independence History

| | 2018 | 2019 | 2020 | 2021 | After AGM |
|---|---|---|---|---|---|
| Board | 90% | 90% | 90% | 94% | 91% |
| Audit Com | 100% | 100% | 100% | 100% | 100% |
| Comp Com | 100% | 100% | 100% | 100% | 100% |
| Nom Com | 100% | 100% | 100% | 100% | 100% |

### Gender Diversity Trend

| | 2018 | 2019 | 2020 | 2021 | After AGM |
|---|---|---|---|---|---|
| male | 70% | 70% | 70% | 75% | 64% |
| female | 30% | 30% | 30% | 25% | 36% |

### Director tenure

0    2    4    6    8    10    12

Copyright © 2022 Institutional Shareholder Services Inc. All Rights Reserved. This proxy analysis and the information herein may not be reproduced or disseminated in whole or in part. For information on the policies applied in this research report, please see our Policy Gateway.

**Exxon Mobil Corporation (XOM)**
POLICY: Catholic

**Meeting Date: 25 May 2022**
Meeting ID: 1632904

## Board Profile (after upcoming meeting)

| Item # | Executive Directors | Affiliation | Independence | | Leadership | Gender | Age | Tenure | Term Ends | Committee | | | |
|--------|---------------------|-------------|--------------|--|------------|--------|-----|--------|-----------|-----------|--|--|--|
| | | | Co. | Catholic Advisory Services | | | | | | Audit | Comp | Nom | Gov |
| **1.11** | **Darren Woods** | | Exec | Exec | CEO, Chair | M | 57 | 6 | 2023 | | | | |
| | Non-Executive Directors | | | | | | | | | | | | |
| **1.7** | **Joseph (Jay) Hooley** | | Ind. | Ind. | Lead Dir | M | 65 | 2 | 2023 | F | | | |
| **1.1** | **Michael (Mike) Angelakis** | | Ind. | Ind. | | M | 57 | 1 | 2023 | F | | | |
| **1.2** | **Susan Avery** | | Ind. | Ind. | | F | 72 | 5 | 2023 | | | M | M |
| **1.3** | **Angela Braly** | | Ind. | Ind. | | F | 60 | 6 | 2023 | | C | | |
| **1.4** | **Ursula Burns** | | Ind. | Ind. | | F | 63 | 9 | 2023 | C F | | | |
| **1.5** | **Gregory (Greg) Goff** | | Ind. | Ind. | | M | 65 | 1 | 2023 | | M | M | M |
| **1.6** | **Kaisa Hietala** | | Ind. | Ind. | | F | 51 | 1 | 2023 | F | | | |
| **1.8** | **Steven Kandarian** | | Ind. | Ind. | | M | 70 | 4 | 2023 | | M | | |
| **1.9** | **Alexander Karsner** | | Ind. | Ind. | | M | 55 | 1 | 2023 | | | M | M |
| **1.10** | **Jeffrey Ubben** | | Ind. | Ind. | | M | 60 | 1 | 2023 | | | | |
| | | | 91% Ind. | 91% Ind. | | 36% F | Ave: 61 | Ave: 3 | Ave: 1 | 100% Ind. | 100% Ind. | 100% Ind. | 100% Ind. |

Committee Membership: M = Member | C = Chair | **F = Financial Expert**

### COMMITMENTS AT PUBLIC COMPANIES

| Item # | Director Name | # of boards* | Company Name | Mandate Type | CEO | Board Chair | Committee | | | Ownership | | |
|--------|---------------|--------------|--------------|--------------|-----|-------------|-----------|--|--|-----------|--|--|
| | | | | | | | Audit | Comp | Nom | # | % stock | % votes |
| 1.11 | Darren Woods | 1 | *Exxon Mobil Corporation* | Executive Director | ☐ | ☐ | | | | 169,496 | <0.1 | <0.1 |
| 1.7 | Joseph (Jay) Hooley | 2 | *Exxon Mobil Corporation* | Non-Executive Director | | | F | | | 13,000 | <0.1 | <0.1 |
| | | | Aptiv Plc | Non-Executive Director | | | F | C | | | | |
| 1.1 | Michael (Mike) Angelakis | 4 | *Exxon Mobil Corporation* | Non-Executive Director | | | F | | | 51,292 | <0.1 | <0.1 |
| | | | Bowlero Corp. | Non-Executive Director | | | | | C | | | |
| | | | TriNet Group, Inc. | Non-Executive Director | | | | M | M | | | |
| | | | Clarivate Plc | Non-Executive Director | | | | | | | | |
| 1.2 | Susan Avery | 1 | *Exxon Mobil Corporation* | Non-Executive Director | | | | | M | 20,500 | <0.1 | <0.1 |
| 1.3 | Angela Braly | 3 | *Exxon Mobil Corporation* | Non-Executive Director | | | | C | | 25,075 | <0.1 | <0.1 |
| | | | The Procter & Gamble Company | Non-Executive Director | | | M | C | | | | |
| | | | Brookfield Asset Management Inc. | Non-Executive Director | | | M | | | | | |
| 1.4 | Ursula Burns | 5 | *Exxon Mobil Corporation* | Non-Executive Director | | | C F | | | 33,206 | <0.1 | <0.1 |
| | | | Plum Acquisition Corp. I | Executive Director | ☐ | | | | | | | |
| | | | Uber Technologies, Inc. | Non-Executive Director | | | F | M | | | | |
| | | | Endeavor Group Holdings, Inc. | Non-Executive Director | | | | | | | | |
| | | | IHS Holding Ltd. | Non-Executive Director | | | | | | | | |
| 1.5 | Gregory (Greg) Goff | 2 | *Exxon Mobil Corporation* | Non-Executive Director | | | | M | M | 20,962 | <0.1 | <0.1 |
| | | | Avient Corporation | Non-Executive Director | | | | | M | | | |
| 1.6 | Kaisa Hietala | 2 | *Exxon Mobil Corporation* | Non-Executive Director | | | F | | | 10,500 | <0.1 | <0.1 |
| | | | Smurfit Kappa Group Plc | Non-Executive Director | | | M | | | | | |
| 1.8 | Steven Kandarian | 2 | *Exxon Mobil Corporation* | Non-Executive Director | | | | M | | 18,000 | <0.1 | <0.1 |
| | | | Jackson Financial, Inc. (Michigan) | Non-Executive Director | | ☐ | | | | | | |
| 1.9 | Alexander Karsner | 3 | *Exxon Mobil Corporation* | Non-Executive Director | | | | | M | 27,500 | <0.1 | <0.1 |
| | | | Applied Materials, Inc. | Non-Executive Director | | | | M | M | | | |
| | | | Alphabet Inc. | Executive Officer (non-director) | | | | | | | | |
| | | | Broadscale Acquisition Corp. | Non-Executive Director | | | | | | | | |
| 1.10 | Jeffrey Ubben | 3 | *Exxon Mobil Corporation* | Non-Executive Director | | | | | | 187,500 | <0.1 | <0.1 |
| | | | Enviva, Inc. | Non-Executive Director | | | | | | | | |
| | | | Fertiglobe Plc | Non-Executive Director | | | | | | | | |

Copyright © 2022 Institutional Shareholder Services Inc. All Rights Reserved. This proxy analysis and the information herein may not be reproduced or disseminated in whole or in part. For information on the policies applied in this research report, please see our Policy Gateway.

**Exxon Mobil Corporation (XOM)**
POLICY: Catholic

**Meeting Date: 25 May 2022**
Meeting ID: 1632904

*The number of boards for each director is the total of executive director and/ or non -executive director mandates.
Ownership values include shares held, stock awards that vest within 60 days of the disclosure date, and deferred stock units  (DSUs). Stock options are excluded.

### DIRECTOR PAY AND ATTENDANCE OVERVIEW MOST RECENT FY

| Item # | Director Name | Board Position | Attendance (in %) | Total Compensation |
|---|---|---|---|---|
| 1.11 | Darren Woods | ED, CEO, Chair | ≥75% | ** |
| 1.7 | Joseph (Jay) Hooley | NED, Audit (M) | ≥75% | USD 214,295 |
| 1.1 | Michael (Mike) Angelakis | NED, Audit (M) | ≥75% | USD 547,185 |
| 1.2 | Susan Avery | NED, Nom (M) | ≥75% | USD 214,295 |
| 1.3 | Angela Braly | NED, Comp (C) | ≥75% | USD 219,020 |
| 1.4 | Ursula Burns | NED, Audit (C) | ≥75% | USD 224,295 |
| 1.5 | Gregory (Greg) Goff | NED, Comp (M), Nom (M) | ≥75% | USD 552,538 |
| 1.6 | Kaisa Hietala | NED, Audit (M) | ≥75% | USD 552,538 |
| 1.8 | Steven Kandarian | NED, Comp (M) | ≥75% | USD 214,295 |
| 1.9 | Alexander Karsner | NED, Nom (M) | ≥75% | USD 552,538 |
| 1.10 | Jeffrey Ubben | NED | ≥75% | USD 547,185 |
| **Total** | | | | USD 3,838,184 |

Attendance rates take into account board and committee meetings.
ED for Executive Directors, NED for Non-Executive Directors
**For executive director data, please refer to Executive Pay Overview.

## Compensation  Profile

### EXECUTIVE PAY OVERVIEW

| Executive | Title | Base Salary | Change in Pension, Deferred Comp, All Other Comp | Bonus & Non-equity Incentives | Restricted Stock | Option Grant | Total |
|---|---|---|---|---|---|---|---|
| D. Woods | Chairman and CEO | 1,615 | 5,310 | 3,142 | 13,573 | 0 | 23,640 |
| N. Chapman | Senior Vice President | 955 | 5,558 | 1,932 | 6,717 | 0 | 15,162 |
| K. Mikells | Senior Vice President; CFO | 1,100 | 260 | 1,932 | 11,293 | 0 | 14,585 |
| J. Williams Jr. | Senior Vice President | 1,068 | 4,632 | 1,932 | 6,717 | 0 | 14,349 |
| L. Mallon | President, ExxonMobil Upstream Company | 849 | 3,280 | 1,429 | 4,861 | 0 | 10,419 |
| **Median CEO Pay** | ISS Selected Peer Group | 1,688 | 963 | 4,253 | 11,813 | 3,151 | **23,313** |
| | Company Defined Peers | 1,669 | 918 | 4,376 | 12,616 | 3,699 | **24,174** |

Source: ISS. Pay in $thousands. Total pay is sum of all reported pay elements, using ISS' Black -Scholes estimate for option grant-date values. Median total pay will not equal sum of pay elements medians. Company Defined Peers are as disclosed. More informa tion on ISS' peer group methodology is available at www.issgovernance.com/policy-gateway/us-compensation-policy-guidance/.

Copyright © 2022 Institutional Shareholder Services Inc.  All Rights Reserved. This proxy analysis and the information herein may not be reproduced or disseminated in whole or in part. For information on the policies applied in this research report,  please see our Policy Gateway.

**Exxon Mobil Corporation (XOM)**
POLICY: Catholic

**Meeting Date: 25 May 2022**
Meeting ID: 1632904

## OPTION VALUATION ASSUMPTIONS

| For CEO's last FY Grant | Company | ISS |
|---|---|---|
| Volatility (%) | N/A | N/A |
| Dividend Yield (%) | N/A | N/A |
| Term (yrs) | N/A | N/A |
| Risk-free Rate (%) | N/A | N/A |
| Grant date fair value per option | N/A | N/A |
| Grant Date Fair Value ($ in 000) | N/A | N/A |

The CEO did not receive stock options in the most recent fiscal year.

## CEO PAY MULTIPLES

| Compared to | Multiple |
|---|---|
| 2nd highest active executive | 1.56 |
| Average active NEO | 1.73 |
| ISS peer median | 1.01 |
| Company peer median | 0.98 |
| Median employee/CEO Pay Ratio* (FY21, FY20) | 125, 86 |

*As disclosed by the company. The company disclosed the median compensation of all employees to be $189,082.

## CEO TALLY SHEET

| CEO | D. Woods |
|---|---|
| CEO tenure at FYE: | 5 years |
| Present value of all accumulated pension: | $32,509,438 |
| Value of CEO stock owned (excluding options): | $14,088,508 |
| **Potential Termination Payments** | |
| Involuntary termination without cause: | N/A |
| Termination after a change in control: | N/A |

Source: DEF14A

## 3-YEAR GRANTED VS. REALIZABLE CEO PAY

3-year TSR: 2.72%



Source: DEF14A and ISS ($ in thousands)

Granted pay equals the sum of all CEO pay, as disclosed in the proxy statement for the applicable fiscal years, except that equity grant values may be based on ISS' valuation. Realizable pay equals the sum of all cash paid (as disclosed) during the same period, plus the value of all equity grants at the end of the period (based on earned value, if applicable, or re-calculated FV of target level equity awards not yet earned/vested). For periods that include multiple CEOs, values include pay to all CEOs during the period. For additional information, please visit www.issgovernance.com/policy-gateway/us-compensation-policy-guidance/.

Copyright © 2022 Institutional Shareholder Services Inc. All Rights Reserved. This proxy analysis and the information herein may not be reproduced or disseminated in whole or in part. For information on the policies applied in this research report, please see our Policy Gateway.

**Exxon Mobil Corporation (XOM)**                                              **Meeting Date: 25 May 2022**
POLICY: Catholic                                                              Meeting ID: 1632904

## Dilution & Burn Rate

### DILUTION

|                                | Dilution (%) |
|--------------------------------|--------------|
| Exxon Mobil Corporation        | 2.56         |
| Peer group median              | 6.23         |
| Peer group weighted average    | 5.61         |
| Peer group 75th percentile     | 9.45         |

Dilution is the sum of the total amount of shares available for grant and outstanding under options and other equity awards (vested and unvested) expressed as a percentage of total basic common shares outstanding as of the record date. The dilution figure typically excludes employee stock purchase plans and 401(k) shares. The underlying information is based on the company's equity compensation table in the most recent proxy statement or 10-K.

### BURN RATE

|                | Unadjusted (%) | Adjusted (%) | Value-Adjusted (%) |
|----------------|----------------|--------------|--------------------|
| 1-year         | 0.20           | 0.41         | 0.20               |
| 3-year average | 0.21           | 0.41         | 0.21               |

Burn rate equals the number of shares granted in each fiscal year, including stock options, restricted stock (units), actual performance shares delivered under the long-term incentive plan or earned deferred shares, to employees and directors divided by weighted average common shares outstanding. The adjusted burn rate places a premium on grants of full-value awards using a multiplier based on the company's annual volatility.
The value-adjusted burn rate uses stock price to value full-value awards and Black Scholes to value stock options. For more information on these burn rate methodologies, please visit www.issgovernance.com/policy-gateway/voting-policies/.

Copyright © 2022 Institutional Shareholder Services Inc. All Rights Reserved. This proxy analysis and the information herein may not be reproduced or disseminated in whole or in part. For information on the policies applied in this research report, please see our Policy Gateway.

**Exxon Mobil Corporation (XOM)**

POLICY: Catholic

**Meeting Date: 25 May 2022**

Meeting ID: 1632904

**QualityScore**

Copyright © 2022 Institutional Shareholder Services Inc.  All Rights Reserved. This proxy analysis and the information herein may not be reproduced or disseminated in whole or in part. For information on the policies applied in this research report,  please see our Policy Gateway.

## Climate Awareness Scorecard

Copyright © 2022 Institutional Shareholder Services Inc.  All Rights Reserved. This proxy analysis and the information herein may not be reproduced or disseminated in whole or in part. For information on the policies applied in this research report,  please see our Policy Gateway.

**Meeting Date: 25 May 2022**
Meeting ID: 1632904

Copyright © 2022 Institutional Shareholder Services Inc.  All Rights Reserved. This proxy analysis and the information herein may not be reproduced or disseminated in whole or in part. For information on the policies applied in this research report,  please see our Policy Gateway.

**Exxon Mobil Corporation (XOM)**
POLICY: Catholic

**Meeting Date: 25 May 2022**
Meeting ID: 1632904

## SDG Impact Rating

Copyright © 2022 Institutional Shareholder Services Inc.  All Rights Reserved. This proxy analysis and the information herein may not be reproduced or disseminated in whole or in part. For information on the policies applied in this research report,  please see our Policy Gateway.

**Exxon Mobil Corporation (XOM)**
POLICY: Catholic

<div align="right">

**Meeting Date: 25 May 2022**
Meeting ID: 1632904

</div>

For more information please visit ISS ESG SDG Impact Ratings. Norms Based Research (NBR) controversy content displayed in the SDG Impact Rating section of this report may differ from NBR controversy content displayed in other sections of the report. For more information on how Norms Based Research content is generated for inclusion in SDG Impact Ratings please refer to the SDG Impact Rating Methodology. If you have additional questions on the methodology, please visit ISS Help Center.

# Vote Results

## ANNUAL MEETING 26 MAY 2021

| Proposal | Board Rec | Catholic Rec | Disclosed Result | Support Including Abstains (%)[1] | Support Excluding Abstains (%)[2] |
|---|---|---|---|---|---|
| 1.1 Elect Director Michael J. Angelakis | For | Do Not Vote | Pass | 98.4 | 98.4 |
| 1.2 Elect Director Susan K. Avery | For | Do Not Vote | Pass | 96.7 | 96.7 |
| 1.3 Elect Director Angela F. Braly | For | Do Not Vote | Pass | 95.3 | 95.3 |
| 1.4 Elect Director Ursula M. Burns | For | Do Not Vote | Pass | 97.8 | 97.8 |
| 1.5 Elect Director Kenneth C. Frazier | For | Do Not Vote | Pass | 94.5 | 94.5 |
| 1.6 Elect Director Joseph L. Hooley | For | Do Not Vote | Pass | 96.6 | 96.6 |
| 1.7 Elect Director Steven A. Kandarian | For | Do Not Vote | Pass | 97.2 | 97.2 |
| 1.8 Elect Director Douglas R. Oberhelman | For | Do Not Vote | Fail | 97.2 | 97.2 |
| 1.9 Elect Director Samuel J. Palmisano | For | Do Not Vote | Fail | 93.2 | 93.2 |
| 1.10 Elect Director Jeffrey W. Ubben | For | Do Not Vote | Pass | 98.1 | 98.1 |
| 1.11 Elect Director Darren W. Woods | For | Do Not Vote | Pass | 94.5 | 94.5 |
| 1.12 Elect Director Wan Zulkiflee | For | Do Not Vote | Fail | 93.4 | 93.4 |
| 2 Ratify PricewaterhouseCoopers LLP as Auditors | For | Do Not Vote | Pass | 96.2 | 96.7 |
| 3 Advisory Vote to Ratify Named Executive Officers' Compensation | For | Do Not Vote | Pass | 87.1 | 88.6 |
| 4 Require Independent Board Chair | Against | Do Not Vote | Fail | 22.5 | 23.0 |
| 5 Reduce Ownership Threshold for Shareholders to Call Special Meeting | Against | Do Not Vote | Fail | 20.2 | 20.7 |
| 6 Issue Audited Report on Financial Impacts of IEA's Net Zero 2050 Scenario | Against | Do Not Vote | Fail | 48.2 | 49.4 |
| 7 Report on Costs and Benefits of Environmental-Related Expenditures | Against | Do Not Vote | Fail | 5.2 | 5.3 |
| 8 Report on Political Contributions | Against | Do Not Vote | Fail | 29.7 | 30.3 |
| 9 Report on Lobbying Payments and Policy | Against | Do Not Vote | Pass | 55.0 | 56.1 |
| 10 Report on Corporate Climate Lobbying Aligned with Paris Agreement | Against | Do Not Vote | Pass | 62.9 | 64.2 |
| 1.1 Elect Director Gregory J. Goff | For | For | Pass | 85.6 | 85.6 |
| 1.2 Elect Director Kaisa Hietala | For | For | Pass | 90.7 | 90.7 |
| 1.3 Elect Director Alexander A. Karsner | For | For | Pass | 73.1 | 73.1 |
| 1.4 Elect Director Anders Runevad | For | Withhold | Fail | 17.7 | 17.7 |
| 1.5 Management Nominee Michael J. Angelakis | For | For | Pass | 98.4 | 98.4 |
| 1.6 Management Nominee Susan K. Avery | For | For | Pass | 96.7 | 96.7 |
| 1.7 Management Nominee Angela F. Braly | For | For | Pass | 95.3 | 95.3 |
| 1.8 Management Nominee Ursula M. Burns | For | For | Pass | 97.8 | 97.8 |
| 1.9 Management Nominee Kenneth C. Frazier | For | For | Pass | 94.5 | 94.5 |
| 1.10 Management Nominee Joseph L. Hooley | For | For | Pass | 96.6 | 96.6 |
| 1.11 Management Nominee Jeffrey W. Ubben | For | For | Pass | 98.1 | 98.1 |
| 1.12 Management Nominee Darren W. Woods | For | For | Pass | 94.5 | 94.5 |
| 2 Ratify PricewaterhouseCoopers LLP as Auditors | For | For | Pass | 96.2 | 96.7 |
| 3 Advisory Vote to Ratify Named Executive Officers' Compensation | Against | For | Pass | 87.1 | 88.6 |

Copyright © 2022 Institutional Shareholder Services Inc. All Rights Reserved. This proxy analysis and the information herein may not be reproduced or disseminated in whole or in part. For information on the policies applied in this research report, please see our Policy Gateway.

**Exxon Mobil Corporation (XOM)**  **Meeting Date: 25 May 2022**
POLICY: Catholic  Meeting ID: 1632904

| | | | | | |
|---|---|---|---|---|---|
| 4 Require Independent Board Chair | None | For | Fail | 22.5 | 23.0 |
| 5 Reduce Ownership Threshold for Shareholders to Call Special Meeting | None | For | Fail | 20.2 | 20.7 |
| 6 Issue Audited Report on Financial Impacts of IEA's Net Zero 2050 Scenario | None | For | Fail | 48.2 | 49.4 |
| 7 Report on Costs and Benefits of Environmental-Related Expenditures | None | Against | Fail | 5.2 | 5.3 |
| 8 Report on Political Contributions | None | For | Fail | 29.7 | 30.3 |
| 9 Report on Lobbying Payments and Policy | None | For | Pass | 55.0 | 56.1 |
| 10 Report on Corporate Climate Lobbying Aligned with Paris Agreement | None | For | Pass | 62.9 | 64.2 |

Shaded results reflect a majority of votes cast FOR shareholder proposal or AGAINST management proposal or director election

[1]Support Including Abstains is defined as %FOR/(For + Against + Abstain), as expressed as a percentage.

[2]Support Excluding Abstains is defined as %FOR/(For + Against), as expressed as a percentage, provided if different from For + Against + Abstain.

Copyright © 2022 Institutional Shareholder Services Inc. All Rights Reserved. This proxy analysis and the information herein may not be reproduced or disseminated in whole or in part. For information on the policies applied in this research report, please see our Policy Gateway.

## Meeting Agenda & Proposals

| **Items 1.1-1.11. Elect Directors** | AGAINST |
|---|---|

### VOTE RECOMMENDATION

A vote AGAINST incumbent nominees Darren Woods, Joseph (Jay) Hooley, Michael (Mike) Angelakis, Susan Avery, Angela Braly, Ursula Burns, Steven Kandarian, Kaisa Hietala, Alexander Karsner, Gregory (Greg) Goff, and Jeffrey Ubben is warranted ███████████████████████

A vote AGAINST CEO and Chair Darren Woods, Lead Director Joseph Hooley, and Public Issues and Contributions Committee Chair Susan Avery is warranted ███████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████

☐ Votes AGAINST CEO/Chair Darren Woods are further warranted ████████████████████
████████████████████████████████████████
████████████████████████████

### BACKGROUND INFORMATION

Policies: Board Accountability | Board Responsiveness | Director Competence | Director Independence | Election of Directors | Catholic Advisory Services Categorization of Directors | Vote No campaigns

**Vote Requirement:** The company has adopted a majority vote standard (of shares cast) for the election of directors with a plurality carve-out for contested elections, and has a director resignation policy in its governance guidelines.

## Discussion

Please see the Board Profile section above for more information on director nominees.

### ELECTION SUMMARY

The company proposes the following (re)elections:

| Type of election | Nominees |
|---|---|
| Incumbent board members to be reelected | Darren Woods, Joseph (Jay) Hooley, Michael (Mike) Angelakis, Susan Avery, Angela Braly, Ursula Burns, Gregory (Greg) Goff, Kaisa Hietala, Steven Kandarian, Alexander Karsner, and Jeffrey Ubben |
| New board nominees to be elected by shareholders | No new board nominees on ballot |
| **Terms of candidates** | **Nominees** |
| One-year term | Darren Woods, Joseph (Jay) Hooley, Michael (Mike) Angelakis, Susan Avery, Angela Braly, Ursula Burns, Gregory (Greg) Goff, Kaisa Hietala, Steven Kandarian, Alexander Karsner, and Jeffrey Ubben |

Copyright © 2022 Institutional Shareholder Services Inc.  All Rights Reserved.  This proxy analysis and the information herein may not be reproduced or disseminated in whole or in part. For information on the policies applied in this research report, please see our Policy Gateway.

**Exxon Mobil Corporation (XOM)**                                    **Meeting Date: 25 May 2022**
POLICY: Catholic                                                        Meeting ID: 1632904

CATHOLIC ADVISORY SERVICES COMPLIANCE TABLE

Copyright © 2022 Institutional Shareholder Services Inc.  All Rights Reserved. This proxy analysis and the information herein may not be reproduced or disseminated in whole or in part. For information on the policies applied in this research report, please see our Policy Gateway.

**Exxon Mobil Corporation (XOM)**
POLICY: Catholic

**Meeting Date: 25 May 2022**
Meeting ID: 1632904



Copyright © 2022 Institutional Shareholder Services Inc.  All Rights Reserved. This proxy analysis and the information herein may not be reproduced or disseminated in whole or in part. For information on the policies applied in this research report, please see our Policy Gateway.

**Exxon Mobil Corporation (XOM)**
POLICY: Catholic

**Meeting Date: 25 May 2022**
Meeting ID: 1632904

Copyright © 2022 Institutional Shareholder Services Inc.  All Rights Reserved. This proxy analysis and the information herein may not be reproduced or disseminated in whole or in part. For information on the policies applied in this research report, please see our Policy Gateway.

**Exxon Mobil Corporation (XOM)**
POLICY: Catholic

**Meeting Date: 25 May 2022**
Meeting ID: 1632904



Copyright © 2022 Institutional Shareholder Services Inc.  All Rights Reserved. This proxy analysis and the information herein may not be reproduced or disseminated in whole or in part. For information on the policies applied in this research report, please see our Policy Gateway.



Copyright © 2022 Institutional Shareholder Services Inc.  All Rights Reserved. This proxy analysis and the information herein may not be reproduced or disseminated in whole or in part. For information on the policies applied in this research report, please see our Policy Gateway.

**Exxon Mobil Corporation (XOM)**
POLICY: Catholic

**Meeting Date: 25 May 2022**
Meeting ID: 1632904



Copyright © 2022 Institutional Shareholder Services Inc.  All Rights Reserved. This proxy analysis and the information herein may not be reproduced or disseminated in whole or in part. For information on the policies applied in this research report, please see our Policy Gateway.

**Exxon Mobil Corporation (XOM)**
POLICY: Catholic

**Meeting Date: 25 May 2022**
Meeting ID: 1632904

Copyright © 2022 Institutional Shareholder Services Inc.  All Rights Reserved.  This proxy analysis and the information herein may not be reproduced or disseminated in whole or in part. For information on the policies applied in this research report, please see our Policy Gateway.

**Exxon Mobil Corporation (XOM)**     **Meeting Date: 25 May 2022**
POLICY: Catholic     Meeting ID: 1632904



Copyright © 2022 Institutional Shareholder Services Inc.  All Rights Reserved.  This proxy analysis and the information herein may not be reproduced or disseminated in whole or in part. For information on the policies applied in this research report, please see our Policy Gateway.



| **Item 2. Ratify PricewaterhouseCoopers LLP as Auditors** | **FOR** |

**VOTE RECOMMENDATION**

A vote FOR this item is warranted ████████████████████

████████████

**BACKGROUND INFORMATION**

Policies: Auditor Ratification

**Vote Requirement:** Majority of votes cast (abstentions not counted)

## Discussion

### AUDIT FIRM INFORMATION

The board recommends that PricewaterhouseCoopers LLP be reappointed as the company's independent audit firm.

| Audit firm name | PricewaterhouseCoopers LLP |
|---|---|
| Audit firm since (as disclosed) | 1934 |
| Audit opinion for the last fiscal year | Unqualified |
| Term to serve if reappointed | 1 year |

Copyright © 2022 Institutional Shareholder Services Inc. All Rights Reserved. This proxy analysis and the information herein may not be reproduced or disseminated in whole or in part. For information on the policies applied in this research report, please see our Policy Gateway.

**Exxon Mobil Corporation (XOM)**                                    **Meeting Date: 25 May 2022**
POLICY: Catholic                                                         Meeting ID: 1632904

## FEES PAID DURING THE LAST FISCAL YEAR

| Audit firm name | PricewaterhouseCoopers LLP |
|---|---|
| Fees currency | USD |
| Total fees paid to the audit firm | 40,900,000 |
| **Audit fees** | **34,100,000** |
| **Audit-related fees** | **5,800,000** |
| Total transaction-related fees | 0 |
| Total tax fees | 1,000,000 |
| Other fees | 0 |
| **Total non-audit fees\*** | **1,000,000** |
| Total non-audit fees as a percentage of total fees | 2.44% |

\*Total non-audit fees include other fees, tax advice fees, and certain transaction-related fees. Non-audit fees will also include any tax-related fees not identified as tax compliance or tax preparation.

The auditor's report contained in the annual report is unqualified, meaning that in the opinion of the auditor, the company's financial statements are fairly presented in accordance with generally accepted accounting principles.

## Analysis



Copyright © 2022 Institutional Shareholder Services Inc. All Rights Reserved. This proxy analysis and the information herein may not be reproduced or disseminated in whole or in part. For information on the policies applied in this research report, please see our Policy Gateway.

## Item 3. Advisory Vote to Ratify Named Executive Officers' Compensation

### FOR

**VOTE RECOMMENDATION**

A vote FOR this proposal is warranted, with caution. ███████████████████████████
████████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████████

**BACKGROUND INFORMATION**

Policies: Advisory Votes on Executive Compensation

**Vote Requirement:** Majority of votes cast (abstentions and broker non-votes not counted)

## Executive Compensation Analysis

**COMPONENTS OF PAY**

| ($ in thousands) | CEO | | | | CEO Peer Median | Other NEOs |
|---|---|---|---|---|---|---|
| | D. Woods | | D. Woods | D. Woods | | |
| | **2021** | **Change** | **2020** | **2019** | **2021** | **2021** |
| Base salary | 1,615 | 0.0% | 1,615 | 1,500 | 1,688 | 3,972 |
| Deferred comp & pension | 5,137 | | 5,349 | 7,071 | 0 | 13,551 |
| All other comp | 173 | -28.1% | 241 | 336 | 518 | 179 |
| Bonus | 3,142 | | 0 | 2,216 | 0 | 7,225 |
| Non-equity incentives | 0 | | 0 | 0 | 3,825 | 0 |
| Restricted stock | 13,573 | 57.7% | 8,606 | 12,373 | 11,813 | 29,588 |
| Option grant | 0 | | 0 | 0 | 3,151 | 0 |
| **Total** | **23,640** | **49.5%** | **15,810** | **23,496** | **23,995** | **54,515** |
| % of Net Income | 0.1% | | | | | 0.2% |
| % of Revenue | N/A | | | | | - |

## Non-Performance-Based Pay Elements (CEO)

| | |
|---|---|
| *Key perquisites ($)* | Personal aircraft use: 57,768; Personal/home security: 43,241; Auto: 31,492; Financial Planning: 12,347 |
| *Key tax gross-ups on perks ($)* | None |
| *Value of accumulated NQDC* ($)* | 648,533 |
| *Present value of all pensions ($)* | 32,509,438 |
| *Years of actual plan service* | 29.3 |
| *Additional years credited service* | None |

Copyright © 2022 Institutional Shareholder Services Inc. All Rights Reserved. This proxy analysis and the information herein may not be reproduced or disseminated in whole or in part. For information on the policies applied in this research report, please see our Policy Gateway.

**Exxon Mobil Corporation (XOM)**
POLICY: Catholic

**Meeting Date: 25 May 2022**
Meeting ID: 1632904

---

*Non-qualified Deferred Compensation

## Disclosed Benchmarking Targets

| | |
|---|---|
| *Base salary* | None Disclosed |
| *Target short-term incentive* | None Disclosed |
| *Target long-term incentive (equity)* | None Disclosed |
| *Target total compensation* | 50th Percentile |

## Severance/Change-in-Control Arrangements (CEO unless noted)

| | |
|---|---|
| *Contractual severance arrangement* | None |
| *Non-CIC estimated severance ($)* | N/A |

### *Change-in-Control Severance Arrangement*

| | |
|---|---|
| *Cash severance trigger** | No Agreement |
| *Cash severance multiple* | N/A |
| *Cash severance basis* | N/A |
| *Treatment of equity* | Not disclosed |
| *Excise tax gross-up** | No |
| *Estimated CIC severance ($)* | Not disclosed |

*All NEOs considered

## Compensation Committee Communication & Responsiveness

### *Disclosure of Metrics/Goals*

| | |
|---|---|
| *Annual incentives* | Partial |
| *Long-term incentives* | Partial (metrics are disclosed but there are no quantified performance targets) |

### *Pay Riskiness Discussion*

| | |
|---|---|
| *Process discussed?* | Yes |
| *Material risks found?* | No |

### *Risk Mitigators*

| | |
|---|---|
| *Clawback policy** | Yes |
| *CEO stock ownership guideline* | Stock ownership guidelines include unvested awards |
| *Stock holding period requirements* | Stock options: No disclosure / Restricted Stock: Holding period until end of employment |

*Must apply to cash as well as equity incentives and at least all NEOs.

### *Pledging/Hedging of Shares*

| | |
|---|---|
| *Anti-hedging policy* | Company has a robust policy |
| *Anti-pledging policy* | The proxy statement does not disclose a robust policy |

---

Publication Date: 12 May 2022

Page 30

Copyright © 2022 Institutional Shareholder Services Inc. All Rights Reserved. This proxy analysis and the information herein may not be reproduced or disseminated in whole or in part. For information on the policies applied in this research report, please see our Policy Gateway.

**Exxon Mobil Corporation (XOM)**
POLICY: Catholic

**Meeting Date: 25 May 2022**
Meeting ID: 1632904

---

*Compensation Committee Responsiveness*

| | |
|---|---|
| *MSOP vote results (F/F+A)* | 2021: 88.6%; 2020: 91.5%; 2019: 91.6% |
| *Frequency approved by shareholders* | Annual with 88.2% support |
| *Frequency adopted by company* | Annual (most recent frequency vote: 2017) |

---

*Repricing History*

| | |
|---|---|
| *Repriced/exchanged underwater options last FY?* | No |

---

## Pay for Performance Evaluation

Copyright © 2022 Institutional Shareholder Services Inc.  All Rights Reserved.  This proxy analysis and the information herein may not be reproduced or disseminated in whole or in part.  For information on the policies applied in this research report, please see our Policy Gateway.

Copyright © 2022 Institutional Shareholder Services Inc.  All Rights Reserved.  This proxy analysis and the information herein may not be reproduced or disseminated in whole or in part. For information on the policies applied in this research report, please see our Policy Gateway.

## Short-Term Cash Incentives

| CEO STI Opportunities | FY 2021 (D. Woods) | | FY 2020 (D. Woods) | |
|---|---|---|---|---|
| | **Target** | **Maximum** | **Target** | **Maximum** |
| *STI targets ($)* | 0 | 0 | ND | 0 |
| *STI targets (calculated)* | ND | 0 | ND | ND |
| *STI targets (as disclosed)* | ND | | | |
| *ISS peer median* | 196% of base salary | | | |
| *Company peer median* | 198% of base salary | | | |

| Actual Payouts ($) | FY 2021 (D. Woods) | | FY 2020 (D. Woods) | |
|---|---|---|---|---|
| | Amount | % of base salary | Amount | % of base salary |
| *Bonus* | 3,142,000 | 195 | 0 | 0 |
| *Non-equity incentive* | 0 | 0 | 0 | 0 |
| *Total Bonus + Non-equity* | 3,142,000 | 195 | 0 | 0 |

| *STI performance metrics/goals* | Metric | Form | Weight | Threshold | Target | Maximum | Actual |
|---|---|---|---|---|---|---|---|
| | Year-over-year change in earnings | Absolute | 100% | ND | ND | ND | ND |

### Other Short-Term Incentive Factors

| *Performance results adjusted?* | N/A |
|---|---|
| *Discretionary component?* | Yes, award sizes are determined using committee discretion, though guided by an assessment of performance. |

Copyright © 2022 Institutional Shareholder Services Inc.  All Rights Reserved. This proxy analysis and the information herein may not be reproduced or disseminated in whole or in part. For information on the policies applied in this research report, please see our Policy Gateway.

**Exxon Mobil Corporation (XOM)**
POLICY: Catholic

**Meeting Date: 25 May 2022**
Meeting ID: 1632904

| | |
|---|---|
| *Discretionary bonus?** | Yes |
| *Future performance metrics* | Not disclosed |

 *Based on the Bonus column in the SCT; per SEC rules, amounts disclosed in this column were not based on  pre-set goals.

## Long-Term Incentives

| | |
|---|---|
| *CEO's last FY LTI target (%)* | None disclosed |
| *NEOs' last FY award type(s)* | Time-based stock |
| *Last FY performance metrics/goals* | N/A (awards do not maintain performance vesting criteria); however, the committee does consider the metrics below in determining award size: |

| Metric | Threshold | Target | Maximum |
|---|---|---|---|
| Personnel Safety | ND | ND | ND |
| Environmental | ND | ND | ND |
| GHG Emissions | ND | ND | ND |
| ROCE | ND | ND | ND |
| Cash Flow from Operations and Asset Sales | ND | ND | ND |
| TSR | ND | ND | ND |
| Strategic Objectives | ND | ND | ND |

*Performance charts are provided for each metric (either compared to peers or based on ExxonMobil's absolute performance) on page 49 of the proxy.

### Long-Term Equity Grants

| CEO Equity Awards | FY 2021 | | | | FY 2020 | | | |
|---|---|---|---|---|---|---|---|---|
| | Shares (#) | % shares* | Value ($)* | % value | Shares (#) | % shares* | Value ($)* | % value |
| *Time-based shares* | 215,000 | 100 | 13,572,950 | 100 | 205,000 | 100 | 8,605,900 | 100 |
| *Time-based options* | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| *Performance shares* | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| *Performance options* | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| *Total equity* | 215,000 | | 13,572,950 | | 205,000 | | 8,605,900 | |
| *Time-based equity vesting* | RSUs: Vest 50 percent after five years and 50 percent upon the later of 10 years from grant and retirement from the company | | | | | | | |
| *Perf. measurement period* | N/A, awards do not have forward-looking performance vesting criteria | | | | | | | |
| *CEO one-time equity award* | N/A | | | | | | | |
| *CEO equity pay mix (by value)** | Performance-conditioned: 0%; Time-based: 100% | | | | | | | |

 *Performance shares, if any, are counted and valued at target.

### Other Long-Term Incentive Factors

| | |
|---|---|
| *Performance results adjusted?* | Not disclosed |
| *Discretionary component?* | Yes, while the size of the award is determined using compensation committee discretion, award determinations are informed by prior 10-year performance, progress against strategic objectives, and compensation benchmarking. |

Copyright © 2022 Institutional Shareholder Services Inc.  All Rights Reserved. This proxy analysis and the information herein may not be reproduced or disseminated in whole or in part. For information on the policies  applied in this research report, please see our Policy Gateway.

## Executive Summary

## Analysis



Copyright © 2022 Institutional Shareholder Services Inc. All Rights Reserved. This proxy analysis and the information herein may not be reproduced or disseminated in whole or in part. For information on the policies applied in this research report, please see our Policy Gateway.

**Exxon Mobil Corporation (XOM)**
POLICY: Catholic

**Meeting Date: 25 May 2022**
Meeting ID: 1632904



Copyright © 2022 Institutional Shareholder Services Inc.  All Rights Reserved.  This proxy analysis and the information herein may not be reproduced or disseminated in whole or in part. For information on the policies applied in this research report, please see our Policy Gateway.

**Exxon Mobil Corporation (XOM)**
POLICY: Catholic

**Meeting Date: 25 May 2022**
Meeting ID: 1632904



| Item 4. Remove Executive Perquisites | FOR |
| --- | --- |

VOTE RECOMMENDATION

A vote FOR this proposal is warranted. ████████████████████
████████████████████████████████████████████████████████
██████████

BACKGROUND INFORMATION

Policies: Disclosure/Setting Levels or Types of Compensation for Executives and Directors | Supplemental Executive Retirement Plans (SERPs) | Golden Coffins/Executive Death Benefits

**Vote Requirement:** Majority of votes cast (abstentions and broker non-votes not counted)

PROPOSAL

Bernie J. Pafford has submitted a proposal requesting the board discontinue payments or reimbursements of perquisites provided for executives that are not provided to the general employee population. The proposal reads in the proxy statement exactly as follows:

"Resolved – Shareholders request that payments and/or reimbursements to current and former Named Executive Officers (NEOs) for personal expenses which are not allowed to US dollar paid salaried employees under the Company's policies and procedures be discontinued."

Copyright © 2022 Institutional Shareholder Services Inc.  All Rights Reserved. This proxy analysis and the information herein may not be reproduced or disseminated in whole or in part. For information on the policies applied in this research report, please see our Policy Gateway.

## PROPONENT'S SUPPORTING STATEMENT

While acknowledging that the total dollar value of executive perquisites is relatively small, the proponent believes that ExxonMobil's executive perquisites are provided as an exception to company policy and that giving these benefits to NEOs sends the wrong message to other employees. The proponent notes that NEOs receive, among other things, tax preparation assistance, financial planning services, residential security systems, and certain personal travel costs. The proponent believes that NEOs are compensated well enough to pay their expenses and points out that other employees who charge personal expenses to the company must reimburse the company or be subject to disciplinary action. The proponent notes that in 2020 the compensation committee discontinued certain tax and financial planning perquisites for future NEOs but did not eliminate the benefit for current NEOs. The proponent also states that there is a current third-party service that provides financial advice to regular employees and asks that NEOs use that service instead. Lastly, the proponent states that NEOs may use ExxonMobil headquarters office space with administrative support after retirement, even for activities that are not necessarily related to their prior employment, which is not provided to other retirees.

## BOARD'S STATEMENT

The board believes that the company's compensation and benefits programs are designed to support the core principles and business strategies and are market competitive for all employees. The board notes that executive and other employees participate in the same broad-based programs and in cases where programs differ, it is generally due to legacy participation in previously provided and/or terminated programs or based on "position-specific requirements." The board uses the financial planning program as an example because all employees can access a broad-based financial planning program, but the executive program was closed to new participants in January of 2021. The board also states that ExxonMobil provides security for employees based on a risk assessment that includes the employee's role and work location. The company does not consider security costs to be personal benefits because they believe these costs are necessary due to the employee's role within the company. The board also points out that the company requires the CEO to use the company aircraft for all travel for security reasons.

## Analysis



Copyright © 2022 Institutional Shareholder Services Inc. All Rights Reserved. This proxy analysis and the information herein may not be reproduced or disseminated in whole or in part. For information on the policies applied in this research report, please see our Policy Gateway.

**Exxon Mobil Corporation (XOM)**                                    **Meeting Date: 25 May 2022**
POLICY: Catholic                                                      Meeting ID: 1632904

| Item 5. Amend Bylaws to Limit Shareholder Rights for Proposal Submission | AGAINST |
|---|---|

**VOTE RECOMMENDATION**

A vote AGAINST this proposal is warranted ███████████████████████████
████████████████████████████████████████████████████████

**Vote Requirement:** Majority of votes cast (abstentions and broker non-votes not counted)

## Discussion

### PROPOSAL

Stephen Milloy has submitted a proposal seeking to limit the rights of what he terms "nuisance shareholders" to submit proposals at annual meetings. The proposal reads as follows:

"Resolved:  That the Company amend its bylaws to no longer permit shareholders to submit precatory (non-binding or advisory) proposals for consideration at annual shareholder meetings, unless the board of directors takes specific action to approve submission of such proposals."

### PROPONENT'S SUPPORTING STATEMENT

The proponent asserts that "many shareholders own stock in publicly-owned corporations for the sole purpose of advancing the shareholders' own social or political agendas, while simultaneously assailing the corporations' legitimate business operations." The proponent states that "climate activists are nuisance shareholders who have leveraged proposals over the years to the point where they now have a significant presence on the ExxonMobil board of directors," and goes on to suggest that such activists "may soon control the ExxonMobil board." He argues further that the submission of precatory shareholder proposals is a "primary tool of nuisance shareholders" which "can coerce management into making decisions not in the best interests of ExxonMobil and its bona fide shareholders," and that the "overarching purpose of these proposals is to harass, intimidate and otherwise force ExxonMobil management into actions that it would not normally undertake and that, in fact, may be harmful to the company and its bona fide shareholders." The proponent believes that this will inevitably reduce the company's profits and thereby prevent it from achieving its "actual social responsibility" of generating wealth.

### BOARD RESPONSE

The board states that it values input from shareholders and respects their right to have their perspectives heard through written and electronic communications with the board, and through shareholder proposals, which it recognizes "can be a constructive element of corporate governance." The board believes this proposal is unnecessary.

## Analysis



Publication Date: 12 May 2022                                        Page 39

Copyright © 2022 Institutional Shareholder Services Inc.  All Rights Reserved.  This proxy analysis and the information herein may not be reproduced or disseminated in whole or in part. For information on the policies applied in this research report, please see our Policy Gateway.

**Exxon Mobil Corporation (XOM)**          Meeting Date: 25 May 2022
POLICY: Catholic                        Meeting ID: 1632904

████████████████████████████████████████████

| Item 6. Set GHG Emissions Reduction targets Consistent Wi th Paris Agreement Goal | FOR |
|---|---|

**VOTE RECOMMENDATION**

A vote FOR this proposal is warranted ████████████████████████████████████
████████████████████████████████████████████████████████████████

**Vote Requirement:** Majority of votes cast (abstentions and broker non-votes not counted)

Discussion

PROPOSAL

Follow This has submitted a precatory proposal asking that the company report on its plans to reduce its total contribution to climate change and align its operations with the Paris Agreement's goals.

The resolution specifically reads:

**"Resolved:** Shareholders request the Company to set and publish medium- and long-term targets to reduce the greenhouse gas (GHG) of the Company's operations and energy products (Scope 1, 2, and 3) consistent with the goal of the Paris Climate Agreement: to limit global warming to well below 2°C above pre -industrial levels and to pursue efforts to limit the temperature increase to 1.5°C."

PROPONENT'S STATEMENT

In its supporting statement, the proponent states that there is scientific consensus that global warming emissions need to be deeply cut in order to limit warming to safe levels, that investors are increasingly insisting on targets to cut emissions, and that companies in the energy sector are likely to face increasing legal risk related to climate change. The proponent cites as an example of potential legal risk the 2021 by a Dutch court for Shell to "severely reduce [its] worldwide emissions (Scope 1, 2, and 3) by 2030." The proponent believes the company "could lead and thrive in the energy transition" and encourages shareholder support for the proposal.

BOARD'S STATEMENT

In its opposing statement, the board states that it agrees with the proponent that the company could be a leader in the energy transition. The company recently published its Advancing Climate Solutions report that discusses initiatives the company is taking to reduce GHG emissions. The company has set a target to achieve net-zero operational (Scope 1 & 2) emissions by 2050. To support that ambition, the company has set medium-term targets to reduce Scope 1 & 2 emissions that will result in a GHG emissions intensity reduction of 20-30 percent and an absolute reduction of 20 percent by 2030 (compared to 2016 levels). The board states that the company plans to spend more than $15 billion by 2027 on low-carbon technologies such as carbon capture and storage, hydrogen, and biofuels. The board also highlights some of the problems that it finds in Scope 3 accounting: that there are some activities that may lower global emissions but would raise one company's Scope 3 emissions, that Scope 3 emissions may be counted by more than one company, and that one company lowering its Scope 3 emissions doesn't necessarily mean that global emissions will go down.

Copyright © 2022 Institutional Shareholder Services Inc. All Rights Reserved. This proxy analysis and the information herein may not be reproduced or disseminated in whole or in part. For information on the policies applied in this research report, please see our Policy Gateway.

## BACKGROUND AND RECENT SHAREHOLDER ACTIVISM

For more information on climate change, see ISS' Environmental and Social Background Report. For an update on the most recent shareholder activism around this issue, view ISS' 2022 U.S. Environmental & Social Issues Proxy Season Preview (requires login to ISS Link).

ExxonMobil has not received a proposal asking for it to set GHG emissions reductions targets in recent years.

### Analysis



Copyright © 2022 Institutional Shareholder Services Inc. All Rights Reserved. This proxy analysis and the information herein may not be reproduced or disseminated in whole or in part. For information on the policies applied in this research report, please see our Policy Gateway.

**Exxon Mobil Corporation (XOM)**
POLICY: Catholic



Copyright © 2022 Institutional Shareholder Services Inc.  All Rights Reserved.  This proxy analysis and the information herein may not be reproduced or disseminated in whole or in part. For information on the policies applied in this research report, please see our Policy Gateway.

**Exxon Mobil Corporation (XOM)**
POLICY: Catholic

**Meeting Date: 25 May 2022**
Meeting ID: 1632904

| Item 7. Report on Low Carbon Business Planning | FOR |
|---|---|

**VOTE RECOMMENDATION**

Votes FOR this shareholder proposal are warranted ████████████████████████████
████████████████████████████████████████████████

**BACKGROUND INFORMATION**

Policies: Climate Change/Greenhouse Gas (GHG) Emissions

**Vote Requirement:** Majority of votes cast (abstentions and broker non-votes not counted)

Discussion

PROPOSAL

Individual shareholders who are clients of Arjuna Capital have submitted a precatory proposal asking the company to report on how the company could change its business model to make money within the limits required by keeping global warming to more than 1.5 degrees C of global warming.

The resolution specifically reads:

Copyright © 2022 Institutional Shareholder Services Inc. All Rights Reserved. This proxy analysis and the information herein may not be reproduced or disseminated in whole or in part. For information on the policies applied in this research report, please see our Policy Gateway.

"Resolved: With board oversight, shareholders request ExxonMobil issue a report (at reasonable cost, omitting proprietary information) describing how the company could alter its business model to yield profits within the limits of a 1.5 degree Celsius global temperature rise by substantially reducing its dependence on fossil fuels."

## PROPONENT'S STATEMENT

In its supporting statement, the proponents assert that "a global transition towards a low carbon economy places unprecedented risk on oil companies and the economy," yet the company has no business strategy consistent with limiting global temperature rise to 1.5 degrees C. The statement cites an IPCC assessment that oil industry emissions need to drop by 50 to 90 percent by 2050 to avoid "catastrophic consequences," that the U.S. Commodity Futures Trading Commissions asserts that climate change "poses a major risk to the stability of the U.S. financial system," and the United Nations Environment Programme Finance Initiative finds that half of companies' earnings are at risk from climate costs. The non-profit Carbon Tracker estimates that 80 of ExxonMobil's investments could be stranded if the world takes adequate action to limit temperature rise to "safe" levels. The proponents highlight that peer companies are investing more in clean energy, including wind, solar, and renewables storage. The World Benchmarking Alliance has reportedly estimated that companies need to dedicate over three-fourths of capital expenditure toward low-carbon projects, yet ExxonMobil has only committed to invest 3.3 percent through 2025. The proponents assert that the company is not pursuing a long-term competitive strategy. They suggest a report from the company could include a roadmap to change its energy mix, including buying renewable energy assets, internally expanding its renewable energy portfolio, and/or focusing capital expenditures on low-carbon capital projects.

## BOARD'S STATEMENT

In its opposing statement, the board states that the company already produces the information requested in its Advancing Climate Solutions report, it Energy Outlook, its Sustainability Report, and other publications and filings. The company states that it plans to spend $15 billion through 2027 to lower emissions in the company's operations and to grow lower-emissions opportunities in carbon capture and storage, hydrogen, and biofuels. The Advancing Climate Solutions report shows the company's analysis of its business and investment portfolio under the International Energy Agency's (IEA's) Net Zero Emissions by 2050 (NZE) scenario. The company's assessment— which assumes a higher price on carbon emissions as the IEA NZE scenario does—showed "significant growth potential exists in chemicals, lower-emission fuels, carbon capture and storage, and hydrogen."

## BACKGROUND AND RECENT SHAREHOLDER ACTIVISM

For more information on climate change, see ISS' Environmental and Social Background Report. For an update on the most recent shareholder activism around this issue, view ISS' 2022 U.S. Environmental & Social Issues Proxy Season Preview (requires login to ISS Link).

This is the first time ExxonMobil has received a request to change its business model to yield profits within the limits of a 1.5 degree Celsius global temperature rise by substantially reducing its dependence on fossil fuels.

## Analysis



Publication Date: 12 May 2022                                            Page 44

Copyright © 2022 Institutional Shareholder Services Inc. All Rights Reserved. This proxy analysis and the information herein may not be reproduced or disseminated in whole or in part. For information on the policies applied in this research report, please see our Policy Gateway.

███████████████████████████████████████████████

## Item 8. Report on Scenario Analysis Consistent with International Energy Agency's Net Zero by 2050

**FOR**

### VOTE RECOMMENDATION

A vote FOR this proposal is warranted ███████████████████████████████
████████████████████████████████████

### BACKGROUND INFORMATION

Policies: Climate Change/Greenhouse Gas (GHG) Emissions

**Vote Requirement:** Majority of votes cast (abstentions and broker non-votes not counted)

Discussion

### PROPOSAL

Christian Brothers Investment Services has submitted a proposal asking the company to report on the potential financial impacts to the company of the IEA Net Zero (NZE) 2050 scenario.

Specifically, the resolution requests:

"RESOLVED: Shareholders request that ExxonMobil's Board of Directors seek an audited report assessing how applying the assumptions of the International Energy Agency's Net Zero by 2050 pathway would affect the assumptions, costs, estimates, and valuations underlying its financial statements, including those related to long-term commodity and carbon prices, remaining asset lives, future asset retirement obligations, capital expenditures and impairments. The Board should obtain and ensure publication of the report by February 2023, at reasonable cost and omitting proprietary information."

### PROPONENT'S STATEMENT

In its supporting statement, the proponent states that investors are increasingly concerned that the company's investment strategy will lead to stranded assets (impairments). For that reason, the proponent is asking the company to provide an assessment, assured by an independent auditor, that compares showing how applying the assumptions of the IEA NZE scenario would impact the company's financial statements. For example, the scenario assumes that no new fossil fuel development is needed and projects an oil price as low as $35/barrel in 2030 and $24/barrel in 2050. The proponent argues that ExxonMobil lags many of its peers who have released more transparent climate disclosures in their audited financial statements.

### BOARD'S STATEMENT

In its opposing statement, the board states that the company recently produced in its Advancing Climate Solutions report an audited analysis comparing its business strategy to the IEA NZE scenario. The company states the company's assessment showed the company "could continue to grow cash flows over time through reduced investments in oil and natural gas and increased investments in accretive projects in chemicals, carbon capture and storage, lower-emissions fuels, hydrogen, and carbon capture and storage." The company goes on to say that the IEA NZE scenario assumes that 24 million barrels of oil and 169 billion cubic feet of natural gas will still be needed to meet demand in 2050. It states that its analysis includes an analysis of the company's spending plan and a modeling of potential future cash flow and that it shows the resiliency of its business strategy.

Copyright © 2022 Institutional Shareholder Services Inc. All Rights Reserved. This proxy analysis and the information herein may not be reproduced or disseminated in whole or in part. For information on the policies applied in this research report, please see our Policy Gateway.

**Exxon Mobil Corporation (XOM)**
POLICY: Catholic

**Meeting Date: 25 May 2022**
Meeting ID: 1632904

BACKGROUND AND RECENT SHAREHOLDER ACTIVISM

For more information on climate change, see ISS' Environmental and Social Background Report. For an update on the most recent shareholder activism around this issue, view ISS' 2022 U.S. Environmental & Social Issues Proxy Season Preview (requires login to ISS Link).

Copyright © 2022 Institutional Shareholder Services Inc.  All Rights Reserved.  This proxy analysis and the information herein may not be reproduced or disseminated in whole or in part. For information on the policies applied in this research report, please see our Policy Gateway.



Analysis

Copyright © 2022 Institutional Shareholder Services Inc.  All Rights Reserved. This proxy analysis and the information herein may not be reproduced or disseminated in whole or in part. For information on the policies applied in this research report, please see our Policy Gateway.



Copyright © 2022 Institutional Shareholder Services Inc.  All Rights Reserved. This proxy analysis and the information herein may not be reproduced or disseminated in whole or in part. For information on the policies applied in this research report, please see our Policy Gateway.

Copyright © 2022 Institutional Shareholder Services Inc.  All Rights Reserved.  This proxy analysis and the information herein may not be reproduced or disseminated in whole or in part. For information on the policies applied in this research report, please see our Policy Gateway.

███████████████████████████████████████████████

| Item 9. Report on Reducing Plastic Pollution | FOR |
|---|---|

VOTE RECOMMENDATION

A vote FOR this proposal is warranted, ████████████████████████████████████████████
███████████████████████████████████████████████████████████

BACKGROUND INFORMATION

Policies: Recycling

**Vote Requirement:** Majority of votes cast (abstentions and broker non-votes not counted)

Discussion

PROPOSAL

Andrew Behar has submitted a precatory proposal requesting that the company produce a report on shifting to recycled polymer for single use plastics.

Specifically, the "resolved clause" states:

"Resolved: Shareholders request that Exxon's Board issue an audited report addressing whether and how a significant reduction in virgin plastic demand, as set forth in *Breaking the Plastic Wave's* System Change Scenario to reduce ocean plastic pollution, would affect the Company's financial position and assumptions underlying its financial statements. The report should be at reasonable cost and omit proprietary information."

PROPONENTS' STATEMENT

In its statement supporting the proposal, the proponents explain the problems caused to the environment by virgin plastic use and the need to shift the current "linear take-make-waste production model" of single-use plastic (SUP). The proponent highlights the fact that the company was recently identified as the largest global producer of SUP-bound polymers (5.9 million metric tons in 2019, an estimated 50 percent of its total polymer production). The proponent cites a BP Energy Outlook report that found that a global SUP plastic ban by 2040 would reduce oil demand growth by 60 percent. This demand destruction for virgin plastics has the potential to result in stranded assets, according to the statement. The proponent suggests that the report asked for include quantification of the company's polymer production for SUP markets; a summary or list of the company's existing and planned investment that may be materially impacted by a scenario similar to the System Change Scenario, and any future plans or goals to shift away from virgin plastics.

BOARD'S STATEMENT

In its opposing statement, the board states that the report asked for by the proposal is unnecessary due to the company's work on plastic recycling goals and its established risk management processes. The board said the company is working with several partners to reduce plastic waste. It is a founding member of the Alliance to End Plastic Waste. It reportedly has plans to build recycling capacity capable of processing approximately 500,000 metric tons of plastics waste per year. The company works to eliminate plastic pellet pollution from its

Copyright © 2022 Institutional Shareholder Services Inc. All Rights Reserved. This proxy analysis and the information herein may not be reproduced or disseminated in whole or in part. For information on the policies applied in this research report, please see our Policy Gateway.

manufacturing facilities. It also formed a joint venture with Agilyx Corp. called Cyclyz International that is focused on aggregating and pre-processing large volumes of plastic waste. The statement also highlights the benefits of lightweight plastics and their important role in lower-emission technologies.

## BACKGROUND AND RECENT SHAREHOLDER ACTIVISM

For more information on extended producer responsibility and post-consumer packaging waste, see ISS' Environmental and Social Background Report. For an update on the most recent shareholder activism on environmental and social issues, refer to ISS' 2022 U.S. Environmental and Social Shareholder Proxy Season Preview (requires login to ISS Link).

This is the first year that ExxonMobil has received a resolution asking for a report on shifting the company's business model away from single use plastics.

## Analysis



Copyright © 2022 Institutional Shareholder Services Inc.  All Rights Reserved. This proxy analysis and the information herein may not be reproduced or disseminated in whole or in part. For information on the policies applied in this research report, please see our Policy Gateway.



| Item 10. Report on Political Contributions and Expenditures | FOR |
|---|---|

**VOTE RECOMMENDATION**

A vote FOR this resolution is warranted ███████████████████████████
████████████████████████████████████████████████████████████
██████████████████████████████████████████

**BACKGROUND INFORMATION**

Policies: Political Spending & Lobbying Activities

**Vote Requirement:** Majority of votes cast (abstentions and broker non-votes not counted)

Discussion

PROPOSAL

The Unitarian Universalist Association and co-filers have filed a precatory proposal requesting that the company report on its political contributions.

Specifically, the resolution states:

**"Resolved,** that the shareholders of Exxon Mobil Corp. ('Exxon' or 'Company') hereby request the Company to prepare and semiannually update a report, which shall be presented to the pertinent board of directors committee and posted on the Company's website, disclosing the Company's:

(a)  Policies and procedures for making electoral contributions and expenditures (direct and indirect) with corporate funds, including the board's role (if any) in that process; and

(b)  Monetary and non-monetary contributions or expenditures that could not be deducted as an ordinary and necessary business expense under section 162(e)(1)(B) of the Internal Revenue Code, including (but not limited to) contributions or expenditures on behalf of candidates, parties, and committees and entities organized and operating under section 501(c)(4) of the Internal Revenue Code, as well as the portion of any dues or payments made to any tax-exempt organization (such as a trade association) used for an expenditure or contribution that, if made directly by the Company, would not be deductible under section 162(e)(1)(B) of the Internal Revenue Code.

The report shall be made available within 12 months of the annual meeting and identify all recipients and the amount paid to each recipient from Company funds. This proposal does not encompass lobbying spending."

Copyright © 2022 Institutional Shareholder Services Inc. All Rights Reserved. This proxy analysis and the information herein may not be reproduced or disseminated in whole or in part. For information on the policies applied in this research report, please see our Policy Gateway.

## SHAREHOLDERS SUPPORTING STATEMENT

In their supporting statement, the proponents say that they support transparency and accountability in corporate spending. The filers state that the company discloses some election related spending, but it does not disclose direct independent expenditures; payments to influence the outcome of ballot measures; or payments to trade associations or 501(c)(4)s that could be used for election-related purposes. Public records show that ExxonMobil has contributed nearly $20 million in corporate funds since the 2010 election cycle, but information on electoral spending through trade associations and 501(c)(4) groups are not publicly available unless the company discloses it. The filers say that this proposal asks that ExxonMobil disclose all of its electoral spending, direct and indirect. They say that would bring the company in line with peers AT&T, Phillips 66, and ConocoPhillips, which present this information on their websites.

## BOARD'S STATEMENT

In its opposing statement, the board states that ExxonMobil is in full compliance with all applicable regulations, and that it publicly shares its corporate political spending policy and its direct contributions to candidates, parties, and committees. It states that the company is of the belief that the disclosure rules outlined by federal and state laws are adequate and equitable. Further, the board states that, pursuant to its Political Activities Guidelines, its corporate political contributions are subject to a strict internal review process that requires approval by the board's chairman. Both political contributions and contributions of its Political Action Committees (PACs) are reviewed annually with the Public Issues and Contributions Committee and the board and these procedures are verified through internal audits. Regarding contributions to third-party organizations, the board says that on its website, ExxonMobil publishes a list of all U.S. trade associations in which it or its affiliates are members and reports using a portion of the company's payments for lobbying. The board believes that, for these reasons, the company's current federal and state oversight and reporting are sufficiently transparent, and requests for further disclosure would be more appropriately addressed to Congress, the Executive Branch, and/or relevant state and local governments.

## BACKGROUND AND RECENT SHAREHOLDER ACTIVISM

For more information on political contributions, see ISS' Environmental and Social Background Report. For an update on the most recent shareholder activism on environmental and social issues, refer to ISS' 2022 U.S. Environmental and Social Shareholder Proxy Season Preview (requires login to ISS Link).

According to the 2021 CPA-Zicklin Index of Corporate Political Disclosure and Accountability, which gauges a company's transparency around political spending, ExxonMobil received a score of 60 out of 100, placing it in the 2nd tier (out of five tiers).

ExxonMobil has received this proposal for the past three years. In 2021, it received 30.5-percent shareholder support. In 2020 and 2019. It received 3- percent and 26.1-percent shareholder support, respectively.

## Analysis



Copyright © 2022 Institutional Shareholder Services Inc.  All Rights Reserved. This proxy analysis and the information herein may not be reproduced or disseminated in whole or in part. For information on the policies applied in this research report, please see our Policy Gateway.

Copyright © 2022 Institutional Shareholder Services Inc.  All Rights Reserved.  This proxy analysis and the information herein may not be reproduced or disseminated in whole or in part. For information on the policies applied in this research report, please see our Policy Gateway.

Copyright © 2022 Institutional Shareholder Services Inc.  All Rights Reserved. This proxy analysis and the information herein may not be reproduced or disseminated in whole or in part. For information on the policies applied in this research report, please see our Policy Gateway.

**Exxon Mobil Corporation (XOM)**
POLICY: Catholic

**Meeting Date: 25 May 2022**
Meeting ID: 1632904

## Detailed Ownership Profile

back to Ownership and Control Overview

Percentages rounded down to 1 decimal. "▶" identifies shareholders considered strategic under ISS' definition.

| Type | Votes per Share | Outstanding |
|---|---|---|
| Common Stock | 1 | 4,225,673,726 |
| **Ownership - Common Stock** | **Number of Shares** | **% of Class** |
| The Vanguard Group | 355,607,673 | 8.4 |
| BlackRock, Inc. | 262,837,867 | 6.2 |
| State Street Corporation | 253,266,613 | 5.9 |
| Fidelity Management & Research Co. LLC | 71,245,644 | 1.6 |
| Geode Capital Management LLC | 70,815,006 | 1.6 |
| Norges Bank Investment Management | 52,041,575 | 1.2 |
| Northern Trust Investments, Inc.(Investment Management) | 48,860,767 | 1.1 |
| GQG Partners LLC | 32,397,153 | 0.7 |
| Charles Schwab Investment Management, Inc. | 30,619,880 | 0.7 |
| State Farm Investment Management Corp. | 30,520,300 | 0.7 |
| Capital Research & Management Co. (World Investors) | 30,240,300 | 0.7 |
| First Eagle Investment Management LLC | 23,812,283 | 0.5 |
| The Bank of New York Mellon Corp. (Investment Management) | 22,130,858 | 0.5 |
| Mellon Investments Corp. | 21,932,098 | 0.5 |
| Morgan Stanley Smith Barney LLC (Investment Management) | 21,553,176 | 0.5 |
| Franklin Advisers, Inc. | 21,520,125 | 0.5 |
| T. Rowe Price Associates, Inc. (Investment Management) | 18,747,010 | 0.4 |
| Dimensional Fund Advisors LP | 18,696,371 | 0.4 |
| ▶D.W. Woods | 169,496 | <0.1 |
| ▶J.P. Williams, Jr. | 137,241 | <0.1 |
| ▶N.A. Chapman | 136,842 | <0.1 |
| ▶K.A. Mikells | 10,050 | <0.1 |

Source(s): Proxy Statement, © 2022 Factset Research Systems, Inc. All Rights Reserved. As of: 28 Feb 2022

## Additional Information

| | |
|---|---|
| Meeting Location | Virtual Meeting Only: www.virtualshareholdermeeting.com/XOM2022 |
| Meeting Time | 09:30 Central Time |
| Shareholder Proposal Deadline | December 8, 2022 |
| Solicitor | D.F. King & Co. |
| Security IDs | 30231G102(CUSIP) |

Copyright © 2022 Institutional Shareholder Services Inc. All Rights Reserved. This proxy analysis and the information herein may not be reproduced or disseminated in whole or in part. For information on the policies applied in this research report, please see our Policy Gateway.

ISS' experienced research team provides comprehensive proxy analyses and complete vote recommendations for approximately 44,000 meetings annually in around 115 markets worldwide. With a team of approximately 300 research professionals, ISS aims to cover every holding within a client's portfolio in both developed and emerging markets.

Our Research Analysts are located in offices worldwide, offering local insight and global breadth. Research office locations include Berlin, Brussels, London, Manila, Mumbai, Norman, Paris, San Francisco, Singapore, Sydney, Tokyo, Toronto, and Rockville, Maryland.

ISS has long been committed to engagement and transparency. For information on the policies applied in this research report, please see our Policy Gateway. Please use the ISS Help Center for questions on research reports, policy, and for requests for engagements.



*The issuer that is the subject of this analysis may have purchased self-assessment tools and publications from ISS Corporate Solutions, Inc. (formerly known as ISS Corporate Services, Inc. and referred to as "ICS"), a wholly-owned subsidiary of ISS, or ICS may have provided advisory or analytical services to the issuer in connection with the proxies described in this report. These tools and services may have utilized preliminary peer groups generated by ISS' institutional research group. No employee of ICS played a role in the preparation of this report. If you are an ISS institutional client, you may inquire about any issuer's use of products and services from ICS by emailing disclosure@issgovernance.com.*

This proxy analysis and vote recommendation has not been submitted to, nor received approval from, the United States Securities and Exchange Commission or any other regulatory body. While ISS exercised due care in compiling this analysis, it makes no warranty, express or implied, regarding the accuracy, completeness or usefulness of this information and assumes no liability with respect to the consequences of relying on this information for investment or other purposes. In particular, the research and voting recommendations provided are not intended to constitute an offer, solicitation or advice to buy or sell securities nor are they intended to solicit votes or proxies.

In February 2021, Deutsche Börse AG ("DB") completed a transaction pursuant to which it acquired an approximate 80% stake in ISS HoldCo Inc., the holding company which owns ISS. The remainder of ISS HoldCo Inc. is held by a combination of Genstar Capital ("Genstar") and ISS management. Policies on non-interference and potential conflicts of interest related to DB and Genstar are available at https://www.issgovernance.com/compliance/due-diligence-materials.

The issuer that is the subject of this proxy analysis may be a client of ISS or ICS, or the parent of, or affiliated with, a client of ISS or ICS.

One or more of the proponents of a shareholder proposal at an upcoming meeting may be a client of ISS or ICS, or the parent of, or affiliated with, a client of ISS or ICS. None of the sponsors of any shareholder proposal(s) played a role in preparing this report.

ISS may in some circumstances afford issuers, whether or not they are clients of ICS, the right to review draft research analyses so that factual inaccuracies may be corrected before the report and recommendations are finalized. Control of research analyses and voting recommendations remains, at all times, with ISS.

ISS makes its proxy voting policy formation process and summary proxy voting policies readily available to issuers, investors and others on its public website: http://www.issgovernance.com/policy.

Copyright © 2022 Institutional Shareholder Services Inc. All Rights Reserved. This proxy analysis and the information herein may not be reproduced or disseminated in whole or in part.

Copyright © 2022 Institutional Shareholder Services Inc. All Rights Reserved. This proxy analysis and the information herein may not be reproduced or disseminated in whole or in part. For information on the policies applied in this research report, please see our Policy Gateway.

# Foster Declaration Exhibit 11

# ISS GOVERNANCE | Insights





December 4, 2025

## A Look at AI-Related Shareholder Proposals at U.S. Companies, 2022-2025

AUTHOR: Joseph Hong, ISS Governance Research

The long-projected systemic and business transformations that can be brought about by Artificial Intelligence (AI) technologies have started. Accordingly, many companies and their boards of directors have faced scrutiny in recent years over effective governance mechanisms and due diligence of the opportunities as well as the material risks—financial, regulatory, legal, and reputational—posed by AI. Potential AI and associated hyperscale data center issues are far-reaching and span governance, environmental, and social aspects. It is perhaps unclear whether markets have yet fully priced in some of the wide-ranging and material risks, alongside the opportunities. The range of issues from an investor perspective are looked at in this article through the lens of recent U.S. shareholder proposals directly related to AI and at companies providing AI tools and infrastructure.

A substantial number of institutional investors have disclosed their expectations and engagements on Responsible AI (RAI) risk management, with respect to long-term financial returns and pragmatic value creation. For example, as of a February 2024 Investor Statement on Ethical AI, the  World Benchmarking Alliance's Collective Impact Coalition (CIC) for Ethical AI comprised investors representing over USD $8.5 trillion in assets under management.

Leading RAI risk management frameworks are striving to standardize due diligence considerations. Many institutional investors have specified alignment with internationally-accepted RAI frameworks, such as the OECD AI Principles and UNESCO's Recommendation on the Ethics of AI, regarding board accountability, transparency, due diligence, and risk management. Additionally, a Banking Policy Institute April 2024 white paper expressed support for the U.S. Department of Commerce's NIST AI Risk Management Framework. ISO/IEC 42001:2023 is another widely cited RAI framework, noted for its potential usefulness for compliance with evolving regulatory standards.

There is a growing consensus among many institutional investors globally that effective AI governance is inextricably linked to fiduciary duty, long-term financial performance, and sustainable economic growth drivers.

On the regulatory compliance front, the EUAI Act possesses extraterritorial reach, as the regulation's scope extends to companies located outside the European Union if their AI activities affect the EU market or individuals within it. There has also been a proliferation of legislation enacted by U.S. states

and other jurisdictions around the world. However, with the rapid pace of investment and innovation around AI technologies, it is oft remarked that stringent mandatory safeguards may disincentivize innovation and lag behind technological developments. On the other hand, others have expressed concern that voluntary principles disclosures can encourage superficial compliance without substantive change, amounting to nothing more than marketing window dressing. In spite of concerns on both sides of the argument, both regulatory compliance and voluntary frameworks are core elements of the RAI ecosystem.

In recent years, a number of U.S. companies—mainly within the technology sector, but increasingly across other sectors—have received shareholder proposals requesting increased disclosure of RAI policies, procedures, and practices with regards to board and committee oversight, environmental sustainability, and human rights risk mitigation. The issues addressed by the varied shareholder proposals have ranged across privacy concerns, copyright infringement, energy and water usage, community and societal impacts, human rights, and "just transition" strategies for affected employees, as well as board oversight of these matters. The business and economic areas concerned have also varied widely - ranging from upstream component procurement, critical minerals sourcing, geopolitical tensions, industrial policy, infrastructure development and financing, and data acquisition, to downstream applications, safety and security concerns, and waste management. For the purposes of this paper, we have looked at U.S. shareholder proposals that have either been explicit in being AI-related or have been implicitly AI-related by being filed at companies that have AI as a substantial or core business strategy element (collectively, "AI-related" in this paper).

AI-related shareholder proposals seen at U.S. companies from 2022 to 2025 have touched on many directly and indirectly AI-related material risks and opportunities including but not limited to:

- Board oversight
- GHG emissions targets, climate goals, and climate transition plans
- Fossil fuel development and production
- Physical risks of climate change
- Water resource management
- Child safety
- End use due diligence (surveillance, censorship, conflict-affected and high-risk areas)
- Ethical data acquisition and usage (privacy, safety, intellectual property)
- Human capital management (bias, discrimination, workplace monitoring, health and safety, automation, and other workforce impacts)
- Just AI transition
- Misinformation and disinformation
- Targeted advertising
- Weapons development

Case 1:26-cv-00717-MPB-MKK    Document 26-3    Filed 04/21/26    Page 690 of 1112
PageID #: 856

**GOV | Insights**
AI-Related Shareholder Proposals in the U.S.

ISS ▷

A summary of the shareholder proposals covered is presented in the table further below.

By the numbers:



[1]*Source: ISS Governance Research & Voting*

In the 2025 U.S. proxy season, there was a significant decrease in the overall number of environmental- and social-related shareholder proposals on ballot, due in part to the U.S. Securities and Exchange Commission's (SEC) issuance of its Staff Legal Bulletin No. 14M (SLB 14M). However, AI-related proposals on ballot did not drop in overall numbers.

Average support levels for AI-related shareholder proposals have followed the recent overall shareholder proposal voting trend of declining support for environmental- and social-related proposals in general; however, with the exception of the relatively small number of environmental-focused proposals, support for AI-related proposals has not decreased as markedly.

The bulk of AI-related shareholder proposals have addressed "social" matters such as human rights and labor rights concerns including child safety, end use due diligence, data acquisition and usage, misinformation and disinformation, targeted advertising, workforce impacts, etc. Each year, there have also been some board oversight-related proposals regarding g AI governance, as well as environmental-related proposals addressing a range of concerns including hyperscaler data center issues, increased energy usage, GHG emissions, water-related risks, and physical risks related to climate change.

[1] The graph above and table below do not consider so-called anti-ESG shareholder proposals.

**GOV | Insights**
AI-Related Shareholder Proposals in the U.S.

Case 1:26-cv-00717-MPB-MKK   Document 26-3   Filed 04/21/26   Page 691 of 1112
PageID #: 857

ISS

Below is the list of AI-related shareholders proposals on ballot at U.S. companies from 2022 to mid-year 2025 identified and covered in this paper.

| Year | SHP Type | Company Name | Ticker | Mtg Date | Agenda Item | Proposal Title | Disclosed Shareholder Vote Support % | Disclosed Proponent (lead proponent if more than one) |
|---|---|---|---|---|---|---|---|---|
| 2025 | Environmental | Alphabet Inc. | GOOGL | 6–Jun–2025 | 7 | Report on Meeting 2030 Climate Goals | 8.2 | Trillium ESG Global Equity Fund |
| 2025 | Social | Alphabet Inc. | GOOGL | 6–Jun–2025 | 9 | Report on Due Diligence Process to Assess Human Rights Risks in High–Risk Countries | 4.5 | Zevin Asset Management |
| 2025 | Social | Alphabet Inc. | GOOGL | 6–Jun–2025 | 11 | Report on Risks of Improper Use of External Data in Development of AI Products | 12.3 | National Legal and Policy Center |
| 2025 | Social | Alphabet Inc. | GOOGL | 6–Jun–2025 | 12 | Publish a Human Rights Impact Assessment of AI Driven Targeted Advertising | 14.3 | Shareholder Association for Research & Education |
| 2025 | Social | Alphabet Inc. | GOOGL | 6–Jun–2025 | 14 | Adopt Metrics Evaluating YouTube Child Safety Policies | 9.3 | Boston Common Asset Management |
| 2025 | Environmental | Amazon.com, Inc. | AMZN | 21–May–2025 | 7 | Report on Impact of Data Centers on Climate Commitments | 20.1 | Emily Cunningham |
| 2025 | Board Oversight | Amazon.com, Inc. | AMZN | 21–May–2025 | 8 | Commission Third Party Assessment of Board Oversight of Human Rights Risks of AI | 10.2 | AFL–CIO Equity Index Funds |
| 2025 | Social | Amazon.com, Inc. | AMZN | 21–May–2025 | 10 | Commission Independent Audit and Report on Warehouse Working Conditions | 22.3 | Tulipshare Capital LLC |
| 2025 | Social | Amazon.com, Inc. | AMZN | 21–May–2025 | 11 | Report on Unethical Use of External Data in Development of AI Products | 10.7 | National Legal and Policy Center |
| 2025 | Social | Apple Inc. | AAPL | 25–Feb–2025 | 4 | Report on Ethical AI Data Acquisition and Usage | 11.6 | National Legal and Policy Center |
| 2025 | Board Oversight | Berkshire Hathaway Inc. | BRK.B | 3–May–2025 | 8 | Establish Board Committee on Artificial Intelligence | 3.5 | Tulipshare Capital LLC |
| 2025 | Social | Digital Realty Trust, Inc. | DLR | 6–Jun–2025 | 5 | Adopt a Policy on Human Right to Water | 10.4 | NorthStar Asset Management, Inc. |
| 2025 | Social | Lyft, Inc. | LYFT | 5–Jun–2025 | 4 | Commission Third Party Human Risk Assessment Regarding Use of Artificial Intelligence | 12.9 | AFL–CIO Equity Index Funds |
| 2025 | Social | Meta Platforms, Inc. | META | 28–May–2025 | 8 | Report on Hate Targeting Marginalized Communities | 14.6 | Jlens |
| 2025 | Social | Meta Platforms, Inc. | META | 28–May–2025 | 9 | Report on Child Safety and Harm Reduction | 13.4 | Proxy Impact |
| 2025 | Social | Meta Platforms, Inc. | META | 28–May–2025 | 10 | Report on Combatting Risks of Online Child Exploitation | 6.5 | Bowyer Research |
| 2025 | Social | Meta Platforms, Inc. | META | 28–May–2025 | 11 | Report on Risks of Unethical Use of External Data to Develop AI Products | 9.9 | National Legal and Policy Center |
| 2025 | Environmental | Meta Platforms, Inc. | META | 28–May–2025 | 12 | Disclose a Climate Transition Plan Resulting in New Renewable Energy Capacity | 3.3 | As You Sow |
| 2025 | Social | Meta Platforms, Inc. | META | 28–May–2025 | 14 | Report on Data Collection and Advertising Practices | 10.9 | Tulipshare Capital LLC |
| 2025 | Social | Microsoft Corporation | MSFT | 10–Dec–2024 | 4 | Report on Risks of Weapons Development | 15.3 | Harrington Investments, Inc. |

| 2025 | Social | Microsoft Corporation | MSFT | 10-Dec-2024 | 6 | Report on Risks of Operating in Countries with Significant Human Rights Concerns | 32 | Olga Bell Greenbaum D'Angelo |
| 2025 | Social | Microsoft Corporation | MSFT | 10-Dec-2024 | 7 | Report on Risks of Using Artificial Intelligence and Machine Learning Tools for Oil and Gas Development and Production | 9.7 | As You Sow |
| 2025 | Social | Microsoft Corporation | MSFT | 10-Dec-2024 | 8 | Report on Risks Related to AI Generated Misinformation and Disinformation | 18.7 | Arjuna Capital |
| 2025 | Social | Microsoft Corporation | MSFT | 10-Dec-2024 | 9 | Report on AI Data Sourcing Accountability | 36.2 | National Legal and Policy Center |
| 2025 | Environmental | Netflix, Inc. | NFLX | 5-Jun-2025 | 4 | Issue a Climate Transition Plan | 10.4 | Trillium Asset Management |
| 2025 | Social | Walmart Inc. | WMT | 5-Jun-2025 | 10 | Report on Health and Safety Governance | 7 | Oxfam America, Inc. |
| 2024 | Board Oversight | Alphabet Inc. | GOOGL | 7-Jun-2024 | 11 | Amend Audit and Compliance Committee Charter to Include Artificial Intelligence Oversight | 7.4 | Trillium ESG Global Equity Fund |
| 2024 | Social | Alphabet Inc. | GOOGL | 7-Jun-2024 | 12 | Report on Risks Related to AI Generated Misinformation and Disinformation | 17.6 | Arjuna Capital |
| 2024 | Social | Alphabet Inc. | GOOGL | 7-Jun-2024 | 13 | Publish Human Rights Risk Assessment on the AI-Driven Targeted Ad Policies | 18.5 | Shareholder Association for Research & Education |
| 2024 | Social | Alphabet Inc. | GOOGL | 7-Jun-2024 | 14 | Adopt Targets Evaluating YouTube Child Safety Policies | 14.1 | Boston Common Asset Management |
| 2024 | Social | Amazon.com, Inc. | AMZN | 22-May-2024 | 6 | Report on Customer Due Diligence | 16.8 | American Baptist Home Mission Society |
| 2024 | Social | Amazon.com, Inc. | AMZN | 22-May-2024 | 12 | Commission Third Party Assessment on Company's Commitment to Freedom of Association and Collective Bargaining | 31.8 | Shareholder Association for Research & Education |
| 2024 | Social | Amazon.com, Inc. | AMZN | 22-May-2024 | 14 | Commission Third Party Study and Report on Risks Associated with Use of Rekognition | 19.1 | John Harrington |
| 2024 | Board Oversight | Amazon.com, Inc. | AMZN | 22-May-2024 | 16 | Establish a Board Committee on Artificial Intelligence | 9.7 | AFL-CIO Equity Index Funds |
| 2024 | Social | Amazon.com, Inc. | AMZN | 22-May-2024 | 17 | Commission a Third Party Audit on Working Conditions | 31.2 | Tulipshare Capital LLC |
| 2024 | Social | Apple Inc. | AAPL | 28-Feb-2024 | 7 | Report on Use of Artificial Intelligence | 37.5 | AFL-CIO Equity Index Funds |
| 2024 | Social | Chipotle Mexican Grill, Inc. | CMG | 6-Jun-2024 | 8 | Report on Adoption of Automation | 18.4 | International Brotherhood of Teamsters General Fund |
| 2024 | Environmental | International Business Machines Corporation | IBM | 30-Apr-2024 | 8 | Adopt Science-Based GHG Emissions Targets Including for Value Chain Emissions | 30.8 | Green Century Capital Management, Inc. |
| 2024 | Social | Meta Platforms, Inc. | META | 29-May-2024 | 6 | Report on Generative AI Misinformation and Disinformation Risks | 16.7 | Arjuna Capital |
| 2024 | Social | Meta Platforms, Inc. | META | 29-May-2024 | 8 | Report on Human Rights Risks in Non-US Markets | 5.5 | AkademikerPension |
| 2024 | Social | Meta Platforms, Inc. | META | 29-May-2024 | 10 | Report on Human Rights Impact Assessment of Targeted Advertising | 14.5 | Mercy Investment Services, Inc. |
| 2024 | Social | Meta Platforms, Inc. | META | 29-May-2024 | 11 | Report on Child Safety and Harm Reduction | 18.5 | Proxy Impact |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| 2024 | Social | Meta Platforms, Inc. | META | 29-May-2024 | 13 | Report on Political Advertising and Election Cycle Enhanced Actions | 3.1 | As You Sow |
| 2024 | Social | Microsoft Corporation | MSFT | 07-Dec-23 | 8 | Report on Risks of Weapons Development | 15.2 | Harrington Investments, Inc. |
| 2024 | Social | Microsoft Corporation | MSFT | 7-Dec-2023 | 11 | Report on Risks of Operating in Countries with Significant Human Rights Concerns | 33.6 | Eko |
| 2024 | Social | Microsoft Corporation | MSFT | 7-Dec-2023 | 13 | Report on Risks Related to AI Generated Misinformation and Disinformation | 21.2 | Arjuna Capital |
| 2024 | Social | Netflix, Inc. | NFLX | 6-Jun-2024 | 4 | Report on Use of Artificial Intelligence | 43.1 | AFL-CIO Equity Index Funds |
| 2024 | Social | Paramount Global | PARA | 4-Jun-2024 | 6 | Report on Use of Artificial Intelligence | 2.1 | AFL-CIO Equity Index Funds |
| 2024 | Social | Walmart Inc. | WMT | 5-Jun-2024 | 6 | Publish Human Rights Risk Assessment on the Impacts of Walmart's Supply Chain | 11.6 | Oxfam America, Inc. |
| 2024 | Social | Warner Bros. Discovery, Inc. | WBD | 3-Jun-2024 | 5 | Report on Use of Artificial Intelligence | 23.7 | AFL-CIO Equity Index Funds |
| 2023 | Social | Alphabet Inc. | GOOGL | 2-Jun-2023 | 10 | Report on Risks of Doing Business in Countries with Significant Human Rights Concerns | 13 | SumOfUs |
| 2023 | Social | Alphabet Inc. | GOOGL | 2-Jun-2023 | 11 | Publish Independent Human Rights Impact Assessment of Targeted Advertising Technology | 17.8 | Shareholder Association for Research & Education |
| 2023 | Social | Alphabet Inc. | GOOGL | 2-Jun-2023 | 12 | Disclose More Quantitative and Qualitative Information on Algorithmic Systems | 17 | Trillium Asset Management |
| 2023 | Social | Alphabet Inc. | GOOGL | 2-Jun-2023 | 13 | Report on Alignment of YouTube Policies With Online Safety Regulations | 17.9 | Boston Common Asset Management |
| 2023 | Social | Amazon.com, Inc. | AMZN | 24-May-2023 | 7 | Report on Customer Due Diligence | 33.9 | American Baptist Home Mission Society |
| 2023 | Social | Amazon.com, Inc. | AMZN | 24-May-2023 | 16 | Commission Third Party Assessment on Company's Commitment to Freedom of Association and Collective Bargaining | 34.6 | Shareholder Association for Research & Education |
| 2023 | Social | Amazon.com, Inc. | AMZN | 24-May-2023 | 21 | Commission a Third Party Audit on Working Conditions | 35.2 | Tulipshare Limited |
| 2023 | Social | Amazon.com, Inc. | AMZN | 24-May-2023 | 23 | Commission Third Party Study and Report on Risks Associated with Use of Rekognition | 37.2 | John Harrington |
| 2023 | Social | Meta Platforms, Inc. | META | 31-May-2023 | 5 | Report on Human Rights Impact Assessment of Targeted Advertising | 17 | Mercy Investment Services, Inc. |
| 2023 | Social | Meta Platforms, Inc. | META | 31-May-2023 | 7 | Report on Allegations of Political Entanglement and Content Management Biases in India | 4.6 | SumOfUs |
| 2023 | Social | Meta Platforms, Inc. | META | 31-May-2023 | 10 | Report on Enforcement of Community Standards and User Content | 7.2 | As You Sow |
| 2023 | Social | Meta Platforms, Inc. | META | 31-May-2023 | 11 | Report on Child Safety and Harm Reduction | 16.3 | Proxy Impact |
| 2023 | Board Oversight | Meta Platforms, Inc. | META | 31-May-2023 | 13 | Commission Independent Review of Audit & Risk Oversight Committee | 6.7 | Harrington Investments, Inc. |
| 2023 | Social | Microsoft Corporation | MSFT | 13-Dec-2022 | 7 | Report on Government Use of Microsoft Technology | 20.4 | Boston Common Asset Management |
| 2023 | Social | Microsoft Corporation | MSFT | 13-Dec-2022 | 8 | Report on Development of Products for Military | 10.5 | Harrington Investments, Inc. |
| 2023 | Social | Walmart Inc. | WMT | 31-May-2023 | 6 | Report on Human Rights Due Diligence | 5.8 | Oxfam America, Inc. |

| Year | | Company | | Date | | Proposal | Support % | Proponent |
|------|------|---------|------|------|------|----------|-----------|-----------|
| 2022 | Environmental | Alphabet Inc. | GOOGL | 1–Jun–2022 | 7 | Report on Physical Risks of Climate Change | 17.7 | Pax World Funds |
| 2022 | Environmental | Alphabet Inc. | GOOGL | 1–Jun–2022 | 8 | Report on Metrics and Efforts to Reduce Water Related Risk | 22.5 | As You Sow |
| 2022 | Social | Alphabet Inc. | GOOGL | 1–Jun–2022 | 13 | Report on Risks of Doing Business in Countries with Significant Human Rights Concerns | 17 | SumOfUs |
| 2022 | Social | Alphabet Inc. | GOOGL | 1–Jun–2022 | 14 | Report on Managing Risks Related to Data Collection, Privacy and Security | 12.2 | Brandon Hardy |
| 2022 | Social | Alphabet Inc. | GOOGL | 1–Jun–2022 | 15 | Disclose More Quantitative and Qualitative Information on Algorithmic Systems | 19.5 | Trillium ESG Global Equity Fund |
| 2022 | Social | Alphabet Inc. | GOOGL | 1–Jun–2022 | 16 | Commission Third Party Assessment of Company's Management of Misinformation and Disinformation Across Platforms | 23 | Sustainability Group of Loring, Wolcott & Coolidge |
| 2022 | Social | Alphabet Inc. | GOOGL | 1–Jun–2022 | 17 | Report on External Costs of Misinformation and Impact on Diversified Shareholders | 3.5 | John Chevedden |
| 2022 | Board Oversight | Alphabet Inc. | GOOGL | 1–Jun–2022 | 19 | Establish an Environmental Sustainability Board Committee | 4.7 | Dale Wannen |
| 2022 | Social | Alphabet Inc. | GOOGL | 1–Jun–2022 | 21 | Report on Policies Regarding Military and Militarized Policing Agencies | 9.2 | Sanford Lewis |
| 2022 | Social | Amazon.com, Inc. | AMZN | 25–May–2022 | 6 | Commission Third Party Report Assessing Company's Human Rights Due Diligence Process | 40.3 | Not specified in DEF 14A |
| 2022 | Social | Amazon.com, Inc. | AMZN | 25–May–2022 | 9 | Report on Worker Health and Safety Disparities | 13.2 | Not specified in DEF 14A |
| 2022 | Social | Amazon.com, Inc. | AMZN | 25–May–2022 | 13 | Report on Protecting the Rights of Freedom of Association and Collective Bargaining | 38.9 | Not specified in DEF 14A |
| 2022 | Social | Amazon.com, Inc. | AMZN | 25–May–2022 | 16 | Commission a Third Party Audit on Working Conditions | 44 | Not specified in DEF 14A |
| 2022 | Social | Amazon.com, Inc. | AMZN | 25–May–2022 | 19 | Commission Third Party Study and Report on Risks Associated with Use of Rekognition | 40.7 | Not specified in DEF 14A |
| 2022 | Social | Meta Platforms, Inc. | META | 25–May–2022 | 7 | Report on External Costs of Misinformation and Impact on Diversified Shareholders | 2.7 | Not specified in DEF 14A |
| 2022 | Social | Meta Platforms, Inc. | META | 25–May–2022 | 8 | Report on Community Standards Enforcement | 19.2 | Not specified in DEF 14A |
| 2022 | Social | Meta Platforms, Inc. | META | 25–May–2022 | 9 | Report on User Risk and Advisory Vote on Metaverse Project | 3 | Not specified in DEF 14A |
| 2022 | Social | Meta Platforms, Inc. | META | 25–May–2022 | 10 | Publish Third Party Human Rights Impact Assessment | 23.8 | Not specified in DEF 14A |
| 2022 | Social | Meta Platforms, Inc. | META | 25–May–2022 | 11 | Report on Child Sexual Exploitation Online | 17.3 | Not specified in DEF 14A |
| 2022 | Board Oversight | Meta Platforms, Inc. | META | 25–May–22 | 14 | Commission Assessment of Audit and Risk Oversight Committee | 10.5 | Not specified in DEF 14A |
| 2022 | Social | Microsoft Corporation | MSFT | 30–Nov–2021 | 7 | Prohibit Sales of Facial Recognition Technology to All Government Entities | 4.1 | Harrington Investments, Inc. |

*Source*: ISS Governance Research & Voting

– # # # –

# We empower investors and companies to build for long-term and sustainable growth by providing high-quality data, analytics, and insight.

## GET STARTED WITH ISS SOLUTIONS

Email sales@iss-stoxx.com or visit issgovernance.com for more information.

This report and all of the information contained in it, including without limitation all text, data, graphs and charts, is the property of ISS STOXX and/or its licensors and is provided for informational purposes only. The information may not be modified, reverse-engineered, reproduced or disseminated, in whole or in part, without prior written permission from ISS STOXX.

The user of this report assumes all risks of any use that it may make or permit to be made of the information. While ISS STOXX exercised due care in compiling this report, ISS STOXX makes no express or implied warranties or representations with respect to the information in, or any results to be obtained by the use of, the report. ISS STOXX shall not be liable for any losses or damages arising from or in connection with the information contained herein or the use of, reliance on, or inability to use any such information.

The Information has not been submitted to, nor received approval from, the United States Securities and Exchange Commission or any other regulatory body. None of the Information constitutes an offer to sell (or a solicitation of an offer to buy), or a promotion or recommendation of, any security, financial product or other investment vehicle or any trading strategy, and ISS does not endorse, approve, or otherwise express any opinion regarding any issuer, securities, financial products or instruments or trading strategies.

© 2025 | Institutional Shareholder Services Inc. and/or its subsidiaries ("ISS STOXX")

# Foster Declaration Exhibit 12



**Institutional Shareholder Services Inc.**
1177 Avenue of Americas, 2nd Floor
New York, NY 10036
T: +1.646.680.6300 | F: +1.646.417.6090

July 6, 2018

The Honorable Michael Crapo
Chairman
Committee on Banking, Housing and Urban Affairs
United States Senate
Washington, D.C.  20510

The Honorable Sherrod Brown
Ranking Member
Committee on Banking, Housing and Urban Affairs
United States Senate
Washington, D.C. 20510

Dear Chairman Crapo and Ranking Member Brown:

Thank you for holding the hearing on June 28, 2018 on "Legislative Proposals to Examine Corporate Governance." Institutional Shareholder Services Inc. (ISS) thanks the Committee for its commitment to ensuring that corporate governance in the United States is robust and works to support our nation's capital markets and economy. To this end, ISS respectfully submits this statement, as well as the enclosed document, for inclusion in the hearing record in order to help clarify misconceptions and to correct misinformation about ISS and the proxy advisory industry that were raised during last week's hearing.

**FACT: ISS is a Registered Investment Adviser (RIA) and is subject to strict SEC oversight**
Contrary to the suggestions oft made in the hearing, ISS is a Registered Investment Adviser ("RIA") and is therefore subject to the Investment Advisers Act of 1940 ("Advisers Act") and the rules and regulations that the U.S. Securities and Exchange Commission ("SEC") has promulgated thereunder. The Advisers Act and related SEC rules provide a mature and comprehensive regulatory regime that covers virtually every aspect of our business and that subjects ISS to the SEC's continuing oversight and examination authority.

As an RIA, ISS is required to implement and maintain a comprehensive compliance program, including a mandatory requirement for a Code of Ethics, which is publicly available on our website.[1]  The RIA regime also dictates that we provide clients with transparency about our internal operations, including how potential conflicts of interest are addressed. Indeed, ISS is already subject to and complying with rigorous federal legal requirements.

**FACT: Proxy advisory firms, including ISS, have a fiduciary obligation to their clients**
As an RIA, ISS has a fiduciary obligation to our investor clients, which means ISS and our employees must carry out our duties solely in the best interest of clients and free from any compromising influences and loyalties.

Further, we note that in 2010, the SEC confirmed that proxy advice is a form of investment advice subject to the Advisers Act and the rules and regulations thereunder.[2] The SEC restated this view just last month in a proposed interpretive release on investment adviser standards of conduct.[3]

**FACT: Proxy advisory firms *do not* set or regulate corporate governance disclosure standards, *do not* set shareholder meeting agendas, *do not* put forward shareholder proposals, and *do not* advocate for shareholder proponents, and *do not* vote proxies.**
ISS' *only* job is to analyze proxy statements and provide informed research and vote recommendations based on the policies and guidelines that our institutional investor clients have selected, and in many cases developed, themselves. We are an independent provider of data, analytics and voting recommendations to support our clients in their own decision-making.

---

[1] Available at: https://www.issgovernance.com/file/duediligence/iss-regulatory-code-and-exhibits-june-2017.pdf

[2] Concept Release on the U.S. Proxy System, IA Release No. 3052 (July 14, 2010) ("Proxy Concept Release") at 110.

[3] Proposed SEC Interpretation Regarding Standard of Conduct for Investment Advisers, IA Release No. 4889 (April 18, 2018) ("IA Interpretive Release")



**Institutional Shareholder Services Inc.**
1177 Avenue of Americas, 2nd Floor
New York, NY 10036
T: +1.646.680.6300 | F: +1.646.417.6090

Indeed, it is proxy advisory firms' clients who control both their voting policies and their vote decisions.

Federal statutes and state law dictate most of the items that appear on proxy statements to be voted upon by shareholders. The remaining agenda items, including the selection of nominees for election to the Board, are overwhelmingly put forward by corporate management, or sometimes by a company's shareholders.

Further, as a disinterested fiduciary, ISS has no financial stake in the outcome of a particular vote. ISS does not choose the ballots or agenda items on which we render advice. Rather, at a client's direction, we are asked by our clients to analyze and provide a voting recommendation for each agenda item related to every equity security held in our clients' portfolios. In fact, we are agnostic as to whether clients support a proposal, reject the proposal or abstain from voting altogether. Indeed, ISS will recommend contradictory votes on the same issue if individual clients' policies conflict. We are similarly indifferent as to whether clients choose to follow an ISS vote recommendation or not.

**FACT: ISS' report error rate is minor, and what's often classified by the issuer as an error is in fact a fundamental disagreement in corporate governance philosophy.**
ISS is committed to ensuring the accuracy and quality of our reports. As an RIA and a fiduciary, we have adopted a number of policies and procedures designed to ensure the integrity of our data collection and research process, upon which our reports are founded. We have robust systems and controls designed to ensure that research reports and vote recommendations include high-quality, relevant information; are accurate; are correctly based on policies selected or developed by the client; and are reviewed by appropriate personnel prior to publication. ISS commissions regular SSAE 16 audits, conducted by a third-party auditor, to ensure compliance with our internal control processes, including our research process.

ISS' research team does, infrequently, identify or receive notice of material factual errors in research reports that have already been published to our clients. ISS tracks such occurrences, which are rare. In 2017, for example, ISS covered over 6,400 meetings in the United States and the error rate was approximately 0.76% as measured by post-publication "Proxy Alerts" to clients notifying them of a material error within our benchmark proxy research that resulted in a change of a vote recommendation.

It is therefore particularly disconcerting that during the hearing Mr. Tom Quaadman, Executive Vice President at the U.S. Chamber Center of Capital Markets Competitiveness, mischaracterized our engagement with Abbott Laboratories ("Abbott"). In fact, it is false that ISS "refused to meet with Abbott Labs or… correct the report." We are enclosing with this submission a letter which ISS sent to Abbott in response to their filing. As the letter explains, after sharing a draft report with Abbott, receiving Abbott's written comments and prior to publishing our final report, ISS, in fact, modified its report and corrected two minor factual inaccuracies: the date Abbott entered into an agreement to acquire Alere and the start year of Abbott's audit firm.

Further, even before Abbott published its proxy statement, ISS considered arguments made by Abbott that ISS should change its selection of "comparable corporations" (or peers) for purposes of evaluating Abbott's executive compensation program. After consideration of the merits of Abbott's comments and consistent with ISS' policy approach, ISS subsequently removed an ISS selected peer to instead include a company suggested by Abbott. This resulted in even greater overlap – 12 out of 16 corporations - between the final peer group used by ISS and Abbott's self-selected peers. In presenting the information to our clients in our report and consistent with our normal approach, we outlined in *side-by-side* fashion the peers selected by Abbott Labs and the ISS-selected peers.

Following this engagement, Abbott requested a meeting, a request which ISS acknowledged and to which it responded. Consistent with our stated engagement policies, and considering the proxy season had already begun, ISS responded the same day to let Abbott know that the company's comments were being reviewed, that we would reach out to Abbott if we had any questions, and asked Abbott to let us know if it had any additional comments. Our records show no other requests for engagement were received from Abbott in 2018 prior to the delivery of the draft ISS Report to Abbott for factual review.



**Institutional Shareholder Services Inc.**
1177 Avenue of Americas, 2nd Floor
New York, NY 10036
T: +1.646.680.6300 | F: +1.646.417.6090

This process and the change made based on Abbott's feedback clearly demonstrate the extent to which ISS does engage with, and take into account, the input of the companies that it covers.  While differences in approach and opinion may still exist, that is a far cry from the suggestion that the underlying analysis or vote recommendation results from a mistake or error.

Finally, we reiterate the findings of a 2007 GAO Report, which concluded that our clients trust us to provide "reliable, efficient services."[4]  The GAO's follow-up report in 2016 addressed this further, stating "Both corporate issuers and institutional investors [the GAO] interviewed said that the data errors they found in the proxy reports were mostly minor..."[5]

**FACT: Proxy advisory firms do not "control" shareholder votes.**

Proxy advisory firms' clients control both their voting policies and their vote decisions. As noted by the Council of Institutional Investors (CII), a leading nonpartisan and nonprofit association of public, corporate and union employee benefit funds and state and local entities with combined assets exceeding $3.5 trillion:  "Proxy advisory firm influence is exaggerated by analyses that confuse correlation with causation.  ISS and Glass Lewis tend to follow investors on governance policy, not lead them….Their franchises are built on credibility with investors. As a result, advisors' views reflect those of many funds."[6]  Indeed, as Ms. Darla Stuckey, President and CEO of the Society for Corporate Governance, acknowledged during the hearing, "proxy advisory firms…serve institutional investors."

We note that this is consistent with the results of a 2012 survey of asset managers by Tapestry Networks that found proxy advisory firms' "role as data aggregators" has become increasingly important to asset managers, and that even if smaller managers are more reliant on such advisory firms, they still acknowledge that responsibility for voting outcomes lies with investors.[7]

We also point you to the myriad of opposition letters to H.R.4015, "The Corporate Governance Reform and Transparency Act," in which institutional investors, pension funds, state retirement systems, as well as state treasurers and comptrollers reiterate their opposition to the assertion that they are uninformed buy-side investors who outsource their investment and proxy voting decisions.

**FACT: ISS discloses all perceived and real conflicts of interest, and transparently complies with relevant SEC requirements.  ISS is not aware of any instance in which a proxy research report or a vote recommendation was compromised by a conflict of interest.**

As an RIA, ISS takes its fiduciary duty of loyalty very seriously. We place primary importance on conducting our business in a transparent and responsible manner, and have developed a comprehensive program to manage potential conflicts of

---

[4] Jones, Y. D. (2007). *Issues Relating to Firms that Advise Institutional Investors on Proxy Voting.* (GAO-07-765). Washington, DC: Government Accountability Office (hereafter, "2007 GAO Report"), note 1 at 13.

[5] Clements, M. (2016). *Proxy Advisory Firms' Role in Voting and Corporate Governance Practices.* (GAO-17-47). Washington, DC: Government Accountability Office at 29.

[6] June 13, 2016 letter from the Council of Institutional Investors to Rep. Hensarling, Chair of House Committee on Financial Services.

[7] Bew, Robyn and Fields, Richard, Voting Decisions at US Mutual Funds: How Investors Really Use Proxy Advisers (June 2012) at 2. Available at SSRN: http://ssrn.com/abstract=2084231. ("Across the board, participants in our research said they value proxy firms' ability to collect, organize, and present vast amounts of data, and they believe smaller asset managers are more reliant on those services. Nonetheless, participants emphasized that responsibility for voting outcomes lies with investors").



**Institutional Shareholder Services Inc.**
1177 Avenue of Americas, 2nd Floor
New York, NY 10036
T: +1.646.680.6300 | F: +1.646.417.6090

interest as required by the Advisers Act and related SEC rules. Moreover, ISS has adopted a significant relationship disclosure policy and took robust steps to enhance transparency following the promulgation of SLB 20.

As required by the Advisers Act's compliance program rule,[8] ISS has implemented, maintains and periodically updates a program designed to eliminate, or manage and disclose, conflicts of interest. This program includes appointing a chief compliance officer, establishing comprehensive compliance policies and procedures, and testing the adequacy of those policies and procedures and the effectiveness of their implementation on an ongoing basis, ISS has also adopted, as mentioned earlier, a comprehensive Code of Ethics as the Advisers Act regulatory regime also requires.[9]

Separate and apart from our compliance protocols, ISS addresses conflicts, in part, by being a transparent, policy-based organization, with research and voting recommendations based on publicly-disclosed information available to all shareholders. Contrary to Mr. Quaadman's claim, ISS provides our clients (and other stakeholders) with an extensive array of information to ensure that they are fully informed of our policies to manage conflicts of interests, and of any potential conflicts and the steps ISS has taken to address them. Among other things, ISS supplies a comprehensive due diligence compliance package, publicly available on our website, so that our clients (and other stakeholders) can confidently and fully assess the reliability and objectivity of our voting recommendations.

One measure that ISS has historically taken to ensure transparency is the disclosure of instances where a relationship between ISS and a party exists that may present a conflict of interest. This includes potential conflicts with ISS Corporate Solutions, Inc. ("ICS"), which is the subsidiary of ISS that provides governance tools and services to corporate issuer clients. ISS' standard institutional client contract contains specific disclosure regarding the work of ICS, ensuring our clients have full visibility into any significant relationships that may exist between ISS and the subjects of our proxy research reports.

ISS' institutional clients can readily identify any potential conflict of interest through ISS' primary client delivery platform, ProxyExchange (PX), which provides information about the identity of ICS clients, as well as the types of services provided to those issuers and the revenue received from them. Similarly, each proxy analysis and research report issued by ISS contains a legend indicating that the subject of the analysis or report may be a client of ICS. This legend also advises institutional clients about the way in which they can receive additional, specific details about any issuer's use of products and services from ICS, which can be as simple as emailing our Legal/Compliance department via disclosure@issgovernance.com.

One of the most important components of the ISS compliance program is the firewall maintained between the core institutional business and the ICS business. This firewall includes the physical and functional separation between ICS and ISS, with a particular focus on the separation of ICS from the ISS Global Research team. A key goal of the firewall is to keep the ISS Global Research team from learning even the identity of ICS' clients, thereby ensuring the objectivity and independence of ISS' research process and vote recommendations. The firewall mitigates potential conflicts via several layers of separation:

- ICS is a separate legal entity from ISS.
- ICS is physically separated from ISS, and its day-to-day operations are separately managed.
- The ISS Global Research team works independently from ICS.
- ICS and ISS staff are forbidden to discuss the identity of ICS clients.
- ISS' institutional analysts' salaries, bonuses and other forms of compensation are not linked to any specific ICS activity or sale.

---

[8] *See* Advisers Act Rule 206(4)-7.

[9] *See.* Advisers Act Rule 204A-1.



**Institutional Shareholder Services Inc.**
1177 Avenue of Americas, 2nd Floor
New York, NY 10036
T: +1.646.680.6300 | F: +1.646.417.6090



Yet another element of the conflict mitigation procedures is the "blackout period," pursuant to which ICS staff may only have limited interactions with issuers or their representatives when a "live" voting issue is pending for review by ISS. The "blackout period" runs from immediately after definitive proxy materials are filed with the appropriate regulatory body through the date of the issuer's shareholders' meeting. During this period, interactions between ICS and its corporate clients are limited. During the blackout period, ICS is precluded from providing advisory services to, or otherwise interacting with, issuers with respect to matters that are "live" or pending on the issuer's proxy statement. In addition, during the blackout period, ICS does not engage in marketing or selling efforts to issuers (whether they are existing ICS clients or prospects).

Moreover, ICS explicitly tells its corporate clients, and also indicates in their contracts that ISS will not give preferential treatment to, and is under no obligation to support, any proxy proposal of an ICS client. Contrary to Ms. Stuckey's statement, neither ISS nor ICS "help you to draft your proxy if you're an issuer." ICS further informs its clients that ISS' Global Research team prepares its analyses and vote recommendations independently of, and with no involvement from, ICS.

Finally, ISS is not aware of any instance in which a proxy research report or a vote recommendation was compromised by a conflict of interest, nor any instance where a regulatory body has reached that conclusion. We are heartened by the fact that the most vocal critics of ISS on this point are those who speak on behalf of corporate management, and not the investors who rely on ISS' research and vote recommendations. We see this as a strong indication that we are managing this potential conflict extremely well.

Furthermore, provisions of HR4015 would be in fact undermine the firewall between these two firms.

**FACT: Proxy advisory industry is competitive and there are no artificial barriers to entry**
There are no artificial barriers to entry into the proxy advisory industry in the United States. We operate in a competitive market and, as Mr. Quaadman himself stated during the hearing, we have seen entrants come and go within the industry. Moreover, institutional investors are not required to purchase our services. In the free market, institutional investors purchase our services because they choose to do so, and find value in the products we provide.

ISS is indeed an industry leader and has earned its market share by virtue of the quality of its work and the level of service it has provided for more than a quarter century. The GAO report entitled "Issues Relating to Firms that Advise Institutional Investors on Proxy Voting" concluded as much when it wrote that ISS has "gained a reputation with institutional investors for providing reliable, comprehensive proxy research and recommendations."[10] While we have seen the widely circulated conjecture that two firms "control" 97% of the proxy advisory industry, this is not a statistic we have verified or can confirm.

Ultimately, as noted at the hearing by Harvard Law Professor John Coates, no one is required by law or regulation to consult a proxy advisor.  Similarly, there is no requirement to follow our vote recommendations. The ultimate voting decision for each resolution at a company meeting remains the responsibility of our clients, the owners of the corporation, as we believe it should. Our clients are sophisticated institutional investors who owe a fiduciary duty to their plan beneficiaries.

With regard to H.R.4015 and any similar legislation, we agree with many of the concerns about the negative impacts of this legislation that were raised during the hearing. We believe the litmus test for any federal intrusion into the free market is whether it targets a proven problem and seeks to address it cost-effectively. The proposed bill does not pass either test. Further, we have not heard from any institutional investor who supports H.R.4015 or the underlying arguments upon which the legislation is founded.

The investors who use proxy advisory services do not see the "problem" the proposed legislation purports to address. In

---

[10] Jones, Y. D. (2007). *Issues Relating to Firms that Advise Institutional Investors on Proxy Voting.* (GAO-07-765). Washington, DC: Government Accountability Office (hereafter, "2007 GAO Report") at 13.



**Institutional Shareholder Services Inc.**
1177 Avenue of Americas, 2nd Floor
New York, NY 10036
T: +1.646.680.6300 | F: +1.646.417.6090

fact, as Mr. Silvers stated, institutional investors are concerned that the legislation, as written, seeks to "impose a new regulatory scheme designed to make [proxy advisory firms] disloyal to their clients" and would "essentially defeat the corporate governance system."

In conclusion, ISS appreciates this opportunity to set the record straight and underscore the rigorous regulatory system and internal compliance program under which we operate. If there is any additional information I can provide or if you have any follow-up questions, please do not hesitate to contact me.

Sincerely,

Gary Retelny, President and Chief Executive Officer

CC: Members, Committee on Banking, Housing and Urban Affairs, U.S. Senate

# Foster Declaration Exhibit 13

**Council of Institutional Investors**®
The voice of corporate governance

# Governance Guide: Proxy Voting

Emmanuel Tamrat, Senior Research Analyst

**July 2024**

**GOVERNANCE GUIDE: PROXY VOTING**



------

*Disclaimer*

This guide is designed to inform readers about the most important rules and procedures for proxy voting by U.S. institutional investors at public companies' annual meetings of shareholders. While CII exercised due care in preparing this guide, it does not guarantee the accuracy of the information.

CII would like to acknowledge Rossie Mayhew and the Tumelo team for contributing to the pass-through voting section of this guide.

For permission to reprint, please send a request to info@cii.org.

© 2024 Council of Institutional Investors

# Table of Contents

**OVERVIEW**.................................................................................................................................4

**PROXY VOTING OVER TIME** ........................................................................................................5

AUTHORITY AND CONTROL OVER PROXY VOTING..............................................................................8

PLAN AUTHORITY OVER VOTING ......................................................................................................8

**DELEGATION OF PROXY VOTING** .............................................................................................9

FIDUCIARY RESPONSIBILITIES WITH THIRD-PARTY VOTING.................................................................9

THE ROLE OF PROXY ADVISORS ......................................................................................................10

VOTING RECOMMENDATIONS .........................................................................................................10

SCRUTINY OF PROXY VOTING SERVICE PROVIDERS .........................................................................11

ERISA GUIDANCE.........................................................................................................................12

SHAREHOLDER ACTIVISM...............................................................................................................13

CONTESTED ELECTIONS .................................................................................................................15

**MECHANICS OF PROXY VOTING**..............................................................................................19

HOW FUNDS VOTE THEIR PROXIES .................................................................................................19

VOTE DECISIONS...........................................................................................................................20

SHARE LENDING............................................................................................................................21

**APPENDIX A** ...........................................................................................................................23

PROXY VOTING GUIDELINES ...........................................................................................................23

PUBLIC AND UNION FUNDS.............................................................................................................23

*State of Connecticut Office of the Treasurer:*................................................................................23

*AFL-CIO Staff Retirement Plan:*.................................................................................................24

*State Board of Administration of Florida:* ...................................................................................24

ASSET MANAGERS ........................................................................................................................24

*T. Rowe Price:*.........................................................................................................................24

*BlackRock:* ..............................................................................................................................24

PROXY ADVISORS .........................................................................................................................25

*ISS Stoxx:* ...............................................................................................................................25

**APPENDIX B** ...........................................................................................................................26

DEPARTMENT OF LABOR'S "AVON LETTER" ON ERISA FIDUCIARY STANDARDS........................................26

*1. The Applicable Provisions of ERISA*........................................................................................26

*2. Proxy Voting by Plan Fiduciaries* ...........................................................................................27

# Overview

Owning stock in a company gives an investor the right to vote on important matters concerning corporate policies and governance, including the election of corporate directors. Prior to its annual meeting, or at any other time that it solicits shareowner votes, a U.S. company must make available to its shareowners a proxy statement and a proxy card or ballot. The proxy statement discusses the company's management, governance practices and certain performance data, along with descriptions of the proposals on which shareowners are asked to vote. Proxy statements and proxy cards are filed with the Securities and Exchange Commission (SEC) and made publicly available to all market participants.

While shareholders can vote in person at shareholder meetings, the vast majority vote remotely by electronically sending voting instructions to a third party legally authorized to execute the instructions. The ability to vote by proxy is critical, given the seasonality of shareowner meetings. Most annual meetings at U.S. public companies take place in April, May or June; in 2023, 82% of meetings at U.S.-based Russell 3000 companies took place during those months.[1] In some overseas markets, proxy voting is even more concentrated. In Japan, for example, more than one-quarter of companies held their annual meetings on the same day in 2022 and 2023, and this figure increased to nearly 30% for 2024, according to Japan Exchange Group.[2]

Proxy voting is a communication tool that investors can use to influence corporate governance and operations at the companies they own. It offers shareowners a tangible way to signal to boards and managers whether the company is on the right track. In some cases, proxy voting also drives change directly. That is why voting rights are considered part of the underlying value of a stock.

Proxy voting is also an oversight mechanism by which a public company's management and board of directors are held accountable to the interests of their shareholders. By allowing shareholders to more effectively advocate for their interests, proxy voting can help mitigate the principal-agent problem, or the misalignment in interest that may arise between shareowners and the company they entrust with their savings.

The proper scope of proxy voting has been the subject of a vibrant discussion in recent years.  While many investors increasingly see proxy voting as a vehicle for driving a broad range of corporate activity, including with

---

[1] Based on CII's analysis of shareholder meeting data from ISS as of May 7, 2024. Analysis covers all annual meetings at US-based Russell 3000 companies between Jan 1, 2019 and Dec 31, 2023.

[2] Proxy voting in Japan: Concentration of AGMs and lack of English disclosure remain key challenges | IR Magazine; "The Change in Concentration Rates for the Most Concentrated Day Each Year, at https://www.jpx.co.jp/english/listing/event-schedules/shareholders-mtg/tvdivq00000007jz-att/press202404e.pdf, p. 4.

respect to environmental and social matters, other investors prefer to defer these issues to the directors they elect.

This paper will discuss the evolution of proxy voting as an institution, how investment funds determine how to vote their proxies, and the different guidelines and regulations that have established today's proxy voting norms.

# Proxy Voting Over Time

Advancements in proxy voting over time have transformed it into a prominent part of share ownership and have helped create a new class of empowered shareholders. Shareholder voting—as a tool, a mechanism for investors to give feedback to the board and management—has been in place since as early as the Dutch East India Company.[3] Proxy voting in particular—the ability to vote shares without being physically present—emerged in the late 1800s.[4] This right is guaranteed to investors under corporate law; however, the manner in which proxy voting is practiced today has evolved from its origins.

Analyzing proxy-related issues and managing the execution of votes can be complex, time-consuming and costly for shareholders, particularly for institutions that own stock in thousands of companies. Historically many institutional investors were more inclined to "vote with their feet" in response to concerns over governance and other matters subject to proxy voting, rather than develop a program to flex their voting power across the portfolio. Historically, most institutional investors relied on the voting services of outside money managers. This began to change with the 1974 Employee Retirement Income Security Act (ERISA). The law—which legally covers corporate and union pension plans, but also serves as a guidepost for the practices of state and local pension plans—requires fund fiduciaries to act solely in the interests of plan participants and beneficiaries.

As merger and acquisition activity heated up in the 1980s, reports revealed that outside money managers were being pressured by corporate plan sponsors to cast votes for or against controversial ballot items, such as anti-takeover provisions and tender offers. In response, the Department of Labor (DOL), in a widely released 1988 letter to Avon Products (see Appendix B), asserted that proxy voting rights, because they had economic value, are pension plan assets and subject to the same ERISA fiduciary standards as other plan assets. That meant that pension funds had a duty to vote their proxies in the best interests of plan participants and beneficiaries.

A lead driver of this change in how proxy voting is practiced has been the evolution of invested capital from an

---

[3] For an explanation of shareholder voting and rights in the 17th century at the Dutch East India Company, the first known publicly traded company, see "IV. Voting Restrictions in Comparative Perspective" in The Evolution of Shareholder Voting Rights: Separation of Ownership and Consumption | Yale Law Journal.

[4] Shareholder Meetings: Unearthing the history | Directors & Boards

atomized, incongruous base of independent beneficial owners to a landscape where professionally managed funds invest pooled resources making engaged ownership more practical and economical, including the exercise of voting rights on behalf of those end investors. Institutional investors today own nearly 70% of public shares, and institutional and retail investors have different voting patterns.

Data supports the notion that pooled, professionally managed assets are more engaged in proxy voting. According to proxy service provider Broadridge, just over 80% of shares held by institutional investors were voted during the 2023 proxy season, while only about 30% of those held by retail investors were voted.[5] And this percentage can fall even lower, with retail investors voting fewer than 10% of their shares at many companies, according to investor relations firm The Shareholder Service Optimizer.[6]



**Figure 1.** Percent of shares voted by retail and institutional shareholders from 2019 to 2023. Retail investors voted 29.6% of the shares they owned in 2023, a slight increase from 2022. However, this is lower than 32.1% in 2019 and represents a trend of lower retail shareholder voting over time.
*Source: Broadridge*

Fund managers have also built a new, sophisticated infrastructure to help end investors exercise their proxy voting rights. Most recently, end-to-end vote confirmation and pass-through voting have provided end investors with greater assurance and control over how their votes are cast.

---

[5] Institutional investors have historically accounted for the vast majority of voting activity at public companies, but voting participation levels have tapered slightly in recent years. 29.6% of shares held by retail investors were voted during the 2023 proxy season, while 80.1% of shares held by institutional investors were voted during the same period, according to the firm's 2023 *ProxyPulse* report, available at https://www.broadridge.com/_assets/pdf/broadridge-proxypulse-2023-proxy-season-review.pdf.

[6] *See* "Drops In Retail Investor Voting Continue" in *The Shareholder Service Optimizer*, Volume 30, Issue 1, Q1 2024, https://optimizeronline.com/wp-content/uploads/VOLUME_30_NUMBER_1.pdf, p. 4.

Proxy voting has become a more prominent part of share ownership. Proxy voting has become influential in how companies behave since the 1990s, with shareholder proposals playing a significant role in the formation of annual meeting agendas.[7] This trend has only continued. From 2018 to 2022 alone, the number of proposals voted on at Russell 3000 companies increased 26% from 442 to 555.[8]

As institutional investor clients increasingly direct their attention toward environmental and social factors in the investment decision-making processes, so too have they placed more attention on these topics when casting their votes. While "ordinary business" matters are not eligible for inclusion in the proxy statement, environmental and social proposals have a long history of being included.[9] This is the primary mechanism by which institutional investors have elevated these issues. Average annual support levels for these proposals have grown for decades before reaching a peak level of 34% in 2021.[10]

In broad terms, shareholder proposals for environmental and social issues received quite limited support until recent decades, when they began to receive significant minority support and in some cases majority support.[11] Support for environmental and social shareholder proposals has declined notably since 2021. Many factors contribute to this decline, including more leniency from the SEC on no-action requests, an ESG backlash, the growth of "anti-ESG" proposals as mentioned earlier in this section, and the spread of proposals that many asset managers view as too prescriptive.

However, this decline shows signs of reversing in 2024. For the year through May 31, median support for environmental shareholder proposals tapered up to 21%, up 1.2 percentage points from 19.8% during the same period in 2023. Social proposals saw an even greater increase in median support from 18.5% in January-May

---

[7] For a lookback on the rising influence of shareholder proposals and other governance advocacy, see "Antitakeover Measures and Corporate Scandals Prompt Calls for Governance Reform" in *The Long View: The Role of Shareholder Proposals in Shaping U.S. Corporate Governance (2000-2018)* by Kosmas Papadopoulos, ISS Analytics, February 6, 2019, https://corpgov.law.harvard.edu/2019/02/06/the-long-view-the-role-of-shareholder-proposals-in-shaping-u-s-corporate-governance-2000-2018/.

[8] "Shareholder Proposal Pass Rate, by Index (2022-2018)," data by ESGAGUE, https://corpgov.law.harvard.edu/2022/11/05/shareholder-voting-trends-2018-2022/. Note: proposal count from ESGAUGE is for shareholder-sponsored proposals at Russell 3000 companies only.

[9] For more about Rule 14a-8(i)(7), which was most recently amended in 2021 to limit the scope of what companies can exclude via the ordinary business exclusion, see New SEC Staff Legal Bulletin Eases Path for Rule 14a-8 Shareholder Proposals on Environmental, Social, and Governance Issues | Foley & Lardner LLP. For an example of the historical use of shareholder proposals to address apartheid in South Africa, see also The Impact of Shareholder Activism on Corporate Involvement in South Africa During the Reagan Era.

[10] "Are There Too Many ESG Shareholder Proposals?" by Lindsey Stewart, CFA, Morningstar, Sep 13, 2023, https://www.morningstar.com/sustainable-investing/are-there-too-many-esg-shareholder-proposals.

[11] Median support for environmental and social shareholder proposals hovered around 6% from 2000-2008 but increased towards the end of the decade. Median support for such proposals reached about 10% in 2010, and by 2013, median support for such proposals exceeded 20%. See *External Pressures in the Aftermath of the Financial Crisis* in The Long View: US Proxy Voting Trends on E&S Issues from 2000 to 2018 (harvard.edu). **Note:** These figures are based on the older methodology of "For" versus "For + Against + Abstained" but are still valuable in understanding long-term trends.

2023 to 20.7% in January-May 2024.[12]

# Authority and Control Over Proxy Voting

## Plan Authority Over Voting

Funds do not necessarily retain full authority over their proxy votes; rather, proxy voting authority arrangements are set jointly between funds and their asset managers or service providers. A fund can retain voting authority over some or all ballot items by marking proxy cards itself or by specifically instructing its investment manager how to mark the plan's ballots. But an investment manager legally can refuse to include the instructions in its contract. An investment manager that has the authority to make proxy voting decisions over an ERISA fund's shares is responsible for making sure those shares are voted prudently in the best economic interests of the fund's participants and beneficiaries.

Pension funds that delegate voting authority over a ballot item may not lawfully vote or direct the investment manager's vote on that item unless such directions are agreed to by contract.

Pension funds that want to delegate voting authority but still wish to provide broad-based voting guidance to investment managers develop and furnish proxy voting guidelines. While investment managers must take the guidance into consideration, they retain the right to vote contrary to furnished guidelines if they believe doing so is in the best interests of the client plan's participants and beneficiaries. But in practice, investment manager votes rarely diverge from client guidelines.

Simply furnishing proxy voting guidelines will not do the trick, though, if a pension fund wants to tell its investment manager how to mark particular ballots. Plans that want to direct how investment managers vote on specific issues on specific proxies must have language to this effect in their investment management contracts. These negotiated clauses are binding since contracts between pension plans and investment managers are considered "plan documents" under ERISA.

Such a clause could say that the pension plan reserves the right to direct the investment manager's vote for any ballot item appearing on any proxy card issued by a portfolio company. A clause might also state that the investment manager will contact the pension fund for voting instructions if a ballot item is not covered by the

---

[12] "Reversal of Declining Support on ESG, Led by Governance and Compensation Proposals" in Pro-ESG Shareholder Proposals Regaining Momentum in 2024 (harvard.edu)

fund's guidelines.

Contractual language could also say the pension plan will tell the investment manager how to vote every ballot item (or certain securities or issues), so that the manager's only voting rule is to physically mark the ballots as instructed.

However, investment managers can refuse to include any curbs on their voting authority in their contracts, or may seek to include language that holds the client fund fully liable for any vote it directs.

Some investment managers even refuse to mark ballots under any voting guidelines except their own. In any case, unless a contract specifies otherwise, a pension plan would violate ERISA if it tried to direct or change an investment manager's vote.

# Delegation of Proxy Voting

In deciding whether to vote in-house or delegate proxy voting decision-making to a third party, one problem funds may face is that the guidelines used by an outside money manager or a third-party voting service may differ from a fund's positions on certain issues. Another concern is that different managers or third-party voting agents may have different proxy voting guidelines; and, as a result, delegating to multiple agents or money managers may dilute a fund's vote, since agents may vote differently on a particular proposal.

Where possible, moving proxy voting duties in-house to be handled by fund staff ensures that the shares will be voted consistently the way the fund wants. Another option is to hire a third-party service to vote a fund's shares using the fund's proxy voting policies. As a failsafe, contractual language can specify that the fund can change any vote submitted by the third party on behalf of the fund.

## Fiduciary Responsibilities with Third-Party Voting

Even if a plan fiduciary delegates proxy voting to an asset manager or advisory firm, the fiduciary still retains some oversight responsibilities. Plan fiduciaries have a duty to periodically monitor and review the investment manager's proxy voting procedures and the votes they cast. This makes accurate and thorough recordkeeping by the investment manager imperative. Electronic recordkeeping systems can be developed in-house or by a third-party.

ERISA funds are required to retain proxy voting records for six years, while public pension funds are subject to

local recordkeeping rules. Some public funds make their proxy voting records available to the general public through their website, while others do not publicly disclose their voting history.

Plan fiduciaries have no recourse if they delegate all voting authority to an investment manager that votes contrary to the fiduciary's preferences, so long as the votes do not violate ERISA or plan documents. However, a pension fund can write a clause into its contracts with investment managers requiring the manager to report and explain any vote that deviates from the manager's proxy voting guidelines.

For example, one CII member stipulates that each of the fund's investment managers "shall deliver a written proxy voting report to the plan on an annual basis. An 'exception' report shall also be delivered by each investment manager specifying any votes that were cast other than pursuant to the manager's voting guidelines." In cases where CII members furnish proxy voting guidelines to outside money managers, the managers almost always cast votes in accordance with such guidance. Contrary votes were rare enough that neither of the two surveyed member funds felt it necessary to have a written policy in place to handle such situations.

## The Role of Proxy Advisors

Service providers such as ISS, Glass Lewis and Egan-Jones offer an array of solutions to help institutional investors manage their proxy voting responsibilities.  These offerings are tailored to client needs and preferences, and they may include proposal-specific research, vote execution services (whether according to the client's voting guidelines or the recommendation of the proxy advisor), record-keeping services and voting platforms to help clients vote on a timely and consistent basis.

Many firms that provide vote execution services also advise institutional investors on how to vote for items presented at annual meetings, from director elections to say-on-pay, shareholder proposals and other ballot items. These voting recommendations are generally based on thorough research into the corporate governance structure of the company and the topic of the proposal, the extent to which the proposal has standing, the company that received the proposal, and whether the proposal concerns a legitimate problem at the company. In the case of a director election, a proxy advisor may base its recommendation on the director's past performance and the alignment of their skills and experience with the needs of the company and its board.

## Voting Recommendations

Institutional investors often bypass their advisor's vote recommendations by incorporating fund-specific proxy voting guidelines into their vote process. Clients that do look to the advisor for recommendations have a range of

options rather than a single "house" recommendation. For example, in addition to its benchmark voting guidelines, ISS offers specialty voting policies for certain types of funds—such as Socially-Responsible Investment, Taft-Hartley, and Public Funds—and thematic policies including faith-based, climate, sustainability, and global board-aligned.[13]  More recently, in response to criticism that their recommendations are too supportive of environmental and social proposals, ISS began offering an "ESG skeptical" voting policy that votes against ESG-linked shareholder proposals.[14]

## Scrutiny of Proxy Voting Service Providers

Critics have raised concerns about the lack of competition in the proxy advice market—dominated by ISS and Glass Lewis—and the potential conflicts of interest that arise when proxy advisors sell research tools and services to companies and then rate their governance. As a result, the proxy advice business has come under government scrutiny.

Similar to ERISA regulation, proxy advisor regulation has experienced volatility with changes in presidential administrations. Under the leadership of Chair Jay Clayton, a Trump appointee, the SEC adopted a rule requiring proxy advisory firms to simultaneously disclose their vote recommendations to clients and companies. The rule was part of a broader effort under Clayton's SEC to reign in the perceived abuse of power by proxy advisory firms, given their significant influence in affecting the outcome of director elections and shareholder proposals.[15]

The Clayton SEC also enacted these rules in response to assertions of material omissions and misstatements of fact by proxy advisor firms that affected the credibility and reliability of their research reports. In addition, the 2020 rules classified proxy advice as a solicitation, which increased the legal exposure of proxy advisory firms in the event of such material omissions or misstatements.

CII has advocated against the proxy advisor rule, arguing that allowing companies to have greater influence over proxy advisor reports would harm CII members by adversely impacting the cost, quality, and timeliness of the proxy research they depend on.[16]

ISS also responded to the rule by filing a lawsuit against the SEC in 2019, claiming that the rule incorrectly

---

[13] https://www.issgovernance.com/policy-gateway/voting-policies/#tab-1642760604179-3-9
[14] 'ESG skeptical' proxy-voting platform from ISS adopted by Texas Permanent | Pensions & Investments
[15] https://news.bloomberglaw.com/esg/sec-rollback-of-proxy-firm-curbs-withstands-second-court-battle; https://www.cooley.com/news/insight/2022/2022-07-22-sec-adopts-amendments-regarding-proxy-rules-applicability-to-proxy-advisory-firms
[16] https://www.cii.org/files/issues_and_advocacy/correspondence/2020/20200213%20PAF%20sign-on%20letter%20FINAL.pdf

classifies proxy advice as a solicitation. Proxy advice is given according to their clients' instructions with their best interests in mind, and proxy advisors are indifferent to the outcome of an election, ISS argued.[17] In contrast, proponents in proxy solicitations have a stake in the outcome of the elections and wants to advance their own interests, which are not necessarily consistent with those of other investors.

In 2022, the SEC formally relaxed the Clayton-era proxy advisor rules, no longer requiring proxy advisors to provide reports to companies at the same time as their clients. This ruling left the solicitation rules in place, however. As of February 2024, in a win for ISS, the SEC's proxy advisor rule in its entirety was declared invalid by a federal judge.[18]

## ERISA Guidance

ERISA guidance has changed over time, but the core principles around the rules have remained the same since its inception in 1974. For example, DOL staff have revised their interpretations on the permissibility of integrating non-pecuniary factors into the investment decision-making process. However, these changes in interpretation have not affected the statutory obligations of fiduciaries to act in the best interest of the fund and its beneficiaries. Administrative interpretation can evolve due to changes in presidential leadership and differences in regulatory agendas and priorities from one administration to the next; however, they do not have a significant legal impact and do not change ERISA's oversight of investment decisions by fiduciaries.

In another example, DOL rulemakings can redefine who is considered a "fiduciary" without changing the core responsibilities that fiduciaries are subject to under ERISA. Such a move would instead change who is subject to fiduciary provisions under the act.[19]

As fiduciaries under ERISA, plan sponsors are required to act in the best economic interest of the fund. Proxy voting is considered a plan asset and thus falls within the scope of this interest. As a result, proxy voting has also been affected by interpretive changes under each administration—issued through interpretive bulletins and administrative rulemaking—to what is considered part of the fund's best long-term interest. For instance, in its 2008 guidance under the Bush administration, the U.S. Department of Labor issued an interpretive bulletin stating that fiduciaries were only allowed to make investment decisions to advance "the economic interest of the plan."[20]

---

[17] The Basis for ISS' Lawsuit Against the SEC (harvard.edu)
[18] SEC Measure Regulating Proxy Advisory Firms Declared Invalid | Bloomberg Law
[19] *See* Here We Go Again: DOL Proposes New Fiduciary Rule | HUB | K&L Gates (klgates.com) [Nov 2023] as an example of this distinction. The proposed rule would broaden the scope of investment advisors that are considered "fiduciaries" under ERISA, which would have the effect of subjecting them to best-interest restrictions and other investor protection measures under the Act.
[20] https://www.federalregister.gov/documents/2008/10/17/E8-24551/interpretive-bulletin-relating-to-investing-in-economically-targeted-investments

Seven years later under the Obama administration, the DOL withdrew its more restrictive 2008 interpretation to revert to the 1994 interpretive bulletin, clarifying that an ESG or economically targeted investment—such as one with impact objective—is not necessarily misaligned with the economic interest of a plan.

In 2018 under the Trump administration, the DOL revised the previous bulletin, warning for ESG factors to be evaluated "appropriate to the relative level of risk and return involved compared to other relevant economic factors."[21] Then, in 2020, the DOL issued a formal rule that, in its original form, would have increased scrutiny on ESG funds and investment activity for potential fiduciary breaches, and would have had a chilling effect on the adoption of ESG funds. The final rule instead underscored the need for sponsors to focus on a "prudent assessment" of "pecuniary factors" in their investment decisions.[22]

More recently, under the Biden administration, this rule was reversed and plan sponsors are now permitted to consider climate change and other ESG-related factors that can influence risk and return, as long as they exercise the same level of rigor in evaluating and integrating ESG information as they do with traditional pecuniary factors.[23]

While each administration may have different views on the incorporation of certain ESG considerations, including proxy voting, a common theme is the importance of rigorous and well-documented decision making to ensure fiduciary obligations are being met.[24]

## Shareholder Activism

In a development several decades in the making, shareholder activists increasingly rely on shareholder proposals and proxy contests as some of the most important tools to exert influence over their portfolio companies. Many large-cap companies receive several shareholder proposals a year, and even if unsuccessful, these proposals can exert pressure on the board to meet a certain demand.

---

[21] fall2021paper_curtisquinn_11-11-21.pdf (yale.edu), p. 23.
[22] The proposed DOL rule stated: "*Environmental, social, corporate governance, or other similarly oriented considerations are pecuniary factors only if they present economic risks or opportunities that qualified investment professionals would treat as material economic considerations under generally accepted investment theories.* The weight given to those factors should appropriately reflect a prudent assessment of their impact on risk and return." From "Do ESG Mutual Funds Deliver on Their Promises?" by Quinn Curtis, Jill Fisch & Adriana Z. Robertson, fall2021paper_curtisquinn_11-11-21.pdf (yale.edu), p. 24.
[23] See *Summary of Final Rule* in lw.com/admin/upload/SiteAttachments/Alert 3058.pdf, p. 3.
[24] From Covington: "Both the ERISA statute and Supreme Court precedent are clear that fiduciary investment management decisions should be made for the exclusive purpose of maximizing financial returns on a risk-adjusted basis in order to provide the benefits due under the plan and to defray the reasonable costs of administering the plan." *See:* DOL's New Rule on ERISA Investment Duties and Its Relationship to ESG | Covington & Burling LLP [Dec 2022].

Proxy contests are far less common, however, and are considered a blunter tool than shareholder proposals in corporate engagement. This is primarily because the results of a proxy contest are binding,[25] and they can lead to significant changes on a company's board. In addition, a proxy contest is a much costlier battle to wage than a shareholder proposal and is likewise much costlier for a company to defend against. Many activists and companies reach a settlement well before contests become public, and fewer campaigns are making it through to annual meetings.[26]

While shareholder proposals originally focused on core governance issues like classified boards and voting structures that can affect a company's long-term value, today they encompass topics as disparate as environmental risk and workforce management. Shareholder advocacy touching social issues has a deep history in the U.S. In 1947, for example, two Freedom Riders sought to pressure Greyhound to desegregate their buses through the proxy ballot. While their campaign and the lawsuit that followed were not successful in reaching the desired outcome, the case contributed to the evolution of U.S. securities laws.[27]

Any shareowner who meets certain ownership requirements, as set forth by the SEC in Rule 14a-8, can file a shareholder proposal.[28] However, this does not guarantee it will be brought to a vote. Proposals are non-binding and generally ask a board to adopt a policy or disclose certain information; however, a proposal can be excluded for a host of reasons. These objections may be procedural in nature—failure to provide proof of ownership, for example—or they may be substantive in nature. For example, if it interferes with "ordinary business" or has failed to receive minimal support in previous years.[29]

When brought to a vote at an annual general meeting, shareholder proposals also give proponents the opportunity to expand the reach of their campaign to all investors at a company, who are then able to vote for or against the proposal based on their proxy voting guidelines.

---

[25] "Delaware law […] vests the right to elect directors in the stockholders regardless of whether the board agrees with the nominee directors' positions or outcomes." *See* https://www.morrisjames.com/newsroom-articles-Manwaring-Application-of-a-Voting-Limitation.html. *See also* 8 Del. C. 1953, § 225, "Contested election of directors; proceedings to determine validity." at https://delcode.delaware.gov/title8/c001/sc07/index.html#225.

[26] Shareholder Activists Should Be Careful About Quick Settlements | Forbes (May 2023); More Activists Lay Down Arms in Battles for Boardroom Control | Wall Street Journal (April 2023)

[27] Shareholder Meetings and Freedom Rides: The Story of Peck v. Greyhound (harvard.edu); Shareholder Meetings and Freedom Rides: The Story of Peck v. Greyhound | The Temple 10-Q

[28] "Eligibility for Initial Submissions of Shareholder Proposals" in SEC Modernizes Shareholder Proposal Rules | Jones Day

[29] Rule 14a-8(i)(12) governs resubmission exclusions while 14a-8(i)(7) governs ordinary business exclusions. See the following presentation from law firm Dorsey & Whitney LLP: https://www.dorsey.com/-/media/files/uploads/images/101617_dorsey_webinar_shareholder_proposals_ppt.pdf, p. 15.

Shareholder proposals are filed by a broad range of proponents, including individuals, asset owners, asset managers, and special-interest advocacy groups. However, activists who run their own board candidates tend to be hedge funds with highly concentrated portfolios.

## "Anti-ESG" Proposals

In recent years, the proponent community has broadened to include sponsors with conservative public policy goals. They contrast with the objectives of many shareholder proponents who are focused on environmental and social issues. Some of these conservative proposals request reforms that are loosely tangential to the primary concern driving the submission of the proposal and detailed in their supporting statements.[30] This development has contributed to a lack of clarity for proxy voters.

As a result of the increasing divergence between proponents' requested reforms and the concerns underlying those requests, institutional investors' interest in disclosure of the sponsors of shareholder resolutions has increased.

Thus far, the investor community appears to be rejecting these types of proposals. Average support levels for proposals from 'anti-ESG' proponents have hovered around 3% of votes cast for environmental and social topics and around 15% for governance topics.[31] However, despite the low support levels seen to date, the number of anti-ESG proposals filed increased in 2022 and 2023,[32] a sign that conservative-leaning proponents are continuing to forge ahead.

Because the bulk of these proposals are filed by a small number of proponents, some institutional investors have discussed automatically voting against any proposal filed by these proponents. In order to do so, some institutional investors have called for companies to publicly disclose the identity of proposals' proponents in their proxy filings. However, these calls have spun a debate on whether one should vote for a proposal based on the identity of the proponent or on the merits of the proposal.

## Contested Elections

---

[30] In some cases, proponents of "anti-ESG" proposals adapt language from proposals previously passed by shareholders, but the text of the proposal does not remain internally consistent, leading to confusion for those voting proxies. For more on this filing strategy, see "Section 2: The Tactics Being Used" at https://www.morningstar.com/sustainable-investing/rise-anti-esg-shareholder-proposals.

[31] According to a report by law firm Sullivan & Cromwell, shareholder support for anti-ESG social/political proposals in 1H 2023 was 3%; 15% for governance proposals; and 2% for environmental proposals. Anti-ESG social/political and governance proposals were a few percentage points lower than the same period in 2022, while support for anti-ESG environmental proposals remained the same. *See* https://www.sullcrom.com/SullivanCromwell/_Assets/PDFs/Memos/sc-publication-2023-proxy-season-review-part-1.pdf, p. 6.

[32] Per A brief review of the 2023 US proxy season and what to expect in 2024 (harvard.edu) and Anti-ESG Shareholder Proposals in 2023 (harvard.edu), anti-ESG proposal volume increased over 60% from 45 in 2022 to 79 in 2023. However, support levels dipped further from 3.4% to 2.4% during this period.

Shareholder activists may also nominate their own candidates for board seats at portfolio companies. Running a competing slate of directors against the company's board is not an uncommon practice; however, these campaigns occur far less frequently than shareholder proposals. Their campaigns are further aided by the adoption of universal proxy card rules by the SEC in 2022. Under UPC, all validly nominated candidates must appear on all versions of the proxy card circulated for a shareholder meeting, regardless of who nominates the director or who is distributing the proxy card.

This practice was already in place in some non-U.S. markets and reduces barriers to activists getting their nominees elected. While few shareholder activists took advantage of UPC in its first year, board activism activity is beginning to increase in its second year. For instance, Trian Partners nominated two candidates in a bid for seats on Disney's board.[33]

Getting a candidate on the ballot is much easier than getting them elected, however. Despite winning the support of proxy advisor ISS, Trian's candidates lost to Disney's incumbent directors by a significant margin.[34]

The full impact of the universal proxy card will likely manifest over time. Notably, while the UPC has helped some activists gain access to the ballot, it has not led to a surge in proxy contests or director nominations, as many market participants anticipated.[35] Law firm Mayer Brown identified few notable changes in the 2023 proxy season compared to 2022.[36] Dissidents largely nominated the same size slates and spent similar amounts of money on their campaigns, and the number of campaigns was almost unchanged at 61 campaigns in 2023, compared to 60 in 2022.[37] These slow changes notwithstanding, what the UPC has done is put a spotlight on directors as individuals instead of part of a competing slate.

The UPC can also help proponents seek resolutions beyond the scope of director elections. In March 2024, the AFL-CIO and the United Mine workers of America (UMWA) conducted a proxy solicitation at Alabama-based Warrior Met Coal, seeking support from shareholders for five shareholder proposals.[38] Two of the five proposals won majority support at the company's April 25, 2024 annual meeting.[39]

---

[33] https://trianpartners.com/wp-content/uploads/2023/12/Trian-Nominates-Two-Candidates-To-The-Walt-Disney-Company-Board.pdf

[34] Proxy advisory firm ISS backs Nelson Peltz's bid to join Disney's board | MarketWatch; Disney, Bob Iger Defeat Activist Nelson Peltz in Shareholder Vote | Wall Street Journal

[35] The Universal Proxy: An Early Look (harvard.edu)

[36] Many investors expected to see a surge in activist activity shortly after the UPC mandate took effect in September 2022. However, this did not immediately materialize. See More board seat battles expected as universal proxy card mandate takes effect | Roll Call for coverage on the UPC mandate's taking effect, with views from activist investors, proxy advisors, and other corporate governance experts.

[37] 2023 Activism Recap: Universal Proxy Rule Predictions Fell Flat; Director Nomination Rejections on the Rise | Mayer Brown

[38] After Warrior Met Coal strike, miners' union, AFL-CIO urge reforms from stockholders | AL.com

[39] Two of the five shareholder proposals filed at Warrior Met Coal (HCC) — Submit Shareholder Rights Plan (Poison Pill) to Shareholder Vote, and Adopt Proxy Access Right — passed at 51.3% and 99.2% respectively. Three other proposals — Amend Certificate of Incorporation to Prohibit the Issuance of Preferred Stock without Prior Shareholder Approval, Submit Severance Agreement (Change-in-

In some cases, activists can change the composition of the board without their candidates ever appearing on a proxy ballot. Some companies may choose to avoid an expensive, protracted battle for board seats, instead settling with activists by appointing some or all of their director nominees.

In other cases, a company may take steps to address an issue that an activist campaign seeks to address, thus negating the need for their nominees on the board. This took place during Strategic Organizing Group's 2024 campaign to seat three nominees with labor relations expertise on the Starbucks board. The group withdrew its nominees after Starbucks reached an agreement with its union on compensation and collective bargaining rights.[40]

## Transfer of Voting Rights

Some market participants have expressed concern over the prospect of services that could allow beneficial owners to easily monetize their voting rights by transferring them for specific shareholder meetings to the highest bidder in an auction-style marketplace.

While such products could allow beneficial owners to unlock greater economic value from their shares, especially in the case of retail owners whose disaggregated holdings are unlikely to influence the outcome of an election, they also raise concerns about the ability of certain actors with a stake in the vote to manipulate the outcome of an election.

For example, a company's management could purchase the votes for sale needed to support a management-sponsored proposal or to tip the scale against a shareholder proposal that is not aligned with their personal interests. These concerns are even greater during a contested election, where the stakes are much higher for the parties involved than an ordinary election.

The Shareholder Vote Exchange (SVE) helped facilitate such transactions from its nascence in 2023 to its closure in April 2024. SVE users bought or sold fewer than one million votes on the platform. Prices for each vote could vary from 1¢ to 20¢ per share depending on supply and demand, with votes for controversial meetings costing more than those for routine meetings. While SVE attracted a significant degree of attention given its size, it failed

---

Control) to Shareholder Vote, and Commission Third Party Assessment on Company's Commitment to Freedom of Association and Collective Bargaining Rights — failed to win majority support. *See* UMWA and AFL-CIO Conclude Historic Proxy Contest at Warrior Met Coal, Inc. | United Mine Workers of America
[40] Labor group withdraws from Starbucks boardroom battle | Axios

to build a sizable user base or attract institutional investors, which limited its ability to scale commercially.[41]

## End-to-End Vote Confirmation

The proxy voting system in the U.S. is extremely complex, and many investors lack confidence that their votes have been accurately recorded.

However, new technologies and protocols are being implemented to help improve the traceability of votes cast at annual meetings. Since 2022, a working group—of which CII is a member—has made progress in making end-to-end vote confirmation available at nearly 2,500 meetings in the first six months of 2022. Nearly all U.S. companies had it available during the 2023 proxy season, according to Broadridge.[42]

CII's policy on Effective and Efficient Voting states that in order to best serve the public markets and its stakeholders, a proxy voting system should be characterized by accuracy and certainty, and should make the best use of available technologies. It specifically calls out end-to-end vote confirmation as way to enhance certainty and improve the proxy voting system for all stakeholders.[43]

## Pass-Through Voting

Pass-through voting allows investors in commingled funds to express their voting preferences for the underlying securities held within the fund. Pass-through voting arose in response to demands from investors, who previously did not have the ability to exercise voting preferences when invested in companies indirectly through commingled funds. Instead, as owners of record of the underlying securities, mutual fund managers retained the right to vote proxies as they saw fit. [44]

Proponents of pass-through voting say that it increases transparency and allows for individual shareholders' views to be represented in proportion to their economic interests. Furthermore, with the rise of index funds, it can serve as a counterweight to the perceived outsized power held by passive fund managers. However, the complex infrastructure required to support pass-through voting can increase administrative costs for funds and companies.

Major players in the implementation of pass-through voting include Broadridge and Tumelo. Large index

---

[41] Votes for Sale! A Startup Is Letting Shareholders Sell Their Proxies | Wall Street Journal; How to Buy Votes | The Activist Investor by Michael R. Levin

[42] 2023 Proxy Season Key Stats and Performance Ratings | Broadridge; 2023 Canadian Proxy Statistics | Broadridge

[43] CII Policies on Other Issues, Effective and Efficient Proxy Voting, adopted October 24, 2018, https://www.cii.org/policies_other_issues#effective_proxy_voting.

[44] Pass-Through Voting | Broadridge

providers—including BlackRock, State Street and Vanguard—have begun pilot-testing pass-through voting for certain funds and clients. However, investors in these funds do not have the option to vote on each individual security. BlackRock allows clients to choose from six different policies (such as socially responsible or board-aligned) developed by ISS and Glass Lewis, while State Street and Vanguard similarly provide thematic policy options to their fund holders.[45]

Some legislators have also turned their attention to the perceived power and influence of the "Big Three" asset managers and their discretion to vote proxies without input from fund investors. In 2022, U.S. Senator Dan Sullivan (R-Alaska) introduced the *Investor Democracy is Expected (INDEX) Act*.[46] Similarly to how current pass-through voting trials are structured, the act would require managers of passive funds to solicit voting instructions from their fund investors and vote shares at company meetings according to those instructions.

# Mechanics of Proxy Voting

## How Funds Vote Their Proxies

A cornerstone of ERISA policy is that fund fiduciaries are required to vote all shares on matters that can potentially affect the economic value of the shares in its portfolio.

While the same standard applies for voting foreign proxies, the DOL says fiduciaries should consider: (1) whether the cost of voting the foreign shares outweighs the potential economic benefit to the plan of voting; and (2) whether the difficulty and expense in voting the shares is reflected in their market price. As a result, some ERISA funds have different approaches to voting domestic vs. international proxies.

The most recent version of the ERISA rule, which took effect in 2023, reaffirms this principle. It clarified that fiduciaries should vote their shares unless there is a compelling reason not to. The 2023 version removed certain language that appeared permissive of fiduciaries abstaining from voting and suggested that proxy voting deserves greater scrutiny than other plan activities.[47]

Governance proposals remain popular ballot items, but environmental and social topics have also gained traction. The five shareowner proposals that appeared most often on company ballots in 2019 pertained to:

---

[45] Institutional Pass-Through Voting | Morrow Sodali
[46] Sullivan Introduces INDEX Act to Empower Investors and Neutralize Wall Street's Biggest Investment Firms (senate.gov)
[47] Final Rule on Prudence and Loyalty in Selecting Plan Investments and Exercising Shareholder Rights | U.S. Department of Labor; "4. The Final Rule reaffirms the fiduciary duty to vote proxies and exercise shareholder rights." in DOL Reframes ESG Investing and Proxy Voting for ERISA Fiduciaries | Morgan Lewis

- Political lobbying disclosure and action

- Independent board chair

- Board and workplace diversity and equity

- Environmental disclosure and action

- Right to act by written consent

In 2023, the most common proposal topics on company ballots concerned:[48]

- Climate change

- Independent board chair

- Nondiscrimination and diversity

- Shareholder approval of severance agreements

- Special meetings

Average investor support for shareowner proposals has increased substantially since 1990, when support averaged 10%. As of May 31, 2024, average support stood at 20.6% and 22 proposals received majority support.[49] While the volume of shareholder proposals continues to increase year-over-year, support levels have eroded from a record-high of 34.3% in 2021, especially for environmental and social proposals.

More recently, investors have shown a renewed focus and interest toward governance and compensation proposals. These proposals are driving an annual increase in the overall volume of shareholder proposals, even as fewer environmental and social proposals have been filed since 2021. These proposals also receive greater support at the ballot, having scored 34.9% median support in 2024, while environmental and social proposals won 21% and 20.7% median support, respectively.[50]

## Vote Decisions

ERISA plan assets must be held in trust by one or more trustees. Plan trustees are solely responsible for voting proxies unless the trustees are subject to voting directions provided by a named fiduciary or the named fiduciary has delegated voting to investment managers.

---

[48] "The five most popular proposal topics in 2023, representing 43% of all shareholder proposal submissions, were (i) climate change, (ii) independent chair, (iii) nondiscrimination and diversity-related, (iv) shareholder approval of certain severance agreements, and (v) special meetings." *See* Shareholder Proposal Developments During the 2023 Proxy Season (harvard.edu)

[49] Figures for 2024 YTD are for Jan 1 to May 31, at Russell 3000 companies. Of the 273 proposals voted in 2024, 8.1% (or 22 proposals) received majority support. *See* Pro-ESG Shareholder Proposals Regaining Momentum in 2024 (harvard.edu)

[50] Russell 3000 companies, Jan 1-May 31, 2024. *See* "Reversal of Declining Support on ESG, Led by Governance and Compensation Proposals" in Pro-ESG Shareholder Proposals Regaining Momentum in 2024 (harvard.edu)

A named fiduciary is a person or entity identified as a fiduciary in the plan, or who is named as a fiduciary by the plan sponsor. ERISA considers proxy voting services to be "investment managers" if they are registered with the SEC as investment advisors.

A trustee generally is not liable for voting decisions if the trustee has followed the instructions of the named fiduciary. But a plan trustee is supposed to analyze the instructions to determine whether they comply with the plan and with ERISA. A trustee who blindly follows voting directions that violate ERISA could be held liable for breach of fiduciary duty.

A named fiduciary can leave investment decisions to outside money managers but retain the right to direct plan trustees to vote proxies—with or without instructions on how to vote. But if the named fiduciary does not reserve the proxy voting right, then the investment manager has the exclusive right to make proxy voting decisions, and it can be held liable for those votes. A fund that uses several investment managers can authorize one of them to vote the proxies of all the plan's investments.

Investment managers and investment advisors also have fiduciary duties to vote in their client's best interest, if they are given voting authority. As emphasized in the 2019 SEC guidance, retaining a third-party proxy advisory firm does not relieve the investment advisor from its fiduciary duties.

Under ERISA, defined contribution plans—but not defined benefit plans—can give their participants the right to respond to tender offers or cast proxy votes. If voting authority is "passed through" in this way, the named fiduciary is not liable for the results of how participants voted.

## Share Lending

Share lending is an arrangement whereby a fund can lend some of its shares in a company to a borrower in exchange for collateral and a fee. Share lending is an established practice in many different markets and can even benefit the fund economically by allowing them to generate additional revenue from their portfolio holdings. Share lending also benefits markets by increasing liquidity and facilitating short selling.

However, because legal ownership of the shares is transferred to the borrower for the duration of the loan, the fund loaning its shares loses many ownership rights during that period, including the right to vote those shares at an annual meeting.

If a fund loans out its shares, then it cannot vote the proxies of those shares unless it recalls them by the record date. The record date is the date a public company establishes for determining who its shareowners are for the purposes of voting at the annual meeting and receiving a dividend. Voting rights generally cannot be separated from shares. When funds lend shares, the borrower acquires the right to vote them. If a fund wants to vote the shares that it has loaned out, it must recall the shares before the record date. Many see share lending as a potential area where blockchain-based technology can help ensure shares are voted correctly and efficiently.

Funds may or may not be required to recall and vote shares that they have loaned to others, depending on their fiduciary responsibilities. In a Feb. 20, 1992, letter to ISS, the DOL said that corporate and union pension plans must consider their fiduciary responsibilities and judge whether to recall and vote loaned shares.[51] Fiduciaries have to weigh the potential benefits of securities lending—such as additional revenue—against the value of the vote.

They must consider the possibility that the borrower may cast votes that clash with the fund's policies and priorities. In cases where the value of the vote is greater than the gains of lending shares, the fund has a duty to recall the shares or prevent them from being loaned in the first place.

One study found that investors are more likely to recall shares to vote at companies with weaker corporate governance and a smaller market capitalization.[52] Investors are also more likely to recall shares when they are voting against management proposals and for shareholder proposals, according to the study. In addition, the study found that funds recalled shares 40% more often when faced with a corporate control-related proposal.

---

[51] See https://www.sec.gov/comments/4-537/4537-25.pdf, p. 20.
[52] "The Role of Institutional Investors in Voting: Evidence from the Securities Lending Market" by Reena Aggarwal, Pedro A. C. Saffi, and Jason Sturgess, https://www.unsw.edu.au/business/sites/default/files/seminars-conferences/seminar-pedro-saffi.pdf

# Appendix A

## Proxy Voting Guidelines

Many funds use proxy voting guidelines not only to disclose how they generally vote on certain common proposals, but also to explain the basis for those inclinations. Here are examples of how different CII members (public funds, union funds and money managers) address proposals on corporate political spending in their proxy voting guidelines:

## Public and Union Funds

### State of Connecticut Office of the Treasurer:[53]

**Corporate Political Expenditures**

Political contributions can benefit the strategic interests of a company. Shareholders understand that corporate participation in the political process including through political contributions can benefit companies strategically and contribute to value creation. However, shareholders are concerned that board level policies and processes need to exist to ensure that such giving is aligned with shareholders' long-term interests. Shareholders are concerned about the influence of corporate political giving. This activity has the potential to create risks to shareholder value, through reputational harm and through reactions by employees and/or customers.

Shareholders seek to understand who sets political giving policies, who makes the decisions on contributions, and what types of internal controls are in place at the board level to manage, monitor and disclose political contributions, and manage related risks. Shareholders are not interested in obtaining disclosure of the reason specific contributions are made, but instead seek data on contributions and an understanding of mechanisms, such as board-level policies and processes, through which the board exercises oversight over the process.

It is not an appropriate role for shareholders to vote on specific political expenditures--whether such vote is in the form of an advisory proposal or would be binding.

Corporate political expenditures can be direct in the form of campaign contributions or indirect in the form of advertising or publicity on politically related issues.

In the aftermath of the U.S. Supreme Court ruling in *Citizens United*, which ruled that corporations have a constitutional right to free speech – including political advertising – new forms of corporate political spending have emerged. New organizations have been created under sections 501(c) (4), 501 (c) (5) and 501 (c) (6) of the Internal Revenue Code that receive corporate contributions and engage in political advertising. These organizations are not required to disclose their donors.

The CRPTF will vote FOR shareholder resolutions that request companies to provide greater disclosure of corporate campaign financing.

The CRPTF will vote FOR shareholder resolutions that request companies to disclose any and all corporate expenditures for advertising in support of, or in opposition to, any political candidate, issue, and/or ballot referendum, including contributions to political candidates, political action committees, 501(c) (3, 4, and 5) organizations or any other expenditure which may be used to influence an election.

The CRPTF will vote FOR shareholder resolutions that call on the board to establish corporate political giving guidelines and internal reporting provisions or controls.

---

[53] https://portal.ct.gov/-/media/OTT/Pension-Funds/Proxy-Voting/110122CRPTF-Proxy-Voting-Policies-2022.pdf, p. 35-36, accessed Feb 12, 2024.

The CRPTF will vote AGAINST shareholder resolutions that seek shareholder input to corporate political giving policies or on the contributions themselves.

The CRPTF will vote AGAINST shareholder resolutions seeking an advisory vote on political contributions.

## AFL-CIO Staff Retirement Plan:[54]

### Political Contributions and Lobbying

The voting fiduciary should support proposals that seek disclosure and board level oversight of corporate political contributions and lobbying expenditures. The expenditure of corporate assets for political contributions is expected to grow as a result of the U.S. Supreme Court's 2010 decision in Citizens United v. Federal Election Commission. Absent a system of transparency and accountability, company assets may be used to pursue policy objectives that are inimical to the long-term interests of the company. Publicly available data on corporate political contributions and lobbying expenditures do not provide a complete picture of these activities. Investors need complete disclosure to be able to evaluate the use of corporate assets for political contributions and lobbying expenditures.

## State Board of Administration of Florida:[55]

### Political contributions and expenditure—

Companies should disclose the amount and rationales for making donations to political campaigns, political action committees (PACs), and other trade groups or special interest organizations. SBA typically considers the following factors:

* Recent significant controversy or litigation related to the company's political contributions or governmental affairs;
* The public availability of a company policy on political contributions and trade association spending, including the types of organizations supported;
* The business rationale for supporting political organizations;
* The board oversight and compliance procedures related to such expenditures of corporate assets.

## Asset Managers

## T. Rowe Price:[56]

### Shareholder proposals related to political spending and lobbying

CASE-BY-CASE, if we believe the decision to engage in political or lobbying activities poses a unique risk for a particular company and it is unclear whether the board oversees and monitors such risk adequately, T. Rowe Price will generally support shareholder resolutions seeking additional disclosure. A company's level of disclosure on this issue relative to its peers is a consideration, as is the level of consistency between a company's public statements on ESG issues and the nature of its lobbying activity.

## BlackRock: [57]

### Corporate political activities

Companies may engage in certain political activities, within legal and regulatory limits, in order to support public policy matters material to their long-term strategies. These activities can also create risks, including: the potential for allegations of corruption; certain reputational risks; and risks that arise from the complex legal, regulatory, and compliance considerations associated with corporate

---

[54] https://aflcio.org/sites/default/files/2017-03/proxy_voting_2012.pdf, accessed Feb. 12, 2024
[55] https://www.sbafla.com/fsb/Portals/FSB/Content/CorporateGovernance/ProxyVoting/SBA%20Corporate%20Governance%20Principles%20and%20Proxy%20Voting%20Guidelines%20FY2023-2024.pdf?ver=2023-10-31-133554-670, p. 19, accessed Feb. 12, 2024
[56] https://www.troweprice.com/content/dam/trowecorp/Pdfs/proxy-voting-guidelines-TRPA.pdf, p. 5, accessed Feb. 12, 2024.
[57] https://www.blackrock.com/corporate/literature/fact-sheet/blk-responsible-investment-guidelines-us.pdf, p. 20, accessed Feb 12, 2024.

political spending and lobbying activity. Companies that engage in political activities should develop and maintain robust processes, including board oversight, to guide these activities and mitigate risks.

We depend on companies to provide accessible and clear disclosures so that investors can easily understand how their political activities support their long-term strategy, including on stated public policy priorities. When presented with shareholder proposals requesting increased disclosure on corporate political activities, BIS will evaluate publicly available information to consider how a company's lobbying and political activities may impact the company. We will also evaluate whether there is general consistency between a company's stated positions on policy matters material to their strategy and the material positions taken by significant industry groups of which they are a member. We may decide to support a shareholder proposal requesting additional disclosures if we identify a material inconsistency or determine that further transparency may clarify how the company's political activities support its longterm strategy.

Our publicly available commentary provides more information on our approach to corporate political activities.

## Proxy Advisors

Proxy advisors similarly keep and annually update in-house voting policies. Here is an example of one proxy advisor's voting policies on corporate political spending:

### ISS Stoxx:[58]

**Political Expenditures and Lobbying Congruency**

**General Recommendation:** Generally vote case-by-case on proposals requesting greater disclosure of a company's alignment of political contributions, lobbying, and electioneering spending with a company's publicly stated values and policies, considering:

- The company's policies, management, board oversight, governance processes, and level of disclosure related to direct political contributions, lobbying activities, and payments to trade associations, political action committees, or other groups that may be used for political purposes;

- The company's disclosure regarding: the reasons for its support of candidates for public offices; the reasons for support of and participation in trade associations or other groups that may make political contributions; and other political activities;

- Any incongruencies identified between a company's direct and indirect political expenditures and its publicly stated values and priorities; and

- Recent significant controversies related to the company's direct and indirect lobbying, political contributions, or political activities.

Generally vote case-by-case on proposals requesting comparison of a company's political spending to objectives that can mitigate material risks for the company, such as limiting global warming.

---

[58] https://www.issgovernance.com/file/policy/active/americas/US-Voting-Guidelines.pdf, p. 79, accessed Feb 12, 2024. This version of the ISS voting guidelines was published in early January 2024 and is effective for meetings on or after Feb 1, 2024.

# Appendix B
## Department of Labor's "Avon Letter" on ERISA Fiduciary Standards

February 23, 1988
Board Avon Products, Inc.
9 West 57th Street
New York, NY 10019
Re: Avon Products, Inc. Employees' Retirement Plan

Dear Mr. Fandl:

The Pension and Welfare Benefits Administration (PWBA) of the Department of Labor is responsible for the administration and enforcement of Title I of the Employee Retirement Income Security Act of 1974 (ERISA). Title I establishes standards governing the operation of employee benefit plans and includes fiduciary responsibility rules governing the conduct of plan officials and others who exercise discretionary authority or control with respect to the assets of employee benefit plans such as the Employees' Retirement Plan (the Plan) which are subject to ERISA.

PWBA has concluded its investigation of the Plan and of your activities as a fiduciary of the Plan, in connection with certain activities concerning the voting of proxies appurtenant to shares held in the accounts of the Plan's investment managers. The facts adduced during this investigation are not conclusive, however, because of the possibility that violations have occurred, and in view of the recurring nature of this aspect of plan asset management, we believe that it would be appropriate to apprise you of the Department's views concerning the general fiduciary obligations of a named fiduciary and an investment manager appointed pursuant to section 402(c)(3) of ERISA with respect to the voting of proxies on plan-owned stock. Since we expect that this information will be useful to the other members of the Plan's retirement board and to the investment-managers of the Plan, we are providing them with copies of this letter.

## 1. The Applicable Provisions of ERISA

Taken together, the provisions of ERISA sections 402, 403, 404 and 405 are intended to, among other things, provide a basis for certainty regarding the identity and responsibilities of those parties involved in managing
and operating the plan as well as each party's liability for mismanagement.

Section 402(a) of ERISA provides that every employee benefit plan shall be established and maintained pursuant to a written instrument. This instrument must provide for one or more named fiduciaries who have authority to control and manage the operation and administration of the plan. The named fiduciaries may be either named in the plan instrument or chosen, through a procedure specified in the plan, by the plan sponsor.

Section 402(b)(2) of ERISA requires plans to describe any procedure for allocating responsibilities for operation and administration of the plan, including any procedure described in section 405(c)(1).

Section 405(c)(1) of ERISA provides, in part, that the named fiduciaries may designate persons other than named fiduciaries to carry out fiduciary responsibilities (other than trustee responsibilities) under the plan.

Section 405(c)(3) of ERISA defines "trustee responsibility to mean any responsibility provided in the plan's trust instrument to manage fiduciary to appoint an investment manager in accordance with section 402(c)(3).

Section 403(a) of ERISA provides, in part, that all assets of an employee benefit plan must be held in trust by one of more trustees. The trustees(s) must have exclusive authority and discretion to manage and control such assets, with two exceptions: (1) when the plan expressly provides that the trustee(s) are subject to the direction of a named fiduciary who is not a trustee, in which case the trustees are subject to proper directions made in accordance with the terms of the plan and not contrary to ERISA, and (2) when the authority to manage, acquire or dispose of assets of the plan is delegated to one or more investment managers pursuant to section 402(c)(3).

Section 402(c)(3) of ERISA states that a plan may provide that with respect to control or management of plan assets a named fiduciary may appoint an investment manager or managers to manage (including the power to acquire and dispose of) plan assets.
Section 3(38) of ERISA defines "investment manager" as any fiduciary (other than a trustee or named fiduciary) (A) who has the power to manage, acquire, or dispose of any plan asset; (B) who is (i) a registered investment advisor under the Investment Advisers Act of 1940: (ii) a bank: or (iii) an insurance company; and (C) who has acknowledged in writing that he is a fiduciary with respect to the plan.

Section 405(c)(2) of ERISA provides, in part, that if a plan expressly provides for a procedure described in section 405(c)(1), and pursuant to such procedure a person is designated to carry out a fiduciary responsibility of a named fiduciary, then such named fiduciary shall not be liable for an act or omission of such person in carrying out such responsibility except to the extent that (A) the named fiduciary violated section 404(a)(1) -- (i) with respect to such designation, (ii) with respect to the establishment or implementation of the procedure under 405(c)(1), or (iii) in continuing the designations or (B) the named fiduciary would otherwise be liable under ERISA section 405(a).

Section 404(a)(1)(B) of ERISA requires a fiduciary to discharge his duties to a plan with the care, skill, prudence and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims.

Section 404(a)(1)(D) of ERISA requires a fiduciary to discharge his duties in accordance with the documents and instruments governing the plan insofar as such documents and instruments are consistent with the provisions of Titles I and IV of ERISA.

## 2. Proxy Voting by Plan Fiduciaries

In general, the fiduciary act of managing plan assets, which are shares of corporate stock, would include the voting of proxies appurtenant to those shares of stock. For example, it is the Department's position that the decision as to how proxies should be voted with regard to the issues presented by the fact pattern are fiduciary acts of plan asset management: a proposal to change the state of incorporation of a corporation in which a plan owned shares (thereby possibly affecting shareholders' rights to participate in the decision-making process of the corporation which, in turn, affects the value of their investment) and a proposal to rescind "poison pill" arrangements with regard to various corporations in which a plan is invested. Moreover, because voting such proxies involves plan asset management, section 403(a) requires that plan trustees have the exclusive authority and responsibility for voting these proxies, unless one of the two exceptions stated in section 403(a) applies.

To the extent that the documents governing the plan permit a named fiduciary to appoint an investment manager pursuant to sections 402(c)(3) and 403(a)(2) of ERISA to manage, acquire, and dispose of plan assets, there would be an ERISA violation if, during the duration of such delegation, either the trustee or the named fiduciary makes the decision how to vote any proxy appurtenant to shares owned by the plan with respect to which the investment manager has investment authority because under the plan documents neither the trustee nor the named fiduciary has authority to make that decision with regard to those shares. Indeed, under such plan provisions if any person other than the investment manager (or a person under the fiduciary supervision of the investment manager)[i] were to make the proxy voting decision, there would be a section 404(a)(1)(D) violation because that person does not have that fiduciary authority under the plan. Finally, with limited exceptions[ii], the named fiduciary, having delegated such responsibility to the investment manager, no longer has the authority to decide how the investment manager votes proxies and would be engaging in a section 404(a)(1)(D) violation in doing so unless, in delegating such management responsibility to the investment manager, it reserves to itself the right to vote proxies.[iii]

Moreover, ERISA contains no provision which would relieve an investment manager of fiduciary liability for any decision he made at the direction of another person under ERISA'S construct, only trustees are able to relieve themselves of fiduciary responsibility and related liabilities by accepting directions, if plan documents so provide, and then only if such directions are "proper directions" made in accordance with the terms of the plan and not contrary to ERISA. Furthermore, neither section 3(38) nor 405(e) of ERISA grants an investment manager the powers of a named fiduciary to allocate or designate its investment management function for plan assets to other persons so as to relieve itself of its fiduciary responsibilities and related liabilities Therefore, to the extent that anyone purports to direct an investment manager as to the voting of proxies, or to the extent that an investment manager purports to delegate to another the responsibility for such voting decisions, the manager would not be relieved of his own responsibilities and related liabilities merely because he either follows the direction of some other person, or has delegated the responsibility to some other person The manager would continue to have full responsibility (and liability) for the exercise of the proxy voting decision.

Finally, the Department notes that section 404(a)(1)(8) requires the named fiduciary appointing the investment manager to periodically monitor the activities of the investment manager with respect to the management of plan assets. In general, this duty would encompass the monitoring of decisions made and actions taken by investment managers with regard to proxy voting. In this regard, it is the opinion of the Department that section 404(a)(1)(B) requires proper documentation of the activities of the investment manager and of the named fiduciary of the plan in monitoring the activities of the investment manager. Specifically, with respect to proxy voting, this would require the investment manager or other responsible fiduciary to keep accurate records as to the voting of proxies.[iv]

We trust you will find the above information useful in discharging your ERISA responsibilities during the 1988 proxy season and thereafter.

Sincerely,

Alan D. Lebowitz
Deputy Assistant Secretary

# Foster Declaration Exhibit 14

**Recommendation of the SEC Investor Advisory Committee (IAC)
Relating to SEC Guidance and Rule Proposals on Proxy Advisors and Shareholder Proposals**

**(January 24, 2020)**

This recommendation addresses recent SEC actions regarding the proxy system, including two guidance documents and two rule proposals (the **PA/SP actions**).[1]  The Investor Advisory Committee (**IAC**) shares the Commission's interest in revisiting the voting system as practices and participants have evolved over time. Periodically reviewing whether SEC oversight is aligned with market practices helps assure that investors are well protected.  The PA/SP actions, when viewed together, will affect the rights and opportunities of investors to engage effectively in the governance of the companies in which they invest.

The IAC has long urged the Commission to address a variety of problems in the proxy system, and there are valuable elements in the PA/SP actions, such as improved disclosure on proxy advisor conflicts of interest.[2] While we appreciate the Commission's effort to seek a productive balance in a changing environment for corporate governance and shareholder engagement, we are concerned the PA/SP actions may collectively shift the balance in a manner that does not serve investor interests.

We believe the PA/SP actions as currently framed will not reliably achieve their stated goals, because the system is in need of more basic reform, and because it is necessary to establish a link between the actions and clearly identified problems. Finally, we believe that reasonable alternatives deserve consideration.

We urge the Commission to consider the following questions and points in assessing next steps in this area.

- What will the **cumulative impact** of these initiatives be on investors, and what is the potential for unintended consequences of the combined actions?  In particular, the Commission should ensure that it has a good understanding of the impact of these initiatives on small and mid-sized market participants, and ensure that it will not result in unjustified additional burdens and costs on small and mid-sized asset managers that will impair their ability to perform their responsibilities to clients.
- Will the proposals preserve the critical role that proxy advisory firms play in the dissemination of information and in providing the **practical machinery** of proxy voting for the vast majority of shareholders (through their representatives)?  These services are essential to the smooth functioning of shareholder engagement in governance and are not dependent on recommendations or advice on how to vote on specific matters.  As discussed more below, we recommend the Commission further evaluate the impact these initiatives may have on the market for proxy advisory services.  There is a risk the proposals could impair the ability of proxy advisors to sustain their businesses, and deter new competitors to enter the business, which could result in increased monopoly power and more – not fewer – one-size-fits-all voting outcomes.
- Are the proposals tightly linked to **clearly identified problems**, and are there **better alternatives**? As detailed below, we recommend a focus on the economic analysis in the releases and a presentation of the specific proposals to ensure they meet the Commission's stated objectives.  In doing so the Commission may be better positioned to develop a broader range of alternatives that may be more likely to achieve the stated goals of the proposals at a lower net social cost.

More specifically, we make three overall recommendations:

- **Revisit Priorities**.  We reiterate our belief that the PA/SP actions simply do not address the most serious issues in the current proxy system – such as **counting votes correctly**.  We believe it critical

that the SEC take up end-to-end vote confirmations, reconciliations, and universal proxies.[*]  Despite inclusion in the SEC's overall proxy system agenda, despite our previous recommendations, no formal guidance or rulemaking regarding proxy plumbing yet have been published by the SEC, and the SEC has not moved to finalize its good 2016 proposal on universal proxies.

- **Revise and Republish the Rule Proposals for Balance and Compliance with SEC Guidance**. The SEC should revise and re-issue the rule proposals to:
  - o Present a balanced assessment of proxy advisors and shareholder proposals.
  - o Comply with SEC guidance on the economic analysis included in the releases.
  - o Present evidence supporting the need for the proposals, rather than stating simply that problems "may" exist.
  - o Address reasonable alternatives to the proposed changes and why they are not more likely to achieve the stated goals of the proposals at a lower net social cost.
  - o More fully address how the PA/SP actions particularly affect small and mid-sized investment managers and "Main Street" shareholders.
  - o Discuss the risk that the proposals could impair the ability of proxy advisors to sustain their businesses, or new competitors to enter the business, which could result in increased monopoly power and more – not fewer – one-size-fits-all voting outcomes.
- **Reconsider the Guidance**.  As the guidance documents did not go through a notice-and-comment process, they did not reflect the input that the rule proposals are now eliciting from knowledgeable stakeholders.  They have generated confusion among many investors, and should be reconsidered in the context of revised rule proposals that respond to the above recommendations.

**Explanation of Recommendations**

1.  **Revisit and establish priorities in improving the proxy system**

We reiterate our belief that what is wrong with the current proxy system – such as challenges that currently exist to counting the votes correctly – are simply not addressed in the PA/SP actions.  We continue to recommend that the SEC take up end-to-end vote confirmations, reconciliations, and universal proxies before spending more time on the PA/SP proposals.  The basic plumbing for determining board elections is at the heart of the corporate governance system, and getting a reliable vote count on a timely basis affects all shareholders.  These are foundational questions where there is a broad investor consensus that the system has basic problems.  Yet to date, no SEC actions in these areas have occurred.

The challenges in remedying proxy plumbing are not simple.  As we have previously noted, private actors have failed to implement reforms on their own for decades.  We believe SEC action is necessary, and getting that action right will not be easy.  For reasons we discuss below, the PA/SP actions involve questions that will require much more hard work to be made ready for adoption in a manner consistent with the statutory framework and with investor interests.

The proxy plumbing issues we have identified in the past are fundamental to the entire proxy voting system. If shareholders do not believe that the outcome of a vote accurately reflects their intent, changes to the role of proxy advisors would occur in the context of an unreliable system. Likewise, bearing in mind that the vast majority of shareholder proposal votes are non-binding, if the ability of shareholders to vote on those proposals is not reliable, this will lead to escalating conflict between shareholders and their fiduciaries, regardless of what shareholder proposal resubmission thresholds or limitations on proxy advisors the Commission seeks to adopt.  The ability of the system to reduce agency costs and capital costs depends on it

---

[*] Recommendation of the SEC Investor Advisory Committee (IAC) Proxy Plumbing September 5, 2019, available at https://www.sec.gov/spotlight/investor-advisory-committee-2012/iac-recommendation-proxy-plumbing.pdf.

2

being accurate and resilient, and changes in the rest of the system will simply have less of an effect until that ability is established.

### 2. Improve conflict-of-interest disclosure generally

We agree that conflict of interest disclosure is important for all major participants in the securities markets, including proxy advisors. We note that the SEC already has in place such disclosure requirements, and commend the SEC for endeavoring to improve the quality of the disclosures that are actually made about conflicts of interest, as in the rule proposal on proxy advisors. As discussed below, however, we are unsure whether the first choice should be new rules, or should be better enforcement of existing rules. We also believe that any improvements made should not be limited to proxy advisors, but considered for other market actors, such as credit ratings agencies, broker-dealers, securities analysts,[3] corporate directors, and investment advisers. In general, we believe that investors need to be confident that when they seek advice that advice is objective and given with investors' interest in mind. As discussed more below, the draft rule appears to treat proxy advisors inconsistently with other advice providers and in a number of respects it could have the effect of creating unmanageable conflicts of interest by inserting SP issuer in the advisory process.

### 3. Add a more balanced presentation of the value of proxy advisors and shareholder proposals

We commend the SEC for noting the value of proxy advisors and shareholder proposals, as when it states "We recognize that proxy voting advice businesses can play a **valuable role** in the proxy voting process,"[4] and that "institutional investors have found **efficiencies** in hiring these businesses to perform voting-related services, rather than performing them in-house."[5] With respect to shareholder proposals, the SEC correctly notes that "A shareholder proposal could be value enhancing not only because it could motivate a **value-enhancing change,** but also because it could **limit insiders' entrenchment** and **provide management with information** about the views of shareholders."[6] These statements are true and important.

Yet these statements about the value of proxy advisors and shareholder proposals make up 34 words each out of 107,000 words in the two rule releases. In the economic analysis of the releases, discussed below, there is no sustained description or analysis of the benefits of proxy advisors and shareholders, even though the SEC is required by law and its own guidance to discuss "costs" of the proposals to the baseline benefits of the regulated activity. This imbalance is notable given that SEC Commissioner Elad Roisman noted at the SEC's Proxy Roundtable that multiple panelists had clearly described "the role and importance that these firms [i.e., proxy advisors] provide to asset managers."[7] It is also notable given that the SEC's own guidance for economic analysis states that any release proposing a rule "should evaluate the costs and benefits even-handedly and candidly" and "frame costs and benefits neutrally and consistently."[8]

There is a marked contrast between lengthy recitation of problems that proxy advisors and shareholder proposals "may" create, on the one hand, and a negligible discussion of their benefits, on the other hand. The imbalanced presentation deprives the public of an adequate foundation for commenting on the proposals. The presentation fails to draw on the extensive discussion and evidence of the benefits of proxy advisors and shareholder proposals at the SEC's Proxy Roundtable, some of which we present below.

**Annex A** contains an overview of some benefits of proxy advisors and shareholder proposals as a starting point for a more balanced pair of revised proposed rule releases. We recommend inclusion of a more balanced presentation of the value of proxy advisors and shareholder proposals to the proxy system.

### 4. Comply with SEC guidance on economic cost-benefit analysis

Any SEC rule release should contain a cost-benefit (or "economic") analysis that complies with existing SEC guidance on rule proposals and case law cited in that guidance.[9] The PA/SP actions do not contain adequate

economic analyses, the most basic elements of which are outlined in this section.† Under the SEC's own guidance, and case law cited in that guidance, an economic analysis cannot simply be added in a final or adopting rule release to justify or rationalize a final approved rule. Rather, it should be contained in the proposing release to explain the need for the proposed rule.[10] This is so the public can understand the SEC's analysis and judgment, and provide comments on not simply the text of the proposed rule, but how well it matches identified purposes and how adequately the SEC's deliberations have been prior to rule proposals.

> a.  Identify clearly relevant market failures or other need for regulation

We recommend that the PA/SP actions clearly identify a market failure or other need for proposed rules. While there are various statements about what some corporate managers perceive to be "problems" in the current system, and therefore a "need" for improvements in the way voting advice is provided by proxy advisors, there is no statement as to why the SEC believes that the market – and private actors on their own – cannot satisfy that need on their own, or at least better respond to any such need than via a government mandate. Without a foundational component of economic analysis, the rule releases do not comply with the standards the SEC has sensibly set for itself. We recommend that the SEC revise and republish both rule proposals to clearly identify the market failures or other needs for regulation, so the public can evaluate the fit between the rule proposals and the market failure they are meant to address.

> b.  More fully set forth existing proxy advisor client protections as part of baseline

We endorse the idea in SEC's prior guidance that economic analysis should present a clear and complete statement of the relevant "baseline," the state of the world prior to adoption of the rule in question. In the case of proxy advisors, the proposing rule release is devoid of sustained analysis of the actual market affected by the proposed rule: the market for voting advice, in which existing legal protections are part of the relevant regulatory baseline. Proxy advisors have sophisticated institutional clients, who enter into contracts with the advisors, and are protected by state and federal laws against fraud. The rule releases identify no reason that traditional market pressures and self-help via contract and private enforcement of contract and tort law cannot do a better job of protecting the interests of proxy advisor clients than government-mandated regulations of the type proposed.

Relevant to the existing regulatory baseline are existing rules of the SEC. To extent the SEC believes the problem is with asset managers overly or recklessly relying on or failing to adequately consider conflicts in relying on proxy advisor recommendations, the SEC already has in place Rule 206(4)-6 of the Investment Advisers Act that requires investment advisers to have policies and procedures reasonably designed to ensure that they are fulfilling their fiduciary duties under state and federal law in respect of voting, including use of proxy advisors. The SEC has two divisions -- OCIE and Enforcement -- available to enforce duties and rules applicable to investment advisers. Nothing disclosed to the public suggests that OCIE or Enforcement is detecting widespread problems with investment advisers in respect of fulfilling their duties.[11]

The releases do not provide reasons why contracts, duties, rules and other legal protections are inadequate to protect the proxy system in the context of proxy advisors, which leaves us and the public in the dark as to the SEC's reasons for intervening here, but not in other parts of the proxy system. We recommend the SEC revise and republish the proxy advisor proposal to make clear why it thinks that the proxy advisor firm clients cannot use contract or rely on other protections at least as efficiently as the rule proposal's changes to guard against the problems that are said "may" exist (errors, conflicts of interest).

---

† Some members of the IAC would point out other limits or shortcomings in the economic analysis and in the paperwork analysis, but this recommendation leaves out those points both due to keep the recommendation shorter and because not all members view those additional points as appropriate for an IAC recommendation.

     c.   Cite reliable evidence of any material "problem" with proxy advisors[‡]

We recommend the SEC cite **evidence** of a problem of the kind that might be addressed by the key elements of the proxy advisor proposal – specifically, the part of the proposal mandating preclearance of draft reports with corporate managers and silencing advisors from speaking to their clients for at least a week[12] while managers review the reports. Instead, the SEC notes that some private interests, such as some corporate managers and their lawyers and trade group representatives, claim problems with proxy advisors exist, such as errors in advice given. The most the SEC says is that such problems "may" or "could" exist.

It is true the SEC cites to sources that assert that errors in proxy advisor reports exist. But a brief review of those sources shows that they provide no reliable basis for concluding material problems actually do exist, particularly problems that cannot otherwise be addressed by market responses, private action, contract, or heightened SEC enforcement of existing rules and duties. For example, the SEC states that

> concerns have been expressed …, particularly within the registrant [i.e., corporate manager] community, that there **could be** factual errors … in proxy voting advice businesses' analysis and information underlying their voting advice that **could** materially affect the reliability of their voting recommendations and **could** affect voting outcomes...[13]

In support, the only specific registrant source that the SEC cites is a letter from Exxon Corporation.[14]

In fact, however, the Exxon letter, fairly read, actually supports the opposite of the idea that there "could" be a significant number of material "factual errors" in proxy advisor reports. The Exxon letter candidly states that "**ISS traditionally has responded promptly to these sorts of errors** which are generally available in our proxy and could undermine client confidence in the quality control applied to ISS reports if left uncorrected." That is, Exxon thinks the largest proxy advisor already does a good job at fixing factual errors, and does so for market-driven reasons. By "these sorts of errors," Exxon makes it clear it means truly factual errors about which no reasonable person could in fairness view as a difference of opinion. (We discuss opinions and mixed fact/opinions below.)

No other source cited by the SEC to support the idea that more than a trivial number of factual errors "may" exist in fact show they exist, and none shows that **any** errors were material to the outcome of an actual shareholder vote.[15] SEC data – summarized later in the rule release[16] but undiscussed in the section that tries to outline the problems motivating the proposal -- show the number of factual errors is likely to be trivially small. From over 17,000 shareholder votes over three years, the number of possible factual errors identified by companies themselves in their proxy supplements amounts to **0.3%** of proxy statements – and **none** of those is shown to be material or to have affected the outcome of the related vote.[17]

| | Data from SEC Proxy Advisor Proposal Table 2 | Number | As % of row 1 |
|---|---|---|---|
| 1 | Companies filing proxy statements 2016-2018 | 17,296 | |
| 2 | Supplemental proxy statements filed by company managers claiming errors in proxy advisor reports | 260 | 1.5% |
| 3 | Classified by SEC as "factual errors" | 54 | 0.3% |
| 4 | Shown to be "material" errors | 0 | 0.0% |
| 5 | Shown to affect outcome of vote | 0 | 0.0% |

Readers of the proxy advisor rule release would have benefited from some relevant baseline for what is possible for how error-free any complex analysis could realistically be expected to be. The SEC has available

---

[‡] One member of the IAC does believe that issuer review of proxy recommendations is a good idea. Other members do not. All voting for the recommendation, however, recommend that the SEC revise and republish after considering and addressing the points made in the overall recommendation.

5

credit rating agency analyses[18] and security analyses by broker-dealers[19] that could have been compared for this purpose. The SEC presents no analysis of that kind, or any other method for the public or the SEC itself to evaluate the significance of the 0.3% error rate it reports for proxy advisor reports.[20]

The SEC also has available methods to test the factual basis for proxy advisor reports.[21] The SEC could survey investment managers who are the proxy advisors' clients, and ask if they have found uncorrected, material factual errors to be common, or indeed, ever a problem. (Indeed, the SEC did ask that kind of question at its Proxy Roundtable, discussed below, and has conducted similar surveys in the past.)

> d. Distinguish between facts and opinions in evaluating the proxy advisor proposal

Economic analysis should be clear about what counts as a benefit, and distinguish problems that can be fixed by regulation from those that cannot. Exxon's letter, cited but not discussed by the SEC, makes an important point. Exxon states that "Ultimately, we do not believe it is productive to discussions of shareholder value to argue over whether any particular issue falls into the 'errors of fact' category or the 'difference of opinion' category." The reason Exxon declined to engage the question of how to distinguish fact and opinion is that it is in practice difficult. Yet for the SEC, the difficulty of distinguishing fact and opinion is a crucial fact for a public understanding of the most that the proposal could accomplish.

The dividing line between "fact" and "opinion" is itself the subject of opinion, as reflected in binding case law arising out of alleged misstatements or omissions by corporate issuers.[22] Some things are clearly facts – Exxon gives as an example "whether a biography correctly reflects a director's experience." Other things are clearly opinion – for example, whether a CFO's experience at one company is "adequate" for the job at another company. But many other claims fall in-between, consisting of a mixture of fact and opinion. In the in-between spaces, where judgment and fact mingle, one can expect reasonable people to reasonably disagree.

One recurrent "error" identified as "factual" in corporate managerial sources cited in the SEC rule release are about choices of companies to include in **peer groups** for benchmarking companies against other companies. Peer groups are crucial for helping investors evaluate corporate performance and executive pay. Inappropriately chosen peer groups can make poor performance look good, and excessive or misaligned compensation look normal. Yet peer group formation is always clearly a mix of fact and opinion, since no two companies are ever precisely alike, and size and industry are often insufficient bases for selection of a clearly and objectively "best" group of peer comparisons. Investors are likely to benefit from hearing the views about appropriate peer groups from a proxy advisor, who is independent of corporate managers. Corporate managers have an obvious conflict of interest in selecting peer groups that are used in part to evaluate those same managers.

The fact that corporate managers may disagree with proxy advisors about peer groups, and about mixed fact/opinion judgments generally, is not an adequate basis for asserting there are enough "factual errors" to warrant SEC intervention. The very differences in such judgments are part of the value that independent advisors add to the proxy system, as discussed in Annex A below. By advancing their views about peer groups, proxy advisors create meaningful public discussion of such topics. Differences of this kind produce not "errors" but discussions. Differences of opinion are not the kinds of differences that a secret preview and comment period for corporate managers are likely to change. If they are the kinds of "errors" at which the rule proposal is aimed, the rule proposal is likely to impose costs without achieving any material benefit.

> e. Relate proposal to its likely effects, which include that it will reduce speech, may bias speech, and create real or reasonably perceived threats to independence

If the proxy advisor rule proposal is adopted and works as intended – if the SEC in fact mandates that companies' managers get up to two shots in secret at converting proxy advisors to their points of view on questions of opinion and judgment – the result may be silencing or hiding of initial differences of opinion

from the view of proxy advisor clients or the public, which should be considered as a cost, not a benefit, of the proposed rule. The result may be not better speech, but less speech. Clients of proxy advisors will not get to see or hear the full back-and-forth exchange between advisors and companies.

If that happens, the effect would **not be viewpoint neutral** – the views that would be advanced would be those of corporate managers, not anyone else's views. The rule proposal cannot reasonably be expected to cause proxy advisors to revise initial opinions further **away from** or against those of corporate managers, because the only new information (except in a rare proxy contest) will be from managers and will favor managers. Peer groups will make performance look better, and executive pay look lower. To the extent proxy advisors draw an opinion out of a spectrum of plausible opinions, the rule proposal will push in one and only one direction – towards corporate managers. The result would be to bias the analysis.

The proxy advisor proposal requirement to share drafts with corporate managers is not limited to facts, for which one could imagine a useful role for companies to review. It covers everything: judgmental peer group selections, complex contestable application of analytical methods, and pure opinions. The requirement to share all opinions with one side of a debate in secret creates the obvious one-sided risk that proxy advisors will **lose their independence** (or be reasonably perceived to do so) by virtue of their routinely hearing directly from the patently self-interested and conflicted company directors before hearing from other market participants, including their own clients. Yet, as noted by one commenter, **"Management already gets 98.2% support for their board nominees**."[23] The proposal clearly risks increasing existing bias in debates about corporate managers and how well they are serving investors.

It is worth emphasizing in this context that the SEC-approved FINRA Rule 2241 explicitly **prohibits** securities analysts from sharing draft research reports with target companies (other than to check facts – and even then, only after approval from the firm's legal or compliance department, suggesting that even fact-checking is viewed as a potential threat to independence). This rule was designed explicitly to "help protect research analysts from influences that could **impair their objectivity and independence**."

We recommend that revised economic analysis acknowledge potential bias as a plausible cost of the rule, and consider alternative ways to the supposed problem the issuer-review proposal is meant to address.

> f.  Address trends and facts established at the SEC's Proxy Roundtable or stated in release

Economic analysis should be consistent and reflect known facts, including known trends. The proxy advisor release does not fairly reflect trends acknowledged by the SEC, or evidence from the Proxy Roundtable, neither of which support the idea that the SEC has identified a problem requiring regulation in this area.

To its credit, the SEC identifies positive trends in proxy advisor performance and held a Proxy Roundtable to gather information prior to issuing its rule proposals. But the rule release does not address those trends and evidence in its economic analysis. As the SEC states, "communication between proxy voting advice businesses and registrants may have improved over time," citing a 2016 GAO Report,[24] which cites evidence that "there has been a noticeable increase in outreach" by proxy advisors. At the Proxy Roundtable, an entire panel was devoted to proxy advisors, which included representatives of large and smaller companies (e.g., General Motors, Atlas Air), investment managers (e.g., Neuberger Berman, State Street), investors (e.g., Ohio Public Employees Retirement System), proxy advisors (e.g., ISS), academics and politicians. On that panel:

- a company representative noted "I do think disclosure [by proxy advisors of potential conflicts of interest] has gotten better"[25] and that "regulation could cause an increased cost that obviates the firms, which would not be the intention,"[26]
- an investment manager representative stated, "we don't feel that it needs to be regulated above and beyond what's currently taking place,"[27]

- a speaker from the American Enterprise Institute stated "we do not see the need for binding or quasi-binding regulation,"[28] and
- an investment owner representative stated "it has not been our experience that there's a compelling need for additional regulation."[29]

The panel's remarks were so consistently **contrary to the need for regulation** that an SEC staff member who was moderating the panel paused at one point to remark:

> I can't believe … Is there **anyone on the panel [who] thinks there should be additional regulation?** I haven't heard it yet, and I'm kind of surprised.[30]

The SEC cites evidence about improvements in proxy advisors, and in its fact-finding event heard no calls for regulation of proxy advisors. Yet it has now proposed to regulate, without considering that whatever problems exist are diminishing over time, and without providing any support for the need for regulation at all. If the trend is positive, and informed observers are not calling for regulatory change, the SEC's rationale for proceeding at this time with a proposal on proxy advisors requires more justification than it has provided.

5. Adequately consider reasonable alternatives to the proxy advisor proposal

We recommend more discussion of plausible alternatives to the proposed rules in its releases. With respect to proxy advisors, it notes seven.[31] Of the seven, however, only one (the last) is less restrictive or burdensome on proxy advisors or their clients. We recommend that the SEC develop and discuss a broader range of reasonable alternatives that are less restrictive or burdensome that might address the possible problems it says company managers perceive, such as conflicts of interest, or which might address those problems in a way that is more beneficial to public investors, as opposed to managers of public companies.

a. Status quo as alternative in economic analysis: the role of Rule 14a-9 and counter-speech

One example of such an alternative would simply be the status quo. With limited and carefully confined exceptions such as fraud and defamation, the normal way that false or incorrect statements are corrected in the U.S. is with more speech – so-called "counter-speech." The SEC has already taken the position in its summer guidance that proxy advisor reports are "solicitations" subject to the antifraud requirement of Rule 14a-9, and this would not change as a result of the rule proposal. Whether true or not, it is the status quo on which the SEC relies. Only "errors" short of fraud can fairly be said to be the target of the rule proposal.

As noted above, companies already file proxy supplements challenging proxy advisor opinions and even allege factual errors. Those are examples of "counter-speech," and the SEC offers no basis for concluding they are not effective at combating any errors in proxy advisor reports. While some shareholders may vote prior to these supplements, proxies are nearly always revocable until the shareholder meeting. Shareholders – if indeed they are persuaded wrongly at first by proxy advisors and then change their minds based on proxy supplements – are usually able to withdraw their initial proxy and re-vote in favor of management. Again, the SEC provides no evidence to show that this process is not adequate to keep voting outcomes in line with what would occur but for the small number of possible factual errors that affect outcomes to begin with.

b. Limit requirement to share reports with company managers to facts only

A second example of an alternative not discussed by the SEC would be to limit the requirement to share draft reports with corporate managers to "facts" and not opinion or mixed fact/opinion statements. This would have the benefit of at least confining the speech-limiting effect of the rule to a category that plausibly could produce useful improvement for investors. This alternative would impose fewer costs and limit the potential bias and reduction in independence of proxy advisors that the actual proposal creates. If the SEC were to take up this alternative, it should not simply do so in a final rule release, because the economic analysis –

8

which the public should and is entitled to review as part of the notice-and-comment process – does not currently embrace or support this alternative.

c.    Publish draft reports rather than prevent proxy advisors from speaking to clients

A third example of an alternative not analyzed by the SEC that would have less risk of biasing proxy advice would be to require proxy advisors to disclose a draft of their reports or recommendations to company managers simultaneously with or somewhat after they disclose them to proxy advisor clients, and to impose a waiting period before clients subject to the SEC's jurisdiction could act on the advice or recommendations. This alternative would give company managers time to respond or correct errors, or argue for changes in opinions, before the public received the reports, and before asset managers acted on the reports.  This alternative would be similarly burdensome on proxy advisors as the SEC's proposal.  And we note that at the SEC's Proxy Roundtable, the SEC heard evidence that many asset manager clients of proxy advisors would prefer to see drafts before the company managers see the drafts.[32]

But this alternative would at least increase transparency in the process of proxy advice formulation, and reduce the risk that the proposal would bias proxy advisors towards managers, as the current rule proposal would do.  It would avoid even the week of "silencing" of proxy advisors, as the current proposal would mandate, as they would be permitted to speak to their clients, and simply would require them to disclose drafts to companies.  It would be content neutral, as (in theory) investment clients or other investors could see the drafts and attempt to persuade the proxy advisors to make the recommendations or reports more critical of corporate managers, even as corporate managers were attempting to persuade the proxy advisors to do the opposite, presumably in each case only if justified by facts or analysis.

6.    Address risk that costs will fall disproportionately on small and medium size asset managers

We are concerned about the impact of the proxy advisor proposal on small and medium-sized asset managers.  As the SEC notes, the market for proxy advice is highly concentrated.  As a result, it is possible they will be able to pass through some or all increased compliance costs to their clients.  Larger asset managers have increasingly internalized voting analysis, are less in need of advisory services, and have more effective choice to cut reliance if not cost-justified.  Already, the SEC notes, "large institutions [rely] less than small institutions on the research and recommendations offered by proxy voting advice businesses."[33]  Small and medium funds do not have this choice.  They will face heightened compliance costs, which may render their businesses unsustainable.  Independent small and mid-sized asset managers are under severe pressures from substantial consolidation in the asset management industry and ongoing shifts towards index-fund sponsors.  In this context, the proposal should discuss its distributional impact on investment managers.

7.    Discuss the risk that the proxy advisor proposal will decrease competition and degrade votes

Currently, the proxy advisor rule release acknowledges in passing on page 111 that "the proposed amendments would impose certain additional costs on proxy voting advice businesses," and that these costs "may not be offset by a reduction in compliance costs for their clients."[34]  As a result, the release notes, tautologically, "If costs borne by proxy voting advice businesses are large enough to cause some businesses to exit the market or potential entrants to stay out of the market, the proposed rules could decrease competition."  Finally, the SEC asserts that it cannot quantify the costs the proposal will create.

Together, these facts should lead to conclusions that the SEC does not state:  the proxy advisor proposal creates the likelihood that smaller firms that the SEC seems to characterize as proxy advisors will exit the business (to the extent such firms are covered by the proposal), and potential new entrants will decide against doing business as proxy advisors; and there is a risk that one or both of the major proxy advisors may be unable to sustain its business model with the increased net costs caused by the rule.  Given how dominant their market shares currently are, if one of the two leading advisors were to exit the market (and no new

9

entrant is willing to compete), the remaining leading advisor would have something close to a **monopoly**. A monopoly is not merely "decrease[d] competition," it is the very absence of competition.

The SEC Commissioners who voted for the proposal should reconsider carefully whether they want to bear that risk. Corporate managers backing the proposal, and their trade group representatives, should carefully reconsider what they are asking for – because they may get it, and not like the result. A resulting monopolist would have more influence in close corporate votes, be less likely to respond to the need for improvements, and have more price-setting power than presently. Investors would clearly lose from this outcome.[35]

The rule release should do more than it currently does to note these risks. It should draw on, and discuss more extensively than it currently does, information about the profitability, economies of scale, and resulting tendency towards monopoly in proxy advisory services.[36] It should note the pre-history of proxy advisory firms – the way that voting took place before proxy advisors emerged in the 1980s and 1990s – a world of voting that was not fairly characterized by high engagement, high levels of information, or carefully nuanced, firm-by-firm voting choices. It should more carefully discuss how increased compliance costs are typically fixed costs, invariant to scale, and will reinforce economies of scale that the current leading proxy advisors already enjoy. It should account for resulting social costs if the rule proposal creates a monopoly, and even if these costs cannot be precisely quantified, consider them in its cost-benefit analysis.

8.    Concerns about conflict of interest disclosure requirements

While we agree that conflict of interest disclosure requirements could be improved for proxy advisors, we have concerns about the proposed disclosure requirements insofar as they require widespread disclosure of policies and procedures to address conflicts. We say "widespread" because as the SEC acknowledges, proxy advisors serve "thousands of clients."[37] We note the SEC purports not to be adopting a requirement that such policies and procedures be "published," but the practical reality of disclosure to thousands of clients will be quite similar to publication in important respects.§

As the SEC notes, there are good reasons for the proxy advisors to not publicize the details of their conflict of interest policies and procedures. For example, their staff may be better prevented from engaging in conflicted behavior if the policies and procedures were not widely available. The SEC makes this point to explain why it is not requiring publication of the policies and procedures. But the same would apply to widespread disclosure to "thousands of clients." Such disclosure may be tantamount to publication.

Consistent with the idea that widespread disclosure of compliance policies would impair their effectiveness, the SEC does not require widespread disclosure to customers or clients of compliance policies in other areas. The details – as opposed to the existence – of policies and procedures adopted by public companies to govern margin loans to executive officers (which routinely generates conflicts of interests) are not currently required to be provided to shareholders, nor are those that govern basic self-dealing by corporate executives. Investment advisers, broker-dealers and credit ratings agencies adopt policies and procedures to govern conflicts of interest for their professionals, and our understanding is that the details of such policies and procedures are not generally required to be disclosed on a widespread basis to investors, clients, or customers.

---

§ Two members of the IAC believe that the SEC should require client disclosure (but not publication) of conflict of interest policies and procedures by proxy advisors, while the majority for those voting for this recommendation do not.

9.  Concerns specific to the proposal regarding shareholder proposals

We also have a number of concerns about the proposal regarding shareholder proposals.  At the outset we noted the absence of a fair statement of the value of shareholder proposals, which should be added to a revised and republished rule proposal.[**]  We have several additional recommendations.

a.  Analyze trends in votes, and avoid unjustified reliance on trends in exclusion rates

We recommend that the rule proposal adequately address trends in data on shareholder proposals over time.  The economic analysis supporting the SEC's rule proposal implicitly assumes that the value of shareholder proposals overall is static – unchanged over time.  It also assumes that because there have been fewer proposals that have been excluded due to the current thresholds over time, the value of shareholder proposals that go to a vote must be declining.

However, data on pages 70-90 of the release show that shareholder proposals have been gaining **higher votes over time**, which coupled with a **decline in the number of proposals voted**,[38] is consistent with an **increase in the value of proposals** over time.[39]  These trends indicate that over time shareholders have sponsored more valuable and targeted proposals.  These facts are noted in the SEC economic analysis.  But they are not mentioned much less discussed adequately in the SEC's overall assessment that there is a need to curtail shareholder proposals, as its rule proposal is intended to do.

Instead of emphasizing the trends towards fewer, more valuable proposals, the SEC instead emphasizes the tangential fact that fewer proposals are being excluded by the initial submission requirements or the resubmission requirements.  The SEC emphasizes the effect of inflation on the initial submission requirements, asserting that lower real thresholds leads to "overuse."[40]  But it does not consider in its discussion of the "need for the proposed amendments" that proposals are obtaining higher average votes, which is inconsistent with a belief that inflation is eroding the value of the proposals.  It also does not there consider the fact fewer proposals are being brought, which is inconsistent with a belief that inflation is resulting in too many proposals.  These trends are inconsistent with "overuse."

With respect to resubmission requirements, the SEC seems to believe – without explanation -- that there should be some natural rate of exclusion due to resubmission requirements, and since there are fewer being excluded, the resubmission thresholds need increasing.[41]  Yet benign and plausible reasons exist to expect resubmission requirements to have less of an impact in the face of a trend towards more valuable and targeted proposals.  Given that trend, and given the ability of shareholder proposal proponents to learn with experience, it should not be surprising or troubling that fewer proposals are being excluded due to resubmission thresholds.  The decline in excluded proposals is more likely to be due to an increase in overall support plus a readier recognition by proponents that a given proposal needs to be withdrawn, modified or improved than it is to a decline in the effectiveness of the current exclusion thresholds.  The trend data show that the shareholder proposal screens are working effectively now, not that they need tightening.

b.  More completely analyze the kinds of proposals that would be excluded and unjustified focus on majority-approved proposals rather than on proposals that receive support to be implemented or for which evidence shows they are value-enhancing

The SEC rule proposal inconsistently analyzes the **kinds of** shareholder proposals that would be excluded if the SEC proposal were to be adopted, and fails to consider available evidence about their value to investors of specific types of proposals that would be excluded by the rule proposals.  The SEC release notes in its

---

[**] Several IAC members believe that the thresholds for submission and inclusion of shareholder proposals should be revisited by the SEC, while not endorsing the specific thresholds in the current rule proposal, believing that a more incremental approach would be more easily justified.

11

economic analysis that many proposals that would fail to meet the proposed resubmission thresholds nevertheless have received increasing and often large support over time, but the SEC does not discuss or confront that fact in its basic explanation for the need for the proposed changes. It also fails to discuss whether the proposals likely to be excluded are a type to which the market has reacted favorably when announced. The SEC acknowledges the shortcoming of its analysis: "Our economic analysis does not speak to whether any particular shareholder proposal or type of proposals are value enhancing, whether the proposed amendments would exclude value enhancing proposals, or whether the proposed amendments would have a disproportionate effect on proposals that are more or less value enhancing."[42]

The SEC should do more to analyze the types of proposals that would be excluded, and their likely value. For example, as noted by Commissioner Jackson in his dissenting statement:

> Proxy-access proposals -- initiatives to allow significant shareholders to put their own candidates up for election to the board … -- are popular proposals [that] hold underperforming executives' feet to the fire with a more realistic threat of a contested election. The evidence shows that these proposals often add value for shareholders over the long run. But today's rule would **remove 40% of these proposals** from the ballot after three tries—and keep them off for three years.

Commissioner Jackson's dissent draws on and cites to his staff's own analysis, as well as to published academic research. The SEC release does not cite or reflect any alternative analysis that supports the proposal on other grounds.

### c.  Adequately discuss plausible unintended consequences

While the SEC says that it is "mindful of concerns that any revisions to the ownership requirements may have a greater effect on shareholders with smaller investments,"[43] we believe it should adequately consider the data on household wealth, the need for diversification, and the resulting implications for how many individual shareholders would be practically able to sponsor proposals under the proposed rule. It particularly neglects to discuss sufficiently the impact of the proposed changes regarding use of representatives on small and medium-sized shareholders, the very "Main Street" investors of the kind so emphasized by Chair Jay Clayton in his time as Chair. As Commissioner Lee rightly emphasizes in her dissenting statement, the results of the rule proposal would be that:

> Main Street investors would generally have to invest virtually their **entire portfolio into one company** (something we strongly discourage) to enjoy the same rights as Wall Street investors, or they would have to wait three years to catch up to them.

The proposed changes regarding initial threshold requirements obviously raise the effective cost for small and medium-sized shareholders to bring proposals, and the proposed changes on the use of representatives will do so indirectly. Meanwhile, the higher initial thresholds will be trivial for large shareholders, and they will be able to bring proposals without relying on representatives. Yet as the SEC notes, proposals sponsored by individuals (who typically own less stock) are often able to obtain high shareholder support, at levels that are comparable to or higher than for resolutions sponsored by institutions. Indeed, "**The percentage of proposals submitted by individuals that received majority support is statistically significantly higher than the percentage of proposals submitted by institutions that received majority support**."[44]

For the SEC to simply assert that it is mindful of the effects on small shareholders, and that it believes that the rules will "adequately permit"[45] all shareholders to do so, is not supported by the relevant facts.

Additional unintended consequences of the SEC proposal on shareholder proposals are plausibly to limit and interfere with the variety of complex relationships that exist among shareholders and their agents. For

example, the proposed "one proposal per person" rule may limit the ability of institutional investors to select the agent of their own choosing to represent them for shareholder engagement purposes.

> d.    Adequately explain and justify the momentum requirement of 10%

We believe the release should analyze and justify the proposed ability of issuers to exclude resubmitted proposals if the support they receive declines by 10% or more compared to the immediately preceding shareholder vote on the matter.  We note initially that the release and proposal could be clarified as to how the requirement would work – on one reading, it would permit exclusion only if a proposal obtained an absolutely lower 10% vote – e.g., from 20% to 10% -- while in other places the release seems to state that the proposal would permit exclusion if a proposal obtain a relatively lower 10% vote – e.g., from 20% to 17.9% (which is more than 10% x 20% = 2% less than 20%).  We note particularly if the intent is a relative 10% decline as a trigger, more analysis is needed to justify it.  Even if a proposal is obtaining an overall increasing level of vote support over time, year-to-year votes can reasonably be expected to fluctuate due to random factors beyond the control of the sponsor, and that have little to do with the merits or support for the proposal.  Given that, without more analysis, it is unclear how the SEC arrived at the 10% decline trigger, or how it would apply to the range of proposals companies regularly receive.  This is also troubling because standard statistical techniques – known to the SEC's staff -- would take into account such fluctuations in providing information about how often a proposal receiving increasing support is likely to ever be implemented or receive high absolute levels of support.  Failing to present such analysis if inconsistent with the SEC's guidance on economic analysis, and leaves the public uncertain as to the likely and predictable effects of the requirement.

> e.    Adequately present and analyze reasonable alternatives

Finally, as with the proxy advisor proposal, the SEC's release should consider reasonable alternatives that would be more likely to improve social welfare than the actual proposal.  For example, the SEC could raise current resubmission thresholds by 1%, rather than jumping from 3% to 6%, etc.  Having raised them 1%, the SEC could observe shareholder and company behavior and develop a much more accurate understanding of the relationship between the higher thresholds, the number of proposals that are brought, and voting outcomes.  If a significant number of proposals continue to be resubmitted and then fail to get more than 4%, etc. then the SEC could also raise the thresholds by another 1%.  And so on.  This incremental approach would avoid the risk of "overshooting" and shutting down a whole cohort of proposals that otherwise would obtain higher votes over time.

10. Reconsider the guidance

In addition to republishing the rule proposals, the SEC should reconsider the guidance actions it took in the summer of 2019.  Our review of the guidance, public statements by the SEC Commissioners in adopting the guidance, conversations with SEC staff, and our conversations with investors and investment advisors all suggest that the guidance did not achieve what it sought to achieve, i.e., clarity for market participants.  On the one hand, the SEC purported to not be changing anything material in its rules regarding shareholder voting or reliance on proxy advisors.  On the other hand, there are widespread impressions, reinforced by some statements in and about the guidance by SEC Commissioners and staff, that the guidance was intended to "update" the way the SEC approached investment advisors' fiduciary duties relating to proxy voting. From the perspective of a regulated investment advisor, any alteration that may increase the scrutiny of the SEC in its evaluation of compliance with a fiduciary duty is material. The resulting confusion is therefore highly problematic and, for the reasons we describe in more detail in the next paragraph, we therefore recommend that the SEC reconsider its interpretations.

There is an inconsistency between "no change" and "update."  As a result of that and other ambiguities in the guidance documents, investors have widely varying beliefs about the import of the guidance actions, ranging

13

from "no change" to "significant increase in likely costs of compliance." We also note that a pending lawsuit suggests that a highly informed (but also highly interested) participant in the proxy system (ISS) does not view the guidance actions as reflecting "no change," and while we take no position on the merits of its lawsuit, it does corroborate some of the confusion that we believe the guidance actions created. The lack of clarity may reflect the fact that the guidance did not go through a public notice-and-comment process, in which asset managers could have been asked whether the proposed guidance documents actually did add clarity. While we believe that interpretation and guidance are important ways the SEC can implement its views, and that many issues are properly addressed without formal rulemaking, we believe the SEC should be open to revisiting efforts to interpret and provide guidance when they have not provided the clarity that they are intended to provide.

More generally, the guidance actions are related to the content of the two rule proposals, and the SEC has an opportunity to provide both clear and improved guidance as it reconsiders the rule proposals. The SEC should consider that the guidance documents do not appear to have in fact provided clarity or actual guidance and were approved without the kinds of input by knowledgeable stakeholders that are now being provided to the SEC as part of the current rulemaking process, and should reconsider the guidance documents in the context of revised rule proposals that respond to the above recommendations.

14

**Annex A – Summary of Some Beneficial Aspects of Proxy Advisors and Shareholder Proposals**

As discussed in the recommendation, the SEC's rule releases fail to fairly present the benefits of proxy advisors and shareholder proposals in the rule releases, while going on at great length at what problems those elements of the proxy system "may" create. This annex provides the starting point for a more complete description of some of the benefits of those elements.

### a. Value of proxy advisors

Proxy advisors provide a very useful service to shareholders, increasing overall welfare by enhancing corporate governance. They distill hundreds of pages of information in proxy statements down to a much smaller number of pages in a consistent format that is easy for clients to digest. These clients have to vote hundreds or even thousands of proxies per year. Most proxy votes must be analyzed and voted during a two-month period of time (May to June), making it virtually impossible for those with voting authority to engage in a de novo review of the entirety of the information provided to them by companies, dissidents and others commenting on the votes. In short, proxy advisors are necessary for a large number of shares to be voted on an informed and timely basis.

For investment fiduciaries, these proxy advisor services are highly valuable, and permit them to carry out their obligations of stewardship in a responsible and cost-effective manner. While some have raised concerns that proxy advisory firm clients vote reflexively or automatically as if the proxy advisory recommendations were binding, there is little reliable evidence that this is a widespread problem. It is entirely appropriate for proxy advisory firm clients to take into account the independent views and information provided by proxy advisors. And because many votes are essentially uncontested (the vast majority of director elections, for example), it is not surprising that there is a high correlation between proxy advisory recommendations and votes of asset managers – indeed, it would be odd and disconcerting if clients routinely voted against the recommendations of advisory firms whose primary business focus are those votes. This is not the same thing as automatic or reflexive voting, however. It simply reflects use of objective and quantitative information provided by advisors in a context in which many shareholders share the same goals and beliefs.

A final point should be made about the value of proxy advisors: they are independent. Despite the claims of pervasive conflicts of interest, it should be obvious that they are less conflicted than others with an interest in the outcome of the votes themselves. The very jobs of the boards of directors of the companies who are holding shareholder votes are at stake in their elections, by definition. Other matters on which shareholders vote commonly constrain director discretion. Dissidents and short-slate sponsors are seeking power and influence for themselves. Proxy advisors do not seek or obtain board representation, they do not obtain the ability to pay themselves compensation from the companies involved, as directors and dissidents do, and they do not directly benefit from the result of any change in the discretion of directors of a company.

Proxy advisors thus play an important and irreplaceable role as independent voices in the proxy system. They can be expected to look for and find flaws or bias in the peer group selections made by officers of companies – who make those selections precisely to benchmark their own pay. Without proxy advisors, shareholders would be left in a typical vote with one and precisely one voice to listen to – those of directly self-interested directors and officers. Alternatively, in the context of proxy fights or struggles between boards and activists such as hedge funds, proxy advisors provide a neutral point of analysis with neither an interest in preserving the status quo for the board nor any direct financial interest in helping the dissidents obtain board seats. Proxy advisors balance the interests of shareholders of all types in voting their shares in all companies in which they hold shares, and do so by looking at issues and votes solely through the eyes of investors.

15

**b.  Value of shareholder proposals**

Shareholder proposals provide a number of important social benefits.  Despite the vast majority being legally non-binding, they commonly are implemented by managers, despite initial opposition or resistance by boards, suggesting that they can persuade managers to review and revise their beliefs about topics covered by resolutions.  In particular, they can address potential agency costs – reduction in value caused by managerial entrenchment – and a broad stream of academic research shows that shareholder proposals have demonstrably done so over the past twenty years.  Indeed, a peer-reviewed article on shareholder proposals in the leading finance journal concludes:  "Shareholder activism and improved democracy inside firms can have **large positive effects on shareholder value**."[46]

Even when shareholder proposals do not result in a majority-approved vote, they facilitate "closer scrutiny of important substantive issues" such as takeover defenses and executive compensation."  In contrast to the relatively low-information environment of the 1990s as regards takeover defenses and executive compensation, for example, shareholder proposals have increasingly led institutional investors – informed by proxy advisors – to become much more sophisticated and focused in their analysis of these topics.  The routinized discipline of companies and shareholders being required to engage in debates over shareholder proposals reduces uncertainty and information asymmetries, increasing market efficiency.

As an example, in the 1990s, it was common for shareholder proposals to focus on "poison pills," despite the fact that the redemption of a pill could be reversed quickly without a shareholder vote, and generally could be undercut by a determined bidder capable of launching a proxy contest – in effect, shareholder proposals led to a non-solution to a non-problem.  Over time, however, the debate over takeover defenses became more serious, in large part due to shareholder proposals, and the focus in the 2000s of most defense-specific proposals shifted to classified boards, which cannot be added by boards without a shareholder vote, and which do have meaningful effects on takeover outcomes.  "As a result of shareholder proposals, a substantial number of companies dismantled their takeover defenses."[47]

The effect over time has been similar with respect to executive compensation.  Initial focus on simply increasing incentive compensation in the late 1980s and 1990s shifted – due to shareholder proposals and subsequently "say on pay" votes – to much more detailed and informed analysis of total pay packages, long-term compensation, hold-backs, and other important elements of how executives are paid and incentivized.  Without shareholder proposals, or with fewer of them, the public debate and firm-specific analysis of pay would have either not occurred, or taken longer to occur.  Moreover, votes on shareholder proposals on pay have effects not simply because they achieve majority votes, but when they simply achieve higher votes than expected.  "Boards reduce the rate of executive pay increases if a proposal targeting CEO compensation receives unexpectedly high shareholder support."[48]  In sum, "Rule 14a-8 is serving a more valuable function today than in the past because it may be more greatly reducing agency costs of the separation of ownership and control than has previously been reported."[49]

Shareholder proposals can also matter because they can lead to situations where shareholders learn about how shareholder-oriented managers in fact are, without the need for an expensive and rare proxy fight.  Thus, "the impact of shareholder proposals is not restricted to their actual content."[50]  This "signaling" effect is significant enough to generate stock market reactions that are measurable and material.   In addition, shareholder proposals are an important vehicle for communication of views among shareholders – not just from the proponent, but also between non-proponent shareholders who can see what issues, in the collective view of shareholders, may have particular merit. In a market where communication between shareholders is sharply constrained, in large part by SEC rules, the value of an unambiguous signal from a vote on a specific

proposal (as opposed to, for example, registering concern by withholding support from a director) has an important value not currently considered in the SEC's rule proposal or the accompanying economic analysis.

---

[1] Amendments to Exemptions from the Proxy Rules for Proxy Voting Advice, Release No. 34-87457; File No. S7-22-19 (Nov. 5, 2019); Procedural Requirements and Resubmission Thresholds under Exchange Act Rule 14a-8, Release No. 34-87458; File No. S7-23-19 (Nov. 5, 2019); Commission Guidance Regarding Proxy Voting Responsibilities of Investment Advisers, Release No. IA-5325 (Aug. 21, 2019) [84 FR 47420 (Sept. 10, 2019)]; Commission Interpretation and Guidance Regarding the Applicability of the Proxy Rules to Proxy Voting Advice, Release No. 34-86721 (Aug. 21, 2019) [84 FR 47416 (Sept. 10, 2019)].

[2] Rel. No. 34-87457 at 27-38.

[3] See, e.g., the SEC public overview entitled Securities Analyst Recommendations, available at https://www.sec.gov/fast-answers/answersanalysthtm.html ("Analysts are generally required to disclose possible conflicts of interest when they recommend the purchase or sale of a specific security."); SEC Analyzing Analyst Recommendations (Aug. 30, 2010), available at https://www.sec.gov/tm/reportspubs/investor-publications/investorpubsanalystshtml.html (nine paragraphs discussing "potential conflicts of interest").

[4] Rel. No. 34-87457 at 26.

[5] Rel. No. 34-87457 at 80.

[6] Rel. No. 34-87458 at 112.

[7] Roundtable on the Proxy Process (Nov. 25, 2018), at 257.

[8] Current Guidance on Economic Analysis in SEC Rulemakings, Memo dated March 6, 2012, available at https://www.sec.gov/divisions/riskfin/rsfi_guidance_econ_analy_secrulemaking.pdf at 14.

[9] Id.

[10] Current Guidance, supra note 7, at 1 et seq. (referring repeatedly to analysis about "proposed" rulemaking).

[11] Neither proxy advisors nor voting appear in OCIE's list of 2019 Exam Priorities, https://www.sec.gov/files/OCIE%202019%20Priorities.pdf, nor has OCIE issued a "risk alert" in the area of proxy voting, https://www.sec.gov/ocie (Risk Alerts tab).  although it has issued a number of such alerts that reflect concerns it has about overall compliance with other aspects of law and regulation applicable to investment advisers.  Enforcement has brought relatively few actions against investment advisers under Rule 206(4)-6 in the last twenty years.  Indeed, we find **two** such actions, Rel. No. IA-2872; Rel. No. IA-3458, out of thousands of enforcement actions.  SEC Division of Enforcement 2019 Annual Report (Nov. 2019), available at https://www.sec.gov/files/enforcement-annual-report-2019.pdf (indicating more than 4,000 enforcement actions in the last 5 years alone).  If the SEC believes that conflicts of interest and errors by proxy advisors are creating significant problems in the proxy system, then one would expect it to have evidence that the very clients of those proxy advisors are not fulfilling their duties when they rely on proxy advisors, even in part.  Yet the SEC's own experience to date is contrary to such an expectation.

[12] The SEC's proposed mandatory waiting periods consist of a three business day initial period followed by a two business day follow-up period.  In practice, given that there are only five business days in any week, the actual waiting period will range from a minimum of seven to a maximum of nine calendar days.

[13] Rel. No. 34-87457 at 39.

[14] Rel. No. 34-87457 at n. 94. The SEC rule release cites a letter dated June 26, 2019; no such letter exists on the SEC's comments' website for its Proxy Roundtable (Roundtable on the U.S. Proxy Process File No. 4-725).  The actual Exxon comment letter at that website is dated July 26, 2019.  One could call this a "factual error" in the SEC rule release, and perhaps count it towards a total number of errors afflicting the SEC process in the proxy area.  It is clearly not material, however, and so in fairness should not be so counted.  The same judgment would be needed to be brought to bear on any errors in proxy advisor reports if in fairness one believed that such reports were filled with factual errors.  Once one used that kind of judgment to exclude immaterial errors, it may be that no significant number of factual errors would remain.  Perhaps that is why neither the Exxon letter nor the SEC assert that material factual errors are in fact a problem with proxy advisor reports.

[15] The SEC also cites in Rel. No. 34-87457 at n. 94 comments from the Business Roundtable, which provides no verifiable information about errors, but instead cites to anonymous reports it says it has received by surveying its members.  Needless to say, anonymous unverifiable reports are an inadequate basis for concluding that material factual errors are common.  The SEC also cites the Squire Patton Boggs LLC  analysis discussed in note 16 below, as well a news article, Richard Levick, 'Vinny' and the Proxy Advisors: A Five Trillion Dollar Debate, FORBES.COM (Dec. 17, 2018), https://www.forbes.com/sites/richardlevick/2018/12/17/vinny-and-the-proxy-advisors-a-five-trillion-dollar-debate/#73164b9f2f4b, but that news article provides no independent support for claim that material factual errors are common, but instead relies on the Squire Patton Boggs LLC discussed in note 16 below.  As noted in the text to that note, if anything, that analysis shows that "factual errors" requirement judgment to identify, the SEC's own analysis differs from that of Squire Patton Boggs LLC, and both analyses demonstrate that material "factual errors" are rare.

[16] Rel. No. 34-87457 at 96 (Table 2).  That table is based on supplemental proxy statements filed by issuers over the period 2016-2018, and shows 54 factual errors out of a total of 17926 proxy statements.  The release does not provide

information sufficient to evaluate materiality or the classification of errors as actually factual.  Similar data published by Squire Patton Boggs LLC on behalf of the American Council for Capital Formation (a trade group representing the interests of corporate managers) that does provide data linking to actual supplemental proxy statements shows that in a number of instances, what were purportedly "factual errors" in fact were disagreements of opinion.  Analysis available at https://accfcorpgov.org/wp-content/uploads/Analysis-of-Proxy-Advisor-Factual-and-Analytical-Errors_October-2018.pdf  For example, with respect to the proxy supplement filed by Abbot Laboratories on April 5, 2018, the dispute fact is described in the summary in part as "ISS selected the wrong peer group," id., which is the lead "error" identified in the proxy supplement itself, https://www.sec.gov/Archives/edgar/data/1800/000110465918022657/a18-9600_1defa14a.htm at 1.  While Abbott's supplement states a number of other "errors" in methodological choices made by ISS, none are clearly "factual" in nature.  As another example, Ambarella, Inc..'s supplemental proxy statement filed May 30, 2018 is cited by Squire Patton Boggs LLC as showing a "factual error" because ISS stated that the company's CEO had received a larger equity award, when the company claimed the award was actually smaller.  See https://www.sec.gov/Archives/edgar/data/1280263/000119312518177136/d789640ddefa14a.htm at 5.  However, the company concedes that its own compensation table showed an increase in the award, and argued that the increase was due to a change in timing of grants, increasing the period between grants to 18 months, a point that may be analytically correct but which does not render the ISS statement factually incorrect, and the supplemental proxy provides no basis for assuming that the analytical disagreement was material.  Nonetheless, the Squire Patton Boggs LLC report identifies the disagreement as a "factual error."  Finally, we note that there are significant discrepancies between the number of "factual errors" identified by the SEC based on its review of the supplemental proxy statements in the same time period as the number of "factual errors" identified by Squire Patton Boggs LLC in the same time period (compare 13 "factual errors" for the year 2017 in Table 2 of Rel. No. 34-87457 at 96 with 23 "factual errors" for the same year in the Squire Sanders Boggs LLC summary table).

[17] Even though it could have done so easily, the SEC did not provide any links or other way to verify even this minimal number of alleged factual errors, rendering the data worthless for public evaluation of the rule proposal.

[18] See, e.g., Summary Report of Commission Staff's Examinations of Each National Statistical Rating Organization (Dec. 2018), available at https://www.sec.gov/files/nrsro-summary-report-2018_0.pdf (discussing numerous 2018 errors reported a credit rating agency).

[19] See, e.g., Jeremiah Green, John R. M. Hand, X. Frank Zhang, Errors and questionable judgments in analysts' DCF models, Rev Account Stud (2016) 21:596–632, at Table 5 (reporting average error rate of 33% in discounted cash flows models in sample of 120 securities analyst reports, consisting of, for example, internal inconsistencies between analyst's own inputs to the analyst's own capital asset pricing model and the analyst's own resulting equity discount rate of more than 30 basis points), as well as Table 6 (reporting separately an average rate of questionable judgments of 21%).

[20] By contrast, **2.5%** of **medical post-mortems** find diagnostic errors related to the principal diagnosis or cause of human death.  National Academies of Sciences, Engineering and Medicine, IMPROVING DIAGNOSIS IN HEALTH CARE, Committee on Diagnostic Error in Health Care, eds. Erin P. Balogh, Bryan T. Miller, and John R. Ball, Editors, Board on Health Care Services, Institute of Medicine, available at https://www.nap.edu/read/21794/chapter/5#101.  In other words, in life and death situations, doctors are more than eight times more frequently wrong than the proxy advisors have been shown to be in making recommendations (and in fact, even more frequently, because the medical error rate is after screening for the materiality of the error, while the claimed proxy advisory factual error rate is not).  Medical diagnoses are obviously a different factual setting from proxy advisory reports in many respects.  But the higher life-and-death personal stakes for both patients and doctors should make the error rate in that setting lower than in less fraught situations, such as in non-binding, advisory reports about shareholder votes the outcome of which rarely are determined by the reports.

[21] It is insufficient to claim, as do some commentators, that the supplemental proxies filed by corporate managers establish a lower bound on the number of errors in proxy reports.  There is nothing to suggest that proxy advisors ever retaliate against companies for correcting factual errors, and if potentially material to vote outcomes, corporate managers have ample incentives to seek corrections, and they can use investor funds to do so.

[22] Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund, 575 U.S. ___ (2015) ("A fact is 'a thing done or existing' or '[a]n actual happening.' Webster's New International Dictionary 782 (1927). An opinion is 'a belief[,] a view,' or a 'sentiment which the mind forms of persons or things.' Id., at 1509. … That [sic] difference between the two is so ingrained in our everyday ways of speaking and thinking as to make resort to old dictionaries seem a mite silly.'); City of Monroe Emps. Ret. Sys. v. Bridgestone Corp., 399 F.3d 651, 669, 674 (6th Cir. 2005) (court distinguished between hard information and soft information, and said about the latter that "vague statements not subject to verification by proof are generally deemed non-actionable"); Rosenzweig v. Azurix Corp., 332 F.3d 854, 869-70 (5th Cir. 2003) (statements that company's "fundamentals are strong," that it is "making steady progress" and that its "pipeline of private transactions . . . remains strong," are immaterial [and] not actionable under the securities laws); In re Lululemon Sec. Litig., 14 F.Supp.3d 553, 2014 WL 1569500, at *15-16 (S.D.N.Y. Apr. 18, 2014) (holding statements were not

19

materially false or misleading because they were statements of opinion or belief and the complaint did not allege that defendants did not believe them at the time they were made); Rubke v. Capital Bancorp Ltd., 551 F.3d 1156 (9th Cir. 2009) ("[M]isleading opinions . . . can give rise to a claim under section 11 only if the complaint alleges with particularity that the statements were both objectively and subjectively false or misleading."); In re Donald J. Trump Casino Sec. Litig., 7 F.3d 357, 368 (3d Cir. 1993) (explaining that opinions, predictions, and other "statements of 'soft information' may be actionable misrepresentations if the speaker does not genuinely and reasonably believe them").

[23] Comment of Brian Stoner, dated November 21, 2019, available at https://www.sec.gov/comments/s7-22-19/s72219-6458605-199162.htm, citing a Conference Board report available at (https://law.rutgers.edu/sites/law/files/RR-1674-18-R.pdf.

[24] Rel. No. 34-87457 at 97, citing GAO Report to Congress, *Corporate Shareholder Meetings—Proxy Advisory Firms' Role in Voting and Corporate Governance Practices* (Nov. 2016) at 23.

[25] Roundtable on the Proxy Process (Nov. 25, 2018), at 214.

[26] Id. at 256.

[27] Id. at 251.

[28] Id. at 247-48.

[29] Id. at 238.

[30] Id. at 250.  No panelist on the proxy advisor panel thereafter spoke in favor in regulating proxy advisors.  These statements and the absence of a response to the staff member's question are not even noted in the rule release, even as the shareholder proposal rule release relies heavily on proxy roundtable testimony.

[31] Rel. No. 34-87457 at 113 et seq.

[32] Roundtable on the Proxy Process (Nov. 25, 2018), at 232.  This statement was made by a representative of ISS, one of the two leading proxy advisors.  The SEC might usefully test the truth of this statement by affirmatively surveying clients of the proxy advisors.  But it should be noted that on the same panel as the ISS representative were representatives of investment advisers and asset owners, and no one spoke up to suggest that the assertion was incorrect.

[33] Rel. No. 34-87457 at 80.

[34] Rel. No. 34-87457 at 111.

[35] Worse, there is also a serious possibility that **neither** of the leading proxy advisors may have a sustainable business model if the rule proposal is adopted.  A predictable result would be **more one-size-fits-all voting** by a larger number of investment managers, not **less**, as the rule release implies.

[36] See, e.g., Paul Joskow, Regulation of Natural Monopoly, in Handbook of Law and Economics.

[37] Rel. No. 34-87457 at 10.

[38] Rel. No. 34-87458 at 74.

[39] The release initially states that "Our analysis shows no discernible trend in the number of submitted shareholder proposals in the 1997 to 2018 period," id. at 70, but also says that "Data on submitted proposals prior to 2004 is incomplete. Hence, our economic analysis focuses on shareholder proposals submitted between 2004 and 2018."  Later, the release notes that the aggregate increase in shareholder support has been accompanied by a **significant decline in the total number of proposals** over the past fifteen years, from 1.85 per company in 2004 to 1.24 in 2018 at S&P 500 companies, and from 0.38 in 2004 to 0.28 in 2018 and Russell 3000 companies.

[40] Id. at 18.

[41] Id. at 49-50; see also at 52 (equating without explanation or discussion "meaningful" and "majority" support); n. 122 (giving data on how often proposals initially receiving low votes go on to obtain majority support).

[42] Id. at 112.

[43] Rel. No. 34-87458 at 25.

[44] Id. at 89.

[45] Id. at 44 ("climate-change proposals … averaged voting support of [~5%] in 1999 and [~38%] by 2017).

[46] Vicente Cuñat, Mireia Gine, & Maria Guadalupe, The Vote Is Cast: The Effect of Corporate Governance on Shareholder Value, 67 J. FIN. 1943 (2012).

[47] Randall S. Thomas & James F. Cotter, Shareholder Proposals in the New Millennium: Shareholder Support, Board Response, and Market Reaction, 13 J. Corp. Fin. 368 (2007).

[48] Thomas, R., Martin, K., 1998. Should labor be allowed to make shareholder proposals? Washington Law Review 73 (1), 41–80.

[49] Randall S. Thomas & James F. Cotter, Shareholder Proposals in the New Millennium: Shareholder Support, Board Response, and Market Reaction, 13 J. Corp. Fin. 368 (2007).

[50] Laurent Bach & Daniel Metzger, How Do Shareholder Proposals Create Value?, Working Paper (Mar. 2017).

# Foster Declaration Exhibit 15



Thomas P. DiNapoli
State Comptroller

110 State Street
Albany, New York 12236

**STATE OF NEW YORK
OFFICE OF THE STATE COMPTROLLER**

February 3, 2020

Vanessa A. Countryman
Secretary
United States Securities and Exchange Commission
110 F Street, N.E.
Washington, D.C. 20549

Re: Comments on Proposed Rule "Amendments to Exemptions from the Proxy Rules for Proxy Voting Advice" [Release No. 34-87457; File No. S7-22-19]

Dear Ms. Countryman,

I write as Trustee of the New York State Common Retirement Fund, which is the third largest public pension fund in the United States, with an estimated $210.5 billion in assets under management as of March 31, 2019. The Fund holds and invests the assets of the New York State and Local Retirement System on behalf of more than 1.1 million members and beneficiaries and pays over $1 billion per month in benefits.

I wholeheartedly disagree with the Commission's premise, analysis, and conclusions for this Proposed Rule, so I appreciate the opportunity to provide a detailed comment outlining my opposition.[1] I hope that after the Commission completes its review and analysis of these comments and others that have been submitted, it finds that the Proposed Rule is unnecessary.

---

[1] As I communicated back in November, the Fund, and numerous other investors, requested additional time to comment on this proposal. In combination with the SEC proposal on "Requirements and Resubmission Thresholds under Exchange Act Rule 14a-8," such dramatic and controversial changes to the proxy process require additional time for all parties to provide comprehensive comments. Letter from New York State Comptroller Thomas P. DiNapoli to Chairman, Jay Clayton, Securities and Exchange Commission (November 18, 2019) https://www.sec.gov/comments/s7-22-19/s72219-6468376-199333.pdf.

Page 1 of 21

**General Comments About the Proposed Rule**

I strongly oppose the Commission's current Proposed Rule to define the distribution of voting recommendations, related research and analysis by proxy advisors as a "solicitation" under the Securities Exchange Act of 1934. The Fund has long opposed rulemaking and legislation that would jeopardize the timely and independent research and voting recommendations we receive to assist us with casting proxy votes at our portfolio companies.[2] If enacted, this Proposed Rule, will unnecessarily interfere in the privately ordered relationship between investors and their advisors in a way that will increase costs, inject complexity, and possibly tilt voting recommendations toward management preference rather than a balanced analysis of the merits of an issue.

The premise of this Proposed Rule is that there is a "risk of proxy voting advice businesses providing inaccurate and incomplete voting advice."[3] However, the Commission has presented no actual evidence that proxy advisor clients are currently receiving inaccurate and incomplete voting advice. Furthermore, the Commission's purported evidence for inaccurate and incomplete voting advice is based solely on anecdotal information from registrants, analyses based upon flawed methodologies, and mischaracterizations of proxy research "errors."

For example, page 96 of the Proposed Rule includes a table with the total number of occasions on which registrants filed additional definitive proxy materials in response to proxy voting advice in calendar years 2016, 2017, and 2018. The Commission concludes that 150 filings indicated particular "errors" with proxy voting advice. At the time of submitting this letter, the Commission has failed to provide the analysis associated with the underlying data of this table. Without this analysis one is unable to conduct an independent review of these "errors."[4] It is therefore unclear whether the Commission found actual "errors" or simply issues on which company management disagreed with analyses or methodologies.

The Commission's methodology in assessing "factual errors" and "analytical errors" may contain the same flaws as the methodologies of groups representing corporate CEOs and other executives who have examined this topic. For example, the most cited "analysis" of proxy voting advice errors conducted by the American Council on Capital Formation (ACCF) is highly inaccurate and misleading. According to an analysis by the Council for Institutional Investors (CII), "most of the claimed "errors" actually are disagreements on analysis and methodologies, and that some other alleged proxy advisory firm errors derive from errors in the company proxy statements," and "...in some cases, ACCF simply misstates what the company said."[5] However, even accepting the Commission and ACCF methodologies would not support the Proposed Rule as the results would show that 99.99% of proxy advisor reports over both

---

[2] Letter from New York State Comptroller Thomas P. DiNapoli to Chairman, Jay Clayton, Securities and Exchange Commission (November 13, 2018) https://www.sec.gov/comments/4-725/4725-4646620-176466.pdf.
[3] Page 11 of Proposed Rule.
[4] Letter from Glenn Davis, Council of Intuitional Investors to SEC Office of FOIA Services (November 14, 2019) https://www.cii.org/files/issues_and_advocacy/correspondence/2019/20191114%20CII%20FOIA%20request%20to %20SEC(1).pdf; Letter from Glenn Davis, Council of Intuitional Investors to SEC Office of FOIA Services (December 31, 2019).
https://www.cii.org/files/issues_and_advocacy/correspondence/2019/20191231%20CII%20Appeal%20for%20Disp ute%20Resolution.pdf.
[5] Letter from Kenneth A. Bertsch, Council of Intuitional Investors to SEC Chairman and Commissioners (October 24, 2019).
https://www.cii.org/files/issues_and_advocacy/correspondence/2019/20191024%20SEC%20comment%20letter%20 proxy%20advisor%20accuracy.pdf.

examination periods had no errors, because the main concerns voiced by registrants are not "errors," but disagreements on analysis and methodologies. These legitimate disagreements are proper grounds for discussion and debate among investors, their proxy advisors, and issuers; they should not be the basis for justifying the adopting of this Proposed Rule.

Proxy advisors have every incentive to conduct credible research and provide accurate recommendations—their clients seek accurate advice and proxy advisors compete to provide it. Additionally, as CII noted in its October 15, 2019, letter, "[p]roxy advisors' business model depends on factual accuracy and their incentives are thus aligned with issuers and institutional investors alike."[6] While, like every other human enterprise, proxy advisors are not perfect, when they make errors, their business interests compel them to immediately correct them and notify their clients. However, there is no real evidence—as opposed to anecdotal accounts and mischaracterizations of disagreements with management as proxy research "errors"—of an accuracy problem warranting government intervention.

### Potential for Increased Litigation

The Proposed Rule's codification of the Commission's interpretation of "solicitation" as it relates to proxy voting advice may introduce new litigation risks for proxy advisors. If this Proposed Rule is adopted, one could readily imagine a case where an issuer may threaten legal action against a proxy advisor because they believe the information provided in the recommendation is false. This litigation risk will increase due-diligence and legal costs for these companies which we may safely assume would be passed on to their investor clients. This threat of litigation could force a change in the recommendation simply to avoid legal fees, or a delay in the timeliness of the research. In both instances, the proxy advisor's clients would be adversely impacted, either by losing the independence and timeliness we expect of proxy advisors or by added legal costs that will be passed on to investor–clients.

### Problematic "Prepublication Review"

Among its several troubling provisions, the Proposed Rule would require that proxy advisors give issuers two chances to review proxy research before it is sent to investor–clients like the Fund. This would give issuers outsized influence and place a barrier between independent researchers and their paying customers. It would significantly disrupt the proxy voting system by introducing new litigation risks for proxy advisors, increasing the cost of their services, imposing severe time constraints on the production of reports, and effectively commandeering the proxy advisory firms to provide an additional platform for companies' views, which are already communicated by companies to shareholders in several other ways.

The Fund, like other institutional investors, retains proxy advisors in order to obtain cost-efficient, informed, and independent research, analysis, and advice. The independence of that advice is absolutely essential, and if proxy advisors are required to obtain issuer review and include reference to issuer objections before releasing their research to investors, that independence would be compromised,

---

[6] Letter from Council of Institutional Investors' members to SEC Chairman and Commissioners (October 15, 2019) https://www.sec.gov/comments/4-725/4725-6308155-193468.pdf.

depriving investors of a vital resource. These concerns were also noted by Commissioner Robert Jackson in his November 5, 2019, dissenting statement.[7]

Another concern with "prepublication review" is that it treats proxy advisors differently than independent research analysts. FINRA Rule 2241, which was approved by the Commission as in the public interest, guards against issuer influence that could impair analysts' independent research. This safeguard was established in order to, as the Commission has explained, "help protect research analysts from influences that could impair their objectivity and independence."[8] Additionally, Commission Investor Advocate Rick Fleming stated that the Commission has been "reluctant to allow companies to influence the research provided to investors" by stock analysts.[9] However, the Proposed Rule takes the opposite approach and requires proxy advisors to allow issuers to review their recommendations and research twice before a client receives it. If the Commission proceeds with this Proposed Rule, an analyst and a proxy adviser could write a report on the same company and the analyst would violate the securities laws by showing it to the company in advance and the proxy advisor would violate the law if it did not show it to the company in advance. This scenario confounds logic and the Commission has provided no rationale as to why proxy advisors should be held to a different standard from analysts.

The Proposed Rule also fails to address First Amendment concerns with "prepublication review." As the Commission itself recognized in exempting proxy advice from the notice and filing requirements of the proxy rules in 1992, "[a] regulatory scheme that inserted the Commission staff and corporate management into every exchange and conversation among shareholders, their advisors and other parties on matters subject to a vote certainly would raise serious questions under the free speech clause of the First Amendment." Nothing has changed in the free speech clause nor the law of the First Amendment that would suggest a different conclusion today. These "serious questions" are even more grave under the Proposed Rule because it seeks not only to limit speech, but to *compel* speech by requiring proxy advisors to publish companies' replies to their reports. Additionally, the "prepublication review" period may pressure proxy advisors to gloss over their initial differences of opinion with company management, resulting in silencing or concealing initial differences of opinion from the view of clients. This could deprive these clients of access to information. As written, the Proposed Rule would not require clients of proxy advisors to give investors the benefit of knowing about the exchange between advisors and issuers. This would be a substantial loss to investors without any tangible benefit to them and may not lead to more accurate information, but less information. In the end, investors will ultimately have access to fewer points of view, while gaining no offsetting benefit.

Lastly, "prepublication review" may not even work in practice. As prominent corporate governance expert Robert Lamm has noted: "[G]iven the concentration of shareholder meetings in the late first/second quarters, getting draft reports to companies and fielding their comments is already a struggle, even though only larger companies are currently favored with draft reports . . . If advisory firms have to

---

[7]Robert J. Jackson, Jr., SEC Commissioner, Statement on Proposed Rules to Restrict Shareholder Voting (November 5,2019) https://www.sec.gov/news/public-statement/statement-jackson-2019-11-05-open-meeting#_ftn4, footnote [5].

[8]SEC Approves Consolidated Rule to Address Conflicts of Interest Relating to the Publication and Distribution of Equity Research Reports https://www.finra.org/rules-guidance/notices/15-30.

[9] Rick Fleming, SEC Investor Advocate, Remarks at SEC Speaks: Important Issues for Investors in 2019 (April 8, 2019) https://www.sec.gov/news/speech/fleming-important-issues-investors-2019.

provide drafts to every company, it's not clear whether or how they will be able to do this."[10] The logistical challenges would be compounded by distracting and unproductive disputes about proxy advisors' recommendations between proxy advisory firms and issuers.

**The Costs of the Proposed Rule Have Not Been Accurately Accounted For**

In terms of the potential increase in costs, I believe the Commission failed to adequately assess and reasonably estimate the costs, for both proxy advisors and their clients, associated with this Proposed Rule. The Proposed Rule's "Costs" section admits this deficiency as it is littered with statements such as "unable to provide quantitative estimates," "unable to quantify this potential cost," and "we lack the data necessary to quantify." Before imposing far-reaching regulatory burdens, the Commission should provide an adequate accounting of costs. I expect that the direct costs of the Proposed Rule to proxy advisors would be passed on to investors like the Fund.

For example, the Commission's cost–benefit analysis inexplicably assumes that, on average, only one-third of U.S. companies would be subject to proxy advisory reports each year, or 1,897 registrants, with one report per registrant. This suggests the Commission was unaware that proxy advisor business models generally require them to cover all companies their clients are invested in, and many institutional investors have widely diversified portfolios.

For example, on January 7, 2020, Glass Lewis & Co (Glass Lewis) submitted a comment letter on the Proposed Rule.[11] In the comment, Glass Lewis states that it issued 5,565 proxy research reports on U.S. companies in 2018. The letter states, "[T]he Commission's summary assertion of a 250 burden hour annual, [sic] ongoing estimate for proxy advisors is entirely unexplained, unsupported by any of the necessary estimates to begin to properly estimate the total burden, and is vastly understated." Glass Lewis concludes that its preliminary, rough estimate of its annual ongoing burden under the proposed rules would be 240 times larger than the Commission's estimate. Therefore the Commission's estimate that proxy advisory firms on average would have to expend a total of 250 hours per year on all additional requirements imposed under the new regulation fails to accurately express the costs and burdens borne by proxy advisors.

Additionally, in his November 5, 2019, dissenting statement, Commissioner Robert Jackson wrote, "[B]ut the real costs of today's new regime lie in considering the issuer's feedback, including the issuer's response in the proxy advisor's report, and facing litigation from an issuer angry about the methodology used to provide anti-management advice . . . and for present purposes I make the unremarkable assumption that corporate managers reviewing a friendly proxy-advisor recommendation will not impose these costs on the advisor issuing that opinion."[12]

Another concern I have with the Proposed Rule is that it may create new barriers to entry in what has historically been an industry with few competitors. Currently in the U.S. market, the proxy advisor

---

[10] Garry Larkin, The Conference Board, On Governance: What Does the Latest SEC Guidance Mean for Proxy Advisors, Companies? (August 26, 2019) https://www.conference-board.org/blog/postdetail.cfm?post=7124.

[11] Letter from Nichol Garzon-Mitchell, General Counsel, Glass Lewis to Alex Goodenough, Policy Analyst, Office of Management and Budget (January 7, 2020) https://www.sec.gov/comments/s7-22-19/s72219-6617071-202957.pdf.

[12] Robert J. Jackson, Jr., SEC Commissioner, Statement on Proposed Rules to Restrict Shareholder Voting (November 5,2019) https://www.sec.gov/news/public-statement/statement-jackson-2019-11-05-open-meeting#_ftn3, footnote [3].

industry is concentrated in two firms: Institutional Shareholder Services (ISS) and Glass Lewis. Those who support further regulation around proxy advisors have long expressed their discontent with this "duopoly." While I believe more competition in the industry would help improve the services provided by proxy advisors, the Proposed Rule may lead to further consolidation in the industry—increasing the market share and power of the largest firms.[13] The Commission's Proposed Rule may lead to increased costs and regulatory burdens that could exacerbate the situation, while providing no clear benefit to investors. Furthermore, these costs and burdens may potentially drive some proxy advisory firms out of business, possibly leaving a true monopoly in the industry.

The Commission has dedicated numerous resources and time to identifying problems with the proxy process, including convening a Proxy Roundtable with an entire panel devoted to proxy advisors. While I appreciate the Commission's work on these important issues, it has failed to take into account the views expressed during that Roundtable. For example, at the end of the Roundtable when the Commission staff asked if proxy advisory firms needed additional regulation, no panelist—including those speaking on behalf of the issuer community—voiced any need for new regulations. Following this, a Commission staff member said: "I can't believe . . . is there anyone on the panel [who] thinks there should be additional regulation? I haven't heard it yet, and I'm kind of surprised." Despite this consensus around the lack of need for further regulation, the Commission proceeded to publish the Proposed Rule, notably omitting the lack of response to that staff member's question.

I have a responsibility to vote proxies with diligence and integrity and in the best long-term interests of the System's participants and beneficiaries. Therefore, it is inappropriate for company management to be interposed between our investment officers and our research service providers.

### About the Fund's Proxy Voting Program

Because the Proposed Rule contains incorrect assumptions about the proxy voting process and the experience of investors generally, I wish to provide the Commission with a brief description of the Fund's proxy voting program. I hope this information will allow the Commission to correct some of its errors regarding investors' experience with the proxy voting process.

The Fund's purpose is to ensure the availability of funds to pay public employee pensions through a balanced investment strategy and a focus on long-term, sustainable returns to provide the System's beneficiaries with a secure pension through prudent asset management. The Fund's public equities portfolio was valued at $113.3 billion as of March 31, 2019, included over three thousand public companies and represented 48.7% of the Fund's total portfolio. The public equities allocation relies on broad passive index funds.

Consistent with my fiduciary duty, I am responsible for safeguarding the Fund's investment portfolio. An essential component of safeguarding the Fund's investments is voting the proxies for the public companies in which the Fund invests and encouraging best corporate governance and sustainable business strategies to reduce risks and realize strong returns. The Fund's use of broad passive indexes means that we are invested in a large number of companies and sectors in the economy.

The Fund believes that proxy voting is an effective means to communicate with boards of directors and management on environmental, social and governance issues as these issues impact the sustainability,

---

[13] Tao Li, Outsourcing Corporate Governance: Conflicts of Interest Within the Proxy Advisory Industry (July 15, 2018) https://papers.ssrn.com/sol3/papers.cfm?abstract_id=2828690.

value and performance of companies. As a result, the Fund has adopted ESG Principles and Proxy Voting Guidelines (Guidelines)[14] which provide guidance on voting practices to Fund staff, its managers, and portfolio companies, and also to other corporate engagements and policy initiatives. Fund staff reviews these Guidelines biennially to address new issues and refine positions based on updated research. The Fund makes its votes available annually on its website and releases an annual Corporate Governance Stewardship Report, which summarizes the Fund's voting during the year.[15]

Proxy voting decisions are based on reviews of available information relating to items on the ballot at each portfolio company's annual and special meetings. The Fund staff analyzes a variety of materials from publicly available sources, including but not limited to: Commission filings, analyst reports, relevant studies and materials from proponents and opponents of shareholder proposals, third-party independent perspectives and studies, and analyses from corporate governance data and proxy research providers.[16]

Because of the scope of the Fund's public equity portfolio, the Fund largely votes by proxy, instead of attending annual and special meetings in- person. The Fund votes on each proposal at annual and special meetings of all its U.S. public equity companies, as well as selected international companies. Accordingly, in 2019, the Fund voted by proxy on 28,322 total ballot items at 3,273 total meetings.

**Fund's Total Number of Meetings and Ballot Items Voted 2017–19**

| Proxy Voting | 2017 | 2018 | 2019 |
|---|---|---|---|
| Meetings | 3,249 | 3,198 | 3,273 |
| Ballot Items Voted | 29,848 | 27,701 | 28,322 |

Like many institutional investors, the Fund must manage voting at thousands of shareholder meetings each year. Even with the assistance of our proxy advisory firms, this is a challenging endeavor that requires a significant investment of staff time and resources. This is compounded by the compressed nature of the season; seventy-seven percent of all U.S. proxy votes are cast between March and June. Because of this, the Fund finds it vastly more efficient to hire proxy advisory firms to assist with proxy research than to conduct this research with Fund staff. As we discuss in greater detail below, the Fund utilizes a proxy advisor's proxy voting platform and rules-based voting, which are customized to the Fund's Guidelines. This is the most efficient and cost-effective way to vote the Fund's proxies.

---

[14]New York State Common Retirement Fund's Environmental, Social & Governance Principles And Proxy Voting Guidelines, https://www.osc.state.ny.us/pension/proxyvotingguidelines.pdf.

[15] Office of the New York State Comptroller, Corporate Governance, https://www.osc.state.ny.us/pension/corporategovernance.htm.

[16] The Fund contracts with several corporate governance data and proxy research providers including Glass Lewis and ISS.

Page 7 of 21

**Fund's Total Ballot Items Voted by Month in 2017–19**

| Month | 2017 | 2018 | 2019 |
|---|---|---|---|
| January | 848 | 851 | 536 |
| February | 644 | 502 | 691 |
| March | 835 | 1,335 | 670 |
| April | 8,318 | 8,337 | 4,219 |
| May | 11,050 | 10,426 | 13,388 |
| June | 4,442 | 2,783 | 5,306 |
| July | 997 | 780 | 660 |
| August | 538 | 634 | 542 |
| September | 571 | 537 | 551 |
| October | 556 | 623 | 514 |
| November | 670 | 587 | 717 |
| December | 379 | 306 | 528 |

As mentioned above, Fund staff spends a considerable amount of time reviewing information and researching different sources to inform its decision on voting each ballot item, all within the abbreviated timeframe between the release of a company's proxy and its voting deadline. In 2019, the Fund on average submitted its vote approximately 15 days ahead of the voting deadline.

Some ballot items require a more detailed analysis, including evaluating corporate actions, controversial directors, company mismanagement or underperformance, say-on-pay, and new shareholder proposals. In 2018, the Fund conducted detailed analysis on 8,309 ballot items, approximately 30 percent of all ballot items voted. Additionally, in 2018, the Fund conducted a review of 18,863 items, approximately 70 percent of all ballot items voted.

The idea that the investors like the Fund could fully review and research every ballot item with in-house staff is daunting, to say the least, especially given the compressed time frame during which most of the voting occurs. Therefore, the Fund relies on proxy advisory firms to provide this research. The Proposed Rule fails to consider the cost of reduced access to these services that may foreseeably result from the Proposed Rule.

Put simply, we rely on proxy advisors to do this research in a manner that can spread costs over a large group of investors because it saves a great deal of money. Since it is reasonably foreseeable that, under the Proposed Rule, the proxy advisors' research will be—at the very least—sometimes late or influenced by management preferences as a result of this Proposed Rule, the Commission must consider these costs that will be borne by investors who will have to independently research potentially thousands of ballot items if proxy advisors' research is no longer considered reliably independent or available timely.

As mentioned above, the Fund independently votes its proxies according to its Guidelines and uses proxy research to help supplement our own internal research. By no means is proxy research the only resource the Fund uses to inform its voting decision. As referenced above, the Fund also analyzes a variety of materials from publicly available sources.

Since 2011, the Fund has used a proxy voting platform to facilitate its proxy voting function. In using the electronic platform, all of Fund's ballots are "prepopulated" in accordance with our own

Page 8 of 21

Guidelines. In advance of each proxy season, Fund staff performs a review to ensure that the prepopulated voting instructions match the Fund's Guidelines.

Furthermore, the Fund manually votes a variety of proxy ballots at approximately 800–1,000 companies a year. In advance of each proxy season, the Fund develops various criteria of companies or proxy items that will require manual votes.

**Fund's Current Proxy Voting Timeline**

In order to shed additional light on the process of voting from the perspective of an investor, I would like to describe the Fund's proxy voting process.

The Fund's proxy advisor will prepopulate all ballots following the publishing of its research and voting recommendation. This allows for our proxy advisor to accurately prepopulate the ballot in accordance with our instructions (the Proxy Voting Guidelines). The Fund's voting deadlines are one day prior to the meeting dates, which ensures proper transmission of our voting position.

Aside from the proxy voting mechanics itself, the Fund looks to proxy advisors to provide detailed research, analysis and voting recommendations about companies through their online platforms. The proxy advisors provide information about the companies' businesses, including ESG aspects. While the Fund's Guidelines are paramount in deciding how to vote, proxy advisors' information may be used to inform the Fund's analysis of the proxy ballot.

I am extremely concerned about the practical and financial impacts of the Proposed Rule on the Fund's proxy voting program. As discussed above, in 2019, the Fund on average submitted its vote approximately 15 days ahead of the voting deadline. Additionally, the Fund receives proxy research on average 23 days before an issuer's meeting. Under the Commission's Proposed Rule, issuers could be provided up to seven business days to conduct both the "review and feedback" and the "final notice of voting advice" periods.

Further, proxy advisors would need additional time to conduct their review and address issuer feedback. ISS has concluded this could add an additional two to three calendar days to the process. Overall, ISS has claimed that if the Proposed Rule were adopted, this would result in a nine to thirteen calendar day delay (eleven days on average) in the publication of reports to clients.[17] One could assume other proxy advisors would face similar delays to its publishing of proxy research and recommendations.

If a company used both periods, this could result in a delay of up to thirteen days in the voting process. This would limit the timeframe to review and consider the Fund's votes, while pushing our vote execution date right up to the voting deadline. If Fund staff spent a week researching and determining its voting position, which is not uncommon (for example, in corporate actions or contested elections), **this delay would mean the Fund would have only 2 days before the voting deadline.** As a result, the Fund may have to expedite its review period in order to complete it in a shorter timeframe, consider eliminating aspects of its review, or further automate its voting.

---

[17] ISS also states: "This estimation is not inclusive of the time that would be required to negotiate confidentiality agreements with all issuers and to coordinate issuer hyperlinks for inclusion in reports and in platform delivery systems. It also does not include any estimate for the considerable additional administrative requirements to manage the various different timeframes and number of draft reviews dependent on issuer proxy filing dates under the proposed rules."

These unpalatable options fly in the face of the Commission's recent "Commission Guidance Regarding Proxy Voting Responsibilities of Investment Advisers," which sets out the responsibilities of investment advisors with respect to their proxy voting and the advice they receive in preparation for voting.[18] On one hand, the Commission is demanding more diligence over the proxy voting process for investment advisors; on the other, the Commission is proposing rules that would constrict the timeframe for which shareholders would have the ability to review, research, and determine its vote in the best interests of its clients. This tension serves no beneficial purpose and only serves to injure shareholders by increasing cost and limiting access to information and guidance.

**"Excessive" Influence of Proxy Advisors**

I would also like to address the arguments made by some issuers and their lobbyists and trade group representatives that proxy advisors have excessive influence over proxy voting and their clients vote in "lockstep" with their recommendations. As stated above, the Fund votes its proxies independently, in accordance with its Guidelines, and in the best interest of its members and beneficiaries. Furthermore, when our proxy advisor prepopulates the Fund's ballots in their proxy voting platform, they do so based on the Fund's Guidelines, not the advisor's recommendations.

While supporters of this Proposed Rule contend that investors vote in "lockstep" with their proxy advisors' advice, this is false. In 2019, the Fund voted with its proxy advisor recommendations 78.1 percent of the time on all ballot items (78.4 percent with recommendations on management proposals and 62.8 percent with recommendations on shareholder proposals).

Additionally, to understand how advisory firms do not exert undue influence generally over how institutional investors vote consider the following:

- In 2018, ISS recommended voting against say-on-pay proposals (SOP) at 12.3% of Russell 3000 companies. Just 2.4% of those companies received less than majority shareholder support on SOP proposals.
- In 2019, Glass Lewis recommended in favor of 89% of directors (the Fund voted in favor of 68% of directors) and 84% of SOP proposals (the Fund voted in favor of 73% of SOP proposals), while directors received average support of 96% and SOP proposals garnered average support of 93%.
- According to Proxy Insight, which analyzes the voting records and policies of over 1,800 global investors and is the world's leading source of information on global shareowner voting, "the number of investors delegating their entire policy and voting to a proxy voting advisor is actually very low—from a sample of 1,413 investors, 75% have their own dedicated proxy voting representing a significant 92% of the assets under management."[19]

Furthermore, academic research has concluded that while both ISS and Glass Lewis appear to have some impact on shareholder voting (estimated at 6%–10% of shareholder votes), supporters of this Proposed Rule often substantially overstate the extent of their influence.[20]

---

[18] Although the Fund is not an investment advisor, the SEC's description of proxy voting responsibilities is couched in the fiduciary duty those advisors have to their clients. Because that duty is at least analogous to the Comptroller's fiduciary duty as trustee, the steps recommended by the SEC are relevant considerations for the Fund.

[19] Letter from Proxy Insight to Brent Fields, Secretary, SEC (November 13, 2018) https://www.sec.gov/comments/4-725/4725-4636546-176444.pdf.

[20]Stephen Choi, Jill Fisch, and Marcel Kahan, The Power of Proxy Advisors: Myth or Reality? (January 1, 2010) https://scholarship.law.upenn.edu/faculty_scholarship/331/.

**Prepopulated and Automated Rules-Based Voting Mechanisms**

The Fund also has concerns with how the Proposed Rule describes automated voting and its inclusion of a "reasonable alternative" of disabling of prepopulated and automatic voting mechanisms. The Fund's rules-based prepopulated ballots and automated voting allows me to fulfill my fiduciary duty in the most efficient and cost-effective manner. As stated above, the Fund does not delegate any decision-making authority to its proxy advisory firm. Rather, our proxy advisor populates ballots with voting positions customized to the Fund's instructions (the Guidelines). In advance of each proxy season, the Fund performs a review to ensure that the prepopulated rules-based voting instructions for the proxy voting platform match the Fund's Guidelines. The Fund believes that employing an automated, customized prepopulation in no way compromises its independent voting or impedes its ability to conduct due diligence of its proxy voting.

The Fund's current proxy voting process is cost-effective and efficient. As mentioned above, if the Fund were required to review and execute all of its proxy votes, it would incur considerable cost. These are the potential costs to the Fund of disabling prepopulated and automatic voting mechanisms. The Commission should consider these costs and its impact on all institutional investors that seek cost-effective and efficient means for voting their proxies.

Another misconception around "automated voting" relates to the ability to modify votes following publication of research and prepopulation ballots. The Fund has the ability to change its vote at any point before a meeting. If the Fund staff acquires new information in supplemental proxy materials, corrections or additions to proxy research, or solicitations from other investors, Fund staff reviews the Fund's votes to ensure that its voting positions remain aligned with the Guidelines.

In addition to these general comments, I wish to share the following answers in response to several of your specific questions. Each of these comments should be considered in light of the fact that I believe no changes to proxy rules for proxy voting advice are necessary at this time.

**1. Should we codify the Commission interpretation on proxy voting advice and the Commission view about unprompted requests for proxy voting advice? Would the proposed codification (adding paragraph (A) to Rule 14a-1(l)(iii) and paragraph (v) to Rule 14a-1(l)(2)) provide market participants with better notice as to the applicability of the federal proxy rules?**

No, the Commission should not treat the proxy voting recommendations provided by proxy advisors to their clients in the same way that the Commission regulates a person or firm soliciting proxies. I believe the Commission is applying an extremely broad interpretation of solicitation; soliciting the authority to vote someone's shares by proxy is not remotely similar to providing research and recommendations under contract to shareholders about factual issues. When providing voting recommendations, proxy advisors do not seek to achieve a specific result and their recommendations can either be ignored or considered by their clients as the clients see fit. This is a completely different activity than an entity soliciting proxy votes for a specific outcome.

As mentioned in my general comments, the Proposed Rule's codification of the Commission's interpretation of "solicitation" as it relates to proxy voting advice, which thereby makes it subject to antifraud prohibitions under Rule 14a-9, will introduce new litigation risks for companies that provide

proxy voting research and jeopardize their independent research, which will ultimately be detrimental to shareholders who rely on this outsourced research.

**7. Is the text of proposed Rule 14a-2(b)(9)(i) sufficient to elicit appropriate disclosure of a proxy voting advice business's conflicts of interest to its clients? Are there other examples of conflicts of interest that the Commission should take into account in considering the text of proposed Rule 14a-2(b)(9)(i)? Is the principles-based requirement in Rule 14a-2(b)(9)(i)(C) sufficient to capture material information about conflicts of interest not otherwise included within the scope of paragraphs (9)(i)(A) and (B)? Is there additional material information that should be required?**

I believe the Commission's Proposed Rule is duplicative of current practices and would not deliver decision-useful information for assessing or making voting decisions.

**24. How prevalent are factual errors or methodological weaknesses in proxy voting advice businesses' analyses? To what extent do those errors or weaknesses materially affect a proxy voting advice business's voting recommendations? To what extent are disputes between proxy voting advice businesses and registrants about issues that are factual in nature versus differences of opinion about methodology, assumptions, or analytical approaches?**

As mentioned above, I do not believe factual errors or methodological weaknesses in proxy voting research are prevalent or warrant rulemaking. Analyses mentioned in the Proposed Rule are solely based on registrants' anecdotes, and they refer to situations which are not truly "errors", but, rather disagreements about analyses and methodologies. Where there are differences of opinion, debate should be encouraged to distill the truth instead of suppression of this exchange of ideas and pressure by government regulation compelling deference in favor of management views.

In the Proposed Rule, the Commission states that some private interests, such as some corporate issuers and their lobbyists and trade group representatives, raise issues with proxy advisors such as errors in published research. When one reviews the sources cited in the Proposed Rule, those sources fail to provide a reliable basis for concluding significant problems actually do exist. For example, the only issuer source noted by the Commission is a letter from the Exxon Mobil Corporation and in that letter, Exxon says it believes ISS already adequately fixes factual errors, and does so for market-driven reasons.

The Commission states that such problems "may" or "could" exist, but fails to demonstrate that more than a trivial number of factual errors have actually occurred, and the analysis does not show that any so-called "errors" were material to the outcome of an actual shareholder vote. Even if one accepts the possible methodological flaws mentioned in the Commission's analysis referenced above, the Commission's Investor Advisory Committee stated: "From over 17,000 shareholder votes over three years, the number of possible factual errors identified by companies themselves in their proxy supplements amounts to 0.3% of proxy statements—and none of those is shown to be material or to have affected the outcome of the related vote."[21] Additionally, the Commission has failed to evaluate and provide analysis regarding the significance of this 0.3% (or 3 out of every 1,000).

---

[21]Recommendation of the Investor-as-Owner Subcommittee of the SEC Investor Advisory Committee (IAC), Relating to SEC Guidance and Rule Proposed Rules on Proxy Advisors and Shareholder Proposed Rules 2 (Jan. 16, 2020) https://www.sec.gov/spotlight/investor-advisory-committee-2012/iac-recommendation-proxy-advisors-shareholder-proposals.pdf.

Furthermore, ISS has stated that its "error rate" was 0.62% in 2018 and 0.73% in 2019.[22] This led to 41 recommendation changes in 2018 and 48 in 2019. These error rates are exceptionally low and reveal that the Proposed Rule is a solution in search of a problem.

While investors demand accuracy and accountability in proxy voting research, this is already occurring through market-driven responses and private ordering. Investors, including the Fund, regularly engage with proxy advisors to survey the procedures for identifying and addressing errors. If these issues were systemic, as some may argue, clients would withdraw their business. Proxy advisors are incentivized to provide highly accurate proxy research with policies and procedures in place to address possible errors. This includes alerting clients when an error is found, explaining the correction in a specific written communication and on the front page of the research report, and allowing clients the ability for additional follow-up if they have further questions on the correction.

In fact, the Proposed Rule may create an incentive to *not* correct errors because of the risk of legal action by companies under Rule 14a-9. In a marginal case, the proxy advisor may err on the side of a minor error that favors management to avoid litigation, rather than further explaining nuances that could invite litigation from issuers.

Additionally, this burden is not solely on the shoulders of proxy advisors. Investors are also responsible for implementing internal controls to identify and mitigate possible proxy advisory firm errors. For example, the Fund has found occasional errors like incorrect names and genders of director nominees. When an error is found, the Fund communicates this to the proxy advisor and they typically correct their research report. Indeed, as remarked above, it already is in the advisors' business interests to do so.

Nevertheless, there is a clear difference between an "error of fact" and "methodological differences" or a "difference of opinion." For example, in ExxonMobil's comment letter, the company states: "Ultimately, we do not believe it is productive to discussions of shareholder value to argue over whether any particular issue falls into the 'errors of fact' category or the 'difference of opinion' category." Clients of proxy advisors contract with firms understanding their methodologies for evaluating various ballot items. Furthermore, many proxy advisors publicly report on their guidelines and how they assess proxy issues. As mentioned above, CII's analysis of the most cited "study" on proxy research errors found that most of the claimed "errors" actually are disagreements on analysis and methodologies.

One of the most frequently identified so-called "errors" in proxy research is analysis surrounding an issuers' peer group. The creation of a peer group is often a combination of fact and opinion because no two companies are exactly alike. Peer group selection can impact many facets of proxy research, including analysis regarding executive pay. While an issuer may disagree with a proxy advisor's determination of its peer group, investors benefit from hearing independent views about appropriate peer groups from a proxy advisor. Proxy advisors also make their policies for selecting peer groups public so all market participants can understand their approach.[23] The fact that issuers may disagree with proxy advisors about peer group selection, is not an adequate basis for asserting there are enough "factual errors" to warrant Commission action. Furthermore, a "prepublication review" period for issuers is not likely to address these "methodological differences" or "difference of opinion." These differences of

---

[22] As measured by post-publication "Proxy Alerts" to clients notifying them of a material error within a benchmark proxy research report that resulted in a change of a vote recommendation.

[23] Glass Lewis, Understand Glass Lewis' Approach to Peer Groups https://www.glasslewis.com/peer-groups/.

Page 13 of 21

opinion are unlikely to be resolved by conversation between a proxy advisor and an issuer. The result would only be increased costs for clients without achieving any benefits for investors.

**25. As a condition to the exemptions in Rules 14a-2(b)(1) and 14a-2(b)(3), should registrants and certain other soliciting persons be permitted an opportunity to review proxy voting advice and provide feedback to the proxy voting advice businesses before the businesses provide the advice to clients, as proposed? If yes, how much time should be given to review and provide feedback on proxy voting advice? Are the timeframes set forth in proposed Rule 14a- 2(b)(9)(ii) appropriate? What would the impact of these proposed timeframes be on registrants, proxy voting advice businesses, and their clients? Are there alternative timeframes that would be more appropriate? Should we allow a proxy voting advice business to provide its final notice of voting advice to the registrant at any time after the registrant has provided its comments during the review and feedback period, regardless of whether the review and feedback period has expired? Are there alternative conditions to the exemptions that the Commission should consider to address the concerns regarding inaccuracies and the ability for investors to get information that is accurate and complete in all material respects?**

Issuers already have numerous venues to communicate with investors. For example, the Commission has noted that companies currently file supplemental proxy materials to counter proxy voting recommendations (however, it also said "the efficacy of this is uncertain"). These supplemental proxy materials are examples of "counter-speech," and the Commission offers no evidence or analysis for concluding that supplemental proxy materials are not an effective way for issuers to communicate their opinions regarding proxy voting recommendations. Additionally, the Commission states that while shareholders have the ability to change their vote prior to a meeting, the Commission believes this "seldom occurs." The Commission also states one explanation for this is the "inconvenience" shareholders face in changing a vote. As stated previously, the Commission has provided no evidence or analysis for concluding this. This is false and evinces the Commission's failure to understand of the process by which shareholders vote their proxies.

The Fund has the ability to withdraw its initial proxy vote and change its vote up until the voting deadline. As stated above, the Fund votes its proxies on average six days after initial proxy research is released. This provides the Fund time to conduct its own research, review proxy research, and in some cases consider issuers' supplemental proxies and possible corrections made to the proxy research.[24] Again, the Commission provides no reason or evidence to show that this process is not adequate to keep voting outcomes in line with what would occur but for the small number of possible factual errors that affect outcomes to begin with.

Another concern with the "prepublication review" period relates to the solicitation of votes. For example, if an issuer is able to preview and gain information regarding proxy advisors' recommendations as they relate to shareholder proposals, they can "game the system" using this information to devise a strategy for soliciting votes against a proposal before the proponent can even access the research. As discussed above, the Proposed Rule could severely shorten the time frame between publication of proxy

---

[24] As stated throughout this letter, the Proposed Rule would limit the time the Fund has to do this research. If the Proposed Rule is enacted, we may not be afforded appropriate time to conduct the requisite diligence before voting proxies following the release of proxy voting research.

Page 14 of 21

advisors' research and the deadline to vote proxies. Because of this, the window for shareholders to file exempt solicitations highlighting or questioning proxy advisor recommendations would also be limited.

**26. Should the number of days for the review and feedback period be contingent on the date that the registrant files its definitive proxy statement? For example, should there be a longer period (e.g., five business days instead of three) if the registrant files its definitive proxy statement some minimum number of days before the shareholder meeting at which proxies will be voted, as proposed? Would registrants and other soliciting persons be likely to take advantage of the additional time by filing their definitive proxy statements early enough to qualify for this treatment?**

I do not believe the proposed timeframes related to the date that a registrant files its definitive proxy statement would compensate for the time that would be lost because of the "prepublication review" periods. It is the Fund's observation based on a sample of 2019 meetings that issuers file definitive proxy statements on the higher end of the ranges cited in the Proposed Rule's footnotes (45-50 days on average). The "prepublication review" period may lead to delays in proxy research and the timeframes provided in the rule do not increase the likelihood of issuers filing definitive proxy statements earlier. Therefore, this would not compensate for the lost time due to the "prepublication review" period.

Additionally, I have concerns with the timeframes and the discrepancies related to business days and calendar days. While the dates for filing definitive proxy statements are in calendar days, the "prepublication review" dates are in business days. Because of the use of business days for the "prepublication review," issuers may be afforded additional days to review research. For example, if a proxy advisor submitted a report to an issuer on Friday, an issuer would have two additional days to review the research. The Proposed Rule does not address this discrepancy.

**27. What impact would the proposed review and feedback period and final notice of voting advice have on the ability of proxy voting advice businesses to complete the formulation of their voting advice and deliver such advice to their clients in a timely manner? Are there additional timing considerations or logistical challenges that we should take into account?**

As stated above, the "prepublication review" periods would negatively impact the timeliness of proxy voting research. The Fund could lose eleven days of its current proxy voting process because of the Proposed Rule. The Commission should consider the overall time it takes for proxy advisors to research and draft proxy research, the time associated with application of rules-based voting population of ballots, and the time it takes shareholders to review and research proxy voting items. Additionally, the Commission should consider the possible impact the Proposed Rule may have on investors' ability to engage with issuers regarding a proxy advisors' recommendation. I am concerned the Proposed Rule would eliminate time that is currently afforded to engage with company management.

**28. Should there generally be a review and feedback period and a final notice of voting advice, as proposed? Should we allow registrants (and certain other soliciting persons) more or fewer opportunities to review the voting advice than proposed? Should a proxy voting advice business be required to provide the final notice of voting advice only if the registrant (or certain other soliciting person) provides comments to the proxy voting advice business during the review and feedback period and the proxy voting advice business's revisions are pertinent to such comments? Should the**

period allotted for the final notice of voting advice be two business days, as proposed? Should it be longer or shorter?

As stated throughout this comment, issuers should not have a "prepublication review" of proxy research and recommendations. Such review would corrupt the independent research clients receive from proxy advisors and inject new burdens, costs, and uncertainties into the proxy voting system.

**29. Are there specific ways in which, if we allow the opportunity for registrants and certain other soliciting persons to review and provide feedback on the proxy voting advice, questions may arise about possible influencing of the proxy voting advice by the reviewing parties? How, if at all, could the independence of the advice be called into question if other parties reviewed and commented on it? How could we address such concerns? For example, would disclosure of the specific comments raised by the reviewing party and the proxy voting advice businesses' responses to this feedback help alleviate concerns about the independence of the advice?**

There are three overarching concerns with allowing issuers to have "prepublication review" of proxy research. One major reason investors contract with proxy advisors is to receive third-party, independent research on its portfolio companies. The independence of proxy advisors from issuers is absolutely essential, and if issuers have the ability to influence any part of this process, the independence could be corrupted. This is the exact reason why stock analysts reports are not subject to issuer review.

Additionally, as described above, "prepublication review" introduces new legal risks for proxy advisors which could impact voting recommendations. If this Proposed Rule is adopted, one could imagine a case where an issuer may threaten legal action against proxy advisors simply because they believe the recommendations are false when, in reality, many of these types of disagreements are due to reasonably different methodologies. This could force a change in the recommendation simply to avoid legal fees, or a delay in the timeliness of the research. In both instances, the proxy advisor's clients would be adversely impacted.

**30. What effect will the Proposed Rules, if adopted, have on proxy voting advice businesses' ability to provide timely voting advice to their clients? What are the anticipated compliance burdens and corresponding costs that proxy voting advice businesses are expected to incur as a result of the proposed new conditions? What impact will these burdens and costs have on proxy voting advice businesses' clients?**

ISS has stated that the Proposed Rule would "potentially substantially reduce our delivery time by between 45 and 65 percent." While the "prepublication review" could add five to seven days as it relates to issuers review, proxy advisors would need additional time to conduct their review and address issuer feedback. ISS has concluded this could add an additional two to three calendar days to the process. As noted above, the total delay to investors due to the Proposed Rule could be thirteen days.

The delay in research and recommendations would further strain shareholders' resources in an already constricted proxy voting season and impact the Fund's ability to make timely and informed voting decisions. The Fund will lose valuable days needed to research and determine its voting positions. It would also limit the Fund's ability to engage with issuers regarding their proxy materials and the research published by proxy advisors.

Page 16 of 21

**31. Should the proposed amendments allow a proxy voting advice business to seek reimbursement from registrants and other soliciting persons of reasonable expenses associated with the review and feedback period and final notice of voting advice in proposed Rule 14a–2(b)(9)(ii)? If so, what would constitute reasonable expenses and how should these amounts be calculated? Should the calculation of these amounts be dependent on the size or other attributes of the proxy voting advice business, or on the size of the registrant, or number of recommendations? Should there be limits on the amount beyond reasonable expenses for which a proxy voting advice business can seek to be reimbursed?**

If enacted, the proposed amendments should include a provision that allows a proxy advisor to seek reimbursement from registrants and other soliciting persons of the reasonable expenses associated with any required review and feedback period. As I have stated, one of my main concerns with the Proposed Rule is related to the potential costs for clients of proxy advisors. This would potentially help defray some of those costs that otherwise likely would be passed along to from investors.

**32. We proposed to limit the review and feedback period and final notice of voting advice requirements to only registrants and soliciting persons conducting non-exempt solicitations. Should the opportunity to review and provide feedback and receive final notice of voting advice also be given to other parties, such as shareholder proponents or persons engaged in exempt solicitations, such as in "vote no" or withhold campaigns?**

As a shareholder who regularly uses Rule 14a-8 to submit shareholder proposals at portfolio companies, the Fund would of course benefit from "prepublication review" of proxy advisor research regarding issuers where it has a proposal on the ballot because it would allow the Fund to plan a strategy before the formal release of the proxy research and voting recommendation. This could include preparing an exempt solicitation promoting the recommendation and encouraging shareholders to vote for the Proposed Rule. However, this kind of "prepublication review" from shareholder proponents, just like the "prepublication review" for issuers, threatens the core independence of the proxy research and can lead to interested parties "gaming the system" for their benefit. The Fund does not want any issuer, soliciting persons, shareholder proponent, or other interested parties to have "prepublication review" of proxy research and recommendations.

**33. Should the voting advice formulated under the custom policies established by clients whose specialized needs are not addressed by a proxy voting advice business's benchmark or specialty policies be subject to the proposed review and feedback period and final notice of voting advice requirements? Are there any confidentiality concerns, such as the revelation of the client's investment strategies, which would arise from the ability of registrants or others to review the advice formulated under these customized policies? If so, is there a need for a method for distinguishing voting advice formulated under a proxy voting advice business's benchmark or specialty policy from advice formulated under a client's custom policy, and what would be the appropriate method for making this distinction? We note, for example, at least one major proxy voting advice business asserts that it is not the "norm" for its clients to adopt all or some of the business's benchmark policy, with the "vast majority of institutional investors" opting for**

**"increasingly more detailed policies with specific views" on the issues presented for a vote in the proxy materials.**

No, custom policies established by clients should not be subject to the proposed review and feedback period and final notice of voting advice requirements. While the Proposed Rule seems to be addressing the differences between a proxy advisor's "benchmark" policy and other policies, for example, faith-based or Taft-Harley policies, one could argue the Commission may be considering allowing issuers "prepublication review" of a proxy advisors' prepopulated voting recommendations for clients with custom voting policies. There is no case in which issuers should be able to review prepopulated voting recommendations. The Fund works with our advisor to create custom rules-based voting on the Fund's Guidelines. These rules lead to the prepopulating of ballots. Additionally, the Fund already makes it Guidelines public for issuers and other market participants to review.

A "prepublication review" and final notice requirement that includes custom policies would likely dramatically impact the timeliness concerns discussed throughout this comment. For example, ISS has stated it has more than 400 custom policies for clients.

**38. Are there any risks raised by proxy voting advice businesses providing advance copies of voting advice (e.g., misuse of material, nonpublic information, or misappropriation of proprietary information), and if so, how can such risks be managed?**

Issuers and interested parties having advance copies of voting advice introduces entirely new and complex issues for all participants. I am concerned about all the risks listed above and how the process of negotiating confidentiality agreements will impact the timeliness and cost of proxy advisor services. As stated above, the determination that proxy research is a solicitation and the "prepublication review" process injects new legal risks for proxy advisors. And while the Commission states the Proposed Rule does not create a new private right of action for registrants against proxy voting advice businesses,[25] it is our expectation that proxy advisors may conclude differently. These risks can be avoided by the Commission not creating them in the first place.

**41. Should proxy voting advice businesses be required to include in their voting advice to clients a hyperlink (or other analogous electronic medium) to the response by the registrant and certain other soliciting persons, as a condition to the exemptions in Rules 14a-2(b)(1) and 14a- 2(b)(3)? Are there better methods of making the response available to the clients of proxy voting advice businesses? Should the proposed rule provide certain guidelines or limitations on the responses (e.g., responses may cover only certain topics, such as disagreements on facts used to formulate the proxy voting advice)?**

I categorically reject the idea that issuers need an additional venue to express their views to investors. As mentioned above, issuers are already afforded numerous opportunities to comment on proxy advisor research and recommendations through supplemental proxy filings. This is a low-cost and effective means for issuers to communicate directly to their shareholders. On the other hand, the "prepublication review" and hyperlink requirements could increase costs and burdens to issuers far beyond the costs of supplemental proxy filings.

---

[25] Page 60 of the Proposed Rule.

Page 18 of 21

The Commission should consider the First Amendment issues I noted above before requiring a hyperlink in proxy voting research.

**44. In instances where proxy voting advice businesses provide voting execution services (pre-population and automatic submission) to clients, are clients likely to review a registrant's response to voting advice? Should we amend Rules 14a-2(b)(1) and 14a-2(b)(3) so that the availability of the exemptions is conditioned on a proxy voting advice business structuring its electronic voting platform to disable the automatic submission of votes in instances where a registrant has submitted a response to the voting advice? Should we require proxy voting advice businesses to disable the automatic submission of votes unless a client clicks on the hyperlink and/or accesses the registrant's (or certain other soliciting persons') response, or otherwise confirms any pre-populated voting choices before the proxy advisor submits the votes to be counted? What would be the impact and costs to clients of proxy voting advice businesses of disabling pre-population or automatic submission of votes? Could there be effects on registrants? For example, if a proxy voting advice business were to disable the automatic submission of clients' votes, could that deter some clients from submitting votes at all, thereby affecting a registrant's ability to achieve quorum for an annual meeting? If we were to adopt such a condition, what transitional challenges or logistical issues would disabling pre-population or automatic submission of votes present for proxy voting advice businesses, and how could those challenges or issues be mitigated?**

I unequivocally oppose the Commission amending Rules 14a–2(b)(1) and 14a–2(b)(3) so that the availability of the proposed exemptions are conditioned on a proxy advisor structuring its electronic voting platform to disable the automatic submission of votes in instances where a registrant has submitted a response to the voting advice. The Commission should not prevent shareholders from exercising their voting rights in this manner simply because they use a proxy voting advice vendor to provide an electronic platform to execute their independent votes.

As mentioned before, the Fund has the ability to change its vote at any point before a meeting. At times, the Fund has changed its voting decision based on additional information, like corrections to proxy research, solicitations, and supplemental proxy materials. Whenever the Fund receives an email from its proxy advisors regarding a correction or update to its proxy research or recommendation, the Fund will review its vote to confirm the vote is still being made based on its Guidelines and is not affected by a correction or update.

The impact of these proposals would lead to a further delay in the voting process, adding more burdensome steps. It would also interfere with our already cost-effective and efficient proxy voting program. Any actions taken to limit prepopulation or voting will add further constraints on the proxy voting process, including additional costs listed above and a delay in the Fund's voting process.

**48. Should proxy voting advice businesses be required to disclose the nature (e.g., frequency, format, substance, etc.) of their communication with registrants (and certain other soliciting persons) to their clients or publicly?**

Proxy advisors already disclose their communications with issuers, soliciting persons, investors, and shareholder–proponents on the front page of their proxy research. Proxy advisors should continue to provide clients with as much information as possible as it relates to its engagements with all market participants, but this does not rise to the level of requiring rulemaking.

Page 19 of 21

**51. To what extent have factual errors or methodological weaknesses in proxy voting advice businesses' analyses resulted in impaired voting advice or adversely affected the ability of proxy voting advice businesses' clients to vote securities effectively?**

I do not believe that factual errors or methodological weaknesses in proxy voting advice businesses' analyses have resulted in impaired voting advice or have adversely affected the ability of proxy voting advice businesses' clients to vote securities effectively. As the Commission's Investor Advisory Committee stated: "From over 17,000 shareholder votes over three years, the number of possible factual errors identified by companies themselves in their proxy supplements amounts to 0.3% of proxy statements——and none of those is shown to be material or to have affected the outcome of the related vote."[26]

**52. Is the Proposed Rule to amend the list of examples in Rule 14a-9 necessary in light of the Commission's recent guidance specifically underscoring the applicability of Rule 14a-9 to proxy voting advice? Should the Proposed Rule to amend Rule 14a-9 list different or additional examples and, if so, which examples?**

I do not believe proxy advisors should be required by a Commission rule to disclose voting advice methodologies. These methodologies are part of the expertise that the Fund purchases as a client of a proxy advisor. I believe the requirement to disclose methodologies could lead to a homogenous set of recommendations from proxy advisors who could be pressured to use other publicly-available methodologies. Coupled with the other changes in the Proposed Rule, including the increased risk of litigation over methodological differences, could reduce the overall quality of the advice provided by proxy advisors.

**57. Is the proposed transition period appropriate? If not, how long should the transition period be and why? Please be specific.**

While I oppose the Proposed Rule in its entirety, if adopted, one year is not a reasonable timeframe for affected parties to comply with the Proposed Rule. This Proposed Rule fundamentally alters the proxy voting system and will impact the way thousands of investors vote and issuers solicit votes.

---

[26] Recommendation of the Investor-as-Owner Subcommittee of the SEC Investor Advisory Committee (IAC), Relating to SEC Guidance and Rule Proposed Rules on Proxy Advisors and Shareholder Proposed Rules 2 (Jan. 16, 2020) https://www.sec.gov/spotlight/investor-advisory-committee-2012/iac-recommendation-proxy-advisors-shareholder-proposals.pdf.

I appreciate the opportunity to submit comments on this important matter. I trust the Commission conducts the necessary analysis and review of these comments and others that have been submitted, and finds that rulemaking relating to proxy advisors is unnecessary. On behalf of the more than one million members, retirees and beneficiaries of the System for whom the Fund invests, thank you for your attention to these comments.

Sincerely,

Thomas P. DiNapoli
State Comptroller

# Foster Declaration Exhibit 16





December 13, 2018

Brent J. Fields, Esq.
Secretary
Securities and Exchange Commission
100 F Street, NE
Washington, DC 20549-0609

Re:    File No. 4-725 – Proxy Voting Roundtable

Dear Mr. Fields:

On November 15, 2018, the Securities and Exchange Commission ("**SEC**") held a Staff
Roundtable on the Proxy Process, which in our view was an efficient yet thorough examination
of the range of perspectives on proxy-related issues in the US markets.  We would like to thank
SEC staff for hosting the roundtable and for the opportunity to provide our perspective on the
issues raised during that discussion, particularly on the role of proxy advisory firms.

T. Rowe Price is in a unique position as both an institutional client of a major proxy advisory
firm as well as a corporate issuer covered by proxy advisory firm research and recommendations.
T. Rowe Price serves as investment adviser to a wide variety of clients, from individual savers to
large institutions.  As of November 30, 2018, T. Rowe Price and its affiliates managed $1.032
trillion in assets.

As an investment adviser subject to the Investment Advisers Act of 1940, T. Rowe Price is
keenly aware of the essential role that the fiduciary standard plays in protecting our clients'
interests with respect to all aspects of the advisory relationship, including voting proxies.  We
retain the proxy advisory firm Institutional Shareholder Services ("**ISS**") to provide fiduciary-
level proxy advisory and voting services.  These services include voting recommendations that
are customized to conform with T. Rowe Price voting guidelines, as well as vote execution and
regulatory reporting across the many markets globally where we invest.  We rely on ISS to
provide advisory and voting administration services that are accurate, timely, and objective.

What was most striking to us about the roundtable was the degree of consensus among investors,
issuers, service providers, academics and other stakeholders that the systems involved in proxy
voting in the United States are badly outdated, and that any improvement to them will only come
about if the Commission leads the way.  Roundtable participants made it abundantly clear that
fixing the "proxy plumbing" is far more important than proxy advisor registration — imposing
additional registration requirements on proxy advisory firms will not help to address the most
critical areas of the proxy process in need of improvements, including the lack of end-to-end vote
confirmation and verification.

# T.RowePrice®

We strongly believe that shareholders deserve to know that their proxy votes are being counted, and counted accurately. In fact, we cannot think of a more important first step toward improving the proxy process for the SEC to take than ensuring that proxy votes are consistently and transparently tabulated.

Proponents of additional regulatory requirements for proxy advisory firms assert that the activities of these firms result in undue influence over the voting decisions of institutional investors. This has not been our experience, and we believe an objective analysis of the voting record of institutional investors on non-routine matters would provide ample proof that investors in this market express thoughtful, varied, and independent views on the voting matters before them.

T. Rowe Price has established a Proxy Committee to develop our firm's positions on all major proxy voting issues, create guidelines, and oversee the voting process to ensure that proxies are voted solely in the interests of our clients. In establishing our proxy guidelines each year, the Proxy Committee relies upon our own fundamental research, independent research provided by ISS as our proxy advisor, and information presented by company management and shareholder groups.[1] Thus, we make our own voting decisions using the independent research provided to us by our proxy advisor as one factor among many used to inform our firm's voting positions.

Proponents of additional regulatory requirements for proxy advisory firms have raised concerns regarding the accuracy of proxy advisor reports, and suggested that issuers should be permitted to review and comment on proxy reports before the reports are shared with the proxy advisors' clients. From T. Rowe Price's perspective as a corporate issuer, we appreciate having effective ways to address factual errors in proxy advisor research reports and find current practices, including the ability to file amended proxy statements with the SEC, to be sufficient. As described during the roundtable, both ISS and Glass Lewis, the largest proxy advisory firms operating in the US, have transparent mechanisms in place for issuers to address any factual errors in their data analyses.

We are significantly more concerned, frankly, with the potential for issuers to inappropriately influence the research provided by proxy advisors to their clients. We note the stark contrast in principle this would have to current rules in place for sell-side research, which generally aim to prevent issuers from influencing the research produced by investment firms. For example, FINRA Rule 2241 requires broker-dealers to adopt and maintain written policies and procedures "reasonably designed to promote objective and reliable research that reflects the truly held opinions of research analysts and to prevent the use of research reports or research analysts to manipulate or condition the market or favor the interests of the member or a current or

---

[1]Independent from the current legislative debates surrounding proxy voting and proxy advisory services, T. Rowe Price continues to publicly share our proxy voting guidelines, which for 2018 can be found at: https://www3.troweprice.com/usis/content/trowecorp/en/utility/policies/_jcr_content/maincontent/polices_row_1/para-mid/thiscontent/pdf_link/pdffile.

INVEST WITH CONFIDENCE®

**T. Rowe Price®**

prospective customer or class of customers." We fail to see why the independence of sell side recommendations should be afforded greater protection than the independence of proxy recommendations.

As noted above, we rely on ISS to provide advisory and voting administration services that are accurate, timely, and objective. We therefore would have significant concerns with any proposed regulatory changes that would sacrifice the objectivity of proxy advisor reports or introduce delays in the proxy voting process that, in an already compressed and intensely seasonal voting cycle, could result in missed vote deadlines.

For these reasons, we strongly believe that the SEC's highest priority with respect to proxy voting and proxy advisory firms should be to modernize our proxy infrastructure. We encourage the Commission to focus the SEC's limited staff and resources on addressing those issues that could truly make a meaningful difference to the proxy process, rather than those that are the most politically heated.

Thank you again for this opportunity to comment on issues with US proxy voting, and for the Commission's consideration of our perspective. Please do not hesitate to contact us if we could be of further assistance.

Respectfully,

Donna F. Anderson
Head of Corporate Governance

Eric Veiel
Co-Head of Global Equity

cc:     The Honorable Jay Clayton, SEC Chairman
        The Honorable Kara M. Stein, SEC Commissioner
        The Honorable Robert J. Jackson, Jr., SEC Commissioner
        The Honorable Hester M. Peirce, SEC Commissioner
        The Honorable Elad L. Roisman, SEC Commissioner
        Dalia Blass, Director, SEC Division of Investment Management

# Foster Declaration Exhibit 17

DocuSign Envelope ID: CFE4AFA4-90DB-41AE-A77A-D555F386ACA0



ELLIOTT MANAGEMENT CORPORATION
40 WEST 57TH STREET, NEW YORK, NY 10019
TEL: +1 212 974 6000

March 30, 2020

Elad L. Roisman
U.S. Securities and Exchange Commission
100 F Street, N.E.
Washington, D.C. 20549-1090
Attention: Ms. Vanessa Countryman, Secretary

**Re: Release No. 34-87457 (Nov. 5, 2019); File No. S7-22-19**

Dear Commissioner Roisman,

Thank you for taking the time to speak to us about our comment letter on the proposed Rule with respect to proxy advisory firms. As you know, we continue to have significant concerns about aspects of the proposal and we appreciated the opportunity to share these with you in greater depth.

As you invited us to do, we are following up regarding the alternative approach that you alluded to in general terms in a speech at the Council on Institutional Investors ("CII") earlier this month. Although we cannot offer adequate comments in the absence of a formal proposed text or a full description of this novel idea, we wanted to try to offer some initial thoughts. As we understand it, the alternative you suggested would include two components. Each proxy advisory firm would send its report to the issuer and its clients at the same time, and then notify its clients in the event the issuer raises any objections. In addition, the rules would impose a "speed bump" (also included in the Commission's report) period during which the proxy voting advice services would be required to suspend their application of established voting policies, or so-called automatic voting. (It was not clear to us when that period of suspension would end and whether such policies could be reinstated as originally intended.)

We want to underscore three concerns we have about this alternative framework. First, because the alternative framework was not addressed in the Commission's request for comments, adopting it would raise a serious question regarding whether the framework is a "logical outgrowth" of the Commission's original proposal, and if not, whether it complies with the requirements under the Administrative Procedure Act for appropriate notice and comment.[1] We believe the better course, as we expressed on the call, would be to initiate a separate rulemaking process in which the "speed bump" proposal is transparently and fully articulated to the public for comment. This approach would also clarify that it is actually an SEC proposal in contrast to, as you pointed out to us, simply the idea of one Commissioner. Many may not view your speech as a proposal on which to comment, particularly while their attention is understandably focused on the ongoing COVID-19 crisis.

---

[1] *See, e.g.*, *Small Refiner Lead Phase-Down Task Force v. EPA*, 705 F.2d 506, 547 (D.C. Cir. 1983) ("Under the APA … [a] final rule must be a 'logical outgrowth' of the proposed rule."); *CSX Transp., Inc. v. Surface Transp. Bd.*, 584 F.3d 1076, 1082 (D.C. Cir. 2009) (vacating rule based on failure to comply with "logical outgrowth" requirement).

DocuSign Envelope ID: CFE4AFA4-90DB-41AE-A77A-D555F386ACA0

As discussed on the call, we also do not believe that the proposed dual "preclearance" approach in which issuers and clients each have an opportunity to comment would be any less problematic under the First Amendment than the Commission's proposal of a "prior review." The requirement that proxy advisory firms must notify their clients of an issuer's objections to the content of the report is a form of compelled speech and is prohibited by the First Amendment.[2] Proxy advisors will be effectively required to broadcast the views of public companies to their clients, which would (1) undermine their credibility with clients, (2) burden them with additional administrative costs, and (3) create potential legal issues as they are compelled to become the intermediaries for issuer statements to investors. These factors make proxy advisors' role under the "speed bump" proposal one that cannot be easily reconciled with their status as a source of independent and objective advice.  That is especially true because public companies have constant opportunity to advocate to their shareholders every day, and there is no credible basis to believe that they need the proxy advisory firms to express their views for them.

As was pointed out in many of the comments on the Commission's proposal, proxy advisory firms and issuers are not on equal footing.  Public companies are well-resourced and powerful institutions.  Although proxy advisors play an important role in shareholder elections, the balance sheets and teams of advisors that can be marshalled by large public companies mean that their "error correction" will resonate loudly in practice. These objections from an issuer would have a substantial chilling effect on the speech of proxy advisors, who will not want to be reprimanded, threatened, or sued by public companies in front of their clients. The alternative, like the original proposal, would no doubt impact the way proxy advisors frame their recommendations, inhibiting fair and impartial criticism of issuers.  In effect, there would be significant damage to the free exchange of ideas that is essential for the proper functioning of the capital markets.

We do not believe such intrusive measures to prevent "errors" are justified for the simple reason that there is no evidence of persistent or even occasional errors by the proxy advisors.  We have repeatedly cited the lack of evidence of significant errors and have yet to see any such evidence be presented.  The independent advice proxy advisors offer investors and the market plays a critical role in the open debate that allows investors to make informed judgements about public companies.  Equally important, public companies already control their disclosures and have access to other avenues including the media in order to correct any such errors, even if they were shown to exist or emerged in the future.

We would add that if there were in fact significant problems in how investors' votes are being cast – another purported argument in favor of the need for a speed bump – we would expect the many investors whose votes were cast against their wishes to have spoken up.  There have been no such concerns expressed in any significant way.  This speed bump then cannot be said to be required in order to protect the integrity of investors' votes.  The unfortunate false letter writing campaign that the SEC was subjected to and in part relied on only emphasizes the reality that there were few if any bona fide investors who are concerned about the way votes are cast.  However, we know that issuers do object to the influence of proxy advisors and how votes are cast.  Therefore, while we understand that you do not

---

[2] *See, e.g.*, *Pacific Gas & Elec. Co. v. Public Util. Comm'n*, 475 U.S. 1, 16 (1986) ("For corporations as for individuals, the choice to speak includes within it the choice of what not to say."); *Riley v. National Fed'n of Blind of N.C., Inc.*, 487 U.S. 781, 795, 798 (1988) ("Mandating speech that a speaker would not otherwise make necessarily alters the content of the speech," thus triggering "exacting First Amendment scrutiny.").

DocuSign Envelope ID: CFE4AFA4-90DB-41AE-A77A-D555F386ACA0

intend to carry water for companies and their desire for more control over what proxy advisors say, you can see why these proposals are broadly perceived to be in service of corporations and not investors.

Finally, we note that the "speed bump" alternative replicates the most fundamental problem of the original proposal because it exceeds the scope of the Commission's authority under the Exchange Act. The alternative, even with its modifications, still seeks to regulate objective and independent advice and, for the reasons we outlined in our original letter, is therefore beyond the scope of the Commission's authority regulate "solicitation." The plain meaning of "solicitation," and the purpose and consistent interpretation of this statutory text, do not support such a significant expansion of the Commission's authority. We therefore urge the Commission to abandon any form of required preclearance as an element of the proposal.

Thank you again for taking the time speak with us on the proposed Rule. We are available at your convenience if you would like to discuss any other aspects of the Rule or our comment letter.

Sincerely,

DocuSigned by:

*Richard Zabel*

28013F08A1DE4C7...

Richard B. Zabel
**General Counsel & Chief Legal Officer**
Elliott Management Corporation
40 West 57th Street, New York, NY 10019
Direct:    +1 (212) 478 1850
Main:    +1 (212) 974 6000

cc:

Chairman Jay Clayton

Commissioners Allison Lee and Hester Peirce

3

# Foster Declaration Exhibit 18



February 3, 2020

Mrs. Vanessa A. Countryman
Secretary
Securities and Exchange Commission
100 F Street, N.E.
Washington, D.C. 20549-1090

Re:    Amendments to Exemptions From the Proxy Rules for Proxy Voting Advice (Release No. 34–87457; File No. S7–22–19).

Dear Secretary Countryman:

Better Markets[1] appreciates the opportunity to comment on the above-captioned rule proposal ("Release" or "Proposal") noticed for public comment by the Securities and Exchange Commission ("SEC" or "Commission"). The Release,[2] if approved as noticed, would give corporate management significant new powers to stifle the independent voices of proxy advisory firms who serve for the benefit of American savers and retirees, and further entrench and strengthen management's ability to defeat dissenting shareholders who fight for executive accountability and improved corporate governance. While the Commission claims it is imposing these new, significant regulations for the benefit of investors, the Release fails to show any legitimate evidence that investors are asking for these protections. The Release also fails to demonstrate—to any reasonable extent—that there is indeed a market failure that requires governmental intervention; at best, the Release cites self-serving and unproven claims from corporate executives and their trade groups about "errors" in proxy advisory firms reports.

Given the corrupted public engagement process that was the impetus for the Release (and the fake, fraudulent, and disingenuous letters from "investors" cited in the Release) and the utter lack of evidence for the need for these regulations, the Commission must withdraw this Release.

The Commission, instead, should act on proposals that genuinely protect and empower shareholders, such as improving the voting process and creating a Universal Proxy so that all shareholders can have similar rights and abilities to exercise their corporate suffrage.

## **SUMMARY**

---

[1]    Better Markets is a non-profit, non-partisan, and independent organization founded in the wake of the 2008 financial crisis to promote the public interest in the financial markets, support the financial reform of Wall Street, and make our financial system work for all Americans again. Better Markets works with allies— including many in finance—to promote pro-market, pro-business, and pro-growth policies that help build a stronger, safer financial system that protects and promotes Americans' jobs, savings, retirements, and more.

[2]    *See*, Release No. 34–87457; File No. S7–22–19, 84 Fed. Reg. 66518 (December 4, 2020) *available* at https://www.federalregister.gov/documents/2019/12/04/2019-24475/amendments-to-exemptions-from-the-proxy-rules-for-proxy-voting-advice.

Securities and Exchange Commission
Page 2

The Release would harm Main Street investors as it would stifle their ability to hold corporate management accountable and weaken their ability to improve corporate governance. It must be withdrawn for the following reasons:

- The Release is a radical, ideologically-driven policy that deliberately ignores the documented value of independent advice to shareholders and fails to cite any legitimate market failures that calls for governmental intervention. The Release inappropriately sides with and further entrenches corporate management's ability to defeat dissenting shareholders.

- The Release was based upon and promoted through a demonstrably fraudulent public engagement and comment process. Eight of nine letters cited in the Release from "investors" are either fake, fraudulent, or clearly disingenuous as they are paid-for by the same corporate interests who have lobbied for the changes proposed in the Release.

- Instead of enacting policies that would obviously harm Main Street investors, the Commission should empower and enable more robust shareholder engagement.

## INTRODUCTION AND  DESCRIPTION OF PROPOSED AMENDMENTS

Proxy advisory firms[3] mainly serve institutional investors (most of whom in turn invest and manage the savings and retirement nest eggs of Americans) and registered investment advisers. Institutional investors own between 70-80% of the market value of U.S. public companies,[4] which means their engagement and corporate suffrage matters significantly in guiding the policies and governance of those public companies. Registered investment advisers manage and invest on behalf of other investors or investment companies, such as mutual funds, that also handle the savings of millions of everyday Americans.

These institutional investors and advisers are asked to process or otherwise vote on tens of thousands of proxies each year. In order to process these proxies and participate in the suffrage efficiently, either directly or on behalf of their clients, they retain the services of proxy advisory firms. Proxy advisory firms provide research and analysis on matters subject to shareholder vote, craft voting guidelines to meet the policies and investment goals of the institutional investors, and "make[] voting recommendations to their clients on specific matters subject to a shareholder vote, either based on the [proxy advisory firm's] own voting guidelines or on custom voting guidelines that the client has created."[5] Proxy advisory firms also maintain certain electronic platforms and

---

[3]     As of this writing, there are five known proxy advisory firms operating in the U.S.: (1) Institutional Shareholder Services (''ISS''); (2) Glass Lewis & Co. (''Glass Lewis''); (3) Egan-Jones Proxy Services; (4) Segal Marco Advisors; and (5) ProxyVote Plus,  *see* fn. 190, Release at 66542. ISS and Glass Lewis are said to dominate the market with over 97% of market share (*see* fn. 215 at Release 66543). ISS is the larger of the two and is registered with the Commission as an investment adviser, subject to all rules and laws regulating investment advisers.

[4]     *See* Release at 66519.

[5]     *See* Release at 66519.

1825 K Street, NW, Suite 1080, Washington, DC 20006     TELEPHONE (1) 202.618.6464     FAX (1) 202.618.6465     WEBSITE bettermarkets.com

Securities and Exchange Commission
Page 3

other administrative capacities to help institutional investors and investment advisers cast and track their votes.[6]

The Release makes significant changes to the regulatory framework that governs proxy advisory firms.

**First**, it proposes to "codify the Commission's interpretation that, as a general matter, proxy voting advice constitutes a solicitation within the meaning of Exchange Act Rule 14a–1(1)."[7] This rule amendment codifies a 2019 Commission Guidance that first expressly concluded that the conduct of proxy advisory firms constitutes as "solicitation." That Guidance was challenged in court, and the case is pending. Current SEC rules require entities engaged in proxy solicitation to make certain filings and public disclosures, unless they fall under certain exemptions. Proxy advisory firms have operated under those exemptions and have generally not been required to comply with those requirements.

**Second**—and most significant for the purposes this comment letter—the Release would "amend[] Exchange Act Rule 14a–2(b) to condition the availability of existing exemptions from the information and filing requirements of the proxy rules (Rules 14a–2(b)(1) and (b)(3)) on all proxy voting advice businesses providing the following in connection with their proxy voting advice: (i) enhanced conflicts of interest disclosure; (ii) a standardized opportunity for review and feedback by [companies] and certain other soliciting persons of proxy voting advice before a proxy voting advice business disseminates its proxy voting advice to clients; and (iii) the option for [companies] and certain soliciting persons to request that proxy voting advice businesses include in their proxy voting advice (and on any electronic medium used to distribute the advice) a hyperlink or other analogous electronic medium directing the recipient of the advice to a written statement that sets forth the [company's] or soliciting person's views on the proxy voting advice."[8]

The second amendment to the rule requires that proxy advisory firms prominently disclose to their clients (*i.e.,* sophisticated institutional investors or registered investment advisers) any conflicts of interest that they might have had when creating their proxy advisory report. These disclosures would include "any material interests, direct or indirect, of the proxy voting advice business (or its affiliates) in the matter or parties concerning which it is providing the advice."[9] The Commission envisions that this detailed conflicts of interest disclosure would also include, "the identities of the parties or affiliates involved in the interest, transaction, or relationship triggering the proposed disclosure requirement and, when necessary for the client to adequately assess the potential effects of the conflict of interest, the approximate dollar amount involved in the interest, transaction, or relationship," and the Commission warns that "boilerplate language that such relationships or interests may or may not exist would be insufficient for purposes of satisfying this condition to the exemptions."[10]

---

[6]     *See* Release at 66520.
[7]     *See* Release at 66540.
[8]     *See* Release at 66540.
[9]     *See* Release at 66526.
[10]    *See* Release at 66526-7.

Securities and Exchange Commission
Page 4

The second change would also allow corporate management of any public company to **twice** review the proxy advisory firm's report and voting recommendations regarding their company's proxy statements **before they are sent to the proxy advisory firm's clients**. These recommendations often relate to voting on directors, say on compensation packages, mergers or other major acquisition or sale decisions, and other decisions subject to shareholder approval (but not shareholder proposals). In general, once the proxy advisory firm completes its report and voting recommendations, they would send those materials to the management of the company, the management would have five business days to review the materials and offer feedback on all matters (including methodology, assessment, opinion, etc.) to the proxy advisory firm. The proxy advisory firm would not be obligated to make any changes to their report but would be obligated to send its final version back to the management, and afford the management another two business days for review before the proxy advisory firm could send the report and recommendation to its clients: the institutional investors and investment advisers who pay for this report and recommendation.

The final rule amendment relating to proxy advisory firm reports would allow companies to require the proxy advisory firms to include a hyper-link in the final recommendation report that would be linked to webpage hosted by the management. The webpage would offer a statement that describes management's perspective and disagreement with the proxy advisory firm's recommendations, analysis, and opinion.

**Third, and finally,** since proxy advisory firms remain liable for false or misleading statements or omission of material fact, the Release adds "as an example of a potentially material misstatement or omission within the meaning of the rule, depending upon particular facts and circumstances, the failure to disclose information such as the proxy voting advice business's methodology, sources of information, conflicts of interest, or the use of standards that materially differ from relevant standards or requirements that the Commission sets or approves."[11]

## COMMENTS

**The Proposal Is a Radical, Ideologically-Driven Policy That Deliberately Ignores the Documented Value of Independent Advice to Investors and Fails to Cite any Legitimate Market Failures That Call for Governmental Intervention. The Release Inappropriately Sides with and Further Entrenches Corporate Management's Ability to Defeat Dissenting Shareholders.**

Proxy advisory firms serve shareholders' interest by providing them valuable information and facilitating their corporate engagement. Before proxy advisory firms became prominent, shareholders would typically follow "the Wall Street Rule," which was to either vote with management or sell their stock.[12] Proxy advisory firms leveled the playing field by increasing access to information and enabling timely and effective shareholder engagement. Proxy advisory firms are a market-based solution to a market-born problem: the volume and frequency of proxy

---

[11] *See* Release at 66540.
[12] See George W. Dent, Jr. *A Defense Of Proxy Advisors,* MICHIGAN STATE LAW REVIEW, (2014), available at https://digitalcommons.law.msu.edu/cgi/viewcontent.cgi?article=1102&context=lr.

Securities and Exchange Commission
Page 5

statements make it **economically inefficient** for each institutional investor or investment adviser to conduct their own analysis and create their own voting platforms. [13]   The efficiencies gained are even more pronounced for small and medium-sized institutional investors who have even fewer resources to conduct the required analysis to be able to satisfy their fiduciary duty obligations towards their clients: savers and retirees.  Proxy advisory firms fill this gap by either entering into a contractual agreement that stipulates their obligations[14] towards their clients—institutional investors and investment advisers—or complying with the statutory obligation to act in the best interest of their clients.[15]

Proxy advisory firms serve the interests of shareholders by providing them objective advice and analysis that is not tainted or spun by the management of a company.[16]  The recommendations that proxy advisory reports produce can improve corporate performance even without gaining shareholder approval.[17]  Proxy advisory firms have empower investors enough that management often seeks to defuse an issue in the interest of the shareholders before (or after) a shareholder vote, or at a minimum, forces the management to better explain the rationale for its  decisions.[18]

Given these developments, it is no surprise that corporate management finds proxy advisory firms a thorn in their side.  Silencing the proxy advisory firms has been on the wish-list of corporate management and their trade associations and lobbying organizations for years, and this Proposal seems to satisfy almost all their demands.  For example, the Business Roundtable's goal has been to regulate-to-death the proxy advisory firms.[19]   The Chamber of Commerce's financial regulation priorities list includes the "reform" of proxy advisory firms as a top priority.[20]  This has been a priority for them for some time, dating back at least to 2014.[21]  The American Securities Association—a lobbying group entirely funded by the financial industry—writes in its Corporate Governance issues section that, "Unfortunately, over time proxy advisory megafirms have exploited Main Street investors by prioritizing a conflict-ridden political agenda over the

---

[13]    *See* Recommendation of the Investor-as-Owner Subcommittee of the SEC Investor advisory Committee (IAC) Relating to SEC Guidance and Rule Proposals on Proxy Advisors and Shareholder Proposals (2020) available at
https://www.sec.gov/spotlight/investor-advisory-committee-2012/sec-guidance-and-rule-proposals-on-proxy-advisors-and-shareholder-proposals.pdf ("IAC Letter").

[14]    As in the case of Glass Lewis, which is not a registered investment adviser.

[15]    As in the case of ISS, a registered investment adviser.

[16]    *See* Stefano Feltri, *Why CEOs and Regulators Clash With the Duopoly of Proxy Advisory Firms,* ProMarket (2019),  *available    at*  https://promarket.org/why-ceos-and-regulators-clash-with-the-duopoly-of-proxy-advisory-firms/
In particular see Professor Lucian Bebchuk's quote to *Politico, "If the proposed rules are adopted, proxy advisers would face the prospect of suits against them by issuers that are displeased with their recommendation, and this prospect would operate to discourage recommendations that are unfavorable to managers and to impose costs that would be borne by investors."*

[17]    *See* George Dent.

[18]    *See* George Dent.

[19]    *See* Business Roundtable's Policy Priorities, *available* at https://www.businessroundtable.org/policy-perspectives/corporate-governance/promoting-responsible-shareholder-engagement.

[20]    *See* U.S. Chamber of Commerce's Legislative and Regulatory Priorities, *available* at https://www.uschamber.com/sites/default/files/soab_20priorities_capitalmkts.pdf.

[21]    *See* Tom Quaadman, *What Color is That Smoke?—Proxy Advisory Firms Need Oversight,* U.S. Chamber of Commerce (2014),  *available* at https://www.uschamber.com/above-the-fold/what-color-smoke-proxy-advisory-firms-need-oversight.

---

Securities and Exchange Commission
Page 6

retirement security of millions of Americans."[22]  The Center for Executive Compensation—a lobby group created to defend current executive compensation practices—has written multiple briefs and reports calling for heightened regulation of proxy advisory firms.[23]  This Release encompasses nearly all the items on the wish-lists of corporate America.

The Proposal pretends that it aims to increase the accuracy of proxy advisory firms' reports and recommendations, yet the "error" and omissions' rate is in fact miniscule.  Moreover, managements have long had the opportunity to correct the record before a shareholder meeting by releasing supplemental proxy materials.  As the IAC letter discusses the matter of errors, "From over 17,000 shareholder votes over three years, the number of possible factual errors identified by companies themselves in their proxy supplements amounts to 0.3% of proxy statements—and none of those is shown to be material or to have affected the outcome of the related vote."[24]  In addition to management's ability to correct the record or otherwise offer supplemental materials that could counter a proxy advisory firm's report or recommendations through the proxy statements (before or after the shareholder meeting), as the Release itself recognizes, both Glass Lewis and ISS already have systems in place to allow companies to correct factual errors in their reports and recommendations "and respond to some aspect of their proxy voting advice" before they are sent to their clients.[25]

The Proposal also pretends that the changes are for the benefit of investors, yet there is little evidence to support that claim (see next section below).   To the contrary, institutional investors who manage trillions of dollars of Americans' savings and retirement funds are urging the SEC **not** to proceed with the misguided policies set forth in the Release.[26]

While there may be one or two laudable ideas in the Release (such as the obligation to disclose conflicts of interest), they cannot justify the overwhelmingly negative impact that these proposals will have on shareholders and investors.  This Proposal, driven by ideology and corporate preferences rather than facts and rigorous analysis, is flawed to its core and must be withdrawn.

**The Release Was Crafted and Promoted on the Basis of  a Demonstrably Fraudulent Public Engagement and Comment Process.**

Throughout the Release, the Commission argues that the Release is intended for the benefit of investors and to help "ensure that investors who use proxy voting advice receive more accurate,

---

[22]    *See* American Securities Association's policy priorities list *available* at https://www.americansecurities.org/issues.

[23]    *See* Center for Executive Compensation, *Policy Brief  on Proxy Advisory Firms,* (2017), *available at* https://execcomp.org/Docs/c17-13_DuffyBill_PB_Updated_12_2017.pdf.

[24]    *See* IAC Letter, p.5.

[25]    *See* Release at 66545.

[26]    *See* Letter from Karen Carraher, Executive Director & Patti Brammer, Corporate Governance Officer, Ohio Public Employees Retirement System (Dec. 13, 2018), *available* at https://www.sec.gov/comments/4-725/4725-4767821-176841.pdf; Letter from Kenneth A. Bertsch, Executive Director, Council of Institutional Investors (Nov. 8, 2018*), available* at https://www.sec.gov/comments/4-725/4725-4630831-176413.pdf; Letter from Marcie Frost, Chief Executive Officer, California Public Employees' Retirement System (Dec. 11, 2018), *available* https://www.sec.gov/comments/4-725/4725-4765670-176812.pdf.

---

1825 K Street, NW, Suite 1080, Washington, DC 20006

TELEPHONE
(1) 202.618.6464

FAX
(1) 202.618.6465

WEBSITE
bettermarkets.com

Securities and Exchange Commission
Page 7

transparent, and complete information on which to make their voting decisions."[27]  In a section discussing the rationale for the changes, the Commission claims that "[i]n recent years, registrants, **investors**, and others have expressed concerns about the proxy voting advice business" and it cites nine letters supposedly from investors.[28]

We examined these recent letters of support allegedly from "investors."  Three are written by an individual who identifies his affiliation as "Chairman, Advisory Council, Main Street Investors Coalition;" one is written by a "Member" of the same advisory council at the same entity; one is affiliated with an organization called "60 Plus Association;" one is affiliated with an entity called "A Coalition of Growth Companies;" one is affiliated with an organization called "Institute of Pension Fund Integrity;" and finally two are written by supposedly unaffiliated individuals.

Further investigation into these entities and individual comment letters reveals that they actually represent the views not of investors but of corporate interests.  The Main Street Investors Coalition has—according to an informed observer— "nothing to do with mom-and-pop investors. The group is actually funded by big business interests that want to diminish the ability of pension funds and large 401(k) plans—where most little guys keep their money—to influence certain corporate governance issues."[29]  The next entity, "60 Plus Association," as discussed further below, is funded by corporate supporters of more stringent proxy adviser regulation.  The third entity, "A Coalition of Growth Companies," seems to be a tagline included in the letterhead of a business association called "American Business Conference,"[30] which promises to "provide its members with unparalleled access to: Cabinet Officers and top Administration policymakers; Members of Congress; Commissioners and staff of the SEC and other regulatory agencies; Key media and Opinion leaders."[31]  The fourth entity, "Institute of Pension Fund Integrity," according to an informed and recent profile of the organization and its leader, seems to be a "dark-money lobbying group" that frequently publishes information that is "rife with errors and seemingly self-serving data."[32]  And, as we further write below, the two individuals cited have denied, on the record, that they even wrote the letters attributed to them.

As we detailed in a separate letter to the Commission, the Release was crafted and promoted based on demonstrably fraudulent public engagement process.[33]  On November 15,

---

[27]    *See* Release at 66518.

[28]    *See* Release at 66520, *see* also fn. 24 at Release at 66520, in which the Release cites the nine letters.

[29]    *See* Andrew Ross Sorkin, *What's Behind a Pitch For The Little-Guy Investor? Big Money Interests*, N.Y. TIMES (July 24, 2018), *available* at https://www.nytimes.com/2018/07/24/business/dealbook/main-street-investors-coalition.html.

[30]    *See* the letterhead that is affixed to a letter the organization sent to the SEC in connection with the announcement of the Proxy Process Roundtable, *available* at https://www.sec.gov/comments/4-725/4725-4226796-172989.pdf.

[31]    *See* About ABC page at http://10432043.sites.myregisteredsite.com/about-abc.php.

[32]    *See* Alicia McElhaney, *The Dark-Money Lobbying Group Going After Pension Funds*, Institutional Investors (April 2019), *available* at https://www.institutionalinvestor.com/article/b1f3bld0jg586l/The-Dark-Money-Lobbying-Group-Going-After-Pension-Funds.

[33]    *See* Better Markets Letter to Chairman Jay Clayton re The SEC Must Investigate Allegations That Dozens of Fraudulent or Misleading Comment Letters Were Submitted to And Relied Upon By The SEC in Connection With Two Recent Rule Proposals on The Proxy Process (December 9, 2019), *available* at https://bettermarkets.com/sites/default/files/Fraudulent_comment_letters_-_Letter_to_SEC_12-9-19.pdf (incorporated by reference herein as if fully set forth herein).

1825 K Street, NW, Suite 1080, Washington, DC 20006

TELEPHONE
(1) 202.618.6464

FAX
(1) 202.618.6465

WEBSITE
bettermarkets.com

Securities and Exchange Commission
Page 8

2018, the SEC held a roundtable in Washington, D.C. focusing on "the current proxy voting mechanics and technology, the shareholder proposal process, and the role of proxy advisory firms."[34]   The SEC solicited public comments on those topics and received over 18,000 submissions following announcement of the roundtable.[35]   In August of this year, the SEC issued two forms of guidance relating to the proxy process.[36]  And on November 5, 2019, the SEC noticed this Release.

At the open meeting on November 5, 2019, Chairman Clayton issued a statement in support of the Proposals, including this Release.[37]   In that statement, he singled out as particularly influential seven specific comment letters, purportedly filed by everyday citizens after the roundtable.  Those letters all expressed strong support for new measures, including the Release.  In Chairman Clayton's words,

> Some of the letters that struck me the most came from long-term Main Street investors, including an army veteran and a Marine veteran, a police officer, a retired teacher, a public servant, a single mom, a couple of retirees who saved for retirement, all of whom expressed concern about the current proxy process.  **A common theme in their letters was the concern that their financial investments—including their retirement funds—were being steered by third parties to promote individual agendas**, rather than to further their primary goals of being able to have enough money to lessen the fear of "running out" in retirement or to leave money to their children and grandchildren.[38]

The clear intent of those comment letters and of Chairman Clayton's public reference to them was to convey the impression that the Proposals were strongly supported by everyday investors, not only by large corporate interests, their boards, and their trade association allies.

However, on November 19, 2019, just two weeks following Chairman Clayton's statements and the Commission's vote to release the Proposals, a Bloomberg article appeared that cast grave doubts on the authenticity of dozens of comment letters submitted to the SEC, including

---

[34]     Securities and Exchange Commission, Spotlight on the Proxy Process (Nov. 15, 2018), *available* at https://www.sec.gov/proxy-roundtable-2018; *see also* Securities and Exchange Commission, Statement Announcing SEC Staff Roundtable on the Proxy Process (July 30, 2018), *available* at https://www.sec.gov/news/public-statement/statement-announcing-sec-staff-roundtable-proxy-process

[35]     Securities and Exchange Commission, Comments on Statement Announcing SEC Staff Roundtable on the Proxy Process, *available at* https://www.sec.gov/comments/4-725/4-725.htm

[36]     Securities and Exchange Commission, Commission Interpretation and Guidance Regarding the Applicability of the Proxy Rules to Proxy Voting Advice, Release No. 34-86721 (Aug. 21, 2019), *available at* https://www.sec.gov/rules/interp/2019/34-86721.pdf; Securities and Exchange Commission, Commission Guidance Regarding Proxy Voting Responsibilities of Investment Advisers, Release Nos. IA-5325; IC-33605 (Aug. 21, 2019), *available at* https://www.sec.gov/rules/interp/2019/ia-5325.pdf.

[37]     *See* Statement of Chairman Jay Clayton on Proposals to Enhance the Accuracy, Transparency and Effectiveness of Our Proxy Voting System (Nov. 5, 2019), *available* at https://www.sec.gov/news/public-statement/statement-clayton-2019-11-05-open-meeting ("Clayton Statement").

[38]     *See* Clayton Statement (emphasis added).

---

1825 K Street, NW, Suite 1080, Washington, DC 20006     TELEPHONE (1) 202.618.6464     FAX (1) 202.618.6465     WEBSITE bettermarkets.com

Securities and Exchange Commission
Page 9

the seven comment letters highlighted by Chairman Clayton.[39]  The article included the appalling revelation that those seven letters, along with at least 19 additional letters in the comment file, were either fraudulent or materially misleading with respect to the identities of the signers. According to the article, several people denied ever signing the letters that bore their names; several people were prevailed upon to sign their letters without any understanding of the issues they were supposedly addressing; and numerous signers were people with close connections to an advocacy group known as "60 Plus Association" ("60 Plus"), which is funded by corporate supporters of the Proposals.  As further reported in the article, those signers included former employees of 60 Plus; a contractor for the group; and friends and relatives of the President of the organization—none of whom disclosed their connection to 60 Plus in their letters.

The alleged conduct may have violated the criminal code, including 18 U.S.C. § 1001(a) (prohibiting materially false statements to the federal government) and 18 U.S.C. §§ 1341 and 1343 (prohibiting the use of the mails or wires in any "scheme or artifice to defraud").  For example, a person violates the mail and wire fraud provision if, with specific intent to defraud, he or she uses the mail or interstate wire communications in furtherance of a scheme to defraud.[40] Forging the names of ostensibly sympathetic retail investors, such as a retired teacher and a single mom, to letters that in fact reflect the industry's desired policy goals, for the purpose of generating a false impression of popular support for corporate-friendly policies, betrays a clear intent to defraud.  Moreover, it is obvious in light of Chairman Clayton's statements, discussed above, that if the letters were forged or misrepresented as alleged, this deception involved **material** false statements, i.e. false statements that are "capable of influencing the decision of the decision-making body to which [they] are addressed."[41]  In fact, the Department of Justice has opened criminal investigations in similar situations where groups have engaged in fraud by submitting forged comment letters urging regulators to take particular actions.[42]

These defects in the rulemaking process are unacceptable.  They have contaminated the Release and they must be addressed through a thorough investigation and a series of remedial measures, including, without limitation, a reassessment of the Proposal without reliance on the fraudulent or misleading comment letters described above.  It would be impermissible for the Commission to attempt to finalize the Proposal on the current record.

## Instead of Enacting Policies That Would Obviously Harm Main Street Investors, the Commission Should Empower and Enable More Robust Shareholder Engagement.

---

[39]  Zachary Mider and Ben Elgin, *SEC Chairman Cites Fishy Letters in Support of Policy Change*, BLOOMBERG, *available at* https://www.bloomberg.com/news/articles/2019-11-19/sec-chairman-cites-fishy-letters-in-support-of-policy-change.

[40]  *United States v. McNeil,* 320 F.3d 1034, 1040 (9th Cir. 2003); *see also United States v. Sawyer*, 85 F.3d 713, 723 (1st Cir. 1996) ("To prove mail and wire fraud, the government must prove, beyond a reasonable doubt: (1) the defendant's knowing and willing participation in a scheme or artifice to defraud with the specific intent to defraud, and (2) the use of the mails or interstate wire communications in furtherance of the scheme.").

[41]  *Neder v. United States*, 527 U.S. 1, 16 (1999).

[42]  Kevin Collier & Jeremy Singer-Vine, *Millions Of Comments About The FCC's Net Neutrality Rules Were Fake. Now The Feds Are Investigating*, BUZZFEED NEWS (Dec. 8, 2018), *available at* https://www.buzzfeednews.com/article/kevincollier/feds-investigation-net-neutrality-comments.

1825 K Street, NW, Suite 1080, Washington, DC 20006

TELEPHONE
(1) 202.618.6464

FAX
(1) 202.618.6465

WEBSITE
bettermarkets.com

Securities and Exchange Commission
Page 10

As demonstrated above, the Proposal suffers from multiple material defects and should be withdrawn and fundamentally reconsidered. But it is not enough for the Commission to withdraw a toxic Proposal; it can and should go further and actively pursue a number of reforms in the proxy process that will better equip shareholders to play an appropriately robust role in the governance of public companies. Two examples stand out as worthy of the Commission's immediate attention:

- The Commission Must Approve Its Universal Proxy Rule: Today, the choices available to shareholders voting for duly nominated directors through the proxy process are not the same as those available to shareholders who attend shareholder meetings in person. Shareholders voting by proxy are effectively required to choose either the company's nominees or those submitted by the dissidents, but not a mixture of both slates. In late 2016, the Commission proposed a sensible rule to fix this problem by requiring both the company and the dissident shareholders to use a Universal Proxy listing all duly nominated candidates (with no regard to the nominating party). This change will afford those voting through the proxy process the same selection as that available to shareholders attending the shareholder meetings in person.[43] The Commission should expeditiously approve this pro-shareholder proposal.

- The Commission Should Improve the Voting Process: Proxy voting infrastructure is critically important for both institutional and retail shareholders. As outlined by Council of Institutional Investors—an association that is comprised of pension funds, employee benefit funds, state and local entities charged with investing public assets, foundations, endowments, asset managers that in total manage over $29 trillion of investments—there are several critical improvements the Commission could undertake that would improve the proxy process infrastructure.[44] With all the advances in technology, accuracy of vote counting is still questioned, and shareholders are not confident whether their votes are indeed counted. The dissemination of proxy materials is slow and cumbersome: shareholders have little time to analyze proxy statements to be maximally informed on how to vote. Costs associated with transmitting proxy materials are too high, and they often fall on shareholders. The Commission could study the use of private blockchain to enable shareholders to vote and track their engagement with the companies they co-own.

## Conclusion

We hope the Commission finds our comments helpful. The Commission must withdraw this patently anti-shareholder Release and instead focus on protecting and empowering today's shareholders so they can more effectively engage with the companies they co-own.

Sincerely,

---

[43]    *See* Better Markets Comment Letter re Universal Proxy (January 9, 2017), *available* at https://www.sec.gov/comments/s7-24-16/s72416-1470144-130398.pdf (incorporated by reference herein as if fully set forth herein).

[44]    *See* Letter from Kenneth A. Bertsch, Executive Director, Council of Institutional Investors (Nov. 8, 2018), *available* at https://www.sec.gov/comments/4-725/4725-4630831-176413.pdf.

Securities and Exchange Commission
Page 11



Dennis M. Kelleher
President & CEO

Lev Bagramian
Senior Securities Policy Advisor

Stephen W. Hall
Legal Director & Securities Specialist


Better Markets, Inc.
1825 K Street, NW
Suite 1080
Washington, DC 20006
(202) 618-6464

███████████████████
███████████████████
████████████

www.bettermarkets.com

# Foster Declaration Exhibit 19

# Council of Institutional Investors®
## The voice of corporate governance

<u>Via Hand Delivery</u>

February 27, 2018

The Honorable Michael Crapo
Chairman
Committee on Banking, Housing, and Urban Affairs
United States Senate
Washington, DC 20510

The Honorable Sherrod Brown
Ranking Member
Committee on Banking, Housing, and Urban Affairs
United States Senate
Washington, DC 20510

Re:     *Proposed Legislation Relating to Proxy Advisory Firms and Institutional Investors*

Dear Mr. Chairman and Ranking Member Brown:

On behalf of the Council of Institutional Investors (CII) and the undersigned 48 investors and investor organizations, we are writing to express our opposition to legislation that was recently passed by the House of Representatives. The legislation, H.R. 4015, "The Corporate Governance Reform and Transparency Act of 2017," was referred to the Senate Banking Committee following its passage in the House on a nearly party-line vote on Dec. 20, 2017.

CII is a nonpartisan, nonprofit association of public, corporate and union employee benefit funds, other employee benefit plans, state and local entities charged with investing public assets, and foundations and endowments with combined assets under management exceeding $3.5 trillion. Our member funds include major long-term shareowners with a duty to protect the retirement savings of millions of workers and their families. Our associate members include a range of asset managers with more than $25 trillion in assets under management.[1]

Many CII members and other institutional investors employ proxy advisory firms to obtain cost-effective independent research to help inform their proxy voting and engagement decisions, and to execute votes based on funds' own proxy voting guidelines. Proxy voting is a critical means by which shareowners hold corporate executives and boards to account and is a hallmark of shareholder ownership and accountability. The system of corporate governance in the United States relies on the accountability of CEOs and boards of directors alike to shareowners, and

---

[1] For more information about the Council of Institutional Investors (Council or CII) and our members, please visit the Council's website at http://www.cii.org/about_us. We note that the two largest U.S. proxy advisory firms, Glass Lewis & Co. and Institutional Shareholder Services Inc. (ISS), are non-voting associate members of CII, paying an aggregate of $24,000 in annual dues—less than 1.0 percent of CII's membership revenues. In addition, CII is a client of ISS, paying approximately $19,600 annually to ISS for its proxy research.

February 27, 2018, Page 2 of 9

ensuring unencumbered shareholder access to independent research is a crucial underpinning of effective corporate governance.

H.R. 4015 threatens to upend this very independence. It would require, as a matter of federal law, that proxy advisory firms share their research reports and proxy voting recommendations with the companies about whom they are writing <u>before</u> they are shared with the institutional investors who are their paying clients. While the stated goal of the proposed legislation is the "protection of investors," we believe the legislation would bias proxy advisory firms in favor of corporate management. We also believe that the new requirements it would impose are unnecessary, overly burdensome and counter-productive.

Further, the proposed legislation appears to be based on several false premises, including the erroneous conclusions that: (1) proxy advisory firms initiate many of the so-called "activist" hedge fund agendas; (2) proxy advisory firms <u>dictate</u> proxy voting results, and (3) institutional investors do not drive or form their own voting decisions. Indeed, while many pension funds and other institutional investors contract with proxy advisory firms to review their research, most large holders have adopted their own policies and may employ the proxy advisory firms to help administer the voting of proxies during challenging proxy seasons.

In short, most large institutional investors do not "rubber stamp" the proxy advisory firms' recommendations. Rather, they vote their proxies according to their own guidelines. While many large institutional investors rely on proxy advisors to manage the analysis of issues presented in the proxy statements accompanying over 38,000 shareholder meetings annually, and to help administer proxy voting, this does not mean that they abdicate their responsibility for their own voting decisions.

The independence that shareowners exercise when voting their proxies is evident in the statistics related to "say on pay" proposals and director elections. Although Institutional Shareholder Services Inc. (ISS), the largest proxy advisory firm, recommended against say-on-pay proposals at 11.92% of Russell 3000 companies in 2017, only 1.28% of those proposals received less than majority support from shareowners. Similarly, although ISS recommended votes in opposition to the election of 10.43% of director-nominees during the most recent proxy season, just 0.185% failed to obtain majority support.

**We are particularly concerned that if enacted, H.R. 4015 would:**
- **Grant companies the right to review the proxy advisory firms' research reports before the paying customers – investors – receive the reports;**
- **Mandate that proxy advisory firms hire an ombudsman to receive and resolve corporations' complaints;**
- **Require proxy advisory firms to publish a company's statement "detailing its complaints" in the proxy advisory firms' final reports to their clients, if the ombudsman is unable to resolve these complaints and if the company makes the request in writing;**
- **Increase barriers to new entrants and potentially lead some current proxy advisory firms to exit the industry altogether, and**
- **Provide no clear benefits to institutional investors.**

February 27, 2018, Page 3 of 9

Giving corporate issuers the "right to review" the proxy advisors' work product BEFORE the reports go to the paying customers is unprecedented. It would give corporate management substantial undue influence over proxy advisory firms' reports. The approach would create a dynamic that would encourage proxy advisory firms to view management as their research clients, rather than the investors who contract for this research.

Another concern is that such forced pre-publication review may not be consistent with First Amendment rights to freedom of speech. Regardless, the attempt by government fiat to interpose corporate management between investors and those whom investors voluntarily hire to provide them with independent research is highly questionable as a matter of public policy and inconsistent with free-market principles.

Practically, the additional regulatory hurdles imposed would: (1) increase the complexity of the challenges faced by the proxy advisory firms; (2) impose even more severe time constraints on the production of reports, and (3) without a doubt, add significant resource burdens that would increase the cost of their services. The higher costs would likely be passed along to their institutional investor clients.

Under H.R. 4015, pension funds and other institutional investors would have less time to analyze the advisor's reports and recommendations in the context of their own adopted proxy voting guidelines to arrive at informed voting decisions. Time is already tight, particularly in the highly concentrated spring "proxy season," due to the limited period between a company's publication of the annual meeting proxy materials and annual meeting dates. Simply put, the proposed legislation is not constructive regulatory "reform," and is not supported by institutional investors.

Moreover, H.R. 4015 does not appear to contemplate a parallel requirement that dissidents in a proxy fight or proponents of shareowner proposals also receive the recommendations and research in advance. This would violate an underlying tenet of U.S. corporate governance that where matters are contested in corporate elections, management and shareowner advocates should operate on a level playing field.

**H.R. 4015 would also require the Securities and Exchange Commission (SEC) to assess the ability of proxy advisory firms to perform their duties and to assess the adequacy of proxy advisory firms' "financial and managerial resources."**

The entities that are in the best position to make assessments about whether any service provider – including proxy advisory firms – are adhering to contractual terms negotiated with clients are the clients themselves, not the government. Pension funds and other institutional investors that choose to purchase these services are sophisticated consumers who are fully capable of making prudent choices based on free-market principles.

In 2014, the SEC staff issued guidance reaffirming that investment advisors have a duty to maintain sufficient oversight of proxy advisory firms and other third-party voting agents. CII and many institutional investors publicly supported that guidance. We are unaware of any compelling empirical evidence indicating that the guidance is not being followed or that the burdensome federal regulatory scheme contemplated by the proposed legislation is needed.

February 27, 2018, Page 4 of 9

**If enacted, the proposed legislation would increase costs for pension plans and other institutional investors with no clear benefits.**

The costs could rise substantially if investors seek to maintain current levels of scrutiny and due diligence around proxy voting amid the exit of some or all proxy advisory firms from the business. Proxy advisory firms, while imperfect, play an important and useful role in enabling effective and cost-efficient independent research, analysis and informed proxy voting advice for large institutional shareholders, particularly since many funds hold shares of thousands of companies in their investment portfolios.

We believe that the cost estimate provided by the Congressional Budget Office (CBO) to the House Financial Services Committee in December 2017 underestimates the costs that this bill would impose through private-sector mandates. The CBO should analyze the probable effects of the proposal on competition, and the costs to investors if: (1) competition is reduced and the pricing power of a surviving proxy advisory firm is enhanced, and (2) if all present firms exit the market and the services they provided are no longer available, forcing individual investors to use internal resources not subject to the new regulatory mandate.

Finally, we note that in October 2017, the United States Department of Treasury (Treasury) performed outreach to identify views on proxy advisory firms in connection with its report to the President on "A Financial System that Creates Economic Opportunities, Capital Markets." In that report, the Treasury found that "institutional investors, who pay for proxy advice and are responsible for voting decisions, find the services valuable, especially in sorting through the lengthy and significant disclosures contained in proxy statements." More importantly, the Treasury *did not* recommend any legislative changes governing the proxy advisory firm industry.

Thank you for considering these views. CII would be very happy to discuss its perspective in more detail. Jeff Mahoney can be reached at jeff@cii.org or by telephone at (202) 822-0800.

Sincerely,

Jeff Mahoney
General Counsel
Council of Institutional Investors

Anne Sheehan
Director of Corporate Governance
California State Teachers' Retirement
System

Marcie Frost
Chief Executive Officer
CalPERS

Ron Baker
Interim Executive Director
Colorado PERA

February 27, 2018, Page 5 of 9

Denise L. Nappier
Connecticut State Treasurer
Trustee
Connecticut Retirement Plans and Trust
Funds

Michael McCauley
Senior Officer
Investment Programs & Governance
Florida State Board of Administration

Michael Frerichs
Illinois State Treasurer

Jonathan Grabel
Chief Investment Officer
Los Angeles County Employees Retirement
Association

Mansco Perry III
Executive Director & CIO
Minnesota State Board of Investment

Scott Stringer
New York City Comptroller

Thomas P. DiNapoli
New York State Comptroller

Karen Carraher
Executive Director
Ohio Public Employees Retirement System

Richard Stensrud
Executive Director
School Employees Retirement System of
Ohio

Michael J. Nehf
Executive Director
STRS Ohio

Tobias Read
Treasurer
State of Oregon

Theresa Whitmarsh
Executive Director
Washington State Investment Board

February 27, 2018, Page 6 of 9

Heather Slavkin Corzo
Director, Office of Investment
AFL-CIO

Lonita Waybright
Director of Benefits
AFSCME Employees Pension Plan

Dieter Waizenegger
Executive Director
CtW Investment Group

Ken Hall
General Secretary-Treasurer
International Brotherhood of Teamsters

Timothy J. Driscoll
Secretary-Treasurer
International Union of Bricklayers & Allied
Craftworkers

/s/ Marc Egan
Director of Government Relations
National Education Association

Cambria Allen
Corporate Governance Director
UAW Retiree Medical Benefits Trust

Kathleen Woods
Co-Chair, Portfolio Advisory Board
Adrian Dominican Sisters

/s/ Danielle Fugere
President
As You Sow

Mike Lubrano
Managing Director, Corporate Governance
and Sustainability
Cartica Management, LLC

Christopher P. Davis
Senior Director
Ceres Investor Network on Climate Risk &
Sustainability

Molly Betournay
Director of Social Research & Advocacy
Clean Yield Asset Management

Karen Watson, CFA
Chief Investment Officer
Congregation of St. Joseph

February 27, 2018, Page 7 of 9

Sister Teresa George, D.C.
Provincial Treasurer
Daughters of Charity, Province of St. Louise

Andy Mims
Partner and Trustee, Sustainability Group
Loring, Wolcott & Coolidge

Mary Ellen Leciejewski, OP
Vice President, Corporate Responsibility
Dignity Health

Jerry Judd
Senior Vice President & Treasurer
Mercy Health

Holly A. Testa
Director, Shareowner Engagement
First Affirmative Financial Network

Susan S. Makos
Vice President of Social Responsibility
Mercy Investment Services, Inc.



Josh Zinner
CEO
Interfaith Center on Corporate
Responsibility

Luan Jenifer
Chief Operating Officer
Miller/Howard Investments, Inc.

Christine Jantz
President
Jantz Management LLC

Michael Kramer
Managing Partner
Natural Investments LLC

Andrew Shapiro
Managing Member & President
Lawndale Capital Management, LLC

Mari Schwartzer
Director of Shareholder Activism and
Engagement
NorthStar Asset Management, Inc

February 27, 2018, Page 8 of 9

Judy Byron, OP
Director
Northwest Coalition for Responsible
Investment

/s/ Sanford Lewis
Director and General Counsel
Shareholder Rights Group

Amy O'Brien
Head of Responsible Investing
Nuveen
A TIAA Company

Ruth Geraets, PBVM
Congregational Treasurer
Sisters of the Presentation, Aberdeen SD

/s/ Maria Egan
Portfolio Manager and Shareholder
Engagement Manager
Reynders, McVeigh Capital Management,
LLC

Jonas D. Kron
Senior Vice President
Director of Shareholder Advocacy
Trillium Asset Management, LLC

Maureen O'Brien
Vice President and Corporate Governance
Director
Segal Marco Advisors

Timothy Smith
Director of ESG Shareowner Engagement
Walden Asset Management

CC:    The Honorable Dean Heller, Chairman, Subcommittee on Securities, Insurance, and
Investment, Committee on Banking, Housing, and Urban Affairs
The Honorable Mark Warner, Ranking Member, Subcommittee on Securities,
Insurance and Investment, Committee on Banking, Housing, and Urban Affairs
The Honorable Richard Shelby, Committee on Banking, Housing, and Urban Affairs
The Honorable Bob Corker, Committee on Banking, Housing, and Urban Affairs

February 27, 2018, Page 9 of 9

The Honorable Patrick J. Toomey, Committee on Banking, Housing, and Urban Affairs

The Honorable Tim Scott, Committee on Banking, Housing, and Urban Affairs

The Honorable Ben Sasse, Committee on Banking, Housing, and Urban Affairs

The Honorable Tom Cotton, Committee on Banking, Housing, and Urban Affairs

The Honorable Michael Rounds, Committee on Banking, Housing, and Urban Affairs

The Honorable David Perdue, Committee on Banking, Housing, and Urban Affairs

The Honorable Thom Tillis, Committee on Banking, Housing, and Urban Affairs

The Honorable John Kennedy, Committee on Banking, Housing, and Urban Affairs

The Honorable Jerry Moran, Committee on Banking, Housing, and Urban Affairs

The Honorable Jack Reed, Committee on Banking, Housing, and Urban Affairs

The Honorable Robert Menendez, Committee on Banking, Housing, and Urban Affairs

The Honorable John Tester, Committee on Banking, Housing, and Urban Affairs

The Honorable Elizabeth Warren, Committee on Banking, Housing, and Urban Affairs

The Honorable Heidi Heitkamp, Committee on Banking, Housing, and Urban Affairs

The Honorable Joe Donnelly, Committee on Banking, Housing, and Urban Affairs

The Honorable Brian Schatz, Committee on Banking, Housing, and Urban Affairs

The Honorable Chris Van Hollen, Committee on Banking, Housing, and Urban Affairs

The Honorable Catherine Cortez Masto, Committee on Banking, Housing, and Urban Affairs

The Honorable Doug Jones, Committee on Banking, Housing, and Urban Affairs

# Foster Declaration Exhibit 20

Learn more about **LSEG**

 Reuters

Subscribe

# Exclusive: Proxy adviser ISS expands offerings for 'ESG skeptic' clients

By **Ross Kerber**

March 4, 2024 5:01 PM EST · Updated March 4, 2024

**Companies**

 **Iss Global A/s**

Follow

 **Apple Inc**

Follow

 **Deutsche Boerse AG**

Follow

**Show more companies**

March 4 (Reuters) - Institutional Shareholder Services (ISS), the influential proxy adviser majority owned by Deutsche Boerse (DB1Gn.DE)  that recommends how shareholders should vote in corporate elections, will offer a new "ESG skeptic" option, according to executives.

The new offering is "in keeping with our longstanding mission to provide a wide array of voting policy choices," ISS global head of investment stewardship Lorraine Kelly said in a statement.

> Make sense of the latest ESG trends affecting companies and governments with the Reuters Sustainable Switch newsletter. Sign up here.

A strong reception for the guidelines could dampen criticism of ISS from U.S. Republican politicians, who have said the Maryland-based firm backs too many shareholder resolutions on environmental, social or governance (ESG) topics.

ISS currently offers seven types of specialty voting guidelines, beyond its benchmark guidelines, for investors like climate-focused groups or religious funds. ISS last year added "board-aligned" investment voting guidelines that opposed many ESG resolutions, though the new offering may appeal to clients who want to go further against ESG.

Advertisement · Scroll to continue

Kelly said the firm is making available the new guidelines in partnership with Bowyer Research, a fund consulting business based near Pittsburgh, for the upcoming shareholder meeting season.

ISS will initially make Bowyer's research available only to public pension plans, according to firm principal Jerry Bowyer.

Bowyer said he calls his approach that of an "ESG skeptic" and that he supports ESG resolutions less than 5% of the time, compared to about 50% for the ISS benchmark guidelines. Bowyer said he and ISS executives started speaking after he criticized ISS on social media site LinkedIn in June 2023, discussions that led to the collaboration.

Advertisement · Scroll to continue

"This is an effort at de-politicization. This isn't an effort to get companies to be more conservative, this is an effort to get companies out of the political process," Bowyer said.

For example, Bowyer said he recommended votes against shareholder measures at Apple (AAPL.O) 🔗 last week related to labor and pay equality issues.

But Bowyer said he backed proposals from conservative groups that he said focused on company policies that created investment risks including a measure calling on Apple to review how it curates app content, citing the removal of religious material in China.

Advertisement · Scroll to continue

Feedback

That measure won support from only 2% of votes cast, a typically low level ⃞ for conservative proposals. Sponsors have blamed a lack of support from proxy advisors, and a petition ⃞ organized by Inspire Investing, which serves Christian investors with what it calls "biblically responsible" policies, called for more specialty policies from proxy advisers.

Inspire portfolio manager Tim Schwarzenberger called the new ISS offering "a big step in the right direction."

Reporting by Ross Kerber in Boston; Editing by Greg Roumeliotis and Will Dunham

Our Standards: **The Thomson Reuters Trust Principles.** ⃞

Suggested Topics:

Climate & Energy    Securities Enforcement    ESG Regulation    ESG Investors    Social Impact

Purchase Licensing Rights

**Ross Kerber**
Thomson Reuters

Ross Kerber is U.S. Sustainable Business Correspondent for Reuters News, a beat he created to cover investors' growing concern for environmental, social and governance (ESG) issues, and the response from executives and policymakers. Ross joined Reuters in 2009 after a decade at The Boston Globe and has written on topics including proxy voting by the largest asset managers, the corporate response to social movements like Black Lives Matter, and the backlash to ESG efforts by conservatives. He writes the weekly Reuters Sustainable Finance Newsletter.

  

# Read Next

Boards, Policy & Regulation
**Spanish wind industry warns EU windfall tax could hurt investment**
8 hours ago

Climate & Energy
**China's Xi urges faster development of new energy system**
9 hours ago

ANALYSIS
**Investors press Amazon, Microsoft and Google on water, power use in US data centers**
5 hours ago

# Foster Declaration Exhibit 21



# Summary of Bowyer Research Proxy Voting Guidelines for States

## Introduction to Proxy Voting

**Shareholder's Right to Vote**

Common stock shareholders in public corporations typically have the right to vote on matters of corporate policy, such as electing directors, approving dividends, or initiating mergers or acquisitions. The number of votes a shareholder has corresponds to the number of shares they own. Shareholders can vote in person at the annual meeting or by proxy. Shareholder voting rights are governed by the corporation's charter, bylaws, state laws, and SEC regulations

**Voting on Proposals**

Proxy proposals are issues or resolutions that are submitted by shareholders or management for a vote at the annual meeting. Shareholders can vote on proxy proposals by mail, internet, phone, or in person. The proxy statement provides background information and recommendations on each proposal. Shareholders can vote for, against, or abstain from each proposal. Proxy voting is important for influencing corporate governance and expressing shareholder views on various environmental, social, and governance (ESG) issues (Proxy voting policy for U.S. portfolio companies).

**Delegating Votes**

Corporate proxy voting is a way for shareholders of a company to participate in the decision-making process of the company without attending the annual meeting. Shareholders can delegate their voting rights to someone else, for example to a financial advisor who will vote on their behalf in alignment with their principles and interests, or they can retain control of their votes for themselves. Shareholders can vote on various issues, such as electing directors, approving executive compensation, or supporting shareholder proposals. Corporate proxy voting is important for ensuring transparency, accountability, and integrity in corporate governance.

**Proxy Advisory Services' Role**

Proxy advisory services are firms that provide research and recommendations to institutional investors on how to vote their shares in corporate matters. They help investors make informed decisions based on the best interests of their clients and the long-term value of the companies. Proxy advisory services also facilitate the voting process by collecting and submitting proxy ballots on behalf of their clients.

Some of the benefits of proxy advisory services are:

- They reduce the information and transaction costs for investors who own shares in many companies across different markets and sectors.
- They provide analysis of corporate governance, performance, and ESG issues.
- They promote shareholder engagement and activism by raising awareness of important topics and proposals.

- They foster accountability and transparency in corporate governance by monitoring and disclosing the voting behavior of investors and companies.

Some of the challenges and criticisms of proxy advisory services are:

- They may have conflicts of interest or biases that affect their voting recommendations, such as providing consulting services to companies or having ideological agendas.
- They may have limited resources or expertise to cover all the companies and issues that they advise on, leading to errors or oversights.
- They may have a one-size-fits-all approach that does not account for the specific circumstances and preferences of each investor and company.
- They may have undue influence or power over the voting outcomes, especially if investors rely too much on their advice without conducting their own due diligence
- They may be disproportionately influenced by activists groups or investment company representatives from the Stewardship, ESG or DEI departments, which might create a selection bias problem and a lack of ideological diversity.

There are three primary proxy advisory firms in the United States: Institutional Shareholder Services (ISS), Glass Lewis & Co., Egan-Jones Proxy Services. However, ISS and Glass Lewis share approximately 97 percent of the market and have significant influence over the voting decisions of institutional investors and the governance choices of publicly traded companies.

## Proxy Advisory Services' Pro-ESG Issues

Some critics argue that proxy advisory services have a pro-ESG political bias that affects their voting recommendations. They claim that proxy advisory services:

- Have conflicts of interest or biases that affect their voting recommendations, such as providing consulting services to companies or having ideological agendas
- Have a one-size-fits-all approach that does not account for the specific circumstances and preferences of each investor and company
- Have undue influence or power over the voting outcomes, especially if investors rely too much on their advice without conducting their own due diligence
- Encourage high support for ESG shareholder resolutions, which demonstrates a liberal bias and is hostile to the oil and gas industry
- Favor left-leaning proponents and freeze out conservatives

Other critics have argued that proxy advisory services are insufficiently committed to ESG and suffered from conservative bias.

**How Proxy Voting Guidelines Work**

The earlier wave of pro-ESG criticism led to the creation of a menu of proxy guideline offerings which are different from the advisory services benchmark or "house" policies, including options focused on sustainability, or on union concerns or a particular interpretation of Catholic social policy. These options are typically more consistently supportive of ESG than house policies. Service has more recently made available options aligned with the board of management of the company, but those are not reliably non-ESG in their approach which we will see below. Proxy advisory services are firms that provide research and recommendations to investors on how to vote their shares, based on their own menu of proxy voting guidelines or the

investors' customized guidelines. In our case, we have created an extensive custom guideline consistent with the more traditional understanding of fiduciary obligation which held prior to the emergence of the ESG movement and the shift towards stakeholder capitalism. Investors can use the proxy voting guidelines and advice from proxy advisory services to make informed and consistent voting decisions that align with their interests and goals or use a customized set of guidelines consistent with their values. However, investors are ultimately responsible for their own proxy voting decisions and should not rely solely on proxy advisory services without conducting their own due diligence and oversight.

Proxy voting guidelines can be general or specific, depending on the type and complexity of the issues to be voted on. Some common topics that proxy voting guidelines may cover are:

- Board composition, independence, diversity, and performance
- Executive compensation, equity plans, and incentives
- Audit and financial reporting quality and integrity
- Shareholder rights, such as voting power, anti-takeover measures, and shareholder proposals
- Environmental, social, and governance (ESG) issues, such as climate change, human rights, and diversity and inclusion increasingly included proposals designed to counter ESG proposals.

Our approach is deeply skeptical regarding ESG and therefore goes beyond simply not supporting it and onto actively countering it when we believe it conflicts with rigorous definitions of pecuniary return to shareholders, which we think it quite commonly does.

Proxy voting guidelines can be developed by different sources, such as:

- Proxy advisory services, which are firms that provide research and recommendations to institutional investors on how to vote their shares, based on their own proxy voting guidelines or the investors' customized guidelines
- Institutional investors, such as mutual funds, pension funds, and hedge funds, which may have their own proxy voting guidelines or adopt those of proxy advisory services or other organizations
- Individual investors, who may follow their own preferences or the guidance of proxy advisory services, institutional investors, or other sources
- Or a trusted third party such as the investor's financial advisor or subadvisor. This is what we offer, a highly transparent set of guidelines from a trusted third party which is well established in opposition to ESG as a movement which tends to politicize corporate governance. More below on our custom approach.

**More on How Custom Guidelines Work**

Custom guidelines are proxy voting guidelines that are tailored to the specific preferences and goals of an individual or institutional investor or of an institution representing individual investors. Custom guidelines allow investors to have more control and flexibility over their voting decisions, as well as to reflect their values and interests on various corporate matters. Custom guidelines can be developed by the investors themselves, or by proxy advisory services or other third-party providers, based on the investors' input and feedback. See below for more information about our custom guidelines.

To create custom guidelines, investors need to:

- Define their objectives and criteria for proxy voting, such as maximizing returns, enhancing governance, or advancing or opposing ESG issues.
- Modify or supplement the existing guidelines to suit their own preferences and needs, or create new guidelines from scratch. For reasons discussed below, we ultimately chose to create our own guidelines from scratch.

- Communicate their custom guidelines to their proxy advisory service or other provider, and ensure that they are implemented correctly and consistently. Proxy Advisory Services are often still used to implement voting policies even in cases in which proxy voting guidelines do not follow the services recommendations and are instead creating from scratch. For example, although we do not follow any Proxy Advisory Service's pre-packaged recommendations and have created our own guidelines, for reason to be discussed below, we still depend on a service to actually carry out the voting process for us.

Custom guidelines can help investors achieve better alignment and outcomes with their proxy voting, as well as to differentiate themselves from other investors. However, custom guidelines also require more time, resources, and expertise to develop and maintain, however, we have already expended the time and resources and procured the expertise to create custom guidelines which are designed to align with public fiduciaries which hold to a strong view of shareholder capitalism and a negative view towards stakeholder-based approaches.

**Fiduciary Responsibilities and Proxy Voting**
The principle of fiduciary responsibility applies to corporate proxy voting because investors who vote proxies on behalf of their clients or beneficiaries have a legal duty to act in their best interests. This means that investors must exercise their proxy voting rights prudently, loyally, and cost-effectively, based on relevant facts and research, and without conflicts of interest or undue influence. Institutional investors must also document and disclose their proxy voting policies and procedures, and monitor and evaluate their proxy voting outcomes. However, the definition of what constitutes a fiduciary approach to proxy voting has become a highly contested space, with some arguing for ESG as an effective way to manage risk and others arguing that ESG is in origin, or at least has become, politicized. Disagreements about what is and what is not fiduciary is one of the reasons that custom policies are built and are rising in demand. We produce annual written reports on our proxy voting policies which are available to clients, so they can judge for themselves whether our concept of fiduciary duty aligns with their own.

**Shareholder Capitalism is Fiduciary, and Stakeholder Capitalism is Not**
Shareholder capitalism is the view that the primary purpose of a corporation is to maximize the value of its shares for the benefit of its shareholders. Stakeholder capitalism is the view that the corporation should consider the interests and needs of all its stakeholders, such as employees, customers, suppliers, communities, and the environment, in addition to shareholders.

Shareholder capitalism is consistent with fiduciary responsibility, which is the legal duty of directors and executives to act in the best interests of the corporation and its shareholders. Stakeholder capitalism, however, challenges this view and suggests directors should expand their definition of fiduciary duty, by considering the impact of board decisions on all stakeholders — both internal and external — despite there currently being no legal requirement to do so.

The case for shareholder capitalism and fiduciary responsibility rests on the following arguments:

- Shareholder capitalism promotes economic efficiency and innovation, by aligning the incentives of managers and shareholders, and by allowing the market to allocate resources to the most productive and profitable uses. Stakeholder capitalism, on the other hand, creates conflicts of interest and trade-offs among different stakeholder groups, and may result in suboptimal decisions and outcomes.
- Shareholder capitalism respects the contractual rights and obligations of the parties involved in the corporation, by honoring the voluntary agreements between shareholders, managers, and other stakeholders. Stakeholder capitalism, however, may violate these contracts and imposes externalities and

costs on shareholders, who are the residual claimants and risk bearers of the corporation.

- Shareholder capitalism enhances accountability and transparency, by providing a clear and measurable objective for corporate performance, and by subjecting managers to the discipline and oversight of shareholders and the market. Stakeholder capitalism, however, reduces accountability and transparency, by introducing multiple and vague objectives for corporate performance, and by allowing managers to escape scrutiny and responsibility by claiming to serve the interests of various stakeholders.

Therefore, shareholder capitalism and fiduciary responsibility are the best way to ensure that corporations create value for shareholders and society, while stakeholder capitalism and fiduciary expansion are likely to harm both shareholders and stakeholders in the long run.

## Overview of Our Principles Regarding Proxy Voting and Engagement

Our guidelines are designed to appeal to investors who hold to a traditional understanding of the obligations of a company towards its shareholders--that is, a focus on shareholder capitalism as opposed to stakeholder capitalism-- and which are deeply skeptical about an ESG approach to corporate governance. While this means that although some might try to describe these guidelines as conservative, they are not designed to impose conservative politics on companies. Instead, they seek to depoliticize corporate governance, to put hotly debated issues such as climate change, abortion and racial justice back in the electoral process and out of corporate governance.

In application this means that the guidelines:

- Oppose attempts to pressure companies to diminish the use of fossil fuels.
- Oppose proposals which pressure financial companies to divest from fossil fuels.
- Oppose attempts to use congruency proposals to defund professional associations and advocacy groups along ideological lines.
- Oppose proposals which pressure companies to disinvest from pro-life states.
- Oppose proposals which seek to embarrass companies for seeking lower-tax jurisdictions.
- Oppose proposals which seek to focus management toward broad social goals (such as racial justice or general market or economic performance) as opposed to matters under company control.
- Oppose proposals which discourage financial services offered to businesses engaged in transactions protected by the 2nd Amendment, or impose surveillance obligation towards the same.
- Support proposals rescinding past decarbonization efforts.
- Support proposals that call into question debanking and deplatforming practices along religious or political lines, and
- Support proposals which discourage companies from speaking out on divisive non-core political issues regarding abortion, social justice, and sexual identity issues.
- Support proposals which examine the risk that DEI programs create legal risk in light of the Harvard SCOTUS ruling regarding race and gender quotas.

Our guidelines differ from board or management recommendations in that they oppose, for example, decarbonization pledges that come from management. Furthermore, we support anti-ESG shareholder proposals that seek to rescind past

decarbonization proposals and past racial equity audit proposals. Our guidelines also support proposals seeking to quantity the financial risks of decarbonization. Proposals such as these which come from outside the usual ESG community do not receive management endorsement, whereas they do tend to receive support from us.

However, we do not offer universal support for proposals from anti-ESG groups. We oppose any such proposals which seek to impose conservative politics on the company in the same way that we oppose proposals which seek to impose liberal ideology on companies. We also do not universally oppose proposals from pro-ESG groups. When pro-ESG proponents identify genuine risk factors, for example sexual predation in online forums or risks arising from sexual harassment in companies with a problematic history, we support them.

We differ from board aligned policies offered by large proxy services in that we do not impose penalties by voting against board members based on lack of racial and gender diversity. Votes against board members are based entirely on the financial underperformance of the company compared to peers.

In addition, we diverge from management recommendations in that our guidelines take a very strict approach when it comes to situations in which board/management interests diverge from shareholder interests. Examples include weakening of shareholder voting rights, compensation practices not aligned with stockholder returns, protections of management perks and job security and shareholder asset dilution.

## Appendix I

## Proxy Voting Instructions FAQ

*What is proxy voting?*

In this context, proxy voting refers to the process by which shareholders of publicly traded companies cast votes on topics such as who will represent their interests on the board of directors, various housekeeping items, and various resolutions placed on the ballot by other shareholders.

*What is the importance of shareholder proposals?*

A high proportion of shareholder proposals are politically sensitive and come from proponents who are aligned with the ESG (environment, social, governance) approach to investing, which is increasingly seen as seeking to advance political causes via the operation of financial markets. Recently, however, proposals are coming from other groups that are acting to counteract ESG activist groups. Currently the proportion of pro-ESG proposals to anti-ESG proposals has gone from roughly twenty to one, to roughly ten to one. That trend is likely to continue with anti-ESG proposals bridging the gap.

*Why did you create a set of proxy voting instructions?*

Proxy voting is extremely complex. There are several hundred shareholder proposals per year and that number is rising rapidly. Shareholder proposals often couch a highly politicized agenda in innocuous sounding language. Shareholder activists obfuscate their intentions by creating misleading titles in increasingly elaborate attempts to "hack" the rules used by Proxy Advisory Services and asset manager to gain'

support. Often, the intent of a proposal is hidden in the details of the proposal's Supporting Statement, which must be read in full to discover the intended purpose.

*Why not just trust the Proxy Advisory Service Benchmark policies to determine our votes for us?*

Many public fiduciaries disagree with the benchmark recommendations of Proxy Advisory Services. Some seem these services as insufficiently aligned with the ESG movement. That is not our view. More recently an anti-ESG backlash has arisen and many have become more vocal in expressing the view that the services are overly aligned with ESG. While the latter have had some success in advocating for their polices in the process of forming Benchmark policies, nevertheless thus far they do not see those policies as fulfilling their needs. For example proxy services have not offered support for proposals that seek to counter ESG until now.

This holds true for all available options presented by these services, even the "Board Aligned" options which, while less favorable to ESG than other guidelines on offer, still do support ESG proposals from management (for example anti-fossil fuel proposals); oppose proposals from ESG skeptical points of view, as well as penalize boards for failing racial and gender diversity criteria.

*How are Bowyer Research Proxy Voting Policies Different?*

Bowyer Research Custom Guidelines evaluate every proposal through the standard of a narrowly focused definition of pecuniary benefit to the investor. This translates into general opposition to ESG proposals whether from shareholders of management. It does how, however, automatically vote against everything ESG. For example, data often point to the importance of governance factors (the G in ESG) as being relevant to shareholder interests. As a general rule, these policies are extremely skeptical of the E and S proposals, but less so of G proposals. In fact the guidelines are very tough on management in regards to governance issues. Examples would include any attempt to weaken shareholder rights or to reward CEOs with high salaries even when shareholder returns do not merit it. We believe that in proper corporate governance, CEOs should work for boards and boards should work for shareholders. We also have a 'no-excuses' policy on the reelection of board members when companies severely underperform their peer group—if the company severely underperformed its peer group, we vote against reelection of the board. From this standpoint, these policies vary significantly from management recommendations (though not necessarily from board-aligned policies in every case).

*Is this arrangement beneficial to ISS?*

Yes, the objective is a win/win. The top two services have 97% market share. It is not practical to offer solutions without working with the existing market leaders. And it is not practical to expect those firms to participate unless they benefit as well. This is the essence of capitalism, exchanges in which both parties win. This option responds to customer demand and offered something the marketplace wanted, but which had not previously been readily available.

*Did ISS write or contribute to these policies?*

No, this document was created without policy input from ISS. It represents Bowyer Research's point of view as well as BR's estimation of the needs expressed by a wide array of public and private fiduciaries which are not aligned with the ESG movement and stakeholder capitalism. There was cooperation between Bowyer Research and ISS in that the policies were written in a way which handshakes well with ISS's existing coding and implementation system, which allowed us to structure the guidelines in a way intended to minimize the likelihood of misunderstanding of the policies voting intent.

*How do these policies differ from a "board aligned" or "management aligned" approach?*

First it is important to understand the distinction between universally voting with board recommendations on the one hand and proxy advisory policies which are described as board or management aligned on the other. "Board aligned" policies do not actually always align with board recommendations. For example both major proxy advisors impose penalties in the form of adverse votes in cases in which the advisor deems the board insufficiently diverse according to race and gender (and in the case of one of the advisors "gender identity"). In addition, board aligned policies, while they default towards siding with management on proposals regarding disclosure of environment and social factors, nevertheless "In those circumstances where it is widely considered that greater disclosure will directly enhance or protect shareholder value and is reflective of a clearly established reporting standard in the market, the Global Board-Aligned Policy will generally recommend in support of such proposals." In other words, board aligned policies may possibly vote against the board on environment and social disclosure proposals based on industry standard practices. However, highly ESG-skeptical fiduciary entities may feel that industry standards have been overly influenced by ESG activists. Examples where Bowyer Research varies from board aligned policies based on "best practices" include support for or against board members; CEO pay, as well as mergers and acquisitions. Board aligned policies tend to follow "best practices" in corporate governance, but the problem is that such policies may have been disproportionately influenced by activists and academics often lacking skin in the game and often lack vigorous support in the financial data. Bowyer Research guidelines tend to take a more market driven approach. Adverse board votes are based on poor stock performance, not on alleged best practices.

Second, it is important to understand that boards oppose shareholder proposals over 90% of the time and this includes proposals from groups which are attempting to counter ESG influence in the boardroom. Typically these proposals come from conservative advocacy groups or asset managers, but often are designed to depoliticize the process. Thus far board-aligned policies have opposed all such counter-ESG proposals from outside the traditional "socially responsible" investing community.

Third, board aligned policies support pro-ESG proposals from the management team such as Net Zero commitments or Say on Climate proposals. Our policy is to oppose these proposals. We do not believe that companies ought to make even non-binding commitments to decarbonization in an uncertain future.

*Do these policies push conservative ideology onto companies?*

No, the approach is non-political and focused narrowly on pecuniary benefit to investors. This is not an attempt to move companies to the right, but rather an attempt to move them to neutral. That having been said, the guidelines do tend to support proposals from conservative groups, but only when those proposals themselves are focused on getting companies away from politics.

*Why do these voting instructions sometimes seem to support proposals that sound like they are coming from the left?*

Because often conservative groups that are promoting depoliticization use titles that mimic some of the language the left has used in the past. They do this because using similar language to past proposals (which have been upheld by the SEC) is estimated to help these new proposals also be upheld by the SEC based on past precedent. So, the language of "diversity" is used to discourage companies from discriminating based on viewpoint, which would not be fiduciary. The language of "racial equity audits" is used to examine whether companies have been engaged in illegal reverse discrimination or to call into question a travel subsidy offered only if the employee is

no longer pregnant when she returns. BR looks carefully at the details to make such distinctions clear.

*Is this offered to private asset managers that public fiduciaries use?*

Not at this time. This would only be available currently to the pension plans (or other similar public fiduciaries), not to their private asset managers. As such it is only applicable in situations in which the public fiduciary entity directly owns the underlying shares.

*Why not make this available to everyone?*

That is under consideration for later, but there are some practical challenges in implementing something like that in such a tight frame as would be required for use in 2024. BR has some existing contractual relationships with private clients that do not allow it to freely share these policies. Those contracts, however, do allow for these instructions to be made available to government funds.

*Why are these instructions so detailed?*

They are detailed in order to minimize the possibility that the clients' wishes will be misunderstood, and also to deal with the rapidly increasing variety of new types of proposals.

*Do you have research support for your positions?*

BR has an extensive library of white papers (currently over 300 of them) supporting the positions represented in the voting instructions.

# Foster Declaration Exhibit 22



☰  **CNN Business**    Markets    Tech    More ˅          ● Watch    🎧 Listen    🔍    [ Sign in ]

| Markets → | | | | Fear & Greed Index → | Latest Market News → |
|---|---|---|---|---|---|
| DOW | 48,218.25 | 0.63% ▲ | | | Judge tosses Trump's Wall Street Journal defamati... |
| S&P 500 | 6,886.24 | 1.02% ▲ | | **Fear** is driving the US market  **41** | Oil prices jump on US plans to blockade Iranian por... |
| NASDAQ | 23,183.74 | 1.23% ▲ | | | Senate housing bill that takes aim at institutional in... |

# Corporate America loves deregulation. Then why is it pushing for these rules?

 By Matt Egan, CNN Business
🕐 5 min read · Updated 7:29 AM EDT, Fri March 29, 2019





🔲 Video Ad Feedback

    JPMorgan CEO isn't worried about the US economy   ⏵ 02:44

 Analyst: Tech will rise 20... ⏵ 01:37   →

**MORE FROM CNN**

 Judge blocks Pentagon's latest bid to limit press access in scathing ruling

 Data centers are spreading around the country. Now, data-center bans are, too

 RFK Jr.'s HHS rewrites rules governing key CDC vaccine committee

**New York (CNN Business)** — Corporate America is once again in a fight over regulation. Except this time, large businesses have switched sides: they're actively asking the government to impose new rules.

The bizarre shift is being led by the US Chamber of Commerce and the National Association of Manufacturers, two powerful groups that often plead with Washington to cut red tape.

Advertisement



CNN                                              **RELATED**                                              ✕

**Judge blocks Pentagon's latest bid to limit press access in scathing ruling**

The corporate lobbies are now urging the SEC to add extra scrutiny on a little-known but critical pocket of the investment world: proxy advisory firms.

Led by Glass Lewis and Institutional Shareholder Services, proxy advisers help pension funds and large asset managers decide how to vote their shares by arming them with independent research and guidance. A recommendation from ISS or Glass Lewis to reject a pay package or oust a director can be quite influential.



> ## Those who want the market to work on its own and want no regulation for themselves are calling for greater regulation."
>
> Eleanor Bloxham, CEO of The Value Alliance

Corporate America, with companies that include Boeing (BA), Chevron and Wynn Resort, argue that proxy advisers wield too much power, have conflicts of interest and are mistake-prone.

The Chamber of Commerce and NAM even launched a $1 million digital and print ad campaign last year aimed at highlighting the "dangers" of proxy advisory firms.

Advertisement

But others say business groups are going after proxy advisers to silence shareholders by cutting them off from the rigorous research needed to scrutinize gaudy pay packages and evaluate complicated proposals on topics such as climate change and minimum wage hikes.

"The attempt to curb necessary independent research should be opposed," New York City Comptroller Scott Stringer told CNN Business in a statement.

The critics of proxy advisory firms, Stringer noted, are the board members and corporate executives who are the subjects of the research.

"Now they're spending big bucks to pull curtains and point at problems that do not exist," he said.

**CNN BUSINESS VIDEOS**


How money app Venmo almost ran out of cash ⊙ **2:26**


'SNL' spoofs Artemis II mission, Melania Trump ⊙ **1:05**


US inflation rises to the highest level in nearly two years ⊙ **2:20**


LinkedIn executives pen new book on how to better adjust to the age of AI ⊙ **7:30**

## 'Extremely ironic'

Notably, the push for enhanced oversight of proxy advisory firms isn't coming from grassroots organizations, corporate governance groups or even institutional shareholders. Instead, it's coming from well-heeled lobbies that frequently complain about excessive regulation.

Advertisement

"It's extremely ironic," said Eleanor Bloxham, the CEO of The Value Alliance, a firm that advises boards on corporate governance practices. "Those who want the market to work on its own and want no regulation for themselves are calling for greater regulation."

Charles Crain, NAM's director of tax and domestic economic policy, insisted that business groups are merely seeking reforms that protect investors by providing effective oversight.

"We aren't trying to regulate proxy firms out of existence," Crain said in an interview.

More than 300 companies, led by Nasdaq (NDAQ), wrote a letter to the SEC last month urging the agency to take "strong action to regulate" proxy advisory firms. The letter proposed giving companies the ability to "identify and correct errors" made by proxy advisors, the disclosure of conflicts of interest and the opportunity to address "significant disputes."

PAID PARTNER CONTENT          Dianomi



**RELATED ARTICLE**
Wells Fargo CEO Tim Sloan
steps down suddenly

"Proxy advisory firms are putting your 401K at risk," a website set up by the Chamber of Commerce and NAM warned.

Advertisement

Regulators are taking the complaints seriously. The SEC held a roundtable on the proxy process in November and could announce new rules in the coming months.

But at least one SEC official has voiced serious skepticism about the looming crackdown.

Last September, SEC Commissioner Robert Jackson called efforts to regulate proxy advisers "misguided" and noted this has "long been a top priority of corporate lobbyists." Jackson added that there is "little proof" that proxy advisers have too much power.

## Contentious board fights

T. Rowe Price knows proxy advisory firms well. The publicly traded asset manager pays to gain access to proxy advisers' research and is also a subject of the research for its own shareholder votes.

In a letter to the SEC, T. Rowe Price (TROW) expressed "significant concerns" with proposed regulatory changes that would "sacrifice the objectivity" of proxy advisory research or delay the voting process. And T. Rowe warned that the proposed changes could allow companies to "inappropriately influence" this research.

Advertisement

"There is a real concern amongst our clients that any dramatic changes will impact the ability of ISS and other proxy advisory firms to deliver the services on a timely and cost-effective basis," Steven Friedman, general counsel at ISS, said in an interview.

Proxy advisers are often caught in the middle of heated board fights.

For instance, ISS urged shareholders to oust most of Wells Fargo's board of directors in 2017 and accused the board of having "failed" for years to provide the kind of tough oversight required to prevent "unsound" banking practices. Glass Lewis similarly took Wells Fargo's board to task for "failings" that led to the scandal.

All of Wells Fargo (WFC)'s directors were re-elected during that contentious shareholder meeting but several directors received unusually-low levels of support. Those directors eventually left the Wells Fargo (WFC) board.

"A new regulatory regime for proxy advisors simply isn't necessary," Glass Lewis CEO Katherine Rabin said in a statement. She said new regulation would likely make it "more difficult" for institutions to do their jobs on behalf of millions of savers.

# Quieting say-on-pay?

Some believe the push to clamp down on proxy firms is really about a desire to protect executive pay. The 2010 Dodd-Frank reform law required companies to hold nonbinding votes on compensation packages, giving shareholders a way to voice disapproval.

Advertisement

Much to companies' dismay, proxy advisory firms have at times called out what they see as excessive pay packages.

**RELATED ARTICLE**
Goldman Sachs made 220 million reporting errors over a decade, UK regulator says

In 2017, proxy advisory firms criticized EpiPen maker Mylan (MYL) for rewarding executives with lavish pay despite controversy over the drug maker's price hikes and tumbling stock price. Glass Lewis gave Mylan (MYL) an "F" for its compensation decisions and ISS urged shareholders to oust the company's entire board.

While Mylan's board survived, shareholders rejected the company's compensation package.

Not surprisingly, Mylan has been involved in lobbying around a bill that would require greater oversight of proxy advisory firms, according to 2018 Congressional records.

"This is an issue of power and control," said Bloxham. "Weakening proxy advisory firms might be viewed as a way to weaken the shareholder votes against a company."

# Up next

Judge blocks Pentagon's latest bid to limit press access in scathing ruling

3 minute read



Data centers are spreading around the country. Now, data-center bans are, too

5 minute read



RFK Jr.'s HHS rewrites rules governing key CDC vaccine committee

5 minute read



# Foster Declaration Exhibit 23

**The New York Times**

https://www.nytimes.com/2014/05/29/business/advisory-group-opposes-re-election-of-most-of-targets-board.html

# *Advisory Group Opposes Re-election of Most of Target's Board*

**By Elizabeth A. Harris**

May 28, 2014

An influential shareholder advisory group said that most of Target's board did not deserve to be re-elected, directly linking what it said was a lack of adequate oversight by the board to the extensive breach of customer data late last year.

The move was unusual for the advisory group, Institutional Shareholder Services, which said that seven of Target's 10 board members deserved to be voted against. An I.S.S. spokesman said that so far this year, the firm has recommended shareholders vote against the majority of board members only 11 times — out of 421 companies it has assessed in the Standard & Poor's 500-stock index.

I.S.S. also said Target should separate the roles of chairman and chief executive.

In outlining its reasons this week for seeking to overturn much of the board's composition, I.S.S. said that members of the board's audit committee and corporate responsibility committees had failed to provide adequate risk oversight, and that changes the committees made since the breach were "largely reactionary in nature."

"The data breach revealed that the company was inadequately prepared for the significant risks of doing business in today's electronic commerce environment," the I.S.S. report said. "It appears that failure of the committees to ensure appropriate management of these risks set the stage for the data breach, which has resulted in significant losses to the company and its shareholders."

On Wednesday, Target called risk oversight "a full board responsibility," rather than the purview of just a few members. It also defended its data security standards before its system was breached — despite the fact that many experts have said the company failed to put in place certain important security measures, and even ignored the warnings of its own security system during the breach.

"With respect to information security matters, the board believes that Target was among the best-in-class within the retail industry," the company said in a statement. "As one would expect, following the criminal attack that resulted in the data breach, the board is re-examining the entire risk oversight structure, including senior management roles and reporting structures, as well as board oversight."

But I.S.S. also criticized many of the very moves Target has made since the breach in an effort to right itself, including its current search for a chief information security officer and a chief compliance officer.

"For shareholders who have seen the value of their investment decline by over 10 percent, this might appear to be a case of 'too little too late,' " I.S.S. said.

Since news of the breach became public in December, Target has been knocked off kilter. Three of the retailer's highest-ranking executives, including Gregg Steinhafel, the chief executive, have resigned or been fired. The company's earnings have taken a substantial hit. All the while, Target has struggled with a disastrous introduction in Canada, its first foray outside the United States.

Target's stock has fallen more than 12 percent in the last six months.

The board members whom I.S.S. recommended voting against were Roxanne S. Austin, Anne M. Mulcahy, Mary E. Minnick, Calvin Darden, Henrique De Castro, Derica W. Rice and James A. Johnson. The voting will take place during Target's annual shareholder meeting, which is scheduled for June 11.

---

A version of this article appears in print on , Section B, Page 2 of the New York edition with the headline: Advisory Group Opposes Re-election of Most of Target's Board

# Foster Declaration Exhibit 24

Learn more about  **LSEG**

 **Reuters**     Subscribe

# JPMorgan pushes back on ISS recommendations on severance, independent chair

By **Reuters**

May 14, 2024 2:40 PM EDT · Updated May 14, 2024

  

A view of the exterior of the JP Morgan Chase & Co. corporate headquarters in New York City May 20, 2015. REUTERS/Mike Segar/File Photo Purchase Licensing Rights 🗗

**Companies**

**Institutional Shareholder Services Inc**

Follow

**JPMorgan Chase & Co**

Follow

**Bank of America Corp**

Follow

**Show more companies**

May 13 (Reuters) - JPMorgan Chase (JPM.N) ⬀ on Monday pushed back against recommendations made by proxy advisor Institutional Shareholder Services (ISS) on investor proposals on severance payouts and the separation of the CEO and board chair positions.

ISS had supported the proposal that two separate people hold the office of the chairman and the office of the CEO, both roles currently held by Jamie Dimon.

> The Week in Breakingviews newsletter offers insights and ideas from Reuters' global financial commentary team. Sign up here.

JPM said in a regulatory filing "this fails to match the empirical evidence of the last 18 years of leadership by the current chairman and CEO that has seen the firm become the largest U.S. bank."

Dimon has been at the helm of the bank for more than 18 years and is one of the most influential figures in American business.

The largest U.S. lender, plans to split the roles when CEO Jamie Dimon eventually steps down, according to its annual proxy statement.

Proxy advisers have also recommend investors vote to separate CEO and chairman's roles at peers including Goldman Sachs (GS.N) ⬀ and Bank of America (BAC.N) ⬀ in a bid to improve the companies' governance.

Advertisement · Scroll to continue

ISS had also backed a shareholder proposal that JPMorgan adopt a policy to seek shareholder approval of senior managers' new or renewed pay package that provides for golden parachute payments. JPM had asked shareholders to vote against the proposal.

Senior management severance packages that pay out more than roughly three times salary and bonus are known as "golden parachutes."

JPMorgan said that there have not been any recent severance-related controversies at the company.

Advertisement · Scroll to continue

Feedback

"The firm does not have such a policy for payouts in excess of market norms because it has an existing policy that already provides for severance payments well below market norms," it said.

Reporting by Arasu Kannagi Basil in Bengaluru and Nupur Anand in New York; Editing by Shailesh Kuber

Our Standards: **The Thomson Reuters Trust Principles.** ↗

# Foster Declaration Exhibit 25



**SAMSUNG**    SmartThings meets AI Home    Learn more

    
SmartThings
meets AI Home

BIG TECH • TESLA

# With $1 trillion pay package on the line, Elon Musk blasts influential firms telling shareholders to reject it: 'Those guys are corporate terrorists'



By **Marco Quiroz-Gutierrez**
Reporter

October 23, 2025, 2:18 PM ET

Add us on

Elon Musk during a news conference in the Oval Office of the White House, in Washington, D.C., May 30, 2025.
ALLISON ROBBERT—AFP

▶ **Listen to the article now**
00:00                                          03:25    🅰 ⟲10 ⟳10  1.0x

Powered by: Trinity Audio

Elon Musk stole the show in the final minutes of Tesla's Wednesday earnings call to label the advisory firms pushing shareholders to reject his $1 trillion pay package "corporate terrorists."

## Recommended Video

☰ Search                    **FORTUNE**                    My Account ⌄





SAMSUNG



SmartThings meets AI Home

Learn more

After months of being relatively quiet following his resignation from the Department of Government Efficiency and subsequent fallout with President Donald Trump, Musk slammed proxy advisory firms Institutional Shareholder Services (ISS) and Glass Lewis.

"I just don't feel comfortable building a robot army here and then being ousted because of some asinine recommendations from ISS and Glass Lewis, who have no freaking clue," Musk said. "I mean, those guys are corporate terrorists."

Musk, in a separate X post on Wednesday, also called into question the role of proxy advisory firms generally. The Tesla CEO echoed criticism from ARK Invest CEO Cathie Wood by saying these firms—which issue recommendations to shareholders for how they should vote on proposals at public companies' annual shareholder meetings—have too much sway, especially with passive investors like index funds, which have substantial voting power because of the shares they hold for clients.

"ISS and Glass Lewis have no actual ownership themselves and often vote along random political lines unrelated to shareholder interests! This is a major problem that is not just limited to Tesla," Musk wrote on X.

However, advisory firms do not vote directly in annual shareholder meetings and merely recommend positions that are also individually analyzed by some of the biggest institutional investors, including BlackRock, Vanguard, and State Street, which do their own in-house research. Both ISS and Glass Lewis twice recommended voters reject Musk's previous 2018 pay package. Shareholders ultimately approved the package twice.

A spokesperson for Glass Lewis told *Fortune* in a statement its job is to provide analysis and recommendations to its clients.

"Those that are Tesla shareholders will ultimately make their own decisions about Mr. Musk's pay proposal and the Board directors that put it forward for shareholder vote," the statement read.

ISS declined to comment. Tesla did not immediately respond to a request for comment.

**SAMSUNG**    SmartThings meets AI Home    Learn more

Musk, who has a net worth of $455 billion, said he needs an ownership stake "in the mid-20s approximately" to achieve his goals at Tesla. The pay package in question would give Musk about $1 trillion over 10 years if he meets performance metrics, one of which includes boosting the company's market cap more than 500% to $8.5 trillion.



**PAID CONTENT**

**The loyalty revolution: How smart brands are turning incentives into growth engines** ⤴

FROM **TALON.ONE**

ISS and Glass Lewis both issued reports earlier this month questioning Musk's pay package, in part because of the package's size and because it would dilute existing shareholders' holdings.

While Tesla claimed regular benchmarking doesn't apply to Musk's pay, because no other company has "remotely similar goals embodied in their compensation programs," Glass Lewis wrote in its report that Musk's 2025 performance award is "unprecedented" compared with that of other public companies, and around 33.5x larger than its predecessor from 2018.

"It is clear that the quantum, on a realizable and granted basis, outpaces all other pay packages."

## About the Author

By **Marco Quiroz-Gutierrez**
Reporter

  

**Role: Reporter**
Marco Quiroz-Gutierrez is a reporter for *Fortune* covering general business news.

See full bio  ›

## Related Articles

# Foster Declaration Exhibit 26

**ExxonMobil**

**Exxon Mobil Corporation**
22777 Springwoods Village Parkway
Spring, Texas 77389
exxonmobil.com

**Davis Polk**

**Davis Polk & Wardwell LLP**
450 Lexington Avenue
New York, NY 10017
davispolk.com

September 15, 2025

Office of Mergers and Acquisitions
Division of Corporation Finance
U.S. Securities and Exchange Commission
100 F Street, NE
Washington, DC 20549

Attn:    Tiffany Posil, Chief of the Office of Mergers and Acquisitions
David Plattner, Special Counsel, Office of Mergers and Acquisitions

RE:    No-Action Request regarding Rules 14a-4(d)(2) and 14a-4(d)(3) in connection with the Proposed Retail Voting Program

Dear Ms. Posil and Mr. Plattner:

In connection with the proposed retail shareholder voting program (the "**Retail Voting Program**") described below and in other program-related materials provided to the Staff of the Division of Corporation Finance (the "**Staff**") for their review, Exxon Mobil Corporation, a New Jersey corporation (the "**Company**" or "**ExxonMobil**"), seeks confirmation that the Staff will not recommend any enforcement action by the U.S. Securities and Exchange Commission (the "**Commission**") against ExxonMobil with respect to the Retail Voting Program as it relates to compliance with Rules 14a-4(d)(2) and 14a-4(d)(3) of Regulation 14A promulgated under the Securities Exchange Act of 1934.

### I.    Background

ExxonMobil's retail investors, many of whom are retired and depend on ExxonMobil's dividends to support their livelihoods, have voiced significant frustration over the annual time commitment required to vote at our meetings of shareholders. Each year, retail investors face a large number of proposals to vote on. This burden is not just a matter of hours spent; it also disproportionately impacts retail investors who lack access to professionals dedicated to voting. This limits their participation in shareholder democracy.

The consequences are tangible: the Company's records indicate that at its most recent annual meeting, nearly 40% of our outstanding shares were held by retail investors, yet only a quarter of these retail shares were voted. Despite these low voting numbers, the Company's engagements reveal that retail investors are deeply invested in ExxonMobil's future and are eager for a more accessible way to participate in the Company's voting process. In reviewing these issues, ExxonMobil has long received feedback from its retail investors that they would welcome the ability to give a standing voting instruction whereby, on an ongoing basis, their votes would be cast as recommended by the Company's Board of Directors (the "**Board**"). This is consistent with current voting patterns among ExxonMobil's retail investors. Over the last five years, approximately 90% of retail investors that voted at ExxonMobil meetings supported all of the Board's recommendations. Such a retail voting program would give retail investors a "**Board**

1

**ExxonMobil**

**Davis Polk**

**Exxon Mobil Corporation**
22777 Springwoods Village Parkway
Spring, Texas 77389
exxonmobil.com

**Davis Polk & Wardwell LLP**
450 Lexington Avenue
New York, NY 10017
davispolk.com

**Recommended Policy**" choice and would complement other voting policy choices that currently exist in the market that are not primarily targeted to retail investors.

In order to (1) promote voting by retail investors, (2) provide a Board Recommended Policy choice, and (3) remove time and other burdens borne by retail investors in the proxy voting process, the Company intends to implement a voluntary, no-cost program that would allow ExxonMobil shareholders to authorize the voting of their shares through a contractual arrangement between each participating shareholder and the Company. The program would give those shareholders the ability to authorize a standing voting instruction that requires ExxonMobil to vote their shares based on the recommendation of the Company's Board at each meeting of shareholders.[1]

## II.    Design of the Retail Voting Program

The Retail Voting Program would be available to all retail investors,[2] including any registered owner or beneficial owner (via their bank, broker or plan administrator) of ExxonMobil's shares at no cost, and each investor would be offered the same opportunity to enroll in the Retail Voting Program. The Company intends to communicate directly with registered owners, and indirectly with non-objecting beneficial owners ("**NOBOs**") and objecting beneficial holders ("**OBOs**") via their banks and brokers and those entities' agents.

*Opt-In Process*

Participating shareholders have two choices for the kinds of matters to which their standing voting instruction would apply: (1) all matters; or (2) all matters except contested director elections[3] or any acquisition, merger or divestiture transaction that, under applicable state law or stock exchange rules, requires approval of ExxonMobil's shareholders. These two choices provide shareholders with the ability to tailor their voting decisions.

*Opt-Out Process, Reminders and Vote Overrides*

Participating shareholders may opt out of the program to cancel their standing voting instruction at any time and at no cost. Because votes for which the Company has received a standing voting instruction will be cast on the same day that the Company files a definitive proxy statement for an upcoming meeting, cancellation of the standing voting instruction will only

---

[1] At this time, the Company is only seeking no-action relief with respect to voting by retail shareholders at duly called annual general or special shareholder meetings and not with respect to any corporate actions that are taken by shareholder written consent.

[2] For the avoidance of doubt, the Retail Voting Program would not be available to investment advisers registered under the Investment Advisers Act of 1940 exercising voting authority with respect to client securities, unless the Commission otherwise determines.

[3] A "contested director election" means an election of directors in which the number of nominees for election to the Company's Board in that election exceeds the number of directors to be elected.

2

**ExxonMobil**

**Exxon Mobil Corporation**
22777 Springwoods Village Parkway
Spring, Texas 77389
exxonmobil.com

**Davis Polk**

**Davis Polk & Wardwell LLP**
450 Lexington Avenue
New York, NY 10017
davispolk.com

apply to future meetings. Future meetings for this purpose means meetings for which the Company has not yet filed a definitive proxy statement.

Participating shareholders will receive annual reminders of their enrollment in the program and their standing voting instruction. This reminder will include explicit language informing the participating shareholder of their ability to opt out and thereby cancel their standing voting instruction with respect to future meetings.

Participating shareholders who selected to have their shares voted on "all matters" will receive an additional reminder prior to any meeting involving a contested director election or an acquisition, merger or divestiture transaction that, under applicable state law or stock exchange rules, requires approval of ExxonMobil's shareholders. This enables that group of participating shareholders to have another opportunity to decide to opt out of the program or override the standing voting instruction prior to that meeting.

While participating shareholders can only opt out of the standing voting instruction for future meetings, they can always override the votes cast by the Company through the standing voting instruction by voting using the proxy materials they received for that meeting. Vote overrides will apply to upcoming meetings for which the Company has filed a definitive proxy statement. In every reminder communication, participating shareholders will be informed that at any time, even after the Company has filed a definitive proxy statement, they can override the standing voting instruction and cast their own votes with respect to any proposal at an upcoming meeting using the proxy materials they receive that year (identical to any other shareholder voting at that meeting).

*Voting Mechanics*

The actual voting of shares pursuant to the standing voting instruction and any other administrative actions related thereto would be facilitated by ExxonMobil's vote processing agent, including communications between and among ExxonMobil, banks and brokers, shareholders and the backend portal through which shareholders may choose to opt in or out of the Retail Voting Program. Information contained within the vote processing agent's system, such as information related to OBOs, stays within the agent's system and will never be disclosed to ExxonMobil as part of the Retail Voting Program.

Shareholders participating in the Retail Voting Program would have their voting positions submitted after the Company files the definitive proxy statement with the Commission, but prior to the distribution of the definitive proxy statement to shareholders. As noted above, a participating shareholder can always override the vote authorized by the standing voting instruction by voting using the proxy materials they received for that meeting. As a result, enrollment in the program is a safeguard for those who want to ensure that their vote is actually cast in alignment with the Board's recommendations in an efficient manner, but it does not interfere with their rights and ability to vote at shareholder meetings. The standing voting instruction is designed to facilitate the shareholder's choice to establish a streamlined and automated process, and the same shareholder can easily override that process by instead voting at an upcoming meeting using the proxy materials they receive that year (identical to any other shareholder voting at that meeting). In this respect, the Retail Voting Program does not

3

**ExxonMobil**

**Davis Polk**

**Exxon Mobil Corporation**
22777 Springwoods Village Parkway
Spring, Texas 77389
exxonmobil.com

**Davis Polk & Wardwell LLP**
450 Lexington Avenue
New York, NY 10017
davispolk.com

limit or restrict shareholders from voting at any time using the proxy materials they received for the meeting.

In addition to program-related communications and reminders provided to participating shareholders, ExxonMobil intends to disclose the Retail Voting Program in its proxy statement for each upcoming shareholder meeting, including the ability of participating shareholders to opt out of the program for future meetings or to override their standing voting instruction with respect to the specified proposals at an upcoming meeting at any time prior to the vote at that meeting. As noted above, banks, brokers and plan administrators will communicate with NOBO and OBO shareholders about the Retail Voting Program via their agents for shareholder communication services.

### III.     Public Disclosure of the Retail Voting Program

At the initiation of the Retail Voting Program, the Company intends to file with the Commission the relevant materials describing the Retail Voting Program under cover of Schedule 14A pursuant to Rule 14a-12 and will subsequently file any material changes to these materials in the same manner.[4]

Furthermore, the Company will make full disclosure on its website and in its proxy statement of the Retail Voting Program. And shareholders will, in connection with each shareholder meeting, receive all proxy materials and will have the ability to opt out and cancel or override their standing voting instruction at any time, as described in detail above.

### IV.     State Law

The Company notes that the granting by a shareholder of a standing voting instruction pursuant to the Retail Voting Program is permitted under New Jersey law, which is the state corporate law applicable to the Company. The Company has also reviewed Delaware law with respect to the same question. New Jersey and Delaware state corporate law each permit the giving of a standing voting instruction that does not expire so long as the instruction provides for such extended duration. *See* NJ Rev Stat § 14A:5-19 ("No proxy shall be valid for more than 11 months, unless a longer time is expressly provided therein"); 8 *Del. C.* § 212(b) (proxies valid for up to three years, "unless the proxy provides for a longer period").

---

[4] The Company is not seeking no-action relief in this letter regarding whether the Retail Voting Program involves the "solicitation" of proxies, as defined in Rule 14a-1(l). In any event, to the extent communications related to the Retail Voting Program are considered "solicitations," the provision of such communications to beneficial owners of the Company's securities by banks, brokers and other nominees would be subject to Rule 14a-2(a)(1).

4

**ExxonMobil**                                                                                          **Davis Polk**

**Exxon Mobil Corporation**                                                        **Davis Polk & Wardwell LLP**
22777 Springwoods Village Parkway                                                          450 Lexington Avenue
Spring, Texas 77389                                                                          New York, NY 10017
exxonmobil.com                                                                                      davispolk.com

**V.        Compliance with Rules 14a-4(d)(2) and 14a-4(d)(3)**

Under Rule 14a-4(d)(2), "no proxy shall confer authority […] [t]o vote at any annual meeting other than the next annual meeting (or any adjournment thereof) to be held after the date on which the proxy statement and form of proxy are first sent or given to security holders." Under a similar provision, Rule 14a-4(d)(3) provides that "no proxy shall confer authority […] [t]o vote with respect to more than one meeting (and any adjournment thereof)." 17 CFR 240.14a-4. The Company respectfully submits that the proposed Retail Voting Program should not be viewed as conflicting with Rules 14a-4(d)(2) or 14a-4(d)(3), given the reminders and easy opt-out and override abilities built into the program and the choices made by shareholders.

As noted above, shareholders that have opted in to the program will receive an annual reminder in the proxy off-season of their opt-in status and selection, which will remind them of their ability to opt out and cancel their standing voting instruction with respect to subsequent meetings. Participating shareholders will have the easy, no-cost ability and choice to leave in place the standing voting instruction, or to opt out and cancel the standing voting instruction. More importantly in this context, even participating shareholders that choose not to opt out are exercising a choice by leaving the standing voting instruction in place. Furthermore, at the time of receiving their proxy materials, participating shareholders again have the easy, no-cost ability and choice to leave the standing voting instruction in place, or to opt out and cancel or override the standing voting instruction.

Accordingly, the choice made (in response to the annual reminder or the proxy materials) is in our view a reaffirmation or renewal of the standing voting instruction, which enables compliance with Rules 14a-4(d)(2) and 14a-4(d)(3).

The Company respectfully submits that this position is consistent with the intent behind Rules 14a-4(d)(2) and 14a-4(d)(3). The Commission's commentary in connection with the adoption of Rule 14a-4(d)(2), for instance, notes that the purpose of Rule 14a-4(d)(2) was to avoid the premature solicitation of proxies.[5] The commentary in connection with the adoption of Rule 14a-4(d)(3) noted that the intent was to codify existing Commission interpretations of the proxy rules regarding proxies.[6]

The Company believes that the Retail Voting Program is not inconsistent with this intent for the following reasons. First, subsequently adopted Rule 14a-12 explicitly permits the solicitation of proxies before a proxy statement is furnished to security holders, so long as the relevant materials are filed with the Commission pursuant to Rule 14a-12 and the proxy

---

[5] See Federal Register, Vol. 12, No. 222, November 5, 1948, 6679 ("In order to prevent the premature solicitation of proxies at a time when material information has not yet become available, the amended rule provides that no proxy shall confer authority to vote at any annual meeting other than the next annual meeting (or any adjournment thereof) which is to be held after the date on which the solicitation is made").

[6] See Federal Register, Vol. 51, No. 224, November 20, 1986, 42049 ("As proposed, the Commission has added paragraph (d)(3) to Rule 14a-4 to codify current interpretations that a proxy may not confer authority to vote at more than one meeting or consent solicitation").

5

**ExxonMobil.**

**Davis Polk**

**Exxon Mobil Corporation**
22777 Springwoods Village Parkway
Spring, Texas 77389
exxonmobil.com

**Davis Polk & Wardwell LLP**
450 Lexington Avenue
New York, NY 10017
davispolk.com

statement is distributed once available. Second, the Retail Voting Program does not "lock in" the proxy or the vote, but rather provides the ability for participating shareholders to opt out of the program at any time for future meetings, and to override the standing voting instruction by voting at the upcoming meeting using the proxy materials they received for that meeting.

Although the Company believes that the Retail Voting Program complies with Rules 14a-4(d)(2) and 14a-4(d)(3) (and the proxy rules generally), the Company is nonetheless seeking confirmation that the Staff will not recommend any enforcement action by the Commission under Rules 14a-4(d)(2) and 14a-4(d)(3) with respect to the Company's implementation of the Retail Voting Program.

***

Should you have any questions regarding this request or require additional information, please do not hesitate to contact us at (212) 450-4539. We appreciate your attention to this matter.

Respectfully yours,

David A. Kern
Exxon Mobil Corporation

Louis Goldberg
Davis Polk

Ning Chiu
Davis Polk

6

# Foster Declaration Exhibit 27

# Conservative Group Launches Proxy Navigator Tool to Fight Woke Corporations

nationalcenter.org/ncppr/2024/03/07/conservative-group-launches-proxy-navigator-tool-to-fight-woke-corporations/

By The National Center

March 7, 2024



## 07 Mar 2024 Conservative Group Launches Proxy Navigator Tool to Fight Woke Corporations

Press Release
Posted at 08:56h in Featured, Free Enterprise Project, Press Releases by The National Center
Washington, D.C. – Today, shareholder proponents at the National Center for Public Policy Research's Free Enterprise Project (FEP) launched Proxy Navigator, a new tool in the fight to hold woke corporations accountable to their shareholders.

Proxy Navigator offers institutional investors an alternative to the expensive and left-wing proxy advisory services Institutional Shareholder Services (ISS) and Glass Lewis while providing retail investors of all sizes a free and efficient means of voting their shares in accordance with their values and business judgments.

The app (also available on the web at https://proxynavigator.com/) allows users to quickly and easily automate the voting of any or all of their proxy ballots in whole or partial accord with FEP's real-time voting recommendations. Those recommendations will be available shortly after the proxy ballots come out.

The app also provides neutrality v. wokeness ratings of covered companies by a growing number of analysts, as well as a real-time stock ticker and general company news.

The app could be game-changing as ISS and Glass Lewis have an outsized influence on the proxy voting process. Seventy-one percent of all shares are held by institutional investors, and ISS and Glass Lewis together control over 95% of this market.

At the same time, individuals — who hold roughly 29% of the total shares — rarely vote, voting their proxies only 28% of the time.

"The whole environmental, social and governance (ESG) nightmare has been propelled by investment-house executives using other people's money to push their own partisan personal policy preferences," said Free Enterprise Project Director Scott Shepard. "It's been a disaster. With Proxy Navigator, shareholders — the real capitalists — can speak to companies for themselves so American businesses can recover from the woke fever dream."

With the average Russell 3000 proxy running 80 pages, most small investors simply don't have the time to follow and respond to shareholder proposals. An investor with a portfolio of just 30 stocks, for example, might need to spend several hundred hours reading their proxies, and even then, he or she might not understand them.



Institutional investors, including many state pension funds, who favor fiduciary duty, good business practices and corporate withdrawal from partisan politics face a similar hurdle. Few have dedicated staff for reviewing their proxies, which can number in the hundreds, and consequently, many farm voting out to proxy advisory companies.

Unfortunately, there has been no conservative alternative to ISS and Glass Lewis, resulting in some red states voting against their own interests. For example, both the Teacher Retirement System of Texas (TRS) and the Employees Retirement System of Texas (ERS) contracted their proxy voting out to ISS and ended up voting all their shares in favor of proposals against oil exploration, even though Texas is the U.S.'s #1 oil-producing state.

Scott Shepard

Companies often view shareholder proposal results as polls of shareholders' wishes, but have so far only been picking up the politics of ISS, Glass Lewis, BlackRock, State Street and Vanguard executives. Corporate America's embrace of the radical climate change and diversity, equity and inclusion (DEI) agendas would never have occurred but for those companies' collective capture and misuse of the system.

Even small changes in proxy voting can have an enormous impact on corporate behavior, and Proxy Navigator is positioned to bring big changes in support of business sanity.

The app is available now in the Google Play Store and the Apple App Store, as well as for download online at https://proxynavigator.com/.

For more information, visit ProxyNavigator.com.

**About**

The National Center for Public Policy Research, founded in 1982, is a non-partisan, free-market, independent conservative think-tank. Ninety-four percent of its support comes from individuals, less than four percent from foundations and less than two percent from corporations. It receives over 350,000 individual contributions a year from over 60,000 active recent contributors. Contributions are tax-deductible and may be earmarked for the Free Enterprise Project. Sign up for email updates at https://nationalcenter.org/subscribe/.

Follow us on Twitter at @FreeEntProject and @NationalCenter for general announcements. To be alerted to upcoming media appearances by National Center staff, follow our media appearances Twitter account at @NCPPRMedia.

# Foster Declaration Exhibit 28

# LAW.COM

Analysis    **Corporate Governance**

## JPMorgan Chase Says AI Can Replace Proxy Advisers, but Others Have Their Doubts

The bank's CEO, Jamie Dimon, speaks contemptuously of the proxy advisory firms—which provide voting guidance to institutional investors—but others see their value and question whether AI is up to the task.

January 20, 2026 at 02:30 PM    By **Michael Gennaro**



JPMorgan Chase CEO Jamie Dimon shares President Donald Trump's disdain for proxy advisory firms. Photo: Richard Drew/AP

Don't write off proxy advisory firms yet.

JPMorgan Chase rocked the world of corporate governance earlier this month when it announced it would no longer turn to proxy advisory firms for guidance on how to vote shares held by its millions of investment-advisory clients, who collectively hold $7 trillion. Instead, it said it would rely on a new artificial intelligence platform, starting with this spring's annual meetings.

The New York City-based bank's snubbing of proxy advisory firms comes at a time that the two firms dominating that business—Institutional Shareholder Services and Glass Lewis—are under assault from President Donald Trump, who calls them too influential and too left-leaning.

The move by the nation's largest bank raised the specter that other corporate titans would take similar action, swiftly shriveling the ISS and Glass Lewis' influence on a range of high-stakes governance matters—from executive compensation packages to board diversity requirements to activist investor campaigns seeking to install new directors.

But governance experts say JPMorgan Chase's view that proxy advisers are expendable is a reflection of CEO Jamie Dimon's long-held animus toward the firms, and that many corporate executives and boards view the firms more favorably, reducing the likelihood that JPMorgan's move will trigger a stampede across corporate America.

"I think that Mr. Dimon has long expressed frustration with the advisers, and I'm not surprised that in this environment, he's decided to cut ties," said Charles Elson, a retired University of Delaware business professor who founded the school's Weinberg Center for Corporate Governance. "I think if there was a time to do it, this was his time to do it."

Elson said the move appeared "rather personal" to Dimon, who has waged a years-long campaign against proxy advisers. At BlackRock's retirement summit last March, Dimon called the firms "incompetent" and declared they "should be gone and dead, done with."

Speaking at the Reagan National Economic Forum in June, Dimon turned up the rhetoric, calling proxy advisory firms "a cancer" that use their platform to promote "green stuff and comp stuff and social stuff," rather than focusing on corporate performance.

Dimon's timing aligns with mounting political pressure on the firms, Elson noted. Trump escalated scrutiny in December with an executive order directing federal regulators to investigate proxy advisers, citing concerns that their influence reflects political agendas rather than fiduciary duty.

Republican attorneys general in Texas, Florida and Mississippi have launched investigations into ISS and Glass Lewis over their environmental, social and governance policies.

Elson doesn't expect a wave of followers, noting that proxy advisory firms provide valuable cost savings for institutional investors managing voting across thousands of companies.

"They save you money in determining how to vote," Elson said, adding that proxy advisers remain "really important" for most investment funds.

"Replacing that infrastructure—even with AI—may require hiring additional staff to oversee the system, potentially increasing expenses rather than reducing them."

After Dimon's repeated attacks on proxy advisers in the first half of 2025, Marcie Frost, CEO of CalPERS, raced to their defense. Following a CalPERS board meeting, she said, "While we ultimately make our own decisions, proxy advisory firms provide valuable research, grounded in governance best practices. Their work enhances transparency, promotes accountability and empowers shareholders to exercise their rights effectively."

While Dimon criticizes proxy advisers as being too activist, some progressive organizations call them too status quo.

For example, in an interview with Law.com, Andrew Behar, CEO of As You Sow, a nonprofit advocating for corporate social responsibility, noted that proxy advisers' recommendations back management the vast majority of the time.

"JPMorgan going to AI for their proxy voting, I don't think it's going to have much of an impact, to be honest, I think they're going to be voting the way they voted before," Behar said. "They're using AI to gather the information they need to make their decision, but their decisions are pretty much management-centric."

Jonathan Gardner, managing partner and head of litigation at Labaton Keller Sucharow, said that he was surprised that JPMorgan Chase had decided to rely on AI, given the nascent state of AI technology in fiduciary contexts.

"I've got questions about whether the tech is ready and capable of replacing human analysis," Gardner said.

As a fiduciary under the Investment Advisers Act, JPMorgan Chase is legally obligated to vote shares in clients' best interests. If the AI system makes poor voting recommendations that harm portfolio performance, the bank could face lawsuits alleging breach of fiduciary duty—claims it previously could defend in part by pointing to independent third-party research.

Elson agreed. "If you simply ... turn it over to AI and it doesn't work out, it doesn't vote in an intelligent, rational manner, then you're going to be responsible for it."

Gardner said JPMorgan Chase's plan to use AI also raises transparency questions. For example, he said, who will train the AI models, what data will inform recommendations, and will the system will adopt conservative or progressive approaches to governance issues?

"There's a lot of risk involved," Gardner said.

**Page printed from:**  https://www.law.com/corpcounsel/2026/01/20/jpmorgan-chase-says-ai-can-replace-proxy-advisers-but-others-have-their-doubts/print/

**NOT FOR REPRINT**

© 2026 ALM Global, LLC, All Rights Reserved. Request academic re-use from www.copyright.com. All other uses, submit a request to asset-and-logo-licensing@alm.com. For more information visit Asset & Logo Licensing.

# Foster Declaration Exhibit 29



# Norfolk Southern Shareholder Letter

May 7, 2024

**RE: Strive's Support of Ancora's Board Nominees at Norfolk Southern**

Fellow Shareholders,

At this year's annual meeting, Norfolk Southern shareholders have the opportunity to replace a majority of the board of directors with nominees from Ancora. Given that Norfolk Southern's existing leadership, including CEO Alan Shaw, have pursued diversity, equity and inclusion (DEI) goals that have distracted the company from its core business operations, we believe Ancora's proposed board nominees offer the best chance to get Norfolk Southern back on track.

In recent years, Norfolk Southern has faced significant challenges, stemming most prominently from its **2023 train derailment**, which damaged cargo, caused fires and released hazardous chemicals into the surrounding community.[1] The disaster led to increased scrutiny over the company's operations, safety protocols, and crisis response, ultimately **costing shareholders over $1 billion.**[2]

But Norfolk Southern's safety issues run deeper. In particular, we have additional concerns that Norfolk Southern's leadership is not prioritizing safety and performance and is instead focused on political issues like DEI metrics and ESG ratings. As we have so recently and unfortunately seen, safety and performance at a railroad is not a matter of skin-deep characteristics: it is a matter of life and death. Norfolk Southern's customers and shareholders deserve leadership that is ready to get back to the basics, which is why we support Ancora's board nominee slate.

**Norfolk Southern's Current Leaders Have Placed DEI Over Safety**

A closer look at the root causes of Norfolk Southern's shortcomings reveals a company that has been focused on divisive, politically-driven metrics over company performance. As various media outlets reported following the crash, the company spent years pursuing the environmental, social and governance (ESG) movement, i.e., "the latest vector by which big corporations push a leftist social agenda that includes diversity quotas, solving climate change, and advancing racial equity."[3]

Norfolk Southern has been a leader in this movement, bringing DEI metrics in to its corporate priorities. It was the first Class I railroad to join the CEO Action for Diversity & Inclusion, through which CEOs pledge, among other things, to force workers to attend "unconscious bias" trainings

and to elevate responsibility for DEI to the board of directors.[4] It encourages corporate leaders to "self reflect" on whether they've "ever assumed someone's pronouns" and chastises executives who believe in a "colorblind" view of society.[5] The group also advocates for highly controversial works, including recommending Ibram X. Kendi's book "How To Be An Antiracist," in which he proclaims that "the only remedy to racist discrimination is *antiracist* discrimination. The only remedy to past discrimination is present discrimination. The only remedy to present discrimination is *future* discrimination."[6] However meaningful those words may be to social activists, they are poor advice for business leaders—particularly after the U.S. Supreme Court's recent decisions in cases such as *Students for Fair Admission v. Harvard and Muldrow v. City of Saint Louis*, which make clear that discrimination of *any* kind is not tolerated under the Civil Rights Act.

Norfolk Southern's policies reflect its misplaced priorities. In a particularly telling comment, one of Norfolk Southern's DEI chiefs has claimed that the company's "goal is to **ingrain inclusion as deeply as safety**."[7] Yet when asked whether its DEI efforts have been a distraction from efforts to maintain rail safety, Norfolk Southern refused to respond.[8]

At the time of the derailment, the company also paid its executives, in part, for "promoting diversity, equity, and inclusion" and "improved diversity hiring."[9] Norfolk Southern removed that language from its proxy this year, but it should not take a catastrophic event to recognize that the management team is mis-incentivized.

Unfortunately, current CEO Alan Shaw has promised to "expand[] our DEI initiatives."[10] One such initiative is its supplier diversity program, through which Norfolk Southern gives preferences to suppliers owned by members of preferred racial and gender groups.[11] To qualify, companies must be vetted by outside organizations who decide whether a company's ownership is, for example, female or black enough to participate. The company's 2023 ESG report also touts 11% increased racial minorities at the VP level and above, $248 million spent with diverse suppliers, and $500,000 donated to historically black colleges and universities and other diversity organizations.[12] When purchasing supplies and component parts for a railroad, neither customers nor shareholders are likely to care what the owner of the vendor companies looks like. Instead, they care about getting safe, quality inputs for a competitive price.

**Norfolk Southern's Current Leaders Emphasize DEI Over Experience**

Norfolk Southern's imprudent focus on identity politics has also infiltrated the board fight itself. The nominating committee admits to selecting candidates based on who "will contribute to [] diversity."[13][14] Surely, these three considerations do not deserve similar weight.

The incumbent board has also made diversity a central plank of its campaign. Over and over again, the company's proxy statement emphasizes that its preferred nominees are "23% ethnically diverse" and "38% female" and "54% gender and/or racially/ethnically diverse."[15] There are

colorful charts slicing and dicing the racial and gender breakdown of the proposed nominees, along with laudatory text.

Campaigning in this manner is disgraceful. Norfolk Southern's takeover defense is inviting shareholders—or at least the money managers who typically cast votes on their behalf —to vote their shares based on race and gender bias, rather than merit. **It is discrimination**, plain and simple.

**Ancora Is Focused On Experience, Not Box-Checking**

Ancora, in contrast, seeks to earn shareholder votes by nominating directors who are sharply focused on increasing shareholder return. "Our fit-for-purpose slate brings necessary experience in governance, finance, legislative and regulatory affairs, strategic transformations, transportation and the railroad sector," Ancora explains.[16] For each candidate, there is a detailed explanation of how he or she will bring experience and expertise needed to deliver value for Norfolk Southern shareholders. As a result, there is no need to mention how many of its candidates self-identify as black or white or female or gay; experience, not skin-deep characteristics, are the focus.

Ancora's turnaround strategy is similarly **shareholder focused**. Its plan to implement precision scheduled railroading and cut costs while improving safety and customer experience is designed to improve the company's financial performance. And its detailed roadmap for how to implement its plan, combined with the qualifications of its nominees, demonstrates that Ancora's strategy is the company's best chance for a turnaround.

Close observers of Strive's governance priorities may wonder about Strive's support of Ancora, as it has promised to reduce carbon emissions in what appears to be service to climate goals. Strive opposes corporate pursuit of voluntary environmental goals that government regulators have declined to impose.[17] Ancora's stray comments pale in comparison to Norfolk Southern's nearly 60-page sustainability report,[18] but we encourage Norfolk Southern's leadership—whether it is the incumbent directors or Ancora's nominees—to abandon stakeholder capitalism in all of its forms, from diversity quotas to environmental goals, and focus on shareholders alone.

Pragmatism makes the choice clear: **Ancora's strategy is our best bet to create long-term financial value** as Norfolk Southern shareholders.

For these reasons, **Strive proudly supports Ancora's nominees** Betsy Atkins, James Barber, Jr., William Clyburn, Jr., Sameh Fahmy, John Kasich, Gilbert Lamphere and Allison Landry, and encourages our fellow shareholders to do the same.

Sincerely,

Justin Danhof
EVP and Head of Corporate Governance

[1] Alicia A. Caldwell, "Ohio Train Derailment, Fire Rattle Rural Town," *Wall Street JournalK/em>, February 5, 2023,* https://www.wsj.com/articles/ohio-train-derailment-fire-rattle-rural-town-11675630255

[2] Lauren Thomas and Esther Fung, "Norfolk Southern CEO Faces Activists Calling for His Ouster," *Wall Street Journal*, February 1, 2024, https://www.wsj.com/business/deals/ancora-led-group-takes-aim-at-norfolk-southern-pushes-to-oust-ceo-shaw-dbd029f7.

[3] Sean Moran and John Binder, "Norfolk Southern Advances Far-Left ESG, DEI Agenda after Spurring Toxic Chemical Disaster in East Palestine," Breitbart, July 19, 2023, https://www.breitbart.com/politics/2023/07/19/norfolk-southern-advances-far-left-esg-dei-agenda-after-spurring-toxic-chemical-disaster-in-east-palestine/; see also Henry Rodgers, "Exclusive: Norfolk Southern Spent Years Pushing Woke DEI Initiatives Prior to East Palestine Train Derailment," Daily Caller, March 20, 2023, https://dailycaller.com/2023/03/20/norfolk-southern-east-palestine-dei-esg-diversity-woke/.

[4] "Home," CEO Action for Diversity & Inclusion, accessed May 1, 2024, https://www.ceoaction.com/

[5] "Quizzes," CEO Action for Diversity & Inclusion, accessed May 1, 2024, https://www.ceoaction.com/resources/education/quizzes/; Ad Council, "Questions to Self Reflect," love has no labels, accessed May 1, 2024, https://lovehasnolabels.com/learn/questions-to-self-reflect.

[6] "Resources," CEO Action for Diversity & Inclusion, accessed May 1, 2024, https://www.ceoaction.com/resources/; Ibram X. Kendi, *How to Be an Antiracist* (New York: One World, 2019), 19.

[7] Norfolk Southern, *Forging a Better Tomorrow: Norfolk Southern Environmental, Social, and Governance Report* (Atlanta: Norfolk Southern, 2023), https://www.norfolksouthern.com/en/commitments/who-we-are/esg-at-norfolk-southern, 20.

[8] Rodgers, "Norfolk Southern Spent Years Pushing Woke DEI Initiatives."

[9] Norfolk Southern Corp, Form DEF 14A (filed March 31, 2023), https://www.sec.gov/Archives/edgar/data/702165/000155278123000213/e23052_nsc-def14a.htm, 49, 51.

[10] Rodgers, "Norfolk Southern Spent Years Pushing Woke DEI Initiatives."

[11] Norfolk Southern, "Supplier Inclusion," accessed May 1, 2024, https://www.norfolksouthern.com/en/suppliers/diversity.

[12] Norfolk Southern, *Forging a Better Tomorrow*, 20.

[13] Norfolk Southern Corp, Form DEFC14A (filed March 20, 2024), https://www.sec.gov/Archives/edgar/data/702165/000119312524072121/d774854ddefc14a.htm, 30.

[14] Norfolk Southern Corp, Form DEFC14A, 30.

[15] Norfolk Southern Corp, Form DEFC14A, 2, 36.

[16] Ancora Holdings Group, "Our Nominees," Move NSC Forward, accessed May 1, 2024, https://www.movenscforward.com/our-nominees.

[17] Strive, "Shareholder Proposals Targeting Net Zero Emissions – White Paper," May 15, 2023, https://www.strive.com/article/shareholder_proposals_targeting_net_zero_emissions__white_paper.

[18] See Norfolk Southern, *Forging a Better Tomorrow*.

# Foster Declaration Exhibit 30



# PROXY ADVISOR TRANSPARENCY ACT

Many investors depend on proxy advisory firms to recommend decisions in their financial interests when voting at annual shareholder meetings. This is because proxy advisors have represented that their services are designed to maximize or increase shareholder value, which aligns with many investors' fiduciary duties. However, proxy advisory firms have used their services to advance an agenda relating to environmental, social, or governance (ESG) and diversity, equity, or inclusion (DEI) issues in a way that is deceptive to shareholders.

Proxy advisory firms have admitted that recommendations like these are not based on a written financial analysis, which contradicts firms' representations and the primary reason that investors pay for proxy advisory services. Those concerns are especially pronounced in situations where a proxy advisory firm is recommending a vote against company management, given that company management has its own independent legal duties to shareholders. This law will ensure that proxy advisors accurately describe their services and disclose to investors and companies when the advisors' recommendations against management are not based on a written financial analysis.

---

*Summary*: AN ACT relating to proxy advisory services.

## Section 1. Legislative Findings

The State of [name of state] finds the following:

(1) When shareholders hire professionals to manage investments, they reasonably expect that the service provider will perform those services in the financial interest of the shareholders, and that the service provider will make recommendations based on financial analysis of what actions would enhance investment value.

(2) There is a particular need for disclosures for proxy voting advice because that advice is often provided for hundreds or thousands of shareholder votes each year, and few investors have the resources to research every shareholder vote, so investors often use proxy advisors for guidance on how to exercise fiduciary duties.

(3) Many companies hire proxy advisors pursuant to the Department of Labor's long-standing conclusion that, under the Employee Retirement Income Security Act, the "fiduciary obligations of prudence and loyalty to plan participants and beneficiaries require the responsible fiduciary to vote proxies on issues that may affect the value of the plan's investment."[1]

(4) Directors of publicly-held companies owe fiduciary duties to shareholders, and make recommendations in line with those fiduciary duties.

(5) Nevertheless, proxy advisors have recommended votes against company management, including votes for shareholder proposals related to environmental, social, or governance (ESG) issues; diversity, equity, or inclusion (DEI) issues; and social credit and sustainability scores;[2] but have not disclosed to clients that the recommendations were made without conducting a financial analysis to determine how these votes would affect shareholder value.

(6) In fact, the chief operating officer of Glass Lewis, a major proxy advisor, stated under penalty of perjury that Glass Lewis does not conduct a written financial analysis before recommending votes on shareholder

proposals, and that other proxy advisors do not do so either.[3] Yet proxy advisors have advertised that the purpose of their recommendations is maximizing, increasing, or protecting shareholder value.[4]

(7) These facts raise concern that proxy advisors are engaged in fraudulent or deceptive practices and are not disclosing material information to their clients, who otherwise would reasonably believe that they are choosing between recommendations of management and a proxy advisor that are based on dueling financial analyses.

(8) Investors purchasing proxy voting services should be informed when recommendations against management are or are not being based on financial analyses that consider the effect on the value of the plan's investment. Investors also should be able to access those analyses upon request, in order to assess whether the analyses were sufficient to uphold fiduciary standards.

(9) Requiring proxy advisors to provide clear, factual disclosures under these circumstances helps investors evaluate whether the proxy advisor's recommendations uphold investors' fiduciary duties of prudence and loyalty.

(10) Requiring proxy advisors to inform companies of these recommendations also promotes disclosures in line with fiduciary duties. For example, a company that is the subject of a shareholder proposal often has additional information regarding whether a proposal is in the shareholder's financial interests or regarding the costs of a proposal, and notice of a proxy advisor's recommendation allows the company to provide additional responsive information to shareholders seeking to uphold their fiduciary duties.

## Section 2. Definitions

(A) "Company" means a publicly-traded, for-profit corporation, limited liability company, partnership, or other business entity.

(B) "Company proposal" means any proposal made by a company to its shareholders that is included in the company's proxy statement, including but not limited to director nominations or elections, or any proposal relating to director nominations or elections, executive compensation, corporate transactions, corporate structure, auditor selection, or company policy on any subject.

(C) "Default recommendation or policy" means a system, set of rules, principles, or guidelines designed to assist with voting decisions on any company proposals or proxy proposals.

(D) "Proxy advisor" means a person who, for compensation, provides a proxy advisory service to shareholders of a company or to other persons with authority to vote on behalf of shareholders of a company.

(E) "Proxy advisory service" means any of the following services that are provided in connection with or in relation to a company, or are provided to any person in this state:

(1) advice or a recommendation on how to vote on a company proposal or proxy proposal;

(2) proxy statement research and analysis regarding a company proposal or proxy proposal; or

(3) development of proxy voting recommendations or policies, including establishing default recommendations or policies.

(F) "Proxy proposal" means any proposal made by a shareholder of a company that is included in the company's proxy statement or has been submitted for inclusion in the company's proxy statement, including but not limited to a proposal relating to any of the subjects that could be covered by a company proposal.

(G) "Shareholder" includes a shareholder, unitholder, limited partner, or other equity owner of a company.

(H) "Written financial analysis" means a written document that:

(1) analyzes the expected short-term and long-term financial benefits and costs to the company of implementing a company proposal or proxy proposal,

(2) concludes what vote or course of action is most likely to positively affect shareholder value, and

(3) explains the methods and processes used to prepare the analysis, including the experience and geographic location of the personnel who formed the recommendation.

## Section 3. Disclosure of Lack of Financial Analysis To Prevent Fraud or Deceit

(A) If a proxy advisor makes a recommendation against company management on a company proposal or proxy proposal, or makes a default recommendation or policy involving votes against company

management on company proposals or proxy proposals, and the proxy advisor does not do so based on a written financial analysis, the proxy advisor shall:

(1) concurrently with providing the proxy advisory service, include a clear and conspicuous disclosure to each shareholder, or entity or other person acting on behalf of a shareholder, receiving the proxy advisory service that:

    (a) identifies the service being provided;
    (b) identifies the recommendation or policy at issue; and
    (c) states that the proxy advisory service has made the recommendation or policy without doing so based on a written financial analysis regarding the impact of that recommended action on company investors that

        (i) analyzes the expected short-term and long-term financial benefits and costs to the company of implementing the company proposal or proxy proposal;
        (ii) concludes what vote or course of action is most likely to positively affect shareholder value; and
        (iii) explains the methods and processes used to prepare the analysis, including the experience and geographic location of the personnel who formed the recommendation.

(2) for a proxy advisory service covered by any of Subsections (E)(1)-(2) of Section 2, concurrently with providing the proxy advisory service, provide the disclosure under Subsection (A)(1) of this Section to the board of directors of each company that is the subject of the service; and

(3) while any proxy advisory services described by Subsection (A) of this Section are being provided, publicly and conspicuously disclose on the home or front page of the proxy advisor's website a statement that the advisor's proxy advisory services include one or more services that include recommendations or policies against company management on company proposals or proxy proposals that are not made based on a written financial analysis regarding the impact of that recommended action on company investors that:

    (a) analyzes the expected short-term and long-term financial benefits and costs to the company of implementing the company proposal or proxy proposal;
    (b) concludes what vote or course of action is most likely to positively affect shareholder value; and
    (c) explains the methods and processes used to prepare the analysis, including the experience and geographic location of the personnel who formed the recommendation.

(B) If a proxy advisor makes a recommendation against company management on a company proposal or proxy proposal, or makes a default recommendation or policy involving votes against company management on company proposals or proxy proposals, and the proxy advisor does so based on a written financial analysis, the proxy advisor shall:

(1) concurrently with providing the proxy advisory service, include a clear and conspicuous disclosure to each shareholder, or entity or other person acting on behalf of a shareholder, receiving the proxy advisory service that:

    (a) identifies the service being provided;
    (b) identifies the recommendation or policy at issue;
    (c) (a) states that the proxy advisor has made the recommendation or policy based on a written financial analysis that

        (i) analyzes the expected short-term and long-term financial benefits and costs to the company of implementing the company proposal or proxy proposal;
        (ii) concludes what vote or course of action is most likely to positively affect shareholder value; and
        (iii) explains the methods and processes used to prepare the analysis, including the experience and geographic location of the personnel who formed the recommendation; and
    (d) states that the analysis is available upon request;

(2) make such analysis available within a reasonable time to any recipient of the proxy advisory service upon request;

(3) for a proxy advisory service covered by any of Subsections (E)(1)-(2) of Section 2, concurrently with providing the proxy advisory service, provide a copy of such analysis to the board of directors of each company that is the subject of the service.

## Section 4. Enforcement

(A) A violation of this chapter is a deceptive trade practice under **[insert state UDAP statute]** and is actionable under the enforcement provisions of that statute. The **[attorney general]** may exercise all investigative powers under **[insert state UDAP statute]** if the attorney general has reason to believe a violation has occurred, is occurring, or is about to occur.

(B) In addition to enforcement under Subsection (A) of this Section, any person aggrieved by a violation of this act may bring an action seeking a declaratory judgment or injunctive relief against a proxy advisor who violates this chapter. Not later than the seventh day after the date on which an action is brought under this subsection, the plaintiff shall provide written notice to the [attorney general], who has a right to intervene in the action. For purposes of this paragraph, an aggrieved person includes:

(1) a recipient of proxy advisory services provided by the proxy advisor;

(2) a company that is the subject of proxy advisory services covered by any of Subsections (E)(1)-(2) of Section 2 provided by the proxy advisor; and

(3) any shareholder, unitholder, limited partner, or other equity owner of a company covered by Subsection (B)(2) of this Section.

## Section 5. Severability

## Section 6. Effective Date

This Act takes effect _____. The changes in law made by this Act apply only to a proxy advisory service provided on or after the effective date of this Act. Nothing in this law eliminates any claim under **[insert state UDAP statute]**, regardless of whether that claim accrues before or after the effective date of this Act.

---

[1] 59 FR 38860, 38861 (1994).

[2] *See, e.g.,* https://corpgov.law.harvard.edu/2025/04/01/navigating-11th-hour-guidance-on-board-dei/ (DEI); https://corpgov.law.harvard.edu/2024/05/13/seven-questions-about-proxy-advisors/ (ESG).

[3] *Glass, Lewis & Co., LLC v. Paxton,* 1:25-cv-01153, Doc. 5, ¶ 45 (July 24, 2025) (declaration of Glass Lewis Chief Operating Officer in support of motion for preliminary injunction).

[4] *See* https://treasurer.utah.gov/wp-content/uploads/09-2024-Financial-Officer-Letter-to-ISS.pdf; *see also* https://www.forbes.com/sites/waynewinegarden/2025/04/28/congress-is-shining-a-light-on-proxy-advisory-firms/.

## Latest News >>

NEWS: PROXY ADVISOR TRANSPARENCY ACT

**Attorney General James Uthmeier Sues Top Proxy Firms Over ESG, Antitrust Concerns**

**READ MORE »**

# Foster Declaration Exhibit 31



# PROTECTING CONSUMERS ADVANCING POLICY DEFENDING LIBERTY

Consumers Defense is the 501c4 arm of Consumers' Research, the country's oldest consumer protection organization. Our mission is to advance policy that protects Americans from the scourge of ESG in all its forms, in every state, and in every arena where it infects.

## MODEL LEGISLATION

## WHAT IS ESG?

protected by reCAPTCHA



# COMBATING ESG ACTIONS



# WOKE CAPITALISM



## Sign up to receive updates about the battle against politcal activism.

First name

Last name

Email

SIGN UP TO RECEIVE UPDATES



CONTACT US

CONNECT WITH US

𝕏

info@consumersdefense.com

Copyright © 2026 Consumers Defense. All Rights Reserved.

# Foster Declaration Exhibit 32

Page 1

INDIANA GENERAL ASSEMBLY

2026 SESSION

HOUSE FINANCIAL INSTITUTIONS COMMITTEE MEETING

January 13, 2026

HOUSE FINANCIAL INSTITUTIONS COMMITTEE DISCUSSION

HOUSE BILL 1273

https://iga.in.gov/session/2026/video/committee_financial_institutions

(Excerpt 1:55:10 - 2:17:30)

Page 2

A P P E A R A N C E S

REPRESENTATIVES:

Jake Teshka - (R), District 7

Kyle Pierce (R), District 36

Mike Andrade (D), District 12

Wendy Dant Chesser (D), District 71

Harold Slager (R), District 15

Christopher Judy (R), District 83

Kyle Miller (D), District 82

Christopher May (R), District 65

Robert Heaton (R), District 46

Jim Lucas (R), District 69

Ryan Lauer (R), District 59

ALSO APPEARING:

Matthew du Mee

Sal Nuzzo

The Clerk

Page 3

R E C O R D I N G

(Excerpt 1:55:10 - 2:17:30)

REPRESENTATIVE TESHKA:  We will move quickly to House Bill 1273. Representative Pierce, do you want to give us a rundown?

REPRESENTATIVE K. PIERCE:  Yes. First, can we take Amendment 2 and have Representative Andrade explain it?

REPRESENTATIVE TESHKA:  Yes. Representative Andrade?

REPRESENTATIVE ANDRADE:  Thank you, Mr. Chair, and thank you, Representative Kyle Pierce. I'll make it brief.

REPRESENTATIVE TESHKA:  Okay. All right. Go ahead.

REPRESENTATIVE ANDRADE:  Thank you. Thank you, Mr. Chair. Last session I brought the Consumer Deceptive Act language here to support law enforcement and suppliers that they were going after, unfortunately, the vehicles, and they were not getting restitution for it. During that discussion we -- by the way, we got the language amended on Senate Bill 464 last session. And during that discussion Representative Lucas and Slager brought something to our attention in regards to what about

Page 4

local units of government or State or local units of government not being under the Deceptive Act and not falling under statute. We heard the concerns. So this summer I worked with our Chairman, our Vice Chair, and, of course, Representative Slager as well. And this amendment, what it does is will allow the local units of government and any political subdivision to be part of the Deceptive Act when it comes to the goods or services that they work with a consumer transaction. So it's a very clean piece of legislation. All we're doing is adding, once again, local units of government or any political subdivision. Thank you to Representative Lucas and Slager for bringing this to our attention last session. We were running late in session. We didn't want to put the language in there until we got clarification on some of the logistics of it. So that's all the amendment does, and I hope we can take this amendment by consent.

REPRESENTATIVE TESHKA:  Any questions for Representative Andrade? Can we take that amendment by consent?

ALL:  Consent.

REPRESENTATIVE TESHKA:  Okay. Go ahead, Representative Pierce.

Page 5

REPRESENTATIVE K. PIERCE:  Thank you very much. So the initial bill is on -- it regulates proxy advisors. And so I'll kind of give a very quick overview of what they are.

So if you have large investments, like mutual funds or 401(k)s, you get to the point where the investors might have enough shares where they actually could have a voting share or voting rights with that individual company. Well, you know, the investors are really focused on financial returns, maybe not so much in terms of a vote of healthcare policy or how they're going to, you know, attack quarter four next year, things like that. So there is a whole industry on proxy advising. So what they do is these advisors advise the investors of, okay, hey, the board packet for quarter three's coming up. Here's these 10 questions. We think you should do yes, no, yes, yes, no, whatever it may be.

And what's occurred and -- under the Obama administration and, and under the Trump administration is, like, kind of look at the, the -- this industry of making sure that there's transparency in this space and making sure that there is kind of a fiduciary duty in that proxy advisor company space. And so there actually was an executive order in December from the

Page 6

Trump administration. The Obama administration had some acts in his second term. And so what the bill does, it says if you are a proxy advisor and you recommend against the company's management in a -- in a -- in a vote, you can do that. And if you're the investor, you can vote with the company management but against the company management, whatever you decide. But if you're a vote -- if you're suggesting against the company management, you basically either have to show we use a financial or value based analysis and, if you did, what was that. And so -- you know, so we disagree with company A's leadership on this vote; and here's how we came up with our reasoning for that.

If they did not -- if they oppose the company leadership, and they do not have a reasoning, they must indicate that as well. So if they have a blanket policy -- if the advisor has a blanket policy on XYZ issue, you should always vote yes or you should always vote no, they have to both indicate that to the person or the investment group as well as to the company leadership of saying, hey, just so you know, we're going to advise our people that we contract with that they should vote against this position of, you know, whatever the opposite of the -- if the company wants a no, and they say yes, you have to let the

Page 7

company know -- leadership know, as well -- as well as let them know the reasoning basis behind it. Is there a financial or a value based reasoning, or is there not -- or is there not?

And then lastly, if they were to not do that -- and this is where we got into Representative Andrade's bill -- it would be considered a deceptive act, if you were not to engage and not to disclose that information. So happy to take questions.

REPRESENTATIVE TESHKA:  Questions for Representative Pierce? Representative Dant Chesser.

REPRESENTATIVE DANT CHESSER:  Thank you so much, Mr. Chair and Rep. Pierce. Thank you for this. It was new information to me. So I appreciate you bringing this and then learning through the process.

Is there a specific issue in Indiana that this is trying to resolve? I'm just trying to put some common --

REPRESENTATIVE K. PIERCE:  So a specific vote or anything like that, no. It's a larger conversation so that -- like, so for example, the -- under the SEC under the Obama administration they started reviewing it. I think they did like a 10-year review on their -- that these proxy advisors are giving recommendations. And then there are some serious

Page 8

questions over, okay, how are you making these decisions? And for many of them, you know, they're saying, hey, you should vote X -- you know, these different ways and not providing a background for it. But it's a service in which there's a -- both an assumption and an agreement that you're going to do a financial analysis or some kind of value analysis. And there have been concerns. JPMorgan Chase, I think -- they, I think, recently said that they're no longer going to use proxy advisors because they're concerned about the lack of analysis. And so it is a broader conversation across the country. I can't speak to a specific company in Indiana or a specific, you know, vote that happened, so --

REPRESENTATIVE TESHKA:  Any other questions for Representative Pierce? Representative Slager.

REPRESENTATIVE SLAGER:  Yes, thank you, Mr. Chairman. Is -- I want to make sure one thing. There's not federal law that we're trying to align with. There's only an executive order. Is that correct?

REPRESENTATIVE K. PIERCE:  There are some SEC rules in this space that are on it, but we're not -- there's not a law that says -- it's not like the Genius Act discussion where there's a, hey, we're trying to do a companion bill, no.

Page 9

REPRESENTATIVE SLAGER:  And is there any concern that this would make it difficult enough to challenge management that that might hinder legitimate challenges?

REPRESENTATIVE K. PIERCE:  Can you -- can you explain the -- can you give me a scenario? I guess I'm trying to follow up the question.

REPRESENTATIVE SLAGER:  Offhand, I don't have one. But it's -- I just don't want -- I guess it's the unintended consequences we haven't thought about.

REPRESENTATIVE K. PIERCE:  So I'll -- okay. I think I can -- I think I'm answering your question. So are you saying there's a scenario where an advisor gives a position opposite of management and could this bill impact that broad --

REPRESENTATIVE SLAGER:  No. The requirement of the disclosures and transparency, which I'm not against --

REPRESENTATIVE K. PIERCE:  Uh-huh.

REPRESENTATIVE SLAGER:  -- would also perhaps make it more difficult for anybody to challenge management.

REPRESENTATIVE K. PIERCE:  I actually think it might be the opposite because now what's going to -- because right now, if the proxy advisor goes to, you

Page 10

know, J.P. Morgan and, and says, hey, for your mutual fund that owns stock in Amazon or whatever, we think you should vote no on this -- on this number -- Item Number 2. And then, you know, the mutual fund says, well, okay, why, or I mean -- because, I mean, we -- if we work off the assumption that the company's management wants the best interest for both the company and the -- and the -- and the investors, so you would assume, broadly speaking, that they would want the best interest in the company, therefore the best interest of the investors, but I'm being told to vote against them. Totally fine. Why? And so what's happened right now, they've not said why. And so there's been concerns both from companies but also investors saying, I'm not opposed to you telling me to vote no. Can you just tell me why I should be voting no?

REPRESENTATIVE SLAGER:  So maybe I need to back down even further. Who is compensating the proxy advisor?

REPRESENTATIVE K. PIERCE:  So it'll be the investor. And so, like, let's say you have a -- I'll keep going back to JPMorgan Chase. You invest in a mutual fund with them or whatever it is. You have some fees. So part of their fee structure or however

Page 11

they like to do it, would go to administrative costs.

One of the administrative costs would be a proxy

advisor.

REPRESENTATIVE TESHKA:  Thank you. Any

further questions? Seeing none, we do have a couple of

folks signed up to testify.  First, we'll call up

Matthew du Mee.

MR. DU MEE:  du Mee.

REPRESENTATIVE TESHKA:  du Mee -- my

apologies.

MR. DU MEE:  (Inaudible).

REPRESENTATIVE TESHKA:  I was trying hard.

Thank you.

MR. DU MEE:  Thank you. My name is Matthew du

Mee. I work for Fusion Law. Prior to working at Fusion

Law I worked with the State Attorney General's Office

doing consumer protection for eight years. Just to

give a little more legal background to understand why

this problem is happening, over 30 years ago the U.S.

Department of Labor issued guidance saying that

fiduciaries must vote the shares of stock that they

hold because of the potential effect on shareholder

value. Now, like many things, this made legal sense

but not practical sense. It made legal sense because

fiduciaries have a responsibility to maximize the

Page 12

investments in their care. Shareholder votes can benefit or harm the value of investments, so then shareholder votes should be voted. But in practical terms it put many pension plans and institutions in a bind because, if they have a well-diversified portfolio, by definition they hold many different shares of stock in many different companies, and now they have to know how they're supposed to vote on all of these issues in order to maximize value. And as the number of shareholder proposals has skyrocketed, figuring out which way to vote became more and more difficult.

So enter the proxy advisors. They offered a solution to these problems. They said, well, look, you just pay us money, you know, a smaller sum, and then we'll just do the analysis for you, and we'll tell you how to vote. And we're doing the analysis for all of these companies anyway, so we'll be able to get you this information. And so these recommendations were supposed to be based on financial value. So companies saw this as a way where they could uphold their fiduciary duties, cast votes based on financial value, without having to have a huge team of people analyzing all of these proposals.

So this situation created these economies of

Page 13

scale favoring large proxy advisors who could cover all votes across all companies and then sell their services cheaply to many different customers. So for years, two proxy advisors have controlled over 90% of the proxy advisory market. Those advisors are ISS and Glass, Lewis, and both of them are foreign owned. But last year, one of those proxy advisors admitted under oath that it does not conduct written financial analysis to assess the effect on shareholder value before it makes recommendations. The advisor's representative also stated under oath that it was not aware of any other proxy advisors conducting such analysis either.

So this is a serious problem for three reasons. First, proxy advisors are advertising that they're attempting to increase shareholder value. So there's a conflict between what they're advertising and what companies are actually receiving.

Second, companies are depending on these proxy advisors to meet their fiduciary duties, to increase the value of the investments. But if the proxy advice isn't based on financial analysis, then those fiduciary duties may not be met.

Third, proxy advisors hold tremendous sway in the U.S. market. One estimate found that the

Page 14

recommendations of the big two advisors could swing a shareholder vote up to 30 percent. If proxy advisors aren't conducting financial analyses, then these votes might be swung in ways that harm shareholders. And this is especially acute where the proxy advisor is recommending a vote against the company's management because the company management, their directors, they have their own fiduciary duties, and they are conducting a financial analysis.

So this bill simply requires disclosure. It requires disclosure of facts when a proxy advisor makes a recommendation to vote against company management. If a company -- if a proxy advisor is not making the recommendation based on the financial analysis, they just need to tell their clients that that's what's happening. And if they are making a recommendation based on their written financial analysis, then they need to make that available. Investors receiving this information either way will be able to better evaluate whether following that recommendation will increase the value of their investment and meet their fiduciary duties. And as mentioned, violations of this bill would be considered violations of the Indiana Deceptive Consumer Sales Act.

Page 15

I hope that background is helpful. And I'm happy to answer any questions.

REPRESENTATIVE TESHKA:  Representative Slager.

REPRESENTATIVE SLAGER:  Thank you, Mr. Chairman. And thank you, for your clarity. I thought that was a tremendous testimony.

So I'm just -- now I have the question I think I was driving at. And I can't imagine management accepting a decision, vote this way against management, of the company and not asking why. Are we saying that they're just saying, just because or we're not going to provide you that information? What's going on there?

MR. DU MEE:  So right now there are just so many proxy votes. There are so many proposals. There are thousands of proposals. And so going into this situation the pitch from proxy advisors is we're making -- we're -- you know, we're doing this in your best financial interest. We're analyzing these things. We're looking that. And that's the -- that's the one thing that they're apparently not doing. So -- and they could continue to do that. This bill would just require them to be honest about what's going on and just say, hey, here's our recommendation. We didn't

Page 16

make it based on a written financial analysis, but here it is. And that'll enable companies -- give them a heads up, if they care about that, to say, well, wait a second, what is this based on then? Why are you making this recommendation? Because that's really important information for fiduciaries.

REPRESENTATIVE SLAGER:  Thank you very much.

REPRESENTATIVE TESHKA:  Representative Pierce. And then I'll come to you Representative Lucas.

REPRESENTATIVE K. PIERCE:  Thank you, Mr. Chairman. So, for example, if one of the proxy advisors said, hey, our -- we have a blanket policy where, if we cannot find another company's leadership has suggested this option before, our automatic position will be opposition. For example, if they said, hey, we want to try a new -- you know, a new process in health insurance, but it's never -- they can't find evidence that's been utilized somewhere else, automatic position's no, they could just say that. And under this bill they could say, hey, we just have -- if it's not seen before, we're just going to say no. Is that -- am I understanding correct?

MR. DU MEE:  Exactly. Yeah. It just -- it just provides more transparency. The proxy advisors

Page 17

under the act don't have to do anything more than explain whether or not they're providing a written financial analysis or whether it's based on that. But that's probably the follow-up question that would be asked. Well, what is this based on then? And then that gives investors and fiduciaries more information to decide do they want to follow this recommendation or do they want to deviate in this instance.

REPRESENTATIVE TESHKA:  Representative Lucas?

REPRESENTATIVE LUCAS:  Thank you, Mr. Chair. Quick question. Sir, does Representative Pierce's bill help fix the dilemma that we're in right now?

MR. DU MEE:  Absolutely. So just requiring this disclosure, you know, sunshine is the best disinfectant. I'm sure you all hear that a lot. But, you know, this was really shocking last year when it -- when it was revealed, like they're not doing a financial analysis. It's the one thing that you really want. You know, I think about if you -- if you came to my city and said, hey, I'd like a restaurant recommendation and I gave you one, and then you found out later I hadn't been there, I didn't know anybody who had been there, I didn't know anything about it, then, you know, you'd be upset with me because that's the one thing that you're looking for. And this is the

Page 18

most important thing to fulfill fiduciary duties that
fiduciaries need. And so this will give them that
information.

REPRESENTATIVE TESHKA:  Thank you. Seeing no
further questions, we will move on to Sal Nuzzo.
Hopefully, I got that one right.

MR. NUZZO:  You got that one right, Mr.
Chairman.

REPRESENTATIVE TESHKA:  Perfect. Thank you.

MR. NUZZO:  Thank you. Thank you very much,
Mr. Chair and members of the committee. I appreciate
the opportunity to be with you. I promise to be as
brief as possible considering it's been a long morning
for you all. My name is Sal Nuzzo. I have the pleasure
of serving as Executive Director of Consumers Defense.
We are the policy arm of the nation's oldest consumer
protection nonprofit. My work takes me to committee
rooms like this around the country, helping to educate
policymakers on the impacts of various potential
proposed legislation and protecting consumers and
investors with the hard-earned money that they invest.

The bill before you this morning really
addresses an issue so in the weeds that I had a smirk
because even one of your representatives on the
committee didn't quite understand exactly what a proxy

Page 19

advisor does. And that's the case across the country.

It is an issue so in the weeds the overwhelming

majority of people have no idea that proxy advisors

even exist, including my wife. We were having a

conversation last night, and I was explaining to her

what I was testifying on. And she was like, "What

exactly is that?" And she's fairly accomplished and

has a pretty good investment portfolio on her own.

So today I would like to try and make this

relatable in a way that might shed light on why it's

important. About one-fourth of Indiana's economy is

tied up in manufacturing. $430 billion, I think, is

around the size of your economy, about 23 percent in

manufacturing. So for an exercise this morning, I want

you to picture you're an in-house maintenance

supervisor at Lilly. For the last 25 years, maxed out

your 401(k) contributions faithfully, especially in

a time where you're, you know, trying to put

three kids through college and in today's economy. And

you may even be investing in Lilly stock with your

401(k). After all, you believe in what you do. But

what you didn't know, as you get closer to retirement,

is, as you were crushing 12 and 14-hour days trying to

put three kids through college, the investment house

that you sent your money to then hired a third-party,

Page 20

a proxy advisor, to help with the shareholding voting process.

We give our money to asset managers who promise to have our financial interests as the most important consideration when they invest for us. The votes on shareholder proposals can be very basic, approving a slate of board of directors, could be very complex, reviewing and approving a merger or acquisition. And when that shareholder voting process is outsourced to a proxy advisor, they get to vote for you with the money that you've put in. And while those votes may be recorded, likely are, nothing underlying the reasoning for those votes necessarily is. So each year proxy advisors make tens of thousands of recommendations on the management of thousands of companies, hundreds of which are not only located in the state of Indiana but are driving your economy. And they do it all in your name, and you have no right to understand why they took a particular vote or made a particular recommendation.

Members, HB 1273 is just basic good government reform in our opinion. It's not just a bipartisan idea. It's a sensible and practical approach for any steward of other people's money. And I would like to close to thank the sponsor, thank

Page 21

the Committee for hearing it. So just in conclusion, if you're going to vote in opposition to management -- and that's fine -- then you simply should make your reasoning available, nothing more, no crazy layers of new government, no additional bureaucracy, just a straightforward alignment of state law with common sense. And so I conclude, thank the sponsor again and the Committee for their consideration, and happy to answer questions if you have them.

REPRESENTATIVE TESHKA:  Thank you, Mr. Nuzzo. Representative Judy.

REPRESENTATIVE JUDY:  Thank you, Mr. Chairman.

MR. NUZZO:  Yes, sir?

REPRESENTATIVE JUDY:  I believe two proxy firms control about 97% of this industry. Do you think this legislation would help increase competition?

MR. NUZZO:  Through the Chair, or do you just go back and forth?

REPRESENTATIVE TESHKA:  Go ahead.

MR. NUZZO:  Okay. Absolutely is my answer. I could go longer, but I'm sure you've got -- we've got other places to be. It's a great step along the way. There are definitely other things to do, but this is a fantastic first step. It's transparency and open

Page 22

government.

REPRESENTATIVE TESHKA:  Thank you. Any other questions for Mr. Nuzzo? What is the committee's will on this? Thank you, Mr. Nuzzo.

MR. NUZZO:  Thank you.

REPRESENTATIVE TESHKA:  Committee discussion?

REPRESENTATIVE ANDRADE:  (Inaudible).

REPRESENTATIVE TESHKA:  We've got Representative Andrade moving as amended. Do we have a second?

UNIDENTIFIED MALE:  Second.

REPRESENTATIVE TESHKA:  All right. We'll call the roll.

THE CLERK:  Representative Andrade?

REPRESENTATIVE ANDRADE:  Yes.

THE CLERK:  Representative Dant Chesser?

REPRESENTATIVE DANT CHESSER:  Yes.

THE CLERK:  Representative Hatcher?

REPRESENTATIVE TESHKA:  Excused.

THE CLERK:  Representative Miller?

REPRESENTATIVE MILLER:  Yes.

THE CLERK:  Chairman Teshka?

REPRESENTATIVE TESHKA:  Yes.

THE CLERK:  Representative Pierce?

REPRESENTATIVE K. PIERCE:  Yes.

Page 23

THE CLERK:  Representative May?

REPRESENTATIVE TESHKA:  Excused.

THE CLERK:  Representative Heaton?

REPRESENTATIVE HEATON:  Yes.

THE CLERK:  Representative Lucas?

REPRESENTATIVE LUCAS:  Aye.

THE CLERK:  Representative Judy?

REPRESENTATIVE JUDY:  Aye.

THE CLERK:  Representative Clere?

REPRESENTATIVE TESHKA:  Excused.

THE CLERK:  Representative Lauer?

REPRESENTATIVE LAUER:  Aye. Aye.

THE CLERK:  Representative Slager.

REPRESENTATIVE SLAGER:  Yes.

THE CLERK:  Ten to zero.

REPRESENTATIVE TESHKA:  Thank you. Ten to zero. And that will conclude our meeting for today. Thank you. We will be meeting next week, yes.

Page 24

CERTIFICATE OF TRANSCRIBER

I, RITA PELUSO, do hereby certify that this transcript was prepared from the digital audio recording of the foregoing proceeding, that said transcript is a true and accurate record of the proceedings to the best of my knowledge, skills, and ability; that I am neither counsel for, related to, nor employed by any of the parties to the action in which this was taken; and, further, that I am not a relative or employee of any counsel or attorney employed by the parties hereto, nor financially or otherwise interested in the outcome of this action.

*Rita Peluso*

RITA PELUSO

**[10 - apparently]**                                           Page 1

| 1 | 6 | | |
|---|---|---|---|
| **10**  5:16 7:23 | **65**  2:12 | **acute**  14:5 | **ahead**  3:15 |
| **12**  2:7 19:23 | **69**  2:14 | **adding**  4:11 | 4:24 21:20 |
| **1273**  1:10 3:4 | **7** | **additional**  21:5 | **align**  8:19 |
| 20:21 | **7**  2:5 | **addresses** | **alignment**  21:6 |
| **13**  1:4 | **71**  2:8 | 18:23 | **allow**  4:6 |
| **14**  19:23 | **8** | **administration** | **amazon**  10:2 |
| **15**  2:9 | **82**  2:11 | 5:20,20 6:1,1 | **amended**  3:22 |
| **18266**  24:14 | **83**  2:10 | 7:22 | 22:9 |
| **1:55:10**  1:14 | **9** | **administrative** | **amendment**  3:7 |
| 3:2 | **90**  13:4 | 11:1,2 | 4:6,18,19,21 |
| **2** | **97**  21:16 | **admitted**  13:7 | **analyses**  14:3 |
| **2**  3:7 10:4 | **a** | **advertising** | **analysis**  6:10 |
| **2026**  1:2,4,12 | **ability**  24:7 | 13:15,17 | 8:7,7,11 12:16 |
| **23**  19:13 | **able**  12:18 | **advice**  13:22 | 12:17 13:9,13 |
| **25**  19:16 | 14:20 | **advise**  5:15 | 13:22 14:9,15 |
| **2:17:30**  1:14 | **absolutely** | 6:22 | 14:18 16:1 |
| 3:2 | 17:13 21:21 | **advising**  5:14 | 17:3,18 |
| **3** | **accepting** | **advisor**  5:24 | **analyzing** |
| **30**  11:19 14:2 | 15:10 | 6:3,17 9:14,25 | 12:23 15:20 |
| **36**  2:6 | **accomplished** | 10:20 11:3 | **andrade**  2:7 |
| **4** | 19:7 | 14:5,11,13 | 3:7,10,11,16 |
| **401**  5:6 19:17 | **accurate**  24:5 | 19:1 20:1,10 | 4:21 22:7,9,14 |
| 19:21 | **acquisition** | **advisor's**  13:10 | 22:15 |
| **430**  19:12 | 20:9 | **advisors**  5:3,14 | **andrade's**  7:7 |
| **46**  2:13 | **act**  3:18 4:2,8 | 7:24 8:10 | **answer**  15:2 |
| **464**  3:23 | 7:8 8:24 14:25 | 12:13 13:1,4,5 | 21:9,21 |
| **5** | 17:1 | 13:7,12,15,20 | **answering**  9:12 |
| **59**  2:15 | **action**  24:8,12 | 13:24 14:1,2 | **anybody**  9:21 |
| | **acts**  6:2 | 15:18 16:13,25 | 17:22 |
| | **actually**  5:7,25 | 19:3 20:14 | **anyway**  12:18 |
| | 9:23 13:18 | **advisory**  13:5 | **apologies**  11:10 |
| | | **ago**  11:19 | **apparently** |
| | | **agreement**  8:6 | 15:22 |

[appearing - common]                                                      Page 2

| | | | |
|---|---|---|---|
| **appearing** 2:17 | **b** | **board** 5:15 | **cheaply** 13:3 |
| **appreciate** 7:14 | **back** 10:19,23 | 20:7 | **chesser** 2:8 |
| 18:11 | 21:19 | **brief** 3:13 | 7:11,12 22:16 |
| **approach** | **background** | 18:13 | 22:17 |
| 20:24 | 8:4 11:18 15:1 | **bringing** 4:14 | **christopher** |
| **approving** 20:7 | **based** 6:10 7:3 | 7:15 | 2:10,12 |
| 20:8 | 12:20,22 13:22 | **broad** 9:15 | **city** 17:20 |
| **arm** 18:16 | 14:14,17 16:1 | **broader** 8:11 | **clarification** |
| **asked** 17:5 | 16:4 17:3,5 | **broadly** 10:9 | 4:17 |
| **asking** 15:11 | **basic** 20:6,21 | **brought** 3:17 | **clarity** 15:6 |
| **assembly** 1:1 | **basically** 6:9 | 3:24 | **clean** 4:10 |
| **assess** 13:9 | **basis** 7:2 | **bureaucracy** | **clere** 23:9 |
| **asset** 20:3 | **believe** 19:21 | 21:5 | **clerk** 2:20 |
| **assume** 10:9 | 21:15 | | 22:14,16,18,20 |
| **assumption** 8:6 | **benefit** 12:2 | **c** | 22:22,24 23:1 |
| 10:6 | **best** 10:7,10,11 | **c** 2:1 3:1 | 23:3,5,7,9,11 |
| **attack** 5:12 | 15:20 17:14 | **call** 11:6 22:12 | 23:13,15 |
| **attempting** | 24:6 | **care** 12:1 16:3 | **clients** 14:15 |
| 13:16 | **better** 14:20 | **case** 19:1 | **close** 20:25 |
| **attention** 3:25 | **big** 14:1 | **cast** 12:22 | **closer** 19:22 |
| 4:14 | **bill** 1:10 3:4,22 | **certificate** 24:1 | **college** 19:19 |
| **attorney** 11:16 | 5:2 6:2 7:7 | **certify** 24:2 | 19:24 |
| 24:10 | 8:25 9:15 | **chair** 3:12,17 | **come** 16:9 |
| **audio** 24:3 | 14:10,23 15:23 | 4:4 7:13 17:10 | **comes** 4:8 |
| **automatic** | 16:21 17:11 | 18:11 21:18 | **coming** 5:16 |
| 16:15,20 | 18:22 | **chairman** 4:4 | **committee** 1:3 |
| **available** 14:18 | **billion** 19:12 | 8:18 15:6 | 1:9,12 18:11 |
| 21:4 | **bind** 12:5 | 16:12 18:8 | 18:17,25 21:1 |
| **aware** 13:12 | **bipartisan** | 21:13 22:22 | 21:8 22:6 |
| **aye** 23:6,8,12 | 20:23 | **challenge** 9:3 | **committee's** |
| 23:12 | **blanket** 6:16,17 | 9:21 | 22:3 |
| | 16:13 | **challenges** 9:4 | **common** 7:18 |
| | | **chase** 8:8 10:23 | 21:6 |

[companies - educate]                                                    Page 3

**companies**
10:14 12:7,18
12:20 13:2,18
13:19 16:2
20:16
**companion**
8:25
**company** 5:9
5:24 6:6,7,9,12
6:14,20,24 7:1
8:13 10:8,10
14:7,12,13
15:11
**company's** 6:4
10:6 14:6
16:14
**compensating**
10:19
**competition**
21:17
**complex** 20:8
**concern** 9:2
**concerned** 8:10
**concerns** 4:3
8:8 10:14
**conclude** 21:7
23:17
**conclusion** 21:1
**conduct** 13:8
**conducting**
13:12 14:3,9
**conflict** 13:17
**consent** 4:19,22
4:23

**consequences**
9:10
**consideration**
20:5 21:8
**considered** 7:7
14:23
**considering**
18:13
**consumer** 3:17
4:9 11:17
14:24 18:16
**consumers**
18:15,20
**continue** 15:23
**contract** 6:22
**contributions**
19:17
**control** 21:16
**controlled** 13:4
**conversation**
7:20 8:12 19:5
**correct** 8:20
16:23
**costs** 11:1,2
**counsel** 24:7,10
**country** 8:12
18:18 19:1
**couple** 11:5
**course** 4:5
**cover** 13:1
**crazy** 21:4
**created** 12:25
**crushing** 19:23

**customers** 13:3

**d**

**d** 2:7,8,11 3:1
**dant** 2:8 7:11
7:12 22:16,17
**days** 19:23
**december** 5:25
**deceptive** 3:18
4:2,8 7:7 14:24
**decide** 6:7 17:7
**decision** 15:10
**decisions** 8:2
**defense** 18:15
**definitely** 21:24
**definition** 12:6
**department**
11:20
**depending**
13:19
**deviate** 17:8
**different** 8:4
12:6,7 13:3
**difficult** 9:2,21
12:12
**digital** 24:3
**dilemma** 17:12
**director** 18:15
**directors** 14:7
20:7
**disagree** 6:12
**disclose** 7:8
**disclosure**
14:10,11 17:14

**disclosures**
9:17
**discussion** 1:9
3:21,24 8:24
22:6
**disinfectant**
17:15
**district** 2:5,6,7
2:8,9,10,11,12
2:13,14,15
**diversified** 12:5
**doing** 4:11
11:17 12:17
15:19,22 17:17
**driving** 15:9
20:17
**du** 2:18 11:7,8
11:8,9,11,14,14
15:15 16:24
17:13
**duties** 12:22
13:20,23 14:8
14:22 18:1
**duty** 5:23

**e**

**e** 2:1,1 3:1
**earned** 18:21
**economies**
12:25
**economy** 19:11
19:13,19 20:17
**educate** 18:18

[effect - heads]                                                    Page 4

**effect** 11:22
  13:9
**eight** 11:17
**either** 6:9 13:13
  14:19
**employed** 24:8
  24:11
**employee** 24:10
**enable** 16:2
**enforcement**
  3:18
**engage** 7:8
**enter** 12:13
**especially** 14:5
  19:17
**estimate** 13:25
**evaluate** 14:20
**evidence** 16:19
**exactly** 16:24
  18:25 19:7
**example** 7:21
  16:12,16
**excerpt** 1:14
  3:2
**excused** 22:19
  23:2,10
**executive** 5:25
  8:20 18:15
**exercise** 19:14
**exist** 19:4
**explain** 3:8 9:6
  17:2
**explaining** 19:5

**f**

**facts** 14:11
**fairly** 19:7
**faithfully** 19:17
**falling** 4:3
**fantastic** 21:25
**favoring** 13:1
**federal** 8:19
**fee** 10:25
**fees** 10:25
**fiduciaries**
  11:21,25 16:6
  17:6 18:2
**fiduciary** 5:23
  12:22 13:20,23
  14:8,22 18:1
**figuring** 12:11
**financ** 1:12
**financial** 1:3,9
  5:10 6:10 7:3
  8:7 12:20,22
  13:8,22 14:3,9
  14:14,17 15:20
  16:1 17:3,18
  20:4
**financially**
  24:11
**find** 16:14,19
**fine** 10:12 21:3
**firms** 21:16
**first** 3:6 11:6
  13:15 21:25

**fix** 17:12
**focused** 5:10
**folks** 11:6
**follow** 9:7 17:4
  17:7
**following** 14:20
**foregoing** 24:4
**foreign** 13:6
**forth** 21:19
**found** 13:25
  17:21
**four** 5:12
**fourth** 19:11
**fulfill** 18:1
**fund** 10:2,4,24
**funds** 5:6
**further** 10:19
  11:5 18:5 24:9
**fusion** 11:15,15

**g**

**g** 3:1
**general** 1:1
**general's** 11:16
**genius** 8:24
**getting** 3:20
**give** 3:5 5:3 9:6
  11:18 16:2
  18:2 20:3
**gives** 9:14 17:6
**giving** 7:24
**glass** 13:6
**go** 3:14 4:24
  11:1 21:19,20

  21:22
**goes** 9:25
**going** 3:19 5:12
  6:22 8:6,10
  9:24 10:23
  15:13,14,17,24
  16:22 21:2
**good** 19:8
  20:21
**goods** 4:9
**government**
  4:1,2,7,12
  20:22 21:5
  22:1
**great** 21:23
**group** 6:20
**guess** 9:6,9
**guidance** 11:20

**h**

**happened** 8:14
  10:13
**happening**
  11:19 14:16
**happy** 7:9 15:2
  21:8
**hard** 11:12
  18:21
**harm** 12:2 14:4
**harold** 2:9
**hatcher** 22:18
**hb** 20:21
**heads** 16:3

[health - lack]                                                                 Page 5

**health**  16:18
**healthcare**  5:11
**hear**  17:15
**heard**  4:3
**hearing**  21:1
**heaton**  2:13
  23:3,4
**help**  17:12 20:1
  21:17
**helpful**  15:1
**helping**  18:18
**hereto**  24:11
**hey**  5:15 6:21
  8:3,24 10:1
  15:25 16:13,17
  16:21 17:20
**hinder**  9:3
**hired**  19:25
**hold**  11:22 12:6
  13:24
**honest**  15:24
**hope**  4:18 15:1
**hopefully**  18:6
**hour**  19:23
**house**  1:3,9,10
  3:4 19:15,24
**https**  1:12
**huge**  12:23
**huh**  9:19
**hundreds**
  20:16

**i**

**ial**  1:13
**idea**  19:3 20:23
**iga.in.gov**  1:12
**imagine**  15:9
**impact**  9:15
**impacts**  18:19
**important**  16:6
  18:1 19:11
  20:5
**inaudible**  11:11
  22:7
**including**  19:4
**increase**  13:16
  13:21 14:21
  21:17
**indiana**  1:1
  7:16 8:13
  14:24 20:17
**indiana's**  19:11
**indicate**  6:16
  6:19
**individual**  5:9
**industry**  5:13
  5:21 21:16
**information**
  7:9,14 12:19
  14:19 15:13
  16:6 17:6 18:3
**initial**  5:2
**instance**  17:8
**institutions**  1:3
  1:9,13 12:4

**insurance**
  16:18
**interest**  10:7,10
  10:11 15:20
**interested**
  24:12
**interests**  20:4
**invest**  10:23
  18:21 20:5
**investing**  19:20
**investment**
  6:20 14:22
  19:8,24
**investments**
  5:5 12:1,2
  13:21
**investor**  6:6
  10:22
**investors**  5:7,9
  5:15 10:8,11
  10:15 14:19
  17:6 18:21
**iss**  13:5
**issue**  6:18 7:16
  18:23 19:2
**issued**  11:20
**issues**  12:9
**it'll**  10:21
**item**  10:4

**j**

**j.p.**  10:1
**jake**  2:5

**january**  1:4
**jim**  2:14
**jpmorgan**  8:8
  10:23
**judy**  2:10 21:11
  21:12,15 23:7
  23:8

**k**

**k**  3:6 5:1,6 7:19
  8:21 9:5,11,19
  9:23 10:21
  16:11 19:17,21
  22:25
**keep**  10:23
**kids**  19:19,24
**kind**  5:3,21,23
  8:7
**know**  5:9,12
  6:11,21,23 7:1
  7:1,2 8:2,3,13
  10:1,4 12:8,15
  15:19 16:17
  17:14,16,19,22
  17:23,24 19:18
  19:22
**knowledge**
  24:6
**kyle**  2:6,11
  3:12

**l**

**labor**  11:20
**lack**  8:11

**[language - okay]** Page 6

**language** 3:18 3:22 4:16
**large** 5:5 13:1
**larger** 7:20
**lastly** 7:5
**late** 4:15
**lauer** 2:15 23:11,12
**law** 3:18 8:19 8:23 11:15,16 21:6
**layers** 21:4
**leadership** 6:12 6:15,21 7:1 16:14
**learning** 7:15
**legal** 11:18,23 11:24
**legislation** 4:11 18:20 21:17
**legitimate** 9:3
**lewis** 13:6
**light** 19:10
**likely** 20:12
**lilly** 19:16,20
**little** 11:18
**local** 4:1,1,6,12
**located** 20:16
**logistics** 4:17
**long** 18:13
**longer** 8:9 21:22
**look** 5:21 12:14

**looking** 15:21 17:25
**lot** 17:15
**lucas** 2:14 3:24 4:13 16:10 17:9,10 23:5,6

**m**

**made** 11:23,24 20:19
**maintenance** 19:15
**majority** 19:3
**make** 3:13 8:18 9:2,21 14:18 16:1 19:9 20:14 21:3
**makes** 13:10 14:12
**making** 5:22,23 8:1 14:14,16 15:19 16:5
**male** 22:11
**management** 6:4,6,7,9 9:3,14 9:22 10:7 14:6 14:7,13 15:9 15:11 20:15 21:2
**managers** 20:3
**manufacturing** 19:12,14
**market** 13:5,25

**matthew** 2:18 11:7,14
**maxed** 19:16
**maximize** 11:25 12:9
**mean** 10:5,5
**mee** 2:18 11:7,8 11:8,9,11,14,15 15:15 16:24 17:13
**meet** 13:20 14:22
**meeting** 1:3 23:17,18
**members** 18:11 20:21
**mentioned** 14:23
**merger** 20:8
**met** 13:23
**mike** 2:7
**miller** 2:11 22:20,21
**money** 12:15 18:21 19:25 20:3,11,24
**morgan** 10:1
**morning** 18:13 18:22 19:14
**move** 3:3 18:5
**moving** 22:9
**mutual** 5:5 10:1,4,24

**n**

**n** 2:1 3:1
**name** 11:14 18:14 20:18
**nation's** 18:16
**necessarily** 20:13
**need** 10:18 14:15,18 18:2
**neither** 24:7
**never** 16:18
**new** 7:14 16:17 16:17 21:5
**night** 19:5
**nonprofit** 18:17
**number** 10:3,4 12:10
**nuzzo** 2:19 18:5,7,10,14 21:11,14,18,21 22:3,4,5

**o**

**o** 3:1
**oath** 13:8,11
**obama** 5:19 6:1 7:22
**occurred** 5:19
**offered** 12:13
**offhand** 9:8
**office** 11:16
**okay** 3:14 4:24 5:15 8:1 9:12

**[okay - r]**                                                                                    Page 7

| | | | |
|---|---|---|---|
| 10:5 21:21 | **party** 19:25 | **position** 6:23 | **provides** 16:25 |
| **oldest** 18:16 | **pay** 12:15 | 9:14 16:16 | **providing** 8:4 |
| **once** 4:11 | **peluso** 24:2,15 | **position's** | 17:2 |
| **open** 21:25 | **pension** 12:4 | 16:20 | **proxy** 5:2,14,24 |
| **opinion** 20:22 | **people** 6:22 | **possible** 18:13 | 6:3 7:24 8:10 |
| **opportunity** | 12:23 19:3 | **potential** 11:22 | 9:25 10:19 |
| 18:12 | **people's** 20:24 | 18:19 | 11:2 12:13 |
| **oppose** 6:14 | **percent** 14:2 | **practical** 11:24 | 13:1,4,5,7,12 |
| **opposed** 10:15 | 19:13 | 12:3 20:23 | 13:15,20,22,24 |
| **opposite** 6:24 | **perfect** 18:9 | **prepared** 24:3 | 14:2,5,11,13 |
| 9:14,24 | **person** 6:19 | **pretty** 19:8 | 15:16,18 16:12 |
| **opposition** | **picture** 19:15 | **prior** 11:15 | 16:25 18:25 |
| 16:16 21:2 | **piece** 4:10 | **probably** 17:4 | 19:3 20:1,10 |
| **option** 16:15 | **pierce** 2:6 3:4,6 | **problem** 11:19 | 20:14 21:15 |
| **order** 5:25 8:20 | 3:13 4:25 5:1 | 13:14 | **put** 4:16 7:17 |
| 12:9 | 7:11,13,19 | **problems** 12:14 | 12:4 19:18,24 |
| **outcome** 24:12 | 8:16,21 9:5,11 | **proceeding** | 20:11 |
| **outsourced** | 9:19,23 10:21 | 24:4 | |
| 20:10 | 16:9,11 22:24 | **proceedings** | **q** |
| **overview** 5:4 | 22:25 | 24:6 | **quarter** 5:12,16 |
| **overwhelming** | **pierce's** 17:11 | **process** 7:15 | **question** 9:7,13 |
| 19:2 | **pitch** 15:18 | 16:18 20:2,9 | 15:8 17:4,11 |
| **own** 14:8 19:8 | **places** 21:23 | **promise** 18:12 | **questions** 4:20 |
| **owned** 13:6 | **plans** 12:4 | 20:4 | 5:17 7:9,10 8:1 |
| **owns** 10:2 | **pleasure** 18:14 | **proposals** | 8:15 11:5 15:2 |
| | **point** 5:6 | 12:10,24 15:16 | 18:5 21:9 22:3 |
| **p** | **policy** 5:11 | 15:17 20:6 | **quick** 5:3 17:11 |
| **p** 2:1,1 | 6:17,17 16:13 | **proposed** 18:20 | **quickly** 3:3 |
| **packet** 5:15 | 18:16 | **protecting** | **quite** 18:25 |
| **part** 4:8 10:25 | **policymakers** | 18:20 | |
| **particular** | 18:19 | **protection** | **r** |
| 20:19,20 | **political** 4:7,12 | 11:17 18:17 | **r** 2:1,5,6,9,10 |
| **parties** 24:8,11 | **portfolio** 12:6 | **provide** 15:13 | 2:12,13,14,15 |
| | 19:8 | | 3:1,1 |

**[really - shares]** Page 8

**really** 5:10 16:5 17:16,18 18:22
**reasoning** 6:13 6:15 7:2,3 20:13 21:4
**reasons** 13:15
**receiving** 13:18 14:19
**recently** 8:9
**recommend** 6:4
**recommendat...** 14:12,14,17,21 15:25 16:5 17:7,21 20:20
**recommendat...** 7:25 12:19 13:10 14:1 20:15
**recommending** 14:6
**record** 24:5
**recorded** 20:12
**recording** 24:4
**reform** 20:22
**regards** 3:25
**regulates** 5:2
**relatable** 19:10
**related** 24:7
**relative** 24:10
**rep** 7:13
**representative** 3:3,4,6,7,9,9,11 3:12,14,16,24 4:5,13,20,21,24

4:25 5:1 7:6,10 7:11,11,12,19 8:15,16,16,17 8:21 9:1,5,8,11 9:16,19,20,23 10:18,21 11:4 11:9,12 13:11 15:3,4,5 16:7,8 16:8,10,11 17:9,9,10,11 18:4,9 21:10 21:11,12,15,20 22:2,6,7,8,9,12 22:14,15,16,17 22:18,19,20,21 22:23,24,25 23:1,2,3,4,5,6,7 23:8,9,10,11,12 23:13,14,16
**representatives** 2:3 18:24
**require** 15:24
**requirement** 9:16
**requires** 14:10 14:11
**requiring** 17:13
**resolve** 7:17
**responsibility** 11:25
**restaurant** 17:20

**restitution** 3:21
**retirement** 19:22
**returns** 5:10
**revealed** 17:17
**review** 7:23
**reviewing** 7:23 20:8
**right** 3:14 9:25 10:13 15:15 17:12 18:6,7 20:18 22:12
**rights** 5:8
**rita** 24:2,15
**robert** 2:13
**roll** 22:13
**rooms** 18:18
**rules** 8:22
**rundown** 3:5
**running** 4:15
**ryan** 2:15

**s**

**s** 2:1 5:6
**sal** 2:19 18:5,14
**sales** 14:24
**saw** 12:21
**saying** 6:21 8:3 9:13 10:15 11:20 15:12,12
**says** 6:3 8:23 10:1,5
**scale** 13:1

**scenario** 9:6,13
**sec** 7:22 8:21
**second** 6:2 13:19 16:4 22:10,11
**seeing** 11:5 18:4
**seen** 16:22
**sell** 13:2
**senate** 3:22
**sense** 11:23,24 11:24 21:7
**sensible** 20:23
**sent** 19:25
**serious** 7:25 13:14
**service** 8:5
**services** 4:9 13:3
**serving** 18:15
**session** 1:2,12 3:17,23 4:15 4:15
**share** 5:8
**shareholder** 11:22 12:1,3 12:10 13:9,16 14:2 20:6,9
**shareholders** 14:4
**shareholding** 20:1
**shares** 5:7 11:21 12:7

**[shed - transcript]**                                    Page 9

| | | | |
|---|---|---|---|
| **shed** 19:10 | **stated** 13:11 | **taken** 24:9 | **thing** 8:18 |
| **shocking** 17:16 | **statute** 4:3 | **takes** 18:17 | 15:22 17:18,25 |
| **show** 6:10 | **step** 21:23,25 | **team** 12:23 | 18:1 |
| **signature** 24:14 | **steward** 20:24 | **tell** 10:16 12:16 | **things** 5:13 |
| **signed** 11:6 | **stock** 10:2 | 14:15 | 11:23 15:20 |
| **simply** 14:10 | 11:21 12:7 | **telling** 10:15 | 21:24 |
| 21:3 | 19:20 | **ten** 23:15,16 | **think** 5:17 7:23 |
| **sir** 17:11 21:14 | **straightforward** | **tens** 20:14 | 8:8,9 9:12,12 |
| **situation** 12:25 | 21:6 | **term** 6:2 | 9:23 10:2 15:9 |
| 15:18 | **structure** 10:25 | **terms** 5:11 12:4 | 17:19 19:12 |
| **size** 19:13 | **subdivision** 4:7 | **teshka** 2:5 3:3 | 21:16 |
| **skills** 24:6 | 4:13 | 3:9,14 4:20,24 | **third** 13:24 |
| **skyrocketed** | **suggested** | 7:10 8:15 11:4 | 19:25 |
| 12:10 | 16:15 | 11:9,12 15:4 | **thought** 9:10 |
| **slager** 2:9 3:24 | **suggesting** 6:8 | 16:8 17:9 18:4 | 15:6 |
| 4:5,14 8:16,17 | **sum** 12:15 | 18:9 21:10,20 | **thousands** |
| 9:1,8,16,20 | **summer** 4:4 | 22:2,6,8,12,19 | 15:17 20:14,15 |
| 10:18 15:4,5 | **sunshine** 17:14 | 22:22,23 23:2 | **three** 13:14 |
| 16:7 23:13,14 | **supervisor** | 23:10,16 | 19:19,24 |
| **slate** 20:7 | 19:16 | **testify** 11:6 | **three's** 5:16 |
| **smaller** 12:15 | **suppliers** 3:19 | **testifying** 19:6 | **tied** 19:12 |
| **smirk** 18:23 | **support** 3:18 | **testimony** 15:7 | **time** 19:18 |
| **solution** 12:14 | **supposed** 12:8 | **thank** 3:11,12 | **today** 19:9 |
| **space** 5:22,24 | 12:20 | 3:16,16 4:13 | 23:17 |
| 8:22 | **sure** 5:22,23 | 5:1 7:12,13 | **today's** 19:19 |
| **speak** 8:12 | 8:18 17:15 | 8:17 11:4,13 | **told** 10:11 |
| **speaking** 10:9 | 21:22 | 11:14 15:5,6 | **took** 20:19 |
| **specific** 7:16,19 | **sway** 13:24 | 16:7,11 17:10 | **totally** 10:12 |
| 8:13,13 | **swing** 14:1 | 18:4,9,10,10 | **transaction** |
| **sponsor** 20:25 | **swung** 14:4 | 20:25,25 21:7 | 4:10 |
| 21:7 | **t** | 21:10,12 22:2 | **transcriber** |
| **started** 7:22 | | 22:4,5 23:16 | 24:1 |
| **state** 4:1 11:16 | **take** 3:7 4:18 | 23:18 | **transcript** 24:3 |
| 20:17 21:6 | 4:21 7:9 | | 24:5 |

**[transparency - zero]**                                       Page 10

| | | w | y |
|---|---|---|---|
| **transparency** 5:22 9:17 16:25 21:25 | **units** 4:1,1,7,12 | **wait** 16:4 | **yeah** 16:24 |
| **tremendous** 13:24 15:7 | **uphold** 12:21 | **want** 3:4 4:16 8:18 9:9 10:10 16:17 17:7,8 17:19 19:14 | **year** 5:12 7:23 13:7 17:16 20:14 |
| **true** 24:5 | **upset** 17:24 | | **years** 11:17,19 13:4 19:16 |
| **trump** 5:20 6:1 | **use** 6:10 8:10 | **wants** 6:25 10:7 | |
| **try** 16:17 19:9 | **utilized** 16:19 | | z |
| **trying** 7:17,17 8:19,25 9:7 11:12 19:18,23 | v | **way** 3:22 12:11 12:21 14:19 15:10 19:10 21:23 | **zero** 23:15,17 |
| **two** 13:4 14:1 21:15 | **value** 6:10 7:3 8:7 11:23 12:2 12:9,20,22 13:9,16,21 14:21 | **ways** 8:4 14:4 | |
| u | **various** 18:19 | **we've** 21:22 22:8 | |
| **u.s.** 11:19 13:25 | **vehicles** 3:20 | **weeds** 18:23 19:2 | |
| **uh** 9:19 | **vice** 4:4 | **week** 23:18 | |
| **under** 4:2,3 5:19,20 7:21 7:22 13:7,11 16:21 17:1 | **video** 1:12 | **wendy** 2:8 | |
| **underlying** 20:12 | **violations** 14:23,24 | **wife** 19:4 | |
| **understand** 11:18 18:25 20:19 | **vote** 5:11 6:5,6 6:8,12,18,19,23 7:19 8:3,14 10:3,12,16 11:21 12:8,11 12:17 14:2,6 14:12 15:10 20:10,19 21:2 | **work** 4:9 10:6 11:15 18:17 | |
| **understanding** 16:23 | | **worked** 4:4 11:16 | |
| **unfortunately** 3:20 | **voted** 12:3 | **working** 11:15 | |
| **unidentified** 22:11 | **votes** 12:1,3,22 13:2 14:3 15:16 20:6,12 20:13 | **written** 13:8 14:17 16:1 17:2 | |
| **unintended** 9:10 | **voting** 5:8,8 10:16 20:1,9 | x | |
| | | **x** 8:3 **xyz** 6:17 | |

# Foster Declaration Exhibit 33

Page 1

INDIANA GENERAL ASSEMBLY

2026 SESSION

HOUSE READING AND VOTE

JANUARY 20, 2026

HOUSE DISCUSSION AND VOTE

HOUSE BILL 1273

https://iga.in.gov/session/2026/video/house

(Excerpt 1:40:20 - 1:49:45)

Page 2

                    A  P  P  E  A  R  A  N  C  E  S


REPRESENTATIVES:

Michael Karickhoff (R), District 30

Kyle Pierce (R), District 36

Mike Andrade (D), District 12

Edward DeLaney (D), District 86

Maureen Bauer (D), District 6


ALSO APPEARING:

Madam Clerk

Page 3

R E C O R D I N G

(Excerpt 1:40:20 - 1:49:45)

SPEAKER KARICKHOFF:  House Bill 1273, Representative Pierce.

MADAM CLERK:  Mr. Speaker, please hand down House Bill 1273.

SPEAKER KARICKHOFF:  Chair hands down House Bill 1273 on final passage.

MADAM CLERK:  House Bill 1273.

SPEAKER KARICKHOFF:  Representative Pierce, you're recognized to present your bill.

REPRESENTATIVE K. PIERCE:  Thank you, Mr. Speaker and Ladies and Gentlemen of the House. This is on regulation of proxy advisors. In Committee we did accept an amendment from Representative Andrade -- I'll let him explain it a little bit more in detail -- on a consumer -- defective consumer sales. Right now under Indiana law, individuals, if there's a deceptive sale, they can call the Attorney General. What this amendment did was it allows more government agencies to engage in this. We had it last session. We allowed police forces to do it. Representative Andrade was working through it during session last year to include other government agencies. We just got to the end of the clock, so we ended up -- he ended up having

a new bill. We've included it in this bill. But the broader discussion of the base bill is on proxy advisors.

So proxy advisors is an entity that are not commonly known to most folks. But if you're investing, and let's say you have a mutual fund, 401K, these -- pension funds -- you have these large institutional investors. You could get to the point where you have so much shares that you actually cannot vote in shareholder votes. And just over 30 years ago the US Department of Labor clarified that fiduciaries must vote shares because of their impact on shareholder value. Well, that theoretically could be hundreds, if not thousands, of votes per year. And these institutional investors, their concern is financial return. They're not thinking about, you know, quarter three or quarter four returns and strategies for this new company, or the CEO's compensation package, or whatever it may be. So there's a whole industry that says, hey, we will address that question for you. We will go through all the votes that you need to take. And we'll give you a recommendation based on you should vote yes or vote no. And they have a fiduciary duty to the person that's investing. And they're supposed to show either value based or

Page 5

financial based analysis.

What's happened, though, is there's been concerns for over 10 years, both showcased and highlighted by the Obama administration, but also the most -- most recently the Trump administration of that's not what's occurring. And so what they're doing is that these advisors sometimes are saying, hey, we're giving a blanket policy recommendation and not giving the analysis to the person that's actually voting. And over hundreds, if not thousands, of votes, that could be potentially misleading.

So what we're doing here in this bill is saying, if you provide these proxy advisor services, you can suggest whatever you want to suggest in voting; however, if you suggest a recommendation against company management, what you need to do is show your homework -- show your work. So if you oppose the company management, and you have some financial or value based analysis of why you think, you know, you should vote no or vote yes, whatever the opposite of management is, totally fine. You can -- the person can vote that way. The advisor can suggest that. But you've just got to showcase why you come up with that -- with that recommendation. And you also need to go and tell the company that you're telling to vote

Page 6

against why they -- why you're opposing them. And then also, if you have no -- if there's no reasoning behind it, you just have a blanket policy, you have to tell folks that as well. If you -- someone were to fail this and not showcase their homework, it would be a deceptive act the AG could engage them in.

So thank you. Happy to take any questions. I hope you join me in passing this bill.

SPEAKER KARICKHOFF:  Further discussion, Representative DeLaney?

REPRESENTATIVE DELANEY:  Will the author yield?

SPEAKER KARICKHOFF:  Will the author yield? He yields.

REPRESENTATIVE DELANEY:  A simple question -- this bill, this proxy business --

REPRESENTATIVE K. PIERCE:  Yeah.

REPRESENTATIVE DELANEY:  -- relates to publicly traded stocks, for example.

REPRESENTATIVE K. PIERCE:  You're on the mic.

REPRESENTATIVE DELANEY:  This relates to publicly traded stocks, for example. Is that right?

REPRESENTATIVE K. PIERCE:  Yes. Like almost -- I would not know of any other way, yes.

REPRESENTATIVE DELANEY:  All right. So are we

Page 7

dealing with a separate new regulatory system? Is this consistent with the SEC regulations?

REPRESENTATIVE K. PIERCE:  Yes. The SEC is not -- does not guide them on this issue. All we're saying is, however you decide to suggest how you -- someone should vote, you just need to tell them, yes, here are why.

REPRESENTATIVE DELANEY:  So every proxy adviser in America who advises a corporation, or a mutual fund, or a family office, as they're called --

REPRESENTATIVE K. PIERCE:  Yup.

REPRESENTATIVE DELANEY:  -- has to comply with this Indiana statute that you want us to pass. Is that right?

REPRESENTATIVE K. PIERCE:  So, yes. So the two that have monopoly that have about combined 90 percent of the -- of the market, those would -- those would need to apply as well as the other some that have the 10 percent of the market, yes.

REPRESENTATIVE DELANEY:  And what are those two companies?

REPRESENTATIVE K. PIERCE:  The initials is ISS, which is kind of close to ISIS, and then Glass Lewis.

REPRESENTATIVE DELANEY:  So they're going to

Page 8

have to fit with our regulation?

REPRESENTATIVE K. PIERCE:  Well, they have to fit -- so it's actually their contract. So the contract says that they actually are going through a financial and value based analysis. So they already have a contractual duty. What's been happening is they sometimes showcased as well in U.S. Senate hearings that they're not going through and doing that. And so this is actually making sure that they're following through on contractual obligations.

REPRESENTATIVE DELANEY:  So we're going to enforce their obligation to the people with whom they have contracts?

REPRESENTATIVE K. PIERCE:  Yes. Yes.

REPRESENTATIVE DELANEY:  So the people can't do it themselves, the people who buy the service?

REPRESENTATIVE K. PIERCE:  So you actually -- how would you -- how would you know? I mean, if they're not --

REPRESENTATIVE DELANEY:  You know.

REPRESENTATIVE K. PIERCE:  Well, I can ask you that question. I'll say this. If they're not showing their work, how do you know an individual is not -- is doing rubber-stamping, which would be against their policy and would be against U.S. Labor

Page 9

direction, which says they have to vote? They can't just be rubber-stamping. They actually have to vote.

REPRESENTATIVE DELANEY:  Permission to speak.

SPEAKER KARICKHOFF:  You're recognized to speak on the bill.

REPRESENTATIVE DELANEY:  I think we're drifting into deep waters without direction. This is a matter for federal regulation, a matter for private enforcement. If I pay an advisor to tell me how to vote on a proxy or a vote for a corporate matter and they don't do their duty, then I have a lawsuit against them. Why the State of Indiana should involve itself in this is beyond my comprehension. It may be that some members are offended by the fact that people would perform their contracts so poorly. But I don't consider that to be any of my business or the business of this body. Thank you.

SPEAKER KARICKHOFF:  Further discussion? Representative Andrade to speak on the bill.

REPRESENTATIVE ANDRADE:  Thank you, Mr. Speaker and Members of the House. Today, I rise in support of House Bill 1273. In addition to the proxy language that it was already discussed, this bill makes important updates to our consumer protection

Page 10

laws, specifically when expands the definition of consumer transaction to include the provisions of good or services for state and local government agencies. It also opts as a definition of supplier to ensure that entities doing business with public agencies are held to the same standards as those serving individual consumers. These changes provide clear authority to the Consumer Protection Division to take action when State and local agencies are treated unfairly or deceptively by vendors. This is a common sense step forward towards protecting taxpayers and ensuring accountability when public entities enter into contracts. House Bill 1273 is a bipartisan effort that ensures suppliers are held accountable, protect public dollars, and promotes fairness for everyone involved in a consumer transaction. I respectfully ask for your support. Thank you.

SPEAKER KARICKHOFF:  Thank you, Representative Andrade. Further discussion? Representative Bauer.

REPRESENTATIVE BAUER:  Will the author yield?

SPEAKER KARICKHOFF:  Will the author yield? He yields.

REPRESENTATIVE K. PIERCE:  Hello.

REPRESENTATIVE BAUER:  Thank you, Mr.

Page 11

Speaker. Representative, you said you have to show your work that this was a financial decision?

REPRESENTATIVE K. PIERCE:  Or value based, yes.

REPRESENTATIVE BAUER:  Okay. Can the values be environmental --

REPRESENTATIVE K. PIERCE:  Yeah, I think -- 100 percent.

REPRESENTATIVE BAUER:  -- or social --

REPRESENTATIVE K. PIERCE:  Yeah.

REPRESENTATIVE BAUER:  -- or of governance?

REPRESENTATIVE K. PIERCE:  You just have to show your -- you have to show your work. You have to show we are making this suggestion based off X, Y and Z. And so -- and now, if you're in an agreement with management, you don't even have to do that. It's just if you're disagreeing with management.

REPRESENTATIVE BAUER:  Okay Thank you for the answer.

SPEAKER KARICKHOFF:  Further discussion on the bill? Chair sees none. The author has right to close. He wants to close.

REPRESENTATIVE K. PIERCE:  Thank you, Mr. Speaker. I do want to make a couple of clarifying points. So first off, this wouldn't be the SEC; this

Page 12

would be the Department of Labor looking into this issue. And the States are ripe to address this issue. Even though President Obama and President Trump have both suggested action from the Department of Labor side, there's nothing stopping to ensure that Hoosiers who are investing are protected when (sic) this space and saying, hey, I'm investing this money, there's those who I've contracted to do a duty, and making sure that, if someone fails that duty, that the Attorney General is able to basically enforce contracts or call up deceptive acts. And I think that's where this law -- this bill strikes a good balance. So thank you so much, and I hope you join me in supporting it.

SPEAKER KARICKHOFF:  The question is on the final passage of the bill. All those will when the machine is open vote aye; those opposed will vote no. Have all the members voted? Tally the roll. Roll call shows 67 voting aye, 21 voting no. The bill is passed. Shall the title of the Bill remain the title of the Act?

UNIDENTIFIED SPEAKER:  (Inaudible).

SPEAKER KARICKHOFF:  Senate sponsors.

MADAM CLERK:  House Bill 1273. Senate sponsors Senator Baldwin.

Page 13

SPEAKER KARICKHOFF:  Clerk shall inform the Senate of the passage of the Bill.

Page 14

CERTIFICATE OF TRANSCRIBER

I, RITA PELUSO, do hereby certify that this transcript was prepared from the digital audio recording of the foregoing proceeding, that said transcript is a true and accurate record of the proceedings to the best of my knowledge, skills, and ability; that I am neither counsel for, related to, nor employed by any of the parties to the action in which this was taken; and, further, that I am not a relative or employee of any counsel or attorney employed by the parties hereto, nor financially or otherwise interested in the outcome of this action.

*Rita Peluso*

RITA PELUSO

**[10 - clear]**

| 1 | a | | |
|---|---|---|---|
| **10**  5:3 7:19 | **ability**  14:7 | **allowed**  3:22 | **best**  14:6 |
| **100**  11:8 | **able**  12:10 | **allows**  3:20 | **beyond**  9:13 |
| **12**  2:6 | **accept**  3:15 | **amendment** | **bill**  1:11 3:3,6,8 |
| **1273**  1:11 3:3,6 | **accountability** | 3:15,20 | 3:9,11 4:1,1,2 |
| 3:8,9 9:23 | 10:12 | **america**  7:9 | 5:12 6:8,16 9:5 |
| 10:13 12:24 | **accountable** | **analysis**  5:1,9 | 9:20,23,24 |
| **18266**  14:14 | 10:14 | 5:19 8:5 | 10:13 11:21 |
| **1:40:20**  1:17 | **accurate**  14:5 | **andrade**  2:6 | 12:12,16,19,20 |
| 3:2 | **act**  6:6 12:21 | 3:15,22 9:20 | 12:24 13:2 |
| **1:49:45**  1:17 | **action**  10:8 | 9:21 10:19 | **bipartisan** |
| 3:2 | 12:4 14:8,12 | **answer**  11:19 | 10:13 |
| | **acts**  12:11 | **appearing**  2:10 | **bit**  3:16 |
| 2 | **actually**  4:9 5:9 | **apply**  7:18 | **blanket**  5:8 6:3 |
| **20**  1:4 | 8:3,4,9,17 9:2 | **assembly**  1:1 | **body**  9:17 |
| **2026**  1:2,4,16 | **addition**  9:23 | **attorney**  3:19 | **broader**  4:2 |
| **21**  12:19 | **address**  4:20 | 12:10 14:10 | **business**  6:16 |
| | 12:2 | **audio**  14:3 | 9:16,17 10:5 |
| 3 | **administration** | **author**  6:11,13 | **buy**  8:16 |
| **30**  2:4 4:10 | 5:4,5 | 10:21,22 11:21 | c |
| **36**  2:5 | **adviser**  7:9 | **authority**  10:7 | **c**  2:1 3:1 |
| 4 | **advises**  7:9 | **aye**  12:17,19 | **call**  3:19 12:11 |
| **401k**  4:6 | **advisor**  5:13,22 | b | 12:19 |
| | 9:9 | **balance**  12:13 | **called**  7:10 |
| 6 | **advisors**  3:14 | **baldwin**  12:25 | **ceo's**  4:18 |
| **6**  2:8 | 4:3,4 5:7 | **base**  4:2 | **certificate**  14:1 |
| **67**  12:19 | **ag**  6:6 | **based**  4:23,25 | **certify**  14:2 |
| 8 | **agencies**  3:21 | 5:1,19 8:5 11:3 | **chair**  3:7 11:21 |
| **86**  2:7 | 3:24 10:3,5,9 | 11:14 | **changes**  10:7 |
| 9 | **ago**  4:10 | **basically**  12:10 | **clarified**  4:11 |
| **90**  7:16 | **agreement** | **bauer**  2:8 10:20 | **clarifying** |
| | 11:15 | 10:21,25 11:5 | 11:24 |
| | | 11:9,11,18 | **clear**  10:7 |

**[clerk - further]**                                                    Page 2

| | | | |
|---|---|---|---|
| **clerk** 2:11 3:5,9 12:24 13:1 | **corporate** 9:10 | 10:19 11:20 | **example** 6:19 6:22 |
| **clock** 3:25 | **corporation** 7:9 | **district** 2:4,5,6 2:7,8 | **excerpt** 1:17 3:2 |
| **close** 7:23 11:22,22 | **counsel** 14:7,10 | **division** 10:8 | **expands** 10:1 |
| **combined** 7:16 | **couple** 11:24 | **doing** 5:6,12 8:8,24 10:5 | **explain** 3:16 |
| **come** 5:23 | **d** | **dollars** 10:15 | **f** |
| **committee** 3:14 | **d** 2:6,7,8 3:1 | **drifting** 9:7 | **fact** 9:14 |
| **common** 10:10 | **dealing** 7:1 | **duty** 4:24 8:6 9:11 12:8,9 | **fail** 6:4 |
| **commonly** 4:5 | **deceptive** 3:19 6:6 12:11 | | **fails** 12:9 |
| **companies** 7:21 | **deceptively** 10:10 | **e** | **fairness** 10:15 |
| **company** 4:18 5:16,18,25 | **decide** 7:5 | **e** 2:1,1 3:1 | **family** 7:10 |
| **compensation** 4:18 | **decision** 11:2 | **edward** 2:7 | **federal** 9:8 |
| **comply** 7:12 | **deep** 9:7 | **effort** 10:13 | **fiduciaries** 4:11 |
| **comprehension** 9:13 | **defective** 3:17 | **either** 4:25 | **fiduciary** 4:24 |
| **concern** 4:15 | **definition** 10:1 10:4 | **employed** 14:8 14:11 | **final** 3:8 12:16 |
| **concerns** 5:3 | **delaney** 2:7 6:10,11,15,18 6:21,25 7:8,12 7:20,25 8:11 8:15,20 9:3,6 | **employee** 14:10 | **financial** 4:15 5:1,18 8:5 11:2 |
| **consider** 9:16 | | **ended** 3:25,25 | **financially** 14:11 |
| **consistent** 7:2 | | **enforce** 8:12 12:10 | **fine** 5:21 |
| **consumer** 3:17 3:17 9:25 10:2 10:8,16 | **department** 4:11 12:1,4 | **enforcement** 9:9 | **first** 11:25 |
| **consumers** 10:7 | **detail** 3:16 | **engage** 3:21 6:6 | **fit** 8:1,3 |
| **contract** 8:3,4 | **digital** 14:3 | **ensure** 10:4 12:5 | **folks** 4:5 6:4 |
| **contracted** 12:8 | **direction** 9:1,7 | **ensures** 10:14 | **following** 8:9 |
| **contracts** 8:13 9:15 10:13 12:11 | **disagreeing** 11:17 | **ensuring** 10:11 | **forces** 3:22 |
| | **discussed** 9:24 | **enter** 10:12 | **foregoing** 14:4 |
| **contractual** 8:6 8:10 | **discussion** 1:10 4:2 6:10 9:19 | **entities** 10:5,12 | **forward** 10:11 |
| | | **entity** 4:4 | **four** 4:17 |
| | | **environmental** 11:6 | **fund** 4:6 7:10 |
| | | | **funds** 4:7 |
| | | | **further** 6:9 9:19 10:19 |

**[further - michael]**                                                      Page 3

11:20 14:9

**g**

**g** 3:1
**general** 1:1
  3:19 12:10
**gentlemen** 3:13
**give** 4:22
**giving** 5:8,9
**glass** 7:24
**go** 4:21 5:25
**going** 7:25 8:4
  8:8,11
**good** 10:2
  12:12
**governance**
  11:11
**government**
  3:20,24 10:3
**guide** 7:4

**h**

**hand** 3:5
**hands** 3:7
**happened** 5:2
**happening** 8:6
**happy** 6:7
**hearings** 8:7
**held** 10:6,14
**hello** 10:24
**hereto** 14:11
**hey** 4:20 5:7
  12:7
**highlighted** 5:4

**homework** 5:17
  6:5
**hoosiers** 12:5
**hope** 6:8 12:13
**house** 1:3,10,11
  1:16 3:3,6,7,9
  3:13 9:22,23
  10:13 12:24
**https** 1:16
**hundreds** 4:13
  5:10

**i**

**iga.in.gov** 1:16
**impact** 4:12
**important** 9:25
**inaudible** 12:22
**include** 3:24
  10:2
**included** 4:1
**indiana** 1:1
  3:18 7:13 9:12
**individual** 8:23
  10:6
**individuals**
  3:18
**industry** 4:20
**inform** 13:1
**initials** 7:22
**institutional**
  4:7,15
**interested**
  14:12

**investing** 4:5
  4:24 12:6,7
**investors** 4:8
  4:15
**involve** 9:13
**involved** 10:15
**isis** 7:23
**iss** 7:23
**issue** 7:4 12:2,2

**j**

**january** 1:4
**join** 6:8 12:13

**k**

**k** 3:12 6:17,20
  6:23 7:3,11,15
  7:22 8:2,14,17
  8:21 10:24
  11:3,7,10,12,23
**karickhoff** 2:4
  3:3,7,10 6:9,13
  9:4,19 10:18
  10:22 11:20
  12:15,23 13:1
**kind** 7:23
**know** 4:16 5:19
  6:24 8:18,20
  8:23
**knowledge**
  14:6
**known** 4:5
**kyle** 2:5

**l**

**labor** 4:11 8:25
  12:1,4
**ladies** 3:13
**language** 9:24
**large** 4:7
**law** 3:18 12:12
**laws** 10:1
**lawsuit** 9:12
**lewis** 7:24
**little** 3:16
**local** 10:3,9
**looking** 12:1

**m**

**machine** 12:17
**madam** 2:11
  3:5,9 12:24
**make** 11:24
**makes** 9:25
**making** 8:9
  11:14 12:8
**management**
  5:16,18,21
  11:16,17
**market** 7:17,19
**matter** 9:8,8,11
**maureen** 2:8
**mean** 8:18
**members** 9:14
  9:22 12:18
**mic** 6:20
**michael** 2:4

**[mike - representative]**  Page 4

| | | | |
|---|---|---|---|
| **mike** 2:6 | **p** | **poorly** 9:15 | 12:15 |
| **misleading** 5:11 | **p** 2:1,1 | **potentially** 5:11 | **questions** 6:7 |
| **money** 12:7 | **package** 4:19 | **prepared** 14:3 | **r** |
| **monopoly** 7:16 | **parties** 14:8,11 | **present** 3:11 | **r** 2:1,4,5 3:1,1 |
| **mutual** 4:6 7:10 | **pass** 7:13 | **president** 12:3 12:3 | **reading** 1:3 |
| **n** | **passage** 3:8 12:16 13:2 | **private** 9:8 | **reasoning** 6:2 |
| **n** 2:1 3:1 | **passed** 12:20 | **proceeding** 14:4 | **recently** 5:5 |
| **need** 4:22 5:16 5:24 7:6,18 | **passing** 6:8 | **proceedings** 14:6 | **recognized** 3:11 9:4 |
| **neither** 14:7 | **pay** 9:9 | **promotes** 10:15 | **recommendat...** 4:22 5:8,15,24 |
| **new** 4:1,18 7:1 | **peluso** 14:2,15 | **protect** 10:14 | **record** 14:5 |
| **o** | **pension** 4:7 | **protected** 12:6 | **recording** 14:4 |
| **o** 3:1 | **people** 8:12,15 8:16 9:15 | **protecting** 10:11 | **regulation** 3:14 8:1 9:8 |
| **obama** 5:4 12:3 | **percent** 7:17,19 11:8 | **protection** 9:25 10:8 | **regulations** 7:2 |
| **obligation** 8:12 | **perform** 9:15 | **provide** 5:13 10:7 | **regulatory** 7:1 |
| **obligations** 8:10 | **permission** 9:3 | **provisions** 10:2 | **related** 14:7 |
| **occurring** 5:6 | **person** 4:24 5:9 5:21 | **proxy** 3:14 4:2 4:4 5:13 6:16 7:8 9:10,23 | **relates** 6:18,21 |
| **offended** 9:14 | **pierce** 2:5 3:4 3:10,12 6:17 6:20,23 7:3,11 7:15,22 8:2,14 8:17,21 10:24 11:3,7,10,12,23 | **public** 10:5,12 10:14 | **relative** 14:10 |
| **office** 7:10 | | **publicly** 6:19 6:22 | **remain** 12:20 |
| **okay** 11:5,18 | **please** 3:5 | **q** | **representative** 3:4,10,12,15,22 6:10,11,15,17 6:18,20,21,23 6:25 7:3,8,11 7:12,15,20,22 7:25 8:2,11,14 8:15,17,20,21 9:3,6,19,21 10:19,20,21,24 10:25 11:1,3,5 11:7,9,10,11,12 |
| **open** 12:17 | **point** 4:8 | **quarter** 4:17,17 | |
| **oppose** 5:17 | **points** 11:25 | **question** 4:20 6:15 8:22 | |
| **opposed** 12:17 | **police** 3:22 | | |
| **opposing** 6:1 | **policy** 5:8 6:3 8:25 | | |
| **opposite** 5:20 | | | |
| **opts** 10:4 | | | |
| **outcome** 14:12 | | | |

**[representative - u.s.]**                                    Page 5

| | | | |
|---|---|---|---|
| 11:18,23 | **serving** 10:6 | **stamping** 8:24 | **tell** 5:25 6:3 7:6 |
| **representatives** | **session** 1:2,16 | 9:2 | 9:9 |
| 2:3 | 3:21,23 | **standards** 10:6 | **telling** 5:25 |
| **respectfully** | **shareholder** | **state** 9:12 10:3 | **thank** 3:12 6:7 |
| 10:16 | 4:10,12 | 10:9 | 9:17,21 10:17 |
| **return** 4:16 | **shares** 4:9,12 | **states** 12:2 | 10:18,25 11:18 |
| **returns** 4:17 | **show** 4:25 5:17 | **statute** 7:13 | 11:23 12:13 |
| **right** 3:17 6:22 | 5:17 11:1,13 | **step** 10:10 | **theoretically** |
| 6:25 7:14 | 11:13,14 | **stocks** 6:19,22 | 4:13 |
| 11:21 | **showcase** 5:23 | **stopping** 12:5 | **think** 5:19 9:6 |
| **ripe** 12:2 | 6:5 | **strategies** 4:17 | 11:7 12:11 |
| **rise** 9:22 | **showcased** 5:3 | **strikes** 12:12 | **thinking** 4:16 |
| **rita** 14:2,15 | 8:7 | **suggest** 5:14,14 | **thousands** 4:14 |
| **roll** 12:18,18 | **showing** 8:23 | 5:15,22 7:5 | 5:10 |
| **rubber** 8:24 9:2 | **shows** 12:19 | **suggested** 12:4 | **three** 4:17 |
| **s** | **sic** 12:6 | **suggestion** | **title** 12:20,20 |
| | **side** 12:5 | 11:14 | **today** 9:22 |
| **s** 2:1 | **signature** 14:14 | **supplier** 10:4 | **totally** 5:21 |
| **sale** 3:19 | **simple** 6:15 | **suppliers** 10:14 | **towards** 10:11 |
| **sales** 3:17 | **skills** 14:6 | **support** 9:23 | **traded** 6:19,22 |
| **saying** 5:7,13 | **social** 11:9 | 10:17 | **transaction** |
| 7:5 12:7 | **space** 12:6 | **supporting** | 10:2,16 |
| **says** 4:20 8:4 | **speak** 9:3,5,20 | 12:14 | **transcriber** |
| 9:1 | **speaker** 3:3,5,7 | **supposed** 4:25 | 14:1 |
| **sec** 7:2,3 11:25 | 3:10,13 6:9,13 | **sure** 8:9 12:9 | **transcript** 14:3 |
| **sees** 11:21 | 9:4,18,22 | **system** 7:1 | 14:5 |
| **senate** 8:7 | 10:18,22 11:1 | **t** | **treated** 10:9 |
| 12:23,24 13:2 | 11:20,24 12:15 | | **true** 14:5 |
| **senator** 12:25 | 12:22,23 13:1 | **take** 4:22 6:7 | **trump** 5:5 12:3 |
| **sense** 10:10 | **specifically** | 10:8 | **two** 7:16,21 |
| **separate** 7:1 | 10:1 | **taken** 14:9 | **u** |
| **service** 8:16 | **sponsors** 12:23 | **tally** 12:18 | |
| **services** 5:13 | 12:25 | **taxpayers** | **u.s.** 8:7,25 |
| 10:3 | | 10:11 | |

**[under - z]**                                                                Page 6

| | |
|---|---|
| **under**  3:18 | **x** |
| **unfairly**  10:9 | **x**   11:14 |
| **unidentified** | **y** |
|  12:22 | **y**   11:14 |
| **updates**  9:25 | **yeah**   6:17 11:7 |
| **v** |  11:10 |
| **value**  4:13,25 | **year**   3:23 4:14 |
|  5:19 8:5 11:3 | **years**   4:10 5:3 |
| **values**  11:5 | **yield**   6:12,14 |
| **vendors**  10:10 |  10:21,22 |
| **video**  1:16 | **yields**   6:14 |
| **vote**  1:3,10 4:9 |  10:23 |
|  4:12,23,23 | **yup**   7:11 |
|  5:20,20,22,25 | **z** |
|  7:6 9:1,2,10,10 | **z**   11:15 |
|  12:17,17 | |
| **voted**  12:18 | |
| **votes**  4:10,14 | |
|  4:21 5:11 | |
| **voting**  5:10,15 | |
|  12:19,19 | |
| **w** | |
| **want**  5:14 7:13 | |
|  11:24 | |
| **wants**  11:22 | |
| **waters**  9:7 | |
| **way**  5:22 6:24 | |
| **we've**  4:1 | |
| **work**  5:17 8:23 | |
|  11:2,13 | |
| **working**  3:23 | |

# Foster Declaration Exhibit 34

Page 1

INDIANA GENERAL ASSEMBLY

2026 SESSION

SENATE INSURANCE AND FINANCIAL INSTITUTIONS

COMMITTEE HEARING


February 11, 2026




DISCUSSION AND VOTE

HOUSE BILL 1273


https://iga.in.gov/session/2026/video/committee_insura

nce_4000/

(Excerpt 33:55 - 1:36:50 and 2:03:51 - 2:04:35)

Page 2

A P P E A R A N C E S

SENATORS:

Scott Baldwin (R), District 20

Greg Walker (R), District 41

Cyndi Carrasco (R), District 36

Lonnie Randolph (D), District 2

Fady Qaddoura (D), District 30

Mike Gaskill (R), District 25

Daryl Schmitt (R), District 48


ALSO APPEARING:

Representative Kyle Pierce (R), District 36

Representative Mike Andrade (D), District 12

Matthew du Mee

Campbell Ricci

Dax Denton

The Clerk

Page 3

R E C O R D I N G

(Excerpt 33:55 - 1:36:50)

SENATOR BALDWIN:  House Bill 1273.

THE CLERK:  Okay.

SENATOR BALDWIN:  We have this set for just an amended vote. Right?

UNIDENTIFIED SPEAKER 1:  No, this is open for testimony.

THE CLERK:  No, (crosstalk).

SENATOR BALDWIN:  Oh, this is the first -- yeah, this is the --

UNIDENTIFIED SPEAKER 2:  Yeah.

SENATOR BALDWIN:  -- first one we -- on 1273 I have two amendments -- no, I have one amendment -- no, I have two amendments. Right?

THE CLERK:  Yes.

SENATOR BALDWIN:  Yeah. And so I'm going to take Amendment 3 first. This one basically exempts charitable organizations, churches, and the like, from the bill. And then we're going to hear more about, you know, exactly what the problem is, but I don't think our problem is -- lies in charitable organizations. So with that, I'd like to move this amendment.

SENATOR WALKER:  Second.

SENATOR BALDWIN:  Can I take this amendment

Page 4

by consent?

SPEAKER CARRASCO:  Consent:

SENATOR WALKER:  Consent.

SENATOR BALDWIN:  Okay. So we have a partially amended bill. Amendment 4 then pulls financial institutions out. And it's really defining it as, a financial institution is defined by ICC 4-4-28-3 that's got deposits by the FDIC. Again there is -- and I don't have bankers signed up to testify, but this is at their request. I don't see any issue with this. I also don't view that as the problem that we're trying to fix, which is why I'm asking to pull that out. So I'd like to move that amendment.

SENATOR WALKER:  Second.

SENATOR BALDWIN:  May we take that amendment by consent?

UNIDENTIFIED CONSENT:  Consent.

SENATOR WALKER:  Consent.

SENATOR BALDWIN:  Okay. So we now have a fully amended bill, if you'd like to present your bill.

REPRESENTATIVE K. PIERCE:  Yes.  Thank you, Mr. Chairman. So the bill -- House Bill 1273 -- it's called Requirements for Proxy Advisors. I always wonder how LSA titles these bills because we added an

Page 5

amendment in committee with Representative Andrade's House Bill 1063. So I'm going to discuss that side of it first, then I'll get into the proxy advisors.

So the bill broadly is actually about deceptive acts. So going first to Representative Andrade's component of it, so last year he did a lot of work on making sure that when police departments have sales, if they're basically sold lemons or there's deceptive acts to them, right now you and I, as individuals, can hold account and go to the AG's office for deceptive acts of -- there's a -- I think there's a list of, I think, 13 or 14; I have it somewhere in my notes in front of me -- of different acts. They say that they have a certain price, and they don't, you can go to the AG's office. But our government agencies actually couldn't do that. And so Representative Andrade did a lot of work last year to include the police departments, and this year it actually adds all these other government agencies.

What it really does, it gets to the point where, if you have a -- if you have a provider or supplier to the -- to the State or a government agency, it has a whole list of items you can't do. For example, the -- if you have a consumer transaction that's said to be a particular standard, quality,

Page 6

grade, or style, and it does not meet that, and the supplier knows or should reasonably know that it doesn't, things like that, that you -- that the -- those agencies could hold those suppliers to account. So that's that side. Representative Andrade is here, and he can speak more to some of that component of the bill.

But the broader proxy advisor bill is -- and most people don't know what proxy advisors are. So this is -- this bill is about transparency, accountability, and fiduciary duty to investors. And so right now you might have your 401(k), or mutual fund, or whatever it is. You might not know it, but you actually are voting on the different companies' investments. Now, you aren't actually voting, but who you are investing with is. So if you have an investment with JPMorgan Chase, or INPRS, or whoever it may be, they actually have a fiduciary duty to vote on these different board votes. And there can be thousands upon thousands of votes. Well, their job is to invest for you and make returns for you. It's not to know what -- you know, how to tackle quarter four for the company or what the, you know, health care coverage should be for their employees of that company that they invested in.

Page 7

So there's an entire market of proxy advisors. And their entire job is saying, hey, in quarter three you're going to be asked to vote on these 30 items; we're suggesting you vote yes or no on the different array of items. And so this field has become more and more popular. And there's actually been -- there's been concerns that have been flagged by both Republican and Democrat administrations. So the Obama administration back I think in 2014, if my memory serves me right, flagged that they had concerns that these proxy advisors were advising against company management for an array of different reasons. And then President Trump's administration actually last December flagged a similar vein.

So what my bill does is says this, is these proxy advisors, what they have to do is, if they're suggesting voting against the company management, they can do that. And those who are investing the -- your INPRS, or J.P. Morgan, or whoever it may be, they can vote however they want. But if the advisor is suggesting to INPRS, for example, we're asking you to vote no when they want you to vote yes, you have to show your homework. How are you getting to that? Is it some financial or value based reason? Okay. Show your reasoning for why that is. And there might be very

Page 8

valid reasons why company management's wrong; they don't -- they're incorrect in their assessment, and you should oppose them. Or they might say there is no reason. We have a blanket -- we have a blanket policy. We always oppose -- for -- one example might be, hey, there's a new concept that's being asked that's never been asked by any other company before, automatic positions no, no economic reason, no value based reason; we just oppose it. Well, they can, again, advise that; and INPRS, or JPMorgan Chase, or whomever can vote that way, that's totally fine. But you have to show your homework both to the person you have a contract with to give this service, and then you have to go to company management and say, hey, we're asking all these investors to vote against you, and here's our -- here's our -- here's our reasonings why. And so if you don't do that, if you don't do your homework, or don't show your homework, or don't give notice to the investor or the company, you get -- that'd be a deceptive act. And so happy to take questions.

SENATOR BALDWIN:  So it's my understanding that we're then basically forcing fiduciary responsibility.

REPRESENTATIVE K. PIERCE:  In a way to the -- within those -- within the proxy advisor and the

Page 9

major investor.

SENATOR BALDWIN:  And the problem we're trying to solve, if you could clarify a little bit for me, we've got proxy advisors that are getting lobbied.

REPRESENTATIVE K. PIERCE:  Yeah.

SENATOR BALDWIN:  And instead of looking at the best interest of the fund and their -- and the person to whom they're advising, they're taking the lobby decision --

REPRESENTATIVE K. PIERCE:  Yes.

SENATOR BALDWIN:  -- sometimes financially.

REPRESENTATIVE K. PIERCE:  Yes. And they have -- there's two or three major players. And we're not discussing right now monopoly discussions and things like that. That's being discussed out in D.C. But you have issues where you have some major proxy advisors that can shift the entire market because they don't like this, even though -- now again, they might be right. There might be some financial reason why all these -- all these companies are wrong, and they should oppose management. But you better be able to show, hey, it's for a financial reason or a value based reason.

SENATOR BALDWIN:  Because I've hired you to --

Page 10

REPRESENTATIVE K. PIERCE:  Yes.

SENATOR BALDWIN:  -- tell me what the financial --

REPRESENTATIVE K. PIERCE:  Yes.

SENATOR BALDWIN:  -- reason is, not to push an agenda that --

REPRESENTATIVE K. PIERCE:  Correct.

SENATOR BALDWIN:  -- you've been hired or paid to push.

REPRESENTATIVE K. PIERCE:  Correct.

SENATOR BALDWIN:  Okay Questions by the Committee, Representative -- I'm sorry -- Senator Carrasco.

SENATOR CARRASCO:  Have I been demoted?

REPRESENTATIVE K. PIERCE:  You've been demoted.

SENATOR BALDWIN:  I demoted you.

REPRESENTATIVE K. PIERCE:  We'll gladly take you.

SENATOR CARRASCO:  Representative Pierce, thanks for being here. Thanks for bringing this bill forward. It's really important topic and very interesting. Maybe you've said it, and I think Chairman Baldwin touched on it. On the fiduciary duty piece I whole heartily support the idea of having to

Page 11

show their work on how they came up with the recommendation. But this is a new concept for me. And I don't -- I don't know that I necessarily understand the fiduciary duty. Is there a fiduciary duty for that advisor -- that third-party proxy advisor?

REPRESENTATIVE K. PIERCE:  There's a contractual duty.  They -- I mean, I -- let's say I'm -- so JPMorgan Chase actually is no longer working with proxy advisors. But they had a contract with them saying that, hey, you will -- you will give us the best financial advice that will -- that will have -- result in the best financial returns. And so there is a contractual duty. What this is what we're saying is we're trying to put it into deceptive acts where that way you're not having to go company by company. If you think there's an advisor doing something, we can go and say, hey this is

SENATOR BALDWIN:  Let me interrupt.

REPRESENTATIVE K. PIERCE:  Yeah.

SENATOR BALDWIN:  Let me interrupt.

REPRESENTATIVE K. PIERCE:  Yeah.

SENATOR BALDWIN:  Why don't you -- because I know I'm -- Senator Carrasco is much smarter than me. But why don't you break this down in a case study type of --

Page 12

REPRESENTATIVE K. PIERCE:  Yeah.

SENATOR BALDWIN:  -- a way? Tell us who's a proxy advisor. If I -- give me an example of what I own, or a --

REPRESENTATIVE K. PIERCE:  Yeah.

SENATOR BALDWIN:  -- stock, or walk through the --

REPRESENTATIVE K. PIERCE:  Yeah.

SENATOR BALDWIN:  -- actual so that she and I --

REPRESENTATIVE K. PIERCE:  Yup.

SENATOR BALDWIN:  -- can understand who's representing who in this. And how does the contractual --

REPRESENTATIVE K. PIERCE:  Yeah.

SENATOR BALDWIN:  -- relationship manifest itself? What should I expect out of that contractual relationship --

REPRESENTATIVE K. PIERCE:  Right.

SENATOR BALDWIN:  -- and why it's being violated, or what's the potential for violation?

REPRESENTATIVE K. PIERCE:  Yup. Can do. And I also know we have a couple of folks who can speak even more in-depth than --

SENATOR BALDWIN:  Oh, okay.

Page 13

REPRESENTATIVE K. PIERCE:  -- I can. So if I don't fully answer it, I know there's a Representative here that can go a little bit more in depth. But, for example, so you invest with, let's say -- INPRS does not contract with these two institutions, but I will use them for an example. So you invest your money in different retirement funds through the State of Indiana. The State of Indiana INPRS now is on the hook for all these votes. And so they're not company managers.

SENATOR BALDWIN:  What do you mean? When you say on the hook for these votes --

REPRESENTATIVE K. PIERCE:  So there is actually a -- and this individual can go into a bit more -- it's the Department of -- I'll -- I'm going to defer where the mandate is to one of the next testifiers. I want to say the Department of Justice. I could be wrong in that statement. But there is a federal guidance that those investing units INPRS, JPMorgan Chase, they must vote. They can't say I'm going to put money into Google, but I don't want to be involved in the vote. They have a fiduciary duty. You've got to vote. And so at that point then they have two options. Either they become experts at Google, or they hire someone that's an

Page 14

expert at companies. And --

SENATOR BALDWIN:  So because of the ownership of stock in Google --

REPRESENTATIVE K. PIERCE:  Yeah.

SENATOR BALDWIN:  -- that I own through my INPRS --

REPRESENTATIVE K. PIERCE:  Yeah.

SENATOR BALDWIN:  -- fund --

REPRESENTATIVE K. PIERCE:  INPRS has a duty.

SENATOR BALDWIN:  -- I now have a vote. I can't go reasonably understand Google. I hire a third party -- or they hire.

REPRESENTATIVE K. PIERCE:  Yeah.

SENATOR BALDWIN:  INPRS hires a --

REPRESENTATIVE K. PIERCE:  Yeah.

SENATOR BALDWIN:  -- third party to help me understand whether I should vote yes or no on a board related issue at Google --

REPRESENTATIVE K. PIERCE:  Yes.

SENATOR BALDWIN:  -- that could negatively affect my stock.

REPRESENTATIVE K. PIERCE:  Correct. Yeah.

SENATOR BALDWIN:  And then that person that I've hired might be getting lobbied by somebody who even maybe pays them --

Page 15

REPRESENTATIVE K. PIERCE:  Uh-huh.

SENATOR BALDWIN:  -- or in some way incentivizes them. And that's what we're trying to stop.

REPRESENTATIVE K. PIERCE:  Yes. That or you have situations where they make blanket decisions based off their own personal desires --

SENATOR BALDWIN:  Okay.

REPRESENTATIVE K. PIERCE:  -- that don't go into company management.

SENATOR BALDWIN:  Senator Carrasco, sorry I interrupted you there.

SENATOR CARRASCO:  No, that's exactly what I was trying to get at. And I think maybe if some of the others who are going to be providing some testimony can provide -- I'm trying to make that last connection about the types of votes that these third proxy advisors are advising on, how that connects to pushing an agenda. And I'm supportive of the bill and --

REPRESENTATIVE K. PIERCE:  Yeah.

SENATOR CARRASCO:  -- totally support what you're -- I'm just trying to understand. And maybe this is a conversation that you and I can have later so that --

REPRESENTATIVE K. PIERCE:  Yeah.

Page 16

SENATOR CARRASCO:  -- because it's really interesting to me.

REPRESENTATIVE K. PIERCE:  Yeah. So it can be an array of things. I mean the ones -- I mean the one that the President called out was you get into environmental standards where they have blanket votes on if you have a company that's an energy space that says, hey, we're not going to shut down all of our oil mills or, you know, our oil --

SENATOR BALDWIN:  Yeah.

REPRESENTATIVE K. PIERCE:  -- refineries. Well we're going to vote against that. And that's one example. I'm not saying that's all that. But that's an example of we don't -- we don't like having oil refineries open; therefore, any vote to extend the life we're going to oppose. Well, there might be, you know, a financial reason or a value based reason to say you should -- we should not extend, you know, refinery number three. But you should be able to show that. Or is it just you don't like oil? And that's again, that's a hyper specific example. It's not all environmental. Again Obama's administration also looked into this issue. They had concerns on more the health care side on health care decisions being made by companies. So it's an array of

Page 17

issues that they -- that these advisors are making that, again, cannot point to, hey, this is actually the best financial interest of the investor.

SENATOR CARRASCO:  Well at this point I almost wonder, you know, does this bill go far enough. But again, I'd love to continue having this conversation --

REPRESENTATIVE K. PIERCE:  Yeah.

SENATOR CARRASCO:  -- with you because it's so important. And the potential for influence --

REPRESENTATIVE K. PIERCE:  Yeah.

SENATOR CARRASCO:  -- in a positive or negative direction --

REPRESENTATIVE K. PIERCE:  Yeah.

SENATOR CARRASCO:  -- is definitely there. So yeah.

REPRESENTATIVE K. PIERCE:  Yeah.

SENATOR BALDWIN:  Okay. Thank you. We'll go and move toward testimony real quick. I'm so sorry, Senator Randolph. I haven't get (sic) to say that yet.

SENATOR RANDOLPH:  Thank you.

SENATOR BALDWIN:  Senator Randolph -- feels good.

SENATOR RANDOLPH:  I'm usually (inaudible). I

Page 18

have a couple of questions, not hypothetical, that was presented --

REPRESENTATIVE K. PIERCE:  Can't hear you.

SENATOR RANDOLPH:  -- not hypothetical, that was presented concerning the fiduciary. The financial advisors at point, you did not say exactly he is a fiduciary, but you implied that he is a fiduciary. Is that correct?

REPRESENTATIVE K. PIERCE:  I don't want to misstate it. They have a contractual duty, and I'll stop there. Someone else might come up and say they have a fiduciary duty, but I'm going to stop at contractual duty.

SENATOR RANDOLPH:  Yeah. Well, let me ask you, in your opinion by having a contract, is he a fiduciary then? Because if he has a contract, he has a duty. There's obligations when you have a contract -- offer --

REPRESENTATIVE K. PIERCE:  Yes.

SENATOR RANDOLPH:  -- acceptance, consideration, debts unsigned.

REPRESENTATIVE K. PIERCE: Yeah.

SENATOR RANDOLPH:  You violate it, you can be sued. Right?

REPRESENTATIVE K. PIERCE:  Yes. Yes.

Page 19

SENATOR RANDOLPH:  Okay. So in a sense he's an implied fiduciary.

REPRESENTATIVE K. PIERCE:  Yes.

SENATOR RANDOLPH:  So, which means he could be liable if, in fact, a lobbyist gets him to vote otherwise. Is that correct?

REPRESENTATIVE K. PIERCE:  Correct. But with the -- the issue we're having here is they're not -- they're not showing their homework and saying, hey, I'm suggesting you vote no, and they're not telling the investor why are you saying no. Because again, the reason for no might be --

SENATOR RANDOLPH:  Uh-huh.

REPRESENTATIVE K. PIERCE:  -- a good valid reason that we all agree with, but --

SENATOR RANDOLPH:  My simple question is could he be liable if, in fact, he votes otherwise?

SENATOR BALDWIN:  Well we'll find out if he shows his homework.

SENATOR RANDOLPH:  Yeah.

REPRESENTATIVE K. PIERCE:  No, no. So this bill does not mandate voting. So they could still agree with them. They could say --

SENATOR RANDOLPH:  Okay.

REPRESENTATIVE K. PIERCE:  -- hey, we want to

Page 20

vote no because we don't like the CEO, and the investor could say, okay, we'll vote no.

SENATOR RANDOLPH:  Now the bill talks about financial report. A proxy, before he goes in with management or meeting, whatever, he's got notification what the issue is going to be around that. Is that correct?

REPRESENTATIVE K. PIERCE:  Can you say the last part again?

SENATOR RANDOLPH:  He's got notice of what the discussion is going to be.

REPRESENTATIVE K. PIERCE:  They're given the board -- the board packet of hey this is the agenda for this meeting here, the (crosstalk).

SENATOR RANDOLPH:  So the proxy would know ahead of time.

REPRESENTATIVE K. PIERCE:  Yes.

SENATOR RANDOLPH:  Right?

REPRESENTATIVE K. PIERCE:  Yeah.

SENATOR RANDOLPH:  Okay. By knowing ahead of time, then why is it not required for them at all times to have a basis of their decision wherever they're going to go financial analysis.

REPRESENTATIVE K. PIERCE:  Can you -- can you restate that?

Page 21

SENATOR BALDWIN:  Well that's what the bill is asking for --

REPRESENTATIVE K. PIERCE:  Yeah.

SENATOR BALDWIN:  -- because they don't have it now.

REPRESENTATIVE K. PIERCE:  Yeah.

SENATOR RANDOLPH:  In this case is based that they should -- if they vote opposite --

REPRESENTATIVE K. PIERCE:  Yeah.

SENATOR RANDOLPH:  -- then they have to have something about financial analysis. But you see my question?

REPRESENTATIVE K. PIERCE:  I do. Are you -- are you saying if they agree with management --

SENATOR RANDOLPH:  Whether they agree or not there should be a basis. In my opinion, they should --

REPRESENTATIVE K. PIERCE:  Yeah.

SENATOR RANDOLPH:  -- have a financial analysis.

REPRESENTATIVE K. PIERCE:  So this is -- this get more -- I hear what you're saying, and I'll respond to it specifically. So --

SENATOR RANDOLPH:  Okay.

REPRESENTATIVE K. PIERCE:  -- in the bill, if the proxy advisor agrees with management, there is no

Page 22

responsibility of proxy advisor. Now some of that is to not be heavy regulators where the business has the company -- we're talking about Google, whatever company you want to name --

SENATOR RANDOLPH:  Yeah.

REPRESENTATIVE K. PIERCE:  -- they have a duty to their -- to their investors, to their board, to, you know, get the highest returns for their investments and perform well. Right? And so if the proxy advisor is agreeing with them, we're putting on a less regulatory burden for them to show their homework. Theoretically, yes, we could make it where they have to show their homework either way. Some of this is where how much regulatory burden do we want to have as a State --

SENATOR RANDOLPH:  Yeah.

REPRESENTATIVE K. PIERCE:  -- where we say no matter what you have to show your homework. If the company is asking for a yes vote on whatever item and there is an implied belief that they are doing it for the best interest of their company, which is the best interest of their investors. Therefore, we're kind of -- we're making it a little bit easier for them to say, hey, there is an assumption that that company is trying to do best for its investors;

Page 23

therefore, we're letting you kind of -- kind of do the easier route on that side. You could theoretically ask them to do their homework on both ends, but it would just be more regulation on them.

SENATOR RANDOLPH:  You kind of lost me a little bit. If I'm a proxy advisor, and I've got a relationship with this company --

REPRESENTATIVE K. PIERCE:  Yeah.

SENATOR RANDOLPH:  -- and they and I agree upon a certain direction --

REPRESENTATIVE K. PIERCE:  Yeah.

SENATOR RANDOLPH:  -- or vote I'm going to take, I would assume that there is going to be some research, some report, something as a basis for us to agree. Right?

REPRESENTATIVE K. PIERCE:  That would be a good assumption. But in front of Congress there had been Glass Lewis and it's ISS have said that they don't always do that. I would -- I would be with you. I would assume that they would. But they have said in public testimony that that's not the case.

SENATOR RANDOLPH:  So how have they been doing in the past then if, in fact, there's no research, no nothing based -- and the proxy goes in and votes otherwise?

Page 24

REPRESENTATIVE K. PIERCE:  It's a very broad process. So some -- so I want to be -- I want to -- I want to be fair to the industry. Some they do hyper detailed research, others they have blanket policies. And so when they have blanket policies, it doesn't ask -- it doesn't look to the question of is this in the best interest of the investor, is this the best interest of the company that we are invested in? We have a blanket policy on all issues that deal with X; therefore, we vote no on every issue that deals with this? We don't do -- we don't ask if it -- is that in the best interest of our investor.

SENATOR RANDOLPH:  But right now there's not a requirement in terms of financial analysis report.

REPRESENTATIVE K. PIERCE:  Well, besides the contractual duty which --

SENATOR RANDOLPH:  Yeah.

REPRESENTATIVE K. PIERCE:  -- they sign --

SENATOR RANDOLPH:  There's none, yeah.

REPRESENTATIVE K. PIERCE:  -- with an investor.

SENATOR RANDOLPH:  Okay. And so, what big difference if it's going to make then, if it's consistently has not been necessary for a report, if you vote positive, to have a report now?

Page 25

REPRESENTATIVE K. PIERCE:  The big difference is ensuring that when you are investing into these large companies, that, if you are giving a suggestion on how to vote, that you are giving your -- having transparency of why you are suggesting what you are suggesting.

SENATOR RANDOLPH:  And so now you make yourself more vulnerable to being liable in lawsuit if, in fact, you're sued by management.

REPRESENTATIVE K. PIERCE:  I would disagree with that assessment.

SENATOR RANDOLPH:  I'm just asking.

REPRESENTATIVE K. PIERCE:  I would disagree with that --

SENATOR RANDOLPH:  You tell me.

REPRESENTATIVE K. PIERCE:  -- assessment because what you're -- because again, (crosstalk) --

SENATOR RANDOLPH:  You tell me. I don't know. You tell me. Educate me.

REPRESENTATIVE K. PIERCE:  I think, no, the answer I would say is no. No.

SENATOR RANDOLPH:  Okay.

REPRESENTATIVE K. PIERCE:  Because 1) the investor could still disagree with the proxy advisor. The proxy advisor says --

Page 26

SENATOR RANDOLPH:  Okay.

REPRESENTATIVE K. PIERCE:  -- hey, we think you should agree with the board on -- we think you should agree with Google and vote yes. And the investor says -- INPRS says, actually we think they're wrong. Now why would they do that? That would be rare circumstances. I'm not going to lie.

SENATOR RANDOLPH:  So, why have a financial report then?

REPRESENTATIVE K. PIERCE:  Because in terms of, if they're disagreeing. We could do it both ways. We could say, hey, if you agree with management or disagree with management, you have to show your analysis. By adding that additional step on the agreement side, that's just more regulation from the State of Indiana. And that's where we're --I'm trying to regulate the least amount possible.

SENATOR RANDOLPH:  Well, there's a good possibility that if, in fact, the financial advisor votes against management with a (inaudible) proxy, chances are they're not going to use them again.

REPRESENTATIVE K. PIERCE:  Not -- I

SENATOR RANDOLPH:  No?

REPRESENTATIVE K. PIERCE:  I think we're trying to get into the mind of an investor. And I

Page 27

think there could be different reasons to vote with or vote against the proxy advisor's --

SENATOR RANDOLPH:  Okay.

REPRESENTATIVE K. PIERCE:  -- position. There could be an array of reasons.

SENATOR RANDOLPH:  But there's no liability there in your mind then?

REPRESENTATIVE K. PIERCE:  Liability on who's on whose -- on whose part to --

SENATOR RANDOLPH:  If there's a contract, you go in -- I know.

REPRESENTATIVE K. PIERCE:  Well, if I'm the investor --

SENATOR RANDOLPH:  Maybe --

REPRESENTATIVE K. PIERCE:  If I'm the -- if I'm INPRS and the proxy advisor says I should vote yes with Google's position -- I keep going back to Google; I shouldn't --

SENATOR RANDOLPH:  Yeah.

REPRESENTATIVE K. PIERCE:  -- do that -- but Google's, you know, expansion decisions in quarter four of next year, the INPRS say, hey, we actually just don't like what they're trying to do -- Google's --

SENATOR RANDOLPH:  Yeah.

Page 28

REPRESENTATIVE K. PIERCE:  -- trying to do, so we're going to oppose them, not because the proxy advisor's position but because of our own position. This bill doesn't mandate votes.

SENATOR RANDOLPH:  But we --

REPRESENTATIVE K. PIERCE:  All it says is you have to show your homework to those investors of why you're opposing board management.

SENATOR RANDOLPH:  I guess I'm just looking at basically fundamental relationships in terms of -- maybe I'm looking at a contractual basis -- I don't know -- in terms of fairness. I would think that I'm representing you, I'm going to know ahead of time in terms of what your thoughts are. And I'm going to have some kind of information that I'm going to --

REPRESENTATIVE K. PIERCE:  Yeah.

SENATOR RANDOLPH:  -- refer to as a basis.

REPRESENTATIVE K. PIERCE:  Uh-huh.

SENATOR RANDOLPH:  Okay? And if, in fact, I go in and I vote opposite as being your proxy, then I'm violating my relationship with you, which means I'm vulnerable to litigation.

REPRESENTATIVE K. PIERCE:  I think I understand that may be a confusion. So the investor is still the one who votes, not the proxy. You hear the

Page 29

word proxy you think, oh, this person votes on my behalf. Now you can --

SENATOR RANDOLPH:  Yeah.

REPRESENTATIVE K. PIERCE:  I can sign a contract for you and say hey, you're going to tell me what you think we should do. I'm going to give you the list of yes and nos, and then you go do it for me. That's a -- that's just more of a administrative step. But if INPRS or a mutual fund says no, we'll be the ones that still vote, we'll be the ones that fill out the form, a proxy advisor does not necessarily go and always vote for them. The investor still chooses how they vote. I understand the word proxy, and that -- especially when you're talking to the legislative --

SENATOR RANDOLPH:  Maybe I'm -- maybe that's what I'm thinking about, proxy advisor --

REPRESENTATIVE K. PIERCE:  Yeah.

SENATOR RANDOLPH:  -- being a actual going through the process of voting on behalf of management. But he's just advising verbally.

REPRESENTATIVE K. PIERCE:  Yes.

SENATOR RANDOLPH:  And the verbalization is that, if he advises against an understanding he has with management, that he's going to vote one -- that they -- he's going to advise one way but advises

Page 30

another way afterwards, that's when the financial

analysis report comes into play. Does that --

REPRESENTATIVE K. PIERCE:  It would -- it

would be when they disagree with management. I mean,

they could --

SENATOR RANDOLPH:  Well that's a

disagreement.

REPRESENTATIVE K. PIERCE:  Yes, yes, yes.

I just didn't understand the questions you asked.

SENATOR RANDOLPH:  Yeah. And that's just --

REPRESENTATIVE K. PIERCE:  Yeah. Yeah.

SENATOR RANDOLPH:  So that's when you have to

do the financial --

REPRESENTATIVE K. PIERCE:  Yes.

SENATOR RANDOLPH:  -- report explaining why.

REPRESENTATIVE K. PIERCE:  Yes.

SENATOR RANDOLPH:  And by doing that, that

jeopardizes relationship with management I would

think.

REPRESENTATIVE K. PIERCE:  I don't

necessarily think so. I mean, one -- I mean, today

they can advise opposed to management. I mean, right?

SENATOR RANDOLPH:  Uh-huh.

REPRESENTATIVE K. PIERCE:  So today there are

votes where these advisors are suggesting against

Page 31

voting with management. So this isn't a new trend by any means.

SENATOR RANDOLPH:  Yeah.

REPRESENTATIVE K. PIERCE:  I would actually --

SENATOR RANDOLPH:  Yeah.

REPRESENTATIVE K. PIERCE:  -- believe that management would appreciate it because now they can say, okay, hey, this is why this advisor is opposing us.

SENATOR RANDOLPH:  Okay.

REPRESENTATIVE K. PIERCE:  I can now meet with the advisor and say, hey, let's talk about why you're concerned about this issue or that issue.

SENATOR RANDOLPH:  Okay. Yeah.

REPRESENTATIVE K. PIERCE:  Because right now they're saying, hey, we oppose this. And they say, well, why do you oppose it? And sometimes they don't -- they don't have to tell management why they're opposing --

SENATOR RANDOLPH:  Okay.

REPRESENTATIVE K. PIERCE:  -- X, Y, or Z. And this -- well, it says you've got to let them know. Management doesn't have to agree with their position. Management could say, you guys are wrong. That's

Page 32

totally fine. And the investor could say, I think the proxy advisor is wrong. I'm going to vote with management.

SENATOR RANDOLPH:  Let me ask you this. Can a proxy advisor also be an employee of management, or is that a conflict?

REPRESENTATIVE K. PIERCE:  I would be -- I'm going to go out in front of my skis and say no.

SENATOR RANDOLPH:  No?

REPRESENTATIVE K. PIERCE:  I don't have that -- I don't have a legal --

SENATOR RANDOLPH:  That's never happened before?

REPRESENTATIVE K. PIERCE:  I would be very surprised to hear that would be --

SENATOR RANDOLPH:  Okay.

REPRESENTATIVE K. PIERCE:  -- the case. I feel comfortable enough to say no without looking into the law. I'd be very surprised that --

SENATOR RANDOLPH:  Okay.

REPRESENTATIVE K. PIERCE:  -- ever happened.

SENATOR RANDOLPH:  I'm just curious. Thank you, Mr. Chair. You know --

SENATOR BALDWIN:  Great Dialog. Good questions, Senator Randolph. Senator Qaddoura?

Page 33

SENATOR QADDOURA:  Thank you. I'll be brief. Thank you for this. I have a couple of questions. Is there currently any specific case in Indiana by which a proxy advisor gave, opposed, or supported investment against the recommended corporate position or vote? Are you aware of any of these cases?

REPRESENTATIVE K. PIERCE:  I can't list a specific example. There might be.

SENATOR QADDOURA:  Sure.

REPRESENTATIVE K. PIERCE:  But I can't list a specific example.

SENATOR QADDOURA:  Great. And the reason I'm asking is that, to understand if this was driven by an actual case in Indiana. The second question -- and this is a sincere question. Like, I'm trying to understand the crux of the matter. Why is government getting in between a contract between two private entities?

REPRESENTATIVE K. PIERCE:  I think, I mean, there's always -- two parts, 1) this is to Senator Randolph's question about the limited nature of which I'm suggesting we regulate, because you could regulate on the, hey, even if you agree --

SENATOR QADDOURA:  Okay.

REPRESENTATIVE K. PIERCE:  -- you have to

Page 34

show your homework. That's why you don't have that side, to limit the amount of regulation. I would say for a couple reasons. 1) We're talking about investments in companies across the country as well as investments here in the State, and also you're talking about retirees' money, including public retirees. We just talked about in our last bill the investments at the State level. And so we need to ensure, because the INPRS, because JPMorgan Chase has a duty to vote, they cannot choose not to vote. So they must vote for the retirees --

SENATOR QADDOURA:  Correct.

REPRESENTATIVE K. PIERCE:  -- for our teachers, for our police.

SENATOR QADDOURA:  Correct.

REPRESENTATIVE K. PIERCE:  They must -- they must vote. They're trying to get them to have the best financial return. So we need to ensure that we're not putting Hoosiers in a position where they're not getting the best financial returns. And that might mean we might need to take a foot into investments.

SENATOR QADDOURA:  And I fully appreciate that.

REPRESENTATIVE K. PIERCE:  And then it gets to the second --

Page 35

SENATOR QADDOURA:  I'm still -- last time I checked --

REPRESENTATIVE K. PIERCE:  Yeah.

SENATOR QADDOURA:  -- I serve in the Indiana General Assembly dominated by a supermajority that frequently said deregulation is good for business; government regulation brings more costs. So my question again, these are not mandated contracts between two private entities, meaning that we do not stipulate by law that a proxy --

REPRESENTATIVE K. PIERCE:  Yup.

SENATOR QADDOURA:  -- advisor -- I mean, if you are Chase JPMorgan --

REPRESENTATIVE K. PIERCE:  Yup.

SENATOR QADDOURA:  -- is there anything in our state law that currently mandates that Chase JPMorgan has to contract with a proxy advisor?

REPRESENTATIVE K. PIERCE:  No, there's nothing that -- there's no contractual --

SENATOR QADDOURA:  Correct.

REPRESENTATIVE K. PIERCE:  -- obligation.

SENATOR QADDOURA:  Correct.

REPRESENTATIVE K. PIERCE:  I will also add though that I think any policy discussion, if you can -- if you can describe an entire ideology within a

Page 36

sentence, it's probably too narrow of a definition.

SENATOR QADDOURA:  Sure. I respect that. I appreciate that. I'm not --

REPRESENTATIVE K. PIERCE:  Yeah.

SENATOR QADDOURA:  -- trying to reduce the discussion. I'm just trying to be respectful --

REPRESENTATIVE K. PIERCE:  Yeah.

SENATOR QADDOURA:  -- of the Chairman's time here. But I think the -- again what -- the piece to me is that if you're a corporation, I'm a proxy advisor, there's nothing in law that mandates you to contract with me, and you can fire me at any point, well, provided contractual, you know, boilerplate language of how you end their contractual relationship. So I'm trying still to get at the point. Even if they lobby, is the corporate governance -- does it require them to adhere to and abide by the proxy recommendations?

REPRESENTATIVE K. PIERCE:  No, they're not -- they're not adhered to. But I will also say, you know, we do regulate in the consumer space.

SENATOR QADDOURA:  Sure.

REPRESENTATIVE K. PIERCE:  There is an entire title -- or entire, you know, chapters on that. And this is a bipartisan issue both with -- again, not many things President Obama and President Trump agree

Page 37

on. And so I -- it's a rare example of bipartisan support on the issue.

SENATOR QADDOURA:  There are things I disagree with President Obama. There are things I disagree with President Trump. So I'm trying to be here specifically --

REPRESENTATIVE K. PIERCE:  Yeah.

SENATOR QADDOURA:  -- looking at issues that impact to private entities in a contract and --

REPRESENTATIVE K. PIERCE:  Well, private entities that also include employees, because it's not --

SENATOR QADDOURA:  True.

REPRESENTATIVE K. PIERCE:  -- it's not JPMorgan Chase. It is the Hoosier investor that might be making minimum --

SENATOR QADDOURA:  Correct.

REPRESENTATIVE K. PIERCE:  -- wage and --

SENATOR QADDOURA:  Correct.

REPRESENTATIVE K. PIERCE:  -- might be putting in $2 a day into their retirement. It might be the DNR IDEM employee that works for our State.

SENATOR QADDOURA:  But earlier --

REPRESENTATIVE K. PIERCE:  We need to make sure that they have the --

Page 38

SENATOR QADDOURA:  Correct.

REPRESENTATIVE K. PIERCE:  -- investments as well.

SENATOR QADDOURA:  Correct.  But, Representative, earlier you told me that this does not exist in Indiana because INPRS does not contract with a --

REPRESENTATIVE K. PIERCE:  No, I didn't --

SENATOR QADDOURA:  -- proxy adviser.

REPRESENTATIVE K. PIERCE:  I didn't -- I didn't say -- I didn't --

SENATOR QADDOURA:  Oh --

REPRESENTATIVE K. PIERCE:  -- say that. No, no, no.

SENATOR QADDOURA:  Can you maybe rephrase what you said earlier? Because I thought --

REPRESENTATIVE K. PIERCE:  I said -- I said the INPRS does not contract with the two major investors and that was giving an example with Glass Lewis. Also, in terms of the -- you asked for is there an example of this happening?

SENATOR QADDOURA:  Sure.

REPRESENTATIVE K. PIERCE:  I'm not going to sit here and give a random example. However, though, any advisor that got the recommendations, for example,

Page 39

of -- on oil or this, that, or the other, would be --

SENATOR QADDOURA:  Correct.

REPRESENTATIVE K. PIERCE:  -- impacted if they have --

SENATOR QADDOURA:  Correct.

REPRESENTATIVE K. PIERCE:  -- an investment that's --

SENATOR QADDOURA:  Correct.

REPRESENTATIVE K. PIERCE:  -- tied to Save Indiana. So it doesn't mean it doesn't exist. I'm just not giving a specific example.

SENATOR QADDOURA:  Correct. I'll give -- I'll get maybe one more question. So earlier you mentioned the word environmental, petroleum, all of that. So it seems to me -- it seems to me -- and I don't need to impose, that this is about ESG. This bill --

REPRESENTATIVE K. PIERCE:  No.

SENATOR QADDOURA:  So what is this about then? Because --

REPRESENTATIVE K. PIERCE:  So --

SENATOR QADDOURA:  -- we passed legislation -- if you don't mind, just really quick --

REPRESENTATIVE K. PIERCE:  Yeah.

SENATOR QADDOURA:  The General Assembly passed legislation I think last year from this

Page 40

committee or maybe a couple of years ago that

prohibited ESG type of decision-making --

REPRESENTATIVE K. PIERCE:  Yeah.

SENATOR QADDOURA:  -- investments. So I'm

trying to think through that legislation. INPRS,

and thinking about practical examples --

REPRESENTATIVE K. PIERCE:  Yeah.

SENATOR QADDOURA:  -- in the State of

Indiana. So I'm still trying to find out, so if it's

not ESG, if it's --

REPRESENTATIVE K. PIERCE:  Healthcare, for

example (crosstalk) --

SENATOR QADDOURA:  Sure.

REPRESENTATIVE K. PIERCE:  So President Obama

--

SENATOR QADDOURA:  Yeah.

REPRESENTATIVE K. PIERCE:  -- so he believed

that these companies were undercutting on healthcare

decisions. And so, I mean, we want private companies

to provide healthcare to their employers I think. At

least I do. I'm assuming you do as well. So that it's

not just -- it's -- well, just because I gave an

example in that space, does not mean it's only in that

space.

SENATOR QADDOURA:  Right.

Page 41

REPRESENTATIVE K. PIERCE:  For example, there's other board -- another advisor could say, hey, we -- if an issue is being brought up for the first time ever, it's never been discussed --

SENATOR QADDOURA:  Okay.

REPRESENTATIVE K. PIERCE:  -- in an emerging economy that we face -- that we have in our nation where there are new businesses popping up every day in the great -- in the great State of Indiana and in our country --

SENATOR QADDOURA:  Correct.

REPRESENTATIVE K. PIERCE:  -- and the advisor says, just because I've never seen this before, I'm going to tell --

SENATOR QADDOURA:  Okay.

REPRESENTATIVE K. PIERCE:  -- you to vote no. Now, I don't think that's good public policy. I'm assuming you don't either. And so that's where it's not just ESG. Just because the example was used of ESG, that doesn't mean that implies the --

SENATOR QADDOURA:  I appreciate that.

REPRESENTATIVE K. PIERCE:  -- entire thing is.

SENATOR QADDOURA:  I appreciate the clarification. I'll say this, and I say it in the

Page 42

utmost respectful way. I don't mean to be -- it's not being combative. It's not -- I really see this bill as interfering with free market economics with private contracts between two different entities. And the way that I see this is that it's a solution in search of a problem. Because when I look at Indiana, unless maybe somebody testifies today, you know, I was pleasantly surprised and happy actually that we did -- and I thank the Chairman for his thoughtfulness for accepting the amendment on the charitable nonprofit organizations. You know, it didn't go as far as I would like it to go. I don't know what the 500,000 threshold is. I would have preferred it to be a little bit higher than that potentially. But I'm still -- maybe I need to wait and listen to folks testify to understand what really the problem is. So I appreciate you engaging --

REPRESENTATIVE K. PIERCE:  Yeah, thank you.

SENATOR QADDOURA:  -- with my questions.

REPRESENTATIVE K. PIERCE:  Thank you.

SENATOR QADDOURA:  Thank you, Chair.

SENATOR BALDWIN:  Good dialog. Let's move to -- we have four folks signed up to testify, and then we'll let you close when they're done. Matthew du Mee from Fusion Law. Sorry if I mispronounced that,

Page 43

Matthew. Thanks for being here. The floor is yours, sir.

MR. DU MEE:  Thank you, Mr. Chair. And don't worry. Everybody mispronounces it. My name is Matthew du Mee, and I work with Fusion Law. And I thank you, Representative Pierce, for the invite. Prior to working at Fusion Law, I worked for a State Attorney General's office for eight years doing consumer protection work.

So over 30 years ago, the U.S. Department of Labor issued guidance stating that fiduciaries must vote their shares of stock that they hold because of the potential effect on shareholder value. Now, like many things, this made legal sense but didn't necessarily make practical sense. On the legal side fiduciaries have a responsibility to maximize the investments in their care. Shareholder votes could benefit or harm those investments. So it made sense to say you have to vote your shares. But in practical terms that put a lot of investors into a bind, especially pension plans, because if they have a well-diversified portfolio or if they own index funds, by definition, they have shares in many different companies pretty much across the whole market. And so, therefore, the DOL guidance meant that these pension

Page 44

plans needed to vote their shares on all of these issues at all of these companies. And as the number of shareholder proposals and topics on shareholder proposals have skyrocketed, figuring out which way to vote on all the different issues became more and more difficult for pension plans and financial institutions. So enter the proxy advisors.

The proxy advisors came and said, here, we have a solution to this problem. We'll -- we will analyze all these things, and then we'll just sell our advice or sell our recommendations to you and to many other people for an affordable cost. So companies saw this as a way to uphold their fiduciary duties while still not having to have an entire wing of their company devoted to just figuring out these issues at every company.

This situation created economies of scale. So large proxy advisors who could cover all the votes and then sell their recommendations cheaply ended up controlling the market. So for years two proxy advisors have controlled over 90 percent of the market share. And those two are Glass Lewis and ISS. But last year, one of those proxy advisors admitted under oath that it does not conduct financial analyses to assess the effect on shareholder values before it makes

Page 45

recommendations. The advisor's representative also stated that, as far as it knew, no other proxy advisor made such financial analyses either.

So this is a serious problem for three reasons. First, proxy advisors are advertising that they attempt to increase shareholder value. So there's a conflict between what proxy advisors are advertising or representing and what clients are actually receiving. Second, companies are depending on proxy advisors to meet their fiduciary duties to increase the value of their investments. If proxy advice isn't based on financial analyses, then these fiduciary duties may not be met. Third, proxy advisors hold tremendous sway in the U.S. market. One prior estimate found that the recommendations of the big two advisors can swing votes between 10 percent and 30 percent. If proxy advisors aren't conducting financial analyses, then these votes might be swung in ways that harm shareholders. This concern is especially acute where proxy advisors are recommending votes against company management because those directors have their own fiduciary duties and presumably are conducting their own financial analyses.

So Senate Bill 375 -- sorry, House Bill 1273 simply requires disclosure of facts when a proxy

Page 46

advisor makes recommendations to vote against company management. If a proxy advisor is not doing so based on a written financial analysis, the advisor just has to disclose that fact and say, here's the recommendation, this is not based on a written financial analysis, here's what I mean when I say written financial analysis. And if a proxy advisor is making a recommendation based on a written financial analysis, then the advisor must say that it's doing so and make that analysis available to its clients and to companies. Investors receiving this information will be able to better evaluate whether following the proxy advisor's recommendation will increase the value of their investment and meet their fiduciary duties. Violations of this bill would be considered violations of Indiana's Deceptive Consumer Sales Act. This bill is an important and common sense consumer protection measure. We appreciate the opportunity to discuss it with the Committee, and I'm happy to answer any questions that the Committee may have.

SENATOR BALDWIN:  Go ahead, Senator Qaddoura.

SENATOR QADDOURA:  Thank you, Mr. -- thank you for your presentation. Very clear and I appreciate that.

So I want to go back a couple of things. The

Page 47

proxy advisors, when you said they do not perform
financial analysis, earlier you explained their role,
that they are hired by corporations because
corporations made the decision that they don't want to
invest in having a whole wing of their company doing
that type of job. Correct?

          MR. DU MEE:  Right.

          SENATOR QADDOURA:  So that was a first
financial decision that a corporation did by
outsourcing a fiduciary function to a private entity,
trusting that they will do a better job or more cost-
effective job. Is that correct?

          MR. DU MEE:  Right.

          SENATOR QADDOURA:  That is the private
relationship between a corporation and a proxy
advisor. Correct?

          MR. DU MEE:  Yes. Yeah.

          SENATOR QADDOURA:  Great. So now let's move
to the proxy advisor. In your testimony you explained
that proxy advisor's role is to help with the
massive skyrocketing number of shareholder proposals.
Correct?

          MR. DU MEE:  Yeah, their job is to give
advice on --

          SENATOR QADDOURA:  Correct.

Page 48

MR. DU MEE:  -- those proposals.

SENATOR QADDOURA:  So the -- I want to understand the nuances between your concern of them not providing financial analysis. I want to understand that point. Are you suggesting that they provide financial analysis, or is their job to review and analyze the proposals by the shareholders and convey what is the summary of those to the corporate -- to the corporations with recommendations? So is that not considered financial analysis of the proposals that have been submitted? What is the distinction between the two different types of financial analyses that you're looking for?

MR. DU MEE:  So I think you're exactly on the right track. The company -- if the company was doing this themselves, just, you know, taking care of all the proxy voting themselves and thinking through all the different issues, the company should be doing a financial analysis. Instead --

SENATOR QADDOURA:  Correct.

MR. DU MEE:  -- they hired a proxy advisor, and the proxy advisors have represented publicly, yeah, we're making recommendations in your financial interest. But then the proxy advisors are not doing the job that they say that they're doing. They're not

Page 49

actually doing a financial analysis. So this bill would just shed light on the situations when that's happening so that the company, when it's getting the recommendation from the proxy advisor, now would know, oh, this recommendation isn't actually based on a written financial analysis. Let's do our own financial analysis then internally to make sure we've got everything squared away, or this recommendation is based on a written financial analysis. Here it is. We have access to it. Yeah, that seems right, or no, we don't think that's right. It's just transparency for the process. So that's all it's providing. It's not changing anybody's obligations except for providing additional --

SENATOR QADDOURA:  Correct.

MR. DU MEE:  -- transparency.

SENATOR QADDOURA:  And I really appreciate your answers on this because it really puts things in perspective. So if I'm a corporation and I'm not happy with the proxy advisor, because why would I want to hire someone that would constantly come up with conflicting recommendations that would create political chaos on the governor structure with a corporate by which the directors of the corporation will constantly be in conflict with recommendations

Page 50

with the proxy advisor, so why not -- you know, it becomes a corporate decision of do I invest in more staff in my corporation to do this business, or do I live through political chaos -- you know, corporate political chaos of constantly dealing with the tension between a proxy advisor and the corporate directors. So it seems to me that, again, it seems a contractual issue. Is it your understanding that -- is there anything in federal or state law that prohibits a corporation from ending a contractual relationship with a proxy advisor, if they feel that they're not doing their due diligence of providing financial analysis to satisfy the needs of the corporation? Is there anything in federal or state law that prohibits that?

MR. DU MEE:  No, there's nothing that prohibits --

SENATOR QADDOURA:  Okay.

MR. DU MEE:  -- that. And I think you may see more of that, if proxy advisors are required to inform companies, hey, this money that you're paying, the recommendations that you're getting back aren't actually based on a written financial analysis. Then I think companies may say, wow, then why are we -- why are we spending this money? Maybe we need to do

Page 51

something internally.

Just recently JPMorgan Chase announced it was cutting ties with proxy advisors. It wasn't using proxy advisors anymore. They're going to do it internally through AI. So other companies may, you know, say, you know what, even if we have to devote employees to this, it's better than getting recommendations that aren't based on anything.

SENATOR QADDOURA:  And that's my precise point, which is free market economics. A company hires a proxy. They're not happy with them. They fire them, and they in-source the function back in. I think the part that I'm still not clear on is the type of financial analysis that we're looking at. You said earlier that the proxy advisor's role is to evaluate all of the proposals because it became too cumbersome for the corporate to do it internally. So currently, when a proxy advisor reviews these proposals, don't they extract any financial analysis, or themes, or recommendations based on the shareholder proposals? Are you suggesting that that's not happening currently? You're looking for more in-depth analysis, that written analysis that currently does not exist.

MR. DU MEE:  So Glass Lewis -- a

Page 52

representative of Glass Lewis, admitted under oath last year they do not conduct a written financial analysis. And so --

SENATOR QADDOURA:  Correct.

MR. DU MEE:  -- I agree with you, the free market is important. But the free market relies on information. That's what --

SENATOR QADDOURA:  Correct. Correct.

MR. DU MEE:  That's what makes people be able to make informed decisions in the free market.

SENATOR QADDOURA:  I sincerely --

MR. DU MEE:  And right now that information isn't available to companies, so this bill would just make sure there's transparency. Proxy advisor doesn't have to do anything differently. They don't have to conduct a written financial analysis. They just need to inform the company that that's not happening.

SENATOR QADDOURA:  And I sincerely, again, appreciate your response. It's clear, concise, and I appreciate that. The question that I'm still not getting to is, even under oath when they said we don't produce written financial statements, what does that mean? Does that -- did -- their statement under oath was that we don't generate our own thoughts of our own -- based on our own financial analysis. It is all

Page 53

based on the shareholder proposals. And in their view that is the scope of their contract to evaluate the financial data and make recommendations based on the shareholder proposals. So was the -- was -- what context was that oath taken under by which they said we don't produce financial state or analysis? Is it that they were suggesting that we are not going to use data that is owned by them that is not based on the shareholders? Can you give maybe a little bit more context to that all?

MR. DU MEE:  Yeah. So the context is Texas passed a bill related to proxy advisors last year. And so -- and I want to be clear. These bills are two different things. There's two different --

SENATOR QADDOURA:  Sure.

MR. DU MEE:  -- approaches. So the approach in Texas was they defined a set of factors and said proxy advisors shouldn't be making recommendations based on these factors; and if they are, then those are -- those factors are non-financial. And the proxy advisors -- and Texas also said you need to provide a written financial analysis. And so the proxy advisors sued over that bill and said -- and in the context of an affidavit, Glass Lewis said we don't provide the written financial analysis, we don't generate that,

Page 54

and nobody else does either as far as we know. So that's the context.

This bill takes a different approach than Texas because it just says all that we're asking for is disclosure. Doesn't matter the issue, doesn't matter what the proposal's about, who's on which side. You know, we're not saying some things are non-financial and some things are financial. We're just asking for transparency. So --

SENATOR QADDOURA:  Sure.

MR. DU MEE:  And that's a big part of the impetus for this bill is, you know, this was a real revelation they're not doing a financial analyses, because that's the whole point of having a proxy advisor. So proxy advisors then under this bill would just have to inform the companies whether or not they're doing their financial analysis.

SENATOR QADDOURA:  I appreciate it. You've been very helpful answering my question. Thank you for that. Thank you, Mr. Chair.

MR. DU MEE:  Thank you.

SENATOR BALDWIN:  Thank you very (inaudible) --

SENATOR RANDOLPH:  Mr. -- I've got a couple of questions. The lack of disclosure, you indicated

Page 55

that that's what you're looking for, that that's a problem. You want to correct that.

MR. DU MEE:  Correct.

SENATOR RANDOLPH:  So the lack of disclosure, does that mean that entities are being injured? And if so, what kind of injuries have they suffered as a result of the lack of disclosure?

MR. DU MEE:  So I think the -- I think the injuries that may have been suffered in the past are companies pay money to these proxy advisors, hire them to provide financially based advice on shareholder proposals, and then they haven't gotten that. So whether those companies want to, you know, take that up in, you know, a contractual case or whatever, they could -- they could potentially do that. But right now the companies don't know what their -- whether the recommendations that they received were actually based on financial advice or not. So this bill is focused on looking forward. In the future when a proxy advisor is giving a recommendation --

SENATOR RANDOLPH:  Okay.

MR. DU MEE:  -- it just needs to say --

SENATOR RANDOLPH:  Uh-huh.

MR. DU MEE:  -- this is based on a written

Page 56

financial analysis or this is not.

SENATOR RANDOLPH:  So in the past the industry has been not just, like J.P. Morgan, suffering damages concerning loss of money that they could have been saving, utilized, or something else then, funds caught -- paying money for these advisors?

MR. DU MEE:  Yeah. So I mean, in -- you know, in --

SENATOR RANDOLPH:  Okay.

MR. DU MEE:  -- my opinion, they haven't been getting --

SENATOR RANDOLPH:  Okay. Let me ask you --

MR. DU MEE:  -- what they -- what they were paying for.

SENATOR RANDOLPH:  Let me ask you this. Strike that. In terms of Morgan -- you said Morgan Chase?

MR. DU MEE:  Yeah. JPMorgan Chase said we're not--

SENATOR RANDOLPH:  JPMorgan Chase --

MR. DU MEE:  -- going to use the proxy advisors anymore for --

SENATOR RANDOLPH:  Anymore.

MR. DU MEE:  -- for their own advice. Yeah.

Page 57

SENATOR RANDOLPH:  What was their reasoning?

MR. DU MEE:  Their reasoning was the proxy advisors aren't making recommendations based on financial analyses. I mean, the --

SENATOR RANDOLPH:  And --

MR. DU MEE:  -- they're not getting -- that they're not getting the recommendations that they're paying for, so they'd rather do it themselves.

SENATOR RANDOLPH:  So they've been suffering losses by the shareholders or what?

MR. DU MEE:  I mean, I think the --

SENATOR RANDOLPH:  I mean, how do you know you're not getting what you're paying for unless you see the results? The results could be complaints by the shareholders saying that losses are being suffered, they're not making enough profit or what, for investments?

MR. DU MEE:  So I don't think there have to be losses. I think this comes --

SENATOR RANDOLPH:  I don't know. I'm asking.

MR. DU MEE:  There -- this comes back to fiduciary duties. So, you know, if you're a pension plan at, you know, Eli Lilly, let's say, and you have stock in many different companies that you're holding on behalf of employees, you need to be able to justify

Page 58

your votes because the Department of Labor said voting on those shares, that's part of your fiduciary duty. So every fiduciary has that responsibility. So even if that vote didn't make a difference in the grand scheme of things, it's still part of their fiduciary duties, and so they need to know whether or not that vote was based on a financial analysis.

SENATOR RANDOLPH:  So in your example, the proxy advisor is actually voting?

MR. DU MEE:  No. The proxy advisor makes the recommendation, but then companies are relying on that when they actually --

SENATOR RANDOLPH:  (Crosstalk) --

MR. DU MEE:  -- cast their vote.

SENATOR RANDOLPH:  -- cast their vote, there is none.

MR. DU MEE:  Correct, yeah.

SENATOR RANDOLPH:  And the proxy advisors, when did it start being prevalent in terms of the industry -- being utilized by industry? I mean --

MR. DU MEE:  Yeah.

SENATOR RANDOLPH:  -- was it recently, or was it something happened 30 years ago, 40 years ago? I mean, when did it start being prevalent, and why did it become prevalent?

Page 59

MR. DU MEE: Yeah. So it's a growing trend. I mean, I think the cause for it is pretty clear. Once -- about 30 years ago, the Department of Labor said you have to vote your shares. Because before that, a fiduciary could just say, look, I'm not going to bother with voting all these shares. I'm just going to hold the stock. And so once the Department of Labor said this is part of your fiduciary duty; you have to vote these shares because voting the shares could increase the value of the investments. So once that happened, then all these institutional investors and pension plans realized, oh, now I have this duty. And so then, as the number of shareholder proposals increased, even companies that were trying to do it on their own said, you know, we can't do this anymore; let's hire somebody.

SENATOR RANDOLPH: Okay.

MR. DU MEE: And ISS and Glass Lewis got bigger, and bigger, and bigger in the process.

SENATOR RANDOLPH: And during that period of time -- the people that they hired, I'm assuming, during that historical period of time, that some of the proxy advisors probably advised something inconsistent with what management want.

MR. DU MEE: Oh, yeah.

Page 60

SENATOR RANDOLPH:  So what -- so what's been happening with those -- the status of those proxy advisors who did that in the past?

MR. DU MEE:  Well, I mean there's nothing necessarily wrong with a proxy advisor advising against what management wants. That might --

SENATOR RANDOLPH:  (Inaudible).

MR. DU MEE:  -- be the best financial thing.

SENATOR BALDWIN:  And I think that's what we're missing here.

SENATOR RANDOLPH:  Yeah.

SENATOR BALDWIN:  We're -- we've talked this in the circle a little bit. But at the end of the day, this is requiring transparency. It'll show your work, but it doesn't make you change your vote.

SENATOR RANDOLPH:  Yeah.

MR. DU MEE:  Right.

SENATOR RANDOLPH:  But my question is, then why is it necessary to put it in law for them to do a financial analysis report?

MR. DU MEE:  So it's necessary because this is really important for fiduciaries and because the proxy advisors are representing that they're making these decisions on financial basis but have admitted they're not actually doing a financial analysis.

Page 61

SENATOR RANDOLPH:  So in --

MR. DU MEE:  So companies that are paying for these services need to know the details about what they're getting when they get these services.

SENATOR RANDOLPH:  So in your mind, they're considered fiduciaries then?

MR. DU MEE:  I -- whether or not they're fiduciaries is --

SENATOR RANDOLPH:  Because you mentioned -- you mentioned fiduciary.

MR. DU MEE:  -- is a hot topic. The companies are definitely fiduciaries. The pension plans are definitely fiduciaries.

SENATOR RANDOLPH:  Yeah. Yeah.

MR. DU MEE:  And then they're kind of outsourcing this and thinking this is fine because we're getting these recommendations, and that's --

SENATOR RANDOLPH:  Right.

MR. DU MEE:  -- based on a financial --

SENATOR RANDOLPH:  Yeah. Yeah. Yeah.

MR. DU MEE:  -- reasoning too. But they're not getting that based on a financial analysis. And they need to know that so that they --

SENATOR RANDOLPH:  Yup.

MR. DU MEE:  -- can make the right fiduciary

Page 62

decisions.

SENATOR RANDOLPH:  Because I see -- I see financial advisors at some point saying, we want to maintain our -- because I could see corporations or companies saying, we're going to stop using financial advisors because they're not benefiting us, and they're costing us money, money we utilize for something else. And I see financial advisors saying, we've got to maintain our status as such. So why don't we go out and try to get insurance, like an attorney, malpractice? Give me some insurance. So this way we'll protect the corporation. If the corporation like, that makes us -- if they want to sue us, because they open a suit, we've got an insurance company that's going to back us up. You see what I'm saying?

MR. DU MEE:  Yeah. And that's an interesting idea. I think another thing that may happen is proxy advisors may say, you know what --

SENATOR RANDOLPH:  Yeah.

MR. DU MEE:  -- it -- let's put together a written financial analysis because then we can --

SENATOR RANDOLPH:  Yeah.

MR. DU MEE:  -- tell our clients, hey, we are doing a written financial analysis --

SENATOR RANDOLPH:  Yeah.

Page 63

MR. DU MEE:  -- and here it is. And that would be better -- that would be better service.

SENATOR RANDOLPH:  Yeah. Yeah.

MR. DU MEE:  But right now, since there's no disclosure --

SENATOR RANDOLPH:  Yeah.

MR. DU MEE:  -- they don't have to do that, and they can --

SENATOR RANDOLPH:  Okay.

MR. DU MEE:  -- just make a recommendation.

SENATOR RANDOLPH:  I'm just saying, I can see -- in this format I can see them going to insurance company and saying, insurance company, insure me for my position as a proxy advisor for this company and no marketing. So anyway, I'm fine. Thank you. It's an interesting conversation.

MR. DU MEE:  Thank you, Senator Randolph.

SENATOR RANDOLPH:  Thank you.

SENATOR BALDWIN:  Any other questions? Senator Carrasco.

SENATOR CARRASCO:  Thank you, Mr. Chairman. Thank you for being here. I just have a couple of questions. Does -- there's been a lot of conversation. And I'm just confused now, I guess, because I don't read the bill as requiring any entity to hire a third-

Page 64

party proxy.

MR. DU MEE:  Correct.

SENATOR CARRASCO:  Did I --

MR. DU MEE:  Nope. You're absolutely right.

SENATOR CARRASCO:  So it doesn't require or -- to hire or to not hire a third-party proxy advisor?

MR. DU MEE:  Correct. Nobody's -- yeah. Nothing is changing in the status quo other than disclosure. When somebody does hire a proxy advisor, they need to --

SENATOR CARRASCO:  Correct.

MR. DU MEE:  -- get this disclosure about what the recommendations are based on.

SENATOR CARRASCO:  Right.

MR. DU MEE:  That's it.

SENATOR CARRASCO:  So you said that, as a result -- I think it was Representative Pierce who talked about how this industry kind of developed of third-party proxy advisors. Do you know how the industry is regulated? Are there any -- because I see this as a regulation of the industry to ensure that they're -- we do this all the time. That's what all of these bills are. So I'm just trying to -- I'm trying to understand how this is different than anything else that we're doing and I -- why we're resisting

Page 65

requiring an industry to show how they're coming up with an analysis for something so critical as an institution having to fulfill their fiduciary duty is creating such heartburn, I'm just confused.

MR. DU MEE:  Yeah. Well, the proxy advisors are in sort of a weird niche inside where a lot of different areas of law where things aren't quite catching them. So just to give you an example, ISS is registered federally as an investment advisor, and they've been that way for a long time. Glass Lewis is not, and their position is they don't have to register as an investment advisor. So even something as fundamental as just whether you're an investment advisor is something that even the big two proxy advisory firms can't agree on. And there's only so much that can be done at the State level. So just requiring basic disclosure like this, that's something that the states can do. But the states probably could not, because of federal law, say, okay, proxy advisors, you have to make a certain kind of recommendation. But the states can -- because the states can prevent against fraud and deceit and protect consumers, the states can say, hey, when you're providing these services to clients, you need to make these disclosures just factual, objective

Page 66

disclosures about what you're basing that on.

SENATOR CARRASCO:  Thank you. Again, I just come back to, to me, this -- I don't know why this discussion has gone so long. We should completely be in favor of this.

SENATOR BALDWIN:  Any further questions?

SENATOR QADDOURA:  I have two.

SENATOR BALDWIN:  Senator Qaddoura?

SENATOR QADDOURA:  Thank you. Is there anything in federal or state law currently that it prohibits a corporation at the time of negotiating a contract between a corporation and a proxy to include in the scope of work that we require you to submit financial statements or financial analyses?

MR. DU MEE:  No, there's nothing preventing that. And I hope that pension plans and financial institutions would start doing that once --

SENATOR QADDOURA:  Okay.

MR. DU MEE:  -- they realize, wait a second, these services that we're getting aren't based on that.

SENATOR QADDOURA:  And here's why I'm shocked. I work in finance. I never signed a contract in my life without understanding the scope of the contract and the cost of that contract. So I'm

Page 67

perplexed when you talk about multi-billion and trillion corporations, they don't look at the scope of their work to see what the deliverables are, including we expect you to deliver a financially written statement on your analysis. So that's the piece that is so difficult for me to understand. How can a company so reputable, so professional, so big, that is investing people's money, that is unable to read a contract to include in that contract the deliverables including a financially written statement on -- of the analysis?

MR. DU MEE:  Well, I think it comes back to a couple things. I think one is the advertising. ISS and Glass Lewis have said we're making decisions based on financial analysis. So, you know, that's what the Deceptive Consumer Sales Act is designed to do is get at situations where the advertising isn't true. And I think the second one is assumptions. Big companies make assumptions. Big companies make mistakes. And when you're using a big player that everybody else is using and everybody else is relying on, then you have that comfort of, you know, I'm in -- I'm using the right player. I'm not doing something --

SENATOR QADDOURA:  Correct.

MR. DU MEE:  -- different than the rest of

Page 68

the market. And so there's, I think, a bit of a herd mentality that developed related to these proxy advisors where people didn't realize they're not getting what they paid for.

SENATOR QADDOURA:  I'll conclude with my second and final question. I think some of the unintended consequences of this could be benefiting some proxy advisors at the expense of other proxy advisors. And this bill would ask the General Assembly probably to help maybe those who currently provide certain line of services or products that are different from others. Going after the two big, I -- you know, I don't really have an interest in that fight between all of that industry. But from a legislator's perspective, my concern, again, is that the part -- you know, to Senator Carrasco's point, I'm always supportive of disclosures. I'm always supportive of financial transparency. But I don't recall ever, maybe in my last four years being here in the General Assembly, coming back, regulating contracts specifically to have specific disclosure between two private entities. You either fire that proxy, or you hire them. And earlier you said under oath one of them said we don't do financial statements, but you're saying that they advertise that

Page 69

they do. So how can that contradict? I mean, that's --
wouldn't a judge look at that and say you're lying and
your advertisement is doing XYZ, but under oath you
said that you don't provide financial statements?

MR. DU MEE:  So --

SENATOR QADDOURA:  There's something missing
that I'm not -- I'm not connecting with.

MR. DU MEE:  Well, let me -- let me just get
back to your --

SENATOR QADDOURA:  Sure.

MR. DU MEE:  -- point that you said at the
beginning about --

SENATOR QADDOURA:  The scope of work.

MR. DU MEE:  -- we're benefiting some proxy -
-

SENATOR QADDOURA:  Oh.

MR. DU MEE:  -- advisors, and we're -- and
we're hurting other ones. To the extent that's
happening, that's only happening because of additional
information. So let's take this to a more traditional
consumer protection context. That's my background. You
know, let's say it was a bill saying that auto dealers
need to disclose all of the, you know, tax, title, and
license --

SENATOR QADDOURA:  Sure.

Page 70

MR. DU MEE:  -- fees, all the insurance fees, or whatever they're going to charge on the back end. You know, if you require that, and that hasn't been required in the past, some dealers are going to be helped who have actually been abiding by that practice, some dealers are going to be hurt who have been cutting all that information out of their advertising. But the bill isn't picking sides. It's just giving consumers accurate information so that they can accurately see what's going on. And so that's what this is designed to do too. It's just transparency. Sunshine is the best disinfectant.

SENATOR BALDWIN:  We're going to move on.

SENATOR QADDOURA:  Thank you.

SENATOR BALDWIN:  We're going to move on to the next one.

SENATOR QADDOURA:  Thank you, Mr. Chair.

SENATOR BALDWIN:  We -- you guys made a good point, and I think we're -- at this point we're beating the horse to death. So I get it.

Any other questions for the -- okay. Thank you very much, Matthew.

MR. DU MEE:  Thank you, Mr. Chair.

SENATOR BALDWIN:  Campbell Ricci from Aim. Kyle, you told me you'd have this thing done by the

Page 71

time I was back.

REPRESENTATIVE K. PIERCE:  Sorry, Mr. Chair.

MR. RICCI:  Thank you, Mr. Chairman, members of the Committee.

SENATOR BALDWIN:  Quick.

MR. RICCI:  Campbell Ricci with Aim representing Cities and Towns. Just want to come here and support the language Representative Andrade added, allowing municipalities to be in the Deceptive Acts statute for when not dealing with proxy advisors at all, just like purchases of road salt, and pool chemicals, and that sort of thing. So appreciate your support. That's all.

SENATOR BALDWIN:  Any questions for Campbell? Seeing none. Thank you for your testimony.

MR. RICCI:  Thank you.

SENATOR BALDWIN:  Mike Andrade. State Representative Mike Andrade, the floor is yours. Thanks for being here.

REPRESENTATIVE ANDRADE:  Thank you, Mr. Chair. My language is very simple and easy. And I appreciate the nice dialog on the proxy. In addition to the proxy language, there's language in here that expands the definition of consumer transaction when it comes to the goods and services for state and local

Page 72

government agencies. Last session we worked with LSA closely and Mason (ph) with law enforcement. We were having issues with their police vehicles and not being able to get anywhere when it comes to the Dodge -- specifically the Dodge vehicles on a state and local level. Up in Lake County we had an issue with the Town of Merrillville. So the police chiefs reached out to me, and we were able to work and amend language when we found out they were not included in statute when it comes to the Consumer Protection Division. So we were able to add them to the language. During that process last session we found out that our political subdivisions, state and local government agencies who deal with vendors and suppliers at the time, were not in statute as well. So we added them in House Committee. We added the language to add them in there. This provides clear authority when it comes to actions when state and local agencies are treated unfairly or by deceptive by the vendors. This is a common sense step forward. This was a bipartisan effort. It was -- it was taken by consent and passed on the floor. So I urge your support. I know there's some questions of the proxy language, but this is a good bill when it comes to this provision that is on the bill, and I hope you support it. Thank you, Mr. Chair

Page 73

SENATOR BALDWIN:  Any questions for Representative Andrade? Senator Randolph, sir.

SENATOR RANDOLPH:  Thank you, Mr. Chair. One quick question. In terms of amendment, I mean, part of the bill, why exclude non-profits?

REPRESENTATIVE ANDRADE:  Why exclude what?

SENATOR RANDOLPH:  Non-profits, charitable.

SENATOR QADDOURA:  That was not his amendment.  That was the --

REPRESENTATIVE ANDRADE:  That has nothing to do with my language --

SENATOR QADDOURA:  He's talking about the other one.

REPRESENTATIVE ANDRADE:  -- Senator.

SENATOR QADDOURA:  I believe the amendment's on the Deceptive Action bill.

SENATOR RANDOLPH:  My correction. Okay. We got the wrong amendment.

REPRESENTATIVE ANDRADE:  Yes. Yeah, that's -- this is language that I was talking about that we did in the House Committee when it came to adding my language on this bill. And it has nothing to do with not-for-profits.

UNIDENTIFIED SPEAKER 3:  It's unfair.

SENATOR BALDWIN:  We all good, Senator

Page 74

Randolph, or you got more?

SENATOR RANDOLPH:  No. We're back on track now.

SENATOR BALDWIN:  Okay, sir.

SENATOR RANDOLPH:  Apparently there's amendment in the House concerning non-profit, that part.

SENATOR BALDWIN:  I wasn't following at first. Now I get it though. So, it just come -- it came to us, and we didn't know you had a separate portion of it, so --

REPRESENTATIVE ANDRADE:  Okay. But I had -- my language had nothing to do with not-for-profits, so I --

SENATOR QADDOURA:  (Inaudible) --

SENATOR RANDOLPH:  Was it on this bill though, or we're you talking about this bill?

SENATOR QADDOURA:  Yeah, on this bill.

SENATOR BALDWIN:  A lot of bills here today.

SENATOR QADDOURA:  Yes, on this one.

SENATOR BALDWIN:  We all good?

SENATOR RANDOLPH:  Strike it.

SENATOR BALDWIN:  Stricken from the record.

REPRESENTATIVE ANDRADE:  Thank you. Anyone else?

Page 75

SENATOR BALDWIN:  Thanks for your testimony today --

REPRESENTATIVE ANDRADE:  Thank you, sir.

SENATOR BALDWIN:  -- Representative Andrade. Two seconds? Mr. Dax Denton from the Indiana Bankers Association to speak on why they have been excluded from the bill.

MR. DENTON:  Thank you, Mr. Chairman and members of the Committee. I'll be extremely brief, just appreciate the consideration and adoption of the amendment that clarifies that financial institutions who have a fiduciary duty in the form of performing wealth management and investment advisory services are excluded. It doesn't exclude financial institutions entirely. It just says the performance of those roles related to performance of their fiduciary duty, that they don't get backed into an additional compliance piece that is essentially redundant, if not a different standard as to related to what they have to comply with with fiduciary duty. So appreciate that adoption of that amendment, and happy to take any questions.

SENATOR BALDWIN:  Thanks for your testimony, Dax. So that concludes our testimony. And we lost Representative Pierce. Are you in the hallway? Maybe

Page 76

take a pause.

SENATOR GASKILL:  (Inaudible).

SENATOR BALDWIN:  Okay. We're going to --
we're going to hold this bill and hear Representative
Pressel's bill. We will vote this bill after we hear
Representative Pressel's bill.

Page 77

(Excerpt 2:03:51 - 2:04:35)

SENATOR BALDWIN:  We're going to go back to Representative Pierce's Requirements for Proxy Advisors 1273. Will of the Committee?

SENATOR WALKER:  Move the bill --

SENATOR BALDWIN:  Okay.

SENATOR WALKER:  -- as amended.

SENATOR BALDWIN:  As amended. And go ahead and call the roll, please.

THE CLERK:  Senator Randolph.

SENATOR RANDOLPH:  (No audible response.)

THE CLERK:  Senator Qaddoura.

SENATOR QADDOURA:  No.

THE CLERK:  Senator Walker.

SENATOR WALKER:  Yes.

THE CLERK:  Senator Gaskill.

SENATOR GASKILL:  Yes.

THE CLERK:  Senator Schmitt.

SENATOR SCHMITT:  Aye.

THE CLERK:  Senator Freeman. Excused.

SENATOR BALDWIN:  Excused.

THE CLERK:  Senator Carrasco.

SENATOR CARRASCO:  Aye.

THE CLERK:  Senator Alting.

SENATOR BALDWIN:  Excused.

Page 78

THE CLERK:  Chairman Baldwin.

SENATOR BALDWIN:  Chair votes aye.

THE CLERK:  Five to two.

SENATOR BALDWIN:  Bill moves to floor five to two. Representative Pierce, thanks for being here today. I think that's it for you today. Right?

Veritext Legal Solutions
215-241-1000 ~ 610-434-8588 ~ 302-571-0510 ~ 202-803-8830

Page 79

CERTIFICATE OF TRANSCRIBER

I, RITA PELUSO, do hereby certify that this transcript was prepared from the digital audio recording of the foregoing proceeding, that said transcript is a true and accurate record of the proceedings to the best of my knowledge, skills, and ability; that I am neither counsel for, related to, nor employed by any of the parties to the action in which this was taken; and, further, that I am not a relative or employee of any counsel or attorney employed by the parties hereto, nor financially or otherwise interested in the outcome of this action.

*Rita Peluso*

RITA PELUSO

**[1 - advising]** Page 1

| 1 |
|---|
| **1**  3:7 25:23 33:20 34:3 |
| **10**  45:16 |
| **1063**  5:2 |
| **11**  1:6 |
| **12**  2:14 |
| **1273**  1:11 3:3 3:14 4:23 45:24 77:4 |
| **13**  5:12 |
| **14**  5:12 |
| **18266**  79:14 |
| **1:36:50**  1:15 3:2 |

| 2 |
|---|
| **2**  2:7 3:12 37:21 |
| **20**  2:4 |
| **2014**  7:9 |
| **2026**  1:2,6,13 |
| **25**  2:9 |
| **28-3**  4:8 |
| **2:03:51**  1:15 77:1 |
| **2:04:35**  1:15 77:1 |

| 3 |
|---|
| **3**  3:18 73:24 |
| **30**  2:8 7:4 43:10 45:16 58:23 59:3 |

**33:55**  1:15 3:2
**36**  2:6,13
**375**  45:24

| 4 |
|---|
| **4**  4:5 |
| **4-4**  4:7 |
| **40**  58:23 |
| **4000**  1:14 |
| **401**  6:12 |
| **41**  2:5 |
| **48**  2:10 |

| 5 |
|---|
| **500,000**  42:12 |

| 9 |
|---|
| **90**  44:21 |

| a |
|---|
| **abide**  36:17 |
| **abiding**  70:5 |
| **ability**  79:7 |
| **able**  9:21 16:20 46:12 52:9 57:25 72:4,8 72:11 |
| **absolutely**  64:4 |
| **acceptance**  18:20 |
| **accepting**  42:10 |
| **access**  49:10 |
| **account**  5:10 6:5 |

**accountability**  6:11
**accurate**  70:9 79:5
**accurately**  70:10
**act**  8:20 46:16 67:16
**action**  73:16 79:8,12
**actions**  72:17
**acts**  5:5,9,11,14 11:15 71:9
**actual**  12:9 29:18 33:14
**actually**  5:4,16 5:19 6:14,15 6:18 7:6,13 11:8 13:14 17:2 26:5 27:22 31:4 42:8 45:8 49:1 49:5 50:23 55:18 58:9,12 60:25 70:5
**acute**  45:19
**add**  35:24 72:11,16
**added**  4:25 71:8 72:15,16
**adding**  26:14 73:21
**addition**  71:22

**additional**  26:14 49:14 69:19 75:17
**adds**  5:19
**adhere**  36:17
**adhered**  36:19
**administration**  7:9,13 16:23
**administrations**  7:8
**administrative**  29:8
**admitted**  44:23 52:1 60:24
**adoption**  75:10 75:21
**advertise**  68:25
**advertisement**  69:3
**advertising**  45:5,7 67:13 67:17 70:8
**advice**  11:11 44:11 45:11 47:24 55:11,18 56:25
**advise**  8:10 29:25 30:22
**advised**  59:23
**adviser**  38:9
**advises**  29:23 29:25
**advising**  7:11 9:8 15:18

**[advising - apparently]** Page 2

29:20 60:5
**advisor** 6:8
7:20 8:25 11:5
11:5,16 12:3
21:25 22:1,10
23:6 25:24,25
26:19 27:16
29:11,16 31:9
31:13 32:2,5
33:4 35:12,17
36:10 38:25
41:2,12 45:2
46:1,2,3,7,9
47:16,19 48:21
49:4,20 50:1,6
50:11 51:18
52:14 54:15
55:20 58:9,10
60:5 63:14
64:6,9 65:9,12
65:14
**advisor's** 27:2
28:3 45:1
46:13 47:20
51:15
**advisors** 4:24
5:3 6:9 7:2,11
7:16 9:4,16
11:9 15:18
17:1 18:6
30:25 44:7,8
44:18,21,23
45:5,7,10,13,15
45:17,20 47:1

48:22,24 50:20
51:3,4 53:12
53:18,21,22
54:15 55:10
56:7,23 57:3
58:18 59:23
60:3,23 62:3,6
62:8,18 64:19
65:5,20 68:3,8
68:9 69:17
71:10 77:4
**advisory** 65:15
75:13
**affect** 14:21
**affidavit** 53:24
**affordable**
44:12
**ag's** 5:10,15
**agencies** 5:16
5:19 6:4 72:1
72:13,18
**agency** 5:23
**agenda** 10:6
15:19 20:13
**ago** 40:1 43:10
58:23,23 59:3
**agree** 19:15,23
21:14,15 23:9
23:15 26:3,4
26:12 31:24
33:23 36:25
52:5 65:15
**agreeing** 22:10

**agreement**
26:15
**agrees** 21:25
**ahead** 20:16,20
28:13 46:21
77:8
**ai** 51:5
**aim** 70:24 71:6
**allowing** 71:9
**alting** 77:24
**amend** 72:8
**amended** 3:6
4:5,20 77:7,8
**amendment**
3:14,18,23,25
4:5,13,15 5:1
42:10 73:4,9
73:18 74:6
75:11,21
**amendment's**
73:15
**amendments**
3:14,15
**amount** 26:17
34:2
**analyses** 44:24
45:3,12,17,23
48:12 54:13
57:4 66:14
**analysis** 20:23
21:11,19 24:14
26:14 30:2
46:3,6,7,9,10
47:2 48:4,6,10

48:19 49:1,6,7
49:9 50:13,23
51:14,19,23,23
52:3,16,25
53:6,22,25
54:17 56:1
58:7 60:20,25
61:22 62:21,24
65:2 67:5,11
67:15
**analyze** 44:10
48:7
**andrade** 2:14
5:17 6:5 71:8
71:17,18,20
73:2,6,10,14,19
74:12,24 75:3
75:4
**andrade's** 5:1,6
**announced**
51:2
**answer** 13:2
25:21 46:19
**answering**
54:19
**answers** 49:18
**anybody's**
49:13
**anymore** 51:4
56:23,24 59:16
**anyway** 63:15
**apparently**
74:5

**[appearing - bigger]**                                        Page 3

**appearing** 2:12
**appreciate** 31:8
  34:22 36:3
  41:21,24 42:16
  46:18,24 49:17
  52:19,20 54:18
  71:12,22 75:10
  75:20
**approach**
  53:16 54:3
**approaches**
  53:16
**areas** 65:7
**array** 7:5,12
  16:4,25 27:5
**asked** 7:3 8:6,7
  30:9 38:20
**asking** 4:12
  7:21 8:14 21:2
  22:19 25:12
  33:13 54:4,9
  57:20
**assembly** 1:1
  35:5 39:24
  68:9,20
**assess** 44:24
**assessment** 8:2
  25:11,16
**association**
  75:6
**assume** 23:13
  23:20
**assuming** 40:21
  41:18 59:21

**assumption**
  22:24 23:17
**assumptions**
  67:18,19
**attempt** 45:6
**attorney** 43:8
  62:10 79:10
**audible** 77:11
**audio** 79:3
**authority** 72:17
**auto** 69:22
**automatic** 8:7
**available** 46:10
  52:13
**aware** 33:6
**aye** 77:19,23
  78:2

**b**

**back** 7:9 27:17
  46:25 50:22
  51:12 57:21
  62:15 66:3
  67:12 68:20
  69:9 70:2 71:1
  74:2 77:2
**backed** 75:17
**background**
  69:21
**baldwin** 2:4 3:3
  3:5,10,13,17,25
  4:4,15,19 8:21
  9:2,6,11,24
  10:2,5,8,11,17

10:24 11:18,20
11:22 12:2,6,9
12:12,16,20,25
13:11 14:2,5,8
14:10,14,16,20
14:23 15:2,8
15:11 16:10
17:18,23 19:18
21:1,4 32:24
42:22 46:21
54:22 60:9,12
63:19 66:6,8
70:13,15,18,24
71:5,14,17
73:1,25 74:4,8
74:19,21,23
75:1,4,23 76:3
77:2,6,8,21,25
78:1,2,4
**bankers** 4:9
  75:5
**based** 7:24 8:8
  9:23 15:7
  16:18 21:7
  23:24 45:12
  46:2,5,8 49:5,9
  50:23 51:8,20
  52:25 53:1,3,8
  53:19 55:11,18
  55:25 57:3
  58:7 61:19,22
  64:13 66:20
  67:14

**basic** 65:17
**basically** 3:18
  5:8 8:22 28:10
**basing** 66:1
**basis** 20:22
  21:16 23:14
  28:11,17 60:24
**beating** 70:20
**beginning**
  69:12
**behalf** 29:2,19
  57:25
**belief** 22:20
**believe** 31:7
  73:15
**believed** 40:17
**benefit** 43:18
**benefiting** 62:6
  68:7 69:14
**best** 9:7 11:11
  11:12 17:3
  22:21,22,25
  24:7,7,12
  34:17,20 60:8
  70:12 79:6
**better** 9:21
  46:12 47:11
  51:7 63:2,2
**big** 24:22 25:1
  45:15 54:11
  65:14 67:7,18
  67:19,20 68:12
**bigger** 59:19,19
  59:19

**[bill - clear]**                                                              Page 4

**bill** 1:11 3:3,20
4:5,20,21,23,23
5:2,4 6:7,8,10
7:15 10:21
15:19 17:5
19:22 20:3
21:1,24 28:4
34:7 39:16
42:2 45:24,24
46:15,16 49:1
52:13 53:12,23
54:3,12,15
55:19 63:25
68:9 69:22
70:8 72:23,24
73:5,16,22
74:17,17,18
75:7 76:4,5,5,6
77:5 78:4
**billion** 67:1
**bills** 4:25 53:13
64:23 74:19
**bind** 43:20
**bipartisan**
36:24 37:1
72:20
**bit** 9:3 13:3,14
22:23 23:6
42:14 53:9
60:13 68:1
**blanket** 8:4,4
15:6 16:6 24:4
24:5,9

**board** 6:19
14:17 20:13,13
22:7 26:3 28:8
41:2
**boilerplate**
36:13
**bother** 59:6
**break** 11:24
**brief** 33:1 75:9
**bringing** 10:21
**brings** 35:7
**broad** 24:1
**broader** 6:8
**broadly** 5:4
**brought** 41:3
**burden** 22:11
22:14
**business** 22:2
35:6 50:3
**businesses** 41:8

**c**

**c** 2:1 3:1
**call** 77:9
**called** 4:24 16:5
**campbell** 2:16
70:24 71:6,15
**care** 6:23 16:24
16:24 43:17
48:16
**carrasco** 2:6
4:2 10:13,14
10:20 11:23
15:11,13,21

16:1 17:4,9,12
17:15 63:20,21
64:3,5,11,14,16
66:2 77:22,23
**carrasco's**
68:16
**case** 11:24 21:7
23:21 32:17
33:3,14 55:14
**cases** 33:6
**cast** 58:14,15
**catching** 65:8
**caught** 56:6
**cause** 59:2
**ceo** 20:1
**certain** 5:14
23:10 65:20
68:11
**certificate** 79:1
**certify** 79:2
**chair** 32:23
42:21 43:3
54:20 70:17,23
71:2,21 72:25
73:3 78:2
**chairman** 4:23
10:24 42:9
63:21 71:3
75:8 78:1
**chairman's**
36:8
**chances** 26:21
**change** 60:15

**changing** 49:13
64:8
**chaos** 49:23
50:4,5
**chapters** 36:23
**charge** 70:2
**charitable** 3:19
3:22 42:10
73:7
**chase** 6:17 8:10
11:8 13:20
34:9 35:13,17
37:15 51:2
56:18,19,21
**cheaply** 44:19
**checked** 35:2
**chemicals**
71:12
**chiefs** 72:7
**choose** 34:10
**chooses** 29:12
**churches** 3:19
**circle** 60:13
**circumstances**
26:7
**cities** 71:7
**clarification**
41:25
**clarifies** 75:11
**clarify** 9:3
**clear** 46:23
51:13 52:19
53:13 59:2
72:17

**[clerk - contracts]**

**clerk** 2:18 3:4,9
3:16 77:10,12
77:14,16,18,20
77:22,24 78:1
78:3
**clients** 45:8
46:10 62:23
65:24
**close** 42:24
**closely** 72:2
**combative** 42:2
**come** 18:11
49:21 66:3
71:7 74:9
**comes** 30:2
57:19,21 67:12
71:25 72:4,10
72:17,24
**comfort** 67:22
**comfortable**
32:18
**coming** 65:1
68:20
**committee** 1:4
1:13 5:1 10:12
40:1 46:19,20
71:4 72:16
73:21 75:9
77:4
**common** 46:17
72:19
**companies** 6:14
9:20 14:1
16:25 25:3

34:4 40:18,19
43:24 44:2,12
45:9 46:11
50:21,24 51:5
52:13 54:16
55:10,13,16
57:24 58:11
59:14 61:2,11
62:5 67:18,19
**company** 6:23
6:24 7:12,17
8:1,7,14,19
11:15,16 13:9
15:10 16:7
22:3,4,19,21,25
23:7 24:8
44:15,16 45:20
46:1 47:5
48:15,15,18
49:3 51:10
52:17 62:14
63:13,13,15
67:7
**complaints**
57:14
**completely**
66:4
**compliance**
75:17
**comply** 75:20
**component** 5:6
6:7
**concept** 8:6
11:2

**concern** 45:19
48:3 68:15
**concerned**
31:14
**concerning**
18:5 56:4 74:6
**concerns** 7:7,10
16:24
**concise** 52:19
**conclude** 68:5
**concludes**
75:24
**conduct** 44:24
52:2,16
**conducting**
45:17,22
**conflict** 32:6
45:7 49:25
**conflicting**
49:22
**confused** 63:24
65:4
**confusion**
28:24
**congress** 23:17
**connecting**
69:7
**connection**
15:16
**connects** 15:18
**consent** 4:1,2,3
4:16,17,17,18
72:21

**consequences**
68:7
**consideration**
18:21 75:10
**considered**
46:15 48:10
61:6
**consistently**
24:24
**constantly**
49:21,25 50:5
**consumer** 5:24
36:20 43:9
46:16,17 67:16
69:21 71:24
72:10
**consumers**
65:23 70:9
**context** 53:5,10
53:11,23 54:2
69:21
**continue** 17:6
**contract** 8:13
11:9 13:5
18:15,16,17
27:10 29:5
33:17 35:17
36:11 37:9
38:6,18 53:2
66:12,23,25,25
67:9,9
**contracts** 35:8
42:4 68:21

**contractual** 11:7,13 12:14 12:17 18:10,13 24:16 28:11 35:19 36:13,14 50:7,10 55:14
**contradict** 69:1
**controlled** 44:21
**controlling** 44:20
**conversation** 15:23 17:7 63:16,23
**convey** 48:7
**corporate** 33:5 36:16 48:8 49:24 50:2,4,6 51:17
**corporation** 36:10 47:9,15 49:19,24 50:3 50:10,13 62:12 62:12 66:11,12
**corporations** 47:3,4 48:9 62:4 67:2
**correct** 10:7,10 14:22 18:8 19:6,7 20:7 34:12,15 35:20 35:22 37:17,19 38:1,4 39:2,5,8 39:12 41:11

47:6,12,16,22 47:25 48:20 49:15 52:4,8,8 55:2,3 58:17 64:2,7,11 67:24
**correction** 73:17
**cost** 44:12 47:11 66:25
**costing** 62:7
**costs** 35:7
**counsel** 79:7,10
**country** 34:4 41:10
**county** 72:6
**couple** 12:23 18:1 33:2 34:3 40:1 46:25 54:24 63:22 67:13
**cover** 44:18
**coverage** 6:24
**create** 49:22
**created** 44:17
**creating** 65:4
**critical** 65:2
**crosstalk** 3:9 20:14 25:17 40:12 58:13
**crux** 33:16
**cumbersome** 51:16

**curious** 32:22
**currently** 33:3 35:16 51:17,22 51:23 66:10 68:10
**cutting** 51:3 70:7
**cyndi** 2:6

**d**

**d** 2:7,8,14 3:1
**d.c.** 9:15
**damages** 56:4
**daryl** 2:10
**data** 53:3,8
**dax** 2:17 75:5 75:24
**day** 37:21 41:9 60:13
**deal** 24:9 72:14
**dealers** 69:22 70:4,6
**dealing** 50:5 71:10
**deals** 24:10
**death** 70:20
**debts** 18:21
**deceit** 65:22
**december** 7:14
**deceptive** 5:5,9 5:11 8:20 11:14 46:16 67:16 71:9 72:19 73:16

**decision** 9:9 20:22 40:2 47:4,9 50:2
**decisions** 15:6 16:25 27:21 40:19 52:10 60:24 62:1 67:14
**defer** 13:16
**defined** 4:7 53:17
**defining** 4:6
**definitely** 17:15 61:12,13
**definition** 36:1 43:23 71:24
**deliver** 67:4
**deliverables** 67:3,10
**democrat** 7:8
**demoted** 10:14 10:16,17
**denton** 2:17 75:5,8
**department** 13:15,17 43:10 58:1 59:3,7
**departments** 5:7,18
**depending** 45:9
**deposits** 4:8
**depth** 12:24 13:3 51:22

**[deregulation - earlier]**                                    Page 7

| | | | |
|---|---|---|---|
| **deregulation** 35:6 | **directors** 45:21 49:24 50:6 | **district** 2:4,5,6 2:7,8,9,10,13 2:14 | 58:10,14,17,21 59:1,18,25 60:4,8,17,21 |
| **describe** 35:25 | **disagree** 25:10 25:13,24 26:13 30:4 37:4,5 | **diversified** 43:22 | 61:2,7,11,15,19 61:21,25 62:16 |
| **designed** 67:16 70:11 | **disagreeing** 26:11 | **division** 72:10 | 62:20,23 63:1 63:4,7,10,17 |
| **desires** 15:7 | **disagreement** 30:7 | **dnr** 37:22 | 64:2,4,7,12,15 |
| **detailed** 24:4 | **disclose** 46:4 69:23 | **dodge** 72:4,5 | 65:5 66:15,19 67:12,25 69:5 |
| **details** 61:3 | **disclosure** 45:25 54:5,25 55:4,7 63:5 64:9,12 65:17 68:21 | **doing** 11:16 22:21 23:23 30:17 43:9 46:2,9 47:5 48:15,18,24,25 49:1 50:12 54:13,17 60:25 62:24 64:25 66:17 67:23 69:3 | 69:8,11,14,17 70:1,23 |
| **developed** 64:18 68:2 | | | **due** 50:12 |
| **devote** 51:6 | | | **duties** 44:13 45:10,13,22 46:14 57:22 58:5 |
| **devoted** 44:15 | | | |
| **dialog** 32:24 42:22 71:22 | | | |
| **difference** 24:23 25:1 58:4 | **disclosures** 65:25 66:1 68:17 | **dol** 43:25 | **duty** 6:11,18 10:24 11:4,4,7 11:13 13:23 14:9 18:10,12 18:13,17 22:7 24:16 34:9 58:2 59:8,12 65:3 75:12,16 75:20 |
| **different** 5:13 6:14,19 7:5,12 13:7 27:1 42:4 43:23 44:5 48:12,18 53:14 53:14 54:3 57:24 64:24 65:7 67:25 68:12 75:19 | **discuss** 5:2 46:18 | **dominated** 35:5 | |
| | **discussed** 9:15 41:4 | **driven** 33:13 | |
| | **discussing** 9:14 | **du** 2:15 42:24 43:3,5 47:7,13 47:17,23 48:1 48:14,21 49:16 50:16,19 51:25 52:5,9,12 53:11,16 54:11 54:21 55:3,8 55:23,25 56:8 56:11,14,19,22 56:25 57:2,6 57:11,18,21 | |
| | **discussion** 1:10 20:11 35:24 36:6 66:4 | | |
| **differently** 52:15 | **discussions** 9:14 | | **e** |
| **difficult** 44:6 67:6 | **disinfectant** 70:12 | | **e** 2:1,1 3:1 |
| **digital** 79:3 | | | **earlier** 37:23 38:5,16 39:13 47:2 51:15 68:23 |
| **diligence** 50:12 | **distinction** 48:11 | | |
| **direction** 17:13 23:10 | | | |

[easier - fees]

easier  22:23
  23:2
easy  71:21
economic  8:8
economics  42:3
  51:10
economies
  44:17
economy  41:7
educate  25:19
effect  43:13
  44:25
effective  47:12
effort  72:20
eight  43:8
either  13:24
  22:13 41:18
  45:3 54:1
  68:22
eli  57:23
emerging  41:6
employed  79:8
  79:11
employee  32:5
  37:22 79:10
employees  6:24
  37:11 51:7
  57:25
employers
  40:20
ended  44:19
ends  23:3
energy  16:7

enforcement
  72:2
engaging  42:17
ensure  34:8,18
  64:21
ensuring  25:2
enter  44:7
entire  7:1,2
  9:17 35:25
  36:22,23 41:22
  44:14
entirely  75:15
entities  33:18
  35:9 37:9,11
  42:4 55:5
  68:22
entity  47:10
  63:25
environmental
  16:6,22 39:14
esg  39:16 40:2
  40:10 41:19,20
especially
  29:14 43:21
  45:19
essentially
  75:18
estimate  45:14
evaluate  46:12
  51:15 53:2
everybody  43:4
  67:20,21
exactly  3:21
  15:13 18:6

48:14
example  5:24
  7:21 8:5 12:3
  13:4,6 16:13
  16:14,22 33:8
  33:11 37:1
  38:19,21,24,25
  39:11 40:12,23
  41:1,19 58:8
  65:8
examples  40:6
except  49:13
excerpt  1:15
  3:2 77:1
exclude  73:5,6
  75:14
excluded  75:6
  75:14
excused  77:20
  77:21,25
exempts  3:18
exist  38:6 39:10
  51:24
expands  71:24
expansion
  27:21
expect  12:17
  67:4
expense  68:8
expert  14:1
experts  13:25
explained  47:2
  47:19

explaining
  30:15
extend  16:16
  16:19
extent  69:18
extract  51:19
extremely  75:9

f

face  41:7
fact  19:5,17
  23:23 25:9
  26:19 28:19
  46:4
factors  53:17
  53:19,20
facts  45:25
factual  65:25
fady  2:8
fair  24:3
fairness  28:12
far  17:5 42:11
  45:2 54:1
favor  66:5
fdic  4:8
february  1:6
federal  13:19
  50:9,14 65:19
  66:10
federally  65:9
feel  32:18 50:11
feels  17:23
fees  70:1,1

[fiduciaries - given]                                                          Page 9

**fiduciaries**
43:11,16 60:22
61:6,8,12,13
**fiduciary** 6:11
6:18 8:22
10:24 11:4,4
13:23 18:5,7,7
18:12,16 19:2
44:13 45:10,12
45:22 46:14
47:10 57:22
58:2,3,5 59:5,8
61:10,25 65:3
75:12,16,20
**field** 7:5
**fight** 68:14
**figuring** 44:4
44:15
**fill** 29:10
**final** 68:6
**finance** 66:23
**financial** 1:3
4:6,7 7:24 9:19
9:22 10:3
11:11,12 16:17
17:3 18:5 20:4
20:23 21:11,18
24:14 26:8,19
30:1,13 34:18
34:20 44:6,24
45:3,12,17,23
46:3,6,7,8 47:2
47:9 48:4,6,10
48:12,19,23

49:1,6,6,9
50:12,23 51:14
51:19 52:2,16
52:22,25 53:3
53:6,20,22,25
54:8,8,13,17
55:18 56:1
57:4 58:7 60:8
60:20,24,25
61:19,22 62:3
62:5,8,21,24
66:14,14,16
67:15 68:18,24
69:4 75:11,14
**financially** 9:11
55:11 67:4,10
79:11
**find** 19:18 40:9
**fine** 8:11 32:1
61:16 63:15
**fire** 36:12 51:11
68:22
**firms** 65:15
**first** 3:10,13,18
5:3,5 41:4 45:5
47:8 74:9
**five** 78:3,4
**fix** 4:12
**flagged** 7:7,10
7:14
**floor** 43:1
71:18 72:21
78:4

**focused** 55:19
**folks** 12:23
42:15,23
**following** 46:12
74:8
**foot** 34:21
**forcing** 8:22
**foregoing** 79:4
**form** 29:11
75:12
**format** 63:12
**forward** 10:22
55:19 72:20
**found** 45:15
72:9,12
**four** 6:22 27:22
42:23 68:19
**fraud** 65:22
**free** 42:3 51:10
52:5,6,10
**freeman** 77:20
**frequently** 35:6
**front** 5:13
23:17 32:8
**fulfill** 65:3
**fully** 4:20 13:2
34:22
**function** 47:10
51:12
**fund** 6:13 9:7
14:8 29:9
**fundamental**
28:10 65:13

**funds** 13:7
43:22 56:6
**further** 66:6
79:9
**fusion** 42:25
43:5,7
**future** 55:20

**g**

**g** 3:1
**gaskill** 2:9 76:2
77:16,17
**general** 1:1
35:5 39:24
68:9,20
**general's** 43:8
**generate** 52:24
53:25
**getting** 7:23 9:4
14:24 33:17
34:20 49:3
50:22 51:7
52:21 56:12
57:6,7,13 61:4
61:17,22 66:20
68:4
**give** 8:13,18
11:10 12:3
29:6 38:24
39:12 47:23
53:9 62:11
65:8
**given** 20:12

**[giving - homework]**

**giving** 25:3,4 38:19 39:11 55:20 70:9

**gladly** 10:18

**glass** 23:18 38:19 44:22 51:25 52:1 53:24 59:18 65:10 67:14

**go** 5:10,15 8:14 11:15,17 13:3 13:14 14:11 15:9 17:5,18 20:23 27:11 28:20 29:7,11 32:8 42:11,12 46:21,25 62:10 77:2,8

**goes** 20:4 23:24

**going** 3:17,20 5:2,5 7:3 13:15 13:21 15:15 16:8,12,16 18:12 20:6,11 20:23 23:12,13 24:23 26:7,21 27:17 28:2,13 28:14,15 29:5 29:6,18,24,25 32:2,8 38:23 41:14 51:4 53:7 56:22 59:5,6 62:5,15 63:12 68:12

70:2,4,6,10,13 70:15 76:3,4 77:2

**good** 17:24 19:14 23:17 26:18 32:24 35:6 41:17 42:22 70:18 72:23 73:25 74:21

**goods** 71:25

**google** 13:21,25 14:3,11,18 22:3 26:4 27:17

**google's** 27:17 27:21,24

**gotten** 55:12

**governance** 36:16

**government** 5:16,19,22 33:16 35:7 72:1,13

**governor** 49:23

**grade** 6:1

**grand** 58:4

**great** 32:24 33:12 41:9,9 47:18

**greg** 2:5

**growing** 59:1

**guess** 28:9 63:24

**guidance** 13:19 43:11,25

**guys** 31:25 70:18

**h**

**hallway** 75:25

**happen** 62:17

**happened** 32:12,21 58:23 59:11

**happening** 38:21 49:3 51:21 52:17 60:2 69:19,19

**happy** 8:20 42:8 46:19 49:19 51:11 75:21

**harm** 43:18 45:18

**health** 6:23 16:24,24

**healthcare** 40:11,18,20

**hear** 3:20 18:3 21:21 28:25 32:15 76:4,5

**hearing** 1:4

**heartburn** 65:4

**heartily** 10:25

**heavy** 22:2

**help** 14:16 47:20 68:10

**helped** 70:5

**helpful** 54:19

**herd** 68:1

**hereto** 79:11

**hey** 7:2 8:5,14 9:22 11:10,17 16:8 17:2 19:9 19:25 20:13 22:24 26:2,12 27:22 29:5 31:9,13,17 33:23 41:3 50:21 62:23 65:23

**higher** 42:14

**highest** 22:8

**hire** 13:25 14:11,12 49:21 55:10 59:16 63:25 64:6,6,9 68:23

**hired** 9:24 10:8 14:24 47:3 48:21 59:21

**hires** 14:14 51:10

**historical** 59:22

**hold** 5:10 6:4 43:12 45:13 59:7 76:4

**holding** 57:24

**homework** 7:23 8:12,17,18 19:9,19 22:12

[homework - investing]                                                        Page 11

22:13,18 23:3 28:7 34:1

**hook** 13:8,12

**hoosier** 37:15

**hoosiers** 34:19

**hope** 66:16 72:25

**horse** 70:20

**hot** 61:11

**house** 1:11 3:3 4:23 5:2 45:24 72:15 73:21 74:6

**https** 1:13

**huh** 15:1 19:13 28:18 30:23 55:24

**hurt** 70:6

**hurting** 69:18

**hyper** 16:21 24:3

**hypothetical** 18:1,4

**i**

**icc** 4:7

**idea** 10:25 62:17

**idem** 37:22

**ideology** 35:25

**iga.in.gov** 1:13

**impact** 37:9

**impacted** 39:3

**impetus** 54:12

**implied** 18:7 19:2 22:20

**implies** 41:20

**important** 10:22 17:10 46:17 52:6 60:22

**impose** 39:16

**inaudible** 17:25 26:20 54:23 60:7 74:15 76:2

**incentivizes** 15:3

**include** 5:18 37:11 66:12 67:9

**included** 72:9

**including** 34:6 67:3,10

**inconsistent** 59:24

**incorrect** 8:2

**increase** 45:6 45:10 46:13 59:10

**increased** 59:14

**index** 43:22

**indiana** 1:1 13:8,8 26:16 33:3,14 35:4 38:6 39:10

40:9 41:9 42:6 75:5

**indiana's** 46:16

**indicated** 54:25

**individual** 13:14

**individuals** 5:10

**industry** 24:3 56:3 58:20,20 64:18,20,21 65:1 68:14

**influence** 17:10

**inform** 50:20 52:17 54:16

**information** 28:15 46:11 52:7,12 69:20 70:7,9

**informed** 52:10

**injured** 55:5

**injuries** 55:6,9

**inprs** 6:17 7:19 7:21 8:10 13:4 13:8,20 14:6,9 14:14 26:5 27:16,22 29:9 34:9 38:6,18 40:5

**inside** 65:6

**institution** 4:7 65:3

**institutional** 59:11

**institutions** 1:3 4:6 13:5 44:7 66:17 75:11,14

**insura** 1:13

**insurance** 1:3 62:10,11,14 63:13,13 70:1

**insure** 63:14

**interest** 9:7 17:3 22:21,22 24:7,8,12 48:24 68:13

**interested** 79:12

**interesting** 10:23 16:2 62:16 63:16

**interfering** 42:3

**internally** 49:7 51:1,5,17

**interrupt** 11:18 11:20

**interrupted** 15:12

**invest** 6:21 13:4,6 47:5 50:2

**invested** 6:25 24:8

**investing** 6:16 7:18 13:19 25:2 67:8

[investment - knowledge]                                    Page 12

**investment**
6:17 33:4 39:6
46:14 65:9,12
65:13 75:13
**investments**
6:15 22:9 34:4
34:5,7,21 38:2
40:4 43:17,18
45:11 57:17
59:10
**investor** 8:19
9:1 17:3 19:11
20:2 24:7,12
24:21 25:24
26:5,25 27:13
28:24 29:12
32:1 37:15
**investors** 6:11
8:15 22:7,22
22:25 28:7
38:19 43:20
46:11 59:11
**invite** 43:6
**involved** 13:22
**iss** 23:18 44:22
59:18 65:8
67:13
**issue** 4:10
14:18 16:23
19:8 20:6
24:10 31:14,14
36:24 37:2
41:3 50:8 54:5
72:6

**issued** 43:11
**issues** 9:16 17:1
24:9 37:8 44:2
44:5,15 48:18
72:3
**it'll** 60:14
**item** 22:20
**items** 5:23 7:4
7:5

**j**

**j.p.** 7:19 56:3
**jeopardizes**
30:18
**job** 6:20 7:2
47:6,11,12,23
48:6,25
**jpmorgan** 6:17
8:10 11:8
13:20 34:9
35:13,17 37:15
51:2 56:19,21
**judge** 69:2
**justice** 13:17
**justify** 57:25

**k**

**k** 4:22 6:12
8:24 9:5,10,12
10:1,4,7,10,15
10:18 11:6,19
11:21 12:1,5,8
12:11,15,19,22
13:1,13 14:4,7
14:9,13,15,19

14:22 15:1,5,9
15:20,25 16:3
16:11 17:8,11
17:14,17 18:3
18:9,19,22,25
19:3,7,14,21,25
20:8,12,17,19
20:24 21:3,6,9
21:13,17,20,24
22:6,17 23:8
23:11,16 24:1
24:15,18,20
25:1,10,13,16
25:20,23 26:2
26:10,22,24
27:4,8,12,15,20
28:1,6,16,18,23
29:4,17,21
30:3,8,11,14,16
30:20,24 31:4
31:7,12,16,22
32:7,10,14,17
32:21 33:7,10
33:19,25 34:13
34:16,24 35:3
35:11,14,18,21
35:23 36:4,7
36:18,22 37:7
37:10,14,18,20
37:24 38:2,8
38:10,13,17,23
39:3,6,9,17,20
39:23 40:3,7
40:11,14,17

41:1,6,12,16,22
42:18,20 71:2
**keep** 27:17
**kind** 22:23 23:1
23:1,5 28:15
55:6 61:15
64:18 65:20
**knew** 45:2
**know** 3:21 6:2
6:9,13,22,22,23
11:3,23 12:23
13:2 16:9,17
16:19 17:5
20:15 22:8
25:18 27:11,21
28:12,13 31:23
32:23 36:13,19
36:23 42:7,11
42:12 48:16
49:4 50:1,4
51:6,6 54:1,7
54:12 55:13,14
55:16 56:8
57:12,20,22,23
58:6 59:15
61:3,23 62:18
64:19 66:3
67:15,22 68:13
68:16 69:22,23
70:3 72:22
74:10
**knowing** 20:20
**knowledge**
79:6

**knows** 6:2
**kyle** 2:13 70:25

**l**

**labor** 43:11
  58:1 59:3,7
**lack** 54:25 55:4
  55:7
**lake** 72:6
**language** 36:13
  71:8,21,23,23
  72:8,11,16,23
  73:11,20,22
  74:13
**large** 25:3
  44:18
**law** 32:19
  35:10,16 36:11
  42:25 43:5,7
  50:9,14 60:19
  65:7,19 66:10
  72:2
**lawsuit** 25:8
**legal** 32:11
  43:14,15
**legislation**
  39:21,25 40:5
**legislative**
  29:14
**legislator's**
  68:15
**lemons** 5:8
**letting** 23:1

**level** 34:8 65:16
  72:6
**lewis** 23:18
  38:20 44:22
  51:25 52:1
  53:24 59:18
  65:10 67:14
**liability** 27:6,8
**liable** 19:5,17
  25:8
**license** 69:24
**lie** 26:7
**lies** 3:22
**life** 16:16 66:24
**light** 49:2
**lilly** 57:23
**limit** 34:2
**limited** 33:21
**line** 68:11
**list** 5:12,23
  29:7 33:7,10
**listen** 42:15
**litigation** 28:22
**little** 9:3 13:3
  22:23 23:6
  42:13 53:9
  60:13
**live** 50:4
**lobbied** 9:4
  14:24
**lobby** 9:9 36:15
**lobbyist** 19:5
**local** 71:25
  72:5,13,18

**long** 65:10 66:4
**longer** 11:8
**lonnie** 2:7
**look** 24:6 42:6
  59:5 67:2 69:2
**looked** 16:23
**looking** 9:6
  28:9,11 32:18
  37:8 48:13
  51:14,22 55:1
  55:19
**loss** 56:4
**losses** 57:10,15
  57:19
**lost** 23:5 75:24
**lot** 5:6,17 43:20
  63:23 65:6
  74:19
**love** 17:6
**lsa** 4:25 72:1
**lying** 69:2

**m**

**made** 16:25
  43:14,18 45:3
  47:4 70:18
**maintain** 62:4
  62:9
**major** 9:1,13
  9:16 38:18
**make** 6:21 15:6
  15:16 22:12
  24:23 25:7
  37:24 43:15

  46:10 49:7
  52:10,14 53:3
  58:4 60:15
  61:25 63:10
  65:20,25 67:19
  67:19
**makes** 44:25
  46:1 52:9
  58:10 62:13
**making** 5:7
  17:1 22:23
  37:16 40:2
  46:8 48:23
  53:18 57:3,16
  60:23 67:14
**malpractice**
  62:11
**management**
  7:12,17 8:14
  9:21 15:10
  20:5 21:14,25
  25:9 26:12,13
  26:20 28:8
  29:19,24 30:4
  30:18,22 31:1
  31:8,19,24,25
  32:3,5 45:21
  46:2 59:24
  60:6 75:13
**management's**
  8:1
**managers**
  13:10

**[mandate - negative]** Page 14

**mandate** 13:16 19:22 28:4
**mandated** 35:8
**mandates** 35:16 36:11
**manifest** 12:16
**market** 7:1 9:17 42:3 43:24 44:20,21 45:14 51:10 52:6,6,10 68:1
**marketing** 63:15
**mason** 72:2
**massive** 47:21
**matter** 22:18 33:16 54:5,6
**matthew** 2:15 42:24 43:1,5 70:22
**maximize** 43:16
**mean** 11:7 13:11 16:4,4 30:4,21,21,22 33:19 34:21 35:12 39:10 40:19,23 41:20 42:1 46:6 52:23 55:5 56:8 57:4,11 57:12 58:20,24 59:2 60:4 69:1 73:4

**meaning** 35:9
**means** 19:4 28:21 31:2
**meant** 43:25
**measure** 46:18
**mee** 2:15 42:25 43:3,5 47:7,13 47:17,23 48:1 48:14,21 49:16 50:16,19 51:25 52:5,9,12 53:11,16 54:11 54:21 55:3,8 55:23,25 56:8 56:11,14,19,22 56:25 57:2,6 57:11,18,21 58:10,14,17,21 59:1,18,25 60:4,8,17,21 61:2,7,11,15,19 61:21,25 62:16 62:20,23 63:1 63:4,7,10,17 64:2,4,7,12,15 65:5 66:15,19 67:12,25 69:5 69:8,11,14,17 70:1,23
**meet** 6:1 31:12 45:10 46:14
**meeting** 20:5 20:14

**members** 71:3 75:9
**memory** 7:10
**mentality** 68:2
**mentioned** 39:13 61:9,10
**merrillville** 72:7
**met** 45:13
**mike** 2:9,14 71:17,18
**mills** 16:9
**mind** 26:25 27:7 39:22 61:5
**minimum** 37:16
**mispronounced** 42:25
**mispronounces** 43:4
**missing** 60:10 69:6
**misstate** 18:10
**mistakes** 67:19
**money** 13:6,21 34:6 50:21,25 55:10 56:4,6 62:7,7 67:8
**monopoly** 9:14
**morgan** 7:19 56:3,17,17
**move** 3:23 4:13 17:19 42:22

47:18 70:13,15 77:5
**moves** 78:4
**multi** 67:1
**municipalities** 71:9
**mutual** 6:12 29:9

**n**

**n** 2:1 3:1
**name** 22:4 43:4
**narrow** 36:1
**nation** 41:8
**nature** 33:21
**nce** 1:14
**necessarily** 11:3 29:11 30:21 43:15 60:5
**necessary** 24:24 60:19,21
**need** 34:8,18,21 37:24 39:15 42:15 50:25 52:16 53:21 57:25 58:6 61:3,23 64:10 65:24 69:23
**needed** 44:1
**needs** 50:13 55:23
**negative** 17:13

| | | | |
|---|---|---|---|
| **negatively** 14:20 | **obama** 7:9 36:25 37:4 40:14 | 77:6 | **ownership** 14:2 |
| **negotiating** 66:11 | **obama's** 16:22 | **once** 59:2,7,10 66:17 | **p** |
| **neither** 79:7 | **objective** 65:25 | **ones** 16:4 29:10 29:10 69:18 | **p** 2:1,1 |
| **never** 8:6 32:12 41:4,13 66:23 | **obligation** 35:21 | **open** 3:7 16:15 62:14 | **packet** 20:13 |
| **new** 8:6 11:2 31:1 41:8 | **obligations** 18:17 49:13 | **opinion** 18:15 21:16 56:11 | **paid** 10:9 68:4 |
| **nice** 71:22 | **offer** 18:18 | **opportunity** 46:18 | **part** 20:9 27:9 51:13 54:11 58:2,5 59:8 68:16 73:4 74:7 |
| **niche** 65:6 | **office** 5:11,15 43:8 | **oppose** 8:3,5,9 9:21 16:16 28:2 31:17,18 | **partially** 4:5 |
| **nobody's** 64:7 | **oh** 3:10 12:25 29:1 38:12 49:5 59:12,25 69:16 | **opposed** 30:22 33:4 | **particular** 5:25 |
| **non** 53:20 54:7 73:5,7 74:6 | | **opposing** 28:8 31:9,20 | **parties** 79:8,11 |
| **nonprofit** 42:10 | **oil** 16:8,9,14,21 39:1 | **opposite** 21:8 28:20 | **parts** 33:20 |
| **nope** 64:4 | **okay** 3:4 4:4,19 7:24 10:11 12:25 15:8 17:18 19:1,24 20:2,20 21:23 24:22 25:22 26:1 27:3 28:19 31:9,11 31:15,21 32:16 32:20 33:24 41:5,15 50:18 55:22 56:10,13 59:17 63:9 65:19 66:18 70:21 73:17 74:4,12 76:3 | **options** 13:24 | **party** 11:5 14:12,16 64:1 64:6,19 |
| **nos** 29:7 | | **organizations** 3:19,22 42:11 | **passed** 39:21 39:25 53:12 72:21 |
| **notes** 5:13 | | **outcome** 79:12 | **past** 23:23 55:9 56:2 60:3 70:4 |
| **notice** 8:18 20:10 | | **outsourcing** 47:10 61:16 | **pause** 76:1 |
| **notification** 20:5 | | **own** 12:4 14:5 15:7 28:3 43:22 45:21,23 49:6 52:24,24 52:25 56:25 59:15 | **pay** 55:10 |
| **nuances** 48:3 | | | **paying** 50:21 56:6,15 57:8 57:13 61:2 |
| **number** 16:19 44:2 47:21 59:13 | | **owned** 53:8 | **pays** 14:25 |
| **o** | | | **peluso** 79:2,15 |
| **o** 3:1 | | | **pension** 43:21 43:25 44:6 57:22 59:12 61:12 66:16 |
| **oath** 44:23 52:1 52:21,23 53:5 68:24 69:3 | | | |

**[people - presumably]** Page 16

| | | | |
|---|---|---|---|
| **people** 6:9 44:12 52:9 59:21 68:3 | 14:9,13,15,19 14:22 15:1,5,9 15:20,25 16:3 | 40:11,14,17 41:1,6,12,16,22 42:18,20 43:6 | **portion** 74:11 **position** 27:4 27:17 28:3,3 |
| **people's** 67:8 | 16:11 17:8,11 | 64:17 71:2 | 31:24 33:5 |
| **percent** 44:21 45:16,16 | 17:14,17 18:3 18:9,19,22,25 | 75:25 78:5 **pierce's** 77:3 | 34:19 63:14 65:11 |
| **perform** 22:9 47:1 | 19:3,7,14,21,25 20:8,12,17,19 | **plan** 57:23 **plans** 43:21 | **positions** 8:8 **positive** 17:12 |
| **performance** 75:15,16 | 20:24 21:3,6,9 21:13,17,20,24 | 44:1,6 59:12 61:12 66:16 | 24:25 **possibility** |
| **performing** 75:12 | 22:6,17 23:8 23:11,16 24:1 | **play** 30:2 **player** 67:20,23 | 26:19 **possible** 26:17 |
| **period** 59:20,22 | 24:15,18,20 | **players** 9:13 | **potential** 12:21 |
| **perplexed** 67:1 | 25:1,10,13,16 | **pleasantly** 42:7 | 17:10 43:13 |
| **person** 8:12 9:8 14:24 29:1 | 25:20,23 26:2 26:10,22,24 | **please** 77:9 **point** 5:20 | **potentially** 42:14 55:15 |
| **personal** 15:7 | 27:4,8,12,15,20 | 13:24 17:2,4 | **practical** 40:6 |
| **perspective** 49:19 68:15 | 28:1,6,16,18,23 29:4,17,21 | 18:6 36:12,15 48:5 51:10 | 43:15,19 **practice** 70:6 |
| **petroleum** 39:14 | 30:3,8,11,14,16 30:20,24 31:4 | 54:14 62:3 68:16 69:11 | **precise** 51:9 **preferred** |
| **ph** 72:2 | 31:7,12,16,22 | 70:19,19 | 42:13 |
| **picking** 70:8 | 32:7,10,14,17 | **police** 5:7,18 | **prepared** 79:3 |
| **piece** 10:25 36:9 67:5 | 32:21 33:7,10 33:19,25 34:13 | 34:14 72:3,7 **policies** 24:4,5 | **present** 4:20 **presentation** |
| 75:18 | 34:16,24 35:3 | **policy** 8:4 24:9 | 46:23 |
| **pierce** 2:13 4:22 8:24 9:5 | 35:11,14,18,21 35:23 36:4,7 | 35:24 41:17 **political** 49:23 | **presented** 18:2 18:5 |
| 9:10,12 10:1,4 | 36:18,22 37:7 | 50:4,5 72:12 | **president** 7:13 |
| 10:7,10,15,18 | 37:10,14,18,20 | **pool** 71:11 | 16:5 36:25,25 |
| 10:20 11:6,19 | 37:24 38:2,8 | **popping** 41:8 | 37:4,5 40:14 |
| 11:21 12:1,5,8 | 38:10,13,17,23 | **popular** 7:6 | **pressel's** 76:5,6 |
| 12:11,15,19,22 | 39:3,6,9,17,20 | **portfolio** 43:22 | **presumably** |
| 13:1,13 14:4,7 | 39:23 40:3,7 | | 45:22 |

[pretty - qaddoura]                                          Page 17

| | | | |
|---|---|---|---|
| **pretty** 43:24 59:2 | **profit** 57:16 74:6 | 11:5,9 12:3 15:17 20:4,15 | **public** 23:21 34:6 41:17 |
| **prevalent** 58:19,24,25 | **profits** 73:5,7 73:23 74:13 | 21:25 22:1,10 23:6,24 25:24 | **publicly** 48:22 |
| **prevent** 65:22 | **prohibited** 40:2 | 25:25 26:20 | **pull** 4:12 |
| **preventing** 66:15 | **prohibits** 50:9 50:14,17 66:11 | 27:2,16 28:2 28:20,25 29:1 | **pulls** 4:5 |
| **price** 5:14 | **proposal's** 54:6 | 29:11,13,16 | **purchases** 71:11 |
| **prior** 43:7 45:14 | **proposals** 44:3 44:4 47:21 | 32:2,5 33:4 35:10,17 36:10 | **push** 10:5,9 |
| **private** 33:17 35:9 37:9,10 | 48:1,7,10 51:16,18,20 | 36:17 38:9 44:7,8,18,20,23 | **pushing** 15:18 |
| 40:19 42:3 47:10,14 68:22 | 53:1,4 55:12 59:13 | 45:2,5,7,9,11 45:13,17,20,25 | **put** 11:14 13:21 43:20 60:19 62:20 |
| **probably** 36:1 59:23 65:18 | **protect** 62:12 65:23 | 46:2,7,12 47:1 47:15,19,20 | **puts** 49:18 |
| 68:10 | **protection** 43:9 46:17 69:21 | 48:17,21,22,24 49:4,20 50:1,6 | **putting** 22:10 34:19 37:21 |
| **problem** 3:21 3:22 4:11 9:2 | 72:10 | 50:11,20 51:3 51:4,11,15,18 | |
| 42:6,16 44:9 45:4 55:2 | **provide** 15:16 40:20 48:5 | 52:14 53:12,18 53:20,22 54:14 | **q** |
| **proceeding** 79:4 | 53:21,24 55:11 68:10 69:4 | 54:15 55:10,20 56:22 57:2 | **qaddoura** 2:8 32:25 33:1,9 |
| **proceedings** 79:6 | **provided** 36:13 | 58:9,10,18 59:23 60:2,5 | 33:12,24 34:12 34:15,22 35:1 |
| **process** 24:2 29:19 49:12 | **provider** 5:21 | 60:23 62:17 | 35:4,12,15,20 35:22 36:2,5,8 |
| 59:19 72:11 | **provides** 72:17 | 63:14 64:1,6,9 64:19 65:5,14 | 36:21 37:3,8 37:13,17,19,23 |
| **produce** 52:22 53:6 | **providing** 15:15 48:4 | 65:19 66:12 68:2,8,8,23 | 38:1,4,9,12,15 38:22 39:2,5,8 |
| **products** 68:11 | 49:12,13 50:12 65:24 | 69:14 71:10,22 71:23 72:23 | 39:12,18,21,24 40:4,8,13,16,25 |
| **professional** 67:7 | **provision** 72:24 | 77:3 | 41:5,11,15,21 41:24 42:19,21 |
| | **proxy** 4:24 5:3 6:8,9 7:1,11,16 8:25 9:4,16 | | 46:21,22 47:8 47:14,18,25 48:2,20 49:15 |

**[qaddoura - record]**                                                    Page 18

49:17 50:18 51:9 52:4,8,11 52:18 53:15 54:10,18 66:7 66:8,9,18,22 67:24 68:5 69:6,10,13,16 69:25 70:14,17 73:8,12,15 74:15,18,20 77:12,13

**quality** 5:25

**quarter** 6:22 7:3 27:21

**question** 19:16 21:12 24:6 33:14,15,21 35:8 39:13 52:20 54:19 60:18 68:6 73:4

**questions** 8:20 10:11 18:1 30:9 32:25 33:2 42:19 46:20 54:25 63:19,23 66:6 70:21 71:14 72:22 73:1 75:22

**quick** 17:19 39:22 71:5 73:4

**quite** 65:7

**quo** 64:8

**r**

**r** 2:1,4,5,6,9,10 2:13 3:1,1

**randolph** 2:7 17:20,22,23,25 18:4,14,20,23 19:1,4,13,16,20 19:24 20:3,10 20:15,18,20 21:7,10,15,18 21:23 22:5,16 23:5,9,12,22 24:13,17,19,22 25:7,12,15,18 25:22 26:1,8 26:18,23 27:3 27:6,10,14,19 27:25 28:5,9 28:17,19 29:3 29:15,18,22 30:6,10,12,15 30:17,23 31:3 31:6,11,15,21 32:4,9,12,16,20 32:22,25 54:24 55:4,22,24 56:2,10,13,16 56:21,24 57:1 57:5,9,12,20 58:8,13,15,18 58:22 59:17,20

60:1,7,11,16,18 61:1,5,9,14,18 61:20,24 62:2 62:19,22,25 63:3,6,9,11,17 63:18 73:2,3,7 73:17 74:1,2,5 74:16,22 77:10 77:11

**randolph's** 33:21

**random** 38:24

**rare** 26:6 37:1

**rather** 57:8

**reached** 72:7

**read** 63:25 67:8

**real** 17:19 54:12

**realize** 66:19 68:3

**realized** 59:12

**really** 4:6 5:20 10:22 16:1 39:22 42:2,16 49:17,18 60:22 68:13

**reason** 7:24 8:4 8:8,9 9:19,22 9:23 10:5 16:17,18 19:12 19:15 33:12

**reasonably** 6:2 14:11

**reasoning** 7:25 57:1,2 61:21

**reasonings** 8:16

**reasons** 7:12 8:1 27:1,5 34:3 45:5

**recall** 68:19

**received** 55:18

**receiving** 45:9 46:11

**recently** 51:2 58:22

**recommendat...** 11:2 46:5,8,13 49:4,5,8 55:21 58:11 63:10 65:21

**recommendat...** 36:17 38:25 44:11,19 45:1 45:15 46:1 48:9,23 49:22 49:25 50:22 51:8,20 53:3 53:18 55:17 57:3,7 61:17 64:13

**recommended** 33:5

**recommending** 45:20

**record** 74:23 79:5

[recording - results]

**recording** 79:4
**reduce** 36:5
**redundant**
  75:18
**refer** 28:17
**refineries**
  16:11,15
**refinery** 16:19
**register** 65:11
**registered** 65:9
**regulate** 26:17
  33:22,22 36:20
**regulated**
  64:20
**regulating**
  68:20
**regulation** 23:4
  26:15 34:2
  35:7 64:21
**regulators** 22:2
**regulatory**
  22:11,14
**related** 14:18
  53:12 68:2
  75:16,19 79:7
**relationship**
  12:16,18 23:7
  28:21 30:18
  36:14 47:15
  50:10
**relationships**
  28:10
**relative** 79:10

**relies** 52:6
**relying** 58:11
  67:21
**rephrase** 38:15
**report** 20:4
  23:14 24:14,24
  24:25 26:9
  30:2,15 60:20
**representative**
  2:13,14 4:22
  5:1,5,17 6:5
  8:24 9:5,10,12
  10:1,4,7,10,12
  10:15,18,20
  11:6,19,21
  12:1,5,8,11,15
  12:19,22 13:1
  13:2,13 14:4,7
  14:9,13,15,19
  14:22 15:1,5,9
  15:20,25 16:3
  16:11 17:8,11
  17:14,17 18:3
  18:9,19,22,25
  19:3,7,14,21,25
  20:8,12,17,19
  20:24 21:3,6,9
  21:13,17,20,24
  22:6,17 23:8
  23:11,16 24:1
  24:15,18,20
  25:1,10,13,16
  25:20,23 26:2
  26:10,22,24

27:4,8,12,15,20
28:1,6,16,18,23
29:4,17,21
30:3,8,11,14,16
30:20,24 31:4
31:7,12,16,22
32:7,10,14,17
32:21 33:7,10
33:19,25 34:13
34:16,24 35:3
35:11,14,18,21
35:23 36:4,7
36:18,22 37:7
37:10,14,18,20
37:24 38:2,5,8
38:10,13,17,23
39:3,6,9,17,20
39:23 40:3,7
40:11,14,17
41:1,6,12,16,22
42:18,20 43:6
45:1 52:1
64:17 71:2,8
71:18,20 73:2
73:6,10,14,19
74:12,24 75:3
75:4,25 76:4,6
77:3 78:5
**represented**
  48:22
**representing**
  12:13 28:13
  45:8 60:23
  71:7

**republican** 7:8
**reputable** 67:7
**request** 4:10
**require** 36:16
  64:5 66:13
  70:3
**required** 20:21
  50:20 70:4
**requirement**
  24:14
**requirements**
  4:24 77:3
**requires** 45:25
**requiring**
  60:14 63:25
  65:1,17
**research** 23:14
  23:24 24:4
**resisting** 64:25
**respect** 36:2
**respectful** 36:6
  42:1
**respond** 21:22
**response** 52:19
  77:11
**responsibility**
  8:23 22:1
  43:16 58:3
**rest** 67:25
**restate** 20:25
**result** 11:12
  55:7 64:17
**results** 57:14
  57:14

**[retirees - senator]**

**retirees** 34:6,6 34:11
**retirement** 13:7 37:21
**return** 34:18
**returns** 6:21 11:12 22:8 34:20
**revelation** 54:13
**review** 48:6
**reviews** 51:18
**ricci** 2:16 70:24 71:3,6,6,16
**right** 3:6,15 5:9 6:12 7:10 9:14 9:19 12:19 18:24 20:18 22:9 23:15 24:13 30:22 31:16 40:25 47:7,13 48:15 49:10,11 52:12 55:16 60:17 61:18,25 63:4 64:4,14 67:23 78:6
**rita** 79:2,15
**road** 71:11
**role** 47:2,20 51:15
**roles** 75:15
**roll** 77:9

**route** 23:2

**s**

**s** 2:1
**sales** 5:8 46:16 67:16
**salt** 71:11
**satisfy** 50:13
**save** 39:9
**saving** 56:5
**saw** 44:12
**saying** 7:2 11:10,14 16:13 19:9,11 21:14 21:21 31:17 54:7 57:15 62:3,5,8,15 63:11,13 68:25 69:22
**says** 7:15 16:8 25:25 26:5,5 27:16 28:6 29:9 31:23 41:13 54:4 75:15
**scale** 44:17
**scheme** 58:4
**schmitt** 2:10 77:18,19
**scope** 53:2 66:13,24 67:2 69:13
**scott** 2:4

**search** 42:5
**second** 3:24 4:14 33:14 34:25 45:9 66:19 67:18 68:6
**seconds** 75:5
**see** 4:10 21:11 42:2,5 50:19 57:14 62:2,3,4 62:8,15 63:12 63:12 64:20 67:3 70:10
**seeing** 71:15
**seems** 39:15,15 49:10 50:7,7
**seen** 41:13
**sell** 44:10,11,19
**senate** 1:3 45:24
**senator** 3:3,5 3:10,13,17,24 3:25 4:3,4,14 4:15,18,19 8:21 9:2,6,11 9:24 10:2,5,8 10:11,12,14,17 10:20 11:18,20 11:22,23 12:2 12:6,9,12,16,20 12:25 13:11 14:2,5,8,10,14 14:16,20,23 15:2,8,11,11,13

15:21 16:1,10 17:4,9,12,15,18 17:20,22,23,23 17:25 18:4,14 18:20,23 19:1 19:4,13,16,18 19:20,24 20:3 20:10,15,18,20 21:1,4,7,10,15 21:18,23 22:5 22:16 23:5,9 23:12,22 24:13 24:17,19,22 25:7,12,15,18 25:22 26:1,8 26:18,23 27:3 27:6,10,14,19 27:25 28:5,9 28:17,19 29:3 29:15,18,22 30:6,10,12,15 30:17,23 31:3 31:6,11,15,21 32:4,9,12,16,20 32:22,24,25,25 33:1,9,12,20,24 34:12,15,22 35:1,4,12,15,20 35:22 36:2,5,8 36:21 37:3,8 37:13,17,19,23 38:1,4,9,12,15 38:22 39:2,5,8 39:12,18,21,24

**[senator - speak]**

| | | | |
|---|---|---|---|
| 40:4,8,13,16,25 | 74:8,15,16,18 | 59:13 | **simply**  45:25 |
| 41:5,11,15,21 | 74:19,20,21,22 | **shareholders** | **sincere**  33:15 |
| 41:24 42:19,21 | 74:23 75:1,4 | 45:19 48:7 | **sincerely**  52:11 |
| 42:22 46:21,21 | 75:23 76:2,3 | 53:9 57:10,15 | 52:18 |
| 46:22 47:8,14 | 77:2,5,6,7,8,10 | **shares**  43:12,19 | **sir**  43:2 73:2 |
| 47:18,25 48:2 | 77:11,12,13,14 | 43:23 44:1 | 74:4 75:3 |
| 48:20 49:15,17 | 77:15,16,17,18 | 58:2 59:4,6,9,9 | **sit**  38:24 |
| 50:18 51:9 | 77:19,20,21,22 | **shed**  49:2 | **situation**  44:17 |
| 52:4,8,11,18 | 77:23,24,25 | **shift**  9:17 | **situations**  15:6 |
| 53:15 54:10,18 | 78:2,4 | **shocked**  66:23 | 49:2 67:17 |
| 54:22,24 55:4 | **senators**  2:3 | **show**  7:23,24 | **skills**  79:6 |
| 55:22,24 56:2 | **sense**  19:1 | 8:12,18 9:22 | **skis**  32:8 |
| 56:10,13,16,21 | 43:14,15,18 | 11:1 16:20 | **skyrocketed** |
| 56:24 57:1,5,9 | 46:17 72:19 | 22:11,13,18 | 44:4 |
| 57:12,20 58:8 | **sentence**  36:1 | 26:13 28:7 | **skyrocketing** |
| 58:13,15,18,22 | **separate**  74:10 | 34:1 60:14 | 47:21 |
| 59:17,20 60:1 | **serious**  45:4 | 65:1 | **smarter**  11:23 |
| 60:7,9,11,12,16 | **serve**  35:4 | **showing**  19:9 | **sold**  5:8 |
| 60:18 61:1,5,9 | **serves**  7:10 | **shows**  19:19 | **solution**  42:5 |
| 61:14,18,20,24 | **service**  8:13 | **shut**  16:8 | 44:9 |
| 62:2,19,22,25 | 63:2 | **sic**  17:20 | **solve**  9:3 |
| 63:3,6,9,11,17 | **services**  61:3,4 | **side**  5:2 6:5 | **somebody** |
| 63:18,19,20,21 | 65:24 66:20 | 16:24 23:2 | 14:25 42:7 |
| 64:3,5,11,14,16 | 68:11 71:25 | 26:15 34:2 | 59:16 64:9 |
| 66:2,6,7,8,8,9 | 75:13 | 43:16 54:6 | **sorry**  10:12 |
| 66:18,22 67:24 | **session**  1:2,13 | **sides**  70:8 | 15:11 17:20 |
| 68:5,16 69:6 | 72:1,12 | **sign**  24:18 29:4 | 42:25 45:24 |
| 69:10,13,16,25 | **set**  3:5 53:17 | **signature**  79:14 | 71:2 |
| 70:13,14,15,17 | **share**  44:22 | **signed**  4:9 | **sort**  65:6 71:12 |
| 70:18,24 71:5 | **shareholder** | 42:23 66:23 | **source**  51:12 |
| 71:14,17 73:1 | 43:13,17 44:3 | **similar**  7:14 | **space**  16:7 |
| 73:2,3,7,8,12 | 44:3,25 45:6 | **simple**  19:16 | 36:20 40:23,24 |
| 73:14,15,17,25 | 47:21 51:20 | 71:21 | **speak**  6:6 12:23 |
| 73:25 74:2,4,5 | 53:1,4 55:12 | | 75:6 |

| | | | |
|---|---|---|---|
| **speaker** 3:7,12 4:2 73:24 | **stating** 43:11 | 33:22 48:5 51:21 53:7 | **take** 3:18,25 4:15 8:20 |
| **specific** 16:21 33:3,8,11 39:11 68:21 | **status** 60:2 62:9 64:8 | **suggestion** 25:3 | 10:18 23:13 34:21 55:14 |
| **specifically** 21:22 37:6 68:21 72:5 | **statute** 71:10 72:9,15 | **suit** 62:14 | 69:20 75:21 76:1 |
| | **step** 26:14 29:8 72:20 | **summary** 48:8 | **taken** 53:5 |
| **spending** 50:25 | **stipulate** 35:10 | **sunshine** 70:12 | 72:21 79:9 |
| **squared** 49:8 | **stock** 12:6 14:3 14:21 43:12 | **supermajority** 35:5 | **takes** 54:3 |
| **staff** 50:3 | 57:24 59:7 | **supplier** 5:22 6:2 | **talk** 31:13 67:1 |
| **standard** 5:25 75:19 | **stop** 15:4 18:11 18:13 62:5 | **suppliers** 6:4 72:14 | **talked** 34:7 60:12 64:18 |
| **standards** 16:6 | **stricken** 74:23 | **support** 10:25 15:21 37:2 | **talking** 22:3 29:14 34:3,5 |
| **start** 58:19,24 66:17 | **strike** 56:17 74:22 | 71:8,13 72:22 72:25 | 73:12,20 74:17 |
| **state** 5:22 13:7 13:8 22:15 | **structure** 49:23 | **supported** 33:4 | **talks** 20:3 |
| 26:16 34:5,8 | **study** 11:24 | **supportive** 15:19 68:17,18 | **tax** 69:23 |
| 35:16 37:22 | **style** 6:1 | **sure** 5:7 33:9 | **teachers** 34:14 |
| 40:8 41:9 43:8 | **subdivisions** 72:13 | 36:2,21 37:25 | **tell** 10:2 12:2 25:15,18,19 |
| 50:9,14 53:6 | **submit** 66:13 | 38:22 40:13 | 29:5 31:19 |
| 65:16 66:10 | **submitted** 48:11 | 49:7 52:14 | 41:14 62:23 |
| 71:17,25 72:5 | **sue** 62:13 | 53:15 54:10 69:10,25 | **telling** 19:10 |
| 72:13,18 | **sued** 18:24 25:9 53:23 | **surprised** 32:15,19 42:8 | **tension** 50:5 |
| **stated** 45:2 | **suffered** 55:6,9 57:16 | **sway** 45:14 | **terms** 24:14 26:10 28:10,12 |
| **statement** 13:18 52:23 | **suffering** 56:4 57:9 | **swing** 45:16 | 28:14 38:20 43:20 56:17 |
| 67:5,11 | **suggesting** 7:4 7:17,21 19:10 | **swung** 45:18 | 58:19 73:4 |
| **statements** 52:22 66:14 | 25:5,6 30:25 | **t** | **testifiers** 13:17 |
| 68:25 69:4 | | **tackle** 6:22 | **testifies** 42:7 |
| **states** 65:18,18 65:21,22,23 | | | **testify** 4:9 42:15,23 |

**[testimony - trying]**                                                    Page 23

| | | | |
|---|---|---|---|
| **testimony** 3:8 15:15 17:19 23:21 47:19 71:15 75:1,23 75:24 | 49:18 53:14 54:7,8 58:5 65:7 67:13 | **thousands** 6:20 6:20 | **traditional** 69:20 |
| **texas** 53:11,17 53:21 54:4 | **think** 3:21 5:11 5:12 7:9 10:23 11:16 15:14 | **three** 7:3 9:13 16:19 45:4 | **transaction** 5:24 71:24 |
| **thank** 4:22 17:18,22 32:22 | 25:20 26:2,3,5 26:24 27:1 | **threshold** 42:13 | **transcriber** 79:1 |
| 33:1,2 42:9,18 42:20,21 43:3 | 28:12,23 29:1 29:6 30:19,21 | **tied** 39:9 | **transcript** 79:3 79:5 |
| 43:6 46:22,23 54:19,20,21,22 | 32:1 33:19 35:24 36:9 | **ties** 51:3 | **transparency** 6:10 25:5 |
| 63:15,17,18,21 63:22 66:2,9 | 39:25 40:5,20 41:17 48:14 | **time** 20:16,21 28:13 35:1 36:8 41:4 | 49:11,16 52:14 54:9 60:14 |
| 70:14,17,21,23 71:3,15,16,20 | 49:11 50:19,24 51:12 55:8,8 | 59:21,22 64:22 65:10 66:11 | 68:18 70:12 |
| 72:25 73:3 74:24 75:3,8 | 57:11,18,19 59:2 60:9 | 71:1 72:14 | **treated** 72:18 |
| **thanks** 10:21 10:21 43:1 | 62:17 64:17 67:12,13,18 | **times** 20:22 | **tremendous** 45:14 |
| 71:19 75:1,23 78:5 | 68:1,6 70:19 78:6 | **title** 36:23 69:23 | **trend** 31:1 59:1 |
| **that'd** 8:19 | **thinking** 29:16 40:6 48:17 | **titles** 4:25 | **trillion** 67:2 |
| **themes** 51:19 | 61:16 | **today** 30:21,24 42:7 74:19 | **true** 37:13 67:17 79:5 |
| **theoretically** 22:12 23:2 | **third** 11:5 14:11,16 15:17 | 75:2 78:6,6 | **trump** 36:25 37:5 |
| **thing** 41:22 60:8 62:17 | 45:13 63:25 64:6,19 | **together** 62:20 | **trump's** 7:13 |
| 70:25 71:12 | **thought** 38:16 | **told** 38:5 70:25 | **trusting** 47:11 |
| **things** 6:3 9:14 16:4 36:25 | **thoughtfulness** 42:9 | **topic** 10:22 61:11 | **try** 62:10 |
| 37:3,4 43:14 44:10 46:25 | **thoughts** 28:14 52:24 | **topics** 44:3 | **trying** 4:12 9:3 11:14 15:3,14 15:16,22 22:25 26:17,25 27:23 28:1 33:15 34:17 36:5,6 36:15 37:5 40:5,9 59:14 64:23,23 |
| | | **totally** 8:11 15:21 32:1 | |
| | | **touched** 10:24 | |
| | | **toward** 17:19 | |
| | | **town** 72:6 | |
| | | **towns** 71:7 | |
| | | **track** 48:15 74:2 | |

**[two - want]**                                                Page 24

| | | | |
|---|---|---|---|
| **two** 3:14,15 9:13 13:5,24 33:17,20 35:9 38:18 42:4 44:20,22 45:15 48:12 53:13,14 65:14 66:7 68:12,22 75:5 78:3,5 | **understanding** 8:21 29:23 50:8 66:24 | **vein** 7:14 | **votes** 6:19,20 13:9,12 15:17 16:6 19:17 23:25 26:20 28:4,25 29:1 30:25 43:17 44:18 45:16,18 45:20 58:1 78:2 |
| **type** 11:24 40:2 47:6 51:13 | **unfair** 73:24 | **vendors** 72:14 72:19 | |
| **types** 15:17 48:12 | **unfairly** 72:18 | **verbalization** 29:22 | |
| **u** | **unidentified** 3:7,12 4:17 73:24 | **verbally** 29:20 | |
| **u.s.** 43:10 45:14 | **unintended** 68:7 | **video** 1:13 | **voting** 6:14,15 7:17 19:22 29:19 31:1 48:17 58:1,9 59:6,9 |
| **uh** 15:1 19:13 28:18 30:23 55:24 | **units** 13:20 | **view** 4:11 53:2 | |
| **unable** 67:8 | **unsigned** 18:21 | **violate** 18:23 | |
| **under** 44:23 52:1,21,23 53:5 54:15 68:23 69:3 | **uphold** 44:13 | **violated** 12:21 | **vulnerable** 25:8 28:22 |
| | **urge** 72:22 | **violating** 28:21 | |
| | **use** 13:6 26:21 53:7 56:22 | **violation** 12:21 | **w** |
| **undercutting** 40:18 | **used** 41:19 | **violations** 46:15,15 | **wage** 37:18 |
| **understand** 11:3 12:12 14:11,17 15:22 28:24 29:13 30:9 33:13,16 42:16 48:3,4 64:24 67:6 | **using** 51:3 62:5 67:20,21,22 | **vote** 1:10 3:6 6:18 7:3,4,20 7:22,22 8:11 8:15 13:20,22 13:23 14:10,17 16:12,15 19:5 19:10 20:1,2 21:8 22:19 23:12 24:10,25 25:4 26:4 27:1 27:2,16 28:20 29:10,12,13,24 32:2 33:5 34:9 34:10,10,17 41:16 43:12,19 44:1,5 46:1 58:4,6,14,15 59:4,9 60:15 76:5 | **wait** 42:15 66:19 |
| | **usually** 17:25 | | **walk** 12:6 |
| | **utilize** 62:7 | | **walker** 2:5 3:24 4:3,14,18 77:5 77:7,14,15 |
| | **utilized** 56:5 58:20 | | **want** 7:20,22 13:17,22 18:9 19:25 22:4,14 24:2,2,3 40:19 46:25 47:4 48:2,4 49:20 53:13 55:2,13 59:24 62:3,13 71:7 |
| | **utmost** 42:1 | | |
| | **v** | | |
| | **valid** 8:1 19:14 | | |
| | **value** 7:24 8:8 9:22 16:17 43:13 45:6,11 46:13 59:10 | | |
| | **values** 44:25 | | |
| | **vehicles** 72:3,5 | | |

**[wants - z]**                                                                    Page 25

| | | |
|---|---|---|
| **wants** 60:6 | 52:2,16,22 | 56:8,19,25 |
| **way** 8:11,24 | 53:22,25 55:25 | 58:17,21 59:1 |
| 11:15 12:2 | 62:21,24 67:4 | 59:25 60:11,16 |
| 15:2 22:13 | 67:10 | 61:14,14,20,20 |
| 29:25 30:1 | **wrong** 8:1 9:20 | 61:20 62:16,19 |
| 42:1,4 44:4,13 | 13:18 26:6 | 62:22,25 63:3 |
| 62:11 65:10 | 31:25 32:2 | 63:3,6 64:8 |
| **ways** 26:11 | 60:5 73:18 | 65:5 73:19 |
| 45:18 | **x** | 74:18 |
| **we've** 9:4 49:7 | **x** 24:9 31:22 | **year** 5:6,17,18 |
| 60:12 62:9,14 | **xyz** 69:3 | 27:22 39:25 |
| **wealth** 75:13 | **y** | 44:23 52:2 |
| **weird** 65:6 | | 53:12 |
| **wing** 44:14 | **y** 31:22 | **years** 40:1 43:8 |
| 47:5 | **yeah** 3:11,12,17 | 43:10 44:20 |
| **wonder** 4:25 | 9:5 11:19,21 | 58:23,23 59:3 |
| 17:5 | 12:1,5,8,15 | 68:19 |
| **word** 29:1,13 | 14:4,7,13,15,22 | **yup** 12:11,22 |
| 39:14 | 15:20,25 16:3 | 35:11,14 61:24 |
| **work** 5:7,17 | 16:10 17:8,11 | **z** |
| 11:1 43:5,9 | 17:14,16,17 | |
| 60:14 66:13,23 | 18:14,22 19:20 | **z** 31:22 |
| 67:3 69:13 | 20:19 21:3,6,9 | |
| 72:8 | 21:17 22:5,16 | |
| **worked** 43:7 | 23:8,11 24:17 | |
| 72:1 | 24:19 27:19,25 | |
| **working** 11:9 | 28:16 29:3,17 | |
| 43:7 | 30:10,11,11 | |
| **works** 37:22 | 31:3,6,15 35:3 | |
| **worry** 43:4 | 36:4,7 37:7 | |
| **wow** 50:24 | 39:23 40:3,7 | |
| **written** 46:3,5 | 40:16 42:18 | |
| 46:7,8 49:6,9 | 47:17,23 48:23 | |
| 50:23 51:23 | 49:10 53:11 | |

# Foster Declaration Exhibit 35

Page 1

INDIANA GENERAL ASSEMBLY

2026 SESSION

SENATE READING AND VOTE

FEBRUARY 17, 2026


SENATE READING AND VOTE

HOUSE BILL 1273


https://iga.in.gov/session/2026/video/senate

(Excerpt 2:48:30 - 2:50:10)

A  P  P  E  A  R  A  N  C  E  S

SENATE:

Lt. Governor Micah Beckwith

Senator Scott Baldwin


ALSO APPEARED:

The Clerk

Unidentified Male

Page 3

R E C O R D I N G

(Excerpt 2:48: - 2:50:10)

THE CLERK:  House Bill 1273. Senator Baldwin.

SENATOR BALDWIN:  Mr. President, please call House Bill 1273 for the third time.

PRESIDENT BECKWITH:  Senator Baldwin calls House Bill 1273 for the third time. Clerk will read.

THE CLERK: (Inaudible).

PRESIDENT BECKWITH:  Senator Baldwin to present the bill.

SENATOR BALDWIN:  Thank you, Mr. President, Members of the Senate. House Bill 1273 deals with proxy advisors. Think of a proxy advisor as a bridge to the information gap between shareholders in very complex corporate issues. They basically attend meetings in your stead and vote on your behalf. They're expected to vote from a fiduciary perspective, and sometimes that doesn't happen because of lobbying efforts. This is an attempt to fix conflicts of interest. It doesn't mandate how they vote or what they can vote. It just makes them show their work basically. They have to provide a report indicating that they've done a financial analysis. I'm happy to answer questions, and I would appreciate your support.

Page 4

PRESIDENT BECKWITH:  Thank you. Is there discussion? Chair hears none. This bill is placed on its passage. The machine is open. All right. The machine's closed. Clerk will tally the roll. 44 ayes, 4 nos. This bill has passed.

UNIDENTIFIED MALE:  (Inaudible).

PRESIDENT BECKWITH:  I'm sorry. 40 -- 41 ayes, 4 nos. This bill has passed. Secretary will inform the House of the passage of the bill.

Page 5

CERTIFICATE OF TRANSCRIBER

I, RITA PELUSO, do hereby certify that this transcript was prepared from the digital audio recording of the foregoing proceeding, that said transcript is a true and accurate record of the proceedings to the best of my knowledge, skills, and ability; that I am neither counsel for, related to, nor employed by any of the parties to the action in which this was taken; and, further, that I am not a relative or employee of any counsel or attorney employed by the parties hereto, nor financially or otherwise interested in the outcome of this action.

*Rita Peluso*

RITA PELUSO

**[1273 - nos]**                                             Page 1

**1**

**1273**  1:11 3:3,5
  3:7,12
**17**  1:4
**18266**  5:14

**2**

**2026**  1:2,4,13
**2:48**  3:2
**2:48:30**  1:14
**2:50:10**  1:14
  3:2

**4**

**4**  4:5,8
**40**  4:7
**41**  4:7
**44**  4:4

**a**

**ability**  5:7
**accurate**  5:5
**action**  5:8,12
**advisor**  3:13
**advisors**  3:13
**analysis**  3:23
**answer**  3:24
**appeared**  2:7
**appreciate**  3:24
**assembly**  1:1
**attempt**  3:19
**attend**  3:16
**attorney**  5:10
**audio**  5:3

**ayes**  4:5,8

**b**

**baldwin**  2:5 3:3
  3:4,6,9,11
**basically**  3:15
  3:22
**beckwith**  2:4
  3:6,9 4:1,7
**behalf**  3:16
**best**  5:6
**bill**  1:11 3:3,5,7
  3:10,12 4:2,5,8
  4:9
**bridge**  3:14

**c**

**c**  2:1 3:1
**call**  3:4
**calls**  3:6
**certificate**  5:1
**certify**  5:2
**chair**  4:2
**clerk**  2:8 3:3,7
  3:8 4:4
**closed**  4:4
**complex**  3:15
**conflicts**  3:19
**corporate**  3:15
**counsel**  5:7,10

**d**

**d**  3:1
**deals**  3:13

**digital**  5:3
**discussion**  4:2

**e**

**e**  2:1,1 3:1
**efforts**  3:19
**employed**  5:8
  5:11
**employee**  5:10
**excerpt**  1:14
  3:2
**expected**  3:17

**f**

**february**  1:4
**fiduciary**  3:17
**financial**  3:23
**financially**  5:11
**fix**  3:19
**foregoing**  5:4
**further**  5:9

**g**

**g**  3:1
**gap**  3:14
**general**  1:1
**governor**  2:4

**h**

**happen**  3:18
**happy**  3:24
**hears**  4:2
**hereto**  5:11
**house**  1:11 3:3
  3:5,7,12 4:9

**https**  1:13

**i**

**iga.in.gov**  1:13
**inaudible**  3:8
  4:6
**indiana**  1:1
**indicating**  3:23
**inform**  4:9
**information**
  3:14
**interest**  3:20
**interested**  5:12
**issues**  3:15

**k**

**knowledge**  5:6

**l**

**lobbying**  3:18
**lt**  2:4

**m**

**machine**  4:3
**machine's**  4:4
**makes**  3:21
**male**  2:9 4:6
**mandate**  3:20
**meetings**  3:16
**members**  3:12
**micah**  2:4

**n**

**n**  2:1 3:1
**neither**  5:7
**nos**  4:5,8

**[o - work]**                                                                 Page 2

| o | | |
|---|---|---|
| **o**  3:1 | **related**  5:7 | **true**  5:5 |
| **open**  4:3 | **relative**  5:10 | **u** |
| **outcome**  5:12 | **report**  3:22 | **unidentified** |
| **p** | **right**  4:3 | 2:9 4:6 |
| **p**  2:1,1 | **rita**  5:2,15 | **v** |
| **parties**  5:8,11 | **roll**  4:4 | **video**  1:13 |
| **passage**  4:3,9 | **s** | **vote**  1:3,10 |
| **passed**  4:5,8 | **s**  2:1 | 3:16,17,20,21 |
| **peluso**  5:2,15 | **scott**  2:5 | **w** |
| **perspective** 3:17 | **secretary**  4:8 | **work**  3:22 |
| **placed**  4:2 | **senate**  1:3,10 1:13 2:3 3:12 | |
| **please**  3:4 | **senator**  2:5 3:3 3:4,6,9,11 | |
| **prepared**  5:3 | **session**  1:2,13 | |
| **present**  3:10 | **shareholders** 3:14 | |
| **president**  3:4,6 3:9,12 4:1,7 | **show**  3:21 | |
| **proceeding**  5:4 | **signature**  5:14 | |
| **proceedings** 5:6 | **skills**  5:6 | |
| **provide**  3:22 | **sorry**  4:7 | |
| **proxy**  3:13,13 | **stead**  3:16 | |
| **q** | **support**  3:25 | |
| **questions**  3:24 | **t** | |
| **r** | **taken**  5:9 | |
| **r**  2:1 3:1,1 | **tally**  4:4 | |
| **read**  3:7 | **thank**  3:11 4:1 | |
| **reading**  1:3,10 | **think**  3:13 | |
| **record**  5:5 | **third**  3:5,7 | |
| **recording**  5:4 | **time**  3:5,7 | |
| | **transcriber**  5:1 | |
| | **transcript**  5:3,5 | |

Veritext Legal Solutions
215-241-1000 ~ 610-434-8588 ~ 302-571-0510 ~ 202-803-8830

# Foster Declaration Exhibit 36

Page 1

INDIANA GENERAL ASSEMBLY

2026 SESSION

HOUSE READING AND VOTE

FEBRUARY 25, 2026

HOUSE READING AND VOTE

HOUSE BILL 1273

https://iga.in.gov/session/2026/video/house

(Excerpt 15:57 - 17:20)

Page 2

A P P E A R A N C E S

REPRESENTATIVES:

Todd Huston (R), District 37

Kyle Pierce (R), District 36


ALSO APPEARING:

Unidentified Female

Page 3

R E C O R D I N G

(Excerpt 15:57 - 17:20)

SPEAKER HUSTON:  House Bill 1273. Representative Pierce, House motion.

UNIDENTIFIED FEMALE:  Mr. Speaker, I move that the House do concur with the Senate amendments to engross House Bill 1273.

SPEAKER HUSTON:  Further motion to second. Chair recognizes Representative Pierce to be called on the motion to concur.

REPRESENTATIVE K. PIERCE:  Thank you, Mr. Speaker, and thank you to my co-authors, Representative Teshka and Representative Andrade. The Senate made two really small changes. They made sure that we clarified that banks are not proxy advisors and that small non-profits are not -- are not proxy advisors. I think it's a good amendment, and I hope you join me in supporting it.

SPEAKER HUSTON:  Further discussion on the motion to concur? Chair sees none. Questions on the adoption of the motion to concur? When the machines open, those in favor of adopting the motion will vote aye; those opposed to vote no. Representative Soliday? Representative Goss-Reeves? Have all the members voted? Tally of the roll. Roll call shows 72 ayes,

Page 4

20 nos. Motion to concur has been adopted. Clerk shall inform the Senate of the adoption of the motion to concur.

Page 5

CERTIFICATE OF TRANSCRIBER

I, RITA PELUSO, do hereby certify that this transcript was prepared from the digital audio recording of the foregoing proceeding, that said transcript is a true and accurate record of the proceedings to the best of my knowledge, skills, and ability; that I am neither counsel for, related to, nor employed by any of the parties to the action in which this was taken; and, further, that I am not a relative or employee of any counsel or attorney employed by the parties hereto, nor financially or otherwise interested in the outcome of this action.

*Rita Peluso*

RITA PELUSO

**[1273 - pierce]**                                                                 Page 1

**1**

**1273** 1:9 3:4,7
**15:57** 1:13 3:2
**17:20** 1:13 3:2
**18266** 5:14

**2**

**20** 4:1
**2026** 1:2,4,12
**25** 1:4

**3**

**36** 2:5
**37** 2:4

**7**

**72** 3:25

**a**

**ability** 5:7
**accurate** 5:5
**action** 5:8,12
**adopted** 4:1
**adopting** 3:22
**adoption** 3:21
 4:2
**advisors** 3:15
 3:17
**amendment**
 3:17
**amendments**
 3:6
**andrade** 3:13
**appearing** 2:7
**assembly** 1:1

**attorney** 5:10
**audio** 5:3
**authors** 3:12
**aye** 3:23
**ayes** 3:25

**b**

**banks** 3:15
**best** 5:6
**bill** 1:9 3:3,7

**c**

**c** 2:1 3:1
**call** 3:25
**called** 3:9
**certificate** 5:1
**certify** 5:2
**chair** 3:9,20
**changes** 3:14
**clarified** 3:15
**clerk** 4:1
**concur** 3:6,10
 3:20,21 4:1,3
**counsel** 5:7,10

**d**

**d** 3:1
**digital** 5:3
**discussion** 3:19
**district** 2:4,5

**e**

**e** 2:1,1 3:1
**employed** 5:8
 5:11

**employee** 5:10
**engross** 3:7
**excerpt** 1:13
 3:2

**f**

**favor** 3:22
**february** 1:4
**female** 2:8 3:5
**financially** 5:11
**foregoing** 5:4
**further** 3:8,19
 5:9

**g**

**g** 3:1
**general** 1:1
**good** 3:17
**goss** 3:24

**h**

**hereto** 5:11
**hope** 3:17
**house** 1:3,8,9
 1:12 3:3,4,6,7
**https** 1:12
**huston** 2:4 3:3
 3:8,19

**i**

**iga.in.gov** 1:12
**indiana** 1:1
**inform** 4:2
**interested** 5:12

**j**

**join** 3:18

**k**

**k** 3:11
**knowledge** 5:6
**kyle** 2:5

**m**

**machines** 3:21
**made** 3:14,14
**members** 3:24
**motion** 3:4,8,10
 3:20,21,22 4:1
 4:2
**move** 3:5

**n**

**n** 2:1 3:1
**neither** 5:7
**non** 3:16
**nos** 4:1

**o**

**o** 3:1
**open** 3:22
**opposed** 3:23
**outcome** 5:12

**p**

**p** 2:1,1
**parties** 5:8,11
**peluso** 5:2,15
**pierce** 2:5 3:4,9
 3:11

**[prepared - voted]**                                              Page 2

| | |
|---|---|
| **prepared** 5:3 | **session** 1:2,12 |
| **proceeding** 5:4 | **shows** 3:25 |
| **proceedings** 5:6 | **signature** 5:14 |
| **profits** 3:16 | **skills** 5:6 |
| **proxy** 3:15,16 | **small** 3:14,16 |
| **q** | **soliday** 3:23 |
| **questions** 3:20 | **speaker** 3:3,5,8 3:12,19 |
| **r** | **supporting** 3:18 |
| **r** 2:1,4,5 3:1,1 | **sure** 3:14 |
| **reading** 1:3,8 | **t** |
| **really** 3:14 | **taken** 5:9 |
| **recognizes** 3:9 | **tally** 3:25 |
| **record** 5:5 | **teshka** 3:13 |
| **recording** 5:4 | **thank** 3:11,12 |
| **reeves** 3:24 | **think** 3:17 |
| **related** 5:7 | **todd** 2:4 |
| **relative** 5:10 | **transcriber** 5:1 |
| **representative** 3:4,9,11,13,13 3:23,24 | **transcript** 5:3,5 |
| **representatives** 2:3 | **true** 5:5 |
| **rita** 5:2,15 | **two** 3:14 |
| **roll** 3:25,25 | **u** |
| **s** | **unidentified** 2:8 3:5 |
| **s** 2:1 | **v** |
| **second** 3:8 | **video** 1:12 |
| **sees** 3:20 | **vote** 1:3,8 3:22 3:23 |
| **senate** 3:6,14 4:2 | **voted** 3:25 |

# Foster Declaration Exhibit 37



January 17, 2023

Gary Retelny
President and CEO
Institutional Shareholder Services, Inc.
1177 Avenue of the Americas, 14th Floor
New York, New York 10036 USA

Kevin Cameron
Executive Chairman
Glass, Lewis & Co.
255 California Street, Suite 1100
San Francisco, CA 94111

Dear Mr. Retelny and Mr. Cameron:

Your companies, International Shareholder Services, Inc. ("ISS") and Glass Lewis & Co. ("Glass Lewis"), provide proxy voting advice to many of our States' investment vehicles and citizens and businesses within our States. You are subject to both federal and state laws governing the advice and duties of proxy advisors. You are also subject to contractual obligations—including directly to some of our States' investment vehicles.

It has come to our attention that you have made several commitments that may interfere with your ability to honor your legal obligations. In this letter, we provide evidence of these potential breaches, specifically as they relate to your climate and diversity, equity, and inclusion priorities. We seek written assurance that you will cease such violations and commit to following the law.

**As Proxy Advisors, ISS and Glass Lewis Must Comply with Applicable Federal and State Laws**

ISS and Glass Lewis must comply with federal law that applies to proxy advisors. Under federal law, proxy advisor recommendations must be free from false or misleading material information. *See* 15 U.S.C. § 78n(a)(1); 17 C.F.R. § 240.14a-9(a) (Securities Exchange Act mandates that proxy solicitations, including voting advice, may not contain false or misleading material information). Moreover, under the Investment Advisers Act, "an adviser is a fiduciary that owes each of its clients

duties of care and loyalty with respect to all services undertaken on the client's behalf, including proxy voting."[1] Although Glass Lewis has contended that it is not an "investment adviser" subject to this Act,[2] ISS has represented in agreements that it *is* an "investment adviser,"[3] and both of you appear to function as investment advisers.[4] Finally, many States have prohibitions on unfair or deceptive trade practices, as well as securities laws that prohibit investment advisers from engaging in fraudulent or misleading practices.[5]

### As Proxy Advisors, ISS and Glass Lewis Must Comply with Contracts with States' Investment Vehicles

Your agreements with States' investment vehicles to provide proxy voting services typically warrant that you will exercise duties of care and loyalty in providing advice. Your duties include acting with reasonable diligence and without conflicts of interest. These agreements also typically require that you consider only one goal: the economic value of the investments. As an example, one State's proxy policies require that proxy recommendations "consider only those factors that relate to the economic value of [the] investment" and be "in accordance with the [plan's] economic best interest," without subordination of the plan's interests "to unrelated objectives" pertaining to social or environmental policy.[6]

Moreover, regarding conflicts of interest, ISS has generally warranted that "there are no relevant facts or circumstances that could give rise to any conflict of interest or appearance of impropriety,"[7] and "that it shall not engage in any actions that could be perceived to be a conflict of interest."[8]

---

[1] 68 Fed. Reg. 6585, 6586 (Feb. 7, 2003) (citing *SEC v. Capital Gains Research Bureau, Inc.*, 375 U.S. 180, 194 (1963)).

[2] Glass Lewis Statement to SEC Chairman Clayton regarding SEC Staff Roundtable on the Proxy Process – File Number 4-725 (Nov. 14, 2018) at 11, Attachment 1, https://www.glasslewis.com/wp-content/uploads/2018/11/GL-SEC-Roundtable-Statement-111418.pdf.

[3] *See* Second Amended and Restated Contractual Agreement between ISS and Employees Retirement System of Texas ("ISS Agreement"), Section 5.5.

[4] *See* 15 U.S.C. § 80b-2 ("'Investment adviser' means any person who, for compensation, engages in the business of advising others, either directly or through publications or writings, as to the value of securities or as to the advisability of investing in, purchasing, or selling securities, or who, for compensation and as part of a regular business, issues or promulgates analyses or reports concerning securities . . . ."). If you are not advisers under this provision, it is not apparent how you purport to legally offer advice concerning the voting of securities.

[5] *E.g.*, Utah Code § 61-1-1 & 2; Tex. Bus. & Com. Code Ann. § 17.46; Tex. Gov't Code Ann. § 4008.101;.

[6] *See* Employees Retirement System of Texas, Proxy Voting Policy, https://ers.texas.gov/About-ERS/ERS-Investments-overview/Proxy-Voting/Proxy-Voting-Policy.pdf (Feb. 22, 2011).

[7] *See* ISS Agreement, Section 14.8.

[8] *See* ISS Agreement, Section 14.1.

2

**ISS and Glass Lewis Have Potentially Violated Their Legal and Contractual Duties as Proxy Advisors**

As explained below, the publicly available statements and actions of ISS and Glass Lewis in the performance of their duties as proxy advisors raise serious questions about whether both have violated their statutory and contractual duties. It appears that both have acted contrary to the financial interests of their clients and have promoted and relied upon false or misleading statements—and in so doing, have engaged in fraudulent and misleading practices.

1. **Evidence of Potential Breaches by ISS and Glass Lewis with Respect to Advocating for and Acting in Alignment with Climate Change Goals**

First, you have each pledged to recommend votes on company directors and proposals based on whether a company is implementing "net zero emissions" goals and related climate commitments that you have made. For companies that are on the Climate Action 100+ Focus Group list, ISS has announced that it will "generally vote against" relevant directors if the company does not implement "[a]ppropriate [greenhouse gas] emissions reduction targets" that must "increase over time."[9] Likewise, Glass Lewis bases its recommendations in part on whether a company is adequately pursuing "broader goals," defined as "net zero emissions goals."[10] In a quintessential example of elevating non-financial considerations over financial ones, ISS argues that the finance industry "must play a central and catalytic role in the global transition to a low-carbon economy" because "[s]ignatories to the 2015 Paris Agreement are largely failing to deliver on their emissions reduction commitments."[11] One of you (Glass Lewis) recently recommended that shareholders reject the climate plan from Woodside Petroleum based on a concern that it did not do enough to reduce *customers'* emissions.[12] Put another way, Glass Lewis faulted the company for not having a good enough plan to get its customers to stop buying its own product.

We question how such recommendations, and the policies that led to them, are based on the financial interests of the investment beneficiaries rather than other

---

[9] *See* ISS, United States Proxy Voting Guidelines, at 16–17, https://www.issgovernance.com/file/policy/active/americas/US-Voting-Guidelines.pdf ("ISS Proxy Voting Guidelines"). ISS defines the Climate Action 100+ focus group list as "significant GHG emitters." *Id.* at 16 n.10.

[10] Glass Lewis, 2022 Policy Guidelines for ESG Initiatives, at 28–29, https://www.glasslewis.com/wp-content/uploads/2021/11/ESG-Initiatives-Voting-Guidelines-GL-2022.pdf ("Glass Lewis ESG Proxy Voting Guidelines").

[11] Emily Faithfull et al., *Tackling Finance Emissions: Introducing Science-Based Targets for Financial Institutions*, ISS ESG (2020), https://www.issgovernance.com/file/publications/ISS-ESG-Tackling-Financed-Emissions.pdf.

[12] Sonali Paul, *Glass Lewis recommends vote against Woodside Petroleum's climate plan*, REUTERS (May 9, 2022), https://www.reuters.com/business/energy/glass-lewis-recommends-vote-against-woodside-petroleums-climate-plan-2022-05-09/.

social goals, and if they are based on the latter, how that complies with your duties described above.

Even as you have agreed to provide advice focused on long-term economic value, informed by investigation and care, you have made conflicting pledges. For instance, you have pledged to require "[d]etailed disclosure of climate-related risks,"[13] even though companies are already required to disclose "impacts related to climate change" that "have a material effect on a [company's] business and operations."[14] Moreover, your attempts to force companies identified by Climate Action 100+ to achieve "net zero emissions" and "to set short- and medium-term targets in line with" the Paris Agreement[15] appear unsupported by your duty to consider only the economic value of investments.

As is commonly known (and you have acknowledged), "[g]overnments are not implementing policies to require net zero."[16] In fact, "[n]one of the world's biggest emitters—China, the United States, the European Union, and India—have reduced their emissions enough to meet Paris Agreement goals."[17] As of December 2021, the countries with legally binding net zero pledges represent merely 10% of global emissions.[18] The lack of action should be no surprise based on the statements of net zero proponents. According to the International Energy Agency ("IEA"), the path to achieving net zero by 2050 is "narrow and requires an unprecedented transformation of how energy is produced, transported and used globally."[19] For example, net zero by 2050 would mean an 8% decrease in energy demand for a global economy projected to be twice as large.[20] The technology required to get to net zero by 2050 does not

---

[13] ISS Proxy Voting Guidelines, at 17; *see also* Glass Lewis ESG Proxy Voting Guidelines, at 27 (requiring "enhanced disclosure on climate-related issues").

[14] Securities and Exchange Commission, Commission Guidance Regarding Disclosure Related to Climate Change (Feb. 8, 2010) (17 CFR Parts 211, 231 and 241; Release Nos. 33-9106; 34-61469; FR-82), at 6, http://www.sec.gov/rules/interp/2010/33-9106.pdf.

[15] Sam Meredith, *Big Oil braces for shareholder revolt over climate plans in proxy voting season*, CNBC (May 11, 2022), https://www.cnbc.com/2022/05/11/climate-big-oil-braces-for-shareholder-revolt-in-proxy-voting-season.html.

[16] Letter from 19 State Attorneys General to Laurence D. Fink (Aug. 4, 2022), at 4, https://www.texasattorneygeneral.gov/sites/default/files/images/executive-management/BlackRock%20Letter.pdf ("19-State Letter to Fink").

[17] Max Bearak et al., *The World is Falling Short of Its Climate Goals. Four Big Emitters Show Why.*, N.Y. TIMES (Nov. 8, 2022), https://www.nytimes.com/interactive/2022/11/08/climate/cop27-emissions-country-compare.html.

[18] Renee Cho, *Net Zero Pledges: Can They Get Us Where We Need to Go?*, Columbia Climate School State of the Planet (Dec. 16, 2021), https://news.climate.columbia.edu/2021/12/16/net-zero-pledges-can-they-get-us-where-we-need-to-go/.

[19] International Energy Agency, *Pathway to critical and formidable goal of net-zero emissions by 2050 is narrow but brings huge benefits, according to IEA special report* (May 18, 2021), https://www.iea.org/news/pathway-to-critical-and-formidable-goal-of-net-zero-emissions-by-2050-is-narrow-but-brings-huge-benefits ("IEA Pathway Report").

[20] *Id.*

exist.[21] Moreover, energy efficiency improvements must average "4% a year through 2030 – about three times the average over the past two decades."[22]

The IEA describes the pathway to net zero as "perhaps the greatest challenge humankind has ever faced."[23] In other words, it is far from certain that any of this will occur. In one of your reports, you repeatedly cite the IEA pathway, yet ignore statements of the pathway's improbability.[24] A rational company acting in the best interests of its shareholders would not voluntarily incur the massive expense estimated by the IEA pathway. The only way a rational actor would spend these funds is in response to a government-imposed mandate. But such mandates are not readily forthcoming, even from countries most eager to do so.

Rather than being based on a rational analysis of the effects that expected changes to government policy would have on any given company, your actions appear more like those of an activist forcing companies to comply with rules that governments will not otherwise institute. This would be consistent with your stated political belief that "[c]ountries with large fossil fuel reserves have a particular responsibility to leave those reserves in the ground,"[25] a responsibility you also ascribe to "large corporations."[26] You note that "the needs of the environment and society come into conflict with established economic paradigms."[27] Contrary to your duty to focus on a company's financial interests, you appear to be acting based upon your opinion of society's environmental needs.

Your apparent preference for environmental goals over financial ones is being put into practice. According to media reports, in 2021 Glass Lewis recommended against approving the Climate Action Transition Plan for BHP because it lacked third-party certification and was not aligned with the Paris Agreement.[28] But it is not apparent why third-party certification would affect the financial aspects of the plan or shareholder value. And it cannot be that alignment with the Paris Agreement provides 100% of the financial value of any climate transition plan, particularly given the problems with that Agreement outlined above. Only if the purpose of your recommendation is political rather than financial does urging shareholders to reject such a proposal make sense.

---

[21] *Id.* ("[I]n 2050[] almost half the reductions come from technologies that are currently only at the demonstration or prototype phase.").

[22] *Id.*

[23] *Id.*

[24] Janina Magdanz et al., *Fighting Climate Change: A Battle of the Sovereigns*, ISS ESG (Sept. 9, 2021), at 3-5, https://www.issgovernance.com/file/publications/iss-esg-fighting-climate-change.pdf.

[25] *Id.* at 3.

[26] *Id.*

[27] *Id.*

[28] Evan Harp, *Glass Lewis Urges BHP Shareholders to Vote Against Emission Reduction Plan*, YAHOO! FINANCE (Sept. 30, 2021), https://finance.yahoo.com/news/glass-lewis-urges-bhp-shareholders-154527612.html.

You also appear intent to punish American companies for being out of step with net zero. Pressuring companies to disclose an emissions reduction target in line with net zero does not appear to be about transparency or maximizing shareholder value; instead, such pressure seems to be about changing behavior. Yet China's emissions increased last year at "the fastest pace in a decade," and the country emits more than the United States, Europe, and Japan combined.[29] Even John Kerry acknowledged that China's course of action "would undo the ability of the rest of the world to achieve a limit of 1.5 degrees."[30] Given your limited ability to affect Chinese emissions, your actions have the effect of strengthening an authoritarian regime while weakening companies within the United States, and punishing the American consumer. As you must be aware, China currently dominates the supply chain for "clean energy" metals.[31] If China were to invade Taiwan,[32] your actions to pressure companies to achieve net zero would have the effect of indirectly funding that regime while weakening American companies and critical infrastructure and inhibiting this country's response to such a crisis.

Your pursuit of net zero also potentially creates a conflict of interest between your company's interests and some of your clients' interests. Most obvious is that each of you offers a substantial number of services related to ESG investing. The value of these services would be undermined if you were to admit in your advisory services that ESG factors are not material to a firm's financial performance. Such a blatant conflict of interest calls into question every recommendation you make related to ESG issues.

But the conflicts are more subtle as well. Some of your clients have committed to jointly pressure you to act in a way that would harm other clients such as our state retirees. As part of joining the Net Zero Asset Managers Initiative, asset managers committed to "engage with . . . proxy advisers . . . to ensure that products and services . . . are consistent with the aim of achieving global net zero emissions by 2050 or sooner."[33] This suggests that your actions may be the product of pressure from some of your clients at the expense of others.

---

[29] Keith Bradsher et al., *China Is Burning More Coal, a Growing Climate Challenge*, N.Y. TIMES (Nov. 3, 2022), https://www.nytimes.com/2022/11/03/business/energy-environment/china-coal-natural-gas.html.

[30] *Id.*

[31] Bruno Venditti, *Visualizing China's Dominance in Clean Energy Metals*, Visual Capitalist (Jan. 23, 2022), https://www.visualcapitalist.com/chinas-dominance-in-clean-energy-metals/.

[32] John Culver, *How We Would Know When China is Preparing to Invade Taiwan*, Carnegie Endowment for International Peace (Oct. 3, 2022) ("U.S. intelligence community now assess that China could attack [Taiwan] as soon as 2024….").

[33] Net Zero Asset Managers Initiative, *Commitment* https://www.netzeroassetmanagers.org/commitment/.

All this evidence regarding climate change advocacy and goals suggests potential violations of your contractual obligations and legal duties.

2. **Evidence of Potential Breaches by ISS and Glass Lewis with Respect to Advocating for and Acting in Alignment with Diversity, Equity, and Inclusion Quotas**

Second, you have each pledged to recommend votes against certain directors on boards that you view as having insufficient racial, ethnic, or sex-based diversity under arbitrary quotas that you have announced. ISS recommends votes based on the number of "apparent racially or ethnically diverse members" and a "gender-diverse status."[34] Glass Lewis recommends votes based on racial disclosures and the number of gender diverse directors.[35] Relatedly, you would support proposals that require companies to perform "racial equity … audit[s]," particularly if a company has not issued sufficient "public statement[s] related to its racial justice efforts" or "engaged with" unidentified "civil rights experts."[36] This pledge has led, for example, ISS to support proposals that would force insurance companies to gather race data in apparent violation of state law.[37] In addition to potentially violating your contractual and fiduciary duties, your actions in this area may violate state anti-discrimination laws as well.

You owe duties of reasonable investigation and care, yet you have advocated for quotas and racial equity audits of questionable efficacy and legality apparently without considering the legal issues posed by those policies. Nor is the connection between such policies and economic value sufficiently clear to justify such quotas, as a California court recently found in striking down a law that imposed similar

---

[34] ISS Proxy Voting Guidelines, at 11–12.

[35] Glass Lewis, 2022 Policy Guidelines, at 40–42, https://www.glasslewis.com/wp-content/uploads/2021/11/US-Voting-Guidelines-US-GL-2022.pdf ("Glass Lewis Proxy Voting Guidelines").

[36] ISS Proxy Voting Guidelines, at 65.

[37] Justin Danhof, *Is environmental, social and corporate governance (ESG) illegal?: The case of Travelers Insurance*, THE WASHINGTON TIMES, Oct. 24, 2022, https://www.washingtontimes.com/news/2022/oct/24/is-environmental-social-and-corporate-governance-e/; *see also* Tex. Ins. Code § 560.002(3)(C) (rates are unfairly discriminatory if "based wholly or partly on the race, creed, color, ethnicity, or national origin of the policyholder or an insured").

7

mandates.[38] You have not even explained how you measure what one of you calls "apparent" racial or sex diversity.[39]

States generally have a constitutional obligation to treat individuals equally without regard to their race or sex. And companies are subject to many federal and state non-discrimination laws. Yet you appear to provide advice that, if taken, could expose both States and companies to significant legal liability for discriminating on prohibited bases. Leaving aside the fact that discriminating on the basis of race and sex is both morally repugnant and anti-American, legal liability would not be financially beneficial. For example, even as you acknowledge that California's laws purporting to require racial and gender board diversity have been enjoined because they violate equal protection, you suggest that you will continue to advise clients, including State pension funds, to make official decisions (voting of shares) based on race and gender.[40] But as the Supreme Court has long held, "[i]ntentional discrimination" "on the basis of gender as well as on the basis of race" "by state actors violates the Equal Protection Clause."[41] Once again, your advice appears to focus on goals apart from economic value that raise the question of undeclared conflicts of interest.

**States Request Assurance that ISS and Glass Lewis Will Cease Such Activity and Affirm Their Commitment to Uphold Their Legal Obligations as Proxy Advisors**

Given our responsibilities to our States and their citizens, we request clarification on the following questions. Your actions may threaten the economic value of our States' and citizens' investments and pensions—interests that may not be subordinated to your social and environmental beliefs, or those of your other clients. In addition to working together, we will also work with any of our federal elected officials interested in conducting oversight of your activities with respect to federal law. Please respond by January 31, 2023.

---

[38] *See Crest v. Padilla*, No. 19STCV27561, 2022 WL 1565613 (Cal. Super. Ct. 2022) ("*Crest – SB 826*") (striking down S.B. 826, which requires representation of women directors on boards of publicly held corporations based in California); *Crest v. Padilla*, No. 20 STCV 37513, 2022 WL 1073294 (Cal. Super. Apr. 1, 2022) ("*Crest - AB 979*") (striking down A.B. 979, which required companies to have at least one board director who is a member of an "underrepresented community" by the end of 2021, and two or three such directors (depending on overall board size) by the end of 2022). In the latter case, the court faulted the legislature for "skip[ping] directly to mandating heterogenous boards" without attempting "to create neutral conditions under which qualified individuals from any group may succeed." *Crest – AB 979* at 1. And in *Crest – SB 826*, the court noted that the state was unable to find academic studies to support its contention that there is "a causal connection between women on corporate boards and corporate governance." 2022 WL 1565613 at 11. Both cases have appeals pending
[39] ISS Proxy Voting Guidelines, at 12.
[40] Glass Lewis Proxy Voting Guidelines, at 40–41 & nn.39–40.
[41] *J.E.B. v. Alabama ex rel. T.B.*, 511 U.S. 127, 130–31 (1994); *see Rogers v. Lodge*, 458 U.S. 613, 617 n.5 (1982) ("Purposeful racial discrimination invokes the strictest scrutiny of adverse differential treatment.").

1. Do you agree that you have undertaken contractual duties of care and loyalty in providing advice, including to our States or their investment vehicles where you have contracted to provide services?  And do you agree that these duties include acting with reasonable diligence and without conflicts of interest? Finally, do you agree that your agreements typically require you to consider only one goal: the economic value of the beneficiary's investments?

2. Explain your materiality analysis for requiring the disclosure of emissions reduction targets. Given that material information must already be disclosed, please explain whether you believe that either (i) companies are systematically failing to disclose material information, or (ii) companies should disclose non-material information.

3. Explain how you determine "appropriate" emissions reduction targets for each company and the financial basis for your determination. Please explain how you determine that a company should provide emissions reduction targets in the absence of any legal duty to do so. Please also address the following.

   a. Explain your assumptions regarding the achievement of net zero, including the timeframe for achieving net zero within the United States, China, India, and globally; when you believe the United States, China, and India will mandate net zero compliance; and what you believe will be the economic impact of achieving net zero in the United States, China, and India both in terms of GDP and consumer gas and electricity prices.  This explanation should include any political and/or legal developments in each country that you believe are necessary for achieving net zero.

   b. Do you agree with the International Energy Agency that "in 2050, almost half the reductions come from technologies that are currently only at the demonstration or prototype phase?"[42] If not, please explain. If yes, please explain the basis for your assumption that these technologies will be sufficiently widespread and economical to be deployed, such that companies must presently make assumptions based on their availability.

   c. Do you agree with the International Energy Agency that achieving net zero by 2050 means an approximately 8% decrease in global energy demand for an economy that is estimated to be twice as large and serve 2 billion more people?[43] If not, please explain. If yes, please explain your assumptions about the impact on the American consumer regarding

---

[42] IEA Pathway Report.
[43] *Id.*

energy prices and the political impact energy price increases will have on net zero policy.

4. Please describe your assumptions about the odds of China invading Taiwan, the likely consequences for U.S. companies from supply chain disruption and otherwise, and why you require disclosures regarding emissions reduction targets, but not for exposure to China.

5. Do you agree that pressuring companies to adopt renewable energy means increasing dependance on China, given China's dominance of the renewable energy supply chain?

6. Please explain how adherence to net zero initiatives will impact American agriculture and/or food security including the use of fertilizer. Do you agree that net zero emissions policies may further increase American reliance on China and Chinese companies for food production?

7. Provide support for your apparent conclusion that no company that is a significant emitter of greenhouse gases may decide that it is in its financial interest not to reduce emissions and therefore not establish emissions reduction targets.

8. Please provide any analysis you conducted to determine that insurance companies' discrimination based on race and sex would not violate the law, and therefore that any recommendation you made did not constitute a recommendation for them to violate the law. Further, please explain how recommending actions that could subject companies to legal liabilities complies with your duty of care and was the product of focus on financial factors.

9. Please explain whether you consider yourselves subject to the federal Investment Advisers Act. If not, explain why not, and (for ISS) further explain why you have represented that you are an investment adviser subject to the Act in your agreements.

10. Please describe the extent of your coordination with Climate Action 100+, including your communications with Climate Action 100+ or any of its members.

11. Please identify which asset managers belonging to the Net Zero Asset Managers Initiative engaged with you on the issue of emissions reductions as it relates to your products or services, describe what they communicated to you, and describe any response that you provided.

10

Sincerely,

Sean D. Reyes
Utah Attorney General

Ken Paxton
Texas Attorney General

Steve Marshall
Alabama Attorney General

Treg R. Taylor
Alaska Attorney General

Tim Griffin
Arkansas Attorney General

Christopher M. Carr
Georgia Attorney General

Raul Labrador
Idaho Attorney General

Todd Rokita
Indiana Attorney General

Brenna Bird
Iowa Attorney General

Kris Kobach
Kansas Attorney General

Daniel Cameron
Kentucky Attorney General

Jeff Landry
Louisiana Attorney General

Lynn Fitch
Mississippi Attorney General

Andrew Bailey
Missouri Attorney General

Austin Knudsen
Montana Attorney General

Mike Hilgers
Nebraska Attorney General

John M. Foremlla
New Hampshire
Attorney General

Dave Yost
Ohio Attorney General

Alan Wilson
South Carolina
Attorney General

Jason S. Miyares
Virginia Attorney General

Patrick Morrisey
West Virginia Attorney General

11

# Foster Declaration Exhibit 38



**IOWA DEPARTMENT OF JUSTICE**
**OFFICE OF THE ATTORNEY GENERAL**

BRENNA BIRD
ATTORNEY GENERAL

1305 E. WALNUT ST.
DES MOINES, IA 50319
515-281-5164
www.iowaattorneygeneral.gov

November 29, 2023

Gary Retelny, President and CEO
Institutional Shareholder Services, Inc.
1177 Avenue of the Americas, 14th Floor
New York, New York 10036 USA

Kevin Cameron, Executive Chairman
Glass, Lewis & Co.
255 California Street, Suite 1100
San Francisco, CA 94111

Dear Mr. Retelny and Mr. Cameron,

Your companies, International Shareholder Services, Inc., and Glass Lewis & Co., provide proxy voting advice to many businesses and investors who are citizens of our States as well as to our States' investment vehicles.

That voting advice directly impacts how our Nation's largest companies operate. Your companies' proxy advice shapes the choices and activity of businesses and ultimately the United States' and global economy. And that is why you must realize with such important power comes important responsibilities. Responsibilities to advise in a manner consistent with your legal duties. And a responsibility to embrace transparency so that regulators and customers easily understand the recommendations you make and why you make them. Although other problematic areas exist, one major point of this letter is to clearly state our view that recommendations opposing shareholder resolutions to increase transparency in debanking run contrary to your duties, responsibilities, and policies.

We have expressed deep concern that ISS and Glass Lewis are prioritizing certain environmental, social, and governance initiatives and that doing so violates your contractual and statutory duties to issue advice consistent with your responsibilities as a fiduciary.

And our criticism has not been limited to ISS and Glass Lewis. In February, 19 States called on JPMorgan Chase to account for its troubling pattern of apparent debanking. As part of the general market rejection of prioritizing ESG over fiduciary duties, last year shareholders sought to hold financial institutions accountable for denying or restricting service to clients based on their political or religious beliefs through the resolution process.

1

Politicized debanking harms businesses and their shareholders and undermines the freedom of every American to participate in the marketplace on equal footing.

Unfortunately, all available evidence shows that you oppose those resolutions—contrary to your claims to be apolitical and neutral. Indeed, your recommendations opposing those shareholder resolutions reflect the opposite of your stated commitment to fairness and diversity. Viewpoint discrimination has its own legal liabilities—but so does lying in publicly available policies and disclosures.

Your lack of transparency is troubling. And your voting recommendations on debanking proposals may breach your legal obligations. We seek more transparency and written assurance that you will cease any practice that violates the law, including your duty to act in the best interest of the citizens of our States, or your stated policies on recommendations.

**To comply with federal and state law and its contract obligations, ISS and Glass Lewis must give sound proxy advice.**

ISS's and Glass Lewis's disregarding federal law governing proxy advisors is illegal. Proxy-advisor recommendations must be free from false or misleading material information. *See* 15 U.S.C. § 78n(a)(1); 17 C.F.R. § 240.14a-9(a). And as the Investment Advisers Act's implementing regulations explain, "[a]n adviser is a fiduciary that owes each of its client's duties of care and loyalty with respect to all services undertaken on the client's behalf, including proxy voting." 68 Fed. Reg. 6585, 6586 (Feb. 7, 2003). Our States contend, consistent with our previous letter, that ISS and Glass Lewis are subject to the Act and its accordant duties.

Moreover, ISS and Glass Lewis advise State-controlled entities, like State pension plans. Your advisory role here necessarily makes you a fiduciary that needs to adhere to fiduciary duties. Your agreements to provide proxy voting services to States' investment vehicles warrant at a minimum that you will exercise duties of care and loyalty in providing advice. Indeed, the contracts themselves, along with some States' laws, expressly impose fiduciary duties on proxy advisors. Fundamental to those duties are the requirements that you maximize economic value and avoid conflicts of interest. To the extent the advice you give relies on ESG considerations that conflict with your duty to maximize the financial return to our States, you are violating those duties.

And no matter what advice you give, proxy-advisor recommendations must be free from false or misleading information. *See* 15 U.S.C. § 78n(a)(1); 17 C.F.R. § 240.14a-9(a). Many States also have blue-sky securities laws prohibiting investment advisers from fraudulent or misleading practices and consumer protection laws prohibiting unfair and deceptive trade practices.

2

Your advice that is contrary to supporting the economic interest of our States' or your advisees in our States' may violate both federal and state laws.

**ISS and Glass Lewis may be violating their legal duties by opposing transparency-in-debanking proposals**

Proxy Advisors have a responsibility to ensure that their recommendations concerning debanking proposals advance fiduciary interests. Some proposals calling for additional transparency or other information about debanking efforts, efforts which themselves may implicate financial concerns for an institution, follow the role of a proxy advisor. For example, one proposal calls for transparency on politicized debanking:

> Shareholders request the Board of Directors . . . conduct an evaluation and issue a report within the next year, at reasonable cost and excluding proprietary information and disclosure of anything that would constitute an admission of pending litigation, evaluating how it oversees risks related to discrimination against individuals based on their race, color, religion (including religious views), sex, national origin, or political views, and whether such discrimination may impact individuals' exercise of their constitutionally protected civil rights.

A bank, that is, would have to report on policies and practices that jeopardize customers' civil rights and incubate litigation risk because of the growing tide of politicized debanking.

When JPMorgan Chase and PayPal tried to exclude it from the shareholders' ballot last year, the SEC agreed that this proposal addresses a significant social policy issue. We expect that this proposal will be filed again this year at other financial institutions.

Despite the power of transparency and the likelihood of encouraging compliance with State laws, all evidence points toward your opposition to that proposal. Each of the debanking transparency resolutions—for example at JPMorgan Chase and PayPal—received 2% or less of the shareholder vote, a result that would not have happened had you recommended voting for it. That has already worried some of our State Financial Officers who have written to you about your opposition to these proposals.

Our States are particularly concerned with debanking. Non-economic debanking efforts by financial institutions appear to be on the rise. Pressure on financial institutions to reject neutrality on issues including the Second Amendment, oil and gas exploration, immigration, and prison reform is well-documented. Law-abiding citizens and companies should not have to fear political retaliation from banks motivated by activist investors.

3

Debanking is also targeting religious and conservative groups. For example, Chase allegedly debanked the National Committee for Religious Freedom after demanding its donor list. And Indigenous Advance filed a complaint with the Tennessee Attorney General's office contending that Bank of America debanked it for religious reasons. Greater transparency will provide clarity and assurances that banks are not targeting customers based on protected statuses like religious belief.

Financial institutions' policies often stray from customers' basic civil liberties. They use vague and subjective "reputational risk" policies or prohibitions on "hate" speech to debank political targets disfavored by activists with little concern or oversight. The Viewpoint Diversity Score Business Index which evaluates major companies' respect for free speech and religious liberty found that 21 of the 44 largest financial institutions in the U.S. have those kinds of discriminatory policies.

Debanking presents significant legal, regulatory, and political risk— which is why measures intended to increase transparency around debanking help to limit those risks. Many federal and state laws prohibit discrimination based on religion, political ideology, and other protected statuses. So debanking may raise serious legal concerns. And already there has been serious regulatory backlash to debanking efforts across the country. States are passing legislation to ensure fairness in corporate decision-making and hold companies engaging in illicit ESG efforts accountable. Many of those laws apply to or include financial institutions—and many States may prefer to pass those laws if they believe viewpoint targeting is occurring. Transparency can limit political risks. And already there has been serious regulatory backlash to debanking efforts across the country.

Debanking also presents serious reputational risks. Even the appearance of politicized debanking can do serious financial harm. Many States are evaluating their relationships with banks and investment managers over concerns that those entities are denying service and capital to legal industries like firearms companies and fossil fuel producers. 57% of respondents would likely stop using service providers that do not respect their values, according to a Viewpoint Diversity Score Poll.

Proxy advisors cannot ignore these risks and still fulfill their fiduciary duties. Being transparent about politicized debanking is an opportunity to address these risks and rebuild the record-low trust consumers have in financial institutions. Opposing debanking proposals contradicts ISS and Glass Lewis' other policies and practices. As many of our States noted, both firms have supported broad audits of how a company may be discriminating or otherwise hurting the "civil rights" of its stakeholders and the public.

Indeed, Glass Lewis appears to be speaking out of both sides of its mouth on this issue. It says it supports transparency on ESG issues—"that

4

insufficient oversight of material environmental and social issues can present direct legal, financial, regulatory and reputational risks that could serve to harm shareholder interests." Yet it opposed the debanking-transparency proposal that would mitigate companies' legal, financial, regulatory, and reputational risks. And while ISS claims that it is apolitical, ISS characterizes all conservative proposals as "anti-ESG" proposals, and votes against nearly every one of them.

This opposition reveals inconsistent or insufficient due diligence and appears to violate a proxy advisor's duty of care. It also raises concerns about proxy advisors' duty of loyalty, particularly given their otherwise full-throated support of transparency on economic, social, and governance issues.

**We seek written assurance that ISS and Glass Lewis will cease this activity and affirm their commitment to uphold their legal duties as proxy advisors.**

This letter should not be necessary. Americans should not have to worry that they will be denied critical financial services because of their religious and political beliefs. Your promises to the public and your clients to be impartial and viewpoint-neutral extend to these fundamental characteristics of American identity. Accordingly, please provide all relevant information and respond fully to these inquiries by December 13, 2023:

1. Provide us all your voting recommendations for debanking proposals for the 2022–2023 proxy season.

2. Explain your materiality analysis for recommending votes against shareholder proposals on debanking.

3. Explain why you have opposed debanking resolutions that focus on the civil rights of customers but have supported proposals asking for much broader civil rights audits.

4. Provide any analysis you conducted to determine whether to support debanking resolutions for the 2022–2023 proxy season.

5. Explain how you have categorized debanking proposals, why you have done so, and provide any analysis you made to make that determination or consider alternative categorizations.

Respectfully Submitted,

Brenna Bird
Brenna Bird
Attorney General of Iowa

5



Steve Marshall
Alabama Attorney General

Treg Taylor
Attorney General of Alaska

Tim Griffin
Attorney General of Arkansas

Ashley Moody
Attorney General of Florida

Chris Carr
Attorney General of Georgia

Raúl R. Labrador
Attorney General of Idaho

Todd Rokita
Attorney General of Indiana

Kris Kobach
Attorney General of Kansas

Jeff Landry
Attorney General of Louisiana

Andrew T. Bailey
Attorney General of Missouri

Lynn Fitch
Attorney General of Mississippi

Austin Knudsen
Attorney General of Montana

Mike Hilgers
Attorney General of Nebraska

John Formella
Attorney General of New
Hampshire

6

Drew Wrigley
Attorney General of North Dakota

Gentner Drummond
Attorney General of Oklahoma

Alan Wilson
Attorney General of South Carolina

Ken Paxton
Attorney General of Texas

Sean D. Reyes
Attorney General of Utah

Jason S. Miyares
Attorney General of Virginia

Patrick Morrisey
Attorney General of West Virginia

Bridget Hill
Attorney General of Wyoming

7

# Foster Declaration Exhibit 39



AUSTIN KNUDSEN        STATE OF MONTANA

August 29, 2024

Abrdn                                      Legal & General Investment Management
Allianz Global Investors                   M&G Investments
Allspring Global Investments               Manulife Investment Management
Amundi Asset Management                     Morgan Stanley
AQR Capital Management                      Mutual of America Capital Management Corp.
Aviva Investors                             Northern Trust
AXA Investment Managers                     Principal Global Investors LLC
BMO Global Asset Management                 ProShares & ProFund Advisors LLC
D.E. Shaw Investment Management             TD Asset Management
Gateway Investment Advisers, LLC            Thrivent Investment Management, Inc.
Guggenheim Investments                      UBS Asset Management Americas
HSBC Global Asset Management                Wilmington Trust Investment Management
IndexIQ Advisors LLC

Dear Asset Managers:

        We, the undersigned attorneys general, are the chief legal officers of our respective states. Among other duties, we enforce our states' civil laws against unfair and deceptive acts and practices, state securities laws, and state common law to protect our residents and the integrity of the marketplace. Your company is among the twenty-five large asset managers or their affiliates ("Asset Managers")* who voted 75% or more of the time with Institutional Shareholder Services ("ISS") recommendations "for" environmental proposals flagged by the activist group Ceres.[1] The Asset Managers' support for these shareholder proposals was *over twice as high* as the overall market, which supported them only 37% of the time, and only 17% of these proposals received majority support.[2] Given this wide disparity, we are concerned that the Asset Managers may have outsourced their voting in this area to ISS or another third party and are failing to carry out their

---

* Copies of this letter are being sent directly to each of the Asset Managers identified above.

[1] This was recently documented in a report of 192 shareholder proposals from 2020-2023. Consumers' Research, *Analysis: Are Asset Managers Blindly following ISS on ESG?*, at 3, https://perma.cc/NXY7-KFLX.

[2] *Id.* at 2.

DEPARTMENT OF JUSTICE

215 North Sanders          (406) 444-2026
PO Box 201401              Contactdoj@mt.gov
Helena, MT 59620-1401      mtdoj.gov

fiduciary duties, so we are writing to request information about whether the Asset Managers' disproportionate support for ISS recommendations was consistent with their fiduciary duties.

Company management opposed all the identified proposals, and many of them are harmful to shareholder value on their face. This includes:

- six proposals to set greenhouse gas (GHG) targets for lenders and underwriters based on their **customers'** emissions,
- thirteen proposals to set GHG targets for traditional energy producers and closely aligned companies (which would effectively limit sales of their products), and
- ten proposals to limit company free speech to conform with the Paris Agreement and net zero by 2050.[3]

One insurer's board wrote that "setting [underwriting] targets would be impractical, would impose unreasonable limits on [its] discretion to responsibly address climate change while supporting energy security, and would expose [it] to substantial risk in the event that the targets could not be met."[4] Yet all of the Asset Managers voted with ISS in favor of that proposal, even though the overall support for it was only 29%. Similarly, a traditional energy company's board explained that a proponent of a proposal to require Scope 1, 2, and 3 medium- and long-term targets admitted such proposals are nothing more than a "'Trojan horse' to force companies to eliminate oil and natural gas investments."[5] Yet all but one of the Asset Managers voted with ISS in support of that proposal, even though it only received 27% overall support.

We are also concerned about whether voting with ISS's recommendations, without further analysis on the Asset Managers' part, violates their fiduciary duties. There are significant reasons to believe that ISS was not conducting financial analyses of these proposals but rather following a presumption of recommending in favor of them. ISS's process for developing its benchmark policy is modeled on federal notice-and-comment rulemaking and is driven by third-party comments. But there is no requirement in this process for conducting financial analyses. When an ISS executive was questioned at a Texas Senate hearing about certain recommendations, the executive simply pointed to the applicable policy provisions and did not claim that ISS performed any additional analysis.[6] Moreover, ISS's benchmark policy makes no mention of financial analysis of specific environmental shareholder proposals, which suggests that ISS is not evaluating these proposals on their specific financial merits to ensure they are in the shareholders' financial interest.

Further, we are concerned about conflicts of interest between financial and non-financial objectives given that ISS's parent, the Deutsche Börse Group, is part of the Net Zero Financial Service Providers Alliance (NZFSPA), whose members sign a commitment to "[s]et an interim target for relevant services and products offered to be aligned to the net zero transition."[7] ISS itself

---

[3] We highlight these specific categories of proposals in the body of this letter and in Appendices A-C.

[4] Chubb, *Proxy Statement for 2023 Ann. Gen. Meeting of S'holders*, at 53, https://perma.cc/3A3R-Q3PZ.

[5] ExxonMobil, *Notice of 2023 Ann. Meeting and Proxy Statement*, at 86, https://perma.cc/JT93-ZAXX.

[6] *See infra* notes 47-50 and accompanying text.

[7] *See* NZFSPA, *Commitment*, https://perma.cc/4BGR-K6D4 .

is an affiliate member of the Interfaith Center on Corporate Responsibility (ICCR), whose members "seek to move companies in key industries to reduce their … [GHG] emissions," and "to phase out fossil fuels."[8]

## Data Shows That Asset Managers Have Voted With ISS "For" Recommendations At Least 75% of the Time For Certain Management-Opposed Climate Change Proposals

The Asset Managers (or one of their affiliates) voted at least 75% of the time in accordance with ISS recommendations in favor of certain climate-related shareholder proposals. This is at least double the support in the overall market, which supported the proposals only 37% on average, and only 17% of these proposals received majority support.[9]

The activist organization Ceres maintains a database of flagged shareholder resolutions on climate issues.[10] Ceres is a major player in the ESG movement: it is one of the founding organizations of Climate Action 100+, which seeks to leverage shareholder power to reduce GHG emissions in line with the Paris Agreement and is currently commencing "Phase 2" to force companies to implement transition plans and deliver on their emissions targets.[11] The Ceres database flags environmental and other proposals that are in line with these activist ESG goals. For 2020–2023, ISS recommended voting for 56.4% of the Ceres flagged proposals.[12]

During the four proxy seasons in 2020-2023, when ISS recommended a "for" vote on one of the Ceres-flagged environmental proposals, the Asset Managers (or one of their affiliates) voted in favor of the proposal 75% or more of the time.[13]

| Asset Manager | How frequently Asset Manager voted "for" when ISS Recommended "for" (2020-2023) |
|---|---|
| Legal & General Investment Manager | 94.3% |
| Allianz Global Investors | 93.2% |
| Parametric Portfolio Associates LLC, an affiliate of Morgan Stanley Investment Management | 93.2% |
| ProFund Advisors LLC and ProShares | 93.2% |
| UBS Asset Management | 93.2% |
| Mutual of America Capital Management Corporation | 91.7% |
| Wilmington Trust Investment Management, an affiliate of M&T Bank Corporation | 88.0% |

---

[8] ICCR, *Climate Change and Env't Justice*, https://perma.cc/M96Z-JB92.

[9] *See* Consumers' Research, *supra* note 1, at 2.

[10] Ceres, *Engagement Tracker*, https://engagements.ceres.org/.

[11] *Climate Action 100+ Phase 2: Summary of Changes*, at 7 (June 2023), https://perma.cc/HYL9-5WNQ.

[12] *See* Consumers' Research, *supra* note 1, at 3. The report noted that the ISS for recommendations are based on synthetically generated assessments from the Insightia platform (aka Diligent Market Intelligence). *Id.*

[13] *Id.* at 2. The report noted that "split" votes were counted as no votes, which was a conservative approach that reduced the percentage of asset manager support. *Id.*

3

| | |
|---|---|
| Aviva Investors | 87.0% |
| Principal Global Investors LLC | 87.0% |
| AQR Capital Management | 86.5% |
| Amundi Asset Management | 85.9% |
| BMO Global Asset Management | 84.9% |
| Gateway Investment Advisers, an affiliate of Natixis Investment Managers | 84.9% |
| Abrdn | 84.4% |
| Guggenheim Investments | 83.9% |
| Manulife Investment Management | 83.9% |
| Northern Trust | 82.8% |
| Allspring Global Investments | 82.3% |
| AXA Investment Managers | 81.8% |
| HSBC Global Asset Management | 80.2% |
| D.E. Shaw Investment Management | 79.7% |
| IndexIQ Advisors LLC, an affiliate of New York Life Investments | 78.1% |
| Thrivent Investment Management, Inc. | 77.1% |
| M&G Investments | 76.6% |
| TD Asset Management | 75.0% |

The high correlation between ISS recommending a "for" vote on an environmental shareholder proposal and an Asset Manager or its affiliate voting "for" a proposal—combined with the disparity between their high level of support and the overall market's low level of support— suggests that the Asset Managers are simply following ISS's recommendations to vote for such proposals (or some other third party that is making recommendations consistent with those of ISS).

## **Specific Proposals Further Call into Question the Asset Managers' Independence and Whether They Are Voting in the Financial Interests of Their Clients**

While the overall voting statistics are troubling, a review of specific shareholder proposals calls into further question why the Asset Managers are following ISS's lead on shareholder proposals that are so obviously contrary to the clients' financial interests. This section outlines proposals related to (1) requiring financial institutions to cut off lending or insurance to their customers for non-financial reasons; (2) mandating emissions targets for traditional energy producers and other companies; and (3) limiting companies' free speech to policymakers so that it is in line with the Paris Agreement and net zero by 2050. As shown below, many management recommendations against these proposals are so clear that whoever made the decision to overrule management either did not read the proposals and management discussions or has a non-financial activist agenda.

4

*Cutting Off Lending or Insurance to Customers Based on Emissions-Reduction Targets*

It is highly troubling that the Asset Managers have followed ISS's lead and voted to establish targets that would force financial services and insurance companies to cut off business relationships with their customers for non-financial reasons. These companies are in the business of lending or insuring, so limiting their output for environmental-activist reasons is clearly contrary to the shareholders' financial interests. The proposals identified in this letter at Appendix A-1 received only 22.8%–35.4% support, but the Asset Managers voted with ISS in favor of all or nearly all of them.[14] It seems highly unlikely that an asset manager voting solely in the financial interests of its shareholders and making independent decisions would support these harmful proposals at this substantially higher level than the overall market.

Moreover, the company board of directors' opposition statements made the harmfulness of the proposals abundantly clear. One insurer's board wrote that "setting such targets would be impractical, would impose unreasonable limits on [its] discretion to responsibly address climate change while supporting energy security, and would expose the Company to substantial risk in the event that the targets could not be met."[15] A large bank's board flatly stated, "we do not believe that producing the report required by the proposal would ultimately serve the best interests of our shareholders."[16] Yet they overruled the companies' boards and threw in their lot with ISS to support an activist agenda.

The list of proposals and board of directors' oppositions are in **Appendix A-1** at the end of this letter. The votes on these shareholder proposals in alphabetical order by portfolio company are in **Appendix A-2**, which shows the Asset Managers' consistently high level of support for ISS's recommendations.

*Cutting Off Energy Production Based on Emissions-Reduction Targets*

A second egregious category of voting consistent with ISS but contrary to the shareholders' financial interest is the Asset Managers' support for proposals to establish GHG emissions targets for companies that produce, transport, or are heavily dependent on fossil fuels. It is not clear why it would be in the financial interests of the Asset Managers' clients as shareholders to support *any* such proposals, as forcing companies in the energy business to limit their or their customers' emissions is equivalent to reducing the energy companies' sales.

Unsurprisingly, these proposals were uniformly opposed by the portfolio companies' boards. One target company's board noted that a proponent of these proposals admitted they are nothing more than a "'Trojan horse' to force companies to eliminate oil and natural gas investments."[17] Another board explained a shareholder proposal was "(i) unnecessary; (ii) unclear; and (iii) undermining of the Board's responsibility and accountability for the Company's

---

[14] *See* App. A-1, *infra* (hyperlinked page lists overall level of support for each proposal).

[15] *Supra* note 4, at 53.

[16] Wells Fargo, *2023 Notice of Ann. Meeting and Proxy Statement*, at 112, https://perma.cc/RPZ6-TFVG.

[17] ExxonMobil, *supra* note 5, at 86.

strategy."[18] Another stated that a proposal "seeks commitments to set targets on a timeframe that is not operationally viable or advisable, that rely on speculative future technologies, and that dismiss the potentially adverse consequences to our business and all of our shareholder's interests if we make expensive, technologically impossible commitments."[19]

The Asset Managers' support also departed from the overall market support. For example, a 2022 proposal to set targets at DTE Energy received only 28.1% of the vote overall, yet all but three of the Asset Managers supported the proposal. Another 2022 proposal at Occidental Petroleum received only 16.6% of the vote, yet all but three supported it. And a 2023 proposal at the Southern Company received only 19.8% of the vote, yet all but one supported it.

The list of proposals and board of directors' oppositions are in **Appendix B-1** at the end of this letter. These votes for 2022 and 2023 in alphabetical order by company are in **Appendix B-2**, and this Appendix shows the Asset Managers' consistent support for ISS in this area.

*Limiting Companies' Speech With Policymakers to Force Conformity with the Paris Agreement and Net Zero by 2050*

A final troubling area consists of votes to limit companies' free speech with policymakers, so that those companies cannot freely advocate for their shareholders' financial interests. Companies should be able, under the direction of their board, to engage with policymakers and seek public policy changes that are in their best financial interests. As one energy company wrote in opposition to one of these proposals, "[w]e strongly believe that [our] long-term value to our shareholders is enhanced by a business environment that protects and supports the oil and gas industry's ability to responsibly operate to provide important resources to consumers."[20] Another company wrote that "holding the Company to a higher [disclosure] standard than other participants in the political process could have negative consequences."[21]

However, certain activists have figured out that they can use shareholder proposals to limit companies' speech over management's opposition. The Asset Managers appeared to follow ISS's "for" recommendations on these proposals. This is particularly concerning since ISS is majority owned by Deutsche Börse AG, a foreign entity. And, as discussed in the next section, ISS or its parent are also members of international organizations that expressly seek to implement the Paris Agreement. Foreign entities and organizations should not be limiting American companies' free speech activities; yet this is exactly what is occurring.

The Asset Managers' votes are also contrary to the overall market's low level of support. For example, a proposal in 2022 to limit Alphabet's lobbying to be in line with the Paris agreement received only 19% overall support, yet all of them voted in favor of it. A similar proposal in 2023

---

[18] Glencore, *Notice of the 2023 Ann. General Meeting*, at 17, https://www.glencore.com/dam/jcr:cef18693-a970-4ae7-a3c6-cb371e11328b/AGM%20NOM%202023_3%20May%20release%20CLEAN.pdf.

[19] Martin Marrieta, *2023 Ann. Meeting of S'holders and Proxy Statement*, at 95, https://perma.cc/D4GY-8UMV.

[20] Coterra, *2023 Proxy Statement and Notice of Ann. Meeting*, at 78, https://perma.cc/M9SD-TD35.

[21] DTE, *2023 Proxy Statement and Notice of Ann. Meeting*, at 71, https://perma.cc/VTK4-UCGZ.

to limit Caterpillar's lobbying received only 28.4% overall support, yet all but one of the Asset Managers supported it.

The list of proposals and board of directors' oppositions are in **Appendix C-1** at the end of this letter. These votes for 2022 and 2023 in alphabetical order by company are in **Appendix C-2**, and this Appendix shows the Asset Managers' consistent voting in line with ISS.

### The Asset Managers' Support of Activist Environmental Proposals Appears to Conflict with Their Fiduciary Duties to Their Clients

The Asset Managers' high percentage of following ISS recommendations on climate-related proposals, as well as their support for the vast majority of specific shareholder proposals discussed above, calls into question whether they are complying with their fiduciary duties. The Investment Advisers Act "establishes federal fiduciary standards to govern the conduct of investment advisers."[22] The fiduciary duty of loyalty requires asset managers to "disclose their conflicts of interest, act in their clients' best interest, and seek best execution for their clients' transactions."[23] A "trustee's decisions ordinarily must not be motivated by a purpose of advancing or expressing the trustee's personal views concerning social or political issues or causes."[24] The fiduciary duty of care requires asset managers to provide advice that is in the best interest of their clients, based on the client's objectives, and to provide advice and monitoring over the course of the relationship.[25] Investment advisers also "must employ reasonable care to avoid misleading clients," and can violate their fiduciary duty under Section 206 "by what is done, what is said, and what is not said."[26]

These duties extend to voting and engagement, and an asset manager cannot simply delegate those activities related to share ownership and thereby absolve itself of its duty to its customers.[27] In 2004, the SEC issued no-action letters to Egan-Jones Proxy Services[28] and Institutional Shareholder Services, Inc.[29] that addressed the requirements for investment advisers that rely on independent third parties to vote client proxies. Although these letters were withdrawn

---

[22] *Robare Grp., Ltd. v. SEC*, 922 F.3d 468, 472 (D.C. Cir. 2019) (citations and quotation marks omitted); *see also SEC v. Nutmeg Grp., LLC*, 162 F. Supp. 3d 754, 778 (N.D. Ill. 2016) (Section 206(2) of the Investment Advisers Act "establishes a statutory fiduciary duty for investment advisers").

[23] *SEC v. Ambassador Advisors, LLC*, 576 F. Supp. 3d 286, 293 (E.D. Pa. 2021). ERISA imposes a sole-interest standard as well. *See* 29 U.S.C. § 1104; *see also* Letter from 21 State Attorneys General to Asset Managers ("21 State AGs Letter"), at 2 (Mar. 30, 2023), https://perma.cc/9T6J-Z7RL.

[24] Letter from 20 State Attorneys General to FERC ("20 State AGs FERC Letter"), at 15 n.81 (Mar. 16, 2024), https://perma.cc/3WEH-ST43.

[25] 21 State AGs Letter, *supra* note 23, at 2.

[26] *Nutmeg Grp.*, 162 F. Supp. 3d at 778.

[27] *See, e.g.*, 17 C.F.R. § 275.206(4)-6.

[28] Letter from Douglas Scheidt, Associate Director and Chief Counsel, to Kent S. Hughes, Managing Director, Egan-Jones Proxy Services (May 27, 2004) ("SEC Eagan-Jones Letter"),

https://www.sec.gov/divisions/investment/noaction/egan052704.htm

[29] Letter from Douglas Scheidt, Associate Director and Chief Counsel, to Mari Anne Pisarri, Esq. (Sept. 15, 2004) ("SEC ISS Letter"), https://www.sec.gov/divisions/investment/noaction/iss091504.htm

as part of the SEC's 2018 "roundtable on the proxy process,"[30] the substance of the letters was incorporated into a 2014 Staff Legal Bulletin that was not withdrawn.[31] In the 2004 letter to Egan-Jones, SEC staff stated:

> An investment adviser should not, however, conclude that it is appropriate to follow the voting recommendations of an independent proxy voting firm without first ascertaining, among other things, whether the proxy voting firm (a) has the capacity and competency to adequately analyze proxy issues, and (b) can make such recommendations in an impartial manner and in the best interests of the adviser's clients.[32]

In the letter to ISS, SEC staff stated:

> In the Egan-Jones Letter, we stated that an investment adviser should obtain information from any prospective proxy voting firm to enable the adviser to determine that the firm is in fact independent, and can make recommendations for voting proxies in an impartial manner and in the best interests of the adviser's clients. We suggested that an investment adviser also obtain such information on an ongoing basis from any proxy voting firm that it employs. … Whether an investment adviser breaches or fulfills its fiduciary duty of care when employing a proxy voting firm depends upon all of the relevant facts and circumstances. Consistent with its fiduciary duty, an investment adviser should take reasonable steps to ensure that, among other things, the firm can make recommendations for voting proxies in an impartial manner and in the best interests of the adviser's clients. Those steps may include a case by case evaluation of the proxy voting firm's relationships with Issuers, a thorough review of the proxy voting firm's conflict procedures and the effectiveness of their implementation, and/or other means reasonably designed to ensure the integrity of the proxy voting process. The relevant facts and circumstances will dictate what steps an investment adviser should take in evaluating a prospective proxy voting firm.[33]

---

[30] SEC Division of Investment Management, *Statement Regarding Staff Proxy Advisory Letters* (Sept. 13, 2018), https://www.sec.gov/news/public-statement/statement-regarding-staff-proxy-advisory-letters.

[31] Staff Legal Bulletin No. 20, "Proxy Voting: Proxy Voting Responsibilities of Investment Advisers and Availability of Exemptions from the Proxy Rules for Proxy Advisory Firms." https://www.sec.gov/investment/slb20-proxy-voting-responsibilities-investment-advisers; *see also* Ropes & Gray, *SEC Withdraws Two No-Action Letters Regarding Use of Proxy Advisory Firms – Chairman Clayton Issues Statement Regarding Staff Views* (Sept. 18, 2018) ("In 2014, the Division affirmed the substance of the two letters in a Staff Legal Bulletin for the purpose of 'providing guidance about investment advisers' responsibilities in voting client proxies and retaining proxy advisory firms.' Last week's Update referred to, but did not withdraw, the Staff Legal Bulletin. Therefore, notwithstanding the Division's withdrawal of the two no-action letters, the Update should not have any practical effect at this time on investment advisers that rely on proxy advisory firms."), https://perma.cc/V7D2-BM5X.

[32] SEC Egan-Jones Letter, *supra* note 29.

[33] SEC ISS Letter, *supra* note 30.

8

State laws may provide similar protections to federal law regarding a breach of fiduciary duty by an investment adviser related to improper reliance on a third-party proxy advisor. As noted above, these federal duties are grounded in the anti-fraud provisions of the federal Investment Advisers Act.[34] State laws contain parallel anti-fraud language.[35] To the extent an investment adviser relies on a proxy advisor without verifying that the proxy advisor can make recommendations in the best interests of the client (and makes this inquiry "on an ongoing basis"[36]), it may be in breach of its obligation to act in its client's best interests. In addition, an investment adviser that fails to adequately disclose or misrepresents its relationship to a proxy advisor could also be in violation of state law.

Three main points suggest that the Asset Managers may be violating their fiduciary duties to the extent they are relying on ISS or another third party to vote on climate-related proposals. The first is the votes themselves, which have been discussed at length in this letter and shown in the appendices below. It is noteworthy that these votes have all been over management opposition and are at a much higher rate than the overall market. This suggests an agenda besides acting in their clients' financial interests: specifically, an environmental agenda.

The second is the potential conflicts created by ISS or a parent's membership in several activist organizations whose purpose is to achieve environmental goals such as net zero greenhouse gas emissions, rather than solely focusing on financial return. For example, ISS's parent, the Deutsche Börse Group, is a member of the Net Zero Financial Service Providers Alliance (NZFSPA).[37] Members of this group sign a commitment to "[s]et an interim target for relevant services and products offered to be aligned to the net zero transition which is consistent with a fair share of the 50% global reduction in carbon emissions needed by 2030" and to "[r]eview and update such targets at least every five years with a view to increasing the proportion of services and products to achieve full alignment."[38] The NZFSPA is one of the sector-specific alliances within the Glasgow Financial Alliance for Net Zero (GFANZ). NZFSPA's main website, which is titled "Committed to Net Zero," states that "[b]y joining the alliance and GFANZ, these firms are committing to ensuring their products and services support a high ambition, credible net zero transition that we need to achieve our 1.5 degree goal."[39] Given the votes on underwriting proposals discussed above, it is noteworthy that another GFANZ group, the Net Zero Insurance

---

[34] *Nutmeg Grp.*, 162 F. Supp. 3d at 778.

[35] *See, e.g.*, *As You Sow v. AIG Fin. Advisors, Inc.*, 584 F. Supp. 2d 1034, 1039 (M.D. Tenn. 2008) (observing that the Tennessee Securities Act "draws upon the language of its federal counterpart," but that it is broader and more protective of investors than federal securities laws).

[36] SEC ISS Letter, *supra* note 30.

[37] *See Commitment*, *supra* note 7.

[38] *See id.*

[39] *See* NZFSPA, *Committed to Net Zero*, https://perma.cc/ADG7-R9S9.

Alliance, dropped from 29 members down to 11[40] and then ultimately collapsed.[41] Yet it appears that ISS is recommending—and the Asset Managers are voting in support of—the same actions that many large insurers themselves appear to have concluded are unlawful.

Another ISS membership that may create a conflict, and clearly warrants the Asset Managers conducting further investigation before relying on ISS, is the Interfaith Center on Corporate Responsibility (ICCR).[42] ISS is an affiliate member of this group.[43] ICCR states under "Current Initiatives" that that its "members are pressing companies to phase out of fossil fuels" and that its "members seek to move companies in key industries to reduce their … [GHG] emissions that are responsible for climate change. We do this by pressing companies for a phasing out of fossil fuels, and a phasing in of low-carbon, renewable energy sources. We also engage the oil & gas sector on the need for transition planning for a 2 degree C or less world."[44] These commitments are not about maximizing shareholder value—which is the Asset Managers' duty to their clients.

The third point indicating a violation of fiduciary duty is the apparent lack of financial analyses conducted by ISS before recommending "for" on environmental proposals. On their face, these proposals should raise huge red flags. ISS's describes its process for developing its benchmark and other policies as a "bottom-up policy formulation process [that] collects feedback from a diverse range of market participants through multiple channels: an annual Policy Survey of institutional investors and corporate issuers, roundtables with industry groups, and ongoing feedback during proxy season."[45] There is no mention in this discussion of a requirement for an economic or financial analysis that the policy, as applied to shareholder proposals at any particular company, is in the financial interest of the shareholders.

ISS's own benchmark policy states—without any financial analysis—that when "evaluating the merits of a shareholder proposal with requests related to [GHG]," ISS considers whether "the company has set emissions reductions targets that are aligned with Paris Agreement goals of limiting warming to well below 2 degrees C," whether "the company has realistic strategies and incentives in place to achieve those targets," whether "the company reports according to the TCFD framework and/or whether it answered the CDP climate-related survey,

---

[40] *Compare* U.N. Environment Programme, *World-Leading Insurers and United Nations Launch Pioneering Target-Setting Protocol to Accelerate Transition to Net-Zero Economy* (Jan. 2023) (touting 29 members) https://perma.cc/4ZRQ-JK2J, *with* U.N. Environment Programme – Finance Initiative, Net-Zero Insurance Alliance, *Members*, https://web.archive.org/web/20231003044453/https://www.unepfi.org/net-zero-insurance/members/ (archived Oct. 3, 2023) (listing only 11 members).

[41] Alastair Marsh, *Insurers Group Targeted by Anti-ESG Campaign Is Being Replaced*, Bloomberg (Apr. 25, 2024), https://www.bloomberg.com/news/articles/2024-04-25/insurers-group-targeted-by-anti-esg-campaign-is-being-replaced

[42] ICCR, https://www.iccr.org/.

[43] ICCR, *Member Directory*, https://www.iccr.org/member-directory/.

[44] ICCR, *Climate Change*, *supra* note 8.

[45] ISS, *Policy Formulation & Application*, https://perma.cc/MTG8-ZUUS.

and the company's CDP rating."[46] None of these factors expressly include *financial* considerations, even though the Asset Managers' duty is to vote in the financial interests of shareholders.

The lack of any financial analysis by ISS is further evidenced by statements from ISS executives. An ISS executive testified before a Texas Senate committee and "recognize[d]" that ISS was there "in part because we let down our long-term client [the Employees' Retirement System of Texas (ERS)] this year in assisting them with several critical voting recommendations."[47] One Senator asked: "How did you advise ERS four times to vote by proxy … against Texas energy projects?"[48] The ISS executive answered: "We unfortunately did not have enough dialog with … ERS to understand their view on that particular issue. And so the policy that we had, we thought we were … recommending in their interests."[49] The ISS executive further testified that when the SEC changed a rule in approximately 2022 to loosen the reins for shareholder proposals, ISS saw an unprecedent number of shareholder proposals and new issues that it had not seen before, and ISS looked to the policy as the framework for making recommendations.[50] The ISS executive did not mention any financial analyses but rather only following the voting policy.

Similarly, the ISS executive stated in a CNBC interview that the ISS benchmark policy is "pretty centrist," not that it was based on specific financial analyses by ISS—or anyone else—of the effect of environmental proposals on shareholder returns.[51] This statement is troubling for two reasons. First, as shown above, it does not fit the data which suggests the ISS benchmark policy is activist, not centrist, on climate issues. Second, even if it were "centrist," simply reflecting the prevailing zeitgeist is not the same thing as conducting a financial analysis. The Asset Managers' fiduciary duty is to act for the financial interests of their clients, and ISS's approach does not appear to comport with the focus of that duty.

For these reasons, it appears that there is a lack of financial analysis underlying many of the "for" recommendations by ISS discussed in this letter. Instead, ISS seems to be following the non-economic provisions in its policy regarding "emissions reductions targets that are aligned with Paris Agreement goals of limiting warming to well below 2 degrees C." Simply following these recommendations may well constitute a violation of the Asset Managers' fiduciary duties.

---

[46] ISS, Procedures & Policies (Non-Compensation): Frequently Asked Questions, at 41 (July 25, 2023), https://perma.cc/Y67D-2W2A.

[47] *Hearing: BlackRock, State Street and ISS Testify before the Texas Senate*, at 2:46:20-2:46:48, YOUTUBE (Dec. 15, 2022), https://www.youtube.com/watch?v=lmrcc1YYkcI.

[48] *Id.* at 2:48:15

[49] *Id.*

[50] *Id.* at 2:49:40-2:50:24.

[51] *See* Squawk Box, *ISS Outlook on 2024 Proxy Season*, at 2:55, CNBC (Mar. 11, 2024), https://perma.cc/2JAU-RHJD.

**Conclusion and Questions**

In addition to responding to the concerns outlined in this letter, we also ask that you provide a written response that includes answers to the following questions. We will review your answers to assist us in determining our future courses of action. Please provide a written response to the concern raised above and the questions below by October 4, 2024.

1. How are the votes supporting the shareholder proposals identified in this letter consistent with your fiduciary duties? In answering this question, please also explain how you can carry out your fiduciary duties of loyalty and care if you are not developing or obtaining specific financial analyses as to whether the proposals are designed and likely to increase shareholder returns such that overriding company management's opposition is appropriate in these circumstances.

2. When voting on shareholder proposals relating to environmental issues, do you consult or rely at all on recommendations of any proxy advisory firms, including but not limited to ISS, or any other third parties? Please also describe in detail which recommendations and other policies you rely or have relied on since 2020 and your process for selecting those.

3. For every proxy advisory firm and other third party identified in your response to Question 2, what specific financial analyses do you receive regarding voting recommendations?

4. Describe in detail your actual process for reviewing votes on shareholder proposals before the votes are actually cast. Do you use software that pre-populates the voting choices? How many levels of review do you have? How (if at all) do you ensure that if a shareholder proposal is opposed by the company's board of directors, someone reviews the opposition and ensures that voting for the proposal over the board's opposition is in the financial interest of the company's shareholders?

5. Do you agree that you must exercise voting rights in a manner that is consistent with your fiduciary duty to your customers to act solely in their financial interest? If not, please describe how you view your fiduciary duty to your clients with respect to voting on shareholder proposals.

6. What analysis, if any, have you done to determine if the commitments by the Deutsche Börse Group (ISS's parent) to 1) the Net Zero Financial Service Providers Alliance, part of GFANZ; and 2) and ISS's affiliation with the Interfaith Center on Corporate Responsibility, including to "to phase out fossil fuels", to "[s]et an interim target … to be aligned to the net zero transition," and "ensuring their products and services support a high ambition, credible net zero transition that we need to achieve our 1.5 degree goal" creates a conflict of interest that precludes relying on ISS for financially-based voting recommendations.

12

7. Do you make any representations to your customers that relate to how you exercise voting rights for funds they invest in? If so, please provide copies of all public-facing documents containing those statements.

8. Describe in detail all proxy voting policies that you have or had in place at any time since 2020 that apply to shareholder proposals on environmental topics, including providing links to all such policies, or if the policies are not available online, copies of the policies.

Sincerely,

AUSTIN KNUDSEN
ATTORNEY GENERAL OF MONTANA

STEVE MARSHALL
ATTORNEY GENERAL OF ALABAMA

TIM GRIFFIN
ATTORNEY GENERAL OF ARKANSAS

ASHLEY MOODY
ATTORNEY GENERAL OF FLORIDA

CHRISTOPHER M. CARR
ATTORNEY GENERAL OF GEORGIA

RAÚL LABRADOR
ATTORNEY GENERAL OF IDAHO

TODD ROKITA
ATTORNEY GENERAL OF INDIANA

BRENNA BIRD
ATTORNEY GENERAL OF IOWA

KRIS KOBACH
ATTORNEY GENERAL OF KANSAS

13

LIZ MURRILL
ATTORNEY GENERAL OF LOUISIANA

LYNN FITCH
ATTORNEY GENERAL OF MISSISSIPPI



ANDREW BAILEY
ATTORNEY GENERAL OF MISSOURI

MIKE HILGERS
ATTORNEY GENERAL OF NEBRASKA

JOHN FORMELLA
ATTORNEY GENERAL OF NEW HAMPSHIRE

DREW H. WRIGLEY
ATTORNEY GENERAL OF NORTH DAKOTA

GENTNER DRUMMOND
ATTORNEY GENERAL OF OKLAHOMA

ALAN WILSON
ATTORNEY GENERAL OF SOUTH CAROLINA

MARTY JACKLEY
ATTORNEY GENERAL OF SOUTH DAKOTA

JONATHAN SKRMETTI
ATTORNEY GENERAL OF TENNESSEE

KEN PAXTON
ATTORNEY GENERAL OF TEXAS

SEAN REYES
ATTORNEY GENERAL OF UTAH

JASON MIYARES
ATTORNEY GENERAL OF VIRGINIA

PATRICK MORRISEY
ATTORNEY GENERAL OF WEST VIRGINIA

BRIDGET HILL
ATTORNEY GENERAL OF WYOMING

14

**Appendix A-1 – Proposals on Cutting Off Lending or Insurance Based on Emissions-Reduction Targets**

| Proposal | Board of Directors' Opposition |
|---|---|
| **Bank of America (2023 Proposal 9)**: "issue a report … that describes how it intends to align its financing activities with its 2030 sectoral greenhouse gas emissions reduction targets, including the specific measures and policies to be implemented, reductions to be achieved by such measures and policies, and timelines for implementation and associated emission reductions."[52] | "In light of our disclosures and declared strategy, the issuance of our 2030 Financing Activity Targets, and our carefully developed and well-articulated risk management framework, our Board believes that the report requested in Proposal 9, which would substantially duplicate our existing transition planning, would not be a productive use of time or effort."[53] |
| **Berkshire Hathaway (2023 Proposal 6)**: "issue a report … addressing if and how it intends to measure, disclose, and reduce the GHG emissions associated with its underwriting, insuring, and investment activities in alignment with the Paris Agreement's 1.5⁰C goal, requiring net zero emissions."[54] | "The primary business of Berkshire's insurance operations is to monitor, assess and price risk at an expected economic profit to address the risk-transfer needs of its insurance customers. … The insurance operations' continual assessment of the risk of natural disasters, strong underwriting controls to limit exposure and stress testing lead the Board to conclude that climate-related risks within the insurance group are appropriately monitored and managed within the Board's risk appetite."[55] |
| **Berkshire Hathaway (2022 Proposal 4)**: "issue a report … addressing if and how it intends to measure, disclose, and reduce the GHG emissions associated with its underwriting, insuring, and investment activities, in alignment with the Paris Agreement's 1.5⁰C goal, requiring net zero emissions."[56] | "The Board does not believe issuing a report addressing if and how Berkshire intends to measure, disclose and reduce the greenhouse gas emissions associated with its underwriting, insuring and investment activities is necessary. … The primary business of Berkshire's insurance operations is to monitor, assess and price risk at an expected economic profit to address the risk-transfer needs of its insurance customers. The insurance risks associated with climate change are assessed within the enterprise risk management framework, along with the |

---

[52] Ceres, *Report on climate transition plan (<2C or unspecified) (BAC 2023 Resol.)*, https://perma.cc/MX9W-Q8TT.

[53] Bank of Am., *2023 Proxy Statement*, at 101, https://perma.cc/5HX6-67HP.

[54] Ceres, *Report on GHG emissions and finance (BRK.A, 2023 Resol.)*, https://perma.cc/2ADM-SS4B.

[55] Berkshire Hathaway, Inc., Sch. 14A Info., at 16, https://wwww.sec.gov/Archives/edgar/data/1067983/000119312523073948/d362436ddef14a.htm.

[56] Ceres, *Report on GHG emissions and finance (BRK.A, 2022 Resol.)*, https://perma.cc/QAA4-MMHJ.

| | adoption of climate-specific risk management procedures."[57] |
|---|---|
| **Chubb (2023 Item 14)**: "issue a report, at reasonable cost and omitting proprietary information, disclosing 1.5ºC aligned medium and long-term GHG targets for its underwriting, insuring, and investment activities."[58] | "We disagree that forcing Chubb to set targets related to the emissions produced by its insureds, rather than Chubb's own emissions, would advance [the goal of a net zero economy by 2050] … setting such targets would be impractical, would impose unreasonable limits on Chubb's discretion to responsibly address climate change while supporting energy security, and would expose the Company to substantial risk in the event that the targets could not be met. … Chubb has no control over its insureds' emissions and no basis to know how any change in any of its underwriting or investment activity would reduce its insureds' emissions or could be aligned with the Paris Agreement."[59] |
| **JP Morgan (2023 Proposal 9)**: "issue a report disclosing a transition plan that describes how it intends to align its financing activities with its 2030 sectoral greenhouse gas emissions reduction targets, including the specific measures and policies necessary to achieve its targets, the reductions to be achieved by such measures and policies, and timelines for implementation and associated emission reductions."[60] | "our climate ambitions are subject to important prerequisites and considerations … including the necessity of technological advancements, the evolution of consumer behavior and demand, and the need for thoughtful climate policies—as well as the potential impact of legal and regulatory obligations and the challenge of balancing our commitment to short-term targets with the need to facilitate energy security. The detail required in the proposal does not give appropriate weight to these realities and the potential need to adjust course as circumstances may merit. … The requested report … would not necessarily be in the best interests of long-term shareholder value."[61] |
| **Wells Fargo (2023 Item 8)**: "issue a report disclosing a transition plan that describes how it intends to align its financing activities with its 2030 sectoral greenhouse gas emissions | "We believe Wells Fargo's existing work developing transition plans in line with evolving market practices remains the prudent approach, and we do not believe that |

[57] Berkshire Hathaway, Inc., *2022 Notice of Ann. Meeting of S'holders*, at 14, https://perma.cc/N5VN-66RA.

[58] Ceres, *Adopt underwriting policy in line with IEA Net Zero Scenario (CB, 2023 Resol.)*, https://perma.cc/6FDA-VHCZ.

[59] Chubb, *supra* note 4, at 53.

[60] Ceres, *Report on climate transition plan (<2C or unspecified) (JPM, 2023 Resol.)*, https://perma.cc/PQS9-8AS6.

[61] JPMorgan Chase & Co., *Ann. Meeting of S'holders Proxy Statement 2023*, at 92, https://perma.cc/XXC3-F7YH.

| | |
|---|---|
| reduction targets, including the specific measures and policies to be implemented, the reductions to be achieved by such measures and policies, and timelines for implementation and associated emission reductions."[62] | producing the report required by the proposal would ultimately serve the best interests of our shareholders."[63] |

---

[62] Ceres, *Report on climate transition plan (<2C or unspecified) (WFC, 2023 Resol.)*, https://perma.cc/W8ZL-8TP4.
[63] Wells Fargo, *supra* note 16, at 112.

| Appendix A-2 - Votes ("X" represents a "For" vote; percent overall support in parentheses) | Bank of America 2023 Prop. 9 (overall support 28.5%) | Berkshire Hathaway 2023 Prop. 6 (overall support 22.8%) | Berkshire Hathaway 2022 Prop. 4 (overall support 26.5%) | Chubb 2023 Item 14 (overall support 28.9%) | JP Morgan 2023 Prop. 9 (overall support 35.4%) | Wells Fargo 2023 Item 8 (overall support 31.1%) |
|---|---|---|---|---|---|---|
| Abrdn | X | X | X | X | X | X |
| Allianz Global Investors | X | X | X | X | X | X |
| Allspring Global Investments | X | X | X | X | | X |
| Amundi Asset Management | X | X | X | X | X | X |
| AQR Capital Management | X | X | X | X | X | X |
| Aviva Investors | X | X | X | X | X | X |
| AXA Investment Managers | X | X | X | X | X | X |
| BMO Global Asset Management | X | X | X | X | X | X |
| D.E. Shaw Investment Management | X | X | X | X | X | X |
| Gateway Investment Advisers | X | X | X | X | X | X |
| Guggenheim Investments | X | X | X | X | X | X |
| HSBC Global Asset Management | X | X | X | X | X | X |
| IndexIQ Advisors | X | X | X | X | X | X |
| Legal & General Investment Management | X | X | X | X | X | X |
| M&G Investments | X | X | X | X | X | X |
| Manulife Investment Management | X | X | X | Split | X | X |
| Mutual of America Capital Management Corporation | X | X | X | X | X | X |

| | | | | | | |
|---|---|---|---|---|---|---|
| Northern Trust Investments | X | X | X | X | X | X |
| Parametric Portfolio Associates | X | X | X | X | X | X |
| Principal Global Investors | X | X | X | X | X | X |
| ProFund Advisors | X | X | X | X | X | X |
| ProShares | X | X | X | X | X | X |
| TD Asset Management | Split | X | X | X | Split | X |
| Thrivent Investment Management | X | X | X | X | X | X |
| UBS Asset Management | X | X | X | X | X | X |
| Wilmington Trust Investment Management | X | X | X | X | X | X |

### Appendix B-1 – Proposals on Emissions-Reduction Targets

| **Proposal** | **Board of Directors' Opposition** |
|---|---|
| **Chevron (2022 Item 5)**: "medium- and long-term targets to reduce the greenhouse gas (GHG) emissions of the Company's operations and energy products (Scope 1, 2, and 3) consistent with the goal of the Paris Climate Agreement"[64] | "We are … mindful that the journey to a lower carbon future will still require oil and gas, particularly in areas where there are currently no effective substitutes, such as shipping and transportation."[65] |
| **ConocoPhillips (2022 Item 7)**: "short-, medium- and long-term targets to reduce the greenhouse gas (GHG) of the Company's operations and energy products (Scope 1, 2, and 3) consistent with the goal of the Paris Climate Agreement"[66] | "[W]e do not believe that Scope 3 targets are appropriate for an upstream-only E&P company like ConocoPhillips…"[67] |
| **DTE Energy (2022 Proposal No. 5)**: "revise its net zero by 2050 target, and interim targets, to integrate its full Scope 3 value chain emissions consistent with guidelines such as the CA100+ and SBTi"[68] | "The Board considers that the science behind measuring Scope 3 emissions is currently too unsettled for full incorporation into the Company's emissions reduction goals. Rushing to incorporate firm Scope 3 emissions targets in this unsettled environment will expose the Company to unnecessary risk without adding meaningful value toward addressing climate change."[69] |
| **Exxon Mobil (2022 Item 9)**: "medium- and long-term targets to reduce the greenhouse gas (GHG) of the Company's operations and energy products (Scope 1, 2, and 3) consistent with the goal of the Paris Climate Agreement"[70] | "We believe setting Scope 3 targets can have significant unintended consequences for society, and therefore we recommend a vote against this proposal. … The proponent is an anti-oil and gas activist group using [ESG] objectives to diminish the important role ExxonMobil plays in the energy industry. The group's founder openly admitted in a TED Talk, which is available on its website, that its shareholder proposals use alignment with the Paris Climate Agreement 1.5°C as a 'Trojan horse' to force companies to eliminate oil and natural gas |

---

[64] Ceres, *Adopt GHG reduction targets (CVX, 2022 Resol.)*, https://perma.cc/L6B4-Z8LF.

[65] Chevron, *2022 Proxy Statement*, at 91, https://perma.cc/Z63F-2GAN.

[66] Ceres, *Adopt GHG reduction targets (COP, 2022 Resol.)*, https://perma.cc/BZ6K-FG6J.

[67] CononcoPhillips, *Proxy Statement 2022*, at 128, https://perma.cc/R59M-J4DN.

[68] Ceres, *Adopt GHG reduction targets (DTE, 2022 Resol.)*, https://perma.cc/LJ2R-UST5.

[69] DTE, *2022 Proxy Statement & Notice of Ann. Meeting*, at 60, https://perma.cc/QR34-W2JN.

[70] Ceres, *Adopt GHG reduction targets (XOM, 2022 Resol.)*, https://perma.cc/EFF3-XJKD.

|  | investments[.]"[71] |
|---|---|
| **Glencore (2023 Resolution 19)**: "Disclosure of how the Company's projected thermal coal production aligns with the Paris Agreement's objective … [and] Details of how the Company's capital expenditure allocated to thermal coal production will align with the disclosure in a. above"[72] | "The Board does not support Resolution 19 because it is: (i) unnecessary; (ii) unclear; and (iii) undermining of the Board's responsibility and accountability for the Company's strategy."[73] "[I]t is clear that the nature of the disclosures sought, together with the supporting statement, gives a strong indication that Resolution 19 is in fact intended to direct the Company's strategy. For instance, the supporting statement refers to 'coal phase-out', which does not form part of Glencore's climate strategy."[74] |
| **Martin Marietta Materials (2023 Proposal 5)**: "issue near, medium and long-term science- based GHG reduction targets aligned with the Paris Agreement[]. … The targets should cover the Company's full range of operational and supply chain emissions."[75] | "[T]he Proposal seeks commitments to set targets on a timeframe that is not operationally viable or advisable, that rely on speculative future technologies, and that dismiss the potentially adverse consequences to our business and all of our shareholder's interests if we make expensive, technologically impossible commitments."[76] |
| **NewMarket (2023 Proposal 6)**: "publish … GHG emissions, and set short-, medium-and long-term emission reduction targets to align business activities with net zero emissions by 2050 in line with the Paris Climate Agreement."[77] | "Given the impact [emissions rules from the SEC] will likely have on future GHG emission and other climate-related disclosures, we believe it is prudent for the company to refrain from devoting the required time and other resources towards the disclosure of its GHG emission until the rules are in final form."[78] |
| **Occidental Petroleum (2022 Proposal 4)**: "targets that are consistent with the goal of the Paris Climate Agreement…. These quantitative targets should cover the short-, medium-, and long-term greenhouse gas (GHG) emissions of the company's operations and the use of its energy products (Scope 1, 2, and 3)."[79] | "We believe that support for the proposal would undermine [Occidental's net-zero strategy], create internal and external confusion and disrupt our business plans at a moment when our company should be focused on executing upon its mission to innovate for a lower-carbon future."[80] |

---

[71] ExxonMobil, *supra* note 5, at 86.

[72] Ceres, *Needs Review (GLEN.L, 2023 Resol.)*, https://perma.cc/85YL-AF8P.

[73] Glencore, *supra* note 18, at 17.

[74] *Id.* at 19.

[75] Ceres, *Adopt GHG targets and transition plan (<2C or unspecified) (MLM, 2023 Resol.)*, https://perma.cc/3ACC-WSLB.

[76] Martin Marietta, *supra* note 19, at 95.

[77] Ceres, *Adopt scope 1-3 GHG targets (1.5C aligned) (NEU, 2023 Resol.)*, https://perma.cc/48DV-B9K7.

[78] NewMarket Corp., SEC, Form DEF 14A, at 49, https://perma.cc/NTK6-BTZ7.

[79] Ceres, *Adopt GHG reduction targets (OXY, 2022 Resol.)*, https://perma.cc/7FHN-6PZV.

[80] Oxy, *2022 Proxy Statement*, at 78, https://perma.cc/6XK5-XD95.

| | |
|---|---|
| **Phillips 66 (2022 Proposal 5)**: "set and publish targets that are consistent with the goal of the Paris Climate Agreement…. These quantitative targets should cover the medium- and long-term greenhouse gas (GHG) emissions of the company's operations and the use of its energy products (Scope 1, 2, and 3)."[81] | "Setting targets that require even more significant technological and social transformation outside our control could create reputational risk and potential harm to shareholders."[82] |
| **Southern Company (2023 Item 7)**: "short and long-term targets aligned with the Paris Agreement's 1.5°C goal requiring Net Zero emissions by 2050 for the full range of its Scope 3 value chain GHG emissions"[83] | "[W]e believe setting reduction targets for our Scope 3 emissions at this time would be premature, not add meaningful information for stockholders unless and until more standardized reporting protocols for Scope 3 emissions, including related mitigation approaches, are widely adopted and instead only expose us to undue risk and distraction."[84] |
| **The Mosaic Company (2023 Proposal 7)**: "issue a report, at reasonable expense and excluding confidential information, disclosing how the Company intends to reduce its full value chain greenhouse gas emissions in alignment with the Paris Agreement's 1.5°C goal requiring Net Zero emissions by 2050."[85] | "[W]e cannot commit to establishing Paris-aligned Scope 3 targets at this time … we feel strongly that our decision to issue Paris-aligned Scope 3 targets must be rooted in sector-based guidance and the realities of our complex business."[86] |
| **Valero (2022 Proposal 4)**: "issue a report within a year, and annually thereafter, at reasonable expense and excluding confidential information, that discloses near- and long-term GHG gas reduction targets aligned with the Paris Agreement's goal … and a plan to achieve them"[87] | "We believe that this proposal seeks a pro forma commitment that does not reflect an understanding of the resilience of our assets"[88] "While our strategy to pursue these reductions reflects our deep understanding of our business and our industry, the proposal favors an untailored approach that is inappropriate for a company like ours. The proposal recommends alignment with the Science-Based Targets initiative, when guidance for the oil and gas sector is not even available yet."[89] |
| **Valero (2023 Proposal 5)**: "report … on its climate transition plan to align | "Mercy seeks GHG emissions targets and reductions that can only come from refinery |

[81] Ceres, *Adopt GHG reduction targets (PSX, 2022 Resol.)*, https://perma.cc/WY95-NXNZ.

[82] Phillips 66, *2022 Proxy Statement*, at 96, https://perma.cc/6269-MPWD.

[83] Ceres, *Adopt scope 3 GHG targets (1.5C aligned) (SO, 2023 Resol.)*, https://perma.cc/274G-TLL2.

[84] Southern Co., *2023 Notice of Ann. Meeting of S'holders & Proxy Statement*, at 113, https://perma.cc/ZTM6-FZPX.

[85] Ceres, *Rep. climate transition plan (1.5C aligned) (MOS, 2023 Resol.)*, https://perma.cc/X8DJ-RBWQ.

[86] The Mosaic Co., *Notice of 2023 Ann. Meeting of S'holders*, at 80, 81, https://perma.cc/8S7E-G7JT.

[87] Ceres, *Adopt GHG reduction targets (VLO, 2022 Resol.)*, https://perma.cc/N7P8-MACT.

[88] Valero Energy Corp., *Notice of 2022 Ann. Meeting of S'holders*, at 93, https://perma.cc/N8MJ-KQZ3.

[89] *Id.* at 94.

| | |
|---|---|
| operations and value chain emissions with a well below 2 degrees Celsius scenario, including short-, medium- and long-term reduction targets for Valero's full GHG emissions (scopes 1, 2, and 3)"[90] | closures. … [Mercy's statement] is indicative of Mercy's belief that shutting down refineries is the only way to meet the goals of the Paris Agreement."[91] |

---

[90] Ceres, *Rep. on GHG targets and transition plan (<2C or unspecified) (VLO, 2023 Resol.)*, https://perma.cc/XG36-D9BA.

[91] Valero Energy Corp., *Notice of 2023 Ann. Meeting of S'holders*, at 102, https://perma.cc/A28Y-ASAT.

| Appendix B-2 - Votes ("X represents a "For" vote; percent overall support in parentheses) | Chevron 2022 Item 5 (32.6) | ConocoPhillips 2022 Item 7 (41.8) | Energy 2022 Prop. 5 (28.1) | Exxon Mobil 2022 Item 9 (27.1) | 2023 Res. 19 (29.2) | Marathon 2023 Prop. 5 (32.8) | Market 2023 Prop. 6 (31.9) | Occidental Petroleum 2022 Prop. 4 (16.6) | Phillips 66 2022 Prop. 5 (36.2) | Southern Co. 2023 Item 7 (19.8) | The Mosaic Co. 2023 Prop. 7 (29.8) | Valero 2022 Prop. 4 (47.1) | Valero 2023 Prop. 5 (33.1) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Abrdn | X | X | X | X | X | X |  | X | X | X | X | X | X |
| Allianz Global Investors | X | X | X | X | X | X | X | X | X | X | X | X | X |
| Allspring Global Investments | X | X | X | Split | X | X | X | X |  | X | X | Split | X |
| Amundi Asset Management | X | X | X | X | X | X | X | X | X | X | X | X | X |
| AQR Capital Management | X | X | X | X | X |  | X | X | X | X | X | X | X |
| Aviva Investors | X | X | X | X | X | X |  | X | X | X | X |  |  |
| AXA Investment Managers | X | X |  | X |  |  |  | X | X |  | X | X | X |
| BMO Global Asset Management | X | Split | X | Split | X | X | X |  | X | X | X | X |  |
| D.E. Shaw Investment Management | X |  | X | X |  | X |  | X | X | X | X |  | X |
| Gateway Investment Advisers | X | X | X | X |  | X |  | X | X | X | X | X | X |
| Guggenheim Investments | X | X | X | X |  | X | X | X | X | X | X | X | X |
| HSBC Global Asset Management | X | X | X | X | X |  | X | X | X |  |  | X |  |
| IndexIQ Advisors | X | X | X | X | X | X |  | X | X | X | X | X | X |
| Legal & General Investment Management | X | X | X | X | X | X | X | X | X | X | X | X | X |
| M&G Investments | X | X | X | X | X | X |  |  |  | X |  | X | X |
| Manulife Investment Management | X | X | X | X | X | X | X | X | X | X | X | X |  |
| Mutual of America Capital Management Corporation | X | X | X | X |  | X | X | X | X | X | X | X | X |
| Northern Trust Investments | X | X | X |  | X |  | X | X | X |  | X | X | X |

| | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Parametric Portfolio Associates | X | X | X | X | X | X | X | X | X | X | X | X | X |
| Principal Global Investors | X | X | X | X | | | X | X | X | X | X | X | X |
| ProFund Advisors | X | X | X | X | | X | X | X | X | X | X | X | X |
| ProShares | X | X | X | X | X | X | X | X | X | X | X | X | X |
| TD Asset Management | X | X | X | X | X | X | X | | | X | X | X | X |
| Thrivent Investment Management | X | X | X | X | X | X | X | X | X | X | X | X | |
| UBS Asset Management | X | X | X | X | X | X | X | X | X | X | X | X | X |
| Wilmington Trust Investment Management | X | X | X | X | X | X | X | X | X | X | X | X | X |

**Appendix C-1 – Proposals on Limiting Companies' Speech With Policymakers to Force Conformity with the Paris Agreement and/or Net Zero by 2050**

| Proposal | Board of Directors' Opposition |
|---|---|
| **Alphabet (2022 Proposal 6)**: "issue a report … describing if, and how, [the Company's] lobbying activities (both direct and indirect) align with the ultimate goal of the Paris Agreement to limit average global warming to 1.5° Celsius, and how [the Company] plans to mitigate risks presented by any misalignment."[92] | "Our comprehensive lobbying disclosures, with oversight from our Board, provide the information needed by our stockholders and other stakeholders to understand the scope of these activities, including as it relates to our positions on climate change and the Paris Agreement. Our Board therefore believes that publishing an additional report narrowly focused on climate-related lobbying would not provide additional meaningful information to our stockholders."[93] |
| **Boeing (2023 Item 8)**: "issue a report … describing if, and how, Boeing's lobbying and policy influence activities (both direct and indirect through trade associations, coalitions, alliances, and other organizations) align with the Paris Agreement's ambition to limit global warming to "well below" 2 degrees Celsius above pre-industrial levels, and to pursue efforts to limit temperature increase to 1.5 degrees Celsius, and how Boeing plans to mitigate the risks presented by any misalignment. In evaluating the degree of alignment, Boeing should consider not only its policy positions and those of organizations of which Boeing is a member, but also the actual lobbying and policy influence activities."[94] | "Based on our efforts and transparency on lobbying disclosures and climate change strategy, the Board believes that a proposal seeking an additional report containing much of the same information we already disclose would not add value to shareholders, yet would result in the expenditure of additional resources by the Company."[95] |
| **Caterpillar (2023 Proposal 6)**: "issue a report … describing if, and how, Caterpillar lobbying and policy influence activities (both | "Caterpillar's robust lobbying disclosures, including our inaugural Lobbying Report, and the oversight of lobbying activities by our |

---

[92] Ceres, *Rep. on lobbying in line with Paris Agreement (GOOGL, 2022 Resol.)*, https://perma.cc/8MWV-LCVD.

[93] Alphabet Inc., *Notice of 2022 Ann. Meeting of S'holders and Proxy Statement*, at 17, https://www.sec.gov/Archives/edgar/data/1652044/000130817922000262/lgoog2022_def14a.htm

[94] Ceres, *Rep. on lobbying in line with Paris Agreement (BA, 2023 Resol.)*, https://perma.cc/GC44-ZQXA.

[95] The Boeing Co., *2023 Ann. Meeting of S'holders*, at 87, https://www.sec.gov/Archives/edgar/data/12927/000119312523059893/d424500ddef14a.htm

| | |
|---|---|
| direct and indirect through trade associations, coalitions, alliances, and other organizations) align with the goal of the Paris Agreement to limit average global warming to well below 2°C above pre-industrial levels, and to pursue efforts to limit temperature increase to 1.5°C, and how Caterpillar plans to mitigate the risks presented by any misalignment."[96] | Board, provide the information needed by our shareholders to understand the scope of these activities, including as it relates to our positions on climate change and the Paris Agreement. Publishing an additional report narrowly focused on climate-related lobbying would be duplicative and would not provide any additional meaningful information to our shareholders."[97] |
| **CNX Resources (2023 Proposal 5)**: "issue a report … describing if, and how, CNX Resources' lobbying and policy influence activities (both direct and indirect through trade associations, coalitions, alliances, and other organizations) align with the goal of the Paris Agreement to limit average global warming to "well below" 2°C above pre-industrial levels, and to pursue efforts to limit temperature increase to 1.5°C, and how CNX plans to mitigate the risks presented by any misalignment."[98] | "The Board believes that CNX, its employees, and its shareholders are better served by the continuing execution of the Corporation's business plans, including through the initiatives and efforts described above, rather than devoting attention and resources to the additional and duplicative reporting called for by the shareholder proposal."[99] |
| **Coterra Energy (2023 Proposal 7)**: "issue a report … describing if, and how, Coterra Energy's lobbying and policy influence activities (both direct and indirect through trade associations, coalitions, alliances, and other organizations) align with the goal of the Paris Agreement to limit average global warming to well below 2°C above pre-industrial levels, and to pursue efforts to limit temperature increase to 1.5°C, and how Coterra plans to mitigate the risks presented by any misalignment."[100] | "We strongly believe that Coterra's long-term value to our shareholders is enhanced by a business environment that protects and supports the oil and gas industry's ability to responsibly operate to provide important resources to consumers."[101] |

---

[96] Ceres, *Rep. on lobbying in line with Paris Agreement (CAT, 2023 Resol.)*, https://perma.cc/2TRX-Y2MF.

[97] Caterpillar Inc., *2023 Proxy Statement*, at 77 https://fintel.io/doc/sec-caterpillar-inc-18230-def-14a-2023-may-01-19478-3890.

[98] Ceres, *Rep. on lobbying in line with Paris Agreement (CNX, 2023 Resol.)*, https://perma.cc/7ZAT-SFR6.

[99] CNX Res. Corp., *Proxy Statement 2023*, at 81, https://investors.cnx.com/~/media/Files/C/CNX-Resources-IR/documents/cnx-proxy-statement.pdf.

[100] Ceres, *Rep. on lobbying in line with Paris Agreement (CTRA, 2023 Resol.)*, https://perma.cc/6PQQ-XBFP.

[101] Coterra, *supra* note 20, at 78.

| | |
|---|---|
| **Honeywell (2022 Proposal 5)**: "issue a report … describing if, and how, Honeywell's lobbying activities (direct and through trade associations and other organizations) align with the goal of the Paris Agreement to limit average global warming to well below 2 degrees Celsius (ideally 1.5 degrees Celsius) and how Honeywell plans to mitigate risks presented by any misalignment."[102] | "Honeywell has conducted an evaluation of its lobbying activities for alignment with the goals of the Paris Agreement, and has published a report that addresses the topics requested in the proposed resolution."[103] |
| **PACCAR (2023 Item 6)**: "issue a report … describing if, and how, PACCAR Inc. lobbying and policy influence activities (both direct and indirect through trade associations, coalitions, alliances, and other organizations) align with the goal of the Paris Agreement to limit average global warming to "well below" 2°C above pre-industrial levels, and to pursue efforts to limit temperature increase to 1.5°C, and how PACCAR plans to mitigate the risks presented by any misalignment. In evaluating the degree of alignment, PACCAR should consider not only its policy positions and those of organizations of which PACCAR is a member, but also the actual lobbying and policy influence activities."[104] | "PACCAR evaluates and publicly discloses its direct and indirect (i.e., through industry trade associations) climate policy engagement activities. These activities are aligned with the goals of the Paris Climate Agreement and are publicly disclosed through PACCAR's annual environmental report to CDP … PACCAR's greenhouse gas emissions targets are aligned with the goals of the Paris Climate Agreement"[105] |
| **Tesla (2022 Proposal 10)**: "issue a report … describing if, and how, Tesla Inc.'s ("Tesla's") lobbying and policy influence activities (direct and through trade associations and social welfare and nonprofit organizations) align with the Paris Agreement's goal to limit average global warming to 1.5 degrees Celsius, and how Tesla plans to mitigate risks presented by any misalignment. The evaluation should examine underlying direct | "The stockholder proponent purports to care about curbing the worst effects of climate change, and yet chooses to devote its attention and criticisms on one of the most well-known and successful clean energy companies in the world. … Because our existing disclosures already provide stockholders with ample information on our lobbying activities, and the alignment of Tesla's mission and actions to the Paris Agreement, we believe that Tesla, |

---

[102] Ceres, *Rep. on lobbying in line with Paris Agreement (HON, 2022 Resol.)*, https://perma.cc/WAG3-AWT8.

[103] Honeywell Int'l Inc., *2022 Proxy Statement and Notice of Ann. Meeting of Shareowners*, at 100, https://www.sec.gov/Archives/edgar/data/773840/000077384022000024/a2022honeywellproxy.htm.

[104] Ceres, *Rep. on lobbying in line with Paris Agreement (PCAR, 2023 Resol.)*, https://perma.cc/FP77-84GH.

[105] Paccar Inc., *2023 Notice of Ann. Meeting of S'holders*, at 46, https://perma.cc/M6VX-SCW8.

| | |
|---|---|
| and indirect lobbying activities and not rely solely on publicly stated positions to determine alignment with the Paris Agreement."[106] | its employees and its stockholders are better served by continuing to execute on our mission rather than devoting attention and resources to additional reporting."[107] |
| **UPS (2022 Proposal 5)**: "issue a report … describing if, and how, UPS's lobbying activities (direct and through trade associations and social welfare and nonprofit organizations) align with the Paris Climate Agreement's goal of limiting average global warming to well below 2 degrees Celsius and how the company plans to mitigate risks presented by any misalignment."[108] | "preparing this requested report is unnecessary and would be an inefficient use of Company resources. … The board believes UPS's sustainability goals are robust, and its policies and practices are transparent. Approval of this proposal is unnecessary given the information that is already publicly available. Therefore, approval of this proposal would not result in an efficient use of resources and will only serve to benefit the limited interests of a small group of shareowners."[109] |
| **Wells Fargo (2023 Item 7)**: "report to shareholders … whether and how it is aligning its lobbying and policy influence activities and positions, both direct and indirect through trade associations, coalitions, alliances, and other organizations, with its public commitment to achieve net zero emissions by 2050 including the activities and positions analyzed, the criteria used to assess alignment, and involvement of stakeholders, if any, in the analytical process."[110] | "we believe this proposal, which requires the Company to produce detailed and prescriptive reporting focused on a single issue, is unnecessary and would be time-consuming and costly to prepare without significant benefit to the Company, our customers, shareholders or other stakeholders."[111] |

---

[106] Ceres, *Rep. on lobbying in line with company values/policy (TSLA, 2022 Resol.)*, https://perma.cc/W7H5-UK3T.

[107] Tesla, Inc., *Notice of 2022 Ann. Meeting of S'holders*, at 31, https://www.sec.gov/Archives/edgar/data/1318605/000156459022022992/tsla-pre14a_20220804.htm

[108] Ceres, *Rep. on lobbying in line with Paris Agreement (UPS, 2022 Resol.)*, https://perma.cc/99SA-2ESY.

[109] UPS, *Notice of 2022 Ann. Meeting of S'holders and Proxy Statement*, at 64, https://perma.cc/M6VX-SCW8.

[110] Ceres, *Rep. on lobbying in line with net zero GHG commitment (WFC, 2023 Resol.)*, https://perma.cc/WV9E-MPSP.

[111] Wells Fargo, *supra* note 16, at 110.

# Foster Declaration Exhibit 40



*Washington Examiner*

BUSINESS

# 'ESG investing' is a leftist power grab by another name

By

Published July 11, 2022 4:18am EST | Updated November 2, 2023 12:06am EST

Add Washington Examiner on Google



From Coca-Cola to Major League Baseball to Disney, companies are wading into contentious political debates. Without fail, these corporations align with leftist positions on the issues of our times. The primary impetus for this leftward drift of corporate America is the rise of "woke capital," or investment designed not to maximize financial returns but to [...]







From Coca-Cola to Major League Baseball to Disney, companies are wading into contentious political debates. Without fail, these corporations align with leftist positions on the issues of our times.

---

### RECOMMENDED STORIES ▶



**Fox partners with Kalshi to integrate betting forecasts in content**



**Trump congratulates Nissan over domestic manufacturing initiative**



**Warren Buffett says he doesn't 'want to be under oath' on Bill Gates-Jeffrey Epstein relationship**

---

The primary impetus for this leftward drift of corporate America is the rise of "woke capital," or investment designed not to maximize financial returns but to impose a leftist social and economic agenda that cannot otherwise be implemented through the ballot box.

In many cases, "woke capital" is dressed up as so-called "ESG investing," a strategy that purports to be concerned with environmental, social, and governance issues.

ESG supporters argue that their activism does not interfere with making money. They are wrong and are deliberately trying to disguise the fact that ESG investing is a ploy to subvert the will of the people for the sake of "progressive" politics.

Right now, the pressure of "woke capital" comes from three main sources: asset managers who use their ownership of company stock to push those companies leftward; banks and insurance companies that refuse to do business with disfavored industries, such as energy or firearms; and government regulators imposing ESG-related legal mandates.

These efforts are coordinated through standard-setting bodies such as the Financial Stability Board or industry coalitions. Financial industry coalitions such as Climate Action 100+ and




the Glasgow Financial Alliance for Net Zero bring together companies with trillions of investable capital to point them all toward the same goal: implementing the Left's agenda through coercive financial means.

Asset managers rarely make headlines, but they can be very effective in pushing businesses to adopt leftist policies by throwing their ownership weight around.

Most recently, many of these asset managers banded together to elect ExxonMobil board members who want to get Exxon out of the oil and gas business. Imagine the board of an oil company actively getting it out of the business it was founded to operate.

The two largest asset managers, Blackrock and State Street, are part of a coalition pushing utilities to retire all of their gas and coal plants. Gas and coal represent over 60% of the U.S. electricity supply. Losing this energy would weaken our country, drive up the high prices we already pay, and produce blackouts threatening our most vulnerable.

There is no reliable evidence that ESG investing produces better returns, but there is evidence that ESG investing does worse for clients. A former Blackrock insider recently explained in detail how these investments do little for the environment. But they do help Blackrock's bottom line.

Even worse, while companies like Blackrock seek to hamstring the United States's energy-producing capabilities, they simultaneously invest in China — which undercuts our national interests and unleashed the COVID-19 pandemic on the world.

Meanwhile, companies refusing to do business with others based on their political beliefs are practicing one of the most treacherous forms of ESG. No one should have to worry that their bank will close their account because they own a gun store or because they tweeted something that was against the left-wing orthodoxy of the day.

ESG is even taking over government regulation. The Securities and Exchange Commission recently proposed a rule that would *require* all publicly traded companies to make expensive disclosures related to ESG issues. This was strongly supported by large asset managers, who want to use the power of government to make all companies comply with their ESG



preferences. This rule was proposed despite evidence that its requirements might actually harm ordinary investors. And what woke capital wants, woke capital gets from the Biden administration.

Elected leaders need to fight back — and state attorneys general and other elected officials are doing so.

States are investigating companies, for example, and passing laws that prohibit state governments from doing business with financial institutions that boycott fossil fuel companies or the gun industry.

As Indiana's attorney general, I have joined with my colleagues around the country and helped lead the states to oppose President Joe Biden's ESG efforts. If Biden doesn't listen, we will follow with litigation.

But others need to take action. This means that elections for state treasurer and governor are very important, as these officials work closely with the pension board and others making state investment decisions. They should not let such funds go to ESG-based woke companies.

I am hopeful that companies will return to their noble purpose of serving their customers and their shareholders. But the fight is far from over.

Elected officials must remain vigilant to counter the threat to liberty from Wall Street banks and the Biden administration imposing ESG policies on Hoosiers. This is a fight we can win — and we must. The country depends on it.

*Todd Rokita is Indiana's attorney general.*

Tag:   **Indiana**   **woke**

# Foster Declaration Exhibit 41

 **IN.gov** An official website of the Indiana State Government  Governor Mike Braun

**Attorney General**

SEARCH

**State of Indiana** > **OAG Calendar** >

Attorney General Todd Rokita continues fight against woke ESG agendas — this time helping to lead multistate lawsuit

## Attorney General Todd Rokita continues fight against woke ESG agendas — this time helping to lead multistate...

📅 Thursday, January 26, 2023

☺ **I'm Interested**

OFFICE OF THE INDIAN ATTORNEY GENERAL

**ABOUT THIS EVENT**

**Add to calendar** 📅

Attorney General Todd Rokita today continued his leadership in the fight against ESG (environmental, social and governance) investment. He announced that Indiana is part of a 25-state lawsuit against the Biden administration over a Department of Labor (DOL) rule that would allow 401(k) managers to direct clients' money toward this discredited strategy instead of rightly exercising their fiduciary duty to maximize financial return for retirement account holders.

The new rule — which runs contrary to the laws outlined in the Employee Retirement Income Security Act of 1974 (ERISA) — would affect the retirement accounts of millions of people.

"ESG investment strategies are not even designed to maximize financial returns for clients," Attorney General Rokita said. "Rather, they have been concocted entirely to impose a leftist social and economic agenda that cannot otherwise be implemented through the ballot box."

Attorney General Rokita has been a national leader in the fight against ESG investing.

He has issued an official advisory opinion clarifying that Indiana and its investment managers must give priority to the financial interests of state employees and retirees — refraining from using investment strategies guided or influenced by ESG considerations.

Among other actions, he is also investigating three of the largest investment managers — BlackRock, Vanguard and State Street.

The new DOL rule, which takes effect on Jan. 30, affects two-thirds of the U.S. population's retirement savings accounts, totaling $12 trillion in assets. Strict laws enacted as part of ERISA are intended to protect retirement savings from these kinds of unnecessary risks.

"Woke big businesses are collaborating with their leftist allies to subvert the will of the people," Rokita said. "That's contrary to the letter and spirit of the law."

Attorney General Rokita thanked his fellow attorneys general from Texas and Utah for their work organizing the multistate coalition filing this week's lawsuit.

The lawsuit is attached.

A headshot of Attorney General Rokita is available online.

###

- 2023.01.26_1 Complaint.pdf

**EVENT DETAILS**

| EVENT TYPE | CALENDAR | GROUP |
|---|---|---|
| PRESS RELEASES | AGENCY   ATG | **Attorney General** |

**CONTACT EMAIL**
press@atg.in.gov



Copyright © 2025 State of Indiana - All rights reserved.

Feedback Survey    Web Policies    Sitemap

**State Information**
Indiana Code
Indiana Administration Code
IN.gov News & Events
Email Updates
Awards

**IN.gov Resources**
Find a State Employee
Find an Agency
Maps & Information
IN.gov FAQs
State Employee Resources

**Find Information**
About State Information Center
State Information Live Chat
Email State Information Center
Call: 1-800-457-8283
Text: 1-888-311-1846

**Web Tools**
Report Accessibility Issues

# Foster Declaration Exhibit 42



IN.gov   An official website of the Indiana State Government     Governor Mike Braun

**Attorney General**     SEARCH

**State of Indiana**  >  **OAG Calendar**  >
Attorney General Todd Rokita investigates six major banks over ESG investing as part of 20-state coalition

## Attorney General Todd Rokita investigates six major banks over ESG investing as part of 20-state coalition

📅 Wednesday, October 19, 2022

☺ **I'm Interested**

OFFICE OF THE INDIAN
ATTORNEY GENERAL

### ABOUT THIS EVENT

### Add to calendar 📅

Attorney General Todd Rokita announced today that Indiana and 19 other states have served six major U.S. banks with civil investigative demands, which act as a subpoena, seeking documents related to the companies' involvement with the United Nations' (UN) Net-Zero Banking Alliance (NZBA).

NZBA-member banks must set emissions reduction targets in their lending and investment portfolios to reach net zero by 2050. The banks under investigation are Bank of America; Citigroup; Goldman Sachs; JP Morgan Chase; Morgan Stanley; and Wells Fargo.

"These banks appear to be colluding with the UN to destroy American companies that specialize in fossil fuels or otherwise depend on them for energy," Attorney General Rokita said. "They are pushing an investment strategy designed not to maximize financial returns but to impose a leftist social and economic agenda that cannot otherwise be implemented through the ballot box."

The apparent conspiracy among the banks represents yet another scheme reflective of so-called "ESG investing" — an approach that purports to prioritize environmental, social, and governance issues over profit.

"This new woke-ism in the financial sector poses a real threat to everyday Hoosiers," Attorney General Rokita said. "Indiana's farmers, truck drivers, and fuel-industry workers are hurt when the radical Left attacks whole segments of our economy. And it's troubling that these banks in the Net-Zero Banking Alliance are taking marching orders

from UN globalists all-too-eager to undermine America's best interests."

More information will be made available as the investigation continues.

A headshot of Attorney General Rokita is available for download.

\###

**EVENT DETAILS**

| EVENT TYPE | CALENDAR | GROUP |
|---|---|---|
| PRESS RELEASES | AGENCY ATG | **Attorney General** |

**CONTACT EMAIL**

press@atg.in.gov

Copyright © 2025 State of Indiana - All rights reserved.

Feedback Survey    Web Policies    Sitemap



**State Information**

Indiana Code

Indiana Administration Code

IN.gov News & Events

Email Updates

Awards

**IN.gov Resources**

Find a State Employee

Find an Agency

Maps & Information

IN.gov FAQs

State Employee Resources

**Find Information**

About State Information Center

State Information Live Chat

Email State Information Center

Call: 1-800-457-8283

Text: 1-888-311-1846

**Web Tools**

Report Accessibility Issues

# Foster Declaration Exhibit 43



**State of Indiana** > **OAG Calendar** >
Attorney General Todd Rokita fights Biden effort to weaponize SEC on behalf of radical climate agenda

**ABOUT THIS EVENT**

**Add to calendar** 📅

## Attorney General Todd Rokita fights Biden effort to weaponize SEC on behalf of radical climate agenda

With a lawsuit filed today, Attorney General Todd Rokita is fighting back against the Biden administration's efforts to weaponize the Securities and Exchange Commission (SEC) through a rule that would place onerous requirements on U.S. companies in service to a radical-left climate agenda.

By implementing the rule, the SEC moves from its traditional role as an independent federal agency enforcing laws against market manipulation to become a partisan purveyor of environmental, social, and governance (ESG) standards.

"Hoosiers rightly expect the SEC to be focused on protecting investors and financial markets rather than making companies bend the knee to radical environmentalism," Attorney General Rokita said. "This is one more disturbing example of leftwing bureaucrats extending the regulatory tentacles of ESG nonsense into every facet of the economy."

The new rule compels companies to compile and disclose cumbersome amounts of material related to their greenhouse-gas emissions and how their activities supposedly affect climate change.

"Companies have a legal fiduciary duty to maximize returns to shareholders," Attorney General Rokita said. "Costly ideological requirements with no proven effect only drive up the price of goods for everyday Hoosiers and reduce value for shareholders. The only winners here are big business and the radical environmentalists with a vendetta against capitalism."

The lawsuit against the SEC asks a federal appeals court to strike down the SEC's new rule as unlawful.

See court document linked online.

A headshot of Attorney General Rokita is available for download.

###

**EVENT DETAILS**

| EVENT TYPE | CALENDAR | GROUP |
|---|---|---|
| PRESS RELEASES | AGENCY  ATG | **Attorney General** |

**CONTACT EMAIL**

press@atg.in.gov



Copyright © 2025 State of Indiana - All rights reserved.

Feedback Survey     Web Policies     Sitemap

**State Information**
Indiana Code
Indiana Administration Code
IN.gov News & Events
Email Updates
Awards

**IN.gov Resources**
Find a State Employee
Find an Agency
Maps & Information
IN.gov FAQs
State Employee Resources

**Find Information**
About State Information Center
State Information Live Chat
Email State Information Center
Call: 1-800-457-8283
Text: 1-888-311-1846

**Web Tools**
Report Accessibility Issues

# Foster Declaration Exhibit 44



FOR IMMEDIATE RELEASE
May 22, 2025

### State Comptroller Nieshalla Votes to Prioritize Fiduciary Duty for Proxy Voting

STATEHOUSE — State Comptroller Elise Nieshalla, as the Chairwoman of the Indiana Deferred Compensation Committee (IDCC), was part of a unanimous vote to change proxy voting polices to reassert the Committee's directive to ensure the Plan's votes be cast in a manner that upholds their fiduciary duty to participants.

By doing so, Comptroller Nieshalla and committee members reaffirmed their priority of delivering value to the Plan's shareholders and ended the possibility of proxy votes promoting environmental, social and governance (ESG) factors. Their vote adopted a new policy made available through the proxy voting service, Institutional Shareholder Services (ISS), and in partnership with fund manager, State Street. The new policy, Bowyer Research Proxy Voting Guidelines, provides a voting framework solely focused on shareholder value

"We were compelled to make this change when we discovered the prioritization of ESG factors can creep into proxy voting policies," said Comptroller Nieshalla.

Proxy votes are cast annually by the service on a vast amount of corporate board decisions for which the Plan and its participants are shareholders. Increased scrutiny has been given to the proxy voting process and the vulnerability of these votes being cast to promote political agendas. The Bowyer Guidelines were recently released and have been made available through ISS and State Street to U.S. governmental entities.

"Step by step, we are turning the tide on ESG on behalf of our retirees to ensure the oversight of their hard-earned dollars is enshrined by the unchanging principal of fiduciary duty," stated Comptroller Nieshalla, also referencing the recent committee vote to divest from a fund that prioritized ESG factors.

In working with Capital Cities LLC investment consulting service, the IDCC has been examining proxy voting policies and their options. Tiffany Spudich, Chief Investment Officer at Capital Cities stated, "State Street offers an Investor Voting Choice Program which provides a great opportunity for plan governance, as being done by the Indiana Deferred Compensation Committee, to direct their proxy votes."

The Indiana Deferred Compensation Plan is also known as Hoosier START. The Plan provides participants with a comprehensive menu of investment options. Some of those investment options include State Street Funds.

### 

*Elise M. Nieshalla is the Indiana State Comptroller, fulfilling the duties of the Constitutional Office of State Auditor. Comptroller Nieshalla is committed to serving our state and local governments by upholding the highest standards of fiscal responsibility in the provision of accurate accounting and reporting of state funds, disbursement of tax revenues to local units of government, payment of Indiana's employees and vendors, administration of the state's deferred compensation plan and delivering financial information through the Indiana Transparency Portal.*

*Follow Indiana State Comptroller Elise Nieshalla on Facebook, LinkedIn or X @Comp_Nieshalla*

*Media Contact: Emily Boesen media@comptroller.in.gov*

# Foster Declaration Exhibit 45

*Indiana* CAPITAL CHRONICLE

# Indiana pension system contracts with conservative anti-ESG firm

Strive co-founder Vivek Ramaswamy paid $4,000 an hour; now running for president

BY: **LESLIE BONILLA MUÑIZ** - MARCH 20, 2023    7:00 AM



Republican presidential candidate Vivek Ramaswamy speaks during the annual Conservative Political Action Conference (CPAC) at the Gaylord National Resort Hotel And Convention Center on March 03, 2023. (Anna Moneymaker/Getty Images)

Indiana's Public Retirement System is the first known state pension system to contract with anti-ESG firm Strive Advisory, LLC and its co-founder Vivek Ramaswamy.

The contract, obtained by the Capital Chronicle, is capped at $150,000 — with conservative Republican presidential candidate Ramaswamy set to earn $4,000 per hour for ad hoc work. Industry publication Responsible Investor first reported the contract's existence after a January public hearing.

Ramaswamy was not running for office when the contract was signed in November 2022. News reports say he has stepped down as CEO to focus on a White House bid.

The contract is part of a crackdown on environmental, social or corporate governmental-based decision-making, dubbed ESG.

"Increased scrutiny on pension fund investment and proxy voting has driven demand for proper pension oversight to an all-time high," said a project update Strive presented at a February INPRS board meeting.

INPRS told the Capital Chronicle it wanted to "strengthen" its investment policy statement and proxy voting policies, but skeptics expressed concern.

And the firm could stand to gain from contentious legislation now making its way through Indiana's GOP-dominated General Assembly. Strive didn't respond to multiple requests for comment.

## Hourly rates range from hundreds to thousands

INPRS hired Strive to review its lengthy investment policy statement, which includes its pecuniary interest framework. That involves the system's external asset managers, and how they make investments and vote on shares on the system's behalf.

Strive and INPRS drafted a definition of ESG investing and overhauled several pages on non-financial investment considerations shareholder engagement, according to the February board meeting documents.

"Additional consulting services were necessary as the INPRS Board of Trustees and INPRS Staff identified opportunities to strengthen the Investment Policy Statement and applicable internal processes," spokesman Dimitri Kyser wrote in emailed responses to the Capital Chronicle.

The contract budgets $100,000 for those services, but caps total compensation at $150,000. The document says that INPRS and Strive will agree on "additional project-based fixed-cost proposals" on a "project-by-project basis."

Ramaswamy, the first consultant listed on the contract, charges an hourly rate of $4,000 for ad hoc services. Two more consultants make $2,000 hourly and two others earn $1,000 hourly. An "optional blended rate" is set at $2,000 hourly and "others" charge $500 hourly.

The rates generated outrage among some.

Indianapolis Rep. Greg Porter — top Democrat on the House's powerful financial committee — said through a spokeswoman that he was "appalled and disappointed that INPRS decided Mr. Ramaswamy's hourly rate of $4,000 ... was a good use of taxpayer dollars."

Porter argued Strive's services were unnecessary.

"I'm not interested in meddling in how INPRS' asset managers decide to make investment decisions," Porter said. "That's their area of expertise – not mine. So long as INPRS' rate of return is satisfactory, as it currently is, why fix what's not broken?"



📷 Rep. Greg Porter, D-Indianapolis (Courtesy Indiana House Democrats)

The contract went into effect November 15, 2022 and extends to June 30, but can be renewed. INPRS' Kyser said the contract is expected to conclude on the original end date.

## "Firewall" concerns

It's unclear where Strive's advising and money management functions begin and end, leading to concerns that its advice could benefit its manager business.

Strive Advisory and Strive Asset Management both live under the parent company Strive Enterprises, a spokeswoman confirmed to industry publication Pensions & Investments.

The contract says that certain employees work for both the advisory and management firms. Strive Advisory President Anson Frericks is also chief operating officer for the management business, for example — and is a consultant listed by name in the contract.

Ramaswamy has stepped down from his executive chairmanship role with the asset management company, according to Pensions & Investments.

But Strive didn't return further requests for comment on his role in the services being provided to INPRS. And he still owns between 50% and 74.9% of that business, according to filings with the U.S. Securities and Exchange Commission.

The contract also acknowledges that the advisory business "may be asked to advise" INPRS on the same asset managers with which the management business competes — a service the company itself advertised.

"That raises a lot of questions because with all of the other proxy advising services, there's a firewall," said Jesse Coleman, a senior researcher at nonpartisan corporate watchdog group Documented.

Strive leaders continued to use the asset management business' name and logo even in pitches plugging the advisory business to states like Oklahoma, according to communications obtained by Documented.

"It's pretty interesting when you read those questions and metrics" in the advisory pitches, Coleman said. "Because who passes with flying colors to manage state funds? Well, Strive Asset Management passes."

INPRS didn't immediately respond to questions about the lack of firewall.

## New bills, new opportunities

Both companies could benefit from a heavily disputed bill nearly tanked by its original price tag.

To comply with new requirements under House Bill 1008, INPRS expects to pay $550,000 annually — $200,000 for custom proxy voting policy and infrastructure, and the rest for additional staff — according to a fiscal analysis.

INPRS didn't immediately respond to questions about how it awards such contracts.

The bill also pushes INPRS to ensure its asset managers aren't partaking in ESG investing. Strive's management company, which bills itself as a "depoliticized investment option," could also win big.

"One has to wonder whether the hysteria over ESG – in no small part manufactured and fanned by Strive Asset Management and Vivek Ramaswamy – is nothing more than a pretense to grift public retirement systems like ours," Porter said.

Indiana House Republicans and the bill's author didn't respond to a request for comment.